UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. SA CV 22-01599 JVS-DFM Date July 8, 2024

Title MR Technologies, GMBH v. Western Digital Technologies, Inc.

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Rolls Royce Paschal for Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Regarding Daubert Motions (Redacted)**

Defendant Western Digital Technologies, Inc. ("WD") filed a Daubert motion to exclude certain expert opinions of Dr. Mark Re. (Re Mot., Dkt. No. 359-1 (sealed).) MRT filed an opposition. (Re Opp'n, Dkt. No. 389-1(sealed).) WD replied. (Re Reply, Dkt. No. 428-2 (sealed).) WD also filed a Daubert motion to exclude certain expert opinions of Jim W. Bergman. (Bergman Mot., Dkt. No. 366-1 (sealed). MRT filed an opposition. (Bergman Opp'n, Dkt. No. 374-1.) WD filed a reply. (Bergman Reply, Dkt. No. 428-1).

For the following reasons, the Court **DENIES-IN-PART** and **GRANTS-IN-PART** the motion to exclude Re's opinions and **GRANTS-IN-PART** and **DENIES-IN-PART** the motion to exclude Bergman's opinions.

## I. BACKGROUND

Dr. Mark Re is MRT's technical expert. Mr. Jim Bergman is MRT's damages expert. Re offered opinions on several technical topics underlying damages issues. See generally Expert Report of Mark Re, Ph.D. ("Re Report"), Dkt. No. 359-4. Relevant to the instant motion, he offered opinions regarding (1) the smallest salable unit; (2) apportionment; (3) multipliers for a settlement agreement with [redacted] (the "[redacted] Agreement"), and (4) calculations to determine the coercive field. Bergman offered several opinions on damages, in part relying on Re's underlying technical analysis. See generally Expert Report of Jim W. Bergman ("Bergman Report"), Dkt. No. 366-2. Relevant to the instant motion, Bergman offered opinions regarding (1) the [redacted] Agreement, (2) apportionment, and (3) regression models used to determine an incremental profit per terabyte value for the Accused Products. The Court discusses each of these challenged opinions in more detail below.

## II. LEGAL STANDARD

Rule 702 allows expert testimony where "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert opinions must "reflect[] a reliable application of the principles and methods to the facts of the case." Id. Expert testimony may not be admitted unless "the proponent demonstrates to the court that it is more likely than not that" the proffered testimony meets the admissibility requirements set forth in Rule 702. Id.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93, 597 (1993), the Supreme Court explained that, in applying Rule 702, "the trial judge plays a 'gatekeeping role,' which 'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1295 (Fed. Cir. 2015). "The Court emphasized that the focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" Id. (quoting 509 U.S. at 595). "Under these rules, a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." Id. at 1295.

## III. DISCUSSION

### *A. Motion to Exclude Re's Opinions*

#### 1. Smallest Salable Patent Practicing Unit

WD argues that Dr. Re's opinion is unreliable because he incorrectly determined that the smallest salable patent practicing unit ("SSPPU") is the accused hard disk drive ("HDD") itself. Dkt. No. 359-1 at 11. WD further challenges Dr. Re's justification for his SSPPU determination, that he was not aware of any smaller patent-practicing unit that WD sells. Id. WD appears to argue that the relevant inquiry is not whether the defendant actually sold something smaller than an HDD but rather whether anyone, including third parties, sold a smaller unit. See id. at 12. In opposition, MRT argues the correct SSPPU is the smallest salable unit sold by the infringer. Dkt. No. 389-1 at 17 (citing Broadcom Corp.

v. Emulex Corp., No. CV 10-03963-JVS, 2011 WL 11025895, at *7 (C.D. Cal. Dec. 13, 2011), aff'd, 732 F.3d 1325 (Fed. Cir. 2013)). MRT further argues that WD presents no evidence that WD purchases media for its products from third parties. Id.

Here, the Court finds evidence concerning both sales by the accused infringer and by third parties potentially relevant in determining the proper SSPPU. Broadcom v. Emulex does not stand for the proposition that the smallest saleable unit is always the smallest unit sold by the infringer. Rather, the Court found the evidence sufficient to permit a reasonable jury that the chips at issue were the smallest salable unit sold by the infringer. 2011 WL 11025895, at *7. LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51 (Fed. Cir. 2012) addresses when a party may rely upon the entire market value rule ("EMVR"). Because MRT does not rely upon the EMVR here, the reasoning in LaserDynamics has limited usefulness in resolving this particular dispute. Still, LaserDynamics appears to support the proposition that juries may consider evidence concerning third party component sales. Id. at 70.

The question here is whether a reasonable jury could find, based on the available evidence, that the entire HDD is the SSPPU. The evidence WD cites does not conclusively establish that HDD media, as opposed to the entire HDD, is the SSPPU here. See Dkt. No. 359-7 at para. 112 (reflects distinction between HDD and HDD Media (disk) in reference to other, purportedly non-comparable license); Dkt. 359-8 at 125:20-126:6 (establishing that WD was a customer of Showa Denko around 2017; SDK manufactures media); Dkt. 359-5 at 334:4-9 (establishing that Seagate was using the technology in the asserted patents at some point in time before 2018); Dkt. No. 360-2 (does not establish that WD purchases from Showa Denko); Dkt. No. 360-3 (cuts against assertion that WD purchases from Showa Denko because it says WD manufactures high-capacity platters in house); Dkt. No.360-4 (characterizes WD as a client of Show Denko); Dkt. No. 360-5 (does not establish that WD purchases from Showa Denko).

MRT presents evidence that WD sells HDDs in their entirety, as a complete system, but does not separately sell media. See Dkt. No. 390-12 at 6 and Dkt. No. 389-12 at 29:16-30:6. Thus, there is at least a fact issue as to whether the entire HDD can be the SSPPU. For the foregoing reasons, the Court does not find Re's determination of the SSPPU as the entire HDD unreliable. Rather, the parties present a fact dispute regarding the SSPPU which this Court leaves the jury to resolve.

The Court **DENIES** WD's motion on this issue.

2. Apportionment

WD challenges several of Re's apportionment-related conclusions as unreliable and requests that the Court strike Re's 46% apportionment figure. Re Mot. at 8.

First, WD challenges Re's determination that 100% of the gains in areal density from 300 Gb/in$^2$ to 700 Gb/in2 are attributable to the Asserted Patents. Id. at 9-10. WD argues that Re did not perform any infringement analysis of products in this range and identified no WD products in this range. Id. at 8-9. In its motion, WD does not actually cite any specific paragraph of Re's report. In response, MRT argues that WD mischaracterizes Re's opinion regarding the amount of AD gains attributable to the Asserted Patents. Re Opp'n at 16. WD insists that old WD products, with only two mag layers, achieve areal density of at least 435 GB/in2. Re Reply at 8. Thus, WD argues Re's opinion is unreliable at least for failing to apportion out these old products. Id. WD also critiques Re's "cherry-picking" from technical documents to arrive at his 46% rate. Id. at 9.

WD also challenges Re's opinions related to research and development. Re Mot. at 10. The Court understands that Bergman, not Re, opined regarding research and development and Re merely mentioned this expected apportionment in his report. See Re Opp'n at 20, fn.5. Accordingly, the Court addresses this issue in considering Bergman's opinions below.

Second, WD challenges Re's opinion attributing 1/3 of the gains above 700 Gb/in2 to the Asserted Patents for failing to quantify the relative contributions of different technologies. Re Mot. at 11. In response, MRT cites several portions of Re's report quantifying the contributions of other technologies. Re Opp'n at 20.

First, the Court addresses Re's opinions concerning the 300 to 700 Gb/in2 AD gains. Re opines that "areal density is the primary determinant of capacity" and explains the basis for his opinion. Re Report, Dkt. No. 359-4 ¶ 590. Thus, the Court does not find Re's decision to use AD as a proxy for the value of the Asserted Patents unreliable. Re then

performs an apportionment in a section of his report titled "Areal Density Gains Not Enabled by or Attributable to WD's Infringement." He acknowledges that "[t]echnologies other than those claimed in the patents-in-suit are responsible for areal density gains." Id. ¶ 595. He excludes all gains from 300 Gb/in2 and below as attributable to non-asserted technologies. Id. ¶ 596. As to the 300-700 Gb/in2 range, he acknowledges that "[o]ther engineering work . . . contributed to these areal density gains." Id. ¶ 597. He then opines that it would be appropriate to deduct advances attributable to WD's research and development work, at approximately a 6-10% range but also states that, in his opinion, this work "is not akin to the technology of the patents-in-suit." Id. Thus, while Re's opinion could be clearer, the Court does not find it unreliable. Moreover, contrary to WD's argument, Re acknowledges WD's efforts within this range. He simply reaches a different conclusion, finding those efforts not "akin" to the technology at issue here. WD is free to dispute this opinion via cross examination.

Second, as to gains beyond the 700 range, Re attributes "at least 1/3 of areal density gains" to WD's infringement. Id. ¶ 600. Re reaches this figure by accounting for other technologies, including shingled magnetic recording ("SMR") and energy assisted magnetic recording. Id. Re reaches this figure based on consideration of various technical documents estimating percentage gains for these technologies. Id. at 598-99. Though, again, Re's math could be clearer here, the Court does not find the 1/3 figure fundamentally inconsistent with these documents and acknowledges that these are estimates compiled from various sources.

Finally, Re explains where the 46% figure comes from. Id. ¶¶ 609-10. He discounts all gains up to 300, attributes all gains from 300-700 to the Asserted Patents, for the reasons stated in ¶¶ 595-97, and attributes 1/3 of the gains from 700 to 1300 to the Asserted Patents for the reasons stated in ¶¶ 598-601. Thus, he determined that 600/1300 or 46% of the gains are attributable to the Asserted Patents.

Accordingly, though Re's analysis could have been clearer, the Court is able to identify a path to the 46% figure and finds Re made an effort to quantify the AD gains he feels are attributable to the Asserted Patents, while distinguishing gains attributable to other technologies.

For the foregoing reasons, the Court **DENIES** WD's motion with respect to Re's

apportionment.

3. The 4x Multiplier Applied to the [redacted] Agreement

Re opines that "the media gains enabled by WD's infringement of the asserted claims of the patents in suit lead to approximately 4x the AD [areal density] gains as TMR gains in general." Re Report ¶ 620. TMR gains refers to the technology covered by the patents at issue in the [redacted] Agreement. See id. In support of the 4x multiplier, Re refers to a slide prepared by Roger Wood at WD showing estimated areal density improvement percentages for different types of technology. Id. Re indicates that "[a]ll of these data points, together" support his opinion, but he does not actually explain how he computed the 4x multiplier. Id.

WD argues that Re's opinion is unreliable because it is not clear how he arrived at the 4x multiplier. Re Mot. at 21. WD also argues that the slide Re relies upon contradicts his opinion and actually shows that the technology at issue here is less valuable than the technology covered by the [redacted] Agreement. Id. at 22. WD further argues that Re's own opinions stating that the [redacted] technology drove areal density growth establish that the [redacted] technology was more valuable that the inventions at issue here. Id. at 21. WD also points out that Re appears to compare media and head technology generally as opposed to the patents in suit versus the patents covered by the [redacted] Agreement. Re Reply at 20.

MRT argues that Re started with a six times multiplier because "WD's total 600 $Gb/in^2$ AD benefit from the patents-in-suit is six times the uncontested 100 $Gb/in_2$ gain from TMR." Re Opp'n at 25. Re then reduced the 6x multiplier to a 4x multiplier to address more recent documents. Id. MRT cites Re's deposition testimony in support. See April 2, 2024 Deposition of Mark Re, Ph.D. ("Re Dep. Tr."), Dkt. No. 389-2 at 368:16-389:22. There, however, Re acknowledges that the 600 figure and the 6x multiplier do not appear in his report. He also offers limited explanation regarding why and how he reduced the multiplier from 6x to 4x.

Here, the Court finds Re's methodology in arriving at the 4x multiplier too murky to be helpful to the trier of fact. The 600 figure and 6x figure do not even appear in his report and his deposition testimony concerning these numbers throws out several numbers and

percentages but does not provide a clear mathematical path. It is also unclear how Re reduced the 6x value to a 4x multiplier. Additionally, it appears that Re does not discuss any specific features of the [redacted] patents as compared to the Asserted Patents and instead refers to the type of technology at issue more broadly.

For these reasons, the Court finds Re's multiplier testimony unreliable and **GRANTS** WD's motion on this issue.

4. Coercive Field Calculations

WD argues that Re's coercive field calculations are unreliable because he does not use "hysteresis loops to determine the coercive field of the [hard magnetic storage layer] HMSL or the nucleation host layers in the Accused Products." Re Mot. at 25. Re instead bases his calculations of the 2K/M formula. See Order re Motions in Limine § II.A. WD argues this formula can only be used to estimate the coercive fields for bilayer prior art structures and only for layers with parallel magnetization. Id. at 26-27. Thus, per WD, Re's calculations are unreliable.

MRT argues that the Asserted Patents do not limit the coercive field formula to bilayer prior art structures. Re Opp'n at 27. Rather, the patents states only, "[t]he coercive field is $H_c=2K_{eff}/M_{eff}$." Id. (citing '864 Patent at 6:54). MRT further disputes that the formula is only applicable for layers having "homogenous, parallel, and uniform" magnetization. Id. at 28.

Here, the Court does not read the Asserted Patents, which discloses the 2K/M formula, to limit that formula to prior art bilayer systems or to only systems having parallel magnetization. Thus, whether the formula is applicable is a fact issue for the jury to resolve. Each expert may present their respective opinions regarding the applicability of the formula and its limitations. Based on the available evidence, however, the Court does not find Re's use of the formula unreliable.

The Court **DENIES** WD's motion as to this issue.

B. Motion to Exclude Bergman's Opinions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 22-01599 JVS-DFM | Date | July 8, 2024 |
|---|---|---|---|
| Title | MR Technologies, GMBH v. Western Digital Technologies, Inc. | | |

1. Comparability Challenge to the [redacted] Agreement

In determining a reasonable royalty rate, Bergman considered a 2010 agreement between [redacted] and WD. See Bergman Opp'n at 7. The [redacted] Agreement settled a litigation asserting one patent against WD for a value of [redacted]. Id. The agreement included this asserted patent as well as other patents related to TMR read/write head HDD technology. Id. Bergman, in reliance on Re, opines that he assessed the technical comparability of the patents covered by the [redacted] Agreement to the Asserted Patents. Id. (citing Bergman Report ¶¶ 194-197, 212, and 304). Bergman also opines that he considered other factors, such as the accused products' use of the licensed technology, the relative areal density benefit of the [redacted] patents versus the Asserted patents, the geographic scope of the [redacted] Agreement, and the timing of the [redacted] Agreement. Id. at 8 (citing Bergman Report ¶¶ 198-205, and 306). Bergman also accounted for litigation-specific factors, like the timing of the license to trial. Id. (citing ¶¶ 206-212).

WD asks the Court to exclude Bergman's reliance on the [redacted] Agreement because (1) litigation settlements are disfavored as comparable licenses, (2) Bergman failed to show that the [redacted] Agreement involved comparable technology, (3) Bergman failed to establish the [redacted] Agreement is economically comparable to the hypothetical negotiation, (4) Bergman failed to consider the [redacted] Agreement, which WD contends is more comparable, and (5) Bergman's multipliers are not reliable. See Bergman Mot. at 12-23. The Court addresses each of these challenges.

At the outset, litigation settlements are not per se inadmissible as comparable licenses. See ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870 (Fed. Cir. 2010) (finding use of settlement agreement appropriate where no other license in the record mentioned the Asserted Patents or showed any "discernible link" to the claimed technology). Still, "[t]he propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 77 (Fed. Cir. 2012). The appropriateness of using a settlement agreement turns on the relevant circumstances, including "similarities and differences in technologies and market conditions and the state of the earlier litigation when settled." Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC, 927 F.3d 1292, 1299 (Fed. Cir. 2019). "[T]he prior licenses or settlements need to be sufficiently comparable for evidentiary purposes and any differences

in circumstances must be soundly accounted for." Id. (citations and quotations omitted).

Here, the Court does not outright exclude the [redacted] Agreement solely because it is a litigation settlement. Rather, the Court remains mindful of this context in evaluating the rest of WD's challenges.

First, the Court considers whether the technology covered by the [redacted] Agreement is sufficiently comparable. WD argues that Bergman and Re have not established technological comparability because Re focuses entirely on the differences between the licenses instead of identifying similarities. Bergman Mot. at 14. MRT argues that Bergman opined "I understand that the [redacted] Agreement licenses comparable technology that provides similar capacity and areal density benefits (but to a much lower extent) to [WD]'s HDD products, which are the class of products at issue here that generally had similar relevant characteristics (TMR heads and graded anisotropy media)." Bergman Opp'n at 14 (quoting Bergman Report ¶ 304).

Here, the Court finds no problem with Bergman relying upon Re's opinions as to technical comparability. The question is whether Re and Bergman's analysis, together, is sufficient. Re opines that the [redacted] patents and the Asserted Patents both offer areal density improvements. See e.g., Re Report ¶ 619 ("The licensed products of the agreement are described as HDD products that are similar to the Accused Products in this case, which both would use TMR and would have the 'graded anisotropy' of the patents-in-suit.") Re goes on to explain that TMR technology in general has provided for increased areal density but less than the Asserted Patents. Id. ¶ 620. Bergman even explains, "this technology is different and older than that enabled by the patents-in-suit" but acknowledges that both provide increased areal density. Bergman Report ¶ 197. Bergman, citing Re, also opined "the capacity differences between the [redacted] Agreement TMR patents and the patents-in-suit are significant." Id.

"When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012). At the same time, "[a] reasonable royalty analysis based on comparable licenses requires only a showing of 'baseline comparability' and 'the issue of comparability is often one of sufficiency of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV 22-01599 JVS-DFM | Date | July 8, 2024 |
| Title | MR Technologies, GMBH v. Western Digital Technologies, Inc. | | |

evidence, not admissibility'." Asetek Danmark A/S v. CoolIT Sys. Inc., No. 19-CV-00410-EMC, 2022 WL 21306657, at *33 (N.D. Cal. Oct. 4, 2022) (citing Bio-Rad Laboratories, Inc., 967 F.3d 1353, 1373-74 (Fed. Cir. 2020). However to establish this baseline comparability, an expert must show "more than a discernable link or a surface similarity between the patents." Id. at *35.

Here, as to similarities, Bergman and Re's comparability analysis meets the "baseline comparability" threshold. Re opines that patents at issue in both licenses use "graded anisotropy," which Re further opines is a key features of the Asserted Patents. Though both Re and Bergman acknowledge important differences between the [redacted] Patents and the Asserted Patents, these differences should go to weight and not admissibility because Bergman and Re make a threshold showing of technical comparability.

Second, the Court addresses economic comparability. WD primarily argues that Bergman fails to establish economic comparability because he does not account for the temporal gap between the date of the [redacted] Agreement and the hypothetical negotiation here. See Bergman Mot. at 9-10. MRT argues that Bergman did account for timing. Bergman explained that "there is no indication that the value of capacity has significantly changed over time." Bergman Opp'n at 12 (citing Bergman Report ¶ 201). Bergman also adjusted for the time value of money and the estimated length of the license. Id.

Here, the Court does not find Bergman failed to establish economic comparability. Bergman did acknowledge the temporal gap. He simply reached a different conclusion than WD, finding the gap less important given the sustained demand for HDD products. Moreover, there is no per se rule that settlement agreements with a certain temporal gap are no longer reliable. Though WD identifies cases in which agreements following a hypothetical negotiation by several years were found inapplicable, MRT identified cases finding agreements pre-dating the negotiation, even by several years, comparable. Thus, the time alone does not determine the comparability and the Court declines to exclude on this basis. Accordingly, the Court declines to exclude based on lack of comparability.

The Court also does not fault Bergman for failure to consider the [redacted] Agreement. Bergman opines that he does not view that agreement as comparable and provides the basis for that opinion. See Bergman Report ¶ 254. WD's expert may disagree

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV 22-01599 JVS-DFM | Date | July 8, 2024 |
| Title | MR Technologies, GMBH v. Western Digital Technologies, Inc. | | |

with that opinion but a disagreement among experts does not warrant exclusion. The jury will resolve any fact issues regarding the comparability of the two agreements and the weight afforded each of them.

Finally, the Court considers the multipliers. First, as discussed above, Re's 4x multiplier is unreliable. Accordingly, the Court would strike Bergman's reliance on the 4x multiplier for the same reasons. See § III.A.3, supra. Second, Bergman applies a 2.5x multiplier to the settlement figure in the [redacted] Agreement. WD argues this figure comes from a PricewaterhouseCoopers ("PWC") litigation study that is not tied to the facts of this case and thus is not reliable. Bergman Mot. at 14. MRT disputes that Bergman relied solely on the PWC study. Bergman Opp'n at 16. MRT argues that Bergman also relied on testimony from WD's corporate representatives indicating that they considered success rates and industry trends to determine royalty rates or settlement amounts. Id. at 16. The Court finds Bergman's analysis underpinning the 2.5 multiplier insufficient. Bergman primarily considered the PWC study and then explains that this is acceptable because WD corporate representatives would also have considered that type of information. The PWC study includes general industry data but is not specific to the technology at issue here. To be reliable, the multiplier must be tied to the relevant facts of the case, which includes some explanation of the technology and how it would affect the multiplier. Without this explanation, Bergman's 2.5 multiplier amounts to general industry data, which is not sufficient.

Accordingly, for the reasons stated above, the Court would allow Bergman to opine regarding the [redacted] Agreement. However, the Court would strike testimony regarding both the 4x and 2.5x multipliers as unreliable. WD's motion is **DENIED-IN-PART** and **GRANTED-IN-PART** on this issue.

2. Apportionment

First, WD challenges Bergman's opinion for failing to use the correct SSPPU. See Bergman Mot. at 23. The Court discussed this issue to decide the Re motion and declined to exclude the testimony given fact issues regarding the proper SSPPU. See § III.A.1. The Court applies the same finding here and declines to strike Bergman's testimony on this basis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 22-01599 JVS-DFM | Date | July 8, 2024 |
|---|---|---|---|
| Title | MR Technologies, GMBH v. Western Digital Technologies, Inc. | | |

Next, WD challenges Bergman's opinion for adopting the same 46% determined by Re. Bergman Mot. at 25. The Court evaluated Re's apportionment above, and declined to strike the testimony. See § III.A.2. The Court applies the same finding here and declines to strike Bergman's testimony on this basis.

Related to the apportionment, WD also challenged Bergman's research and development deduction. Bergman Mot. at 19. Bergman opines, based on Re's testimony, discussed above, that it is reasonable to allocate 10% of the price per terabyte to research and development costs. Bergman Report ¶ 162. Bergman then explains he further credits "gross profits to be realized from these costs." Id. He estimates a [redacted] gross profit margin based on historical data. Id. He then determines that, applying the [redacted] gross margin to the [redacted] allocation, a [redacted] allocation for research and development is appropriate. The Court does not find this opinion per se unreliable and does not find apportionment factors based on research and development inappropriate. See Glaukos Corp. v. Ivantis, Inc., No. SACV18620JVSJDEX, 2020 WL 10501851, at *4 (C.D. Cal. July 23, 2020). The 10% figure comes from Re and the rest of the calculation is economic but not technical in nature. Thus, it is within Bergman's wheelhouse. WD may still dispute that accuracy and usefulness of this calculation but the Court declines to exclude it.

3. Regression Models

Bergman applied a regression model to determine the average selling price per terabyte for the Accused Products. See Bergman Report ¶¶ 113, 128, and 143. He used a similar model to determine average cost per terabyte. Id. ¶¶ 114, 149, and 145. He then adjusted his findings based on research and development costs as well as other costs, to arrive at an incremental cost per terabyte value. Id. ¶¶ 126, 141, 157.

WD again challenges Bergman's model for failing to use the correct SSPPU. Bergman Mot. at 27. The Court already addressed that issue. WD then challenges Bergman's model for failing to account for important variables, such as heteroskedasticity, and for using a linear instead of a quadratic model. Id. at 27-28. MRT responds that these issues are a "dispute between experts about how best to model data." Bergman Opp'n at 25. For instance, MRT argues Bergman purposefully chose a linear model instead of a quadratic model because he felt it better captures the relationship. Id. at 26. MRT also argues

Bergman considered heteroskedasticity and chose to run a model that would account for changes over time. Id.

Here, the Court agrees with MRT. It does not appear that Bergman ignored factors such as the appropriateness of a linear versus quadratic model and the effect of heteroskedasicity. See In re Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012) ("[T]he key question regarding the admissibility of [] statistical analyses is whether they account for the 'major factors.'") Rather, Bergman considered these factors and then made choices differing from the decisions WD's experts made. Because Bergman offers testimony explaining why he made particular choices and WD fails to present evidence conclusively establishing that Bergman's choices were improper, the Court views this issue as a dispute between the experts. WD can raise any criticisms of Bergman's methodology through cross examination. The Court finds exclusion unnecessary here.

For the foregoing reasons, WD's motion is **DENIED** as to this issue.

* * * * * * * * * * * * *

The Court orders the parties to meet and confer and, within 7 days, notify the Court via email to the Courtroom Deputy Clerk which parts of the sealed order should be redacted from the publicly filed version of the order. If the parties request that any portions of the order remain sealed, when submitting their request, they shall attach a copy thereof with proposed redactions for the Court's review.

**Counsel are ordered to advise the parties and all witnesses of the Court's rulings so that there are no inadvertent violations of this Order.**