**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

| | |
|---|---|
| MR TECHNOLOGIES, GMBH, | ) |
| | ) |
|     Plaintiff and | ) **Certified Transcript** |
|     Counterclaim Defendant, | ) |
| | ) Case No. |
|     vs. | ) 8:22-cv-01599-JVS-DFM |
| | ) |
| Western Digital TECHNOLOGIES, | ) |
| INC., | ) |
| | ) |
|     Defendant and | ) |
|     Counterclaim Plaintiff. | ) **DAY 2, VOLUME II** |
| | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

WEDNESDAY, JULY 17, 2024

1:27 P.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF and COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  MARC A FENSTER, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mfenster@raklaw.com

RUSS AUGUST & KABAT
BY:  BRIAN D. LEDAHL, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
bledahl@raklaw.com

RUSS AUGUST & KABAT
BY:  JACOB ROBERT BUCZKO, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
jbuczko@raklaw.com

RUSS AUGUST & KABAT
BY:  MATTHEW D. AICHELE, ESQ., Pro Hac Vice
800 Maine Avenue, SW
Suite 200
Washington, D.C. 20024
202-664-0623
maichele@raklaw.com

RUSS AUGUST & KABAT
BY:  MINNA Y. CHAN, ATTORNEY AT LAW
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mchan@raklaw.com

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL**
**(Continued:)**

**FOR PLAINTIFF AND COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  PAUL A. KROEGER, ESQ.
1224 Wilshire Boulevard
Suite 1200
Los Angeles, California 90025
310-826-7474
pkroeger@raklaw.com

RUSS AUGUST & KABAT
BY:  REZA MIRZAIE, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
rmirzaie@raklaw.com

LATHAM & WATKINS LLP
BY:  DALE CHANG, ESQ.
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
dchang@raklaw.com

**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

LATHAM & WATKINS LLP
BY:  DOUGLAS E. LUMISH, ESQ.
140 Scott Drive
Menlo Park, California 94025
650-328-4600
doug.lumish@lw.com

LATHAM & WATKINS LLP
BY:  JOSEPH HYUK LEE, ESQ.
650 Town Center Drive
20th Floor
Costa Mesa, California 92626
714-540-1235
joseph.lee@lw.com

**UNITED STATES DISTRICT COURT**

4

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**


STRADLING YOCCA CARLSON & RAUTH LLP
BY:  SALIL BALI, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4278
sbali@stradlinglaw.com

LATHAM & WATKINS LLP
BY:  CHAARUSHENA DEB, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
chaaru.deb@lw.com

STRADLING YOCCA CARLSON & RAUTH LLP
BY:  STEVEN M. HANLE, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4000
shanle@stradlinglaw.com

LATHAM AND WATKINS LLP
BY:  SARAH W. WANG, ATTORNEY AT LAW
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
sarah.wang@lw.com

LATHAM & WATKINS LLP
BY:  PATRICIA YOUNG, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
patricia.young@lw.com


**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

            LATHAM & WATKINS LLP
            BY:  RICHARD GREGORY FRENKEL, ESQ.
            140 Scott Drive
            Menlo Park, California 94025-1008
            650-328-4600
            rick.frenkel@lw.com


**ALSO PRESENT:**

            Wendy Liu, paralegal (Russ August & Kabat)
            Dieter Suess, MR Technologies corporate
            representative
            Andy Mortenson, plaintiff's IT technician
            Chris Schmoller, defendant's IT technician
            Mary Noffsinger, defendant's jury consultant
            Mrugresh Desai, Western Digital corporate
            representative

**UNITED STATES DISTRICT COURT**

**I N D E X**

**WITNESSES**                                                                **PAGE**

**DIETER SUESS, CALLED BY THE PLAINTFF**
    Direct Examination by Mr. Fenster (continued)         9
    Cross-Examination by Mr. Lumish                       24
    Redirect-Examination by Mr. Fenster                   85

**MRUGRESH DESAI (Videotaped deposition played)**         95

**YOSHIHIRO IKEDA (Videotaped deposition played)**        96

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| PTX-286 | "Micromagnetic Modeling of Composite Micromagnetic Media" presentation by Suess [undated]; attached to MRT_WD00002704 | 10 | |
| JX-2084 | Suess, D. "Multilayer exchange spring media for magnetic recording" 9/11/06 | 14 | |
| JX-2058 | Suess, D., et. al. "Exchange-coupled perpendicular media" Journal of Magnestism and Magnetic Materials, 7/18/08 | 15 | |
| PTX-003 | U.S. Patent No. 9,928,864 File History | 50 | |
| DX-1213 | F B Hagedorn-1, Analysis of Exchange ]Coupled Magnetic Thin Films | 61 | |

**UNITED STATES DISTRICT COURT**

**I N D E X**
(Continued:)

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| DX-1041 | Slide deck titled "Domain Wall Switched Media: Overcoming the Superparamagnetic Limit" by Suess | 70 | |
| JX-2142 | Oct. 16, 2007 presentation by D. Suess at PMRC titled "Exchange Spring Media for Perpendicular Recording" | 75 | |
| DX-1044 | Abstract Submitted For The Mar07 Meeting Of The American Physical Society | 77 | |
| JX-2034 | WD - Media Magnetics, Y. Ikeda, Tutorial Session, 1/25/19 | 96 | |
| JX-2083 | Choe, G., et. Al., "Writeability Enhancement in Perpendicular Magnetic Multilayered Oxide Media for High Areal Density Recording" 01/2011 | 96 | |
| JX-2084 | Suess, D. "Multilayer exchange spring media for magnetic recording" 9/11/06 | 96 | |
| JX-2015 | [Excel] SL6a - Design, Composition, Method Ku | 96 | |
| JX-2026 | WD Presentation by Desai "Media Magnetic Technology" 4/19/18 | 96 | |

**UNITED STATES DISTRICT COURT**

**I N D E X**

**(Continued:)**

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| JX-2028 | Excel WD Test Data | 96 | |
| JX-2037 | WD - PMR Media Magnetics Roadmap, Desai Presentation, 9/10/15 | 96 | |
| JX-2038 | WD Presentation by Desai "Media Magnetics Roadmap, Challenges" 9/9/19 | 96 | |
| PTX-127 | [Excel] Layer Recipe GS9 - Target PN numbers (Printed) | 96 | |
| PTX-129 | [Excel] Layer Recipe GT5 - Target PN numbers (Printed) | 96 | |
| PTX-130 | [Excel] Layer Recipe SL6a - Target PN numbers (Printed) | 96 | |

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 17, 2024**

**1:27 P.M.**

**- - -**

**(In the presence of the jury.)**

THE COURTROOM DEPUTY:  Please be seated and come to order.  This Court is again in session.

Sir, you are reminded that you are still under oath.

THE COURT:  Good afternoon, ladies and gentlemen.

Mr. Fenster.

MR. FENSTER:  Good afternoon, Your Honor.  Good afternoon, ladies and gentlemen, Dr. Suess.

**DIETER SUESS, PREVIOUSLY SWORN, RESUMES THE STAND**

**DIRECT EXAMINATION (Continue)**

BY MR. FENSTER:

Q    Before the break, you had been describing your inventions.  And you described that after you had your invention in preparation for this 2006 Intermag Conference, you changed the slides.

Do you recall that?

A    I recall.

Q    If you could turn in your binder to PTX-286.  And do you recognize that document?

A    I recognize this document.

Q    And what is it?

A    It's a presentation I gave at the San Diego conference, 2006 Intermag Conference.

MR. FENSTER:  Your Honor, we move PTX-286 into evidence.

THE COURT:  Any objection?

MR. LUMISH:  No objection, Your Honor.

THE COURT:  286 will be received.

**(Exhibit Number PTX-286 received.)**

BY MR. FENSTER:

Q    And on the slide, is this sort of an overview of the slides that you gave at the Intermag presentation?

A    Yes, I agree.

Q    Okay.  And if we can go ahead and go to PTX-286, page 1. This is the first page of your presentation?

A    Yes, that's correct.

Q    And if we can go to PTX-286, page 12, please.  And what are you showing here?

A    I show here a magnetic trilayer.  The one layer, the smallest anisotropy, higher anisotropy, and highest anisotropy.

Q    And is this a multilayer graded anis- -- multilayer structure?

A    Exactly.

Q    In this one, you have the highest on top.  Can you explain why that is?

UNITED STATES DISTRICT COURT

A     Here, I have no substrate on the right head.  Here, it's below.

Q     I see.  Okay.

And, again, can you explain, is there any sort of discreteness or separate or discrete difference between the nucleation host layers and the hard storage layer?

A     The top -- this layer here with the highest anisotropy, this is what we just named storage layer.  And the outer layers in the patent application, we didn't alter the nucleation host.  But here it is just three layers, which we labeled with these names.

Q     Is data stored in all three layers?

A     Yes, of course, it's stored.  Because each layer -- and we have seen before this animation with all the spins pointing in one direction.  In all layers, the spins, the magnetic compass needles are pointing in the same direction.  Obviously they all store data.  They all store the same bit.  They all contribute to the straight which is -- which is read out by the recording read head.

Q     Okay.  And if you had one layer that stored bits in one direction and other layers that were exchange coupled having -- pointing in a different direction, would that be a stable structure?

A     Not at all.  That doesn't make any sense for this recording bits.  After reversal, all the spins are pointing in

the same direction, having the same bit information.

Q    Okay.  And if we can go to PTX-286, page 18, please.  And what are you showing in this slide?

A    I'm happy to share this slide because this is now an accurate simulation of this energy landscape picture.  I depict before in a schematic way.  This is now not a schematic way.  This is the restart of our simulation, but this is the restart of an accurate simulation.

For the trilayer structure, which the structure is three layers which have this graded anisotropy -- smaller, higher, highest -- you see here exactly the same what we have seen before, this energy landscape moving.  And the interesting thing is that for the single-layer structure, you have basically the same height of the hill, but a completely different slope here.  But the single layer, the slope is very high.  And for the trilayer structure, the slope is significantly reduced.

And this is now not a schematic image but an accurate simulation which shows that the barrier height can be kept constant.  So the stability can be kept constant, and you can significantly reduce the slope so you can significantly reduce the coercive field or switching field.

Q    Okay.  And is this -- are these the results that you got when you modeled your new structure with the graded anisotropy back in 2086 [sic] -- back in 2006?

**UNITED STATES DISTRICT COURT**

A      Yeah, yeah.  I just wanted to say "not correct."  It was 2006.

Q      Great.  And if we can go back to the slides, please.

So when you gave this talk in 2006, what was the reaction?

A      It was a fantastic reaction at the conference because it really showed that thermostability and coercivity is not connected.  It was beyond textbook knowledge, and it was a huge debate and discussion about this concept, if it's really possible to decouple these two things, which led to this recording trilemma, which led to superparamagnetic limit, which was a problem.

Q      Did a lot of people come up to you after the talk?

A      Yeah, a lot came up.  I shared the presentations.  I shared preprints of my paper with companies.  Seagate, Toshiba.

Q      You mentioned your paper.  In addition to presenting your discovery at the 2006 Intermag Conference, did you write a paper on those ideas as well?

A      Yes, I wrote the paper about this idea.

Q      And if you could turn in your binder to JX-2084.

Do you recognize that document?

A      Yes, I recognize this document.

Q      And what is JX-2084?

A      This is my paper "Multilayer Exchange Spring Media for Magnetic Recording."

MR. FENSTER:  Your Honor, we move JX-2084 into evidence.

MR. LUMISH:  No objection.

THE COURT:  284 [sic] will be received.

**(Exhibit Number JX-2084 received.)**

MR. FENSTER:  And if we can publish that to the jury, that would be great.

BY MR. FENSTER:

Q    So this is your 2006 paper describing your multilayer concept?

A    Exactly.

Q    And if we can go to Figure 3, which I believe is on page 4.  And is that the figure that you just showed from your Intermag talk with -- as a result of the simulation showing the trilayer versus a single-phase media?

A    Exactly.

Q    And has anyone cited your 2006 article?

A    Yes, a lot.  It's one of the most -- one of my most cited articles.  So I think about 280 times cited, which means 280 other papers of scholar researchers or company researchers cited this work.

Q    Was this paper important for your academic career?

A    Definitely.  I did my habilitation, which is a requirement in Europe to become professor position.  And this concept that one could untangle coercivity from stability gave completely

new fuel to the concept of coercivity magnets.  And it was basically -- I had not become professor without this idea.

Q     You --

A     I think.

Q     You earned -- you believe that this -- that this idea in publishing this paper in 2006 had something to do with you gaining tenure as a professor at the university?

A     Definitely.  I also got recommendation letters also based on these concepts.

Q     Earlier when you were explaining to the jury the concept of the ping-pong ball going over the hill -- do you recall that? -- did you publish that concept or that illustration as well?

A     Yes.  I also published this illustration, which is an illustration to explain this concept.  And I also published this in a scientific journal article.

Q     And if you turn in your binder to JX-2058.  Do you recognize that as the journal article in which you published that figure?

A     Yes, I do.

           MR. FENSTER:  Your Honor, we move JX-2058 into evidence.

           THE COURT:  Any objection?

           MR. LUMISH:  No objection, Your Honor.

           THE COURT:  2058 will be received.

(Exhibit Number JX-2058 received.)

BY MR. FENSTER:

Q     And is this your paper "Exchange-coupled Perpendicular Media" published in the *Journal of Magnetism and Magnetic Materials*?

A     Yes, it is.

Q     And if we can go to Figure 8.

Is that the image that you were talking about?

A     Yes, it is.

Q     Now, after your Intermag presentation and your 2006 publication, were you invited to any other talks?

A     Yeah, I had to -- I had the possibility to give a lot of invited talks on this concept.

I was invited at the 2006 MINT workshop, which is a workshop organized of the Materials for Information Technology department in Alabama.  And the main themes of this workshop was -- and I was also invited on this, on discussions if it's really possible to decouple stability from coercivity.  Is it really possible that one breaks the recording trilemma.

That was one of the main theme here of this MINT workshop, where fellow and famous other people contributed to this workshop.

Q     And at the bottom you have a 2008 semi plenary talk. What was that?

A     That's an honor to share with you this experience.  I had

UNITED STATES DISTRICT COURT

the pleasure to be invited by the organizers, and the

organizers suggested the title of this.  It's the largest

European conference to give a talk.  And the suggested title

was "Recording - Micromagnetic Miracle."  And I had the

pleasure to give the talk, a semi plenary talk, directly after

the Nobel prize winner, Albert Fert.

Q    And what is that title, "Recording - Micromagnetic

Miracle"?

A    It was referring to the invention and to the discovery

that you can decouple stability from writeability.

Q    Is that something that you came up with?

A    Yes.

Q    Okay.  No, no, no, I mean the title, the "Micromagnetic

Miracle."

A    This was a suggestion by the conference organizers, as

previously mentioned, Professor Michael Coey, a very respected

researcher, and Professor Sanvito.

Q    And they suggested that you title your talk "Recording -

Micromagnetic Miracle"?

A    Yeah.

Q    Okay.

A    Correct.

Q    So after your talk in 2006, soon after, you applied for

your patent in June 2006; is that right?

A    Yes.

Q    And was that your -- the first time you had ever applied for a patent?

A    This was the very first time.  So I think a very important patent.  But it was the first patent I applied for.

Q    And was it -- tell us about the process of getting a patent.  Was it an easy process?

A    Oh, not at all.  So it took me 12 years from -- I filed the patent 2006, and it was issued, as we discussed before, 2018.  So there was huge forth and back between the patent office, who checked a lot of prior art.  And it was also an amazing process for 12 years to go for this patent.

Q    And did you disclose to the patent office the prior art that you were aware of when you applied for your patent?

A    Yes, of course.

Q    Does the patent actually refer to the references cited that the patent office examined before issuing your patent?

A    Yes, it does.

Q    Mr. Mortensen, can we go to the patent and the references cited.

         You were here for opening statement?

A    Yes.

Q    And you heard Mr. Lumish talk about some of the prior art references that they contend invalidate your patent; is that right?

A    I have heard about this.

Q     Okay.  And one was called Victora, one was called Berger, one was called Hagedorn?

A     I recall.

Q     And were those cited to the patent office?

A     Yes, of course.

          MR. FENSTER:  Can we go to the next slide.  Or the next...

Q     BY MR. FENSTER:  So first what you're showing here, this is the 2005 Suess article.  Is this your bilayer that was cited as prior art to the patent office?

A     Exactly.  This was my exchange spring bilayer paper.

Q     And so the patent office had your bilayer in front of it when it issued your patent; right?

A     Of course.  Yes.

Q     And if we can go on to the next one.  And at the top there's a reference to Berger.

          If you can blow that up, please.

A     Yes, I see the reference to Berger.

Q     And was there a Berger patent that was cited to the patent office?

A     Yes, of course.

Q     And the examiner had the Berger patent in front of it when it was examining your patent for all that time before it issued your patent?

A     Yes.

**UNITED STATES DISTRICT COURT**

Q    And if we can go back out.

And this is -- so that's your 2005 article; is that right?  The top one?

A    Top one is 2005, yes.

Q    And what's the bottom one?

A    That's the first time when I talked about exchange spring media for magnetic recording, which was 2004.

Q    And that was in 2004?

A    Yes.

Q    And that's before Berger talked about it in 2005?

A    Yes.

Q    Did you talk to Berger about your exchange spring idea after 2004 and before --

A    Yes, I did.

Q    -- and before his paper in 2005?

A    Yes, I did.

MR. FENSTER:  Let's go to the next one.  And if you can blow up at the top.

BY MR. FENSTER:

Q    Is that the Victora reference?

A    Yes, it is.

Q    And the patent office had that when it was considering your patent?

A    Yes.

MR. FENSTER:  Next.

UNITED STATES DISTRICT COURT

BY MR. FENSTER:

Q    And there's a reference to Hagedorn in 1970.  Was that also cited to the patent office?

A    Yes, of course.

Q    Okay.  And the patent office had all of that prior art in front of it before it issued your patent; is that right?

A    Yes.

Q    Okay.  So your parents get --

Thank you, Mr. Mortenson.

So your patents get issued in 2018 and 2021.  Tell us about when you formed MR Tech and for what purpose.

A    MR Tech was formed 2020 with the purpose to license and partner with companies to develop magnetic recording technologies based on my invention.

Q    And do you have a financial interest in the outcome of this case?

A    Yes, I have.

Q    And what is that financial interest?

A    It's about 20 percent.

Q    So let's go to back to the slides, please.

And you've explained your invention.  What are some of the benefits of the invention?

A    All the benefit is very simple.  It is to increase areal density and increase storage capacity.  And a lot of factors contributed to the invention.  I already talked about it.  It's

**UNITED STATES DISTRICT COURT**

more thermally stable.  You can make the grains smaller in thickness or diameter, but you also can make due to the fact that the grains are not so stable.  Also, during the reversal process --

Q    Excuse me, Dr. Suess.  So the overall benefit is increasing anisotropy; is that right?

A    Right.

Q    And are there several factors that come together to overall increase anisotropy as a result of your invention?

A    Yes.

Q    And how did you determine that?

A    I performed analysis and simulations.

Q    So your -- so through simulation with your modeling software, is that how you were able to determine the various mechanisms and how your structure contributed to increasing areal density?

A    Yes.

Q    Okay.  Go ahead.  Now can you explain some of those factors, please?

A    The second factor was just talking about that during the reversal process, if a grain and a particle is much more stable, thermal fluctuations, which kicks the magnetization during the reversal process, are not so important anymore.  So you can also more reliable reverse the structure, which means you can write a bit more accurately.  And now the effect is

that material imperfection, so neighboring grains have slightly different material parameters.  They average out with this invention very good.

And it also improves the performance you write a bit.  You have -- maybe don't go through all the other improvements.  If you have basically all the bad defective -- gradient where you can define the bit better when it's starting to write.

But overall all these advantages improve the signal-to-noise ratio.  And this basically, if you have a high signal-to-noise ratio to high signal with low noise, you can increase storage capacity because you can increase areal density.

Q    And, Dr. Suess, can you tell the jury why are you here today?

A    We are here because we believe that Western Digital infringes two of our patents.  And what we are asking for is a fair compensation of the use of our technology and the product.

Q    Thank you very much, Dr. Suess.

MR. FENSTER:  I'll pass the witness.

THE COURT:  Mr. Lumish.

MR. LUMISH:  Thank you, Your Honor.

May I proceed, Your Honor?

THE COURT:  Mr. Lumish.

MR. LUMISH:  Thank you.

**UNITED STATES DISTRICT COURT**

///

**CROSS-EXAMINATION**

BY MR. LUMISH:

Q    Good afternoon, Doctor.  We haven't been formally introduced, but you understand I'm a lawyer for Western Digital?

A    Sure.  I understand.

Q    Okay.  And you understand it's my turn to ask you some questions now?

A    I do.

Q    All right.  I'm going to start with some questions about your background, where your lawyer started.

You are still a professor at the University of Vienna; is that right?

A    Yes.  I'm professor to University of Vienna.

Q    And you've been there since 2007?

A    2017.

Q    2017.  You published, you said, something on the order of 280 papers?

A    Yes.

Q    And you said you had something on the order of 25 different patent families; is that right?

A    Yes.

Q    You understand that the case today is only about two patents; right?

**UNITED STATES DISTRICT COURT**

A    Yes.  That's correct.

Q    You, in your direct examination, talked something about sensors that you've created, how you think they help keeping bridges from falling down.

Do you remember that testimony?

A    Yes, I did.

Q    Those sensors are not related to the two patents in this case; is that true?

A    That's correct.

Q    Okay.  And you talked about work you were doing that you hoped would help treat cancer.

Do you recall that?

A    Yes, I do.

Q    And that has nothing to do with the two patents in this case; right?

A    No.

Q    It's not right?  Or they don't?

A    Sorry.  They have -- cancer treatment has nothing to do with high density storage technology; that's correct.

Q    All right.  And towards the end of your testimony, you talked about how you were lecturing or speaking at a conference, I should say, after Dr. Fert, who won the Nobel prize.

Do you remember that?

A    I remember.

Q     You're not saying you won the Nobel prize?

A     This is correct, that I did not won the Nobel prize.

Q     You're not claiming you had anything to do with Dr. Fert winning the Nobel prize?

A     That's correct.

Q     You weren't on Dr. Fert's team.  You didn't participate in any of that work; true?

A     That's correct.

Q     You have no basis to suggest today that you've been considered even as a candidate to win a Nobel prize; is that true?

A     I guess so.  I'm not sure.

Q     You formed MR Technologies in 2020.

      Do I have that right?

A     Yes, that's correct.

Q     And that was about two years after the '864 patent issued?

A     That's correct.

Q     And roughly a year before the '997 patent issued?

A     That's correct.

Q     You own MRT indirectly, don't you?

A     Indirectly by a trust.

Q     And what I mean by "indirectly" is you own a company called PFR Electronics.  And PFR Electronics owns MR Technologies; is that correct?

**UNITED STATES DISTRICT COURT**

A    That's not correct.

Q    Okay.  Was I incorrect in saying that you own PFR Technologies?

A    That's incorrect.

Q    Okay.

A    I even do not know PFR Electronics.

Q    Can we agree, sir, that you are the sole beneficiary owner of the plaintiff in this case, MR Technologies?

A    That PFR is a law firm.  They are the owner of MR Technology.  They hold it on a trust on my behalf.

Q    Let me ask my question again.

Can you agree that you are the sole beneficiary owner of the plaintiff in this case, MR Technologies?

A    Yes.

Q    You don't take a salary.  You're not paid by MR Technologies; true?

A    I don't think -- I'm not on the payroll of MR Technologies.

Q    And MR Technologies doesn't develop hard disk drives; right?

A    That's correct.

Q    It doesn't develop hard disk drive media either; is that true?

A    That's correct.

Q    MR Technologies doesn't develop any components for hard

drives?

A    That's correct.

Q    And you don't sell any hard drives or hard drive components that implement the patents in this case; is that true?

A    That's correct.

Q    MR Technologies has no revenues at this stage; is that also correct?

A    I'm not sure about that.

Q    The only --

A    Not -- definitely not very high revenues.

No.  I have to correct the answer.  That's not correct.

Q    Well, is it true, sir, the only asset that MR Technologies holds is the patent in this case?

A    I think that's fair to say.

Q    And you haven't licensed those patents and obtained any license fees; is that right?

A    I think that's correct.  Yeah, that's correct.

Q    All right.  Let's talk about the patents, if we might, please.  I think you were handed a binder, but I wanted to start just with your patent, the '864.  I'll use that as an example in the same way your lawyer did, if that's okay with you, sir.

A    Definitely.

MR. LUMISH:  Okay.  Why don't we bring up, please, Mr. Schmoller, JX-2000, page 14.

I wanted to look at Claim 1 of the '864 patent, if I might.

A     Yes.  So can I ask you for the reference again, please?

Q     Oh, sure.  And it should be up on the screen any moment.

So JX-2000, page 14, you'll see that in the bottom right corner, it's Claim 1 of your '864 patent.

May be having a technical holdup here.

So while on the screen, sir, you see Claim 1?

A     I see Claim 1.

Q     You were involved in the process of what we call prosecuting your -- the patents, the effort of getting your application submitted and getting a patent issued by the patent office; is that right?

A     That's correct.

Q     Did you write some of the patents in this case or parts of the patents in this case?

A     I wrote part of the patents; that's correct.  I help -- at least I helped writing it.  I had a patent agent, what we discussed, and I also wrote, as it is typical, I think, for the inventors, as part of the specification, hands on.

Q     And you stand behind what's written in your two patents in this case; is that fair?

A     Yes.  That's fair.

Q    The claim on the screen has got a lot of details, doesn't it?

A    It's a relative term.  Of course it has to describe the media.

Q    Well, can we agree, sir, it doesn't just say "any use of graded anisotropy across multiple layers"?

A    It doesn't have the word "graded" in the claim.  That's correct.

Q    It doesn't, in any other words, say that all the claim covers is increasing anisotropy across multiple layers.  Can we agree on that?

A    It says it [as read:] "comprises ferromagnetic layers with increasing anisotropy from layer to layer."

Q    And that's the last eight or ten words of the claim?

A    Which is, I think is usual in a claim, the most important part, because the first part described some standard things like a disk and an underlayer.  And take the sense here, this increasing anisotropy from layer to layer.

Q    Would you mind answering my question, though, please.

A    So could I ask you for the question again?  Now I forgot. I'm sorry.

Q    Why don't I ask you my question again.

        The language you pointed us to is showing this increasing anisotropy from layer to layer.  That's the last couple of lines, let's call it, of the claim?

**UNITED STATES DISTRICT COURT**

A    This is correct.

Q    Your claim includes, still, everything above it; right?

A    Definitely.

Q    And, sir, you have described the invention that you claim in your patents as a hard magnetic storage layer with a multilayer nucleation host.  Isn't that true?

A    That's correct.  These are parts of this claim.

MR. LUMISH:  Mr. Schmoller, would you mind highlighting for me the "hard magnetic storage layer" up top there in blue.

BY MR. LUMISH:

Q    One part of the claim is called a hard magnetic storage layer; right?

A    That's correct.

Q    And the way you wrote this claim, or you did with your agent, was to describe it as a storage layer that has a first coercive field.  And you give a little formula for that; right?

A    Yes, I do.

Q    And you say where that layer is formed, you say "formed on the underlayer"; right?

A    This is what stands here.

Q    Okay.  So your claim describes this component of it as a thing called a hard magnetic storage layer.

Did you pick that language?

A    Yes.  We picked this language to label -- to give a name

to this layer.

Q    And you picked that name?

A    I can't recall if it's -- well, either my patent agent or myself.

Q    The name of the layer is a storage layer -- right? -- conveying that it stores?

A    The name is -- yeah, that's correct.  It's hard magnetic storage layer.  Correct.

Q    So now we go down to the next limitation, we lawyers call it, that next sort of opposite, indented paragraph, and it refers to a nucleation host.

         Do you see that?  We've got it highlighted in green?

A    I see this.

Q    And can we agree, sir, that everything that follows that green highlighting for the rest of the claim is referring to something about the nucleation host, meaning where it is, how it interacts with other parts of the claim, but the rest of the claim is about this nucleation host.  Can we agree on that?

A    It is about the nucleation host and how it is coupled in the storage layer.  I agree on this.

Q    And you gave it that name, "nucleation host"?

A    It is the same as before.  I can't recall if this name, which are just names, came from the patent agent or myself.

Q    Well, you keep saying they're just names.  Words are important, aren't they, sir?

**UNITED STATES DISTRICT COURT**

A      Words are important.  That's correct.

Q      And can you think of a situation where words are more important than in a patent claim where somebody's accusing somebody of infringement?

A      I think the names are fine.

Q      Okay.  So we have a nucleation host.  Can we agree -- this is the big question, I suppose.  Can we agree that the way you wrote it into your patent, or your patent agent did, is two distinct components, one called a hard magnetic storage layer and the other called a nucleation host?

A      I think it's fair to say that there are two components.

Q      Two distinct components?

A      Two distinct components.

Q      You describe the hard magnetic -- sorry, withdraw.

You describe the nucleation host -- you'll see it comes down about four lines from the green highlighting.  You describe it as being formed on the hard magnetic storage layer.

Do you see that?

A      Yes, I see this.

Q      And that also tells us these are two distinct things. One being formed on the other tells us they're not one thing; true?

A      We describe two different structures with two different properties, as it clearly can be seen here.  One has a coercive field larger than 0.5; other, smaller.

**UNITED STATES DISTRICT COURT**

Q     And they had different functions, didn't they, these two different structures with different components?

A     I can agree on this.

Q     You can't agree?  I'm sorry, I didn't hear.

A     I can agree the nucleation host of this, the reversal of the hard storage layer.  But both layers, of course, store data.

Q     Do you agree that the purpose of the nucleation host is to assist the switching of the hard magnetic storage layer?

A     Yes, I can agree on this.

Q     Okay.  So that's the claim structure.  I want to ask you about -- you said you had seen and watched my opening statement.  I want to ask you about some of the other parts of the patent that I presented on this morning and see if you disagree with what I said.

So can we go to the abstract, please, Mr. Schmoller.

This will be at JX-2000, first page of your patent, sir.

And if you can blow up the abstract for us.  Thank you very much.

So what I said earlier was the very first thing you'd read in the abstract in the very first sentence draws the same distinction between a hard magnetic storage layer, which I highlighted in blue, and a nucleation host in green.

Do you agree with that, sir?

**UNITED STATES DISTRICT COURT**

A     Sure.  I agree.

Q     And if we drop down to the third sentence, the abstract again refers to a hard magnetic storage layer and then separately to a nucleation host; is that true?

A     Sure.  That's consistent --

Q     I'm sorry, I misspoke.  That wasn't true.

The third sentence only refers to the hard magnetic storage layer.  But it does refer to one of those components; is that right, sir?

A     I'll have to be more careful, but --

Q     That was my mistake.  I apologize.

A     Can I ask you to repeat again?

Q     I'd be happy to.  And my apologies.  I messed up my own question.

A     No problem.

Q     The third sentence in the abstract in your patent refers to the hard magnetic storage layer as a component.  Can we agree on that?

A     Yes.

Q     And if we drop down to the fourth sentence, that's where we see a reference now to the nucleation host; true?

A     Yes.

Q     The fifth sentence refers to a nucleation host as well.

Do you see that?

A     So I believe that it's -- don't start counting the

sentences, but I see that here the next sentence is, "For a multilayer nucleation host, the anisotropy..."

Q   And the sixth sentence refers twice to a nucleation host.

Do you see that?

A   So the sixth sentence --

Q   Oh, I apologize.

A   Yeah, now I was ready --

Q   I'm sorry, I got my notes wrong again.

So the sixth sentence, I meant to say, refers to both components, the nucleation host and the hard magnetic storage layer?

A   Yes, I agree.

Q   Okay.  I have that right.

And then the eighth sentence, we drop down two sentences, again, refers to a nucleation host.

Do you see that?

A   This sentence, which is just highlighted, refers to nucleation host.

Q   So I'm going to stop here, as I think you get my point.

But I'll ask you the question that I represented to the jury, which is:  Can we agree, sir, that this two-part structure having this distinct nucleation host and hard magnetic storage layers wasn't just a passing reference.  It's something you said over and over again in your abstract?

A   I wouldn't say it this way.

**UNITED STATES DISTRICT COURT**

Q    You agree that you reference it repeatedly in the abstract, the two distinct components of a nucleation host and a hard magnetic storage layer?

A    I agree that the abstract describe these two distinct structures which are part of this in green.  Yes.

Q    I'm going to ask you to turn to the Summary that's on page -- begins on page -- JX-2000, page 9.  This begins at column 2, line 46 of your '846 patent.

And the same question, sir:  The first sentence here in the Summary refers to a multilayer structure that has a nucleation host and a separate hard magnetic storage layer. That's the way you wrote the Summary, or your patent agent did; is that right?

A    The patent has multiple layers with -- ferromagnetic layers with increasing anisotropy.  Two words, the bottom and the last layer record magnetic storage layer.

Q    It doesn't say "bottom," does it?

A    The asserted patent claims, it says.

Q    Your patent claims -- well, we'll come back to that in a moment.

On your Summary here, can we agree that you draw the same distinction -- and I can show you each of them if you'd like, but you draw the same distinction repeatedly between something called a nucleation host and something called a hard magnetic storage layer?

A       Yeah, sure.

Q       Can you turn to Figure 1, please.  That's at JX-2000, page 3.

If you'd blow that up first, please, Mr. Schmoller.

You recognize this, sir, as a figure showing the structure that you claim as an invention?

A       These structure, yes.

Q       And it's true that the -- you see the reference numeral 24 pointing to the top section there?  You understand that's pointing to what you call the hard magnetic storage layer when describing this figure in your patent?

A       This is correct.

Q       You see the number 21 pointing to the bottom?

A       Yes, I see this number 21.

Q       And you agree with me that you explain in your patent that 21 is the nucleation host; right?

A       I explain in the patent that 21 is the nucleation host and there are two embodiments, 21 on top --

Q       This one shows the hard magnetic storage layer on the top, but your claims have it on the bottom; is that right?

A       That's correct.  Asserted claims have the hard magnetic storage layer formed on an underlayer.

Q       I don't want to go through every part of your patent, so I'm going to try something and see if I can make my point more simply.

UNITED STATES DISTRICT COURT

Mr. Schmoller, are you able to keyword search the patent for us live here?

I was hoping to just keyword search the phrase "nucleation host" and show you how many times it comes up. Maybe it's not working as easily as I'd hoped.

You see it says one document with 118 instances, sir?  Are you able to read that?

A    I can read that there are 118 instances.

Q    Is it surprising to you that you reference the nucleation host by its name, as an entity, over 100 times in your '864 patent?

A    No.

Q    Can we agree, sir, that the structure that has these two distinct components of a nucleation host and a hard magnetic storage layer is a critical aspect of what you've claimed as an invention in the two patents in this case?

A    I think it's fair to say.

MR. LUMISH:  Can you go back to Claim 1 for me, please, Mr. Schmoller.  So page JX-2000, page 14.

BY MR. LUMISH:

Q    I want to ask you a little bit about the coercive fields that I touched on a moment ago.

So can you blow up Claim 1, Mr. Schmoller.  So we're on JX-2000, page 14.

Okay.  So in the hard magnetic storage layer

UNITED STATES DISTRICT COURT

limitation, you refer to it having a first coercive field, and it says "Hs," the little "s" in superscript there -- subscript there -- that's greater than 0.5 T.

Did I read that correctly?

A     This is correct.

Q     And you're saying there that the hard magnetic storage layer has a measurable coercive field of less than what's called a half of a tesla; is that right?

A     This is not correct.

Q     Well, it does say less than half a tesla; right?

A     It says larger than half a tesla.

Q     Ah.  Larger than half a tesla.  Excuse me.

A     This is correct.

Q     I misread it.

So can we agree that your claim is referring to a coercive field that the hard magnetic storage layer has, that's got to be more than half a tesla?

A     This is correct.

Q     Thank you for correcting me on it.

The nucleation host also has a coercive field; right?

A     This is correct.

Q     And it's described as a different coercive field.  You give it a different letter.  It's Hn instead of Hs; right?

A     This is correct.

**UNITED STATES DISTRICT COURT**

Q    And is it Hs for H storage and Hn for H nucleation?

A    This is correct.

Q    And this is another place where you're distinguishing between the nucleation host and the hard magnetic storage layer in the fields that they have.  Is that fair?

A    This is correct.

Q    And, in fact, you talk about the nucleation host's coercive field as being measured "without the hard magnetic storage layer."

     Do you see that language in the claim?  Mr. Schmoller will highlight that for you.

A    Yes.  This is in the claim.

Q    Okay.  So it's another place.  Now you're saying, "We're going to measure the coercive field for the nucleation host separate from and without the hard magnetic storage layer field"?

A    It says -- what stands here.  It says "Hn," the coercive field, "without the hard magnetic storage layer."

Q    Can we agree coercive field can be measured?

A    Yes.

Q    There are lots of methods that are known for measuring coercive fields?

A    Yes.

Q    You're familiar with one of those techniques that's called VSM or vibrating sample magnetometry?

A    I have one in my lab, yes.

Q    And you've used it?

A    Yes.

Q    You've used it to measure coercive fields?

A    Yes.

Q    The -- another technique for measuring coercive fields is using something called a gradient magnetometer.

Do I have that right?

A    This is correct.

Q    And a third technique is something called MOKE, M-O-K-E, which stands for magneto-optical Kerr effect, K-e-r-r?

A    That's correct.

Q    And your counsel asked you about an equation that I think you know we criticize in this case:  2K over Ms.  It's sometimes worded a little differently, but you know what I'm talking about there?

A    Yes and no.

Q    That's an equation you reference in your patent; right?

A    I reference the equation, and this is how it defines the coercive field.

Q    Can we agree, sir, that 2K over Ms would be what you refer to as a very coarse approximation for a coercive field?

A    I cannot agree.

Q    Do you have your deposition in front of you, sir?

A    Yes.

**UNITED STATES DISTRICT COURT**

MR. FENSTER:  Which one?

MR. LUMISH:  Fair point.

I'm going to go to page 80.  It's the deposition from January 22nd, 2024.

BY MR. LUMISH:

Q    Do you have your deposition there from page 80?

A    Yes.

Q    Okay.  So I'm going to ask you to read it to yourself and see if it refreshes your recollection as to whether you've testified in the past that 2K over Ms is a very coarse approximation in a lot of cases.

So the question begins at page 80 at line 15, and the testimony that I'd like you to look at is at page 81, lines 9 through 11.  Can you look at those lines for me, please.

A    This is perfectly correct and --

Q    Let me ask the question then, sir, if you don't mind. Sorry to interrupt you, but I'm not trying to impeach you here. I just want to see if your memory is refreshed.

Can we agree, sir, that the equation 2 times K1 over Ms is a very coarse approximation in a lot of cases?

A    In a lot of cases, yes, but not in the case of the hard magnetic storage layer on the recording conditions.

Q    You'll agree that there are some conditions under which that equation might be a good approximation, but there are

other situations under which it would be a very bad approximation?

A    Definitely.

Q    And whether it's good or bad depend on things like the layer thickness; true?

A    I wouldn't say it this way.

Q    I'm sorry?

A    It depends on a lot of properties.

Q    Is one of those layer thickness?

A    It can be.

Q    Let's look at your deposition, please.  So if you turn -- the same volume, so this is January 22nd, 2024.  You'll see question and answer beginning at page 11.

        MR. LUMISH:  And, Your Honor, I'd like to read --

        MR. FENSTER:  What page?

        MR. LUMISH:  Page 90 -- sorry -- line 11.  Page 90, line 11, through page 91, line 2.

        THE COURT:  Any objection?

        MR. FENSTER:  No objection, Your Honor.

        MR. LUMISH:  All right.  Can we bring that up, please, Mr. Schmoller.

BY MR. LUMISH:

Q    So, sir, you were deposed in this case.

        Do you recall that?

A    Yes, that's correct.

Q      And you swore under oath the same way you did here?

A      Yes.

Q      And you did your best to give accurate testimony in that deposition?

A      Yes.

Q      All right.  So the question you were asked -- and there's context above if you need it, but the question you were asked, I think, is pretty simple.

MR. FENSTER:  Objection, Your Honor.  If we're going to read it and show it on the screen, he should include the entire answer, please.

MR. LUMISH:  I intend to.  I said through -- I said through page 91, line 2.

MR. FENSTER:  Well, what's on the screen is --

MR. LUMISH:  Oh, no.  We need the whole thing, Mr. Schmoller.  So page 90, beginning at line 11.

BY MR. LUMISH:

Q      The question was:  "And what -- and what parameters" --

Do we have it?  Yes.

"And what parameters would it depend on, whether it was a good approximation or a not good approximation?"

Let's jump down to line 17.

You said:

"As I said in the answer, one has to look at

the particular media.  I think I answered it before.  It depends on the layer thickness."

You continue from there.  You say:

"It depends on the anisotropy constant.  It might depend on the ratio of the anisotropy constant.  It might depend on the shape of the grain.  It might depend on how -- on the -- how fast the field is applied."

Do you see that testimony, sir?

A    Yes, I fully agree with this.  For this -- and it depends on all these properties and their conditions.  Like the recording conditions where it's a very good approximation, not cause approximation.  But it depends.  If it's measured on a timescale of seconds, in particular on layer thickness, on how fast the field is applied, on the temperature, and on a lot of things.

That's why we defined in the patent the coercive field and give the formula of 2 times K1 over Ms, which is a very good way to give a coercive field on the recording condition on 1 nanosecond, which is 1 billionth time of a second.  You cannot measure it.

Q    Okay.  Let me see if I can get my question answered though, again, sir.  I think we're in agreement though.

You agree with me that whether 2K over Ms is a good or bad approximation depends on a number of parameters,

including, as one of them, layer thickness; right?

A    It depends on the situation, if it depends on the layer thickness.  If you have -- if it is measured in 1 nanosecond, it does not strongly depend on layer thickness.  If it's measured in 1 second, it strongly depends because temperature effect play an important role, which do not -- which is not the case at 1 nanosecond.

Q    Can we agree that when you were deposed under oath and asked what the parameters were, you said one of them was layer thickness, sir?

A    I completely agree that in situations it depends on layer thickness.  I just agreed right now on the same.

Q    And another parameter that -- whether it's a good or very bad approximation, is the anisotropy constant; true?

A    It depends on the situation.  If it's measured on a timescale of second, then anisotropy constant plays a role.  It doesn't play a role if it's measured in 1 nanosecond.  Then it's still a good approximation.

Q    Another parameter, sir, whether KS -- 2 times K over Ms is a good or very bad approximation, is the ratio of the anisotropy constant; right?

A    I think you refer to ratio of the anisotropy constants.  If there are more anisotropy constants in a layer, for example, yes, I agree.

Q    Another parameter that will help determine whether 2K

over Ms is a good or very bad approximation is the shape of the grain; true?

A    If it is measured on a timescale of a second, like in a VSM, yes.  It will depend on the shape of the grain here.

Q    Another -- I'm sorry.  I didn't mean to interrupt you. Were you finished?  Okay.  My apologies if I interrupted you.

Another factor or parameter that will help determine whether 2K over Ms is a good or very bad approximation of a coercive field is how fast that field is applied; right?

A    This is definitely correct.  And this is what I wanted to explain.

Q    And then the last parameter that I was going to ask you about is the size of the grain.  You'll agree that's also a parameter you should take into account when determining whether use of 2K over Ms is a good or bad approximation; true?

A    Again, if the field is applied on the recording conditions for nanosecond, it will not matter.  If it's applied slowly, it matters.

Q    Was that a "yes"?

A    I would not say -- I can't say that it's always depending on that.  That's why on this question I couldn't answer it like this.

Q    You had previously testified -- and are you disagreeing now? -- that whether 2K over Ms is a good or very bad approximation has, as one of the parameters, the shape of the

**UNITED STATES DISTRICT COURT**

grain?

A    I testified that it can depend on all these parameters, depending on the condition of entities used, this formula.

Q    Okay.  I want to ask you about the prosecution of the patent a little bit.  We had spoken before about how you participated in that.  I want to ask you a little more detail about that, if I might, sir.  So I'm shifting gears now.

A    Sure.

Q    Okay.  You said that at times you may have participated in or done some of the prosecution, meaning the effort of getting the patent filed and issued from the patent office; right?

A    Yes, I mentioned this.

Q    And I'd like to look at an example of where you did that.  You have in your binder, sir, PTX-003 in the binder that we handed up to you.  It's a very thick document.

          Do you see that?

A    Yes.

Q    Should be the first one in your binder.

          Do you recognize this, sir, as the file history, the record in the patent office for all the back-and-forth between you and your lawyers or patent agents in the patent office?

A    Yeah, that's -- I think that's the file history, yes.

          MR. LUMISH:  All right.  Your Honor, we would ask to move into evidence PTX-3.

UNITED STATES DISTRICT COURT

MR. FENSTER:  No objection, Your Honor.

THE COURT:  PTX-3 will be received.

**(Exhibit Number PTX-003 received.)**

BY MR. LUMISH:

Q    I'm going to ask you to turn for me, please, sir, to 162 in the bottom right corner.  So it'll be PTX-3.162.  The name of this document is "Amendment After Final," and it goes on from there with some regulatory language.

Do you understand what we're looking at here is the first page of an amendment that was made to the claims in your patent as part of that patent prosecution?

A    Yes.

Q    And I'd like you to -- so you'll see at the bottom it says page 1 of 10.  I'd like to turn you to the last page, 10 of 10, which is PTX-3.171.  And you'll see a signature block at the bottom there.  It says, "Respectively submitted, Dieter Suess, Ph.D."

Is that your signature, sir?

A    Yes, this is my signature.

Q    So you prepared the amendments to the claims here and the arguments or comments that were made accompanying those amendments to the patent office; right?

A    I think this is fair to say.

MR. LUMISH:  All right.  If we can go back to the first page, please, Mr. Schmoller, PTX-3.162.

BY MR. LUMISH:

Q    I just wanted to show you the date.  You'll see it shows "Received" on a stamp at the top there, November 28, 2014.  So these are amendments and comments that you made, or arguments that you made, in 2014; true?

A    This is correct.

Q    If we go to the next page, PTX-3.163, you'll see Amendments to the Claim as a header, and then you'll see Claim 1 with a series of texts crossed out or underlined.

        Do you recognize that as showing texts you removed by crossing it out and texts you added by underlining it?

        MR. FENSTER:  Objection, Your Honor.  Relevance.

        MR. LUMISH:  I think it's relevant, Your Honor, to show that the claims have changed over time from the 2006 story that we heard before.

        THE COURT:  Overruled.

BY MR. LUMISH:

Q    So I'll ask again, sir.  You show here text that you added to the claims and things that you crossed out; right?

A    Yes.  This is correct.

Q    And we are eight years, at this point, after you filed your patent claims; is that true?

A    I think this is correct.  Yes.

Q    And you'll see that the "hard magnetic storage layer, formed on an underlayer" is being added to this claim here;

**UNITED STATES DISTRICT COURT**

right?

A    This is what is added here, yes, that's correct.

Q    And you see that the location of the nucleation host being formed on the hard magnetic storage layer and exchange coupled to the hard magnetic storage layer is being added here in 2014; right?

A    That's correct.

Q    And, again, this is eight years after you told the jury, in 2006, you had this revelation about doing it this way; right?

A    That's a deleted sentence at the bottom, "The nucleation host is deposited on the hard magnetic storage layer."

Q    Right.  So there's a nucleation host there that comprises a number of things, but you crossed that one out; right?

A    Yeah, but the order did not changed.

Q    Okay.  Let's look at the arguments you make.  So if I can ask you to turn to page 7.  So PTX-3.168.  You'll see at the bottom left there "Claim Rejections, 35 U.S.C., Section 103."

          Do you see that?

A    Yes, I see.

Q    And it refers to the claims having been rejected as unpatentable over Honda, et al.  And it lists a patent number 5851643.

          Do you see that?

A    Yes, I see this.

**UNITED STATES DISTRICT COURT**

Q    Do you recall that that was a Hitachi patent?

A    This, I can't recall.  I know and I can recall Honda, but I don't recall who he was employed.

Q    So you don't know if Mr. Honda there was a -- an engineer working at Hitachi in Japan, part of Western Digital now?

A    I don't know Honda personally, and I don't know where he was employed.

Q    Okay.  You then have -- let's go to the next page, please, PTX-3.169.

You see "Remarks regarding rejections" beginning about, I don't know, two inches down in the text?

A    I see "Remarks regarding rejections" right now, yes.

MR. LUMISH:  Let's bring up number 1, please, both paragraphs, Mr. Schmoller.

BY MR. LUMISH:

Q    So the first remark -- you enumerate three or more here. It's like five different sections of arguments that you made. I wanted to ask you about the first couple anyway, or several of them.

So the first one here, you say, "In the claimed embodiment" --

MR. FENSTER:  Objection, Your Honor.  The objection is relevance.  I don't understand why we're talking about Honda, which is not any prior art that was disclosed here. We're talking about claims that are not at issue here.  It

UNITED STATES DISTRICT COURT

seems -- the Court has issued a claim construction on the final claims.

MR. LUMISH:  Your Honor, what I wanted to get to, actually, is the second part of number 1, which -- and, frankly, the point here being that Dr. Suess points out to the examiner that the examiner is making mistakes along the way.

MR. FENSTER:  And, Your Honor, the point that he's making, I think, is that relates to a piece of prior art that is not in any of the expert reports.  It's not being asserted.  It's not part of their invalidity case here.

THE COURT:  Overruled.

BY MR. LUMISH:

Q    So, sir, you here respond to this rejection over the Honda patent; right?

A    I see here remarks regarding the rejection of the Honda patent, yes.

Q    And in the second paragraph, you say:

        "Applicant has already presented this

        argument in the previous response.  Unfortunately,

        the present office action completely ignored

        Applicant's argument."

        Do you see that, sir?

A    This is what stands there, yes.

Q    And you felt that way.  You felt like this examiner here in your -- prosecuting your patents had made a mistake?

**UNITED STATES DISTRICT COURT**

A       I would not say so.

Q       Well, you said they ignored an argument you made; right?

A       If this is -- if you regard "ignore an argument" as a mistake, then I might agree.

Q       You did say that the examiner ignored your argument.  Can we agree on that?

A       This is a very normal process with the patent office, that you -- it's forth and back over 12 years on argumenting [sic], sure.

Q       You felt they ignored your argument; true?

A       That the patent examiner -- as it seems, we repeated this argument and, I guess, successfully, because we came over Honda to bring in, obviously, slightly other arguments.

Q       Can you look at number 2.

        If you'd bring up number 2 for us, please, Mr. Schmoller.

        In the third paragraph, I think here -- I want to see if you'll agree with me -- now you're saying that the patent office made a mistake.  The third paragraph, you say, "However, the office action misidentifies the claimed layers in Honda."  And you go on from there.

        Do you see that?

A       That is what stands here, yes.

Q       And can we agree there you're saying that the patent office made a mistake?  It misidentified layers?

A    I agree that it -- that it misidentifies, standing here, yes.

Q    And that was a mistake; right?

A    This is a discussion.  If this is a mistake by myself or by the patent office, of writing this, but my point was that it misidentified, yes.

Q    Let's turn to the next page, please, PTX-3.170.  And you have your argument number 3 there.

And in the first sentence of the second paragraph, you wrote, "The office action rejected Claim 3 in an inherently self-contradicting manner"; right?

A    Did I write this?

Q    I asked you that before.  We showed you --

A    I don't believe -- is this still the same office action?

Q    Yes, sir.  I can show you your signature again if you'd like.

A    Okay.  It's just because I -- I was not sure.

Q    Well, let me ask the question.

So in this document that I showed you your signature on, the sentence I just read is there.  "The office action rejected Claim 3 in an inherently self-contradicting manner"; right?

A    This is what stands here, yes.

Q    And that's a big mistake, as you put it -- or as it's written there.  Wouldn't you agree, sir?

**UNITED STATES DISTRICT COURT**

A    It stands what it stands.

Q    Can we agree that you're -- you were, if you're going to say it's your patent agents, "We're telling the patent office they made a big mistake here"?

A    It stands what it stands.  I think it's -- everyone will interpret it as he wants, yes.

Q    You testified on direct examination that the patent office had a lot of prior art in front of it.

Do you recall that?

A    Yes.

Q    And I didn't hear you mention Seagate's patent to Dr. Li, L-i.  That patent wasn't in front of the patent office; right?

A    It was in front of the patent office, the last issued patent, which is not asserted in this case.  But this was also examined by the patent office, and it also came over this.

Q    I'm asking you about the two patents in this case.  Your lawyer asked you about prior art that was in front of the patent office for these two patents.  That didn't include Dr. Li's patent out of Seagate, did it?

A    Yes, this is correct.

Q    More than that, sir, we can agree that nobody from Western Digital was involved in any way in the prosecution of the patents that issued in this case; right?

A    That's correct.

Q    I wasn't there; right?  I mean, you personally met at one

point with the examiner at the patent office; right?

A   At one point we flew to Washington to meet up, because it was such a long process.  And we met with the patent examiner in Washington to meet up there, yes.

Q   And you can agree, sir, that nobody advocating for Western Digital had a voice in that process, where they can go to the patent office and say, "We don't think that's true.  We think this prior art really does disclose things."

No arguments like that were made by anybody on our side?

A   I think this is fair to say.

Q   And can we agree that this trial is the first time Western Digital is getting to make those arguments to somebody who will make a decision about them?

A   This, I can't agree.

Q   Let me ask it a different way.

Can we agree that this trial is the first time somebody's hearing the arguments and the witnesses that we're going to present in this trial?

A   Western Digital can make in particular review.  Did not do.  So I agree that here it's the first time that the Western Digital has a jury to discuss it.  This I confirm, yes.

Q   Now, you talked about how long it took.  It took 12 years between filing your patent application and '864 being issued; true?

A       Yes.

Q       And it took 15 years for the '997 patent?

A       I think that's correct.

Q       And there were many back-and-forths, many rejections and changes and arguments back and forth; right?

        The first thing you filed wasn't what got issued by the patent office.  Can we agree on that?

A       Yes, I agree.  It was -- yes.

Q       Let's look at some of the prior art references in your patent.  So your lawyer on direct asked you about the Hagedorn paper.

        Do you remember that?

A       Yes.

Q       You cited in your patent, at JX-2000, page 12 --

        Can we bring that up, please, Mr. Schmoller.

        So, again, this is the '864.  So we're going to go to Column 7, lines 5 through 9.

        Do you see where you cite Dr. Hagedorn there?

A       Yes, I see the Hagedorn citation.

Q       And you say, "A factor of five decrease was shown by Hagedorn."  And you list the name of his paper.

        Do you see that?

A       That's correct.

Q       By citing his paper in your paper, your patent application here, were you admitting that what you're doing is

the same as Dr. Hagedorn's?

A    I don't agree.

Q    Right.

And can we agree that just because a scientist or a researcher, somebody like that, cites somebody else's paper in their own work, that doesn't amount to some sort of confession that they're actually using or copying or infringing on somebody else's work?

A    I think that's fair to say.

Q    Sometimes scientists in research cite each other's papers to show it as an example of something somebody else did before; right?

A    I think that's fair to say.

Q    Now, let me ask you to look at the Hagedorn paper.  It should be in your binder as DX-1213.

Do you have that in front of you, sir?

A    DX --

Q    DX-1213.  It's towards the back, I guess, about three quarters of the way through the binder.

Do you have that in front of you?

A    I have it in front of me, yes.

Q    Do you recognize that DX-1213 is the Hagedorn paper that you cited in your patent?

A    Yes.  That's correct.

Q    And you're aware of this paper being published before you

**UNITED STATES DISTRICT COURT**

filed the application for your patent; right?

A     That's correct.

          MR. LUMISH:  Your Honor, we move DX-1213 into evidence.

          MR. FENSTER:  No objection.

          THE COURT:  1213 will be received.

          **(Exhibit Number DX-1213 received.)**

BY MR. LUMISH:

Q     You've called this paper a nice paper; right?

A     That might be correct.  I can't recall exactly, but I would say it's a nice paper, yes.

Q     Would you agree it's a good piece of scholarship?

A     To have it on paper?

Q     Yes, sir.

A     Yes.

Q     You first learned about it, you said, in 2006?

A     Yes.

Q     And you learned about the Hagedorn paper from a different researcher, a gentleman named Alexander Dobin; right?

A     As far as I remember, that's correct, yes.

Q     Dr. Dobin, you met him -- or in this instance you met with him at a conference in San Diego in 2006; right?

A     I -- that's correct.  I learned about it after I gave my presentation, as far as I remember.

Q     You understood that Dr. Dobin had described using

elements of the Hagedorn paper in his presentation at that same conference; right?

A     This is what he informed me, yes.

Q     Well, you know he gave a presentation called "Domain Wall Assisted Recording"; right?

A     That's correct.

Q     And that presentation described a hard magnetic layer and a soft magnetic layer -- multiple soft magnetic layers; is that true?

A     That's not correct.

Q     Do you agree it disclosed a hard and soft magnetic layer?

        MR. FENSTER:  Objection, Your Honor.  Calls for opinion testimony about a reference that's not being asserted here.

        MR. LUMISH:  I'm not asking his opinion.  I'm asking him what he remembers Dr. Dobin told him.

        THE COURT:  Overruled.

BY MR. LUMISH:

Q     Do you recall, sir, Dr. Dobin presenting to you his idea of using a hard layer and a soft layer?

A     It was not new here, but this is what he presented, yes.

Q     Do you recall Dr. Dobin telling you he thought his model was similar to the one you were talking about at Intermag 2006; right?

        MR. FENSTER:  Objection.  Hearsay, Your Honor.

**UNITED STATES DISTRICT COURT**

THE WITNESS:  This, I --

THE COURT:  Just a minute.  Just a minute.

MR. LUMISH:  Your Honor, this is something he would have heard himself as a percipient witness, and it goes to something he actually heard.

THE COURT:  I'll overrule the objection, but what was said to him is not for the truth but simply from the fact that he heard it or it was said, not for the truth of the statement.

THE WITNESS:  Can I ask you for the question again?

BY MR. LUMISH:

Q    Sure.  Happy to.

Do you recall Dr. Dobin saying that he -- that his model was similar to the model you used?

A    I'm not very sure now on this sentence.

Q    Let me ask you to look at your deposition, please.  So this is, I believe, the same volume, so January 22nd, 2024, deposition.

MR. LUMISH:  And, Your Honor, I'd ask to read from page 58, line 11, through 59, line 3.

MR. FENSTER:  I'd object, Your Honor.  It's not impeachment.  This isn't referring to a statement.  He's referring to -- he was being asked about the publication itself, and that does call for opinion testimony.

THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

BY MR. LUMISH:

Q    So let's look at the testimony, sir.

A    Which line, please?

Q    We're beginning at 58, line 11.

And you were asked:

"So it was a single structure that included soft magnetic layers and hard magnetic layers; correct?"

And then we'll drop down to your answer; it begins on line 18.  And you say:

"So what I recall from the publication, it was a single -- a spin-chain model where several spins were used to describe the soft layer and several spins were used to describe the hard magnetic layer.  In some regards, I would recall this model similar to the model I used.  Just that our model was a three-dimensional model taking into account for three dimension, and the model of Dobin and Richter is a one-dimensional model of the spin chain."

Do you see that?

A    Yes, I see this.

Q    Is true, sir, that you remembered or recalled the model that was presented by Dr. Dobin at Intermag as being similar to yours?

A    I thought you asked me if Alex Dobin told me that the model was similar.  Because that might be my misunderstanding.

Q    I'm asking you a new question now.

A    Okay.

Q    Do you need it again?

A    Yes, of course, it states in this deposition, this is what I say exactly like this right now.

Q    So let me just make sure your testimony is clear.

Do you agree that you recall the presentation Dr. Dobin gave at Intermag, describing a model that was similar to yours?

A    Yes.

Q    You reference the publication that was presented at that conference from Dr. Dobin and Richter in your patents; right?

A    Yes.

Q    And why don't we just take a quick look at that, if we could.  So we'll go to JX-2000, page 9.  This is your patent, sir.

I just need to find it here.  Unfortunately, I didn't write down the line.  Why don't we come back to that, sir.

Let me ask you this:  If you turn to page -- DX-1009 in your binder, you'll see the Dobin and Richter paper.

A    Sorry.  Which binder?

Q    The one that I handed you or my team did.  It should be

the -- I think it's white.

A    Sorry.

Q    It'd be the same one that had the file history in it and the other exhibits I've shown you.

A    Yeah.  DX --

Q    1009.

Do you have that, sir?

A    Yes.

Q    Do you recognize DX-1009 as the Dobin and Richter paper that you cite in your patent?

A    I know that I cited an archive article of this paper.  If this is exactly this, I would need to check.

Q    Can you look along the left-hand side of the document? You'll see an archive entry printed on the left margin.

A    Yes.  I think this is an archive article.  There might be more versions.  I'm not sure because in archive you can have more versions.  So I'm not 100 percent sure.

Q    Do you recognize DX-1009, though, as the archive version of the Dobin and Richter paper that you cited in your patent?

A    I recognize it as an archive article from Dobin and Richter in 2000 [sic].

Q    All right.  Let me shift gears to Dr. Victora.  You saw him in the back of the courtroom?

A    Yes.

Q    You know Dr. Victora; right?

**UNITED STATES DISTRICT COURT**

A     Yes, very well.

Q     You've met him many times?

A     Very often.

Q     You've met him at conferences?

A     Fortunately, yes.

Q     You consider yourself friendly colleagues?

A     Definitely.

Q     You consider him an expert in the field?

A     Definitely.

Q     Can we agree that Dr. Victora is a very well-known and very-well regarded expert in the exact field we're here to talk about in this lawsuit?

A     Yes, I agree.

Q     And you have reviewed papers from Dr. Victora, have you not?

A     Yes.

Q     I'm just asking in general.

        And you know that Dr. Victora had disclosed combining a hard layer and a soft layer in papers that predate the filing of your patent applications; right?

A     Yes.

Q     And you reference some of these papers in your patent; isn't that true?

A     Yes, that's correct.

Q     Let me show you one of those.  If you go to JX-2000,

**UNITED STATES DISTRICT COURT**

page 9 for me, please, in the patent.  So we're going to look at Column 1, lines 61 through 65.

You refer to a paper there as Wang, et al.  But do you know that that's actually a paper that Dr. Victora is a co-author on?

A    I think so, yes.  I'm not 100 percent sure, but I think so.

Q    You list the title of the patent there -- the paper, I should say -- as "Composite media (dynamic tilted) media for magnetic recording."

Do you see that?

A    That's correct.

Q    I want to ask about that tilted part.  So dynamic tilted media.  That means that access to the media would be tilted at an angle, for example, at 45 degrees; right?

A    In tilted media, which is the paper not about, they wrote that here to tilt the grains 45 degree to reduce the test.

Q    But you know that, as used by Dr. Victora, "tilted media" was also used as a phrase to explain his exchange-coupled composite media, which could act like tilted media, even if the magnetization was straight up and down; right?

A    I think it came -- I'm not sure who -- I know that if it was Professor Victora or Professor Vaughn (phonetic) who came up with this name or this comparison.  So I cannot say.

Q    But you understand that "tilted media" has been used to

UNITED STATES DISTRICT COURT

refer to Dr. Victora's work, even when the magnetization is up and down?

A    I would not -- I can't agree with the way it's phrased right now, the question.

Q    Okay.  Let me ask you a different question then.  Maybe this is all that really matters.

You cited this paper that you call "Wang, et al." with the title that includes "tilted" in it in your patent because you thought it was relevant; right?

A    Yes.

Q    And the fact that it talks about tilted media doesn't somehow mean it's irrelevant to your patent; right?

A    As I said, it is not a paper about tilted media.  It is -- this concept as proposed, as far as I know, from Professor Victora is composite media and was labeled to be dynamically tilted media.  Just a name, like hard storage layer.  Just a name, dynamically tilted media.

MR. LUMISH:  Okay.  Can you take that down.

BY MR. LUMISH:

Q    I'm going to ask you a little bit more about Dr. Victora, and I'm going to show you some slides that I think you've seen before.

You heard of Dr. Victora's work referred to in the field as ECC or exchange-coupled composite media; right?

A    That's correct.

UNITED STATES DISTRICT COURT

Q    And do you understand that that name comes from a title of one of Dr. Victora's papers?

A    This is my understanding, yes.

Q    Okay.  I'd ask you to look at DX-1041 in your binder, please.

Do you have that in front of you, sir?

A    Yes.

Q    Do you recognize Exhibit 1041 as a presentation -- or slides from a presentation you gave in October of 2006?

A    Yes, I do.

MR. LUMISH:  Your Honor, I'd move DX-1041 into evidence.

MR. FENSTER:  No objection, Your Honor.

THE COURT:  1041 will be received.

**(Exhibit Number DX-1041 received.)**

MR. LUMISH:  And can we bring up the front.  Thank you.

BY MR. LUMISH:

Q    So your name is first there, but you also list several other folks.  They were co-presenters or co-authors of these slides with you; is that true?

A    Yes.  So co-author of these slides.

Q    Okay.  And one of the co-authors was Gerardo Bertero.

Do you see that on the bottom of the right side of list of names there?

A    Yes.

Q    That's Dr. Bertero, who was at Western Digital for -- was at Komag at that time, which then became part of Western Digital.  You understand that; right?

A    This is correct.

Q    And you didn't name any of these co-inventors as -- sorry.  Withdraw.

You didn't name any of these co-authors of your slides as co-inventors of your patents in this case; right?

A    These slides are October 2006, yes.  It was later than that, the patent application.

Q    Can you turn to Slide 4 for me, please.  DX-1041, Slide 4.

Do you recognize this slide, sir?

A    I recognize the slide, yes.

Q    And you prepared it?

A    Yes.

Q    And you'll see on the left you show "Composite Media ECC," and you have a Footnote 1 notation there.

Do you see that?

A    Yes, I see.

Q    And that 1 -- I'm sorry.  Were you done?

A    Yes.

Q    Thank you.

So the 1 refers down to Dr. Victora as the person

you're crediting with that idea; right?

A    Yes.

Q    And then you have "Exchange Spring Media" on the right side, and you credit yourself with that, with Footnote 2.

Do I have that right?

A    This is correct.

Q    Now, you're distinguishing ECC, or exchange composite media, from Dr. Victora, from your work; is that right?  From exchange spring media, I should say.

A    Yes.  We had here different models, and so I distinguish.  Correct.

Q    Okay.  You testified on direct, though, sir, that it was completely new to have the anisotropy increased from top going down to the bottom.

Do you remember that testimony?

A    Yes.

Q    But this here, in your slide, is showing the hard layer on the bottom in gray and the soft layer in yellow on the top for Dr. Victora's work; right?

A    This shows the slide, yes.

Q    Let's look at the next slide, please, DX-1041, Slide 5, just to make sure we see the labeling here.

You created this slide, didn't you?

A    Yes, I created this slide.

Q    And if you look at -- there's -- you've got the two

structures on the left side and right side of the bottom, and then there's arrows pointing to the yellow one that says "Ksoft."

Do you see that?

A    Yes.

Q    And then drop down to the bottom one.  It says "Khard," and it's got some numbers after that, and the arrows point to the gray structure; right?

A    Yes.

Q    So you're describing and disclosing here in Dr. Victora's work the softer, lower anisotropy component on top of the harder, higher anisotropy component, aren't you?

A    The image on the left was also done by me.  Just typing Dr. -- or Professor Victora.  So this is not an image of the Victora paper, but I did it.

Q    I totally understand that.  But my question is different, which is:  You're describing Dr. Victora's work in this slide; right?

A    Yes.

Q    And you label the top yellow part of the structure as soft; true?

A    Yes.

Q    And you label the gray hard part on the bottom as hard.

A    Yes.

Q    So the anisotropy is increasing as you go down from top

to bottom?

A    In two layers.  I was saying on my two bilayers.  This is what I say in the direct.

Q    Okay.  But it goes top to bottom; right?

A    Here, we don't have any underlayer.  It's top to bottom in this image.  We have no underlayer.  We have no head field.  Though you have -- it doesn't say if it's top or bottom of the -- which is on the underlayer.

Q    Can you turn to DX-2142 [sic] in your binder, please.

          THE COURT:  I think we'll take the afternoon break before we do that.  We'll be in recess for 15 minutes.  Please remember the admonition.

          THE COURTROOM DEPUTY:  All rise.

          **(Recess from 3:01 p.m. to 3:18 p.m.)**

          **(In the presence of the jury.)**

          THE COURT:  You may proceed.

          MR. LUMISH:  Thank you, Your Honor.

BY MR. LUMISH:

Q    I only have about three more documents for you, sir.  So appreciate your patience.

A    Very good.

Q    Let me ask you to turn to JX-2142 in your binder, please.

A    2142?

Q    2142, yes, sir.

          Do you recognize JX-2142 as slides from a

presentation you gave in October of 2007?

A    Yes, I recognize it.

        MR. LUMISH:  Your Honor, we move JX-2142 into evidence.

        MR. FENSTER:  No objection, Your Honor.

        THE COURT:  2142 will be received.

        **(Exhibit Number JX-2142 received.)**

BY MR. LUMISH:

Q    Here, again, you have co-authors on the slide deck.  You have Professor Schrefl; is that right?

A    That's correct.

Q    Did he help you present or draft the slides for this presentation?

A    We definitely had discussions.

Q    Was he a co-presenter at this conference with you?

A    He is listed definitely as a co-author at the top here.

Q    I see that he's listed, and I'm asking if that means he co-presented with you at the conference.

A    I was the presenter, and you can have co-authors.

Q    Okay.  So you presented these slides on your own?

A    Yes.

Q    Understood.  Thank you.

        If you turn, please, to JX-2142, Slide 3, please. And just to put us in time, this October 2007 time period is more than a year after you filed your patent applications for

the patents in this case; right?

A    Yes.

Q    And the title of the slide is "Overcoming the superparamagnetic limit."

Do you see that?

A    Yes, I see.

Q    And -- sorry to interrupt you.

That was a subject you spent a fair bit of time with your lawyer on, on direct examination, talking about having solved or fixed with the patents in this case; right?

A    Yes.

Q    But let's look at what your slide shows here.  If we go down, you'll see you credit yourself there with exchange spring media, as number 2.  But right below that is ECC; right?

A    This is correct.

Q    And this -- you list ECC, and you credit Dr. Victora and his co-author Dr. Shen for that; right?

A    This is correct.

Q    And you're listing them and their work on ECC here in your slide that you presented on your own about overcoming the superparamagnetic limit.

Do I have that right, sir?

A    This is correct, that this is on the slide that's "Overcoming superparamagnetic limit."

Q    Can I ask you to turn to DX-1044 in your binder, please.

Do you recognize DX-1044 -- I'm sorry.  I'll let you get there.

Do you have 1044 in front of you there?

A     Yes, I have.

Q     Do you recognize DX-1044 as an abstract you submitted to the American Physical Society?

A     Yes.

MR. LUMISH:  Your Honor, we move DX-1044 into evidence.

MR. FENSTER:  No objection, Your Honor.

THE COURT:  1044 will be received.

**(Exhibit Number DX-1044 received.)**

BY MR. LUMISH:

Q     This was an abstract.  The whole thing is about, I don't know, looks like 15 lines or so.  It's that one paragraph; right?

A     Yes.

Q     And you submitted this to the American Physical Society in March of 2007 for the March 2007 conference that they were holding; is that true?

A     I don't think so.  Because the document states, "Date submitted:  November 2006."

Q     You're correct.  So let me correct my question then.

You submitted it on November 27, 2006, but for the March 2007 conference.

Do I have that right?

A    I don't know the date of the conference by heart.

Q    If you look at -- oh, you don't need to.  Sorry.  You have this monitor in front of you.

At the very top of the abstract, you'll see it says, "for the MAR07 Meeting of the American Physical Society."

A    Yes.  This is what it's saying.  I don't know if this is March 7th or the seventh meeting.  I don't know, but --

Q    Well, would you understand it to be the March 2007 meeting?  So you're submitting in November of '06 for the meeting a few months later in March of '07?

A    I think I did not submit it.

Q    Okay.  Well, let's look back down at the bottom line.  It says, "Date submitted:  27 November 2006."

Do you have any reason to doubt that that is, in fact, the date you submitted this abstract to the American Physical Society, sir?

A    Yes, I have.

Q    And what is that?

A    Because on the right it says submitted "Gergely Zimanyi."

Q    Right.  And who is Mr. Zimanyi?

A    He's a professor at UC Davis.

Q    Right.  So let's look at the top line of the abstract.  It says, "Optimizing Graded Recording Media," and it lists both Mr. Zimanyi and yourself.

UNITED STATES DISTRICT COURT

A    Yes.

Q    Okay.  Does that help you understand that the abstract was submitted by Mr. Zimanyi, on your behalf as well, in November of 2006 to the American Physical Society?

A    It was submitted by Professor Zimanyi.

Q    Okay.  It bears your name too.  Do you stand behind this submission?

A    Yes, I do.

Q    The American Physical Society is an important organization; right?

A    Definitely.

Q    You're careful to make sure that if something bears your name and is submitted to it, it's accurate.  Can we agree on that?

A    Yes.

Q    Now, we saw in your slides a moment ago, you crediting yourself with exchange spring media.  But here in this submission, sir, you'll see five lines down, about a little more than halfway across that line, a sentence that starts with the word "Recently."

     Do you see that?  I'm going to read it into evidence once you find it.

A    Yes.

Q    Your abstract says:

     "Recently, Victora and Shen proposed that the

recording density of perpendicular media is increased in exchange spring media:  a structure with a soft and hard layer."  Right?

A     This is what it says here.

Q     And do you stand behind this document as one that bears your name as being accurate, sir?

A     If you have more author on a submission, there might be different flavors, who you want to call it.  I call it the work of Professor Victora, exchange-coupled composite media.

Q     But your co-author here of this abstract to the American Physical Society, or you, depending on who wrote this, referred to Dr. Victora with his co-author Dr. Shen as having proposed this exchange spring media.  Is that true, sir?

A     If you want to name it like this.  It's not the name I have chosen to reference the work of Professor Victora because I prefer to use the name how he presented it, and he called it "exchange composite media."

Q     So the abstract that was submitted with your name on it to the American Physical Society is wrong?

A     I would not say so.

Q     Okay.  I'm going to switch gears again, sir, away from the prior art now and ask you some other questions.  And I want to go back to the file history, which was PTX-3.  You had that earlier.  Can you find that for me, please.  And in particular I want you to go to page 350.  So PTX-3.350, please.

And do you recognize that this was a presentation or the first page of some slides for a presentation that you gave when you met with the examiner at the patent office?

A    I think this is correct.

Q    And you see the date there is March 20, 2017; right?

A    Yes.

Q    And so this is about 11 years -- a little less than 11 years after you filed your patent applications; is that true?

A    I think so.  About 11 years later, yes.

Q    And they're still pending before the patent office.  They still haven't issued; right?

A    This is correct.

Q    Okay.  And I really want to ask you about the next slide. So if we turn to the next page, please, PTX-3.351, you'll see a picture of yourself on the left and a picture of Dr. Zimanyi on the right.

Do I have that correct?

A    This is correct.

Q    And you were giving some biological -- or withdraw.

You were giving some biographical information about yourself to the examiner just to kind of introduce yourself here; is that right?

A    Yes, this is correct.

Q    You cite the number of papers you have and the number of citations, but I want to drop down to the very last line.  You

**UNITED STATES DISTRICT COURT**

wrote, "Lifetime grant awards:  $5 million."

Do you see that?

A      Yes.

Q      And so what you were telling the patent office was, as of 2017, as a professor, the lifetime grants that you've received for your work and research is $5 million.  Is that what that means?

A      I think that's -- that might be correct, yes.

Q      And those were grants to support all of your research work; right?

A      Yes.

Q      So the work that went into the patents in this case but also all of the other hundreds of patents and papers -- I should say hundreds of papers and other patents that you've produced; is that true?

A      I think that's fair to say.

Q      Now, with these kinds of grants, you don't keep all that money.  A lot of it goes to students and facilities and equipment; is that true?

A      That's correct.  I don't keep any of this money.

Q      You don't keep any of it.  So none of it went to you personally?

A      This is how you -- yeah.  This is correct.  This is what you get at the university.

Q      Do you know that $5 million in grants is -- withdrawn.

**UNITED STATES DISTRICT COURT**

Let me try that a different way.

I'm trying to get down to the damages issues in this case and the $305 million that your company is asking for from this jury. And so do you understand, sir, that that number of $305 million would be more than 61 times the lifetime grants you had received by 2017, according to your slide?

A    I think this calculation is correct.

Q    You mentioned in the direct examination that -- you said something about Western Digital using your simulation software. Do you recall that?

A    This is correct.

Q    That simulation software is not an implementation of the things that you claim as inventions in these patents; right?

A    This is correct.

Q    And you're not suggesting to the jury that Western Digital is using that software without your permission, are you?

A    This is correct.

Q    Western Digital paid for a license to get software -- your simulation software to use in its head divisions. Is that true to your understanding, sir?

A    I would not say it this way.

Q    Well, do you understand that they paid for a license to your software, Western Digital?

A    Yes. Definitely.

Q    And twice, actually.  There's HGST and Western Digital proper, both have a license to your software; is that true, sir?

A    That's correct.  There were two licenses that we are combined to one license.

Q    They didn't steal it from you.  They paid for it; right?

A    Yes.

Q    And you agreed to the price that Western Digital paid for the software for both of those companies?

A    Yes.  Definitely.

Q    And the price for the Western Digital company was roughly $67,000 U.S.; is that true?

         MR. FENSTER:  Objection, Your Honor.  Relevance. This goes to a noncomparable license that all parties have agreed as noncomparable.

         THE COURT:  Sustained.

         MR. FENSTER:  Thank you.

BY MR. LUMISH:

Q    Let me ask you this about the big number again though.

         So on the $305 million, do you recognize that that would be thousands of times more than the average annual salary of a disk drive engineer?

         MR. FENSTER:  Objection.  Relevance.  Argumentative.

         THE COURT:  Sustained.

         MR. LUMISH:  I can argue the relevance.  I had one

more question along that line, Your Honor.

THE COURT:  Ask the question.

MR. LUMISH:  Okay.  I wanted to make sure I wasn't crossing your line.  That's all.

BY MR. LUMISH:

Q    How about -- I'll ask you this, sir.  The $305 million, can you tell us how many times that would be a multiple of your professor salary?

MR. FENSTER:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

MR. LUMISH:  All right.  Well, thank you for -- for answering my questions, sir.

I'm going to go ahead and pass the witness.

THE WITNESS:  Thank you very much.

**REDIRECT EXAMINATION**

BY MR. FENSTER:

Q    Good afternoon, Dr. Suess.

Do you recall that Mr. Lumish was asking you questions about the abstract in your patent?

A    Yes.

Q    Do you recall he was asking you questions about the summary in your patent?

A    Yes.

Q    Is it your understanding that either the abstract or the summary actually define the invention that it can be infringed

in this case?

A     The invention is described by the patent claims.

Q     Now, he asked you if you would be surprised -- remember he was asking you about the nucleation host and how many times your specification mentions the nucleation host?

A     Yes, I remember.

Q     He would -- and he asked you if you would be surprised that the specification mentioned it 180 times or so?

A     I remember.  I was not surprised.

Q     How many times in your specification does your patent say that the nucleation host layers cannot store data?

A     Zero time.

Q     Now, Mr. Lumish was asking you about the -- trying to suggest that there's a -- that there are distinct structures between the nucleation host and the claims.

        Do you recall that?

A     I recall.

Q     I'm sorry.  A distinct structure between the nucleation host and the hard storage layer?

A     Yes, I recall.

Q     And is that consistent with your claims, that they are distinct?

A     My claim contains a nucleation host and the hard storage layer.

Q     This is -- let's see if we can do this.  This is Claim 1

UNITED STATES DISTRICT COURT

of the '864; right?  And it describes "an exchange coupled magnetic multilayer structure"; right?

A    That's correct.

Q    The hard magnetic storage layer is one layer; right?

A    This is correct.

Q    And does your patent describe the hard magnetic storage layer as one ferromagnetic layer?

A    Yes.

Q    And it says that there is a nucleation host that comprises ferromagnetic layers; right?

A    This is correct.

Q    So is your claim aimed at a stack -- a multilayer exchange-coupled structure that is comprised of multiple layers?

A    Yes.  Definitely.

Q    And your patent -- the claim actually requires that it -- do you understand it to be a comprising claim?

A    Yes.

Q    Is there anything in your claim that says that the nucleation host layers cannot store data?

A    No.  It's -- yeah.

Q    Is it true that in your patent the layers of the nucleation host assist in switching the hard storage layer?

A    This is correct.

Q    And in your patent and in your claims, do they allow for

**UNITED STATES DISTRICT COURT**

the different layers to perform multiple functions?

A    Yes.

Q    And so can the nucleation host layers, in addition to assisting switching, also store data?

A    Yes.  Definitely.

Q    Now, Dr. Lumish --

         Mr. Lumish, I just promoted you.

         MR. LUMISH:  Thank you.

BY MR. LUMISH:

Q    Mr. Lumish was asking you about coercive field.  Do you recall that?  And he was asking you multiple questions about under what conditions H equals 2K over M is accurate?

A    Yes.

Q    If we can -- I'll just show you.  This is PDX-2.20.  This is a slide that you showed that has my handwriting on it -- I apologize -- for the hard -- the coercive field.

         Do you recall that?

A    I recall this.

Q    And what you show is HSL, meaning the H -- the coercive field of the storage layer equals 2K over M.

         Do you see that?

A    Yes.  This is correct.

Q    Is that a correct statement that H -- that the coercive field equals 2K over M at recording scale?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    Now, up above with the nucleation host, he was asking you all these questions about under what conditions it would be accurate.

Do you recall that?

A    Yes.

Q    Now, do you say that the nucleation host coercive field equals 2K effective over M effective there?

A    I don't state this as data.  2 times K effective Ms gives an upper limit; so you know that's a coercive that is smaller than.

Q    Is that consistent with the requirement in your claims that the Hn be less than Hs?

A    If one knows that's effect -- this 2 times K effective times M effective is smaller than the 2 times K Ms of the storage layer, then one definitely knows that the coercive nucleation host is smaller than that of the half layer because it gives an upper limit.

Q    Now, let's switch gears to the prosecution history.

Do you recall that Mr. Lumish was asking you questions about what happened during the prosecution history?

A    Yes, I do.

BY MR. FENSTER:

Q    And, ladies and gentlemen, this is the thickness of the prosecution history.

And the part that Mr. Lumish was asking you about

was about right here in the middle; is that right?

A    I don't know.  But if you tell me, although I don't know.

Q    So in the back-and-forth with the patent office, after all that back-and-forth, did the examiner ultimately conclude that your claims were valid and met all of the requirements of the prior art?

A    Yes.  Definitely.  That's why it's an issued patent.

Q    Do you recall that Mr. Lumish was asking you about a Mr. Dobin and a conversation that you might have had at the Intermag Conference after your presentation?

A    Yes, I do.

Q    Do you recall what Mr. Dobin's reaction to your presentation was?

A    He was very surprised and impressed.

Q    Did he doubt that your -- did he express skepticism that your structure would work?

        MR. LUMISH:  Object to the hearsay, Your Honor.

        THE COURT:  Sustained.

BY MR. FENSTER:

Q    Mr. Lumish was asking you lots of questions about Victora and whether it was called exchange spring or so forth.

        Do you recall that?

A    I do.

Q    Did Dr. Victora or Dr. Wang or Dr. Berger ever discuss a multilayer structure above the hard storage layer that had

varying or graded anisotropy -- increasing anisotropy before your invention?

A     No.

MR. FENSTER:  If you can bring up, Mr. Mortenson, JX-2142.

THE WITNESS:  Excuse me.  Which document?

BY MR. FENSTER:

Q     It's up on the screen.

Do you recall that he was asking you about JX-2142, which was a presentation that you gave in October 16 --

A     This is --

Q     -- on 2007.  Do you recall that?

A     This is correct, yes.

Q     And if we can go to slide -- page 3, please.

And he asked you about this page, about "Overcoming the superparamagnetic limit."  And he asked you about the credits to the bottom -- at the bottom that cite Dr. Victora among others.

Do you see that?

A     I see this.

Q     Did Dr. Victora or Dr. Inaba, did any of those reference -- and it actually cites your 2004 paper and a different paper in 2000 -- did any of those papers solve the superparamagnetic problem?

A     It did not completely decouple it, as mentioned already in

**UNITED STATES DISTRICT COURT**

my representation.  It just gave a different optimization.  But it was still connected with the thermostability and coercivity.

Q    And then if we can go to page 25.

Now, Mr. Lumish in his cross-examination didn't show you this page, did he?

A    He did not.

Q    And this page talks about the bilayer at the top, and then it goes to graded media.

Do you see that?

A    Yes.

Q    And is the graded media referring to your contributions that had a multilayer nucleation host with the cascading anisotropy down toward the hard storage layer?

A    Yes, this is correct.

Q    If we can go to DX-1044.  If you could blow this up a little bit.

And he was referring you to the statement [as read:]

"Recently, Victora and Shen proposed the recording density of perpendicular media is increased in exchange spring media:  a structure with a soft and a hard.  And a decrease in coercivity up to a factor of 4 has been predicted."

Do you see that?

A    I see this.

Q    And that's totally consistent with what you told the jury

about what the Victora bilayer accomplished; correct?

A    I did not tell the jury the factor.

Q    Okay.  Fair enough.

And then it goes on, if you can go just a little bit further.

Mr. Lumish didn't show you the next sentence, right, which says:

"Very recently, Suess considered a trilayer system, reporting further increase."  Right?

A    That's correct.

Q    Okay.  Now, Mr. Lumish was trying to suggest that there was some confusion because Mr. Zimanyi -- Dr. Zimanyi, who had written this, referred to -- used the label "exchange spring" when talking about Dr. Victora.

MR. LUMISH:  Object to the argument, Your Honor.

THE COURT:  Overruled.

BY MR. FENSTER:

Q    Do you recall that?

A    Yes.

Q    And having been in the industry for a long time, has it been the case that "exchange spring" and "exchange coupled composite," those labels have been applied by different people in different ways?

A    Definitely.  Also, Hans Juergen Richter, working at, I think, Western Digital, they also listed different -- different

names.

Q    And so what defines the actual structure that is your invention?

A    The patent claims.

Q    Okay.  And the patent claims talk about a multilayer nucleation host formed on top of a hard storage layer with increasing anisotropy down towards the hard storage layer; is that right?

A    This is correct.

Q    And that structure, did anyone before you have that structure, anyone in the world?

A    No.  At least I don't know about it.

MR. FENSTER:  I'll pass the witness, Your Honor.

MR. LUMISH:  Nothing further, Your Honor.

THE COURT:  Sir, you may step down.  Thank you.

Would you call your next witness, please.

MR. FENSTER:  Your Honor, my partner Minna Chan will be introducing our next witness.

MS. CHAN:  Good morning, everyone.  My name is Minna Chan.

The next witness we would like to call is Mrugresh Desai by video deposition.  To give you some background, he's the senior director of engineering at Western Digital.  He was Western Digital's corporate representative on the design and development of the recording media or disks that are used in

the accused products, including the magnetic attributes of the layers of those disks.

**(Videotaped deposition of Mrugresh Desai**

**played, not reported.)**

MS. CHAN:  Your Honor, plaintiff would now like to move into evidence the exhibits discussed by Dr. Desai, JX-2015, JX-2026, JX-2028, JX-2037, JX-2038, PTX-127, PTX-129, and PTX-130.

MR. HANLE:  Your Honor, we would just confirm that those are the -- match up with the deposition exhibits.  I don't think there's an issue.  We just need to confirm that. And we'll get back to the Court right away on that.

THE COURT:  That's fine.

MS. CHAN:  The next witness we would like to call is also going to be by deposition.  It's Mr. Yoshihiro Ikeda.  He is the former senior technical staff member at Hitachi and then became a senior technologist at Western Digital after the acquisition.  And he will be providing testimony about the design and attributes of the accused products as well as the 2010 paper he published.

And we're estimating a combined total of around 18 minutes.

MR. LUMISH:  That's what I was going to raise, Your Honor, was just the timing issue.

THE COURT:  That would run us to about 4:35.  Is

that doable?  If that's not doable, please tell me.  Does anybody absolutely need to be out of here at 4:30?

THE JUROR:  That's fine.

THE COURT:  Doable?  Okay.

MS. CHAN:  Thank you, Your Honor.

**(Videotaped deposition of Mr. Yoshihiro Ikeda played, not reported.)**

MS. CHAN:  Your Honor, plaintiff would like to move into evidence the exhibits discussed by Dr. Ikeda, JX-2034, JX-2083, and JX-2084.

MR. LUMISH:  No objection, Your Honor.

THE COURT:  2034, 2083, 2084 will be received.

**(Exhibit Numbers JX-2034, JX-2083, JX-2084 received.)**

THE COURT:  And you'll report back to us tomorrow on the others?

MR. HANLE:  We're ready now.  We're able to confirm that those exhibits that were offered are not objected to.

THE COURT:  Okay.  Then 2015, 2026, 2028, 2037, 2038, PTX-127, PTX-129, and PTX-130 will all be received.

**(Exhibit Numbers JX-2015, JX-2026, JX-2028, JX-2037, JX-2038, PTX-127, PTX-129, PTX-130 received.)**

MS. CHAN:  Thank you, Your Honor.

THE COURT:  We're going to conclude here for the

UNITED STATES DISTRICT COURT

day, ladies and gentlemen.  Regular day tomorrow, 9:00 to 4:30.

Please remember the admonition not to discuss the case with anyone.  You're not to form any opinions on the issues in the case until it's submitted to you.

I'll trust you have a good evening.  See you in the morning.

**(Out of the presence of the jury.)**

THE COURT:  If you could provide me the agreed splits on time for the depositions, I'll plug them into my trial log.

MR. KROEGER:  Thank you, Your Honor.  Paul Kroeger for plaintiff.  We've conferred.  For Dr. Desai, MR Tech is charged 23 minutes, and WD is charged 5 minutes.  And for Dr. Ikeda, MR Tech is charged 12 minutes, 30 seconds, and WD is charged 5 minutes.

THE COURT:  Okay.

MR. KROEGER:  And then, Your Honor, was the court reporter transcribing the videos?

THE COURT:  No.

MR. KROEGER:  Okay.  So we will undertake to lodge a final list of clips and then a run of the transcripts for the record.

THE COURT:  Right.  I'll hand out the trial log in the morning, but MR Tech used about 150, and -- well, almost two hours, and Western Digital used about 138.  I'll give you a

UNITED STATES DISTRICT COURT

paper handout in the morning.

MR. LUMISH:  Thank you, Your Honor.

THE COURT:  Anything before we adjourn?

MR. FENSTER:  Not from plaintiff, Your Honor.

MR. LUMISH:  Not for the defense, Your Honor.

THE COURT:  Very good.  See you in the morning.

**(Proceedings concluded at 4:39 p.m.)**

**--oOo--**

**UNITED STATES DISTRICT COURT**

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  July 18, 2024*

                              */S/ DEBBIE HINO-SPAAN*

                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

**$**

**$305** [4] - 83:3, 83:5, 84:20, 85:6
**$67,000** [1] - 84:12

**'**

**'06** [1] - 78:10
**'07** [1] - 78:11
**'846** [1] - 37:8
**'864** [8] - 26:16, 28:22, 29:3, 29:8, 39:10, 58:24, 59:16, 87:1
**'997** [2] - 26:19, 59:2

**/**

**/S** [1] - 99:19

**0**

**0.5** [2] - 33:25, 40:3
**01/2011** [1] - 7:17

**1**

**1** [23] - 10:14, 29:3, 29:8, 29:10, 29:11, 38:2, 39:18, 39:23, 46:20, 47:3, 47:5, 47:7, 47:17, 50:14, 51:9, 53:13, 54:4, 68:2, 71:19, 71:22, 71:25, 86:25
**1-053** [1] - 1:24
**1/25/19** [1] - 7:14
**10** [4] - 6:14, 50:14, 50:15
**100** [3] - 39:10, 66:17, 68:6
**1009** [1] - 66:6
**103** [1] - 52:18
**1041** [2] - 70:8, 70:14
**1044** [2] - 77:3, 77:11
**11** [10] - 43:14, 44:13, 44:16, 44:17, 45:16, 63:20, 64:4, 81:7, 81:9
**118** [2] - 39:6, 39:8
**12** [7] - 10:17, 18:7, 18:11, 55:8, 58:23, 59:14, 97:14
**1200** [1] - 3:5
**1213** [1] - 61:6
**1224** [1] - 3:5
**12424** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**12th** [5] - 2:5, 2:9, 2:13, 2:21, 3:9

**138** [1] - 97:25
**14** [5] - 6:17, 29:2, 29:7, 39:19, 39:24
**140** [4] - 3:19, 4:9, 4:21, 5:5
**15** [5] - 6:19, 43:12, 59:2, 74:11, 77:15
**150** [1] - 97:24
**16** [2] - 7:8, 91:10
**1600** [2] - 4:6, 4:13
**162** [1] - 50:5
**17** [3] - 1:16, 9:1, 45:23
**18** [4] - 12:2, 64:10, 95:21, 99:15
**180** [1] - 86:8
**1970** [1] - 21:2
**1:27** [2] - 1:17, 9:2

**2**

**2** [14] - 1:10, 37:8, 43:20, 44:17, 45:13, 46:18, 47:19, 55:14, 55:15, 72:4, 76:14, 89:8, 89:13, 89:14
**20** [2] - 21:19, 81:5
**200** [1] - 2:17
**2000** [2] - 66:21, 91:23
**20024** [1] - 2:18
**2004** [4] - 20:7, 20:8, 20:13, 91:22
**2005** [5] - 19:9, 20:2, 20:4, 20:10, 20:15
**2006** [25] - 9:18, 10:3, 12:25, 13:2, 13:4, 13:17, 14:9, 14:17, 15:6, 16:10, 16:14, 17:23, 17:24, 18:8, 51:14, 52:9, 61:16, 61:22, 62:23, 70:9, 71:10, 77:22, 77:24, 78:14, 79:4
**2007** [9] - 7:8, 24:16, 75:1, 75:24, 77:19, 77:25, 78:9, 91:12
**2008** [1] - 16:23
**2010** [1] - 95:20
**2014** [3] - 51:3, 51:5, 52:6
**2015** [1] - 96:19
**2017** [5] - 24:17, 24:18, 81:5, 82:5, 83:6
**2018** [2] - 18:9, 21:10
**202-664-0623** [1] - 2:18
**2020** [2] - 21:12, 26:13
**2021** [1] - 21:10
**2024** [6] - 1:16, 9:1,

43:4, 44:12, 63:17, 99:15
**2026** [1] - 96:19
**2028** [1] - 96:19
**2034** [1] - 96:12
**2037** [1] - 96:19
**2038** [1] - 96:20
**2058** [1] - 15:25
**2083** [1] - 96:12
**2084** [1] - 96:12
**2086** [1] - 12:25
**20th** [1] - 3:23
**21** [5] - 38:13, 38:14, 38:16, 38:17, 38:18
**2142** [3] - 74:23, 74:24, 75:6
**22nd** [3] - 43:4, 44:12, 63:17
**23** [1] - 97:13
**24** [2] - 6:5, 38:9
**25** [2] - 24:21, 92:3
**27** [2] - 77:24, 78:14
**28** [2] - 51:3, 99:8
**280** [3] - 14:19, 24:19
**284** [1] - 14:4
**286** [1] - 10:8
**2K** [12] - 42:14, 42:21, 43:10, 46:24, 47:25, 48:8, 48:15, 48:24, 88:12, 88:20, 88:24, 89:7

**3**

**3** [8] - 14:12, 38:3, 56:8, 56:10, 56:21, 63:20, 75:23, 91:14
**30** [1] - 97:14
**310-826-7474** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**312-876-7700** [2] - 3:14, 4:18
**330** [2] - 3:13, 4:17
**35** [1] - 52:18
**350** [1] - 80:25
**3:01** [1] - 74:14
**3:18** [1] - 74:14

**4**

**4** [4] - 14:13, 71:12, 71:13, 92:22
**4/19/18** [1] - 7:23
**411** [1] - 1:24
**45** [2] - 68:15, 68:17
**46** [1] - 37:8
**4:30** [2] - 96:2, 97:1
**4:35** [1] - 95:25

**4:39** [1] - 98:7
**4TH** [1] - 1:24

**5**

**5** [7] - 59:17, 72:21, 82:1, 82:6, 82:25, 97:13, 97:15
**50** [1] - 6:22
**58** [2] - 63:20, 64:4
**5851643** [1] - 52:23
**59** [1] - 63:20

**6**

**60611** [2] - 3:14, 4:18
**61** [3] - 6:24, 68:2, 83:5
**65** [1] - 68:2
**650** [1] - 3:22
**650-328-4600** [4] - 3:20, 4:10, 4:22, 5:6
**660** [2] - 4:5, 4:13

**7**

**7** [2] - 52:17, 59:17
**7/18/08** [1] - 6:21
**70** [1] - 7:5
**714-540-1235** [1] - 3:24
**75** [1] - 7:8
**753** [1] - 99:8
**77** [1] - 7:11
**7953** [2] - 1:23, 99:20
**7th** [1] - 78:8

**8**

**8** [1] - 16:7
**80** [3] - 43:3, 43:6, 43:12
**800** [1] - 2:17
**81** [1] - 43:13
**85** [1] - 6:5
**8:22-cv-01599-JVS-DFM** [1] - 1:7

**9**

**9** [6] - 6:4, 37:7, 43:14, 59:17, 65:17, 68:1
**9,928,864** [1] - 6:22
**9/10/15** [1] - 8:9
**9/11/06** [2] - 6:18, 7:19
**9/9/19** [1] - 8:11
**90** [3] - 44:16, 45:16
**90025** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**91** [2] - 44:17, 45:13

**92626** [1] - 3:23
**92660** [2] - 4:6, 4:14
**92701** [1] - 1:24
**94025** [3] - 3:19, 4:10, 4:21
**94025-1008** [1] - 5:5
**949-725-4000** [1] - 4:14
**949-725-4278** [1] - 4:7
**95** [1] - 6:6
**96** [12] - 6:7, 7:13, 7:15, 7:18, 7:20, 7:22, 8:7, 8:8, 8:10, 8:12, 8:13, 8:15
**9:00** [1] - 97:1

**A**

**able** [4] - 22:14, 39:1, 39:7, 96:17
**above-entitled** [1] - 99:11
**absolutely** [1] - 96:2
**abstract** [19] - 34:16, 34:19, 34:22, 35:2, 35:16, 36:24, 37:2, 37:4, 77:5, 77:14, 78:5, 78:16, 78:23, 79:2, 79:24, 80:10, 80:18, 85:19, 85:24
**Abstract** [1] - 7:11
**academic** [1] - 14:22
**access** [1] - 68:14
**accompanying** [1] - 50:21
**accomplished** [1] - 93:1
**according** [1] - 83:6
**account** [2] - 48:14, 64:18
**accurate** [8] - 12:5, 12:8, 12:19, 45:3, 79:13, 80:6, 88:12, 89:3
**accurately** [1] - 22:25
**accused** [2] - 95:1, 95:19
**accusing** [1] - 33:3
**acquisition** [1] - 95:18
**act** [1] - 68:20
**action** [5] - 54:20, 55:20, 56:10, 56:14, 56:20
**actual** [1] - 94:2
**added** [5] - 51:11, 51:19, 51:25, 52:2, 52:5
**addition** [2] - 13:16, 88:3
**adjourn** [1] - 98:3

**UNITED STATES DISTRICT COURT**

**admitting** [1] - 59:25
**admonition** [2] - 74:12, 97:2
**advantages** [1] - 23:9
**advocating** [1] - 58:5
**afternoon** [6] - 9:9, 9:11, 9:12, 24:4, 74:10, 85:17
**agent** [6] - 29:20, 31:16, 32:3, 32:23, 33:8, 37:12
**agents** [2] - 49:22, 57:3
**ago** [2] - 39:22, 79:16
**agree** [61] - 10:13, 27:7, 27:12, 30:5, 30:11, 32:14, 32:18, 32:20, 33:6, 33:7, 34:3, 34:4, 34:5, 34:8, 34:10, 34:25, 35:1, 35:18, 36:12, 36:21, 37:1, 37:4, 37:21, 38:15, 39:13, 40:15, 41:19, 42:21, 42:23, 43:20, 43:24, 46:10, 46:24, 47:8, 47:11, 47:24, 48:13, 55:4, 55:6, 55:18, 55:24, 56:1, 56:25, 57:2, 57:21, 58:5, 58:12, 58:15, 58:17, 58:21, 59:7, 59:8, 60:2, 60:4, 61:12, 62:11, 65:9, 67:10, 67:13, 69:3, 79:13
**agreed** [4] - 47:12, 84:8, 84:15, 97:8
**agreement** [1] - 46:23
**ahead** [3] - 10:14, 22:18, 85:13
**AICHELE** [1] - 2:16
**aimed** [1] - 87:12
**al** [5] - 6:19, 7:15, 52:22, 68:3, 69:7
**Alabama** [1] - 16:16
**Albert** [1] - 17:6
**Alex** [1] - 65:1
**Alexander** [1] - 61:19
**allow** [1] - 87:25
**almost** [1] - 97:24
**ALSO** [1] - 5:8
**alter** [1] - 11:9
**amazing** [1] - 18:11
**Amendment** [1] - 50:7
**amendment** [1] - 50:10
**Amendments** [1] - 51:8
**amendments** [3] - 50:20, 50:22, 51:4

**American** [9] - 7:11, 77:6, 77:18, 78:6, 78:16, 79:4, 79:9, 80:10, 80:19
**amount** [1] - 60:6
**ANA** [3] - 1:18, 1:24, 9:1
**Analysis** [1] - 6:24
**analysis** [1] - 22:12
**AND** [5] - 3:3, 3:17, 4:3, 4:16, 5:3
**Andy** [1] - 5:10
**ANGELES** [1] - 99:3
**Angeles** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**angle** [1] - 68:15
**animation** [1] - 11:14
**anis** [1] - 10:21
**anisotropy** [29] - 10:20, 11:7, 12:10, 12:24, 22:6, 22:9, 30:6, 30:10, 30:13, 30:18, 30:24, 37:15, 46:4, 46:5, 47:14, 47:16, 47:21, 47:22, 47:23, 72:13, 73:11, 73:12, 73:25, 91:1, 92:13, 94:7
**anisotropy..** [1] - 36:2
**annual** [1] - 84:21
**answer** [6] - 28:12, 44:13, 45:11, 45:25, 48:21, 64:9
**answered** [2] - 46:1, 46:22
**answering** [2] - 30:19, 85:12
**anyway** [1] - 53:18
**apologies** [2] - 35:13, 48:6
**apologize** [3] - 35:11, 36:6, 88:16
**APPEARANCES** [4] - 2:1, 3:1, 4:1, 5:1
**Applicant** [1] - 54:18
**Applicant's** [1] - 54:21
**application** [6] - 11:9, 29:14, 58:24, 59:25, 61:1, 71:11
**applications** [3] - 67:20, 75:25, 81:8
**applied** [10] - 17:23, 18:1, 18:4, 18:13, 46:8, 46:15, 48:9, 48:16, 48:17, 93:22
**appreciate** [1] - 74:20
**approximation** [17] - 42:22, 43:11, 43:21, 43:25, 44:2, 45:21,

45:22, 46:12, 46:13, 46:25, 47:14, 47:18, 47:20, 48:1, 48:8, 48:15, 48:25
**archive** [6] - 66:11, 66:14, 66:15, 66:16, 66:18, 66:20
**areal** [3] - 21:23, 22:16, 23:12
**Areal** [1] - 7:17
**argue** [1] - 84:25
**argument** [9] - 54:19, 54:21, 55:2, 55:3, 55:5, 55:10, 55:12, 56:8, 93:15
**argumentative** [1] - 84:23
**argumenting** [1] - 55:8
**arguments** [9] - 50:21, 51:4, 52:16, 53:17, 55:13, 58:9, 58:13, 58:18, 59:5
**arrows** [2] - 73:2, 73:7
**art** [13] - 18:10, 18:12, 18:22, 19:10, 21:5, 53:24, 54:8, 57:8, 57:17, 58:8, 59:9, 80:22, 90:6
**article** [8] - 14:17, 15:16, 15:18, 19:9, 20:2, 66:11, 66:15, 66:20
**articles** [1] - 14:19
**aspect** [1] - 39:15
**asserted** [5] - 37:18, 38:21, 54:9, 57:14, 62:13
**asset** [1] - 28:14
**assist** [2] - 34:9, 87:23
**Assisted** [1] - 62:5
**assisting** [1] - 88:4
**AT** [4] - 2:20, 4:9, 4:16, 4:20
**attached** [1] - 6:16
**ATTORNEY** [4] - 2:20, 4:9, 4:16, 4:20
**attributes** [2] - 95:1, 95:19
**August** [1] - 5:9
**AUGUST** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**author** [7] - 68:5, 70:22, 75:16, 76:17, 80:7, 80:10, 80:12
**authors** [5] - 70:20, 70:23, 71:8, 75:9, 75:19
**Avenue** [3] - 2:17,

3:13, 4:17
**average** [2] - 23:2, 84:21
**awards** [1] - 82:1
**aware** [2] - 18:13, 60:25

## B

**back-and-forth** [3] - 49:21, 90:3, 90:4
**back-and-forths** [1] - 59:4
**background** [2] - 24:12, 94:22
**bad** [10] - 23:6, 44:1, 44:4, 46:25, 47:14, 47:20, 48:1, 48:8, 48:15, 48:24
**BALI** [1] - 4:5
**ball** [1] - 15:11
**barrier** [1] - 12:19
**based** [2] - 15:8, 21:14
**basis** [1] - 26:9
**Beach** [2] - 4:6, 4:14
**bears** [3] - 79:6, 79:12, 80:5
**became** [2] - 71:3, 95:17
**become** [2] - 14:24, 15:2
**beginning** [4] - 44:13, 45:16, 53:10, 64:4
**begins** [4] - 37:7, 43:12, 64:9
**behalf** [2] - 27:10, 79:3
**behind** [3] - 29:23, 79:6, 80:5
**below** [2] - 11:2, 76:14
**beneficiary** [2] - 27:7, 27:12
**benefit** [2] - 21:23, 22:5
**benefits** [1] - 21:22
**Berger** [8] - 19:1, 19:16, 19:18, 19:19, 19:22, 20:10, 20:12, 90:24
**Bertero** [2] - 70:23, 71:2
**best** [1] - 45:3
**better** [1] - 23:7
**between** [9] - 11:5, 18:9, 34:23, 37:23, 41:4, 49:21, 58:24, 86:15, 86:18
**beyond** [1] - 13:8
**big** [4] - 33:7, 56:24, 57:4, 84:19

**bilayer** [5] - 19:9, 19:11, 19:12, 92:7, 93:1
**bilayers** [1] - 74:2
**billionth** [1] - 46:20
**binder** [15] - 9:22, 13:20, 15:17, 28:21, 49:15, 49:19, 60:15, 60:19, 65:23, 65:24, 70:4, 74:9, 74:22, 76:25
**biographical** [1] - 81:20
**biological** [1] - 81:19
**bit** [11] - 11:17, 12:1, 22:25, 23:5, 23:7, 39:21, 49:5, 69:20, 76:8, 92:16, 93:4
**bits** [2] - 11:20, 11:25
**bledahl@raklaw. com** [1] - 2:11
**block** [1] - 50:15
**blow** [6] - 19:17, 20:18, 34:19, 38:4, 39:23, 92:15
**blue** [2] - 31:10, 34:24
**bottom** [25] - 16:23, 20:5, 29:7, 37:15, 37:17, 38:13, 38:20, 50:6, 50:13, 50:16, 52:11, 52:18, 70:24, 72:14, 72:18, 73:1, 73:6, 73:23, 74:1, 74:4, 74:5, 74:7, 78:13, 91:17
**Boulevard** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**break** [2] - 9:16, 74:10
**breaks** [1] - 16:19
**BRIAN** [1] - 2:8
**bridges** [1] - 25:4
**bring** [8] - 29:1, 44:20, 53:13, 55:13, 55:15, 59:15, 70:16, 91:4
**BUCZKO** [1] - 2:12
**BY** [48] - 2:8, 2:16, 3:8, 3:12, 3:18, 3:22, 4:5, 4:9, 4:12, 4:16, 4:20, 5:4, 6:4, 9:15, 10:10, 14:8, 16:2, 19:8, 20:19, 21:1, 24:3, 31:11, 39:20, 43:5, 44:22, 45:17, 50:4, 51:1, 51:17, 53:15, 54:12, 61:8, 62:18, 63:11, 64:1, 69:19, 70:18, 74:18, 75:8, 77:13, 84:18, 85:5, 85:16, 88:9, 89:22,

90:19, 91:7, 93:17

## C

CA [1] - 1:24
calculation [1] - 83:7
California [14] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10, 3:19, 3:23, 4:6, 4:10, 4:14, 4:21, 5:5, 99:7
CALIFORNIA [4] - 1:2, 1:18, 9:1, 99:4
CALLED [1] - 6:4
cancer [2] - 25:11, 25:18
candidate [1] - 26:10
cannot [5] - 42:23, 46:21, 68:24, 86:11, 87:20
capacity [2] - 21:24, 23:12
career [1] - 14:22
careful [2] - 35:10, 79:12
CARLSON [2] - 4:4, 4:12
cascading [1] - 92:12
Case [1] - 1:6
case [29] - 21:16, 24:24, 25:8, 25:15, 27:8, 27:13, 28:4, 28:15, 29:17, 29:18, 29:24, 39:16, 42:14, 43:22, 44:23, 47:7, 54:10, 57:14, 57:16, 57:23, 71:9, 76:1, 76:10, 82:12, 83:3, 86:1, 93:21, 97:3, 97:4
cases [3] - 43:11, 43:21, 43:22
Center [3] - 3:22, 4:5, 4:13
Central [1] - 99:7
CENTRAL [1] - 1:2
CERTIFICATE [1] - 99:1
Certified [1] - 1:5
certify [1] - 99:7
chaaru.deb@lw.com [1] - 4:11
CHAARUSHENA [1] - 4:9
chain [2] - 64:12, 64:20
Challenges [1] - 8:11
CHAN [7] - 2:20, 94:19, 95:5, 95:14, 96:5, 96:8, 96:24

Chan [2] - 94:17, 94:20
CHANG [1] - 3:12
changed [3] - 9:19, 51:14, 52:15
changes [1] - 59:5
charged [4] - 97:13, 97:14, 97:15
check [1] - 66:12
checked [1] - 18:10
Chicago [2] - 3:14, 4:18
Choe [1] - 7:15
chosen [1] - 80:15
Chris [1] - 5:11
citation [1] - 59:19
citations [1] - 81:25
cite [5] - 59:18, 60:10, 66:10, 81:24, 91:17
cited [15] - 14:17, 14:18, 14:19, 14:21, 18:15, 18:19, 19:4, 19:9, 19:19, 21:3, 59:14, 60:23, 66:11, 66:19, 69:7
cites [2] - 60:5, 91:22
citing [1] - 59:24
Claim [12] - 29:3, 29:8, 29:10, 29:11, 39:18, 39:23, 51:8, 51:9, 52:18, 56:10, 56:21, 86:25
claim [29] - 30:1, 30:7, 30:9, 30:14, 30:15, 30:25, 31:2, 31:4, 31:7, 31:12, 31:15, 31:22, 32:15, 32:17, 32:18, 33:3, 34:11, 38:6, 40:15, 41:10, 41:12, 51:25, 54:1, 83:13, 86:23, 87:12, 87:16, 87:17, 87:19
claimed [3] - 39:15, 53:20, 55:20
claiming [1] - 26:3
claims [20] - 37:18, 37:19, 38:20, 38:21, 50:10, 50:20, 51:14, 51:19, 51:22, 52:21, 53:25, 54:2, 86:2, 86:15, 86:21, 87:25, 89:11, 90:5, 94:4, 94:5
clear [1] - 65:8
clearly [1] - 33:24
clips [1] - 97:21
co [16] - 68:5, 70:20, 70:22, 70:23, 71:6, 71:8, 71:9, 75:9, 75:15, 75:16, 75:18,

75:19, 76:17, 80:10, 80:12
co-author [6] - 68:5, 70:22, 75:16, 76:17, 80:10, 80:12
co-authors [5] - 70:20, 70:23, 71:8, 75:9, 75:19
co-inventors [2] - 71:6, 71:9
co-presented [1] - 75:18
co-presenter [1] - 75:15
co-presenters [1] - 70:20
coarse [3] - 42:22, 43:10, 43:21
Code [1] - 99:8
coercive [28] - 12:22, 31:17, 33:24, 39:21, 40:1, 40:7, 40:16, 40:20, 40:23, 41:8, 41:14, 41:17, 41:19, 41:22, 42:4, 42:6, 42:20, 42:22, 46:17, 46:19, 48:9, 88:10, 88:16, 88:19, 88:23, 89:6, 89:9, 89:15
coercivity [6] - 13:7, 14:25, 15:1, 16:18, 92:2, 92:22
Coey [1] - 17:16
colleagues [1] - 67:6
column [1] - 37:8
Column [2] - 59:17, 68:2
combined [2] - 84:5, 95:21
combining [1] - 67:19
comments [2] - 50:21, 51:4
companies [3] - 13:15, 21:13, 84:9
company [4] - 14:20, 26:23, 83:3, 84:11
comparison [1] - 68:24
compass [1] - 11:15
compensation [1] - 23:18
completely [6] - 12:14, 14:25, 47:11, 54:20, 72:13, 91:25
component [4] - 31:22, 35:17, 73:11, 73:12
components [11] - 27:25, 28:4, 33:9, 33:11, 33:12, 33:13,

34:2, 35:8, 36:10, 37:2, 39:14
composite [8] - 68:9, 68:20, 69:15, 69:24, 72:7, 80:9, 80:17, 93:22
Composite [2] - 6:15, 71:18
Composition [1] - 7:21
comprised [1] - 87:13
comprises [3] - 30:12, 52:13, 87:10
comprising [1] - 87:17
concept [9] - 13:9, 14:10, 14:24, 15:1, 15:10, 15:12, 15:15, 16:13, 69:14
concepts [1] - 15:9
conclude [2] - 90:4, 96:25
concluded [1] - 98:7
condition [2] - 46:20, 49:3
conditions [7] - 43:23, 43:24, 46:11, 46:12, 48:16, 88:12, 89:2
Conference [5] - 9:18, 10:3, 13:17, 90:10, 99:12
conference [13] - 10:2, 13:6, 17:3, 17:15, 25:22, 61:22, 62:2, 65:14, 75:15, 75:18, 77:19, 77:25, 78:2
conferences [1] - 67:4
conferred [1] - 97:12
confession [1] - 60:6
confirm [4] - 58:22, 95:9, 95:11, 96:17
conformance [1] - 99:12
confusion [1] - 93:12
connected [2] - 13:8, 92:2
consider [2] - 67:6, 67:8
considered [2] - 26:10, 93:8
considering [1] - 20:22
consistent [4] - 35:5, 86:21, 89:11, 92:25
constant [7] - 12:20, 46:4, 46:6, 47:14, 47:16, 47:21
constants [2] - 47:22, 47:23
construction [1] -

54:1
consultant [1] - 5:11
contains [1] - 86:23
contend [1] - 18:23
context [1] - 45:7
Continue [1] - 9:14
continue [1] - 46:3
Continued [5] - 3:1, 4:1, 5:1, 7:1, 8:2
continued [1] - 6:4
contradicting [2] - 56:11, 56:21
contribute [1] - 11:17
contributed [3] - 16:21, 21:25, 22:15
contributions [1] - 92:11
conversation [1] - 90:9
conveying [1] - 32:6
copying [1] - 60:7
corner [2] - 29:8, 50:6
corporate [3] - 5:9, 5:12, 94:24
correct [101] - 10:16, 13:1, 17:22, 25:1, 25:9, 25:19, 26:2, 26:5, 26:8, 26:15, 26:18, 26:20, 26:25, 27:1, 27:21, 27:24, 28:2, 28:6, 28:8, 28:12, 28:13, 28:19, 29:16, 29:19, 30:8, 31:1, 31:7, 31:14, 32:7, 32:8, 33:1, 38:12, 38:21, 40:5, 40:9, 40:13, 40:18, 40:22, 40:25, 41:2, 41:6, 42:9, 42:12, 43:16, 44:25, 48:10, 51:6, 51:20, 51:23, 52:2, 52:7, 57:20, 57:24, 59:3, 59:23, 60:24, 61:2, 61:10, 61:20, 61:23, 62:6, 62:10, 64:8, 67:24, 68:12, 69:25, 71:5, 72:6, 72:11, 75:11, 76:15, 76:18, 76:23, 77:23, 81:4, 81:12, 81:17, 81:18, 81:23, 82:8, 82:20, 82:23, 83:7, 83:11, 83:14, 83:18, 84:4, 87:3, 87:5, 87:11, 87:24, 88:22, 88:23, 91:13, 92:14, 93:1, 93:10, 94:9, 99:9
correcting [1] - 40:19
correctly [1] - 40:4

**Costa** [1] - 3:23
**counsel** [1] - 42:13
**COUNSEL** [4] - 2:1, 3:1, 4:1, 5:1
**Counterclaim** [2] - 1:6, 1:10
**COUNTERCLAIM** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**counting** [1] - 35:25
**COUNTY** [1] - 99:3
**couple** [2] - 30:25, 53:18
**coupled** [11] - 6:20, 11:21, 16:3, 32:19, 52:5, 68:19, 69:24, 80:9, 87:1, 87:13, 93:21
**course** [9] - 11:13, 18:14, 19:5, 19:14, 19:21, 21:4, 30:3, 34:6, 65:6
**COURT** [45] - 1:1, 1:23, 9:9, 10:6, 10:8, 14:4, 15:23, 15:25, 23:21, 23:24, 44:18, 50:2, 51:16, 54:11, 61:6, 62:17, 63:2, 63:6, 63:25, 70:14, 74:10, 74:16, 75:6, 77:11, 84:16, 84:24, 85:2, 85:10, 90:18, 93:16, 94:15, 95:13, 95:25, 96:4, 96:12, 96:15, 96:19, 96:25, 97:8, 97:16, 97:19, 97:23, 98:3, 98:6, 99:6
**court** [1] - 97:17
**Court** [5] - 9:7, 54:1, 95:12, 99:6, 99:20
**courtroom** [1] - 66:23
**COURTROOM** [2] - 9:6, 74:13
**covers** [1] - 30:10
**created** [3] - 25:3, 72:23, 72:24
**credit** [3] - 72:4, 76:13, 76:16
**crediting** [2] - 72:1, 79:16
**credits** [1] - 91:17
**critical** [1] - 39:15
**criticize** [1] - 42:14
**cross** [1] - 92:4
**Cross** [1] - 6:5
**CROSS** [1] - 24:2
**cross-examination** [1] - 92:4
**Cross-Examination**

[1] - 6:5
**CROSS-EXAMINATION** [1] - 24:2
**crossed** [3] - 51:9, 51:19, 52:14
**crossing** [2] - 51:11, 85:4
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 99:20

**D**

**D.C** [1] - 2:18
**DALE** [1] - 3:12
**damages** [1] - 83:2
**data** [7] - 11:12, 11:17, 34:7, 86:11, 87:20, 88:4, 89:8
**Data** [1] - 8:7
**Date** [3] - 77:21, 78:14, 99:15
**date** [4] - 51:2, 78:2, 78:16, 81:5
**Davis** [1] - 78:22
**DAY** [1] - 1:10
**dchang@raklaw. com** [1] - 3:15
**DEB** [1] - 4:9
**debate** [1] - 13:9
**DEBBIE** [3] - 1:23, 99:5, 99:19
**Debbie** [1] - 99:20
**decision** [1] - 58:14
**deck** [2] - 7:5, 75:9
**decouple** [4] - 13:10, 16:18, 17:10, 91:25
**decrease** [2] - 59:20, 92:21
**defective** [1] - 23:6
**DEFENDANT** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**Defendant** [2] - 1:6, 1:9
**defendant's** [2] - 5:11, 5:11
**defense** [1] - 98:5
**define** [2] - 23:7, 85:25
**defined** [1] - 46:17
**defines** [2] - 42:19, 94:2
**definitely** [19] - 14:23, 15:8, 28:11, 28:25, 31:3, 44:3, 48:10, 67:7, 67:9, 75:14, 75:16, 79:11, 83:25, 84:10, 87:15, 88:5, 89:15, 90:7, 93:24
**degree** [1] - 68:17

**degrees** [1] - 68:15
**deleted** [1] - 52:11
**density** [6] - 21:24, 22:16, 23:13, 25:19, 80:1, 92:19
**Density** [1] - 7:17
**department** [1] - 16:16
**depict** [1] - 12:5
**deposed** [2] - 44:23, 47:8
**deposited** [1] - 52:12
**deposition** [15] - 6:6, 6:7, 42:24, 43:3, 43:6, 44:11, 45:4, 63:16, 63:18, 65:6, 94:22, 95:3, 95:10, 95:15, 96:6
**depositions** [1] - 97:9
**DEPUTY** [2] - 9:6, 74:13
**Desai** [8] - 5:12, 7:22, 8:8, 8:10, 94:22, 95:3, 95:6, 97:12
**DESAI** [1] - 6:6
**describe** [10] - 30:3, 31:16, 33:14, 33:15, 33:17, 33:23, 37:4, 64:13, 64:14, 87:6
**described** [7] - 9:17, 30:16, 31:4, 40:23, 61:25, 62:7, 86:2
**describes** [2] - 31:22, 87:1
**describing** [6] - 9:16, 14:9, 38:11, 65:10, 73:10, 73:17
**Design** [1] - 7:20
**design** [2] - 94:24, 95:19
**detail** [1] - 49:6
**details** [1] - 30:1
**determine** [4] - 22:11, 22:14, 47:25, 48:7
**determining** [1] - 48:14
**develop** [4] - 21:13, 27:19, 27:22, 27:25
**development** [1] - 94:25
**dhinospaan@yahoo. com** [1] - 1:25
**diameter** [1] - 22:2
**Diego** [2] - 10:2, 61:22
**Dieter** [2] - 5:9, 50:16
**DIETER** [2] - 6:4, 9:13
**difference** [1] - 11:5
**different** [26] - 11:22, 12:15, 23:2, 24:22, 33:23, 34:1, 34:2, 40:23, 40:24, 53:17,

58:16, 61:18, 69:5, 72:10, 73:16, 80:8, 83:1, 88:1, 91:23, 92:1, 93:22, 93:23, 93:25
**differently** [1] - 42:15
**Digital** [23] - 1:8, 5:12, 23:16, 24:6, 53:5, 57:22, 58:6, 58:13, 58:20, 58:22, 71:2, 71:4, 83:9, 83:16, 83:19, 83:24, 84:1, 84:8, 84:11, 93:25, 94:23, 95:17, 97:25
**Digital's** [1] - 94:24
**dimension** [1] - 64:18
**dimensional** [2] - 64:17, 64:19
**direct** [7] - 25:2, 57:7, 59:10, 72:12, 74:3, 76:9, 83:8
**DIRECT** [1] - 9:14
**Direct** [1] - 6:4
**direction** [5] - 11:15, 11:16, 11:21, 11:22, 12:1
**directly** [1] - 17:5
**director** [1] - 94:23
**disagree** [1] - 34:15
**disagreeing** [1] - 48:23
**disclose** [2] - 18:12, 58:8
**disclosed** [3] - 53:24, 62:11, 67:18
**disclosing** [1] - 73:10
**discovery** [2] - 13:17, 17:9
**discrete** [1] - 11:5
**discreteness** [1] - 11:5
**discuss** [3] - 58:22, 90:24, 97:2
**discussed** [4] - 18:8, 29:21, 95:6, 96:9
**discussion** [2] - 13:9, 56:4
**discussions** [2] - 16:17, 75:14
**disk** [4] - 27:19, 27:22, 30:17, 84:22
**disks** [2] - 94:25, 95:2
**distinct** [11] - 33:9, 33:12, 33:13, 33:20, 36:22, 37:2, 37:4, 39:14, 86:14, 86:18, 86:22
**distinction** [3] - 34:23, 37:22, 37:23
**distinguish** [1] - 72:10

**distinguishing** [2] - 41:3, 72:7
**District** [2] - 99:6, 99:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**DIVISION** [1] - 1:2
**divisions** [1] - 83:20
**doable** [3] - 96:1, 96:4
**Dobin** [17] - 61:19, 61:21, 61:25, 62:16, 62:19, 62:22, 63:13, 64:18, 64:24, 65:1, 65:10, 65:14, 65:23, 66:9, 66:19, 66:20, 90:9
**Dobin's** [1] - 90:12
**Doctor** [1] - 24:4
**document** [12] - 9:23, 9:24, 13:21, 13:22, 39:6, 49:16, 50:7, 56:19, 66:13, 77:21, 80:5, 91:6
**documents** [1] - 74:19
**Domain** [2] - 7:5, 62:4
**done** [3] - 49:10, 71:22, 73:13
**doubt** [2] - 78:15, 90:15
**doug.lumish@lw. com** [1] - 3:20
**DOUGLAS** [1] - 3:18
**down** [25] - 25:4, 32:9, 33:16, 35:2, 35:20, 36:14, 45:23, 53:11, 64:9, 65:20, 68:21, 69:2, 69:18, 71:25, 72:14, 73:6, 73:25, 76:13, 78:13, 79:18, 81:25, 83:2, 92:13, 94:7, 94:15
**Dr** [58] - 9:12, 22:5, 23:14, 23:19, 25:22, 26:3, 26:6, 54:5, 57:11, 57:19, 59:18, 60:1, 61:21, 61:25, 62:16, 62:19, 62:22, 63:13, 64:24, 65:10, 65:14, 66:22, 66:25, 67:10, 67:14, 67:18, 68:4, 68:18, 69:1, 69:20, 69:23, 70:2, 71:2, 71:25, 72:8, 72:19, 73:10, 73:14, 73:17, 76:16, 76:17, 80:12, 81:15, 85:17, 88:6, 90:24, 91:17, 91:21, 93:12, 93:14, 95:6, 96:9, 97:12, 97:14
**draft** [1] - 75:12

draw [2] - 37:21, 37:23
draws [1] - 34:22
Drive [7] - 3:19, 3:22, 4:5, 4:9, 4:13, 4:21, 5:5
drive [3] - 27:22, 28:3, 84:22
drives [3] - 27:19, 28:1, 28:3
drop [6] - 35:2, 35:20, 36:14, 64:9, 73:6, 81:25
due [1] - 22:2
during [4] - 22:3, 22:20, 22:23, 89:20
DX [2] - 60:17, 66:5
DX-1009 [3] - 65:22, 66:9, 66:18
DX-1041 [6] - 7:5, 70:4, 70:11, 70:15, 71:12, 72:21
DX-1044 [7] - 7:11, 76:25, 77:1, 77:5, 77:8, 77:12, 92:15
DX-1213 [6] - 6:24, 60:15, 60:18, 60:22, 61:3, 61:7
DX-2142 [1] - 74:9
dynamic [2] - 68:9, 68:13
dynamically [2] - 69:16, 69:17

## E

earned [1] - 15:5
easily [1] - 39:5
easy [1] - 18:6
ECC [6] - 69:24, 71:19, 72:7, 76:14, 76:16, 76:19
effect [4] - 22:25, 42:11, 47:6, 89:13
effective [5] - 89:7, 89:8, 89:13, 89:14
effort [2] - 29:13, 49:10
eight [3] - 30:14, 51:21, 52:8
eighth [1] - 36:14
either [3] - 27:22, 32:3, 85:24
Electronics [3] - 26:24, 27:6
elements [1] - 62:1
embodiment [1] - 53:21
embodiments [1] - 38:18
employed [2] - 53:3,

53:7
end [1] - 25:20
energy [2] - 12:5, 12:12
engineer [2] - 53:4, 84:22
engineering [1] - 94:23
Enhancement [1] - 7:15
entire [1] - 45:11
entities [1] - 49:3
entitled [1] - 99:11
entity [1] - 39:10
entry [1] - 66:14
enumerate [1] - 53:16
equals [4] - 88:12, 88:20, 88:24, 89:7
equation [5] - 42:13, 42:18, 42:19, 43:20, 43:25
equipment [1] - 82:19
ESQ [12] - 2:4, 2:8, 2:12, 2:16, 3:4, 3:8, 3:12, 3:18, 3:22, 4:5, 4:12, 5:4
estimating [1] - 95:21
et [5] - 6:19, 7:15, 52:22, 68:3, 69:7
Europe [1] - 14:24
European [1] - 17:3
evening [1] - 97:5
evidence [11] - 10:5, 14:2, 15:22, 49:25, 61:4, 70:12, 75:4, 77:9, 79:21, 95:6, 96:9
EVIDENCE [3] - 6:13, 7:4, 8:6
exact [1] - 67:11
exactly [8] - 10:23, 12:11, 14:11, 14:16, 19:11, 61:10, 65:7, 66:12
EXAMINATION [3] - 9:14, 24:2, 85:15
Examination [3] - 6:4, 6:5, 6:5
examination [5] - 25:2, 57:7, 76:9, 83:8, 92:4
examined [2] - 18:16, 57:15
examiner [11] - 19:22, 54:6, 54:24, 55:5, 55:11, 58:1, 58:3, 81:3, 81:21, 90:4
examining [1] - 19:23
example [5] - 28:23, 47:23, 49:14, 60:11,

68:15
Excel [5] - 7:20, 8:7, 8:12, 8:13, 8:15
exchange [24] - 6:17, 7:19, 11:21, 19:11, 20:6, 20:12, 52:4, 68:19, 69:24, 72:7, 72:9, 76:13, 79:17, 80:2, 80:9, 80:13, 80:17, 87:1, 87:13, 90:21, 92:20, 93:13, 93:21
Exchange [5] - 6:20, 7:9, 13:24, 16:3, 72:3
exchange-coupled [4] - 68:19, 69:24, 80:9, 87:13
Exchange-coupled [2] - 6:20, 16:3
Exchange]Coupled [1] - 6:24
Excuse [1] - 22:5
excuse [2] - 40:12, 91:6
Exhibit [11] - 10:9, 14:5, 16:1, 50:3, 61:7, 70:8, 70:15, 75:7, 77:12, 96:13, 96:21
EXHIBIT [3] - 6:13, 7:4, 8:6
exhibits [5] - 66:4, 95:6, 95:10, 96:9, 96:18
EXHIBITS [3] - 6:11, 7:2, 8:4
experience [1] - 16:25
expert [3] - 54:9, 67:8, 67:11
explain [8] - 10:25, 11:4, 15:15, 22:18, 38:15, 38:17, 48:11, 68:19
explained [1] - 21:21
explaining [1] - 15:10
express [1] - 90:15

## F

facilities [1] - 82:18
fact [5] - 22:2, 41:7, 63:7, 69:11, 78:16
factor [5] - 22:20, 48:7, 59:20, 92:22, 93:2
factors [3] - 21:24, 22:8, 22:19
fair [15] - 23:18, 28:16, 29:24, 29:25, 33:11,

39:17, 41:5, 43:2, 50:23, 58:11, 60:9, 60:13, 76:8, 82:16, 93:3
falling [1] - 25:4
familiar [1] - 41:24
families [1] - 24:22
famous [1] - 16:21
fantastic [1] - 13:6
far [3] - 61:20, 61:24, 69:14
fast [3] - 46:8, 46:15, 48:9
FEDERAL [2] - 1:23, 99:5
Federal [1] - 99:20
fees [1] - 28:18
fellow [1] - 16:21
felt [3] - 54:24, 55:10
FENSTER [46] - 2:4, 9:11, 9:15, 10:4, 10:10, 14:1, 14:6, 14:8, 15:21, 16:2, 19:6, 19:8, 20:17, 20:19, 20:25, 21:1, 23:20, 43:1, 44:15, 44:19, 45:9, 45:14, 50:1, 51:12, 53:22, 54:7, 61:5, 62:12, 62:25, 63:21, 70:13, 75:5, 77:10, 84:13, 84:17, 84:23, 85:9, 85:16, 89:22, 90:19, 91:4, 91:7, 93:17, 94:13, 94:17, 98:4
Fenster [3] - 6:4, 6:5, 9:10
ferromagnetic [4] - 30:12, 37:14, 87:7, 87:10
Fert [3] - 17:6, 25:22, 26:3
Fert's [1] - 26:6
few [1] - 78:11
field [32] - 12:22, 31:17, 33:25, 40:1, 40:7, 40:16, 40:20, 40:23, 41:8, 41:14, 41:16, 41:18, 41:19, 42:20, 42:22, 46:8, 46:15, 46:18, 46:19, 48:9, 48:16, 67:8, 67:11, 69:24, 74:6, 88:10, 88:16, 88:20, 88:24, 89:6
fields [5] - 39:21, 41:5, 41:22, 42:4, 42:6
fifth [1] - 35:23
Figure [3] - 14:12, 16:7, 38:2

figure [4] - 14:13, 15:19, 38:5, 38:11
File [1] - 6:22
file [4] - 49:20, 49:23, 66:3, 80:23
filed [7] - 18:7, 49:11, 51:21, 59:6, 61:1, 75:25, 81:8
filing [2] - 58:24, 67:20
Films [1] - 6:25
final [2] - 54:1, 97:21
Final [1] - 50:7
financial [2] - 21:15, 21:18
fine [3] - 33:5, 95:13, 96:3
finished [1] - 48:6
firm [1] - 27:9
first [28] - 10:15, 18:1, 18:3, 18:4, 19:8, 20:6, 30:16, 31:16, 34:17, 34:21, 34:22, 37:9, 38:4, 40:1, 49:19, 50:10, 50:25, 53:16, 53:18, 53:20, 56:9, 58:12, 58:17, 58:21, 59:6, 61:16, 70:19, 81:2
five [3] - 53:17, 59:20, 79:18
fixed [1] - 76:10
flavors [1] - 80:8
flew [1] - 58:2
Floor [6] - 2:5, 2:9, 2:13, 2:21, 3:9, 3:23
fluctuations [1] - 22:22
folks [1] - 70:20
follows [1] - 32:14
Footnote [2] - 71:19, 72:4
FOR [5] - 2:3, 3:3, 3:17, 4:3, 5:3
foregoing [1] - 99:9
forgot [1] - 30:20
form [1] - 97:3
formally [1] - 24:4
format [1] - 99:11
formed [11] - 21:11, 21:12, 26:13, 31:19, 33:17, 33:21, 38:22, 51:25, 52:4, 94:6
former [1] - 95:16
formula [3] - 31:17, 46:18, 49:3
forth [7] - 18:9, 49:21, 55:8, 59:5, 90:3, 90:4, 90:21
forths [1] - 59:4

**fortunately** [1] - 67:5
**four** [1] - 33:16
**fourth** [1] - 35:20
**frankly** [1] - 54:5
**FRENKEL** [1] - 5:4
**friendly** [1] - 67:6
**front** [15] - 19:12, 19:22, 21:6, 42:24, 57:8, 57:12, 57:13, 57:17, 60:16, 60:20, 60:21, 70:6, 70:16, 77:3, 78:4
**fuel** [1] - 15:1
**fully** [1] - 46:10
**functions** [2] - 34:1, 88:1

## G

**gaining** [1] - 15:7
**gears** [4] - 49:7, 66:22, 80:21, 89:18
**general** [1] - 67:17
**gentleman** [1] - 61:19
**gentlemen** [4] - 9:9, 9:12, 89:23, 97:1
**Gerardo** [1] - 70:23
**Gergely** [1] - 78:20
**GMBH** [1] - 1:4
**Graded** [1] - 78:24
**graded** [8] - 10:21, 12:10, 12:24, 30:6, 30:7, 91:1, 92:8, 92:11
**gradient** [2] - 23:7, 42:7
**grain** [6] - 22:21, 46:7, 48:2, 48:4, 48:13, 49:1
**grains** [4] - 22:1, 22:3, 23:1, 68:17
**grant** [1] - 82:1
**grants** [5] - 82:5, 82:9, 82:17, 82:25, 83:5
**gray** [3] - 72:18, 73:8, 73:23
**great** [2] - 13:3, 14:7
**greater** [1] - 40:3
**green** [5] - 32:12, 32:15, 33:16, 34:24, 37:5
**GREGORY** [1] - 5:4
**GS9** [1] - 8:12
**GT5** [1] - 8:13
**guess** [3] - 26:12, 55:12, 60:18

## H

**habilitation** [1] - 14:23

**Hac** [1] - 2:16
**Hagedorn** [10] - 19:2, 21:2, 59:10, 59:18, 59:19, 59:21, 60:14, 60:22, 61:18, 62:1
**Hagedorn's** [1] - 60:1
**Hagedorn-1** [1] - 6:24
**half** [6] - 40:8, 40:10, 40:11, 40:12, 40:17, 89:16
**halfway** [1] - 79:19
**hand** [2] - 66:13, 97:23
**handed** [3] - 28:21, 49:16, 65:25
**handout** [1] - 98:1
**hands** [1] - 29:22
**handwriting** [1] - 88:15
**HANLE** [3] - 4:12, 95:9, 96:17
**Hans** [1] - 93:24
**happy** [3] - 12:4, 35:13, 63:12
**hard** [63] - 11:6, 27:19, 27:22, 27:25, 28:3, 31:5, 31:9, 31:12, 31:23, 32:7, 33:9, 33:14, 33:17, 34:6, 34:9, 34:23, 35:3, 35:7, 35:17, 36:10, 36:22, 37:3, 37:11, 37:24, 38:10, 38:19, 38:21, 39:14, 39:25, 40:6, 40:16, 41:4, 41:8, 41:15, 41:18, 43:22, 51:24, 52:4, 52:5, 52:12, 62:7, 62:11, 62:20, 64:7, 64:14, 67:19, 69:16, 72:17, 73:23, 80:3, 86:19, 86:23, 87:4, 87:6, 87:23, 88:16, 90:25, 92:13, 92:21, 94:6, 94:7
**harder** [1] - 73:12
**head** [4] - 11:1, 11:19, 74:6, 83:20
**header** [1] - 51:8
**hear** [2] - 34:4, 57:11
**heard** [7] - 18:22, 18:25, 51:15, 63:4, 63:5, 63:8, 69:23
**hearing** [1] - 58:18
**Hearsay** [1] - 62:25
**hearsay** [1] - 90:17
**heart** [1] - 78:2
**height** [2] - 12:14, 12:19
**held** [1] - 99:10

**help** [7] - 25:3, 25:11, 29:19, 47:25, 48:7, 75:12, 79:2
**helped** [1] - 29:20
**hereby** [1] - 99:7
**HGST** [1] - 84:1
**high** [5] - 12:16, 23:10, 23:11, 25:19, 28:11
**High** [1] - 7:17
**higher** [3] - 10:20, 12:11, 73:12
**highest** [4] - 10:20, 10:24, 11:7, 12:11
**highlight** [1] - 41:11
**highlighted** [3] - 32:12, 34:24, 36:17
**highlighting** [3] - 31:9, 32:15, 33:16
**hill** [2] - 12:14, 15:11
**himself** [1] - 63:4
**HINO** [3] - 1:23, 99:5, 99:19
**Hino** [1] - 99:20
**HINO-SPAAN** [3] - 1:23, 99:5, 99:19
**Hino-Spaan** [1] - 99:20
**History** [1] - 6:23
**history** [7] - 49:20, 49:23, 66:3, 80:23, 89:18, 89:20, 89:24
**Hitachi** [3] - 53:1, 53:5, 95:16
**Hn** [4] - 40:24, 41:1, 41:17, 89:12
**hold** [1] - 27:10
**holding** [1] - 77:20
**holds** [1] - 28:15
**holdup** [1] - 29:9
**Honda** [9] - 52:22, 53:2, 53:4, 53:6, 53:24, 54:14, 54:15, 55:12, 55:21
**honor** [1] - 16:25
**Honor** [51] - 9:11, 10:4, 10:7, 14:1, 15:21, 15:24, 23:22, 23:23, 44:14, 44:19, 45:9, 49:24, 50:1, 51:12, 51:13, 53:22, 54:3, 54:7, 61:3, 62:12, 62:25, 63:3, 63:19, 63:21, 70:11, 70:13, 74:17, 75:3, 75:5, 77:8, 77:10, 84:13, 85:1, 85:9, 90:17, 93:15, 94:13, 94:14, 94:17, 95:5, 95:9, 95:24, 96:5,

96:8, 96:11, 96:24, 97:11, 97:17, 98:2, 98:4, 98:5
**HONORABLE** [1] - 1:3
**hoped** [2] - 25:11, 39:5
**hoping** [1] - 39:3
**host** [52] - 11:6, 11:9, 31:6, 32:11, 32:16, 32:18, 32:19, 32:21, 33:6, 33:10, 33:15, 34:5, 34:8, 34:24, 35:4, 35:21, 35:23, 36:2, 36:3, 36:10, 36:15, 36:18, 36:22, 37:2, 37:11, 37:24, 38:16, 38:17, 39:4, 39:10, 39:14, 40:20, 41:4, 41:14, 52:3, 52:12, 52:13, 86:4, 86:5, 86:11, 86:15, 86:19, 86:23, 87:9, 87:20, 87:23, 88:3, 89:1, 89:6, 89:16, 92:12, 94:6
**host's** [1] - 41:7
**hours** [1] - 97:25
**Hs** [4] - 40:2, 40:24, 41:1, 89:12
**HSL** [1] - 88:19
**huge** [2] - 13:8, 18:9
**hundreds** [2] - 82:13, 82:14
**HYUK** [1] - 3:22

## I

**idea** [6] - 13:19, 15:2, 15:5, 20:12, 62:19, 72:1
**ideas** [1] - 13:18
**ignore** [1] - 55:3
**ignored** [4] - 54:20, 55:2, 55:5, 55:10
**II** [1] - 1:10
**Ikeda** [5] - 7:13, 95:15, 96:6, 96:9, 97:14
**IKEDA** [1] - 6:7
**Illinois** [2] - 3:14, 4:18
**illustration** [3] - 15:12, 15:14, 15:15
**image** [5] - 12:18, 16:8, 73:13, 73:14, 74:6
**impeach** [1] - 43:18
**impeachment** [1] - 63:22
**imperfection** [1] - 23:1
**implement** [1] - 28:4

**implementation** [1] - 83:12
**important** [9] - 14:22, 18:3, 22:23, 30:15, 32:25, 33:1, 33:3, 47:6, 79:9
**impressed** [1] - 90:14
**improve** [1] - 23:9
**improvements** [1] - 23:6
**improves** [1] - 23:4
**IN** [3] - 6:13, 7:4, 8:5
**Inaba** [1] - 91:21
**INC** [1] - 1:8
**inches** [1] - 53:11
**include** [2] - 45:10, 57:18
**included** [1] - 64:6
**includes** [2] - 31:2, 69:8
**including** [2] - 47:1, 95:1
**incorrect** [2] - 27:2, 27:4
**increase** [6] - 21:23, 21:24, 22:9, 23:12, 93:9
**increased** [3] - 72:13, 80:2, 92:20
**increasing** [10] - 22:6, 22:15, 30:10, 30:13, 30:18, 30:24, 37:15, 73:25, 91:1, 94:7
**indented** [1] - 32:10
**indirectly** [3] - 26:21, 26:22, 26:23
**industry** [1] - 93:20
**information** [2] - 12:1, 81:20
**Information** [1] - 16:15
**informed** [1] - 62:3
**infringed** [1] - 85:25
**infringement** [1] - 33:4
**infringes** [1] - 23:17
**infringing** [1] - 60:7
**inherently** [2] - 56:10, 56:21
**instance** [1] - 61:21
**instances** [2] - 39:6, 39:8
**instead** [1] - 40:24
**intend** [1] - 45:12
**interacts** [1] - 32:17
**interest** [2] - 21:15, 21:18
**interesting** [1] - 12:12
**Intermag** [10] - 9:18, 10:3, 10:12, 13:17,

14:14, 16:10, 62:23, 64:24, 65:10, 90:10
**interpret** [1] - 57:6
**interrupt** [3] - 43:18, 48:5, 76:7
**interrupted** [1] - 48:6
**introduce** [1] - 81:21
**introduced** [1] - 24:5
**introducing** [1] - 94:18
**invalidate** [1] - 18:23
**invalidity** [1] - 54:10
**invention** [15] - 9:18, 17:9, 21:14, 21:21, 21:22, 21:25, 22:9, 23:3, 31:4, 38:6, 39:16, 85:25, 86:2, 91:2, 94:3
**inventions** [2] - 9:17, 83:13
**inventors** [3] - 29:22, 71:6, 71:9
**invited** [5] - 16:11, 16:13, 16:14, 16:17, 17:1
**involved** [2] - 29:12, 57:22
**irrelevant** [1] - 69:12
**issue** [3] - 53:25, 95:11, 95:24
**issued** [16] - 18:8, 19:13, 19:24, 21:6, 21:10, 26:17, 26:19, 29:14, 49:11, 54:1, 57:13, 57:23, 58:24, 59:6, 81:11, 90:7
**issues** [2] - 83:2, 97:4
**issuing** [1] - 18:16
**IT** [2] - 5:10, 5:11
**it'd** [1] - 66:3
**it'll** [1] - 50:6
**itself** [1] - 63:24

### J

**JACOB** [1] - 2:12
**JAMES** [1] - 1:3
**January** [3] - 43:4, 44:12, 63:17
**Japan** [1] - 53:5
**jbuczko@raklaw. com** [1] - 2:15
**JOSEPH** [1] - 3:22
**joseph.lee@lw.com** [1] - 3:24
**Journal** [2] - 6:21, 16:4
**journal** [2] - 15:16, 15:18
**JUDGE** [1] - 1:3

**Judicial** [1] - 99:12
**Juergen** [1] - 93:24
**JULY** [2] - 1:16, 9:1
**July** [1] - 99:15
**jump** [1] - 45:23
**June** [1] - 17:24
**JUROR** [1] - 96:3
**jury** [14] - 5:11, 9:5, 14:7, 15:10, 23:14, 36:21, 52:8, 58:22, 74:15, 83:4, 83:15, 92:25, 93:2, 97:7
**JURY** [1] - 1:15
**JX-2000** [10] - 29:2, 29:7, 34:17, 37:7, 38:2, 39:19, 39:24, 59:14, 65:17, 67:25
**JX-2015** [3] - 7:20, 95:7, 96:21
**JX-2026** [3] - 7:22, 95:7, 96:21
**JX-2028** [3] - 8:7, 95:7, 96:21
**JX-2034** [3] - 7:13, 96:9, 96:13
**JX-2037** [3] - 8:8, 95:7, 96:22
**JX-2038** [3] - 8:10, 95:7, 96:22
**JX-2058** [4] - 6:19, 15:17, 15:21, 16:1
**JX-2083** [3] - 7:15, 96:10, 96:13
**JX-2084** [8] - 6:17, 7:18, 13:20, 13:23, 14:1, 14:5, 96:10, 96:13
**JX-2142** [8] - 7:8, 74:22, 74:25, 75:3, 75:7, 75:23, 91:5, 91:9

### K

**K1** [2] - 43:20, 46:18
**KABAT** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**Kabat** [1] - 5:9
**keep** [4] - 32:24, 82:17, 82:20, 82:21
**keeping** [1] - 25:3
**kept** [2] - 12:20
**Kerr** [1] - 42:11
**KERR** [1] - 42:11
**keyword** [2] - 39:1, 39:3
**Khard** [1] - 73:6
**kicks** [1] - 22:22
**kind** [1] - 81:21

**kinds** [1] - 82:17
**knowledge** [1] - 13:8
**known** [2] - 41:21, 67:10
**knows** [2] - 89:13, 89:15
**Komag** [1] - 71:3
**Kroeger** [1] - 97:11
**KROEGER** [4] - 3:4, 97:11, 97:17, 97:20
**KS** [1] - 47:19
**Ksoft** [1] - 73:3
**Ku** [1] - 7:21

### L

**L-i** [1] - 57:12
**lab** [1] - 42:1
**label** [4] - 31:25, 73:20, 73:23, 93:13
**labeled** [2] - 11:10, 69:15
**labeling** [1] - 72:22
**labels** [1] - 93:22
**ladies** [4] - 9:9, 9:12, 89:23, 97:1
**landscape** [2] - 12:5, 12:12
**language** [5] - 30:23, 31:24, 31:25, 41:10, 50:8
**larger** [3] - 33:25, 40:11, 40:12
**largest** [1] - 17:2
**last** [7] - 30:14, 30:24, 37:16, 48:12, 50:14, 57:13, 81:25
**LATHAM** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4
**law** [1] - 27:9
**LAW** [4] - 2:20, 4:9, 4:16, 4:20
**lawsuit** [1] - 67:12
**lawyer** [6] - 24:5, 24:12, 28:23, 57:17, 59:10, 76:9
**lawyers** [2] - 32:9, 49:22
**layer** [92] - 10:19, 11:6, 11:7, 11:8, 11:13, 11:20, 12:13, 12:15, 30:13, 30:18, 30:24, 31:5, 31:9, 31:13, 31:16, 31:19, 31:23, 32:1, 32:5, 32:8, 32:20, 33:9, 33:17, 34:6, 34:9, 34:23, 35:3, 35:8, 35:17, 36:11, 37:3,

37:11, 37:16, 37:25, 38:10, 38:19, 38:22, 39:15, 39:25, 40:7, 40:16, 41:4, 41:9, 41:15, 41:18, 43:23, 44:5, 44:9, 46:2, 46:14, 47:1, 47:2, 47:4, 47:9, 47:11, 47:23, 51:24, 52:4, 52:5, 52:12, 62:7, 62:8, 62:11, 62:20, 64:13, 64:15, 67:19, 69:17, 72:17, 72:18, 80:3, 86:19, 86:24, 87:4, 87:7, 87:23, 88:20, 89:15, 89:16, 90:25, 92:13, 94:6, 94:7
**Layer** [3] - 8:12, 8:13, 8:15
**layers** [28] - 11:6, 11:8, 11:10, 11:12, 11:15, 11:21, 12:10, 30:6, 30:10, 30:12, 34:6, 36:23, 37:14, 37:15, 55:20, 55:25, 62:8, 64:7, 74:2, 86:11, 87:10, 87:14, 87:20, 87:22, 88:1, 88:3, 95:2
**learned** [3] - 61:16, 61:18, 61:23
**least** [2] - 29:20, 94:12
**lecturing** [1] - 25:21
**led** [2] - 13:10, 13:11
**LEDAHL** [1] - 2:8
**LEE** [1] - 3:22
**left** [7] - 52:18, 66:13, 66:14, 71:18, 73:1, 73:13, 81:15
**left-hand** [1] - 66:13
**less** [4] - 40:7, 40:10, 81:7, 89:12
**letter** [1] - 40:24
**letters** [1] - 15:8
**li** [1] - 57:11
**Li's** [1] - 57:19
**license** [7] - 21:12, 28:18, 83:19, 83:23, 84:2, 84:5, 84:14
**licensed** [1] - 28:17
**licenses** [1] - 84:4
**lifetime** [3] - 82:1, 82:5, 83:5
**limit** [7] - 13:11, 76:4, 76:21, 76:24, 89:9, 89:17, 91:16
**Limit** [1] - 7:7
**limitation** [2] - 32:9, 40:1

**line** [20] - 37:8, 43:12, 44:16, 44:17, 45:13, 45:16, 45:23, 63:20, 64:3, 64:4, 64:10, 65:20, 78:13, 78:23, 79:19, 81:25, 85:1, 85:4
**lines** [8] - 30:25, 33:16, 43:14, 59:17, 68:2, 77:15, 79:18
**list** [6] - 59:21, 68:8, 70:19, 70:25, 76:16, 97:21
**listed** [3] - 75:16, 75:17, 93:25
**listing** [1] - 76:19
**lists** [2] - 52:22, 78:24
**Liu** [1] - 5:9
**live** [1] - 39:2
**LLP** [9] - 3:12, 3:18, 3:21, 4:4, 4:8, 4:12, 4:16, 4:20, 5:4
**location** [1] - 52:3
**lodge** [1] - 97:20
**log** [2] - 97:10, 97:23
**look** [22] - 29:3, 43:13, 43:14, 44:11, 45:25, 49:14, 52:16, 55:14, 59:9, 60:14, 63:16, 64:2, 65:16, 66:13, 68:1, 70:4, 72:21, 72:25, 76:12, 78:3, 78:13, 78:23
**looking** [1] - 50:9
**looks** [1] - 77:15
**Los** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**LOS** [1] - 99:3
**low** [1] - 23:11
**lower** [1] - 73:11
**LUMISH** [64] - 3:18, 10:7, 14:3, 15:24, 23:22, 23:25, 24:3, 29:1, 31:8, 31:11, 39:18, 39:20, 43:2, 43:5, 44:14, 44:16, 44:20, 44:22, 45:12, 45:15, 45:17, 49:24, 50:4, 50:24, 51:1, 51:13, 51:17, 53:13, 53:15, 54:3, 54:12, 61:3, 61:8, 62:15, 62:18, 63:3, 63:11, 63:19, 64:1, 69:18, 69:19, 70:11, 70:16, 70:18, 74:17, 74:18, 75:3, 75:8, 77:8, 77:13, 84:18, 84:25, 85:3, 85:5, 85:11, 88:8, 88:9, 90:17,

93:15, 94:14, 95:23, 96:11, 98:2, 98:5
**Lumish** [16] - 6:5, 18:22, 23:21, 23:24, 85:18, 86:13, 88:6, 88:7, 88:10, 89:19, 89:25, 90:8, 90:20, 92:4, 93:6, 93:11

## M

**Magnestism** [1] - 6:21
**magnetic** [53] - 6:18, 7:19, 10:19, 11:15, 20:7, 21:13, 31:5, 31:9, 31:12, 31:23, 32:7, 33:9, 33:14, 33:17, 34:9, 34:23, 35:3, 35:7, 35:17, 36:10, 36:23, 37:3, 37:11, 37:16, 37:25, 38:10, 38:19, 38:21, 39:14, 39:25, 40:6, 40:16, 41:4, 41:8, 41:15, 41:18, 43:23, 51:24, 52:4, 52:5, 52:12, 62:7, 62:8, 62:11, 64:7, 64:15, 68:10, 87:2, 87:4, 87:6, 95:1
**Magnetic** [6] - 6:21, 6:24, 7:16, 7:22, 13:25, 16:4
**Magnetics** [3] - 7:13, 8:8, 8:10
**Magnetism** [1] - 16:4
**magnetization** [3] - 22:22, 68:21, 69:1
**magneto** [1] - 42:11
**magneto-optical** [1] - 42:11
**magnetometer** [1] - 42:7
**magnetometry** [1] - 41:25
**magnets** [1] - 15:1
**maichele@raklaw. com** [1] - 2:19
**main** [2] - 16:16, 16:20
**Maine** [1] - 2:17
**manner** [2] - 56:11, 56:21
**MAR07** [1] - 78:6
**Mar07** [1] - 7:11
**MARC** [1] - 2:4
**March** [7] - 77:19, 77:25, 78:8, 78:9, 78:11, 81:5
**margin** [1] - 66:14
**mary** [1] - 5:11

**match** [1] - 95:10
**material** [2] - 23:1, 23:2
**Materials** [3] - 6:21, 16:5, 16:15
**matter** [2] - 48:17, 99:11
**matters** [2] - 48:18, 69:6
**MATTHEW** [1] - 2:16
**mchan@raklaw.com** [1] - 2:23
**mean** [5] - 17:13, 26:23, 48:5, 57:25, 69:12
**meaning** [3] - 32:16, 49:10, 88:19
**means** [5] - 14:19, 22:24, 68:14, 75:17, 82:7
**meant** [1] - 36:9
**measurable** [1] - 40:7
**measure** [3] - 41:14, 42:4, 46:21
**measured** [8] - 41:8, 41:19, 46:13, 47:3, 47:5, 47:15, 47:17, 48:3
**measuring** [2] - 41:21, 42:6
**mechanisms** [1] - 22:15
**Media** [13] - 6:15, 7:6, 7:9, 7:13, 7:16, 7:22, 8:8, 8:10, 13:24, 16:4, 71:18, 72:3, 78:24
**media** [37] - 6:18, 6:20, 7:19, 14:15, 20:7, 27:22, 30:4, 46:1, 68:9, 68:14, 68:16, 68:18, 68:20, 68:25, 69:11, 69:13, 69:15, 69:16, 69:17, 69:24, 72:8, 72:9, 76:14, 79:17, 80:1, 80:2, 80:9, 80:13, 80:17, 92:8, 92:11, 92:19, 92:20, 94:25
**meet** [2] - 58:2, 58:4
**Meeting** [2] - 7:11, 78:6
**meeting** [3] - 78:8, 78:10, 78:11
**member** [1] - 95:16
**memory** [1] - 43:19
**Menlo** [4] - 3:19, 4:10, 4:21, 5:5
**mention** [1] - 57:11
**mentioned** [6] - 13:16,

17:16, 49:13, 83:8, 86:8, 91:25
**mentions** [1] - 86:5
**Mesa** [1] - 3:23
**messed** [1] - 35:13
**met** [8] - 57:25, 58:3, 61:21, 67:2, 67:4, 81:3, 90:5
**Method** [1] - 7:21
**methods** [1] - 41:21
**mfenster@raklaw. com** [1] - 2:7
**Michael** [1] - 17:16
**Micromagnetic** [6] - 6:14, 6:15, 17:4, 17:7, 17:13, 17:19
**middle** [1] - 90:1
**might** [14] - 28:20, 29:4, 43:25, 46:5, 46:6, 46:7, 49:7, 55:4, 61:10, 65:2, 66:15, 80:7, 82:8, 90:9
**million** [7] - 82:1, 82:6, 82:25, 83:3, 83:5, 84:20, 85:6
**mind** [3] - 30:19, 31:8, 43:17
**Minna** [2] - 94:17, 94:19
**MINNA** [1] - 2:20
**MINT** [2] - 16:14, 16:20
**minute** [2] - 63:2
**minutes** [6] - 74:11, 95:22, 97:13, 97:14, 97:15
**Miracle** [4] - 17:4, 17:8, 17:14, 17:19
**MIRZAIE** [1] - 3:8
**misidentified** [2] - 55:25, 56:6
**misidentifies** [2] - 55:20, 56:1
**misread** [1] - 40:14
**misspoke** [1] - 35:6
**mistake** [9] - 35:11, 54:25, 55:4, 55:19, 55:25, 56:3, 56:4, 56:24, 57:4
**mistakes** [1] - 54:6
**misunderstanding** [1] - 65:2
**model** [13] - 62:22, 63:14, 64:12, 64:16, 64:17, 64:18, 64:19, 64:23, 65:2, 65:10
**modeled** [1] - 12:24
**Modeling** [1] - 6:14
**modeling** [1] - 22:13

**models** [1] - 72:10
**MOKE** [2] - 42:10
**moment** [4] - 29:6, 37:20, 39:22, 79:16
**money** [2] - 82:18, 82:20
**monitor** [1] - 78:4
**months** [1] - 78:11
**morning** [6] - 34:14, 94:19, 97:6, 97:24, 98:1, 98:6
**Mortensen** [1] - 18:18
**Mortenson** [3] - 5:10, 21:9, 91:4
**most** [3] - 14:18, 30:15
**move** [10] - 10:4, 14:1, 15:21, 49:25, 61:3, 70:11, 75:3, 77:8, 95:6, 96:8
**moving** [1] - 12:12
**MR** [131] - 1:4, 5:9, 9:11, 9:15, 10:4, 10:7, 10:10, 14:1, 14:3, 14:6, 14:8, 15:21, 15:24, 16:2, 19:6, 19:8, 20:17, 20:19, 20:25, 21:1, 21:11, 21:12, 23:20, 23:22, 23:25, 24:3, 26:13, 26:24, 27:8, 27:10, 27:13, 27:16, 27:18, 27:19, 27:25, 28:7, 28:15, 29:1, 31:8, 31:11, 39:18, 39:20, 43:1, 43:2, 43:5, 44:14, 44:15, 44:16, 44:19, 44:20, 44:22, 45:9, 45:12, 45:14, 45:15, 45:17, 49:24, 50:1, 50:4, 50:24, 51:1, 51:12, 51:13, 51:17, 53:13, 53:15, 53:22, 54:3, 54:7, 54:12, 61:3, 61:5, 61:8, 62:12, 62:15, 62:18, 62:25, 63:3, 63:11, 63:19, 63:21, 64:1, 69:18, 69:19, 70:11, 70:13, 70:16, 70:18, 74:17, 74:18, 75:3, 75:5, 75:8, 77:8, 77:10, 77:13, 84:13, 84:17, 84:18, 84:23, 84:25, 85:3, 85:5, 85:9, 85:11, 85:16, 88:8, 88:9, 89:22, 90:17, 90:19, 91:4, 91:7, 93:15, 93:17, 94:13,

94:14, 94:17, 95:9, 95:23, 96:11, 96:17, 97:11, 97:12, 97:14, 97:17, 97:20, 97:24, 98:2, 98:4, 98:5
**MRT** [1] - 26:21
**MRT_WD00002704** [1] - 6:16
**Mrugresh** [3] - 5:12, 94:21, 95:3
**MRUGRESH** [1] - 6:6
**MS** [5] - 95:5, 95:14, 96:5, 96:8, 96:24
**Multilayer** [3] - 6:17, 7:18, 13:24
**multilayer** [11] - 10:21, 14:9, 31:6, 36:2, 37:10, 87:2, 87:12, 90:25, 92:12, 94:5
**Multilayered** [1] - 7:16
**multiple** [8] - 30:6, 30:10, 37:14, 62:8, 85:7, 87:13, 88:1, 88:11

## N

**name** [24] - 31:25, 32:2, 32:5, 32:7, 32:21, 32:22, 39:10, 50:6, 59:21, 68:24, 69:16, 69:17, 70:1, 70:19, 71:6, 71:8, 79:6, 79:13, 80:6, 80:14, 80:16, 80:18, 94:19
**named** [2] - 11:8, 61:19
**names** [6] - 11:11, 32:23, 32:24, 33:5, 70:25, 94:1
**nanosecond** [5] - 46:20, 47:3, 47:7, 47:17, 48:17
**need** [8] - 45:7, 45:15, 65:5, 65:19, 66:12, 78:3, 95:11, 96:2
**needles** [1] - 11:16
**neighboring** [1] - 23:1
**new** [5] - 12:24, 15:1, 62:21, 65:3, 72:13
**Newport** [4] - 4:5, 4:6, 4:13, 4:14
**next** [18] - 19:6, 19:15, 20:17, 20:25, 32:9, 32:10, 36:1, 51:7, 53:8, 56:7, 72:21, 81:13, 81:14, 93:6, 94:16, 94:18, 94:21, 95:14

**next..** [1] - 19:7
**nice** [2] - 61:9, 61:11
**Nobel** [6] - 17:6, 25:22, 26:1, 26:2, 26:4, 26:10
**nobody** [2] - 57:21, 58:5
**Noffsinger** [1] - 5:11
**noise** [3] - 23:10, 23:11
**noncomparable** [2] - 84:14, 84:15
**none** [1] - 82:21
**normal** [1] - 55:7
**North** [2] - 3:13, 4:17
**notation** [1] - 71:19
**notes** [1] - 36:8
**nothing** [3] - 25:14, 25:18, 94:14
**November** [6] - 51:3, 77:22, 77:24, 78:10, 78:14, 79:4
**nucleation** [54] - 11:6, 11:9, 31:6, 32:11, 32:16, 32:18, 32:19, 32:21, 33:6, 33:10, 33:15, 34:5, 34:8, 34:24, 35:4, 35:21, 35:23, 36:2, 36:3, 36:10, 36:15, 36:18, 36:22, 37:2, 37:11, 37:24, 38:16, 38:17, 39:4, 39:9, 39:14, 40:20, 41:1, 41:4, 41:7, 41:14, 52:3, 52:11, 52:13, 86:4, 86:5, 86:11, 86:15, 86:18, 86:23, 87:9, 87:20, 87:23, 88:3, 89:1, 89:6, 89:16, 92:12, 94:6
**Number** [8] - 10:9, 14:5, 16:1, 50:3, 61:7, 70:15, 75:7, 77:12
**number** [15] - 38:13, 38:14, 46:25, 52:14, 52:22, 53:13, 54:4, 55:14, 55:15, 56:8, 76:14, 81:24, 83:4, 84:19
**Numbers** [2] - 96:13, 96:21
**numbers** [4] - 8:12, 8:14, 8:15, 73:7
**numeral** [1] - 38:8

**O**

**oath** [3] - 9:8, 45:1,

47:8
**object** [3] - 63:21, 90:17, 93:15
**objected** [1] - 96:18
**objection** [23] - 10:6, 10:7, 14:3, 15:23, 15:24, 44:18, 44:19, 45:9, 50:1, 51:12, 53:22, 61:5, 62:12, 62:25, 63:6, 70:13, 75:5, 77:10, 84:13, 84:23, 85:9, 96:11
**obtained** [1] - 28:17
**obviously** [2] - 11:16, 55:13
**Oct** [1] - 7:8
**October** [5] - 70:9, 71:10, 75:1, 75:24, 91:10
**OF** [9] - 1:2, 1:14, 2:1, 3:1, 4:1, 5:1, 99:1, 99:3, 99:4
**offered** [1] - 96:18
**office** [37] - 18:10, 18:12, 18:16, 19:4, 19:10, 19:12, 19:20, 20:22, 21:3, 21:5, 29:15, 49:11, 49:21, 49:22, 50:22, 54:20, 55:7, 55:19, 55:20, 55:25, 56:5, 56:10, 56:14, 56:20, 57:3, 57:8, 57:12, 57:13, 57:15, 57:18, 58:1, 58:7, 59:7, 81:3, 81:10, 82:4, 90:3
**Official** [1] - 99:20
**OFFICIAL** [3] - 1:23, 99:1, 99:5
**often** [1] - 67:3
**once** [1] - 79:22
**one** [56] - 10:19, 10:24, 11:15, 11:20, 14:18, 14:25, 16:19, 16:20, 19:1, 19:2, 19:15, 20:3, 20:4, 20:5, 20:17, 31:12, 33:9, 33:21, 33:24, 35:8, 38:19, 39:6, 41:24, 42:1, 43:1, 44:9, 45:25, 47:1, 47:9, 48:25, 49:19, 52:14, 53:20, 57:25, 58:2, 62:23, 64:19, 65:25, 66:3, 67:25, 70:2, 70:23, 73:2, 73:6, 77:15, 80:5, 84:5, 84:25, 87:4, 87:7, 89:13, 89:15
**one-dimensional** [1] -

64:19
**oOo** [1] - 98:8
**opening** [2] - 18:20, 34:12
**opinion** [3] - 62:13, 62:15, 63:24
**opinions** [1] - 97:3
**opposite** [1] - 32:10
**optical** [1] - 42:11
**optimization** [1] - 92:1
**Optimizing** [1] - 78:24
**OR** [3] - 6:13, 7:4, 8:5
**order** [4] - 9:7, 24:18, 24:21, 52:15
**organization** [1] - 79:10
**organized** [1] - 16:15
**organizers** [3] - 17:1, 17:2, 17:15
**outcome** [1] - 21:15
**outer** [1] - 11:8
**overall** [3] - 22:5, 22:9, 23:9
**overcoming** [2] - 76:20, 91:15
**Overcoming** [3] - 7:6, 76:3, 76:24
**overrule** [1] - 63:6
**overruled** [5] - 51:16, 54:11, 62:17, 63:25, 93:16
**overview** [1] - 10:11
**own** [7] - 26:21, 26:23, 27:2, 35:13, 60:6, 75:20, 76:20
**owner** [3] - 27:8, 27:9, 27:13
**owns** [1] - 26:24
**Oxide** [1] - 7:16

**P**

**P.M** [2] - 1:17, 9:2
**p.m** [3] - 74:14, 98:7
**PAGE** [1] - 6:3
**page** [47] - 10:14, 10:15, 10:17, 12:2, 14:13, 29:2, 29:7, 34:17, 37:7, 38:3, 39:19, 39:24, 43:3, 43:6, 43:12, 43:13, 44:13, 44:15, 44:16, 44:17, 45:13, 45:16, 50:10, 50:14, 50:25, 51:7, 52:17, 53:8, 56:7, 59:14, 63:20, 65:17, 65:22, 68:1, 80:25, 81:2, 81:14, 91:14, 91:15, 92:3, 92:5, 92:7, 99:11

**Page** [1] - 44:16
**paid** [5] - 27:15, 83:19, 83:23, 84:6, 84:8
**paper** [40] - 13:15, 13:16, 13:18, 13:19, 13:24, 14:9, 14:22, 15:6, 16:3, 19:11, 20:15, 59:11, 59:21, 59:24, 60:5, 60:14, 60:22, 60:25, 61:9, 61:11, 61:13, 61:18, 62:1, 65:23, 66:9, 66:11, 66:19, 68:3, 68:4, 68:8, 68:16, 69:7, 69:13, 73:15, 91:22, 91:23, 95:20, 98:1
**papers** [11] - 14:20, 24:19, 60:10, 67:14, 67:19, 67:22, 70:2, 81:24, 82:13, 82:14, 91:23
**paragraph** [6] - 32:10, 54:17, 55:17, 55:19, 56:9, 77:15
**paragraphs** [1] - 53:14
**paralegal** [1] - 5:9
**parameter** [6] - 47:13, 47:19, 47:25, 48:7, 48:12, 48:14
**parameters** [7] - 23:2, 45:18, 45:20, 46:25, 47:9, 48:25, 49:2
**parents** [1] - 21:8
**Park** [4] - 3:19, 4:10, 4:21, 5:5
**part** [17] - 29:19, 29:22, 30:16, 31:12, 36:21, 37:5, 38:23, 50:11, 53:5, 54:4, 54:10, 68:13, 71:3, 73:20, 73:23, 89:25
**participate** [1] - 26:6
**participated** [2] - 49:6, 49:9
**particle** [1] - 22:21
**particular** [4] - 46:1, 46:14, 58:20, 80:24
**parties** [1] - 84:14
**partner** [2] - 21:13, 94:17
**parts** [4] - 29:17, 31:7, 32:17, 34:13
**pass** [3] - 23:20, 85:13, 94:13
**passing** [1] - 36:23
**past** [1] - 43:10
**Patent** [1] - 6:22
**patent** [129] - 11:9, 17:24, 18:2, 18:4,

18:6, 18:8, 18:9, 18:11, 18:12, 18:13, 18:15, 18:16, 18:18, 18:23, 19:4, 19:10, 19:12, 19:13, 19:19, 19:20, 19:22, 19:23, 19:24, 20:22, 20:23, 21:3, 21:5, 21:6, 24:22, 26:16, 26:19, 28:15, 28:22, 29:3, 29:8, 29:14, 29:20, 32:3, 32:23, 33:3, 33:8, 34:14, 34:17, 35:16, 37:8, 37:12, 37:14, 37:18, 37:19, 38:11, 38:15, 38:17, 38:23, 39:2, 39:11, 42:18, 46:17, 49:5, 49:11, 49:21, 49:22, 50:11, 50:22, 51:22, 52:22, 53:1, 54:14, 54:16, 55:7, 55:11, 55:19, 55:24, 56:5, 57:3, 57:7, 57:11, 57:12, 57:13, 57:14, 57:15, 57:18, 57:19, 58:1, 58:3, 58:7, 58:24, 59:2, 59:7, 59:10, 59:14, 59:24, 60:23, 61:1, 65:17, 66:10, 66:19, 67:20, 67:22, 68:1, 68:8, 69:8, 69:12, 71:11, 75:25, 81:3, 81:8, 81:10, 82:4, 85:19, 85:22, 86:2, 86:10, 87:6, 87:16, 87:22, 87:25, 90:3, 90:7, 94:4, 94:5
**patents** [27] - 21:10, 23:17, 24:25, 25:7, 25:14, 28:4, 28:17, 28:20, 29:13, 29:17, 29:18, 29:19, 29:23, 31:5, 39:16, 54:25, 57:16, 57:18, 57:23, 65:14, 71:9, 76:1, 76:10, 82:12, 82:13, 82:14, 83:13
**patience** [1] - 74:20
**PATRICIA** [1] - 4:20
**patricia.young@lw. com** [1] - 4:22
**PAUL** [1] - 3:4
**Paul** [1] - 97:11
**payroll** [1] - 27:17
**PDX-2.20** [1] - 88:14
**pending** [1] - 81:10
**people** [3] - 13:13, 16:21, 93:22

**percent** [3] - 21:19, 66:17, 68:6
**percipient** [1] - 63:4
**perfectly** [1] - 43:16
**perform** [1] - 88:1
**performance** [1] - 23:4
**performed** [1] - 22:12
**period** [1] - 75:24
**permission** [1] - 83:16
**perpendicular** [3] - 6:20, 80:1, 92:19
**Perpendicular** [3] - 7:10, 7:16, 16:3
**person** [1] - 71:25
**personally** [3] - 53:6, 57:25, 82:22
**PFR** [5] - 26:24, 27:2, 27:6, 27:9
**Ph.D** [1] - 50:17
**phase** [1] - 14:15
**phonetic** [1] - 68:23
**phrase** [2] - 39:3, 68:19
**phrased** [1] - 69:3
**Physical** [9] - 7:12, 77:6, 77:18, 78:6, 78:17, 79:4, 79:9, 80:11, 80:19
**pick** [1] - 31:24
**picked** [2] - 31:25, 32:2
**picture** [3] - 12:5, 81:15
**piece** [2] - 54:8, 61:12
**ping** [1] - 15:11
**ping-pong** [1] - 15:11
**pkroeger@raklaw. com** [1] - 3:7
**place** [2] - 41:3, 41:13
**PLAINTFF** [1] - 6:4
**plaintiff** [6] - 27:8, 27:13, 95:5, 96:8, 97:12, 98:4
**Plaintiff** [2] - 1:5, 1:10
**PLAINTIFF** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**plaintiff's** [1] - 5:10
**play** [2] - 47:6, 47:17
**played** [4] - 6:6, 6:7, 95:4, 96:7
**plays** [1] - 47:16
**pleasure** [2] - 17:1, 17:5
**plenary** [2] - 16:23, 17:5
**plug** [1] - 97:9
**PMR** [1] - 8:8
**PMRC** [1] - 7:9

**PN** [3] - 8:12, 8:14, 8:15
**point** [10] - 36:19, 38:24, 43:2, 51:21, 54:5, 54:7, 56:5, 58:1, 58:2, 73:7
**pointed** [1] - 30:23
**pointing** [8] - 11:14, 11:16, 11:22, 11:25, 38:9, 38:10, 38:13, 73:2
**points** [1] - 54:5
**pong** [1] - 15:11
**position** [1] - 14:24
**possibility** [1] - 16:12
**possible** [3] - 13:10, 16:18, 16:19
**predate** [1] - 67:19
**predicted** [1] - 92:22
**prefer** [1] - 80:16
**preparation** [1] - 9:18
**prepared** [2] - 50:20, 71:16
**preprints** [1] - 13:15
**presence** [3] - 9:5, 74:15, 97:7
**present** [3] - 54:20, 58:19, 75:12
**PRESENT** [1] - 5:8
**Presentation** [3] - 7:22, 8:8, 8:10
**presentation** [20] - 6:15, 7:8, 10:2, 10:12, 10:15, 16:10, 61:24, 62:1, 62:4, 62:7, 65:9, 70:8, 70:9, 75:1, 75:13, 81:1, 81:2, 90:10, 90:13, 91:10
**presentations** [1] - 13:14
**presented** [9] - 34:14, 54:18, 62:21, 64:24, 65:13, 75:18, 75:20, 76:20, 80:16
**presenter** [2] - 75:15, 75:19
**presenters** [1] - 70:20
**presenting** [2] - 13:16, 62:19
**pretty** [1] - 45:8
**previous** [1] - 54:19
**previously** [2] - 17:16, 48:23
**PREVIOUSLY** [1] - 9:13
**price** [2] - 84:8, 84:11
**printed** [1] - 66:14
**Printed** [3] - 8:12, 8:14, 8:15

**prize** [6] - 17:6, 25:23, 26:1, 26:2, 26:4, 26:10
**Pro** [1] - 2:16
**problem** [3] - 13:12, 35:15, 91:24
**proceed** [2] - 23:23, 74:16
**Proceedings** [1] - 98:7
**PROCEEDINGS** [1] - 1:14
**proceedings** [1] - 99:10
**process** [10] - 18:5, 18:6, 18:11, 22:4, 22:21, 22:23, 29:12, 55:7, 58:3, 58:6
**produced** [1] - 82:15
**product** [1] - 23:18
**products** [2] - 95:1, 95:19
**professor** [8] - 14:24, 15:2, 15:7, 24:13, 24:15, 78:22, 82:5, 85:8
**Professor** [10] - 17:16, 17:17, 68:23, 69:15, 73:14, 75:10, 79:5, 80:9, 80:15
**promoted** [1] - 88:7
**proper** [1] - 84:2
**properties** [3] - 33:24, 44:8, 46:11
**proposed** [4] - 69:14, 79:25, 80:12, 92:18
**prosecuting** [2] - 29:13, 54:25
**prosecution** [7] - 49:4, 49:10, 50:11, 57:22, 89:18, 89:20, 89:24
**provide** [1] - 97:8
**providing** [1] - 95:18
**PTX-003** [3] - 6:22, 49:15, 50:3
**PTX-127** [4] - 8:12, 95:7, 96:20, 96:22
**PTX-129** [4] - 8:13, 95:7, 96:20, 96:22
**PTX-130** [4] - 8:15, 95:8, 96:20, 96:22
**PTX-286** [7] - 6:14, 9:22, 10:4, 10:9, 10:14, 10:17, 12:2
**PTX-3** [3] - 49:25, 50:2, 80:23
**PTX-3.162** [2] - 50:6, 50:25
**PTX-3.163** [1] - 51:7

**PTX-3.168** [1] - 52:17
**PTX-3.169** [1] - 53:9
**PTX-3.170** [1] - 56:7
**PTX-3.171** [1] - 50:15
**PTX-3.350** [1] - 80:25
**PTX-3.351** [1] - 81:14
**publication** [4] - 16:11, 63:23, 64:11, 65:13
**publish** [2] - 14:6, 15:12
**published** [7] - 15:14, 15:15, 15:18, 16:4, 24:18, 60:25, 95:20
**publishing** [1] - 15:6
**purpose** [3] - 21:11, 21:12, 34:8
**pursuant** [1] - 99:8
**put** [2] - 56:24, 75:24

### Q

**quarters** [1] - 60:19
**questions** [10] - 24:9, 24:11, 80:22, 85:12, 85:19, 85:21, 88:11, 89:2, 89:20, 90:20
**quick** [1] - 65:16

### R

**raise** [1] - 95:23
**ratio** [5] - 23:10, 23:11, 46:5, 47:20, 47:22
**RAUTH** [2] - 4:4, 4:12
**reaction** [3] - 13:5, 13:6, 90:12
**read** [14] - 11:18, 11:19, 30:12, 34:22, 39:7, 39:8, 40:4, 43:8, 44:14, 45:10, 56:20, 63:19, 79:21, 92:17
**ready** [2] - 36:7, 96:17
**really** [7] - 13:7, 13:9, 16:18, 16:19, 58:8, 69:6, 81:13
**REALTIME** [1] - 99:5
**reason** [1] - 78:15
**recalled** [1] - 64:23
**Received** [1] - 51:3
**received** [22] - 10:8, 10:9, 14:4, 14:5, 15:25, 16:1, 50:2, 50:3, 61:6, 61:7, 70:14, 70:15, 75:6, 75:7, 77:11, 77:12, 82:5, 83:6, 96:12, 96:14, 96:20, 96:23

**recently** [1] - 93:8
**Recently** [3] - 79:20, 79:25, 92:18
**recess** [1] - 74:11
**Recess** [1] - 74:14
**Recipe** [3] - 8:12, 8:13, 8:15
**recognize** [21] - 9:23, 9:24, 13:21, 13:22, 15:18, 38:5, 49:20, 51:10, 60:22, 66:9, 66:18, 66:20, 70:8, 71:14, 71:15, 74:25, 75:2, 77:1, 77:5, 81:1, 84:20
**recollection** [1] - 43:9
**recommendation** [1] - 15:8
**record** [3] - 37:16, 49:21, 97:22
**recording** [17] - 6:18, 7:19, 11:18, 11:25, 13:11, 16:19, 20:7, 21:13, 43:23, 46:12, 46:19, 48:16, 68:10, 80:1, 88:24, 92:19, 94:25
**Recording** [8] - 7:10, 7:17, 13:25, 17:4, 17:7, 17:18, 62:5, 78:24
**REDIRECT** [1] - 85:15
**Redirect** [1] - 6:5
**Redirect-Examination** [1] - 6:5
**reduce** [3] - 12:21, 12:22, 68:17
**reduced** [1] - 12:17
**refer** [7] - 18:15, 35:8, 40:1, 42:22, 47:22, 68:3, 69:1
**reference** [17] - 19:16, 19:18, 20:20, 21:2, 29:5, 35:21, 36:23, 37:1, 38:8, 39:9, 42:18, 42:19, 62:13, 65:13, 67:22, 80:15, 91:22
**references** [4] - 18:15, 18:18, 18:23, 59:9
**referred** [3] - 69:23, 80:11, 93:13
**referring** [7] - 17:9, 32:15, 40:15, 63:22, 63:23, 92:11, 92:17
**refers** [12] - 32:11, 35:3, 35:7, 35:16, 35:23, 36:3, 36:9, 36:15, 36:17, 37:10,

52:21, 71:25
**refreshed** [1] - 43:19
**refreshes** [1] - 43:9
**regard** [1] - 55:3
**regarded** [1] - 67:11
**regarding** [3] - 53:10, 53:12, 54:15
**regards** [1] - 64:15
**regular** [1] - 97:1
**regulations** [1] - 99:12
**regulatory** [1] - 50:8
**REJECTED** [3] - 6:13, 7:4, 8:6
**rejected** [3] - 52:21, 56:10, 56:21
**rejection** [2] - 54:13, 54:15
**Rejections** [1] - 52:18
**rejections** [3] - 53:10, 53:12, 59:4
**related** [1] - 25:7
**relates** [1] - 54:8
**relative** [1] - 30:3
**Relevance** [1] - 84:23
**relevance** [5] - 51:12, 53:23, 84:13, 84:25, 85:9
**relevant** [2] - 51:13, 69:9
**reliable** [1] - 22:24
**remark** [1] - 53:16
**remarks** [1] - 54:15
**Remarks** [2] - 53:10, 53:12
**remember** [12] - 25:5, 25:24, 25:25, 59:12, 61:20, 61:24, 72:15, 74:12, 86:3, 86:6, 86:9, 97:2
**remembered** [1] - 64:23
**remembers** [1] - 62:16
**reminded** [1] - 9:8
**removed** [1] - 51:10
**repeat** [1] - 35:12
**repeated** [1] - 55:11
**repeatedly** [2] - 37:1, 37:23
**report** [1] - 96:15
**reported** [3] - 95:4, 96:7, 99:10
**reporter** [1] - 97:18
**REPORTER** [3] - 1:23, 99:1, 99:6
**Reporter** [1] - 99:20
**REPORTER'S** [1] - 1:14
**reporting** [1] - 93:9
**reports** [1] - 54:9

**representation** [1] - 92:1
**representative** [3] - 5:10, 5:12, 94:24
**represented** [1] - 36:20
**requirement** [2] - 14:23, 89:11
**requirements** [1] - 90:5
**requires** [1] - 87:16
**research** [3] - 60:10, 82:6, 82:9
**researcher** [3] - 17:17, 60:5, 61:19
**researchers** [2] - 14:20
**respected** [1] - 17:16
**respectively** [1] - 50:16
**respond** [1] - 54:13
**response** [1] - 54:19
**rest** [2] - 32:15, 32:17
**restart** [2] - 12:7
**result** [2] - 14:14, 22:9
**results** [1] - 12:23
**RESUMES** [1] - 9:13
**revelation** [1] - 52:9
**revenues** [2] - 28:7, 28:11
**reversal** [5] - 11:25, 22:3, 22:21, 22:23, 34:5
**reverse** [1] - 22:24
**review** [1] - 58:20
**reviewed** [1] - 67:14
**REZA** [1] - 3:8
**RICHARD** [1] - 5:4
**Richter** [7] - 64:19, 65:14, 65:23, 66:9, 66:19, 66:21, 93:24
**rick.frenkel@lw.com** [1] - 5:6
**rise** [1] - 74:13
**rmirzaie@raklaw. com** [1] - 3:11
**Roadmap** [2] - 8:8, 8:10
**ROBERT** [1] - 2:12
**role** [3] - 47:6, 47:16, 47:17
**ROOM** [1] - 1:24
**roughly** [2] - 26:19, 84:11
**run** [2] - 95:25, 97:21
**RUSS** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**Russ** [1] - 5:9

## S

**salary** [3] - 27:15, 84:21, 85:8
**SALIL** [1] - 4:5
**sample** [1] - 41:25
**San** [2] - 10:2, 61:22
**SANTA** [3] - 1:18, 1:24, 9:1
**Sanvito** [1] - 17:17
**SARAH** [1] - 4:16
**sarah.wang@lw. com** [1] - 4:19
**saw** [2] - 66:22, 79:16
**sbali@stradlinglaw. com** [1] - 4:7
**scale** [1] - 88:24
**schematic** [3] - 12:6, 12:18
**Schmoller** [15] - 5:11, 29:2, 31:8, 34:16, 38:4, 39:1, 39:19, 39:23, 41:11, 44:21, 45:16, 50:25, 53:14, 55:16, 59:15
**scholar** [1] - 14:20
**scholarship** [1] - 61:12
**Schrefl** [1] - 75:10
**scientific** [1] - 15:16
**scientist** [1] - 60:4
**scientists** [1] - 60:10
**Scott** [4] - 3:19, 4:9, 4:21, 5:5
**screen** [6] - 29:6, 29:10, 30:1, 45:10, 45:14, 91:8
**Seagate** [2] - 13:15, 57:19
**Seagate's** [1] - 57:11
**search** [2] - 39:1, 39:3
**seated** [1] - 9:6
**second** [8] - 22:20, 46:21, 47:5, 47:16, 48:3, 54:4, 54:17, 56:9
**seconds** [2] - 46:14, 97:14
**section** [1] - 38:9
**Section** [2] - 52:18, 99:8
**sections** [1] - 53:17
**see** [80] - 11:3, 12:11, 19:18, 29:7, 29:10, 29:11, 32:12, 32:13, 33:15, 33:18, 33:19, 34:14, 35:21, 35:24, 36:1, 36:4, 36:16, 38:8, 38:13, 38:14, 38:24, 39:6, 41:10,

43:9, 43:19, 44:12, 46:9, 46:22, 49:17, 50:13, 50:15, 51:2, 51:7, 51:8, 51:24, 52:3, 52:17, 52:19, 52:20, 52:24, 52:25, 53:10, 53:12, 54:15, 54:22, 55:18, 55:22, 59:18, 59:19, 59:22, 64:21, 64:22, 65:23, 66:14, 68:11, 70:24, 71:18, 71:20, 71:21, 72:22, 73:4, 75:17, 76:5, 76:6, 76:13, 78:5, 79:18, 79:21, 81:5, 81:14, 82:2, 86:25, 88:21, 91:19, 91:20, 92:9, 92:23, 92:24, 97:5, 98:6
**self** [2] - 56:11, 56:21
**self-contradicting** [2] - 56:11, 56:21
**sell** [1] - 28:3
**SELNA** [1] - 1:3
**semi** [2] - 16:23, 17:5
**senior** [3] - 94:23, 95:16, 95:17
**sense** [2] - 11:24, 30:17
**sensors** [2] - 25:3, 25:7
**sentence** [19] - 34:22, 35:2, 35:7, 35:16, 35:20, 35:23, 36:1, 36:3, 36:5, 36:9, 36:14, 36:17, 37:9, 52:11, 56:9, 56:20, 63:15, 79:19, 93:6
**sentences** [2] - 36:1, 36:15
**separate** [3] - 11:5, 37:11, 41:15
**separately** [1] - 35:4
**series** [1] - 51:9
**session** [1] - 9:7
**Session** [1] - 7:13
**seventh** [1] - 78:8
**several** [5] - 22:8, 53:18, 64:12, 64:14, 70:19
**shanle@ stradlinglaw.com** [1] - 4:15
**shape** [4] - 46:6, 48:1, 48:4, 48:25
**share** [2] - 12:4, 16:25
**shared** [2] - 13:14, 13:15
**Shen** [4] - 76:17, 79:25, 80:12, 92:18

**shift** [1] - 66:22
**shifting** [1] - 49:7
**show** [16] - 10:19, 37:22, 39:4, 45:10, 51:2, 51:14, 51:18, 56:15, 60:11, 67:25, 69:21, 71:18, 88:14, 88:19, 92:4, 93:6
**showed** [5] - 13:7, 14:13, 56:13, 56:19, 88:15
**showing** [8] - 10:18, 12:3, 14:14, 19:8, 30:23, 38:5, 51:10, 72:17
**shown** [2] - 59:20, 66:4
**shows** [5] - 12:19, 38:19, 51:2, 72:20, 76:12
**sic** [4] - 12:25, 14:4, 55:8, 74:9
**sic]** [1] - 66:21
**side** [6] - 58:10, 66:13, 70:24, 72:4, 73:1
**signal** [3] - 23:10, 23:11
**signal-to-noise** [2] - 23:10, 23:11
**signature** [5] - 50:15, 50:18, 50:19, 56:15, 56:19
**significantly** [3] - 12:17, 12:21
**similar** [6] - 62:23, 63:14, 64:16, 64:24, 65:2, 65:10
**simple** [2] - 21:23, 45:8
**simply** [2] - 38:25, 63:7
**simulation** [9] - 12:5, 12:7, 12:8, 12:19, 14:14, 22:13, 83:9, 83:12, 83:20
**simulations** [1] - 22:12
**single** [5] - 12:13, 12:15, 14:15, 64:6, 64:12
**single-layer** [1] - 12:13
**single-phase** [1] - 14:15
**situation** [3] - 33:2, 47:2, 47:15
**situations** [2] - 44:1, 47:11
**sixth** [3] - 36:3, 36:5, 36:9

**size** [1] - 48:13
**skepticism** [1] - 90:15
**SL6a** [2] - 7:20, 8:15
**slide** [21] - 10:11, 12:3, 12:4, 19:6, 71:14, 71:15, 72:17, 72:20, 72:21, 72:23, 72:24, 73:17, 75:9, 76:3, 76:12, 76:20, 76:23, 81:13, 83:6, 88:15, 91:14
**Slide** [5] - 7:5, 71:12, 71:13, 72:21, 75:23
**slides** [15] - 9:19, 10:12, 13:3, 21:20, 69:21, 70:9, 70:21, 70:22, 71:9, 71:10, 74:25, 75:12, 75:20, 79:16, 81:2
**slightly** [2] - 23:1, 55:13
**slope** [4] - 12:15, 12:16, 12:21
**slowly** [1] - 48:17
**smaller** [6] - 12:10, 22:1, 33:25, 89:9, 89:14, 89:16
**smallest** [1] - 10:20
**Society** [9] - 7:12, 77:6, 77:18, 78:6, 78:17, 79:4, 79:9, 80:11, 80:19
**soft** [11] - 62:8, 62:11, 62:20, 64:7, 64:13, 67:19, 72:18, 73:21, 80:3, 92:21
**softer** [1] - 73:11
**software** [9] - 22:14, 83:9, 83:12, 83:16, 83:19, 83:20, 83:24, 84:2, 84:9
**sole** [2] - 27:7, 27:12
**solve** [1] - 91:23
**solved** [1] - 76:10
**sometimes** [2] - 42:15, 60:10
**soon** [1] - 17:23
**sorry** [18] - 25:18, 30:21, 33:14, 34:4, 35:6, 36:8, 43:18, 44:7, 44:16, 48:5, 65:24, 66:2, 71:7, 71:22, 76:7, 77:1, 78:3, 86:18
**sort** [4] - 10:11, 11:4, 32:10, 60:6
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 99:20
**SPAAN** [3] - 1:23, 99:5, 99:19

**speaking** [1] - 25:21
**specification** [4] - 29:22, 86:5, 86:8, 86:10
**spent** [1] - 76:8
**spin** [2] - 64:12, 64:19
**spin-chain** [1] - 64:12
**spins** [5] - 11:14, 11:15, 11:25, 64:13, 64:14
**splits** [1] - 97:9
**spoken** [1] - 49:5
**spring** [14] - 6:18, 7:19, 19:11, 20:6, 20:12, 72:9, 76:13, 79:17, 80:2, 80:13, 90:21, 92:20, 93:13, 93:21
**Spring** [3] - 7:9, 13:24, 72:3
**stability** [4] - 12:20, 14:25, 16:18, 17:10
**stable** [4] - 11:22, 22:1, 22:3, 22:22
**stack** [1] - 87:12
**staff** [1] - 95:16
**stage** [1] - 28:7
**stamp** [1] - 51:3
**STAND** [1] - 9:13
**stand** [3] - 29:23, 79:6, 80:5
**standard** [1] - 30:16
**standing** [1] - 56:1
**stands** [10] - 31:21, 41:17, 42:11, 54:23, 55:23, 56:23, 57:1, 57:5
**start** [3] - 24:11, 28:22, 35:25
**started** [1] - 24:12
**starting** [1] - 23:7
**starts** [1] - 79:19
**state** [1] - 89:8
**STATE** [1] - 99:4
**statement** [6] - 18:20, 34:13, 63:9, 63:22, 88:23, 92:17
**states** [2] - 65:6, 77:21
**States** [3] - 99:6, 99:8, 99:13
**STATES** [1] - 1:1
**steal** [1] - 84:6
**stenographically** [1] - 99:10
**step** [1] - 94:15
**STEVEN** [1] - 4:12
**still** [8] - 9:8, 24:13, 31:2, 47:18, 56:14, 81:10, 81:11, 92:2
**stop** [1] - 36:19

**storage** [56] - 11:6, 11:8, 21:24, 23:12, 25:19, 31:5, 31:9, 31:12, 31:16, 31:23, 32:5, 32:8, 32:20, 33:9, 33:17, 34:6, 34:9, 34:23, 35:3, 35:8, 35:17, 36:11, 36:23, 37:3, 37:11, 37:16, 37:25, 38:10, 38:19, 38:22, 39:15, 39:25, 40:6, 40:16, 41:1, 41:4, 41:9, 41:15, 41:18, 43:23, 51:24, 52:4, 52:5, 52:12, 69:16, 86:19, 86:23, 87:4, 87:6, 87:23, 88:20, 89:15, 90:25, 92:13, 94:6, 94:7
**store** [6] - 11:17, 34:6, 86:11, 87:20, 88:4
**stored** [3] - 11:12, 11:13, 11:20
**stores** [1] - 32:6
**story** [1] - 51:14
**STRADLING** [2] - 4:4, 4:12
**straight** [2] - 11:18, 68:21
**STREET** [1] - 1:24
**strongly** [2] - 47:4, 47:5
**structure** [28] - 10:22, 11:23, 12:9, 12:13, 12:16, 12:24, 22:15, 22:24, 34:11, 36:22, 37:10, 38:6, 38:7, 39:13, 64:6, 73:8, 73:20, 80:2, 86:18, 87:2, 87:13, 90:16, 90:25, 92:20, 94:2, 94:10, 94:11
**structures** [5] - 33:23, 34:2, 37:5, 73:1, 86:14
**students** [1] - 82:18
**subject** [1] - 76:8
**submission** [3] - 79:7, 79:18, 80:7
**submit** [1] - 78:12
**Submitted** [1] - 7:11
**submitted** [14] - 29:14, 50:16, 77:5, 77:18, 77:22, 77:24, 78:14, 78:16, 78:20, 79:3, 79:5, 79:13, 80:18, 97:4
**submitting** [1] - 78:10
**subscript** [1] - 40:2

**substrate** [1] - 11:1
**successfully** [1] - 55:12
**Suess** [16] - 5:9, 6:15, 6:17, 6:19, 7:7, 7:9, 7:18, 9:12, 19:9, 22:5, 23:14, 23:19, 50:17, 54:5, 85:17, 93:8
**SUESS** [2] - 6:4, 9:13
**suggest** [3] - 26:9, 86:14, 93:11
**suggested** [3] - 17:2, 17:3, 17:18
**suggesting** [1] - 83:15
**suggestion** [1] - 17:15
**Suite** [6] - 2:17, 3:5, 3:13, 4:6, 4:13, 4:17
**Summary** [4] - 37:6, 37:10, 37:12, 37:21
**summary** [2] - 85:22, 85:25
**Superparamagnetic** [1] - 7:7
**superparamagnetic** [6] - 13:11, 76:4, 76:21, 76:24, 91:16, 91:24
**superscript** [1] - 40:2
**support** [1] - 82:9
**suppose** [1] - 33:7
**surprised** [4] - 86:3, 86:7, 86:9, 90:14
**surprising** [1] - 39:9
**sustained** [4] - 84:16, 84:24, 85:10, 90:18
**SW** [1] - 2:17
**switch** [2] - 80:21, 89:18
**Switched** [1] - 7:6
**switching** [4] - 12:22, 34:9, 87:23, 88:4
**swore** [1] - 45:1
**SWORN** [1] - 9:13
**system** [1] - 93:9

**T**

**talks** [4] - 16:11, 16:13, 69:11, 92:7
**Target** [3] - 8:12, 8:14, 8:15
**team** [2] - 26:6, 65:25
**Tech** [5] - 21:11, 21:12, 97:12, 97:14, 97:24
**technical** [2] - 29:9, 95:16
**technician** [2] - 5:10, 5:11

**technique** [2] - 42:6, 42:10
**techniques** [1] - 41:24
**technologies** [1] - 21:14
**TECHNOLOGIES** [2] - 1:4, 1:8
**Technologies** [12] - 5:9, 26:13, 26:25, 27:3, 27:8, 27:13, 27:16, 27:18, 27:19, 27:25, 28:7, 28:15
**technologist** [1] - 95:17
**technology** [2] - 23:18, 25:19
**Technology** [3] - 7:22, 16:15, 27:10
**temperature** [2] - 46:15, 47:5
**ten** [1] - 30:14
**tenure** [1] - 15:7
**term** [1] - 30:3
**tesla** [5] - 40:8, 40:10, 40:11, 40:12, 40:17
**Test** [1] - 8:7
**test** [1] - 68:17
**testified** [5] - 43:10, 48:23, 49:2, 57:7, 72:12
**testimony** [11] - 25:5, 25:20, 43:13, 45:3, 46:9, 62:13, 63:24, 64:2, 65:8, 72:15, 95:18
**text** [2] - 51:18, 53:11
**textbook** [1] - 13:8
**texts** [3] - 51:9, 51:10, 51:11
**THE** [51] - 6:4, 9:6, 9:9, 9:13, 10:6, 10:8, 14:4, 15:23, 15:25, 23:21, 23:24, 44:18, 50:2, 51:16, 54:11, 61:6, 62:17, 63:1, 63:2, 63:6, 63:10, 63:25, 70:14, 74:10, 74:13, 74:16, 75:6, 77:11, 84:16, 84:24, 85:2, 85:10, 85:14, 90:18, 91:6, 93:16, 94:15, 95:13, 95:25, 96:3, 96:4, 96:12, 96:15, 96:19, 96:25, 97:8, 97:16, 97:19, 97:23, 98:3, 98:6
**theme** [1] - 16:20
**themes** [1] - 16:16
**thermal** [1] - 22:22
**thermally** [1] - 22:1

**thermostability** [2] - 13:7, 92:2
**thick** [1] - 49:16
**thickness** [11] - 22:2, 44:5, 44:9, 46:2, 46:14, 47:1, 47:3, 47:4, 47:10, 47:12, 89:23
**Thin** [1] - 6:25
**third** [6] - 35:2, 35:7, 35:16, 42:10, 55:17, 55:19
**thousands** [1] - 84:21
**three** [8] - 11:10, 11:12, 12:10, 53:16, 60:18, 64:17, 64:18, 74:19
**three-dimensional** [1] - 64:17
**tilt** [1] - 68:17
**tilted** [13] - 68:9, 68:13, 68:14, 68:16, 68:18, 68:20, 68:25, 69:8, 69:11, 69:13, 69:16, 69:17
**timescale** [3] - 46:14, 47:16, 48:3
**timing** [1] - 95:24
**Title** [1] - 99:8
**title** [9] - 17:2, 17:3, 17:7, 17:13, 17:18, 68:8, 69:8, 70:1, 76:3
**titled** [2] - 7:5, 7:9
**today** [3] - 23:15, 24:24, 26:9
**together** [1] - 22:8
**tomorrow** [2] - 96:15, 97:1
**took** [4] - 18:7, 58:23, 59:2
**top** [24] - 10:24, 11:7, 19:15, 20:3, 20:4, 20:18, 31:9, 38:9, 38:18, 38:20, 51:3, 72:13, 72:18, 73:11, 73:20, 73:25, 74:4, 74:5, 74:7, 75:16, 78:5, 78:23, 92:7, 94:6
**Toshiba** [1] - 13:15
**total** [1] - 95:21
**totally** [2] - 73:16, 92:25
**touched** [1] - 39:22
**toward** [1] - 92:13
**towards** [3] - 25:20, 60:18, 94:7
**Town** [1] - 3:22
**transcribing** [1] -

97:18
**Transcript** [1] - 1:5
**transcript** [2] - 99:9, 99:11
**TRANSCRIPT** [1] - 1:14
**transcripts** [1] - 97:21
**treat** [1] - 25:11
**treatment** [1] - 25:18
**TRIAL** [1] - 1:15
**trial** [5] - 58:12, 58:17, 58:19, 97:10, 97:23
**trilayer** [5] - 10:19, 12:9, 12:16, 14:15, 93:8
**trilemma** [2] - 13:11, 16:19
**true** [37] - 25:8, 26:7, 26:11, 27:16, 27:23, 28:5, 28:14, 31:6, 33:22, 35:4, 35:6, 35:21, 38:8, 44:5, 47:14, 48:2, 48:15, 51:5, 51:22, 55:10, 58:7, 58:25, 62:9, 64:23, 67:23, 70:21, 73:21, 77:20, 80:13, 81:8, 82:15, 82:19, 83:21, 84:2, 84:12, 87:22, 99:9
**trust** [3] - 26:22, 27:10, 97:5
**truth** [2] - 63:7, 63:8
**try** [2] - 38:24, 83:1
**trying** [4] - 43:18, 83:2, 86:13, 93:11
**turn** [18] - 9:22, 13:20, 15:17, 24:8, 37:6, 38:2, 44:11, 50:5, 50:14, 52:17, 56:7, 65:22, 71:12, 74:9, 74:22, 75:23, 76:25, 81:14
**Tutorial** [1] - 7:13
**twice** [2] - 36:3, 84:1
**two** [31] - 13:10, 23:17, 24:24, 25:7, 25:14, 26:16, 29:23, 33:8, 33:11, 33:12, 33:13, 33:20, 33:23, 34:1, 36:14, 36:21, 37:2, 37:4, 37:15, 38:18, 39:13, 39:16, 53:11, 57:16, 57:18, 72:25, 74:2, 84:4, 97:25
**two-part** [1] - 36:21
**typical** [1] - 29:21
**typing** [1] - 73:13

## U

**U.S** [3] - 1:3, 6:22, 84:12
**U.S.C** [1] - 52:18
**UC** [1] - 78:22
**ultimately** [1] - 90:4
**undated** [1] - 6:16
**under** [7] - 9:8, 43:24, 44:1, 45:1, 47:8, 88:12, 89:2
**underlayer** [7] - 30:17, 31:20, 38:22, 51:25, 74:5, 74:6, 74:8
**underlined** [1] - 51:9
**underlining** [1] - 51:11
**understood** [2] - 61:25, 75:22
**undertake** [1] - 97:20
**unfortunately** [2] - 54:19, 65:19
**UNITED** [1] - 1:1
**United** [3] - 99:6, 99:8, 99:13
**university** [2] - 15:7, 82:24
**University** [2] - 24:13, 24:15
**unpatentable** [1] - 52:22
**untangle** [1] - 14:25
**up** [30] - 13:13, 13:14, 17:11, 19:17, 20:18, 29:1, 29:6, 31:9, 34:19, 35:13, 38:4, 39:4, 39:23, 44:20, 49:16, 53:13, 55:15, 58:2, 58:4, 59:15, 68:21, 68:24, 69:1, 70:16, 89:1, 91:4, 91:8, 92:15, 92:22, 95:10
**upper** [2] - 89:9, 89:17
**usual** [1] - 30:15

## V

**valid** [1] - 90:5
**various** [1] - 22:14
**varying** [1] - 91:1
**Vaughn** [1] - 68:23
**version** [1] - 66:18
**versions** [2] - 66:16, 66:17
**versus** [1] - 14:15
**very-well** [1] - 67:11
**vibrating** [1] - 41:25
**Vice** [1] - 2:16
**Victora** [28] - 19:1,

20:20, 66:22, 66:25, 67:10, 67:14, 67:18, 68:4, 68:18, 68:23, 69:15, 69:20, 71:25, 72:8, 73:14, 73:15, 76:16, 79:25, 80:9, 80:12, 80:15, 90:20, 90:24, 91:17, 91:21, 92:18, 93:1, 93:14
**Victora's** [6] - 69:1, 69:23, 70:2, 72:19, 73:10, 73:17
**video** [1] - 94:22
**videos** [1] - 97:18
**Videotaped** [3] - 6:6, 6:7, 95:3
**videotaped** [1] - 96:6
**Vienna** [2] - 24:14, 24:15
**voice** [1] - 58:6
**volume** [2] - 44:12, 63:17
**VOLUME** [1] - 1:10
**vs** [1] - 1:7
**VSM** [2] - 41:25, 48:4

## W

**Wabash** [2] - 3:13, 4:17
**Wall** [2] - 7:6, 62:4
**WANG** [1] - 4:16
**Wang** [3] - 68:3, 69:7, 90:24
**wants** [1] - 57:6
**Washington** [3] - 2:18, 58:2, 58:4
**watched** [1] - 34:12
**WATKINS** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4
**ways** [1] - 93:23
**WD** [7] - 7:13, 7:22, 8:7, 8:8, 8:10, 97:13, 97:14
**WEDNESDAY** [2] - 1:16, 9:1
**well-known** [1] - 67:10
**Wendy** [1] - 5:9
**WEST** [1] - 1:24
**Western** [24] - 1:8, 5:12, 23:16, 24:5, 53:5, 57:22, 58:6, 58:13, 58:20, 58:21, 71:2, 71:3, 83:9, 83:15, 83:19, 83:24, 84:1, 84:8, 84:11, 93:25, 94:23, 94:24, 95:17, 97:25
**white** [1] - 66:1

**whole** [2] - 45:15, 77:14
**Wilshire** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**win** [1] - 26:10
**winner** [1] - 17:6
**winning** [1] - 26:4
**withdraw** [3] - 33:14, 71:7, 81:19
**withdrawn** [1] - 82:25
**WITHDRAWN** [3] - 6:12, 7:3, 8:5
**witness** [8] - 23:20, 63:4, 85:13, 94:13, 94:16, 94:18, 94:21, 95:14
**WITNESS** [4] - 63:1, 63:10, 85:14, 91:6
**WITNESSES** [1] - 6:3
**witnesses** [1] - 58:18
**won** [3] - 25:22, 26:1, 26:2
**word** [2] - 30:7, 79:20
**worded** [1] - 42:15
**words** [6] - 30:9, 30:14, 32:24, 33:1, 33:2, 37:15
**workshop** [5] - 16:14, 16:15, 16:16, 16:21, 16:22
**world** [1] - 94:11
**write** [7] - 13:17, 22:25, 23:4, 23:8, 29:17, 56:12, 65:20
**Writeability** [1] - 7:15
**writeability** [1] - 17:10
**writing** [2] - 29:20, 56:5
**written** [3] - 29:23, 56:25, 93:13
**wrote** [10] - 13:19, 29:19, 29:21, 31:15, 33:8, 37:12, 56:10, 68:16, 80:11, 82:1

## Y

**year** [2] - 26:19, 75:25
**years** [11] - 18:7, 18:11, 26:16, 51:21, 52:8, 55:8, 58:23, 59:2, 81:7, 81:8, 81:9
**yellow** [3] - 72:18, 73:2, 73:20
**YOCCA** [2] - 4:4, 4:12
**Yoshihiro** [2] - 95:15, 96:6
**YOSHIHIRO** [1] - 6:7
**YOUNG** [1] - 4:20

14

**yourself** [9] - 43:8, 67:6, 72:4, 76:13, 78:25, 79:17, 81:15, 81:21

## Z

**zero** [1] - 86:12
**Zimanyi** [8] - 78:20, 78:21, 78:25, 79:3, 79:5, 81:15, 93:12

**UNITED STATES DISTRICT COURT**