1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

| | |
|---|---|
| MR TECHNOLOGIES, GMBH, ) | |
| ) | |
| Plaintiff and ) | **Certified Transcript** |
| Counterclaim Defendant, ) | |
| ) | Case No. |
| vs. ) | 8:22-cv-01599-JVS-DFM |
| ) | |
| WESTERN DIGITAL TECHNOLOGIES, ) | |
| INC., ) | |
| ) | |
| Defendant and ) | |
| Counterclaim Plaintiff. ) | **DAY 4, VOLUME I** |
| ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

FRIDAY, JULY 19, 2024

8:14 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF and COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  MARC A FENSTER, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mfenster@raklaw.com

RUSS AUGUST & KABAT
BY:  BRIAN D. LEDAHL, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
bledahl@raklaw.com

RUSS AUGUST & KABAT
BY:  JACOB ROBERT BUCZKO, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
jbuczko@raklaw.com

RUSS AUGUST & KABAT
BY:  MATTHEW D. AICHELE, ESQ., Pro Hac Vice
800 Maine Avenue, SW
Suite 200
Washington, D.C. 20024
202-664-0623
maichele@raklaw.com

RUSS AUGUST & KABAT
BY:  MINNA Y. CHAN, ATTORNEY AT LAW
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mchan@raklaw.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR PLAINTIFF AND COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  PAUL A. KROEGER, ESQ.
1224 Wilshire Boulevard
Suite 1200
Los Angeles, California 90025
310-826-7474
pkroeger@raklaw.com

RUSS AUGUST & KABAT
BY:  REZA MIRZAIE, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
rmirzaie@raklaw.com

LATHAM & WATKINS LLP
BY:  DALE CHANG, ESQ.
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
dchang@raklaw.com


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

LATHAM & WATKINS LLP
BY:  DOUGLAS E. LUMISH, ESQ.
140 Scott Drive
Menlo Park, California 94025
650-328-4600
doug.lumish@lw.com

LATHAM & WATKINS LLP
BY:  JOSEPH HYUK LEE, ESQ.
650 Town Center Drive
20th Floor
Costa Mesa, California 92626
714-540-1235
joseph.lee@lw.com


**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**


STRADLING YOCCA CARLSON & RAUTH LLP
BY:  SALIL BALI, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4278
sbali@stradlinglaw.com

LATHAM & WATKINS LLP
BY:  CHAARUSHENA DEB, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
chaaru.deb@lw.com

STRADLING YOCCA CARLSON & RAUTH LLP
BY:  STEVEN M. HANLE, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4000
shanle@stradlinglaw.com

LATHAM AND WATKINS LLP
BY:  SARAH W. WANG, ATTORNEY AT LAW
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
sarah.wang@lw.com

LATHAM & WATKINS LLP
BY:  PATRICIA YOUNG, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
patricia.young@lw.com


**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

            LATHAM & WATKINS LLP
            BY:  RICHARD GREGORY FRENKEL, ESQ.
            140 Scott Drive
            Menlo Park, California 94025-1008
            650-328-4600
            rick.frenkel@lw.com


**ALSO PRESENT:**

            Wendy Liu, paralegal (Russ August & Kabat)
            Dieter Suess, plaintiff's corporate representative
            Andy Mortensen, plaintiff's IT technician
            Chris Schmoller, defendant's IT technician


**UNITED STATES DISTRICT COURT**

# I N D E X

**WITNESSES**                                                              **PAGE**

**MARK EDWARD RE, CALLED BY THE PLAINTIFF**
    Redirect Examination by Mr. Chang                                   14
    Recross-Examination by Mr. Lumish                                   30

**JAMES WAYNE BERGMAN, CALLED BY THE PLAINTIFF**
    Direct Examination by Ledahl                                        38
    Cross-Examination by Ms. Young                                     118

## EXHIBITS

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| JX-2124 | [Excel] MR tech data (Q4FY21 to Q4FY23) ship to US added gross revenue | 84 | |
| JX-2125 | [Excel] MR tech data (FY18 to Q3FY21) ship to US added Gross revenue updated | 85 | |
| PTX-716 | Bergman Report, Exhibits 4.3-4.8 | 88 | |
| JX-2116 | WDC Ultrastar DC HC570 Mmap Final | 96 | |
| JX-2118 | WD BlueMobile 2018 Amazon Aplus r2 | 97 | |
| JX-2119 | WD Elements Desktop HDD Storage product overview | 99 | |

**I N D E X**
**(Continued:)**

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| JX-2120 | WD elements Portable Storage product overview | 99 | |
| JX-2121 | WD My Passport Portable HDD Storage product overview | 100 | |
| PTX-717 | Bergman Report, Exhibits 5.1-5.3 | 112 | |

**SANTA ANA, CALIFORNIA; FRIDAY, JULY 19, 2024**

**8:14 A.M.**

**- - -**

**(Out of the presence of the jury.)**

THE COURTROOM DEPUTY:  Calling Item Number 1, SACV-22-10599, MR Technologies, GmbH, vs. Western Digital Technologies, Inc.

Counsel, please state your appearances.

MR. FENSTER:  Good morning, Your Honor.  Marc Fenster for the plaintiff, MR Technologies.  With us at counsel table is Dr. Dieter Suess, Brian Ledahl, Dale Chang, Paul Kroeger, Reza Mirzaie, Jacob Buczko, Minna Chan, and Matthew Aichele.  And we're ready to proceed, Your Honor.

THE COURT:  Very good.  Good morning.

MR. LUMISH:  Good morning, Your Honor.  Doug Lumish for Western Digital.  With us today is Salil Bali, Rick Frenkel, Patricia Young, Sarah Wang, Chaaru Deb.  And also from the client, we have Jesse Mulholland and Jennifer Beard.

THE COURT:  Good morning.  I understand you wanted to take up some objections to exhibits?

MR. FENSTER:  Good morning, Your Honor.  Marc Fenster.  These apply to -- so there are two issues with respect to the anticipated testimony from Dr. Desai, who will be defendant's first witness.

These relate to Exhibits 1324 -- and, Your Honor, the issue is that Exhibits 1324 and 1322 relate to noninfringing alternatives that were expressly struck by the Court's order.  You may recall that they sought to introduce late noninfringing alternatives that weren't identified in the interrogatories.  That was Firebird.  1322 as Mercury, Mariner, Zephyr, and Firebird.

We move to -- we moved *in limine* because those had not been identified.  Your Honor granted that.  MRT served an interrogatory for this reason.  Grants MRT's motion to strike on this issue.  You struck these portions from Dr. Bertero's report.  This is paragraph 222 that was stricken, which is Mercury, Mariner, Zephyr, and Firebird.  So these are all the noninfringing alternatives that were stricken.

Your Honor, at the meet and confer last night, Western Digital indicated that they thought that that just meant as to expert -- as to experts, not as to fact witnesses.  Mr. Frankel, at the beginning of this trial, indicated Western Digital presented noninfringing alternatives.  It was stricken by this Court in the MIL.  So there's no longer a presentation of noninfringing alternatives.  There's no need to bring this up.  So we object to them trying to do it through Dr. Desai.

MR. FRENKEL:  Good morning, Your Honor.  To be clear, we're not presenting noninfringing alternatives case.  We're very aware of this Court's MIL.  These were documents

that were produced by Western Digital in November of 2023, months before the close of -- in December of 2023, months before the close of fact discovery.

Dr. Desai was involved in these programs.  He's here to authenticate.  There's no authentication objection.

At the end of Dr. Re's testimony, the second-to-the-last question was:

"So if Western Digital couldn't use the invention, what would it be left with."

And Dr. Re answered:

"So it could be stuck on that bilayer design that we saw at the beginning of those roadmap charts at a much lower areal density than" -- and I can't read my handwriting -- "than we have today."

These charts, these documents help the jury put that into context.  In essence, to keep these out would allow Dr. Re to give testimony that Dr. Desai could not put into context.  It will not be relied on by Dr. Bertero in any way.  There will be no discussion of noninfringing alternatives.  I mentioned that at the meet and confer yesterday.

THE COURT:  What's the purpose of offering them, then?

MR. FRENKEL:  The purpose of offering them is two reasons:  One is to offer background as to how these programs got involved.  And two, areal density is a big issue in this

case.  The question is should -- if infringement is found, should Western Digital be liable for 100 percent of the development between 300 gigabits per square inch and 700 gigabits per square inch.

These were programs that produced real products within Western Digital that were released to the public that were at 640 gigabits per square inch.  Ultimately, the jury should be able to consider these programs.  That is not part of Dr. Bertero's report that was stricken.  It is based on documents that were produced during the fact discovery.

Dr. Goglia relies on those documents in his report. He's an expert on the evolution of PMR that will be testifying next week.

MR. FENSTER:  Your Honor, they're offering it exactly for noninfringing alternatives to suggest to the jury, whether they do it through the expert or not, that these are noninfringing.  There's no expert -- they hadn't identified it, and there's no expert testimony.  They made this exact same argument in connection with the MIL before Latham came in and Your Honor granted the MIL.  They should be excluded, Your Honor.

THE COURT:  It will be excluded.

MR. FENSTER:  Your Honor, I have one other concern. So based on what you've heard and based on the documents that they presented, I know this one will be excluded, but

Dr. Desai, we have a concern about him offering opinion testimony about quantification of areal benefits.

As you know, Dr. Re submitted an expert report. Western Digital submitted two expert reports, and Your Honor -- by Dr. Bertero and Dr. Goglia regarding the quantification of areal density.  That's clearly a subject for expert testimony.  And, in fact, Your Honor granted a motion excluding overlapping testimony from the two experts.

They should not be allowed to -- so we are concerned and ask that the Court advise that Dr. Desai can't provide testimony in quantifying certain -- quantifying the areal density attributable to certain enablers because that is the subject of expert testimony as to which we have three experts already testifying, Your Honor.

THE COURT:  And he's not designated as an expert.

MR. FENSTER:  That's correct.  And there is no report.

THE COURT:  Okay.  Mr. Frenkel.

MR. FRENKEL:  Dr. Desai will not be presenting expert testimony on the quantification of areal density.  We have other people who are doing that.

THE COURT:  Okay.  Resolved?

MR. FENSTER:  Very good, Your Honor.

THE COURT:  Okay.

MR. FENSTER:  We'll object if we think it's opinion

testimony.

THE COURT:  Okay.  Any other matters you'd like to take up now?

MR. FENSTER:  That's it for us, Your Honor.

MR. LUMISH:  Nothing else for Western Digital, Your Honor.

THE COURT:  Okay.  Then we'll -- next Tuesday we need to start a little bit later.  We'll start at 9:45 rather than 9:00.  And we'll just take an hour for lunch.

We'll be in recess.

**(Recess from 8:56 a.m. to 9:00 a.m.)**

**(In the presence of the jury.)**

THE COURTROOM DEPUTY:  Please be seated and come to order.  This Court is again in session.

Sir, you are reminded that you are still under oath.

THE COURT:  Good morning, ladies and gentlemen.

Two things:  You've already done it, but if it's easier for you to see, to move around a little bit in the jury box, that's fine.  Also, if you need to stretch at some point, you can do that too.  Okay?

Also, we're going to start a little bit later on Tuesday.  We're going to start at 9:45 rather than 9:00, but we're only going to take one hour for lunch on Tuesday.

Okay.  Mr. Chang.

///

**UNITED STATES DISTRICT COURT**

**MARK EDWARD RE, PREVIOUSLY SWORN, RESUMES THE STAND**

**REDIRECT EXAMINATION**

BY MR. CHANG:

Q     Good morning, Dr. Re.

A     Good morning.

Q     So yesterday Mr. Lumish was grilling you about the K and 2K over M values that you used for the G1 layer of Group 3.

Do you recall that?

A     I do.

MR. CHANG:  Can we put up PTX-3, Slide 60.

BY MR. CHANG:

Q     Did Mr. Lumish ask you about the K, M, or 2K over M values for Group 1?

A     No, he did not.

MR. CHANG:  Can you put up the next slide, please.

BY MR. CHANG:

Q     Did he ask you about the relative anisotropy levels of Group 1 or the overall increase of anisotropy toward the hard storage layer?

A     No.

MR. CHANG:  Can we put up Slide 70, please.

BY MR. CHANG:

Q     Did Mr. Lumish ask you anything about the K, M, or coercive field 2K over M values for Group 2?

A     No.

**UNITED STATES DISTRICT COURT**

MR. CHANG:  Can we go to the next slide, please.

BY MR. CHANG:

Q    And did he ask you anything about the relative anisotropy levels for Group 2 or the overall increase in anisotropy toward the hard storage layer?

A    He did not.

MR. CHANG:  Can we go to Slide 90, please.

BY MR. CHANG:

Q    Did Mr. Lumish ask you anything about the K, M, or coercive field 2K over M values for Group 4a?

A    No.

MR. CHANG:  Can we go to the next slide.

BY MR. CHANG:

Q    Did he ask you anything about the relative anisotropy levels for Group 4a or the overall increase in anisotropy toward the hard storage layer?

A    He did not.

MR. CHANG:  Can we go to Slide 97, please.

BY MR. CHANG:

Q    Did Mr. Lumish ask you anything about the K, M, or 2K over M values for Group 4b?

A    No.

MR. CHANG:  Next slide.

BY MR. CHANG:

Q    Did he ask you about the relative anisotropy levels for

Group 4b or the overall increase toward the hard storage layer?

A    He didn't.

MR. CHANG:  Can we go to Slide 103, please.

BY MR. CHANG:

Q    Did Mr. Lumish ask you anything about the K, M, or 2K over M values for Group 4c?

A    No.

MR. CHANG:  Go to the next slide.

BY MR. CHANG:

Q    Did he ask you about the relative anisotropy levels or how they increased toward the hard storage layer?

A    No, he didn't.

MR. CHANG:  Next slide -- or Slide 108, please.

BY MR. CHANG:

Q    Did Mr. Lumish ask you anything about the K, M, or 2K over M values for Group 5?

A    He didn't.

MR. CHANG:  Go to the next slide.

BY MR. CHANG:

Q    And did he ask you anything about the relative anisotropy levels for Group 5 or how they increased toward the hard storage layer?

A    No.

Q    So did Mr. Lumish ask you a single question about the anisotropy K or the coercive field 2K over M values for those

UNITED STATES DISTRICT COURT

six groups?

A    No.

Q    Let's turn to Group 3, the 5X1.  And go to Slide 80.

Even as to this group, did Mr. Lumish ask you anything about the two -- the K, the M, or 2K over M values that you used for the layers of the nucleation host?

A    No.

Q    Was the only number he asked you about for the G1 layer of Group 3?

A    Yes.

Q    All right.  Let's see whether that matters.

Can we zoom in on the right four columns.

Can you tell us what alloy the G1 layer is?

A    Let's see.  1310 alloy.

Q    And did Western Digital produce two sets of data for that same alloy?

A    They did.

Q    Does that alloy have the same composition --

A    Yes, it does.

Q    -- regardless?

A    Yes, it does.

Q    And you chose this set of test data; right?

A    I did.

Q    Why did you do that?

A    It's in the Western Digital document and confirmed by a

**UNITED STATES DISTRICT COURT**

witness.

Q    Now, do you recall Mr. Lumish suggesting that you should have used data from a different spreadsheet?

A    Yes, I do.

Q    Do you recall that you said -- you testified that under that test data, the Group 3 products would still infringe?

A    Yes.

        MR. CHANG:  Okay.  Let's put up PTX-112.

BY MR. CHANG:

Q    So here we have the '864, Claim 1.

        Do you see that?

A    I do.

        MR. CHANG:  Can we zoom in on Elements 1[d] and 1[e].  Let's go ahead and highlight:

        "A hard magnetic storage layer, having a
    first coercive field Hs greater than 0.5 tesla."
    As well as "a nucleation host, having a second
    coercive field Hn lower than the first coercive
    field Hn less than Hs."

        Dr. Re, can you remind us, what are the two requirements of the claims as to the magnetic properties of the hard storage layer?

A    The hard storage layer needs a coercive field greater than 0.5 tesla.  And it also has to have a coercive field greater than the coercive field of the nucleation host.

**UNITED STATES DISTRICT COURT**

MR. CHANG:  Okay.  Can we put up JX-2015.

BY MR. CHANG:

Q     Is this the spreadsheet that Mr. Lumish suggested you should have used?

A     Yes, it is.

MR. LUMISH:  Your Honor, objection.

THE COURT:  Just a minute.

MR. LUMISH:  Beyond the scope of his report. They're trying to now do it through opinion.

MR. CHANG:  He testified to this in his direct examination.

THE COURT:  Overruled.

MR. CHANG:  Can we search for the Alloy 1310.  And scroll to the right three columns, please.

BY MR. CHANG:

Q     Is this the test data Mr. Lumish suggested that you should have used?

A     Yes, it is.

Q     And what is the 2K over M or coercive field value in this spreadsheet?

A     2 tesla.

Q     Now is 2 tesla greater than 0.5 tesla?

A     Yes, it is.

Q     Okay.  So does that meet the first requirement as to the magnetic properties of the hard storage layer in the claims?

UNITED STATES DISTRICT COURT

A    It does.

Q    Can we go to PTX-3.164.

What did you determine the upper limit of the coercive field of the nucleation host to be?

A    The upper limit for the nucleation host was 1.71 tesla.

Q    And, again, that calculation was determined based on values Mr. Lumish didn't ask you about; right?

A    Correct.

Q    Can you write "2.0 T," tesla, next to the Hs?

        **(The witness complies.)**

BY MR. CHANG:

Q    Is 1.71 tesla less than 2.0 tesla?

A    Yes, it is.

Q    So does that meet the second requirement of the claims as the magnetic properties of the hard storage layer?

A    It does.

Q    So under the test data that you chose and under the test data Mr. Lumish suggested you should have used, the accused product still infringe?

A    Yes, they do.

Q    Did you see any data that would suggest that Group 3 somehow doesn't infringe?

A    No, I did not.

Q    Did Mr. Lumish ask you about any data produced by Western Digital under which Group 3 wouldn't infringe?

A     No, he didn't.

Q     Now, Mr. Lumish suggested that the data you chose was for a discontinued product.  Do you remember that?

A     Yes, I do.

Q     Now, whether that testing for that alloy was done in connection with another product, is that relevant to infringement?

A     No, it's not.

Q     Why not?

A     It's still -- was an alloy that was used, and the data that was presented -- either set of data that was presented would still infringe on the claims.

Q     And alloys -- the same alloy can be used across multiple different products; right?

A     Yes, it can.

Q     The alloy is the same regardless of which products it's used in?

          THE COURT:  Sustained.

          MR. LUMISH:  Objection to the leading.  Thank you, Your Honor.

MR. CHANG:

Q     Can you tell us whether the alloy has any differences depending on the product it's used in?

A     Not to my knowledge.

Q     And does an alloy number, like 1310, does that refer to

different compositions or the same composition?

A    The same composition.

Q    So is Western Digital's testing of an alloy valid for a particular alloy regardless of which product it's in?

A    Yes.

Q    Do you recall Mr. Lumish was asking you questions about whether you had evidence that the layers do not switch at the exact same time?

A    I do remember that.

MR. CHANG:  Can we put up Slide 152.

BY MR. CHANG:

Q    Do all of the accused products have ferromagnetic layers with an overall increase in anisotropy toward the hard storage layer?

A    Yes, they do.

Q    Do they all have exchange coupling layers between those ferromagnetic layers?

A    Yes.

Q    And so what does that tell you about whether the switching is coherent or incoherent?

A    It tells me that the switching should be incoherent.

Q    What does that mean?

A    That means that -- "coherent" would mean that all the moments rotate together, and "incoherent" means that they would rotate incoherently or not together.

UNITED STATES DISTRICT COURT

Q     What's the purpose of an exchange coupling layer?

A     To have the alloy switch incoherently.

Q     And what's the purpose of using lower anisotropy layers toward the top, closest to the write head?

A     So those start to switch first, as taught in the patent.

Q     Is there any evidence in this case at all that you've seen that suggests that all the layers somehow switch at the same time?

A     None whatsoever.

Q     Did any of the testimony you've seen from Western Digital witnesses suggest that all the layers switch at the same time?

A     No.

Q     Did Western Digital's expert, Dr. Bertero, say that they switch all at the same time?

A     No.

Q     And given the structure that we see here, how do you know that the top G layers -- or the nucleation host layers, how do you know that those help assist switching the hard storage layer?

A     Because they have lower anisotropy.  They start to switch first.  The switching occurs, as we've said, incoherently until it reaches the hard storage layer, and then they assist in switching of that.

        MR. CHANG:  Can we put up JX-2047, please.

BY MR. CHANG:

Q    Now, do you recognize this as a -- Dr. Bertero's 2010 presentation?

A    Yes, I do.

Q    Is this a document that you've reviewed and analyzed?

A    I have.

MR. CHANG:  Can we go to Slide 22 of this presentation.

BY MR. CHANG:

Q    Can you look at the first two bullets.

Do you see those bullets?

A    I do.

Q    What is Dr. Bertero describing there?

A    He is describing a double exchange-break layer, or three magnetic structure.

Q    Is there another name for "exchange-break layer"?

A    Exchange coupling layer.

Q    Is that referred to as "ECL" for short?

A    Yes, it is.

Q    The same thing is used --

A    Same layer, yeah.

Q    -- used in the accused products?

A    Yes, they are.

Q    And is that consistent with your understanding of how the accused products work?

A    Yes.  Allowing incoherent switching throughout the grain,

**UNITED STATES DISTRICT COURT**

yes.

Q    Is incoherent switching the exact opposite of what Mr. Lumish was suggesting as far as the accused products, all the layers switching at the same time?

A    Yes, it is.

Q    And how does incoherent switching relate to your opinion that the nucleation host assists in switching the hard storage layer?

A    Well, that supports it.  That's how the physics work. It's just how that structure would behave.

Q    Do you need measurements or simulations to know that?

A    No, I don't.

        MR. CHANG:  Can we go to Slide 129.

BY MR. CHANG:

Q    Which of the figures here on Slide 56 shows incoherent switching?

A    That would be the bottom figure where there's some spacing between the dominos.

Q    Can you explain how that shows incoherent switching?

A    Sure.  If they were all together, they would all fall together.  Whereas, as we were talking about this domino effect, if they were separated slightly, the momentum from this one would hit the next domino and so on and so on.  So that would be incoherent because the first domino is starting to move before the second domino, before the third.

UNITED STATES DISTRICT COURT

Q    And can we take a look at Dr. Ikeda's testimony.

Can you remind the jury what Dr. Ikeda had to say about that.

A    He said the figures on the bottom illustrate the underlying principle of multi -- multiple ECL media.

Q    What kind of media are the accused products?

A    Multiple ECL media.

Q    Is there any dispute about that?

A    Not that I'm aware of.

Q    Now, yesterday Mr. Lumish was asking you --

We can take that down.

-- if a G1 layer alone could store data.

Do you remember that?

A    I do.

Q    And he was talking about if the G1 layer were all by itself, not exchange coupled to anything else; right?

A    (No audible response.)

Q    Do you recall that?

A    I do recall that, yes.

MR. CHANG:  Can we go to Claim 1.

BY MR. CHANG:

Q    Now, does Claim 1 of the '864 patent claim a hard storage layer all by itself or exchange coupled in a multilayer magnetic structure?

A    Exchange coupled in a multimagnetic structure.

**UNITED STATES DISTRICT COURT**

MR. CHANG:  Can we zoom in on the bottom part of the claim and highlight the key phrase there.

BY MR. CHANG:

Q    Okay.  Now, are the G1 layers you identified exchange coupled to a nucleation host as part of an exchange coupled multilayer magnetic structure?

A    Yes, they are.

Q    And can you explain just briefly what we're seeing highlighted here and how the nucleation host is exchanged coupled to the hard magnetic storage layer?

A    So it says (as read:)

          "An exchange coupled magnetic multilayer
          structure, including a hard magnetic storage layer,
          a nucleation host wherein said nucleation host is
          exchange coupled to the hard magnetic storage
          layer."

          So in the structures we've been looking at, they're exchange coupled through the ECL layer between the hard storage layer and the bottom layer of the nucleation host.

Q    And so is there any requirement for the hard storage layer separate from that structure, not exchange coupled to the hard storage layer, to by itself store or be thermally stable?

A    None whatsoever.

Q    And do the G1 layers in all the accused products, do those meet the Court's claim construction of storing data in

magnetically oriented bits as they exist in the disks of the accused products?

A     Yes, they do.

Q     Do you recall Mr. Lumish asking you if the -- about some design documents and whether they were before 2018?

A     Yes.

Q     Were all those design documents, the dates of those documents, after the date of Dr. Suess's invention?

A     Yes.  They're after the priority date, yes.

Q     So no suggestion that somehow Western Digital came up with any of that before Dr. Suess; right?

A     I have no information that they did, no.

Q     And if Western Digital makes, uses, or sells a product or hard drives that meets all the elements of the claims after the patent issues, what does that mean?

A     That means that they infringe on the patent.

Q     Why did you find documents dated before 2018 to be relevant to your analysis?

A     I thought it was useful to show that there was a roadmap that was taught by the invention so that, you know, it would predict increased areal density over a long period of time.

Q     And is that reflected in the accused products?

A     It is.

Q     And your infringement conclusions, does that depend on comparing the structure of the accused products to the actual

claim language?

A     Yes, it does.

Q     Does it depend on what things are named or labeled or color?

A     No.

Q     And were those structures that you analyzed, was your analysis based on recipes that Western Digital itself produced?

A     Yes.

Q     Did Mr. Lumish ask you any questions about those recipes?

A     No, he didn't.

Q     Now, he did ask you some questions about some Seagate document.  Remember that?

A     I do.

Q     Can you just remind us what that was about?

A     Yeah.  I would say it's a tech talk, as I called.  These are talks I gave to the employees at Seagate.  You know, sometimes the industry will say, "Well, hard drives are going to go away.  They'll be replaced by SSD," which hasn't happened.  So they were conferring to the employees that we have a future.

        Also, I think around that time is when cloud storage was starting to happen.  So I was, again, assuring the employees that there was a future for hard drives.  And also -- I mean, it's basically a talk to get people's spirits up.  So I would recognize what people at Seagate were doing.

Q    If Dr. Suess were one of your employees, would you have given him credit?

A    I probably would have promoted him and given him credit, yes.

Q    Did Mr. Lumish ask you any questions about your actual calculation of the 46 percent areal density gain?

A    No, none.

Q    Are you at all uncertain that Dr. Suess's invention has been the biggest contributor to areal density gain in PMR media?

A    No.  I'm very confident.  In fact, I think I was conservative on those calculations.

Q    Thank you, Dr. Re.

          THE COURT:  Mr. Lumish.

          MR. LUMISH:  Thank you, Your Honor.

                    **RECROSS-EXAMINATION**

BY MR. LUMISH:

Q    Good morning, Dr. Re.

A    Good morning.

Q    Just a few more questions for you --

A    Sure.

Q    -- and we'll let you off the stand here.

          There was a constant refrain from Mr. Chang about whether I asked you questions, "Did he ask you this question?" or "Did he ask you that question?"

I asked you a lot of questions about the need in the claims of the asserted patents for a distinct hard magnetic storage layer and nucleation host; right?

A     Yes, you did.

Q     And I asked you a lot of questions about how only the entire stack of magnetic layers that you accuse of infringement here work together as a unit to store data in magnetically oriented bits; right?

A     Correct.

Q     I asked you a lot of questions about how the one layer you accuse of being the hard magnetic storage layer, the G1 or SLC layers, don't do that, don't store data in magnetically oriented bits on their own; right?

A     Not on their own, but collectively, as the Court construction says.

Q     Collectively with all the other magnetic layers in the stack that you call a nucleation host?

A     Correct.

Q     Okay.  I did ask you a lot of questions about that, didn't I?

A     You did.

Q     And Mr. Chang didn't show you any measurements that you took or that we could rely upon to prove that the layers you call the nucleation host in any way assist the layer you call a hard magnetic storage layer in switching; right?  No

measurements?

A    Dr. Suess showed modeling, and that's how the physics works.

Q    He didn't show modeling of our accused products, though, right, Doctor?

A    He showed modeling of a multilayered structure with a nucleation host and a hard storage layer that did switch in this direction.

Q    But he didn't show -- Dr. Suess didn't show any modeling of Western Digital's accused products, did he?

A    Not that I'm aware of.  I don't know if that model matched the products, since he wouldn't know what was in the accused products.  He hasn't seen that data.

Q    Right.  And it was your job in this case to establish infringement, not Dr. Suess's; right?

A    Yes.

Q    You didn't hear him offer any opinions of infringement in this case, did you?

A    I don't think he's allowed, but...

Q    Right.  So that was your job?

A    Yes.

Q    You're telling the jury that you're going to rely on something Dr. Suess said about modeling things in general, that aren't the accused products, to prove infringement in this case?

**UNITED STATES DISTRICT COURT**

A    I'm relying on his to underpin the basic physics, and then I made my conclusions based on that, WD documents, and WD testimony.

Q    And now after the redirect examination, we still don't have any evidence in this case that that Cobra G test data that you relied upon for the G1 layer of Group 3 was ever sold; right?

A    I didn't look at that.

Q    And it's not an accused product; right?

A    The Cobra G isn't.  The 1310 alloy, though, is.

Q    Right.  So the 1310 alloy, I took the gist of the questioning to be the alloy is the alloy, it doesn't matter what drive you test it in or anything else; right?

A    Right.

Q    But we know that's not true because the values were different in the Cobra G spreadsheet compared to the JX-2015 spreadsheet you used for every other value; right?

A    True.  But it would still infringe.

Q    But the values were different because the parameters were different and the conditions of the testing were different; right?

A    I don't know how WD arrived at that data --

Q    So you --

A    -- but it was data in a WD document which I did use.

Q    Sorry to interrupt you, sir.

**UNITED STATES DISTRICT COURT**

A    I'm sorry I wasn't done.

Q    Not a problem.

So you don't know why the values are different from the Cobra G spreadsheet versus the 2015 -- JX-2015 spreadsheet?

A    No.  It's still WD data.

Q    Can you agree with me, sir, they're from a nonaccused drive with -- that was tested under different conditions and different parameters than the values you used from JX-2015?

A    Again, I don't know how they were tested, and I don't know if it was a nonused [sic] drive.

Q    But you went ahead and used that data for the critical G1 layer values for the best-selling group of accused products in this case?

A    Either data I used, it would have still infringed.

Q    Can you answer my question, though?

A    Yes.

Q    And you didn't use that spreadsheet for any other value for any other accused drive in this case?

A    No, I didn't.

MR. LUMISH:  Mr. Schmoller, would you please bring up JX-2047.

BY MR. LUMISH:

Q    Mr. Chang walked you through this exhibit in your redirect examination; right?

A    Uh-huh.

35

Q    That was a "yes"?

A    Sorry.  That was a "yes."  My apologies.

Q    We all do that.  I understand.

And so you'll see on the cover there it's authored, this exhibit, by Dr. Bertero and Dr. Desai as well as some other folks?

A    Uh-huh.  Yes.

Q    And you said that this reflected what's in today's accused products.  Have you ever heard Dr. Bertero, Dr. Srinivasan, Dr. Desai, or anybody else say that this document reflects what's actually in the accused products today?

A    Well, I know the three-layer magnetic structure is.  The specific one in here, no, I'm not aware of that.

Q    Well, my question is a little different --

A    Okay.

Q    -- which is I know you're going to say it's in the accused products.

I'm asking if you've heard any testimony -- you read everybody's depositions, you've said -- if you've heard any testimony from anybody that the JX-2047 discussion is in the accused products today?

A    I'm not aware of that.

Q    And the date in the upper right corner on the cover there is from 2010; right?

UNITED STATES DISTRICT COURT

A     Correct.

Q     You haven't heard anybody say that the presentation here from eight years ago has technology in it that continued eight years later, into 2018 and later, when the patents issued; right?

A     I'm not aware of that.

        MR. LUMISH:  And can you go to the next slide for me, please, Mr. Schmoller.  So JX-2047.2.

        Do you see the second bullet down says, "ECC Media Concept and Expectations.  Reality Check"?

A     Yes.

Q     Do you understand, sir, that what this presentation really was about was talking about a concept and expectations for a concept, as opposed to discussing technology in products that Western Digital was selling?

A     Again, I would need to look through the whole presentation to be able to tell what they were talking of.

Q     You didn't do that before you told the jury this reflected the accused products and proved infringement?

A     I looked through it, obviously, but I haven't looked through it recently to see all the slides.  Sorry, I can't remember the millions of pages that I've looked at.

Q     Well, but this isn't millions of pages.  This is an exhibit your counsel just highlighted for you, for the jury to try to prove infringement in this case.

A    So, again, to understand what "reality check" means, they could have affirmed, which it appears they did, that this was real.

MR. LUMISH:  All right.  Will you take that down, please, Mr. Schmoller.

BY MR. LUMISH:

Q    The -- withdraw.

Mr. Chang asked you both in the sort of bookends of your redirect examination there about what the claims do and don't require as it relates to storing data in magnetically oriented bits.

You agree, sir, don't you, that under the Court's construction, the hard magnetic storage layer has to record data in magnetically oriented bits?  Or store data, I should say.

A    That's correct.

Q    And your testimony today is that it does that only when it's in media together in a stack with all the other magnetic layers; right?

A    Correct.

Q    And you agree, the thing you call the hard magnetic storage layer does not, in fact, store data in magnetically oriented bits on its own?

A    That's correct.

Q    All right.

**UNITED STATES DISTRICT COURT**

MR. LUMISH:  Nothing further, Your Honor.

THE COURT:  Sir, you may step down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness, please.

MR. LEDAHL:  Your Honor, the plaintiffs call Mr. Jim Bergman to the stand.

### JAMES WAYNE BERGMAN, PLAINTIFF WITNESS, IS SWORN

THE COURTROOM DEPUTY:  Please state your name and spell your full name for the record.

THE WITNESS:  It's James Wayne Bergman, J-a-m-e-s, W-a-y-n-e, B-e-r-g-m-a-n.

### DIRECT EXAMINATION

BY MR. LEDAHL:

Q    Good morning, Mr. Bergman.

A    Good morning.

Q    Could you please introduce yourself to the jury.

A    Sure.

Hi.  My name is Jim Bergman.  I'm the president and founder of Bergman Consulting.

Q    And what do you do for a living, Mr. Bergman?

A    I'm an economist.  I specialize in the valuation of intellectual property, like patents and trade secrets.  And that frequently occurs in the context of litigation, exactly like this one.

Q    Have you been retained as an expert in connection with

UNITED STATES DISTRICT COURT

this case?

A    I have, yes.

Q    And were you retained by MR Technologies?

A    Yes.

Q    What were you asked to do in connection with this case?

A    So I was asked to perform an analysis into the amount that Western Digital should pay MR Technologies if Western Digital is found to have infringed the '864 patent and the '997 patent.

Q    And in connection with performing that analysis and the work that you do, are you compensated for your work?

A    I am, yes.

Q    How are you compensated?

A    My billable rate is $695 an hour.

Q    Does your compensation depend at all on the outcome of this case, what the jury finds at the end?

A    It does not.

Q    Now, do you have any connection outside of that work to MR Technologies, the plaintiff in this case?

A    I do not.

Q    You've never been an employee of MR Technologies?

A    I have not.

Q    Do you own any stock, or anything like that, of MR Technologies?

A    I don't.

Q    Does that matter, for purposes of your work as an expert

UNITED STATES DISTRICT COURT

in this case?

A      It doesn't.

Q      And did you prepare some slides to help assist, explain your opinions and presentations this morning?

A      I did, yes.

Q      Let's bring up those materials.

Let's start, Mr. Bergman, if you could, by telling us a little bit about your employment background.

A      Sure.  So as I said, I'm the president and founder of Bergman Consulting, which is a firm that I started in 2017. Bergman Consulting specializes in the valuation of assets and the quantification of damages for litigation purposes.

Prior to that I was the head of the intellectual property group at a national financial advisory firm called Conway MacKenzie.  Prior to that I spent ten years as an in-house economist at various national and global law firms. So I was working on commercial litigation cases, bankruptcy cases, and intellectual property cases like this one.

And then even before that, so for about a decade before that, I was actually in the information technology space.  I was a network administrator; I was a database administrator and a director of information technologies.

Q      Can you also describe for the jury your educational background?

A      Yeah, sure.

So I have a bachelor's of arts in economics and a master's of business administration, both from the University of California at Irvine.  And then I'm currently pursuing a master's in computer science from the Georgia Institute of Technology.

Q    Do you have any background in your education specifically relating to statistics?

A    I do.  So in my undergraduate economics degree, I took statistics classes.  In my master's of business administration, I also took statistics classes.  And then surprisingly, there's a lot of statistics actually in the master's in computer science.  We do a lot of statistical analysis as part of that work.

Q    Do you hold any professional designations?

A    I do.  I'm a chartered financial analyst, which is a certification that requires 18 hours' worth of testing over a three-year period in various financial disciplines like economics, statistics, accounting, asset valuation, things like that.  It's generally considered to be like a master's in finance.

Q    I'm sorry.  Did you say 18 hours just of tests?

A    18 hours' worth of testing over a three-year period, yes.

Q    So a lot more study, I'm guessing?

A    It's a lot of studying, yes.

Q    And one of the subjects for that chartered financial

analyst, one of those exams was about statistics, did you say?

A     It was.  It was a core aspect of really -- a couple -- there was -- two years' worth of that testing had statistics as a significant aspect of it.

Q     Any other professional certifications or designations that you hold?

A     Yeah.  Back in my days working in IT, I was a Microsoft Certified Systems Engineer and a Certified Novell Engineer.

Q     Are you a member of any professional organizations?

A     Yeah, I'm a member of the CFA Institute, which is an organization made up of CFA charter holders.  I'm also a member of the Licensing Executives Society, which is a global organization made up of IP professionals that sort of meet to discuss the licensing and the valuation of intellectual property.

Q     And with regard to the issues of patents and patent valuation, can you provide the jury an overview of your experience in that area?

A     Sure.  So I've got over 20 years of experience working on patent cases -- damages and patent cases.  I've worked on well more than 100 cases, specifically in the high-tech industry like this one.  A lot of the work that I'm doing is valuing high-tech patents.  And then I've been involved in licensing discussions, settlement negotiations, things like that.

Q     Now, obviously, you're working as an expert on behalf of

the plaintiff in this case.  Do you only work for plaintiffs in this kind of work?

A    I don't.  I work for both plaintiffs and defendants.  I would say that the majority of my work to date has been for plaintiffs.  But I do work for both.

Q    Does your methodology or the approaches that you take change depending upon whether you're working for a plaintiff or defendant?

A    It doesn't.  So we're going to see -- I'm going to walk through the methodology that I used in this case to determine what a reasonable royalty would be.  And that methodology is exactly the same regardless of whether or not I'm working for plaintiff or defendant.

Q    Do you get paid any differently if you're working for a plaintiff or defendant?

A    I do not.

Q    Have you ever testified as an expert in a U.S. District Court like this one before?

A    I have.  It's probably about 20 times now.  Most of the time it has been in patent cases like this one.

MR. LEDAHL:  Your Honor, the plaintiff would tender Mr. Bergman as an expert in patent valuation and damages and reasonable royalty damages.

MS. YOUNG:  No objection.

THE COURT:  The Court accepts Mr. Bernal [sic] as an

expert in the stated areas.  That means he has the minimum -- at least the minimum qualifications to express opinions in those areas.  It's for you to figure out how much weight to give his testimony.

BY MR. LEDAHL:

Q    So, Mr. Bergman, turning to this case, what information did you review to prepare your analysis?

A    I looked at a lot of information in this case, as you would expect.  I looked at Western Digital's documents.  I reviewed the patents, looked at court filings.  I had extensive discussions with Dr. Re and Dr. Suess to understand the technology.  I read all the depositions in this case, reviewed Western Digital's financial information.

I did my own industry research on the hard disk drive market to get an understanding of it, reviewed licenses, expert reports.  And then I've been sitting in the courtroom all week, listening to the testimony as it's come in.

Q    How much total time have you spent working on your analysis in this matter?

A    So I work with a team that assists.  Collectively, we've spent about 450 hours working on this case.  Me personally, I've spent probably over 200 hours.

Q    So I know we're going to get into some details, but I'd like to start with a summary of what opinions you formed after you've conducted all this work and analysis.

A       Yeah.  So it's my opinion -- and we'll get into the details of the analysis, but it's my opinion that a reasonable royalty for Western Digital's infringement would be a lump-sum royalty of $305.9 million.

Q       And I'm just going to pause for a second because I want to make sure the jurors have an opportunity to take notes. And, of course, your slides that we're showing won't be available to them after the trial during deliberations.

When you said a moment ago, though, that this is a lump-sum royalty, can you explain what that means?

A       Yeah.  And we're going to get into a little more detail about this, but it basically means that the royalty is paid all up front, all at one time, as opposed to being paid over time.

Q       And why would the parties agree on a lump-sum royalty in this case?

A       So there's evidence in this case that Western Digital would prefer to have a lump-sum payment, to just pay all up front and then not have to make ongoing payments.  And I discussed this with Dr. Suess, and he was also okay with the lump-sum payment.

Q       So your understanding is that's something both parties would be happy with or at least agreeable to?

A       That's right.

Q       So you understand that the products -- the accused products in this case were separated into categories called DCM

groups?

A    That's my understanding, yes.

Q    Did you calculate damages for each DCM group as part of your analysis?

A    I did, yes.

Q    And what were those calculations?

A    So there's the various DCM groups.  So for Group 1, my damages calculation was 24.5 million; for Group 2, 8.8 million; for Group 3, 109.5 million; for Group 4a, 15.2 million; Group 4b, 84 million; Group 4c, 15 million; Group 5, 48.9 million. And that all adds up to the $305.9 million number.

Q    Thank you.

Now, how did you go about determining what the damages should be in this case?

A    So I start my analysis the same place I start my analysis in every single case, which is really with the law and understanding what does the law say with regard to damages in the patent context.

Q    I see that you have a statute, it looks like, on the slide.  What is that statute?

A    So this is Section 284 of the Patent Act.  And it actually gives a definition of how you go about determining damages in the patent context.  And what it says is:

"Upon finding for the claimant," which is the patent holder, "the Court shall award the claimant

UNITED STATES DISTRICT COURT

damages adequate to compensate for infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."

Q    And I noted you have a couple things underlined here. Let's talk about that first one, "adequate to compensate for the infringement."  What's the importance of that?

A    So the importance is that the analysis is focused in on the infringement and making sure that there is adequate compensation for that infringement.

Q    And you also highlighted -- or underlined, rather, this language:  "for the use made of the invention by the infringer."  What's the significance of that language?

A    So when I look at this patent statute as an economist, this language tells me a lot about how I'm going to go about determining the value here.  And what it says is "for the use made of the invention by the infringer."  What that tells me is that my analysis is based on how is the infringer using and benefiting from this technology.

It's not about how Dr. Suess may have used this technology.  It's not about how Western Digital may have used other technology or how much an engineer gets paid or how much a professor is able to get in grants.  It's all about how did the infringer use this technology, profit from this technology, and that's what you base a reasonable royalty on.

Q    Now, you've mentioned and the statute refers to "a

reasonable royalty" a number of times.  What's a royalty?

A    So "royalty" most simplistically is the right for -- the payment for the right to use somebody's property.  So the most classic example is if you think of rent.  Somebody else owns the house; you pay rent, which is a form of a royalty, to use that property.

Q    Now, what's the period of time over which you're looking at calculating a reasonable royalty in this case?

A    So in this case, the damage period in this case starts in March of 2018, which is the issue date of the '864 patent, and runs until June of 2027, which is the expiration date of the '864 patent.

Q    And what about the '997 patent?

A    So the '997 patent actually issues after March of 2018 and expires before June of 2027.  So this period covers the infringement of the '997 patent.

Q    Did you also calculate a separate damages figure if it was just for the '997 patent?

A    Yeah.  Because the '997 patent is within that window, damages for just the '997 patent is $149.1 million.  Now, it's important to recognize that that's not in addition to the 305.9 that Western Digital would only pay once for infringement.  So the total amount is 305.9.  But if it was just the '997 patent, it would be 149.1 million.

Q    And you say they don't add up; they overlap.  Why is

**UNITED STATES DISTRICT COURT**

that?

A    Because the benefits that are provided by those patents -- and you can actually see this from Dr. Re's testimony.  You know, there's a lot of commonality between the claims.  So the benefits that Western Digital is receiving is really the same regardless of which patent is found to have infringed, so they're not duplicative.

Q    So what's the framework that you would use to then analyze what's a reasonable royalty in this case?

A    Yeah.  So fortunately, we have some guidance from the courts on how to determine a reasonable royalty outside of the patent statute.  And one of the ways that the courts have laid out is a reasonable way to determine a reasonable royalty is by what's called a hypothetical negotiation.

Q    And what's a hypothetical negotiation?  Can you explain that concept?

A    So Mr. Fenster sort of previewed this in his opening, but a hypothetical negotiation is sort of this artificial construct that envisions a world where the patent holder and the infringer sit down at a table just prior to the date of first infringement and try to come to an agreement as to what a reasonable royalty would be for these patents.

Q    And what are some of the parameters or the assumptions that you have to make in assessing that hypothetical negotiation?

UNITED STATES DISTRICT COURT

A    Yeah, so there's some really important assumptions that are baked into that hypothetical negotiation that differ significantly from a real-world negotiation.  And one of those is that in the hypothetical negotiation, the parties agree that the patents are both valid and infringed.  There's no dispute about that.

And so, obviously, in a real-world negotiation, validity and infringement are often contested; right?  We see that in this courtroom here.  There's, you know, issues about infringement and validity.  And the hypothetical negotiation is off the table.  Both parties recognize that there's infringement and validity.

Q    Any other difference?

A    Yeah, so another significant difference is that in the hypothetical negotiation, the parties at the hypothetical negotiation have access to all relevant information.  Both parties do.  So there's no one party has information that the other party doesn't have, which is often common in a real-world negotiation.

And not only that, the parties actually have information into the future.  If we think back to the patent statute, the patent statute says, "for the use made of the invention by the infringer."  So we have to know how the party's -- how the infringer's actually using that technology into the future.

So at the hypothetical negotiation, the parties know that.  They know the benefits.  They know the profitability that's going to come from Western Digital's use of these products.  Obviously in a real-world negotiation you don't have access to future information.  You don't, a lot of times, even have access to the same information.  So that's a big difference in the hypothetical negotiation.

Q    You talked about having access to information from the future.  Can you explain that a little better or give us an example?

A    Yeah.  So maybe an example would be, you know, let's say I'm negotiating with somebody over Tom Brady's rookie card.  It's before he's played a single game in the NFL.  And imagine a negotiation -- a real-world negotiation is:  I don't know how he's going to do, so I'm going to negotiate over that rookie card having no information about how he's actually going to perform.

And then, separately, a negotiation in which both parties actually know he's going to win seven Super Bowls.  He's going to be considered to be one of the best quarterbacks in the NFL.  That's a completely different negotiation with a completely different outcome.

Q    Are there any other differences between the hypothetical negotiation and a real-world negotiation?

A    Yeah.  In a hypothetical negotiation, the parties have to

come to an agreement.  In a real-world negotiation, the best option to a party may just be to get up and walk away from the table.

Q    So in the hypothetical negotiation, no one could just say, "I'm just -- I'm done.  I don't want a license.  I'm leaving"?

A    That's right.

Q    In your experience, what do these assumptions allow for in the hypothetical context?

A    Yeah.  So if we think about why these assumptions are sort of baked into the hypothetical negotiation, it makes sense. Because ultimately, at the end of the day, what -- we're trying to figure out what's the value of these patents to Western Digital.

So it allows us to strip away all these sort of extraneous things that may impact a hypothetical nego- -- or a real-world negotiation that don't have anything to do with the value of the patents, because we're laser focused in on what's the value of these patents to Western Digital.

Q    Now, this hypothetical negotiation framework, is that something you came up with to perform a royalty analysis?

A    It's not.  As I said, this is guidance from the courts.

Q    So the courts dictate this framework, and that's what you applied?

A    As one of the ways that you can do this, yes.

**UNITED STATES DISTRICT COURT**

Q    So what does the hypothetical negotiation look like in this case?

A    So in this case, you would have Western Digital sitting at a table with Dr. Suess in March of 2018 to negotiate for rights to these two patents.

Q    And why would the negotiation take place in March of 2018?

A    Because that's the issuance date of the '864 patent.

Q    And so that would be when the actual infringement started?

A    Right.  So there would be no infringement prior to that date, but at the issuance date is when infringement would begin.

Q    Now, is it your understanding that it matters if -- so, for example, if a product was sold both in 2017 and 2018, you would only count the 2018 part?  Am I understanding correctly?

A    Right.  So if a product was sold in 2017, before infringement began, it's not part of my damages calculations. Only post March of 2018.

Q    Okay.  So what are the factors that you have to consider in determining a reasonable royalty?

A    So, again, we get some guidance from the courts.  So the court system has provided 15 factors that one can look at in trying to determine a reasonable royalty.  And so I've summarized those factors on the screen here.  This comes from a

**UNITED STATES DISTRICT COURT**

case called *Georgia-Pacific v. U.S. Plywood*.  It's back from the 1970s.  And so these are the factors that you would consider.

Q    And just so the jurors don't feel they have to write all this down, is it your understanding these are part of the instructions the Court will give the jury at the end of the case?

A    That's right.  That's my understanding.

Q    Now, are all the factors equally important in an analysis of a reasonable royalty?

A    So as part of my analysis, I evaluate all 15 factors for every patent case I work on.  But as you would imagine, every case is different.  Facts and circumstances are different in every case, so some factors are more important than others.

       And so as I walk through the analysis today, I'm going to highlight certain of these factors that are most relevant in this case.

Q    Is there anything unique to patents that you take into account when evaluating the value of a patent and a reasonable royalty?

A    Yeah, there is.  So, you know, as you would imagine, you know, an invention can be something that's a small improvement over something that exists.  It can be something big and foundational, something significant in the market, like we've heard with the Suess patents here.

So one thing that's really important to consider in evaluation of a patent is what's the benefit over what came before it?  What are the alternatives into the market?  And what kind of -- what is this invention providing over those alternatives?

Q    Can you give us an example of that kind of analysis?

A    Sure.  So I have a very simple example.  So let's say I came up with an invention that was sticking a very large motor on a two-wheel vehicle.  Like, nobody's ever thought of this. I'm the first person to come up with this, and I'm trying to figure out what it's worth.

So one of the ways to figure out what it's worth is you actually look into the market.  And you see, well, what else is out there?  What are people doing other than this?

And if I look into the market and I see there are two-wheel vehicles that have smaller engines in them, the benefit of my patent is between that and what my patent provides.  It's going to give me some indicator of value.  But if for some reason I look into the market and nobody has ever stuck a motor on a two-wheel vehicle before, it's a much different value proposition.

So in both cases, my patent is exactly the same. Nothing's changed.  The claims are the same, the specification is the same.  But the value over what came before it -- or what came before it is really driving that value.

UNITED STATES DISTRICT COURT

Q    Does your analysis -- excuse me -- analysis as to the damages due to MR Technologies take into account noninfringing alternatives to the patent?

A    It absolutely does, yes.

Q    How, in a general sense, does that factor in?

A    Well, so you imagine, again, we're in a hypothetical negotiation.  Western Digital is going to be sitting at the table, and they're going to be asked to be taking a license for the MR Technologies patents.

Western Digital is going to think to itself, "Well, what else can I do?  If I don't take a license to this patent, how are my products going to be impacted?  What else could I do to compensate for that?  And if I -- and what's going to be the impact to my revenue and profitability?"

So all of that is going to be in the mind of Western Digital in a hypothetical negotiation.

THE REPORTER:  Sir, please slow down.

BY MR. LEDAHL:

Q    So let's start with the patents here.  There's been a lot of discussions about the patents already.  But can you give us a brief summary of what are the patents-in-suit here?

A    Yeah.  So, you know, Dr. Re has spent a lot of time walking through the patents.  I'm not going to do any of that.  But we've got two patents.  They're related to each other.  And for my purposes, I'm focusing in on the asserted claims and

valuing those asserted claims.

Q    Do your opinion on -- excuse me.

Does your opinion on damages depend on which claim is infringed in this analysis?

A    So we talked about different damages for each of the patents.  So the '864 patent covers the entire damage period, and that was the 305.9.  But in my opinion, it doesn't matter whether or not Claim 1 is found to infringe or Claim 10 or all of them or some subset of them.  The damage amount wouldn't change.  And then the same for the '997 patent.

Q    And why wouldn't it change?

A    For the same reason that there's not a difference in the value associated between the '864 and the '997 patent, that the benefits that Western Digital is receiving from infringing each of those claims is the same.  So the damages are the same.

Q    What else did you look at in connection with understanding the patents?

A    I also looked at understanding the companies who have had patents subsequent to the issuance of these patents, how many of those -- which companies have cited back to these patents in their own patents.

Q    And what did you find ?

A    That some of the biggest hard disk drive companies have cited back to these patents.  Seagate has cited back to them.  Western Digital has cited back to these patents multiple times

in their own patents.

Q    Did you also evaluate the technical benefits that are provided by these patented inventions from Dr. Suess?

A    I did, yes.

Q    And what are those technical benefits?

A    So we heard a lot of discussion about this from Dr. Re's testimony yesterday afternoon.

I had discussions with Dr. Re to understand those technical benefits, and it's my understanding that the benefits that flow from these patents are increased areal density, resulting in increased capacity.  Smaller form factors; right?  Because if you can fit more capacity into a single drive, you can actually have smaller form factor drives.  You don't have to have bigger form factors.

And then some of the more technical benefits are improved switched field time, signal-to-noise ratio, reduced overwrite complexity, an increased pulse width for improved data density.  It's my understanding those last three sort of all feed into that areal density and capacity benefits.

Q    Okay.  So let's start talking about your royalty analysis here and, in particular, your determination of the appropriate royalty.  What method do you use to determine the royalty or the value for the patents in this case?

A    Yeah.  So at a very high level, I used what's called the income approach to determine the value of these patents.

Q    What's the income approach?

A    So the income approach is -- it's actually a very well-known methodology to determine the value of any asset.  So it could be a patent, it could be a small business, it could be an income-generating piece of real estate.  And basically what it does is it determines the value of something based on the profit that's generated by that asset over time.

So an example would be I've got a small business here and I want to figure out what's the value of that small business.  I can see how much profitability is being generated by that small business, use that to determine the value.

In the patent context, it's no different. Understanding how much does that patent drive revenue, drive profitability, and then using that to determine the value.

Q    And why is the income approach a relevant methodology for this case?

A    So it's highly relevant because it's directly tied to the patents.  How much revenue and profitability is being driven only by the patents, that can tell us the value.  So it's hyperfocused in on the value of the patents themselves.

Q    And I notice you have a slide showing some of these factors we looked at a moment ago.  How does this income approach relate to that Georgia-Pacific factor analysis you talked about?

A    Yeah.  So if we think about some of those Georgia-Pacific

factors, a number of them relate to this concept of the income approach. So we have Factors 8, 9, 10, and 13. Those factors basically -- if you sort of think about them collectively, it's an understanding of the products, understanding the profitability and revenue associated with those products, and then measuring the value of the patents to those products over the next best alternative.

Q    And "over the next best alternative," is that the point you discussed a moment ago with me, that that's -- has to do with what they could do if they couldn't use this invention?

A    That's exactly right.

Q    Did you speak to Dr. Re about Western Digital's alternatives?

A    I did, yes.

Q    And what did he tell you?

A    Same thing he told the jury, which is that Western Digital has no feasible noninfringing alternative other than having to revert back to the prior art. So their only alternative in this case is to go back to technology before the patents were issued, which would result in lower areal density, therefore, lower capacity.

As we heard from Dr. Re as well, Western Digital wouldn't be able to compete in this market using the prior art technology. He talked about adding platters as potential noninfringing alternative, but that would add costs. It would

increase the form factors, which would be problematic, that they're not really alternatives in that case.

Q    And what -- why is that important that -- you mentioned they wouldn't be able to compete.  How does that factor into the analysis here for this hypothetical negotiation?

A    Well, again, you know, if we sort of put ourselves in the mind-set of this hypothetical negotiation, Western Digital would be sitting at the table, recognizing that without these patents, they would have significant capacity loss and what the implications of that would mean to the market.

Q    And you mentioned that they would -- they would not have any alternatives.  Is it your understanding that Western Digital disputes that there are no noninfringing alternatives here?

A    It's my understanding that there's really no dispute that Western Digital's only alternative is to revert back to prior art technology.

Q    And prior art technology, is that technology before the patent issued?

A    Yes.

Q    And is it also technology that would have to have existed before Dr. Suess filed his patent?

A    That's right.

Q    So we're not talking about 2018 technology.  We're talking about technology all the way back to 2006 is what they

would have to use?

A     That's my understanding, yes.

Q     Did Dr. Re quantify the capacity impact to Western Digital from this lack of access to alternatives?

A     Yeah.  So as we heard from Dr. Re yesterday that Western Digital's areal density and capacity would be at most 54 percent of what it is now, which basically means that Western Digital would lose 46 percent of its capacity based on not having access to these patents.

Q     And did you see any Western Digital documents that confirmed or related to this analysis in any way?

A     Yeah.  So, obviously, I'm not the technical expert, but, you know, as I do in most cases, I do what I can to get an understanding as the -- as to the validity of what the technical expert is telling me.  And so looking at the deposition testimony, looking at the documents to get an understanding as to the importance of this technology is what I did.

Q     And I see you have here a slide with a quote from Dr. Srinivasan.  What was the relevance of this to your analysis?

A     Yeah.  So this is -- we've seen this before, but this is his testimony.  He was specifically asked:

        "Why was the goal to increase the areal
        storage density."

His answer:

"The holy grail of magnetic recording storage is to pack more storage capacity in a given space. Areal density has always been one of the most important end goals for the magnetic recording."

Q   Any other documents or testimony that supported your analysis here?

A   Yeah.  So similar testimony from him.  He said:

"The stack of magnetic layers with gradient in the magnetic anisotropy has played a paramount role in advancing recording technologies towards 1 terabyte per square inch in areal density."

And I understand that that's related to the patented technology.

Q   Any other Western Digital documents that related to this concept?

A   Yes.  So this is from JX-2038.  This is a presentation that Western Digital gave in 2019.  So after the patents had issued, showing that graded anisotropy has led to areal density increases from 200 gigabits per square inch to 1 terabit per square inch in the accused products.

Q   Any other documents that you saw that related to this concept?

A   Yes.  And we've seen this multiple times.  JX-2030 talks about PMR being the prevailing magnetic storage technology and

that the exchange-spring principle has guided most of the
advances in PMR media since inception.  Again, my understanding
is that this is what related to the patented technology in this
case.

Q    How do you know this relates in any way to the patented
technology?

A    I think, as we've heard multiple times in this case, the
image that's shown here is an image that comes directly from
Dr. Suess's papers.

Q    And you mentioned a couple numbers:  JX-2038, JX-2030.
Are those the exhibits that the jury will have access to after
the trial?

A    That's my understanding, yes.

Q    So Dr. Re said that without the patents, Western
Digital's areal density would be, I think you said, at most
54 percent of what it is now.  What does that mean in the
context of the accused products in this case?

A    Yeah.  So we can take a representative example.  So if I
have a -- you know, if Western Digital has a 4 terabyte My Book
product, what that means is that without access to the patented
technology, they would lose about 1.84 terabytes of capacity.
So what they would offer into the market instead is a product
that's a little bit over 2 terabytes.

Q    So now that we understand that capacity impact to Western
Digital's products, how did you go about determining the value

**UNITED STATES DISTRICT COURT**

of that to Western Digital for purposes of coming up with a reasonable royalty?

A     So now that we know what the impact of capacity is, if we can figure out what the value to Western Digital is of capacity, say, on a per terabyte basis, we can apply that to the number of terabytes that have been sold over the damage period.  And now we can figure out, well, what's the value of the patented technology?

Q     So how can you determine the value of a terabyte of storage?  How do you do that?

A     Yeah.  So there's -- you know, there's a number of ways that you can do that.  You know, one way is you can just look at Western Digital's products and see how much they charge for an extra terabyte of storage.

Q     Can you give us an example of that?

A     Sure.  So this actually comes directly from Western Digital's website.  So this is a -- what I'm showing here is a My Book product that on the left is a 16-terabyte My Book product; on the right is an 18-terabyte My Book product.

So the features of that product are exactly the same other than the fact that there's two additional terabytes.  So the form factor's the same; the speed of the hard drive is the same; the connectivity is the same.  The only difference is the number of terabytes.  And we can see on the bottom the price difference between that is $30, and so that's showing a

$15-per-terabyte value.

Q    So just using this method you showed of comparing two products, is that a reliable methodology for the whole analysis in this case?

A    So while I think it tells you something, it clearly tells you that Western Digital charges separately for capacity, which, honestly, makes a lot of sense given these particular products.  But we're dealing with a period here of nine years, hundreds of products.  So just looking at one example from their website is not really a very robust way to go about doing the analysis.

Q    So what's a better way to figure this out?

A    Well, we have Western Digital financial information.  So for purposes of this case, Western Digital has provided us actual sales transactions, about 650,000 transactions over a five-year period, of their sales.  So using that information, we can actually do a statistical analysis to tease out the value that Western Digital was able to get on a per-terabyte basis.

Q    I want to clarify something you said.  You said there were, I think you said, 650,000 transactions.  Does that mean there were 650,000 individual hard drives sold that are relevant to this case?

A    No.  So -- and we'll actually see this as we go further on -- it's each individual sale.  So if Western Digital -- if I

bought 5 of these drives on Western Digital's website, that would be a transaction.  If they sold 10,000 hard drives to Best Buy, that would be another -- a single transaction.

Q    Got it.  Thank you.

And you talked about analyzing these transactions. Is there a name for this kind of analysis?

A    Yeah.  So the statistical analysis that you would perform is called a regression.

Q    So what's a regression?

A    So at a very high level, a regression is taking a lot of data, trying to find patterns in that data, determining the significance of the patterns in that data, and then using that information to help make predictions.

Q    So before -- let me back up first.  You said using that to make predictions.  What kind of predictions are we talking about?

A    Well, it depends on the regression.  It depends on what you're trying to measure.  But in this case, we're taking in the -- we're taking in capacity, and we're trying to figure out the value of that capacity.  So if I were to plug in 10 terabytes, for example, the regression is going to tell me what's the value of an additional 10 terabytes.

Q    Thank you.

So I think before we get into your actual regression analysis, maybe you could give us an example to explain a

regression a little bit more?

A     Sure.  Absolutely.

Q     I think you've prepared an example to talk about here?

A     Yeah.  So, again, trying to come up with a simple example to explain this concept.  Let's say I'm trying to figure out the price of a stock.  Okay?  I want to be able to maybe predict the price of the stock in the future.  And one of the things I'm trying to figure out is how does the impact of time -- how does time impact the price of a stock?  Okay?

And so what I'm going to do is I'm going to take some observable data points.  I'm going to take things that I know.  So let's say -- you can more forward.  Let's say I know five -- I have five days' worth of information.  These are known observable data points.  And I plot that out on a graph, and I can see -- so I can see those five data points there.

And I'm trying to figure out, how can I use this to actually understand the impact of time on the price of a stock and then maybe use that to predict things in the future?

Q     So using this example of stock and time, how would you run a regression to learn that information?

A     Yeah.  So one of the first things you'd want to do -- if I've decided I'm going to use a regression to do this, one of the first things I want to do is figure out what's the right type of regression to run.

Q     What does that mean?

UNITED STATES DISTRICT COURT

A    Well, as you would imagine, there are many different types of regressions that you can run.  And a lot of it is figuring out, what is my data telling me when I look at these particular data points on a graph?  What is it telling me is the most appropriate type of regression to run?

Q    And so what does that mean for your example here?

A    So for this example here, what I'm going to do is I'm just going -- I'm going to use the easiest regression to explain, which is a linear regression.

Q    What's a linear regression?

A    A linear regression is how it sounds.  I'm going to try to draw a line that best represents these individual data points.

And so if we -- if we move forward.

Okay, this is a line that gets created based on those individual data points where -- the whole point of the regression is to minimize the amount of space between the observable data points and the line.  That's the best-fit line for those observable data points.

And so now that I can draw this line, the benefit of having a line is -- if we all remember from high school algebra, a line can be represented as a formula.

Q    And so can you describe the formula that we're talking about here in this example?

A    Sure.  So a line is basically made up of really just two pieces.  You have a constant, which is what is the value before

I make any -- before I add any additional changes; right?  So it's really where that line meets the Y axis.

So in this instance, the price of the stock is going to be $9.62.  Before I add any days, before any impact of time whatsoever, that's where that line starts.  That's called the constant.

Q    And what's the next piece?

A    The next piece is called the slope, which is really the slope of the line.  And what that is indicating is how much, as I move forward in time, is time contributing to the price of the stock.

So what this is telling me is that if the slope is a dollar 62, every day that I move forward in time, it's adding a dollar 62 to the price of the stock.  And so now I've created that formula.

Q    And so with that formula, what does that -- what does that mean?  What does that allow us to do?

A    So, really, it gives us two important pieces of information.  Number one, it's telling us what is the contribution of time to the price of the stock?  And we know that that contribution is a dollar 62.  That's how much every day is contributing to the price of the stock.

The second thing it does is it allows us to make a prediction; right?  Now that we know how much the number of days is contributing to the price of the stock, we can now

figure out, "Well, in Day 6, what do we think the price of the stock is going to be?"

Q    And is that what you're showing here?

A    Exactly.  So we can see we have our five observable data points.  And what the regression equation suggests is that in Day 6 the price of the stock is $19.34.

Q    So how do you determine whether the regression makes sense in light of the data and the information you have?

A    So I think what you do in every single regression you run, right, obviously you want to -- you want to understand whether or not this makes sense in light of the data.  And there's two ways.

One is the program that runs the regression will actually kick out a whole bunch of statistical information. Not only does it tell you the constant and the coefficients, it's also going to give you a lot of statistical information to tell you how significant are these individual factors; right?

Because if you imagine data points that are much more spread out, I'm still going to get a line.  It's going to do its best to fit that, but it may not be all that significant.  So there will be some statistical analysis there.

Q    Is that sort of what you're showing here?  I know it's a little small for everyone to see.

Maybe we can zoom in on that box.

A    Yeah, so this is -- this is the analysis that I actually

ran on these five data points.  And so you can see right here, you know, the number of observations is five; right?  So this is the regression that I ran on those five data points there.

And, you know, I could spend an hour talking about all these individual pieces and what these things mean, but I'm going to focus in on the most important, at least for purposes of this case.

Q    So I'm going to jump ahead to your next slide.

Is this what you're referring to?

A    That's right, yes.

Q    So can you explain -- I think you've highlighted, it looks like, four things here from the analysis.  What are those four things?

A    Yeah, so, again, this is actually being output from the regression itself.  And what you can see is, you know, these are the two variables here.  We have constant and number of days.  And then these rows are telling you things about each of those variables.

Q    What kind of things?  Go ahead.

A    So the very first thing, the box I have here, is the coefficient; right?  This is our $9.62 that represents the value of the constant, and then a dollar 62 representing the contribution of the number of days.  So this is what we're using to define the formula.

And then besides that, there are additional --

**UNITED STATES DISTRICT COURT**

there's additional information that gets shown.  So this box here is providing some information about the statistical significance of those individual items.  And so these are called -- one's called the t-value, and one's called the p-value.  And they both are giving measures of statistical significance.

I'm going to focus mostly on the p-value because I think it's the easiest to sort of read and understand.  And what it means is the lower the p-value, the more statistically significant it is.  And, really, the calculation, you can sort of think of it is 1 minus this amount is giving you a value of the statistical significance.

So at .008, what this means is this is statistically significant at 99.2 percent, which is a very high statistical significance.  So that's what the p-value does.

Q    Since you moved away from your mic for a second, I'm just going to ask.  You said the statistical significance here of that p-value was .008?

A    That's right.

Q    And then you converted that to 99.2 percent?

A    That's right.

Q    What does that mean?

A    So that just means that's telling you that it has a very high statistical significance.  That it's explaining a lot of the price of a stock and that it's -- it's highly significant.

Q    And I saw you also have on the right here a reference to the confidence interval.  What's that?

A    So the confidence interval is -- you know, obviously we're not creating a line that perfectly matches each of those data points.  We're drawing a line that is the best fit for those individual points.  And so what this confidence interval is telling you is that the program is basically saying there's a 95 percent chance that the data point that is being represented is going to be between these amounts.

So the regression is outputting a dollar 62, but it's saying there's a 95 percent chance that it's between 81 cents and $2.43.  The tighter the confidence interval, the more statistically significant that regression is going to be.

Q    Now, that sounds like kind of a big range, with your $1.62, I think it was.  Why would you say that's a big -- why would there be such a big range of confidence intervals in this regression?

A    Well, as I said, that's sort of the output from the regression.  And it's based on where the observable data points are.  So if the observable data points are further away from the line that gets drawn, it's going to have a larger confidence interval.

Q    Now, how would you characterize the regression for this example that you just did?

A    So if you just look at this output here, you'd say that

the passage of time is highly statistically significant to the price of the stock.

Q    So taking a step back.  Just because the output from the regression says there's this high significant -- statistical significance -- "anisotropy" is another one that's hard to say, I know -- does that end your analysis?  You just say, "I'm done.  It's high significance"?

A    No.  So I think a very important part of the analysis is once you've got -- once you've run this regression, it always makes sense to kind of take a step back and evaluate it in light of what you're trying to measure here.

So I think this is a perfect example; right?  If you were to run this regression and say, "Oh, I get to predict the price of a stock just simply based on the passage of time," that would be a terrible way of going to predict the price of a stock.  You'd lose a lot of money doing that.

So even though this is showing very high statistical significance, it always makes sense, take a step back, review this in light of the data, and say does this actually make sense.

Q    Okay.  So let's talk about, now, the regression you did for this case and the analysis you did.  How did you go about doing that analysis?

A    Yeah.  So I used the steps I would use in determining -- in using any type of regression.

So the first step is, you know, to come up with some observable general relationship. What am I trying to measure here? I figure out the appropriate regression type. I assemble the data necessary to run the regression. I run that regression. I then evaluate it in the context of the statistical output, like we just did here. And then I also evaluate it in the context of the product, sort of taking that step back and saying does it actually make sense.

Q    So what was the relationship that you started with and observed in this case?

A    Yeah, so the relationship that I was looking at is the relationship between capacity and the average selling price of the products, and measuring whether it's statistically significant and measurable. And, honestly, if we think about these products, thinking about capacity and its relation to the average selling price, it makes a lot of sense that those two things are related. And so that's what we're trying to measure here.

Q    Now, why didn't you just take the Western Digital data and look at what they said the price was or the value per terabyte of capacity?

A    Because we got -- we have a lot of data over a long passage of time. Not only that, the data that we got from Western Digital was only until 2023. And I'm determining damages through 2027. So part of the analysis is that

**UNITED STATES DISTRICT COURT**

predictive aspect, understanding the value of a per-terabyte basis and trying to figure out what it's worth into the future.

Q    Did Western Digital produce any documents or information in this case that actually had this value per terabyte calculated already?

A    They did not, no.

Q    So what's the next step?  You mentioned you were going to use this relationship.  How do you go about doing that?

A    Yeah, so first is, again, we're using the average selling price of the products.  And the reason why I used the average selling price of the products themselves is because this is the -- this is the price that they're selling for the accused products.  I think we heard Dr. Re say, you know, they don't sell individual media into the market.  They don't sell subcomponents of the drive.  They sell the drive itself.  So I'm starting with that.

And then the second part is to figure out what's the right type of regression to run here.

Q    Now, did you assume that -- in your analysis that capacity is the only thing that contributes to the price of these products?

A    I did not.  So this is one of the really nice things about a regression, is the whole point of a regression is to take a lot of information, maybe for products that have multiple features, and to use it to sort of tease out the value of an

individual feature.

And when I actually think about these particular products, you know, these hard drives, there's a very limited number of features in these hard drives; right?  There's capacity, there's the speed of the drive, there's maybe the interface.  It's not like there's hundreds and hundreds of features.  And those features are all discrete and independent from each other.  And, frankly, this is the perfect application for a regression, is these products themselves.

Q    And do you have to test every possible variable, all these different features that you mentioned?

A    You don't.  As I said, that's the whole point of a regression.  If any time you wanted to run a regression you had to do every single feature, it would be unwieldy and overwhelming.  So you don't have to.

Q    And in your analysis did you actually test some regressions, where you looked at other features and variables to see how they might impact the analysis?

A    I did.  So as we go through this, my analysis only focused in on the impact of capacity.  But I did run alternative calculations taking into account the speed of the hard drive and the type of interface, and it didn't -- there was no material difference between those values.

Q    Okay.  So what's the next step in the regression analysis?

A    So the next step is figuring out what's the right regression type to run.

Q    And how did you go about choosing?

A    So, really, a lot of it is -- as I described before, it's sort of thinking about the data, thinking about what makes the most sense in light of this data.  And so what I did is I ran two different types of regressions.

Q    What types of regression did you run?

A    Well, the first regression that I ran was a linear regression, exactly like the example we started with.  The technical term is called an ordinary least squares regression --

            **(Reporter requests clarification**

            **for the record.)**

            THE WITNESS:  Ordinary least squares regression.  So I ran that regression.

Q    And so that we don't have to say that phrase too many times, is that sometimes referred to as an OLS regression?

A    It is, yes.

Q    And what was the other type that you ran?

A    So the other type is called a mixed linear regression.  The reason why I ran a mixed linear regression in addition to an OLS regression is because an OLS regression doesn't take into account the impact of time.

            And so if we think about if we have terabytes and

price, and those are our only two factors -- you know, we're dealing with technology products here.  We all know that technology products may be introduced with a premium, and then that premium slowly goes away, the price of the product falls.  But another product may take its place that has a premium, and then falls over time.

An OLS model doesn't take that into account.  So I wanted to be able to take that into account with what's called a mixed linear regression.

Q    And are there any downsides to using that type, the mixed linear regression?

A    Yeah.  So using a mixed linear regression, there's two downsides.

One of the fundamental concepts in running a regression is balancing the model fit with complexity.  So, obviously, you can throw more and more complex regressions, types, at data to try to better fit the data, but it also adds a tremendous amount of complexity to it.  And complexity can be problematic in statistics.  So that's one of the downsides compared to a linear model.

The other downside is when, based on the way that you perform a mixed linear regression, it actually reduces the number of observable data points.  And so that can be a little bit problematic as well.

Q    And so I think you said you ran both kinds of

**UNITED STATES DISTRICT COURT**

regressions?

A    I did.  You know, no regression is going to be perfect. They're all going to have their benefits but also going to have their downsides.  So what I thought was reasonable in this case is to actually run both and then to compare the outputs to make sure that they were consistent with each other such that I wasn't getting a huge variability in one compared to the other, to kind of look at the analysis that way.

Q    So what's the next step after you've picked the regression technique that you're going to use, or in this case two?  What do you do next?

A    So the next step is to assemble the data necessary to run that regression.

Q    So how did you do that in this case?

A    Yeah.  So it sounds pretty simple to just pull the data together and run the regression, but it can be complicated; right?  Because as we talked about, there are hundreds of products here, products that are being sold to different types of markets.

So in my opinion, instead of just sort of taking them all together and running a regression based on that, it made the most sense to break them into categories based on the market that they're sold to and trying to find similarities in the product mix.

Q    So can you explain how that applies in this case?

A      Sure.  So that's what's shown on the screen here is -- what I decided is to break these products into four separate groups.  And I think you heard Dr. Re testify to this yesterday, that these different groups made sense to him based on the features of these products.

And so the first group that I put these accused products into a category is the external products.  So these are the hard drives that are external to the computers, usually connected by a USB port, have external housing associated with them.  That was about 56 percent of the total units.

Q      And what's that second group, color products?  Can you explain that?

A      These are the color products.  Dr. Re talked a little bit about these, but these are internal hard drives I think typically sold to consumers.  So those fit nicely together as a product mix.  That represents about 35 percent of the total units.

Q      And then if we go to the bottom left, what are the Ultrastar products?

A      So these are the data center products; right?  So these are the more high performance products that you would see in data centers.  It makes up about seven percent of the total units.

Q      And when you say "data centers," can you just give a brief -- what are you talking about?  What is a data center?

A    Yeah.  So these are -- you know, you would think of these big server farms; right?  So these big warehouses that are just filled with servers that are running, you know, the cloud, for example, you know, cloud-type applications.  Those are the kinds of hard drives that you would see in those data centers.

Q    And what's that final other grouping that you have?

A    Yeah.  So this other grouping was sort of a hodgepodge of different accused products that -- you know, it only represented about 2 percent of the units.  They didn't fit nicely into any of the other categories because they had unique features associated with them.

Q    So which of these groups did you use in your regression analysis?

A    So for my regression analysis, I used the external products, the color products, and the Ultrastar products.  I did not run a regression on the other products.

Q    Why not?

A    Because, as I said, they don't really share a lot of common characteristics, and they were only 2 percent of the units.  So even if I were to figure out a way to run a clean regression on those, it wasn't going to make a material difference.

Q    Now, when you say you used those other three categories, did you put them altogether and run one regression with all of them?

A    I didn't, no.  I ran regressions for each of them.

Q    So let's go -- in your binder there you should have some exhibits -- to JX-2124.

And if we could bring that up on the screen, Mr. Mortensen.  Oh, actually, I'll wait to bring it up.

Take a look at that first, Mr. Bergman.

A    I'm there.

Q    What is JX-2124?

A    So this is a document produced by Western Digital for purposes of this litigation, and it has -- I was talking about the transactions.  It has all the transactions from 2021 through 2023.

Q    Okay.  And do you remember about how many transactions we're talking about on that schedule?

A    I think there was somewhere close to 400,000 transactions.

MR. LEDAHL:  Your Honor, plaintiff would offer 2124 into evidence.

MS. YOUNG:  No objection.

THE COURT:  2124 will be received.

**(Exhibit Number JX-2124 received.)**

MR. LEDAHL:  Mr. Mortensen, if you could bring that up on the screen briefly.

BY MR. LEDAHL:

Q    This is a spreadsheet.  In your binder there, does this go on for some pages, or is this just one quick little thing?

A    I only have two pages --

Q    Oh, I'm sorry.

A    -- in the binder.  But, yes, this is -- as we're scrolling through, you can see all the transactions.  You know, this is showing 2021, for example.

Q    Okay.  So these are --

That's fine.  Thank you.

We can -- I think we'd be scrolling for a while to look at 400,000 of those.

So can you also then open your binder to the next tab, 2125?

A    Yes.  I'm there.

Q    What is this document?

A    This is a similar document produced by Western Digital for purposes of this case.  It's the transaction data from 2018 to 2021.

Q    And about how many transactions are on that document?

A    About 250,000.

Q    And you used that as part of your analysis?

A    I did, yes.

MR. LEDAHL:  Your Honor, plaintiff would offer Exhibit 2125 in evidence.

MS. YOUNG:  No objection.

THE COURT:  2125 will be received.

**(Exhibit Number JX-2125 received.)**

**UNITED STATES DISTRICT COURT**

BY MR. LEDAHL:

Q    Now, can you also open your binder, while you still have it there, to PTX-716.

THE COURT:  Before we do that, why don't we take the midmorning break.

MR. LEDAHL:  That's fine, Your Honor.  Thank you.

THE COURT:  Be in recess for 15 minutes, ladies and gentlemen.  Please remember the admonition.

THE COURTROOM DEPUTY:  All rise.

**(Out of the presence of the jury.)**

THE COURT:  Anything before we take the break?

MR. LEDAHL:  I don't believe so.

MS. YOUNG:  Can I raise an issue?

THE COURT:  Sure.

MS. YOUNG:  This is Patricia Young on behalf of Western Digital.  During Mr. Bergman's direct exam, it was elicited testimony that Western Digital does not dispute that there are any noninfringing alternatives.  And it is our position that that has opened the door for us to argue that, in fact, there are.

THE COURT:  You want to respond?

MR. LEDAHL:  I will, Your Honor.  It's been presented in this case multiple times.  Indeed, Mr. Frenkel stood up and said, "We're not disputing that there are no noninfringing alternatives."  None were identified; none were

UNITED STATES DISTRICT COURT

presented to be considered.  It's appropriate for Mr. Bergman to say that.  That's not opening the door to excluded testimony.

THE COURT:  They haven't opened the door.  We'll be in recess.

MR. LEDAHL:  Thank you, Your Honor.

**(Recess from 10:34 a.m. to 10:49 a.m.)**

**(In the presence of the jury.)**

THE COURT:  Mr. Ledahl.

MR. LEDAHL:  Thank you, Your Honor.

BY MR. LEDAHL:

Q    Welcome back, Mr. Bergman.

I think, before we broke, I was about to ask you about Exhibit PTX-716.  Could you turn to that in your binder, please.

A    I'm there.

Q    What is PTX-716?

A    PTX-716 is a document that my team and I put together that is an aggregation of those 750,000 transactions into the average selling price by the accused product.

Q    And so this is a summary you prepared of the data that was produced from Western Digital?

A    That's right.

MR. LEDAHL:  Your Honor, plaintiff would offer PTX-716 into evidence.

MS. YOUNG:  No objection.

THE COURT:  716 will be received.

**(Exhibit Number PTX-716 received.)**

BY MR. LEDAHL:

Q    You said one of your steps was to assemble the data. Sounds like that was part of what you did.  And then what was the next piece from there?

A    Yeah.  So this is -- what's represented here is a snippet from Exhibit 716.  So this is taking all of those transactions, aggregating them together by model, product, the period of time in which it was sold, the average selling price, and the capacity of that drive.  So this is the data that I'm going to then use for the regression.

Q    So what's the next step?

A    The next step is to actually run the regression.  We've assembled the data, so now we run it.

Q    Let's start with the external products.  What did you find when you ran the regression?  Is this the -- which regression is this, first of all?

A    This is the OLS model, so the linear regression.

Q    Okay.  And what did you find from that regression?

A    What's here on the screen to the right is that same statistical analysis that we saw that gets created from running the actual program that creates that regression.  It's a little bit hard to see.

Can you blow that part out?

So we can see we've got the constant, which is $25.12, and then the price per terabyte of capacity at $18.45. So that's telling us what the contribution is of 1 terabyte to the accused external products.

And then we can see the statistical significance of that. We looked at that p-value before. And remember, a lower p-value represents a higher statistical significance. This actually has a p-value that comes from this at 0.000, so a very high statistical significance at something greater than 99.9 percent.

Q    You mentioned a moment ago the constant, and I think you said it was $25.12?

A    That's right.

Q    Can you remind us?  What's the constant in the context of this regression analysis?

A    If we think about what the constant represents, the constant is the value of everything else other than capacity. So it's the amount that Western Digital is able to receive from all the other features that it's offering other than capacity.

So if we think about the external products, these have external casings; these have design features associated with them. So that $25 represents the value of all the other features other than capacity.

Q    Were there any issues or concerns with this regression?

A       Well, you can see -- and maybe we can -- if we can blow out the actual dot plot itself, I think this gives us a good indication too.

So remember, in our example we have the observable data points, those five data points, and we're trying to figure out what the best line is here.  The blue dots here represent our observable data points, and the red line is the linear regression that comes from this.  So you can barely -- very clearly see there's a linear relationship.  As you're increasing the number of terabytes and capacity, that value, that slope is relatively unchanged.

So -- but the problem with that is, like I said before, it doesn't take into account time as a factor.  We're just looking at the average selling price for a particular model.  So that's why I ran the mixed linear regression.

Q       What did you find when you ran the mixed linear regression?

A       If we look at the next slide, this is the statistical output that comes from the mixed linear model.  And we can see that the price per terabyte is $19 .22.  Again, we have a p-value of basically zero, so very high statistical significance, with a constant at, you know, roughly $24.

Q       So under the OLS model or the regression, that yielded a price per terabyte of $18.45.  And the mixed linear, it was $19.22?

A    That's right.

Q    What does that tell you about the validity of these regression analyses?

A    Yeah, so if you remember, the reason why I ran the two was to see if there's really a significant difference between those two, such that I would need to make additional adjustments. And those numbers are pretty close to each other, which gives me some comfort that I'm in the right range for a price per terabyte.

Q    And did you -- you say you also ran a regression for the color products, the internal ones you talked about?

A    I did, yes.

Q    And is this the results from that regression?  Or one of them?

A    Yeah.  So this actually -- I'm now including on the single slide both the OLS model and the mixed linear model.  The OLS model for the color products is $25.80.  So higher than what we were seeing in the external products.  The mixed linear was $26.37.  Again, I have a p-value of basically zero.  So very high statistical significance at 99.9 percent.

Q    I notice -- hopefully everyone can see -- the constant value you have here.  It looks like, depending on which regression we're looking at, it's around $6-and-something. That's significantly lower than the one for the external products.  Can you explain why that is the case?

**UNITED STATES DISTRICT COURT**

A     Yeah, it actually makes sense when you think about it; right?  The external products, they have that external casing. They have design features associated with them.  So people are buying these not only because they have capacity but also because they have these extra design features.

These internal products, they don't have any of that.  They're sold to consumers.  It's really just to add capacity to the drive.  So the fact that the constant is a lot lower actually makes sense in context.

Q     And let's talk about your regression for the Ultrastar products that you mentioned.  What did that show?

A     It showed -- that showed a -- under the OLS model, a price per terabyte of $17.04; under the mixed linear model, $17.36. Again, both of these had p-values at almost zero.  So very high statistical significance.

Q     So can you summarize for the jury the data points from your regressions based on these product types?

A     Sure.  So this is a summary of all of those, based on the product group and the regression type.  It's showing the capacity on a per-terabyte basis of anywhere between $17.04 up to $26.37, depending upon the product group.  But you can see within the product groups themselves, it's very -- those numbers are pretty close to each other, which gave me comfort that those regressions are sort of reinforcing each other.

Q     And I want to just step back for a second.  You have a

UNITED STATES DISTRICT COURT

reference here, price of capacity per terabyte.  What are we talking about?  Are we talking about the price to consumers that -- basically what they sell these things for?

A    Yeah.  So this is the actual amount that they're receiving in revenue associated with the price per terabyte.

Q    Okay.  So once you have that price per terabyte, what's the next step in your analysis?

A    Yeah, so the next step in the analysis is -- again, if we're trying to figure out what's the value of these patents and we're trying to figure out the benefit that Western Digital is receiving, this is just revenue.  Obviously, Western Digital has costs associated with the generation of this revenue.  So we want to take into account costs.

Q    And how did you do that?

A    Well, fortunately, in the exact same spreadsheets that they gave us the price that they were charging for these devices, Western Digital also provided the costs.  So I'm able to perform the exact same analysis that I performed in calculating the price per terabyte.  Instead of using the average selling price, I could use the average selling cost and I can run the exact same regressions.

Q    And what did you find when you ran those regressions?

A    So I'm going to have a summary sheet that's going to show you each of these, but -- I don't need to walk through these all again, but I think it is important to recognize that for

every single one of these, I basically have p-values close to zero. So on the average selling cost side, they were highly statistically significant. So these numbers looked good.

Q So can you summarize, much like you did with the price, the cost per capacity that you found running these regression analyses?

A Yeah. So running the regression using average selling cost as opposed to average selling price, the cost of capacity was anywhere between $5.75 up to $7.21, depending upon the product and the type of regression.

Q So we looked at the price and we looked at the cost. What does that -- what does that get you to?

A So now if we can take the price, which effectively represents revenue, we subtract the cost from that, we can get to the profit on a per-capacity basis. So looking at that, we can see that just focusing on a per-terabyte basis, we can see that Western Digital's profit is anywhere between $11.14 up to $19.27, depending upon the product.

Q Are you calculating here all the profit that Western Digital would make, necessarily, on a given product?

A I'm not.

Q And we talked a little bit about the constant, that part that's sort of separate from the $18.45, for example, in the first line. Would Western Digital make profit on that separately?

**UNITED STATES DISTRICT COURT**

A     Yeah.  So if you think about this analysis, this is before we even get to the price per terabyte.  We're sort of setting aside the constant.  Western Digital is receiving all of the value of that constant, both the revenue and the profitability associated with that, before we even get here.

Q     Okay.  So you have a summary here on the right.  These are the profits per terabyte for each of these different models that you used.  Am I understanding that correctly?

A     That's correct.

Q     So does that mean we're done with regression analysis here?

A     Unfortunately, no.

Q     What else do we need to do?

A     So we performed all those regression steps, but the one thing that we haven't done is sort of take a step back and say does this actually make sense?  Do these numbers make sense?  Does the statistical significance make sense in light of these products themselves?

Q     Okay.  Is that something that we need to look at information or documents to do?

A     Yes.

Q     So could you open your binder first to JX-2116.

A     Okay.

Q     What is this document, Mr. Bergman?

A     This is an internal Western Digital document that's

talking about how Western Digital should market its Ultrastar product.

Q    So their strategy for presenting that product to the public?

A    Yes.

Q    Is this something you considered as part of your analysis?

A    Yes.

MR. LEDAHL:  Your Honor, plaintiff would offer JX-2116 in evidence.

MS. YOUNG:  No objection.

THE COURT:  2116 will be received.

**(Exhibit Number JX-2116 received.)**

BY MR. LEDAHL:

Q    And did you look at other documents like this?

A    I did, yes.

Q    Okay.  Can you turn to JX-2118, please.

A    I'm there.

Q    What is this document?

A    This is a Western Digital marketing document for its WD Blue product.

Q    And why did you look at this document?

A    Because this is showing the things that it's telling the market are the reasons why you should purchase the product.

MR. LEDAHL:  And, Your Honor -- well, strike that.

**UNITED STATES DISTRICT COURT**

BY MR. LEDAHL:

Q    Mr. Bergman, did you consider this document in preparing your analysis in this case?

A    I did, yes.

MR. LEDAHL:  Your Honor, plaintiff would offer JX-2118 into evidence.

MS. YOUNG:  No objection.

THE COURT:  2118 will be received.

**(Exhibit Number JX-2118 received.)**

MR. LEDAHL:  And if we can bring that up quickly, Mr. Mortensen.

BY MR. LEDAHL:

Q    So this is, it looks like, some kind of a brochure for a Western Digital product?

A    Yes.

Q    And what are they -- why was this important to you as part of your analysis?

A    So, again, it's to kind of look and see, you know, do these numbers make sense, does the high statistical significance make sense.  You know, they're selling hard drives that have capacity in them.  And you can see from their marketing documents, they're advertising that capacity and the importance of that capacity.  So it's, you know, really using it in light of that.

Q    And if we could -- I think Mr. Mortensen is ahead of me,

even.

This block that was from that document, what is this part showing?

A    This is showing the various WD Blue drives in various capacities.

Q    So they're showing the different sizes you could buy?

A    That's right.

Q    And if we could look, Mr. Mortensen, at the block that was actually just to the left of that one on the original document.

What's this one showing?

A    This is basically showing form factor.  So not only are you getting large capacity, you're getting it in a form factor that will fit in your drive.

Q    And these are some of the benefits you talked about that come from Dr. Suess's invention to Western Digital?

A    That's right.

Q    And so they're -- is it important that they're marketing their products, touting these benefits?

A    It is, yes.

Q    And let's take a look now, if we could, at -- in your binder, at JX-2119.

What is JX-2119, Mr. Bergman?

A    This is a marketing document for the WD Elements product. This is one of the external products.

Q    And is this something you also relied on in your analysis in this case?

A    Yes.

MR. LEDAHL:  Your Honor, plaintiff would offer JX-2119 into evidence.

MS. YOUNG:  No objection.

THE COURT:  2119 will be received.

**(Exhibit Number JX-2119 received.)**

BY MR. LEDAHL:

Q    Mr. Bergman, if you could also turn to JX-2120.

A    I'm there.

Q    What is this document?

A    This is another marketing document for the WD Elements product.

Q    And this is something you considered in your analysis?

A    It is, yes.

MR. LEDAHL:  Your Honor, plaintiff offers JX-2120 into evidence.

MS. YOUNG:  No objection.

THE COURT:  2120 will be received.

**(Exhibit Number JX-2120 received.)**

BY MR. LEDAHL:

Q    And the last one, I promise.  Can you turn to JX-2121.

A    I'm there.

Q    What is this document?

UNITED STATES DISTRICT COURT

A    This is a marketing document for the My Passport product.

Q    And is this something you also relied on in your analysis?

A    It is, yes.

MR. LEDAHL:  Your Honor, plaintiff would offer JX-2121 in evidence.

MS. YOUNG:  No objection.

THE COURT:  2121 will be received.

**(Exhibit Number JX-2121 received.)**

BY MR. LEDAHL:

Q    I won't show all of these, but these are all marketing documents, I think you said, from Western Digital?

A    Yes, or internal documents describing how they would go about marketing other products.

Q    And what did you glean from looking at all these marketing documents?

A    Well, unsurprisingly, capacity is one of the primary features that they're advertising in these products which, again, sort of gives me -- when I take that step back and I'm looking at the statistical analysis and understanding it, it makes sense in light of Western Digital's own documents.

Q    So what's the next step in your analysis?

A    Well, so the next step is -- I think it makes sense to kind of reset and remember what we're doing; right?  We're at a hypothetical negotiation with Western Digital and

**UNITED STATES DISTRICT COURT**

MR Technologies or -- and Dr. Suess.  The parties to that hypothetical negotiation, they have access to all of this information.  They know that the profitability of these products is going to be, you know, between $11 and, you know, $18.50, in that range.  And so the question is, what do they do with that information?  How do they come to an appropriate reasonable royalty in this case?

Q     And what is your opinion about what the parties would agree to at this hypothetical negotiation you talked about?

A     Yeah.  So the way that I thought about this is if Western Digital is at the table and they're looking at this capacity of the profit per terabyte, Western Digital is going to, you know, put forth a number of arguments.  One of those arguments being "Look, we're a big company.  We have lots of engineers.  We have lots of Ph.D.s.  We contribute to the commercialization of these.  We should get some benefit from that."

When I look at the bargaining between the parties, it's my opinion that they would have agreed to an $11.24 number to kind of carry forward for the rest of the analysis.

Q     And why would that be a number they would agree on?

A     For a number of reasons.  Number one is, it's the amount for the external products; right?  We know the external products represent the majority of the products in this case.

And then secondarily, at the bargaining table, as I said, Western Digital would say, you know, "We have some

bargaining power here.  We bring commercialization."  And so I think Dr. Suess would want to give them credit for that.

And so by choosing the lower end of the overall range compensates or gives credit to Western Digital for some of that.  And then also thinking about the administrative aspect of this; right?  As we carry forward, it would just be easier for the parties to apply a single number going forward to the number of terabytes as opposed to a whole bunch of different numbers for a whole different bunch of products.  So it made sense to me in light of that.

Q    Now, I see you've grayed out the other rows from this summary we looked at a few minutes ago.  Did you just disregard those numbers?

A    I didn't.  I think they're highly informative into coming up with the $11.24 amount.  So as I said, the parties would know all of this information, and so it's highly relevant to the ultimate amount.

Q    Okay.  So now that we've figured out this capacity profit that the parties would agree on, this 11.24 per terabyte, what's the next step?

A    So, again, the next step would be recognizing, you know, Western Digital saying, "Look, we" -- and I think we heard this from Dr. Re yesterday -- "Western Digital is providing some amount of capacity gains, some amount of increase in areal density, and so we want to give credit to Western Digital for

that."

And so we heard from Dr. Re yesterday that Western Digital is providing smaller incremental advances to areal gain, and this is part of its ordinary research and development work.

Q    I know you referenced it as "ordinary research and development."  Is that a tiny number that you're talking about?

A    At the end of the day, no, it's not.

Q    So you're crediting them for this research and development.  How did you do that?

A    So, unfortunately, Western Digital doesn't appear to track research and development costs specific to things like areal density.  They track research and development costs sort of in whole for their entire hard disk drive market.  And so the information that I had to rely on is all their research and development costs.  So that's what I took into account as part of my analysis.

Q    So how did you use that in your analysis?

A    So I used Western Digital's own information.

So we can click forward one.

We can see that between 2018 and 2023 Western Digital has spent about -- between 7.2 percent and 9.8 percent of its revenue on research and development.  So I wanted to give credit to Western Digital for that research and development effort.

UNITED STATES DISTRICT COURT

Q    And so how did you give them credit for that?

A    So what I decided to do was just kind of start at a baseline of 10 percent.  You know, over that period of time, they were south of that, but I thought 10 percent was a reasonable allocation to start with.  And that's really conservative because if you think about it, this is including all their research and development expenses for every aspect of that hard drive, even for research and development that actually never turned into a commercialization.

        Research and development that they spent on functionality that may have never been implemented, I'm still giving them credit for that.  So that's kind of the baseline place to start.

Q    What else, if anything, did you do with that research and development aspect?

A    So I would recognize that Western Digital, at this hypothetical bargaining table, would say, "Well, look, we expend these costs in order to generate additional revenue, in order to generate profit.  So we should get some profit on top of that as well."  And so I thought that was reasonable is to give them an additional amount of profit on top of that.

Q    And how did you calculate that profit?

A    I looked at their historical profit margins for the products.  They make about 30 percent margin on these products as a whole.  So instead of using that 10 percent, I used a

14.3 percent of total revenue allocation to Western Digital.

Q    Now, when you say their profit margin is 30 percent, can you explain what you're referring to there?

A    Yeah.  It's when you look at the total price of the product, what the profit is on the total price of the product.

Q    So when they sell a product for -- I'm going to use a simple number -- $100, their reported data suggests that 30 percent of that or $30 would be profit?

A    That's right.

Q    Okay.  So what was the next step in your analysis?

A    So now when I apply that 14.3 percent to the $18.45 that we're using as the price per terabyte -- this isn't a profit. We're going all the way up to revenue at this point -- it results in an allocation to Western Digital of $2.64.

Q    Other than R&D, did you credit Western Digital with any other expenditures or contributions?

A    I did.  So, again, thinking to the hypothetical negotiation, I think Western Digital, one of the things that they would say is "Look, these patents are foundational to capacity.  We have to spend money marketing our products, which includes the marketing for things like capacity.  So we should get some benefit from our marketing efforts."  So I wanted to take that into account.

Q    How did you go about taking that aspect into account?

A    Well, similar to research and development, I didn't have

costs specific to just marketing.  I had their overall operating expenses, which would include sales and marketing.  So my allocation included allocating value to all of their operating expenses, so not only sales and marketing.  I allocated expenses to IT, to administrative staff, to executive salaries.  Any expense that they had in their operating expenses, I gave them credit for.

Q    So credit for what they paid those hundreds or thousands of Ph.D.s we heard about, that's all factored into your analysis here?

A    It is, yes.

Q    What's the next step in your analysis?

A    So now if we look at what they historically spent, they spent about 7 percent of revenue on operating expenses.  So you apply that 7 percent to the $18.45, you get to about a dollar 29 per terabyte.

Q    So that was what you credited Western Digital in this model that you worked out in the hypothetical negotiation?

A    That's right.

Q    So can we look at a summary of how this plays out in how your analysis comes together?

A    Sure.  So we start at the 18 .45 in revenue.  We take out the cost associated on a per-terabyte basis to get to our gross profit of 11.24.  We credit Western Digital at $2.64 for not only their research and development costs but also some profit

**UNITED STATES DISTRICT COURT**

on top of that.  We take out a dollar 29 for the general and administrative costs to get to what I believe the parties to the hypothetical negotiation would agree is a reasonable per profit amount on a terabyte basis of $7.31.

Q    So the parties would agree using this -- let me step back.  All this data that you looked at and the regressions that you did, is that information the parties would know in this hypothetical negotiation?

A    Absolutely.  Under the assumptions of the hypothetical negotiation, the parties would have full access to this information.

Q    And so your opinion is that with all that access and information, they would agree on this $7.31 figure as the profit per terabyte that Western Digital realizes?

A    Yeah.  Based on the facts and circumstances of this case and given the bargaining positions of the parties, yes.

Q    And so what did you do next in your analysis?

A    So the next step is just to figure out of this $7.31, how do we split that between what Western Digital keeps and what Dr. Suess keeps?

Q    And how did you go about deciding how to split that in this case?

A    Well, we have from Dr. Re an understanding as to the contribution of these patents on a per terabyte basis, so we can just apply that to get to the direct benefit associated

**UNITED STATES DISTRICT COURT**

with these patents.

Q    So you used that 46 percent number here on the $7.31.  Am I understanding correctly?

A    That's right.

Q    Okay.  And that's after having previously deducted that R&D allocation that you mentioned?

A    Yes.

Q    That's after having deducted the general and administrative costs for everything else at Western Digital; is that right?

A    That's right.

Q    Okay.  Now is this 46 percent of all their revenue that you're using as the allocation?

A    It is not, no.

Q    Is it 46 percent of all of their profits that you're using?

A    It is not, no.

Q    So can you just explain what exactly is the 46 percent that we're talking about here?

A    Yeah.  It's the 46 percent that is associated with the agreed per profit amount on a per terabyte basis.

Q    And I think, you know, Dr. Re talked about some ranges: 300 to 700 gigabits per square inch in increased capacity and then 700 to 1300 gigabits per square inch.  Are you saying it's 46 percent of -- or excuse me.  The 46 percent, does that apply

to that whole range?

A    It does, yes.

Q    So are you taking 100 percent of any part of that range?

A    I am not, no.

Q    Okay.  So how does this factor in -- maybe you could give us -- let me step back.  The $3.36, what does that represent?

A    So this represents the amount that the parties to the hypothetical negotiation would agree would be the amount that would be paid to Dr. Suess for his -- for the patents.

Q    So can you give an example of how this would work with, like, a particular product?

A    Sure.  So, you know, we saw something like this in Mr. Fenster's opening, but I think it's an important way to sort of put into context this allocation.  So if we're looking at a product that was actually sold in June of 2021, it's a 1 terabyte product, so I wanted to use a product where we didn't have to do a lot of multiplication here.  We can just apply the $3.36 amount.

So we have this product.  It's a My Passport Ultra at $66.37.  So if we start at the very beginning, we know that the price of capacity is $18.45.  So if we start as that as our first part, what that means is, for this particular product, Western Digital is keeping $47.92 right off the bat.  Okay?

Then we make further allocations.  We take into account the cost of capacity at $7.21.  Western Digital keeps

that entire amount.  R&D, operating costs, allocations to Western Digital, they keep that entire amount.

Then we get to the contribution.  We split it based on the percentage attributable to the Suess patents at 46 percent to get to $3.36.  It means, for this particular product, the royalty to Dr. Suess is $3.36; Western Digital is keeping $63.  Now, every product is going to look different.  But as a representative product, Western Digital would be keeping the $63.

Q    Now, the $3.36, that's part of that split, the 46 percent between Dr. Suess and Western Digital in the contributions?

A    Yes.

Q    So you're crediting Western Digital with the 54 percent.  Am I understanding that right?

A    That's right.

Q    And that's in addition to the R&D that you credited them for?

A    That's right.  Yes.

Q    So would you expect that that 54 percent was based on that R&D?

A    It is, in part, based on that R&D.  But I think it's important to recognize, you know, when Dr. Re spoke about his determination of the 46 percent, he said but built into that is some of the contribution associated with Western Digital's research and development.

**UNITED STATES DISTRICT COURT**

And, you know, I think it's important to sort of compare those numbers; right?  So I'm allocating an additional $2.64 for that incremental gains in areal density and allocating $3.36 to Dr. Suess for a significant contribution to those areal gains.

So just the relationship between those shows that it's a very conservative allocation to Western Digital for its sort of ordinary research and development.

Q    I just want to make sure I understand.  You said you're allocating $2.64 for their R&D.  That's in addition to the 54 percent.  If we do that math with the $7.31, that's, what, about $3.90-something cents?

A    That's right.  So that's just an allocation outside of that 54 percent allocation.

Q    Got it.  Thank you.

So now that we know the parties would agree on this $3.36 per terabyte as the allocation to Dr. Suess, how do we figure out the reasonable royalty from that?

A    Yeah.  So the next step, now we know the value per terabyte, now we just need to figure out how many terabytes there are over the overall damage period.

Q    Mr. Bergman, can you turn to PTX-717 in your binder.

A    I'm there.

Q    What is this document?

A    This is a document my team and I put together that took

those 650,000 transactions from Western Digital and aggregated them all to figure out how many terabytes had been sold over the period of time in which we had actual data.

Q    Okay.  So let me see if I understand that.  You took -- so some of the products, obviously, are 1 terabyte products, like the one we just looked at.  Others have 5, 10, 100 terabytes, maybe.  You had to add up all those terabytes?

A    That's right.  Yes.

Q    And that's what's reflected in Exhibit 717?

A    That's right.  Yes.

        MR. LEDAHL:  Your Honor, plaintiff would offer PTX-717 in evidence.

        MS. YOUNG:  No objection.

        THE COURT:  717 will be received.

        **(Exhibit Number PTX-717 received.)**

BY MR. LEDAHL:

Q    And having done that analysis, what did that show you?

A    So that gave us the ability to figure out how many actual terabytes they'd sold.  But we only had data through June -- I think June of 2023.

Q    Okay.  So why is that a problem?

A    Because I'm determining damages all the way up to 2027, when the patent -- when the '864 patent expired.  So I needed to project out through 2027 -- or up to 2027 to figure out the number of terabytes.

Q    How did you go about doing that projection?

A    So I looked at the historical performance of the accused products to kind of understand the pattern of how they'd been selling over time, and then just used that going forward.

Q    And were they sort of increasing, decreasing, the same? How did that come out when you looked at that pattern?

A    So when you look at the 2018 to 2023 amounts, they were actually -- had negative growth of about 11 percent over that period of time.  So I brought that negative growth rate forward through 2027.  So declining sales by 11 percent to that date.

Q    And after you did all that analysis with both the data that you had and the projections that you had to do, what was the conclusion of how many terabytes Western Digital sold or would sell, total, during this damages period?

A    So combining those two things together, it was total terabytes of 116.4 million.

Q    So they would have sold throughout that nine-year period that you looked at, approximately, 116.4 million terabytes of capacity in their hard drive products?

A    For the accused products, yes.

Q    Specifically just the accused products.  Thank you.

     And so what do you do with that number once you have the 116 million?

A    Well, now that we have the 116 million, we know we have the $3.36, we can just multiply those two together to get to an

amount of $391.7 million.

Q    Now, I'm pretty sure I heard Mr. Fenster, and even you at the beginning of your presentation, use a slightly different number than $391 million.  Why is that?

A    The one thing that this doesn't account for is the fact that the parties at the hypothetical negotiation would agree to a lump sum royalty.  So a royalty that's paid all up front.

Q    And that's back in 2018?

A    That's right.

Q    So how do you account for that in your analysis?

A    Yeah, so what we've calculated, this $391 million represents the value that Western Digital is going to receive over time.  The payment that they're making is all based on a single date as of March of 2018.  So we have to take into account the fact that there's a time value of money issue.

Q    And so how do you factor in that time value of money issue?

A    So I think a way to think about it -- the easiest example of time value of money is inflation; right?  You have a dollar today that you can buy goods with.  You know that at some point in the future you're going to need more money to buy that same good because of inflation.  And so maybe you need a dollar 25 in the future.

        This analysis is actually doing the opposite of that.  We're coming from the future and going backwards.  So we

need to discount these amounts from the future -- from future dollars to earlier dollars back in 2018.  And so what I'm representing on the slide here is sort of a visual representation of that.

We have a dollar that Western Digital earned in 2022 would actually be worth about 72 cents as of the hypothetical negotiation date, taking into account this sort of time value of money issue.  As we go further out into the timeline, 2027 dollar would be worth about 32 cents as of the date of the hypothetical negotiation.  So we're taking that into account.

Q     And I see you have a line there coming back all the way from 2027, the end of the damages period.  What -- how do you calculate that?

A     Yeah, so similar to what we're doing with figuring out the number of terabytes, we have actual data and we have projected data.  So figuring out the right rate, I used two different rates to do that.

So for the period in which we have actual data, I used what's called the prime rate, which is a low-risk rate, to discount those amounts back.  And the reason I did that is because if you think about this, these are actual sales that Western Digital has made.  They've received the money, they've put it in their pocket.  There's almost no risk associated with this amount.  So it makes sense to bring it back at a low-risk rate.

For the period in which we're projecting into the future, I used a higher risk rate.  Because there's some risk that they may sell more, they may sell less.  It's a little bit riskier.  So I used what's called Western Digital's cost of capital, which is sort of an industry standard for what is the company's overall risk profile.  And so I used that rate to discount those amounts.

Q    Now, using a higher rate that you just described, does that make the overall end result of your analysis higher or lower?

A    Lower.  So that's why you can see in 2027 -- a dollar in 2027 is only being credited at about 30 cents in 2018.

Q    Okay.  So how did you then use this calculation that you've been describing to come up with your end result of your analysis?

A    Yeah, so I applied this on a year-over-year basis, different discount rates based on different periods of time.  What that means is that $391 million that's being earned over time gets discounted back to a present value as of March of 2018 at the $305.9 million number.

Q    Okay.  So that's the number we saw earlier, is that right, the 305.9?

A    That's right.

Q    So, Mr. Bergman, can I ask you to just summarize your reasonable royalty analysis in this case?

**UNITED STATES DISTRICT COURT**

A      Sure.  So it's my opinion that if Western Digital and Dr. Suess had sat down at a table in March of 2018, understanding that there's no disputes that the patents are valid and infringed, they have access to all relevant information, they understand that the Suess patents contribute 46 percent to capacity, that Western Digital has no alternatives to this infringement, that they would agree to an amount of $305.9 million.  Recognizing that this amount represents the low end of the per-terabyte amounts that were calculated with the regression.

It credits Western Digital for its research and development costs, and profit on top of that.  It credits Western Digital for all its operating costs.  And it actually -- and I think this is important, is it doesn't take into account the competitive impact that would happen to Western Digital.

The analysis that I've performed assumes that Western Digital has sold the exact same amount of hard drives. Nothing has changed with regard to the units being sold, just that they would have to charge a lower price.  And so this assumes no competitive impact other than that change in capacity.

Q      But, now, is it your opinion, based on the testimony we've heard about the impact, that there would be a competitive impact in the real world if they couldn't use Dr. Suess's

invention?

A    That's my understanding, yes.

Q    What kind of competitive impact?

A    From what I understand, they wouldn't be able to compete in the market.  So they wouldn't be able to sell the accused units, a number of these that would impact their overall sales.  So the profit associated not just with terabytes but with all other aspects would come into play.

Q    Are you saying that if they didn't make those sales, they wouldn't get those profits, even on the stuff that's not what you're accounting for here?

A    That's right.  I didn't account for that analysis.

Q    Okay.  Thank you, Mr. Bergman.

        MR. LEDAHL:  I'll pass the witness.

        MS. YOUNG:  Good afternoon.  Patricia Young on behalf of defendant, Western Digital.

                        **CROSS-EXAMINATION**

BY MS. YOUNG:

Q    Good afternoon, Mr. Bergman.

A    Good afternoon.

Q    Nice to meet you.  I don't believe we've met before.

A    Nice to meet you as well.

Q    Sir, you said your current position is the president and founder of Bergman Consulting; right?

A    That's correct.

Q       And you've been there since 2017?

A       Yes.

Q       And MRT's attorneys in this case are from the Russ August firm; correct?

A       That's right.

Q       And you've actually also been working with them since 2017?

A       That sounds right.

Q       And, in fact, this is the fifth or sixth case that you have done with Russ August; is that right?

A       That sounds fair.

Q       So, now, you testified --

        Actually, can I get PDX-4-9.

        So you testified that the framework that you used to determine the reasonable royalty is the hypothetical negotiation framework; correct?

A       That's right.

Q       And, in fact, you also testified that the Georgia-Pacific factors are factors you have to consider; correct?

A       Yeah.  They provide guidance for how you determine a reasonable royalty.

Q       And, in fact, you said that you evaluated all 15 of them?

A       I did, yes.

Q       I think you also testified that you considered licenses; correct?

**UNITED STATES DISTRICT COURT**

A    I did, yes.

Q    So, yet, when you did your discussion with the jury, you only discussed Factors 8, 9, 10, and 13.

Can I get Slide PDX-4-10.

So you only discussed Factors 8, 9, 10, and 13; correct?

A    I did, yes.

Q    And one of the factors under Georgia-Pacific, Factor 2, says, "Royalties paid by a licensee from comparable agreements."  Correct?

A    That's right.

Q    Now, you were here yesterday when Dr. Re testified; right?

A    I was, yes.

Q    And you heard him say that it is his opinion that Seagate uses the patents in this case.

Do you remember that?

A    I do, yes.

Q    And MRT has no license agreements for the patents-in-suit?

A    That's right.

Q    But you did consider licenses, you said?

A    I did, yes.

Q    So Western Digital has license agreements; correct?

A    I've seen Western Digital licenses, yes.

Q    And you didn't mention any of them to the jury, did you?

A    I didn't, because I think they're all not comparable to this case.

Q    That's not true, is it?

A    It is true.

Q    Okay.  We can explore that later.

All right.  So you are not a technical expert; correct?

A    I'm not a technical expert in this case, no.

Q    And you rely on Dr. Re for your opinions and understanding of the patented technology?

A    Generally, as well as looking at Western Digital's own documents.  But for the most part, yes, Dr. Re.

Q    And since you're not a technical expert, you do not have any opinions about infringement?

A    I do not have any opinions about infringement.

Q    And you also don't have any opinions about invalidity?

A    That's right.

Q    So just to be clear, though, if Western Digital is found not to infringe, then you would agree that damages in this case is zero; right?

A    That's my understanding.

Q    And if the MRT patents are found to be invalid, then damages is also zero?

A    That's my understanding.

**UNITED STATES DISTRICT COURT**

Q    And if Dr. Re's calculation of the 46 percent increase in areal density is incorrect, then you would also agree that your opinion that damages will be $305 million is also unsupported; correct?

A    I think that that's a complicated question to answer.  It depends on to what extent it's incorrect.

Q    Sure.  But you would agree that you need 46 percent in order to arrive at the number 305 million; correct?

A    I think the $305 million number is -- includes that 46 percent.  But if for some reason it's a different number, you can use the exact same methodology that I used to come up with a reasonable royalty.

Q    Okay.  So you would agree with me that that math is required to get to $305 million.  You would need 46 percent as an input into the math that you do to get to your $305 million?

A    I would say, yeah, mathematically that's what's -- that's what's being used mathematically.  If the number were different, it changes all kinds of other circumstances that you have to take into account that I haven't done because I've relied on the 46 percent.

Q    Exactly.  So you relied on the 46 percent to get to the 305.  Okay.

Let's see.  Can I get PDX-4-6.  Thank you.

And since you were here yesterday for Dr. Re's testimony, you heard the discussion regarding the input that he

used for the Group 3 products; correct?

A    Yes.

Q    And so just to be clear, if the jury finds that for some reason Dr. Re's testimony on the Group 3 products is not credible, just to understand your analysis and your summary opinions, then the jury should not credit the $109.5 million; correct?

A    I don't think that I can provide that kind of opinion. What I can tell you is that I valued the Group 3 patents at $109.5 million.

Q    So if the Group 3 patents -- or if the Group 3 products are found to not infringe for any reason, then the jury should remove the $109.5 million from your $305 million conclusion; correct?

A    I'm not going to tell the jury what they should do.  But what I will say, if there is no infringement on the Group 3 patents, there would be no damages associated with the Group 3 patents.

Q    Fair.  Thank you.

         All right.  So going back to your analysis, you said that your analysis relies on an income approach.  And the income approach to valuation determines, as you put it, the incremental benefit of the invention based on the use made of the patents-in-suit by the defendant; correct?

A    That sounds fair.

Q    Okay.  And then you also say that your analysis claim to calculate the incremental benefit to Western Digital over prior art products?

A    I think that's fair.

Q    The other thing that you said about your calculations is that -- I guess not what you said, but you said that you looked at the entire hard drive; correct?

A    You're going to have to put that in context.

Q    Sure.  So you're familiar with a concept called the smallest salable patent practicing unit?

A    Generally, yes.

Q    And it is your opinion that the accused hard drive product, the entire disk -- not the entire disk -- the entire hard drive product is the smallest salable patent practicing unit; correct?

A    That's my understanding.  That's the smallest thing that Western Digital sells into the market.

Q    And so when you're looking at -- I will go back to that.

        But when you're looking at the revenues when you are doing your calculations, you're looking at the revenues for the entire hard disk drive; correct?

A    That's the starting point before I make all the allocations.  But yes.

Q    Sure.  That's the starting point.

        And now going back to -- and, actually, just to be

UNITED STATES DISTRICT COURT

fair, you do rely on Dr. Re for that opinion; correct?

A    I know Dr. Re has that opinion.  I've seen nothing to show that Western Digital sells anything other than the actual products into the market.  So that -- I think that sounds reasonable based on my opinion as well.

Q    Okay.  So you keep saying that you didn't see anything about Western Digital selling anything other than the hard disk drives into the market, but you were here when Dr. Re and actually Dr. Suess testified about the fact that the media is a smaller component in the products; correct?

A    Yes.

Q    And the media is the feature at issue here?

A    What do you mean when you say "the feature at issue"?

Q    You had -- you testified a lot about increases -- or you testified -- let me start over.

You've heard a lot of testimony about the increases in areal density; correct?

A    Yes.

Q    That's about the media, isn't it?

A    I think that's fair, yeah.

Q    And so you've said that Western Digital doesn't sell any other components or any other thing -- any components other than the hard drive, but one can buy media; correct?

A    I don't know.

Q    So you don't know if media is sold in the market?

A       I don't know how Western Digital gets its media, whether or not it makes it itself or buys it from somebody else.  So I don't know.

Q       So the only thing you're looking at is whether or not -- from your perspective, it only matters if Western Digital sells it; correct?

A       I don't think that's fair.  I mean, ultimately, from my perspective, it's what's the benefit that Western Digital is receiving from using these patents.  And so whether or not you -- if you remember, my analysis initially carves out the entire value of everything else and gets to the media before I start doing my allocations.

Q       That's actually not my question.

So we're talking about the smallest salable patent practicing unit.  And I just wanted to be clear --

**(Reporter requests clarification**

**for the record.)**

MS. YOUNG:  We are talking about the smallest salable patent practicing unit.  And I just want to be clear that from your perspective, the reason why you say it is the hard disk drive is because, as far as you're aware, Western Digital doesn't sell a smaller component.

A       I think that's fair.  Again, we're starting prior to my allocations, but I think that that's fair.

Q       Okay.  And I just wanted to be clear, though, that -- and

UNITED STATES DISTRICT COURT

you just said that you are not aware, either way, if one can buy that media?

A    I haven't seen any evidence that Western Digital sells that media.

Q    But you have no information, either way, about whether or not one can buy that media?

A    I'm not sure why buying it is relevant.  I'm focused in on how Western Digital has benefited from these patents.  So the cost that it spends for the media is not reflective of the value it receives from the media.

Q    Okay.  And I'm not talking about your analysis.  I'm literally just trying to drill down on what the unit is that we're talking about.  And I just want to be clear, because you keep tying it to what Western Digital sells.

And I just want to be clear.  We're just talking about the smallest salable patent practicing unit.  You have no opinion either way as to whether or not -- you're not aware of any evidence as to whether or not one in the market can purchase media; correct?

A    I don't have an opinion about one in the market.  I'm not focusing in on somebody else in the market.  I'm focused on Western Digital.

Q    Okay.  Let's talk about your model.

Can I get -- we'll just talk about it.

So you calculate what you claim to be the

incremental benefit by multiplying a base of 116.4 million terabytes with a rate; is that fair?

A    Generally, yes.

Q    And then I think you said that 116.4 million terabytes is the total number of terabytes in all units of the accused products; right?

A    Yes.  Based on actual sales and then projections.

Q    And to calculate the rate that you used that you multiply against the 116.4 million terabytes --

Can I get PDX-4-52, Mr. Schmoller.  Thank you.

To calculate the rate, you start by calculating a gross profit per terabyte; is that fair?

A    Can you repeat that one more time?

Q    So in order to get to the rate that you multiply by 116.4 million terabytes, you start by calculating a gross profit per terabyte.  Is that fair?

A    I don't know if that's the place I started.  I think I started higher than that, but that is a component of my analysis, yes.

Q    Sure.  And then to calculate the gross profit per terabyte, you effectively use a formula of price minus costs per terabyte?

A    I'm sorry.  Are we talking about the 1124?

Q    Yes.

A    Yes.

Q    I can highlight it.  Very far away, though.

So you get to this number.  And you start by -- to get to that number, you basically subtract your calculation of cost from your calculation of price?

A    Right.  On a per-terabyte basis, yes.

Q    And then you say that your model determines the portion of the accused product price that's attributable to capacity?

A    Repeat that one more time, please.

Q    You claim that your model determines the portion of the accused product average selling price that is attributable to capacity.  Is that fair?

A    That sounds right.

Q    And to do that, you discuss multiple regressions that you ran?

A    As part of that, yes.

Q    And you also did the same with respect to the portion of accused product cost that is attributable to capacity; correct?

A    Yes.

Q    Okay.  You can take that down, Mr. Schmoller.

I want to explore those regressions that you ran.

If I can get PDX-4-43.  Actually, let's do 4-39.  Thank you.

So one of the regressions that you run is called the mixed linear model; right?

Actually, the next slide.  Lots of regressions here.

Perfect.  Okay.

One of the regressions you run is called the mixed linear model?

A    That's right.

Q    And the output of this model is a straight line; is that fair?

A    Yes.

Q    And then in 4-39, you run the OLS model?

A    Yes.

Q    And then just to be clear, the output of that model --

If we can go one slide back, Mr. Schmoller --

-- is also a straight line?

A    Yes.

Q    Okay.  And if we go to 4-43.

You said you ran both of those models for at least three years of products, which was external, other, and Ultrastar; correct?

A    That's correct.

Q    And so that's three separate mixed linear regression models and three separate OLS models; correct?

A    Yes.

Q    But then if we go here, we see your input of -- we see your input of 18.45; correct?

A    Yes.

Q    Or a result.

**UNITED STATES DISTRICT COURT**

And that's actually what you decide, if you go to 4-52, is the number that you used for the price; correct?

A    As I said, yes, that's what I think the parties to the hypothetical negotiation would carry forward.  It was based on those external products.

Q    Understood.

And so just to be clear, if we go back to 4-43, 18.45 is not the same as any of the other results that you arrived at from your regression models; correct?

A    That's right.

Q    And if you go to 4-37, you pointed out that the external products, which is where the 18.45 comes from, is 56 percent of the total units; correct?

A    Yes.

Q    And so that means you do not use the results for 44 percent of the accused products?

A    I don't think that's right.

Q    The number that you used is not from the results of 44 percent of the accused products?

A    I think what I said on my direct is the 44 percent of the other accused products, the number that gets generated is informative as to why the parties to the hypothetical negotiation would agree to that $18.45 amount.

Q    Sure.  I understand what you said.

But I'm just asking a very specific question, which

is:  The $18.45 is not the result of the regressions that you run on 44 percent of the other products; correct?

A     It's not that precise amount, that's true.

Q     All right.  Let's look at your cost numbers, which is on PDX-4-45.  Here you, again, run a total of six regressions on three sets of products; correct?

A     Yes.

Q     And, again, the number that you end up choosing when you get to your final model is $7.21 -- correct? -- as a cost per capacity?

A     Yes.

Q     And, again, here, we're talking about the same percentages.  $7.21 is not the result of your regression that you get on 44 percent of your accused products; correct?

A     I think it's the same answer that I gave you before, which is it's not that precise amount, but it is informed by the other amounts.

Q     But it's not that number?

A     It is not that number.

Q     Actually, you said that you do not run a regression --

          Actually, if we can go back to 4-37.  Thank you.

          You talked about these -- the category of other products.  And then you said that you did not use any regression results for those products.  But those products do represent 2 percent of total units?

A    That's right.

Q    And I think -- I don't know how many hundreds of thousands of units you mentioned -- I forgot the number -- but it's a lot of units, 2 percent; right?  Absolute number?

A    "A lot" is always a relative amount.  So relative to the others, it's not, but maybe an absolute amount -- somebody would consider it being a lot of units.

Q    And just to be clear, did you try to run any regressions on these 2 percent of products?

A    I actually did, yeah.

Q    And you didn't present those to the jury?

A    No, because they -- because they were so different from each other, the statistical analysis that was being output from those regressions, it didn't make a lot of sense.  And, again, stepping back to think about why, it actually makes a lot of sense why it didn't work.

Q    I just wanted to confirm that you did not present those to the jury.

A    I did not present those to the jury.

Q    So where the data just didn't work, you didn't -- you chose not to present it to the jury?

            MR. LEDAHL:  Objection.  Argumentative.

            THE COURT:  Overruled.

            THE WITNESS:  I don't think that's a fair characterization of what I did.

BY MS. YOUNG:

Q    So the external products you used for your model only has capacities between 0.5 terabytes and 22 terabytes; right?

A    I don't recall as I sit here.  I think that sounds about right to me.

Q    Well, if you want, you can turn to PTX-716, which I think came in during your direct exam.  If you want to confirm.

A    What was that number again?  Sorry.

Q    PTX-716.

A    Based on my quick review, that sounds right.

Q    So the external product you used for your model only had capacities between 0.5 terabytes to 22 terabytes?

A    For the external accused products model, yes.

Q    But, in fact, Western Digital sells products with higher than 22-terabyte capacity; correct?

A    Yes.

Q    In fact, it goes all the way up to at least 160 terabytes.  Does that sound right?

A    That sounds right.

Q    So those data points were not considered in your modeling, then?

A    I don't think that's right.

Q    Well, just to be clear, those -- when you arrived at the $18.45 price and the $7.21 cost, the data points for the products that go up beyond 22 terabytes were not the result of

your external accused products model; correct?

A    You're going to have to break that down.

Q    Sure.  So you just said that the 18.45 number price comes from your regression, and it's specifically the OLS regression of your external accused products; correct?

A    Right.  When I run that regression, I get an $18.45 amount.

Q    When you ran the other regressions, you don't get to that number; correct?

A    Not to that precise number.  That's right.

Q    And you also just said -- agreed with me that the external accused products that you considered only go up to 22 terabytes; correct?

A    That's right.

Q    So, therefore, there are other products that are higher capacity than that for which ultimately, to the extent that they are not part of the external accused products regression, if you ran the regression of those products, it is not the $18.45 result?

A    Again, I'm not sure I understand the question.  Maybe I can help out.

        The external products only go to 22 terabytes.  The output from that is $18.45.  So by its nature, it's not -- that regression is not going to include anything above 22 terabytes.

Q    That was actually just fine.  Thank you for that.  Let's

move on.

Just to understand your model, you said that -- as you explained, that the OLS model outputs a straight line; correct?

A    Yes.

Q    And so that means that you predict that for every 1 terabyte increase in capacity, there is an $18.45 increase in price?

A    For the external product, yes.

Q    Well, that's your ultimate model as well; correct?

A    I don't think that's a fair way to characterize that, no.

Q    So, ultimately, when you multiply by --

Well, actually, can I get -- Mr. Schmoller, can I get 4-52 again.

So when you put up this demonstrative earlier, you said that the parties would have agreed that the profit per terabyte is $7.31; correct?

A    That's right.

Q    And you get to that by using the price of $18.45 -- correct? -- as your starting point?

A    Right.  Based on what the parties would have agreed to, understanding the outputs from all of the regressions.

Q    But as we've discussed, 18.45 is the precise number from your external accused products regression?

A    That's right.

**UNITED STATES DISTRICT COURT**

Q    So what you do when you get to the end number is you then multiply by Dr. Re's 46 percent and you get a number of $3.30-something-cents?

A    36 cents.

Q    36 cents.  Thank you.

But you take that and you multiply that number by, as we discussed, the 116 million terabytes which come from all the accused products; right?

A    That's right.

Q    Okay.  So, ultimately, when you're doing that math, what you're doing is you're taking that $18.46 and effectively applying it to every single terabyte for every single accused product?

A    That's right.  Based on what the parties to the hypothetical negotiation would have agreed to, yes.

Q    So, therefore, under your model that you are predicting that for every single 1 terabyte increase, there is an $18.45 increase in price?

A    I don't think that's a fair way to characterize that. Again, this is an agreed-upon amount in the hypothetical negotiation, taking into account all the regressions where per terabyte amounts go up to $26.

Q    Okay.  But, yet, you still -- you do multiply that against the terabytes for every single product, irregardless of whether it's an external accused product, as you call it, or an

**UNITED STATES DISTRICT COURT**

Ultrastar product, as you call it?

A    That's right.

Q    And so, therefore, you end up applying that number regardless of whether it is a product that is 0.5 terabytes, which is how you get to the 116 million, or if it's an input of a product that has 160 terabytes, which allows you to get to the 116 million terabytes?

A    I'm sorry.  I'm not sure --

Q    I'll back up.

So you have products -- Western Digital's products that are 0.5 terabytes, and Western Digital products that have 116 terabytes.  So when you did your math, you ultimately had to apply -- to get to 116 million terabytes, you had to input products that were 0.5 terabytes, and you had to input products that were 160 terabytes?

A    That's right.  The regressions include all of that.

Q    All right.

THE COURT:  Is this a good breaking point?

MS. YOUNG:  Yes.

THE COURT:  We'll take the lunch hour here, ladies and gentlemen.  We'll resume at 1:30.  Please remember the admonition not to discuss the case with anyone, not to form any opinions on the issues in the case until it's submitted to you. See you at 1:30, please.

THE COURTROOM DEPUTY:  All rise.

**(Out of the presence of the jury.)**

THE COURT:  Anything before we take the break?

MR. FENSTER:  Not for plaintiff, Your Honor.

MS. YOUNG:  Not for defendant.

**(Morning proceedings conclude at 11:59 a.m.)**

--oOo--

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  July 19, 2024*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

| $ | | | | |
|---|---|---|---|---|
| **$1.62** [1] - 74:15 | **$9.62** [2] - 70:4, 72:21 | 113:18, 128:1, 128:4, 128:9, 128:14 | 63:20 | 16:5, 16:15, 16:25, 17:5, 19:19 |

**$ column:**
**$1.62** [1] - 74:15
**$100** [1] - 105:7
**$11** [1] - 101:4
**$11.14** [1] - 94:17
**$11.24** [2] - 101:18, 102:15
**$17.04** [2] - 92:13, 92:20
**$17.36** [1] - 92:13
**$18.45** [15] - 89:3, 90:24, 94:23, 105:11, 106:15, 109:21, 131:23, 132:1, 134:24, 135:6, 135:19, 135:23, 136:7, 136:19, 137:17
**$18.46** [1] - 137:11
**$18.50** [1] - 101:5
**$19** [1] - 90:20
**$19.22** [1] - 90:25
**$19.27** [1] - 94:18
**$19.34** [1] - 71:6
**$2.43** [1] - 74:12
**$2.64** [4] - 105:14, 106:24, 111:3, 111:10
**$24** [1] - 90:22
**$25** [1] - 89:23
**$25.12** [2] - 89:3, 89:13
**$25.80** [1] - 91:17
**$26** [1] - 137:22
**$26.37** [2] - 91:19, 92:21
**$3.36** [8] - 109:6, 109:18, 110:5, 110:6, 110:10, 111:4, 111:17, 113:25
**$30** [2] - 65:25, 105:8
**$305** [5] - 122:3, 122:9, 122:14, 122:15, 123:13
**$391** [3] - 114:4, 114:11, 116:18
**$47.92** [1] - 109:23
**$5.75** [1] - 94:9
**$63** [2] - 110:7, 110:9
**$66.37** [1] - 109:20
**$695** [1] - 39:13
**$7.21** [5] - 94:9, 109:25, 132:9, 132:13, 134:24
**$7.31** [6] - 107:4, 107:13, 107:18, 108:2, 111:11, 136:17

**' column:**
**$9.62** [2] - 70:4, 72:21

**' (apostrophe) column:**
**'864** [9] - 18:10, 26:22, 39:8, 48:10, 48:12, 53:8, 57:6, 57:13, 112:23
**'997** [10] - 39:8, 48:13, 48:14, 48:16, 48:18, 48:19, 48:20, 48:23, 57:10, 57:13

**/ column:**
**/S** [1] - 140:19

**0 column:**
**0.000** [1] - 89:9
**0.5** [8] - 18:16, 18:24, 19:22, 134:3, 134:12, 138:4, 138:11, 138:14
**008** [2] - 73:13, 73:18

**1 column:**
**1** [16] - 8:6, 14:13, 14:18, 18:10, 26:20, 26:22, 46:7, 57:8, 63:12, 63:20, 73:11, 89:4, 109:16, 112:5, 136:7, 137:17
**1-053** [1] - 1:24
**1.71** [2] - 20:5, 20:12
**1.84** [1] - 64:21
**10** [10] - 57:8, 60:2, 67:21, 67:22, 104:3, 104:4, 104:25, 112:6, 120:3, 120:5
**10,000** [1] - 67:2
**100** [5] - 7:7, 11:2, 42:21, 109:3, 112:7
**103** [1] - 16:3
**108** [1] - 16:13
**109.5** [4] - 46:9, 123:6, 123:10, 123:13
**10:34** [1] - 87:7
**10:49** [1] - 87:7
**11** [2] - 113:8, 113:10
**11.24** [2] - 102:19, 106:24
**112** [1] - 7:8
**1124** [1] - 128:23
**116** [7] - 113:23, 113:24, 137:7, 138:5, 138:7, 138:12, 138:13
**116.4** [6] - 113:16,

**1 (second part) column:**
113:18, 128:1, 128:4, 128:9, 128:14
**118** [1] - 6:7
**11:59** [1] - 139:5
**1200** [1] - 3:5
**1224** [1] - 3:5
**12424** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**129** [1] - 25:13
**12th** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**13** [3] - 60:2, 120:3, 120:5
**1300** [1] - 108:24
**1310** [5] - 17:14, 19:13, 21:25, 33:10, 33:11
**1322** [2] - 9:2, 9:6
**1324** [2] - 9:1, 9:2
**14** [1] - 6:4
**14.3** [2] - 105:1, 105:11
**140** [4] - 3:19, 4:9, 4:21, 5:5
**149.1** [2] - 48:20, 48:24
**15** [5] - 46:10, 53:23, 54:11, 86:7, 119:22
**15-per-terabyte** [1] - 66:1
**15.2** [1] - 46:9
**152** [1] - 22:10
**16-terabyte** [1] - 65:18
**160** [3] - 134:17, 138:6, 138:15
**1600** [2] - 4:6, 4:13
**18** [4] - 41:16, 41:21, 41:22, 106:22
**18-terabyte** [1] - 65:19
**18.45** [5] - 130:23, 131:8, 131:12, 135:3, 136:23
**19** [3] - 1:16, 8:1, 140:15
**1970s** [1] - 54:2
**1:30** [2] - 138:21, 138:24
**1[d** [1] - 18:13
**1[e]** [1] - 18:14

**2 column:**
**2** [12] - 14:24, 15:4, 19:21, 19:22, 46:8, 64:23, 83:9, 83:19, 120:8, 132:25, 133:4, 133:9
**2.0** [2] - 20:9, 20:12
**20** [2] - 42:19, 43:19
**200** [3] - 2:17, 44:22,

**2 (second part) column:**
63:20
**20024** [1] - 2:18
**2006** [1] - 61:25
**2010** [2] - 24:1, 35:25
**2015** [1] - 34:4
**2017** [5] - 40:10, 53:15, 53:17, 119:1, 119:7
**2018** [21] - 6:21, 28:5, 28:17, 36:4, 48:10, 48:14, 53:4, 53:7, 53:15, 53:16, 53:19, 61:24, 85:15, 103:21, 113:7, 114:8, 114:14, 115:2, 116:12, 116:20, 117:2
**2019** [1] - 63:18
**202-664-0623** [1] - 2:18
**2021** [4] - 84:11, 85:5, 85:16, 109:15
**2022** [1] - 115:5
**2023** [7] - 10:1, 10:2, 76:24, 84:12, 103:21, 112:20, 113:7
**2024** [3] - 1:16, 8:1, 140:15
**2027** [11] - 48:11, 48:15, 76:25, 112:22, 112:24, 113:10, 115:8, 115:12, 116:11, 116:12
**20th** [1] - 3:23
**2116** [1] - 96:12
**2118** [1] - 97:8
**2119** [1] - 99:7
**2120** [1] - 99:20
**2121** [1] - 100:8
**2124** [2] - 84:16, 84:19
**2125** [3] - 85:11, 85:22, 85:24
**22** [8] - 24:6, 90:20, 134:3, 134:12, 134:25, 135:12, 135:22, 135:24
**22-terabyte** [1] - 134:15
**222** [1] - 9:12
**24.5** [1] - 46:8
**25** [1] - 114:22
**250,000** [1] - 85:18
**28** [1] - 140:8
**2800** [2] - 3:13, 4:17
**284** [1] - 46:21
**29** [2] - 106:16, 107:1
**2K** [10] - 14:7, 14:12, 14:24, 15:10, 15:20,

**3 column:**
**3** [15] - 14:7, 17:3, 17:9, 18:6, 20:21, 20:25, 33:6, 46:9, 123:1, 123:4, 123:9, 123:11, 123:16, 123:17
**3.30-something-cents** [1] - 137:3
**3.90-something** [1] - 111:12
**30** [5] - 6:5, 104:24, 105:2, 105:7, 116:12
**300** [2] - 11:3, 108:23
**305** [2] - 122:8, 122:22
**305.9** [8] - 45:4, 46:11, 48:21, 48:23, 57:7, 116:20, 116:22, 117:8
**310-826-7474** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**312-876-7700** [2] - 3:14, 4:18
**32** [1] - 115:9
**330** [2] - 3:13, 4:17
**35** [1] - 82:16
**36** [2] - 137:4, 137:5
**38** [1] - 6:6
**391.7** [1] - 114:1

**4 column:**
**4** [2] - 1:10, 64:19
**4-37** [2] - 131:11, 132:21
**4-39** [2] - 129:21, 130:8
**4-43** [2] - 130:14, 131:7
**4-52** [2] - 131:2, 136:14
**4.3-4.8** [1] - 6:19
**400,000** [2] - 84:15, 85:9
**411** [1] - 1:24
**44** [5] - 131:16, 131:18, 131:20, 132:2, 132:14
**45** [1] - 106:22
**450** [1] - 44:21
**46** [20] - 30:6, 62:8, 108:2, 108:12, 108:15, 108:18, 108:20, 108:25, 110:5, 110:10,

**UNITED STATES DISTRICT COURT**

110:23, 117:6, 122:1, 122:7, 122:10, 122:14, 122:20, 122:21, 137:2
**48.9** [1] - 46:10
**4a** [3] - 15:10, 15:15, 46:9
**4b** [3] - 15:21, 16:1, 46:10
**4c** [2] - 16:6, 46:10
**4TH** [1] - 1:24

## 5

**5** [5] - 16:16, 16:21, 46:10, 67:1, 112:6
**5.1-5.3** [1] - 7:9
**54** [6] - 62:6, 64:16, 110:13, 110:19, 111:11, 111:14
**56** [3] - 25:15, 82:10, 131:12
**5X1** [1] - 17:3

## 6

**6** [2] - 71:1, 71:6
**6-and-something** [1] - 91:23
**60** [1] - 14:10
**60611** [2] - 3:14, 4:18
**62** [5] - 70:13, 70:14, 70:21, 72:22, 74:10
**640** [1] - 11:7
**650** [1] - 3:22
**650,000** [4] - 66:15, 66:21, 66:22, 112:1
**650-328-4600** [4] - 3:20, 4:10, 4:22, 5:6
**660** [2] - 4:5, 4:13

## 7

**7** [2] - 106:14, 106:15
**7.2** [1] - 103:22
**70** [1] - 14:21
**700** [3] - 11:4, 108:23, 108:24
**714-540-1235** [1] - 3:24
**716** [2] - 88:2, 88:9
**717** [2] - 112:9, 112:14
**72** [1] - 115:6
**750,000** [1] - 87:19
**753** [1] - 140:8
**7953** [2] - 1:23, 140:20

## 8

**8** [3] - 60:2, 120:3, 120:5
**8.8** [1] - 46:8
**80** [1] - 17:3
**800** [1] - 2:17
**81** [1] - 74:12
**84** [2] - 6:14, 46:10
**85** [1] - 6:16
**88** [1] - 6:18
**8:14** [2] - 1:17, 8:2
**8:22-cv-01599-JVS-DFM** [1] - 1:7
**8:56** [1] - 13:11

## 9

**9** [3] - 60:2, 120:3, 120:5
**9.8** [1] - 103:22
**90** [1] - 15:7
**90025** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**92626** [1] - 3:23
**92660** [2] - 4:6, 4:14
**92701** [1] - 1:24
**94025** [3] - 3:19, 4:10, 4:21
**94025-1008** [1] - 5:5
**949-725-4000** [1] - 4:14
**949-725-4278** [1] - 4:7
**95** [2] - 74:8, 74:11
**96** [1] - 6:20
**97** [2] - 6:21, 15:18
**99** [2] - 6:23, 7:5
**99.2** [2] - 73:14, 73:20
**99.9** [2] - 89:11, 91:20
**9:00** [3] - 13:9, 13:11, 13:22
**9:45** [2] - 13:8, 13:22

## A

**A.M** [2] - 1:17, 8:2
**a.m** [5] - 13:11, 87:7, 139:5
**ability** [1] - 112:18
**able** [12] - 11:8, 36:17, 47:22, 60:23, 61:4, 66:18, 68:6, 80:8, 89:19, 93:17, 118:4, 118:5
**above-entitled** [1] - 140:11
**absolute** [2] - 133:4, 133:6
**absolutely** [3] - 56:4, 68:2, 107:9

**accepts** [1] - 43:25
**access** [12] - 50:16, 51:5, 51:6, 51:8, 62:4, 62:9, 64:11, 64:20, 101:2, 107:10, 107:12, 117:4
**account** [21] - 54:19, 56:2, 78:21, 79:24, 80:7, 80:8, 90:13, 93:13, 103:16, 105:23, 105:24, 109:25, 114:5, 114:10, 114:15, 115:7, 115:10, 117:15, 118:12, 122:19, 137:21
**accounting** [2] - 41:18, 118:11
**accuse** [2] - 31:6, 31:11
**accused** [52] - 20:18, 22:12, 24:21, 24:24, 25:3, 26:6, 27:24, 28:2, 28:22, 28:25, 32:4, 32:10, 32:12, 32:24, 33:9, 34:12, 34:18, 35:9, 35:11, 35:18, 35:22, 36:19, 45:24, 63:21, 64:17, 77:12, 82:6, 83:8, 87:20, 89:5, 113:2, 113:20, 113:21, 118:5, 124:12, 128:5, 129:7, 129:10, 129:17, 131:16, 131:19, 131:21, 132:14, 134:13, 135:1, 135:5, 135:12, 135:17, 136:24, 137:8, 137:12, 137:25
**Act** [1] - 46:21
**actual** [15] - 28:25, 30:5, 53:9, 66:15, 67:24, 88:24, 90:2, 93:4, 112:3, 112:18, 115:15, 115:18, 115:21, 125:3, 128:7
**add** [6] - 48:25, 60:25, 70:1, 70:4, 92:7, 112:7
**added** [2] - 6:15, 6:17
**adding** [2] - 60:24, 70:13
**addition** [4] - 48:21, 79:22, 110:16, 111:10
**additional** [9] - 65:21,

67:22, 70:1, 72:25, 73:1, 91:6, 104:18, 104:21, 111:2
**adds** [2] - 46:11, 80:17
**adequate** [3] - 47:1, 47:5, 47:8
**adjustments** [1] - 91:6
**administration** [2] - 41:2, 41:9
**administrative** [4] - 102:5, 106:5, 107:2, 108:9
**administrator** [2] - 40:21, 40:22
**admonition** [2] - 86:8, 138:22
**advances** [2] - 64:2, 103:3
**advancing** [1] - 63:11
**advertising** [2] - 97:22, 100:18
**advise** [1] - 12:10
**advisory** [1] - 40:14
**affirmed** [1] - 37:2
**afternoon** [4] - 58:7, 118:15, 118:19, 118:20
**aggregated** [1] - 112:1
**aggregating** [1] - 88:10
**aggregation** [1] - 87:19
**ago** [6] - 36:3, 45:9, 59:22, 60:9, 89:12, 102:12
**agree** [20] - 34:6, 37:12, 37:21, 45:14, 50:4, 101:9, 101:20, 102:19, 107:3, 107:5, 107:13, 109:8, 111:16, 114:6, 117:7, 121:20, 122:2, 122:7, 122:13, 131:23
**agreeable** [1] - 45:22
**agreed** [7] - 101:18, 108:21, 135:11, 136:16, 136:21, 137:15, 137:20
**agreed-upon** [1] - 137:20
**agreement** [2] - 49:21, 52:1
**agreements** [3] - 120:10, 120:19, 120:24
**ahead** [5] - 18:14, 34:11, 72:8, 72:19, 97:25

**Aichele** [1] - 8:14
**AICHELE** [1] - 2:16
**algebra** [1] - 69:21
**allocated** [1] - 106:5
**allocating** [4] - 106:3, 111:2, 111:4, 111:10
**allocation** [11] - 104:5, 105:1, 105:14, 106:3, 108:6, 108:13, 109:14, 111:7, 111:13, 111:14, 111:17
**allocations** [5] - 109:24, 110:1, 124:23, 126:12, 126:24
**allow** [3] - 10:16, 52:8, 70:17
**allowed** [2] - 12:9, 32:19
**allowing** [1] - 24:25
**allows** [3] - 52:15, 70:23, 138:6
**alloy** [17] - 17:13, 17:14, 17:16, 17:18, 21:5, 21:10, 21:13, 21:16, 21:22, 21:25, 22:3, 22:4, 23:2, 33:10, 33:11, 33:12
**Alloy** [1] - 19:13
**alloys** [1] - 21:13
**almost** [2] - 92:14, 115:23
**alone** [1] - 26:12
**ALSO** [1] - 5:8
**alternative** [7] - 60:7, 60:8, 60:17, 60:18, 60:25, 61:16, 78:20
**alternatives** [19] - 9:3, 9:5, 9:14, 9:19, 9:21, 9:24, 10:19, 11:15, 55:3, 55:5, 56:3, 60:13, 61:2, 61:12, 61:13, 62:4, 86:18, 86:25, 117:7
**altogether** [1] - 83:24
**Amazon** [1] - 6:21
**amount** [33] - 39:6, 48:23, 57:9, 69:16, 73:11, 80:18, 89:19, 93:4, 101:21, 102:15, 102:17, 102:24, 104:21, 107:4, 108:21, 109:7, 109:8, 109:18, 110:1, 110:2, 114:1, 115:24, 117:8, 117:18, 131:23, 132:3, 132:16,

133:5, 133:6, 135:7, 137:20

**amounts** [8] - 74:9, 113:7, 115:1, 115:20, 116:7, 117:9, 132:17, 137:22

**ANA** [3] - 1:18, 1:24, 8:1

**analyses** [2] - 91:3, 94:6

**analysis** [91] - 28:18, 29:7, 39:6, 39:9, 41:12, 44:7, 44:19, 44:25, 45:2, 46:4, 46:15, 47:7, 47:17, 52:21, 54:9, 54:11, 54:15, 55:6, 56:1, 57:4, 58:20, 59:23, 61:5, 62:11, 62:21, 63:7, 66:3, 66:11, 66:17, 67:6, 67:7, 67:25, 71:21, 71:25, 72:12, 75:6, 75:8, 75:22, 75:23, 76:25, 77:19, 78:16, 78:18, 78:19, 78:25, 81:8, 83:13, 83:14, 85:19, 88:23, 89:16, 93:7, 93:8, 93:18, 95:1, 95:10, 96:7, 97:3, 97:17, 99:1, 99:15, 100:3, 100:20, 100:22, 101:19, 103:17, 103:18, 105:10, 106:10, 106:12, 106:21, 107:17, 112:17, 113:11, 114:10, 114:24, 116:9, 116:15, 116:25, 117:17, 118:12, 123:5, 123:20, 123:21, 124:1, 126:10, 127:11, 128:19, 133:13

**analyst** [2] - 41:15, 42:1

**analyze** [1] - 49:9

**analyzed** [2] - 24:4, 29:6

**analyzing** [1] - 67:5

**AND** [5] - 3:3, 3:17, 4:3, 4:16, 5:3

**andy** [1] - 5:10

**ANGELES** [1] - 140:3

**Angeles** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10

**anisotropy** [16] -

14:17, 14:18, 15:3, 15:4, 15:14, 15:15, 15:25, 16:10, 16:20, 16:25, 22:13, 23:3, 23:20, 63:10, 63:19, 75:5

**answer** [4] - 34:15, 63:1, 122:5, 132:15

**answered** [1] - 10:10

**anticipated** [1] - 8:24

**Aplus** [1] - 6:22

**apologies** [1] - 35:2

**appear** [1] - 103:11

**appearances** [1] - 8:9

**APPEARANCES** [4] - 2:1, 3:1, 4:1, 5:1

**application** [1] - 78:8

**applications** [1] - 83:4

**applied** [2] - 52:24, 116:16

**applies** [1] - 81:25

**apply** [9] - 8:23, 65:5, 102:7, 105:11, 106:15, 107:25, 108:25, 109:18, 138:13

**applying** [2] - 137:12, 138:3

**approach** [8] - 58:25, 59:1, 59:2, 59:15, 59:23, 60:2, 123:21, 123:22

**approaches** [1] - 43:6

**appropriate** [5] - 58:21, 69:5, 76:3, 87:1, 101:6

**area** [1] - 42:18

**areal** [25] - 10:13, 10:25, 12:2, 12:6, 12:11, 12:20, 28:21, 30:6, 30:9, 58:10, 58:19, 60:20, 62:6, 62:24, 63:4, 63:12, 63:19, 64:15, 102:24, 103:3, 103:12, 111:3, 111:5, 122:2, 125:17

**areas** [2] - 44:1, 44:3

**argue** [1] - 86:19

**argument** [1] - 11:19

**Argumentative** [1] - 133:22

**arguments** [2] - 101:13

**arrive** [1] - 122:8

**arrived** [3] - 33:22, 131:9, 134:23

**art** [5] - 60:18, 60:23, 61:17, 61:18, 124:3

**artificial** [1] - 49:18

**arts** [1] - 41:1

**aside** [1] - 95:3

**aspect** [7] - 42:2, 42:4, 77:1, 102:6, 104:7, 104:15, 105:24

**aspects** [1] - 118:8

**assemble** [3] - 76:4, 81:12, 88:5

**assembled** [1] - 88:16

**asserted** [3] - 31:2, 56:25, 57:1

**assessing** [1] - 49:24

**asset** [3] - 41:18, 59:3, 59:7

**assets** [1] - 40:11

**assist** [4] - 23:18, 23:22, 31:24, 40:3

**assists** [2] - 25:7, 44:20

**associated** [16] - 57:13, 60:5, 82:9, 83:11, 89:22, 92:3, 93:5, 93:12, 95:5, 106:23, 107:25, 108:20, 110:24, 115:23, 118:7, 123:17

**assume** [1] - 77:19

**assumes** [2] - 117:17, 117:21

**assumptions** [5] - 49:23, 50:1, 52:8, 52:10, 107:9

**assuring** [1] - 29:22

**AT** [4] - 2:20, 4:9, 4:16, 4:20

**ATTORNEY** [4] - 2:20, 4:9, 4:16, 4:20

**attorneys** [1] - 119:3

**attributable** [5] - 12:12, 110:4, 129:7, 129:10, 129:17

**audible** [1] - 26:17

**AUGUST** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8

**August** [3] - 5:9, 119:3, 119:10

**authenticate** [1] - 10:5

**authentication** [1] - 10:5

**authored** [1] - 35:4

**available** [1] - 45:8

**Avenue** [3] - 2:17, 3:13, 4:17

**average** [13] - 76:12, 76:16, 77:9, 77:10, 87:20, 88:11, 90:14, 93:20, 94:2, 94:7, 94:8, 129:10

**award** [1] - 46:25

**aware** [9] - 9:25, 26:9, 32:11, 35:14, 35:23, 36:6, 126:21, 127:1, 127:17

**axis** [1] - 70:2

## B

**B-e-r-g-m-a-n** [1] - 38:11

**bachelor's** [1] - 41:1

**background** [4] - 10:24, 40:8, 40:24, 41:6

**backwards** [1] - 114:25

**baked** [2] - 50:2, 52:11

**balancing** [1] - 80:15

**BALI** [1] - 4:5

**Bali** [1] - 8:17

**bankruptcy** [1] - 40:17

**barely** [1] - 90:8

**bargaining** [5] - 101:17, 101:24, 102:1, 104:17, 107:16

**base** [2] - 47:24, 128:1

**based** [32] - 11:9, 11:24, 20:6, 29:7, 33:2, 47:17, 59:6, 62:8, 69:14, 74:19, 75:14, 80:21, 81:21, 81:22, 82:4, 92:17, 92:18, 107:15, 110:3, 110:19, 110:21, 114:13, 116:17, 117:23, 123:23, 125:5, 128:7, 131:4, 134:10, 136:21, 137:14

**baseline** [2] - 104:3, 104:12

**basic** [1] - 33:1

**basis** [12] - 65:5, 66:19, 77:2, 92:20, 94:15, 94:16, 106:23, 107:4, 107:24, 108:21, 116:16, 129:5

**bat** [1] - 109:23

**Beach** [2] - 4:6, 4:14

**Beard** [1] - 8:19

**began** [1] - 53:18

**begin** [1] - 53:13

**beginning** [4] - 9:18, 10:12, 109:20, 114:3

**behalf** [3] - 42:25, 86:15, 118:16

**behave** [1] - 25:10

**benefit** [11] - 55:2, 55:17, 69:19, 93:10, 101:16, 105:22, 107:25, 123:23, 124:2, 126:8, 128:1

**benefited** [1] - 127:8

**benefiting** [1] - 47:18

**benefits** [14] - 12:2, 49:2, 49:5, 51:2, 57:14, 58:2, 58:5, 58:9, 58:15, 58:19, 81:3, 98:15, 98:19

**Bergman** [25] - 6:18, 7:8, 38:6, 38:10, 38:14, 38:18, 38:19, 38:20, 40:7, 40:10, 40:11, 43:22, 44:6, 84:6, 87:1, 87:12, 95:24, 97:2, 98:23, 99:10, 111:22, 116:24, 118:13, 118:19, 118:24

**BERGMAN** [2] - 6:6, 38:7

**Bergman's** [1] - 86:16

**Bernal** [1] - 43:25

**Bertero** [6] - 10:18, 12:5, 23:13, 24:12, 35:5, 35:9

**Bertero's** [3] - 9:11, 11:9, 24:1

**best** [10] - 34:12, 51:20, 52:1, 60:7, 60:8, 69:12, 69:17, 71:20, 74:5, 90:6

**Best** [1] - 67:3

**best-fit** [1] - 69:17

**best-selling** [1] - 34:12

**better** [3] - 51:9, 66:12, 80:17

**between** [27] - 11:3, 22:16, 25:18, 27:18, 49:4, 51:23, 55:17, 57:13, 65:25, 69:16, 74:9, 74:11, 76:12, 78:23, 91:5, 92:20, 94:9, 94:17, 101:4, 101:17, 103:21, 103:22, 107:19, 110:11, 111:6, 134:3, 134:12

**beyond** [2] - 19:8, 134:25

**big** [9] - 10:25, 51:6, 54:23, 74:14, 74:15, 74:16, 83:2, 101:14

**bigger** [1] - 58:14

**biggest** [2] - 30:9,

57:23

**bilayer** [1] - 10:11
**billable** [1] - 39:13
**binder** [9] - 84:2, 84:24, 85:3, 85:10, 86:2, 87:14, 95:22, 98:22, 111:22
**bit** [11] - 13:8, 13:18, 13:21, 40:8, 64:23, 68:1, 80:24, 82:13, 88:25, 94:22, 116:3
**bits** [6] - 28:1, 31:8, 31:13, 37:11, 37:14, 37:23
**bledahl@raklaw. com** [1] - 2:11
**block** [2] - 98:2, 98:8
**blow** [2] - 89:1, 90:1
**blue** [1] - 90:6
**Blue** [2] - 96:21, 98:4
**BlueMobile** [1] - 6:21
**Book** [4] - 64:19, 65:18, 65:19
**bookends** [1] - 37:8
**bottom** [6] - 25:17, 26:4, 27:1, 27:19, 65:24, 82:18
**bought** [1] - 67:1
**Boulevard** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**Bowls** [1] - 51:19
**box** [4] - 13:19, 71:24, 72:20, 73:1
**Brady's** [1] - 51:12
**break** [8] - 24:13, 24:15, 81:22, 82:2, 86:5, 86:11, 135:2, 139:2
**breaking** [1] - 138:18
**Brian** [1] - 8:12
**BRIAN** [1] - 2:8
**brief** [2] - 56:21, 82:25
**briefly** [2] - 27:8, 84:22
**bring** [9] - 9:21, 34:20, 40:6, 84:4, 84:5, 84:21, 97:10, 102:1, 115:24
**brochure** [1] - 97:13
**broke** [1] - 87:13
**brought** [1] - 113:9
**Buczko** [1] - 8:13
**BUCZKO** [1] - 2:12
**built** [1] - 110:23
**bullet** [1] - 36:9
**bullets** [2] - 24:9, 24:10
**bunch** [3] - 71:14, 102:8, 102:9

**business** [6] - 41:2, 41:9, 59:4, 59:8, 59:10, 59:11
**but..** [1] - 32:19
**buy** [6] - 98:6, 114:20, 114:21, 125:23, 127:2, 127:6
**Buy** [1] - 67:3
**buying** [2] - 92:4, 127:7
**buys** [1] - 126:2
**BY** [55] - 2:8, 2:16, 3:8, 3:12, 3:18, 3:22, 4:5, 4:9, 4:12, 4:16, 4:20, 5:4, 6:4, 6:6, 14:3, 14:11, 14:16, 14:22, 15:2, 15:8, 15:13, 15:19, 15:24, 16:4, 16:9, 16:14, 16:19, 18:9, 19:2, 19:15, 20:11, 22:11, 23:25, 24:8, 25:14, 26:21, 27:3, 30:17, 34:22, 37:6, 38:13, 44:5, 56:18, 84:23, 86:1, 87:11, 96:14, 97:1, 97:12, 99:9, 99:22, 100:10, 112:16, 118:18, 134:1

## C

**CA** [1] - 1:24
**calculate** [9] - 46:3, 48:17, 104:22, 115:13, 124:2, 127:25, 128:8, 128:11, 128:20
**calculated** [3] - 77:5, 114:11, 117:10
**calculating** [5] - 48:8, 93:19, 94:19, 128:11, 128:15
**calculation** [8] - 20:6, 30:6, 46:8, 73:10, 116:13, 122:1, 129:3, 129:4
**calculations** [6] - 30:12, 46:6, 53:18, 78:21, 124:5, 124:20
**CALIFORNIA** [4] - 1:2, 1:18, 8:1, 140:4
**California** [15] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10, 3:19, 3:23, 4:6, 4:10, 4:14, 4:21, 5:5, 41:3, 140:7
**CALLED** [2] - 6:4, 6:6
**capacities** [3] - 98:5, 134:3, 134:12

**capacity** [58] - 58:11, 58:12, 58:19, 60:21, 61:9, 62:3, 62:6, 62:8, 63:3, 64:21, 64:24, 65:3, 65:5, 66:6, 67:19, 67:20, 76:12, 76:15, 76:21, 77:20, 78:5, 78:20, 88:12, 89:3, 89:18, 89:20, 89:24, 90:10, 92:4, 92:8, 92:20, 93:1, 94:5, 94:8, 94:15, 97:21, 97:22, 97:23, 98:13, 100:17, 101:11, 102:18, 102:24, 105:20, 105:21, 108:23, 109:21, 109:25, 113:19, 117:6, 117:22, 129:7, 129:11, 129:17, 132:10, 134:15, 135:16, 136:7
**capital** [1] - 116:5
**card** [2] - 51:12, 51:16
**CARLSON** [2] - 4:4, 4:12
**carry** [3] - 101:19, 102:6, 131:4
**carves** [1] - 126:10
**case** [75] - 9:24, 11:1, 23:6, 32:14, 32:18, 32:25, 33:5, 34:13, 34:18, 36:25, 39:1, 39:5, 39:15, 39:18, 40:1, 43:1, 43:10, 44:6, 44:8, 44:12, 44:21, 45:15, 45:16, 45:25, 46:14, 46:16, 48:8, 48:9, 49:9, 53:2, 53:3, 54:1, 54:7, 54:12, 54:13, 54:14, 54:17, 58:23, 59:16, 60:19, 61:2, 64:4, 64:7, 64:17, 66:4, 66:14, 66:23, 67:18, 72:7, 75:22, 76:10, 77:4, 81:4, 81:10, 81:14, 81:25, 85:15, 86:23, 91:25, 97:3, 99:2, 101:7, 101:23, 107:15, 107:22, 116:25, 119:3, 119:9, 120:16, 121:3, 121:9, 121:20, 138:22, 138:23
**Case** [1] - 1:6
**cases** [9] - 40:17,

40:18, 42:20, 42:21, 43:20, 55:22, 62:13
**casing** [1] - 92:2
**casings** [1] - 89:22
**categories** [4] - 45:25, 81:22, 83:10, 83:23
**category** [2] - 82:7, 132:22
**Center** [3] - 3:22, 4:5, 4:13
**center** [2] - 82:20, 82:25
**centers** [3] - 82:22, 82:24, 83:5
**Central** [1] - 140:7
**CENTRAL** [1] - 1:2
**cents** [7] - 74:12, 111:12, 115:6, 115:9, 116:12, 137:4, 137:5
**certain** [3] - 12:11, 12:12, 54:16
**CERTIFICATE** [1] - 140:1
**certification** [1] - 41:16
**certifications** [1] - 42:5
**Certified** [3] - 1:5, 42:8
**certify** [1] - 140:7
**CFA** [2] - 42:10, 42:11
**Chaaru** [1] - 8:18
**chaaru.deb@lw.com** [1] - 4:11
**CHAARUSHENA** [1] - 4:9
**CHAN** [1] - 2:20
**Chan** [1] - 8:13
**chance** [2] - 74:8, 74:11
**Chang** [7] - 6:4, 8:12, 13:24, 30:23, 31:22, 34:23, 37:8
**CHANG** [48] - 3:12, 14:3, 14:10, 14:11, 14:15, 14:16, 14:21, 14:22, 15:1, 15:2, 15:7, 15:8, 15:12, 15:13, 15:18, 15:19, 15:23, 15:24, 16:3, 16:4, 16:8, 16:9, 16:13, 16:14, 16:18, 16:19, 18:8, 18:9, 18:13, 19:1, 19:2, 19:10, 19:13, 19:15, 20:11, 21:21, 22:10, 22:11, 23:24, 23:25, 24:6, 24:8, 25:13, 25:14, 26:20, 26:21,

27:1, 27:3
**change** [4] - 43:7, 57:10, 57:11, 117:21
**changed** [2] - 55:23, 117:19
**changes** [2] - 70:1, 122:18
**characteristics** [1] - 83:19
**characterization** [1] - 133:25
**characterize** [3] - 74:23, 136:11, 137:19
**charge** [2] - 65:13, 117:20
**charges** [1] - 66:6
**charging** [1] - 93:16
**charter** [1] - 42:11
**chartered** [2] - 41:15, 41:25
**charts** [2] - 10:13, 10:15
**check** [1] - 37:1
**Check** [1] - 36:10
**Chicago** [2] - 3:14, 4:18
**choosing** [3] - 79:3, 102:3, 132:8
**chose** [4] - 17:22, 20:17, 21:2, 133:21
**Chris** [1] - 5:10
**circumstances** [3] - 54:13, 107:15, 122:18
**cited** [4] - 57:20, 57:24, 57:25
**Claim** [5] - 18:10, 26:20, 26:22, 57:8
**claim** [8] - 26:22, 27:2, 27:25, 29:1, 57:3, 124:1, 127:25, 129:9
**claimant** [2] - 46:24, 46:25
**claims** [12] - 18:21, 19:25, 20:14, 21:12, 28:14, 31:2, 37:9, 49:4, 55:23, 56:25, 57:1, 57:15
**clarification** [2] - 79:13, 126:16
**clarify** [1] - 66:20
**classes** [2] - 41:9, 41:10
**classic** [1] - 48:4
**clean** [1] - 83:20
**clear** [12] - 9:24, 121:19, 123:3, 126:15, 126:19, 126:25, 127:13,

127:15, 130:10, 131:7, 133:8, 134:23
**clearly** [3] - 12:6, 66:5, 90:9
**click** [1] - 103:20
**client** [1] - 8:19
**close** [6] - 10:2, 10:3, 84:15, 91:7, 92:23, 94:1
**closest** [1] - 23:4
**cloud** [3] - 29:21, 83:3, 83:4
**cloud-type** [1] - 83:4
**Cobra** [4] - 33:5, 33:10, 33:16, 34:4
**Code** [1] - 140:8
**coefficient** [1] - 72:21
**coefficients** [1] - 71:15
**coercive** [11] - 14:24, 15:10, 16:25, 18:16, 18:18, 18:23, 18:24, 18:25, 19:19, 20:4
**coherent** [2] - 22:20, 22:23
**collectively** [4] - 31:14, 31:16, 44:20, 60:3
**color** [6] - 29:4, 82:11, 82:13, 83:15, 91:11, 91:17
**columns** [2] - 17:12, 19:14
**combining** [1] - 113:15
**comfort** [2] - 91:8, 92:23
**coming** [4] - 65:1, 102:14, 114:25, 115:11
**commercial** [1] - 40:17
**commercialization** [3] - 101:15, 102:1, 104:9
**common** [2] - 50:18, 83:19
**commonality** [1] - 49:4
**companies** [3] - 57:18, 57:20, 57:23
**company** [1] - 101:14
**company's** [1] - 116:6
**comparable** [2] - 120:9, 121:2
**compare** [2] - 81:5, 111:2
**compared** [3] - 33:16, 80:20, 81:7
**comparing** [2] - 28:25,

66:2
**compensate** [3] - 47:1, 47:5, 56:13
**compensated** [2] - 39:10, 39:12
**compensates** [1] - 102:4
**compensation** [2] - 39:14, 47:9
**compete** [3] - 60:23, 61:4, 118:4
**competitive** [4] - 117:15, 117:21, 117:24, 118:3
**completely** [2] - 51:21, 51:22
**complex** [1] - 80:16
**complexity** [4] - 58:17, 80:15, 80:18
**complicated** [2] - 81:16, 122:5
**complies** [1] - 20:10
**component** [3] - 125:10, 126:22, 128:18
**components** [2] - 125:22
**composition** [3] - 17:18, 22:1, 22:2
**compositions** [1] - 22:1
**computer** [2] - 41:4, 41:11
**computers** [1] - 82:8
**Concept** [1] - 36:10
**concept** [8] - 36:13, 36:14, 49:16, 60:1, 63:16, 63:23, 68:5, 124:9
**concepts** [1] - 80:14
**concern** [2] - 11:23, 12:1
**concerned** [1] - 12:9
**concerns** [1] - 89:25
**conclude** [1] - 139:5
**conclusion** [2] - 113:13, 123:13
**conclusions** [2] - 28:24, 33:2
**conditions** [2] - 33:20, 34:7
**conducted** [1] - 44:25
**confer** [2] - 9:15, 10:20
**Conference** [1] - 140:12
**conferring** [1] - 29:19
**confidence** [6] - 74:2, 74:3, 74:6, 74:12, 74:16, 74:22

**confident** [1] - 30:11
**confirm** [2] - 133:17, 134:7
**confirmed** [2] - 17:25, 62:11
**conformance** [1] - 140:12
**connected** [1] - 82:9
**connection** [7] - 11:19, 21:6, 38:25, 39:5, 39:9, 39:17, 57:16
**connectivity** [1] - 65:23
**conservative** [3] - 30:12, 104:6, 111:7
**consider** [8] - 11:8, 53:20, 54:3, 55:1, 97:2, 119:19, 120:22, 133:7
**considered** [8] - 41:19, 51:20, 87:1, 96:6, 99:15, 119:24, 134:20, 135:12
**consistent** [2] - 24:23, 81:6
**constant** [17] - 30:23, 69:25, 70:6, 71:15, 72:16, 72:22, 89:2, 89:12, 89:15, 89:17, 89:18, 90:22, 91:21, 92:8, 94:22, 95:3, 95:4
**construct** [1] - 49:18
**construction** [3] - 27:25, 31:15, 37:13
**Consulting** [4] - 38:19, 40:10, 40:11, 118:24
**consumers** [3] - 82:15, 92:7, 93:2
**contested** [1] - 50:8
**context** [14] - 10:16, 10:17, 38:23, 46:18, 46:23, 52:9, 59:12, 64:17, 76:5, 76:7, 89:15, 92:9, 109:14, 124:8
**Continued** [4] - 3:1, 4:1, 5:1, 7:1
**continued** [1] - 36:3
**contribute** [2] - 101:15, 117:5
**contributes** [1] - 77:20
**contributing** [3] - 70:10, 70:22, 70:25
**contribution** [8] - 70:20, 70:21, 72:23, 89:4, 107:24, 110:3,

110:24, 111:4
**contributions** [2] - 105:16, 110:11
**contributor** [1] - 30:9
**converted** [1] - 73:20
**Conway** [1] - 40:15
**core** [1] - 42:2
**corner** [1] - 35:24
**corporate** [1] - 5:9
**correct** [55] - 12:16, 20:8, 31:9, 31:18, 36:1, 37:16, 37:20, 37:24, 95:9, 118:25, 119:4, 119:16, 119:19, 119:25, 120:6, 120:10, 120:24, 121:8, 122:4, 122:8, 123:1, 123:7, 123:14, 123:24, 124:7, 124:15, 124:21, 125:1, 125:10, 125:17, 125:23, 126:6, 127:19, 129:17, 130:17, 130:18, 130:20, 130:23, 131:2, 131:9, 131:13, 132:2, 132:6, 132:9, 132:14, 134:15, 135:1, 135:5, 135:9, 135:13, 136:4, 136:10, 136:17, 136:20, 140:9
**correctly** [3] - 53:16, 95:8, 108:3
**cost** [16] - 93:20, 94:2, 94:5, 94:8, 94:11, 94:14, 106:23, 109:25, 116:4, 127:9, 129:4, 129:17, 132:4, 132:9, 134:24
**Costa** [1] - 3:23
**costs** [16] - 60:25, 93:12, 93:13, 93:17, 103:12, 103:13, 103:16, 104:18, 106:1, 106:25, 107:2, 108:9, 110:1, 117:12, 117:13, 128:21
**counsel** [3] - 8:9, 8:11, 36:24
**COUNSEL** [4] - 2:1, 3:1, 4:1, 5:1
**count** [1] - 53:16
**Counterclaim** [2] - 1:6, 1:10
**COUNTERCLAIM** [5] -

2:3, 3:3, 3:17, 4:3, 5:3
**COUNTY** [1] - 140:3
**couple** [3] - 42:2, 47:4, 64:10
**coupled** [10] - 26:16, 26:23, 26:25, 27:5, 27:10, 27:12, 27:15, 27:18, 27:21
**coupling** [3] - 22:16, 23:1, 24:16
**course** [1] - 45:7
**Court** [10] - 9:20, 12:10, 13:14, 31:14, 43:18, 43:25, 46:25, 54:6, 140:6, 140:20
**court** [2] - 44:10, 53:23
**COURT** [41] - 1:1, 1:23, 8:15, 8:20, 10:21, 11:22, 12:15, 12:18, 12:22, 12:24, 13:2, 13:7, 13:16, 19:7, 19:12, 21:18, 30:14, 38:2, 38:4, 43:25, 84:19, 85:24, 86:4, 86:7, 86:11, 86:14, 86:21, 87:4, 87:9, 88:2, 96:12, 97:8, 99:7, 99:20, 100:8, 112:14, 133:23, 138:18, 138:20, 139:2, 140:6
**Court's** [4] - 9:4, 9:25, 27:25, 37:12
**COURTROOM** [5] - 8:6, 13:13, 38:8, 86:9, 138:25
**courtroom** [2] - 44:16, 50:9
**courts** [5] - 49:11, 49:12, 52:22, 52:23, 53:22
**cover** [2] - 35:4, 35:24
**covers** [2] - 48:15, 57:6
**created** [3] - 69:14, 70:14, 88:23
**creates** [1] - 88:24
**creating** [1] - 74:4
**credible** [1] - 123:5
**credit** [13] - 30:2, 30:3, 102:2, 102:4, 102:25, 103:24, 104:1, 104:12, 105:15, 106:7, 106:8, 106:24, 123:6
**credited** [3] - 106:17, 110:16, 116:12
**crediting** [2] - 103:9,

110:13
**credits** [2] - 117:11, 117:12
**critical** [1] - 34:11
**Cross** [1] - 6:7
**CROSS** [1] - 118:17
**Cross-Examination** [1] - 6:7
**CROSS-EXAMINATION** [1] - 118:17
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 140:20
**current** [1] - 118:23

## D

**D.C** [1] - 2:18
**DALE** [1] - 3:12
**Dale** [1] - 8:12
**damage** [5] - 48:9, 57:6, 57:9, 65:6, 111:21
**damages** [25] - 40:12, 42:20, 43:22, 43:23, 46:3, 46:8, 46:14, 46:17, 46:22, 47:1, 48:17, 48:20, 53:18, 56:2, 57:3, 57:5, 57:15, 76:25, 112:22, 113:14, 115:12, 121:20, 121:24, 122:3, 123:17
**data** [89] - 6:14, 6:16, 17:15, 17:22, 18:3, 18:6, 19:16, 20:17, 20:18, 20:21, 20:24, 21:2, 21:10, 21:11, 26:12, 27:25, 31:7, 31:12, 32:13, 33:5, 33:22, 33:24, 34:5, 34:11, 34:14, 37:10, 37:14, 37:22, 58:18, 67:11, 67:12, 68:11, 68:14, 68:15, 69:3, 69:4, 69:12, 69:15, 69:17, 69:18, 71:4, 71:8, 71:11, 71:18, 72:1, 72:3, 74:4, 74:8, 74:19, 74:20, 75:19, 76:4, 76:19, 76:22, 76:23, 79:5, 79:6, 80:17, 80:23, 81:12, 81:15, 82:20, 82:22, 82:24, 82:25, 83:5, 85:15, 87:21, 88:5, 88:12, 88:16, 90:5, 90:7, 92:16, 105:7, 107:6, 112:3,

112:19, 113:11, 115:15, 115:16, 115:18, 133:20, 134:20, 134:24
**database** [1] - 40:21
**date** [14] - 28:8, 28:9, 35:24, 43:4, 48:10, 48:11, 49:20, 53:8, 53:12, 113:10, 114:14, 115:7, 115:9
**Date** [1] - 140:15
**dated** [1] - 28:17
**dates** [1] - 28:7
**DAY** [1] - 1:10
**days** [5] - 42:7, 70:4, 70:25, 72:17, 72:23
**days'** [1] - 68:13
**DC** [1] - 6:20
**dchang@raklaw.com** [1] - 3:15
**DCM** [3] - 45:25, 46:3, 46:7
**dealing** [2] - 66:8, 80:2
**Deb** [1] - 8:18
**DEB** [1] - 4:9
**Debbie** [1] - 140:20
**DEBBIE** [3] - 1:23, 140:5, 140:19
**decade** [1] - 40:19
**December** [1] - 10:2
**decide** [1] - 131:1
**decided** [3] - 68:22, 82:2, 104:2
**deciding** [1] - 107:21
**declining** [1] - 113:10
**decreasing** [1] - 113:5
**deducted** [2] - 108:5, 108:8
**Defendant** [2] - 1:6, 1:9
**defendant** [6] - 43:8, 43:13, 43:15, 118:16, 123:24, 139:4
**DEFENDANT** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**defendant's** [2] - 5:10, 8:25
**defendants** [1] - 43:3
**define** [1] - 72:24
**definition** [1] - 46:22
**degree** [1] - 41:8
**deliberations** [1] - 45:8
**demonstrative** [1] - 136:15
**density** [23] - 10:13, 10:25, 12:6, 12:12, 12:20, 28:21, 30:6,

30:9, 58:10, 58:18, 58:19, 60:20, 62:6, 62:25, 63:4, 63:12, 63:19, 64:15, 102:25, 103:13, 111:3, 122:2, 125:17
**deposition** [1] - 62:16
**depositions** [2] - 35:20, 44:12
**DEPUTY** [5] - 8:6, 13:13, 38:8, 86:9, 138:25
**Desai** [9] - 8:24, 9:22, 10:4, 10:17, 12:1, 12:10, 12:19, 35:5, 35:10
**describe** [2] - 40:23, 69:22
**described** [2] - 79:4, 116:8
**describing** [4] - 24:12, 24:13, 100:13, 116:14
**design** [6] - 10:11, 28:5, 28:7, 89:22, 92:3, 92:5
**designated** [1] - 12:15
**designations** [2] - 41:14, 42:5
**Desktop** [1] - 6:23
**detail** [1] - 45:11
**details** [2] - 44:23, 45:2
**determination** [2] - 58:21, 110:23
**determine** [14] - 20:3, 43:10, 49:11, 49:13, 53:24, 58:22, 58:25, 59:3, 59:11, 59:14, 65:9, 71:7, 119:15, 119:20
**determined** [1] - 20:6
**determines** [4] - 59:6, 123:22, 129:6, 129:9
**determining** [9] - 46:13, 46:22, 47:15, 53:21, 64:25, 67:11, 75:24, 76:24, 112:22
**development** [18] - 11:3, 103:4, 103:7, 103:10, 103:12, 103:13, 103:16, 103:23, 103:25, 104:7, 104:8, 104:10, 104:15, 105:25, 106:25, 110:25, 111:8, 117:12
**devices** [1] - 93:17
**dhinospaan@yahoo.**

**com** [1] - 1:25
**dictate** [1] - 52:23
**Dieter** [2] - 5:9, 8:12
**differ** [1] - 50:2
**difference** [9] - 50:13, 50:14, 51:7, 57:12, 65:23, 65:25, 78:23, 83:22, 91:5
**differences** [2] - 21:22, 51:23
**different** [36] - 18:3, 21:14, 22:1, 33:16, 33:19, 33:20, 34:3, 34:7, 34:8, 35:15, 51:21, 51:22, 54:13, 55:21, 57:5, 59:12, 69:1, 78:11, 79:7, 81:18, 82:4, 83:8, 95:7, 98:6, 102:9, 110:7, 114:3, 115:16, 116:17, 122:10, 122:18, 133:12
**differently** [1] - 43:14
**Digital** [130] - 8:7, 8:17, 9:16, 9:19, 10:1, 10:8, 11:2, 11:6, 12:4, 13:5, 17:15, 17:25, 20:25, 23:10, 28:10, 28:13, 29:7, 36:15, 39:7, 45:16, 47:20, 48:22, 49:5, 52:14, 52:19, 53:3, 56:7, 56:10, 56:16, 57:14, 57:25, 60:16, 60:22, 61:7, 61:13, 62:4, 62:8, 62:10, 63:15, 63:18, 64:19, 65:1, 65:4, 66:6, 66:13, 66:14, 66:18, 66:25, 76:19, 76:24, 77:3, 84:9, 85:14, 86:16, 86:17, 87:22, 89:19, 93:10, 93:11, 93:17, 94:20, 94:24, 95:3, 95:25, 96:1, 96:20, 97:14, 98:16, 100:12, 100:25, 101:11, 101:12, 101:25, 102:4, 102:22, 102:23, 102:25, 103:3, 103:11, 103:22, 103:24, 104:16, 105:1, 105:14, 105:15, 105:18, 106:17, 106:24, 107:14, 107:19, 108:9, 109:23, 109:25,

110:2, 110:6, 110:8, 110:11, 110:13, 111:7, 112:1, 113:13, 114:12, 115:5, 115:22, 117:1, 117:6, 117:11, 117:13, 117:16, 117:18, 118:16, 120:24, 120:25, 121:19, 124:2, 124:17, 125:3, 125:7, 125:21, 126:1, 126:5, 126:8, 126:22, 127:3, 127:8, 127:14, 127:22, 134:14, 138:11
**DIGITAL** [1] - 1:8
**Digital's** [22] - 22:3, 23:13, 32:10, 44:9, 44:13, 45:3, 51:3, 60:12, 61:16, 62:6, 64:15, 64:25, 65:13, 65:17, 67:1, 94:17, 100:21, 103:19, 110:24, 116:4, 121:12, 138:10
**Direct** [1] - 6:6
**DIRECT** [1] - 38:12
**direct** [5] - 19:10, 86:16, 107:25, 131:20, 134:7
**direction** [1] - 32:8
**directly** [3] - 59:17, 64:8, 65:16
**director** [1] - 40:22
**disciplines** [1] - 41:17
**discontinued** [1] - 21:3
**discount** [4] - 115:1, 115:20, 116:7, 116:17
**discounted** [1] - 116:19
**discovery** [2] - 10:3, 11:10
**discrete** [1] - 78:7
**discuss** [3] - 42:14, 129:13, 138:22
**discussed** [6] - 45:19, 60:9, 120:3, 120:5, 136:23, 137:7
**discussing** [1] - 36:14
**discussion** [5] - 10:19, 35:21, 58:6, 120:2, 122:25
**discussions** [4] - 42:24, 44:11, 56:20, 58:8

disk [8] - 44:14, 57:23, 103:14, 124:13, 124:21, 125:7, 126:21
disks [1] - 28:1
dispute [4] - 26:8, 50:5, 61:15, 86:17
disputes [2] - 61:13, 117:3
disputing [1] - 86:24
disregard [1] - 102:12
distinct [1] - 31:2
DISTRICT [3] - 1:1, 1:2, 1:3
District [3] - 43:17, 140:6, 140:7
DIVISION [1] - 1:2
Doctor [1] - 32:5
document [25] - 17:25, 24:4, 29:12, 33:24, 35:11, 84:9, 85:13, 85:14, 85:17, 87:18, 95:24, 95:25, 96:19, 96:20, 96:22, 97:2, 98:2, 98:10, 98:24, 99:12, 99:13, 99:25, 100:1, 111:24, 111:25
documents [25] - 9:25, 10:15, 11:10, 11:11, 11:24, 28:5, 28:7, 28:8, 28:17, 33:2, 44:9, 62:10, 62:16, 63:6, 63:15, 63:22, 77:3, 95:20, 96:15, 97:22, 100:12, 100:13, 100:16, 100:21, 121:13
dollar [12] - 70:13, 70:14, 70:21, 72:22, 74:10, 106:16, 107:1, 114:19, 114:22, 115:5, 115:9, 116:11
dollars [2] - 115:2
domino [4] - 25:21, 25:23, 25:24, 25:25
dominos [1] - 25:18
done [10] - 13:17, 21:5, 34:1, 52:5, 75:7, 95:10, 95:15, 112:17, 119:10, 122:19
door [3] - 86:19, 87:2, 87:4
dot [1] - 90:2
dots [1] - 90:6
double [1] - 24:13
Doug [1] - 8:16

doug.lumish@lw. com [1] - 3:20
DOUGLAS [1] - 3:18
down [11] - 26:11, 36:9, 37:4, 38:2, 49:20, 54:5, 56:17, 117:2, 127:12, 129:19, 135:2
downside [1] - 80:21
downsides [4] - 80:10, 80:13, 80:19, 81:4
Dr [88] - 8:12, 8:24, 9:11, 9:22, 10:4, 10:6, 10:10, 10:16, 10:17, 10:18, 11:9, 11:11, 12:1, 12:3, 12:5, 12:10, 12:19, 14:4, 18:20, 23:13, 24:1, 24:12, 26:1, 26:2, 28:8, 28:11, 30:1, 30:8, 30:13, 30:18, 32:2, 32:9, 32:15, 32:23, 35:5, 35:9, 35:10, 44:11, 45:19, 47:19, 49:3, 53:4, 56:22, 58:3, 58:6, 58:8, 60:12, 60:22, 61:22, 62:3, 62:5, 62:20, 64:9, 64:14, 77:13, 82:3, 82:13, 98:16, 101:1, 102:2, 102:23, 103:2, 107:20, 107:23, 108:22, 109:9, 110:6, 110:11, 110:22, 111:4, 111:17, 117:2, 117:25, 120:12, 121:10, 121:13, 122:1, 122:24, 123:4, 125:1, 125:2, 125:8, 125:9, 137:2
draw [2] - 69:12, 69:19
drawing [1] - 74:5
drawn [1] - 74:21
drill [1] - 127:12
drive [26] - 33:13, 34:7, 34:10, 34:18, 44:15, 57:23, 58:12, 59:13, 65:22, 77:15, 78:5, 78:21, 88:12, 92:8, 98:14, 103:14, 104:8, 113:19, 124:7, 124:12, 124:14, 124:21, 125:23, 126:21
Drive [7] - 3:19, 3:22, 4:5, 4:9, 4:13, 4:21,

5:5
driven [1] - 59:18
drives [16] - 28:14, 29:17, 29:23, 58:13, 66:22, 67:1, 67:2, 78:3, 78:4, 82:8, 82:14, 83:5, 97:20, 98:4, 117:18, 125:8
driving [1] - 55:25
due [1] - 56:2
duplicative [1] - 49:7
during [5] - 11:10, 45:8, 86:16, 113:14, 134:7

**E**

earned [2] - 115:5, 116:18
easier [2] - 13:18, 102:7
easiest [3] - 69:8, 73:8, 114:18
ECC [1] - 36:9
ECL [4] - 24:17, 26:5, 26:7, 27:18
economics [3] - 41:1, 41:8, 41:18
economist [3] - 38:21, 40:16, 47:13
education [1] - 41:6
educational [1] - 40:23
EDWARD [2] - 6:4, 14:1
effect [1] - 25:22
effectively [3] - 94:13, 128:21, 137:11
effort [1] - 103:25
efforts [1] - 105:22
eight [2] - 36:3
either [5] - 21:11, 34:14, 127:1, 127:5, 127:17
Elements [4] - 6:23, 18:13, 98:24, 99:13
elements [2] - 7:5, 28:14
elicited [1] - 86:17
employee [1] - 39:20
employees [4] - 29:16, 29:19, 29:23, 30:1
employment [1] - 40:8
enablers [1] - 12:12
end [15] - 10:6, 39:15, 52:12, 54:6, 63:5, 75:6, 102:3, 103:8, 115:12, 116:9, 116:14, 117:9, 132:8, 137:1, 138:3

engineer [1] - 47:21
Engineer [2] - 42:8
engineers [1] - 101:14
engines [1] - 55:16
entire [11] - 31:6, 57:6, 103:14, 110:1, 110:2, 124:7, 124:13, 124:21, 126:11
entitled [1] - 140:11
envisions [1] - 49:19
equally [1] - 54:9
equation [1] - 71:5
ESQ [12] - 2:4, 2:8, 2:12, 2:16, 3:4, 3:8, 3:12, 3:18, 3:22, 4:5, 4:12, 5:4
essence [1] - 10:16
establish [1] - 32:14
estate [1] - 59:5
evaluate [5] - 54:11, 58:2, 75:10, 76:5, 76:7
evaluated [1] - 119:22
evaluating [1] - 54:19
evaluation [1] - 55:2
event [1] - 47:2
evidence [15] - 22:7, 23:6, 33:5, 45:16, 84:17, 85:22, 87:25, 96:10, 97:6, 99:5, 99:18, 100:6, 112:12, 127:3, 127:18
EVIDENCE [2] - 6:13, 7:4
evolution [1] - 11:12
exact [8] - 11:18, 22:8, 25:2, 93:15, 93:18, 93:21, 117:18, 122:11
exactly [10] - 11:15, 38:23, 43:12, 55:22, 60:11, 65:20, 71:4, 79:10, 108:18, 122:21
exam [2] - 86:16, 134:7
examination [4] - 19:11, 33:4, 34:24, 37:9
EXAMINATION [4] - 14:2, 30:16, 38:12, 118:17
Examination [4] - 6:4, 6:5, 6:6, 6:7
example [27] - 48:4, 51:10, 51:11, 53:15, 55:6, 55:7, 59:8, 64:18, 65:15, 66:9,

67:21, 67:25, 68:3, 68:4, 68:19, 69:6, 69:7, 69:23, 74:24, 75:12, 79:10, 83:4, 85:5, 90:4, 94:23, 109:10, 114:18
exams [1] - 42:1
Excel [2] - 6:14, 6:16
exchange [15] - 22:16, 23:1, 24:13, 24:15, 24:16, 26:16, 26:23, 26:25, 27:4, 27:5, 27:12, 27:15, 27:18, 27:21, 64:1
exchange-break [2] - 24:13, 24:15
exchange-spring [1] - 64:1
exchanged [1] - 27:9
excluded [4] - 11:20, 11:22, 11:25, 87:2
excluding [1] - 12:7
excuse [3] - 56:1, 57:2, 108:25
executive [1] - 106:5
Executives [1] - 42:12
Exhibit [13] - 84:20, 85:22, 85:25, 87:14, 88:3, 88:9, 96:13, 97:9, 99:8, 99:21, 100:9, 112:9, 112:15
exhibit [3] - 34:23, 35:5, 36:24
EXHIBIT [2] - 6:13, 7:4
exhibits [3] - 8:21, 64:11, 84:3
Exhibits [4] - 6:18, 7:8, 9:1, 9:2
EXHIBITS [2] - 6:11, 7:2
exist [1] - 28:1
existed [1] - 61:21
exists [1] - 54:23
expect [2] - 44:9, 110:19
Expectations [1] - 36:10
expectations [1] - 36:13
expend [1] - 104:18
expenditures [1] - 105:16
expense [1] - 106:6
expenses [6] - 104:7, 106:2, 106:4, 106:5, 106:7, 106:14
experience [3] - 42:18, 42:19, 52:8
expert [24] - 9:17, 11:12, 11:16, 11:17,

11:18, 12:3, 12:4, 12:6, 12:13, 12:15, 12:20, 23:13, 38:25, 39:25, 42:25, 43:17, 43:22, 44:1, 44:16, 62:12, 62:15, 121:7, 121:9, 121:14

**experts** [3] - 9:17, 12:8, 12:13
**expiration** [1] - 48:11
**expired** [1] - 112:23
**expires** [1] - 48:15
**explain** [15] - 25:19, 27:8, 40:3, 45:10, 49:15, 51:9, 67:25, 68:5, 69:8, 72:11, 81:25, 82:12, 91:25, 105:3, 108:18
**explained** [1] - 136:3
**explaining** [1] - 73:24
**explore** [2] - 121:6, 129:20
**express** [1] - 44:2
**expressly** [1] - 9:3
**extensive** [1] - 44:10
**extent** [2] - 122:6, 135:16
**external** [29] - 82:7, 82:8, 82:9, 83:14, 88:17, 89:5, 89:21, 89:22, 91:18, 91:24, 92:2, 98:25, 101:22, 130:16, 131:5, 131:11, 134:2, 134:11, 134:13, 135:1, 135:5, 135:12, 135:17, 135:22, 136:9, 136:24, 137:25
**extra** [2] - 65:14, 92:5
**extraneous** [1] - 52:16

## F

**fact** [17] - 9:17, 10:3, 11:10, 12:7, 30:11, 37:22, 65:21, 86:20, 92:8, 114:5, 114:15, 119:9, 119:18, 119:22, 125:9, 134:14, 134:17
**factor** [9] - 56:5, 58:13, 59:23, 61:4, 90:13, 98:12, 98:13, 109:5, 114:16
**Factor** [1] - 120:8
**factor's** [1] - 65:22
**factored** [1] - 106:9
**factors** [19] - 53:20, 53:23, 53:25, 54:2,

54:9, 54:11, 54:14, 54:16, 58:11, 58:14, 59:22, 60:1, 60:2, 61:1, 71:17, 80:1, 119:19, 120:8
**Factors** [3] - 60:2, 120:3, 120:5
**facts** [2] - 54:13, 107:15
**fair** [17] - 119:11, 123:19, 123:25, 124:4, 125:1, 125:20, 126:7, 126:23, 126:24, 128:2, 128:12, 128:16, 129:11, 130:6, 133:24, 136:11, 137:19
**fall** [1] - 25:20
**falls** [2] - 80:4, 80:6
**familiar** [1] - 124:9
**far** [3] - 25:3, 126:21, 129:1
**farms** [1] - 83:2
**feasible** [1] - 60:17
**feature** [4] - 78:1, 78:14, 125:12, 125:13
**features** [15] - 65:20, 77:25, 78:4, 78:7, 78:11, 78:17, 82:5, 83:11, 89:20, 89:22, 89:24, 92:3, 92:5, 100:18
**FEDERAL** [2] - 1:23, 140:5
**Federal** [1] - 140:20
**feed** [1] - 58:19
**FENSTER** [10] - 2:4, 8:10, 8:22, 11:14, 11:23, 12:16, 12:23, 12:25, 13:4, 139:3
**Fenster** [4] - 8:11, 8:23, 49:17, 114:2
**Fenster's** [1] - 109:13
**ferromagnetic** [2] - 22:12, 22:17
**few** [2] - 30:20, 102:12
**field** [12] - 14:24, 15:10, 16:25, 18:16, 18:18, 18:19, 18:23, 18:24, 18:25, 19:19, 20:4, 58:16
**fifth** [1] - 119:9
**figure** [30] - 25:17, 44:3, 48:17, 52:13, 55:11, 55:12, 59:9, 65:4, 65:7, 66:12, 67:19, 68:5, 68:8, 68:16, 68:23, 71:1,

76:3, 77:2, 77:17, 83:20, 90:5, 93:9, 93:10, 107:13, 107:18, 111:18, 111:20, 112:2, 112:18, 112:24
**figured** [1] - 102:18
**figures** [2] - 25:15, 26:4
**figuring** [4] - 69:2, 79:1, 115:14, 115:16
**filed** [1] - 61:22
**filings** [1] - 44:10
**filled** [1] - 83:3
**Final** [1] - 6:20
**final** [2] - 83:6, 132:9
**finance** [1] - 41:20
**financial** [6] - 40:14, 41:15, 41:17, 41:25, 44:13, 66:13
**fine** [4] - 13:19, 85:7, 86:6, 135:25
**Firebird** [3] - 9:6, 9:7, 9:13
**firm** [3] - 40:10, 40:14, 119:4
**firms** [1] - 40:16
**first** [24] - 8:25, 18:16, 18:18, 19:24, 23:5, 23:21, 24:9, 25:24, 47:5, 49:20, 55:10, 67:14, 68:21, 68:23, 72:20, 76:1, 77:9, 79:9, 82:6, 84:6, 88:19, 94:24, 95:22, 109:22
**fit** [9] - 58:12, 69:17, 71:20, 74:5, 80:15, 80:17, 82:15, 83:9, 98:14
**five** [9] - 66:16, 68:13, 68:15, 71:4, 72:1, 72:2, 72:3, 90:5
**five-year** [1] - 66:16
**Floor** [6] - 2:5, 2:9, 2:13, 2:21, 3:9, 3:23
**flow** [1] - 58:10
**focus** [2] - 72:6, 73:7
**focused** [5] - 47:7, 52:18, 78:19, 127:7, 127:21
**focusing** [3] - 56:25, 94:16, 127:21
**folks** [1] - 35:6
**FOR** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**foregoing** [1] - 140:9
**forgot** [1] - 133:3
**form** [9] - 48:5, 58:11, 58:13, 58:14, 61:1,

65:22, 98:12, 98:13, 138:22
**format** [1] - 140:11
**formed** [1] - 44:24
**formula** [6] - 69:21, 69:22, 70:15, 70:16, 72:24, 128:21
**forth** [1] - 101:13
**fortunately** [2] - 49:10, 93:15
**forward** [11] - 68:12, 69:13, 70:10, 70:13, 101:19, 102:6, 102:7, 103:20, 113:4, 113:9, 131:4
**foundational** [2] - 54:24, 105:19
**founder** [3] - 38:19, 40:9, 118:24
**four** [4] - 17:12, 72:12, 72:13, 82:2
**framework** [5] - 49:8, 52:20, 52:23, 119:14, 119:16
**Frankel** [1] - 9:18
**frankly** [1] - 78:8
**Frenkel** [3] - 8:18, 12:18, 86:23
**FRENKEL** [4] - 5:4, 9:23, 10:23, 12:19
**frequently** [1] - 38:23
**FRIDAY** [2] - 1:16, 8:1
**front** [3] - 45:13, 45:18, 114:7
**full** [2] - 38:9, 107:10
**functionality** [1] - 104:11
**fundamental** [1] - 80:14
**future** [15] - 29:20, 29:23, 50:21, 50:25, 51:5, 51:9, 68:7, 68:18, 77:2, 114:21, 114:23, 114:25, 115:1, 116:2
**FY18** [1] - 6:16

## G

**G1** [10] - 14:7, 17:8, 17:13, 26:12, 26:15, 27:4, 27:24, 31:11, 33:6, 34:11
**gain** [3] - 30:6, 30:9, 103:4
**gains** [3] - 102:24, 111:3, 111:5
**game** [1] - 51:13
**general** [5] - 32:23, 56:5, 76:2, 107:1,

108:8
**generally** [4] - 41:19, 121:12, 124:11, 128:3
**generate** [2] - 104:18, 104:19
**generated** [3] - 59:7, 59:10, 131:21
**generating** [1] - 59:5
**generation** [1] - 93:12
**gentlemen** [3] - 13:16, 86:8, 138:21
**Georgia** [6] - 41:4, 54:1, 59:23, 59:25, 119:18, 120:8
**Georgia-Pacific** [5] - 54:1, 59:23, 59:25, 119:18, 120:8
**gigabits** [6] - 11:3, 11:4, 11:7, 63:20, 108:23, 108:24
**gist** [1] - 33:11
**given** [7] - 23:16, 30:2, 30:3, 63:3, 66:7, 94:20, 107:16
**glean** [1] - 100:15
**global** [2] - 40:16, 42:12
**GMBH** [1] - 1:4
**GmbH** [1] - 8:7
**goal** [1] - 62:24
**goals** [1] - 63:5
**Goglia** [2] - 11:11, 12:5
**goods** [1] - 114:20
**graded** [1] - 63:19
**gradient** [1] - 63:9
**grail** [1] - 63:2
**grain** [1] - 24:25
**granted** [3] - 9:9, 11:20, 12:7
**grants** [2] - 9:10, 47:22
**graph** [2] - 68:14, 69:4
**grayed** [1] - 102:11
**greater** [5] - 18:16, 18:23, 18:24, 19:22, 89:10
**GREGORY** [1] - 5:4
**grilling** [1] - 14:6
**gross** [6] - 6:15, 6:17, 106:23, 128:12, 128:15, 128:20
**Group** [32] - 14:7, 14:13, 14:18, 14:24, 15:4, 15:10, 15:15, 15:21, 16:1, 16:6, 16:16, 16:21, 17:3, 17:9, 18:6, 20:21, 20:25, 33:6, 46:7,

46:8, 46:9, 46:10, 123:1, 123:4, 123:9, 123:11, 123:16, 123:17
**group** [8] - 17:4, 34:12, 40:14, 46:3, 82:6, 82:11, 92:19, 92:21
**grouping** [2] - 83:6, 83:7
**groups** [7] - 17:1, 46:1, 46:7, 82:3, 82:4, 83:12, 92:22
**growth** [2] - 113:8, 113:9
**guess** [1] - 124:6
**guessing** [1] - 41:23
**guidance** [4] - 49:10, 52:22, 53:22, 119:20
**guided** [1] - 64:1

## H

**Hac** [1] - 2:16
**handwriting** [1] - 10:14
**HANLE** [1] - 4:12
**happy** [1] - 45:22
**hard** [56] - 14:18, 15:5, 15:16, 16:1, 16:11, 16:21, 18:15, 18:22, 18:23, 19:25, 20:15, 22:13, 23:18, 23:22, 25:7, 26:22, 27:10, 27:13, 27:15, 27:18, 27:20, 27:22, 28:14, 29:17, 29:23, 31:2, 31:11, 31:25, 32:7, 37:13, 37:21, 44:14, 57:23, 65:22, 66:22, 67:2, 75:5, 78:3, 78:4, 78:21, 82:8, 82:14, 83:5, 88:25, 97:20, 103:14, 104:8, 113:19, 117:18, 124:7, 124:12, 124:14, 124:21, 125:7, 125:23, 126:21
**HC570** [1] - 6:20
**HDD** [2] - 6:23, 7:7
**head** [2] - 23:4, 40:13
**hear** [1] - 32:17
**heard** [20] - 11:24, 35:9, 35:19, 35:20, 36:2, 54:25, 58:6, 60:22, 62:5, 64:7, 77:13, 82:3, 102:22, 103:2, 106:9, 114:2, 117:24, 120:15,

122:25, 125:16
**held** [1] - 140:10
**help** [5] - 10:15, 23:18, 40:3, 67:13, 135:21
**hereby** [1] - 140:7
**hi** [1] - 38:18
**high** [16] - 42:21, 42:23, 58:24, 67:10, 69:20, 73:14, 73:24, 75:4, 75:7, 75:17, 82:21, 89:10, 90:21, 91:20, 92:14, 97:19
**high-tech** [2] - 42:21, 42:23
**higher** [8] - 89:8, 91:17, 116:2, 116:8, 116:9, 128:18, 134:14, 135:15
**highlight** [4] - 18:14, 27:2, 54:16, 129:1
**highlighted** [4] - 27:9, 36:24, 47:10, 72:11
**highly** [6] - 59:17, 73:25, 75:1, 94:2, 102:14, 102:16
**HINO** [3] - 1:23, 140:5, 140:19
**Hino** [1] - 140:20
**HINO-SPAAN** [3] - 1:23, 140:5, 140:19
**Hino-Spaan** [1] - 140:20
**historical** [2] - 104:23, 113:2
**historically** [1] - 106:13
**hit** [1] - 25:23
**Hn** [2] - 18:18, 18:19
**hodgepodge** [1] - 83:7
**hold** [2] - 41:14, 42:6
**holder** [2] - 46:25, 49:19
**holders** [1] - 42:11
**holy** [1] - 63:2
**honestly** [2] - 66:7, 76:14
**Honor** [39] - 8:10, 8:14, 8:16, 8:22, 9:1, 9:9, 9:15, 9:23, 11:14, 11:20, 11:21, 11:23, 12:4, 12:7, 12:14, 12:23, 13:4, 13:6, 19:6, 21:20, 30:15, 38:1, 38:5, 43:21, 84:16, 85:21, 86:6, 86:22, 87:6, 87:10, 87:24, 96:9, 96:25, 97:5, 99:4, 99:17, 100:5,

112:11, 139:3
**HONORABLE** [1] - 1:3
**hopefully** [1] - 91:21
**host** [16] - 17:6, 18:17, 18:25, 20:4, 20:5, 23:17, 25:7, 27:5, 27:9, 27:14, 27:19, 31:3, 31:17, 31:24, 32:7
**hour** [5] - 13:9, 13:23, 39:13, 72:4, 138:20
**hours** [3] - 41:21, 44:21, 44:22
**hours'** [2] - 41:16, 41:22
**house** [2] - 40:16, 48:5
**housing** [1] - 82:9
**Hs** [3] - 18:16, 18:19, 20:9
**huge** [1] - 81:7
**hundreds** [6] - 66:9, 78:6, 81:17, 106:8, 133:2
**hyperfocused** [1] - 59:20
**hypothetical** [41] - 49:14, 49:15, 49:18, 49:24, 50:2, 50:4, 50:10, 50:15, 51:1, 51:7, 51:23, 51:25, 52:4, 52:9, 52:11, 52:16, 52:20, 53:1, 56:6, 56:16, 61:5, 61:7, 100:25, 101:2, 101:9, 104:17, 105:17, 106:18, 107:3, 107:8, 107:9, 109:8, 114:6, 115:6, 115:10, 119:15, 131:4, 131:22, 137:15, 137:20
**HYUK** [1] - 3:22

## I

**identified** [5] - 9:5, 9:9, 11:17, 27:4, 86:25
**Ikeda** [1] - 26:2
**Ikeda's** [1] - 26:1
**Illinois** [2] - 3:14, 4:18
**illustrate** [1] - 26:4
**image** [2] - 64:8
**imagine** [6] - 51:13, 54:12, 54:21, 56:6, 69:1, 71:18
**impact** [18] - 52:16, 56:14, 62:3, 64:24, 65:3, 68:8, 68:9,

68:17, 70:4, 78:18, 78:20, 79:24, 117:15, 117:21, 117:24, 117:25, 118:3, 118:6
**impacted** [1] - 56:12
**implemented** [1] - 104:11
**implications** [1] - 61:10
**importance** [4] - 47:6, 47:7, 62:17, 97:23
**important** [17] - 48:21, 50:1, 54:9, 54:14, 55:1, 61:3, 63:5, 70:18, 72:6, 75:8, 93:25, 97:16, 98:18, 109:13, 110:22, 111:1, 117:14
**improved** [2] - 58:16, 58:17
**improvement** [1] - 54:22
**IN** [2] - 6:13, 7:4
**in-house** [1] - 40:16
**Inc** [1] - 8:8
**INC** [1] - 1:8
**inception** [1] - 64:2
**inch** [8] - 11:3, 11:4, 11:7, 63:12, 63:20, 63:21, 108:23, 108:24
**include** [3] - 106:2, 135:24, 138:16
**included** [1] - 106:3
**includes** [2] - 105:21, 122:9
**including** [3] - 27:13, 91:15, 104:6
**incoherent** [9] - 22:20, 22:21, 22:24, 24:25, 25:2, 25:6, 25:15, 25:19, 25:24
**incoherently** [3] - 22:25, 23:2, 23:21
**income** [9] - 58:25, 59:1, 59:2, 59:5, 59:15, 59:22, 60:1, 123:21, 123:22
**income-generating** [1] - 59:5
**incorrect** [2] - 122:2, 122:6
**increase** [13] - 14:18, 15:4, 15:15, 16:1, 22:13, 61:1, 62:24, 102:24, 122:1, 136:7, 137:17, 137:18
**increased** [7] - 16:11,

16:21, 28:21, 58:10, 58:11, 58:17, 108:23
**increases** [3] - 63:20, 125:14, 125:16
**increasing** [2] - 90:10, 113:5
**incremental** [5] - 103:3, 111:3, 123:23, 124:2, 128:1
**indeed** [1] - 86:23
**independent** [1] - 78:7
**indicated** [2] - 9:16, 9:18
**indicating** [1] - 70:9
**indication** [1] - 90:3
**indicator** [1] - 55:18
**individual** [10] - 66:22, 66:25, 69:12, 69:15, 71:17, 72:5, 73:3, 74:6, 77:14, 78:1
**industry** [4] - 29:17, 42:21, 44:14, 116:5
**inflation** [2] - 114:19, 114:22
**information** [37] - 28:12, 40:20, 40:22, 44:6, 44:8, 44:13, 50:16, 50:17, 50:21, 51:5, 51:6, 51:8, 51:16, 66:13, 66:16, 67:13, 68:13, 68:20, 70:19, 71:8, 71:14, 71:16, 73:1, 73:2, 77:3, 77:24, 95:20, 101:3, 101:6, 102:16, 103:15, 103:19, 107:7, 107:11, 107:13, 117:5, 127:5
**informative** [2] - 102:14, 131:22
**informed** [1] - 132:16
**infringe** [10] - 18:6, 20:19, 20:22, 20:25, 21:12, 28:16, 33:18, 57:8, 121:20, 123:12
**infringed** [6] - 34:14, 39:8, 49:6, 50:5, 57:4, 117:4
**infringement** [28] - 11:1, 21:7, 28:24, 31:6, 32:15, 32:17, 32:24, 36:19, 36:25, 45:3, 47:1, 47:6, 47:8, 47:9, 48:16, 48:22, 49:21, 50:8, 50:10, 50:12, 53:9, 53:11, 53:12, 53:18, 117:7, 121:15, 121:16, 123:16

**UNITED STATES DISTRICT COURT**

**infringer** [7] - 47:3, 47:12, 47:16, 47:17, 47:23, 49:20, 50:23
**infringer's** [1] - 50:24
**infringing** [1] - 57:14
**input** [7] - 122:15, 122:25, 130:22, 130:23, 138:5, 138:13, 138:14
**instance** [1] - 70:3
**instead** [4] - 64:22, 81:20, 93:19, 104:25
**Institute** [2] - 41:4, 42:10
**instructions** [1] - 54:6
**intellectual** [4] - 38:22, 40:13, 40:18, 42:14
**interface** [2] - 78:6, 78:22
**internal** [5] - 82:14, 91:11, 92:6, 95:25, 100:13
**interrogatories** [1] - 9:6
**interrogatory** [1] - 9:10
**interrupt** [1] - 33:25
**interval** [5] - 74:2, 74:3, 74:6, 74:12, 74:22
**intervals** [1] - 74:16
**introduce** [2] - 9:4, 38:16
**introduced** [1] - 80:3
**invalid** [1] - 121:23
**invalidity** [1] - 121:17
**invention** [15] - 10:9, 28:8, 28:20, 30:8, 47:3, 47:11, 47:16, 50:23, 54:22, 55:4, 55:8, 60:10, 98:16, 118:1, 123:23
**inventions** [1] - 58:3
**involved** [3] - 10:4, 10:25, 42:23
**IP** [1] - 42:13
**irregardless** [1] - 137:24
**Irvine** [1] - 41:3
**IS** [1] - 38:7
**issuance** [3] - 53:8, 53:12, 57:19
**issue** [10] - 9:2, 9:11, 10:25, 48:10, 86:13, 114:15, 114:17, 115:8, 125:12, 125:13
**issued** [4] - 36:4, 60:20, 61:19, 63:19

**issues** [7] - 8:23, 28:15, 42:16, 48:14, 50:9, 89:25, 138:23
**IT** [4] - 5:10, 5:10, 42:7, 106:5
**Item** [1] - 8:6
**items** [1] - 73:3
**itself** [9] - 26:16, 26:23, 27:22, 29:7, 56:10, 72:15, 77:15, 90:2, 126:2

## J

**Jacob** [1] - 8:13
**JACOB** [1] - 2:12
**James** [1] - 38:10
**JAMES** [4] - 1:3, 6:6, 38:7, 38:10
**jbuczko@raklaw. com** [1] - 2:15
**Jennifer** [1] - 8:19
**Jesse** [1] - 8:19
**Jim** [2] - 38:5, 38:18
**job** [2] - 32:14, 32:20
**JOSEPH** [1] - 3:22
**joseph.lee@lw.com** [1] - 3:24
**JUDGE** [1] - 1:3
**Judicial** [1] - 140:12
**JULY** [2] - 1:16, 8:1
**July** [1] - 140:15
**jump** [1] - 72:8
**June** [5] - 48:11, 48:15, 109:15, 112:19, 112:20
**jurors** [2] - 45:6, 54:4
**jury** [31] - 8:5, 10:15, 11:7, 11:15, 13:12, 13:18, 26:2, 32:22, 36:18, 36:24, 38:16, 39:15, 40:23, 42:17, 54:6, 60:16, 64:11, 86:10, 87:8, 92:16, 120:2, 121:1, 123:3, 123:6, 123:12, 123:15, 133:11, 133:18, 133:19, 133:21, 139:1
**JURY** [1] - 1:15
**JX-2015** [4] - 19:1, 33:16, 34:4, 34:8
**JX-2030** [2] - 63:24, 64:10
**JX-2038** [2] - 63:17, 64:10
**JX-2047** [3] - 23:24, 34:21, 35:21
**JX-2047.2** [1] - 36:8
**JX-2116** [4] - 6:20,

95:22, 96:10, 96:13
**JX-2118** [4] - 6:21, 96:17, 97:6, 97:9
**JX-2119** [5] - 6:23, 98:22, 98:23, 99:5, 99:8
**JX-2120** [4] - 7:5, 99:10, 99:17, 99:21
**JX-2121** [4] - 7:7, 99:23, 100:6, 100:9
**JX-2124** [4] - 6:14, 84:3, 84:8, 84:20
**JX-2125** [2] - 6:16, 85:25

## K

**KABAT** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**Kabat** [1] - 5:9
**keep** [4] - 10:16, 110:2, 125:6, 127:14
**keeping** [3] - 109:23, 110:7, 110:9
**keeps** [3] - 107:19, 107:20, 109:25
**key** [1] - 27:2
**kick** [1] - 71:14
**kind** [19] - 26:6, 43:2, 55:4, 55:6, 67:6, 67:15, 72:19, 74:14, 75:10, 81:8, 97:13, 97:18, 100:24, 101:19, 104:2, 104:12, 113:3, 118:3, 123:8
**kinds** [3] - 80:25, 83:5, 122:18
**knowledge** [1] - 21:24
**known** [2] - 59:3, 68:14
**Kroeger** [1] - 8:13
**KROEGER** [1] - 3:4

## L

**labeled** [1] - 29:3
**lack** [1] - 62:4
**ladies** [3] - 13:16, 86:7, 138:20
**laid** [1] - 49:12
**language** [4] - 29:1, 47:11, 47:12, 47:14
**large** [2] - 55:8, 98:13
**larger** [1] - 74:21
**laser** [1] - 52:18
**last** [4] - 9:15, 10:7, 58:18, 99:23
**late** [1] - 9:5

**Latham** [1] - 11:19
**LATHAM** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4
**law** [3] - 40:16, 46:16, 46:17
**LAW** [4] - 2:20, 4:9, 4:16, 4:20
**layer** [45] - 14:7, 14:19, 15:5, 15:16, 16:1, 16:11, 16:22, 17:8, 17:13, 18:15, 18:22, 18:23, 19:25, 20:15, 22:14, 23:1, 23:19, 23:22, 24:13, 24:15, 24:16, 24:20, 25:8, 26:12, 26:15, 26:23, 27:10, 27:13, 27:16, 27:18, 27:19, 27:21, 27:22, 31:3, 31:10, 31:11, 31:24, 31:25, 32:7, 33:6, 34:12, 35:13, 37:13, 37:22
**layers** [19] - 17:6, 22:7, 22:12, 22:16, 22:17, 23:3, 23:7, 23:11, 23:17, 25:4, 27:4, 27:24, 31:6, 31:12, 31:16, 31:23, 37:19, 63:9
**leading** [1] - 21:19
**learn** [1] - 68:20
**least** [7] - 44:2, 45:22, 72:6, 79:11, 79:15, 130:15, 134:17
**leaving** [1] - 52:6
**led** [1] - 63:19
**Ledahl** [3] - 6:6, 8:12, 87:9
**LEDAHL** [36] - 2:8, 38:5, 38:13, 43:21, 44:5, 56:18, 84:16, 84:21, 84:23, 85:21, 86:1, 86:6, 86:12, 86:22, 87:6, 87:10, 87:11, 87:24, 88:4, 96:9, 96:14, 96:25, 97:1, 97:5, 97:10, 97:12, 99:4, 99:9, 99:17, 99:22, 100:5, 100:10, 112:11, 112:16, 118:14, 133:22
**LEE** [1] - 3:22
**left** [4] - 10:9, 65:18, 82:18, 98:9
**less** [4] - 18:19, 20:12, 47:2, 116:3
**level** [2] - 58:24, 67:10

**levels** [6] - 14:17, 15:4, 15:15, 15:25, 16:10, 16:21
**liable** [1] - 11:2
**license** [5] - 52:5, 56:8, 56:11, 120:19, 120:24
**licensee** [1] - 120:9
**licenses** [4] - 44:15, 119:24, 120:22, 120:25
**Licensing** [1] - 42:12
**licensing** [2] - 42:14, 42:23
**light** [9] - 71:8, 71:11, 75:11, 75:19, 79:6, 95:17, 97:24, 100:21, 102:10
**limine** [1] - 9:8
**limit** [2] - 20:3, 20:5
**limited** [1] - 78:3
**line** [22] - 69:12, 69:14, 69:17, 69:19, 69:20, 69:21, 69:24, 70:2, 70:5, 70:9, 71:19, 74:4, 74:5, 74:21, 90:6, 90:7, 94:24, 115:11, 130:5, 130:12, 136:3
**linear** [24] - 69:9, 69:10, 69:11, 79:9, 79:21, 79:22, 80:9, 80:11, 80:12, 80:20, 80:22, 88:20, 90:7, 90:9, 90:15, 90:16, 90:19, 90:24, 91:16, 91:18, 92:13, 129:24, 130:3, 130:19
**listening** [1] - 44:17
**literally** [1] - 127:12
**litigation** [4] - 38:23, 40:12, 40:17, 84:10
**Liu** [1] - 5:9
**living** [1] - 38:20
**LLP** [9] - 3:12, 3:18, 3:21, 4:4, 4:8, 4:12, 4:16, 4:20, 5:4
**look** [36] - 24:9, 26:1, 33:8, 36:16, 47:13, 53:1, 53:23, 55:13, 55:15, 55:19, 57:16, 65:12, 69:3, 74:25, 76:20, 81:8, 84:6, 85:9, 90:18, 95:19, 96:15, 96:22, 97:18, 98:8, 98:21, 101:14, 101:17, 102:22, 104:17, 105:4, 105:19, 106:13,

106:20, 110:7, 113:7, 132:4
**looked** [21] - 36:20, 36:22, 44:8, 44:9, 44:10, 57:18, 59:22, 78:17, 89:7, 94:3, 94:11, 102:12, 104:23, 107:6, 112:6, 113:2, 113:6, 113:18, 124:6
**looking** [18] - 27:17, 48:7, 62:15, 62:16, 66:9, 76:11, 90:14, 91:23, 94:15, 100:15, 100:20, 101:11, 109:14, 121:12, 124:18, 124:19, 124:20, 126:4
**looks** [4] - 46:19, 72:12, 91:22, 97:13
**Los** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**LOS** [1] - 140:3
**lose** [3] - 62:8, 64:21, 75:16
**loss** [1] - 61:9
**low** [3] - 115:19, 115:24, 117:9
**low-risk** [2] - 115:19, 115:24
**lower** [14] - 10:13, 18:18, 23:3, 23:20, 60:20, 60:21, 73:9, 89:7, 91:24, 92:9, 102:3, 116:10, 116:11, 117:20
**Lumish** [25] - 6:5, 8:16, 14:6, 14:12, 14:23, 15:9, 15:20, 16:5, 16:15, 16:24, 17:4, 18:2, 19:3, 19:16, 20:7, 20:18, 20:24, 21:2, 22:6, 25:3, 26:10, 28:4, 29:9, 30:5, 30:14
**LUMISH** [14] - 3:18, 8:16, 13:5, 19:6, 19:8, 21:19, 30:15, 30:17, 34:20, 34:22, 36:7, 37:4, 37:6, 38:1
**lump** [6] - 45:3, 45:10, 45:14, 45:17, 45:20, 114:7
**lump-sum** [5] - 45:3, 45:10, 45:14, 45:17, 45:20
**lunch** [3] - 13:9, 13:23, 138:20

# M

**MacKenzie** [1] - 40:15
**magnetic** [25] - 18:15, 18:21, 19:25, 20:15, 24:14, 26:24, 27:6, 27:10, 27:12, 27:13, 27:15, 31:2, 31:6, 31:11, 31:16, 31:25, 35:13, 37:13, 37:18, 37:21, 63:2, 63:5, 63:9, 63:10, 63:25
**magnetically** [6] - 28:1, 31:7, 31:12, 37:10, 37:14, 37:22
**maichele@raklaw. com** [1] - 2:19
**Maine** [1] - 2:17
**majority** [2] - 43:4, 101:23
**Marc** [2] - 8:10, 8:22
**MARC** [1] - 2:4
**March** [8] - 48:10, 48:14, 53:4, 53:6, 53:19, 114:14, 116:19, 117:2
**margin** [2] - 104:24, 105:2
**margins** [1] - 104:23
**Mariner** [2] - 9:6, 9:13
**MARK** [2] - 6:4, 14:1
**market** [22] - 44:15, 54:24, 55:3, 55:13, 55:15, 55:19, 60:23, 61:10, 64:22, 77:14, 81:23, 96:1, 96:24, 103:14, 118:5, 124:17, 125:4, 125:8, 125:25, 127:18, 127:20, 127:21
**marketing** [15] - 96:20, 97:22, 98:18, 98:24, 99:13, 100:1, 100:11, 100:14, 100:16, 105:20, 105:21, 105:22, 106:1, 106:2, 106:4
**markets** [1] - 81:19
**master's** [5] - 41:2, 41:4, 41:9, 41:11, 41:19
**matched** [1] - 32:11
**matches** [1] - 74:4
**material** [2] - 78:23, 83:21
**materials** [1] - 40:6
**math** [5] - 111:11, 122:13, 122:15, 137:10, 138:12

**mathematically** [2] - 122:16, 122:17
**matter** [5] - 33:12, 39:25, 44:19, 57:7, 140:11
**matters** [4] - 13:2, 17:11, 53:14, 126:5
**MATTHEW** [1] - 2:16
**Matthew** [1] - 8:13
**mchan@raklaw.com** [1] - 2:23
**mean** [15] - 22:22, 22:23, 28:15, 29:24, 61:10, 64:16, 66:21, 68:25, 69:6, 70:17, 72:5, 73:22, 95:10, 125:13, 126:7
**means** [17] - 22:23, 22:24, 28:16, 37:1, 44:1, 45:10, 45:12, 62:7, 64:20, 73:9, 73:13, 73:23, 109:22, 110:5, 116:18, 131:15, 136:6
**meant** [1] - 9:17
**measurable** [1] - 76:14
**measure** [4] - 67:18, 75:11, 76:2, 76:17
**measurements** [3] - 25:11, 31:22, 32:1
**measures** [1] - 73:5
**measuring** [2] - 60:6, 76:13
**media** [20] - 26:5, 26:6, 26:7, 30:10, 37:18, 64:2, 77:14, 125:9, 125:12, 125:19, 125:23, 125:25, 126:1, 126:11, 127:2, 127:4, 127:6, 127:9, 127:10, 127:19
**Media** [1] - 36:9
**meet** [8] - 9:15, 10:20, 19:24, 20:14, 27:25, 42:13, 118:21, 118:22
**meets** [2] - 28:14, 70:2
**member** [3] - 42:9, 42:10, 42:11
**Menlo** [4] - 3:19, 4:10, 4:21, 5:5
**mention** [1] - 121:1
**mentioned** [11] - 10:19, 47:25, 61:3, 61:11, 64:10, 77:7, 78:11, 89:12, 92:11, 108:6, 133:3

**Mercury** [2] - 9:6, 9:13
**Mesa** [1] - 3:23
**met** [1] - 118:21
**method** [2] - 58:22, 66:2
**methodology** [7] - 43:6, 43:10, 43:11, 59:3, 59:15, 66:3, 122:11
**mfenster@raklaw. com** [1] - 2:7
**mic** [1] - 73:16
**Microsoft** [1] - 42:7
**midmorning** [1] - 86:5
**might** [1] - 78:18
**MIL** [4] - 9:20, 9:25, 11:19, 11:20
**million** [38] - 45:4, 46:8, 46:9, 46:10, 46:11, 48:20, 48:24, 113:16, 113:18, 113:23, 113:24, 114:1, 114:4, 114:11, 116:18, 116:20, 117:8, 122:3, 122:8, 122:9, 122:14, 122:15, 123:6, 123:10, 123:13, 128:1, 128:4, 128:9, 128:15, 137:7, 138:5, 138:7, 138:13
**millions** [2] - 36:22, 36:23
**mind** [2] - 56:15, 61:7
**mind-set** [1] - 61:7
**minimize** [1] - 69:16
**minimum** [2] - 44:1, 44:2
**MINNA** [1] - 2:20
**Minna** [1] - 8:13
**minus** [2] - 73:11, 128:21
**minute** [1] - 19:7
**minutes** [2] - 86:7, 102:12
**Mirzaie** [1] - 8:13
**MIRZAIE** [1] - 3:8
**mix** [2] - 81:24, 82:16
**mixed** [16] - 79:21, 79:22, 80:9, 80:10, 80:12, 80:22, 90:15, 90:16, 90:19, 90:24, 91:16, 91:18, 92:13, 129:24, 130:2, 130:19
**Mmap** [1] - 6:20
**model** [32] - 32:11, 80:7, 80:15, 80:20, 88:10, 88:20, 90:15,

90:19, 90:23, 91:16, 91:17, 92:12, 92:13, 106:18, 127:23, 129:6, 129:9, 129:24, 130:3, 130:5, 130:8, 130:10, 132:9, 134:2, 134:11, 134:13, 135:1, 136:2, 136:3, 136:10, 137:16
**modeling** [6] - 32:2, 32:4, 32:6, 32:9, 32:23, 134:21
**models** [5] - 95:7, 130:15, 130:20, 131:9
**moment** [4] - 45:9, 59:22, 60:9, 89:12
**moments** [1] - 22:24
**momentum** [1] - 25:22
**money** [8] - 75:16, 105:20, 114:15, 114:16, 114:19, 114:21, 115:8, 115:22
**months** [2] - 10:2
**morning** [14] - 8:10, 8:15, 8:16, 8:20, 8:22, 9:23, 13:16, 14:4, 14:5, 30:18, 30:19, 38:14, 38:15, 40:4
**Morning** [1] - 139:5
**mortensen** [1] - 84:5
**Mortensen** [5] - 5:10, 84:21, 97:11, 97:25, 98:8
**most** [14] - 43:19, 48:2, 48:3, 54:16, 62:6, 62:13, 63:4, 64:1, 64:15, 69:4, 72:6, 79:6, 81:22, 121:13
**mostly** [1] - 73:7
**motion** [2] - 9:10, 12:7
**motor** [2] - 55:8, 55:20
**move** [7] - 9:8, 13:18, 25:25, 69:13, 70:10, 70:13, 136:1
**moved** [2] - 9:8, 73:16
**MR** [119] - 1:4, 6:14, 6:16, 8:7, 8:10, 8:11, 8:16, 8:22, 9:23, 10:23, 11:14, 11:23, 12:16, 12:19, 12:23, 12:25, 13:4, 13:5, 14:3, 14:10, 14:11, 14:15, 14:16, 14:21, 14:22, 15:1, 15:2,

15:7, 15:8, 15:12, 15:13, 15:18, 15:19, 15:23, 15:24, 16:3, 16:4, 16:8, 16:9, 16:13, 16:14, 16:18, 16:19, 18:8, 18:9, 18:13, 19:1, 19:2, 19:6, 19:8, 19:10, 19:13, 19:15, 20:11, 21:19, 21:21, 22:10, 22:11, 23:24, 23:25, 24:6, 24:8, 25:13, 25:14, 26:20, 26:21, 27:1, 27:3, 30:15, 30:17, 34:20, 34:22, 36:7, 37:4, 37:6, 38:1, 38:5, 38:13, 39:3, 39:7, 39:18, 39:20, 39:23, 43:21, 44:5, 56:2, 56:9, 56:18, 84:16, 84:23, 85:21, 86:1, 86:6, 86:12, 86:22, 87:6, 87:10, 87:11, 87:24, 88:4, 96:9, 96:14, 96:25, 97:1, 97:5, 97:10, 97:12, 99:4, 99:9, 99:17, 99:22, 100:5, 100:10, 101:1, 112:11, 112:16, 118:14, 133:22, 139:3
MRT [3] - 9:9, 120:19, 121:23
MRT's [2] - 9:10, 119:3
MS [18] - 43:24, 84:18, 85:23, 86:13, 86:15, 88:1, 96:11, 97:7, 99:6, 99:19, 100:7, 112:13, 118:15, 118:18, 126:18, 134:1, 138:19, 139:4
Mulholland [1] - 8:19
multi [1] - 26:5
multilayer [3] - 26:23, 27:6, 27:12
multilayered [1] - 32:6
multimagnetic [1] - 26:25
multiple [9] - 21:13, 26:5, 26:7, 57:25, 63:24, 64:7, 77:24, 86:23, 129:13
multiplication [1] - 109:17
multiply [7] - 113:25, 128:8, 128:14, 136:12, 137:2, 137:6, 137:23
multiplying [1] - 128:1

**N**

name [5] - 24:15, 38:8, 38:9, 38:18, 67:6
named [1] - 29:3
national [2] - 40:14, 40:16
nature [1] - 135:23
necessarily [1] - 94:20
necessary [2] - 76:4, 81:12
need [16] - 9:21, 13:8, 13:19, 25:11, 31:1, 36:16, 91:6, 93:24, 95:13, 95:19, 111:20, 114:21, 114:22, 115:1, 122:7, 122:14
needed [1] - 112:23
needs [1] - 18:23
negative [2] - 113:8, 113:9
nego [1] - 52:16
negotiate [2] - 51:15, 53:4
negotiating [1] - 51:12
negotiation [50] - 49:14, 49:15, 49:18, 49:25, 50:2, 50:3, 50:4, 50:7, 50:10, 50:15, 50:16, 50:19, 51:1, 51:4, 51:7, 51:14, 51:18, 51:21, 51:24, 51:25, 52:1, 52:4, 52:11, 52:17, 52:20, 53:1, 53:6, 56:7, 56:16, 61:5, 61:7, 100:25, 101:2, 101:9, 105:18, 106:18, 107:3, 107:8, 107:10, 109:8, 114:6, 115:7, 115:10, 119:16, 131:4, 131:23, 137:15, 137:21
negotiations [1] - 42:24
network [1] - 40:21
never [3] - 39:20, 104:9, 104:11
Newport [4] - 4:5, 4:6, 4:13, 4:14
next [41] - 11:13, 13:7, 14:15, 15:1, 15:12, 15:23, 16:8, 16:13, 16:18, 20:9, 25:23, 36:7, 38:4, 60:7, 60:8, 70:7, 70:8, 72:8, 77:7, 78:24, 79:1, 81:9, 81:11,

81:12, 85:10, 88:7, 88:14, 88:15, 90:18, 93:7, 93:8, 100:22, 100:23, 102:20, 102:21, 105:10, 106:12, 107:17, 107:18, 111:19, 129:25
NFL [2] - 51:13, 51:21
nice [3] - 77:22, 118:21, 118:22
nicely [2] - 82:15, 83:10
night [1] - 9:15
nine [2] - 66:8, 113:17
nine-year [1] - 113:17
nobody [1] - 55:19
nobody's [1] - 55:9
noise [1] - 58:16
nonaccused [1] - 34:6
none [5] - 23:9, 27:23, 30:7, 86:25
noninfringing [15] - 9:3, 9:5, 9:14, 9:19, 9:21, 9:24, 10:19, 11:15, 11:17, 56:2, 60:17, 60:25, 61:13, 86:18, 86:25
nonused [1] - 34:10
North [2] - 3:13, 4:17
noted [1] - 47:4
notes [1] - 45:6
nothing [4] - 13:5, 38:1, 117:19, 125:2
nothing's [1] - 55:23
notice [2] - 59:21, 91:21
Novell [1] - 42:8
November [1] - 10:1
nucleation [16] - 17:6, 18:17, 18:25, 20:4, 20:5, 23:17, 25:7, 27:5, 27:9, 27:14, 27:19, 31:3, 31:17, 31:24, 32:7
Number [10] - 8:6, 84:20, 85:25, 88:3, 96:13, 97:9, 99:8, 99:21, 100:9, 112:15
number [57] - 17:8, 21:25, 46:11, 48:1, 60:1, 65:6, 65:11, 65:24, 70:19, 70:24, 72:2, 72:16, 72:23, 78:4, 80:23, 90:10, 101:13, 101:18, 101:20, 101:21, 102:7, 102:8, 103:7, 105:7, 108:2, 112:25, 113:22,

114:4, 115:15, 116:20, 116:21, 118:6, 122:8, 122:9, 122:10, 122:17, 128:5, 129:2, 129:3, 131:2, 131:18, 131:21, 132:8, 132:18, 132:19, 133:3, 133:4, 134:8, 135:3, 135:9, 135:10, 136:23, 137:1, 137:2, 137:6, 138:3
numbers [10] - 64:10, 91:7, 92:23, 94:3, 95:16, 97:19, 102:9, 102:13, 111:2, 132:4

**O**

oath [1] - 13:15
object [2] - 9:22, 12:25
objection [14] - 10:5, 19:6, 21:19, 43:24, 84:18, 85:23, 88:1, 96:11, 97:7, 99:6, 99:19, 100:7, 112:13, 133:22
objections [1] - 8:21
observable [11] - 68:11, 68:14, 69:17, 69:18, 71:4, 74:19, 74:20, 76:2, 80:23, 90:4, 90:7
observations [1] - 72:2
observed [1] - 76:10
obviously [10] - 36:20, 42:25, 50:7, 51:4, 62:12, 71:10, 74:3, 80:16, 93:11, 112:5
occurs [2] - 23:21, 38:23
OF [9] - 1:2, 1:14, 2:1, 3:1, 4:1, 5:1, 140:1, 140:3, 140:4
offer [11] - 10:24, 32:17, 64:22, 84:16, 85:21, 87:24, 96:9, 97:5, 99:4, 100:5, 112:11
offering [5] - 10:21, 10:23, 11:14, 12:1, 89:20
offers [1] - 99:17
OFFICIAL [3] - 1:23, 140:1, 140:5
Official [1] - 140:20
often [2] - 50:8, 50:18

OLS [13] - 79:18, 79:23, 80:7, 88:20, 90:23, 91:16, 92:12, 130:8, 130:20, 135:4, 136:3
once [5] - 48:22, 75:9, 93:6, 113:22
one [68] - 10:24, 11:23, 11:25, 13:23, 25:23, 30:1, 31:10, 35:14, 38:24, 40:18, 41:25, 42:1, 42:22, 43:18, 43:20, 45:13, 47:5, 49:12, 50:3, 50:17, 51:20, 52:4, 52:25, 53:23, 55:1, 55:12, 63:4, 65:12, 66:9, 68:7, 68:21, 68:22, 70:19, 71:13, 75:5, 77:22, 80:14, 80:19, 81:7, 83:24, 84:25, 88:5, 91:13, 91:24, 94:1, 95:14, 98:9, 98:11, 98:25, 99:23, 100:17, 101:13, 101:21, 103:20, 105:18, 112:6, 114:5, 120:8, 125:23, 127:1, 127:6, 127:18, 127:20, 128:13, 129:8, 129:23, 130:2, 130:11
one's [2] - 73:4
ones [1] - 91:11
ongoing [1] - 45:18
oOo [1] - 139:6
open [3] - 85:10, 86:2, 95:22
opened [2] - 86:19, 87:4
opening [3] - 49:17, 87:2, 109:13
operating [6] - 106:2, 106:4, 106:6, 106:14, 110:1, 117:13
opinion [24] - 12:1, 12:25, 19:9, 25:6, 45:1, 45:2, 57:2, 57:3, 57:7, 81:20, 101:8, 101:18, 107:12, 117:1, 117:23, 120:15, 122:3, 123:8, 124:12, 125:1, 125:2, 125:5, 127:17, 127:20
opinions [10] - 32:17, 40:4, 44:2, 44:24,

121:10, 121:15, 121:16, 121:17, 123:6, 138:23
**opportunity** [1] - 45:6
**opposed** [4] - 36:14, 45:13, 94:8, 102:8
**opposite** [2] - 25:2, 114:24
**option** [1] - 52:2
**OR** [2] - 6:13, 7:4
**order** [6] - 9:4, 13:14, 104:18, 104:19, 122:8, 128:14
**ordinary** [5] - 79:11, 79:15, 103:4, 103:6, 111:8
**organization** [2] - 42:11, 42:13
**organizations** [1] - 42:9
**oriented** [6] - 28:1, 31:8, 31:13, 37:11, 37:14, 37:23
**original** [1] - 98:9
**ourselves** [1] - 61:6
**outcome** [2] - 39:14, 51:22
**output** [10] - 72:14, 74:18, 74:25, 75:3, 76:6, 90:19, 130:5, 130:10, 133:13, 135:23
**outputs** [3] - 81:5, 136:3, 136:22
**outputting** [1] - 74:10
**outside** [3] - 39:17, 49:11, 111:13
**overall** [11] - 14:18, 15:4, 15:15, 16:1, 22:13, 102:3, 106:1, 111:21, 116:6, 116:9, 118:6
**overlap** [1] - 48:25
**overlapping** [1] - 12:7
**overruled** [2] - 19:12, 133:23
**overview** [4] - 6:23, 7:6, 7:7, 42:17
**overwhelming** [1] - 78:15
**overwrite** [1] - 58:17
**own** [10] - 31:13, 31:14, 37:23, 39:22, 44:14, 57:21, 58:1, 100:21, 103:19, 121:12
**owns** [1] - 48:4

## P

**p-value** [10] - 73:5, 73:7, 73:9, 73:15, 73:18, 89:7, 89:8, 89:9, 90:21, 91:19
**p-values** [2] - 92:14, 94:1
**Pacific** [5] - 54:1, 59:23, 59:25, 119:18, 120:8
**pack** [1] - 63:3
**page** [1] - 140:11
**PAGE** [1] - 6:3
**pages** [4] - 36:22, 36:23, 84:25, 85:1
**paid** [8] - 43:14, 45:12, 45:13, 47:21, 106:8, 109:9, 114:7, 120:9
**papers** [1] - 64:9
**paragraph** [1] - 9:12
**paralegal** [1] - 5:9
**parameters** [3] - 33:19, 34:8, 49:23
**paramount** [1] - 63:10
**Park** [4] - 3:19, 4:10, 4:21, 5:5
**part** [28] - 11:8, 27:1, 27:5, 41:12, 46:3, 53:16, 53:18, 54:5, 54:11, 75:8, 76:25, 77:17, 85:19, 88:6, 89:1, 94:22, 96:6, 97:17, 98:3, 103:4, 103:16, 109:3, 109:22, 110:10, 110:21, 121:13, 129:15, 135:17
**particular** [9] - 22:4, 58:21, 66:7, 69:3, 78:2, 90:14, 109:11, 109:22, 110:5
**parties** [29] - 45:14, 45:21, 50:4, 50:11, 50:15, 50:17, 50:20, 51:1, 51:19, 51:25, 101:1, 101:8, 101:17, 102:7, 102:15, 102:19, 107:2, 107:5, 107:7, 107:10, 107:16, 109:7, 111:16, 114:6, 131:3, 131:22, 136:16, 136:21, 137:14
**party** [3] - 50:17, 50:18, 52:2
**party's** [1] - 50:24
**pass** [1] - 118:14
**passage** [3] - 75:1,

75:14, 76:23
**Passport** [3] - 7:7, 100:1, 109:19
**patent** [53] - 23:5, 26:22, 28:15, 28:16, 39:8, 42:16, 42:20, 43:20, 43:22, 46:18, 46:23, 46:25, 47:13, 48:10, 48:12, 48:13, 48:14, 48:16, 48:18, 48:19, 48:20, 48:23, 49:6, 49:12, 49:19, 50:21, 50:22, 53:8, 54:12, 54:19, 55:2, 55:17, 55:22, 56:3, 56:11, 57:6, 57:10, 57:13, 59:4, 59:12, 59:13, 61:19, 61:22, 112:23, 124:10, 124:14, 126:14, 126:19, 127:16
**Patent** [1] - 46:21
**patented** [7] - 58:3, 63:13, 64:3, 64:5, 64:20, 65:8, 121:11
**patents** [60] - 31:2, 36:4, 38:22, 42:16, 42:23, 44:10, 49:2, 49:22, 50:5, 52:13, 52:18, 52:19, 53:5, 54:18, 54:25, 56:9, 56:19, 56:20, 56:21, 56:23, 56:24, 57:6, 57:17, 57:19, 57:20, 57:21, 57:24, 57:25, 58:1, 58:10, 58:23, 58:25, 59:18, 59:19, 59:20, 60:6, 60:19, 61:9, 62:9, 63:18, 64:14, 93:9, 105:19, 107:24, 108:1, 109:9, 110:4, 117:3, 117:5, 120:16, 120:20, 121:23, 123:9, 123:11, 123:17, 123:18, 123:24, 126:9, 127:8
**patents-in-suit** [3] - 56:21, 120:20, 123:24
**Patricia** [3] - 8:18, 86:15, 118:15
**PATRICIA** [1] - 4:20
**patricia.young@lw. com** [1] - 4:22
**pattern** [2] - 113:3, 113:6
**patterns** [2] - 67:11, 67:12
**PAUL** [1] - 3:4

**Paul** [1] - 8:12
**pause** [1] - 45:5
**pay** [4] - 39:7, 45:17, 48:5, 48:22
**payment** [4] - 45:17, 45:20, 48:3, 114:13
**payments** [1] - 45:18
**PDX-4-10** [1] - 120:4
**PDX-4-43** [1] - 129:21
**PDX-4-45** [1] - 132:5
**PDX-4-52** [1] - 128:10
**PDX-4-6** [1] - 122:23
**PDX-4-9** [1] - 119:13
**people** [4] - 12:21, 29:25, 55:14, 92:3
**people's** [1] - 29:24
**per** [49] - 11:3, 11:4, 11:7, 63:12, 63:20, 65:5, 66:18, 76:20, 77:1, 77:4, 89:3, 90:20, 90:24, 91:8, 92:13, 92:20, 93:1, 93:5, 93:6, 93:19, 94:5, 94:15, 94:16, 95:2, 95:7, 101:12, 102:19, 105:12, 106:16, 106:23, 107:3, 107:14, 107:24, 108:21, 108:23, 108:24, 111:17, 111:19, 117:9, 128:12, 128:15, 128:20, 128:22, 129:5, 132:9, 136:16, 137:21
**per-capacity** [1] - 94:15
**per-terabyte** [7] - 66:18, 77:1, 92:20, 94:16, 106:23, 117:9, 129:5
**percent** [62] - 11:2, 30:6, 62:7, 62:8, 64:16, 73:14, 73:20, 74:8, 74:11, 82:10, 82:16, 82:22, 83:9, 83:19, 89:11, 91:20, 103:22, 104:3, 104:4, 104:24, 104:25, 105:1, 105:2, 105:8, 105:11, 106:14, 106:15, 108:2, 108:12, 108:15, 108:18, 108:20, 108:25, 109:3, 110:5, 110:10, 110:13, 110:19, 110:23, 111:11,

111:14, 113:8, 113:10, 117:6, 122:1, 122:7, 122:10, 122:14, 122:20, 122:21, 131:12, 131:16, 131:19, 131:20, 132:2, 132:14, 132:25, 133:4, 133:9, 137:2
**percentage** [1] - 110:4
**percentages** [1] - 132:13
**perfect** [4] - 75:12, 78:8, 81:2, 130:1
**perfectly** [1] - 74:4
**perform** [6] - 39:6, 51:17, 52:21, 67:7, 80:22, 93:18
**performance** [2] - 82:21, 113:2
**performed** [3] - 93:18, 95:14, 117:17
**performing** [1] - 39:9
**period** [20] - 28:21, 41:17, 41:22, 48:7, 48:9, 48:15, 57:6, 65:7, 66:8, 66:16, 88:10, 104:3, 111:21, 112:3, 113:9, 113:14, 113:17, 115:12, 115:18, 116:1
**periods** [1] - 116:17
**person** [1] - 55:10
**personally** [1] - 44:21
**perspective** [3] - 126:5, 126:8, 126:20
**Ph.D.s** [2] - 101:15, 106:9
**phrase** [2] - 27:2, 79:17
**physics** [3] - 25:9, 32:2, 33:1
**picked** [1] - 81:9
**piece** [4] - 59:5, 70:7, 70:8, 88:7
**pieces** [3] - 69:25, 70:18, 72:5
**pkroeger@raklaw. com** [1] - 3:7
**place** [5] - 46:15, 53:6, 80:5, 104:13, 128:17
**plaintiff** [17] - 8:11, 39:18, 43:1, 43:7, 43:13, 43:15, 43:21, 84:16, 85:21, 87:24, 96:9, 97:5, 99:4, 99:17, 100:5, 112:11, 139:3

PLAINTIFF [8] - 2:3, 3:3, 3:17, 4:3, 5:3, 6:4, 6:6, 38:7
Plaintiff [2] - 1:5, 1:10
plaintiff's [2] - 5:9, 5:10
plaintiffs [4] - 38:5, 43:1, 43:3, 43:5
platters [1] - 60:24
play [1] - 118:8
played [2] - 51:13, 63:10
plays [1] - 106:20
plot [2] - 68:14, 90:2
plug [1] - 67:20
Plywood [1] - 54:1
PMR [4] - 11:12, 30:9, 63:25, 64:2
pocket [1] - 115:23
point [12] - 13:19, 60:8, 69:15, 74:8, 77:23, 78:12, 105:13, 114:20, 124:22, 124:24, 136:20, 138:18
pointed [1] - 131:11
points [23] - 68:11, 68:14, 68:15, 69:4, 69:12, 69:15, 69:17, 69:18, 71:5, 71:18, 72:1, 72:3, 74:5, 74:6, 74:19, 74:20, 80:23, 90:5, 90:7, 92:16, 134:20, 134:24
port [1] - 82:9
Portable [2] - 7:5, 7:7
portion [3] - 129:6, 129:9, 129:16
portions [1] - 9:11
position [2] - 86:19, 118:23
positions [1] - 107:16
possible [1] - 78:10
post [1] - 53:19
potential [1] - 60:24
power [1] - 102:1
practicing [5] - 124:10, 124:14, 126:15, 126:19, 127:16
precise [4] - 132:3, 132:16, 135:10, 136:23
predict [6] - 28:21, 68:7, 68:18, 75:13, 75:15, 136:6
predicting [1] - 137:16
prediction [1] - 70:24
predictions [3] -

67:13, 67:15
predictive [1] - 77:1
prefer [1] - 45:17
premium [3] - 80:3, 80:4, 80:5
prepare [2] - 40:3, 44:7
prepared [2] - 68:3, 87:21
preparing [1] - 97:2
presence [5] - 8:5, 13:12, 86:10, 87:8, 139:1
PRESENT [1] - 5:8
present [5] - 116:19, 133:11, 133:17, 133:19, 133:21
presentation [8] - 9:20, 24:2, 24:7, 36:2, 36:12, 36:16, 63:17, 114:3
presentations [1] - 40:4
presented [6] - 9:19, 11:25, 21:11, 86:23, 87:1
presenting [3] - 9:24, 12:19, 96:3
president [3] - 38:18, 40:9, 118:23
pretty [4] - 81:15, 91:7, 92:23, 114:2
prevailing [1] - 63:25
previewed [1] - 49:17
PREVIOUSLY [1] - 14:1
previously [1] - 108:5
price [61] - 65:24, 68:6, 68:7, 68:9, 68:17, 70:3, 70:10, 70:14, 70:20, 70:22, 70:25, 71:1, 71:6, 73:25, 75:2, 75:14, 75:15, 76:12, 76:16, 76:20, 77:10, 77:11, 77:12, 77:20, 80:1, 80:4, 87:20, 88:11, 89:3, 90:14, 90:20, 90:24, 91:8, 92:12, 93:1, 93:2, 93:5, 93:6, 93:16, 93:19, 93:20, 94:4, 94:8, 94:11, 94:13, 95:2, 105:4, 105:5, 105:12, 109:21, 117:20, 128:21, 129:4, 129:7, 129:10, 131:2, 134:24, 135:3, 136:8, 136:19,

137:18
primary [1] - 100:17
prime [1] - 115:19
principle [2] - 26:5, 64:1
priority [1] - 28:9
Pro [1] - 2:16
problem [3] - 34:2, 90:12, 112:21
problematic [3] - 61:1, 80:19, 80:24
proceed [1] - 8:14
PROCEEDINGS [1] - 1:14
proceedings [2] - 139:5, 140:10
produce [2] - 17:15, 77:3
produced [8] - 10:1, 11:5, 11:10, 20:24, 29:7, 84:9, 85:14, 87:22
product [65] - 6:23, 7:6, 7:7, 20:19, 21:3, 21:6, 21:23, 22:4, 28:13, 33:9, 53:15, 53:17, 64:20, 64:22, 65:18, 65:19, 65:20, 76:7, 80:4, 80:5, 81:24, 82:16, 87:20, 88:10, 92:17, 92:19, 92:21, 92:22, 94:10, 94:18, 94:20, 96:2, 96:3, 96:21, 96:24, 97:14, 98:24, 99:14, 100:1, 105:5, 105:6, 109:11, 109:15, 109:16, 109:19, 109:22, 110:6, 110:7, 110:8, 124:13, 124:14, 129:7, 129:10, 129:17, 134:11, 136:9, 137:13, 137:24, 137:25, 138:1, 138:4, 138:6
products [133] - 11:5, 18:6, 21:14, 21:16, 22:12, 24:21, 24:24, 25:3, 26:6, 27:24, 28:2, 28:22, 28:25, 32:4, 32:10, 32:12, 32:13, 32:24, 34:12, 35:9, 35:11, 35:18, 35:22, 36:14, 36:19, 45:24, 45:25, 51:4, 56:12, 60:4, 60:5, 60:6, 63:21, 64:17, 64:25, 65:13, 66:3, 66:8, 66:9, 76:13,

76:15, 77:10, 77:11, 77:13, 77:21, 77:24, 78:3, 78:9, 80:2, 80:3, 81:18, 82:2, 82:5, 82:7, 82:11, 82:13, 82:19, 82:20, 82:21, 83:8, 83:15, 83:16, 88:17, 89:5, 89:21, 91:11, 91:17, 91:18, 91:25, 92:2, 92:6, 92:11, 95:18, 98:19, 98:25, 100:14, 100:18, 101:4, 101:22, 101:23, 102:9, 104:24, 105:20, 112:5, 113:3, 113:19, 113:20, 113:21, 123:1, 123:4, 123:11, 124:3, 125:4, 125:10, 128:6, 130:16, 131:5, 131:12, 131:16, 131:19, 131:21, 132:2, 132:6, 132:14, 132:23, 132:24, 133:9, 134:2, 134:13, 134:14, 134:25, 135:1, 135:5, 135:12, 135:15, 135:17, 135:18, 135:22, 136:24, 137:8, 138:10, 138:11, 138:14
professional [3] - 41:14, 42:5, 42:9
professionals [1] - 42:13
professor [1] - 47:22
profile [1] - 116:6
profit [28] - 47:23, 59:7, 94:15, 94:17, 94:19, 94:24, 101:12, 102:18, 104:19, 104:21, 104:22, 104:23, 105:2, 105:5, 105:8, 105:12, 106:24, 106:25, 107:4, 107:14, 108:21, 117:12, 118:7, 128:12, 128:15, 128:20, 136:16
profitability [8] - 51:2, 56:14, 59:10, 59:14, 59:18, 60:5, 95:4, 101:3
profits [3] - 95:7,

108:15, 118:10
program [3] - 71:13, 74:7, 88:24
programs [4] - 10:4, 10:24, 11:5, 11:8
project [1] - 112:24
projected [1] - 115:15
projecting [1] - 116:1
projection [1] - 113:1
projections [2] - 113:12, 128:7
promise [1] - 99:23
promoted [1] - 30:3
properties [3] - 18:21, 19:25, 20:15
property [6] - 38:22, 40:14, 40:18, 42:15, 48:3, 48:6
proposition [1] - 55:21
prove [3] - 31:23, 32:24, 36:25
proved [1] - 36:19
provide [4] - 12:10, 42:17, 119:20, 123:8
provided [5] - 49:2, 53:23, 58:3, 66:14, 93:17
provides [1] - 55:18
providing [4] - 55:4, 73:2, 102:23, 103:3
PTX-112 [1] - 18:8
PTX-3 [1] - 14:10
PTX-3.164 [1] - 20:2
PTX-716 [9] - 6:18, 86:3, 87:14, 87:17, 87:18, 87:25, 88:3, 134:6, 134:9
PTX-717 [4] - 7:8, 111:22, 112:12, 112:15
public [2] - 11:6, 96:4
pull [1] - 81:15
pulse [1] - 58:17
purchase [2] - 96:24, 127:19
purpose [4] - 10:21, 10:23, 23:1, 23:3
purposes [8] - 39:25, 40:12, 56:25, 65:1, 66:14, 72:6, 84:10, 85:15
pursuant [1] - 140:8
pursuing [1] - 41:3
put [20] - 10:15, 10:17, 14:10, 14:15, 14:21, 18:8, 19:1, 22:10, 23:24, 61:6, 82:6, 83:24, 87:18, 101:13, 109:14,

111:25, 115:23, 123:22, 124:8, 136:15

**Q**

**Q3FY21** [1] - 6:17
**Q4FY21** [1] - 6:14
**Q4FY23** [1] - 6:15
**qualifications** [1] - 44:2
**quantification** [4] - 12:2, 12:5, 12:20, 40:12
**quantify** [1] - 62:3
**quantifying** [2] - 12:11
**quarterbacks** [1] - 51:20
**questioning** [1] - 33:12
**questions** [10] - 22:6, 29:9, 29:11, 30:5, 30:20, 30:24, 31:1, 31:5, 31:10, 31:19
**quick** [2] - 84:25, 134:10
**quickly** [1] - 97:10
**quote** [1] - 62:19

**R**

**R&D** [7] - 105:15, 108:6, 110:1, 110:16, 110:20, 110:21, 111:10
**r2** [1] - 6:22
**raise** [1] - 86:13
**ran** [20] - 72:1, 72:3, 79:6, 79:9, 79:16, 79:20, 79:22, 80:25, 84:1, 88:18, 90:15, 90:16, 91:4, 91:10, 93:22, 129:14, 129:20, 130:15, 135:8, 135:18
**range** [7] - 74:14, 74:16, 91:8, 101:5, 102:4, 109:1, 109:3
**ranges** [1] - 108:22
**rate** [13] - 39:13, 113:9, 115:16, 115:19, 115:25, 116:2, 116:6, 116:8, 128:2, 128:8, 128:11, 128:14
**rates** [2] - 115:17, 116:17
**rather** [3] - 13:8, 13:22, 47:10
**ratio** [1] - 58:16

**RAUTH** [2] - 4:4, 4:12
**re** [29] - 10:10, 10:16, 12:3, 14:4, 18:20, 30:13, 30:18, 44:11, 56:22, 58:8, 60:12, 60:22, 62:3, 62:5, 64:14, 77:13, 82:3, 82:13, 102:23, 103:2, 107:23, 108:22, 110:22, 120:12, 121:10, 121:13, 125:1, 125:2, 125:8
**RE** [2] - 6:4, 14:1
**Re's** [1] - 137:2
**re's** [6] - 10:6, 49:3, 58:6, 122:1, 122:24, 123:4
**reaches** [1] - 23:22
**read** [5] - 10:14, 27:11, 35:19, 44:12, 73:8
**ready** [1] - 8:14
**real** [12] - 11:5, 37:3, 50:3, 50:7, 50:18, 51:4, 51:14, 51:24, 52:1, 52:17, 59:5, 117:25
**real-world** [8] - 50:3, 50:7, 50:18, 51:4, 51:14, 51:24, 52:1, 52:17
**Reality** [1] - 36:10
**reality** [1] - 37:1
**realizes** [1] - 107:14
**really** [22] - 36:13, 42:2, 46:16, 49:5, 50:1, 55:1, 55:25, 61:2, 61:15, 66:10, 69:24, 70:2, 70:8, 70:18, 73:10, 77:22, 79:4, 83:18, 91:5, 92:7, 97:23, 104:5
**REALTIME** [1] - 140:5
**reason** [11] - 9:10, 55:19, 57:12, 77:10, 79:22, 91:4, 115:20, 122:10, 123:4, 123:12, 126:20
**reasonable** [28] - 43:11, 43:23, 45:2, 47:2, 47:24, 48:1, 48:8, 49:9, 49:11, 49:13, 49:22, 53:21, 53:24, 54:10, 54:19, 65:2, 81:4, 101:7, 104:5, 104:20, 107:3, 111:18, 116:25, 119:15, 119:21, 122:12,

125:5
**reasons** [3] - 10:24, 96:24, 101:21
**receive** [2] - 89:19, 114:12
**received** [19] - 84:19, 84:20, 85:24, 85:25, 88:2, 88:3, 96:12, 96:13, 97:8, 97:9, 99:7, 99:8, 99:20, 99:21, 100:8, 100:9, 112:14, 112:15, 115:22
**receives** [1] - 127:10
**receiving** [6] - 49:5, 57:14, 93:4, 93:11, 95:3, 126:9
**recently** [1] - 36:21
**recess** [3] - 13:10, 86:7, 87:5
**Recess** [2] - 13:11, 87:7
**recipes** [2] - 29:7, 29:9
**recognize** [7] - 24:1, 29:25, 48:21, 50:11, 93:25, 104:16, 110:22
**recognizing** [3] - 61:8, 102:21, 117:8
**record** [4] - 37:13, 38:9, 79:14, 126:17
**recording** [3] - 63:2, 63:5, 63:11
**RECROSS** [1] - 30:16
**Recross** [1] - 6:5
**RECROSS-EXAMINATION** [1] - 30:16
**Recross-Examination** [1] - 6:5
**red** [1] - 90:7
**REDIRECT** [1] - 14:2
**redirect** [3] - 33:4, 34:24, 37:9
**Redirect** [1] - 6:4
**reduced** [1] - 58:16
**reduces** [1] - 80:22
**refer** [1] - 21:25
**reference** [2] - 74:1, 93:1
**referenced** [1] - 103:6
**referred** [2] - 24:17, 79:18
**referring** [2] - 72:9, 105:3
**refers** [1] - 47:25
**reflected** [4] - 28:22, 35:8, 36:19, 112:9

**reflective** [1] - 127:9
**reflects** [1] - 35:11
**refrain** [1] - 30:23
**regard** [3] - 42:16, 46:17, 117:19
**regarding** [2] - 12:5, 122:25
**regardless** [6] - 17:20, 21:16, 22:4, 43:12, 49:6, 138:4
**regression** [106] - 67:8, 67:9, 67:10, 67:17, 67:21, 67:24, 68:1, 68:20, 68:22, 68:24, 69:5, 69:8, 69:9, 69:10, 69:11, 69:16, 71:5, 71:7, 71:9, 71:13, 72:3, 72:15, 74:10, 74:13, 74:17, 74:19, 74:23, 75:4, 75:9, 75:13, 75:21, 75:25, 76:3, 76:4, 76:5, 77:18, 77:23, 78:9, 78:13, 78:24, 79:2, 79:8, 79:9, 79:10, 79:12, 79:15, 79:16, 79:18, 79:21, 79:22, 79:23, 80:9, 80:11, 80:12, 80:15, 80:22, 81:2, 81:10, 81:13, 81:16, 81:21, 83:12, 83:14, 83:16, 83:21, 83:24, 88:13, 88:15, 88:18, 88:19, 88:20, 88:21, 88:24, 89:16, 89:25, 90:8, 90:15, 90:17, 90:23, 91:3, 91:10, 91:13, 91:23, 92:10, 92:19, 94:5, 94:7, 94:10, 95:10, 95:14, 117:10, 130:19, 131:9, 132:13, 132:20, 132:24, 135:4, 135:6, 135:17, 135:18, 135:24, 136:24
**regressions** [24] - 69:2, 78:17, 79:7, 80:16, 81:1, 84:1, 92:17, 92:24, 93:21, 93:22, 107:6, 129:13, 129:20, 129:23, 129:25, 130:2, 132:1, 132:5, 133:8, 133:14, 135:8, 136:22, 137:21, 138:16
**regulations** [1] - 140:12

**reinforcing** [1] - 92:24
**REJECTED** [2] - 6:13, 7:4
**relate** [5] - 9:1, 9:2, 25:6, 59:23, 60:1
**related** [7] - 56:24, 62:11, 63:13, 63:15, 63:22, 64:3, 76:17
**relates** [2] - 37:10, 64:5
**relating** [1] - 41:7
**relation** [1] - 76:15
**relationship** [7] - 76:2, 76:9, 76:11, 76:12, 77:8, 90:9, 111:6
**relative** [8] - 14:17, 15:3, 15:14, 15:25, 16:10, 16:20, 133:5
**relatively** [1] - 90:11
**released** [1] - 11:6
**relevance** [1] - 62:20
**relevant** [10] - 21:6, 28:18, 50:16, 54:17, 59:15, 59:17, 66:23, 102:16, 117:4, 127:7
**reliable** [1] - 66:3
**relied** [6] - 10:18, 33:6, 99:1, 100:2, 122:20, 122:21
**relies** [2] - 11:11, 123:21
**rely** [5] - 31:23, 32:22, 103:15, 121:10, 125:1
**relying** [1] - 33:1
**remember** [15] - 21:3, 22:9, 26:13, 29:12, 36:22, 69:20, 84:13, 86:8, 89:7, 90:4, 91:4, 100:24, 120:17, 126:10, 138:21
**remind** [4] - 18:20, 26:2, 29:14, 89:15
**reminded** [1] - 13:15
**remove** [1] - 123:13
**rent** [2] - 48:4, 48:5
**repeat** [2] - 128:13, 129:8
**replaced** [1] - 29:18
**Report** [2] - 6:18, 7:8
**report** [6] - 9:12, 11:9, 11:11, 12:3, 12:17, 19:8
**reported** [2] - 105:7, 140:10
**Reporter** [1] - 140:20
**REPORTER** [4] - 1:23, 56:17, 140:1, 140:6
**reporter** [2] - 79:13,

126:16
**REPORTER'S** [1] - 1:14
**reports** [2] - 12:4, 44:16
**represent** [4] - 90:6, 101:23, 109:6, 132:25
**representation** [1] - 115:4
**representative** [3] - 5:9, 64:18, 110:8
**represented** [4] - 69:21, 74:8, 83:9, 88:8
**representing** [2] - 72:22, 115:3
**represents** [10] - 69:12, 72:21, 82:16, 89:8, 89:17, 89:23, 94:14, 109:7, 114:12, 117:9
**requests** [2] - 79:13, 126:16
**require** [1] - 37:10
**required** [1] - 122:14
**requirement** [3] - 19:24, 20:14, 27:20
**requirements** [1] - 18:21
**requires** [1] - 41:16
**research** [18] - 44:14, 103:4, 103:6, 103:9, 103:12, 103:13, 103:15, 103:23, 103:24, 104:7, 104:8, 104:10, 104:14, 105:25, 106:25, 110:25, 111:8, 117:11
**reset** [1] - 100:24
**resolved** [1] - 12:22
**respect** [2] - 8:24, 129:16
**respond** [1] - 86:21
**response** [1] - 26:17
**rest** [1] - 101:19
**result** [8] - 60:20, 116:9, 116:14, 130:25, 132:1, 132:13, 134:25, 135:19
**resulting** [1] - 58:11
**results** [6] - 91:13, 105:14, 131:8, 131:15, 131:18, 132:24
**resume** [1] - 138:21
**RESUMES** [1] - 14:1
**retained** [2] - 38:25,

39:3
**revenue** [18] - 6:15, 6:17, 56:14, 59:13, 59:18, 60:5, 93:5, 93:11, 93:12, 94:14, 95:4, 103:23, 104:18, 105:1, 105:13, 106:14, 106:22, 108:12
**revenues** [2] - 124:19, 124:20
**revert** [2] - 60:18, 61:16
**review** [3] - 44:7, 75:18, 134:10
**reviewed** [4] - 24:4, 44:10, 44:12, 44:15
**REZA** [1] - 3:8
**Reza** [1] - 8:13
**RICHARD** [1] - 5:4
**Rick** [1] - 8:17
**rick.frenkel@lw.com** [1] - 5:6
**rights** [1] - 53:4
**rise** [2] - 86:9, 138:25
**risk** [6] - 115:19, 115:23, 115:24, 116:2, 116:6
**riskier** [1] - 116:4
**rmirzaie@raklaw. com** [1] - 3:11
**roadmap** [2] - 10:12, 28:19
**ROBERT** [1] - 2:12
**robust** [1] - 66:10
**role** [1] - 63:11
**rookie** [2] - 51:12, 51:15
**ROOM** [1] - 1:24
**rotate** [2] - 22:24, 22:25
**roughly** [1] - 90:22
**rows** [2] - 72:17, 102:11
**Royalties** [1] - 120:9
**royalty** [36] - 43:11, 43:23, 45:3, 45:4, 45:10, 45:12, 45:14, 47:2, 47:24, 48:1, 48:2, 48:5, 48:8, 49:9, 49:11, 49:13, 49:22, 52:21, 53:21, 53:24, 54:10, 54:20, 58:20, 58:22, 65:2, 101:7, 110:6, 111:18, 114:7, 116:25, 119:15, 119:21, 122:12
**run** [31] - 68:20, 68:24, 69:2, 69:5, 71:9,

75:9, 75:13, 76:4, 77:18, 78:13, 78:20, 79:2, 79:8, 81:5, 81:12, 81:16, 83:16, 83:20, 83:24, 88:15, 88:16, 93:21, 129:23, 130:2, 130:8, 132:2, 132:5, 132:20, 133:8, 135:6
**running** [6] - 80:14, 81:21, 83:3, 88:23, 94:5, 94:7
**runs** [2] - 48:11, 71:13
**Russ** [3] - 5:9, 119:3, 119:10
**RUSS** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8

## S

**SACV-22-10599** [1] - 8:7
**salable** [5] - 124:10, 124:14, 126:14, 126:19, 127:16
**salaries** [1] - 106:6
**sale** [1] - 66:25
**sales** [9] - 66:15, 66:16, 106:2, 106:4, 113:10, 115:21, 118:6, 118:9, 128:7
**Salil** [1] - 8:17
**SALIL** [1] - 4:5
**SANTA** [3] - 1:18, 1:24, 8:1
**Sarah** [1] - 8:18
**SARAH** [1] - 4:16
**sarah.wang@lw. com** [1] - 4:19
**sat** [1] - 117:2
**saw** [6] - 10:12, 63:22, 74:1, 88:23, 109:12, 116:21
**sbali@stradlinglaw. com** [1] - 4:7
**schedule** [1] - 84:14
**Schmoller** [8] - 5:10, 34:20, 36:8, 37:5, 128:10, 129:19, 130:11, 136:13
**school** [1] - 69:20
**science** [2] - 41:4, 41:12
**scope** [1] - 19:8
**Scott** [4] - 3:19, 4:9, 4:21, 5:5
**screen** [5] - 53:25, 82:1, 84:4, 84:22, 88:22

**scroll** [1] - 19:14
**scrolling** [2] - 85:3, 85:8
**Seagate** [5] - 29:11, 29:16, 29:25, 57:24, 120:15
**search** [1] - 19:13
**seated** [1] - 13:13
**second** [11] - 10:7, 18:17, 20:14, 25:25, 36:9, 45:5, 70:23, 73:16, 77:17, 82:11, 92:25
**second-to-the-last** [1] - 10:7
**secondarily** [1] - 101:24
**secrets** [1] - 38:22
**Section** [2] - 46:21, 140:8
**see** [55] - 13:18, 17:11, 17:14, 18:11, 20:21, 23:16, 24:10, 35:4, 36:9, 36:21, 43:9, 46:19, 49:3, 50:8, 55:13, 55:15, 59:10, 62:10, 62:19, 65:13, 65:24, 66:24, 68:15, 71:4, 71:23, 72:1, 72:15, 78:18, 82:21, 83:5, 85:4, 88:25, 89:2, 89:6, 90:1, 90:9, 90:19, 91:5, 91:21, 92:21, 94:16, 97:18, 97:21, 102:11, 103:21, 112:4, 115:11, 116:11, 122:23, 125:6, 130:22, 138:24
**seeing** [2] - 27:8, 91:18
**sell** [11] - 77:14, 77:15, 93:3, 105:6, 113:14, 116:3, 118:5, 125:21, 126:22
**selling** [19] - 34:12, 36:15, 76:12, 76:16, 77:9, 77:11, 77:12, 87:20, 88:11, 90:14, 93:20, 94:2, 94:7, 94:8, 97:20, 113:4, 125:7, 129:10
**sells** [7] - 28:13, 124:17, 125:3, 126:5, 127:3, 127:14, 134:14
**SELNA** [1] - 1:3
**sense** [26] - 52:11, 56:5, 66:7, 71:8,

71:11, 75:10, 75:18, 75:20, 76:8, 76:16, 79:6, 81:22, 82:4, 92:1, 92:9, 95:16, 95:17, 97:19, 97:20, 100:21, 100:23, 102:10, 115:24, 133:14, 133:16
**separate** [6] - 27:21, 48:17, 82:2, 94:23, 130:19, 130:20
**separated** [2] - 25:22, 45:25
**separately** [3] - 51:18, 66:6, 94:25
**served** [1] - 9:9
**server** [1] - 83:2
**servers** [1] - 83:3
**session** [1] - 13:14
**set** [3] - 17:22, 21:11, 61:7
**sets** [2] - 17:15, 132:6
**setting** [1] - 95:2
**settlement** [1] - 42:24
**seven** [2] - 51:19, 82:22
**shall** [1] - 46:25
**shanle@ stradlinglaw.com** [1] - 4:15
**share** [1] - 83:18
**sheet** [1] - 93:23
**ship** [2] - 6:15, 6:17
**short** [1] - 24:17
**show** [10] - 28:19, 31:22, 32:4, 32:9, 92:11, 93:23, 100:11, 112:17, 125:2
**showed** [5] - 32:2, 32:6, 66:2, 92:12
**showing** [16] - 45:7, 59:21, 63:19, 65:17, 65:25, 71:3, 71:22, 75:17, 85:5, 92:19, 96:23, 98:3, 98:4, 98:6, 98:11, 98:12
**shown** [3] - 64:8, 73:1, 82:1
**shows** [3] - 25:15, 25:19, 111:6
**sic** [2] - 34:10, 43:25
**side** [1] - 94:2
**signal** [1] - 58:16
**signal-to-noise** [1] - 58:16
**significance** [19] - 47:12, 67:12, 73:3, 73:6, 73:12, 73:15, 73:17, 73:24, 75:5,

75:7, 75:18, 89:6, 89:8, 89:10, 90:22, 91:20, 92:15, 95:17, 97:20

**significant** [16] - 42:4, 50:14, 54:24, 61:9, 71:17, 71:21, 73:10, 73:14, 73:25, 74:13, 75:1, 75:4, 76:14, 91:5, 94:3, 111:4

**significantly** [2] - 50:3, 91:24

**similar** [4] - 63:8, 85:14, 105:25, 115:14

**similarities** [1] - 81:23

**simple** [4] - 55:7, 68:4, 81:15, 105:7

**simplistically** [1] - 48:2

**simply** [1] - 75:14

**simulations** [1] - 25:11

**single** [15] - 16:24, 46:16, 51:13, 58:12, 67:3, 71:9, 78:14, 91:15, 94:1, 102:7, 114:14, 137:12, 137:17, 137:24

**sit** [2] - 49:20, 134:4

**sitting** [4] - 44:16, 53:3, 56:7, 61:8

**six** [2] - 17:1, 132:5

**sixth** [1] - 119:9

**sizes** [1] - 98:6

**SLC** [1] - 31:12

**Slide** [12] - 14:10, 14:21, 15:7, 15:18, 16:3, 16:13, 17:3, 22:10, 24:6, 25:13, 25:15, 120:4

**slide** [17] - 14:15, 15:1, 15:12, 15:23, 16:8, 16:13, 16:18, 36:7, 46:20, 59:21, 62:19, 72:8, 90:18, 91:16, 115:3, 129:25, 130:11

**slides** [3] - 36:21, 40:3, 45:7

**slightly** [2] - 25:22, 114:3

**slope** [4] - 70:8, 70:9, 70:12, 90:11

**slow** [1] - 56:17

**slowly** [1] - 80:4

**small** [6] - 54:22, 59:4, 59:8, 59:9, 59:11, 71:23

**smaller** [6] - 55:16,

58:11, 58:13, 103:3, 125:10, 126:22

**smallest** [6] - 124:10, 124:14, 124:16, 126:14, 126:18, 127:16

**snippet** [1] - 88:8

**Society** [1] - 42:12

**sold** [19] - 33:6, 53:15, 53:17, 65:6, 66:22, 67:2, 81:18, 81:23, 82:15, 88:11, 92:7, 109:15, 112:2, 112:19, 113:13, 113:17, 117:18, 117:19, 125:25

**sometimes** [2] - 29:17, 79:18

**somewhere** [1] - 84:15

**sorry** [9] - 33:25, 34:1, 35:2, 36:21, 41:21, 85:2, 128:23, 134:8, 138:8

**sort** [31] - 37:8, 42:13, 49:17, 49:18, 52:10, 52:15, 58:18, 60:3, 61:6, 71:22, 73:8, 73:10, 74:18, 76:7, 77:25, 79:5, 81:20, 83:7, 92:24, 94:23, 95:2, 95:15, 100:19, 103:13, 109:14, 111:1, 111:8, 113:5, 115:3, 115:7, 116:5

**sought** [1] - 9:4

**sound** [1] - 134:18

**sounds** [12] - 69:11, 74:14, 81:15, 88:6, 119:8, 119:11, 123:25, 125:4, 129:12, 134:4, 134:10, 134:19

**south** [1] - 104:4

**SOUTHERN** [1] - 1:2

**Spaan** [1] - 140:20

**SPAAN** [3] - 1:23, 140:5, 140:19

**space** [3] - 40:21, 63:3, 69:16

**spacing** [1] - 25:17

**specialize** [1] - 38:21

**specializes** [1] - 40:11

**specific** [4] - 35:14, 103:12, 106:1, 131:25

**specifically** [5] - 41:6, 42:21, 62:23, 113:21, 135:4

**specification** [1] -

55:23

**speed** [3] - 65:22, 78:5, 78:21

**spell** [1] - 38:9

**spend** [2] - 72:4, 105:20

**spends** [1] - 127:9

**spent** [9] - 40:15, 44:18, 44:21, 44:22, 56:22, 103:22, 104:10, 106:13, 106:14

**spirits** [1] - 29:24

**split** [4] - 107:19, 107:21, 110:3, 110:10

**spread** [1] - 71:19

**spreadsheet** [9] - 18:3, 19:3, 19:20, 33:16, 33:17, 34:4, 34:17, 84:24

**spreadsheets** [1] - 93:15

**spring** [1] - 64:1

**square** [8] - 11:3, 11:4, 11:7, 63:12, 63:20, 63:21, 108:23, 108:24

**squares** [2] - 79:11, 79:15

**Srinivasan** [2] - 35:10, 62:20

**SSD** [1] - 29:18

**stable** [1] - 27:22

**stack** [4] - 31:6, 31:17, 37:18, 63:9

**staff** [1] - 106:5

**STAND** [1] - 14:1

**stand** [2] - 30:22, 38:6

**standard** [1] - 116:5

**start** [24] - 13:8, 13:21, 13:22, 23:5, 23:20, 40:7, 44:24, 46:15, 56:19, 58:20, 88:17, 104:2, 104:5, 104:13, 106:22, 109:20, 109:21, 125:15, 126:12, 128:11, 128:15, 129:2

**started** [6] - 40:10, 53:10, 76:9, 79:10, 128:17, 128:18

**starting** [7] - 25:24, 29:22, 77:16, 124:22, 124:24, 126:23, 136:20

**starts** [2] - 48:9, 70:5

**state** [2] - 8:9, 38:8

**STATE** [1] - 140:4

**STATES** [1] - 1:1

**States** [3] - 140:6, 140:8, 140:13

**statistical** [27] - 41:12, 66:17, 67:7, 71:14, 71:16, 71:21, 73:2, 73:5, 73:12, 73:14, 73:17, 73:24, 75:4, 75:17, 76:6, 88:23, 89:6, 89:8, 89:10, 90:18, 90:21, 91:20, 92:15, 95:17, 97:19, 100:20, 133:13

**statistically** [6] - 73:9, 73:13, 74:13, 75:1, 76:13, 94:3

**statistics** [8] - 41:7, 41:9, 41:10, 41:11, 41:18, 42:1, 42:3, 80:19

**statute** [7] - 46:19, 46:20, 47:13, 47:25, 49:12, 50:22

**stenographically** [1] - 140:10

**step** [28] - 38:2, 75:3, 75:10, 75:18, 76:1, 76:8, 77:7, 78:24, 79:1, 81:9, 81:12, 88:14, 88:15, 92:25, 93:7, 93:8, 95:15, 100:19, 100:22, 100:23, 102:20, 102:21, 105:10, 106:12, 107:5, 107:18, 109:6, 111:19

**stepping** [1] - 133:15

**steps** [3] - 75:24, 88:5, 95:14

**STEVEN** [1] - 4:12

**sticking** [1] - 55:8

**still** [13] - 13:15, 18:6, 20:19, 21:10, 21:12, 33:4, 33:18, 34:5, 34:14, 71:19, 86:2, 104:11, 137:23

**stock** [18] - 39:22, 68:6, 68:7, 68:9, 68:17, 68:19, 70:3, 70:11, 70:14, 70:20, 70:22, 70:25, 71:2, 71:6, 73:25, 75:2, 75:14, 75:16

**stood** [1] - 86:24

**Storage** [3] - 6:23, 7:5, 7:7

**storage** [35] - 14:19, 15:5, 15:16, 16:1, 16:11, 16:22, 18:15,

18:22, 18:23, 19:25, 20:15, 22:13, 23:18, 23:22, 25:7, 26:22, 27:10, 27:13, 27:15, 27:18, 27:20, 27:22, 29:21, 31:3, 31:11, 31:25, 32:7, 37:13, 37:22, 62:25, 63:2, 63:3, 63:25, 65:10, 65:14

**store** [6] - 26:12, 27:22, 31:7, 31:12, 37:14, 37:22

**storing** [2] - 27:25, 37:10

**STRADLING** [2] - 4:4, 4:12

**straight** [3] - 130:5, 130:12, 136:3

**strategy** [1] - 96:3

**STREET** [1] - 1:24

**stretch** [1] - 13:19

**stricken** [4] - 9:12, 9:14, 9:19, 11:9

**strike** [2] - 9:10, 96:25

**strip** [1] - 52:15

**struck** [2] - 9:3, 9:11

**structure** [11] - 23:16, 24:14, 25:10, 26:24, 26:25, 27:6, 27:13, 27:21, 28:25, 32:6, 35:13

**structures** [2] - 27:17, 29:6

**stuck** [2] - 10:11, 55:20

**study** [1] - 41:23

**studying** [1] - 41:24

**stuff** [1] - 118:10

**subcomponents** [1] - 77:15

**subject** [2] - 12:6, 12:13

**subjects** [1] - 41:25

**submitted** [3] - 12:3, 12:4, 138:23

**subsequent** [1] - 57:19

**subset** [1] - 57:9

**subtract** [2] - 94:14, 129:3

**Suess** [26] - 5:9, 8:12, 28:11, 30:1, 32:2, 32:9, 32:23, 44:11, 45:19, 47:19, 53:4, 54:25, 58:3, 61:22, 101:1, 102:2, 107:20, 109:9, 110:4, 110:6, 110:11, 111:4,

111:17, 117:2, 117:5, 125:9
**Suess's** [6] - 28:8, 30:8, 32:15, 64:9, 98:16, 117:25
**suggest** [3] - 11:15, 20:21, 23:11
**suggested** [4] - 19:3, 19:16, 20:18, 21:2
**suggesting** [2] - 18:2, 25:3
**suggestion** [1] - 28:10
**suggests** [3] - 23:7, 71:5, 105:7
**suit** [3] - 56:21, 120:20, 123:24
**Suite** [6] - 2:17, 3:5, 3:13, 4:6, 4:13, 4:17
**sum** [6] - 45:3, 45:10, 45:14, 45:17, 45:20, 114:7
**summarize** [3] - 92:16, 94:4, 116:24
**summarized** [1] - 53:25
**summary** [9] - 44:24, 56:21, 87:21, 92:18, 93:23, 95:6, 102:12, 106:20, 123:5
**Super** [1] - 51:19
**supported** [1] - 63:6
**supports** [1] - 25:9
**surprisingly** [1] - 41:10
**sustained** [1] - 21:18
**SW** [1] - 2:17
**switch** [8] - 22:7, 23:2, 23:5, 23:7, 23:11, 23:14, 23:20, 32:7
**switched** [1] - 58:16
**switching** [13] - 22:20, 22:21, 23:18, 23:21, 23:23, 24:25, 25:2, 25:4, 25:6, 25:7, 25:16, 25:19, 31:25
**SWORN** [2] - 14:1, 38:7
**system** [1] - 53:23
**Systems** [1] - 42:8

**T**

**t-value** [1] - 73:4
**tab** [1] - 85:11
**table** [11] - 8:12, 49:20, 50:11, 52:3, 53:4, 56:8, 61:8, 101:11, 101:24, 104:17, 117:2
**talks** [2] - 29:16, 63:24

**taught** [2] - 23:5, 28:20
**team** [3] - 44:20, 87:18, 111:25
**tease** [2] - 66:17, 77:25
**tech** [5] - 6:14, 6:16, 29:15, 42:21, 42:23
**technical** [10] - 58:2, 58:5, 58:9, 58:15, 62:12, 62:15, 79:11, 121:7, 121:9, 121:14
**technician** [2] - 5:10, 5:10
**technique** [1] - 81:10
**technologies** [2] - 40:22, 63:11
**TECHNOLOGIES** [2] - 1:4, 1:8
**Technologies** [11] - 8:7, 8:8, 8:11, 39:3, 39:7, 39:18, 39:20, 39:23, 56:2, 56:9, 101:1
**technology** [28] - 36:3, 36:14, 40:20, 44:12, 47:18, 47:20, 47:21, 47:23, 50:24, 60:19, 60:24, 61:17, 61:18, 61:21, 61:24, 61:25, 62:17, 63:14, 63:25, 64:3, 64:6, 64:21, 65:8, 80:2, 80:3, 121:11
**Technology** [1] - 41:5
**ten** [1] - 40:15
**tender** [1] - 43:21
**terabit** [1] - 63:20
**terabyte** [47] - 63:12, 64:19, 65:5, 65:9, 65:14, 66:18, 76:21, 77:1, 77:4, 89:3, 89:4, 90:20, 90:24, 91:9, 92:13, 92:20, 93:1, 93:5, 93:6, 93:19, 94:16, 95:2, 95:7, 101:12, 102:19, 105:12, 106:16, 106:23, 107:4, 107:14, 107:24, 108:21, 109:16, 111:17, 111:20, 112:5, 117:9, 128:12, 128:16, 128:21, 128:22, 129:5, 136:7, 136:17, 137:12, 137:17, 137:22
**terabytes** [45] - 64:21,

64:23, 65:6, 65:21, 65:24, 67:21, 67:22, 79:25, 90:10, 102:8, 111:20, 112:2, 112:7, 112:19, 112:25, 113:13, 113:16, 113:18, 115:15, 118:7, 128:2, 128:4, 128:5, 128:9, 128:15, 134:3, 134:12, 134:18, 134:25, 135:13, 135:22, 135:24, 137:7, 137:24, 138:4, 138:6, 138:7, 138:11, 138:12, 138:13, 138:14, 138:15
**term** [1] - 79:11
**terrible** [1] - 75:15
**tesla** [9] - 18:16, 18:24, 19:21, 19:22, 20:5, 20:9, 20:12
**test** [9] - 17:22, 18:6, 19:16, 20:17, 33:5, 33:13, 78:10, 78:16
**tested** [2] - 34:7, 34:9
**testified** [11] - 18:5, 19:10, 43:17, 119:12, 119:14, 119:18, 119:24, 120:12, 125:9, 125:14, 125:15
**testify** [1] - 82:3
**testifying** [2] - 11:12, 12:14
**testimony** [31] - 8:24, 10:6, 10:17, 11:18, 12:2, 12:6, 12:8, 12:11, 12:13, 12:20, 13:1, 23:10, 26:1, 33:3, 35:19, 35:21, 37:17, 44:4, 44:17, 49:3, 58:7, 62:16, 62:23, 63:6, 63:8, 86:17, 87:3, 117:23, 122:25, 123:4, 125:16
**testing** [6] - 21:5, 22:3, 33:20, 41:16, 41:22, 42:3
**tests** [1] - 41:21
**THE** [51] - 6:4, 6:6, 8:6, 8:15, 8:20, 10:21, 11:22, 12:15, 12:18, 12:22, 12:24, 13:2, 13:7, 13:13, 13:16, 14:1, 19:7, 19:12, 21:18, 30:14,

38:2, 38:3, 38:4, 38:8, 38:10, 43:25, 56:17, 79:15, 84:19, 85:24, 86:4, 86:7, 86:9, 86:11, 86:14, 86:21, 87:4, 87:9, 88:2, 96:12, 97:8, 99:7, 99:20, 100:8, 112:14, 133:23, 133:24, 138:18, 138:20, 138:25, 139:2
**themselves** [5] - 59:20, 77:11, 78:9, 92:22, 95:18
**therefore** [4] - 60:20, 135:15, 137:16, 138:3
**thermally** [1] - 27:22
**they've** [2] - 115:22
**thinking** [5] - 76:15, 79:5, 102:5, 105:17
**third** [1] - 25:25
**thousands** [2] - 106:8, 133:3
**three** [12] - 12:13, 19:14, 24:13, 35:13, 41:17, 41:22, 58:18, 83:23, 130:16, 130:19, 130:20, 132:6
**three-layer** [1] - 35:13
**three-year** [2] - 41:17, 41:22
**throughout** [2] - 24:25, 113:17
**throw** [1] - 80:16
**tied** [1] - 59:17
**tighter** [1] - 74:12
**timeline** [1] - 115:8
**tiny** [1] - 103:7
**Title** [1] - 140:8
**today** [7] - 8:17, 10:14, 35:12, 35:22, 37:17, 54:15, 114:20
**today's** [1] - 35:8
**together** [15] - 22:24, 22:25, 25:20, 25:21, 31:7, 37:18, 81:16, 81:21, 82:15, 87:18, 88:10, 106:21, 111:25, 113:15, 113:25
**Tom** [1] - 51:12
**took** [7] - 31:23, 33:11, 41:8, 41:10, 103:16, 111:25, 112:4
**top** [6] - 23:4, 23:17, 104:19, 104:21,

107:1, 117:12
**total** [14] - 44:18, 48:23, 82:10, 82:16, 82:22, 105:1, 105:4, 105:5, 113:14, 113:15, 128:5, 131:13, 132:5, 132:25
**touting** [1] - 98:19
**toward** [8] - 14:18, 15:4, 15:16, 16:1, 16:11, 16:21, 22:13, 23:4
**towards** [1] - 63:11
**Town** [1] - 3:22
**track** [2] - 103:11, 103:13
**trade** [1] - 38:22
**transaction** [3] - 67:2, 67:3, 85:15
**transactions** [13] - 66:15, 66:21, 67:5, 84:11, 84:13, 84:15, 85:4, 85:17, 87:19, 88:9, 112:1
**transcript** [2] - 140:9, 140:11
**Transcript** [1] - 1:5
**TRANSCRIPT** [1] - 1:14
**tremendous** [1] - 80:18
**trial** [3] - 9:18, 45:8, 64:12
**TRIAL** [1] - 1:15
**true** [6] - 33:15, 33:18, 121:4, 121:5, 132:3, 140:9
**try** [5] - 36:25, 49:21, 69:11, 80:17, 133:8
**trying** [21] - 9:22, 19:9, 52:12, 53:24, 55:10, 67:11, 67:18, 67:19, 68:4, 68:5, 68:8, 68:16, 75:11, 76:2, 76:17, 77:2, 81:23, 90:5, 93:9, 93:10, 127:12
**Tuesday** [3] - 13:7, 13:22, 13:23
**turn** [7] - 17:3, 87:14, 96:17, 99:10, 99:23, 111:22, 134:6
**turned** [1] - 104:9
**turning** [1] - 44:6
**two** [33] - 8:23, 10:23, 10:25, 12:4, 12:8, 13:17, 17:5, 17:15, 18:20, 24:9, 42:3, 53:5, 55:9, 55:16,

55:20, 56:24, 65:21, 66:2, 69:24, 70:18, 71:11, 72:16, 76:16, 79:7, 80:1, 80:12, 81:11, 85:1, 91:4, 91:6, 113:15, 113:25, 115:16
**two-wheel** [3] - 55:9, 55:16, 55:20
**tying** [1] - 127:14
**type** [13] - 68:24, 69:5, 75:25, 76:3, 77:18, 78:22, 79:2, 79:20, 79:21, 80:10, 83:4, 92:19, 94:10
**types** [6] - 69:1, 79:7, 79:8, 80:17, 81:18, 92:17
**typically** [1] - 82:15

## U

**U.S** [3] - 1:3, 43:17, 54:1
**ultimate** [2] - 102:17, 136:10
**ultimately** [7] - 11:7, 52:12, 126:7, 135:16, 136:12, 137:10, 138:12
**Ultra** [1] - 109:19
**Ultrastar** [7] - 6:20, 82:19, 83:15, 92:10, 96:1, 130:17, 138:1
**uncertain** [1] - 30:8
**unchanged** [1] - 90:11
**under** [13] - 13:15, 18:5, 20:17, 20:25, 34:7, 37:12, 90:23, 92:12, 92:13, 107:9, 120:8, 137:16
**undergraduate** [1] - 41:8
**underlined** [2] - 47:4, 47:10
**underlying** [1] - 26:5
**underpin** [1] - 33:1
**understood** [1] - 131:6
**unfortunately** [2] - 95:12, 103:11
**unique** [2] - 54:18, 83:10
**unit** [7] - 31:7, 124:10, 124:15, 126:15, 126:19, 127:12, 127:16
**UNITED** [1] - 1:1
**United** [3] - 140:6, 140:8, 140:13

**units** [13] - 82:10, 82:17, 82:23, 83:9, 83:20, 117:19, 118:6, 128:5, 131:13, 132:25, 133:3, 133:4, 133:7
**University** [1] - 41:2
**unsupported** [1] - 122:3
**unsurprisingly** [1] - 100:17
**unwieldy** [1] - 78:14
**up** [54] - 8:21, 9:22, 13:3, 14:10, 14:15, 14:21, 18:8, 19:1, 22:10, 23:24, 28:10, 29:24, 34:21, 40:6, 42:11, 42:13, 45:13, 45:17, 46:11, 48:25, 52:2, 52:21, 55:8, 55:10, 65:1, 67:14, 68:4, 69:24, 76:1, 82:22, 84:4, 84:5, 84:22, 86:24, 92:20, 94:9, 94:17, 97:10, 102:15, 105:13, 112:7, 112:22, 112:24, 114:7, 116:14, 122:11, 132:8, 134:17, 134:25, 135:12, 136:15, 137:22, 138:3, 138:9
**updated** [1] - 6:17
**upper** [3] - 20:3, 20:5, 35:24
**US** [2] - 6:15, 6:17
**USB** [1] - 82:9
**useful** [1] - 28:19
**uses** [2] - 28:13, 120:16

## V

**valid** [3] - 22:3, 50:5, 117:4
**validity** [5] - 50:8, 50:10, 50:12, 62:14, 91:2
**valuation** [7] - 38:21, 40:11, 41:18, 42:14, 42:17, 43:22, 123:22
**value** [65] - 19:19, 33:17, 34:17, 47:15, 52:13, 52:18, 52:19, 54:19, 55:18, 55:21, 55:24, 55:25, 57:13, 58:23, 58:25, 59:3, 59:6, 59:9, 59:11, 59:14, 59:19, 59:20,

60:6, 64:25, 65:4, 65:7, 65:9, 66:1, 66:18, 67:20, 67:22, 69:25, 72:22, 73:4, 73:5, 73:7, 73:9, 73:11, 73:15, 73:18, 76:20, 77:1, 77:4, 77:25, 89:7, 89:8, 89:9, 89:18, 89:23, 90:10, 90:21, 91:19, 91:22, 93:9, 95:4, 106:3, 111:19, 114:12, 114:15, 114:16, 114:19, 115:7, 116:19, 126:11, 127:10
**valued** [1] - 123:9
**values** [18] - 14:7, 14:13, 14:24, 15:10, 15:21, 16:6, 16:16, 16:25, 17:5, 20:7, 33:15, 33:19, 34:3, 34:8, 34:12, 78:23, 92:14, 94:1
**valuing** [2] - 42:22, 57:1
**variability** [1] - 81:7
**variable** [1] - 78:10
**variables** [3] - 72:16, 72:18, 78:17
**various** [5] - 40:16, 41:17, 46:7, 98:4
**vehicle** [2] - 55:9, 55:20
**vehicles** [1] - 55:16
**versus** [1] - 34:4
**Vice** [1] - 2:16
**visual** [1] - 115:3
**VOLUME** [1] - 1:10
**vs** [2] - 1:7, 8:7

## W

**Wabash** [2] - 3:13, 4:17
**wait** [1] - 84:5
**walk** [4] - 43:9, 52:2, 54:15, 93:24
**walked** [1] - 34:23
**walking** [1] - 56:23
**WANG** [1] - 4:16
**Wang** [1] - 8:18
**warehouses** [1] - 83:2
**Washington** [1] - 2:18
**WATKINS** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4
**Wayne** [1] - 38:10
**WAYNE** [3] - 6:6, 38:7, 38:11

**ways** [5] - 49:12, 52:25, 55:12, 65:11, 71:12
**WD** [13] - 6:21, 6:23, 7:5, 7:7, 33:2, 33:22, 33:24, 34:5, 96:21, 98:4, 98:24, 99:13
**WDC** [1] - 6:20
**website** [3] - 65:17, 66:10, 67:1
**week** [2] - 11:13, 44:17
**weight** [1] - 44:3
**Welcome** [1] - 87:12
**well-known** [1] - 59:3
**Wendy** [1] - 5:9
**WEST** [1] - 1:24
**Western** [152] - 8:7, 8:17, 9:16, 9:18, 10:1, 10:8, 11:2, 11:6, 12:4, 13:5, 17:15, 17:25, 20:24, 22:3, 23:10, 23:13, 28:10, 28:13, 29:7, 32:10, 36:15, 39:7, 44:9, 44:13, 45:3, 45:16, 47:20, 48:22, 49:5, 51:3, 52:13, 52:19, 53:3, 56:7, 56:10, 56:15, 57:14, 57:25, 60:12, 60:16, 60:22, 61:7, 61:12, 61:16, 62:3, 62:5, 62:7, 62:10, 63:15, 63:18, 64:14, 64:19, 64:24, 65:1, 65:4, 65:13, 65:16, 66:6, 66:13, 66:14, 66:18, 66:25, 67:1, 76:19, 76:24, 77:3, 84:9, 85:14, 86:16, 86:17, 87:22, 89:19, 93:10, 93:11, 93:17, 94:17, 94:19, 94:24, 95:3, 95:25, 96:1, 96:20, 97:14, 98:16, 100:12, 100:21, 100:25, 101:10, 101:12, 101:25, 102:4, 102:22, 102:23, 102:25, 103:2, 103:11, 103:19, 103:21, 103:24, 104:16, 105:1, 105:14, 105:15, 105:18, 106:17, 106:24, 107:14, 107:19, 108:9, 109:23, 109:25, 110:2,

110:6, 110:8, 110:11, 110:13, 110:24, 111:7, 112:1, 113:13, 114:12, 115:5, 115:22, 116:4, 117:1, 117:6, 117:11, 117:13, 117:16, 117:18, 118:16, 120:24, 120:25, 121:12, 121:19, 124:2, 124:17, 125:3, 125:7, 125:21, 126:1, 126:5, 126:8, 126:21, 127:3, 127:8, 127:14, 127:22, 134:14, 138:10, 138:11
**WESTERN** [1] - 1:8
**whatsoever** [3] - 23:9, 27:23, 70:5
**wheel** [3] - 55:9, 55:16, 55:20
**whereas** [1] - 25:21
**wherein** [1] - 27:14
**whole** [11] - 36:16, 66:3, 69:15, 71:14, 77:23, 78:12, 102:8, 102:9, 103:14, 104:25, 109:1
**width** [1] - 58:17
**Wilshire** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**win** [1] - 51:19
**window** [1] - 48:19
**withdraw** [1] - 37:7
**WITHDRAWN** [2] - 6:12, 7:3
**WITNESS** [5] - 38:3, 38:7, 38:10, 79:15, 133:24
**witness** [5] - 8:25, 18:1, 20:10, 38:4, 118:14
**witnesses** [2] - 9:17, 23:11
**WITNESSES** [1] - 6:3
**works** [1] - 32:3
**world** [10] - 49:19, 50:3, 50:7, 50:18, 51:4, 51:14, 51:24, 52:1, 52:17, 117:25
**worth** [9] - 41:16, 41:22, 42:3, 55:11, 55:12, 68:13, 77:2, 115:6, 115:9
**write** [3] - 20:9, 23:4, 54:4

UNITED STATES DISTRICT COURT

## Y

**year** [6] - 41:17, 41:22, 66:16, 113:17, 116:16
**year-over-year** [1] - 116:16
**years** [6] - 36:3, 36:4, 40:15, 42:19, 66:8, 130:16
**years'** [1] - 42:3
**yesterday** [10] - 10:20, 14:6, 26:10, 58:7, 62:5, 82:4, 102:23, 103:2, 120:12, 122:24
**yielded** [1] - 90:23
**YOCCA** [2] - 4:4, 4:12
**Young** [4] - 6:7, 8:18, 86:15, 118:15
**YOUNG** [19] - 4:20, 43:24, 84:18, 85:23, 86:13, 86:15, 88:1, 96:11, 97:7, 99:6, 99:19, 100:7, 112:13, 118:15, 118:18, 126:18, 134:1, 138:19, 139:4
**yourself** [1] - 38:16

## Z

**Zephyr** [2] - 9:7, 9:13
**zero** [6] - 90:21, 91:19, 92:14, 94:2, 121:21, 121:24
**zoom** [4] - 17:12, 18:13, 27:1, 71:24

**UNITED STATES DISTRICT COURT**