**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

MR TECHNOLOGIES, GMBH,               )
                                     )
          Plaintiff and             ) **Certified Transcript**
          Counterclaim Defendant,   )
                                     ) Case No.
          vs.                       ) 8:22-cv-01599-JVS-DFM
                                     )
WESTERN DIGITAL TECHNOLOGIES,        )
INC.,                                )
                                     )
          Defendant and             )
          Counterclaim Plaintiff.   ) **DAY 6, VOLUME I**
                                     )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

WEDNESDAY, JULY 24, 2024

8:43 A.M.

SANTA ANA, CALIFORNIA

DEBBIE HINO-SPAAN, CSR 7953, CRR
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF and COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  MARC A FENSTER, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mfenster@raklaw.com

RUSS AUGUST & KABAT
BY:  BRIAN D. LEDAHL, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
bledahl@raklaw.com

RUSS AUGUST & KABAT
BY:  JACOB ROBERT BUCZKO, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
jbuczko@raklaw.com

RUSS AUGUST & KABAT
BY:  MATTHEW D. AICHELE, ESQ., Pro Hac Vice
800 Maine Avenue, SW
Suite 200
Washington, D.C. 20024
202-664-0623
maichele@raklaw.com

RUSS AUGUST & KABAT
BY:  MINNA Y. CHAN, ATTORNEY AT LAW
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mchan@raklaw.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**

**FOR PLAINTIFF AND COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:   PAUL A. KROEGER, ESQ.
1224 Wilshire Boulevard
Suite 1200
Los Angeles, California 90025
310-826-7474
pkroeger@raklaw.com

RUSS AUGUST & KABAT
BY:   REZA MIRZAIE, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
rmirzaie@raklaw.com

LATHAM & WATKINS LLP
BY:   DALE CHANG, ESQ.
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
dchang@raklaw.com


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

LATHAM & WATKINS LLP
BY:   DOUGLAS E. LUMISH, ESQ.
140 Scott Drive
Menlo Park, California 94025
650-328-4600
doug.lumish@lw.com

LATHAM & WATKINS LLP
BY:   JOSEPH HYUK LEE, ESQ.
650 Town Center Drive
20th Floor
Costa Mesa, California 92626
714-540-1235
joseph.lee@lw.com

**UNITED STATES DISTRICT COURT**

4

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**


STRADLING YOCCA CARLSON & RAUTH LLP
BY:  SALIL BALI, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4278
sbali@stradlinglaw.com

LATHAM & WATKINS LLP
BY:  CHAARUSHENA DEB, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
chaaru.deb@lw.com

STRADLING YOCCA CARLSON & RAUTH LLP
BY:  STEVEN M. HANLE, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4000
shanle@stradlinglaw.com

LATHAM AND WATKINS LLP
BY:  SARAH W. WANG, ATTORNEY AT LAW
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
sarah.wang@lw.com

LATHAM & WATKINS LLP
BY:  PATRICIA YOUNG, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
patricia.young@lw.com


**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**

**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

LATHAM & WATKINS LLP
BY:  RICHARD GREGORY FRENKEL, ESQ.
140 Scott Drive
Menlo Park, California 94025-1008
650-328-4600
rick.frenkel@lw.com

**ALSO PRESENT:**

Wendy Liu, paralegal (Russ August & Kabat)
Dieter Suess, plaintiff's corporate representative
Andy Mortensen, plaintiff's IT technician
Chris Schmoller, defendant's IT technician

# I N D E X

**WITNESSES**                                                                    **PAGE**

**GERARDO BERTERO, CALLED BY THE DEFENDANT**
Direct Examination by By Mr. Frenkel (continued)    17
Cross-Examination by Mr. Fenster                    28
Redirect Examination by Mr. Frenkel                 92
Recross-examination Mr. Fenster                    111

**STEPHEN BECKER, CALLED BY THE DEFENDANT**
Direct Examination by Ms. Young                     116

## EXHIBITS

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| JX-2068 | "ECC and Exchange Spring Media" Komag Presentation, 5/25/06 | 23 | |

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 24, 2024**

**8:43 A.M.**

**- - -**

**(Out of the presence of the jury.)**

THE COURTROOM DEPUTY:  Calling Matter 1, SACV-22-1599, MR Technologies, GmbH, vs. Western Digital Technologies, Inc.

Counsel, please state your appearances for the record.

MR. FENSTER:  Good morning, Your Honor.  Marc Fenster for MR Technologies.  With me is Dr. Dieter Suess, our client rep, Brian Ledahl, Dale Chang, Reza Mirzaie, Jacob Buczko, Wendy Liu, Minna Chan, and Matthew Aichele.

THE COURT:  Good morning.

MR. FENSTER:  Good morning.

MR. LUMISH:  Good morning, Your Honor.  Doug Lumish, Latham & Watkins, for Western Digital.  With us at counsel table is Dr. Desai, our corporate representative, Rick Frenkel, Patricia Young.  We also have Steve Hanle, Sarah Wang, Chaaru Deb, Ahmad Takouche.  And from the client, Jesse Mulholland and Jennifer Beard.

THE COURT:  Good morning.

First of all, I've had an opportunity to review the briefs on the 50(a) motion.  I'm going to submit all claims to

the jury.  I find that there's sufficient evidence for a jury to support a verdict in favor of plaintiff on all claims.

You wanted to take up some matters?

MR. MIRZAIE:  Yes, Your Honor.  May I?

THE COURT:  Please.

MR. MIRZAIE:  So we have two sets of objections to Dr. Becker's demonstrative slides, and I brought a few copies here.  May I approach to hand them to you?

THE COURT:  Please.

MR. MIRZAIE:  So the first set of objections, Your Honor, are to Slides 5 through 8.  And the main issue here is a notice issue, Your Honor.  It's a Rule 26, just undisclosed opinions that weren't part of Dr. Becker's report in this case.  And there's possibly some piggybacking on previously stricken opinions by this Court as well.

If you look at Slide 5, there's a pie that reads "Western Digital HDD Profit."  Now, that's an overall number that was disclosed in Dr. Becker's report.  And this slide alone -- we want to make clear, if Western Digital is just talking about the overall HDD profit, we have no problem with that.

THE COURT:  That's all that's on 5.

MR. MIRZAIE:  Right.  But then there's a progression through 6 through 8.  It's clear what they're going to convey to the jury is that through 6 and 7, they start slicing out

media-related profits. And then, clearly, on 7 and 8 they're comparing what MR Tech's demand is, in their words, to the media profit and the remaining HDD profit.

That comparison, that's not an opinion that's disclosed in his report. It's also -- the media part, the media slice you see here, the only sense we can make out of that is that it is part of a previously stricken opinion by this Court. Previously, this Court has stricken, as this Court will recall, Dr. Becker's affirmative opinions about -- based on patent counting. And the calculation of the media was based on patent counting.

This is the Court's order from July 8, 2024. The Court will recall that -- the Court found that Dr. Becker's analysis using patent counting, which he used to determine the media profit, was unreliable and insufficiently tied to the facts of this case, and that the Court did not -- or Dr. Becker, rather, did not disclose how he identified the selected patents, and excluded Dr. Becker's approach for calculating that media.

They had a check in the report that was basically the same number based on R&D, but we submit that that media calculation was stricken by the Court.

And what was never disclosed, even absent this stricken material, is a comparison of that media spend to MR Tech's demand or what would be left -- and this is on

Slide 8 -- which is MR Tech's demand compared to the remaining hard disk drive profit, as you can see, now removing the part that was calculated based on the stricken media slice.

So there's two issues here:  No notice of that comparison, and it's based on the stricken material.

THE COURT:  As far as the comparison goes, I don't know why they can't -- why you necessarily need an expert opinion to compare what Western Digital seeks versus profits for the division.  That objection is overruled.  But what --

MS. YOUNG:  Your Honor -- Your Honor, we already dropped Slides 6 and 7.  So it's only 5 and 8 remaining, to your point about the comparison is just facts in the case.

MR. MIRZAIE:  Your Honor, if I may.  This --

THE COURT:  Wait a minute.  Wait a minute.

MR. MIRZAIE:  Okay.

THE COURT:  You're going to offer 6?

MS. YOUNG:  We are not offering 6.  We are not offering 7.  Only 5 and 8.  We already told them that this morning.

THE COURT:  I'm sorry?

MS. YOUNG:  We already told counsel that we're dropping 6 and 7 this morning.

THE COURT:  Well, the other one --

MR. MIRZAIE:  If I may, Your Honor.  8 is --

THE COURT:  He can testify to that.

MR. MIRZAIE:  Okay.  Our issue is that it's clearly based on the media slice being removed.  That's how they get the remaining HDD profit, if you see the progression from 7 to 8.  7 they agreed to remove because of the Court's ruling, but 8 is just a progression from 7 with the removed material that was based on an improper calculation.

THE COURT:  Well, 8's fine if it just compares -- strike the word "remaining" for Western Digital and take the middle piece out, if that's all you want to do.

MS. YOUNG:  Okay.  So, Your Honor, just to be clear, we are not addressing 6 and 7, which we told counsel this morning.  For 8, Dr. Becker does have in his report the total profit.  And we also --

THE COURT:  That's fine.

MS. YOUNG:  Right.

THE COURT:  The word "remaining" in 8.

MS. YOUNG:  Oh, okay.  That's fine.

THE COURT:  And the little middle part.

MS. YOUNG:  The middle part.  Let me just...

THE COURT:  The slice that goes through the middle.

MS. YOUNG:  Well, this is just MRT's demand.  That's just a fact.

THE COURT:  That's fine.  But I'm not sure whether you intend to show that MRT's demand has been lifted up or that there is something else in that middle slice.

MS. YOUNG:  There's nothing in the -- when you go to the slide, it just pops it out.  It's just the two halves popped out.

THE COURT:  That's fine.  Just take out "remaining."

MS. YOUNG:  Okay.

MR. MIRZAIE:  Thank you, Your Honor.

There's one more bucket of objections, and this is to Slides 34 through 36.  This is a Rule 26 issue.  We've received no notice of these opinions, and they're significantly new.  And I think what may be helpful is if we start on Slide 31.

So in Dr. Becker's report, he has a criticism of Mr. Bergman's regression analysis, and he does his own regression analysis to derive what you see there on Slide 31, which is a corrected price per terabyte.  That part was disclosed.  The purple box that he applies it to was never disclosed, the allocation.

He never disclosed that -- there's an opinion where he does his own allocation multiplied by the results of the -- the results of the regression analysis.  And so when you go to Slide 33, he does have an opinion that 46 is too high.  So we're okay with that slide.  The problem really begins on Slide 34 through 36.  What's not disclosed is that a 4.9 percent number is a number he relies on.  He merely states that he's going to rely on Dr. Goglia.

Dr. Goglia threw out a lot of different numbers yesterday.  In Dr. Becker's report, he never says what number he's relying on.  He never says that he's going to use this methodology for an affirmative opinion.  This Court will recall that his sole affirmative opinion of $1.7 million was based on the patent counting.  So the Court struck that.  He had no other affirmative opinion in his report.

Yesterday, for the first time, we received this analysis where he's pointing to -- taking his criticism of the regression but adding to it, working through the math, choosing a 4.9 percent number that's nowhere in his report, and then arriving at a calculation.  As you could see on Slides 35 and 36, taking a nominal royalty, correcting that by applying a net present value calculation that's also not disclosed anywhere in his report, and arriving at an entirely new affirmative opinion for the first time yesterday of $13.68 million.

Very different opinion than the affirmative opinion that was stricken, and there's just no affirmative opinion resembling this in Dr. Becker's report.  And we've prepared our case for months based on the Court's rulings.

THE COURT:  Ms. Young.

MS. YOUNG:  So, Your Honor, in Dr. Becker's report, he has a section titled "Mr. Bergman's Regression Analysis Extrapolates to Unreliable Prices and Costs."  And within that section, a few pages later, he explicitly says that he relies

on Dr. Bertero and Dr. Goglia to correct for Dr. Re's 46 percent factor.

Further, in the footnote in that section he then relies on Dr. Re's -- or Dr. Goglia's correction to get to a number. And he actually does that in the rebuttal to Mr. Bergman's report.

The issue -- and I will confess, the issue is that counsel are complaining about the fact that the exact 13.68 million number is not in Dr. Becker's report. And that's because --

THE COURT: And I assume it isn't.

MS. YOUNG: It's not. It's not.

THE COURT: What about the 4.9 percent?

MS. YOUNG: So the 4.9 percent -- what happened is, if you recall during the trial, certain issues were MIL'd out. So ultimately, Dr. Goglia testified yesterday, which is a fact in the case. And under 703, experts can rely on facts that come out at trial. And what Dr. Becker says in his report is, "I'm relying on Dr. Goglia, that's here, for the number."

THE COURT: The number came out yesterday for the first time in Dr. Goglia's testimony.

MS. YOUNG: Yes.

THE COURT: Therefore, it was not disclosed previously; correct?

MS. YOUNG: Correct.

THE COURT: Not in an opening report, not in a rebuttal report. It's out.

MS. YOUNG: Okay. So just to be clear, though, Dr. Becker does have the formula, and he can -- I think counsel said that he has the formula in his report and he does explain the formula. And so he does say the jury can rely on Dr. Goglia's number.

THE COURT: No, he can't. It's a matter of disclosure.

MS. YOUNG: So Dr. Becker can't say the jury can rely on Dr. Goglia's --

THE COURT: If Goglia put that number out there in a report or in testimony prior to trial and he used that number in his report or rebuttal report, it would have been appropriately disclosed. But if that number comes out yesterday, that's too late.

MS. YOUNG: Okay. But, I'm sorry, what I'm asking is can Dr. Becker say that, as he said in his report, that Dr. Goglia is the one who corrected for Dr. Re's number, and so therefore, you know, that's what the jury can look to? Because that's what he says in his report. Even if he can't do the math. Because this is all about just doing the final calculation, which he's done three different versions of it, just not the one that relies on 4.9 percent.

THE COURT: You can do that, but you can't put the

UNITED STATES DISTRICT COURT

13 million number in front of a jury.

MS. YOUNG:  Okay.  Thank you.

MR. MIRZAIE:  Thank you very much, Your Honor.  And just to be clear for the record --

THE COURT:  Let me correct you.  It's a matter of form.  I make the rulings.  No "thank you's," please.

MR. MIRZAIE:  I apologize, Your Honor.

I just had a follow-up comment for the record that the number also -- because I didn't say this in my first portion -- the number also appears on Slide 4, the $13 million number.

THE COURT:  Okay.  Anything else?

MR. LUMISH:  Nothing else from Western Digital, Your Honor.

MR. MIRZAIE:  Nothing else from plaintiff, Your Honor.

MR. FENSTER:  Your Honor, excuse me, just a heads-up.  There are a few slides that we -- that we have objections to with respect to Victora.  He'll be going in the afternoon.

THE COURT:  Okay.  Have we discussed those?

MR. LUMISH:  The parties are still meeting and conferring, Your Honor.  We're trying to narrow those disputes.  If you'd like to hear them now, we certainly can --

THE COURT:  No.  No.  I'd like you to narrow the

disputes.  That's where the efforts should be.

MR. LUMISH:  Thank you.  I think we're making progress as well.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  All rise.

**(Recess from 8:57 a.m. to 9:03 a.m.)**

THE COURTROOM DEPUTY:  Be seated and come to order.  This Court is again in session.

**(In the presence of the jury.)**

THE COURT:  Good morning, ladies and gentlemen.

Mr. Frenkel.

MR. FRENKEL:  Thank you, Your Honor.

**GERARDO BERTERO, PREVIOUSLY SWORN, RESUMES THE STAND**

**DIRECT EXAMINATION (Continued)**

BY MR. FRENKEL:

Q    Good morning, Dr. Bertero.  Welcome back to the stand.

A    Good morning.

Q    I believe that when we left off, we were discussing the other media technologies that Western Digital used to drive areal density growth, and your next opinion related to grain segregation.

Can you explain, what is grain segregation?

A    Yes.  What you see -- excuse me.  What you see on the image are the grains that we made reference to last -- yesterday.  And surrounding those grains -- I apologize.

**UNITED STATES DISTRICT COURT**

Surrounding those grains, there's a second phase.  That phase is materials that we add to the deposition target that get segregated to the grain boundaries in the material.

Excuse me.  I need to clear my throat.

**(Pause in proceedings.)**

BY MR. FRENKEL:

Q    Turning to the next slide, Dr. Bertero, what happens when the grain boundary is weak?

A    That grain segregation is particularly important in order to -- for those units to switch independently.  I think we made some reference to that yesterday.  When that segregation is imperfect, these grains start acting as a cluster.  And that really degrades the signal-to-noise performance of a media.

So when you have clustering like this, which is quite common, you cannot write transitions as sharp as you would like for them to be.  And that creates noise in the system.  Again, it degrades the noise -- the signal-to-noise performance.

Accomplishing this grain segregation and uniformity in the grains, it's very critical.  It's not a trivial matter in designing media.

Q    And how did Western Digital achieve higher areal density with improved grain segregation?

A    So this is just one example of what happens day to day. You see on the far left an image of a granular structure where

the segregant -- in this case it was silicon oxide 20 percent added to the magnetic alloy -- it's just insufficient.  And it may not be the proper oxide, because you see the morphology being all irregular.  You don't see well-defined grains.  Very jagged boundaries.  That's just a bad media design.

And then progressing towards the far right, you see different oxides and different combination of oxides, until we arrive at a more acceptable microstructure for the grains, where the phase segregating the grains, separating the grains is more uniform around them.  So that media would be a much, much better-performing media than the one on the left.

And I'd like to add that this type of work, it's done day in and day out, 24 hours a day.  The machines don't stop.  And engineers deposit and analyze, and technicians test the samples.  This is not a trivial matter.

Q    Let's turn to your third reason to drive areal density growth, and that's the soft underlayer improvements.

Turning to the next slide, how does this demonstrate how improvements to the soft underlayer structure help increase areal density?

A    Right.  So we spoke of the soft magnetic underlayer yesterday, and I was trying to explain how the soft underlayer provides an image to the writing field of the head, so that the gap of the head is now this distance here.  And the uniform across the media is very -- the field across the media, the

UNITED STATES DISTRICT COURT

magnetic media, is very uniform.

So if the soft magnetic underlayer were to be imperfect, then the mirror image of the head would be very degraded.  And then the writing process is degraded.  And if the writing is bad, then the resulting SNR is bad.

The soft magnetic underlayer is not a simple layer that easily does that.  It has to be coupled to the design of the head.  The soft underlayer is a structure.  It's a synthetic antiferromagnetic structure.  It's got radial anisotropy, which is not trivial to achieve.  And its magnetization, its properties, its -- the ability of it to reflect and provide an image to the head is -- has to be redesigned from program to program.

Q    What happens if you have a noisy signal?

A    So if you have a noisy signal, the signal-to-noise ratio, the areal density capability of your sample suffers.  The pictorial on the right shows that if you look yourself at a fun mirror, at a mirror -- a defective mirror or distorted mirror in a funhouse, your image wouldn't be perfect.  That's pretty much what happens in a recording system.

Q    All right.  Let's turn to your last technology that drove areal density growth or that drives areal density growth, increasing magnetization in the top mag layers.

What does this mean, Dr. Bertero?

A    In order to be able to read correctly with the highest

possible signal, sputter engineers at WD -- and many other companies that make hard disk drives -- Seagate, Toshiba -- you have to optimize the amount of magnetization through a column of the grain.  You want to read back with as much signal as you can.

But also, the media has to protect -- the top layers have to protect the magnetic material from corrosion.  It has to survive for the life of the drive, without corroding.  Any amount of corrosion, any tiny amount, renders the drive totally useless.  That's why the top layer, the capping layer, and the top layers of the magnetic stack tend to have more chromium in them and more platinum.  Those things protect the media from corrosion but also they -- the moments.

So the layering towards the top, maybe the last three layers or so, tend to have higher magnetization, less platinum, less chromium in order to boost the magnetization, the magnetic signal, to compensate for the loss in signal from the capping layer.

Q    So do you have an analogy for that?

A    Yes.  For the read-back process, I imagine that you're trying to read, in this case, from a flashlight that scatters light everywhere.  Your signal to noise for reading would be imperfect.

Contrary to that, if you were to have better optimized magnetization distribution through the column of the

grain, and you are reading from a nicely focused laser with good intensity, then your signal-to-noise ratio for read back would be significantly improved.

Q    Now, are any of these improvements that we've just discussed attributable to the MR Tech patents?

A    No, they're not.

Q    In light of this testimony, do you agree with Dr. Re that all improvements in areal density, from 300 to 700 gigabits per square inch and 33 percent of the improvements beyond that, are attributable to the MR Tech patents?

A    Absolutely not.

        MR. FRENKEL:  All right.  Before we wrap up, Mr. Schmoller, I'd like to -- I'll blank out the screen here. Okay.

BY MR. FRENKEL:

Q    If you could turn in your binder, Dr. Bertero, to Exhibit JX-2068.

A    Which one?

Q    2068.

A    I got it.

Q    Do you recognize it?

A    Yes, I do.

Q    And this is a presentation that you made in May 25th, 2006?

A    Yes.

UNITED STATES DISTRICT COURT

MR. FRENKEL:  Your Honor, I'd like to move JX-2068 into evidence.

THE COURT:  Any objection?

MR. FENSTER:  Pardon me, Your Honor.  No objection.

THE COURT:  2068 will be received.

**(Exhibit Number JX-2068 received.)**

MR. FRENKEL:  Mr. Schmoller, if you could put up the cover page.  Thank you.

BY MR. FRENKEL:

Q    What is pictured here in the background of this -- this is Komag.  What is pictured here in the slide in the background?

A    That was the Research & Development Center at Komag.

Q    All right.  And you were the vice president of research and development at the time at Komag; right?

A    I was.

Q    What did you do as part of that?  Did you attend conferences?

A    Aside from the day-to-day work, yes, myself and many engineers would attend conferences.  That was something that I always promoted.  I always wanted to keep the engineers updated to the latest developments.  Attending conferences is something that, across the industry, people helped organize and fomented.  So that was something useful, yes.

Q    These conferences, they included people from industry and

academia; is that right?

A     Yes.

Q     And as part of those conferences -- I'm sorry.  In following those conferences, would you discuss the research that you saw with other people at Komag?

A     You wouldn't disclose trade secrets.  You would make models and study things that were more fundamental, things that then the company would allow you to present publicly at a conference.  You would never -- you would never spill the beans.  You would never, you know, report on the samples that constituted trade secrets.

Q     Let me ask you -- I don't think you understood what I was asking.

      I said, when you attended a conference and you were able to get publicly available materials, would you then share it within the company and discuss it?

A     I apologize.  Yes, absolutely.  It's a very common practice to trade presentations and have discussions.  And then when you go back, you -- for the benefit of those who couldn't attend the conference, you would present what you heard.

Q     And then you've heard testimony about the Intermag Conference in May 2006?

A     I have.

Q     And did you go to that conference?

A     I did.

**UNITED STATES DISTRICT COURT**

Q    MR Tech showed this presentation early on in the case and pointed to slides that you -- from Dr. Suess.  But was that the only thing you shared in this presentation?

A    No, it was not.

MR. FRENKEL:  Mr. Schmoller, if you could turn to Slide 6, JX-2068.  Thank you.

BY MR. FRENKEL:

Q    What does this series of slides that starts on page 6 show?

A    These are slides that Dr. Victora provided to me after having attended the conference where he has, on this page, a bilayer structure.  This is what he called the ECC media.  And not seen here is a thin exchange break layer that he had proposed for it.

Q    Did you also include slides from Dr. Suess in this presentation within Komag showing the research that you saw at the Intermag Conference?

A    Yes, I did.

MR. FRENKEL:  Mr. Schmoller, if you could turn to Slide 11.

BY MR. FRENKEL:

Q    And I'm not going to go through it.  I'm sure you'll get some of that from counsel for MR Tech, but were you -- did you share the slides in order for people to understand Dr. Suess's work?

UNITED STATES DISTRICT COURT

A    Yes, absolutely.  You will always have expected the folks that were lucky enough to attend the conference to then come back and distribute what they learned.  This is a common practice in academia and in industry for people attending public events.

Q    And then what was your initial reaction to the ECC and exchange spring concepts that you learned in May -- what was your initial reaction as of May 2006 as to the ECC and exchange spring concepts?

A    They were interesting concepts.  Knowing what we knew and what we know about media, of course, there's always some skepticism.  But they were interesting concepts that we wanted to study and understand better.

Q    And did Komag and then Western Digital -- again, without going into any details right now, but did Komag and Western Digital continue to do its own research into the feasibility of using -- practically use of the concepts in ECC or exchange spring media?

A    Yes, absolutely.

Q    Did Western Digital continue to research other types of structures and ways to develop media between the 2006 and 2018 time period when the MRT patents issued?

A    Absolutely.  We were always doing research, development, and pushing the areal density capability of our media.  Like I said, this is a day-to-day activity conducted by many, many

people inside the company.  And it's 24 hours a day.

Q     And then during the 2006 to 2018 time period, again, before the MR Tech patents issued, did Western Digital ever sell a commercial product where the media had a single hard magnetic storage layer that was independently thermally stable?

A     No, it did not.

MR. FRENKEL:  So let's turn back to the slides, Mr. Schmoller, and wrap it up.  Let's go to Slide 87, please.

BY MR. FRENKEL:

Q     To summarize your opinions for the jury, Dr. Bertero, what were your opinions in this case?

A     What are written on the page, the accused WD products do not infringe.  The single G1 layer in the accused products cannot store, as we've discussed.  All of the magnetic -- that magnetic layer is just too thin to be independently thermally stable and store data over the useful life of the product.

Dr. Re also used the wrong coercivity estimates.  So I disagree with his methodology.  And don't -- he did not meet the burden of proof required in the claims.

And I also disagree with Dr. Re's opinions on the contributions of the patent in WD's ability to increase areal density.  He omitted many other aspects of the media, but also he omitted greatly other improvements from elsewhere in the media that constitute a drive.

Q     Thank you, Dr. Bertero.

**UNITED STATES DISTRICT COURT**

MR. FRENKEL:  Pass the witness.

THE COURT:  Mr. Fenster.

MR. FENSTER:  May I have just a moment to set up, Your Honor?

May I approach?

**CROSS-EXAMINATION**

BY MR. FENSTER:

Q    Pardon the interruption, ladies and gentlemen.  Good morning.

Good morning, Dr. Bertero.

A    Good morning.

Q    Dr. Bertero, you and I have met on a couple of occasions at your depositions; is that correct?

A    That's correct, yes.

Q    You even signed your book for me, didn't you?

A    I did.

Q    Appreciate that.

Your role in this case is as an expert witness; correct?

A    It is.

Q    And you were hired by Western Digital to testify that the accused products do not infringe the MR Tech's patents in this case; correct?

A    Correct.

Q    You agree that expert witnesses are supposed to provide

objective, independent analysis and opinions to the jury to aid the jury in making their decision; fair?

A      I do.

Q      Expert witnesses are not just supposed to do a party's bidding; right?

A      Correct.

Q      You understand that Dr. Re, MR Tech's witness -- expert has no affiliation with MR Tech or Dr. Suess; correct?

A      Correct.

Q      He's an industry expert who has worked in the hard disk drive for decades; correct?

A      Correct.

Q      Now, for infringement, you and Dr. Re are really the two -- only two witnesses that the jury will be able to hear from with respect to infringement; fair?

A      Fair.

Q      And so for infringement the jury's decision is going to come down to comparing Dr. Re's testimony and analysis with yours; fair?

A      Fair.

Q      You understand that one of the factors the jury can consider in weighing your testimony versus that of Dr. Re is whether you're truly objective, independent in providing your analysis; fair?

A      Correct.

**UNITED STATES DISTRICT COURT**

Q    Now, in fact, you have very deep personal, professional, and financial ties to the defendant, Western Digital, in this case; true?

A    Financial deep -- financial ties, not anymore.

Q    You worked there for a long time.  You agree you have deep personal connections there, yes?

A    I worked there for 27 years, I believe, yes.

Q    You have good friends there?

A    Of course.

Q    You have deep professional ties there.  That's the only job that you had after graduating from grad school; correct?

A    Yes.  I also have professional ties with people at Seagate and many other places, yes.

Q    Now, as an employee, you received shares of Western Digital stock over the years; correct?

A    Of course, yes.

Q    And you've made millions of dollars over the years from your sales of that Western Digital stock; correct?

A    Over 29 years, it adds up, you know, to a few million dollars, yes.

Q    And you still own over $100,000 worth of shares of WD stock; correct?

A    I don't know what the stock price is, but it's around that number.  I stopped trading a year ago or eight months ago when I learned about the date of this trial and for, you know,

abundance of caution.

Q    This case was filed in 2022; correct?

A    Correct.

Q    And you were still working with Western Digital's lawyers on this case while you were an employee at Western Digital; correct?  That's when you started working on this case?

A    I was, yes.  As a fact witness, yes.

Q    And then when you retired in March of '23, you were immediately hired as an expert; correct?

A    I was asked to continue working on the case as I was familiarized with it and I knew how Western Digital works, like any other company.  So like I said in my testimony, direct testimony, you have to really have worked in one of these companies in order to understand what goes on, yes.

Q    And as an expert, WD is now paying you $500 an hour for your testimony; correct?

A    Correct.

Q    And that's more per hour than you were making as an employee at Western Digital; fair?

A    I haven't done that calculation.  I think that's fair.

Q    And you still have many friends that work at Western Digital or used to work at Western Digital who still have Western Digital stock; fair?

A    It's acquaintances, yes.  Of course, yes.

Q    And you would agree, then, that Western Digital has not

**UNITED STATES DISTRICT COURT**

presented a neutral, independent expert in this case who will testify that Western Digital has not infringed MR Tech's patents; fair?

A    I'm sorry.  Can you repeat that?

Q    Sure.  You would agree that Western Digital has not presented a neutral, independent expert in this case who will testify that Western Digital has not infringed Dr. Suess's patents; correct?

A    I believe I am a neutral, independent expert witness.

Q    Okay.  Let's talk about some of the testing that Western Digital does.  Western Digital does test to -- does testing to determine the anisotropy of the materials used in the accused products; correct?

A    Mr. Fenster, you saw that many of those materials that were in the products did not have values of anisotropy.  WD doesn't focus on the value of anisotropy strictly, so -- in designing products.  In fact, Dr. Re had to pull the data out of a scientific paper from a Japanese author in order to obtain the value because it wasn't existing in WD's database.

Q    Let me break that down.  You said that WD does not focus on anisotropy in designing its products.  That's what you said; right?

A    Correct.

Q    Okay.  Now, you didn't answer my question though.  My question is WD does, in fact, do testing to determine

**UNITED STATES DISTRICT COURT**

anisotropy of many of the materials that it uses in its products; true?

A    Yes.  Anisotropy is a very relevant quantity.  But in designing all the layers that make up the stack, we don't even know the value of some of those layers.

Q    Okay.  Dr. Bertero --

A    Let me correct myself.

Q    We're on the clock.  If you could just focus yourself on my questions, I'd appreciate it.  Your counsel will have a question to redirect you.  Okay?

A    Okay.

    MR. FENSTER:  Now, if we can have PDX-3.47, please.

BY MR. FENSTER:

Q    This is just a summary of the testing data.  This is showing JX-2015, JX-2028, and JX-2027.

A    I'm sorry.  Can you repeat the tab that I'm supposed to open?

Q    If you could just look on your screen, Dr. Bertero.

A    Oh, I'm sorry.

Q    You know that, because of your work on your case, that WD has produced the test data that does have anisotropy information and that is in admitted Exhibits JX-2015, JX-2028, and JX-2027; correct?

A    Correct.

    MR. FENSTER:  And if we could bring up -- I think

UNITED STATES DISTRICT COURT

it's PDX-5.22.  Is that the 2015 -- yeah.

BY MR. FENSTER:

Q    So this is a blown-up version, a little bit, of what JX-2015 actually shows; right?

A    Yes.

MR. FENSTER:  And to be fair, ladies and gentlemen, this is a big spreadsheet, and we hid the other columns so that we can focus in on the alloy; the composition; the Ms; the Hk, which is 2K over M; and the Ku values, which are anisotropy.

BY MR. FENSTER:

Q    And you agree that WD produced finally this data with all of this anisotropy information --

(To Mr. Mortensen)  You could scroll through that, Mr. Mortensen.

-- and see that there's quite a bit of it; right?

A    Yeah.  This is over 40 years, 30 years of R&D.  This is a table of materials that WD uses, yes.

Q    And Dr. Re showed that for each of the layers in the accused products, he showed where he got the anisotropy data from the testing data produced in this case or how he calculated it using Sharrock's [sic] formula?

A    No.  The anisotropy value is -- I'm sorry.

Q    Was it Shimatsu?  Did I --

A    Yeah, Shimatsu, not Sharrock.

Q    All right.  My apologies.  You've been educating me

throughout this case.

So Dr. Re showed that -- where in WD's documents he got every single Ku value or how he calculated it using the Shimatsu method; correct?

A    Estimated it, yeah; calculated, no.  But estimated it.

Q    And with one exception, you have not disputed a single number that Dr. Re presented for anisotropy -- correct? -- in this trial?

A    Correct.  We didn't have any better way to estimate what we didn't have.  So I did not dispute the numbers Dr. Re used.

MR. FENSTER:  So if we could pull up PDX-3.60.

BY MR. FENSTER:

Q    This was the anisotropies for Group 1, and you had no dispute with the anisotropy values that he showed for Group 1; correct?

A    Correct.

Q    And you had no dispute with any of the anisotropy values that Dr. Re calculated for Group 2; correct?

A    Correct.

Q    And let's go to 4a.  We'll come back to 3.  You had no dispute with any of the anisotropy values that Dr. Re presented for Group 4a; correct?

A    Correct.

Q    And the same is true for 4b; correct?

A    Correct.

Q    And the same is true for 4c; correct?

A    Correct.

Q    And the same is true for 5 -- Group 5; correct?

A    I assume so, yeah, correct.  I can't remember every number, but I didn't dispute it, yeah.

Q    And if we can pull up 3.80 for Group 3 -- this is the DCM 5X1 -- you didn't dispute any of the numbers in the Ku anisotropy values for the purple nucleation host member -- layers; correct?

A    The alleged nucleation host layer, yeah.  The ones in the purple box, those are not nucleation host.  In my opinion, they are --

Q    Dr. Bertero, in your direct examination, you never asserted the opinion that those layers were not nucleation host layers; correct?

A    I was not allowed to say that.

Q    Okay.  So let's stay there.  Stay with my question, please.  My question is you do not dispute any of the Ku values of the anisotropy for the layers in the purple box for the identified nucleation host layers; fair?

A    That's correct.

Q    Okay.  So the only number that -- out of all of the data, the Ku data that you had an issue with, that WD has made an issue of is the -- has to do with the G1 value for Group 3; correct?

A    Correct.

Q    Okay.  So you agree that WD's testing data allows you to determine the relative anisotropy of adjacent mag layers in the alleged nucleation host; correct?

A    Like I said, there were missing points that Dr. Re had to take from published data.  So once Dr. Re put those numbers in, then you can arrive at that number.  But you can see that if we used an alloy and didn't even have a value for it, it's not like WD engineers can do it on a day-to-day basis.

        MR. FENSTER:  If we can pull up 3.107, please.

BY MR. FENSTER:

Q    So let's look at Group 5.  So these are the values for Group 5 that come straight from Western Digital's data; correct?

A    Correct.

Q    Okay.  And you agree that WD's testing data allows you to determine the relative anisotropy of adjacent mag layers in the alleged nucleation host; correct?

A    In general, yes.

Q    Now, before Western Digital produced that data in this case, you signed a sworn declaration to the Court stating that WD did not have any such data; correct?

A    No, I don't recall that.

        MR. FENSTER:  Can we -- in your binder, if you can go to the fourth tab.  And this is Declaration Number 1,

Mr. Mortensen.

BY MR. FENSTER:

Q    You signed a declaration on August 9, 2023; correct?

A    Yes, I did.

Q    And if we can go to paragraph 24.

You stated (as read):

"In sum, the relative anisotropy of the heterogeneous adjacent layers in the finished stack cannot be determined based on the target layer compositions, nor by any other data possessed by Western Digital."

Did I read that right?

A    That is absolutely correct.  I stand by that statement. But that doesn't mean what you just asked me.

Q    You did not tell the Court that you had testing showing the anisotropies of the materials used in those mag layers; correct?

A    No.  That is not true.  What I'm saying here is that --

Q    Dr. Bertero --

A    No.  But you're asking me a question.

Q    I've asked you the question, and I'd like for you to stick with my question, please.

You did not tell the Court that you had -- that WD -- when you made this statement, you did not tell the Court that WD had testing that showed the anisotropies of the alloys

used in the mag layers in its products; correct?

A    This statement has nothing to do --

Q    Well --

A    -- with that.

Q    -- correct or not?

        MR. FRENKEL:  Your Honor, he's interrupting him and not letting him answer the question.

        THE COURT:  Sir, answer the question directly.

        THE WITNESS:  It's that this statement doesn't apply to that.

BY MR. FENSTER:

Q    Dr. Bertero, when you made this statement --

A    So no.  I don't agree with your premise.

Q    Okay.  Instead, you affirmatively told the Court that WD did not have any such data; correct?

A    No.  That's not -- that's incorrect.

Q    Let's go in the same declaration, paragraph 25.

        You state at the bottom (as read):

        "This testing does not include measurements

    of the anisotropy of the layers of the storage

    media, nor can anisotropy of the individual layers

    be inferred from such testing."

        Did I read that --

A    From a full --

Q    Did I read that correctly?

A      You read correctly.

From a full stack, you cannot infer what individual layers are.  You have to deposit them independently.  This is what this statement says.  But in a full stack, you would never be able to extract data from individual layers.

Q      So you are making a very careful, narrow statement that you think is true?

A      I know it's true.

Q      Okay.  But the fact is that you didn't tell the judge in this statement the whole truth, which is that Western Digital has lots of data showing the anisotropy of the alloys in the layers, did you?

A      No.  You're missing the context of all the discussion that went behind.  I'm making this statement in relation to the fact that you cannot determine anisotropy once you deposited the sample.  You cannot analyze a sample and say, "Oh, the anisotropy of, you know, G2 or G3 is such and such."  You have to measure them independently.

Q      Dr. Bertero, it's true that you filed that declaration at a time when Western Digital was trying to stop this case before it had to produce the anisotropy data; true?

A      I don't know what WD was trying to do.  I was stating the truth.

Q      Today, you do admit that Western Digital does measure the anisotropy of many of the alloys it uses in the accused

UNITED STATES DISTRICT COURT

products; true?

A     That has been my testimony, I believe, since day one.  It measures the anisotropy of the materials, not from a full stack.

Q     Let's take a look at your -- this is in your third tab, your April 17, 2023, declaration.

You signed this under oath?

A     Yes, I did.

Q     Let's go to paragraph 16, please:

"With respect to unspecified 'development documents,' based on my many years of experience designing, developing, and testing media at WD, it does not measure or develop its media based on the intrinsic anisotropy of the alloys it uses."

Did I read that right?

A     You read correctly.

Q     And then you go on and you say (as read):

"Western Digital may measure anisotropy for the storage layers" -- which you said don't exist; right?

A     No.  No.  Storage -- all of them are storage layers.

Q     (Reading:)

"WD may measure anisotropy for the storage layer on rare occasions, but anisotropy measurements are not part of the media design

**UNITED STATES DISTRICT COURT**

documentation..."

That's what you told the Court; right?

A    That is absolutely correct.  The media design documents that we provided do not have anisotropy in them.

Q    Dr. Bertero, not only does WD measure anisotropy, but WD specifically designs its products to have an anisotropy gradient; true?

A    No.  Not true.

Q    In fact, WD has been designing its media to achieve an anisotropy gradient in the magnetic layers in its media for years; true?

A    Not true.

MR. FENSTER:  Let's pull up JX-2032, please. JX-2032 is an admitted document.

BY MR. FENSTER:

Q    This is PMR Media Design Summary, dated 2019; correct?

A    Correct.

Q    This is after the patent issued; right?  This is labeled "WD Confidential."

(To Mr. Mortensen)  I don't know if you can blow that up a little bit.

But this is an internal WD confidential document; correct?

A    Correct.

Q    And this document describes WD's actual accused products;

correct?

A    You have to show me what it does or -- for me to make that statement.

Q    I will.

        MR. FENSTER:  Let's go to page 2.  And if you can blow up the Ku grading multi-oxide.

BY MR. FENSTER:

Q    So this is talking about the design -- PMR Media Design Parameters Related to Functional Performance.  This is an internal presentation by the sputter group.  They're the ones that make the media; right?

A    Correct.

Q    Okay.  And one of the things that you're highlighting -- that is being highlighted on this page is Ku, which is anisotropy; right?

A    I'm not highlighting it; right?  Okay.

Q    Ku grading multi oxide; right?

A    That's what I read there, right.

Q    And every time we see "Ku," we know that means anisotropy; right?  It's anisotropy constant, Ku?

A    Correct.

Q    What it says is there's a Ku gradient from G1 layer to G6; right?

A    That's what it says, yes.

Q    And it says Ku for the G1 is greater than the Ku for the

G2, which is greater than the Ku for G3, -4, and -5, which is greater than the Ku for 6.  That's a gradient; right?

A    Yes.  It also says that the gradient -- the ratio of G1 to G6 is very large.

Q    That it can be close to 1?  Is that what you mean?

A    No.  That it's far apart.  The gradient is large.  Not the ratio.

Q    Right.  Okay.  Got you.  I agree.

So let's go to page 2032.

And GP5, that's an accused product in Group 4b; right?

A    Correct.

Q    So that is an actual product; right?

A    GP5 is not the structure that you're showing me.

Q    Pardon me?

A    GP5 is the DCM of an accused product.

Q    Yes.

A    The structure that you're showing me doesn't correspond to that.

Q    This is an internal sputter document that's labeled G5, which corresponds to a DCM in an accused product, yes?

A    Can we compare this to the accused product, the description, the Ku gradient that you are saying that corresponds to that?  And you will see that it doesn't.

Q    Okay.  So this internal document for GP5 says that it

starts with a low Ku; right?

A      It does.

Q      Then a high, a high, a high, then a higher; right?

A      It does.

Q      That's showing an overall increase down toward the green, G1 layer; right?

A      It does.

Q      Now, this coloring, of course, this was done by Western Digital; right?  Western Digital chose to denote the G1 layer separately with green and distinguish it from the upper G layers that are in purple; right?

A      This was after I moved away from the media division, but I assume that this was -- you know, somebody did it that way, yes.  It's not a general thing, but the bottom layer is marked green in every schematic that we see here.

            MR. FENSTER:  Okay.  And if you can just highlight the "Ku graded."  If you could blow that up, please, Mr. Mortensen.

BY MR. FENSTER:

Q      And that is also showing that it was designed to have a Ku gradient; correct?

A      The document says so, but that's not what's in the product.

Q      Okay.

A      You have to understand that this is for internal --

Q      Dr. Bertero.

A      Okay.

Q      Let's go to page 4.

GS9 is an accused product in Group 4b; right?

A      Correct.

Q      And it's -- and let's go to 2032.5, next page.

And GT5, GXB, GTB, those are all accused products; correct?

A      I don't recall every one of the DCM.  There were tens and tens -- but I assume so.  I'll take your word.

Q      I'll represent to you that the ladies and gentlemen of the jury will find it in your stipulations that are in your binder as accused products.

If you can go to -- if you can blow up the part that says "6ECL by optimizing."

So this is showing that -- the internal documents are showing that WD was optimizing the anisotropy gradient; correct?

A      It's stated here as such, yes.

Q      But your testimony to the jury is that Western Digital never designed its product to have an anisotropy gradient.  That was your testimony; right?

A      Well, I was there.  That was my testimony.  Yes.

Q      Okay.

A      This is not in the products.

UNITED STATES DISTRICT COURT

Q    All right.  Let's go to 2032.06.

And SMB, that's an accused product in Group 4b; correct?

A    Correct.

Q    And that also shows that the sputter group was designing it with an anisotropy gradient; correct?

A    I think that misstate reality.  It wasn't designing them; it's showing them to somebody, to internal folks, that there is a Ku gradient.  But that's not reality.  The reality says other things, and you can see them in the DCM produced by WD.

Q    We'll go through those too.

What this is showing is that Western Digital is touting that it was slightly modifying the Ku gradient.  Not only does it design it to have a Ku gradient, but then it modifies it and improves it over time; right?

A    You always want to improve writeability, improve thermal stability.  You need high-anisotropy materials.  So I am not surprised by that.  So -- but, like, again, I've seen so many of these documents stating things that are not in the real product.

Q    That does seem to have been a theme this week, doesn't it?

A    It's the reality.

MR. FENSTER:  Okay.  So if you can take down the call-out.

**UNITED STATES DISTRICT COURT**

BY MR. FENSTER:

Q    Each of the layers in these products, these layers are represented by recipes; right?  There are recipes for the product?

A    The stack is represented by a recipe.

Q    And the recipe has a row for each layer; correct?

A    Correct.

Q    And each of those rows represent one layer; right?

A    Yes.

Q    And each of those layers are deposited in a separate chamber; correct?

A    Correct.

Q    So I think it was -- Dr. Desai was showing us that big machine and talked about multiple chambers going on a train. Do you recall that?  I think he described it as a train?

A    That's a good analogy anyways.

Q    So just to be clear, what happens is one layer will get deposited in one vacuum-sealed chamber; correct?

A    Correct.

Q    Then that product will be moved to a different vacuum-sealed chamber and the next layer will be deposited; right?

A    Correct.

Q    And that's how that happens for all the accused products?

A    Yes, it does.

**UNITED STATES DISTRICT COURT**

Q     If we can go to your April 17 declaration.

          MR. FENSTER:  And if we can bring up that module that we created.  So, Mr. Mortensen, I think this is the -- starts on PDX-5.1.

BY MR. FENSTER:

Q     So you told the Court that Western Digital does not measure or develop its media based on the anisotropies; right?

A     (No audible response.)

Q     And then the documents tell a different story, don't they?  We've seen in JX-2032?

A     The schematics say so.  Again, if I may, people -- you may ask any engineer at Western Digital what the Ku of a certain alloy is.  They wouldn't know because people don't make media that way.  Media gets done -- you put a target; you try to optimize performance.  It's -- you know, every two, three minutes you get a different sample.  And you test a different thing, and eventually the stack works best, but it's not because you say "I'm going to put the high anisotropy here, the low anisotropy here" and so forth.  So that's my statement.

Q     Okay.  If we can go to 5.3.  This is a page from PTX-29, page 6.  And if you can blow up the right side, please.

          This is from a presentation in 2013.  And it shows triple EBL design, graded anisotropy, and the first bullet point says (as read):

          "Graded anisotropy...concept is achieved

**UNITED STATES DISTRICT COURT**

using multiple exchange break layers and optimizing the Ku for magnetic layers"; correct?

MR. FRENKEL:  Your Honor, I'm sorry to interrupt.

But I'd like to get the document number that you're using in cross, the JX number that this is from.

MR. FENSTER:  It is PTX-29.

MR. FRENKEL:  Thank you.

THE WITNESS:  The concept -- the concept is correct. Yes, the concept.

BY MR. FENSTER:

Q    Okay.  And, Dr. Bertero, what this is showing -- if you look in the graph on the right, this is showing a really notable improvement in SNR just by going from a two EBL product to a three EBL product; correct?

A    Not product.  These are samples that were made to -- and we published some of this work that don't represent the product.

MR. FENSTER:  Okay.  If we can go to 5.5, please.

MR. FRENKEL:  I'm sorry to interrupt again.  We did not get a copy of that in the cross binder.  We would like to get a copy of it, please.

MR. FENSTER:  It's an admitted document.

BY MR. FENSTER:

Q    The -- in 5.5 -- actually, if we can go -- so 5.4, this is from the "PMR Media Design Roadmap"; right?  And it's from

2013, presented by Dr. Desai.  And your statement on the left under oath is "We don't design with respect to anisotropy"; right?

A     The real product, yeah.

Q     Okay.

A     To show me a schematic that -- you have to explain things to people that don't understand how things work and is -- and is a way of saying it.

Q     And then if we can go to 5.5 and blow up the graphic on the right, it's again saying that:

"Graded anisotropy media concept is achieved using multiple exchange break layers and optimizing the Ku of magnetic layers"; correct?

A     Concept.  Again, you don't see the design that Dr. Suess would have proposed with a hard magnetic storage layer and nucleation host.  The concept of having exchange break layers is something that existed in the -- in magnetic recording media for a long, long, long time.

Q     Dr. Bertero, Dr. Desai testified that these two images on the right represent real products.

Do you recall that?

A     I don't recall that.

Q     And if we can go to 5.7, this is still juxtaposed against your statement that Western Digital doesn't care about anisotropy, doesn't design with respect to anisotropy.

UNITED STATES DISTRICT COURT

(To Mr. Mortensen)  If you can blow up the right side.

This is showing "towards anisotropy graded media -- graded anisotropy media"; correct?  And this is in 2019?

A    Mr. Fenster, we care about --

Q    Can you answer the question?

A    Well, you're asking -- you told me that I said something that is not true.  We care about anisotropy.  We don't design with what materials have -- you know, we don't design based on what this document says.

Q    Okay.  Your documents -- your design documents all say "towards graded anisotropy," all show an anisotropy gradient; fair?

A    These are not design documents.  These are schematics to show what, you know, a layering of a product may be.  And we actually refer to them by the number of EBL layers that they have because that's a nice way to represent what -- the generation to generation.  Every time you add an EBL layer, you have to upgrade the system, have many, many months of downtime.  It's a big deal.  So the number of EBL layers that we add to the system, it's a good way of characterizing the generation for that product.

Q    And over time, Western Digital did add -- once it went to a trilayer design, it continued to add more mag layers and more EBLs in the products; correct?

A    That's correct.

Q    And this document is showing that that increase in complexity as you add more layers, that corresponded with going from 200 gigabits per square inch to approximately a terabit per square inch; correct?

A    Correct, but --

Q    Dr. Bertero, you've answered my question.  Thank you.

Now, you say that graded anisotropy that you -- that this has nothing to do with the products; right?

A    Not in the way that the schematics try to imply.

Q    Let's go to Slide 5.10.  These are the bar charts that Dr. Re showed to show that every single product, in fact, based on the actual Ku values, based on the actual recipes, not cartoons, not design documents that you're disclaiming; right? Actual recipes, actual data, they all show an overall increase in anisotropy toward the hard storage layer; correct?  I'm asking if that's -- that's what he was showing here; right?

A    Yeah, overall, I think it's probably not a good description for some of these stacks.  But you can see right here that low, med, high as was described in the schematics is not represented in the real -- what the real product is.

Q    Dr. Bertero, in your direct examination, you did not offer an opinion today that any of the accused products do not have an overall -- a nucleation host with an overall increase in anisotropy toward the hard storage layer; correct?

A    That's correct.

MR. FENSTER:  Okay.  Let's pull up PDX-3.107.

BY MR. FENSTER:

Q    And this is the layer recipe with the K -- back up, please.  This is the layer recipe for SL6a, which is the representative product for Group 5; correct?

A    Correct.

Q    And the accused products have a cap layer.

(To Mr. Mortensen)  If you could blow up -- blow that up now, Mr. Mortensen.

BY MR. FENSTER:

Q    All of the accused products have a cap layer; correct?

A    They do.  They have to have it.

Q    And that cap layer is on top of the stack above the topmost G layer, in this case G7; correct?

A    Yes.

Q    And as we just established, Dr. Re established that there is an overall increase in anisotropy in the ferromagnetic layers toward the hard storage layer; correct?

A    Correct.

Q    Now, the cap layers all, being on the top, have even lower values than Dr. Re identifies for the nucleation host top layer; correct?

A    Yes.  As I explained before, that's a necessity for corrosion tribology protection.  You have to have a lot of

chromium, a lot of platinum to render that alloy more protective.

Q    Today, you know and admit that every cap layer in every product has the lowest anisotropy among the mag layers; correct?

A    When you add lots of chromium, it's -- it's a consequence of that, yes.

Q    That's not what you told the Court under oath previously, is it?

A    That's exactly what I told the Court.

Q    Let's go to your April 17 declaration.

A    I see it.

Q    This was signed by you on April 17 under penalty of perjury, yes?

A    Right.

Q    This is one of the first things that you did after being retained as a paid expert; right?

A    Correct.

Q    Let's go to paragraph 9, please.  And you state:

        "In fact, based on my experience, the uppermost cap layer has a very high anisotropy, certainly higher than the adjacent layers ECL6 and G6, and higher than at least some of the next seven layers G5 through ECL2"; correct?

A    Correct.

Q    That's what you told the Court?

A    Correct.  But I didn't -- I didn't have the data in front of me because like I said -- first of all, I think that the data for the cap layers was missing in most of the DCM products that we produced -- that WD produced.

Q    That statement was false, yes?

A    No, it was based on what I as an expert in the field --

Q    Let me rephrase.

Dr. Bertero, I'm not saying that you intended to lie.  You know today that that statement is false, yes?

A    I know today, after having seen anisotropy values for that layer, I was basing my opinion on the fact that the platinum content in that layer is extremely high.  And like I said, we don't focus that much on anisotropy in designing the products. Therefore, that was my assumption, that the anisotropy had to be very high.  In fact, it wasn't because of the high chromium content once I saw the data that was filled in by looking at Shimatsu data and so forth.

Q    So you made a statement, without sufficient evidence at the time, that maybe you believed to be true and turned out not to be true; fair?

A    Fair.

Q    You never corrected that with the Court; correct?

A    I didn't think I needed to because it was corrected by the evidence.

Q     It certainly has been.

And if we can pull up Dr. Desai's testimony.

And so on the left is your declaration.  And on the right, Dr. Desai testified:

"So you agree that the cap layers have the lower -- have lower Ku than any of the G layers; correct."

And he answered "Yes."

Do you see that testimony?  That's correct testimony, yes?

A     Yes, after having seen all the data, of course.

Q     And Dr. Papusoi, the test engineer, he also said it's possible to call it a cap because the anisotropy is the lowest; correct?

A     That's not why it's called a cap.

Q     So you disagree with Dr. Papusoi?

A     Yes.

Q     All right.  Now, the reason that you filed that declaration when you did, that was at a time before Western Digital had produced any anisotropy data in this case; correct?

A     Yes.  I wasn't even aware that there was a master list. Having been vice president for a number of years, I think that that table might have been compiled and kept by Dr. Papusoi. But I wasn't -- I wasn't aware of the extensive list of anisotropy and magnetic properties in that document.

Q    You filed that declaration because you were trying to tell the Court that MR Tech could not prove an overall increase in anisotropy.  And because the cap layer was on the top, you wanted to say it started high then went low.  That was -- that's why you submitted that declaration; correct?

A    I submitted that declaration based on what I understood the product to be.  The rest are words that you are putting in my mouth.

Q    That was part of Western Digital's effort to stop this case before it had to actually produce the data that showed that they had the overall increasing anisotropy; correct?

A    The ulterior motive was --

        MR. FRENKEL:  Lacks foundation.  Objection.  This question lacks foundation.

        THE COURT:  Overruled.

        THE WITNESS:  Yeah.  The ulterior motive, I don't know.  I was asked to give my expert opinion on these matters, and I did.

BY MR. FENSTER:

Q    Now, we've seen documents from Western Digital that refer to Dr. Suess.  You've seen those presentations about the trilemma and the superparamagnetic limit, how to solve it.  And then the next slide is "Enter the 'exchange-spring,'" and they cite to Dr. Suess.

        Do you recall that?

UNITED STATES DISTRICT COURT

A       I've seen those documents.

Q       Now, other people in the industry have credited Dr. Suess's invention for breaking the superparamagnetic limit too; correct?

A       Conceptually, never in practice.  It's always in front of us.

Q       In 2008, you were sent --

        MR. FENSTER:  Can we pull up the Gupta-Harrell article?

BY MR. FENSTER:

Q       In 2008, you were sent an article from your colleagues at Seagate.  Seagate is another hard disk drive manufacturer; correct?

        Do you recall this?

A       Yes.

Q       And this was actually produced from your files, I'll represent to you.

        Do you recall that?

A       No.  But I believe so.  I have thousands or hundreds of them.

Q       And Jan-Ulrich is someone at Seagate who sent this to you?

A       Yeah.  Jan-Ulrich Thiele is a very well-known researcher that was at IBM, HGST, and now at Seagate.

Q       And one of the things that they sent you was a proposal

by Harrell and Gupta; correct?

A     I don't recall.  But I'm reading that here, so it must be.

MR. FENSTER:  Can we pull up that article, please?  Okay.  If you can zoom in at the top.

BY MR. FENSTER:

Q     Now, Gupta and Harrell, those are well-respected professors in magnetics at the University of Alabama; right?

A     I don't know them that well.  I don't -- this is the first time I read those names.

Q     Isn't it true that you've co-authored papers with Dr. Harrell?

A     I don't recall.

Q     Okay.

A     My name might have been in -- I don't think so.

Q     Okay.  Let's take a look at what they wrote.  In "The Need," it says:

         "The most fundamental problem facing magnetic
      recording is the superparamagnetic limit..."

         Do you see that?

A     I do.

MR. FENSTER:  Then if we can go down to "The Opportunity."  Actually, go back to the last one.

BY MR. FENSTER:

Q     (Reading:)

         "Thus, a way must be found to write

UNITED STATES DISTRICT COURT

magnetically hard materials with available write fields."

Do you see that?

A   I do.

Q   Let's go down to what they say about "The Opportunity" (as read):

"Recently, however, a simple idea has emerged which has the potential to convert what appeared to be a physical impossibility (advancing beyond the superparamagnetic limit) into a set of extremely challenging - but exciting - problems...

"The idea is the realization that it is not necessary to reverse all of the atomic moments of the grain simultaneously.  In fact, as emphasized by Suess and Visscher, by properly grading the anisotropy profile of a magnetic column, one can, in principle, switch an arbitrarily hard magnetic material with an arbitrarily small field..."

Did I read that right?

A   I believe so.

Q   And you received that in 2017; correct?

A   No.  That doesn't sound right.

Q   No.  2008.

A   Okay.

Q   Sorry.

**UNITED STATES DISTRICT COURT**

Okay.  Let's talk about infringement.

A    I'm sorry, but did you have a point here?

Q    My point was that you know that other people in the industry --

A    No, not industry.  This is highly academic.  These people have no idea what industry is like.

Q    Okay.  Other people in --

A    Academia.

Q    -- in academia.  Sure.

A    Okay.  So not reality at all.  They don't know what it takes to make media.

Q    Professors don't know anything?

A    They know fundamentals.  But these people don't know.

Q    Okay.  These people are -- that you're talking to -- Dr. Gupta and Dr. Harrell, these people that you're dismissing as not knowing anything, they're the heads of the magnetics material at the University of Alabama, which is a very well-respected physics institution, yes?

A    Media is a very different thing.

Q    Okay.  Let's talk about infringement and what you did here.

A    Okay.

Q    You understand that for infringement, the only proper comparison is between the accused product and the asserted claims; fair?

UNITED STATES DISTRICT COURT

A    Yes.

Q    It is improper for infringement to compare the accused products to embodiments or descriptions or abstracts or summaries, only the claims; right?

A    Correct.

Q    And you have to compare only to the claims as construed by the Court; right?

A    Correct.

Q    Any analysis for either infringement or invalidity that doesn't apply the Court's claim construction faithfully, invalid; right?

A    Correct.

Q    It would be an improper analysis?

A    I think so.

Q    The Court -- the jury should disregard any such analysis; fair?

A    Fair.

Q    Okay.  You understand that if Western Digital made, used, or sold any product that meets the elements of the claims, it infringes?

A    That's my understanding.

Q    It doesn't matter if they intended to, it doesn't matter if they knew about the patent, it doesn't matter if they independently developed it.  If the product meets the elements of the claims, it infringes, yes?

A    That's my understanding.

Q    Now, it's also true that if Western Digital makes, uses, or sells a product that meets the elements of the claim after the patent issued, it infringes; correct?

A    I assume so, yes.

Q    Even if -- and -- even if it made the same product before the patent issued; right?

A    Yeah.  Yeah.  After the priority date, yeah.  Correct.

Q    Western Digital was totally free to use Dr. Suess's teachings, Dr. Suess's invention, even, before the patent issued; right?

A    No.  I don't believe so.  I don't believe so.  What do you mean it was totally free to use it?

Q    Until a patent issues --

A    Oh.  You mean WD could have made -- could have rendered that idea, that invention to practice and would have -- yes.

Q    Yeah.  And they were free to do that until the patent issued; right?

A    In which case you would see that there was a protected IP in it, yes.

Q    Okay.  Now, you haven't expressed any opinions on validity in this case; correct?

A    Not validity.  That will be Dr. Victora's role.

Q    Dr. Victora will do that.

        But you understand that the claims have to be

**UNITED STATES DISTRICT COURT**

applied the same, consistently, for both infringement and invalidity; correct?

A    I assume so.  I'm not an expert on invalidity, but I'll take your word.

Q    It would be improper to apply the claims one way for infringement and another way for validity; right?

A    Sounds right.

Q    If we can pull up PDX-3.49.

A    Is that in the binder?

Q    No.  We'll pull it up on the screen for you.  Okay.

So this was an overview slide that we showed that the accused products have a multilayer nucleation host.  You agree with that; right?

A    No.

Q    Let me start over.

Dr. Bertero, you did not express any opinion on the stand today on direct testimony that the accused products do not have a multilayer nucleation host with overall increase in anisotropy; correct?

A    I was not allowed to say so.  My opinion is that it does not --

Q    Dr. Bertero, I'm not -- please stay with my question and stay within the bounds of the Court's rules.  Okay?

A    Sorry.  You're asking me a question.

THE COURT:  Sir, listen to the question.  Answer the

question put to you, and only that question, please.

THE WITNESS:  Okay.

BY MR. FENSTER:

Q    You did not express any opinion in direct disputing that the ferromagnetic layers of the nucleation host are formed on the hard storage layer, such that the hard storage layer is between the ferromagnetic layers of the nucleation host and the substrate.  You didn't express that opinion today; correct?

A    I didn't.  I did not -- I don't agree that there's a nucleation host in WD's products.

MR. FENSTER:  Move to strike as nonresponsive, Your Honor.

THE COURT:  The last part of the response will be stricken, ladies and gentlemen.  You are to disregard it.

Again, sir, I advise you to answer the question and only the question.  Your counsel will have an opportunity to ask you additional questions.

THE WITNESS:  Okay.  Understood.

MR. FENSTER:  Now, if we can go to 3.152, please.

BY MR. FENSTER:

Q    So Element 1[e] requires a nucleation host that has a second coercive field.  I understand that you expressed an opinion disputing the coercive field methodology, yes?

A    Correct.

Q    But you did not express any opinion disputing that the

accused products have a nucleation host that meets the Court's claim construction; correct?

A     No.  That's correct.  Yes.

          MR. FENSTER:  And if we can go to 3.153, please. That's okay.  You can take that down.  If we can go to 3.186, please.

BY MR. FENSTER:

Q     I think we've already covered this, but you did not express any opinion disputing Dr. Re's analysis that all of the accused products meet Element 1[h] that have ferromagnetic layers increasing -- with increasing anisotropy constant K from layer to layer in accordance with the Court's claim construction; correct?

A     Correct.

Q     Now, it's also true that you did not express any opinions about Claims 10 or 11 of the '864 patent; correct?

A     One was regarding the grain size, and the other one -- yeah, I didn't.  I didn't.

Q     And so if the jury finds -- if the jury disagrees with you and finds that we have met our burden of proving infringement of '864 Claim 1, you would agree that '864 Claims 10 and 11 are also infringed; correct?

A     Correct.

Q     And the same is true with '997 Claims 1 and 7; correct? You didn't offer any opinions today specific to those claims?

A    I didn't offer any opinions specific to the dependent claims.  I did offer opinions in relation to independent claims.

Q    Correct.  So if the jury finds that the '864 Claim 1 is infringed, then it should find all of the claims infringed, including '997 Claims 1 and 7; correct?

A    Correct.

Q    Thank you.

Your counsel asked you some questions about whether Western Digital uses the term "nucleation host."

Do you recall that?

A    I do.

Q    That's irrelevant to infringement; right?  It doesn't matter what it's called, as long as it meets the elements of the claim as construed by the Court; right?

A    Correct.  Yes.

Q    They could call it a meatball, but if it met the elements of the claim, it would still infringe; right?

A    Correct.

MR. FENSTER:  Okay.  And if we can go to PDX-3.151. And blow up the claim construction, please.

BY MR. FENSTER:

Q    So the Court construed a nucleation host as a structure that includes ferromagnetic layers that assist in switching the hard magnetic storage layer and optional coupling layers;

correct?

A      Correct.

Q      And you did not offer any opinion today that the accused products do not have the nucleation host that meets the Court's claim construction; correct?

A      I was not allowed to do so.  Correct.

MR. FENSTER:  And if we can go to 3.152.  And if you could just maybe zoom in on the right -- can you zoom in on the right and play the animations?  If you can show the animations, that's fine.

BY MR. FENSTER:

Q      And this was the slide that Dr. Re showed about the cascading effect and how the layers assist in switching the next layers.

Do you recall that?

A      I do.

Q      And you didn't offer any opinions today that the upper layers of the alleged -- the identified nucleation host do not assist in switching the G1 layer; correct?

A      Correct.  I couldn't.

Q      The accused products are all multiple ECL layers?

A      Yes, they are.

Q      And one of the primary benefits of multiple ECL media is that it allows a higher degree of incoherent switching throughout the grain; correct?

A    Yes.  Not in the cascading manner that was shown here, but having more layers allows for a higher degree of incoherency.

Q    Okay.  Let's turn to the hard storage layer.  So Element 1[d] requires a hard storage layer, and the Court construed "hard storage layer" as a "magnetic layer that stores information in magnetically oriented bits"; correct?

A    Correct.

Q    And Dr. Re identified the magnetic layer in each of the accused products that he says meets the hard storage layer, generally called the G1 layer; right?

A    Correct.

Q    The accused products in this case are disk drives?  Yes?

A    Yes.

Q    They store information?

A    They do.

Q    They store information in magnetically oriented bits; correct?

A    Correct.

Q    And in two different declarations to the Court, you identified a storage layer and a hard magnetic storage layer; correct?

A    I'm sorry.  Can you repeat the question?

Q    I can.  In two different declarations to the Court, you made reference to a storage layer and to a hard magnetic storage layer; correct?

**UNITED STATES DISTRICT COURT**

A      Not in WD's products.

Q      Let's take a look at the April 17, 2023, declaration. This is in paragraph 16.  And you said:

"WD may measure anisotropy for the storage layer on rare occasions, but anisotropy measurements are not part of the media design" and you went on; right?

A      No.  That's not the hard storage magnetic layer.

Q      Okay.  Let's take a --

A      The hard magnetic storage layer as defined in the patent.

Q      Okay.  Let's --

A      The storage layer is any one of those layers.

Q      Let's take a look at your next declaration.  This is March 23, '23.  If we can go to page 4 in the footnote, you stated:

"And there are 11 layers before the exchange coupling layer between the nucleation layers and the hard magnetic storage layer."

That was referring to your products; correct?

A      As defined by Dr. Re, yes.

Q      Okay.  Now, all of the G1 layers that Dr. Re identifies as hard storage layers, they're magnetic layers; right? Ferromagnetic?

A      They are.

Q      And in the accused products, the hard storage layers are

part of a media stack in which they're exchange coupled to other mag layers in the identified nucleation host; correct?

A    All of the layers are exchange coupled to each other; otherwise, the thermal stability of the whole structure would not be sufficient.

Q    You agree that the G1 layer stores information when it's part of the exchange coupled stack in the accused products. But your argument is that it can't store information on its own.

Do I have that right?

A    Correct.

Q    Okay.  Let's take a look at the claim, Claim 1.

Now, you're familiar with Claim 1 of the '864 patent?

A    I am.

Q    Claim 1 does not claim a hard storage layer on its own; fair?

A    It says:

"A hard magnetic storage layer, having a first coercive field of greater than 0.5 tesla, formed on the underlayer; and a nucleation host, having a second coercive field."

Q    It doesn't say "by itself," does it?

A    It says that you have to measure each one by itself.

Q    Dr. Bertero, Claim 1 does not claim a hard storage layer

**UNITED STATES DISTRICT COURT**

on its own.  It claims it as part of an exchange coupled multilayer magnetic stack, yes?

A     Correct.

Q     Okay.  And we can see that because it says "a magnetic recording medium," and it goes on to "an exchange coupled magnetic multilayer structure."  That includes a hard magnetic storage layer, a nucleation host that's exchanged coupled with the nucleation host comprises ferromagnetic layers; correct?

A     Correct.

Q     The claim claims it altogether as part of an exchange coupled multilayer media stack; correct?

A     Correct.

Q     And you agree that, as part of that exchange coupled multilayer magnetic media stack, G1 layer stores information in magnetically oriented bits; correct?

A     Not by itself, but yes.

Q     You agree that, as part of the claimed exchange coupled multilayer media stack, it is thermally stable; correct?  The stack is stable?

A     Correct.

Q     The data stored in G1 layer as part of that stack is stable; correct?

A     I'm sorry.  Can you repeat that?

Q     Yeah.  Let me withdraw it.  It probably wasn't a good question.

**UNITED STATES DISTRICT COURT**

MR. FENSTER:  Let's go to PDX-5.14.  I'll be just two minutes.  This is the one that's naked and afraid.

BY MR. FENSTER:

Q    So the claims actually refer to all of these layers exchange coupled together -- right? -- including the G1 layer; right?

A    Correct.

Q    Okay.  And your argument -- and you agree that as an exchange coupled multilayer stack, the G1 layer stores information in magnetically oriented bits; right?

A    Not on its own, but, yes.

Q    Okay.  And your argument is that if someone were to take out or make the G1 layer all by itself kind of naked and afraid on a table -- that's how I've been referring to it -- then it wouldn't be stable all by itself; right?

A    That's correct.  It wouldn't have the ability to store information as construed by the Court.

Q    Because it's too thin; right?

A    It's extremely thin, yes.

Q    Because they're all around three nanometers; right?

A    Correct.

MR. FENSTER:  And if we can go to JX-2000, Mr. Mortensen, at Column 5, lines 3 to 5.

BY MR. FENSTER:

Q    (Reading:)

UNITED STATES DISTRICT COURT

"In some embodiments the thickness of the hard magnetic storage layer is between 3 nanometers and 30.  In other architectures it can be outside of these ranges"; correct?

A    That's correct.

Q    The patent expressly discloses that the hard magnetic storage layer can be as thin as 3 or even thinner nanometers; correct?

A    Only with the proper materials.

Q    Okay.

A    The Court agrees that we can argue that materials properties are important.  And if you had an anisotropy that's huge, as Dr. Suess listed on the patent, then three nanometers would be sufficient.  But with the materials that we use in the industry, three nanometers is totally insufficient to be thermally stable.

        MR. FENSTER:  Move to strike as nonresponsive after "yes."

        THE COURT:  It will be stricken.  Disregard everything after "yes," ladies and gentlemen.

        MR. FENSTER:  Now would be a good time for a break, Your Honor.

        THE COURT:  We'll take a break here, ladies and gentlemen, for 15 minutes.  Please remember the admonition.

        THE COURTROOM DEPUTY:  All rise.

UNITED STATES DISTRICT COURT

**(Recess from 10:32 a.m. to 10:49 a.m.)**

**(In the presence of the jury.)**

THE COURTROOM DEPUTY:  Be seated and come to order. This Court is again in session.

MR. FENSTER:  May I proceed?

THE COURT:  You may.

BY MR. FENSTER:

Q    Good afternoon, Dr. Bertero -- are we still morning? Good morning.

A    Good morning.

Q    I'd like to talk to you about your opinions on coercive field.  So pretty much your primary noninfringement argument, I think it's fair to say, is the coercive field -- that Dr. Re used the wrong formula; fair?  You disagree with his methodology?

A    No.  We have two main objections.

Q    We talked about the hard storage layer.

A    That's the main one.

Q    Sure.  And the next one is that you disagree with the methodology that Dr. Re used to calculate the coercive field requirements of the claims; right?

A    Correct.

Q    Okay.  Now, you agree that the patent at Column 6, line 54, states clearly, "The coercive field is Hc equals 2K effective over M effective."  You agree that that's in the

patent; correct?

A    It's in the patent.

Q    And I understand that you disagree that that formula is the right formula, but that's what the patent says, yes?

A    Yes, but...

Q    Dr. Bertero, and that's the formula that Dr. Re applied; correct?

A    Correct.

Q    And you don't dispute that he correctly applied -- I know you disagree with the formula, okay, but you don't disagree that --

A    I don't disagree the formula as stated in the patent.

Q    I know you disagree that it was improper for Dr. Re to rely on this formula that's stated in the patent in calculating the coercive field for -- in this case; right?

A    That, I do, yes.

Q    Okay.  But you don't disagree with -- that his calculations are right.  In other words, if this is the right formula, you agree that the 2K over M value for each of the G1 values in the accused products exceeds 0.5 tesla; correct?

A    That's not the coercive field.

Q    Dr. Bertero.  Dr. Bertero, stay with my question, please.

A    0.5 tesla is defined as the coercivity.  The Court construed coercivity --

Q    Dr. Bertero, I'd ask that you wait for my question,

UNITED STATES DISTRICT COURT

please.  Okay?

A     Ask your question, please.

Q     I'm getting there.

Dr. Bertero, the coercive field -- strike that.

Dr. Re applied the formula that the coercive field equals 2K over M; correct?

A     That's not how the Court defined "coercive field."

Q     Dr. Bertero, stay with my question.

Dr. Re applied the formula in the patent, 2K over M, to determine coercive field; correct?

A     Correct.

Q     Okay.  And let's just figure out where we agree and disagree.  You don't disagree that his calculations of 2K over M are right.  You agree that, if that were the right formula, which I know you disagree with, it is true that the 2K over M value for each of the G1 layers exceeds 0.5 tesla; fair?

A     Yes, but I disagree with the methodology as well.

THE COURT:  Sir.  Sir.

THE WITNESS:  Yes.

THE COURT:  Answer only the question.

THE WITNESS:  Okay.

THE COURT:  He'll have a chance to ask you additional questions to provide additional information.  But it will go much quicker for all of us if you listen to the question and answer the question.  Can you do that?

UNITED STATES DISTRICT COURT

THE WITNESS:  I can.  I'll try my best.

So I have to disagree then.

BY MR. FENSTER:

Q     You disagree that the 2K over M values for each of the G layers exceeds 0.5 tesla?

A     2K over Ms exceeds 0.5 tesla, but that's not the coercive field.

Q     My question, Dr. Bertero -- and I'd ask that you really just answer my question.  I'm going to give you a straight question; I'd like a straight answer -- you agree that the 2K over M value that Dr. Re calculated for each of the G1 values exceeds 0.5 tesla; correct?

A     That, I do, yes.

Q     Thank you.

And you also agree that the 2K over M values that Dr. Re calculated for the G1 values exceeds the Hn values that he calculated using 2K effective over M effective; correct?

A     Yes.

Q     Okay.  So if this formula is correct, you agree that -- and I understand this is a hypothetical for you.  If that formula is the right formula to apply, you agree that Dr. Re shows that those limitations have been met; correct?

A     If the formula is the right one, yes.

Q     Okay.  Now, you did not present any test data in your direct for coercive field either for the hard storage layer or

**UNITED STATES DISTRICT COURT**

the nucleation host; correct?

A    I was not allowed to.

Q    You think that instead of using this formula, Dr. Re should have done a measurement like a BSM or MOKE measurement; right?

A    He could have asked for the samples to be made and measured them.  Absolutely.

Q    Okay.  But the accused products have a time -- a recording timescale of approximately 1 nanosecond; correct?

A    They do.

Q    And MOKE measurements are typically performed at a timescale of 3 to 10 seconds; correct?

A    Correct.

Q    You agree that that's not even close, it's orders of magnitude off from the timescale in normal operating conditions; correct?

A    That's how it's done all the time, yes.

Q    The difference in magnitude is like the difference between 1 second and approximately 32 years; correct?

A    10 to the 9.  So I assume that's correct.

Q    Now, Dr. Suess -- you were here for his testimony, yes?

A    I believe I was, yes.

Q    And he testified that he chose 2K over M because it was good approximation of coercive field at recording timescale.

Do you recall that?

**UNITED STATES DISTRICT COURT**

A    I don't, but I take your word for it.

Q    And you were here for Dr. Re's testimony; right?

A    I'm sorry.  Let me correct my statement.  Dr. Suess stated that 2K over Ms -- that Hn value is less than 2K over Ms effective.  So that's what I recall.

Q    Okay.  And Dr. Re -- you were here for Dr. Re?

A    Dr. Re, yes.

Q    And Dr. Re testified that at recording timescale of approximately 1 nanosecond, the coercive field is approximately 2K over M.

        Do you recall that?

A    No.  It says it's equal to, not approximately.

Q    Now, you're familiar with Dr. Papusoi?

A    I am.

Q    He's a testing engineer at WD; right?

A    Product testing, yeah.

        MR. FENSTER:  If we could have PDX-3.141, please.  And blow up the whole right side, including the formula at the top, please.

BY MR. FENSTER:

Q    So this is -- this is Dr. Papusoi testifying.  He said (as read):

        "So this is what we just described, that the recording in Western Digital's hard disk drive occurs on a short timescale approximating

UNITED STATES DISTRICT COURT

1 nanosecond; the coercivity approaches Hk, which equals 2K over MS; correct?"

And he answered "Yes."

Did I read that correctly?

A    You read correctly.

Q    And I asked him:

"Hk, which is the approximate value of the coercivity on the short timescale of approximately 1 nanosecond; correct."

And he answered "Yes"; correct?

A    Correct.

Q    Now, you disagree, even if other engineers at Western Digital say that the coercive field can be approximated by 2K over M at recording timescale; correct?

A    I don't believe that Dr. Papusoi was correct.  I don't believe other engineers would agree with that.

Q    Now unlike you, Dr. Papusoi, when he testified, he was not being paid; correct?

A    Correct.

Q    And in addition to Dr. Papusoi's testimony, WD has published articles stating that the coercive field approaches 2K over M at recording timescales; correct?

A    "Approaches" is the correct word, yes.

MR. FENSTER:  And if we can bring up JX-2036.  This is -- if you blow that up.  This is an article by Dr. Papusoi.

**UNITED STATES DISTRICT COURT**

And if you can go to the two call-outs.

BY MR. FENSTER:

Q    (As read:)

"Since recording occurs on a short timescale (approximately 1 nanosecond), the medium coercivity and saturation field approach the anisotropy field Hk equals 2K over M, where Ms is the saturation magnetization."

Right?  That's what the article says?

A    That's what the article says, yes.

Q    Other scientists also use 2K over M for switching fields; correct?  Or coercively?

A    For anisotropy field, yes.  Coercivity, no.

Q    Let's go to the Gupta-Harrell article.  This is at DX-1583.

And this is Gupta and Harrell.  These are the scientists who don't know anything in the University Alabama MINT magnetics system; right?  That's the -- that's what this article is, Dr. Bertero?

A    Yes.

Q    Okay.  And they say that (as read):

"Although materials with very high magnetic anisotropy energy per unit volume exist, their use is precluded by the field requirement for the coherent reversal of a grain which is proportional

to Ku" -- and it says, "Hs equals 2K over M.";
right?

A     That's the saturation field.  It's not coercivity.

Q     Hs is coercivity, isn't it?

A     Hs is saturation field.  The same for anisotropy field.

Q     So bottom line, Dr. Bertero, you agree that if the formula in the patent is applied, the accused products meet the coercivity -- the coercive field requirements; correct?

A     If Dr. Re proves that, that would be correct.  But I don't -- I don't -- I know that he used the wrong formula.

Q     Okay.  Now, you were part of an advanced recording group at Komag -- this is way back in the day -- that was responsible for researching and investigating new technologies; correct?

A     Correct.

Q     It was your job to keep on top of the latest and greatest research when it came to magnetic recording media?

A     I tried to, yes.

Q     And the first time that you heard anyone -- anyone introduce the concept of multiple magnetic layers on top of a hard storage layer was from Dr. Suess in 2006; correct?

A     I'm sorry.  Can you repeat that?  Because I believe that's not correct.  But if you repeat it, I'll be able to...

Q     The first time you heard anyone introduce the concept of multiple magnetic layers on top of the hardest recording layer was from Dr. Suess in 2006; correct?

A     No.   That's very incorrect.

Q     All right.  Let's go to your deposition.  This is in January 30, 2024, at page 31.

      And I asked:

      "When was the first time that you heard anyone introduce the concept of introducing more than one layer on top of the hardest recording layer in order to increase the figure of merit."

      And you said:

      "So in the context of magnetic recording, that was probably Dr. Suess in about the same time, 2005, I believe.  No, sorry, 2005, because that would have been the bilayer.  More than two layers, probably 2006 by Dr. Suess."

      Do you recall that?

A     Yes.  Obviously, I was --

Q     Did I read your testimony correctly?

A     You read it correctly, interpret it incorrectly.

Q     If we can have -- let's talk a little bit about your benefits opinions.  So Dr. -- you were here for Dr. Desai's testimony?

A     I wasn't.

Q     You weren't.  Well, let me show you from the trial transcript at 64 to 67.

      Page 64, he said:

**UNITED STATES DISTRICT COURT**

"And do you agree that media segregation is key for areal density increase."

"Absolutely."

A    I agree.

MR. FENSTER:  And if we could pull up -- and if you go to Claim 66 -- or page 66.

BY MR. FENSTER:

Q    He was asked:

"Does segregation have anything to do with the relationship between different layers."

And he answered "No."

A    That's correct.

Q    Now, you were here for --

(To Mr. Mortensen)  Or let's pull up PDX-2.24.

And Dr. Suess identified better grain segregation as a benefit of the invention that leads to areal density during his testimony.

Do you recall that?

A    Yes.  I found that to be amazing.

Q    And if we can pull up PDX-3.216.

You were here when Dr. Re identified better grain segregation as one of the benefits that Western Digital's use of the invention leads to increased areal density; right?

A    I was.  I was.

Q    Now, you said that you agreed with Dr. Desai, that the

layers have nothing to do with grain segregation, the relationship of the layers?

A     That's not how it was stated in Dr. Desai's testimony. The relationship between the layers has nothing to do with grain segregation.  That's what Dr. Desai testified.

Q     The patented inventions here relate to multiple layers in the ferromagnetic -- in the nucleation host, two or more layers in the nucleation host in addition to the storage layer; correct?

A     Correct.  But --

Q     You've answered me.

      And Dr. Suess explained that the more layers you add, the more benefits you get; right?

A     For writeability and, yes, for coercivity reduction.  But not for grain segregation.

      MR. FENSTER:  And if we can go to PDX-3.62.

BY MR. FENSTER:

Q     Here we see the mag structure revolution showing that Western Digital has, in fact, been following Dr. Suess's roadmap, adding more layers to increase areal density; correct?

A     This is not what it's represented in the real products.

      And let me point out that the annotations here are not WD's.  It's the nucleation host, hard storage layer --

Q     That's correct.

A     -- soft underlayer, and the red arrow.

**UNITED STATES DISTRICT COURT**

Q    These are ours.

A    Those are not WD's.

Q    Right.  That's not the point, though.

The point is:  In the slide, the mag layer structure revolution has been that Western Digital has continued to increase layers to increase areal density over the years; correct?

A    That is true.

Q    Okay.  Now if we can go to PDX-3.113.

And this is the overview slide showing all of the accused products.  And the accused products also show that Western Digital has, in fact, added more and more layers going from three mag layers to seven layers over the years to increase areal density; correct?

A    That is always the progression in designing magnetically.  It was true in longitudinal magnetic recording and it's true in perpendicular recording, correct.

Q    Contrary to what you just said and what Dr. Desai said, the reason WD adds additional layers is to improve grain segregation; correct?

A    It's one of the reasons, but has nothing to do with Dr. Suess's patent.

Q    Let's go to your report.  You agree that the reason that WD adds additional layers is to improve grain segregation ; correct?

A    Not the sole reason, no.

Q    Let's go to your report, paragraph 268.

At the bottom there you state (as read):

"The reason for adding layers was to improve grain segregation..."

That was in your expert report; correct?

A    Okay.  But not the sole reason.

Q    Okay.  And if we can go to PDX-222 -- no.  This should be JX-2018, is what I'm looking for.

MR. FRENKEL:  It's in the cross binder.

MR. FENSTER:  That's right.  Let's move on.

BY MR. FENSTER:

Q    Now, you talked about -- you were here to respond to Dr. Re's quantification of the benefits attributable to Western Digital's use of the invention; correct?

A    Not quantification, but his opinions.

Q    But you know that Dr. Re did, in fact, rely on Western Digital's documents to quantify each of the contributions and come up with his 46 percent; correct?

A    Documents that don't necessarily reflect what's in the products.

Q    Now, you talked about a lot of technologies, but you didn't quantify any of them; correct?

A    That was not my job.

Q    That was not your job?

**UNITED STATES DISTRICT COURT**

A      No.

Q      The fact is that once Western Digital introduced the trilayer system with increasing anisotropy, the layers only got more complicated, not less; correct?

A      What do you mean by "more complicated"?

Q      More mag layers, more break layers, all with graded anisotropy.

A      The product got more complex.  But not the layers, right.

Q      Once you -- once Western Digital introduced the trilayer system, they never went back to a bilayer system; correct?

A      No.  It'd be silly to do so.  You spent millions of dollars to be able to do that.

Q      Now, adding layers is expensive; right?  You told me that to add each layer, it cost tens of millions of dollars to add a new chamber; right?

A      I just stated that, yes.

Q      So the benefits that Western Digital achieves from adding each new layer must far exceed that; fair?

A      Yes.  I just -- you have to, you know, amortize it and make up for that investment, of course.  But adding layers has nothing to do with Dr. Re -- Dr. Suess invention.  Adding layers has always been the trend.  It allows you for more degrees of freedom designing products.

Q      Dr. Bertero, it's true that today you have not offered any testimony that Western Digital would have been able to

achieve the areal density gains that it has without using a
multilayer structure with overall increasing anisotropy toward
the G1 layer; true?

A       That's not true.

Q       You're saying that you told the jury today that there
were other ways to achieve the same density without using
multilayer?  You didn't give that opinion today, did you?

A       No, I didn't give that opinion but --

Q       Okay.  That was my question, Dr. Bertero.  On the stand
when you were up here on direct examination to tell the story
that Western Digital wanted you to tell, you didn't tell the
jury that there was -- that Western Digital had any other way
to achieve the areal density gains that it has achieved other
than using a multilayer exchange coupled stack that has overall
increasing anisotropy down towards the G1 layer; correct?

A       In WD, if you include --

Q       Can you answer my question?  Did you give that testimony
or not?

A       No, because that's not how people talk about.  We don't
stop before the G1 layer.  For us it's one single stack, and if
you do that, then you realize that your statement is incorrect.

                MR. FENSTER:  Move to strike, Your Honor.

                THE COURT:  Answer will be stricken.

                Ladies and gentlemen, you recall in the initial
instructions, I gave you a number of factors that you could

consider in evaluating the weight of a witness's testimony. One of those ways is to consider the witness's manner while testifying.

BY MR. FENSTER:

Q    Dr. Bertero, I'm going to ask you one more time.

A    Okay.

Q    On direct examination, you did not offer any opinion that Western Digital had any noninfringing way to achieve the same areal density benefits with -- other than by using a multilayer graded anisotropy product; correct?

A    I did not opine on that, yes.

Q    Thank you.

         MR. FENSTER:  I'll pass the witness.

         THE COURT:  Mr. Frenkel.

         MR. FRENKEL:  Yes.  One second, Your Honor.

**REDIRECT-EXAMINATION**

BY MR. FRENKEL:

Q    Dr. Bertero, you recall Mr. Fenster asking you whether you were hired by Western Digital to find noninfringement?

         Do you remember that question?

A    I do.

Q    Were you hired by Western Digital to find noninfringement at all costs or to evaluate noninfringement?

A    To evaluate noninfringement.

Q    And if you had found infringement, would you have served

**UNITED STATES DISTRICT COURT**

as an expert in this case?

A    As I stated in the direct testimony, if I had found that WD is infringing, I would have told WD that WD is infringing, and no.

Q    All right.  Mr. Fenster put your declarations in front of you and asked you questions about them.

        Do you remember that?

A    I do.

Q    And he suggested that you may not have told the truth in your declarations; is that right?

A    That's what he did.

Q    Did you do that?  Did you lie in your declarations?

A    No, absolutely not.

Q    Would you ever do that?

A    No.

Q    Let's look at the declarations.  The first one that I think you went to was a declaration from you, signed on August 9, 2023.  Give me one second.  Takes a minute for it to boot up.

        This is a cover page to the declaration.  Declaration in support of --

        MR. FENSTER:  Your Honor, objection.  We've been careful to avoid the pretrial motions and so forth.  I just showed the redacted declaration so that we didn't get into the back-and-forth in pretrial proceedings.

**UNITED STATES DISTRICT COURT**

MR. FRENKEL:  I can ask it a different way, Your Honor.

BY MR. FRENKEL:

Q    Dr. Bertero, were you involved in the legal arguments surrounding the declarations?

A    No, not at all.

Q    Were you just involved in the scientific part?

A    Yes.

Q    All right.  Well, he showed you paragraph 24 of the declaration, which says (as read):

"In sum, the relative anisotropy of the heterogeneous adjacent layers in the finished stack cannot be determined based on the target layer compositions nor by any other data possessed by WD."

Was that true when you wrote it?

A    Yes, that's what I was trying to say.

Q    Why is it true?

A    Because once you build up the stack, it's impossible to determine -- to measure in any possible way what the anisotropy of every one of those layers present in the product is.  It's just not possible with the tools that anybody hasn't had.

Q    But if asked, Western Digital could provide the layers so that those could be measured?

A    Yes, they could have asked for that.

UNITED STATES DISTRICT COURT

Q    All right.  Next, he turns to -- again, I won't show the cover page, but it was your April 17, 2023, declaration.  And we looked at paragraph 16, which I think spans the page, the sentence he was looking at.  It says here that based on your years of experience (as read):

"Designing, developing, and testing media..., it does not measure or develop its media based on the intrinsic anisotropy of the alloys it uses. Western Digital may measure anisotropy for the storage layer on rare occasions but those are not part of the media design documentation."

Take that one sentence at a time.  Is it true that Western Digital does not develop its media based on the anisotropy of the alloys it uses?

A    Yeah, I believe that's a true statement.  It's rare that you would ask anybody in this sputter media development organization as to what the target anisotropy in this chamber is or that chamber.  It's just not how it's done.

Q    But does Western Digital measure the anisotropy for all of the storage layers of the stack as part of development or of some of them?

A    No.  Not as part of -- it measures the magnetic properties of alloys and materials, but you saw many holes in the product description that had to be filled up by looking at the published literature.  It supports that statement.

UNITED STATES DISTRICT COURT

Q    And then -- Mr. Fenster then turned to your March 23rd, '23, declaration.  And on this one, he put up Footnote 1 and said that you used the term "nucleation host."  If we could just -- I'm going to just -- what Footnote 1 is referring to -- you said (as read):

            "What plaintiff asserts is the depth of the
        'nucleation layer.'"

            In Footnote 1, were you just using the nomenclature that was provided by plaintiff?

A    I was.

Q    Do you use the term "nucleation host" within Western Digital whether it's relevant or not?

A    We never speak about the layers in WD in the manner that Dr. Suess does in the patent at all.  There's no nucleation host or hard magnetic storage layer.  We design all of the layers to be fairly symmetric in function and in thickness, so no.  The answer is no.

            MR. FRENKEL:  Okay.  Let's go to a document that Mr. Fenster used, JX-2030.  Mr. Schmoller, if you can put that up.

BY MR. FRENKEL:

Q    And he pointed you to -- first of all, he talked about the trilemma, and so let's just look at Slide 8.  And this is one that the jury has seen a lot, and this is from, I guess, a presentation.  The media trilemma:  Has Western Digital been

able to overcome the media trilemma through its years and years and years of research?

A     No, not at all.

        MR. FENSTER:  Objection, Your Honor, beyond the scope.

        MR. FRENKEL:  He referred to it in his cross.

        THE COURT:  Sustained.

BY MR. FRENKEL:

Q     Okay.  Let's go to Slide 13.  Mr. Fenster definitely showed you this slide; right, Dr. Bertero?

A     He did.

Q     And he asked you if this was accurate as to how the Western Digital products work; is that right?

A     He did.

Q     All right.  And is this meant -- peering back to the first page, Mr. Schmoller -- is this a presentation that was made publicly?

A     Yes.  2018 MRS Spring Meeting.  "MRS" stands for Materials Research Society.

Q     April in Phoenix sounds nice.

        MR. FRENKEL:  If you could go back to Slide 13, please.

BY MR. FRENKEL:

Q     Is this an accurate representation of what's happening in the Western Digital products?

A    No, not at all.  This is a model structure that Dr. Srinivasan might have made to be able to show publicly, but it's not what's in the products.

MR. FRENKEL:  All right.  And then if we could go to JX-2032, Mr. Schmoller.

All right.  And on this one if you could turn to -- sorry.  I've lost my notes here.  Give me one second.  Sorry. That's the slide I wanted to keep, Mr. Schmoller.

BY MR. FRENKEL:

Q    Do you remember Mr. Fenster showing you the anisotropy gradient for the GX1 product?

A    He did, yes.

Q    And actually, it was for the GT5 product.

MR. FRENKEL:  If you could go to Slide 6, Mr. Schmoller.  That's not the one.  Sorry.  If you could go back to Slide 5.

BY MR. FRENKEL:

Q    He asked you about the fact that it went from low to high to very high in the GX1 products.

Do you remember that?

A    I do.

Q    And why would JX-2032 and other documents like it describe an anisotropy gradient if the DCM recipes for the accused products shows there is none?

A    Because you don't want to show, even internally, to the

rest of the company what exactly is in the products.  People leave one job, go to another company.  That type of information is usually kept fairly tight.  But obviously, the jury has seen the recipes for each one of the products, and it's not what's represented in this document.

Q    Now, GT5, Mr. Fenster showed you that it was -- he told you that it was a Group 4b product.

But if we could go to PTX-129, please.  Excuse me one second.

And do you see "GT5" there in the top, Dr. Bertero?

A    I do.

MR. FRENKEL:  And then if we could go to, really quickly, Mr. Schmoller, PDX-3.101.

BY MR. FRENKEL:

Q    Is it your understanding that the GT5 layer is actually part of the Group 4c product, not the Group 4b product?

A    Okay.

MR. FRENKEL:  All right.  Now let's go to PTX-129. Mr. Schmoller, if you could blow up the Ku column just for the G layers.

BY MR. FRENKEL:

Q    Looking at the 4c products -- it's still hard to read, but I'll read it for the record.  It says, "5.88" -- oop, no. "5.88, 8.27, 8.27, 7.67, 7.67, 7.17."  Is that an accurate depiction of what we saw in JX-2032 with a very high at the

bottom -- in the layer above it and going -- and the anisotropy getting lower as you go up?

A    No.  This is exactly what I was making a reference before, that the descriptions that you see in those schematic diagrams do not represent at all what's actually in the products.

Q    Okay.  If you could go to PTX-29, please.

Do you recall Mr. Fenster showing you PTX-29?

A    I do.

Q    And he showed you a page on the cap layer, which we can --

Mr. Schmoller, you can just scroll through so I can find the page.  All right.  Go back one.  One more.  There you go.

BY MR. FRENKEL:

Q    I think he showed you this page?

A    He did.

Q    PTX-29.  That representation, the middle of the triple EBL product, is it your understanding that that product has a single hard magnetic storage layer that is independently thermally stable?

A    No, not at all.

MR. FENSTER:  Objection.

THE WITNESS:  No layer here would be able to store -- store -- meaningfully store information for any reasonable period of time on their own.

**UNITED STATES DISTRICT COURT**

BY MR. FRENKEL:

Q    All right.  And then he showed you PDX-3.62 next?

A    I don't recall, but --

Q    I'm sorry.

A    Yes.

Q    And, again, is this representation having a low low Ku, a low Ku, and then a high Ku representative of any product -- commercial product that Western Digital has released at any time where those products would have been sold after the issuance date of the patent?

A    Not to my knowledge.

        MR. FRENKEL:  All right.  Then turn to PDX-3.60. No, I don't need to use that.  Okay.  Now let's go to DX-1583.

        If you could blow up the paragraph that we were looking at, the first paragraph.

        Evidently, I need to see the optometrist when I get out of here.

        The second paragraph, Mr. Schmoller.

        And the sentence that he was referring to, first, it says:

        "The idea is the realization that it is not

    necessary to reverse all the atomic moments of the

    grain simultaneously."

        And there's a citation to References 1, 2, and 3.

        Do you see that?

A    I do.

Q    And you mentioned Dr. Suess, but if you can go to the last page --

Mr. Schmoller, next page of the article.  Sorry.

And look at Reference Number 1.  Is that Reference Number 1 to Dr. Victora's work that you spoke about earlier?

A    Yes, it is.

Q    And if we can go back to the previous page.

And it says, "In fact, as emphasized" --

If you go to "Opportunity" and blow that up.  Thank you.

Do you remember Mr. Fenster asking you about the sentence:

"In fact, as emphasized by Suess and
Visscher, by properly grading the anisotropy
profile of the magnetic column, one can, in
principle, switch an arbitrarily hard material with
an arbitrarily small magnetic field by designing
the material in such a way that the energy of a
column containing a domain wall in the presence of
a specified magnetic field is independent of the
domain wall position."

And let me just ask this question carefully, because I don't want to run afoul of any orders.  But is it your understanding -- what is your understanding of the term

**UNITED STATES DISTRICT COURT**

"arbitrarily hard" in that sentence?

A    That it could be of any value.

Q    Okay.  And --

A    Any value -- high value.

Q    What kind of value would -- and do you see that it says that, "by Suess," "in principle"?  What is your understanding of what that was referring to?

A    Because it's a theoretical construct.  It's not really possible.  And it's not -- it's not something that we had available to do in our product.  It would require -- as described here having a domain wall that moves, as Dr. Suess showed, would require extremely thick media overall thickness that is just not practical in our products.  Our products have, if anything, gotten thinner, even by adding more layers.

Q    All right.  Let's turn to PDX-3.152 for a second.

        Do you recall you were asked about this element -- and just, again, listen to my question very carefully.  You're not -- you are disputing in this case the coercivity measurements of that element mentioned -- that Dr. Re had; correct?

A    Correct.

        MR. FRENKEL:  Okay.  Now let's go to JX-2000, please.  And if you could, Mr. Schmoller, go to Column 5, please.  And if you could look at lines 1 through -- blow up lines 1 through 7, Mr. Schmoller.

UNITED STATES DISTRICT COURT

BY MR. FRENKEL:

Q    Do you recall Mr. Fenster asking you -- it says:

"In some embodiments the thickness of hard magnetic storage layer 24 is between 3 nanometers and 30 nanometers"?

A    I do.

Q    And you testified that -- I'm sorry.  Let me rephrase that.

Is it your belief that in order to have a single hard magnetic storage layer that's independently thermally stable, using the materials that are available to hard disk drive -- using the materials that Western Digital uses today, would it be able to be 3 nanometers?

A    Impossible.  It's just too thin.  And the materials that we use are the materials that we can use.  There are other materials in nature that would give you much, much higher anisotropy, but they're not usable in the hard disk drive.  We just don't have them available to us.

Q    Now, did Dr. Suess disclose materials that are hard enough that you could use thin layers in a hard magnetic storage layer that's thermally stable?

A    Yes, he did.

Q    Do you see any there on the screen above what we're looking?

A    Those are not the materials that he -- that he disclosed.

**UNITED STATES DISTRICT COURT**

There's another section in the patent where he mentions samarium-cobalt or L10 iron-platinum.  Those materials have extremely, extremely high anisotropy values.  But they're not usable in our products.

Q    And you mentioned samarium.  Is that on the periodic table, and does it have the abbreviation "Sm" that's on line 2 there?

A    Yes.

Q    What is samarium?

A    Samarium is considered a rare-earth element.  It's usually alloyed with cobalt.  And samarium-cobalt gives you extremely, extremely high saturation -- sorry -- anisotropy, but it's extremely highly corrosive.  It's just extremely difficult to handle.  You have to ship those targets in oil, immersed in oil, to prevent corrosion.

You cannot orient them and manipulate them and create them in granular form.  They tend to amorphize, meaning that the crystal structure would -- would not be crystalline. It would be amorphous.  So not practical for any use in magnetic recording.

Q    And you mentioned corrosion a couple times.  What's the impact of corrosion if you use materials that are inappropriate for hard disk drive manufacturing?

A    The drive just cannot handle corrosion at all.  It has to -- the surface has to be perfect.  The head is flying at

**UNITED STATES DISTRICT COURT**

10 -- at 10 angstroms.  1 nanometer of the surface of the disk. 1 nanometer.  That's 5 atoms thick.  And so if any corrosion of any kind happens, the drive fails.

Q    All right.  Let's go to Claim 1 of the '864 patent.  I believe Mr. Fenster asked you if you limited your analysis to the independent claims of the patent, and you said yes.

Do you remember that?

A    Yes.

Q    Is that because if the independent claims are not infringed, then neither are any of the dependant claims?

A    That's correct.

Q    Mr. Fenster referred to -- I'll quote him.  He said it three times, "exchange coupled magnetic multilayer stack."

Looking at the claim, is that what it says there?

A    No, it's not.

Q    And what does it say?

A    "Exchange coupled magnetic multilayer structure."

Q    Did you look at the Court's claim construction for what that must be?

A    Yes.

Q    And I don't have it up here, but do you remember what it was?

A    It's a multilayer structure consisting of two separate modules --

Q    Stop.  It consists of which words on this page?

A    A hard magnetic storage layer and a nucleation host.

Q    Okay.  Let me move on.

And once again, Mr. Fenster asked you whether this stack, the entire stack -- and he was asking about the claim, but then he had started asking about G1.  He asked you if the entire stack in Western Digital's products was stable, and you said it was.  That's true; right?

A    Correct.

Q    But is the G1 layer on its own stable?

A    No.  It cannot be.  It's too thin for the anisotropy values of our samples.  You would have to have a thickness of the entire stack for that layer to be thermally stable.

Q    Okay.  If we could turn to PDX-3.141.

Ah.  Dr. Papusoi.  All right.  He asked you questions about this testimony from Dr. Papusoi.  Why don't you explain to the jury what Dr. Papusoi's job was within Western Digital.

A    Yeah.  Dr. Papusoi leads a lab where they do BSM measurements or measurements of coercivity and energy barrier and other characterizations that have nothing to do with magnetic recording.  Dr. Papusoi is not a magnetic recording expert.

Q    And --

A    I recall Dr. Papusoi stating that he doesn't even know what the field -- the writing field is in the recording that

was shown.

Q    Okay.  And then back to my previous question.  Well, actually, let's go to your deposition next.

Mr. Schmoller, it's the January 30th, 2024, deposition.  One second.  I think it's at page --

MR. FENSTER:  Your Honor, objection.  Hearsay.  I don't -- there's a ruling.

MR. FRENKEL:  You used it on his cross.  You asked him about a question on cross.  I'm just asking a redirect question.

MR. FENSTER:  I don't think it's proper to show the jury.

THE COURT:  On the mic, please.

MR. FENSTER:  I think he can ask the question.  I'm not sure that it's proper to show the jury his own deposition testimony.  And it's a hearsay statement.

MR. FRENKEL:  I apologize.  I thought you put it up when you -- no, I disagree.  He put it up on the screen and asked questions about it.  I should be able to do the same.

MR. FENSTER:  That's for impeachment, Your Honor.

MR. FRENKEL:  But this is redirect.

THE COURT:  Sustained.

MR. FRENKEL:  All right.

BY MR. FRENKEL:

Q    Well, I'll read the question.  It says:

"When was the first time that you heard of anyone introduced the concept of introducing more than one layer on top of the hardest recording layer in order to increase the figure of merit."

And you mentioned, going down a little bit:

"More than two layers, probably 2006, by Dr. Suess."

And it continues:  "And Dr. Suess made very, very wild claims of being able to achieve arbitrary high figures of merit."

Was that testimony true and accurate at the time of your deposition?

A     Yes.  As read, yes.  So it was -- I was referring to the specific structure that Dr. Suess had proposed.

Q     And, again, we showed some slides at the end of your direct testimony.  I'd like to go back to those, but let me first ask you a foundational question.

In your slides that you showed after attending Intermag, did you include the entire presentation by Dr. Suess or only excerpts?

A     Excerpts.

Q     But had you seen the entire presentation?

A     Yes, I have.

Q     All right.

MR. FRENKEL:  Your Honor, I'd like to use on

**UNITED STATES DISTRICT COURT**

redirect the entire Dr. Suess presentation, PTX-286.

MR. FENSTER: Objection, Your Honor. Beyond the scope. This wasn't something I asked about.

THE COURT: Sustained.

MR. FRENKEL: All right.

BY MR. FRENKEL:

Q   From your recollection at the time, of the concept that Dr. Suess testified, was that -- did he disclose a structure that was too thick, in your memory?

MR. FENSTER: Same objections, Your Honor. And also in violation of the MIL that we talked about comparison to prior art.

MR. FRENKEL: No.

THE COURT: Sustained.

MR. FRENKEL: Okay.

BY MR. FRENKEL:

Q   With the materials available to you at Western Digital, how thick would the G1 layers need to be to store information in magnetically oriented bits?

MR. FENSTER: Objection, Your Honor. Same objection. This is comparing to prior art.

THE COURT: Sustained.

MR. FRENKEL: Your Honor, this wasn't prior art. I'm talking about the accused product.

THE COURT: Effectively, you've asked the same

question.

MR. FRENKEL:  If I rephrase it just referring to the accused products, Your Honor, would that be acceptable?

MR. FENSTER:  Your Honor, the patents do not place any requirement.  There's no requirement in the claims as to a minimum or maximum thickness.  It's totally irrelevant to the Court's claim -- to the claims.  It's in violation of the Court's MIL.

MR. FRENKEL:  It's not in violation.  It's not irrelevant.  But if you agree...

THE COURT:  Sustained.

MR. FRENKEL:  Okay.  Then we'll pass the witness then.

Thank you, Dr. Bertero.

THE COURT:  Mr. Fenster.

**RECROSS-EXAMINATION**

BY MR. FENSTER:

Q    Dr. Bertero, I just have a few questions.

So Mr. Frenkel was asking you about whether the car- -- what you call the cartoons in the design documents represent your actual products, and you said no.

Do you recall that?

A    I didn't say "cartoons."  I said "schematics."

Q    Okay.  But you know that Dr. Re used the actual recipes and the actual data in doing his analysis; correct?

A    Correct.

Q    Okay.  The -- you have stated that -- both in your declaration and, I think, on the stand, that WD does not design its products with respect to the anisotropy data; right?

A    What I --

Q    Something along those lines?

A    Something, but not quite that.  WD does not ignore anisotropy, but it doesn't have the values of anisotropy of all of the layers in its products, emphasizing the fact that it's not something totally relevant for the design of the WD product.

Q    Okay.  If we can pull up Dr. Desai's deposition testimony.  Dr. Desai was testifying as the corporate representative on behalf of Western Digital at his deposition, designated to provide testimony for WD.

At page 120, lines 7 through 14, Dr. Desai was asked:

"So the measurements in Exhibit 11" --

(To the jury)  And I'll represent to you, ladies and gentlemen, and to Dr. Bertero, Exhibit 11 at the time was JX-2015.  That's the spreadsheet with all the anisotropy data.

He was asked:

"Okay.  So the measurements in Exhibit 11 help you develop new iterations of existing media design; is that right?

"ANSWER:  Yeah.  It helps me develop the media design.  Knowing those characteristics is helpful."

        Did I read that correctly?

A    That's correct.

Q    And if you can go to Dr. Desai at page 134, lines 5 through 8, he was asked again:

        "QUESTION:  I see.  So the measurements in Exhibit 11" -- again, that's JX-2015 -- "for SL6A, one of the accused products -- may be useful in optimizing or further improving the media design?

        "ANSWER:  That's correct."

A    That is correct.  But still it doesn't -- it doesn't violate -- or it doesn't oppose the statement that I made before.  You do want to know in general what the values of the magnetic properties are.  But like I said, there are many missing ones.

        MR. FENSTER:  Can you please pull up PDX-3.126.

BY MR. FENSTER:

Q    So Mr. Frenkel was asking you about the claim construction for exchange coupled magnetic multilayer structure.  And it is a mouthful, and sometimes I shorten it. It's -- it is "exchange coupled magnetic multilayer structure." And the Court's claim construction is "a structure including a nucleation host that is exchange coupled to a hard magnetic

storage layer"; correct?

A    Correct.

Q    There is nothing in the claim -- the only place that the hard magnetic storage layer occurs in Claim 1 is as part of the exchange coupled magnetic multilayer structure where it is exchange coupled to the nucleation host; correct?

A    No, it's incorrect.  The claim construction for hard magnetic storage layer is a layer, one layer.  It's not a multilayer.

Q    All right.  Dr. Bertero, Mr. Frenkel started by asking you about some of your declarations and whether they were true?

A    Correct.

Q    And you understand that here the oath that you gave is to tell the truth, the whole truth, and nothing but the truth; right?

A    Absolutely.

Q    So you agree that it would be -- that today you're under the obligation to be truthful and not say something that would be misleading by omission; right?

A    Correct.

Q    When you signed your declaration, did you have the same understanding?  And --

A    Yes.  That's my signature.  I had the exact same understanding.

Q    Okay.  So when you told the judge, the Court, under oath

UNITED STATES DISTRICT COURT

that you had no data, Western Digital could not infer the anisotropies or the relative anisotropies in the stack from any data possessed by Western Digital?

A    I never said such a thing.

Q    We've seen your declarations.

A    Yes.  But it's not what you are stating --

Q    Okay.

A    -- at all.

Q    Okay.  You don't think that it was misleading by omission to tell the Court that "We don't have this -- we can't tell the relative anisotropies in the finished stack" without telling the Court that you had JX-2015 that has the anisotropies of all of the alloys that are used in that stack.  Is that your testimony?

A    My testimony was that many alloys are not present in that spreadsheet in that master document.

Q    And that's the same standard -- you've used the same standard of candor today that you did with your declarations?

A    I always told the truth, if that's what you mean, yes.

Q    All right.  Thank you.

            MR. FENSTER:  No further questions.

            THE COURT:  Doctor, you may step down.  Thank you.

            MS. YOUNG:  Good morning, Your Honor.  Your Honor, at this -- Patricia Young for Western Digital.  Your Honor, at this time, we'd like to call Dr. Stephen Becker.

**<u>STEPHEN BECKER, DEFENDANT'S WITNESS, WAS SWORN</u>**

THE COURTROOM DEPUTY:  Could you please state your first and last name, spelling your first and last name for the record.

THE WITNESS:  Yes.  It's Stephen Becker, and that's S-t-e-p-h-e-n B-e-c-k-e-r.

THE COURTROOM DEPUTY:  Thank you.

**DIRECT EXAMINATION**

BY MS. YOUNG:

Q    Good morning, Dr. Becker.

A    Good morning.

Q    Can you please introduce yourself to the jury.

A    Yes.  My name is Stephen Becker, and I work at a firm in Austin, Texas, called Applied Economics.

Q    And what is your role in this proceeding?

A    I am here as a damages expert for Western Digital.

Q    And have you prepared slides to help explain your work in your opinion?

A    I have.

Q    Are these the slides?

A    They are.

Q    All right.  Dr. Becker, what is your background?

A    So for most of my career, over the last probably 40 years, I've been focused on the fields of finance and economics.  I started out with a degree in computer science and electrical

**UNITED STATES DISTRICT COURT**

engineering from the University of Pennsylvania and worked for a few years as an engineer, and then was still doing technology-related consulting for probably another five, six years. But then after I got my MBA from the University of Texas, and ever since then, I've been focused entirely on finance and economics. And in particular, a field called econometrics.

Q    What is econometrics?

A    Econometrics is a subspecialty within economics where we use mathematical techniques, in particular statistics, to answer economic questions.

Q    Now, you said you worked at a company called Applied Economics. What do you do there?

A    So I'm one of the founding members of this firm. I founded it, I think now, 26 years ago. And so one of the things I do there is help run the firm. We've got about 20 professionals that report to me and to my business partner.

        And in my role at Applied Economics, other than managing the firm, I spend all of my professional time providing expert opinions on economic valuation issues. And in particular, patent and intellectual property valuation.

Q    Can you tell the jury what you did prior to Applied Economics?

A    Sure. Those top two logos are Schlumberger and The Solutions Group. Those were both companies where I was working

as a systems engineer.  Schlumberger is a very large international oil field services company, and I was in their R&D labs in Houston and in Austin.

I then was at a firm called The Solutions Group, where I was designing small computer systems, very customized computer systems, and writing a lot of the code for those.

The middle two logos are after my -- I got my MBA. I went to work for a consulting firm called Booz Allen and Hamilton.  I was doing some technology and business strategy-related consulting for very large companies, all across North America.  I traveled to Mexico and Canada and all over the U.S. consulting for those clients.

Becker & Associates is the firm that I had while I was working on my Ph.D.  I put myself through school, and so I had to keep a shingle out and keep doing work.  And that was just the firm that I had to continue the consulting work that I had been doing at Booz Allen while I was working on the Ph.D.

Q    So during the 25-year period that you've been at Applied Economics, how many times have you served as an economic expert on damages or valuation?

A    Gosh, I've been hired as an expert on well over, I'd say, 350 different matters.  Not all of those, you know, progressed to the point of trial, but I'm sure it's over 350.

Q    And how many of those matters have been patent damages specifically?

**UNITED STATES DISTRICT COURT**

A    At least half.  I'd say over 150 different matters over the last 25 years.

Q    You mentioned trial.  How many times have you testified at trial as an expert on patent damages?

A    Over 30.

Q    And in your work as an expert in patent cases, have you testified on behalf of both plaintiffs and defendants?

A    Yes.

Q    What percentage is your breakdown?

A    So if I look over the last, you know, full 20-plus years, it's been 50/50.  It varies from year to year.  But generally about half the work I do is for patentholders and half for defendants.

Q    Now, Dr. Becker, are you being compensated for your work on this case?

A    I am.

Q    And how so?

A    My firm bills my time at $800 an hour.

Q    Does your compensation depend upon the outcome of this case in any way?

A    No.

        MS. YOUNG:  At this time, I'd like to proffer Dr. Becker as an expert in econometrics, patent valuation, and damages.

        MR. MIRZAIE:  No objection, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  Dr. Becker will be received as an expert in those areas.  Again, ladies and gentlemen, I find that he has at least the minimum credentials to testify on those subjects.  It's for you to determine how much weight to give his testimony.

BY MS. YOUNG:

Q    Dr. Becker, let's turn to the work you did for this case. Can you please explain to the jury what your assignment was?

A    So my assignment was to look at the opinions that Mr. Bergman has given and to read his reports, study his data, study the methodology that he used, study the assumptions that he made, and in particular look at the conclusions that he draws from that data and analysis and provide an opinion about whether his damages opinion that he draws from that is reliable and reasonable.

Q    And as a patent valuation expert, do you have to make any assumptions about the asserted patents in this case?

A    I do.

Q    And what are they?

A    So any patent damages expert, whichever side you're on, has to assume that the patents, for the purposes of their analysis, are valid and infringed.

Q    But just to be clear, are you offering any opinions on the question of whether MRT's patents are not infringed?

A    No.

UNITED STATES DISTRICT COURT

Q    Now, if the jury agrees with Western Digital and finds that MRT's patents are not infringed, would there be any damages?

A    No.

Q    And are you offering an opinion as to whether the MRT patents are invalid?

A    I'm not.

Q    Likewise, if the jury agrees with Western Digital and finds that MRT's patents are invalid, would there be any damages?

A    No.

Q    So before we go to your opinion, what evidence did you review in preparation of your opinions?

A    So I focused a lot on the body of information that went into Mr. Bergman's analysis.  So there's a lot of data and documents produced by Western Digital in this case.  I also relied on and reviewed all the deposition transcripts and expert reports, not only Mr. Bergman's expert reports but Dr. Re's expert report and the reports of Western Digital's experts.  And I had conversations with Dr. Goglia and Dr. Bertero.  I've also been here in trial for the whole proceeding.

Q    And also can you give the jury a summary of the opinions that we're going to discuss today?

A    Yes.  After studying Mr. Bergman's models and the

assumptions that went into it, I found some pretty serious flaw with one part of his analysis and some other big assumptions that he makes that I think are at least unreliable and unreasonable.

If you take those together and actually look at the impact of that on the ingredients that he uses to get to his damages number, it is clear that he has dramatically overstated the profits on these products.  And by doing so, he's overstating the damages.

MS. YOUNG:  Your Honor, is this a good time to take lunch?

THE COURT:  That's fine.

Ladies and gentlemen, we'll be in recess for lunch until 1:30.  Please remember the admonition.

THE COURTROOM DEPUTY:  All rise.

**(Out of the presence of the jury.)**

THE COURT:  Mr. Fenster, the -- MR stands at a little over 2 hours and 30 minutes.

MR. FENSTER:  We had about 2:38 or so.  Is that -- thank you.

THE COURT:  When a witness, particularly an expert witness, continues to evade the question or to testify beyond the question such that I believe it's disruptive of the proceedings, initially I will simply invite the witness to listen to the question and answer that question, and inform the

witness that his counsel will have an opportunity to bring out more matter.

At a certain point that proves insufficient and I find it appropriate to advise the jury, as I did in the initial jury instructions, that in assessing the weight of the witness's testimony they can consider the manner in which the witness has testified. I do that rarely, but I felt it was appropriate this morning.

Anything for the record?

MR. LUMISH: Nothing from Western Digital, Your Honor.

THE COURT: Very good.

THE COURTROOM DEPUTY: This Court is in recess.

**(Proceedings concluded at 12:01 p.m.)**

**--oOo--**

UNITED STATES DISTRICT COURT

*CERTIFICATE OF OFFICIAL REPORTER*


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

             I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


*Date:  July 24, 2024*




                    */S/ DEBBIE HINO-SPAAN*

                    *Debbie Hino-Spaan, CSR No. 7953*
                    *Federal Official Court Reporter*

**$**

**$100,000** [1] - 30:21
**$13** [1] - 16:10
**$13.68** [1] - 13:16
**$500** [1] - 31:15
**$800** [1] - 119:18

**'**

**'23** [3] - 31:8, 71:14, 96:2
**'864** [6] - 67:16, 67:21, 68:4, 72:13, 106:4
**'997** [2] - 67:24, 68:6
**'development** [1] - 41:10
**'exchange** [1] - 58:23
**'exchange-spring** [1] - 58:23
**'nucleation** [1] - 96:7

**/**

**/S** [1] - 124:19

**0**

**0.5** [7] - 72:20, 77:20, 77:23, 78:16, 79:5, 79:6, 79:12

**1**

**1** [31] - 7:6, 35:13, 35:14, 37:25, 44:5, 67:21, 67:24, 68:4, 68:6, 72:12, 72:13, 72:16, 72:25, 80:9, 80:19, 81:9, 82:1, 82:9, 83:5, 96:2, 96:4, 96:8, 101:24, 102:5, 102:6, 103:24, 103:25, 106:1, 106:2, 106:4, 114:4
**1-053** [1] - 1:24
**1.7** [1] - 13:5
**10** [6] - 67:16, 67:22, 80:12, 80:20, 106:1
**10:32** [1] - 76:1
**10:49** [1] - 76:1
**11** [8] - 25:20, 67:16, 67:22, 71:16, 112:18, 112:20, 112:23, 113:9
**111** [1] - 6:6
**116** [1] - 6:7
**120** [1] - 112:16
**1200** [1] - 3:5

**1224** [1] - 3:5
**12424** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**12:01** [1] - 123:14
**12th** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**13** [3] - 16:1, 97:9, 97:21
**13.68** [1] - 14:9
**134** [1] - 113:6
**14** [1] - 112:16
**140** [4] - 3:19, 4:9, 4:21, 5:5
**15** [1] - 75:24
**150** [1] - 119:1
**16** [3] - 41:9, 71:3, 95:3
**1600** [2] - 4:6, 4:13
**17** [7] - 6:4, 41:6, 49:1, 55:11, 55:13, 71:2, 95:2
**1:30** [1] - 122:14
**1[d** [1] - 70:4
**1[e** [1] - 66:21
**1[h** [1] - 67:10

**2**

**2** [5] - 35:18, 43:5, 101:24, 105:6, 122:18
**20** [2] - 19:1, 117:16
**20-plus** [1] - 119:10
**200** [2] - 2:17, 53:4
**20024** [1] - 2:18
**2005** [2] - 85:12
**2006** [9] - 22:24, 24:22, 26:8, 26:21, 27:2, 84:20, 84:25, 85:14, 109:6
**2008** [3] - 59:7, 59:11, 61:23
**2013** [2] - 49:22, 51:1
**2015** [1] - 34:1
**2017** [1] - 61:21
**2018** [3] - 26:21, 27:2, 97:18
**2019** [2] - 42:16, 52:4
**202-664-0623** [1] - 2:18
**2022** [1] - 31:2
**2023** [5] - 38:3, 41:6, 71:2, 93:18, 95:2
**2024** [6] - 1:16, 7:1, 9:12, 85:3, 108:4, 124:15
**2032** [1] - 44:9
**2032.06** [1] - 47:1
**2032.5** [1] - 46:6
**2068** [2] - 22:19, 23:5

**20th** [1] - 3:23
**23** [2] - 6:17, 71:14
**23rd** [1] - 96:1
**24** [8] - 1:16, 7:1, 19:13, 27:1, 38:5, 94:9, 104:4, 124:15
**25** [2] - 39:17, 119:2
**25-year** [1] - 118:18
**25th** [1] - 22:23
**26** [3] - 8:12, 12:8, 117:15
**268** [1] - 89:2
**27** [1] - 30:7
**28** [2] - 6:5, 124:8
**29** [1] - 30:19
**2800** [2] - 3:13, 4:17
**2:38** [1] - 122:19
**2K** [22] - 34:9, 76:24, 77:19, 78:6, 78:9, 78:13, 78:15, 79:4, 79:6, 79:10, 79:15, 79:17, 80:23, 81:4, 81:10, 82:2, 82:13, 82:22, 83:7, 83:11, 84:1

**3**

**3** [10] - 35:20, 36:6, 36:24, 74:23, 75:2, 75:7, 80:12, 101:24, 104:4, 104:13
**3.107** [1] - 37:10
**3.152** [2] - 66:19, 69:7
**3.153** [1] - 67:4
**3.186** [1] - 67:5
**3.80** [1] - 36:6
**30** [6] - 34:16, 75:3, 85:3, 104:5, 119:5, 122:18
**300** [1] - 22:8
**30th** [1] - 108:4
**31** [3] - 12:11, 12:14, 85:3
**310-826-7474** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**312-876-7700** [2] - 3:14, 4:18
**32** [1] - 80:19
**33** [2] - 12:21, 22:9
**330** [2] - 3:13, 4:17
**34** [2] - 12:8, 12:23
**35** [1] - 13:12
**350** [2] - 118:22, 118:23
**36** [3] - 12:8, 12:23, 13:13

**4**

**4** [4] - 16:10, 44:1, 46:3, 71:14
**4.9** [5] - 12:24, 13:11, 14:13, 14:14, 15:24
**40** [2] - 34:16, 116:23
**411** [1] - 1:24
**46** [3] - 12:21, 14:2, 89:19
**4a** [2] - 35:20, 35:22
**4b** [6] - 35:24, 44:10, 46:4, 47:2, 99:7, 99:16
**4c** [3] - 36:1, 99:16, 99:22
**4TH** [1] - 1:24

**5**

**5** [17] - 8:11, 8:16, 8:22, 10:11, 10:18, 36:3, 37:12, 37:13, 44:1, 54:6, 74:23, 98:16, 103:23, 106:2, 113:6
**5.10** [1] - 53:11
**5.3** [1] - 49:20
**5.4** [1] - 50:24
**5.5** [3] - 50:18, 50:24, 51:9
**5.7** [1] - 51:23
**5.88** [2] - 99:23, 99:24
**5/25/06** [1] - 6:18
**50(a** [1] - 7:25
**50/50** [1] - 119:11
**54** [1] - 76:24
**5X1** [1] - 36:7

**6**

**6** [14] - 1:10, 8:24, 8:25, 10:11, 10:16, 10:17, 10:22, 11:11, 25:6, 25:8, 44:2, 49:21, 76:23, 98:14
**60611** [2] - 3:14, 4:18
**64** [2] - 85:24, 85:25
**650** [1] - 3:22
**650-328-4600** [4] - 3:20, 4:10, 4:22, 5:6
**66** [2] - 86:6
**660** [2] - 4:5, 4:13
**67** [1] - 85:24
**6ECL** [1] - 46:15

**7**

**7** [13] - 8:25, 9:1, 10:11, 10:18, 10:22,

11:3, 11:4, 11:5, 11:11, 67:24, 68:6, 103:25, 112:16
**7.17** [1] - 99:24
**7.67** [2] - 99:24
**700** [1] - 22:8
**703** [1] - 14:17
**714-540-1235** [1] - 3:24
**753** [1] - 124:8
**7953** [2] - 1:23, 124:20

**8**

**8** [14] - 8:11, 8:24, 9:1, 9:12, 10:1, 10:11, 10:18, 10:24, 11:4, 11:5, 11:12, 11:16, 96:23, 113:7
**8's** [1] - 11:7
**8.27** [2] - 99:24
**800** [1] - 2:17
**87** [1] - 27:8
**8:22-cv-01599-JVS-DFM** [1] - 1:7
**8:43** [2] - 1:17, 7:2
**8:57** [1] - 17:6

**9**

**9** [4] - 38:3, 55:19, 80:20, 93:18
**90025** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**92** [1] - 6:5
**92626** [1] - 3:23
**92660** [2] - 4:6, 4:14
**92701** [1] - 1:25
**94025** [3] - 3:19, 4:10, 4:21
**94025-1008** [1] - 5:5
**949-725-4000** [1] - 4:14
**949-725-4278** [1] - 4:7
**9:03** [1] - 17:6

**A**

**A.M** [2] - 1:17, 7:2
**a.m** [4] - 17:6, 76:1
**abbreviation** [1] - 105:6
**ability** [3] - 20:11, 27:21, 74:16
**able** [13] - 20:25, 24:15, 29:14, 40:5, 84:22, 90:12, 90:25, 97:1, 98:2, 100:23, 104:13, 108:19, 109:9

**above-entitled** [1] - 124:11
**absent** [1] - 9:23
**absolutely** [11] - 22:11, 24:17, 26:1, 26:19, 26:23, 38:13, 42:3, 80:7, 86:3, 93:13, 114:16
**abstracts** [1] - 63:3
**abundance** [1] - 31:1
**academia** [4] - 24:1, 26:4, 62:8, 62:9
**academic** [1] - 62:5
**acceptable** [2] - 19:8, 111:3
**accomplishing** [1] - 18:19
**accordance** [1] - 67:12
**accurate** [4] - 97:12, 97:24, 99:24, 109:11
**accused** [40] - 27:12, 27:13, 28:22, 32:12, 34:19, 40:25, 42:25, 44:10, 44:16, 44:21, 44:22, 46:4, 46:7, 46:13, 47:2, 48:24, 53:23, 54:8, 54:12, 62:24, 63:2, 65:12, 65:17, 67:1, 67:10, 69:3, 69:21, 70:9, 70:12, 71:25, 72:7, 77:20, 80:8, 84:7, 88:11, 98:24, 110:24, 111:3, 113:10
**achieve** [8] - 18:22, 20:10, 42:9, 91:1, 91:6, 91:13, 92:8, 109:9
**achieved** [3] - 49:25, 51:11, 91:13
**achieves** [1] - 90:17
**acquaintances** [1] - 31:24
**acting** [1] - 18:12
**activity** [1] - 26:25
**actual** [9] - 42:25, 44:13, 53:13, 53:15, 111:21, 111:24, 111:25
**add** [11] - 18:2, 19:12, 52:18, 52:20, 52:23, 52:24, 53:3, 55:6, 87:13, 90:14
**added** [2] - 19:2, 88:12
**adding** [8] - 13:10, 87:20, 89:4, 90:13, 90:17, 90:20, 90:21,

103:14
**addition** [2] - 82:20, 87:8
**additional** [5] - 66:17, 78:23, 88:19, 88:24
**addressing** [1] - 11:11
**adds** [3] - 30:19, 88:19, 88:24
**adjacent** [5] - 37:3, 37:17, 38:8, 55:22, 94:12
**admit** [2] - 40:24, 55:3
**admitted** [3] - 33:22, 42:14, 50:22
**admonition** [2] - 75:24, 122:14
**advanced** [1] - 84:11
**advancing** [1] - 61:9
**advise** [2] - 66:15, 123:4
**affiliation** [1] - 29:8
**affirmatively** [1] - 39:14
**afoul** [1] - 102:24
**afraid** [2] - 74:2, 74:13
**afternoon** [2] - 16:20, 76:8
**ago** [3] - 30:24, 117:15
**agree** [34] - 22:7, 28:25, 30:5, 31:25, 32:5, 34:11, 37:2, 37:16, 39:13, 44:8, 57:5, 65:13, 66:9, 67:21, 72:6, 73:13, 73:17, 74:8, 76:23, 76:25, 77:19, 78:12, 78:14, 79:10, 79:15, 79:19, 79:21, 80:14, 82:16, 84:6, 86:1, 86:4, 88:23, 114:17
**agree..** [1] - 111:10
**agreed** [2] - 11:4, 86:25
**agrees** [3] - 75:11, 121:1, 121:8
**Ahmad** [1] - 7:21
**AICHELE** [1] - 2:16
**Aichele** [1] - 7:14
**aid** [1] - 29:1
**Alabama** [3] - 60:7, 62:17, 83:17
**alleged** [4] - 36:10, 37:4, 37:18, 69:18
**Allen** [2] - 118:8, 118:17
**allocation** [2] - 12:17, 12:19
**allow** [1] - 24:8
**allowed** [4] - 36:16, 65:20, 69:6, 80:2

**allows** [5] - 37:2, 37:16, 69:24, 70:2, 90:22
**alloy** [5] - 19:2, 34:8, 37:8, 49:13, 55:1
**alloyed** [1] - 105:11
**alloys** [9] - 38:25, 40:11, 40:25, 41:14, 95:8, 95:14, 95:23, 115:13, 115:15
**alone** [1] - 8:19
**ALSO** [1] - 5:8
**altogether** [1] - 73:10
**amazing** [1] - 86:19
**America** [1] - 118:11
**amorphize** [1] - 105:17
**amorphous** [1] - 105:19
**amortize** [1] - 90:19
**amount** [3] - 21:3, 21:9
**ANA** [3] - 1:18, 1:25, 7:1
**analogy** [2] - 21:19, 48:16
**Analysis** [1] - 13:23
**analysis** [18] - 9:14, 12:13, 12:14, 12:20, 13:9, 29:1, 29:18, 29:24, 63:9, 63:13, 63:15, 67:9, 106:5, 111:25, 120:13, 120:22, 121:15, 122:2
**analyze** [2] - 19:14, 40:16
**AND** [5] - 3:3, 3:17, 4:3, 4:16, 5:3
**Andy** [1] - 5:10
**Angeles** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**ANGELES** [1] - 124:3
**angstroms** [1] - 106:1
**animations** [2] - 69:9
**anisotropies** [8] - 35:13, 38:16, 38:25, 49:7, 115:2, 115:11, 115:12
**anisotropy** [104] - 20:10, 32:12, 32:15, 32:16, 32:21, 33:1, 33:3, 33:21, 34:9, 34:12, 34:19, 34:22, 35:7, 35:14, 35:17, 35:21, 36:8, 36:19, 37:3, 37:17, 38:7, 39:20, 39:21, 40:11, 40:15, 40:17, 40:21,

40:25, 41:3, 41:14, 41:18, 41:23, 41:24, 42:4, 42:5, 42:6, 42:10, 43:15, 43:20, 46:17, 46:21, 47:6, 47:17, 49:18, 49:19, 49:23, 51:2, 51:11, 51:25, 52:3, 52:4, 52:8, 52:12, 53:8, 53:16, 53:25, 54:18, 55:4, 55:21, 56:11, 56:14, 56:15, 57:13, 57:20, 57:25, 58:3, 58:11, 61:16, 65:19, 67:11, 71:4, 71:5, 75:12, 83:6, 83:13, 83:23, 84:5, 90:3, 90:7, 91:2, 91:15, 92:10, 94:11, 94:20, 95:8, 95:9, 95:14, 95:17, 95:19, 98:10, 98:23, 100:1, 102:15, 104:17, 105:3, 105:12, 107:10, 112:4, 112:8, 112:21
**anisotropy...concept** [1] - 49:25
**annotations** [1] - 87:22
**answer** [15] - 32:24, 39:7, 39:8, 52:6, 65:25, 66:15, 78:20, 78:25, 79:9, 79:10, 91:17, 91:23, 96:17, 117:11, 122:25
**ANSWER** [2] - 113:1, 113:12
**answered** [6] - 53:7, 57:8, 82:3, 82:10, 86:11, 87:11
**antiferromagnetic** [1] - 20:9
**anyways** [1] - 48:16
**apart** [1] - 44:6
**apologies** [1] - 34:25
**apologize** [4] - 16:7, 17:25, 24:17, 108:17
**APPEARANCES** [4] - 2:1, 3:1, 4:1, 5:1
**appearances** [1] - 7:9
**appeared** [1] - 61:8
**applied** [6] - 65:1, 77:6, 77:9, 78:5, 78:9, 84:7
**Applied** [5] - 116:14, 117:12, 117:18, 117:22, 118:18
**applies** [1] - 12:16
**apply** [4] - 39:9, 63:10,

65:5, 79:21
**applying** [1] - 13:13
**appreciate** [2] - 28:17, 33:9
**approach** [4] - 8:8, 9:18, 28:5, 83:6
**approaches** [3] - 82:1, 82:21, 82:23
**appropriate** [2] - 123:4, 123:8
**appropriately** [1] - 15:15
**approximate** [1] - 82:7
**approximated** [1] - 82:13
**approximating** [1] - 81:25
**approximation** [1] - 80:24
**April** [7] - 41:6, 49:1, 55:11, 55:13, 71:2, 95:2, 97:20
**arbitrarily** [5] - 61:17, 61:18, 102:17, 102:18, 103:1
**arbitrary** [1] - 109:10
**architectures** [1] - 75:3
**areal** [19] - 17:20, 18:22, 19:16, 19:20, 20:16, 20:22, 22:8, 26:24, 27:21, 86:2, 86:16, 86:23, 87:20, 88:6, 88:14, 91:1, 91:13, 92:9
**areas** [1] - 120:2
**argue** [1] - 75:11
**argument** [4] - 72:8, 74:8, 74:12, 76:12
**arguments** [1] - 94:4
**arrive** [2] - 19:8, 37:7
**arriving** [2] - 13:12, 13:15
**arrow** [1] - 87:25
**art** [3] - 110:12, 110:21, 110:23
**article** [9] - 59:9, 59:11, 60:3, 82:25, 83:9, 83:10, 83:14, 83:19, 102:4
**articles** [1] - 82:21
**aside** [1] - 23:19
**aspects** [1] - 27:22
**asserted** [3] - 36:14, 62:24, 120:17
**asserts** [1] - 96:6
**assessing** [1] - 123:5
**assignment** [2] - 120:8, 120:9
**assist** [3] - 68:24,

69:13, 69:19
**Associates** [1] - 118:13
**assume** [8] - 14:11, 36:4, 45:13, 46:10, 64:5, 65:3, 80:20, 120:21
**assumption** [1] - 56:15
**assumptions** [4] - 120:11, 120:17, 122:1, 122:2
**AT** [4] - 2:20, 4:9, 4:16, 4:20
**atomic** [2] - 61:13, 101:22
**atoms** [1] - 106:2
**attend** [4] - 23:17, 23:20, 24:20, 26:2
**attended** [2] - 24:14, 25:11
**attending** [3] - 23:22, 26:4, 109:18
**ATTORNEY** [4] - 2:20, 4:9, 4:16, 4:20
**attributable** [3] - 22:5, 22:10, 89:14
**audible** [1] - 49:8
**August** [3] - 5:9, 38:3, 93:18
**AUGUST** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**Austin** [2] - 116:14, 118:3
**author** [1] - 32:18
**authored** [1] - 60:10
**available** [6] - 24:15, 61:1, 103:10, 104:11, 104:18, 110:17
**Avenue** [3] - 2:17, 3:13, 4:17
**avoid** [1] - 93:23
**aware** [2] - 57:21, 57:24

**B**

**B-e-c-k-e-r** [1] - 116:6
**back-and-forth** [1] - 93:25
**background** [3] - 23:10, 23:12, 116:22
**bad** [3] - 19:5, 20:5
**BALI** [1] - 4:5
**bar** [1] - 53:11
**barrier** [1] - 107:19
**based** [23] - 9:9, 9:10, 9:21, 10:3, 10:5,

11:2, 11:6, 13:5, 13:20, 38:9, 41:11, 41:13, 49:7, 52:9, 53:12, 53:13, 55:20, 56:7, 58:6, 94:13, 95:4, 95:7, 95:13
**basing** [1] - 56:12
**basis** [1] - 37:9
**Beach** [2] - 4:6, 4:14
**beans** [1] - 24:10
**Beard** [1] - 7:22
**Becker** [16] - 9:17, 11:12, 14:18, 15:4, 15:10, 15:18, 115:25, 116:5, 116:10, 116:13, 116:22, 118:13, 119:14, 119:23, 120:1, 120:7
**BECKER** [2] - 6:7, 116:1
**Becker's** [11] - 8:7, 8:13, 8:18, 9:9, 9:13, 9:18, 12:12, 13:2, 13:19, 13:22, 14:9
**begins** [1] - 12:22
**behalf** [2] - 112:14, 119:7
**behind** [1] - 40:14
**belief** [1] - 104:9
**benefit** [2] - 24:19, 86:16
**benefits** [7] - 69:23, 85:20, 86:22, 87:13, 89:14, 90:17, 92:9
**Bergman** [1] - 120:10
**Bergman's** [6] - 12:13, 13:23, 14:6, 121:15, 121:18, 121:25
**Bertero** [47] - 14:1, 17:16, 18:7, 20:24, 22:16, 27:10, 27:25, 28:10, 28:12, 33:6, 33:18, 36:13, 38:19, 39:12, 40:19, 42:5, 46:1, 50:11, 51:19, 53:7, 53:22, 56:9, 65:16, 65:22, 72:25, 76:8, 77:6, 77:22, 77:25, 78:4, 78:8, 79:8, 83:19, 84:6, 90:24, 91:9, 92:5, 92:18, 94:4, 97:10, 99:10, 111:14, 111:18, 112:20, 114:10, 121:21
**BERTERO** [2] - 6:4, 17:13
**best** [2] - 49:17, 79:1
**better** [6] - 19:11,

21:24, 26:13, 35:9, 86:15, 86:21
**better-performing** [1] - 19:11
**between** [9] - 26:21, 62:24, 66:7, 71:17, 75:2, 80:19, 86:10, 87:4, 104:4
**beyond** [5] - 22:9, 61:9, 97:4, 110:2, 122:22
**bidding** [1] - 29:5
**big** [4] - 34:7, 48:13, 52:20, 122:2
**bilayer** [3] - 25:12, 85:13, 90:10
**bills** [1] - 119:18
**binder** [6] - 22:16, 37:24, 46:13, 50:20, 65:9, 89:10
**bit** [5] - 34:3, 34:15, 42:21, 85:19, 109:5
**bits** [5] - 70:6, 70:16, 73:15, 74:10, 110:19
**blank** [1] - 22:13
**bledahl@raklaw. com** [1] - 2:11
**blow** [16] - 42:20, 43:6, 45:17, 46:14, 49:21, 51:9, 52:1, 54:9, 68:21, 81:18, 82:25, 99:19, 101:14, 102:10, 103:24
**blown** [1] - 34:3
**blown-up** [1] - 34:3
**body** [1] - 121:14
**book** [1] - 28:15
**boost** [1] - 21:16
**boot** [1] - 93:19
**Booz** [2] - 118:8, 118:17
**bottom** [5] - 39:18, 45:14, 84:6, 89:3, 100:1
**Boulevard** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**boundaries** [2] - 18:3, 19:5
**boundary** [1] - 18:8
**bounds** [1] - 65:23
**box** [3] - 12:16, 36:11, 36:19
**break** [8] - 25:13, 32:20, 50:1, 51:12, 51:16, 75:21, 75:23, 90:6
**breakdown** [1] - 119:9
**breaking** [1] - 59:3

**Brian** [1] - 7:13
**BRIAN** [1] - 2:8
**briefs** [1] - 7:25
**bring** [4] - 33:25, 49:2, 82:24, 123:1
**brought** [1] - 8:7
**BSM** [2] - 80:4, 107:18
**bucket** [1] - 12:7
**BUCZKO** [1] - 2:12
**Buczko** [1] - 7:14
**build** [1] - 94:19
**bullet** [1] - 49:23
**burden** [2] - 27:19, 67:20
**business** [2] - 117:17, 118:9
**but..** [1] - 77:5
**BY** [76] - 2:8, 2:16, 3:8, 3:12, 3:18, 3:22, 4:5, 4:9, 4:12, 4:16, 4:20, 5:4, 6:4, 6:7, 17:15, 18:6, 22:15, 23:9, 25:7, 25:21, 27:9, 28:7, 33:13, 34:2, 34:10, 35:12, 37:11, 38:2, 39:11, 42:15, 43:7, 45:19, 48:1, 49:5, 50:10, 50:23, 54:3, 54:11, 58:19, 59:10, 60:5, 60:23, 66:3, 66:20, 67:7, 68:22, 69:11, 74:3, 74:24, 76:7, 79:3, 81:20, 83:2, 86:7, 87:17, 89:12, 92:4, 92:17, 94:3, 96:21, 97:8, 97:23, 98:9, 98:17, 99:14, 99:21, 100:14, 101:1, 104:1, 108:24, 110:6, 110:16, 111:17, 113:19, 116:9, 120:6

**C**

**CA** [1] - 1:25
**calculate** [1] - 76:20
**calculated** [8] - 10:3, 34:21, 35:3, 35:5, 35:18, 79:11, 79:16, 79:17
**calculating** [2] - 9:19, 77:14
**calculation** [7] - 9:10, 9:22, 11:6, 13:12, 13:14, 15:23, 31:20
**calculations** [2] - 77:18, 78:13
**California** [14] - 2:6,

2:10, 2:14, 2:22, 3:6, 3:10, 3:19, 3:23, 4:6, 4:10, 4:14, 4:21, 5:5, 124:7
**CALIFORNIA** [4] - 1:2, 1:18, 7:1, 124:4
**call-out** [1] - 47:25
**call-outs** [1] - 83:1
**CALLED** [2] - 6:4, 6:7
**Canada** [1] - 118:11
**candor** [1] - 115:18
**cannot** [10] - 18:15, 27:14, 38:9, 40:2, 40:15, 40:16, 94:13, 105:16, 105:24, 107:10
**cap** [12] - 54:8, 54:12, 54:14, 54:21, 55:3, 55:21, 56:4, 57:5, 57:13, 57:15, 58:3, 100:9
**capability** [2] - 20:16, 26:24
**capping** [2] - 21:10, 21:18
**car** [1] - 111:20
**care** [3] - 51:24, 52:5, 52:8
**career** [1] - 116:23
**careful** [2] - 40:6, 93:23
**carefully** [2] - 102:23, 103:17
**CARLSON** [2] - 4:4, 4:12
**cartoons** [3] - 53:14, 111:20, 111:23
**cascading** [2] - 69:13, 70:1
**Case** [1] - 1:6
**case** [37] - 8:14, 9:16, 10:12, 13:20, 14:17, 19:1, 21:21, 25:1, 27:11, 28:18, 28:23, 30:3, 31:2, 31:5, 31:6, 31:10, 32:1, 32:6, 33:20, 34:20, 35:1, 37:21, 40:20, 54:15, 57:20, 58:10, 64:19, 64:22, 70:12, 77:15, 93:1, 103:18, 119:15, 119:20, 120:7, 120:17, 121:16
**cases** [1] - 119:6
**caution** [1] - 31:1
**Center** [4] - 3:22, 4:5, 4:13, 23:13
**Central** [1] - 124:7
**CENTRAL** [1] - 1:2

certain [3] - 14:15, 49:12, 123:3
certainly [3] - 16:24, 55:22, 57:1
CERTIFICATE [1] - 124:1
Certified [1] - 1:5
certify [1] - 124:7
Chaaru [1] - 7:20
chaaru.deb@lw.com [1] - 4:11
CHAARUSHENA [1] - 4:9
challenging [1] - 61:11
chamber [6] - 48:11, 48:18, 48:21, 90:15, 95:17, 95:18
chambers [1] - 48:14
Chan [1] - 7:14
CHAN [1] - 2:20
chance [1] - 78:22
CHANG [1] - 3:12
Chang [1] - 7:13
characteristics [1] - 113:2
characterizations [1] - 107:20
characterizing [1] - 52:21
charts [1] - 53:11
check [1] - 9:20
Chicago [2] - 3:14, 4:18
choosing [1] - 13:10
chose [2] - 45:9, 80:23
Chris [1] - 5:10
chromium [5] - 21:11, 21:16, 55:1, 55:6, 56:16
citation [1] - 101:24
cite [1] - 58:24
claim [21] - 63:10, 64:3, 67:2, 67:12, 68:15, 68:18, 68:21, 69:5, 72:12, 72:16, 72:25, 73:10, 106:14, 106:18, 107:4, 111:7, 113:20, 113:24, 114:3, 114:7
Claim [8] - 67:21, 68:4, 72:12, 72:13, 72:25, 86:6, 106:4, 114:4
claimed [1] - 73:17
claims [24] - 7:25, 8:2, 27:19, 62:25, 63:4, 63:6, 63:19, 63:25, 64:25, 65:5, 67:25,

68:2, 68:3, 68:5, 73:1, 73:10, 74:4, 76:21, 106:6, 106:9, 106:10, 109:9, 111:5, 111:7
Claims [4] - 67:16, 67:22, 67:24, 68:6
clear [9] - 8:19, 8:24, 11:10, 15:3, 16:4, 18:4, 48:17, 120:23, 122:7
clearly [3] - 9:1, 11:1, 76:24
client [2] - 7:13, 7:21
clients [1] - 118:12
clock [1] - 33:8
close [2] - 44:5, 80:14
cluster [1] - 18:12
clustering [1] - 18:14
co [1] - 60:10
co-authored [1] - 60:10
cobalt [3] - 105:2, 105:11
code [1] - 118:6
Code [1] - 124:8
coercive [21] - 66:22, 66:23, 72:20, 72:22, 76:11, 76:13, 76:20, 76:24, 77:15, 77:21, 78:4, 78:5, 78:7, 78:10, 79:6, 79:25, 80:24, 81:9, 82:13, 82:21, 84:8
coercively [1] - 83:12
coercivity [13] - 27:17, 77:23, 77:24, 82:1, 82:8, 83:5, 83:13, 84:3, 84:4, 84:8, 87:14, 103:18, 107:19
coherent [1] - 83:25
colleagues [1] - 59:11
coloring [1] - 45:8
Column [3] - 74:23, 76:23, 103:23
column [6] - 21:3, 21:25, 61:16, 99:19, 102:16, 102:20
columns [1] - 34:7
combination [1] - 19:7
comment [1] - 16:8
commercial [2] - 27:4, 101:8
common [3] - 18:15, 24:17, 26:3
companies [4] - 21:2, 31:14, 117:25, 118:10
company [8] - 24:8,

24:16, 27:1, 31:12, 99:1, 99:2, 117:12, 118:2
compare [4] - 10:8, 44:22, 63:2, 63:6
compared [1] - 10:1
compares [1] - 11:7
comparing [3] - 9:2, 29:18, 110:21
comparison [7] - 9:4, 9:24, 10:5, 10:6, 10:12, 62:24, 110:11
compensate [1] - 21:17
compensated [1] - 119:14
compensation [1] - 119:19
compiled [1] - 57:23
complaining [1] - 14:8
complex [1] - 90:8
complexity [1] - 53:3
complicated [2] - 90:4, 90:5
composition [1] - 34:8
compositions [2] - 38:10, 94:14
comprises [1] - 73:8
computer [3] - 116:25, 118:5, 118:6
concept [11] - 50:8, 50:9, 51:11, 51:14, 51:16, 84:19, 84:23, 85:6, 109:2, 110:7
concepts [5] - 26:7, 26:9, 26:10, 26:12, 26:17
conceptually [1] - 59:5
concluded [1] - 123:14
conclusions [1] - 120:12
conditions [1] - 80:16
conducted [1] - 26:25
conference [6] - 24:9, 24:14, 24:20, 24:24, 25:11, 26:2
Conference [3] - 24:22, 25:17, 124:12
conferences [6] - 23:18, 23:20, 23:22, 23:25, 24:3, 24:4
conferring [1] - 16:23
confess [1] - 14:7
Confidential [1] - 42:19
confidential [1] - 42:22
conformance [1] -

124:12
connections [1] - 30:6
consequence [1] - 55:6
consider [4] - 29:22, 92:1, 92:2, 123:6
considered [1] - 105:10
consistently [1] - 65:1
consisting [1] - 106:23
consists [1] - 106:25
constant [2] - 43:20, 67:11
constitute [1] - 27:24
constituted [1] - 24:11
construct [1] - 103:8
construction [9] - 63:10, 67:2, 67:13, 68:21, 69:5, 106:18, 113:21, 113:24, 114:7
construed [6] - 63:6, 68:15, 68:23, 70:5, 74:17, 77:24
consulting [5] - 117:3, 118:8, 118:10, 118:12, 118:16
containing [1] - 102:20
content [2] - 56:13, 56:17
context [2] - 40:13, 85:10
continue [4] - 26:16, 26:20, 31:10, 118:16
Continued [4] - 3:1, 4:1, 5:1, 17:14
continued [3] - 6:4, 52:24, 88:5
continues [2] - 109:8, 122:22
contrary [2] - 21:24, 88:18
contributions [2] - 27:21, 89:18
conversations [1] - 121:20
convert [1] - 61:8
convey [1] - 8:24
copies [1] - 8:7
copy [2] - 50:20, 50:21
corporate [3] - 5:9, 7:19, 112:13
correct [246] - 14:1, 14:24, 14:25, 16:5, 28:13, 28:14, 28:19, 28:23, 28:24, 29:6, 29:8, 29:9, 29:11, 29:12, 29:25, 30:11,

30:15, 30:18, 30:22, 31:2, 31:3, 31:6, 31:9, 31:16, 31:17, 32:8, 32:13, 32:23, 33:7, 33:23, 33:24, 35:4, 35:7, 35:9, 35:15, 35:16, 35:18, 35:19, 35:22, 35:23, 35:24, 35:25, 36:1, 36:2, 36:3, 36:4, 36:9, 36:15, 36:21, 36:25, 37:1, 37:4, 37:14, 37:15, 37:18, 37:22, 38:3, 38:13, 38:17, 39:1, 39:5, 39:15, 42:3, 42:16, 42:17, 42:23, 42:24, 43:1, 43:12, 43:21, 44:12, 45:21, 46:5, 46:8, 46:18, 47:3, 47:4, 47:6, 48:6, 48:7, 48:11, 48:12, 48:18, 48:19, 48:23, 50:2, 50:8, 50:14, 51:13, 52:4, 52:25, 53:1, 53:5, 53:6, 53:16, 53:25, 54:1, 54:6, 54:7, 54:12, 54:15, 54:19, 54:20, 54:23, 55:5, 55:18, 55:24, 55:25, 56:2, 56:23, 57:7, 57:9, 57:14, 57:20, 58:5, 58:11, 59:4, 59:13, 60:1, 61:21, 63:5, 63:8, 63:12, 64:4, 64:8, 64:22, 65:2, 65:19, 66:8, 66:24, 67:2, 67:3, 67:13, 67:14, 67:16, 67:22, 67:23, 67:24, 68:4, 68:6, 68:7, 68:16, 68:19, 69:1, 69:2, 69:5, 69:6, 69:19, 69:20, 69:25, 70:6, 70:7, 70:11, 70:17, 70:18, 70:21, 70:25, 71:19, 72:2, 72:11, 73:3, 73:8, 73:9, 73:11, 73:12, 73:15, 73:18, 73:20, 73:22, 74:7, 74:16, 74:21, 75:4, 75:5, 75:8, 76:22, 77:1, 77:7, 77:8, 77:20, 78:6, 78:10, 78:11, 79:12, 79:17, 79:19, 79:22, 80:1, 80:9, 80:12, 80:13, 80:16, 80:19, 80:20, 81:3, 82:2, 82:9, 82:10, 82:11,

**UNITED STATES DISTRICT COURT**

82:14, 82:15, 82:18, 82:19, 82:22, 82:23, 83:12, 84:8, 84:9, 84:13, 84:14, 84:20, 84:22, 84:25, 86:12, 87:9, 87:10, 87:20, 87:24, 88:7, 88:14, 88:17, 88:20, 88:25, 89:6, 89:15, 89:19, 89:23, 90:4, 90:10, 91:15, 92:10, 103:20, 103:21, 106:11, 107:8, 111:25, 112:1, 113:5, 113:12, 113:13, 114:1, 114:2, 114:6, 114:12, 114:20, 124:9

**corrected** [4] - 12:15, 15:19, 56:23, 56:24
**correcting** [1] - 13:13
**correction** [1] - 14:4
**correctly** [10] - 20:25, 39:25, 40:1, 41:16, 77:9, 82:4, 82:5, 85:17, 85:18, 113:4
**correspond** [1] - 44:18
**corresponded** [1] - 53:3
**corresponds** [2] - 44:21, 44:24
**corroding** [1] - 21:8
**corrosion** [9] - 21:7, 21:9, 21:13, 54:25, 105:15, 105:21, 105:22, 105:24, 106:2
**corrosive** [1] - 105:13
**cost** [1] - 90:14
**Costa** [1] - 3:23
**costs** [1] - 92:23
**Costs** [1] - 13:24
**counsel** [11] - 7:9, 7:18, 10:21, 11:11, 14:8, 15:4, 25:23, 33:9, 66:16, 68:9, 123:1
**COUNSEL** [4] - 2:1, 3:1, 4:1, 5:1
**Counterclaim** [2] - 1:6, 1:10
**COUNTERCLAIM** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**counting** [4] - 9:10, 9:11, 9:14, 13:6
**COUNTY** [1] - 124:3
**couple** [2] - 28:12,

105:21
**coupled** [20] - 20:7, 72:1, 72:3, 72:7, 73:1, 73:5, 73:7, 73:11, 73:13, 73:17, 74:5, 74:9, 91:14, 106:13, 106:17, 113:21, 113:23, 113:25, 114:5, 114:6
**coupling** [2] - 68:25, 71:17
**course** [7] - 26:11, 30:9, 30:16, 31:24, 45:8, 57:11, 90:20
**Court** [41] - 8:15, 9:8, 9:13, 9:16, 9:22, 13:4, 13:6, 17:8, 37:21, 38:15, 38:23, 38:24, 39:14, 42:2, 49:6, 55:8, 55:10, 56:1, 56:23, 58:2, 63:7, 63:15, 68:15, 68:23, 70:4, 70:19, 70:23, 74:17, 75:11, 76:4, 77:23, 78:7, 114:25, 115:10, 115:12, 123:13, 124:6, 124:20
**COURT** [66] - 1:1, 1:24, 7:15, 7:23, 8:5, 8:9, 8:22, 10:6, 10:14, 10:16, 10:20, 10:23, 10:25, 11:7, 11:14, 11:16, 11:18, 11:20, 11:23, 12:4, 13:21, 14:11, 14:13, 14:20, 14:23, 15:1, 15:8, 15:12, 15:25, 16:5, 16:12, 16:21, 16:25, 17:4, 17:10, 23:3, 23:5, 28:2, 39:8, 58:15, 65:25, 66:13, 75:19, 75:23, 76:6, 78:18, 78:20, 78:22, 91:23, 92:14, 97:7, 108:13, 108:22, 110:4, 110:14, 110:22, 110:25, 111:11, 111:15, 115:22, 120:1, 122:12, 122:17, 122:21, 123:12, 124:6
**Court's** [12] - 9:12, 11:4, 13:20, 63:10, 65:23, 67:1, 67:12, 69:4, 106:18, 111:7, 111:8, 113:24
**COURTROOM** [9] - 7:6, 17:5, 17:7,

75:25, 76:3, 116:2, 116:7, 122:15, 123:13
**cover** [3] - 23:8, 93:20, 95:2
**covered** [1] - 67:8
**create** [1] - 105:17
**created** [1] - 49:3
**creates** [1] - 18:16
**credentials** [1] - 120:3
**credited** [1] - 59:2
**critical** [1] - 18:20
**criticism** [2] - 12:12, 13:9
**Cross** [1] - 6:5
**cross** [6] - 50:5, 50:20, 89:10, 97:6, 108:8, 108:9
**CROSS** [1] - 28:6
**Cross-Examination** [1] - 6:5
**CROSS-EXAMINATION** [1] - 28:6
**CRR** [1] - 1:23
**crystal** [1] - 105:18
**crystalline** [1] - 105:18
**CSR** [2] - 1:23, 124:20
**customized** [1] - 118:5

## D

**D.C** [1] - 2:18
**DALE** [1] - 3:12
**Dale** [1] - 7:13
**damages** [11] - 116:16, 118:20, 118:24, 119:4, 119:24, 120:14, 120:20, 121:3, 121:10, 122:7, 122:9
**data** [39] - 27:16, 32:17, 33:14, 33:21, 34:11, 34:19, 34:20, 36:22, 36:23, 37:2, 37:6, 37:13, 37:16, 37:20, 37:22, 38:10, 39:15, 40:5, 40:11, 40:21, 53:15, 56:2, 56:4, 56:17, 56:18, 57:11, 57:20, 58:10, 73:21, 79:24, 94:14, 111:25, 112:4, 112:21, 115:1, 115:3, 120:10, 120:13, 121:15
**database** [1] - 32:19
**Date** [1] - 124:15

**date** [3] - 30:25, 64:8, 101:10
**dated** [1] - 42:16
**DAY** [1] - 1:10
**day-to-day** [3] - 23:19, 26:25, 37:9
**dchang@raklaw. com** [1] - 3:15
**DCM** [7] - 36:7, 44:16, 44:21, 46:9, 47:10, 56:4, 98:23
**deal** [1] - 52:20
**Deb** [1] - 7:21
**DEB** [1] - 4:9
**Debbie** [1] - 124:20
**DEBBIE** [3] - 1:23, 124:5, 124:19
**decades** [1] - 29:11
**decision** [2] - 29:2, 29:17
**declaration** [23] - 37:21, 38:3, 39:17, 40:19, 41:6, 49:1, 55:11, 57:3, 57:19, 58:1, 58:5, 58:6, 71:2, 71:13, 93:17, 93:20, 93:21, 93:24, 94:10, 95:2, 96:2, 112:3, 114:21
**Declaration** [1] - 37:25
**declarations** [10] - 70:19, 70:23, 93:5, 93:10, 93:12, 93:16, 94:5, 114:11, 115:5, 115:18
**deep** [4] - 30:1, 30:4, 30:6, 30:10
**defective** [1] - 20:18
**DEFENDANT** [7] - 2:3, 3:3, 3:17, 4:3, 5:3, 6:4, 6:7
**Defendant** [2] - 1:6, 1:9
**defendant** [1] - 30:2
**defendant's** [1] - 5:10
**DEFENDANT'S** [1] - 116:1
**defendants** [2] - 119:7, 119:13
**defined** [5] - 19:4, 71:10, 71:20, 77:23, 78:7
**definitely** [1] - 97:9
**degraded** [2] - 20:4
**degrades** [2] - 18:13, 18:17
**degree** [3] - 69:24, 70:2, 116:25
**degrees** [1] - 90:23

**demand** [5] - 9:2, 9:25, 10:1, 11:21, 11:24
**demonstrate** [1] - 19:18
**demonstrative** [1] - 8:7
**denote** [1] - 45:9
**density** [20] - 17:20, 18:22, 19:16, 19:20, 20:16, 20:22, 22:8, 26:24, 27:22, 86:2, 86:16, 86:23, 87:20, 88:6, 88:14, 91:1, 91:6, 91:13, 92:9
**dependant** [1] - 106:10
**dependent** [1] - 68:1
**depiction** [1] - 99:25
**deposit** [2] - 19:14, 40:3
**deposited** [4] - 40:15, 48:10, 48:18, 48:21
**deposition** [9] - 18:2, 85:2, 108:3, 108:5, 108:15, 109:12, 112:12, 112:14, 121:17
**depositions** [1] - 28:13
**depth** [1] - 96:6
**DEPUTY** [9] - 7:6, 17:5, 17:7, 75:25, 76:3, 116:2, 116:7, 122:15, 123:13
**derive** [1] - 12:14
**Desai** [11] - 7:19, 48:13, 51:1, 51:19, 57:4, 86:25, 87:5, 88:18, 112:13, 112:16, 113:6
**Desai's** [4] - 57:2, 85:20, 87:3, 112:12
**describe** [1] - 98:23
**described** [4] - 48:15, 53:20, 81:23, 103:11
**describes** [1] - 42:25
**description** [3] - 44:23, 53:19, 95:24
**descriptions** [2] - 63:3, 100:4
**design** [25] - 19:5, 20:7, 41:25, 42:3, 43:8, 47:14, 49:23, 51:2, 51:14, 51:25, 52:8, 52:9, 52:11, 52:14, 52:24, 53:14, 71:6, 95:11, 96:15, 111:20, 112:3, 112:10, 112:25,

113:2, 113:11
**Design** [3] - 42:16, 43:8, 50:25
**designated** [1] - 112:15
**designed** [2] - 45:20, 46:21
**designing** [14] - 18:21, 32:17, 32:21, 33:4, 41:12, 42:9, 47:5, 47:7, 56:14, 88:15, 90:23, 95:6, 102:18, 118:5
**designs** [1] - 42:6
**details** [1] - 26:15
**determine** [9] - 9:14, 32:12, 32:25, 37:3, 37:17, 40:15, 78:10, 94:20, 120:4
**determined** [2] - 38:9, 94:13
**develop** [7] - 26:21, 41:13, 49:7, 95:7, 95:13, 112:24, 113:1
**developed** [1] - 63:24
**developing** [2] - 41:12, 95:6
**Development** [1] - 23:13
**development** [4] - 23:15, 26:23, 95:16, 95:20
**developments** [1] - 23:22
**dhinospaan@yahoo. com** [1] - 1:25
**diagrams** [1] - 100:4
**Dieter** [2] - 5:9, 7:12
**difference** [2] - 80:18
**different** [16] - 13:1, 13:17, 15:23, 19:7, 48:20, 49:9, 49:16, 62:19, 70:19, 70:23, 86:10, 94:1, 118:22, 119:1
**difficult** [1] - 105:13
**DIGITAL** [1] - 1:8
**Digital** [83] - 7:7, 7:18, 8:17, 8:19, 10:8, 11:8, 16:13, 17:19, 18:22, 26:14, 26:16, 26:20, 27:3, 28:21, 30:2, 30:15, 30:18, 31:5, 31:11, 31:19, 31:22, 31:23, 31:25, 32:2, 32:5, 32:7, 32:11, 37:20, 38:11, 40:10, 40:20, 40:24, 41:18, 45:9, 46:20, 47:12, 49:6, 49:12,

51:24, 52:23, 57:20, 58:20, 63:18, 64:2, 64:9, 68:10, 82:13, 87:19, 88:5, 88:12, 90:2, 90:9, 90:17, 90:25, 91:11, 91:12, 92:8, 92:19, 92:22, 94:23, 95:9, 95:13, 95:19, 96:12, 96:25, 97:13, 97:25, 101:8, 104:12, 107:17, 110:17, 112:14, 115:1, 115:3, 115:24, 116:16, 121:1, 121:8, 121:16, 123:10
**Digital's** [9] - 31:4, 37:13, 58:9, 81:24, 86:22, 89:15, 89:18, 107:6, 121:19
**DIRECT** [2] - 17:14, 116:8
**Direct** [2] - 6:4, 6:7
**direct** [10] - 31:12, 36:13, 53:22, 65:17, 66:4, 79:25, 91:10, 92:7, 93:2, 109:16
**directly** [1] - 39:8
**disagree** [19] - 27:18, 27:20, 57:16, 76:14, 76:19, 77:3, 77:10, 77:12, 77:13, 77:17, 78:13, 78:15, 78:17, 79:2, 79:4, 82:12, 108:18
**disagrees** [1] - 67:19
**disclaiming** [1] - 53:14
**disclose** [4] - 9:17, 24:6, 104:19, 110:8
**disclosed** [11] - 8:18, 9:5, 9:23, 12:16, 12:17, 12:18, 12:23, 13:14, 14:23, 15:15, 104:25
**discloses** [1] - 75:6
**disclosure** [1] - 15:9
**discuss** [3] - 24:4, 24:16, 121:24
**discussed** [3] - 16:21, 22:5, 27:14
**discussing** [1] - 17:18
**discussion** [1] - 40:13
**discussions** [1] - 24:18
**disk** [10] - 10:2, 21:2, 29:10, 59:12, 70:12, 81:24, 104:11, 104:17, 105:23, 106:1

**dismissing** [1] - 62:15
**dispute** [8] - 35:10, 35:14, 35:17, 35:21, 36:5, 36:7, 36:18, 77:9
**disputed** [1] - 35:6
**disputes** [2] - 16:23, 17:1
**disputing** [5] - 66:4, 66:23, 66:25, 67:9, 103:18
**disregard** [3] - 63:15, 66:14, 75:19
**disruptive** [1] - 122:23
**distance** [1] - 19:24
**distinguish** [1] - 45:10
**distorted** [1] - 20:18
**distribute** [1] - 26:3
**distribution** [1] - 21:25
**District** [2] - 124:6, 124:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**division** [2] - 10:9, 45:12
**DIVISION** [1] - 1:2
**doctor** [1] - 115:22
**document** [14] - 42:14, 42:22, 42:25, 44:20, 44:25, 45:22, 50:4, 50:22, 52:10, 53:2, 57:25, 96:18, 99:5, 115:16
**documentation** [1] - 95:11
**documentation..** [1] - 42:1
**documents** [17] - 35:2, 41:11, 42:3, 46:16, 47:19, 49:9, 52:11, 52:14, 53:14, 58:20, 59:1, 89:18, 89:20, 98:22, 111:20, 121:16
**dollars** [4] - 30:17, 30:20, 90:12, 90:14
**domain** [3] - 102:20, 102:22, 103:11
**done** [8] - 15:23, 19:13, 31:20, 45:8, 49:14, 80:4, 80:17, 95:18
**Doug** [1] - 7:17
**doug.lumish@lw. com** [1] - 3:20
**DOUGLAS** [1] - 3:18
**down** [10] - 29:18, 32:20, 45:5, 47:24, 60:21, 61:5, 67:5,

91:15, 109:5, 115:22
**downtime** [1] - 52:19
**Dr** [205] - 7:12, 7:19, 8:7, 8:13, 8:18, 9:9, 9:13, 9:17, 9:18, 11:12, 12:12, 12:25, 13:1, 13:2, 13:19, 13:22, 14:1, 14:4, 14:9, 14:16, 14:18, 14:19, 14:21, 15:4, 15:7, 15:10, 15:11, 15:18, 15:19, 17:16, 18:7, 20:24, 22:7, 22:16, 25:2, 25:10, 25:15, 25:24, 27:10, 27:17, 27:20, 27:25, 28:10, 28:12, 29:7, 29:8, 29:13, 29:18, 29:22, 32:7, 32:17, 33:6, 33:18, 34:18, 35:2, 35:7, 35:10, 35:18, 35:21, 36:13, 37:5, 37:6, 38:19, 39:12, 40:19, 42:5, 46:1, 48:13, 50:11, 51:1, 51:14, 51:19, 53:7, 53:12, 53:22, 54:17, 54:22, 56:9, 57:2, 57:4, 57:12, 57:16, 57:23, 58:21, 58:24, 59:3, 60:11, 62:15, 64:9, 64:10, 64:23, 64:24, 65:16, 65:22, 67:9, 69:12, 70:8, 71:20, 71:21, 72:25, 75:13, 76:8, 76:13, 76:20, 77:6, 77:13, 77:22, 77:25, 78:4, 78:5, 78:8, 78:9, 79:8, 79:11, 79:16, 79:21, 80:3, 80:21, 81:2, 81:3, 81:6, 81:7, 81:8, 81:13, 81:21, 82:15, 82:17, 82:20, 82:25, 83:19, 84:6, 84:9, 84:20, 84:25, 85:11, 85:14, 85:20, 86:15, 86:21, 86:25, 87:3, 87:5, 87:12, 87:19, 88:18, 88:22, 89:14, 89:17, 90:21, 90:24, 91:9, 92:5, 92:18, 94:4, 96:14, 97:10, 98:2, 99:10, 102:2, 102:6, 103:11, 103:19, 104:19, 107:14, 107:15, 107:16, 107:18, 107:21, 107:24, 109:7, 109:8,

109:14, 109:19, 110:1, 110:8, 111:14, 111:18, 111:24, 112:12, 112:13, 112:16, 112:20, 113:6, 114:10, 115:25, 116:10, 116:22, 119:14, 119:23, 120:1, 120:7, 121:19, 121:20, 121:21
**dramatically** [1] - 122:7
**draws** [2] - 120:13, 120:14
**drive** [14] - 10:2, 17:19, 19:16, 21:8, 21:9, 27:24, 29:11, 59:12, 81:24, 104:12, 104:17, 105:23, 105:24, 106:3
**Drive** [7] - 3:19, 3:22, 4:5, 4:9, 4:13, 4:21, 5:5
**drives** [3] - 20:22, 21:2, 70:12
**dropped** [1] - 10:11
**dropping** [1] - 10:22
**drove** [1] - 20:21
**during** [4] - 14:15, 27:2, 86:16, 118:18
**DX-1583** [2] - 83:15, 101:13

## E

**early** [1] - 25:1
**earth** [1] - 105:10
**easily** [1] - 20:7
**EBL** [7] - 49:23, 50:13, 50:14, 52:16, 52:18, 52:20, 100:18
**EBLs** [1] - 52:25
**ECC** [5] - 6:17, 25:12, 26:6, 26:8, 26:17
**ECL** [2] - 69:21, 69:23
**ECL2** [1] - 55:24
**ECL6** [1] - 55:22
**econometrics** [4] - 117:7, 117:8, 117:9, 119:23
**economic** [3] - 117:11, 117:20, 118:19
**Economics** [5] - 116:14, 117:13, 117:18, 117:23, 118:19

**economics** [3] - 116:24, 117:6, 117:9
**educating** [1] - 34:25
**effect** [1] - 69:13
**effective** [5] - 76:25, 79:17, 81:5
**effectively** [1] - 110:25
**effort** [1] - 58:9
**efforts** [1] - 17:1
**eight** [1] - 30:24
**either** [2] - 63:9, 79:25
**electrical** [1] - 116:25
**element** [3] - 103:16, 103:19, 105:10
**Element** [3] - 66:21, 67:10, 70:4
**elements** [5] - 63:19, 63:24, 64:3, 68:14, 68:17
**elsewhere** [1] - 27:23
**embodiments** [3] - 63:3, 75:1, 104:3
**emerged** [1] - 61:7
**emphasized** [3] - 61:14, 102:9, 102:14
**emphasizing** [1] - 112:9
**employee** [3] - 30:14, 31:5, 31:19
**end** [1] - 109:15
**energy** [3] - 83:23, 102:19, 107:19
**engineer** [5] - 49:12, 57:12, 81:15, 117:2, 118:1
**engineering** [1] - 117:1
**engineers** [7] - 19:14, 21:1, 23:20, 23:21, 37:9, 82:12, 82:16
**Enter** [1] - 58:23
**entire** [6] - 107:4, 107:6, 107:12, 109:19, 109:22, 110:1
**entirely** [2] - 13:15, 117:5
**entitled** [1] - 124:11
**equal** [1] - 81:12
**equals** [5] - 76:24, 78:6, 82:2, 83:7, 84:1
**ESQ** [12] - 2:4, 2:8, 2:12, 2:16, 3:4, 3:8, 3:12, 3:18, 3:22, 4:5, 4:12, 5:4
**established** [2] - 54:17
**estimate** [1] - 35:9
**estimated** [2] - 35:5

**estimates** [1] - 27:17
**evade** [1] - 122:22
**evaluate** [2] - 92:23, 92:24
**evaluating** [1] - 92:1
**events** [1] - 26:5
**eventually** [1] - 49:17
**everywhere** [1] - 21:22
**EVIDENCE** [1] - 6:16
**evidence** [5] - 8:1, 23:2, 56:19, 56:25, 121:12
**evidently** [1] - 101:16
**exact** [2] - 14:8, 114:23
**exactly** [3] - 55:10, 99:1, 100:3
**EXAMINATION** [5] - 17:14, 28:6, 92:16, 111:16, 116:8
**Examination** [4] - 6:4, 6:5, 6:5, 6:7
**examination** [5] - 6:6, 36:13, 53:22, 91:10, 92:7
**example** [1] - 18:24
**exceed** [1] - 90:18
**exceeds** [6] - 77:20, 78:16, 79:5, 79:6, 79:12, 79:16
**exception** [1] - 35:6
**excerpts** [2] - 109:20, 109:21
**exchange** [26] - 25:13, 26:7, 26:8, 26:17, 50:1, 51:12, 51:16, 71:16, 72:1, 72:3, 72:7, 73:1, 73:5, 73:10, 73:13, 73:17, 74:5, 74:9, 91:14, 106:13, 106:17, 113:21, 113:23, 113:25, 114:5, 114:6
**Exchange** [1] - 6:17
**exchanged** [1] - 73:7
**exciting** [1] - 61:11
**excluded** [1] - 9:18
**excuse** [4] - 16:17, 17:23, 18:4, 99:8
**Exhibit** [6] - 22:17, 23:6, 112:18, 112:20, 112:23, 113:9
**EXHIBIT** [1] - 6:16
**Exhibits** [1] - 33:22
**EXHIBITS** [1] - 6:14
**exist** [2] - 41:19, 83:23
**existed** [1] - 51:17
**existing** [2] - 32:19,

112:24
**expected** [1] - 26:1
**expensive** [1] - 90:13
**experience** [3] - 41:11, 55:20, 95:5
**expert** [32] - 10:7, 28:18, 28:25, 29:4, 29:7, 29:10, 31:9, 31:15, 32:1, 32:6, 32:9, 55:17, 56:7, 58:17, 65:3, 89:6, 93:1, 107:22, 116:16, 117:20, 118:19, 118:21, 119:4, 119:6, 119:23, 120:1, 120:16, 120:20, 121:18, 121:19, 122:21
**experts** [2] - 14:17, 121:20
**explain** [7] - 15:5, 17:22, 19:22, 51:6, 107:16, 116:17, 120:8
**explained** [2] - 54:24, 87:12
**explicitly** [1] - 13:25
**express** [6] - 65:16, 66:4, 66:8, 66:25, 67:9, 67:15
**expressed** [2] - 64:21, 66:22
**expressly** [1] - 75:6
**extensive** [1] - 57:24
**extract** [1] - 40:5
**Extrapolates** [1] - 13:24
**extremely** [10] - 56:13, 61:10, 74:19, 103:12, 105:3, 105:11, 105:12, 105:13

### F

**facing** [1] - 60:17
**fact** [23] - 11:22, 14:8, 14:16, 30:1, 31:7, 32:17, 32:25, 40:9, 40:14, 42:9, 53:12, 55:20, 56:12, 56:16, 61:14, 87:19, 88:12, 89:17, 90:2, 98:18, 102:9, 102:14, 112:9
**factor** [1] - 14:2
**factors** [2] - 29:21, 91:25
**facts** [3] - 9:16, 10:12, 14:17

**fails** [1] - 106:3
**fair** [23] - 29:2, 29:15, 29:16, 29:19, 29:20, 29:24, 31:19, 31:20, 31:23, 32:3, 34:6, 36:20, 52:13, 56:21, 56:22, 62:25, 63:16, 63:17, 72:17, 76:13, 76:14, 78:16, 90:18
**fairly** [2] - 96:16, 99:3
**faithfully** [1] - 63:10
**false** [2] - 56:6, 56:10
**familiar** [2] - 72:13, 81:13
**familiarized** [1] - 31:11
**far** [5] - 10:6, 18:25, 19:6, 44:6, 90:18
**favor** [1] - 8:2
**feasibility** [1] - 26:16
**FEDERAL** [2] - 1:24, 124:5
**Federal** [1] - 124:20
**felt** [1] - 123:7
**FENSTER** [93] - 2:4, 7:11, 7:16, 16:17, 23:4, 28:3, 28:7, 33:12, 33:13, 33:25, 34:2, 34:6, 34:10, 35:11, 35:12, 37:10, 37:11, 37:24, 38:2, 39:11, 42:13, 42:15, 43:5, 43:7, 45:16, 45:19, 47:24, 48:1, 49:2, 49:5, 50:6, 50:10, 50:18, 50:22, 50:23, 54:2, 54:3, 54:11, 58:19, 59:8, 59:10, 60:3, 60:5, 60:21, 60:23, 66:3, 66:11, 66:19, 66:20, 67:4, 67:7, 68:20, 68:22, 69:7, 69:11, 74:1, 74:3, 74:22, 74:24, 75:17, 75:21, 76:5, 76:7, 79:3, 81:17, 81:20, 82:24, 83:2, 86:5, 86:7, 87:16, 87:17, 89:11, 89:12, 91:22, 92:4, 92:13, 93:22, 97:4, 100:22, 108:6, 108:11, 108:14, 108:20, 110:2, 110:10, 110:20, 111:4, 111:17, 113:18, 113:19, 115:21, 122:19
**Fenster** [21] - 6:5, 6:6, 7:12, 28:2, 32:14,

52:5, 92:18, 93:5, 96:1, 96:19, 97:9, 98:10, 99:6, 100:7, 102:12, 104:2, 106:5, 106:12, 107:3, 111:15, 122:17
**ferromagnetic** [8] - 54:18, 66:5, 66:7, 67:10, 68:24, 71:23, 73:8, 87:7
**few** [6] - 8:7, 13:25, 16:18, 30:19, 111:18, 117:2
**field** [37] - 19:23, 19:25, 56:7, 66:22, 66:23, 72:20, 72:22, 76:12, 76:13, 76:20, 76:24, 77:15, 77:21, 78:4, 78:5, 78:7, 78:10, 79:7, 79:25, 80:24, 81:9, 82:13, 82:21, 83:6, 83:13, 83:24, 84:3, 84:5, 84:8, 102:18, 102:21, 107:25, 117:6, 118:2
**field..** [1] - 61:18
**fields** [3] - 61:2, 83:11, 116:24
**figure** [3] - 78:12, 85:8, 109:4
**figures** [1] - 109:10
**filed** [4] - 31:2, 40:19, 57:18, 58:1
**files** [1] - 59:16
**filled** [2] - 56:17, 95:24
**final** [1] - 15:22
**finally** [1] - 34:11
**finance** [2] - 116:24, 117:6
**financial** [3] - 30:2, 30:4
**fine** [7] - 11:7, 11:14, 11:17, 11:23, 12:4, 69:10, 122:12
**finished** [3] - 38:8, 94:12, 115:11
**firm** [9] - 116:13, 117:14, 117:16, 117:19, 118:4, 118:8, 118:13, 118:16, 119:18
**first** [23] - 7:24, 8:10, 13:8, 13:16, 14:21, 16:9, 49:23, 55:16, 56:3, 60:8, 72:20, 84:18, 84:23, 85:5, 93:16, 96:22, 97:16, 101:15, 101:19,

109:1, 109:17, 116:3
**five** [1] - 117:3
**flashlight** [1] - 21:21
**flaw** [1] - 122:1
**Floor** [6] - 2:5, 2:9, 2:13, 2:21, 3:9, 3:23
**flying** [1] - 105:25
**focus** [5] - 32:16, 32:20, 33:8, 34:8, 56:14
**focused** [4] - 22:1, 116:24, 117:5, 121:14
**folks** [2] - 26:1, 47:8
**follow** [1] - 16:8
**follow-up** [1] - 16:8
**following** [2] - 24:4, 87:19
**fomented** [1] - 23:23
**Footnote** [3] - 96:2, 96:4, 96:8
**footnote** [2] - 14:3, 71:14
**FOR** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**foregoing** [1] - 124:9
**form** [2] - 16:6, 105:17
**format** [1] - 124:11
**formed** [2] - 66:5, 72:21
**formula** [23] - 15:4, 15:5, 15:6, 34:21, 76:14, 77:3, 77:4, 77:6, 77:10, 77:12, 77:14, 77:19, 78:5, 78:9, 78:14, 79:19, 79:21, 79:23, 80:3, 81:18, 84:7, 84:10
**forth** [4] - 49:19, 56:18, 93:23, 93:25
**foundation** [2] - 58:13, 58:14
**foundational** [1] - 109:17
**founded** [1] - 117:15
**founding** [1] - 117:14
**fourth** [1] - 37:25
**free** [3] - 64:9, 64:13, 64:17
**freedom** [1] - 90:23
**FRENKEL** [60] - 5:4, 17:12, 17:15, 18:6, 22:12, 22:15, 23:1, 23:7, 23:9, 25:5, 25:7, 25:19, 25:21, 27:7, 27:9, 28:1, 39:6, 50:3, 50:7, 50:19, 58:13, 89:10, 92:15, 92:17, 94:1, 94:3, 96:18, 96:21,

97:6, 97:8, 97:21, 97:23, 98:4, 98:9, 98:14, 98:17, 99:12, 99:14, 99:18, 99:21, 100:14, 101:1, 101:12, 103:22, 104:1, 108:8, 108:17, 108:21, 108:23, 108:24, 109:25, 110:5, 110:6, 110:13, 110:15, 110:16, 110:23, 111:2, 111:9, 111:12
**Frenkel** [8] - 6:4, 6:5, 7:19, 17:11, 92:14, 111:19, 113:20, 114:10
**friends** [2] - 30:8, 31:21
**front** [4] - 16:1, 56:2, 59:5, 93:5
**full** [5] - 39:24, 40:2, 40:4, 41:3, 119:10
**fun** [1] - 20:17
**function** [1] - 96:16
**Functional** [1] - 43:9
**fundamental** [2] - 24:7, 60:17
**fundamentals** [1] - 62:13
**funhouse** [1] - 20:19

## G

**G1** [26] - 27:13, 36:24, 43:22, 43:25, 44:3, 45:6, 45:9, 69:19, 70:10, 71:21, 72:6, 73:14, 73:21, 74:5, 74:9, 74:13, 77:19, 78:16, 79:11, 79:16, 91:3, 91:15, 91:20, 107:5, 107:9, 110:18
**G2** [2] - 40:17, 44:1
**G3** [2] - 40:17, 44:1
**G5** [2] - 44:20, 55:24
**G6** [3] - 43:23, 44:4, 55:23
**G7** [1] - 54:15
**gains** [2] - 91:1, 91:13
**gap** [1] - 19:24
**general** [3] - 37:19, 45:14, 113:15
**generally** [2] - 70:10, 119:11
**generation** [3] - 52:18, 52:21
**gentlemen** [11] - 17:10, 28:8, 34:6,

46:11, 66:14, 75:20, 75:24, 91:24, 112:20, 120:2, 122:13
**GERARDO** [2] - 6:4, 17:13
**gigabits** [2] - 22:8, 53:4
**given** [1] - 120:10
**GmbH** [1] - 7:7
**GMBH** [1] - 1:4
**Goglia** [8] - 12:25, 13:1, 14:1, 14:16, 14:19, 15:12, 15:19, 121:20
**Goglia's** [4] - 14:4, 14:21, 15:7, 15:11
**gosh** [1] - 118:21
**GP5** [4] - 44:10, 44:14, 44:16, 44:25
**grad** [1] - 30:11
**graded** [10] - 45:17, 49:23, 49:25, 51:11, 52:3, 52:4, 52:12, 53:8, 90:6, 92:10
**gradient** [17] - 42:7, 42:10, 43:22, 44:2, 44:3, 44:6, 44:23, 45:21, 46:17, 46:21, 47:6, 47:9, 47:13, 47:14, 52:12, 98:11, 98:23
**grading** [4] - 43:6, 43:17, 61:15, 102:15
**graduating** [1] - 30:11
**grain** [22] - 17:20, 17:22, 18:3, 18:8, 18:9, 18:19, 18:23, 21:4, 22:1, 61:14, 67:17, 69:25, 83:25, 86:15, 86:21, 87:1, 87:5, 87:15, 88:19, 88:24, 89:5, 101:23
**grains** [9] - 17:24, 17:25, 18:1, 18:12, 18:20, 19:4, 19:8, 19:9
**granular** [2] - 18:25, 105:17
**graph** [1] - 50:12
**graphic** [1] - 51:9
**greater** [4] - 43:25, 44:1, 44:2, 72:20
**greatest** [1] - 84:15
**greatly** [1] - 27:23
**green** [3] - 45:5, 45:10, 45:15
**GREGORY** [1] - 5:4
**Group** [18] - 35:13, 35:14, 35:18, 35:22,

36:3, 36:6, 36:24, 37:12, 37:13, 44:10, 46:4, 47:2, 54:6, 99:7, 99:16, 117:25, 118:4
**group** [3] - 43:10, 47:5, 84:11
**growth** [4] - 17:20, 19:17, 20:22
**GS9** [1] - 46:4
**GT5** [5] - 46:7, 98:13, 99:6, 99:10, 99:15
**GTB** [1] - 46:7
**guess** [1] - 96:24
**Gupta** [6] - 59:8, 60:1, 60:6, 62:15, 83:14, 83:16
**Gupta-Harrell** [2] - 59:8, 83:14
**GX1** [2] - 98:11, 98:19
**GXB** [1] - 46:7

## H

**Hac** [1] - 2:16
**half** [3] - 119:1, 119:12
**halves** [1] - 12:2
**Hamilton** [1] - 118:9
**hand** [1] - 8:8
**handle** [2] - 105:14, 105:24
**HANLE** [1] - 4:12
**Hanle** [1] - 7:20
**hard** [52] - 10:2, 21:2, 27:4, 29:10, 51:15, 53:16, 53:25, 54:19, 59:12, 61:1, 61:17, 66:6, 68:25, 70:3, 70:4, 70:5, 70:9, 70:20, 70:24, 71:8, 71:10, 71:18, 71:22, 71:25, 72:16, 72:19, 72:25, 73:6, 75:2, 75:6, 76:17, 79:25, 81:24, 84:20, 87:23, 96:15, 99:22, 100:19, 102:17, 103:1, 104:3, 104:10, 104:11, 104:17, 104:19, 104:20, 105:23, 107:1, 113:25, 114:4, 114:7
**hardest** [3] - 84:24, 85:7, 109:3
**Harrell** [7] - 59:8, 60:1, 60:6, 60:11, 62:15, 83:14, 83:16
**Hc** [1] - 76:24
**HDD** [4] - 8:17, 8:20,

9:3, 11:3
**head** [6] - 19:23, 19:24, 20:3, 20:8, 20:12, 105:25
**heads** [2] - 16:18, 62:16
**heads-up** [1] - 16:18
**hear** [2] - 16:24, 29:14
**heard** [6] - 24:20, 24:21, 84:18, 84:23, 85:5, 109:1
**Hearsay** [1] - 108:6
**hearsay** [1] - 108:16
**held** [1] - 124:10
**help** [4] - 19:19, 112:24, 116:17, 117:16
**helped** [1] - 23:23
**helpful** [2] - 12:10, 113:3
**helps** [1] - 113:1
**hereby** [1] - 124:7
**heterogeneous** [2] - 38:8, 94:12
**HGST** [1] - 59:24
**hid** [1] - 34:7
**high** [21] - 12:21, 45:3, 47:17, 49:18, 53:20, 55:21, 56:13, 56:16, 58:4, 83:22, 98:18, 98:19, 99:25, 101:7, 103:4, 105:3, 105:12, 109:10
**high-anisotropy** [1] - 47:17
**higher** [8] - 18:22, 21:15, 45:3, 55:22, 55:23, 69:24, 70:2, 104:16
**highest** [1] - 20:25
**highlight** [1] - 45:16
**highlighted** [1] - 43:14
**highlighting** [2] - 43:13, 43:16
**highly** [2] - 62:5, 105:13
**Hino** [1] - 124:20
**HINO** [3] - 1:23, 124:5, 124:19
**Hino-Spaan** [1] - 124:20
**HINO-SPAAN** [3] - 1:23, 124:5, 124:19
**hired** [5] - 28:21, 31:9, 92:19, 92:22, 118:21
**Hk** [4] - 34:8, 82:1, 82:7, 83:7
**Hn** [2] - 79:16, 81:4
**holes** [1] - 95:23
**Honor** [46] - 7:11,

7:17, 8:4, 8:11, 8:12, 10:10, 10:13, 10:24, 11:10, 12:6, 13:22, 16:3, 16:7, 16:14, 16:16, 16:17, 16:23, 17:12, 23:1, 23:4, 28:4, 39:6, 50:3, 66:12, 75:22, 91:22, 92:15, 93:22, 94:2, 97:4, 108:6, 108:20, 109:25, 110:2, 110:10, 110:20, 110:23, 111:3, 111:4, 115:23, 115:24, 119:25, 122:10, 123:11
**HONORABLE** [1] - 1:3
**host** [35] - 36:8, 36:10, 36:11, 36:14, 36:20, 37:4, 37:18, 51:16, 53:24, 54:22, 65:12, 65:18, 66:5, 66:7, 66:10, 66:21, 67:1, 68:10, 68:23, 69:4, 69:18, 72:2, 72:21, 73:7, 73:8, 80:1, 87:7, 87:8, 87:23, 96:3, 96:11, 96:15, 107:1, 113:25, 114:6
**hour** [3] - 31:15, 31:18, 119:18
**hours** [3] - 19:13, 27:1, 122:18
**Houston** [1] - 118:3
**Hs** [3] - 84:1, 84:4, 84:5
**huge** [1] - 75:13
**hundreds** [1] - 59:19
**hypothetical** [1] - 79:20
**HYUK** [1] - 3:22

## I

**IBM** [1] - 59:24
**idea** [5] - 61:7, 61:12, 62:6, 64:16, 101:21
**identified** [8] - 9:17, 36:20, 69:18, 70:8, 70:20, 72:2, 86:15, 86:21
**identifies** [2] - 54:22, 71:21
**ignore** [1] - 112:7
**Illinois** [2] - 3:14, 4:18
**image** [6] - 17:24, 18:25, 19:23, 20:3, 20:12, 20:19
**images** [1] - 51:19
**imagine** [1] - 21:20

**immediately** [1] - 31:9
**immersed** [1] - 105:14
**impact** [2] - 105:22, 122:6
**impeachment** [1] - 108:20
**imperfect** [3] - 18:12, 20:3, 21:23
**imply** [1] - 53:10
**important** [2] - 18:9, 75:12
**impossibility** [1] - 61:9
**impossible** [2] - 94:19, 104:14
**improper** [5] - 11:6, 63:2, 63:13, 65:5, 77:13
**improve** [5] - 47:16, 88:19, 88:24, 89:4
**improved** [2] - 18:23, 22:3
**improvement** [1] - 50:13
**improvements** [6] - 19:17, 19:19, 22:4, 22:8, 22:9, 27:23
**improves** [1] - 47:15
**improving** [1] - 113:11
**IN** [1] - 6:16
**inappropriate** [1] - 105:22
**INC** [1] - 1:8
**Inc** [1] - 7:8
**inch** [3] - 22:9, 53:4, 53:5
**include** [4] - 25:15, 39:19, 91:16, 109:19
**included** [1] - 23:25
**includes** [2] - 68:24, 73:6
**including** [4] - 68:6, 74:5, 81:18, 113:24
**incoherency** [1] - 70:2
**incoherent** [1] - 69:24
**incorrect** [4] - 39:16, 85:1, 91:21, 114:7
**incorrectly** [1] - 85:18
**increase** [16] - 19:19, 27:21, 45:5, 53:2, 53:15, 53:24, 54:18, 58:2, 65:18, 85:8, 86:2, 87:20, 88:6, 88:14, 109:4
**increased** [1] - 86:23
**increasing** [7] - 20:23, 58:11, 67:11, 90:3, 91:2, 91:15
**independent** [9] - 29:1, 29:23, 32:1,

32:6, 32:9, 68:2, 102:21, 106:6, 106:9
**independently** [8] - 18:10, 27:5, 27:15, 40:3, 40:18, 63:24, 100:19, 104:10
**individual** [3] - 39:21, 40:2, 40:5
**industry** [9] - 23:23, 23:25, 26:4, 29:10, 59:2, 62:4, 62:5, 62:6, 75:15
**infer** [2] - 40:2, 115:1
**inferred** [1] - 39:22
**inform** [1] - 122:25
**information** [15] - 33:22, 34:12, 70:6, 70:14, 70:16, 72:6, 72:8, 73:14, 74:10, 74:17, 78:23, 99:2, 100:24, 110:18, 121:14
**infringe** [3] - 27:13, 28:22, 68:18
**infringed** [9] - 32:2, 32:7, 67:22, 68:5, 106:10, 120:22, 120:24, 121:2
**infringement** [13] - 29:13, 29:15, 29:17, 62:1, 62:20, 62:23, 63:2, 63:9, 65:1, 65:6, 67:21, 68:13, 92:25
**infringes** [3] - 63:20, 63:25, 64:4
**infringing** [2] - 93:3
**ingredients** [1] - 122:6
**initial** [4] - 26:6, 26:8, 91:24, 123:4
**inside** [1] - 27:1
**instead** [2] - 39:14, 80:3
**institution** [1] - 62:18
**instructions** [2] - 91:25, 123:5
**insufficient** [3] - 19:2, 75:15, 123:3
**insufficiently** [1] - 9:15
**intellectual** [1] - 117:21
**intend** [1] - 11:24
**intended** [2] - 56:9, 63:22
**intensity** [1] - 22:2
**interesting** [2] - 26:10, 26:12
**Intermag** [3] - 24:21, 25:17, 109:19

**internal** [7] - 42:22, 43:10, 44:20, 44:25, 45:25, 46:16, 47:8
**internally** [1] - 98:25
**international** [1] - 118:2
**interpret** [1] - 85:18
**interrupt** [2] - 50:3, 50:19
**interrupting** [1] - 39:6
**interruption** [1] - 28:8
**intrinsic** [2] - 41:14, 95:8
**introduce** [4] - 84:19, 84:23, 85:6, 116:12
**introduced** [3] - 90:2, 90:9, 109:2
**introducing** [2] - 85:6, 109:2
**invalid** [3] - 63:11, 121:6, 121:9
**invalidity** [3] - 63:9, 65:2, 65:3
**invention** [7] - 59:3, 64:10, 64:16, 86:16, 86:23, 89:15, 90:21
**inventions** [1] - 87:6
**investigating** [1] - 84:13
**investment** [1] - 90:20
**invite** [1] - 122:24
**involved** [2] - 94:4, 94:7
**IP** [1] - 64:19
**iron** [1] - 105:2
**iron-platinum** [1] - 105:2
**irregular** [1] - 19:4
**irrelevant** [3] - 68:13, 111:6, 111:10
**issuance** [1] - 101:10
**issue** [8] - 8:11, 8:12, 11:1, 12:8, 14:7, 36:23, 36:24
**issued** [7] - 26:22, 27:3, 42:18, 64:4, 64:7, 64:11, 64:18
**issues** [4] - 10:4, 14:15, 64:14, 117:20
**IT** [2] - 5:10, 5:10
**It'd** [1] - 90:11
**iterations** [1] - 112:24
**itself** [5] - 72:23, 72:24, 73:16, 74:13, 74:15

## J

**JACOB** [1] - 2:12
**Jacob** [1] - 7:13

**jagged** [1] - 19:5
**JAMES** [1] - 1:3
**Jan** [2] - 59:21, 59:23
**Jan-Ulrich** [2] - 59:21, 59:23
**January** [2] - 85:3, 108:4
**Japanese** [1] - 32:18
**jbuczko@raklaw. com** [1] - 2:15
**Jennifer** [1] - 7:22
**Jesse** [1] - 7:21
**job** [6] - 30:11, 84:15, 89:24, 89:25, 99:2, 107:16
**JOSEPH** [1] - 3:22
**joseph.lee@lw.com** [1] - 3:24
**judge** [2] - 40:9, 114:25
**JUDGE** [1] - 1:3
**Judicial** [1] - 124:12
**July** [2] - 9:12, 124:15
**JULY** [2] - 1:16, 7:1
**jury** [38] - 7:5, 8:1, 8:25, 15:6, 15:10, 15:20, 16:1, 17:9, 27:10, 29:1, 29:2, 29:14, 29:21, 46:12, 46:20, 63:15, 67:19, 68:4, 76:2, 91:5, 91:12, 96:24, 99:3, 107:16, 108:12, 108:15, 112:19, 116:12, 117:22, 120:8, 121:1, 121:8, 121:23, 122:16, 123:4, 123:5
**JURY** [1] - 1:15
**jury's** [1] - 29:17
**just..** [1] - 11:19
**juxtaposed** [1] - 51:23
**JX** [1] - 50:5
**JX-2000** [2] - 74:22, 103:22
**JX-2015** [6] - 33:15, 33:22, 34:4, 112:21, 113:9, 115:12
**JX-2018** [1] - 89:9
**JX-2027** [2] - 33:15, 33:23
**JX-2028** [2] - 33:15, 33:22
**JX-2030** [1] - 96:19
**JX-2032** [6] - 42:13, 42:14, 49:10, 98:5, 98:22, 99:25
**JX-2036** [1] - 82:24
**JX-2068** [5] - 6:17, 22:17, 23:1, 23:6,

25:6

## K

**KABAT** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**Kabat** [1] - 5:9
**keep** [5] - 23:21, 84:15, 98:8, 118:15
**kept** [2] - 57:23, 99:3
**key** [1] - 86:2
**kind** [3] - 74:13, 103:5, 106:3
**knowing** [3] - 26:10, 62:16, 113:2
**knowledge** [1] - 101:11
**known** [1] - 59:23
**Komag** [9] - 6:18, 23:11, 23:13, 23:15, 24:5, 25:16, 26:14, 26:15, 84:12
**KROEGER** [1] - 3:4
**Ku** [32] - 34:9, 35:3, 36:7, 36:18, 36:23, 43:6, 43:14, 43:17, 43:19, 43:20, 43:22, 43:25, 44:1, 44:2, 44:23, 45:1, 45:17, 45:21, 47:9, 47:13, 47:14, 49:12, 50:2, 51:13, 53:13, 57:6, 84:1, 99:19, 101:6, 101:7

## L

**L10** [1] - 105:2
**lab** [1] - 107:18
**labeled** [2] - 42:18, 44:20
**labs** [1] - 118:3
**lacks** [2] - 58:13, 58:14
**ladies** [11] - 17:10, 28:8, 34:6, 46:11, 66:14, 75:20, 75:23, 91:24, 112:19, 120:2, 122:13
**large** [4] - 44:4, 44:6, 118:1, 118:10
**laser** [1] - 22:1
**last** [11] - 17:24, 20:21, 21:14, 60:22, 66:13, 102:3, 116:3, 116:23, 119:2, 119:10
**late** [1] - 15:16
**latest** [2] - 23:22,

84:15
**LATHAM** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4
**Latham** [1] - 7:18
**LAW** [4] - 2:20, 4:9, 4:16, 4:20
**lawyers** [1] - 31:4
**layer** [107] - 20:6, 21:10, 21:18, 25:13, 27:5, 27:13, 27:15, 36:10, 38:9, 41:24, 43:22, 45:6, 45:9, 45:14, 48:6, 48:8, 48:17, 48:21, 51:15, 52:18, 53:16, 53:25, 54:4, 54:5, 54:8, 54:12, 54:14, 54:15, 54:19, 54:23, 55:3, 55:21, 56:12, 56:13, 58:3, 66:6, 67:12, 68:25, 69:19, 70:3, 70:4, 70:5, 70:8, 70:9, 70:10, 70:20, 70:24, 70:25, 71:5, 71:8, 71:10, 71:12, 71:17, 71:18, 72:6, 72:16, 72:19, 72:25, 73:7, 73:14, 73:21, 74:5, 74:9, 74:13, 75:2, 75:7, 76:17, 79:25, 84:20, 84:24, 85:7, 85:8, 87:8, 87:23, 88:4, 90:14, 90:18, 91:3, 91:15, 91:20, 94:13, 95:10, 96:7, 96:15, 99:15, 100:1, 100:9, 100:19, 100:23, 104:4, 104:10, 104:21, 107:1, 107:9, 107:12, 109:3, 109:4, 114:1, 114:4, 114:8
**layering** [2] - 21:14, 52:15
**layers** [106] - 20:23, 21:6, 21:11, 21:15, 33:4, 33:5, 34:18, 36:9, 36:14, 36:15, 36:19, 36:20, 37:3, 37:17, 38:8, 38:16, 39:1, 39:20, 39:21, 40:3, 40:5, 40:12, 41:19, 41:21, 42:10, 45:11, 48:2, 48:10, 50:1, 50:2, 51:12, 51:13, 51:16, 52:16, 52:20, 52:24, 53:3, 54:19, 54:21, 55:4,

55:22, 55:24, 56:4, 57:5, 57:6, 66:5, 66:7, 67:11, 68:24, 68:25, 69:13, 69:14, 69:18, 69:21, 70:2, 71:12, 71:16, 71:17, 71:21, 71:22, 71:25, 72:2, 72:3, 73:8, 74:4, 78:16, 79:5, 84:19, 84:24, 85:13, 86:10, 87:1, 87:2, 87:4, 87:6, 87:7, 87:12, 87:20, 88:6, 88:12, 88:13, 88:19, 88:24, 89:4, 90:3, 90:6, 90:8, 90:13, 90:20, 90:22, 94:12, 94:21, 94:23, 95:20, 96:13, 96:16, 99:20, 103:14, 104:20, 109:6, 110:18, 112:9
**leads** [3] - 86:16, 86:23, 107:18
**learned** [3] - 26:3, 26:7, 30:25
**least** [4] - 55:23, 119:1, 120:3, 122:3
**leave** [1] - 99:2
**LEDAHL** [1] - 2:8
**Ledahl** [1] - 7:13
**LEE** [1] - 3:22
**left** [6] - 9:25, 17:18, 18:25, 19:11, 51:1, 57:3
**legal** [1] - 94:4
**less** [4] - 21:15, 21:16, 81:4, 90:4
**letting** [1] - 39:7
**lie** [2] - 56:10, 93:12
**life** [2] - 21:8, 27:16
**lifted** [1] - 11:24
**light** [2] - 21:22, 22:7
**likewise** [1] - 121:8
**limit** [3] - 58:22, 59:3, 61:10
**limit..** [1] - 60:18
**limitations** [1] - 79:22
**limited** [1] - 106:5
**line** [3] - 76:24, 84:6, 105:6
**lines** [6] - 74:23, 103:24, 103:25, 112:6, 112:16, 113:6
**list** [2] - 57:21, 57:24
**listed** [1] - 75:13
**listen** [4] - 65:25, 78:24, 103:17, 122:25
**literature** [1] - 95:25
**Liu** [2] - 5:9, 7:14

**LLP** [9] - 3:12, 3:18, 3:21, 4:4, 4:8, 4:12, 4:16, 4:20, 5:4
**logos** [2] - 117:24, 118:7
**longitudinal** [1] - 88:16
**look** [20] - 8:16, 15:20, 20:17, 33:18, 37:12, 41:5, 50:12, 60:15, 71:2, 71:13, 72:12, 93:16, 96:23, 102:5, 103:24, 106:18, 119:10, 120:9, 120:12, 122:5
**looked** [1] - 95:3
**looking** [8] - 56:17, 89:9, 95:4, 95:24, 99:22, 101:15, 104:24, 106:14
**LOS** [1] - 124:3
**Los** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**loss** [1] - 21:17
**lost** [1] - 98:7
**low** [8] - 45:1, 49:19, 53:20, 58:4, 98:18, 101:6, 101:7
**lower** [4] - 54:22, 57:6, 100:2
**lowest** [2] - 55:4, 57:13
**lucky** [1] - 26:2
**Lumish** [1] - 7:17
**LUMISH** [6] - 3:18, 7:17, 16:13, 16:22, 17:2, 123:10
**lunch** [2] - 122:11, 122:13

## M

**machine** [1] - 48:14
**machines** [1] - 19:13
**mag** [12] - 20:23, 37:3, 37:17, 38:16, 39:1, 52:24, 55:4, 72:2, 87:18, 88:4, 88:13, 90:6
**magnetic** [65] - 19:2, 19:21, 20:1, 20:2, 20:6, 21:7, 21:11, 21:17, 27:5, 27:14, 27:15, 42:10, 50:2, 51:13, 51:15, 51:17, 57:25, 60:17, 61:16, 61:17, 68:25, 70:5, 70:8, 70:20, 70:24, 71:8, 71:10, 71:18, 71:22, 72:19, 73:2,

73:4, 73:6, 73:14, 75:2, 75:6, 83:22, 84:16, 84:19, 84:24, 85:10, 88:16, 95:22, 96:15, 100:19, 102:16, 102:18, 102:21, 104:4, 104:10, 104:20, 105:20, 106:13, 106:17, 107:1, 107:21, 113:16, 113:21, 113:23, 113:25, 114:4, 114:5, 114:8
**magnetically** [7] - 61:1, 70:6, 70:16, 73:15, 74:10, 88:15, 110:19
**magnetics** [3] - 60:7, 62:16, 83:18
**magnetization** [7] - 20:11, 20:23, 21:3, 21:15, 21:16, 21:25, 83:8
**magnitude** [2] - 80:15, 80:18
**maichele@raklaw. com** [1] - 2:19
**main** [3] - 8:11, 76:16, 76:18
**Maine** [1] - 2:17
**managing** [1] - 117:19
**manipulate** [1] - 105:16
**manner** [4] - 70:1, 92:2, 96:13, 123:6
**manufacturer** [1] - 59:12
**manufacturing** [1] - 105:23
**Marc** [1] - 7:11
**MARC** [1] - 2:4
**March** [3] - 31:8, 71:14, 96:1
**marked** [1] - 45:14
**master** [2] - 57:21, 115:16
**material** [9] - 9:24, 10:5, 11:5, 18:3, 21:7, 61:18, 62:17, 102:17, 102:19
**Materials** [1] - 97:18
**materials** [26] - 18:2, 24:15, 32:12, 32:14, 33:1, 34:17, 38:16, 41:3, 47:17, 52:9, 61:1, 75:9, 75:11, 75:14, 83:22, 95:23, 104:11, 104:12, 104:14, 104:15,

104:16, 104:19, 104:25, 105:2, 105:22, 110:17
**math** [2] - 13:10, 15:22
**mathematical** [1] - 117:10
**matter** [10] - 15:8, 16:5, 18:20, 19:15, 63:22, 63:23, 68:14, 123:2, 124:11
**Matter** [1] - 7:6
**matters** [5] - 8:3, 58:17, 118:22, 118:24, 119:1
**MATTHEW** [1] - 2:16
**Matthew** [1] - 7:14
**maximum** [1] - 111:6
**MBA** [2] - 117:4, 118:7
**mchan@raklaw.com** [1] - 2:23
**mean** [7] - 20:24, 38:14, 44:5, 64:13, 64:15, 90:5, 115:19
**meaning** [1] - 105:17
**meaningfully** [1] - 100:24
**means** [1] - 43:19
**meant** [1] - 97:15
**measure** [13] - 40:18, 40:24, 41:13, 41:18, 41:23, 42:5, 49:7, 71:4, 72:24, 94:20, 95:7, 95:9, 95:19
**measured** [2] - 80:7, 94:24
**measurement** [2] - 80:4
**measurements** [10] - 39:19, 41:25, 71:6, 80:11, 103:19, 107:19, 112:18, 112:23, 113:8
**measures** [2] - 41:3, 95:22
**meatball** [1] - 68:17
**med** [1] - 53:20
**media** [66] - 9:1, 9:3, 9:5, 9:6, 9:10, 9:15, 9:19, 9:21, 9:24, 10:3, 11:2, 17:19, 18:13, 18:21, 19:5, 19:10, 19:11, 19:25, 20:1, 21:6, 21:12, 25:12, 26:11, 26:18, 26:21, 26:24, 27:4, 27:22, 27:24, 39:21, 41:12, 41:13, 41:25, 42:3, 42:9, 42:10, 43:11, 45:12, 49:7,

49:13, 49:14, 51:11, 51:17, 52:3, 52:4, 62:11, 62:19, 69:23, 71:6, 72:1, 73:11, 73:14, 73:18, 84:16, 86:1, 95:7, 95:11, 95:13, 95:16, 96:25, 97:1, 103:12, 112:24, 113:2, 113:11
**Media** [4] - 6:18, 42:16, 43:8, 50:25
**media-related** [1] - 9:1
**media..** [1] - 95:6
**medium** [2] - 73:5, 83:5
**meet** [3] - 27:18, 67:10, 84:7
**Meeting** [1] - 97:18
**meeting** [1] - 16:22
**meets** [7] - 63:19, 63:24, 64:3, 67:1, 68:14, 69:4, 70:9
**member** [1] - 36:8
**members** [1] - 117:14
**memory** [1] - 110:9
**Menlo** [4] - 3:19, 4:10, 4:21, 5:5
**mentioned** [6] - 102:2, 103:19, 105:5, 105:21, 109:5, 119:3
**mentions** [1] - 105:1
**merely** [1] - 12:24
**merit** [3] - 85:8, 109:4, 109:10
**Mesa** [1] - 3:23
**met** [4] - 28:12, 67:20, 68:17, 79:22
**method** [1] - 35:4
**methodology** [7] - 13:4, 27:18, 66:23, 76:15, 76:20, 78:17, 120:11
**Mexico** [1] - 118:11
**mfenster@raklaw. com** [1] - 2:7
**mic** [1] - 108:13
**microstructure** [1] - 19:8
**middle** [7] - 11:9, 11:18, 11:19, 11:20, 11:25, 100:17, 118:7
**might** [3] - 57:23, 60:14, 98:2
**MIL** [2] - 110:11, 111:8
**MIL'd** [1] - 14:15
**million** [6] - 13:5, 13:16, 14:9, 16:1, 16:10, 30:19
**millions** [3] - 30:17,

90:11, 90:14
**minimum** [2] - 111:6, 120:3
**Minna** [1] - 7:14
**MINNA** [1] - 2:20
**MINT** [1] - 83:18
**minute** [3] - 10:14, 93:18
**minutes** [4] - 49:16, 74:2, 75:24, 122:18
**mirror** [5] - 20:3, 20:18
**MIRZAIE** [14] - 3:8, 8:4, 8:6, 8:10, 8:23, 10:13, 10:15, 10:24, 11:1, 12:6, 16:3, 16:7, 16:15, 119:25
**Mirzaie** [1] - 7:13
**misleading** [2] - 114:19, 115:9
**missing** [4] - 37:5, 40:13, 56:4, 113:17
**misstate** [1] - 47:7
**model** [1] - 98:1
**models** [2] - 24:7, 121:25
**modifies** [1] - 47:15
**modifying** [1] - 47:13
**module** [1] - 49:2
**modules** [1] - 106:24
**MOKE** [2] - 80:4, 80:11
**moment** [1] - 28:3
**moments** [3] - 21:13, 61:13, 101:22
**months** [3] - 13:20, 30:24, 52:19
**morning** [21] - 7:11, 7:15, 7:16, 7:17, 7:23, 10:19, 10:22, 11:12, 17:10, 17:16, 17:17, 28:9, 28:10, 28:11, 76:8, 76:9, 76:10, 115:23, 116:10, 116:11, 123:8
**morphology** [1] - 19:3
**Mortensen** [12] - 5:10, 34:13, 34:14, 38:1, 42:20, 45:18, 49:3, 52:1, 54:9, 54:10, 74:23, 86:14
**most** [3] - 56:4, 60:17, 116:23
**motion** [1] - 7:25
**motions** [1] - 93:23
**motive** [2] - 58:12, 58:16
**mouth** [1] - 58:8
**mouthful** [1] - 113:22
**move** [6] - 23:1, 66:11,

75:17, 89:11, 91:22, 107:2
**moved** [2] - 45:12, 48:20
**moves** [1] - 103:11
**MR** [186] - 1:4, 7:7, 7:11, 7:12, 7:16, 7:17, 8:4, 8:6, 8:10, 8:23, 9:2, 9:24, 10:1, 10:13, 10:15, 10:24, 11:1, 12:6, 16:3, 16:7, 16:13, 16:15, 16:17, 16:22, 17:2, 17:12, 17:15, 18:6, 22:5, 22:10, 22:12, 22:15, 23:1, 23:4, 23:7, 23:9, 25:1, 25:5, 25:7, 25:19, 25:21, 25:23, 27:3, 27:7, 27:9, 28:1, 28:3, 28:7, 28:22, 29:7, 29:8, 32:2, 33:12, 33:13, 33:25, 34:2, 34:6, 34:10, 35:11, 35:12, 37:10, 37:11, 37:24, 38:2, 39:6, 39:11, 42:13, 42:15, 43:5, 43:7, 45:16, 45:19, 47:24, 48:1, 49:2, 49:5, 50:3, 50:6, 50:7, 50:10, 50:18, 50:19, 50:22, 50:23, 54:2, 54:3, 54:11, 58:2, 58:13, 58:19, 59:8, 59:10, 60:3, 60:5, 60:21, 60:23, 66:3, 66:11, 66:19, 66:20, 67:4, 67:7, 68:20, 68:22, 69:7, 69:11, 74:1, 74:3, 74:22, 74:24, 75:17, 75:21, 76:5, 76:7, 79:3, 81:17, 81:20, 82:24, 83:2, 86:5, 86:7, 87:16, 87:17, 89:10, 89:11, 89:12, 91:22, 92:4, 92:13, 92:15, 92:17, 93:22, 94:1, 94:3, 96:18, 96:21, 97:4, 97:6, 97:8, 97:21, 97:23, 98:4, 98:9, 98:14, 98:17, 99:12, 99:14, 99:18, 99:21, 100:14, 100:22, 101:1, 101:12, 103:22, 104:1, 108:6, 108:8, 108:11, 108:14, 108:17, 108:20, 108:21, 108:23,

108:24, 109:25, 110:2, 110:5, 110:6, 110:10, 110:13, 110:15, 110:16, 110:20, 110:23, 111:2, 111:4, 111:9, 111:12, 111:17, 113:18, 113:19, 115:21, 119:25, 122:17, 122:19, 123:10
**MRS** [2] - 97:18
**MRT** [2] - 26:22, 121:5
**MRT's** [5] - 11:21, 11:24, 120:24, 121:2, 121:9
**MS** [25] - 10:10, 10:17, 10:21, 11:10, 11:15, 11:17, 11:19, 11:21, 12:1, 12:5, 13:22, 14:12, 14:14, 14:22, 14:25, 15:3, 15:10, 15:17, 16:2, 82:2, 115:23, 116:9, 119:22, 120:6, 122:10
**Mulholland** [1] - 7:21
**multi** [2] - 43:6, 43:17
**multi-oxide** [1] - 43:6
**multilayer** [19] - 65:12, 65:18, 73:2, 73:6, 73:11, 73:14, 73:18, 74:9, 91:2, 91:7, 91:14, 92:9, 106:13, 106:17, 106:23, 113:21, 113:23, 114:5, 114:9
**multiple** [8] - 48:14, 50:1, 51:12, 69:21, 69:23, 84:19, 84:24, 87:6
**multiplied** [1] - 12:19
**must** [4] - 60:2, 60:25, 90:18, 106:19

## N

**naked** [2] - 74:2, 74:13
**name** [4] - 60:14, 116:3, 116:13
**names** [1] - 60:9
**nanometer** [2] - 106:1, 106:2
**nanometers** [8] - 74:20, 75:2, 75:7, 75:13, 75:15, 104:4, 104:5, 104:13
**nanosecond** [5] - 80:9, 81:9, 82:1, 82:9, 83:5

narrow [3] - 16:23, 16:25, 40:6
nature [1] - 104:16
necessarily [2] - 10:7, 89:20
necessary [2] - 61:13, 101:22
necessity [1] - 54:24
need [6] - 10:7, 18:4, 47:17, 101:13, 101:16, 110:18
Need [1] - 60:16
needed [1] - 56:24
net [1] - 13:13
neutral [3] - 32:1, 32:6, 32:9
never [16] - 9:23, 12:16, 12:18, 13:2, 13:3, 24:9, 24:10, 36:13, 40:4, 46:21, 56:23, 59:5, 90:10, 96:13, 115:4
new [6] - 12:10, 13:15, 84:13, 90:15, 90:18, 112:24
Newport [4] - 4:5, 4:6, 4:13, 4:14
next [14] - 17:20, 18:7, 19:18, 46:6, 48:21, 55:23, 58:23, 69:14, 71:13, 76:19, 95:1, 101:2, 102:4, 108:3
nice [2] - 52:17, 97:20
nicely [1] - 22:1
noise [7] - 18:13, 18:16, 18:17, 20:15, 21:22, 22:2
noisy [2] - 20:14, 20:15
nomenclature [1] - 96:8
nominal [1] - 13:13
none [1] - 98:24
noninfringement [5] - 76:12, 92:19, 92:22, 92:23, 92:24
noninfringing [1] - 92:8
nonresponsive [2] - 66:11, 75:17
normal [1] - 80:15
North [3] - 3:13, 4:17, 118:11
notable [1] - 50:13
notes [1] - 98:7
nothing [13] - 12:1, 16:13, 16:15, 39:2, 53:9, 87:1, 87:4, 88:21, 90:21, 107:20, 114:3,

114:14, 123:10
notice [3] - 8:12, 10:4, 12:9
nowhere [1] - 13:11
nucleation [36] - 36:8, 36:10, 36:11, 36:14, 36:20, 37:4, 37:18, 51:16, 53:24, 54:22, 65:12, 65:18, 66:5, 66:7, 66:10, 66:21, 67:1, 68:10, 68:23, 69:4, 69:18, 71:17, 72:2, 72:21, 73:7, 73:8, 80:1, 87:7, 87:8, 87:23, 96:3, 96:11, 96:14, 107:1, 113:25, 114:6
Number [4] - 23:6, 37:25, 102:5, 102:6
number [31] - 8:17, 9:21, 12:24, 13:2, 13:11, 14:5, 14:9, 14:19, 14:20, 15:7, 15:12, 15:13, 15:15, 15:19, 16:1, 16:9, 16:10, 16:11, 30:24, 35:7, 36:5, 36:22, 37:7, 50:4, 50:5, 52:16, 52:20, 57:22, 91:25, 122:7
numbers [4] - 13:1, 35:10, 36:7, 37:6

**O**

oath [5] - 41:7, 51:2, 55:8, 114:13, 114:25
objection [12] - 10:9, 23:3, 23:4, 58:13, 93:22, 97:4, 100:22, 108:6, 110:2, 110:20, 110:21, 119:25
objections [6] - 8:6, 8:10, 12:7, 16:19, 76:16, 110:10
objective [2] - 29:1, 29:23
obligation [1] - 114:18
obtain [1] - 32:18
obviously [2] - 85:16, 99:3
occasions [4] - 28:12, 41:24, 71:5, 95:10
occurs [3] - 81:25, 83:4, 114:4
OF [9] - 1:2, 1:14, 2:1, 3:1, 4:1, 5:1, 124:1, 124:3, 124:4
offer [8] - 10:16,

53:23, 67:25, 68:1, 68:2, 69:3, 69:17, 92:7
offered [1] - 90:24
offering [4] - 10:17, 10:18, 120:23, 121:5
Official [1] - 124:20
OFFICIAL [3] - 1:24, 124:1, 124:5
oil [3] - 105:14, 105:15, 118:2
omission [2] - 114:19, 115:9
omitted [2] - 27:22, 27:23
once [9] - 37:6, 40:15, 52:23, 56:17, 90:2, 90:9, 94:19, 107:3
one [59] - 10:23, 12:7, 15:19, 15:24, 18:24, 19:11, 22:18, 29:21, 31:13, 35:6, 41:2, 43:13, 46:9, 48:8, 48:17, 48:18, 55:16, 59:25, 60:22, 61:16, 65:5, 67:17, 69:23, 71:12, 72:24, 74:2, 76:18, 76:19, 79:23, 85:7, 86:22, 88:21, 91:20, 92:2, 92:5, 92:15, 93:16, 93:18, 94:21, 95:12, 96:2, 96:24, 98:6, 98:7, 98:15, 99:2, 99:4, 99:9, 100:12, 102:16, 108:5, 109:3, 113:10, 114:8, 117:14, 117:15, 122:2
ones [3] - 36:10, 43:10, 113:17
oOo [1] - 123:15
oop [1] - 99:23
open [1] - 33:17
opening [1] - 15:1
operating [1] - 80:15
opine [1] - 92:11
opinion [34] - 9:4, 9:7, 10:8, 12:18, 12:21, 13:4, 13:5, 13:7, 13:15, 13:17, 13:18, 17:20, 36:11, 36:14, 53:23, 56:12, 58:17, 65:16, 65:20, 66:4, 66:8, 66:23, 66:25, 67:9, 69:3, 91:7, 91:8, 92:7, 116:18, 120:13, 120:14, 121:5, 121:12
opinions [22] - 8:13,

8:15, 9:9, 12:9, 27:10, 27:11, 27:20, 29:1, 64:21, 67:15, 67:25, 68:1, 68:2, 69:17, 76:11, 85:20, 89:16, 117:20, 120:9, 120:23, 121:13, 121:23
Opportunity [3] - 60:22, 61:5, 102:10
opportunity [3] - 7:24, 66:16, 123:1
oppose [1] - 113:14
optimize [2] - 21:3, 49:15
optimized [1] - 21:25
optimizing [5] - 46:15, 46:17, 50:1, 51:12, 113:11
optional [1] - 68:25
optometrist [1] - 101:16
OR [1] - 6:16
order [12] - 9:12, 17:7, 18:9, 20:25, 21:16, 25:24, 31:14, 32:18, 76:3, 85:8, 104:9, 109:4
orders [2] - 80:14, 102:24
organization [1] - 95:17
organize [1] - 23:23
orient [1] - 105:16
oriented [5] - 70:6, 70:16, 73:15, 74:10, 110:19
otherwise [1] - 72:4
outcome [1] - 119:19
outs [1] - 83:1
outside [1] - 75:3
overall [14] - 8:17, 8:20, 45:5, 53:15, 53:18, 53:24, 54:18, 58:2, 58:11, 65:18, 91:2, 91:14, 103:12
overcome [1] - 97:1
overruled [2] - 10:9, 58:15
overstated [1] - 122:7
overstating [1] - 122:9
overview [2] - 65:11, 88:10
own [11] - 12:13, 12:19, 26:16, 30:21, 72:9, 72:16, 73:1, 74:11, 100:25, 107:9, 108:15
oxide [4] - 19:1, 19:3, 43:6, 43:17

oxides [2] - 19:7

**P**

p.m [1] - 123:14
page [30] - 23:8, 25:8, 25:11, 27:12, 43:5, 43:14, 44:9, 46:3, 46:6, 49:20, 49:21, 71:14, 85:3, 85:25, 86:6, 93:20, 95:2, 95:3, 97:16, 100:9, 100:12, 100:15, 102:3, 102:4, 102:8, 106:25, 108:5, 112:16, 113:6, 124:11
PAGE [1] - 6:3
pages [1] - 13:25
paid [2] - 55:17, 82:18
paper [1] - 32:18
papers [1] - 60:10
Papusoi [13] - 57:12, 57:16, 57:23, 81:13, 81:21, 82:15, 82:17, 82:25, 107:14, 107:15, 107:18, 107:21, 107:24
Papusoi's [2] - 82:20, 107:16
paragraph [11] - 38:5, 39:17, 41:9, 55:19, 71:3, 89:2, 94:9, 95:3, 101:14, 101:15, 101:18
paralegal [1] - 5:9
Parameters [1] - 43:9
pardon [3] - 23:4, 28:8, 44:15
Park [4] - 3:19, 4:10, 4:21, 5:5
part [29] - 8:13, 9:5, 9:7, 10:2, 11:18, 11:19, 12:15, 23:17, 24:3, 41:25, 46:14, 58:9, 66:13, 71:6, 72:1, 72:7, 73:1, 73:10, 73:13, 73:17, 73:21, 84:11, 94:7, 95:11, 95:20, 95:22, 99:16, 114:4, 122:2
particular [4] - 117:6, 117:10, 117:21, 120:12
particularly [2] - 18:9, 122:21
parties [1] - 16:22
partner [1] - 117:17
party's [1] - 29:4
pass [3] - 28:1, 92:13,

111:12
**patent** [38] - 9:10, 9:11, 9:14, 13:6, 27:21, 42:18, 63:23, 64:4, 64:7, 64:10, 64:14, 64:17, 67:16, 71:10, 72:14, 75:6, 75:13, 76:23, 77:1, 77:2, 77:4, 77:12, 77:14, 78:9, 84:7, 88:22, 96:14, 101:10, 105:1, 106:4, 106:6, 117:21, 118:24, 119:4, 119:6, 119:23, 120:16, 120:20
**patented** [1] - 87:6
**patentholders** [1] - 119:12
**patents** [15] - 9:18, 22:5, 22:10, 26:22, 27:3, 28:22, 32:3, 32:8, 111:4, 120:17, 120:21, 120:24, 121:2, 121:6, 121:9
**PATRICIA** [1] - 4:20
**Patricia** [2] - 7:20, 115:24
**patricia.young@lw. com** [1] - 4:22
**PAUL** [1] - 3:4
**Pause** [1] - 18:5
**paying** [1] - 31:15
**PDX-2.24** [1] - 86:14
**PDX-222** [1] - 89:8
**PDX-3.101** [1] - 99:13
**PDX-3.107** [1] - 54:2
**PDX-3.113** [1] - 88:9
**PDX-3.126** [1] - 113:18
**PDX-3.141** [2] - 81:17, 107:13
**PDX-3.151** [1] - 68:20
**PDX-3.152** [1] - 103:15
**PDX-3.216** [1] - 86:20
**PDX-3.47** [1] - 33:12
**PDX-3.49** [1] - 65:8
**PDX-3.60** [2] - 35:11, 101:12
**PDX-3.62** [2] - 87:16, 101:2
**PDX-5.1** [1] - 49:4
**PDX-5.14** [1] - 74:1
**PDX-5.22** [1] - 34:1
**peering** [1] - 97:15
**penalty** [1] - 55:13
**Pennsylvania** [1] - 117:1
**people** [19] - 23:23, 23:25, 24:5, 25:24,

26:4, 27:1, 30:12, 49:11, 49:13, 51:7, 59:2, 62:3, 62:5, 62:7, 62:13, 62:14, 62:15, 91:19, 99:1
**per** [6] - 12:15, 22:8, 31:18, 53:4, 53:5, 83:23
**percent** [9] - 12:24, 13:11, 14:2, 14:13, 14:14, 15:24, 19:1, 22:9, 89:19
**percentage** [1] - 119:9
**perfect** [2] - 20:19, 105:25
**Performance** [1] - 43:9
**performance** [3] - 18:13, 18:18, 49:15
**performed** [1] - 80:11
**performing** [1] - 19:11
**period** [4] - 26:22, 27:2, 100:25, 118:18
**periodic** [1] - 105:5
**perjury** [1] - 55:14
**perpendicular** [1] - 88:17
**personal** [2] - 30:1, 30:6
**Ph.D** [2] - 118:14, 118:17
**phase** [3] - 18:1, 19:9
**Phoenix** [1] - 97:20
**physical** [1] - 61:9
**physics** [1] - 62:18
**pictorial** [1] - 20:17
**pictured** [2] - 23:10, 23:11
**pie** [1] - 8:16
**piece** [1] - 11:9
**piggybacking** [1] - 8:14
**pkroeger@raklaw. com** [1] - 3:7
**place** [2] - 111:4, 114:3
**places** [1] - 30:13
**plaintiff** [4] - 8:2, 16:15, 96:6, 96:9
**Plaintiff** [2] - 1:5, 1:10
**PLAINTIFF** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**plaintiff's** [2] - 5:9, 5:10
**plaintiffs** [1] - 119:7
**platinum** [5] - 21:12, 21:16, 55:1, 56:12, 105:2
**play** [1] - 69:9
**PMR** [3] - 42:16, 43:8,

50:25
**point** [9] - 10:12, 49:24, 62:2, 62:3, 87:22, 88:3, 88:4, 118:23, 123:3
**pointed** [2] - 25:2, 96:22
**pointing** [1] - 13:9
**points** [1] - 37:5
**popped** [1] - 12:3
**pops** [1] - 12:2
**portion** [1] - 16:10
**position** [1] - 102:22
**possessed** [3] - 38:10, 94:14, 115:3
**possible** [5] - 21:1, 57:13, 94:20, 94:22, 103:9
**possibly** [1] - 8:14
**potential** [1] - 61:8
**practical** [2] - 103:13, 105:19
**practically** [1] - 26:17
**practice** [4] - 24:18, 26:4, 59:5, 64:16
**precluded** [1] - 83:24
**premise** [1] - 39:13
**preparation** [1] - 121:13
**prepared** [2] - 13:19, 116:17
**presence** [5] - 7:5, 17:9, 76:2, 102:20, 122:16
**present** [6] - 13:14, 24:8, 24:20, 79:24, 94:21, 115:15
**PRESENT** [1] - 5:8
**presentation** [11] - 22:23, 25:1, 25:3, 25:16, 43:10, 49:22, 96:25, 97:16, 109:19, 109:22, 110:1
**Presentation** [1] - 6:18
**presentations** [2] - 24:18, 58:21
**presented** [5] - 32:1, 32:6, 35:7, 35:21, 51:1
**president** [2] - 23:14, 57:22
**pretrial** [2] - 93:23, 93:25
**pretty** [3] - 20:19, 76:12, 122:1
**prevent** [1] - 105:15
**previous** [2] - 102:8, 108:2

**previously** [5] - 8:15, 9:7, 9:8, 14:24, 55:8
**PREVIOUSLY** [1] - 17:13
**price** [2] - 12:15, 30:23
**Prices** [1] - 13:24
**primary** [2] - 69:23, 76:12
**principle** [3] - 61:17, 102:17, 103:6
**priority** [1] - 64:8
**Pro** [1] - 2:16
**problem** [3] - 8:20, 12:22, 60:17
**problems..** [1] - 61:11
**proceed** [1] - 76:5
**proceeding** [2] - 116:15, 121:22
**Proceedings** [1] - 123:14
**PROCEEDINGS** [1] - 1:14
**proceedings** [4] - 18:5, 93:25, 122:24, 124:10
**process** [2] - 20:4, 21:20
**produce** [2] - 40:21, 58:10
**produced** [10] - 33:21, 34:11, 34:20, 37:20, 47:10, 56:5, 57:20, 59:16, 121:16
**product** [48] - 27:4, 27:16, 44:10, 44:13, 44:16, 44:21, 44:22, 45:23, 46:4, 46:21, 47:2, 47:20, 48:4, 48:20, 50:13, 50:14, 50:15, 50:17, 51:4, 52:15, 52:22, 53:12, 53:21, 54:6, 55:4, 58:7, 62:24, 63:19, 63:24, 64:3, 64:6, 81:16, 90:8, 92:10, 94:21, 95:23, 98:11, 98:13, 99:7, 99:16, 100:18, 101:7, 101:8, 103:10, 110:24, 112:11
**products** [68] - 27:12, 27:13, 28:22, 32:13, 32:15, 32:17, 32:21, 33:2, 34:19, 39:1, 41:1, 42:6, 42:25, 46:7, 46:13, 46:25, 48:2, 48:24, 51:20, 52:25, 53:9, 53:23, 54:8, 54:12, 56:4,

56:14, 63:3, 65:12, 65:17, 66:10, 67:1, 67:10, 69:4, 69:21, 70:9, 70:12, 71:1, 71:19, 71:25, 72:7, 77:20, 80:8, 84:7, 87:21, 88:11, 89:21, 90:23, 97:13, 97:25, 98:3, 98:19, 98:24, 99:1, 99:4, 99:22, 100:5, 101:9, 103:13, 105:4, 107:6, 111:3, 111:21, 112:4, 112:9, 113:10, 122:8
**professional** [4] - 30:1, 30:10, 30:12, 117:19
**professionals** [1] - 117:17
**professors** [2] - 60:7, 62:12
**proffer** [1] - 119:22
**profile** [2] - 61:16, 102:16
**Profit** [1] - 8:17
**profit** [7] - 8:20, 9:3, 9:15, 10:2, 11:3, 11:13
**profits** [3] - 9:1, 10:8, 122:8
**program** [2] - 20:13
**progress** [1] - 17:3
**progressed** [1] - 118:22
**progressing** [1] - 19:6
**progression** [4] - 8:23, 11:3, 11:5, 88:15
**promoted** [1] - 23:21
**proof** [1] - 27:19
**proper** [5] - 19:3, 62:23, 75:9, 108:11, 108:15
**properly** [2] - 61:15, 102:15
**properties** [5] - 20:11, 57:25, 75:12, 95:22, 113:16
**property** [1] - 117:21
**proportional** [1] - 83:25
**proposal** [1] - 59:25
**proposed** [3] - 25:14, 51:15, 109:14
**protect** [3] - 21:6, 21:7, 21:12
**protected** [1] - 64:19
**protection** [1] - 54:25
**protective** [1] - 55:2

| | | | | |
|---|---|---|---|---|
| **prove** [1] - 58:2<br>**proves** [2] - 84:9, 123:3<br>**provide** [6] - 20:12, 28:25, 78:23, 94:23, 112:15, 120:13<br>**provided** [3] - 25:10, 42:4, 96:9<br>**provides** [1] - 19:23<br>**providing** [2] - 29:23, 117:20<br>**proving** [1] - 67:20<br>**PTX-129** [2] - 99:8, 99:18<br>**PTX-286** [1] - 110:1<br>**PTX-29** [5] - 49:20, 50:6, 100:6, 100:7, 100:17<br>**public** [1] - 26:5<br>**publicly** [4] - 24:8, 24:15, 97:17, 98:2<br>**published** [4] - 37:6, 50:16, 82:21, 95:25<br>**pull** [16] - 32:17, 35:11, 36:6, 37:10, 42:13, 54:2, 57:2, 59:8, 60:3, 65:8, 65:10, 86:5, 86:14, 86:20, 112:12, 113:18<br>**purple** [5] - 12:16, 36:8, 36:11, 36:19, 45:11<br>**purposes** [1] - 120:21<br>**pursuant** [1] - 124:8<br>**pushing** [1] - 26:24<br>**put** [13] - 15:12, 15:25, 23:7, 37:6, 49:14, 49:18, 66:1, 93:5, 96:2, 96:19, 108:17, 108:18, 118:14<br>**putting** [1] - 58:7<br><br>**Q**<br><br>**quantification** [2] - 89:14, 89:16<br>**quantify** [2] - 89:18, 89:23<br>**quantity** [1] - 33:3<br>**QUESTION** [1] - 113:8<br>**questions** [10] - 33:9, 66:17, 68:9, 78:23, 93:6, 107:15, 108:19, 111:18, 115:21, 117:11<br>**quicker** [1] - 78:24<br>**quickly** [1] - 99:13<br>**quite** [3] - 18:15, 34:15, 112:7 | **quote** [1] - 106:12<br><br>**R**<br><br>**R&D** [3] - 9:21, 34:16, 118:3<br>**radial** [1] - 20:9<br>**ranges** [1] - 75:4<br>**rare** [5] - 41:24, 71:5, 95:10, 95:15, 105:10<br>**rare-earth** [1] - 105:10<br>**rarely** [1] - 123:7<br>**rather** [1] - 9:17<br>**ratio** [4] - 20:15, 22:2, 44:3, 44:7<br>**RAUTH** [2] - 4:4, 4:12<br>**re** [40] - 22:7, 27:17, 29:7, 29:13, 29:22, 32:17, 34:18, 35:2, 35:7, 35:10, 35:18, 35:21, 37:5, 37:6, 53:12, 54:17, 54:22, 69:12, 70:8, 71:20, 71:21, 76:13, 76:20, 77:6, 77:13, 78:5, 78:9, 79:11, 79:16, 80:3, 81:6, 81:7, 81:8, 84:9, 86:21, 89:17, 90:21, 103:19, 111:24<br>**Re** [1] - 79:21<br>**re's** [9] - 14:1, 14:4, 15:19, 27:20, 29:18, 67:9, 81:2, 89:14, 121:19<br>**reaction** [2] - 26:6, 26:8<br>**read** [36] - 20:25, 21:4, 21:20, 21:21, 22:2, 38:6, 38:12, 39:18, 39:23, 39:25, 40:1, 41:15, 41:16, 41:17, 43:18, 49:24, 60:9, 61:6, 61:19, 81:22, 82:4, 82:5, 83:3, 83:21, 85:17, 85:18, 89:3, 94:10, 95:5, 96:5, 99:22, 99:23, 108:25, 109:13, 113:4, 120:10<br>**read-back** [1] - 21:20<br>**Reading** [3] - 41:22, 60:24, 74:25<br>**reading** [3] - 21:22, 22:1, 60:2<br>**reads** [1] - 8:16<br>**real** [6] - 47:19, 51:4, 51:20, 53:21, 87:21<br>**reality** [5] - 47:7, 47:9, 47:23, 62:10 | **realization** [2] - 61:12, 101:21<br>**realize** [1] - 91:21<br>**really** [8] - 12:22, 18:13, 29:13, 31:13, 50:12, 79:8, 99:12, 103:8<br>**REALTIME** [1] - 124:5<br>**reason** [7] - 19:16, 57:18, 88:19, 88:23, 89:1, 89:4, 89:7<br>**reasonable** [2] - 100:25, 120:15<br>**reasons** [1] - 88:21<br>**rebuttal** [3] - 14:5, 15:2, 15:14<br>**received** [7] - 12:9, 13:8, 23:5, 23:6, 30:14, 61:21, 120:1<br>**recently** [1] - 61:7<br>**Recess** [2] - 17:6, 76:1<br>**recess** [2] - 122:13, 123:13<br>**recipe** [4] - 48:5, 48:6, 54:4, 54:5<br>**recipes** [7] - 48:3, 53:13, 53:15, 98:23, 99:4, 111:24<br>**recognize** [1] - 22:21<br>**recollection** [1] - 110:7<br>**record** [6] - 7:10, 16:4, 16:8, 99:23, 116:4, 123:9<br>**recording** [23] - 20:20, 51:17, 60:18, 73:5, 80:9, 80:24, 81:8, 81:24, 82:14, 82:22, 83:4, 84:11, 84:16, 84:24, 85:7, 85:10, 88:16, 88:17, 105:20, 107:21, 107:25, 109:3<br>**Recross** [1] - 6:6<br>**RECROSS** [1] - 111:16<br>**Recross-examination** [1] - 6:6<br>**RECROSS-EXAMINATION** [1] - 111:16<br>**red** [1] - 87:25<br>**redacted** [1] - 93:24<br>**redesigned** [1] - 20:13<br>**redirect** [4] - 33:10, 108:9, 108:21, 110:1<br>**Redirect** [1] - 6:5<br>**REDIRECT** [1] - 92:16<br>**REDIRECT-EXAMINATION** [1] - | 92:16<br>**reduction** [1] - 87:14<br>**refer** [3] - 52:16, 58:20, 74:4<br>**Reference** [2] - 102:5<br>**reference** [4] - 17:24, 18:11, 70:24, 100:3<br>**References** [1] - 101:24<br>**referred** [2] - 97:6, 106:12<br>**referring** [7] - 71:19, 74:14, 96:4, 101:19, 103:7, 109:13, 111:2<br>**reflect** [2] - 20:12, 89:20<br>**regarding** [1] - 67:17<br>**Regression** [1] - 13:23<br>**regression** [4] - 12:13, 12:14, 12:20, 13:10<br>**regulations** [1] - 124:12<br>**REJECTED** [1] - 6:16<br>**relate** [1] - 87:6<br>**related** [4] - 9:1, 17:20, 117:3, 118:10<br>**Related** [1] - 43:9<br>**relation** [2] - 40:14, 68:2<br>**relationship** [3] - 86:10, 87:2, 87:4<br>**relative** [6] - 37:3, 37:17, 38:7, 94:11, 115:2, 115:11<br>**released** [1] - 101:8<br>**relevant** [3] - 33:3, 96:12, 112:10<br>**reliable** [1] - 120:14<br>**relied** [1] - 121:17<br>**relies** [4] - 12:24, 13:25, 14:4, 15:24<br>**rely** [6] - 12:25, 14:17, 15:6, 15:11, 77:14, 89:17<br>**relying** [2] - 13:3, 14:19<br>**remaining** [7] - 9:3, 10:1, 10:11, 11:3, 11:8, 11:16, 12:4<br>**remember** [10] - 36:4, 75:24, 92:20, 93:7, 98:10, 98:20, 102:12, 106:7, 106:21, 122:14<br>**remove** [1] - 11:4<br>**removed** [2] - 11:2, 11:5<br>**removing** [1] - 10:2<br>**render** [1] - 55:1 | **rendered** [1] - 64:15<br>**renders** [1] - 21:9<br>**rep** [1] - 7:13<br>**repeat** [6] - 32:4, 33:16, 70:22, 73:23, 84:21, 84:22<br>**rephrase** [3] - 56:8, 104:7, 111:2<br>**report** [29] - 8:13, 8:18, 9:5, 9:20, 11:12, 12:12, 13:2, 13:7, 13:11, 13:15, 13:19, 13:22, 14:6, 14:9, 14:18, 15:1, 15:2, 15:5, 15:13, 15:14, 15:18, 15:21, 24:10, 88:23, 89:2, 89:6, 117:17, 121:19<br>**reported** [1] - 124:10<br>**Reporter** [1] - 124:20<br>**REPORTER** [3] - 1:24, 124:1, 124:6<br>**REPORTER'S** [1] - 1:14<br>**reports** [4] - 120:10, 121:18, 121:19<br>**represent** [9] - 46:11, 48:8, 50:16, 51:20, 52:17, 59:17, 100:5, 111:21, 112:19<br>**representation** [3] - 97:24, 100:17, 101:6<br>**representative** [5] - 5:9, 7:19, 54:6, 101:7, 112:14<br>**represented** [5] - 48:3, 48:5, 53:21, 87:21, 99:5<br>**require** [2] - 103:10, 103:12<br>**required** [1] - 27:19<br>**requirement** [3] - 83:24, 111:5<br>**requirements** [2] - 76:21, 84:8<br>**requires** [2] - 66:21, 70:4<br>**Research** [2] - 23:13, 97:19<br>**research** [8] - 23:14, 24:4, 25:16, 26:16, 26:20, 26:23, 84:16, 97:2<br>**researcher** [1] - 59:23<br>**researching** [1] - 84:13<br>**resembling** [1] - 13:19<br>**respect** [6] - 16:19, 29:15, 41:10, 51:2, 51:25, 112:4 |

**respected** [2] - 60:6, 62:18
**respond** [1] - 89:13
**response** [2] - 49:8, 66:13
**responsible** [1] - 84:12
**rest** [2] - 58:7, 99:1
**resulting** [1] - 20:5
**results** [2] - 12:19, 12:20
**RESUMES** [1] - 17:13
**retained** [1] - 55:17
**retired** [1] - 31:8
**reversal** [1] - 83:25
**reverse** [2] - 61:13, 101:22
**review** [2] - 7:24, 121:13
**reviewed** [1] - 121:17
**revolution** [2] - 87:18, 88:5
**Reza** [1] - 7:13
**REZA** [1] - 3:8
**RICHARD** [1] - 5:4
**Rick** [1] - 7:19
**rick.frenkel@lw.com** [1] - 5:6
**rise** [3] - 17:5, 75:25, 122:15
**rmirzaie@raklaw.com** [1] - 3:11
**roadmap** [1] - 87:20
**Roadmap** [1] - 50:25
**ROBERT** [1] - 2:12
**role** [4] - 28:18, 64:23, 116:15, 117:18
**ROOM** [1] - 1:24
**row** [1] - 48:6
**rows** [1] - 48:8
**royalty** [1] - 13:13
**Rule** [2] - 8:12, 12:8
**rules** [1] - 65:23
**ruling** [2] - 11:4, 108:7
**rulings** [2] - 13:20, 16:6
**run** [2] - 102:24, 117:16
**RUSS** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**Russ** [1] - 5:9

**S**

**SACV-22-1599** [1] - 7:7
**sales** [1] - 30:18
**SALIL** [1] - 4:5
**samarium** [5] - 105:2,

105:5, 105:9, 105:10, 105:11
**samarium-cobalt** [2] - 105:2, 105:11
**sample** [4] - 20:16, 40:16, 49:16
**samples** [5] - 19:15, 24:10, 50:15, 80:6, 107:11
**SANTA** [3] - 1:18, 1:25, 7:1
**Sarah** [1] - 7:20
**SARAH** [1] - 4:16
**sarah.wang@lw.com** [1] - 4:19
**saturation** [5] - 83:6, 83:7, 84:3, 84:5, 105:12
**saw** [6] - 24:5, 25:16, 32:14, 56:17, 95:23, 99:25
**sbali@stradlinglaw.com** [1] - 4:7
**scatters** [1] - 21:21
**schematic** [3] - 45:15, 51:6, 100:4
**schematics** [5] - 49:11, 52:14, 53:10, 53:20, 111:23
**Schlumberger** [2] - 117:24, 118:1
**Schmoller** [19] - 5:10, 22:13, 23:7, 25:5, 25:19, 27:8, 96:19, 97:16, 98:5, 98:8, 98:15, 99:13, 99:19, 100:11, 101:18, 102:4, 103:23, 103:25, 108:4
**school** [2] - 30:11, 118:14
**science** [1] - 116:25
**scientific** [2] - 32:18, 94:7
**scientists** [2] - 83:11, 83:17
**scope** [2] - 97:5, 110:3
**Scott** [4] - 3:19, 4:9, 4:21, 5:5
**screen** [5] - 22:13, 33:18, 65:10, 104:23, 108:18
**scroll** [2] - 34:13, 100:11
**Seagate** [6] - 21:2, 30:12, 59:12, 59:21, 59:24
**sealed** [2] - 48:18, 48:21
**seated** [2] - 17:7, 76:3

**second** [11] - 18:1, 66:22, 72:22, 80:19, 92:15, 93:18, 98:7, 99:9, 101:18, 103:15, 108:5
**seconds** [1] - 80:12
**secrets** [2] - 24:6, 24:11
**section** [4] - 13:23, 13:25, 14:3, 105:1
**Section** [1] - 124:8
**see** [33] - 9:6, 10:2, 11:3, 12:14, 13:12, 17:23, 18:25, 19:3, 19:4, 19:6, 34:15, 37:7, 43:19, 44:24, 45:15, 47:10, 51:14, 53:19, 55:12, 57:9, 60:19, 61:3, 64:19, 73:4, 87:18, 99:10, 100:4, 101:16, 101:25, 103:5, 104:23, 113:8
**seeks** [1] - 10:8
**seem** [1] - 47:21
**segregant** [1] - 19:1
**segregated** [1] - 18:3
**segregating** [1] - 19:9
**segregation** [15] - 17:21, 17:22, 18:9, 18:11, 18:19, 18:23, 86:1, 86:9, 86:15, 86:22, 87:1, 87:5, 87:15, 88:20, 88:24
**segregation..** [1] - 89:5
**selected** [1] - 9:18
**sell** [1] - 27:4
**sells** [1] - 64:3
**SELNA** [1] - 1:3
**sense** [1] - 9:6
**sent** [4] - 59:7, 59:11, 59:21, 59:25
**sentence** [5] - 95:4, 95:12, 101:19, 102:13, 103:1
**separate** [2] - 48:10, 106:23
**separately** [1] - 45:10
**separating** [1] - 19:9
**series** [1] - 25:8
**serious** [1] - 122:1
**served** [2] - 92:25, 118:19
**services** [1] - 118:2
**session** [2] - 17:8, 76:4
**set** [3] - 8:10, 28:3, 61:10
**sets** [1] - 8:6

**seven** [2] - 55:23, 88:13
**shanle@stradlinglaw.com** [1] - 4:15
**share** [2] - 24:15, 25:24
**shared** [1] - 25:3
**shares** [2] - 30:14, 30:21
**sharp** [1] - 18:15
**Sharrock** [1] - 34:24
**Sharrock's** [1] - 34:21
**Shimatsu** [4] - 34:23, 34:24, 35:4, 56:18
**shingle** [1] - 118:15
**ship** [1] - 105:14
**short** [3] - 81:25, 82:8, 83:4
**shorten** [1] - 113:22
**show** [16] - 11:24, 25:9, 43:2, 51:6, 52:12, 52:15, 53:12, 53:15, 69:9, 85:23, 88:11, 95:1, 98:2, 98:25, 108:11, 108:15
**showed** [20] - 25:1, 34:18, 34:19, 35:2, 35:14, 38:25, 53:12, 58:10, 65:11, 69:12, 93:24, 94:9, 97:10, 99:6, 100:9, 100:15, 101:2, 103:12, 109:15, 109:18
**showing** [22] - 25:16, 33:15, 38:15, 40:11, 44:14, 44:18, 45:5, 45:20, 46:16, 46:17, 47:8, 47:12, 48:13, 50:11, 50:12, 52:3, 53:2, 53:17, 87:18, 88:10, 98:10, 100:7
**shown** [2] - 70:1, 108:1
**shows** [6] - 20:17, 34:4, 47:5, 49:22, 79:22, 98:24
**sic** [1] - 34:21
**side** [4] - 49:21, 52:2, 81:18, 120:20
**signal** [11] - 18:13, 18:17, 20:14, 20:15, 21:1, 21:4, 21:17, 21:22, 22:2
**signal-to-noise** [4] - 18:13, 18:17, 20:15, 22:2
**signature** [1] - 114:23
**signed** [7] - 28:15,

37:21, 38:3, 41:7, 55:13, 93:17, 114:21
**significantly** [2] - 12:9, 22:3
**silicon** [1] - 19:1
**silly** [1] - 90:11
**simple** [2] - 20:6, 61:7
**simply** [1] - 122:24
**simultaneously** [2] - 61:14, 101:23
**single** [8] - 27:4, 27:13, 35:3, 35:6, 53:12, 91:20, 100:19, 104:9
**six** [1] - 117:3
**size** [1] - 67:17
**skepticism** [1] - 26:12
**SL6A** [1] - 113:9
**SL6a** [1] - 54:5
**slice** [5] - 9:6, 10:3, 11:2, 11:20, 11:25
**slicing** [1] - 8:25
**Slide** [16] - 8:16, 10:1, 12:11, 12:14, 12:21, 12:23, 16:10, 25:6, 25:20, 27:8, 53:11, 96:23, 97:9, 97:21, 98:14, 98:16
**slide** [13] - 8:18, 12:2, 12:22, 18:7, 19:18, 23:11, 58:23, 65:11, 69:12, 88:4, 88:10, 97:10, 98:8
**slides** [12] - 8:7, 16:18, 25:2, 25:8, 25:10, 25:15, 25:24, 27:7, 109:15, 109:18, 116:17, 116:20
**Slides** [4] - 8:11, 10:11, 12:8, 13:12
**slightly** [1] - 47:13
**Sm** [1] - 105:6
**small** [3] - 61:18, 102:18, 118:5
**SMB** [1] - 47:2
**SNR** [2] - 20:5, 50:13
**Society** [1] - 97:19
**soft** [8] - 19:17, 19:19, 19:21, 19:22, 20:2, 20:6, 20:8, 87:25
**sold** [2] - 63:19, 101:9
**sole** [3] - 13:5, 89:1, 89:7
**Solutions** [2] - 117:25, 118:4
**solve** [1] - 58:22
**someone** [2] - 59:21, 74:12
**sometimes** [1] -

113:22
**sorry** [24] - 10:20, 15:17, 24:3, 32:4, 33:16, 33:19, 34:22, 50:3, 50:19, 61:25, 62:2, 65:24, 70:22, 73:23, 81:3, 84:21, 85:12, 98:7, 98:15, 101:4, 102:4, 104:7, 105:12
**sound** [1] - 61:22
**sounds** [2] - 65:7, 97:20
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 124:20
**SPAAN** [3] - 1:23, 124:5, 124:19
**spans** [1] - 95:3
**specific** [3] - 67:25, 68:1, 109:14
**specifically** [2] - 42:6, 118:25
**specified** [1] - 102:21
**spelling** [1] - 116:3
**spend** [2] - 9:24, 117:19
**spent** [1] - 90:11
**spill** [1] - 24:9
**spreadsheet** [3] - 34:7, 112:21, 115:16
**spring** [4] - 26:7, 26:9, 26:18, 58:23
**Spring** [2] - 6:17, 97:18
**sputter** [5] - 21:1, 43:10, 44:20, 47:5, 95:16
**square** [3] - 22:9, 53:4, 53:5
**Srinivasan** [1] - 98:2
**stability** [2] - 47:17, 72:4
**stable** [13] - 27:5, 27:16, 73:18, 73:19, 73:22, 74:15, 75:16, 100:20, 104:11, 104:21, 107:6, 107:9, 107:12
**stack** [31] - 21:11, 33:4, 38:8, 40:2, 40:4, 41:4, 48:5, 49:17, 54:14, 72:1, 72:7, 73:2, 73:11, 73:14, 73:18, 73:19, 73:21, 74:9, 91:14, 91:20, 94:12, 94:19, 95:20, 106:13, 107:4, 107:6, 107:12, 115:2, 115:11, 115:13

**stacks** [1] - 53:19
**STAND** [1] - 17:13
**stand** [5] - 17:16, 38:13, 65:17, 91:9, 112:3
**standard** [2] - 115:17, 115:18
**stands** [2] - 97:18, 122:17
**start** [4] - 8:25, 12:10, 18:12, 65:15
**started** [5] - 31:6, 58:4, 107:5, 114:10, 116:25
**starts** [3] - 25:8, 45:1, 49:4
**state** [5] - 7:9, 39:18, 55:19, 89:3, 116:2
**STATE** [1] - 124:4
**statement** [22] - 38:13, 38:24, 39:2, 39:9, 39:12, 40:4, 40:6, 40:10, 40:14, 43:3, 49:19, 51:1, 51:24, 56:6, 56:10, 56:19, 81:3, 91:21, 95:15, 95:25, 108:16, 113:14
**STATES** [1] - 1:1
**states** [2] - 12:24, 76:24
**States** [3] - 124:6, 124:8, 124:13
**stating** [6] - 37:21, 40:22, 47:19, 82:21, 107:24, 115:6
**statistics** [1] - 117:10
**stay** [6] - 36:17, 65:22, 65:23, 77:22, 78:8
**stenographically** [1] - 124:10
**step** [1] - 115:22
**STEPHEN** [3] - 6:7, 116:1, 116:6
**Stephen** [3] - 115:25, 116:5, 116:13
**Steve** [1] - 7:20
**STEVEN** [1] - 4:12
**stick** [1] - 38:22
**still** [11] - 16:22, 30:21, 31:4, 31:21, 31:22, 51:23, 68:18, 76:8, 99:22, 113:13, 117:2
**stipulations** [1] - 46:12
**stock** [5] - 30:15, 30:18, 30:22, 30:23, 31:23
**stop** [5] - 19:14,

40:20, 58:9, 91:20, 106:25
**stopped** [1] - 30:24
**storage** [50] - 27:5, 39:20, 41:19, 41:21, 41:23, 51:15, 53:16, 53:25, 54:19, 66:6, 68:25, 70:3, 70:4, 70:5, 70:9, 70:20, 70:24, 70:25, 71:4, 71:8, 71:10, 71:12, 71:18, 71:22, 71:25, 72:16, 72:19, 72:25, 73:7, 75:2, 75:7, 76:17, 79:25, 84:20, 87:8, 87:23, 95:10, 95:20, 96:15, 100:19, 104:4, 104:10, 104:21, 107:1, 114:1, 114:4, 114:8
**store** [10] - 27:14, 27:16, 70:14, 70:16, 72:8, 74:16, 100:24, 110:18
**stored** [1] - 73:21
**stores** [4] - 70:5, 72:6, 73:14, 74:9
**story** [2] - 49:9, 91:10
**STRADLING** [2] - 4:4, 4:12
**straight** [3] - 37:13, 79:9, 79:10
**strategy** [1] - 118:10
**strategy-related** [1] - 118:10
**STREET** [1] - 1:24
**stricken** [11] - 8:15, 9:7, 9:8, 9:22, 9:24, 10:3, 10:5, 13:18, 66:14, 75:19, 91:23
**strictly** [1] - 32:16
**strike** [5] - 11:8, 66:11, 75:17, 78:4, 91:22
**struck** [1] - 13:6
**structure** [23] - 18:25, 19:19, 20:8, 20:9, 25:12, 44:14, 44:18, 68:23, 72:4, 73:6, 87:18, 88:4, 91:2, 98:1, 105:18, 106:17, 106:23, 109:14, 110:8, 113:22, 113:23, 113:24, 114:5
**structures** [1] - 26:21
**study** [5] - 24:7, 26:13, 120:10, 120:11
**studying** [1] - 121:25

**subjects** [1] - 120:4
**submit** [2] - 7:25, 9:21
**submitted** [2] - 58:5, 58:6
**subspecialty** [1] - 117:9
**substrate** [1] - 66:8
**Suess** [31] - 5:9, 7:12, 25:2, 25:15, 29:8, 51:14, 58:21, 58:24, 61:15, 75:13, 80:21, 81:3, 84:20, 84:25, 85:11, 85:14, 86:15, 87:12, 90:21, 96:14, 102:2, 102:14, 103:6, 103:11, 104:19, 109:7, 109:8, 109:14, 109:19, 110:1, 110:8
**Suess's** [7] - 25:24, 32:7, 59:3, 64:9, 64:10, 87:19, 88:22
**suffers** [1] - 20:16
**sufficient** [4] - 8:1, 56:19, 72:5, 75:14
**suggested** [1] - 93:9
**Suite** [6] - 2:17, 3:5, 3:13, 4:6, 4:13, 4:17
**sum** [2] - 38:7, 94:11
**summaries** [1] - 63:4
**summarize** [1] - 27:10
**summary** [2] - 33:14, 121:23
**Summary** [1] - 42:16
**superparamagnetic** [4] - 58:22, 59:3, 60:18, 61:10
**support** [2] - 8:2, 93:21
**supports** [1] - 95:25
**supposed** [3] - 28:25, 29:4, 33:16
**surface** [2] - 105:25, 106:1
**surprised** [1] - 47:18
**surrounding** [3] - 17:25, 18:1, 94:5
**survive** [1] - 21:8
**sustained** [6] - 97:7, 108:22, 110:4, 110:14, 110:22, 111:11
**SW** [1] - 2:17
**switch** [3] - 18:10, 61:17, 102:17
**switching** [5] - 68:24, 69:13, 69:19, 69:24, 83:11
**SWORN** [2] - 17:13, 116:1

**sworn** [1] - 37:21
**symmetric** [1] - 96:16
**synthetic** [1] - 20:9
**system** [8] - 18:17, 20:20, 52:19, 52:21, 83:18, 90:3, 90:10
**systems** [3] - 118:1, 118:5, 118:6

**T**

**tab** [3] - 33:16, 37:25, 41:5
**table** [5] - 7:19, 34:17, 57:23, 74:14, 105:6
**Takouche** [1] - 7:21
**target** [5] - 18:2, 38:9, 49:14, 94:13, 95:17
**targets** [1] - 105:14
**teachings** [1] - 64:10
**Tech** [7] - 22:5, 22:10, 25:1, 25:23, 27:3, 29:8, 58:2
**Tech's** [6] - 9:2, 9:25, 10:1, 28:22, 29:7, 32:2
**technician** [2] - 5:10, 5:10
**technicians** [1] - 19:14
**techniques** [1] - 117:10
**Technologies** [3] - 7:7, 7:8, 7:12
**TECHNOLOGIES** [2] - 1:4, 1:8
**technologies** [3] - 17:19, 84:13, 89:22
**technology** [3] - 20:21, 117:3, 118:9
**technology-related** [1] - 117:3
**tend** [3] - 21:11, 21:15, 105:17
**tens** [3] - 46:9, 46:10, 90:14
**terabit** [1] - 53:4
**terabyte** [1] - 12:15
**term** [4] - 68:10, 96:3, 96:11, 102:25
**tesla** [7] - 72:20, 77:20, 77:23, 78:16, 79:5, 79:6, 79:12
**test** [6] - 19:14, 32:11, 33:21, 49:16, 57:12, 79:24
**testified** [12] - 14:16, 51:19, 57:4, 80:23, 81:8, 82:17, 87:5, 104:7, 110:8, 119:3,

119:7, 123:7
**testify** [6] - 10:25, 28:21, 32:2, 32:7, 120:3, 122:22
**testifying** [3] - 81:21, 92:3, 112:13
**testimony** [38] - 14:21, 15:13, 22:7, 24:21, 29:18, 29:22, 31:12, 31:13, 31:16, 41:2, 46:20, 46:22, 46:23, 57:2, 57:9, 57:10, 65:17, 80:21, 81:2, 82:20, 85:17, 85:21, 86:17, 87:3, 90:25, 91:17, 92:1, 93:2, 107:15, 108:16, 109:11, 109:16, 112:13, 112:15, 115:14, 115:15, 120:5, 123:6
**testing** [15] - 32:10, 32:11, 32:25, 33:14, 34:20, 37:2, 37:16, 38:15, 38:25, 39:19, 39:22, 41:12, 81:15, 81:16, 95:6
**Texas** [2] - 116:14, 117:5
**THE** [85] - 6:4, 6:7, 7:6, 7:15, 7:23, 8:5, 8:9, 8:22, 10:6, 10:14, 10:16, 10:20, 10:23, 10:25, 11:7, 11:14, 11:16, 11:18, 11:20, 11:23, 12:4, 13:21, 14:11, 14:13, 14:20, 14:23, 15:1, 15:8, 15:12, 15:25, 16:5, 16:12, 16:21, 16:25, 17:4, 17:5, 17:7, 17:10, 17:13, 23:3, 23:5, 28:2, 39:8, 39:9, 50:8, 58:15, 58:16, 65:25, 66:2, 66:13, 66:18, 75:19, 75:23, 75:25, 76:3, 76:6, 78:18, 78:19, 78:20, 78:21, 78:22, 79:1, 91:23, 92:14, 97:7, 100:23, 108:13, 108:22, 110:4, 110:14, 110:22, 110:25, 111:11, 111:15, 115:22, 116:2, 116:5, 116:7, 120:1, 122:12, 122:15, 122:17, 122:21, 123:12, 123:13

**theme** [1] - 47:21
**theoretical** [1] - 103:8
**therefore** [3] - 14:23, 15:20, 56:15
**thermal** [2] - 47:16, 72:4
**thermally** [8] - 27:5, 27:15, 73:18, 75:16, 100:20, 104:10, 104:21, 107:12
**thick** [4] - 103:12, 106:2, 110:9, 110:18
**thickness** [6] - 75:1, 96:16, 103:12, 104:3, 107:11, 111:6
**Thiele** [1] - 59:23
**thin** [8] - 25:13, 27:15, 74:18, 74:19, 75:7, 104:14, 104:20, 107:10
**thinner** [2] - 75:7, 103:14
**third** [2] - 19:16, 41:5
**thousands** [1] - 59:19
**three** [9] - 15:23, 21:15, 49:15, 50:14, 74:20, 75:13, 75:15, 88:13, 106:13
**threw** [1] - 13:1
**throat** [1] - 18:4
**throughout** [2] - 35:1, 69:25
**tied** [1] - 9:15
**ties** [4] - 30:2, 30:4, 30:10, 30:12
**tight** [1] - 99:3
**timescale** [9] - 80:9, 80:12, 80:15, 80:24, 81:8, 81:25, 82:8, 82:14, 83:4
**timescales** [1] - 82:22
**tiny** [1] - 21:9
**Title** [1] - 124:8
**titled** [1] - 13:23
**to..** [1] - 84:22
**today** [17] - 40:24, 53:23, 55:3, 56:10, 56:11, 65:17, 66:8, 67:25, 69:3, 69:17, 90:24, 91:5, 91:7, 104:12, 114:17, 115:18, 121:24
**together** [2] - 74:5, 122:5
**tools** [1] - 94:22
**top** [18] - 20:23, 21:6, 21:10, 21:11, 21:14, 54:14, 54:21, 54:22, 58:3, 60:4, 81:19, 84:15, 84:19, 84:24,

85:7, 99:10, 109:3, 117:24
**topmost** [1] - 54:15
**Toshiba** [1] - 21:2
**total** [1] - 11:12
**totally** [6] - 21:9, 64:9, 64:13, 75:15, 111:6, 112:10
**touting** [1] - 47:13
**toward** [5] - 45:5, 53:16, 53:25, 54:19, 91:2
**towards** [5] - 19:6, 21:14, 52:3, 52:12, 91:15
**Town** [1] - 3:22
**trade** [3] - 24:6, 24:11, 24:18
**trading** [1] - 30:24
**train** [2] - 48:14, 48:15
**transcript** [3] - 85:24, 124:9, 124:11
**Transcript** [1] - 1:5
**TRANSCRIPT** [1] - 1:14
**transcripts** [1] - 121:17
**transitions** [1] - 18:15
**traveled** [1] - 118:11
**trend** [1] - 90:22
**trial** [10] - 14:15, 14:18, 15:13, 30:25, 35:8, 85:23, 118:23, 119:3, 119:4, 121:21
**TRIAL** [1] - 1:15
**tribology** [1] - 54:25
**tried** [1] - 84:17
**trilayer** [3] - 52:24, 90:3, 90:9
**trilemma** [4] - 58:22, 96:23, 96:25, 97:1
**triple** [2] - 49:23, 100:17
**trivial** [3] - 18:20, 19:15, 20:10
**true** [37] - 30:3, 33:2, 35:24, 36:1, 36:3, 38:18, 40:7, 40:8, 40:19, 40:21, 41:1, 42:7, 42:8, 42:11, 42:12, 52:8, 56:20, 56:21, 60:10, 64:2, 67:15, 67:24, 78:15, 88:8, 88:16, 90:24, 91:3, 91:4, 94:16, 94:18, 95:12, 95:15, 107:7, 109:11, 114:11, 124:9
**truly** [1] - 29:23
**truth** [7] - 40:10,

40:23, 93:9, 114:14, 115:19
**truthful** [1] - 114:18
**try** [3] - 49:14, 53:10, 79:1
**trying** [7] - 16:23, 19:22, 21:21, 40:20, 40:22, 58:1, 94:17
**turn** [12] - 19:16, 20:21, 22:16, 25:5, 25:19, 27:7, 70:3, 98:6, 101:12, 103:15, 107:13, 120:7
**turned** [2] - 56:20, 96:1
**turning** [2] - 18:7, 19:18
**turns** [1] - 95:1
**two** [19] - 8:6, 10:4, 12:2, 29:14, 49:15, 50:13, 51:19, 70:19, 70:23, 74:2, 76:16, 83:1, 85:13, 87:7, 106:23, 109:6, 117:24, 118:7
**type** [2] - 19:12, 99:2
**types** [1] - 26:20
**typically** [1] - 80:11

## U

**U.S** [2] - 1:3, 118:12
**Ulrich** [2] - 59:21, 59:23
**ulterior** [2] - 58:12, 58:16
**ultimately** [1] - 14:16
**under** [7] - 14:17, 41:7, 51:2, 55:8, 55:13, 114:17, 114:25
**underlayer** [9] - 19:17, 19:19, 19:21, 19:22, 20:2, 20:6, 20:8, 72:21, 87:25
**understood** [3] - 24:12, 58:6, 66:18
**undisclosed** [1] - 8:13
**uniform** [3] - 19:10, 19:24, 20:1
**uniformity** [1] - 18:19
**unit** [1] - 83:23
**UNITED** [1] - 1:1
**United** [3] - 124:6, 124:8, 124:13
**units** [1] - 18:10
**University** [5] - 60:7, 62:17, 83:17, 117:1, 117:4

**unlike** [1] - 82:17
**unreasonable** [1] - 122:4
**unreliable** [2] - 9:15, 122:3
**Unreliable** [1] - 13:24
**unspecified** [1] - 41:10
**up** [58] - 8:3, 11:24, 16:8, 16:18, 22:12, 23:7, 27:8, 28:3, 30:19, 33:4, 33:25, 34:3, 35:11, 36:6, 37:10, 42:13, 42:21, 43:6, 45:17, 46:14, 49:2, 49:21, 51:9, 52:1, 54:2, 54:4, 54:9, 54:10, 57:2, 59:8, 60:3, 65:8, 65:10, 68:21, 81:18, 82:24, 82:25, 86:5, 86:14, 86:20, 89:19, 90:20, 91:10, 93:19, 94:19, 95:24, 96:2, 96:20, 99:19, 100:2, 101:14, 102:10, 103:24, 106:21, 108:17, 108:18, 112:12, 113:18
**updated** [1] - 23:21
**upgrade** [1] - 52:19
**upper** [2] - 45:10, 69:17
**uppermost** [1] - 55:21
**usable** [2] - 104:17, 105:4
**useful** [3] - 23:24, 27:16, 113:10
**useless** [1] - 21:10
**uses** [10] - 33:1, 34:17, 40:25, 41:14, 64:2, 68:10, 95:8, 95:14, 104:12, 122:6

## V

**vacuum** [2] - 48:18, 48:21
**vacuum-sealed** [2] - 48:18, 48:21
**valid** [1] - 120:22
**validity** [3] - 64:22, 64:23, 65:6
**valuation** [5] - 117:20, 117:21, 118:20, 119:23, 120:16
**value** [17] - 13:14, 32:16, 32:19, 33:5, 34:22, 35:3, 36:24, 37:8, 77:19, 78:16,

79:11, 81:4, 82:7, 103:2, 103:4, 103:5

**values** [21] - 32:15, 34:9, 35:14, 35:17, 35:21, 36:8, 36:18, 37:12, 53:13, 54:22, 56:11, 77:20, 79:4, 79:11, 79:15, 79:16, 105:3, 107:11, 112:8, 113:15

**varies** [1] - 119:11

**verdict** [1] - 8:2

**version** [1] - 34:3

**versions** [1] - 15:23

**versus** [2] - 10:8, 29:22

**vice** [2] - 23:14, 57:22

**Vice** [1] - 2:16

**Victora** [3] - 16:19, 25:10, 64:24

**Victora's** [2] - 64:23, 102:6

**violate** [1] - 113:14

**violation** [3] - 110:11, 111:7, 111:9

**Visscher** [2] - 61:15, 102:15

**volume** [1] - 83:23

**VOLUME** [1] - 1:10

**vs** [2] - 1:7, 7:7

## W

**Wabash** [2] - 3:13, 4:17

**wait** [3] - 10:14, 77:25

**wall** [3] - 102:20, 102:22, 103:11

**Wang** [1] - 7:20

**WANG** [1] - 4:16

**WAS** [1] - 116:1

**Washington** [1] - 2:18

**Watkins** [1] - 7:18

**WATKINS** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4

**ways** [3] - 26:21, 91:6, 92:2

**WD** [43] - 21:1, 27:12, 30:21, 31:15, 32:15, 32:20, 32:25, 33:20, 34:11, 34:17, 36:23, 37:9, 37:22, 38:24, 38:25, 39:14, 40:22, 41:12, 41:23, 42:5, 42:9, 42:19, 42:22, 46:17, 47:10, 56:5, 64:15, 71:4, 81:15, 82:20, 88:19, 88:24, 91:16, 93:3, 94:15,

96:13, 112:3, 112:7, 112:10, 112:15

**WD's** [10] - 27:21, 32:19, 35:2, 37:2, 37:16, 42:25, 66:10, 71:1, 87:23, 88:2

**weak** [1] - 18:8

**WEDNESDAY** [2] - 1:16, 7:1

**week** [1] - 47:21

**weighing** [1] - 29:22

**weight** [3] - 92:1, 120:4, 123:5

**welcome** [1] - 17:16

**well-defined** [1] - 19:4

**well-known** [1] - 59:23

**well-respected** [2] - 60:6, 62:18

**Wendy** [2] - 5:9, 7:14

**WEST** [1] - 1:24

**Western** [92] - 7:7, 7:18, 8:17, 8:19, 10:8, 11:8, 16:13, 17:19, 18:22, 26:14, 26:15, 26:20, 27:3, 28:21, 30:2, 30:14, 30:18, 31:4, 31:5, 31:11, 31:19, 31:21, 31:22, 31:23, 31:25, 32:2, 32:5, 32:7, 32:10, 32:11, 37:13, 37:20, 38:11, 40:10, 40:20, 40:24, 41:18, 45:8, 45:9, 46:20, 47:12, 49:6, 49:12, 51:24, 52:23, 57:19, 58:9, 58:20, 63:18, 64:2, 64:9, 68:10, 81:24, 82:12, 86:22, 87:19, 88:5, 88:12, 89:14, 89:17, 90:2, 90:9, 90:17, 90:25, 91:11, 91:12, 92:8, 92:19, 92:22, 94:23, 95:9, 95:13, 95:19, 96:11, 96:25, 97:13, 97:25, 101:8, 104:12, 107:6, 107:16, 110:17, 112:14, 115:1, 115:3, 115:24, 116:16, 121:1, 121:8, 121:16, 121:19, 123:10

**WESTERN** [1] - 1:8

**whichever** [1] - 120:20

**whole** [5] - 40:10, 72:4, 81:18, 114:14, 121:21

**wild** [1] - 109:9

**Wilshire** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9

**withdraw** [1] - 73:24

**WITHDRAWN** [1] - 6:15

**witness** [12] - 28:1, 28:18, 29:7, 31:7, 32:9, 92:13, 111:12, 122:21, 122:22, 122:24, 123:1, 123:7

**WITNESS** [11] - 39:9, 50:8, 58:16, 66:2, 66:18, 78:19, 78:21, 79:1, 100:23, 116:1, 116:5

**witness's** [3] - 92:1, 92:2, 123:6

**WITNESSES** [1] - 6:3

**witnesses** [3] - 28:25, 29:4, 29:14

**word** [6] - 11:8, 11:16, 46:10, 65:4, 81:1, 82:23

**words** [4] - 9:2, 58:7, 77:18, 106:25

**works** [2] - 31:11, 49:17

**worth** [1] - 30:21

**wrap** [2] - 22:12, 27:8

**write** [3] - 18:15, 60:25, 61:1

**writeability** [2] - 47:16, 87:14

**writing** [5] - 19:23, 20:4, 20:5, 107:25, 118:6

**written** [1] - 27:12

**wrote** [2] - 60:15, 94:16

## Y

**year** [3] - 30:24, 119:11

**years** [22] - 30:7, 30:15, 30:17, 30:19, 34:16, 41:11, 42:11, 57:22, 80:19, 88:6, 88:13, 95:5, 97:1, 97:2, 116:23, 117:2, 117:4, 117:15, 119:2, 119:10

**yesterday** [9] - 13:2, 13:8, 13:16, 14:16, 14:20, 15:16, 17:25, 18:11, 19:22

**YOCCA** [2] - 4:4, 4:12

**you's** [1] - 16:6

**Young** [3] - 6:7, 7:20, 115:24

**YOUNG** [25] - 4:20, 10:10, 10:17, 10:21, 11:10, 11:15, 11:17, 11:19, 11:21, 12:1, 12:5, 13:22, 14:12, 14:14, 14:22, 14:25, 15:3, 15:10, 15:17, 16:2, 115:23, 116:9, 119:22, 120:6, 122:10

**young** [1] - 13:21

**yourself** [3] - 20:17, 33:8, 116:12

## Z

**zoom** [3] - 60:4, 69:8

UNITED STATES DISTRICT COURT