# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE

MR TECHNOLOGIES, GMBH, )
)
      Plaintiff and ) **Certified Transcript**
      Counterclaim Defendant, )
) Case No.
      vs. ) 8:22-cv-01599-JVS-DFM
)
WESTERN DIGITAL TECHNOLOGIES, )
INC., )
)
      Defendant and )
      Counterclaim Plaintiff. ) **DAY 7, VOLUME I**
)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

THURSDAY, JULY 25, 2024

8:31 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF and COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  MARC A FENSTER, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mfenster@raklaw.com

RUSS AUGUST & KABAT
BY:  BRIAN D. LEDAHL, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
bledahl@raklaw.com

RUSS AUGUST & KABAT
BY:  JACOB ROBERT BUCZKO, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
jbuczko@raklaw.com

RUSS AUGUST & KABAT
BY:  MATTHEW D. AICHELE, ESQ., Pro Hac Vice
800 Maine Avenue, SW
Suite 200
Washington, D.C. 20024
202-664-0623
maichele@raklaw.com

RUSS AUGUST & KABAT
BY:  MINNA Y. CHAN, ATTORNEY AT LAW
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mchan@raklaw.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR PLAINTIFF AND COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  PAUL A. KROEGER, ESQ.
1224 Wilshire Boulevard
Suite 1200
Los Angeles, California 90025
310-826-7474
pkroeger@raklaw.com

RUSS AUGUST & KABAT
BY:  REZA MIRZAIE, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
rmirzaie@raklaw.com

LATHAM & WATKINS LLP
BY:  DALE CHANG, ESQ.
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
dchang@raklaw.com


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

LATHAM & WATKINS LLP
BY:  DOUGLAS E. LUMISH, ESQ.
140 Scott Drive
Menlo Park, California 94025
650-328-4600
doug.lumish@lw.com

LATHAM & WATKINS LLP
BY:  JOSEPH HYUK LEE, ESQ.
650 Town Center Drive
20th Floor
Costa Mesa, California 92626
714-540-1235
joseph.lee@lw.com


**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**

**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

STRADLING YOCCA CARLSON & RAUTH LLP
BY:  SALIL BALI, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4278
sbali@stradlinglaw.com

LATHAM & WATKINS LLP
BY:  CHAARUSHENA DEB, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
chaaru.deb@lw.com

STRADLING YOCCA CARLSON & RAUTH LLP
BY:  STEVEN M. HANLE, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4000
shanle@stradlinglaw.com

LATHAM AND WATKINS LLP
BY:  SARAH W. WANG, ATTORNEY AT LAW
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
sarah.wang@lw.com

LATHAM & WATKINS LLP
BY:  PATRICIA YOUNG, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
patricia.young@lw.com

5

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

          LATHAM & WATKINS LLP
          BY:  RICHARD GREGORY FRENKEL, ESQ.
          140 Scott Drive
          Menlo Park, California 94025-1008
          650-328-4600
          rick.frenkel@lw.com

          LATHAM & WATKINS LLP
          BY:  LINFONG TZENG, ESQ.
          140 Scott Drive
          Menlo Park, California 94025
          650-328-4600
          linfong.tzeng@lw.com

          STRADLING YOCCA CARLSON & RAUTH LLP
          BY:  AHMAD SAID TAKOUCHE, ESQ.
          660 Newport Center Drive
          Suite 1600
          Newport Beach, California 92660
          949-725-4153
          atakouche@stradlinglaw.com


**ALSO PRESENT:**

          Wendy Liu, paralegal (Russ August & Kabat)
          Dieter Suess, plaintiff's corporate representative
          Andy Mortensen, plaintiff's IT technician
          Chris Schmoller, defendant's IT technician
          Cynthia Tregillis, Western Digital general counsel
          Jesse Mulholland
          Jennifer Beard

**UNITED STATES DISTRICT COURT**

# I N D E X

**WITNESSES**                                                          **PAGE**

**RANDAL VICTORA, CALLED BY THE DEFENDANT**
Direct Examination by Mr. Lee (continued)              15
Cross-Examination by Mr. Fenster                      108

## EXHIBITS

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---------|---|---|---|
| DX-1797 | Article by J.-P. Wang, W. K. Shen, and J. M. Bai, titled "Exchange Coupled Composite Media For Perpendicular Magnetic Recording," IEEE Transactions On Magnetics, Vol. 41, No. 10, Oct. 2005, pp. 3181-3186 | 35 | |
| DX-1187 | Publication by Y. Sonobe et. al., titled "Thermally stable CGC perpendicular recording media with Pt-rich CoPtCr and thin Pt layers" | 37 | |
| DX-1796 | Article by Y. K. Takahashi et al., titled "Low-Temperature Fabrication of High-Coercivity L10 Ordered FePt Magnetic Thin Films" by Sputtering, Jpn. Appl. Phys.. Vol. 40 (2001) pp. L1367-L1369 | 47 | |

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; THURSDAY, JULY 25, 2024**

**8:31 A.M.**

**- - -**

**(Out of the presence of the jury.)**

THE COURTROOM DEPUTY:  Calling Matter 1, SACV-22-1599, MR Technologies, GmbH, vs. Western Digital Technologies, Inc.

Counsel, please state your appearances for the record.

MR. FENSTER:  Good morning, Your Honor.  Marc Fenster for the plaintiff, MR Technologies.  We will have Dr. Dieter Suess, our inventor.  Brian Ledahl, Mr. Dale Chang will be here today.  Minna Chan, Paul Kroeger -- I'm sorry -- Jacob Buczko, Paul Kroeger, Wendy Liu, and Matthew Aichele for the plaintiff.

THE COURT:  Good morning.

MR. LUMISH:  Good morning, Your Honor.  Doug Lumish, Latham & Watkins, for Western Digital.  With me at table is Dr. Desai, our corporate representative; Linfong Tzeng; Joseph Lee.  We have Salil Bali, Patricia Young, Sarah Wang, Chaaru Deb, Ahmad Takouche.  And then from the client, we have our general counsel, Cynthia Tregillis; Jesse Mulholland; and Jennifer Beard.

THE COURT:  Good morning and welcome to those who

**UNITED STATES DISTRICT COURT**

are new to this.

MR. LUMISH:  And I skipped Rick Frenkel.  Pardon me.

THE COURT:  I understand you want to take up some objections?

MR. LUMISH:  Just a couple, Your Honor.

MR. BALI:  Good morning, Your Honor.  I believe yesterday at the end of the day we were discussing DX-1383, whether it was admitted, and the trial testimony here.  I don't know if the -- there we go.  So this was DX-1383.  This was an exhibit that Dr. Goglia relied upon.

But during Dr. Becker's testimony, it was shown to Dr. Becker, and he clearly says (as read):

"I haven't studied this.  I can't for sure say what -- one way or another whether you're right interpreting this."

It wasn't in his report.  He never used it.  It was the first time he saw it on the stand.  So I don't think it's appropriate for DX-1383 to be admitted.

MR. KROEGER:  Good morning, Your Honor.  Paul Kroeger.  Backing up a few lines to 84, 8 to 10, the question was (as read):

"Now, one of the documents that Dr. Goglia relied on is his document" --

**(Reporter requests clarification**

**for the record.)**

**UNITED STATES DISTRICT COURT**

MR. KROEGER:  "One of the documents that Dr. Goglia relied on is his Document DX-1383.  You have your binder.  You have that?

"ANSWER:  Yes."

The testimony was Becker relied on Dr. Goglia for inputs.  This was a document Goglia considered.  Your Court already overruled the objection.  This was outside the scope of direct, and WD has no objections to the document.

THE COURT:  You want to respond?

MR. BALI:  Dr. Goglia relied on the document; Dr. Becker says he's never seen the document.

THE COURT:  The document could have been put in through Dr. Goglia.

MR. BALI:  Dr. Goglia was here and could have given some context to the document.  They didn't raise it with Dr. Goglia.

THE COURT:  Would you expect that if he were back here, whatever foundation would be required would be laid?

MR. BALI:  It is not a document that Dr. Goglia himself authored.  He -- it's a publication, a journal publication that he used as part of his testimony.  So, yes, he did consider it.

But any context that they're asking Dr. Becker questions about it, Dr. Goglia wasn't able to respond to the context with which he relied upon it or explain the document or

how he used it.  And so I think it's inappropriate now to try to bring it in through a different expert that never has seen it.

THE COURT:  If Dr. Goglia were here, wouldn't it come in at least if not for the truth but the fact that he relied upon it?

MR. BALI:  The fact that he relied upon it, perhaps yes, but then there would also be a chance to cross -- or ask Dr. Goglia on redirect how he used it and what was the context in which he used it.  None of that now is before the jury.  So for the document to go back to the jury without any context to how Dr. Goglia used it or why certain parts were used or not seems inappropriate and unfair.

THE COURT:  It will be refused.

MR. BALI:  Thank you.

MR. KROEGER:  While we're on the subject of the exhibits from yesterday, Your Honor, you also asked for the transcript cites for PTX-29.  That was yesterday morning at 49:20 to 50:17.  This was a document used with Dr. Bertero on cross.

He answered questions about it starting at -- so Mr. Fenster asked, for example (as read):

"Okay.  And, Dr. Bertero, what this is showing -- if you look at the graph on the right, this is showing a really notable improvement in SNR

just by going from two EBL products to three EBL products; correct?"

THE COURT:  Slow down a little bit.

MR. KROEGER:  (Reading:)

"ANSWER:  Not product.  These were samples that were made," et cetera.

He established foundation; he established authenticity.  And I would also note that WD has no objections to PTX-29 on the exhibit list.

THE COURT:  It will be received.

MR. KROEGER:  Thank you, Your Honor.

THE COURT:  Also understand that you had some issues with regard to a witness who will come on this afternoon?

MS. YOUNG:  Yes, Your Honor.

THE COURT:  Let's take that up now.  When I get back here, I'll rush in the door and take the bench.

MS. YOUNG:  Patricia Young for Western Digital.  And this is with respect to Dr. -- Mr. Bergman's demonstratives.  So, Your Honor, first, I'd like to address Slides 8 through 11.  And Slide 11 is effectively an accumulation of the prior three, so I'm going to start there.

THE COURT:  Where's the numbering?

MS. YOUNG:  It says PDX-10_11 on the lower right.

THE COURT:  Okay.

MS. YOUNG:  Your Honor, so this slide is -- well, as

Your Honor said yesterday about, you know, having notice -- what we're objecting to is under Rule 26.  This slide includes information, none of -- of which none of the numbers are in Mr. -- or Dr. -- Mr. Bergman's report.

Specifically, for example, it looks like what they did is they took Dr. Becker's regression numbers.  So the per terabyte columns were Dr. Becker's numbers, but then they created brand-new calculations that just appear nowhere in Mr. Bergman's report.  For example, the terabytes per drive, then they -- well, I think this is what they did.  They did a multiplication and created a total number which doesn't appear anywhere in Mr. Bergman's report.  Same with the cost.  Same with the profit.  And then they added a bunch of numbers up, I think, and created a new number that doesn't appear anywhere in Mr. Bergman's report.

MR. LEDAHL:  Your Honor, Mr. Buczko is going to address these.  I was going to let him speak to that.

THE COURT:  Okay.

MR. BUCZKO:  Good morning, Your Honor.  Jacob Buczko for plaintiff.  So the information on this slide, this came in yesterday through Dr. Becker's testimony.  The first column, the terabytes column and the drive size column, that came in through one of Dr. Becker's slides where he listed units per drive-size level, and so it's the same data.  It comes right from admitted data that is in JX-2124, 2125, and PTX-716.

Those are Excel spreadsheets that have all the information. This is just sorting and presenting data that was in -- that is in evidence and that was testified to yesterday by Dr. Becker.

The per terabyte numbers here were also presented by Dr. Becker during his testimony on slides and in testimony. So it comes right from that. And so does the per terabyte cost, and the profit number comes right from that. And then it's simple multiplication after that.

This is very different than the situation yesterday with presenting a new calculation based on new figures that were never available throughout discovery. This is just a rebuttal point to respond to the point that the regressions are very different. And these -- the numbers are all in evidence, and it's just basically a simple multiplication to illustrate a rebuttal point, Your Honor.

THE COURT: Ms. Young.

MS. YOUNG: Your Honor, as Mr. Buczko said, this is multiplication. And so, therefore, Mr. Bergman -- this is not a simple multiplication. Yes, he is multiplying numbers, but then he is tallying them up. It's a calculation that doesn't appear in his report anywhere. So from that first premise, the calculation doesn't exist. And to simply say that you can take raw data -- just to be clear, the raw data that they're talking about just literally says "units."

THE COURT: You would agree that all the data on the

chart except for the calculated number is in evidence through Becker?

MS. YOUNG:  So I would agree that the drive size and the terabytes are in and then Becker's regressions are in, but not the calculated ASPs per drive size, the calculated cost per drive size.  It was never broken down or analyzed in that way, and so the fact that this is a new opinion as well of Mr. Bergman.

THE COURT:  Objection will be overruled.  I think this is appropriate rebuttal.

MS. YOUNG:  I do have one more point to raise.  So with respect to -- I want to clarify something.  So with respect to Slides 1 through 3 and Slides 12 and 13 -- so I will admit that Mr. Bergman brought the exact figure or graph to his deposition, but the underlying data or the regression numbers were never produced in the case.

So I just want to -- to the extent, one, I think -- we, therefore, think these are inappropriate to present.  But to the extent that he intends to present these, I want to make sure he cannot go beyond the bounds of what was literally in his graph and not provide any additional data.

THE COURT:  That's fine.  If you have an objection, make it during the testimony.

MS. YOUNG:  Okay.

MR. BUCZKO:  Our Honor, may I clarify one point?

Just that the data was -- Your Honor, in case this comes up during the examination that the dot plot data was testified to by Dr. Becker.  These are exact same dot plots that both Dr. Becker and Mr. Bergman used.  So I disagree that this data wasn't produced.  It's agreed.

THE COURT:  Okay.  We'll be in recess until the jury comes up.

THE COURTROOM DEPUTY:  All rise.  Court is in recess.

**(Recess from 8:56 a.m. to 9:05 a.m.)**

**(In the presence of the jury.)**

THE COURT:  Good morning, ladies and gentlemen.  I expect that we'll finish with the evidence today and that I'll work with counsel at the end of the day and we'll have instructions and closing arguments tomorrow.

Mr. Lee.

THE COURTROOM DEPUTY:  Sir, you're just reminded you're still under oath.

THE WITNESS:  Thank you.

**RANDALL H. VICTORA, PREVIOUSLY SWORN, RESUMES THE STAND**

**DIRECT EXAMINATION (Continued)**

BY MR. LEE:

Q    Good morning, Professor Victora.

A    Good morning.

Q    We have a limited amount of time, so why don't we just

jump right to it.  I believe where we left off was on Slide 45 of your presentation.

Can we please get that pulled up.

So, Professor Victora, I see the title at the top of your slide.  Can you please explain what document or documents that we're about to talk about next?

A    Yes.  We're about to talk about three of my papers.  And the first one is "Exchange Coupled Composite Media for Perpendicular Magnetic Recording."  This was written by myself with my graduate student Xiao Shen, and we published it in 2005.

Q    And you said that this is a reference to your published ECC work.  Is that the work that you did at the center?

A    This is true.

Q    And so -- and I see the title of this document is called -- well, I see the title refers to perpendicular magnetic recording.  Just to be clear, did Dr. Suess invent perpendicular magnetic recording or PMR?

A    No.  Iwasaki did in the 1980s.

Q    And when was this article, which I see we're calling Victora-1, was published?

A    2005.

Q    And, again, I see you have a DX number highlighted or magnified at the bottom corner.  What is that a reference to?

A    Well, the DX number allows the jury to locate the document

Q    So in this case, the Victora-1 paper corresponds to the DX-1015?

A    Right.

Q    I see also in the title it's called "Exchanged Coupled Composite Media."  Is that the same thing as ECC?

A    It is.

Q    Then turning to the next paper -- oh, I'm sorry.  I forgot to ask you one more question.  And was this Victora-1, was it publicly made available or published in a public journal?

A    Right, it was published in *IEEE Transitions on Magnetics*, which is the main engineering journal in this field.

Q    So then turning to the next article describing your work, which one is this?

A    This is "Composite Media for Perpendicular Magnetic Recording," done also with my graduate student Xiao Shen and myself and also published in 2005.  This is actually the first paper on the subject.  I would mention that the title has -- this first title is called "composite media" as opposed to "exchange coupled composite media."  Because after we published the first paper, we discovered that the name "composite media" was already used for a different technology.  So we changed the name to ECC instead.

Q    I see you magnified a DX number in the corner.  So is

DX-1030, does that correspond to the Victora-2 paper?

A    It does.

Q    I think there's a third paper.  Can you please talk about this one?

A    Yes.  This is called "Composite Media (Dynamic Tilted Media) for Magnetic Recording."  This is done with an experimental group.  This is our first experimental realization of the idea.  It -- the lead author there is Professor Jian-Ping Wang, who I worked with on this.  It was also published in 2005.  And I particularly call your attention to the DX-1031 on this paper because this is probably the article you'll be referring to the most.

Q    And this paper, I think you said it was based on experimental work.  What do you mean by that?

A    We actually made -- we deposited layers; we measured the properties.  It's a real thing you could hold.

Q    And is the thing that you made, is that the stuff that you described in the Victora-1 and -2?

A    It is.

Q    And, again, is this paper and the work that describes it, that was all done in 2005 or earlier?

A    This is true.

Q    And, Professor Victora, just to be clear, that was also made publicly available?

A    Right.  This is in "Applied Physics Letters," which is

UNITED STATES DISTRICT COURT

probably the premier applied physics, so not -- beyond magnetics. Over all of applied physics, probably the premier journal for that.

Q    And I see you've magnified another DX number in the corner?

A    The DX-1031, yes.

Q    So if they were to look at page 1 of DX-1031, would that be the same as page 1 of Victora-3?

A    Yes. You're referring to the fact of this particular journal, when you pull it offline -- you know, off the internet, it puts in an advertisement on the first page. So if you have a hard copy, it has a one different page number than if you take it from the online version.

Q    So page 1 of the article is actually page 2 of DX-1031?

A    True. True.

Q    Just want to make sure there's no confusion there.

So then in terms of your 2005 published ECC work, including the work as described in Victora-1, -2, and -3, is that prior art to the MRT patents?

A    Clearly, it is.

Q    And let's talk about the work itself. So what is it that you're showing us on this slide?

A    Well, what I'm showing you is that -- on the left basically I'm showing you what the problem is, which is we want to improve areal density. And the reason why it's hard to

improve is because you need to keep the media thermally stable so it just doesn't lose information in time.  At the same time, you have to be able to write it.  So those are the three underlying words or phrases there.

On the right I show a solution, and that's the exchange coupled composite structure that consists of a soft layer and a hard magnetic layer, and together they provide good thermal conductivity -- good thermal stability and good writeability, meaning you can actually write it with a recording head.

Q    And in terms of the solution that you proposed, maybe we can talk about that a little bit further.

Actually, before we do that, so these are the same sort of improvements and objectives that you describe with respect to the Suess patent?

A    This is true.

Q    So can you maybe go into a little more detail on exactly what that solution was that you described -- or that you built and described?

A    Sure.  I think probably the easiest way to see it is if you look at the figure, you have a hard magnetic layer, you have a coupling layer on top -- you've heard about coupling layers that connect the two magnetically -- and then you have a soft magnetic layer there.

Q    And I see that here we have one hard and one soft

magnetic layer with a coupling layer in between.  In terms of how this relates to the MRT patents, is this identical to the MRT patents?

A    Well, the MRT patents have a hard layer like I have, and they have a nucleation host, which would correspond to the soft magnetic layer.

Q    And what is it that you would think of or a person of skill in the art would think of in terms of further improving the soft magnetic layer?

A    Well, much like my layer cake here, if you start with a two-layer cake, you might be able to improve the flavor by adding a few more layers.  And similarly here, you might be able to add -- get better writeability by adding in a few more layers.

Q    Other than sort of the intuitive cake example we show here, is there anything that we've seen so far that would also suggest adding more layers?

A    Yes.  Late yesterday you saw the description of the work by Hagedorn.  And I'm not going to repeat it except to say that he showed that if you could add more layers in, in a particular anisotropy gradient style, then you would end up with a greatly reduced coercivity.

Q    And so then what would the result of that look like?

A    It would look as though -- well, it's exactly as it's shown in the picture.  But basically, the soft magnetic layer

is replaced by a soft magnetic layer and then a very soft magnetic layer.

Q    And so here are you showing us, then, the soft layers as a multilayer structure?

A    I am.

Q    And that's similar to -- or corresponds to the nucleation host in the MRT patents?

A    It does.

Q    And then the hard magnetic layer, does that correspond to the hard storage magnetic layer in the MRT patents?

A    It does.

Q    So then what's the next patent that we're going to talk about?

Or actually, let me ask you a question.  Now that you've shown us this, is this all that needs to be done in order to establish that your work, as described in your papers, combined with Hagedorn invalidates or renders obvious the claims?

A    Oh, not at all.  Later on in my talk here, we're going to go through it claim by claim, limitation by limitation, to cover all the legal grounds.  But this gives you the idea.

Q    Thank you, Professor.

Why don't we talk about the next reference you're going to talk about.  What's this one?

A    This is Berger, and it is a patent that was filed in 2005.

And it's about what he calls an exchange-spring structure.  He worked for Hitachi Global Storage at the time, which is now part of Western Digital.  I think that's probably the big things we need to mention except for the DX number, which is 1245.

Q    And this patent, the application was -- the original application, I guess I should say -- was filed in February 2005?

A    Yes.

Q    So then is this also prior art to the patents-in-suit?

A    Yes, it is.  That should be -- yes, that's right on the slide.

Q    Sorry.  You're ahead of me.

And so why don't we talk about Berger.  So what is it you're showing us here?

A    Well, what Berger did was pretty much the same kind of thing that I had done in terms of you want to improve the writeability, and so he uses a little different words though.  So I call it a soft layer.  Professor Suess calls it a nucleation host.  He calls it an exchange-spring layer.  But they're all the same thing in the terms of they get the nucleation started.

If you look in the right-hand side, you can see the -- some of that wording explicitly.  He has an exchange-spring layer, that soft layer, that is exchange

coupled to the magnetic recording layer -- all those words are underlined -- and you get improved writeability out of it.

Q    And so then can you sort of explain what's on this next slide?  I see you have a figure here from Berger.

A    Right.  This is Figure 3 from Berger.  This is in terms of how patents', you know, figures look is they label each of the elements.  So here particularly, you can see Element 302 is the hard layer.  Then you can see Element 306; that's the coupling layer.  And then you can see Element 304, which he calls the exchange-spring layer, which I called the soft layer.

Q    And I think you refer to Figure 3 at page 4 of the DX-1245.  And then where is that description of Figure 3 found in Berger?  Is that page 11 of 1245?

A    Yes, yes, yes.  Right.  I apologize.  Yes.  It's column 5, lines 12 to 33.

Q    So then, again, does Berger itself disclose -- well, actually, let me ask you a predicate question.  The layer that's colored green that you've labeled "exchange-spring layer," what does that correspond to in the MRT patent claims?

A    The nucleation host.

Q    And what does the blue layer that you've labeled "magnetic recording layer" correspond to in the MRT patents?

A    The hard storage layer.

Q    And at least in the figure you're showing us in Berger, does that exchange-spring layer itself have multiple layers?

A     As shown by Berger, no, he does not have multiple layers.

Q     But what would a person of skill in the art, looking at Berger, have thought to have done?

A     The same exact example I used with the chocolate cake, which is to use more layers.  And the motivation for that is to combine it with Hagedorn.

Q     That's the Hagedorn at page 9 of DX-1213?

A     True.

Q     That's the same thing that I think you point to for --

A     Yeah.

Q     -- your earlier papers?

A     It's -- right.  This is the same argument.

Q     And so then what would the result of that combination of Berger with Hagedorn look like?

A     Well, you'd have the hard storage layer in blue at the bottom, the coupling layer in the middle, and on top you would have the green -- in this case two-layer exchange-spring layer or nucleation host.

Q     And just to be clear, you're not saying that this figure with your modification is in Berger.  You're just showing what the result of it would look like if you had modified that figure?

A     That is correct.

Q     So then what is the next prior art that we're going to be talking about?

A    Yeah.  The next one is an entirely different direction which is by Li, Shaoping Li, of Seagate Technology.  It, however, was also filed in 2005.  And here the title is "Perpendicular Magnetic Recording Media with Magnetic Anisotropy/Coercivity Gradient and Local Exchange Coupling."

Q    Okay.  And this also has a DX number?

A    It does.  DX-1001.  You might want to copy this one down. Again, this is important to the argument.

Q    And, again, this is filed in 2005?

A    It is.

Q    Okay.  And so then -- and by the way, Seagate, that's a Western Digital competitor?

A    It is true.

Q    That's a company that Dr. Re used to work for?

A    It is.

Q    Okay.  And so what's your opinion as whether or not the Li patent is prior art to the MRT patents?

A    It is prior art.

Q    And I just want to make sure we understand here.  So I see here that all of Hagedorn, Berger, Li, and your work as described in Victora-1, -2, and -3, that all predates the filing date -- the June 17, 2006, filing date of the MRT patents?

A    It does.  It does.

Q    Now, are you aware -- or do you understand that MRT

doesn't assert, for purposes of, you know, invalidity and obviousness analysis, any earlier invention date than the June 17, 2006 date?

A    That is correct.

Q    So that's the date that you looked at and -- when you did your analysis in terms of finding prior art?

A    That is true.

Q    And with respect to the Victora-1, -2, and -3 papers specifically, just want to make sure I understand, you have them sort of grouped together.  Were those papers closely related?

A    Yes.  They were all an exact same media design.  Two of them were strictly theoretical, and then the third one was the experimental realization of it.

Q    And they all are a reference to the same body of work that you worked on up to and including the 2005 date of the papers?

A    Yes.  Yes.

Q    Okay.  And would a person of skill in the art understand that all those papers would be considered together as a single reference?

A    Yes, they would.

Q    So now let's turn back to Li.  Can you please tell the jury what you have in this slide?

A    Well, he, again, is interested in dealing with -- he wants

to have a high recording rate, which amounts to big magnetic field, and he wants it without significant loss of thermal stability.  So, again, he's addressing the superparamagnetic limit.

The distinction for him, though, is that he explicitly includes an anisotropy gradient in his patent.  So you can see here he has (as read):

"A gradient of anisotropy field Hk extending along its length between the front and the second -- first end and the second end."

So he basically has a gradient already there.

Q    So then did Dr. Suess invent the multilayer media?

A    No.

Q    Did -- I mean, I think the jury saw yesterday.  You won an award in 2001 for multilayer media?

A    That is true.

Q    Okay.  And Li, I think you just described, also describes a multilayer media?

A    Yes.  I mean, he explicitly has an anisotropy gradient in it.

Q    Okay.  So then Dr. Suess also didn't invent gradient anisotropy or the concept of increasing anisotropy, then?

A    That's right.

Q    So let's dive into -- actually, let me ask you.  So with respect to the gradient, you know, how important -- or how

significant is the use of a gradient to what Li describes in his patent?

A     Well, if you search on the terms "anisotropy gradient" throughout his patent, you find 15 total instances here, some of which talk about an anisotropy field, some of which just talk about anisotropy gradient by itself.  But, yeah, he clearly -- I mean, it's important to him.  It's the whole topic of the patent really.

Q     And you mentioned he refers to an anisotropy gradient, and I think the claims require an anisotropy gradient -- or anisotropy constant that varies.

And then you also mention "anisotropy gradient field."  Are those two related to each other?

A     They're connected through the magnetization.  They're proportional, but it depends on the magnetization.

Q     And does Li give limits to the magnetization that would make the anisotropy field and the anisotropy constant sort of vary proportionally with each other?

MR. FENSTER:  Objection, Your Honor.  Rule 26. Dr. Victora had zero discussion of magnetization in his expert report.  There was no disclosure of this opinion.

MR. LEE:  Your Honor, Mr. Fenster actually questioned Dr. Victora about this exact same subject at his deposition.  I'm happy to give you the question-and-answer citation if you'd like.  Dr. Victora is entitled to also

discuss stuff raised at his deposition, especially since it's stuff that's rebuttal to what Dr. Re provided in his report.

MR. FENSTER:  He admitted it was not in his report, Your Honor.

THE COURT:  Why don't you come back to this.  Let's see the cite and the deposition.

MR. LEE:  Sure.

BY MR. LEE:

Q    So let's turn, now, to what is it exactly that Dr. Li -- I think it's Dr. Li; right?

A    It is.

Q    -- described as his -- with respect to the anisotropy gradient media?

A    Well, he gave a number of embodiments, of which a couple are shown right here.  The first one is a four-layer embodiment where the first layer, which is the layer that has the highest anisotropy, has an anisotropy field of 12 kilooersteds.  And then you can see -- he doesn't present in the exact order, but you can just go from first to second -- second is 9 kilooersteds; third is 6 kilooersteds; fourth is 3 kilooersteds.  That's all from the right-hand side.  And then the left-hand side.

And then on the right-hand side he gives a three-layer embodiment that goes from 12 kilooersteds to 9 kilooersteds to 3 kilooersteds.

UNITED STATES DISTRICT COURT

Q    And the anisotropy field is equal to 2 times K over M; is that right?

A    That is true.

Q    Okay.  So if the M were constant, then the anisotropy field and the anisotropy value would be proportional to each other?

MR. FENSTER:  Objection, Your Honor.  This is a Rule 36 -- Rule 26.  He didn't disclose it in his report.  And in his deposition, he specifically admitted that there was no discussion of magnetization in this reference.  This should be out, Your Honor.

MR. LEE:  Your Honor, again, he's testifying about the equation itself.  And Mr. Fenster asked him questions at his deposition, elicited this testimony from him.  Your Honor's order allows experts to talk about what was -- what they were questioned about at their deposition.  That's all we're doing here, Your Honor.  And I'm happy to show you exactly where he says it in his deposition.

MR. FENSTER:  I asked him and he specifically said there was no disclosure in the reference that says that magnetization is kept constant.  It didn't have any discussion of the magnetization.

THE COURT:  Bring it out on cross.

MR. LEE:  Thank you, Your Honor.

BY MR. LEE:

UNITED STATES DISTRICT COURT

Q    So then, if magnetization was constant, then the anisotropy gradient constant and the field would change proportional from layer to layer in the same way?

A    It would.  That's true.

Q    And did you find that Li did, in fact, give limits on magnetization in his patent?

A    He does give limits in some of the embodiments, yes.

Q    And based on that, did you confirm that, in fact, with that -- with those values applied that the anisotropy gradient -- anisotropy constant would also vary from layer to layer as the claims require?

A    He allowed for that possibility.

Q    So then to be clear, let's take a look at the figure.  I know it's hard to see, but what does the blue correspond to -- the blue top layer correspond to with respect to the MRT patent claims?

A    Well, the blue layer is the hard storage layer.

Q    What then do the three -- in the figure, at least -- the three green layers correspond to in the MRT claims?

A    Those would correspond to the nucleation layer.

Q    And here I see there are actually an M2, M3, and M4. Does that mean that there are multiple layers in the Li nucleation host?

A    Yes.

Q    But is this exactly as the MRT patents require the order

of the layers to be?

A     No, it's not.

Q     So what would a person of skill in the art, having looked at that, thought to have done?

A     Well, if you look on the internet, there's an argument going on about when you make cheeseburgers when you put cheese on the top or the bottom.  And disregarding the issue of what tastes better, if you put the cheese on the bottom, it's going to fall on the grill.  It's going to be a mess.  So in order on to avoid that you flip it around, still a cheeseburger, but you have an advantage.

Q     I frankly don't matter which side.  As long as there's cheese on there, I'm a happy camper.

        But turning to the actual patents themselves, how does this relate to what a person of skill in the art would have understood, looking at Li?

A     Flip it upside down.

Q     And why would a person of skill in the art have thought to have done that?

A     It's a lot easier to grow.

Q     What do you mean by "it's a lot easier to grow"?

        MR. FENSTER:  Objection, Your Honor.  This is outside the scope of his report.  Never disclosed.

        MR. LEE:  I mean, Your Honor, again, it's in his deposition.

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.

MR. LEE:  Thank you, Your Honor.

THE WITNESS:  Well, basically when you're growing a very hard layer, it is very beneficial to have a seed layer directly beneath it.  You can't put the seed layer in the middle of the stack because it will break the magnetic coupling.  So you have to stick it at the bottom.

BY MR. LEE:

Q    And so -- but couldn't you have put a seed layer and then put a lower anisotropy layer, grow that, and then grow a higher anisotropy layer above that?

A    You would be able to grow it, but what would be the point of that?  I mean, the patent is teaching about having anisotropy gradients, not mixed-up situations.

Q    Okay.  So then, to a person of skill in the art, would they have looked at the Li figure and have thought to have put the hard layer on the bottom?

A    I believe so, yes.

Q    Are there examples of where people of skill in the art have actually put the hard layer on the bottom, leaving aside the stuff that we've been talking about with the other prior art?

A    Yes.  So, for example, in Wang, he shows explicitly in his Figure 1 -- and this is the Wang paper.  I guess the DX number is 1797 -- he shows that he has a hard layer on the bottom and

UNITED STATES DISTRICT COURT

then the soft layer on the top.

MR. LEE:  And I apologize, Your Honor.  I just realize now that we have not yet introduced this exhibit.  So I'm going to switch off of it.

Professor, can you please take a look at your binder at DX-1797.

THE WITNESS:  Yes.

BY MR. LEE:

Q     And when you have, can you please let me know if you recognize it?

A     Yes, this is it.

Q     And what is that document?

A     This is the paper by Wang showing that particular figure.  It's "Exchange Coupled Composite Media for Perpendicular Magnetic Recording."

MR. LEE:  Your Honor, we'd like to publish this exhibit to the jury.

MR. FENSTER:  No objection.

THE COURT:  Exhibit will be received.

**(Exhibit Number DX-1797 received.)**

MR. LEE:  Apologies.  We have to respect the formalities here.

BY MR. LEE:

Q     The -- so what is it that this paper is showing us with respect to the orientation of the layers?

A       It's showing the hard layer on the bottom, then an exchange coupling layer, and then a soft layer.

Q       And what year is this paper from?

A       Well, this is a 2005 paper.

Q       Now, are there examples of where the hard layer was placed on -- other examples of where the hard layers were placed on the bottom?

        Oh, you know what, I screwed up again.  Sorry, Professor.  Can you please open up your binder and take a look at DX-1187.

A       I have it.

Q       Do you recognize that paper?

A       I do.

Q       What is it?

A       It is a paper that's called "Thermally stable CGC perpendicular recording media with platinum-rich cobalt platinum chromium and thin platinum layers."

        MR. LEE:  Your Honor, we'd like to publish this DX-1187.

        THE COURT:  Any objection?

        MR. FENSTER:  The objection is that this reference was never disclosed in connection with this combination, Your Honor.

        MR. LEE:  Your Honor, I'm happy to show you where in his report he discusses it.  He explicitly disclosed this for

putting the hard layer on the bottom.  I can show that to you if you'd like.

THE COURT:  Overruled.

MR. FENSTER:  No objection to the admission, Your Honor.

THE COURT:  1187 will be received.

**(Exhibit Number DX-1187 received.)**

MR. LEE:  Thank you, Your Honor.

BY MR. LEE:

Q     So let me show you the slide now.  What is this showing us here?

A     This is showing you -- so CGC media, what they had was a hard layer covered by what's called a continuous soft layer, which means that you don't have the grain boundaries that some of the other materials do.  AND it was just coming to be a commercial product at about the time this all was going on.

And here it shows an earlier paper on it, which clearly shows that they grow the hard layer on the bottom and the soft layer on the top.

Q     And this was in -- what year was this?

A     This is 2002, I believe.

Q     Okay.  And this CGC perpendicular recording media that you're referring to, was that actually sold anywhere?

A     Yeah.  It's widely sold.  It's probably still out there.

Q     And so then going back to the figure from Li -- and to be

UNITED STATES DISTRICT COURT

clear, that's DX-1187, page 1, that you're referring to and the figure therein?

A     True.

Q     So then looking at Li, combined with the knowledge of a person of ordinary skill in the art, what would a person of ordinary skill in the art to have thought to have done to the layers in Li?

A     He would have flipped them upside down.

Q     So is that what you're showing here by this animation?

A     That's the idea, yes.

Q     So then let's turn to -- back to the slide I think you showed us earlier.  Actually, I think you showed us yesterday.

So are these the three references that you're going to be talking about in more detail today with respect to the limitation-by-limitation analysis?

A     That is correct.

Q     And to be clear, were some of these references before the patent office during the examination of the MRT patents in this case?

A     Yes.  Some of them were.  I believe it is Victora-2, Victora-3, and Berger and Hagedorn, but not Li or Victora-1.

Q     And so the patent office examiner didn't have the benefit of looking at Li with the multiple layers or Victora-1 when it was deciding whether or not to -- whether or not Suess's patent claims were valid?

A     That's my understanding, yes.

Q     And I see you have it as POSITA, a person of skill in the art.

      Besides Dr. Suess, was there a person of skill in the art there with the examiner, to explain to the examiner what they understood or would have understood looking at these references?

A     My understanding is no.

Q     Were you there to explain to the examiner, you know, the significance of what these references disclosed and how they interact with each other?

A     For sure, I was not.

Q     Are you familiar with the concept of peer review?

A     Yes.

Q     And can you describe just briefly what that is?

A     Well, when you publish a paper, it goes out to referees and they write about, you know -- they review the paper, see whether it's correct, see what kind of improvements it should have, et cetera, and write back to the editor and tell them what their conclusions are.

Q     And those -- and so those papers that are reviewed, they're essentially vetted by others knowledgeable in the same field to see whether or not the scholarship is sound?

A     That's true.

Q     Okay.  Now, was there anyone besides the examiner peer

UNITED STATES DISTRICT COURT

reviewing Dr. Suess's patent during the prosecution?

A    I don't think so, no.

Q    And let me ask you this question.  I know you're not an expert in patent law, but if the examiner had the benefit of you and others, to be fair, people like Dr. Re, to provide their input into what the references covered and what his -- how his patent relates to those references, do you think that the examiner would have benefited from that during that examination?

MR. FENSTER:  Objection.  Speculation.  Foundation.

THE COURT:  Speculation sustained.

BY MR. LEE:

Q    Let me ask you a different question.  The examiner did not have the benefit of a peer review process?

A    True.

Q    And so now that the jury is sitting in as, as they say, a jury of peers, do they have the benefit of your expertise in determining for themselves whether or not the claims are valid or invalid?

A    They do.

Q    And so that's the difference between what the examiner did or had available to it versus what the jury has available to it?

A    That is true.

Q    So then are we done now or is there more to do?

UNITED STATES DISTRICT COURT

A    No.  Basically we have reviewed the basic analysis that I did.  But now we have to actually go through it legally.  And that means claim by claim, limitation by limitation.  It's probably going to take a half hour or more of just going step by step.

Q    Okay.  And I think it's going to take a little longer than that, unfortunately.  I apologize.  But we will get through this as quickly as we can.  Unfortunately, we're limited on time, so -- but we'll try and get through it as quickly as we can.

So let's now turn to -- what is it exactly we're going to be covering next?

A    Well, we are going to cover the claims of the '964 [sic] patent, or the asserted claims, anyway, the ones that are actually being tested in this trial.  And that's Claims 1, 10, and 11.

We're also going to look at the '997 patent, which came from the same specification.  That's independent Claims 1 and 7.

Q    So let's go through those in order.  So what's the first limitation that -- or, actually, so what's the first claim that we're going to talk about?

A    Well, we're going to talk about Claim 1 of the '864 patent.

Q    And what's the first limitation in that claim we're going

to talk about?

A     Magnetic recording medium.

Q     And does your published ECC work disclose this limitation?

A     It's clearly stated on the title page of Victora-1, -2, and -3.

Q     And so -- and that's, again, just the pages -- first page of each of those?  I guess except for Victora-3, where it's technically page 2?

A     That's true.

Q     So then what's your conclusion as to whether or not this limitation is met?

A     It is met.

Q     So now let's go to the next limitation.  Which one is that?

A     Essentially, nonmagnetic substrate.

Q     Does your work, as reflected in your papers, disclose a nonmagnetic substrate?

A     Right.  For example, in Victora-3 it talks about that all layers were deposited in an eight-target DC magnetron sputtering system.  Cover glasses were used as the substrate.  Glass is not magnetic.

Q     And that's at DDX-1031 [sic], page 2?

A     True.

Q     And so what's your conclusion as to whether or not this

limitation is found in your published work?

A     It's met.

Q     Then what's the next limitation we're going to be talking about?

A     You need to have an underlayer that is formed on the nonmagnetic substrate.

Q     So then what does your work have to say about this limitation?

A     Well, in, for example, Victora-3, they talk about traditional soft underlayer used with PMR media.  And in Victora-2, more explicitly, it shows a figure of the soft underlayer, which is in purple.

Q     Okay.  And that's the Figure 12 in Victora-2?

A     It is.

Q     Okay.  And then Victora-3, that's the page 2 of the DX?

A     Uh-huh.

Q     Okay.  And I see you have some additional citations.  Is that additional evidence --

A     Right.

Q     -- for the underlayer being shown?

A     Yeah.  There's numerous examples available in the papers.

Q     Okay.  And actually, to be clear, despite the fact that you're calling out and showing some of these examples, are you saying that that's the only examples where this stuff is disclosed in the various prior art?

A     No.  No.  I usually just do the most illustrative example. It's easy for the jury to see.

Q     Okay.  And so at the bottom, for example, I see you have pages 2 and 5 of Victora-2, and then page 4 of the DX document for Victora-3.  Those are additional cites?

A     Yes.

Q     So then what's your conclusion as to whether or not the underlayer limitation is found in the -- in your published work?

A     It is met.

Q     So then what's the next limitation that we're going to be talking about?

A     This is a little more complex.  The first underlying part says -- is basically definitional.  It says there's going to be an exchange coupled magnetic multilayer structure.  And it's going to be comprised of two parts:  a hard magnetic storage layer and a nucleation host.

Q     And you called it definitional.  So is that based on the Court's claim construction?

A     The Court did define it.  And it says that the exchange coupled magnetic multilayer structure is a structure including a nucleation host that is exchange coupled to a hard magnetic storage layer.

Q     And I see the Court also -- I don't know if you need to read it, but I see the Court also provided a construction of

**UNITED STATES DISTRICT COURT**

"exchange coupled."  Did you apply that construction in your analysis of the claims?

A      I did.

Q      So then why, then, do we have the exchange coupled magnetic multilayer structure underlined and then the rest of the claim highlighted in blue and green?

A      Well, to me, I have it differently because one just sort of specifies what we're going to talk about next.

Q      Okay.  And so does the blue correspond to the hard magnetic storage layer required by the exchange coupled magnetic multilayer structure?

A      It does.

Q      And does the green, is that the nucleation host that is the other part of -- that's required by exchange coupled magnetic multilayer structure?

A      It is.

Q      Okay.  And you have to show that both exist in order to show that the claims are invalid?

A      That is correct.

Q      And do you also -- are you also going to be talking about, I guess in the context of nucleation host limitations, that those two, the hard magnetic storage layer and nucleation host, are coupled together as required by the multilayer structure limitation?

A      That is true.

Q    So why don't we go through that.  Let's talk about the first limitation underneath that.

What is this limitation?

A    It's "a hard magnetic storage layer, having a first coercive field greater than 0.5 tesla, formed on the underlayer."

Q    Tesla, I think others have mentioned the term "tesla" as well.  That's not a reference to the car Tesla, is it?

A    It's named after the same guy, but, no, it's not the car.

Q    Okay.  And is that just a measurement of, like, a magnetic field or something?

I guess I should just ask you:  What is that a measurement of?

A    Well, it is a measurement of magnetic fields.  And basically what you want to remember is that 1 tesla is 10 kilooersteds.  Because you'll see both terms used.

Q    Is there a way for us to understand how strong a 1-tesla field is?

A    Well, the Earth's field is roughly an oersted.  So you're talking about something 10,000 times stronger than the Earth's field.

Q    Okay.  So pretty strong, then?

A    Yeah.  Yeah.

Q    Okay.  So, now, does your work, including the three Victora papers, does that disclose the required hard magnetic

storage layer?

A     It does.

Q     And where is that shown, for example?

A     Well, it's shown in several places.  I'll mention the Victora-3 reference first.  And this is -- basically it lists, I believe very near the top of it, a magnetic hard layer.

Also, in Victora-2, it talks about magnetically hard region, and hard region again.

Q     So that's Victora-3 at the DX page 2 number, and then Victora-2 at the abstract, also on page 1?

A     Yes.

Q     Okay.  And what about the requirement that the hard storage layer have a field strength greater than 0.5 tesla?

A     Right.

Q     Oh, and actually before we do that, I have one more.  I think this will be the last one.  Oh, maybe not, actually.

DX-1796, can you please look at your binder?

A     Yes.

Q     Do you recognize that document?

A     Yes.  It's a paper by Takahashi and Hono and other authors.

MR. LEE:  Your Honor, we'd like to publish DX-1796.

MR. FENSTER:  No objection, Your Honor.

THE COURT:  1796 will be received.

**(Exhibit Number DX-1796 received.)**

**UNITED STATES DISTRICT COURT**

MR. LEE:  Thank you, Your Honor.

BY MR. LEE:

Q    What about the requirement that the hard magnetic storage layer have a greater than 0.5 tesla in strength?

A    Well, for example, in the Victora-3, we mention the use of ordered iron -- ordered iron-platinum alloys.  And in the Takahashi reference, it tells about what kind of coercivity they have, which, in this particular case, was 7 kilooersteds.  And 7 kilooersteds would be 0.7 tesla, which is greater than half a tesla.

Q    So would it be obvious to a person skilled in the art using the iron-platinum alloys described in Victora-3 to have a hard magnetic storage layer with a field strength -- Hs field strength greater than 0.5 tesla?

A    It would be.

Q    So then what's your conclusion as to whether or not -- oh, and then I should ask you as well, is that hard storage layer described in your report, that would be formed on the underlayer?

A    This is true.

Q    So then what's your conclusion as to whether or not the hard storage -- magnetic storage layer limitation is met in your work as described in your articles?

A    It is met.

Q    And what's the next limitation we're going to be talking

about?

A     Well, the nucleation host, having a second coercive field, without the hard magnetic storage layer, lower than the first coercive field.

Q     And is that found in your work?

MR. FENSTER:  Objection, Your Honor.  Testimony is contrary to the Court's claim construction.  The Court specifically defined the nucleation host as comprising ferromagnetic layers, plural.  He's admitted that his work only had a single soft layer.

MR. LEE:  Your Honor, we will address the limitation on the multiple layers at the appropriate point in the claim language.

THE COURT:  Proceed.

MR. LEE:  Thank you, Your Honor.

BY MR. LEE:

Q     So then with respect to the first requirement for a nucleation host having a coercive field lower than a hard magnetic storage layer, is that described or disclosed in your publish work?

A     Yes.  First of all, I'll call your attention to Victora-3 that lists an explicit value of 1.5 kilooersteds, which is less than half a tesla.

Q     Okay.  And --

A     Similarly in Victora-2, it talks about you want a soft

region less than one-tenth of that of the hard region.

Q    So that's the -- for Victora-3, that's the DX-1031, page 3, and Victora-2, 1030, page 3 as well?

A    That's correct.

Q    And now, then what's your opinion as to whether or not this first requirement for a nucleation host is met?

A    It is met.

Q    What's the second thing that's required in a nucleation host?

A    Well, it has to be formed on the hard magnetic storage layer such that the hard magnetic layer is between the nucleation host and the nonmagnetic substrate.

Q    What does your work have to say about this requirement?

A    It says:

        "The magnetic hard layer was put on the
        bottom and the soft layer on top."

Q    And that's at Victora-3, DX-1031, page 2?

A    True.

Q    And so then is it your opinion that this requirement for the nucleation host being formed on the hard magnetic storage layer is met?

A    It is met.

Q    So then what is the next limitation that we're going to be talking about for a nucleation host in the claim?

A    It has to be exchange coupling to the hard magnetic

storage layer.

Q    And this is the exchange coupling that we were talking about with respect to the underlying limitation above where the nucleation host and hard magnetic storage layer have to be coupled together?

A    True.

Q    So then what does your work disclosed with respect to that limitation?

A    Again, I'll focus on Victora-3 where they talk about a proper exchange coupling with the virtually adjacent hard grains in the hard layer and two vertically exchange coupled magnetic layers.  Also in Victora-1 -- Victora-2, there's also stuff.  But, yeah, it's -- there are many references to this state.

Q    Forgive me, but just for the record, you're referring to, in Victora-3, page 2 of the 1031?

A    True.

Q    And for Victora-2, page 1 of the 1030?

A    Right.  In the abstract.

Q    And then I think you also cited page 3 of 1031, Victora-3?

A    True.

Q    And Figure 3 in there?

A    Yes.  Yes.

Q    All right.  So then what's your conclusion as to whether

**UNITED STATES DISTRICT COURT**

or not this limitation, with respect to the exchange coupling between the nucleation host and hard magnetic storage layer, is met?

A     It is met.

Q     So now what is the final limitation for the nucleation host that we will be discussing?

A     That it must comprise ferromagnetic layers with increasing anisotropy constant K from layer to layer.

Q     And I think we had talked earlier that your work, at least as described in the papers, doesn't explicitly disclose multiple layers for a nucleation host, but would have been obvious for a person of skill in the art to combine Hagedorn with Victora to reach that conclusion or to come up with this limitation and the requirements for the nucleation host generally?

A     That is true.

Q     Okay.  So then let's remind the jury what Hagedorn discloses with respect to what it's addressed towards.

A     This is the same Hagedorn reference you saw earlier in the overview.  And what it says essentially is that you could reduce by -- you basically can add in multiple layers, multiple slabs that's listed here -- N of them, in fact -- and reduce the coercivity to very low values.

Q     So you say Hagedorn refers to as slabs.  Is slabs and layers, aren't those the same thing for purposes of --

A    You can be using the words interchangeably.

Q    And you say, "N slabs."  Does that just mean that you can use an arbitrary number of slabs or layers?

A    Yeah.  Yes.  That's what it means.

Q    And are those layers arrayed or combined so that there is increasing anisotropy from layer to layer?

A    They are.

Q    And so -- and then the point as to lower coercivity?

A    True.

Q    And so does both your work and the Hagedorn work -- are they both focused on reducing coercivity?

A    Yes.  That is true.

Q    And so then would that be a motivation to combine those works because they're both directed towards addressing the same issues?

A    It would be.

Q    And that's -- I think you give some examples of that DX-1031, page 2, and DX-1213, page 11?

A    That's true.

Q    Now -- sorry.  I screwed up.  I asked -- let me flip the questions around.

       So the other question I had for you is with respect to your research and Hagedorn, are they both directed towards addressing problems in exchange coupled magnetic films?

A    They are, yes.

**UNITED STATES DISTRICT COURT**

Q    And I think my cite -- what I read was actually with respect to that.  I apologize for mixing up the slides.

And then I think we already talked about the reducing coercivity.  Is the references -- the citations that you're pointing to for that, is that found at DX-1031, page 2, for Victora-3, and then DX-1213, page 9, for Hagedorn?

A    Yes, it is.

Q    Now, it's true, isn't it, that your work that you describe in your paper, was that enough?  Like, once you had come up with the ECC media described in your work, did you conclude that you didn't need to make it better?  It was good enough for all time?

A    No, no, of course not.

Q    And so would a person of skill in the art looking at your papers, would they have been motivated to continue to further improve things like coercivity?

A    I believe so, yes.

Q    And would the Hagedorn paper have been something that they would have thought to have looked at to help them do that?

A    I think so.

Q    Now, I think we had talked earlier about Fred Hagedorn, the author of his paper, and you had mentioned he had won the IEEE Magnetics Society Achievement Award in 2001.  Would people in the magnetics field, including working on magnetic storage media, have known of that award and of his receiving that

award?

A    Of course.

Q    And was that award for his scholarship?

A    Yes.

Q    Including this paper that we're talking about here?

A    That is true.

Q    And so would people of skill in the art, would they have thought to have looked at "Hey, this guy won the award.  Let's take a look and see if there's anything useful in what he's written"?

A    That would be the tendency, yes.

Q    Now let's talk a little bit further about Hagedorn.  What is it really that Hagedorn is talking about?  Is it talking about a very narrow, specific application here?

A    He's providing general science.

Q    Okay.  And would you say that he's using physics principles to improve coercivity using multiple layers?

        MR. FENSTER:  Objection.  Leading.

        THE COURT:  Sustained.

        MR. LEE:  Sorry.

BY MR. LEE:

Q    What is he proposing to improve coercivity using multiple layers?

A    I didn't get the question.

Q    Sorry.  What is he proposing -- what principles are -- is

UNITED STATES DISTRICT COURT

he proposing to improve coercivity using magnetic layers?

A    He's basically proposing using, for example, anisotropy gradients or layers of just two layers.  Yeah, just two layers.

MR. LEE:  Now -- and, Your Honor, we have another exhibit that we'd like to get admitted:  DX-1009 for the Hagedorn.

Can you please take a look at that in your binder?

THE WITNESS:  1009.  Yes.

MR. LEE:  Your Honor, we move to admit DX-1009.

MR. FENSTER:  It's already admitted, Your Honor.

MR. LEE:  Fair enough.  Thank you, Mr. Fenster.

BY MR. LEE:

Q    All right.  So now, you were here when Dr. Re testified about attending an Intermag 2006 conference?

A    I was.

Q    Okay.  Do you know of a Dobin and Richter that also presented at that conference?

A    Yes.  Yes.  Dr. Dobin was previously my graduate student, and I worked with Hans Richter often.

Q    And were they presenting a paper on magnetic recording at the conference?

A    Yes.  Yes.

Q    And did they site the Hagedorn paper in their presentation and paper?

A    That is correct.  They did.

Q      So they -- and would you call them persons of skill in
the art?

A      Absolutely.

Q      And so did they acknowledge that the Hagedorn paper was
something that they would look to and pull from when trying to,
you know, work on problems, advanced art, that kind of thing?

          MR. FENSTER:  Objection.  Leading.

          THE WITNESS:  Basically what they did --

          THE COURT:  Just a minute.

          THE WITNESS:  Sorry.

          THE COURT:  Overruled.

          THE WITNESS:  Basically, what they were doing is
they wrote a paper about magnetic recording media, in fact,
two-layer media.  And they included some statements by Hagedorn
and some analysis based on Hagedorn inside that paper.

BY MR. LEE:

Q      And I think -- were you at that conference yourself?

A      I was.

Q      Did you attend that presentation?

A      I did.

Q      Do you recall whether or not they mentioned Hagedorn at
that presentation?

A      Yes, they did.

Q      I think Dr. Suess testified that he also attended that
presentation?

A    I believe that is true.

Q    Okay.

A    I think that might be on the next slide, perhaps.

Q    You're way ahead of me.

A    Oh, I'm sorry.

Q    No.  No.  No need to apologize.

And so did Dr. Suess also learn about the Hagedorn paper at that conference?

A    According to his testimony, yes.

Q    And more specifically, from that Dobin presentation that we were just discussing?

A    That is correct.

Q    Now, then, what is your conclusion as to whether or not the last limitation of the '864 patent Claim 1 as well as the nucleation host and the multilayer structure limitations are obvious in light of a combination of your work and Hagedorn?

A    They are obvious.

Q    And so then what's your conclusion as to Claim 1 of the '864 patent?  Is that obvious in the light of the combination of your work, which on this slide we're calling Victora, and Hagedorn?

A    It is obvious.

Q    So I'm just going to check the appropriate limitations so this will be a good visual guide for the jury to follow along as we proceed.

**UNITED STATES DISTRICT COURT**

So then what's the next claim that we're going to be talking about?

A    The next claim is that:

"Wherein:  the nucleation host has a thickness smaller than 30 nanometers."

Q    And Claim 10, you understand that that's a dependent claim?

A    True.

Q    So what do we need to show in order to show that the dependent claim is invalid?

A    Well, it needs to be invalid as well as Claim 1.

Q    So let's -- so then the fact that we've already gone through the Claim 1 limitations, does that mean we can focus on the remaining limitation added by Claim 10?

A    That is true.

Q    Let's do that.  So what is that additional limitation?

A    Well, that the nucleation host has a thickness smaller than 30 nanometers.

Q    And does your work -- is it obvious in light of the combination of your work and Hagedorn that the nucleation host would have a thickness smaller than 30 nanometers?

A    I believe so.

Q    And where do you find evidence for that?

A    So, for example, when we actually made the material, we had a nucleation host that was 5 nanometers thick.  And if you

add multiple layers, like three or four layers, then presumably you would multiply that by 3 or 4, get 15 or 20, which is still less than 30.

Q    And that's at Victora-3, the DX-1031, page 3?

A    Yes.

Q    So then what's your conclusion as to whether or not the additional limitation that's Claim 10 is found in your work or obvious in light of your work and Hagedorn?

A    It is found.

Q    So then what is your opinion as to whether or not Claim 10 is obvious in light of the combination of Victora and Hagedorn?

A    It is obvious.

Q    Let's go to the next limitation.  What limitation is that?

A    Claim 11.

Q    And so Claim 11, does that also depend on Claim 1?

A    It does.

Q    So, again, we've already talked about Claim 1.  Can we focus on the additional limitation of Claim 11 to complete this set?

A    Yeah.  Basically what this is about is that the nucleation host comprises grains with an average diameter greater than 2 nanometers and less than 10 nanometers.

Q    So then where is that disclosed in your report -- sorry,

not your report.

Your prior art work as described in the Victora papers, where is that disclosed?

A    So, for example, in Victora-3, it lists that the average grain size is 7.6 nanometers.

Q    And that's at DX-1031, page 3?

A    True.

Q    And I see there's a further sentence talking about also 7.8 nanometers?

A    Yes.

Q    That's also, I guess, between 2 and 10?

A    That is also between 2 and 10.

Q    Okay.  Now, I just want to understand how these grains work.  The grains, do they extend vertically through the layers?

A    Okay.  So people do argue that point.  Most authors believe that there's this single-grain structure going from top to bottom, but you will certainly find in the literature people who will claim they are separate grains.

Q    I see.  But regardless of whether or not you technically separate them or they're the same, the grain sizes would not significantly vary from layer to layer?

A    This is true.

Q    So then what's your opinion as to whether or not the additional limitation added by Claim 11 is obvious in light of

**UNITED STATES DISTRICT COURT**

Victora and Hagedorn, your work in Hagedorn?

A     It is obvious.

Q     And so then, again, just for the record, what's your opinion as to whether or not Claim 11 is obvious in light of the Victora and Hagedorn combination?

A     It is obvious.

Q     So now let's turn to the next patent, the '997 patent.

So do you understand the first claim that we are going through is Claim 1 of the '997 patent?

A     True.

Q     And I think -- well, actually, I'll ask you.  Do a lot of the limitations overlap, at least in substance, between Claim 1 of the '864 patent and Claim 1 of the '997 patent?

A     They're very similar, except that the '997 patent requires a system to be there.

Q     And so then since we've already gone through the '864 claim limitations, can we focus on -- to save time, to focus on the additional limitations added by Claim 1 of the '997 patent?

A     It would be wise.

Q     So let's focus on those.  And, again, just to save time, let's sort of look at them as a set.

So are these the additional limitations, magnetic recording system comprising writing head and disk including, you know, essentially what's in Claim 1 of the '864 patent?

A     That is true.

**UNITED STATES DISTRICT COURT**

Q    And where in your published work do you disclose, or at the very least that it's obvious, that these limitations are found in your work or your work combined with Hagedorn?

A    Well, right in the title it talks about media, and it talks about recording head.

Q    Okay.

A    I'm sorry.  It talks about -- could you go back there?

Q    Sure.  Sorry.

A    It talks about magnetic recording.

Q    Now, magnetic recording, could you -- do you need a write head for that?

A    You do.

Q    And would you -- would you essentially have to put it on a disk?

A    Yes.

Q    And so, again, you're just calling out the titles, I guess, of Victora-1, -2, and -3?

A    That is correct.

Q    Okay.  So then what's your conclusion as to whether or not the additional limitations added at the top by the '997 Claim 1 are found in the combination of -- or obvious in light of the combination of your work and Hagedorn?

A    They're obvious.

Q    So, again, Claim 1 of the '997 patent, is that obvious in light of the combination of Victora and Hagedorn?

**UNITED STATES DISTRICT COURT**

A    It is obvious.

Q    So then let's turn to -- I think this is the last claim for -- that we're going to talk about for Victora, at least.

What does Claim 7 add to Claim 1 of the '864 patent?

A    It's very similar, but it requires there be a thin exchange coupling layer within the nucleation host.

Q    So we've already gone through the other limitations, so we're just going to be talking about the additional limitation that Claim 7 adds?

A    That's true.

Q    So let's focus on that.  And I think you already mentioned what that was.  So that's between the layers and the nucleation host, they have to be coupled together with an exchange coupling layer?

A    True.

Q    So is that additional limitation obvious in light of the combination of your work and Hagedorn?

A    Yes.  We explicitly describe how to obtain even a proper coupling layer as shown -- I think the best example here is in Figure 3 of Victora-3, where it shows how to make the layer. Basically, you vary the thickness of the layer in order to get different values of the exchange coupling.

Q    Is that specifically using an exchange coupling layer between the hard and the soft layers?

A    That is correct.

**UNITED STATES DISTRICT COURT**

Q    And, again, the hard and the soft layers correspond to the hard magnetic storage layer and the nucleation host in the claims?

A    True.

Q    And, again, I think we had previously discussed that what Hagedorn adds is multiple layers in the nucleation host.

And does Hagedorn also talk about exchange coupling those layers together?

A    He does.

Q    And, again, just for the record, I think you had talked -- or referred to Victora-3, the Figure 3 found on page 3 of the DDX [sic], and also additional language from there, and then DDX-1030 [sic], page 1, and also DDX-1030 [sic], page 2?

A    Yes.

Q    Okay.  And then for Hagedorn, I believe page 2 and 9 of Hagedorn?

A    Yes.

Q    So then what's your conclusion as to whether or not that additional limitation that Claim 7 of the '997 patent adds, whether that's obvious in light of the combination of Victora and Hagedorn?

A    It is obvious.

Q    And so then what's your conclusion as to whether or not Claim 7 of the '997 patent is obvious in light of the

combination of Victora and Hagedorn?

A    It is obvious.

Q    And, again, you know, I should have done this up front. I apologize.

You have this in three columns, and then you have some of the text next to each other in the same row. What are you representing by that?

A    Okay. Are you talking about the right-hand side or the left-hand side?

Q    The first three columns. For example, you have "underlayer" listed in each of the first three columns next to each other. Is that a reference to the same underlayer limitation in each of Claims 1 of the '864 and Claims 1 and 7 of the '997?

A    It is.

Q    And so finding that for one claim, means you've already found it for the other claims?

A    True.

Q    But are you still, in giving your opinions as to the claim as a whole, saying that you have found that combination obvious in light of each of your prior combinations?

A    Yes.

THE REPORTER:  Counsel, can you please slow down.

MR. LEE:  I am -- I am very sorry. It's a bad habit of mine.

UNITED STATES DISTRICT COURT

BY MR. LEE:

Q    Okay.  Now, just to be clear, we have talked about Victora-1, -2, and -3 as a paper.  Each of those papers describe the work that you did.  And I guess 3 is sort of an accumulation because it's the description of the experimental work, the actual thing that you guys made based upon the concepts and ideas as described in Victora-1 or -2?

A    True.

Q    Okay.  And so does Victora-3, because it's sort of the capstone, does that alone sort of describe everything, in combination with Hagedorn?

A    Yes, it does.

Q    And so what's your conclusion as to whether or not Victora -- the combination of Victora and Hagedorn renders obvious all of the asserted claims?

A    It renders them all obvious.

Q    So now I think we have to go to the next one.  We have two more.

         Berger.  That's the Berger patent we talked about before?

A    Right.  So now we're starting a whole new set of the -- examining the three analyses and going through.  And now we're going to the second analysis, which is for Berger.

Q    And I'm running short on time.  The judge already promised you we'd be done with testimony today, so I want to

honor that promise.  So let's move through it a little bit more quicker.

Let's talk about the first limitation of the '864 patent.  Where is that disclosed in Berger?

A    Berger discloses it in multiple places, but I will choose to focus on Figure 3.  And Figure 3 shows, again, a perpendicular magnetic recording medium.

Q    And that's also on page 11 of the DX figure -- DX Berger exhibit?

A    It is.

Q    And so what's your opinion as to whether or not the first limitation is found in Berger?

A    It is found.

Q    So let's go to the next one, the nonmagnetic substrate.  Where is that disclosed in Berger?  Or is that obvious in light of the disclosures in Berger?

A    Right.  Berger actually makes recording media that he's going to do recording measurements on.  He couldn't have possibly have done that without a nonmagnetic substrate beneath it.

Q    And you're pointing to his disclosures about the recording medium on page 11, including the figure, I guess, on page 11?

A    True.

Q    And the figure itself is, I guess, on page 4?

A     Yeah.

Q     And so is this substrate limitation found or obvious in light of Berger?

A     It is obvious.

Q     And, I guess, Berger plus Hagedorn, but we'll get to that in a minute.

       So let's talk about the next one, the underlayer limitation.  Is that also disclosed in Berger?

A     Yes, it is disclosed in Berger, and it's shown in three -- well, it's Element 312 marked in purple.

Q     Okay.  And that's at Figure 3?

A     That is at Figure 3.

Q     Okay.  And then there's further descriptions, I guess, at figure -- or sorry -- page 11 of the Berger exhibit?

A     This is true.

Q     Okay.  And then does Berger Figures 1 and 2 provide additional support?

A     Yes, they do.

Q     So then the underlayer limitation, is that found in Berger and met by Berger?

A     Yes, it is.

Q     So let's talk about the next one.  And I think we already discussed how the multilayer structure is going to be addressed, so let's just move --

A     This argument is going to be very similar to what you just

**UNITED STATES DISTRICT COURT**

saw for the Victora papers.

Q   So let's address the first component required of that multiple structure, the hard magnetic storage layer.

Does Berger disclose a hard magnetic storage layer with the required elements?

A   He does.

Q   All right.  And so can you sort of walk through those disclosures in Berger for us, please?

A   Right.  So, for example, he shows in blue a hard magnetic storage layer, and he also mentions it in the text in, for example, column 5 and column 6 and, as I said, in Figure 3 as well.

Q   And that's the Element 302 in figure 3?

A   That is true.

Q   Okay.  And then what about the Hs value?  Does it show that that's higher than 0.5 tesla?

A   Yes.  He shows a value of 10 kilooersteds, which is 1 tesla, which is certainly greater than half a tesla.

Q   And is that -- is that layer formed on an underlayer?

A   Yes, it is.

Q   Okay.  And that's at page 11 of his -- of the exhibit as well as page 4 with the figure?

A   Yes.

Q   So, then, what's your conclusion as to whether or not the hard magnetic storage layer limitation is met by Berger?

A    It is met.

Q    Okay.  So now let's turn to the next limitation, the first of the nucleation host limitations.  Where is that found in Berger?

A    Well, for Berger, the nucleation host becomes the exchange-spring layer, and the exchange-spring layer is marked in green.  It's Element 340 in Figure 3, and it is described in the text in column 5.

Q    Okay.  And is that Hs value less than the Hn value for the hard storage layer we were just talking about?

A    Yes.  He specifies it should be less than 6 kilooersteds, which is certainly less than 10 kilooersteds.

Q    And less than the -- okay.

All right.  So then this first limitation, nucleation host, is that found in Berger?

A    It is found.

Q    So let's go to the next one.  So this is the one about where it's physically located on a hard storage -- magnetic storage layer.  Is that disclosed in Berger as well?

A    It is disclosed.

Q    Where are examples of where it's disclosed?

A    So, for example, exchange-spring layer 304 in green is shown in Figure 3 as well in text in Figure 5 -- column 5 and column 6.

Q    Okay.  And, again, in terms of the hard magnetic storage

layer -- sorry?

A     I think I misspoke.  You were asking about the hard layer or the nucleation?

Q     I was asking -- actually, I was going to ask you about all three.  The hard magnetic storage layer, the nucleation host, and the substrate required by this limitation, where are they relative to each other as disclosed by Berger?

A     The order is substrate on the bottom, hard layer next, and deposit atop it, and then soft layer above that with an exchange break layer or control layer in between the hard and the soft layer, which is called the exchange-spring layer, and corresponds to the nucleation host.

Q     So, again, just so I understand, substrate on the bottom, underlayer next, the recording layer which corresponds to the hard magnetic storage layer, exchange-spring layer, and then the nucleation host or the exchange-spring layer on top?

A     Correct.

Q     Okay.  And that's found in Figure 3 as well as column 5 and 6 of Berger?

A     True.

Q     So then, is this limitation about the relationship between the various layers, is that met by Berger?

A     It is met.

Q     Okay.  So let's go to the next one, which is the nucleation host being exchanged coupled to the hard magnetic

storage layer.

Does Berger disclose that?

A    Yes, he does.  In fact, it was just in the previous discussion.  We'll just mention it again that he talks about exchange coupling between the two layers 302 and 304, and he labels that Element 306.

Q    That's found at Figure 3 of Berger as well as -- I see you have a number of cites on pages 10 -- or 11 and 12 of Berger as well?

A    True.

Q    So then this limitation is found by Berger or met by Berger?

A    It is met by Berger.

Q    So let's talk about the last one, the one with the nucleation host with layers increasing in anisotropy constant from K from layer to layer.

Now, again, I think as you mentioned earlier up-front, Berger itself doesn't explicitly disclose multiple layers in its nucleation host?

A    This is correct.

Q    Okay.  But Berger does disclose, of course, the use of ferromagnetic layers?

MR. FENSTER:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  He does.

UNITED STATES DISTRICT COURT

BY MR. LEE:

Q    Okay.  And that's at page 11 of Berger?

A    Yes.  In column 5.

Q    Thank you.  And I think we had talked about this before with Victora.  Would a person of skill in the art have thought to have looked at Hagedorn and combined that with Berger to add additional layers to that nucleation host?

A    Yes.  It's the exact same argument.

Q    And can you remind the jury of what that argument is?

A    The argument is that Hagedorn provides a prescription for the lowering the coercivity of the structure by replacing a single soft layer with multiple layers.

Q    And is that something that is -- would be a goal?  Like, would people have looked at Berger and thought, "Hey, I think the coercivity here is good enough.  We don't need to improve any further"?

A    People always -- the rule in this field is you're always trying to get better.  You want to beat your competition, et cetera.  They would, of course, try to move forward.

Q    And is adding layers, is that something that folks would have considered when they're working on that coercivity problem?

A    Yes.

Q    Okay.  And so, again -- so Hagedorn provides that specific example that people would have looked at to confirm,

yes, adding more layers would have lowered coercivity field and improved anisotropy -- or with an anisotropy gradient?

A     Yes.

Q     And that's true for both, of course -- that's true for both the Victora references as well as the Berger one that we're talking about here?

A     It's the same argument.

Q     Okay.  Are both -- is Berger also directed, as Victora and Hagedorn are, to exchange coupled magnetic media films?

A     They are.

Q     So then what's your conclusion as to whether or not Berger, in combination with Hagedorn, renders obvious this last limitation?

A     I believe it to be obvious.

Q     And so then for Claim 1 as a whole -- sorry.  And so that also would check the box for multilayer structure and the nucleation host as a whole?

A     Yes.

Q     So then what is your opinion as to whether or not the combination of Berger and Hagedorn renders obvious Claim 1 of the '864 patent?

A     It renders it obvious.

Q     So now let's go next to Claim 10 of Berger.  That's the thickness of the nucleation host.  Is that obvious in light of the combination of Berger and Hagedorn?

A    Yes.  Because he specifies how thick he wants his layer to be, certainly less than 10 nanometers, and more preferably between about 2 and 6 nanometers.  And that's in column 5, lines 44 to 47, of Berger.

Q    And even if you add in more layers, would you still be under 30 nanometers?

A    Yes.

Q    So then, with Claim 10, that additional limitation, that's obvious in light of the combination of Berger and Hagedorn?

A    I believe so.

Q    And so then, as a whole, what is your opinion as to whether or not Claim 10 is obvious in light of the combination of Berger and Hagedorn?

A    It is obvious.

Q    So let's turn to Claim 11, which is the grain size between 2 and 10.  Again, is that obvious in the light of the combination of Berger and Hagedorn?

A    I believe it is obvious because basically this is about average grain diameter.  It has to be between 2 and 10 nanometers.  And it was well-known in the art at that time if you're below 2 nanometers, you were going to be superparamagnetic no matter what trick you used, and it was just not a good idea.

          And if you were above 10, why are you wasting your

time going to perpendicular media because longitudinal media already could provide you some decent performance.  So if you're talking about perpendicular media, you're probably talking about 2 to 10 nanometer grains.

Q    Are you aware of any perpendicular media with a grain size greater than 10 nanometers?

Or let me ask you a different question.  Is it your understanding that if you're using perpendicular magnetic recording media, you would have a grain size less than 10 nanometers?

A    Anything that's useful is going to be that way.

Q    Okay.  And Berger itself is directed towards perpendicular magnetic recording media?

A    He is.

Q    And just to be clear, because I think you mentioned it, at 2 nanometers you're still dealing with issues related to the superparamagnetic limit.  Dr. Suess's patent doesn't solve issues with being below 2 nanometers, does it?

A    I don't think so.  Even much more modern technologies don't.

Q    Okay.  All right.  And so then, what's the summary -- what's your opinion with respect to whether or not the combination of Berger and Hagedorn renders obvious --

I'm going to withdraw that question because I forgot to read the cite.

So just when you were talking about what Berger disclosed with respect to grain size, were you referring to DX-1245, page 1?

A      I was.

Q      Or page 11.  I misread that.  Okay.  Page 11?

A      I was.

Q      Okay.  So -- and that's specifically at 5, 12 through 20?

A      True.

Q      So, now, what's your opinion as to whether or not the combination of Berger and Hagedorn discloses or renders obvious Claim 11 of the '864 patent?

A      They render it obvious.

Q      Now, let's turn to Claim '997 -- Claim 1, '997 patent. We already discussed additional limitations this adds.  So let's just get right to it.

What does Berger disclose or render obvious with regards to a magnetic recording system, a writing head, and a disk?

A      Well, he shows the writing head.  He shows a disk that he actually measured on.  So he clearly has included a recording system.

Q      So then what's your opinion as to whether or not the magnetic recording system comprising a writing head and a disk, including the elements of Claim 1 -- or the remaining elements of the Claim 1 in '997 patent, whether or not that is obvious

in light of Berger and Hagedorn?

A    It is obvious.

Did you need to include the DX number?

Q    Yes,

I did.  You are absolutely right.  Thank you for keeping me

honest.

So what is that evidence -- what pages did you cite

to for that?  4 and 11?

A    That is correct.

Q    Thank you.

So then what is your conclusion as to whether or not

Claim 1 of the '997 patent is obvious in light of Berger and

Hagedorn?

A    It is obvious.

Q    And so I think we have one more claim for Berger.  That's

Claim 7 of the '997 patent.

So the additional limitation that it adds to the

stuff we've already discussed is the layers and nucleation host

being coupled with the thin exchange coupling layer.  Is that

obvious in light of the disclosures in the combination of

Berger and Hagedorn?

A    Yes.  The argument is very similar to what I provided in

the case of Victora, plus Hagedorn.  Essentially, Hagedorn says

that he wants to control the exchange coupling between layers,

and -- that's what Hagedorn said.  And Berger shows how to do

it.

Q    And so the Berger reference you're talking about is DX-1245, page 11?

A    Yes.

Q    Okay.  And then the Hagedorn cite is on page 2.  And I see you also site to page 9?

A    True.

Q    So then I'm just going to cut to the chase.  This last limitation and Claim 7 of the '997 as a whole, is that obvious in the light of the combination of Berger and Hagedorn?

A    It is obvious.

Q    So it looks like all the boxes are checked in the Berger and Hagedorn column.  But just for the record, is it your opinion that the combination of Berger and Hagedorn renders obvious each of the asserted claims in the '997 and '864 patents?

A    It renders it obvious.

Q    So now let's go to Li.  And we'll talk about Li.  Again, let's get through this as quickly as we can.

            THE COURT:  Before we do that, I think we'll take the midmorning break.

            MR. LEE:  Thank you, Your Honor.

            THE COURT:  We'll be in recess for 15 minutes.

            Ladies and gentlemen, I have a longstanding obligation to give a speech at noon for the

Federal Bar Association.  So the lunch break is going to be a little bit longer today, from 11:30 to 1:30.

So we'll be in recess for 15 minutes.

THE COURTROOM DEPUTY:  All rise.

**(Recess from 10:28 a.m. to 10:47 a.m.)**

**(In the presence of the jury.)**

THE COURT:  Mr. Lee.

BY MR. LEE:

Q    Professor Victora, I think where we left off is we were just about to talk about the Li patent.

So if we could please bring up Slide 157.  Thank you, Mr. Schmoller.

So for this one, what's the first limitation we're going to talk about?

A    That it has to include a magnetic recording medium.

Q    And what are you showing us with respect to that limitation here?

A    Well, what I'm showing you is Figure 1, which explicitly shows the magnetic recording medium.  And it's also mentioned in the text in DX-1001, page 1.

Q    And so what's your conclusion as to this limitation?

A    It's been met.

Q    So let's go to the next one.  What's the next limitation?

A    Essentially, a nonmagnetic substrate.

Q    And what are your findings with respect to this

limitation for Li?

A    Most obviously, he has it right in his abstract, a nonmagnetic substrate.  And that is DX-1001, page 1.

Q    And are you also illustrating it, highlighting in the Figure 1 on the right?

A    I am.

Q    Okay.  That's at page 3?

A    Yes.

Q    So then what's your conclusion as to this limitation for Li?

A    It's been met.

Q    Let's go to the next limitation.  What's the next limitation discussed?

A    An underlayer formed on the nonmagnetic substrate.

Q    What does Li have to say about this limitation?

A    He mentions magnetically soft underlayer, which he abbreviates "SUL" in, for example, column 1, lines 37 to 50. And shows it in Figure 1 in purple.

Q    So what's your conclusion as to this limitation for Li?

A    It has been met.

Q    So, again, I think we're going to be talking about the multilayer structure as we go through the remaining limitations.  Why don't we start with the first one.

         What's the first one to discuss?

A    A hard magnetic storage layer, having a first coercive

force greater than a half tesla, formed on the underlayer.

Q    Does Li disclose this?

A    He discloses a hard layer of 3 to 50 kilooersteds.

Q    And is that higher than 0.5 tesla?

A    Substantially.  It is -- you know, 5 tesla is much greater than a half tesla.

Q    All right.  Now, are you aware of certain criticisms that MRT has regarding the hard storage layer limitations requirement to be formed on the underlayer?

A    I am.

Q    Okay.  And do you agree with those criticisms?

A    No.

Q    Now, the Li patent itself discloses the idea of a distance between a write head and the storage layer.

Do you recall that?

MR. FENSTER:  Objection, Your Honor.  This is a Rule 26 objection.  He never discussed head media spacing at all in his expert report.

MR. LEE:  Your Honor, this is the same as their prior objections.  Mr. Fenster questioned Professor Victora extensively about it at his deposition.  I'm happy to show you where in his deposition it's located.

MR. FENSTER:  He can't expand on the expert report. And he's testifying beyond the expert report.

THE COURT:  Sustained.

MR. FENSTER:  Thank you.

BY MR. LEE:

Q    So let me ask you a different question then.

In terms of the -- in terms of the need to -- to read the data on the layer, do the different layers work together to allow for that reading to take place?

A    The reading picks up the magnetization from all the layers.

Q    In terms of the writing, does the writing occur through all the layers?

A    Yes.

Q    And so in terms of where the layers are relative to the write head, is that -- what sort of distances are we talking about here?

A    A couple nanometers.

Q    And I think other folks have specified how big a nanometer is.  But do you have sort of an easy way to understand how big a nanometer is?

A    It's -- you know, a nanometer is, like, four atoms.

Q    Okay.  So we're talking pretty small distances, regardless of which way you flip the Li layers then?

MR. FENSTER:  Objection.  Leading.

BY MR. LEE:

Q    So regardless of which way you flip the Li layers, is it still relatively small distance?

A    This is true.

Q    Now, in terms of your understanding of a person of skill in the art, would you have understood that a person of skill in the art -- well, I'll just ask you.

Where do you think a person of skill in the art would have put the hardest layer in Li when they were actually building these products?

A    As disclosed earlier, it is so much easier to grow up with the hard layer on the bottom.

Q    And so then -- I think the jury may have seen this before, but is this an example of where it's discussed in the literature of putting the hard layer on the bottom?

A    Yes.  Here, we have the Wang reference.  This is Figure 1.  And the hard layer, in blue, is on the bottom.

Q    And that's DX-1797, page 1?

A    True.

Q    And are there examples where people have actually built hard drives with the hardest layer on the bottom?

A    Yes, there are.  For example, CGC media.  Here, we show the picture from Sonobe.  This is, again, Figure 1.  He has the hard layer on the bottom.

Q    That's 1187 -- DX-1187, page 1?

A    True.

Q    This is all prior to 2006?

A    True.

**UNITED STATES DISTRICT COURT**

Q    Okay.  And just speaking generally -- again, we're talking about the knowledge of a person of skill in the art -- if somebody were to actually take the Li patent and try to build it, would they have built it with the hardest layer on the top?

A    It seems unlikely to me.  I think they would have done the easiest thing and put the hard layer on the bottom.

Q    And so then what is your conclusion as to whether or not it would be obvious to a person of skill in the art to have a hard magnetic storage layer with a -- formed on the underlayer, as opposed to above the other layers?

A    I believe it is obvious they would put the hard magnetic storage layer next to the underlayer.

Q    So then let's turn to the nucleation host limitations.  What's the first limitation we're going to talk about here?

A    The nucleation host, having a second coercive field without the hard magnetic storage layer, lower than the first coercive field.

Q    And where is that disclosed in Li?

A    There are numerous examples.  There's a four-layer structure on the left, which is Li column 5, line 66, to column 6, line 9.  In addition -- I'm sorry, that was the three-layer structure.  The four-layer structure is Li, in column 6, lines 10 to 23.  In both cases, that's true.

Q    And then I see you also show the figure.  I think the

jury has seen that figure before?

A      Yes.

Q      Figure 3?

A      Yes.  Figure 3 illustrates the switching, which really tells you how the anisotropy field varies.

Q      And then I see you have additional cites on pages 7, 8, 10, and 11?

A      True.

Q      So what's your opinion as to whether or not Li discloses or renders obvious this first limitation?

A      It renders it obvious.

Q      Let's go to the next limitation.  What does this show?

A      This is the nucleation host should be formed on the hard magnetic storage layer such that the hard magnetic storage layer is between the nucleation host and the nonmagnetic substrate.

Q      And I think we talked before about where the hard layer is, and that the hard layer is on the bottom.  And so, again, as we talked about before, then where would the nucleation host layers be?

A      The nucleation host layers would be on top of the hard layer.

Q      And so I think the jury has seen this before.  What are you trying to show here by this animation?

A      Basically flipping it upside down, you get what would

actually be made.

Q    And would the -- actually, I'll talk about that in a second.  So to a person skilled in the art, knowing their knowledge, including things like, you know, other people have put the hard storage layer on the bottom, it would be easier to put it on the bottom.  What conclusion can you draw, looking at Li -- again, looking from the perspective of a person of ordinary skill in the art -- that you would just flip the layers?

A    Flipping layers would gain you two advantages.  It's easier to grow, and also you preserve the anisotropy gradient that you want.

Q    Would that be true even if there were other aspects of flipping the layer that you would have to adjust?  Would that be a hard adjustment to make?

A    It would be easier than doing the reverse.

Q    So then what's your conclusion as to whether or not Li discloses the requirement from the claims to have the hard magnetic storage layer -- or sorry -- the nucleation host formed on the hard magnetic storage layer?

A    This limitation is met.  It is that obvious.

Q    So what's the next limitation we're going to talk about?

A    The nucleation host has to be exchanged coupled to the hard magnetic storage layer.

Q    And where does Li disclose that?

**UNITED STATES DISTRICT COURT**

A    Well, he explicitly discloses his exchange coupling, which is actually between all layers in his case, including between the hard and the soft.  And he gives prescriptive ways of doing it, of which I mention three here, Number 3 at column 7, lines 1 through 12.  And basically he positions the magnetic layer of selected thickness between adjacent magnetically hard sublayers.

Q    And I think there's also additional cites on page 7 and 8 of the Li exhibit?

A    Says essentially the same thing, column 5.

Q    Okay.

A    Yeah.

Q    All right.  So then what's your conclusion as to this limitation for Li?

A    It is met.

Q    And then finally, the Li requirement for the layers increasing anisotropy K from layer to layer for nucleation host, is that disclosed or obvious in light of Li?

A    It is disclosed and obvious.  I think probably the best example here is, for example, in column 6, lines 10 through 23.

Q    And looking at the -- sorry.  And so that's -- I think you cite a number of things.  Just for the record, that's pages 1, 3, 8, 9, and 11, and 4, I guess, of Li?

A    True.

Q    And, again, let's turn back to the graphic that you

showed us earlier.  If you flip the layers like you show here, would the layers be increasing in anisotropy from layer to layer towards the hard magnetic storage layer?

A      They would be.

Q      And the anisotropy -- and to be clear, you're referring to the claim requirement for the anisotropy constant K to be increasing?

A      Yes.  I mean, within the text, he mentions both anisotropy constant and he mentions anisotropy field.

Q      But it's your understanding that Li explicitly does disclose that the anisotropy constant K would be increasing from layer to layer?

A      Yes.

MR. FENSTER:  Objection, Your Honor.  This is undisclosed and contrary to the teaching of the Li reference and contrary to what he showed.

MR. LEE:  Your Honor, he does have an opinion that says Li satisfies this limitation.  If he disagrees that -- with Professor Victora's opinion, he can certainly cross him on it, but the opinion is disclosed.

THE COURT:  Overruled.

BY MR. LEE:

Q      So then what's your conclusion as to whether or not Li, combined with the knowledge of a person of skill -- ordinary skill in the art, discloses the entirety of Claim 1 of the '864

UNITED STATES DISTRICT COURT

patent?

A    He discloses it.

Q    Okay.  So let's go through the remaining claims.

So what's the next claim that we're going to be talking about?

A    Listed in Claim 10, which is a thickness smaller than 30 nanometers.

Q    Is that disclosed or obvious in light of Li?

A    Yes.  So he clearly has a nucleation host and -- because he has multiple layers.  And he says that, for example, in column 6, lines 10 through 23, that "the thickness of each of the four sub-layers is about five nanometers," which means a 15-nanometer nucleation host.

Q    I see on the left you have a three-layer combination.  I guess two of those layers would be the nucleation host.  What would be the thickness there?

A    It would be, in that case, 12 to 16 nanometers, and that is column 5, line 66, to column 6, line 9.

Q    So then let's then confirm with respect to Claim 10 of the '864 patent, is that obvious in light of Li, combined with the knowledge of a person of skill in the art?

A    It is.

Q    So now let's look at Claim 11.  What does Claim 11 add?

A    Here he talks about the grain diameters.

Q    And does Li -- would it have been obvious to a person of

ordinary skill in the art looking at Li, combined with their knowledge, of course, to know that the nucleation host would be between 2 to 10 nanometers?

A    This is the same argument as for Berger in that the 2-nanometer grains are -- less than 2-nanometer grains are too small, they will be superparamagnetic.  And greater than 10 nanometers, why did you bother doing it in the first place?  It should stop with longitudinal magnetic recording.

Q    Okay.  So I guess the goal was to get -- I think you highlighted here -- grain sizes which approach the so-called superparamagnetic limit of magnetic particles?

A    True.

Q    And so that's at DX-1001, page 8, column 3:35 to 52?

A    True.

Q    So then what's your opinion as to whether or not this additional limitation Claim 11, as well as Claim 11 as a whole, is obvious in light of Li and the knowledge of a person of skill in the art?

A    It is obvious.

Q    So now let's turn to the '997 claims.  And we'll talk about the additional claims that adds -- or sorry -- additional limitations that that adds first.  What does it add again?  Can you remind the jury?

A    In this case, they want to add a recording system to the rest of the -- to the media.  That means they need a writing

head and a disk.

Q    So then what would have been obvious to a person of ordinary skill in the art looking at Li in terms of including a magnetic recording system with a writing head and a disk?

A    Right.  So, for example, in Figure 1 he shows a writing head explicitly.  And in the abstract he refers to a perpendicular magnetic recording medium adapted for high density and high data rate recording.

Q    Okay.  And that's on pages 1 and 3 of Li?

A    True.

Q    And so what's your conclusion as to these additional limitations in Claim 1 of the '997 patent as well as whether or not Claim 1 of the '997 patent itself is obvious in light of Li and the knowledge of a person of ordinary skill in the art?

A    It is obvious.

Q    So then let's talk about the last claim, Claim 7.  What is it that Claim 7 is adding here?

A    Well, Claim 7 is telling you that you need to have a thin exchange coupling layer between at least two of the ferromagnetic layers of the host.

Q    So does Li disclose ferromagnetic layers that are coupled with a thin exchange coupling layer between the layers and the nucleation host?

A    Yes.  He explicitly tells you how to do it in, for example -- again, this is column 5, lines 26 to 35.  And you

can see, like, in Number 3:

"A magnetic layer of selected thickness positioned between adjacent magnetically hard sub-layers."

Q    And would this still be true if you flipped the layers as you showed us before?

A    It would still be true.

Q    And so then with respect to the additional Claim 7 limitation, as well as Claim 7 of the '997 patent as a whole, is that obvious in light of the disclosures of Li, combined with the knowledge of a person of ordinary skill in the art?

A    It is.

Q    So now that we've gone through all the claims -- sorry. I just checked it.  Now that we've gone through all of the claims for each of the three combinations that you've been discussing, is there anything else that we need to discuss?

A    Well, we need to discuss the secondary considerations, which is a different topic than we've discussed before. Secondary considerations are considerations that are factors that a jury could use to help decide whether or not it's obvious or not obvious.

Q    Now, is it -- now, you understand it's Western Digital's burden to prove invalidity as a whole?

A    It is Western Digital's burden to prove invalidity as a whole, but it's MRT's burden to show secondary considerations.

**UNITED STATES DISTRICT COURT**

Q    In addition to showing that the secondary considerations exist, is there an additional requirement in order for those secondary considerations to be actually considered with respect to the obviousness analysis?

A    Yes.  The formal wording is to require a nexus between the factor and the inventive aspect of the claimed invention. "Nexus" in this means connection.

Q    And what are the secondary considerations that you're going to be talking about?

A    Well, you can see them.  They are commercial success copying, longstanding need, failure by others, unexpected results, teaching away, praise by other, licensing.

Q    All right.  So let me then ask you -- actually, before we get into the individual ones, just to -- to aid everyone, how would you use one of these secondary considerations to decide whether or not something was or wasn't obvious, or at least to help you make that determination?

A    So one that's very easy to discuss is licensing.  If, for example, another company, such as Seagate, had taken a license on the patent, that would be taken as an indication that it's valid or it is not obvious.  If, on the other hand, they haven't, then that would be a contrary indication.

Q    And just to be clear, just because something is or isn't licensed doesn't mean that that's determinative in terms of obviousness?

A      None of these considerations are determinative.

Q      So even if some of these are found, that doesn't mean that the fact finder or a jury needs to then conclude that the claims must be obvious or must not be obvious then?

A      True.

Q      Okay.  So then let's talk about the first couple that you show here.  What's the first one that you're going to be discussing?

A      Well, the first one I'll discuss is the commercial success of the product based on the merits of the claimed invention. And there are two parts to this issue.  First of all, did, in fact, the -- Western Digital infringe the patent, which is an issue you've been hearing a lot about.  And then the other question is even if they did, was that responsible for their commercial success?  For example, commercial success can be provided by things like better marketing, better distribution, better costs.  So they have to show both of those.

Q      And to be clear, you're not giving an opinion one way or another on whether or not the commercial -- any commercial success is attributable to the merits of the invention itself, are you?

A      Not in that statement, I was not, no.

Q      You're just responding to what you understand MRT's arguments to be?

A      That is my -- yes, that's my -- that is correct.

Q    What about copying?  Have you seen anything where MRT has shown that actual copying has taken place as opposed to -- because as the jury has heard, they think that Western Digital infringes.  But I want to make clear that we're not talking about whether or not it works the same.  We're talking about whether or not they copied.  Is there any evidence that you've seen or anything that you understand that they have pointed to of actual copying?

A    No.  I understand copying to be sort of similar to a student copying someone else's exam or homework.  No, there has been -- to my knowledge, there's nothing alleged about copying.

Q    So then what can we conclude with respect to these first two secondary considerations?  Do they support or not support nonobviousness?

A    They do not support nonobviousness.

Q    All right.  So now let's move to the next set.  What considerations are you addressing here on the next slide?

A    The next thing I'm going to talk about is the lull where there's a long-felt unresolved need successfully addressed by the claimed invention.

Q    And what do you understand the claimed invention to be addressed to trying to solve?

A    It's been stated numerous times, that it's addressing the superparamagnetic limit.

Q    Now, is it your understanding that Dr. Suess, or the MRT

patent, fully solved the superparamagnetic limit, so that no one had to worry about it anymore?

A    No.  Nothing can solve the superparamagnetic limit completely.  Except going to zero temperature, which would be -- like, minus 400 degrees Fahrenheit, which would be ridiculous.

Q    Now, are you saying that Dr. Suess's invention as described in his patent, that it didn't help to improve the superparamagnetic limit, at least theoretically?

A    Yes, he certainly did partially address the problem.  And he provided an interesting solution, but -- meaning in the partial sense, not in the complete sense.

Q    But have others, both before and after Dr. Suess, also made contributions and also have improved the superparamagnetic limit in a similar way?

A    Yes.  Other people, including myself.  And so, for example, in the three papers that you've been hearing about today, as well as on the next slide -- or do you want --

Q    Oh.  No.  Sorry.  Keep going.

A    -- which is the Shaoping Li patent that we just described, as well as the Berger patent that we described previously, all of them are also addressing the superparamagnetic limit.

Q    Now, are you and Dr. Li and Dr. Berger, in their patents, are those the only attempts -- or successful attempts at, at least, improving on the superparamagnetic limit?

**UNITED STATES DISTRICT COURT**

A    I am sure there have been many, many attempts, but these are the three I mentioned.

Q    Okay.  And in terms of -- again, let's look at what was done before the patent.  In terms of efforts to improve the superparamagnetic limit, were things at a standstill until Dr. Suess came along?

A    No, they were not.  As you can see, there were three papers or three approaches that were already known before Dr. Suess's paper -- before Dr. Suess's patent.

Q    And so what is your conclusion as to whether or not there was a longstanding need or a failure by others in terms of whether those factors support a finding that the claims are not obvious?

A    They do not support them.

Q    So let's move to the next set of factors.  Unexpected results.  Let's start with that.

      Were you here in court when Dr. Re testified that he attended Dr. Suess's presentation?

A    I was.

Q    And did you hear him say that he thought Dr. Suess, or I guess his presentation at least, was crazy?

A    I heard him say that, yes.

Q    Were you also at that presentation?

A    I was -- I was at that conference, and I did attend that presentation.

UNITED STATES DISTRICT COURT

Q    Was that your reaction to that presentation?

A    I thought it was a very interesting talk.  I took notes.  But, no, it wasn't all that surprising.

Q    And why did you not think that it was surprising?

A    I mean, we had -- we had been working on this -- we had been working on three-layer media in our lab, for example.

MR. FENSTER:  Objection, Your Honor.  That's beyond the scope.  And there's no prior art asserted based on anything that he had in his lab.  That should be stricken from the record.

MR. LEE:  Your Honor, I mean, I think -- he's not offering it for -- as prior art.  He's just talking about why it's not a surprise to him.

MR. FENSTER:  It's very prejudicial, Your Honor.  It should be stricken.  It is not prior art.

THE COURT:  It will be stricken.

MR. FENSTER:  Thank you, Your Honor.

BY MR. LEE:

Q    Okay.  Let me ask it a different way.  And I think you should be mindful of the judge's instructions there.

Did you understand what Dr. Suess was presenting in his presentation?

A    I did.

Q    In terms of the proposal that he offered in terms of the multiple layers, did the results -- or at least to predict the

results that he discussed, was that different than what you would have expected if you were using multiple layers?

A    It is not different.

Q    And so there wasn't, like -- you, for example, didn't think, prior to his presentation, multiple layers wouldn't work?

MR. FENSTER:  Objection.  Leading.

MR. LEE:  I'll reask the question, Your Honor.

BY MR. LEE:

Q    Did you think, prior to his presentation, that the use of multiple layers would be useful to work on this problem?

A    Of course --

MR. FENSTER:  Objection, Your Honor.  There's no evidence of this.  This is not prior art that's --

THE COURT:  Get on the mic, please.

MR. FENSTER:  Sorry, Your Honor.

There's -- this is not prior art that's being asserted in this case.  He's talking beyond the scope of the prior art, Your Honor.

MR. LEE:  Your Honor --

MR. FENSTER:  And beyond the scope of his report.

MR. LEE:  Your Honor, he's just talking as an expert.  I'm not asking about his work specifically, just on what his expectations were.  That's a factor in secondary considerations he discussed in his report.  That's all he's

talking about.

MR. FENSTER:  Move to strike, Your Honor.

THE COURT:  It will be stricken.

BY MR. LEE:

Q    All right.  Then do you understand what the general reception to others -- people of skill in the art was to his presentation?  Was it that -- that it was more akin to Dr. Re's reaction or your reaction?

A    People I talked to had a similar reaction.

MR. FENSTER:  Objection, Your Honor.  Hearsay.  Not in his report.  Move to strike.

MR. LEE:  Your Honor, it's not offered for the matter of the truth asserted.  It's --

THE COURT:  Sustained.

BY MR. LEE:

Q    Let me ask you whether or not you agree with Dr. Re's testimony about Dr. Suess's ideas being crazy.

A    I do not agree.

Q    And in terms of the invention itself, and your understanding of the work done in the field prior to that, was there anything where Dr. Suess presented something that was qualitatively superior to work that other people had done?

A    Not qualitatively.

Q    All right.  Now, have you seen any evidence -- by the way, the presentation that Dr. Suess gave, that's not exactly

UNITED STATES DISTRICT COURT

the same as what's required by the patent claims?

A        No.   They do not match.

Q       So even if Dr. Suess had -- or sorry -- Dr. Re had thought Dr. Suess's presentation was crazy, is that necessarily a reflection of how somebody would have considered the actual claims in the patent?

            MR. FENSTER:   Objection.   Leading.

            THE COURT:   Sustained.

BY MR. LEE:

Q       So in terms of Dr. Re's comments about "crazy," do you understand that to apply to the patent itself?

A       That's how I thought I heard it, yes.

Q       Okay.   So are you saying that the reaction to the patent -- so I'm talking about -- sorry.   Let me take a step back.

            So in terms of what Dr. Re was responding to or saying that he was responding to, it was Dr. Suess's presentation?

            MR. FENSTER:   Objection, Your Honor.   Beyond the --

BY MR. LEE:

Q       Was it -- was it Dr. Suess's presentation?

            MR. FENSTER:   Your Honor, this is beyond the scope of his report.

            MR. LEE:   He's commenting on testimony from Dr. Re. And this is rebuttal testimony.   Dr. Re and MRT have the burden

on this issue.

THE COURT:  Overruled.

THE WITNESS:  Could you repeat the question?

BY MR. LEE:

Q    Yes, I will repeat the question.

In terms of Dr. Re's testimony about he thought
Dr. Suess's presentation was crazy, he wasn't saying that he
read the patent and he thought that that was crazy?

MR. FENSTER:  Objection.  Leading.

THE WITNESS:  Okay.  I think I understand the --

THE COURT:  Just a minute.  Let's get the question
out.

MR. LEE:  Sorry?

THE COURT:  Get your question out, please.

BY MR. LEE:

Q    Let me reask the question.

Did Dr. Re ever testify he read the patent and he
thought the ideas in the patent were crazy?

A    That -- no, he did not say that.

Q    Is the patent the same thing as Dr. Suess's presentation?

A    It is not.

Q    Regarding teaching away, have you seen any credible
suggestions with respect to teaching away from the claimed
invention by others?

A    I have not seen credible teaching away by others.

Q    So then what's your conclusion as to whether or not the factors of unexpected results and the teaching away that we just talked about is -- renders the claims obvious or not obvious?

A    It renders them obvious.

Q    And then what about the next factor, praise by others? Have you seen any praise by others of Dr. Suess's patents?

A    I have not.

Q    Okay. And are citations to -- regardless of whether it's patents or publications, are citations the same thing as praise?

A    No. In fact, some of the most notorious papers in science have had many, many citations. You can't make the connection.

Q    So then what's your conclusion as to whether or not there is praise by others that shows that the claims are not -- or tends to support a finding that the claims are not obvious?

A    It tends to find -- it tends to show that the claims are obvious.

Q    And then, finally, what about licensing? Is there any evidence of licensing that would support a finding of nonobviousness?

A    Yes. Mr. Bergman's report -- he was actually asked to -- has MRT entered any license agreements for the patents-in-suit? And the answer was basically no.

Q    Then what's your opinion as to whether or not there's any

evidence of licensing that would support a nonobviousness finding?

A       Again, it is obvious.  The licensing result implies obviousness.

Q       And so then having considered these secondary factors, has your opinion changed that each of the asserted claims are invalid in light of each of the combination of Victora and Hagedorn, Berger and Hagedorn, or Li and the knowledge of a person of ordinary skill in the art?

A       They have not changed.

Q       Let me end with this:  Other experts have been asked at the beginning of their testimony how much they've been paid for this case and how much they worked.  I didn't do that, so let me do that now.

How much have you been paid for the time spent working on this case, on an hourly basis?

A       $600 an hour.

Q       And approximately how much time would you estimate that you've spent on this case?

A       Hundreds of hours.

Q       Now, is the money -- let me ask you one more question. Is your compensation at all dependent upon the substance of the opinions you give?

A       No.  It is not dependent on the substance of the opinions I give.

Q    Now, is the money that you're being paid for your time in this case, was that the reason you decided to become an expert for this case?

A    No.  No.

Q    Why did you decide to take on that role -- actually, before I ask that, have you been an expert for a lot of other cases?

A    Very few.

Q    Okay.  And why is that?

A    Well, I usually get one or two requests a year.  Usually when I look at it, I say -- you know, I say, "Send me the patents."  If they won't send me the patents right away, I just ignore them.  When I see the patents, then I see whether it has anything to do with my field.  And then I see whether or not I actually believe their side is right.  And in most cases, that's pretty much the end of the discussion.

        And by the way, I misspoke.  I mean, it is wrong to say that I don't appreciate the money.  I do appreciate the money.

Q    I think we all appreciate the money.

A    But there is a very, you know -- almost always, I turn people down.

Q    The money is not the motivation for your expert work?

A    Right.

Q    And so why did you, then, decide to take on the role of

expert in this case?

A    Well, in this case when I was sent the patents, it seemed that -- I found them a little underwhelming, I guess is the word.

Q    And even before you were paid a single dime in this case, did you believe, after your review of those patents, that those patents were invalid?

A    I -- yes, I obviously knew about Hagedorn.  I knew about Victora.  And I thought probably not valid.

MR. LEE:  No further -- pass the witness, Your Honor.

THE COURT:  Mr. Fenster?

MR. FENSTER:  Can we approach with binders, Your Honor?

**(Pause in proceedings.)**

May I proceed, Your Honor?

THE COURT:  You may.

**CROSS-EXAMINATION**

BY MR. FENSTER:

Q    Good morning, Dr. Victora.

A    Good morning.

Q    Western Digital has contributed at least a million dollars to your center since 2010; correct?

A    That's correct.

Q    You visit Western Digital at least once a year?

**UNITED STATES DISTRICT COURT**

A    That's correct.

Q    Your friend Dr. Bertero is the one who called you to ask for your help in this case; correct?

A    That is correct.

Q    And your $600 an hour is much more per hour, that you're making testifying for Western Digital, than you do as a professor; fair?

A    On an hourly basis, that is true.

Q    Your role in this case is as an expert witness to prove that Dr. Suess's patents are invalid for obviousness; correct?

A    My role in this case is to evaluate the patents for obviousness.

Q    Now, before this case, you thought his patents were pretty impressive, though; right?

A    Before -- I hadn't even seen his patents until then.

Q    Okay.  You're a fellow with the IEEE; correct?

A    True.

Q    And in order to become a fellow, you have to be nominated by another member; correct?

A    True.

Q    You were nominated by Dr. Bertero; right?

A    No.  I was nominated by Bill Doyle.

Q    I'll withdraw.

     You wrote a letter nominating Dr. Suess to become a fellow of the IEEE; correct?

A       This is true.

Q       That's not something you told the jury; right?

A       I don't think it's come up yet, no.

Q       Okay.  Can we pull up the email, please.  And this is --

MR. LEE:  Your Honor, this is not a trial exhibit.  It wasn't disclosed as a trial exhibit.  They haven't even tried to clear it.

MR. FENSTER:  It's impeachment, Your Honor.

MR. LEE:  I'm not sure --

MR. FENSTER:  Not moving to admit it.  It's impeachment.

MR. LEE:  What is the question that's being impeached?

MR. FENSTER:  It's showing that he's made inconsistent statements.

MR. LEE:  I don't think he's shown that there's any inconsistent statements yet, Your Honor.

THE COURT:  Objection sustained.

MR. FENSTER:  Your Honor, he makes specific statements about the patent in the nomination that are contrary to what he's testified to here.

MR. LEE:  Your Honor, he can ask the questions.  If there is inconsistency, he can try to impeach.  He has not asked any questions yet.

MR. FENSTER:  I did ask the question:  You thought

the patents were impressive before.

And I will show you the impeachment, Your Honor.

MR. LEE:  Your Honor, the witness's testimony was he hadn't seen the patents earlier.  That was his testimony.  There's nothing inconsistent.

MR. FENSTER:  He references them in this document I'm going to show Your Honor.

THE COURT:  Overruled.

MR. FENSTER:  Thank you.

Can we pull up the email.

BY MR. FENSTER:

Q    This is an email that you sent on January 31, 2017, to Dr. Suess; correct?

A    True.

Q    It's entitled "IEEE Fellow"; correct?

A    Well -- oh, yeah.  Yes, it is.

Q    And you say, "Attached are my proposed sections for your nomination"; correct?

A    True.

Q    And you say:

"Your citation should read, 'For contributions to the understanding of coercivity and thermal stability of magnetic structures and their optimization for storage devices'"; correct?

A    True.

Q    The next page is the attachment.  And this is what you wrote in support of Dr. -- of your nomination of Dr. Suess in his -- for admission to be an IEEE fellow; correct?

A    It's a draft of it.

Q    You said:

"In 2005 Dr. Suess proposed exchange spring media, which is a concept similar to ECC media. Both media break the recording trilemma by allowing very small grains to be both thermally stable and easily written by conventional heads.  This concept opened a completely new view to the mechanism of coercivity.  The general belief was that a high thermal stability goes along with a high coercivity.

"However, the new media demonstrated that the coercivity can be partially decoupled from thermostability by the use of multiple magnetic layers with graded anisotropy.  The concept of exchange spring media was patented by Dr. Suess in 2006."

I've read that correct so far; right?

A    You have.

Q    And then you go on:

"This new media storage" -- strike that.

You go on:

"This new storage media was quickly applied
by industry.  Media based on the new concept was
quickly adopted by industry.  Nowadays almost all
state-of-the-art hard disks rely on this idea.  The
work on exchange spring media of Dr. Suess is cited
over 800 times."

That's what you wrote in his nomination; correct?

A    This is true.

Q    Now, the next page, you have to cite the three citations
that most support your nomination; right?  In Section 6:

"List the three most important items of
tangible and verifiable evidence of technical
accomplishments"; right?  You identified, number
one, Dr. Suess's 2005 article; correct?

A    True.

Q    Number two, you identified Dr. Suess's 2006 paper
describing the Intermag trilayer idea; correct?

A    True.

Q    And number three, you cited Dr. Suess's multilayer
exchange spring media, the patent publication US201000062286 in
2010; correct?

A    I don't think that is an issued patent.

Q    That is the published -- that's the publication of
Dr. Suess's patent; correct?

A    I will take your word for it.

**UNITED STATES DISTRICT COURT**

Q    I will show it to you.

So this is the U.S. Patent Publication 2010 -- and you see it ends in 2286?

A    I'm sorry.  I missed what you're saying.

Q    Sure.  The U.S. patent publication number -- you understand that patents, before they are issued, are published to the world?

A    I do.

Q    And there's a publication number; right?

A    True.

Q    And the publication number -- let's just look at the last two -- 2286, in 2010; right?

A    Right.

MR. FENSTER:  Okay.  Now, Mr. Mortensen, if you could bring up the '864 patent.  Thank you.

BY MR. FENSTER:

Q    And you see the prior publication data?

A    True.

Q    And this is the 2286, 2010 patent publication that you were referencing in your nomination letter for Dr. Suess to the IEEE; correct?

A    I am referencing it.

Q    Okay.

THE COURT:  We need to stop here, Mr. Fenster.

Ladies and gentlemen, we'll resume at 1:30.  Please

remember the admonition.

THE COURTROOM DEPUTY:  All rise.

**(Proceedings concluded at 11:31 a.m.)**

**--oOo--**

**UNITED STATES DISTRICT COURT**

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  July 26, 2024*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

**$**

**$600** [2] - 106:17, 109:5

**'**

**'864** [15] - 41:23, 58:14, 58:19, 62:13, 62:16, 62:24, 64:4, 66:13, 68:3, 75:21, 78:11, 80:15, 90:25, 91:20, 114:15
**'964** [1] - 41:13
**'997** [22] - 41:17, 62:7, 62:9, 62:13, 62:14, 62:18, 63:20, 63:24, 65:20, 65:25, 66:14, 78:13, 78:25, 79:12, 79:16, 80:9, 80:15, 92:20, 93:12, 93:13, 94:9
**'For** [1] - 111:21

**/**

**/S** [1] - 116:19

**0**

**0.5** [6] - 46:5, 47:13, 48:4, 48:14, 70:16, 83:4
**0.7** [1] - 48:9

**1**

**1** [56] - 7:6, 14:13, 19:7, 19:8, 19:14, 34:24, 38:1, 41:15, 41:18, 41:23, 46:15, 47:10, 51:18, 58:14, 58:18, 59:11, 59:13, 60:17, 60:19, 62:9, 62:12, 62:13, 62:18, 62:24, 63:21, 63:24, 64:4, 65:13, 66:13, 69:16, 70:18, 75:15, 75:20, 78:3, 78:13, 78:24, 78:25, 79:12, 81:18, 81:20, 82:3, 82:5, 82:17, 82:18, 85:13, 85:15, 85:20, 85:22, 89:5, 89:23, 90:25, 93:5, 93:9, 93:12, 93:13
**1-053** [1] - 1:24
**1-tesla** [1] - 46:17
**1.5** [1] - 49:22
**10** [32] - 6:16, 8:20, 41:15, 46:16, 59:6,

59:14, 60:7, 60:11, 60:24, 61:11, 61:12, 70:17, 71:12, 73:8, 75:23, 76:2, 76:8, 76:13, 76:17, 76:20, 76:25, 77:4, 77:6, 77:9, 86:24, 87:7, 89:20, 91:6, 91:11, 91:19, 92:3, 92:6
**10,000** [1] - 46:20
**1009** [1] - 56:8
**1030** [2] - 50:3, 51:18
**1031** [2] - 51:16, 51:20
**108** [1] - 6:5
**10:28** [1] - 81:5
**10:47** [1] - 81:5
**11** [29] - 11:19, 11:20, 24:13, 41:16, 53:18, 60:16, 60:17, 60:20, 61:25, 62:4, 68:8, 68:22, 68:23, 69:14, 70:21, 73:8, 74:2, 76:16, 78:5, 78:11, 79:8, 80:3, 87:7, 89:23, 91:23, 92:16
**1187** [2] - 37:6, 85:22
**11:30** [1] - 81:2
**11:31** [1] - 115:3
**12** [9] - 14:13, 24:15, 30:17, 30:24, 43:13, 73:8, 78:7, 89:5, 91:17
**1200** [1] - 3:5
**1224** [1] - 3:5
**12424** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**1245** [2] - 23:5, 24:13
**12th** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**13** [1] - 14:13
**140** [5] - 3:19, 4:9, 4:21, 5:5, 5:8
**15** [5] - 6:4, 29:4, 60:2, 80:23, 81:3
**15-nanometer** [1] - 91:13
**157** [1] - 81:11
**16** [1] - 91:17
**1600** [3] - 4:6, 4:13, 5:12
**17** [2] - 26:22, 27:3
**1796** [1] - 47:24
**1797** [1] - 34:25
**1980s** [1] - 16:19
**1:30** [2] - 81:2, 114:25

**2**

**2** [34] - 18:18, 19:14, 19:18, 26:21, 27:8,

31:1, 42:5, 42:9, 42:23, 43:15, 44:4, 47:9, 50:17, 51:16, 53:18, 54:5, 60:24, 61:11, 61:12, 63:17, 65:14, 65:16, 67:3, 67:7, 69:16, 76:3, 76:17, 76:20, 76:22, 77:4, 77:16, 77:18, 80:5, 92:3
**2-nanometer** [2] - 92:5
**20** [2] - 60:2, 78:7
**200** [1] - 2:17
**2001** [3] - 6:23, 28:15, 54:23
**2002** [1] - 37:21
**20024** [1] - 2:18
**2005** [15] - 6:16, 16:11, 16:22, 17:18, 18:10, 18:21, 19:17, 22:25, 23:8, 26:3, 26:9, 27:16, 36:4, 112:6, 113:14
**2006** [6] - 26:22, 27:3, 56:14, 85:24, 112:20, 113:16
**2010** [5] - 108:23, 113:21, 114:2, 114:12, 114:19
**2017** [1] - 111:12
**202-664-0623** [1] - 2:18
**2024** [3] - 1:16, 7:1, 116:15
**20th** [1] - 3:23
**2125** [1] - 12:25
**2286** [3] - 114:3, 114:12, 114:19
**23** [3] - 86:24, 89:20, 91:11
**25** [2] - 1:16, 7:1
**26** [6] - 12:2, 29:19, 31:8, 83:17, 93:25, 116:15
**28** [1] - 116:8
**2800** [2] - 3:13, 4:17

**3**

**3** [41] - 14:13, 19:18, 24:5, 24:11, 24:12, 26:21, 27:8, 30:20, 30:25, 42:6, 50:3, 51:20, 51:23, 60:2, 60:4, 61:6, 63:17, 64:20, 65:11, 65:12, 67:3, 67:4, 68:6, 69:11, 69:12, 70:11, 70:13, 71:7, 71:23, 72:18, 73:7, 82:7,

83:3, 87:3, 87:4, 89:4, 89:23, 93:9, 94:1
**30** [6] - 59:5, 59:18, 59:21, 60:3, 76:6, 91:6
**302** [3] - 24:7, 70:13, 73:5
**304** [3] - 24:9, 71:22, 73:5
**306** [2] - 24:8, 73:6
**31** [1] - 111:12
**310-826-7474** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**312** [1] - 69:10
**312-876-7700** [2] - 3:14, 4:18
**3181-3186** [1] - 6:16
**33** [1] - 24:15
**330** [2] - 3:13, 4:17
**340** [1] - 71:7
**35** [2] - 6:13, 93:25
**36** [1] - 31:8
**37** [2] - 6:17, 82:17
**3:35** [1] - 92:13

**4**

**4** [7] - 24:11, 44:4, 60:2, 68:25, 70:22, 79:8, 89:23
**40** [1] - 6:23
**400** [1] - 98:5
**41** [1] - 6:16
**411** [1] - 1:24
**44** [1] - 76:4
**45** [1] - 16:1
**47** [2] - 6:20, 76:4
**49:20** [1] - 10:19
**4TH** [1] - 1:24

**5**

**5** [16] - 24:14, 44:4, 59:25, 70:11, 71:8, 71:23, 72:18, 74:3, 76:3, 78:7, 83:5, 86:21, 89:10, 91:18, 93:25
**50** [2] - 82:17, 83:3
**50:17** [1] - 10:19
**52** [1] - 92:13

**6**

**6** [12] - 30:20, 70:11, 71:11, 71:24, 72:19, 76:3, 86:22, 86:24, 89:20, 91:11, 91:18,

113:10
**60611** [2] - 3:14, 4:18
**650** [1] - 3:22
**650-328-4600** [5] - 3:20, 4:10, 4:22, 5:6, 5:9
**66** [2] - 86:21, 91:18
**660** [3] - 4:5, 4:13, 5:12

**7**

**7** [19] - 1:10, 41:19, 48:8, 48:9, 64:4, 64:9, 65:20, 65:25, 66:13, 79:16, 80:9, 87:6, 89:4, 89:8, 93:16, 93:17, 93:18, 94:8, 94:9
**7.6** [1] - 61:5
**7.8** [1] - 61:9
**714-540-1235** [1] - 3:24
**753** [1] - 116:8
**7953** [2] - 1:23, 116:20

**8**

**8** [6] - 8:20, 11:19, 87:6, 89:8, 89:23, 92:13
**800** [2] - 2:17, 113:6
**84** [1] - 8:20
**8:22-cv-01599-JVS-DFM** [1] - 1:7
**8:31** [2] - 1:17, 7:2
**8:56** [1] - 15:10

**9**

**9** [9] - 25:7, 30:19, 30:25, 54:6, 65:16, 80:6, 86:22, 89:23, 91:18
**90025** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**92626** [1] - 3:23
**92660** [3] - 4:6, 4:14, 5:13
**92701** [1] - 1:25
**94025** [4] - 3:19, 4:10, 4:21, 5:9
**94025-1008** [1] - 5:5
**949-725-4000** [1] - 4:14
**949-725-4153** [1] - 5:13
**949-725-4278** [1] - 4:7
**9:05** [1] - 15:10

**UNITED STATES DISTRICT COURT**

# A

**A.M** [2] - 1:17, 7:2
**a.m** [5] - 15:10, 81:5, 115:3
**abbreviates** [1] - 82:17
**able** [5] - 9:24, 20:3, 21:11, 21:13, 34:12
**above-entitled** [1] - 116:11
**absolutely** [2] - 57:3, 79:5
**abstract** [4] - 47:10, 51:19, 82:2, 93:6
**accomplishments** [1] - 113:13
**according** [1] - 58:9
**accumulation** [2] - 11:20, 67:5
**Achievement** [1] - 54:23
**acknowledge** [1] - 57:4
**actual** [5] - 33:14, 67:6, 97:2, 97:8, 103:5
**adapted** [1] - 93:7
**add** [10] - 21:13, 21:20, 52:21, 60:1, 64:4, 74:6, 76:5, 91:23, 92:22, 92:24
**added** [5] - 12:13, 59:14, 61:25, 62:18, 63:20
**adding** [6] - 21:12, 21:13, 21:17, 74:20, 75:1, 93:17
**addition** [2] - 86:22, 95:1
**additional** [28] - 14:21, 43:17, 43:18, 44:5, 59:16, 60:7, 60:20, 61:25, 62:18, 62:22, 63:20, 64:8, 64:16, 65:12, 65:20, 69:17, 74:7, 76:8, 78:14, 79:17, 87:6, 89:8, 92:16, 92:21, 93:11, 94:8, 95:2
**address** [5] - 11:19, 12:17, 49:11, 70:2, 98:10
**addressed** [4] - 52:18, 69:24, 97:19, 97:22
**addressing** [6] - 28:3, 53:14, 53:24, 97:17, 97:23, 98:22
**adds** [7] - 64:9, 65:6, 65:20, 78:14, 79:17,

92:21, 92:22
**adjacent** [3] - 51:10, 89:6, 94:3
**adjust** [1] - 88:14
**adjustment** [1] - 88:15
**admission** [2] - 37:4, 112:3
**admit** [3] - 14:14, 56:9, 110:10
**admitted** [8] - 8:8, 8:18, 12:25, 30:3, 31:9, 49:9, 56:5, 56:10
**admonition** [1] - 115:1
**adopted** [1] - 113:3
**advanced** [1] - 57:6
**advantage** [1] - 33:11
**advantages** [1] - 88:10
**advertisement** [1] - 19:11
**afternoon** [1] - 11:13
**agree** [5] - 13:25, 14:3, 83:11, 102:16, 102:18
**agreed** [1] - 15:5
**agreements** [1] - 105:23
**ahead** [2] - 23:13, 58:4
**Ahmad** [1] - 7:22
**AHMAD** [1] - 5:11
**AICHELE** [1] - 2:16
**Aichele** [1] - 7:15
**aid** [1] - 95:14
**akin** [1] - 102:7
**al** [2] - 6:18, 6:21
**alleged** [1] - 97:11
**allow** [1] - 84:6
**allowed** [1] - 32:12
**allowing** [1] - 112:8
**allows** [2] - 16:25, 31:15
**alloys** [2] - 48:6, 48:12
**almost** [2] - 107:21, 113:3
**alone** [1] - 67:10
**ALSO** [1] - 5:15
**amount** [1] - 15:25
**amounts** [1] - 28:1
**ANA** [3] - 1:18, 1:25, 7:1
**analyses** [1] - 67:22
**analysis** [8] - 27:2, 27:6, 38:15, 41:1, 45:2, 57:15, 67:23, 95:4
**analyzed** [1] - 14:6
**AND** [6] - 3:3, 3:17, 4:3, 4:16, 5:3, 37:15

**Andy** [1] - 5:17
**ANGELES** [1] - 116:3
**Angeles** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**animation** [2] - 38:9, 87:24
**anisotropy** [43] - 21:21, 28:6, 28:8, 28:19, 28:22, 29:3, 29:5, 29:6, 29:9, 29:10, 29:11, 29:12, 29:17, 30:12, 30:17, 31:1, 31:4, 31:5, 32:2, 32:9, 32:10, 34:10, 34:11, 34:14, 52:8, 53:6, 56:2, 73:15, 75:2, 87:5, 88:11, 89:17, 90:2, 90:5, 90:6, 90:8, 90:9, 90:11, 112:18
**Anisotropy/ Coercivity** [1] - 26:5
**answer** [2] - 29:24, 105:24
**ANSWER** [2] - 9:4, 11:5
**answered** [1] - 10:21
**anyway** [1] - 41:14
**apologies** [1] - 35:21
**apologize** [6] - 24:14, 35:2, 41:7, 54:2, 58:6, 66:4
**appear** [4] - 12:8, 12:11, 12:14, 13:21
**APPEARANCES** [4] - 2:1, 3:1, 4:1, 5:1
**appearances** [1] - 7:9
**Appl** [1] - 6:23
**application** [3] - 23:6, 23:7, 55:14
**Applied** [1] - 18:25
**applied** [4] - 19:1, 19:2, 32:9, 113:1
**apply** [2] - 45:1, 103:11
**appreciate** [3] - 107:18, 107:20
**approach** [2] - 92:10, 108:13
**approaches** [1] - 99:8
**appropriate** [4] - 8:18, 14:10, 49:12, 58:23
**arbitrary** [1] - 53:3
**areal** [1] - 19:25
**argue** [1] - 61:16
**argument** [10] - 25:12, 26:8, 33:5, 69:25, 74:8, 74:9, 74:10, 75:7, 79:22, 92:4

**arguments** [2] - 15:15, 96:24
**arrayed** [1] - 53:5
**art** [52] - 19:19, 21:8, 23:10, 25:2, 25:24, 26:17, 26:18, 27:6, 27:19, 33:3, 33:15, 33:18, 34:15, 34:19, 34:22, 38:5, 38:6, 39:3, 39:5, 43:25, 48:11, 52:12, 54:14, 55:7, 57:2, 57:6, 61:2, 74:5, 76:21, 85:3, 85:4, 85:5, 86:2, 86:9, 88:3, 88:8, 90:25, 91:21, 92:1, 92:18, 93:3, 93:14, 94:11, 100:8, 100:12, 100:15, 101:14, 101:17, 101:19, 102:6, 106:9, 113:4
**article** [5] - 16:20, 17:14, 18:11, 19:14, 113:14
**Article** [2] - 6:13, 6:20
**articles** [1] - 48:23
**aside** [1] - 34:20
**aspect** [1] - 95:6
**aspects** [1] - 88:13
**ASPs** [1] - 14:5
**assert** [1] - 27:1
**asserted** [7] - 41:14, 67:15, 80:15, 100:8, 101:18, 102:13, 106:6
**Association** [1] - 81:1
**AT** [4] - 2:20, 4:9, 4:16, 4:20
**atakouche@ stradlinglaw.com** [1] - 5:14
**atoms** [1] - 84:19
**atop** [1] - 72:9
**Attached** [1] - 111:17
**attachment** [1] - 112:1
**attempts** [3] - 98:24, 99:1
**attend** [2] - 57:19, 99:24
**attended** [2] - 57:24, 99:18
**attending** [1] - 56:14
**attention** [2] - 18:10, 49:21
**ATTORNEY** [4] - 2:20, 4:9, 4:16, 4:20
**attributable** [1] - 96:20
**August** [1] - 5:16

**AUGUST** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**authenticity** [1] - 11:8
**author** [2] - 18:8, 54:22
**authored** [1] - 9:20
**authors** [2] - 47:21, 61:16
**available** [6] - 13:11, 17:10, 18:24, 40:22, 43:21
**Avenue** [3] - 2:17, 3:13, 4:17
**average** [3] - 60:23, 61:4, 76:20
**avoid** [1] - 33:10
**Award** [1] - 54:23
**award** [5] - 28:15, 54:25, 55:1, 55:3, 55:8
**aware** [3] - 26:25, 77:5, 83:7

# B

**backing** [1] - 8:20
**bad** [1] - 66:24
**Bai** [1] - 6:13
**BALI** [7] - 4:5, 8:6, 9:10, 9:14, 9:19, 10:7, 10:15
**Bali** [1] - 7:21
**Bar** [1] - 81:1
**based** [9] - 13:10, 18:13, 32:8, 44:18, 57:15, 67:6, 96:10, 100:8, 113:2
**basic** [1] - 41:1
**basis** [2] - 106:16, 109:8
**Beach** [3] - 4:6, 4:14, 5:13
**Beard** [2] - 5:19, 7:24
**beat** [1] - 74:18
**Becker** [9] - 8:12, 9:5, 9:11, 9:23, 13:3, 13:5, 14:2, 15:3, 15:4
**Becker's** [6] - 8:11, 12:6, 12:7, 12:21, 12:23, 14:4
**become** [3] - 107:2, 109:18, 109:24
**becomes** [1] - 71:5
**beginning** [1] - 106:12
**belief** [1] - 112:12
**below** [2] - 76:22, 77:18
**bench** [1] - 11:16

**beneath** [2] - 34:5, 68:19
**beneficial** [1] - 34:4
**benefit** [4] - 38:22, 40:4, 40:14, 40:17
**benefited** [1] - 40:8
**Berger** [81] - 22:25, 23:14, 23:16, 24:4, 24:5, 24:13, 24:16, 24:24, 25:1, 25:3, 25:14, 25:20, 26:20, 38:21, 67:19, 67:23, 68:4, 68:5, 68:8, 68:12, 68:15, 68:16, 68:17, 69:3, 69:5, 69:8, 69:9, 69:14, 69:16, 69:20, 70:4, 70:8, 70:25, 71:4, 71:5, 71:15, 71:19, 72:7, 72:19, 72:22, 73:2, 73:7, 73:9, 73:11, 73:12, 73:13, 73:18, 73:21, 74:2, 74:6, 74:14, 75:5, 75:8, 75:12, 75:20, 75:23, 75:25, 76:4, 76:9, 76:14, 76:18, 77:12, 77:23, 78:1, 78:10, 78:16, 79:1, 79:12, 79:15, 79:21, 79:25, 80:2, 80:10, 80:12, 80:14, 92:4, 98:21, 98:23, 106:8
**Bergman** [4] - 13:18, 14:8, 14:14, 15:4
**Bergman's** [6] - 11:18, 12:4, 12:9, 12:12, 12:15, 105:22
**Bertero** [4] - 10:19, 10:23, 109:2, 109:21
**best** [2] - 64:19, 89:19
**better** [7] - 21:13, 33:8, 54:11, 74:18, 96:16, 96:17
**between** [27] - 21:1, 28:9, 40:21, 50:11, 52:2, 61:11, 61:12, 62:12, 64:12, 64:24, 72:10, 72:22, 73:5, 76:3, 76:17, 76:20, 79:24, 83:14, 87:15, 89:2, 89:6, 92:3, 93:19, 93:22, 94:3, 95:5
**beyond** [8] - 14:20, 19:1, 83:24, 100:7, 101:18, 101:21, 103:19, 103:22
**big** [4] - 23:3, 28:1, 84:16, 84:18

**Bill** [1] - 109:22
**binder** [5] - 9:3, 35:5, 36:9, 47:17, 56:7
**binders** [1] - 108:13
**bit** [5] - 11:3, 20:12, 55:12, 68:1, 81:2
**bledahl@raklaw. com** [1] - 2:11
**blue** [9] - 24:21, 25:15, 32:14, 32:15, 32:17, 45:6, 45:9, 70:9, 85:14
**body** [1] - 27:15
**bother** [1] - 92:7
**bottom** [26] - 16:24, 25:16, 33:7, 33:8, 34:7, 34:17, 34:20, 34:25, 36:1, 36:7, 37:1, 37:18, 44:3, 50:16, 61:18, 72:8, 72:13, 85:9, 85:12, 85:14, 85:18, 85:21, 86:7, 87:18, 88:5, 88:6
**Boulevard** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**boundaries** [1] - 37:14
**bounds** [1] - 14:20
**box** [1] - 75:16
**boxes** [1] - 80:12
**brand** [1] - 12:8
**brand-new** [1] - 12:8
**break** [5] - 34:6, 72:10, 80:21, 81:1, 112:8
**BRIAN** [1] - 2:8
**Brian** [1] - 7:13
**briefly** [1] - 39:15
**bring** [4] - 10:2, 31:23, 81:11, 114:15
**broken** [1] - 14:6
**brought** [1] - 14:14
**BUCZKO** [3] - 2:12, 12:19, 14:25
**Buczko** [4] - 7:15, 12:16, 12:19, 13:17
**build** [1] - 86:4
**building** [1] - 85:7
**built** [3] - 20:18, 85:17, 86:4
**bunch** [1] - 12:13
**burden** [4] - 94:23, 94:24, 94:25, 103:25
**BY** [43] - 2:8, 2:16, 3:8, 3:12, 3:18, 3:22, 4:5, 4:9, 4:12, 4:16, 4:20, 5:4, 5:11, 6:4, 30:8, 31:25, 34:8, 35:8, 35:23, 37:9, 40:12,

48:2, 49:16, 55:21, 56:12, 57:16, 67:1, 74:1, 81:8, 84:2, 84:23, 90:22, 100:18, 101:9, 102:4, 102:15, 103:9, 103:20, 104:4, 104:15, 108:19, 111:11, 114:16

## C

**CA** [1] - 1:25
**cake** [4] - 21:10, 21:11, 21:15, 25:4
**calculated** [3] - 14:1, 14:5
**calculation** [3] - 13:10, 13:20, 13:22
**calculations** [1] - 12:8
**California** [16] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10, 3:19, 3:23, 4:6, 4:10, 4:14, 4:21, 5:5, 5:9, 5:13, 116:7
**CALIFORNIA** [4] - 1:2, 1:18, 7:1, 116:4
**CALLED** [1] - 6:4
**camper** [1] - 33:13
**cannot** [1] - 14:20
**capstone** [1] - 67:10
**car** [2] - 46:8, 46:9
**CARLSON** [3] - 4:4, 4:12, 5:11
**Case** [1] - 1:6
**case** [23] - 14:16, 15:1, 17:2, 25:17, 38:19, 48:8, 79:23, 89:2, 91:17, 92:24, 101:18, 106:13, 106:16, 106:19, 107:2, 107:3, 108:1, 108:2, 108:5, 109:3, 109:9, 109:11, 109:13
**cases** [3] - 86:24, 107:7, 107:15
**center** [2] - 16:13, 108:23
**Center** [4] - 3:22, 4:5, 4:13, 5:12
**Central** [1] - 116:7
**CENTRAL** [1] - 1:2
**certain** [2] - 10:12, 83:7
**certainly** [6] - 61:18, 70:18, 71:12, 76:2, 90:19, 98:10
**CERTIFICATE** [1] -

116:1
**Certified** [1] - 1:5
**certify** [1] - 116:7
**cetera** [3] - 11:6, 39:19, 74:19
**CGC** [5] - 6:18, 36:15, 37:12, 37:22, 85:19
**Chaaru** [1] - 7:21
**chaaru.deb@lw.com** [1] - 4:11
**CHAARUSHENA** [1] - 4:9
**CHAN** [1] - 2:20
**Chan** [1] - 7:14
**chance** [1] - 10:8
**Chang** [1] - 7:13
**CHANG** [1] - 3:12
**change** [1] - 32:2
**changed** [3] - 17:23, 106:6, 106:10
**chart** [1] - 14:1
**chase** [1] - 80:8
**check** [2] - 58:23, 75:16
**checked** [2] - 80:12, 94:14
**cheese** [3] - 33:6, 33:8, 33:13
**cheeseburger** [1] - 33:10
**cheeseburgers** [1] - 33:6
**Chicago** [2] - 3:14, 4:18
**chocolate** [1] - 25:4
**choose** [1] - 68:5
**Chris** [1] - 5:18
**chromium** [1] - 36:17
**citation** [2] - 29:25, 111:21
**citations** [6] - 43:17, 54:4, 105:9, 105:10, 105:13, 113:9
**cite** [7] - 30:6, 54:1, 77:25, 79:7, 80:5, 89:22, 113:9
**cited** [3] - 51:20, 113:5, 113:19
**cites** [5] - 10:18, 44:5, 73:8, 87:6, 89:8
**claim** [26] - 22:20, 41:3, 41:21, 41:25, 44:19, 45:6, 49:7, 49:12, 50:24, 59:1, 59:3, 59:7, 59:10, 60:16, 61:19, 62:8, 62:17, 64:2, 66:16, 66:20, 79:15, 90:6, 91:4, 93:16
**Claim** [55] - 41:23,

58:14, 58:18, 59:6, 59:11, 59:13, 59:14, 60:7, 60:11, 60:17, 60:19, 60:20, 61:25, 62:4, 62:9, 62:12, 62:13, 62:18, 62:24, 63:21, 63:24, 64:4, 64:9, 65:20, 65:25, 75:15, 75:20, 75:23, 76:8, 76:13, 76:16, 78:11, 78:13, 78:24, 78:25, 79:12, 79:16, 80:9, 90:25, 91:6, 91:19, 91:23, 92:16, 93:12, 93:13, 93:16, 93:17, 93:18, 94:8, 94:9
**claimed** [5] - 95:6, 96:10, 97:20, 97:21, 104:23
**claims** [31] - 22:18, 24:19, 29:10, 32:11, 32:16, 32:19, 38:25, 40:18, 41:13, 41:14, 45:2, 45:18, 65:3, 66:17, 67:15, 80:15, 88:18, 91:3, 92:20, 92:21, 94:13, 94:15, 96:4, 99:12, 103:1, 103:6, 105:3, 105:15, 105:16, 105:17, 106:6
**Claims** [4] - 41:15, 41:18, 66:13
**clarification** [1] - 8:24
**clarify** [2] - 14:12, 14:25
**clear** [15] - 13:23, 16:17, 18:23, 25:19, 32:13, 38:1, 38:17, 43:22, 67:2, 77:15, 90:5, 95:23, 96:18, 97:4, 110:7
**clearly** [7] - 8:12, 19:20, 29:7, 37:18, 42:5, 78:20, 91:9
**client** [1] - 7:22
**closely** [1] - 27:10
**closing** [1] - 15:15
**cobalt** [1] - 36:16
**Code** [1] - 116:8
**coercive** [7] - 46:5, 49:2, 49:4, 49:18, 82:25, 86:16, 86:18
**Coercivity** [1] - 6:22
**coercivity** [18] - 21:22, 48:7, 52:23, 53:8, 53:11, 54:4, 54:16, 55:17, 55:22, 56:1, 74:11, 74:15, 74:21,

75:1, 111:22, 112:12, 112:14, 112:16
**colored** [1] - 24:18
**column** [25] - 12:21, 12:22, 24:14, 70:11, 71:8, 71:23, 71:24, 72:18, 74:3, 76:3, 80:13, 82:17, 86:21, 86:22, 86:24, 89:4, 89:10, 89:20, 91:11, 91:18, 92:13, 93:25
**columns** [4] - 12:7, 66:5, 66:10, 66:11
**combination** [29] - 25:13, 36:22, 58:16, 58:19, 59:20, 60:11, 62:5, 63:21, 63:22, 63:25, 64:17, 65:21, 66:1, 66:20, 67:11, 67:14, 75:12, 75:20, 75:25, 76:9, 76:13, 76:18, 77:23, 78:10, 79:20, 80:10, 80:14, 91:14, 106:7
**combinations** [2] - 66:21, 94:15
**combine** [3] - 25:6, 52:12, 53:13
**combined** [9] - 22:17, 38:4, 53:5, 63:3, 74:6, 90:24, 91:20, 92:1, 94:10
**coming** [1] - 37:15
**commenting** [1] - 103:24
**comments** [1] - 103:10
**commercial** [7] - 37:16, 95:10, 96:9, 96:15, 96:19
**company** [2] - 26:14, 95:19
**compensation** [1] - 106:22
**competition** [1] - 74:18
**competitor** [1] - 26:12
**complete** [2] - 60:20, 98:12
**completely** [2] - 98:4, 112:11
**complex** [1] - 44:13
**component** [1] - 70:2
**composite** [4] - 17:20, 17:21, 17:22, 20:6
**Composite** [6] - 6:14, 16:8, 17:6, 17:16, 18:5, 35:14
**comprise** [1] - 52:7

**comprised** [1] - 44:16
**comprises** [1] - 60:23
**comprising** [3] - 49:8, 62:23, 78:23
**concept** [6] - 28:22, 39:13, 112:7, 112:10, 112:18, 113:2
**concepts** [1] - 67:7
**conclude** [3] - 54:11, 96:3, 97:12
**concluded** [1] - 115:3
**conclusion** [29] - 42:11, 42:25, 44:7, 48:16, 48:21, 51:25, 52:13, 58:13, 58:18, 60:6, 63:19, 65:19, 65:24, 67:13, 70:24, 75:11, 79:11, 81:21, 82:9, 82:19, 86:8, 88:6, 88:17, 89:13, 90:23, 93:11, 99:10, 105:1, 105:14
**conclusions** [1] - 39:20
**conductivity** [1] - 20:8
**Conference** [1] - 116:12
**conference** [6] - 56:14, 56:17, 56:21, 57:17, 58:8, 99:24
**confirm** [3] - 32:8, 74:25, 91:19
**conformance** [1] - 116:12
**confusion** [1] - 19:16
**connect** [1] - 20:23
**connected** [1] - 29:14
**connection** [3] - 36:22, 95:7, 105:13
**consider** [1] - 9:22
**considerations** [12] - 94:17, 94:19, 94:25, 95:1, 95:3, 95:8, 95:15, 96:1, 97:13, 97:17, 101:25
**considered** [6] - 9:6, 27:20, 74:21, 95:3, 103:5, 106:5
**consists** [1] - 20:6
**constant** [12] - 29:11, 29:17, 31:4, 31:21, 32:1, 32:2, 32:10, 52:8, 73:15, 90:6, 90:9, 90:11
**construction** [4] - 44:19, 44:25, 45:1, 49:7
**context** [6] - 9:15, 9:23, 9:25, 10:9,

10:11, 45:21
**continue** [1] - 54:15
**Continued** [4] - 3:1, 4:1, 5:1, 15:21
**continued** [1] - 6:4
**continuous** [1] - 37:13
**contrary** [5] - 49:7, 90:15, 90:16, 95:22, 110:20
**contributed** [1] - 108:22
**contributions** [2] - 98:14, 111:22
**control** [2] - 72:10, 79:24
**conventional** [1] - 112:10
**copied** [1] - 97:6
**CoPtCr** [1] - 6:19
**copy** [2] - 19:12, 26:7
**copying** [7] - 95:11, 97:1, 97:2, 97:8, 97:9, 97:10, 97:11
**corner** [3] - 16:24, 17:25, 19:5
**corporate** [2] - 5:17, 7:20
**correct** [37] - 11:2, 25:23, 27:4, 38:16, 39:18, 45:19, 50:4, 56:25, 58:12, 63:18, 64:25, 72:17, 73:20, 79:9, 96:25, 108:23, 108:24, 109:1, 109:3, 109:4, 109:10, 109:16, 109:19, 109:25, 111:13, 111:15, 111:18, 111:24, 112:3, 112:21, 113:7, 113:14, 113:17, 113:21, 113:24, 114:21, 116:9
**correspond** [11] - 18:1, 21:5, 22:9, 24:19, 24:22, 32:14, 32:15, 32:19, 32:20, 45:9, 65:1
**corresponds** [4] - 17:2, 22:6, 72:12, 72:14
**cost** [3] - 12:12, 13:6, 14:5
**Costa** [1] - 3:23
**costs** [1] - 96:17
**COUNSEL** [4] - 2:1, 3:1, 4:1, 5:1
**counsel** [5] - 5:18, 7:9, 7:23, 15:14,

66:23
**Counterclaim** [2] - 1:6, 1:10
**COUNTERCLAIM** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**COUNTY** [1] - 116:3
**couple** [4] - 8:5, 30:14, 84:15, 96:6
**Coupled** [4] - 6:14, 16:8, 17:5, 35:14
**coupled** [20] - 17:21, 20:6, 24:1, 44:15, 44:21, 44:22, 45:1, 45:4, 45:10, 45:14, 45:23, 51:5, 51:11, 53:24, 64:13, 72:25, 75:9, 79:19, 88:23, 93:21
**coupling** [23] - 20:22, 21:1, 24:8, 25:16, 34:7, 36:2, 50:25, 51:2, 51:10, 52:1, 64:6, 64:14, 64:19, 64:22, 64:23, 65:7, 73:5, 79:19, 79:24, 89:1, 93:19, 93:22
**Coupling** [1] - 26:5
**course** [7] - 54:13, 55:2, 73:21, 74:19, 75:4, 92:2, 101:12
**Court** [7] - 9:6, 44:20, 44:24, 44:25, 49:7, 116:6, 116:20
**court** [2] - 15:8, 99:17
**COURT** [56] - 1:1, 1:24, 7:17, 7:25, 8:3, 9:9, 9:12, 9:17, 10:4, 10:14, 11:3, 11:10, 11:12, 11:15, 11:22, 11:24, 12:18, 13:16, 13:25, 14:9, 14:22, 15:6, 15:12, 30:5, 31:23, 34:1, 35:19, 36:20, 37:3, 37:6, 40:11, 47:24, 49:14, 55:19, 57:9, 57:11, 73:24, 80:20, 80:23, 81:7, 83:25, 90:21, 100:16, 101:15, 102:3, 102:14, 103:8, 104:2, 104:11, 104:14, 108:12, 108:17, 110:18, 111:8, 114:24, 116:6
**Court's** [2] - 44:19, 49:7
**COURTROOM** [5] - 7:6, 15:8, 15:17,

81:4, 115:2
**cover** [3] - 22:21, 41:13, 42:21
**covered** [2] - 37:13, 40:6
**covering** [1] - 41:12
**crazy** [7] - 99:21, 102:17, 103:4, 103:10, 104:7, 104:8, 104:18
**created** [3] - 12:8, 12:11, 12:14
**credible** [2] - 104:22, 104:25
**criticisms** [2] - 83:7, 83:11
**Cross** [1] - 6:5
**cross** [5] - 10:8, 10:20, 31:23, 90:19, 108:18
**cROSS-EXAMINATION** [1] - 108:18
**Cross-Examination** [1] - 6:5
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 116:20
**cut** [1] - 80:8
**Cynthia** [2] - 5:18, 7:23

## D

**D.C** [1] - 2:18
**Dale** [1] - 7:13
**DALE** [1] - 3:12
**data** [14] - 12:24, 12:25, 13:2, 13:23, 13:25, 14:15, 14:21, 15:1, 15:2, 15:4, 84:5, 93:8, 114:17
**Date** [1] - 116:15
**date** [6] - 26:22, 27:2, 27:3, 27:5, 27:16
**DAY** [1] - 1:10
**DC** [1] - 42:20
**dchang@raklaw. com** [1] - 3:15
**DDX** [1] - 65:12
**DDX-1030** [2] - 65:13
**DDX-1031** [1] - 42:23
**dealing** [2] - 27:25, 77:16
**Deb** [1] - 7:22
**DEB** [1] - 4:9
**Debbie** [1] - 116:20
**DEBBIE** [3] - 1:23, 116:5, 116:19
**decent** [1] - 77:2
**decide** [4] - 94:20,

95:15, 107:5, 107:25
**decided** [1] - 107:2
**deciding** [1] - 38:24
**decoupled** [1] - 112:16
**DEFENDANT** [6] - 2:3, 3:3, 3:17, 4:3, 5:3, 6:4
**Defendant** [2] - 1:6, 1:9
**defendant's** [1] - 5:18
**define** [1] - 44:20
**defined** [1] - 49:8
**definitional** [2] - 44:14, 44:18
**degrees** [1] - 98:5
**demonstrated** [1] - 112:15
**demonstratives** [1] - 11:18
**density** [2] - 19:25, 93:8
**dependent** [4] - 59:6, 59:10, 106:22, 106:24
**deposit** [1] - 72:9
**deposited** [2] - 18:15, 42:20
**deposition** [11] - 14:15, 29:24, 30:1, 30:6, 31:9, 31:14, 31:16, 31:18, 33:25, 83:21, 83:22
**DEPUTY** [5] - 7:6, 15:8, 15:17, 81:4, 115:2
**Desai** [1] - 7:20
**describe** [6] - 20:14, 39:15, 54:9, 64:18, 67:4, 67:10
**described** [20] - 18:18, 19:18, 20:18, 20:19, 22:16, 26:21, 28:17, 30:12, 48:12, 48:18, 48:23, 49:19, 52:10, 54:10, 61:2, 67:7, 71:7, 98:8, 98:20, 98:21
**describes** [3] - 18:20, 28:17, 29:1
**describing** [2] - 17:14, 113:17
**description** [3] - 21:18, 24:12, 67:5
**descriptions** [1] - 69:13
**design** [1] - 27:12
**despite** [1] - 43:22
**detail** [2] - 20:17, 38:14

**determination** [1] - 95:17
**determinative** [2] - 95:24, 96:1
**determining** [1] - 40:18
**devices'** [1] - 111:24
**dhinospaan@yahoo. com** [1] - 1:25
**diameter** [2] - 60:23, 76:20
**diameters** [1] - 91:24
**Dieter** [2] - 5:17, 7:13
**difference** [1] - 40:21
**different** [16] - 10:2, 13:9, 13:13, 17:23, 19:12, 23:18, 26:1, 40:13, 64:22, 77:7, 84:3, 84:5, 94:18, 100:19, 101:1, 101:3
**differently** [1] - 45:7
**Digital** [11] - 5:18, 7:7, 7:19, 11:17, 23:3, 26:12, 96:12, 97:3, 108:22, 108:25, 109:6
**DIGITAL** [1] - 1:8
**Digital's** [2] - 94:22, 94:24
**dime** [1] - 108:5
**direct** [1] - 9:8
**Direct** [1] - 6:4
**DIRECT** [1] - 15:21
**directed** [4] - 53:14, 53:23, 75:8, 77:12
**direction** [1] - 26:1
**directly** [1] - 34:5
**disagree** [1] - 15:4
**disagrees** [1] - 90:18
**disclose** [16] - 24:16, 31:8, 42:3, 42:17, 46:25, 52:10, 63:1, 70:4, 73:2, 73:18, 73:21, 78:16, 83:2, 88:25, 90:11, 93:21
**disclosed** [25] - 33:23, 36:22, 36:25, 39:10, 43:25, 49:19, 51:7, 60:25, 61:3, 68:4, 68:15, 69:8, 69:9, 71:19, 71:20, 71:21, 72:7, 78:2, 85:8, 86:19, 89:18, 89:19, 90:20, 91:8, 110:6
**discloses** [10] - 52:18, 68:5, 78:10, 83:3, 83:13, 87:9, 88:18, 89:1, 90:25, 91:2
**disclosure** [2] - 29:21, 31:20

**disclosures** [5] - 68:16, 68:21, 70:8, 79:20, 94:10
**discovered** [1] - 17:22
**discovery** [1] - 13:11
**discuss** [6] - 30:1, 82:24, 94:16, 94:17, 95:18, 96:9
**discussed** [10] - 65:5, 69:23, 78:14, 79:18, 82:13, 83:17, 85:11, 94:18, 101:1, 101:25
**discusses** [1] - 36:25
**discussing** [5] - 8:7, 52:6, 58:11, 94:16, 96:8
**discussion** [5] - 29:20, 31:10, 31:21, 73:4, 107:16
**disk** [7] - 62:23, 63:14, 78:18, 78:19, 78:23, 93:1, 93:4
**disks** [1] - 113:4
**disregarding** [1] - 33:7
**distance** [2] - 83:14, 84:25
**distances** [2] - 84:13, 84:20
**distinction** [1] - 28:5
**distribution** [1] - 96:16
**District** [2] - 116:6, 116:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**dive** [1] - 28:24
**DIVISION** [1] - 1:2
**Dobin** [3] - 56:16, 56:18, 58:10
**document** [18] - 8:23, 9:6, 9:8, 9:10, 9:11, 9:12, 9:15, 9:19, 9:25, 10:11, 10:19, 16:5, 16:15, 16:25, 35:12, 44:4, 47:19, 111:6
**Document** [1] - 9:2
**documents** [3] - 8:22, 9:1, 16:5
**dollars** [1] - 108:23
**done** [17] - 17:17, 18:6, 18:21, 22:15, 23:17, 25:3, 33:4, 33:19, 38:6, 40:25, 66:3, 67:25, 68:19, 86:6, 99:4, 102:20, 102:22
**door** [1] - 11:16
**dot** [2] - 15:2, 15:3

**Doug** [1] - 7:18
**doug.lumish@lw. com** [1] - 3:20
**DOUGLAS** [1] - 3:18
**down** [8] - 11:3, 14:6, 26:7, 33:17, 38:8, 66:23, 87:25, 107:22
**Doyle** [1] - 109:22
**Dr** [96] - 7:13, 7:20, 8:10, 8:11, 8:12, 8:22, 9:2, 9:5, 9:10, 9:11, 9:13, 9:14, 9:16, 9:19, 9:23, 9:24, 10:4, 10:9, 10:12, 10:19, 10:23, 11:18, 12:4, 12:6, 12:7, 12:21, 12:23, 13:3, 13:5, 15:3, 15:4, 16:17, 26:14, 28:12, 28:21, 29:20, 29:23, 29:25, 30:2, 30:9, 30:10, 39:4, 40:1, 40:5, 56:13, 56:18, 57:24, 58:7, 77:17, 97:25, 98:7, 98:13, 98:23, 99:6, 99:9, 99:17, 99:18, 99:20, 100:21, 102:7, 102:16, 102:17, 102:21, 102:25, 103:3, 103:4, 103:10, 103:16, 103:17, 103:21, 103:24, 103:25, 104:6, 104:7, 104:17, 104:20, 105:7, 108:20, 109:2, 109:10, 109:21, 109:24, 111:13, 112:2, 112:6, 112:19, 113:5, 113:14, 113:16, 113:19, 113:24, 114:20
**draft** [1] - 112:4
**draw** [1] - 88:6
**drive** [6] - 12:9, 12:22, 12:24, 14:3, 14:5, 14:6
**Drive** [9] - 3:19, 3:22, 4:5, 4:9, 4:13, 4:21, 5:5, 5:8, 5:12
**drive-size** [1] - 12:24
**drives** [1] - 85:18
**during** [7] - 8:11, 13:5, 14:23, 15:2, 38:18, 40:1, 40:8
**DX** [13] - 16:23, 16:25, 17:25, 19:4, 23:4,

26:6, 34:24, 43:15, 44:4, 47:9, 68:8, 79:3
**DX-1001** [4] - 26:7, 81:20, 82:3, 92:13
**DX-1009** [2] - 56:5, 56:9
**DX-1015** [1] - 17:3
**DX-1030** [1] - 18:1
**DX-1031** [10] - 18:11, 19:6, 19:7, 19:14, 50:2, 50:17, 53:18, 54:5, 60:4, 61:6
**DX-1187** [6] - 6:17, 36:10, 36:19, 37:7, 38:1, 85:22
**DX-1213** [3] - 25:7, 53:18, 54:6
**DX-1245** [3] - 24:12, 78:3, 80:3
**DX-1383** [4] - 8:7, 8:9, 8:18, 9:2
**DX-1796** [4] - 6:20, 47:17, 47:22, 47:25
**DX-1797** [4] - 6:13, 35:6, 35:20, 85:15
**Dynamic** [1] - 18:5

## E

**Earth's** [2] - 46:19, 46:20
**easier** [6] - 33:20, 33:21, 85:8, 88:5, 88:11, 88:16
**easiest** [2] - 20:20, 86:7
**easily** [1] - 112:10
**easy** [3] - 44:2, 84:17, 95:18
**EBL** [2] - 11:1
**ECC** [7] - 16:13, 17:6, 17:24, 19:17, 42:3, 54:10, 112:7
**editor** [1] - 39:19
**effectively** [1] - 11:20
**efforts** [1] - 99:4
**eight** [1] - 42:20
**eight-target** [1] - 42:20
**Element** [7] - 24:7, 24:8, 24:9, 69:10, 70:13, 71:7, 73:6
**elements** [4] - 24:7, 70:5, 78:24
**elicited** [1] - 31:14
**email** [3] - 110:4, 111:10, 111:12
**embodiment** [2] - 30:15, 30:24

**UNITED STATES DISTRICT COURT**

**embodiments** [2] - 30:14, 32:7
**end** [7] - 8:7, 15:14, 21:21, 28:10, 106:11, 107:16
**ends** [1] - 114:3
**engineering** [1] - 17:13
**entered** [1] - 105:23
**entirely** [1] - 26:1
**entirety** [1] - 90:25
**entitled** [3] - 29:25, 111:15, 116:11
**equal** [1] - 31:1
**equation** [1] - 31:13
**especially** [1] - 30:1
**ESQ** [14] - 2:4, 2:8, 2:12, 2:16, 3:4, 3:8, 3:12, 3:18, 3:22, 4:5, 4:12, 5:4, 5:8, 5:11
**essentially** [8] - 39:22, 42:16, 52:20, 62:24, 63:13, 79:23, 81:24, 89:10
**establish** [1] - 22:16
**established** [2] - 11:7
**estimate** [1] - 106:18
**et** [5] - 6:18, 6:20, 11:6, 39:19, 74:19
**evaluate** [1] - 109:11
**evidence** [13] - 13:3, 13:13, 14:1, 15:13, 43:18, 59:23, 79:7, 97:6, 101:14, 102:24, 105:20, 106:1, 113:12
**EVIDENCE** [1] - 6:12
**exact** [7] - 14:14, 15:3, 25:4, 27:12, 29:23, 30:18, 74:8
**exactly** [7] - 20:17, 21:24, 30:9, 31:17, 32:25, 41:11, 102:25
**exam** [1] - 97:10
**EXAMINATION** [2] - 15:21, 108:18
**examination** [3] - 15:2, 38:18, 40:9
**Examination** [2] - 6:4, 6:5
**examiner** [9] - 38:22, 39:5, 39:9, 39:25, 40:4, 40:8, 40:13, 40:21
**examining** [1] - 67:22
**example** [34] - 10:22, 12:5, 12:9, 21:15, 25:4, 34:23, 42:19, 43:9, 44:1, 44:3, 47:3, 48:5, 56:2,

59:24, 61:4, 64:19, 66:10, 70:9, 70:11, 71:22, 74:25, 82:17, 85:11, 85:19, 89:20, 91:10, 93:5, 93:25, 95:19, 96:15, 98:17, 100:6, 101:4
**examples** [10] - 34:19, 36:5, 36:6, 43:21, 43:23, 43:24, 53:17, 71:21, 85:17, 86:20
**Excel** [1] - 13:1
**except** [6] - 14:1, 21:19, 23:4, 42:8, 62:14, 98:4
**exchange** [47] - 17:21, 20:6, 23:1, 23:20, 23:25, 24:10, 24:18, 24:25, 25:17, 36:2, 44:15, 44:20, 44:22, 45:1, 45:4, 45:10, 45:14, 50:25, 51:2, 51:10, 51:11, 52:1, 53:24, 64:6, 64:14, 64:22, 64:23, 65:7, 71:6, 71:22, 72:10, 72:11, 72:15, 72:16, 73:5, 75:9, 79:19, 79:24, 89:1, 93:19, 93:22, 112:6, 112:19, 113:5, 113:20
**Exchange** [4] - 6:14, 16:8, 26:5, 35:14
**exchange-spring** [13] - 23:1, 23:20, 23:25, 24:10, 24:18, 24:25, 25:17, 71:6, 71:22, 72:11, 72:15, 72:16
**exchanged** [2] - 72:25, 88:23
**Exchanged** [1] - 17:5
**EXHIBIT** [1] - 6:12
**exhibit** [11] - 8:10, 11:9, 35:3, 35:17, 56:5, 68:9, 69:14, 70:21, 89:9, 110:5, 110:6
**Exhibit** [4] - 35:19, 35:20, 37:7, 47:25
**exhibits** [1] - 10:17
**EXHIBITS** [1] - 6:10
**exist** [3] - 13:22, 45:17, 95:2
**expand** [1] - 83:23
**expect** [2] - 9:17, 15:13
**expectations** [1] - 101:24
**expected** [1] - 101:2

**experimental** [5] - 18:7, 18:14, 27:14, 67:5
**expert** [12] - 10:2, 29:20, 40:4, 83:18, 83:23, 83:24, 101:23, 107:2, 107:6, 107:23, 108:1, 109:9
**expertise** [1] - 40:17
**experts** [2] - 31:15, 106:11
**explain** [5] - 9:25, 16:5, 24:3, 39:5, 39:9
**explicit** [1] - 49:22
**explicitly** [14] - 23:24, 28:6, 28:19, 34:23, 36:25, 43:11, 52:10, 64:18, 73:18, 81:18, 89:1, 90:10, 93:6, 93:24
**extend** [1] - 61:14
**extending** [1] - 28:8
**extensively** [1] - 83:21
**extent** [2] - 14:17, 14:19

## F

**Fabrication** [1] - 6:21
**fact** [14] - 10:5, 10:7, 14:7, 19:9, 32:5, 32:8, 43:22, 52:22, 57:13, 59:12, 73:3, 96:3, 96:12, 105:12
**factor** [3] - 95:6, 101:24, 105:6
**factors** [5] - 94:19, 99:12, 99:15, 105:2, 106:5
**Fahrenheit** [1] - 98:5
**failure** [2] - 95:11, 99:11
**fair** [3] - 40:5, 56:11, 109:7
**fall** [1] - 33:9
**familiar** [1] - 39:13
**far** [2] - 21:16, 112:21
**February** [1] - 23:7
**Federal** [2] - 81:1, 116:20
**FEDERAL** [2] - 1:24, 116:5
**fellow** [4] - 109:16, 109:18, 109:25, 112:3
**Fellow** [1] - 111:15
**felt** [1] - 97:19
**FENSTER** [47] - 2:4,

7:11, 29:19, 30:3, 31:7, 31:19, 33:22, 35:18, 36:21, 37:4, 40:10, 47:23, 49:6, 55:18, 56:10, 57:7, 73:23, 83:16, 83:23, 84:1, 84:22, 90:14, 100:7, 100:14, 100:17, 101:7, 101:13, 101:16, 101:21, 102:2, 102:10, 103:7, 103:19, 103:22, 104:9, 108:13, 108:19, 110:8, 110:10, 110:14, 110:19, 110:25, 111:6, 111:9, 111:11, 114:14, 114:16
**Fenster** [9] - 6:5, 7:12, 10:22, 29:22, 31:13, 56:11, 83:20, 108:12, 114:24
**FePt** [1] - 6:22
**ferromagnetic** [5] - 49:9, 52:7, 73:22, 93:20, 93:21
**few** [4] - 8:20, 21:12, 21:13, 107:8
**field** [31] - 17:13, 28:2, 28:8, 29:5, 29:13, 29:17, 30:17, 31:1, 31:5, 32:2, 39:23, 46:5, 46:11, 46:18, 46:19, 46:21, 47:13, 48:13, 49:2, 49:4, 49:18, 54:24, 74:17, 75:1, 86:16, 86:18, 87:5, 90:9, 102:20, 107:14
**fields** [1] - 46:14
**Figure** [24] - 24:5, 24:11, 24:12, 34:24, 43:13, 51:23, 64:20, 65:11, 68:6, 69:11, 69:12, 70:11, 71:7, 71:23, 72:18, 73:7, 81:18, 82:5, 82:18, 85:13, 85:20, 93:5
**figure** [23] - 14:14, 20:21, 24:4, 24:24, 25:19, 25:22, 32:13, 32:18, 34:16, 35:13, 37:25, 38:2, 43:11, 68:8, 68:22, 68:25, 69:14, 70:13, 70:22, 86:25, 87:1, 87:3, 87:4
**Figures** [1] - 69:16

**figures** [2] - 13:10, 24:6
**filed** [4] - 22:25, 23:7, 26:3, 26:9
**filing** [2] - 26:22
**Films** [1] - 6:22
**films** [2] - 53:24, 75:9
**final** [1] - 52:5
**finally** [2] - 89:16, 105:19
**finder** [1] - 96:3
**findings** [1] - 81:25
**fine** [1] - 14:22
**finish** [1] - 15:13
**first** [48] - 8:17, 11:19, 12:21, 13:21, 16:8, 17:18, 17:20, 17:22, 18:7, 19:11, 28:10, 30:15, 30:16, 30:19, 41:20, 41:21, 41:25, 42:7, 44:13, 46:2, 46:4, 47:5, 49:3, 49:17, 49:21, 50:6, 62:8, 66:10, 66:11, 68:3, 68:11, 70:2, 71:3, 71:14, 81:13, 82:23, 82:24, 82:25, 86:15, 86:17, 87:10, 92:7, 92:22, 96:6, 96:7, 96:9, 96:11, 97:12
**five** [1] - 91:12
**flavor** [1] - 21:11
**flip** [7] - 33:10, 33:17, 53:20, 84:21, 84:24, 88:8, 90:1
**flipped** [2] - 38:8, 94:5
**flipping** [3] - 87:25, 88:10, 88:14
**Floor** [6] - 2:5, 2:9, 2:13, 2:21, 3:9, 3:23
**focus** [8] - 51:9, 59:13, 60:20, 62:17, 62:20, 64:11, 68:6
**focused** [1] - 53:11
**folks** [2] - 74:20, 84:16
**follow** [1] - 58:24
**FOR** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**force** [1] - 83:1
**foregoing** [1] - 116:9
**forgive** [1] - 51:15
**forgot** [2] - 17:9, 77:24
**formal** [1] - 95:5
**formalities** [1] - 35:22
**format** [1] - 116:11
**formed** [12] - 43:5, 46:5, 48:18, 50:10, 50:20, 70:19, 82:14, 83:1, 83:9, 86:10,

87:13, 88:20
**forward** [1] - 74:19
**foundation** [3] - 9:18, 11:7, 40:10
**four** [6] - 30:15, 60:1, 84:19, 86:20, 86:23, 91:12
**four-layer** [3] - 30:15, 86:20, 86:23
**fourth** [1] - 30:20
**frankly** [1] - 33:12
**Fred** [1] - 54:21
**Frenkel** [1] - 8:2
**FRENKEL** [1] - 5:4
**friend** [1] - 109:2
**front** [3] - 28:9, 66:3, 73:18
**fully** [1] - 98:1

## G

**gain** [1] - 88:10
**general** [5] - 5:18, 7:23, 55:15, 102:5, 112:12
**generally** [2] - 52:15, 86:1
**gentlemen** [3] - 15:12, 80:24, 114:25
**given** [1] - 9:14
**glass** [1] - 42:22
**glasses** [1] - 42:21
**Global** [1] - 23:2
**GMBH** [1] - 1:4
**GmbH** [1] - 7:7
**goal** [2] - 74:13, 92:9
**Goglia** [14] - 8:10, 8:22, 9:2, 9:5, 9:6, 9:10, 9:13, 9:14, 9:16, 9:19, 9:24, 10:4, 10:9, 10:12
**graded** [1] - 112:18
**Gradient** [1] - 26:5
**gradient** [18] - 21:21, 28:6, 28:8, 28:11, 28:19, 28:21, 28:25, 29:1, 29:3, 29:6, 29:9, 29:10, 29:12, 30:13, 32:2, 32:10, 75:2, 88:11
**gradients** [2] - 34:14, 56:3
**graduate** [3] - 16:10, 17:17, 56:18
**grain** [11] - 37:14, 61:5, 61:17, 61:21, 76:16, 76:20, 77:5, 77:9, 78:2, 91:24, 92:10
**grains** [9] - 51:11,

60:23, 61:13, 61:14, 61:19, 77:4, 92:5, 112:9
**graph** [3] - 10:24, 14:14, 14:21
**graphic** [1] - 89:25
**greater** [11] - 46:5, 47:13, 48:4, 48:9, 48:14, 60:23, 70:18, 77:6, 83:1, 83:5, 92:6
**greatly** [1] - 21:21
**green** [7] - 24:18, 25:17, 32:19, 45:6, 45:13, 71:7, 71:22
**GREGORY** [1] - 5:4
**grill** [1] - 33:9
**grounds** [1] - 22:21
**group** [1] - 18:7
**grouped** [1] - 27:10
**grow** [8] - 33:20, 33:21, 34:10, 34:12, 37:18, 85:8, 88:11
**growing** [1] - 34:3
**guess** [17] - 23:7, 34:24, 42:8, 45:21, 46:12, 61:11, 63:17, 67:4, 68:22, 68:25, 69:5, 69:13, 89:23, 91:15, 92:9, 99:21, 108:3
**guide** [1] - 58:24
**guy** [2] - 46:9, 55:8
**guys** [1] - 67:6

## H

**habit** [1] - 66:24
**Hac** [1] - 2:16
**Hagedorn** [71] - 21:19, 22:17, 25:6, 25:7, 25:14, 26:20, 38:21, 52:12, 52:17, 52:19, 52:24, 53:10, 53:23, 54:6, 54:18, 54:21, 55:12, 55:13, 56:6, 56:23, 57:4, 57:14, 57:15, 57:21, 58:7, 58:16, 58:21, 59:20, 60:8, 60:12, 62:1, 62:5, 63:3, 63:22, 62:5, 63:3, 63:22, 63:25, 64:17, 65:6, 65:7, 65:16, 65:17, 65:22, 66:1, 67:11, 67:14, 69:5, 74:6, 74:10, 74:24, 75:9, 75:12, 75:20, 75:25, 76:10, 76:14, 76:18, 77:23, 78:10, 79:1, 79:13, 79:21, 79:23,

79:25, 80:5, 80:10, 80:13, 80:14, 106:8, 108:8
**half** [6] - 41:4, 48:10, 49:23, 70:18, 83:1, 83:6
**hand** [7] - 23:23, 30:21, 30:22, 30:23, 66:8, 66:9, 95:21
**HANLE** [1] - 4:12
**Hans** [1] - 56:19
**happy** [5] - 29:24, 31:17, 33:13, 36:24, 83:21
**hard** [92] - 19:12, 19:25, 20:7, 20:21, 20:25, 21:4, 22:9, 22:10, 24:8, 24:23, 25:15, 32:14, 32:17, 34:4, 34:17, 34:20, 34:25, 36:1, 36:5, 36:6, 37:1, 37:13, 37:18, 44:16, 44:22, 45:9, 45:22, 46:4, 46:25, 47:6, 47:7, 47:8, 47:12, 48:3, 48:13, 48:17, 48:22, 49:3, 49:18, 50:1, 50:10, 50:11, 50:15, 50:20, 50:25, 51:4, 51:10, 51:11, 52:2, 64:24, 65:1, 65:2, 70:3, 70:4, 70:9, 70:25, 71:10, 71:18, 71:25, 72:2, 72:5, 72:8, 72:10, 72:15, 72:25, 82:25, 83:3, 83:8, 85:9, 85:12, 85:14, 85:18, 85:21, 86:7, 86:10, 86:12, 86:17, 87:13, 87:14, 87:17, 87:18, 87:21, 88:5, 88:15, 88:18, 88:20, 88:24, 89:3, 89:6, 90:3, 94:3, 113:4
**hardest** [3] - 85:6, 85:18, 86:4
**head** [13] - 20:10, 62:23, 63:5, 63:11, 78:17, 78:19, 78:23, 83:14, 83:17, 84:13, 93:1, 93:4, 93:6
**heads** [1] - 112:10
**hear** [1] - 99:20
**heard** [4] - 20:22, 97:3, 99:22, 103:12
**hearing** [2] - 96:13, 98:17
**hearsay** [1] - 102:10

**held** [1] - 116:10
**help** [5] - 54:19, 94:20, 95:17, 98:8, 109:3
**hereby** [1] - 116:7
**high** [5] - 28:1, 93:7, 93:8, 112:12, 112:13
**High** [1] - 6:21
**higher** [3] - 34:10, 70:16, 83:4
**highest** [1] - 30:16
**highlighted** [3] - 16:23, 45:6, 92:10
**highlighting** [1] - 82:4
**himself** [1] - 9:20
**Hino** [1] - 116:20
**HINO** [3] - 1:23, 116:5, 116:19
**Hino-Spaan** [1] - 116:20
**HINO-SPAAN** [3] - 1:23, 116:5, 116:19
**Hitachi** [1] - 23:2
**Hk** [1] - 28:8
**Hn** [1] - 71:9
**hold** [1] - 18:16
**homework** [1] - 97:10
**honest** [1] - 79:6
**Hono** [1] - 47:20
**Honor** [75] - 7:11, 7:18, 8:5, 8:6, 8:19, 10:17, 11:11, 11:14, 11:19, 11:25, 12:1, 12:16, 12:19, 13:15, 13:17, 14:25, 15:1, 29:19, 29:22, 30:4, 31:7, 31:11, 31:12, 31:17, 31:24, 33:22, 33:24, 34:2, 35:2, 35:16, 36:18, 36:23, 36:24, 37:5, 37:8, 47:22, 47:23, 48:1, 49:6, 49:11, 49:15, 56:4, 56:9, 56:10, 80:22, 83:16, 83:19, 90:14, 90:17, 100:7, 100:11, 100:14, 100:17, 101:8, 101:13, 101:16, 101:19, 101:20, 101:22, 102:2, 102:10, 102:12, 103:19, 103:22, 108:11, 108:14, 108:16, 110:5, 110:8, 110:17, 110:19, 110:22, 111:2, 111:3, 111:7
**honor** [1] - 68:1
**Honor's** [1] - 31:14
**HONORABLE** [1] - 1:3

**host** [62] - 21:5, 22:7, 23:20, 24:20, 25:18, 32:23, 44:17, 44:22, 45:13, 45:21, 45:23, 49:2, 49:8, 49:18, 50:6, 50:9, 50:12, 50:20, 50:24, 51:4, 52:2, 52:6, 52:11, 52:14, 58:15, 59:4, 59:17, 59:20, 59:25, 60:23, 64:6, 64:13, 65:2, 65:6, 71:3, 71:5, 71:15, 72:6, 72:12, 72:16, 72:25, 73:15, 73:19, 74:7, 75:17, 75:24, 79:18, 86:14, 86:16, 87:13, 87:15, 87:19, 87:21, 88:19, 88:23, 89:18, 91:9, 91:13, 91:15, 92:2, 93:20, 93:23
**hour** [4] - 41:4, 106:17, 109:5
**hourly** [2] - 106:16, 109:8
**hours** [1] - 106:20
**Hs** [3] - 48:13, 70:15, 71:9
**hundreds** [1] - 106:20
**HYUK** [1] - 3:22

## I

**idea** [7] - 18:8, 22:21, 38:10, 76:24, 83:13, 113:4, 113:17
**ideas** [3] - 67:7, 102:17, 104:18
**identical** [1] - 21:2
**identified** [2] - 113:13, 113:16
**IEEE** [8] - 6:15, 17:12, 54:23, 109:16, 109:25, 111:15, 112:3, 114:21
**ignore** [1] - 107:13
**Illinois** [2] - 3:14, 4:18
**illustrate** [1] - 13:14
**illustrates** [1] - 87:4
**illustrating** [1] - 82:4
**illustrative** [1] - 44:1
**impeach** [1] - 110:23
**impeached** [1] - 110:13
**impeachment** [3] - 110:8, 110:11, 111:2
**implies** [1] - 106:3
**important** [4] - 26:8, 28:25, 29:7, 113:11
**impressive** [2] -

109:14, 111:1
**improve** [11] - 19:25, 20:1, 21:11, 23:17, 54:16, 55:17, 55:22, 56:1, 74:15, 98:8, 99:4
**improved** [3] - 24:2, 75:2, 98:14
**improvement** [1] - 10:25
**improvements** [2] - 20:14, 39:18
**improving** [2] - 21:8, 98:25
**IN** [1] - 6:11
**inappropriate** [3] - 10:1, 10:13, 14:18
**INC** [1] - 1:8
**Inc** [1] - 7:8
**include** [2] - 79:3, 81:15
**included** [2] - 57:14, 78:20
**includes** [2] - 12:2, 28:6
**including** [13] - 19:18, 27:16, 44:21, 46:24, 54:24, 55:5, 62:23, 68:22, 78:24, 88:4, 89:2, 93:3, 98:16
**inconsistency** [1] - 110:23
**inconsistent** [3] - 110:15, 110:17, 111:5
**increasing** [8] - 28:22, 52:7, 53:6, 73:15, 89:17, 90:2, 90:7, 90:11
**independent** [1] - 41:18
**indication** [2] - 95:20, 95:22
**individual** [1] - 95:14
**industry** [2] - 113:2, 113:3
**information** [4] - 12:3, 12:20, 13:1, 20:2
**infringe** [1] - 96:12
**infringes** [1] - 97:4
**input** [1] - 40:6
**inputs** [1] - 9:6
**inside** [1] - 57:15
**instances** [1] - 29:4
**instead** [1] - 17:24
**instructions** [2] - 15:15, 100:20
**intends** [1] - 14:19
**interact** [1] - 39:11
**interchangeably** [1] -

53:1
**interested** [1] - 27:25
**interesting** [2] - 98:11, 100:2
**Intermag** [2] - 56:14, 113:17
**internet** [2] - 19:11, 33:5
**interpreting** [1] - 8:15
**introduced** [1] - 35:3
**intuitive** [1] - 21:15
**invalid** [7] - 40:19, 45:18, 59:10, 59:11, 106:7, 108:7, 109:10
**invalidates** [1] - 22:17
**invalidity** [3] - 27:1, 94:23, 94:24
**invent** [3] - 16:17, 28:12, 28:21
**invention** [9] - 27:2, 95:6, 96:10, 96:20, 97:20, 97:21, 98:7, 102:19, 104:24
**inventive** [1] - 95:6
**inventor** [1] - 7:13
**iron** [3] - 48:6, 48:12
**iron-platinum** [2] - 48:6, 48:12
**issue** [4] - 33:7, 96:11, 96:13, 104:1
**issued** [2] - 113:22, 114:6
**issues** [4] - 11:12, 53:15, 77:16, 77:18
**IT** [2] - 5:17, 5:18
**items** [1] - 113:11
**itself** [13] - 19:21, 24:16, 24:25, 29:6, 31:13, 68:25, 73:18, 77:12, 83:13, 93:13, 96:20, 102:19, 103:11
**Iwasaki** [1] - 16:19

**J**

**J.-P** [1] - 6:13
**Jacob** [2] - 7:15, 12:19
**JACOB** [1] - 2:12
**JAMES** [1] - 1:3
**January** [1] - 111:12
**jbuczko@raklaw. com** [1] - 2:15
**Jennifer** [2] - 5:19, 7:24
**Jesse** [2] - 5:19, 7:23
**Jian** [1] - 18:9
**Jian-Ping** [1] - 18:9
**JOSEPH** [1] - 3:22
**Joseph** [1] - 7:20

**joseph.lee@lw.com** [1] - 3:24
**journal** [5] - 9:20, 17:11, 17:13, 19:3, 19:10
**Jpn** [1] - 6:23
**judge** [1] - 67:24
**JUDGE** [1] - 1:3
**judge's** [1] - 100:20
**Judicial** [1] - 116:12
**JULY** [2] - 1:16, 7:1
**July** [1] - 116:15
**jump** [1] - 16:1
**June** [2] - 26:22, 27:3
**jury** [25] - 7:5, 10:10, 10:11, 15:6, 15:11, 16:25, 27:24, 28:14, 35:17, 40:16, 40:17, 40:22, 44:2, 52:17, 58:24, 74:9, 81:6, 85:10, 87:1, 87:23, 92:23, 94:20, 96:3, 97:3, 110:2
**JURY** [1] - 1:15
**JX-2124** [1] - 12:25

**K**

**KABAT** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
**Kabat** [1] - 5:16
**keep** [2] - 20:1, 98:19
**keeping** [1] - 79:5
**kept** [1] - 31:21
**kilooersteds** [15] - 30:17, 30:20, 30:21, 30:24, 30:25, 46:16, 48:8, 48:9, 49:22, 70:17, 71:11, 71:12, 83:3
**kind** [4] - 23:16, 39:18, 48:7, 57:6
**knowing** [1] - 88:3
**knowledge** [11] - 38:4, 86:2, 88:4, 90:24, 91:21, 92:2, 92:17, 93:14, 94:11, 97:11, 106:8
**knowledgeable** [1] - 39:22
**known** [3] - 54:25, 76:21, 99:8
**KROEGER** [6] - 3:4, 8:19, 9:1, 10:16, 11:4, 11:11
**Kroeger** [3] - 7:14, 7:15, 8:20

**L**

**L10** [1] - 6:22
**L1367-L1369** [1] - 6:24
**lab** [2] - 100:6, 100:9
**label** [1] - 24:6
**labeled** [2] - 24:18, 24:21
**labels** [1] - 73:6
**ladies** [3] - 15:12, 80:24, 114:25
**laid** [1] - 9:18
**language** [2] - 49:13, 65:12
**last** [8] - 47:16, 58:14, 64:2, 73:14, 75:12, 80:8, 93:16, 114:11
**late** [1] - 21:18
**Latham** [1] - 7:19
**LATHAM** [8] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4, 5:7
**law** [1] - 40:4
**LAW** [4] - 2:20, 4:9, 4:16, 4:20
**layer** [176] - 20:7, 20:21, 20:22, 20:24, 21:1, 21:4, 21:6, 21:9, 21:10, 21:11, 21:25, 22:1, 22:2, 22:9, 22:10, 23:19, 23:20, 23:25, 24:1, 24:8, 24:9, 24:10, 24:17, 24:19, 24:21, 24:22, 24:23, 24:25, 25:15, 25:16, 25:17, 30:15, 30:16, 30:24, 32:3, 32:10, 32:11, 32:15, 32:17, 32:20, 34:4, 34:5, 34:9, 34:10, 34:11, 34:17, 34:20, 34:25, 35:1, 36:1, 36:2, 36:5, 37:1, 37:13, 37:18, 37:19, 44:17, 44:23, 45:10, 45:22, 46:4, 47:1, 47:6, 47:13, 48:4, 48:13, 48:18, 48:22, 49:3, 49:10, 49:19, 50:11, 50:15, 50:16, 50:21, 51:1, 51:4, 51:11, 52:2, 52:8, 53:6, 57:14, 61:22, 64:6, 64:14, 64:19, 64:20, 64:21, 64:23, 65:2, 70:3, 70:4, 70:10, 70:19, 70:25, 71:6, 71:10, 71:19, 71:22, 72:1, 72:2, 72:5, 72:8,

72:9, 72:10, 72:11, 72:14, 72:15, 72:16, 73:1, 73:16, 74:12, 76:1, 79:19, 82:25, 83:3, 83:8, 83:14, 84:5, 85:6, 85:9, 85:12, 85:14, 85:18, 85:21, 86:4, 86:7, 86:10, 86:13, 86:17, 86:20, 86:23, 87:14, 87:15, 87:17, 87:18, 87:22, 88:5, 88:14, 88:19, 88:20, 88:24, 89:6, 89:17, 90:2, 90:3, 90:12, 91:14, 93:19, 93:22, 94:2, 100:6
**layers** [83] - 6:19, 18:15, 20:23, 21:12, 21:14, 21:17, 21:20, 22:3, 24:25, 25:1, 25:5, 32:19, 32:22, 33:1, 35:25, 36:6, 36:17, 38:7, 38:23, 42:20, 49:9, 49:12, 51:12, 52:7, 52:11, 52:21, 52:25, 53:3, 53:5, 55:17, 55:23, 56:1, 56:3, 60:1, 61:15, 64:12, 64:24, 65:1, 65:6, 65:8, 72:22, 73:5, 73:15, 73:19, 73:22, 74:7, 74:12, 74:20, 75:1, 76:5, 79:18, 79:24, 84:5, 84:8, 84:10, 84:12, 84:21, 84:24, 86:11, 87:20, 87:21, 88:9, 88:10, 89:2, 89:16, 90:1, 90:2, 91:10, 91:12, 91:15, 93:20, 93:21, 93:22, 94:4, 94:5, 100:25, 101:2, 101:5, 101:11, 112:18
**lead** [1] - 18:8
**Leading** [7] - 55:18, 57:7, 73:23, 84:22, 101:7, 103:7, 104:9
**learn** [1] - 58:7
**least** [15] - 10:5, 24:24, 32:18, 52:10, 62:12, 63:2, 64:3, 93:19, 95:16, 98:9, 98:25, 99:21, 100:25, 108:22, 108:25
**leaving** [1] - 34:20
**Ledahl** [1] - 7:13
**LEDAHL** [2] - 2:8,

**UNITED STATES DISTRICT COURT**

12:16

**LEE** [66] - 3:22, 15:22, 29:22, 30:7, 30:8, 31:12, 31:24, 31:25, 33:24, 34:2, 34:8, 35:2, 35:8, 35:16, 35:21, 35:23, 36:18, 36:24, 37:8, 37:9, 40:12, 47:22, 48:1, 48:2, 49:11, 49:15, 49:16, 55:20, 55:21, 56:4, 56:9, 56:11, 56:12, 57:16, 66:24, 67:1, 74:1, 80:22, 81:8, 83:19, 84:2, 84:23, 90:17, 90:22, 100:11, 100:18, 101:8, 101:9, 101:20, 101:22, 102:4, 102:12, 102:15, 103:9, 103:20, 103:24, 104:4, 104:13, 104:15, 108:10, 110:5, 110:9, 110:12, 110:16, 110:22, 111:3

**Lee** [4] - 6:4, 7:21, 15:16, 81:7

**left** [7] - 16:1, 19:23, 30:22, 66:9, 81:9, 86:21, 91:14

**left-hand** [2] - 30:22, 66:9

**legal** [1] - 22:21

**legally** [1] - 41:2

**length** [1] - 28:9

**less** [11] - 49:22, 50:1, 60:3, 60:24, 71:9, 71:11, 71:12, 71:13, 76:2, 77:9, 92:5

**letter** [2] - 109:24, 114:20

**Letters** [1] - 18:25

**level** [1] - 12:24

**Li** [61] - 26:2, 26:17, 26:20, 27:23, 28:17, 29:1, 29:16, 30:9, 30:10, 32:5, 32:22, 33:16, 34:16, 37:25, 38:4, 38:7, 38:21, 38:23, 80:18, 81:10, 82:1, 82:10, 82:15, 82:19, 83:2, 83:13, 84:21, 84:24, 85:6, 86:3, 86:19, 86:21, 86:23, 87:9, 88:7, 88:17, 88:25, 89:9, 89:14, 89:16, 89:18, 89:23, 90:10, 90:15,

90:18, 90:23, 91:8, 91:20, 91:25, 92:1, 92:17, 93:3, 93:9, 93:13, 93:21, 94:10, 98:20, 98:23, 106:8

**license** [2] - 95:19, 105:23

**licensed** [1] - 95:24

**licensing** [6] - 95:12, 95:18, 105:19, 105:20, 106:1, 106:3

**light** [30] - 58:16, 58:19, 59:19, 60:8, 60:11, 61:25, 62:4, 63:21, 63:25, 64:16, 65:21, 65:25, 66:21, 68:15, 69:3, 75:24, 76:9, 76:13, 76:17, 79:1, 79:12, 79:20, 80:10, 89:18, 91:8, 91:20, 92:17, 93:13, 94:10, 106:7

**limit** [11] - 28:4, 77:17, 92:11, 97:24, 98:1, 98:3, 98:9, 98:15, 98:22, 98:25, 99:5

**limitation** [74] - 22:20, 38:15, 41:3, 41:21, 41:25, 42:4, 42:12, 42:14, 43:1, 43:3, 43:8, 44:8, 44:11, 45:24, 46:2, 46:3, 48:22, 48:25, 49:11, 50:23, 51:3, 51:8, 52:1, 52:5, 52:14, 58:14, 59:14, 59:16, 60:7, 60:14, 60:20, 61:25, 64:8, 64:16, 65:20, 66:13, 68:3, 68:12, 69:2, 69:8, 69:19, 70:25, 71:2, 71:14, 72:6, 72:21, 73:11, 75:13, 76:8, 79:17, 80:9, 81:13, 81:17, 81:21, 81:23, 82:1, 82:9, 82:12, 82:13, 82:15, 82:19, 86:15, 87:10, 87:12, 88:21, 88:22, 89:14, 90:18, 92:16, 94:9

**limitation-by-limitation** [1] - 38:15

**limitations** [18] - 45:21, 58:15, 58:23, 59:13, 62:12, 62:17, 62:18, 62:22, 63:2, 63:20, 64:7, 71:3, 78:14, 82:23, 83:8, 86:14, 92:22, 93:12

**limited** [2] - 15:25,

41:9

**limits** [3] - 29:16, 32:5, 32:7

**line** [4] - 86:21, 86:22, 91:18

**lines** [9] - 8:20, 24:15, 76:4, 82:17, 86:24, 89:5, 89:20, 91:11, 93:25

**LINFONG** [1] - 5:8

**Linfong** [1] - 7:20

**linfong.tzeng@lw. com** [1] - 5:10

**list** [1] - 11:9

**List** [1] - 113:11

**listed** [4] - 12:23, 52:22, 66:11, 91:6

**lists** [3] - 47:5, 49:22, 61:4

**literally** [2] - 13:24, 14:20

**literature** [2] - 61:18, 85:12

**Liu** [2] - 5:16, 7:15

**LLP** [11] - 3:12, 3:18, 3:21, 4:4, 4:8, 4:12, 4:16, 4:20, 5:4, 5:7, 5:11

**Local** [1] - 26:5

**locate** [1] - 16:25

**located** [2] - 71:18, 83:22

**long-felt** [1] - 97:19

**longitudinal** [2] - 77:1, 92:8

**longstanding** [3] - 80:25, 95:11, 99:11

**look** [23] - 10:24, 19:7, 20:21, 21:23, 21:24, 23:23, 24:6, 25:14, 25:21, 32:13, 33:5, 35:5, 36:9, 41:17, 47:17, 55:9, 56:7, 57:5, 62:21, 91:23, 99:3, 107:11, 114:11

**looked** [8] - 27:5, 33:3, 34:16, 54:19, 55:8, 74:6, 74:14, 74:25

**looking** [11] - 25:2, 33:16, 38:4, 38:23, 39:6, 54:14, 88:6, 88:7, 89:21, 92:1, 93:3

**looks** [2] - 12:5, 80:12

**LOS** [1] - 116:3

**Los** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10

**lose** [1] - 20:2

**loss** [1] - 28:2

**low** [1] - 52:23

**Low** [1] - 6:21

**Low-Temperature** [1] - 6:21

**lower** [6] - 11:23, 34:10, 49:3, 49:18, 53:8, 86:17

**lowered** [1] - 75:1

**lowering** [1] - 74:11

**lull** [1] - 97:18

**Lumish** [1] - 7:18

**LUMISH** [4] - 3:18, 7:18, 8:2, 8:5

**lunch** [1] - 81:1

## M

**M2** [1] - 32:21

**M3** [1] - 32:21

**M4** [1] - 32:21

**magnetic** [90] - 16:17, 16:18, 20:7, 20:21, 20:24, 21:1, 21:6, 21:9, 21:25, 22:1, 22:2, 22:9, 22:10, 24:1, 24:22, 28:1, 34:6, 42:2, 42:22, 44:15, 44:16, 44:21, 44:22, 45:5, 45:10, 45:11, 45:15, 45:22, 46:4, 46:11, 46:14, 46:25, 47:6, 48:3, 48:13, 48:22, 49:3, 49:19, 50:10, 50:11, 50:15, 50:20, 50:25, 51:4, 51:12, 52:2, 53:24, 54:24, 56:1, 56:20, 57:13, 62:22, 63:9, 63:10, 65:2, 68:7, 70:3, 70:4, 70:9, 70:25, 71:18, 71:25, 72:5, 72:15, 72:25, 75:9, 77:8, 77:13, 78:17, 78:23, 81:15, 81:19, 82:25, 86:10, 86:12, 86:17, 87:14, 88:19, 88:20, 88:24, 89:5, 90:3, 92:8, 92:11, 93:4, 93:7, 94:2, 111:23, 112:17

**Magnetic** [8] - 6:15, 6:22, 16:9, 17:16, 18:6, 26:4, 35:15

**magnetically** [5] - 20:23, 47:7, 82:16, 89:6, 94:3

**magnetics** [2] - 19:2, 54:24

**Magnetics** [3] - 6:15,

17:12, 54:23

**magnetization** [10] - 29:14, 29:15, 29:16, 29:20, 31:10, 31:21, 31:22, 32:1, 32:6, 84:7

**magnetron** [1] - 42:20

**magnified** [3] - 16:24, 17:25, 19:4

**maichele@raklaw. com** [1] - 2:19

**main** [1] - 17:13

**Maine** [1] - 2:17

**Marc** [1] - 7:11

**MARC** [1] - 2:4

**marked** [2] - 69:10, 71:6

**marketing** [1] - 96:16

**match** [1] - 103:2

**material** [1] - 59:24

**materials** [1] - 37:15

**matter** [4] - 33:12, 76:23, 102:13, 116:11

**Matter** [1] - 7:6

**MATTHEW** [1] - 2:16

**Matthew** [1] - 7:15

**mchan@raklaw.com** [1] - 2:23

**mean** [16] - 18:14, 28:14, 28:19, 29:7, 32:22, 33:21, 33:24, 34:13, 53:2, 59:13, 90:8, 95:24, 96:2, 100:5, 100:11, 107:17

**meaning** [2] - 20:9, 98:11

**means** [7] - 37:14, 41:3, 53:4, 66:16, 91:12, 92:25, 95:7

**measured** [2] - 18:15, 78:20

**measurement** [3] - 46:10, 46:13, 46:14

**measurements** [1] - 68:18

**mechanism** [1] - 112:11

**Media** [8] - 6:14, 16:8, 17:6, 17:16, 18:5, 18:6, 26:4, 35:14

**media** [41] - 6:19, 17:20, 17:21, 17:22, 20:1, 27:12, 28:12, 28:15, 28:18, 30:13, 36:16, 37:12, 37:22, 43:10, 54:10, 54:25, 57:13, 57:14, 63:4, 68:17, 75:9, 77:1,

77:3, 77:5, 77:9, 77:13, 83:17, 85:19, 92:25, 100:6, 112:7, 112:8, 112:15, 112:19, 112:24, 113:1, 113:2, 113:5, 113:20
**medium** [6] - 42:2, 68:7, 68:22, 81:15, 81:19, 93:7
**member** [1] - 109:19
**Menlo** [5] - 3:19, 4:10, 4:21, 5:5, 5:9
**mention** [7] - 17:19, 23:4, 29:12, 47:4, 48:5, 73:4, 89:4
**mentioned** [9] - 29:9, 46:7, 54:22, 57:21, 64:12, 73:17, 77:15, 81:19, 99:2
**mentions** [4] - 70:10, 82:16, 90:8, 90:9
**merits** [2] - 96:10, 96:20
**Mesa** [1] - 3:23
**mess** [1] - 33:9
**met** [24] - 42:12, 42:13, 43:2, 44:10, 48:22, 48:24, 50:6, 50:7, 50:21, 50:22, 52:3, 52:4, 69:20, 70:25, 71:1, 72:22, 72:23, 73:11, 73:13, 81:22, 82:11, 82:20, 88:21, 89:15
**mfenster@raklaw. com** [1] - 2:7
**mic** [1] - 101:15
**middle** [2] - 25:16, 34:6
**midmorning** [1] - 80:21
**might** [4] - 21:11, 21:12, 26:7, 58:3
**million** [1] - 108:22
**mindful** [1] - 100:20
**mine** [1] - 66:25
**MINNA** [1] - 2:20
**Minna** [1] - 7:14
**minus** [1] - 98:5
**minute** [3] - 57:9, 69:6, 104:11
**minutes** [2] - 80:23, 81:3
**MIRZAIE** [1] - 3:8
**misread** [1] - 78:5
**missed** [1] - 114:4
**misspoke** [2] - 72:2, 107:17
**mixed** [1] - 34:14

**mixed-up** [1] - 34:14
**mixing** [1] - 54:2
**modern** [1] - 77:19
**modification** [1] - 25:20
**modified** [1] - 25:21
**money** [6] - 106:21, 107:1, 107:18, 107:19, 107:20, 107:23
**morning** [13] - 7:11, 7:17, 7:18, 7:25, 8:6, 8:19, 10:18, 12:19, 15:12, 15:23, 15:24, 108:20, 108:21
**Mortensen** [2] - 5:17, 114:14
**most** [8] - 18:12, 44:1, 61:16, 82:2, 105:12, 107:15, 113:10, 113:11
**motivated** [1] - 54:15
**motivation** [3] - 25:5, 53:13, 107:23
**move** [8] - 56:9, 68:1, 69:24, 74:19, 97:16, 99:15, 102:2, 102:11
**moving** [1] - 110:10
**MR** [131] - 1:4, 7:7, 7:11, 7:12, 7:18, 8:2, 8:5, 8:6, 8:19, 9:1, 9:10, 9:14, 9:19, 10:7, 10:15, 10:16, 11:4, 11:11, 12:16, 12:19, 14:25, 15:22, 29:19, 29:22, 30:3, 30:7, 30:8, 31:7, 31:12, 31:19, 31:24, 31:25, 33:22, 33:24, 34:2, 34:8, 35:2, 35:8, 35:16, 35:18, 35:21, 35:23, 36:18, 36:21, 36:24, 37:4, 37:8, 37:9, 40:10, 40:12, 47:22, 47:23, 48:1, 48:2, 49:6, 49:11, 49:15, 49:16, 55:18, 55:20, 55:21, 56:4, 56:9, 56:10, 56:11, 56:12, 57:7, 57:16, 66:24, 67:1, 73:23, 74:1, 80:22, 81:8, 83:16, 83:19, 83:23, 84:1, 84:2, 84:22, 84:23, 90:14, 90:17, 90:22, 100:7, 100:11, 100:14, 100:17, 100:18, 101:7, 101:8, 101:9, 101:13, 101:16,

101:20, 101:21, 101:22, 102:2, 102:4, 102:10, 102:12, 102:15, 103:7, 103:9, 103:19, 103:20, 103:22, 103:24, 104:4, 104:9, 104:13, 104:15, 108:10, 108:13, 108:19, 110:5, 110:8, 110:9, 110:10, 110:12, 110:14, 110:16, 110:19, 110:22, 110:25, 111:3, 111:6, 111:9, 111:11, 114:14, 114:16
**MRT** [20] - 19:19, 21:2, 21:3, 21:4, 22:7, 22:10, 24:19, 24:22, 26:17, 26:22, 26:25, 32:15, 32:19, 32:25, 38:18, 83:8, 97:1, 97:25, 103:25, 105:23
**MRT's** [2] - 94:25, 96:23
**MS** [8] - 11:14, 11:17, 11:23, 11:25, 13:17, 14:3, 14:11, 14:24
**Mulholland** [2] - 5:19, 7:23
**multilayer** [15] - 22:4, 28:12, 28:15, 28:18, 44:15, 44:21, 45:5, 45:11, 45:15, 45:23, 58:15, 69:23, 75:16, 82:22, 113:19
**multiple** [22] - 24:25, 25:1, 32:22, 38:23, 49:12, 52:11, 52:21, 55:17, 55:22, 60:1, 65:6, 68:5, 70:3, 73:18, 74:12, 91:10, 100:25, 101:2, 101:5, 101:11, 112:17
**multiplication** [5] - 12:11, 13:8, 13:14, 13:18, 13:19
**multiply** [1] - 60:2
**multiplying** [1] - 13:19
**must** [3] - 52:7, 96:4

### N

**name** [2] - 17:22, 17:24

**named** [1] - 46:9
**nanometer** [4] - 77:4, 84:17, 84:18, 84:19
**nanometers** [23] - 59:5, 59:18, 59:21, 59:25, 60:24, 61:5, 61:9, 76:2, 76:3, 76:6, 76:21, 76:22, 77:6, 77:10, 77:16, 77:18, 84:15, 91:7, 91:12, 91:17, 92:3, 92:7
**narrow** [1] - 55:14
**near** [1] - 47:6
**necessarily** [1] - 103:4
**need** [19] - 20:1, 23:4, 43:5, 44:24, 54:11, 58:6, 59:9, 63:10, 74:15, 79:3, 84:4, 92:25, 93:18, 94:16, 94:17, 95:11, 97:19, 99:11, 114:24
**needs** [3] - 22:15, 59:11, 96:3
**never** [9] - 8:16, 9:11, 10:2, 13:11, 14:6, 14:16, 33:23, 36:22, 83:17
**new** [12] - 8:1, 12:8, 12:14, 13:10, 14:7, 67:21, 112:11, 112:15, 112:24, 113:1, 113:2
**Newport** [6] - 4:5, 4:6, 4:13, 4:14, 5:12, 5:13
**next** [48] - 16:6, 17:8, 17:14, 22:12, 22:23, 24:3, 25:24, 26:1, 41:12, 42:14, 43:3, 44:11, 45:8, 48:25, 50:23, 58:3, 59:1, 59:3, 60:14, 62:7, 66:6, 66:11, 67:17, 68:14, 69:7, 69:22, 71:2, 71:17, 72:8, 72:14, 72:24, 75:23, 81:23, 82:12, 86:13, 87:12, 88:22, 91:4, 97:16, 97:17, 97:18, 98:18, 99:15, 105:6, 112:1, 113:9
**nexus** [2] - 95:5, 95:7
**nominated** [3] - 109:18, 109:21, 109:22
**nominating** [1] - 109:24
**nomination** [6] - 110:20, 111:18,

112:2, 113:7, 113:10, 114:20
**none** [4] - 10:10, 12:3, 96:1
**nonmagnetic** [10] - 42:16, 42:18, 43:6, 50:12, 68:14, 68:19, 81:24, 82:3, 82:14, 87:15
**nonobviousness** [4] - 97:14, 97:15, 105:21, 106:1
**noon** [1] - 80:25
**North** [2] - 3:13, 4:17
**notable** [1] - 10:25
**note** [1] - 11:8
**notes** [1] - 100:2
**nothing** [3] - 97:11, 98:3, 111:5
**notice** [1] - 12:1
**notorious** [1] - 105:12
**nowadays** [1] - 113:3
**nowhere** [1] - 12:8
**nucleation** [64] - 21:5, 22:6, 23:20, 23:22, 24:20, 25:18, 32:20, 32:23, 44:17, 44:22, 45:13, 45:21, 45:22, 49:2, 49:8, 49:18, 50:6, 50:8, 50:12, 50:20, 50:24, 51:4, 52:2, 52:5, 52:11, 52:14, 58:15, 59:4, 59:17, 59:20, 59:25, 60:22, 64:6, 64:13, 65:2, 65:6, 71:3, 71:5, 71:15, 72:3, 72:5, 72:12, 72:16, 72:25, 73:15, 73:19, 74:7, 75:17, 75:24, 79:18, 86:14, 86:16, 87:13, 87:15, 87:19, 87:21, 88:19, 88:23, 89:17, 91:9, 91:13, 91:15, 92:2, 93:23
**Number** [5] - 35:20, 37:7, 47:25, 89:4, 94:1
**number** [24] - 12:11, 12:14, 13:7, 14:1, 16:23, 16:25, 17:25, 19:4, 19:12, 23:4, 26:6, 30:14, 34:24, 47:9, 53:3, 73:8, 79:3, 89:22, 113:13, 113:16, 113:19, 114:5, 114:9, 114:11
**numbering** [1] - 11:22
**numbers** [8] - 12:3, 12:6, 12:7, 12:13,

13:4, 13:13, 13:19, 14:15
**numerous** [3] - 43:21, 86:20, 97:23

**O**

**oath** [1] - 15:18
**objecting** [1] - 12:2
**objection** [28] - 9:7, 14:9, 14:22, 29:19, 31:7, 33:22, 35:18, 36:20, 36:21, 37:4, 40:10, 47:23, 49:6, 55:18, 57:7, 73:23, 83:16, 83:17, 84:22, 90:14, 100:7, 101:7, 101:13, 102:10, 103:7, 103:19, 104:9, 110:18
**objections** [4] - 8:4, 9:8, 11:8, 83:20
**objectives** [1] - 20:14
**obligation** [1] - 80:25
**obtain** [1] - 64:18
**obvious** [83] - 22:17, 48:11, 52:12, 58:16, 58:17, 58:19, 58:22, 59:19, 60:8, 60:11, 60:13, 61:25, 62:2, 62:4, 62:6, 63:2, 63:21, 63:23, 63:24, 64:1, 64:16, 65:21, 65:23, 65:25, 66:2, 66:21, 67:15, 67:16, 68:15, 69:2, 69:4, 75:12, 75:14, 75:20, 75:22, 75:24, 76:9, 76:13, 76:15, 76:17, 76:19, 77:23, 78:10, 78:12, 78:16, 78:25, 79:2, 79:12, 79:14, 79:20, 80:9, 80:11, 80:15, 80:17, 86:9, 86:12, 87:10, 87:11, 88:21, 89:18, 89:19, 91:8, 91:20, 91:25, 92:17, 92:19, 93:2, 93:13, 93:15, 94:10, 94:21, 95:16, 95:21, 96:4, 99:13, 105:3, 105:4, 105:5, 105:16, 105:18, 106:3
**obviously** [2] - 82:2, 108:8
**obviousness** [6] - 27:2, 95:4, 95:25, 106:4, 109:10, 109:12

**occur** [1] - 84:9
**Oct** [1] - 6:16
**oersted** [1] - 46:19
**OF** [9] - 1:2, 1:14, 2:1, 3:1, 4:1, 5:1, 116:1, 116:3, 116:4
**offered** [2] - 100:24, 102:12
**offering** [1] - 100:12
**office** [2] - 38:18, 38:22
**OFFICIAL** [3] - 1:24, 116:1, 116:5
**Official** [1] - 116:20
**offline** [1] - 19:10
**often** [1] - 56:19
**once** [2] - 54:9, 108:25
**one** [49] - 8:14, 8:22, 12:23, 14:11, 14:17, 14:25, 16:8, 17:9, 17:15, 18:4, 19:12, 20:25, 22:24, 26:1, 26:7, 27:13, 30:15, 42:14, 45:7, 47:15, 47:16, 50:1, 66:16, 67:17, 68:14, 69:7, 69:22, 71:17, 72:24, 73:14, 75:5, 79:15, 81:13, 81:23, 82:23, 82:24, 95:15, 95:18, 96:7, 96:9, 96:18, 98:2, 106:21, 107:10, 109:2, 113:14
**One** [1] - 9:1
**one-tenth** [1] - 50:1
**ones** [2] - 41:14, 95:14
**online** [1] - 19:13
**oOo** [1] - 115:4
**open** [1] - 36:9
**opened** [1] - 112:11
**opinion** [23] - 14:7, 26:16, 29:21, 50:5, 50:19, 60:10, 61:24, 62:4, 68:11, 75:19, 76:12, 77:22, 78:9, 78:22, 80:14, 87:9, 90:17, 90:19, 90:20, 92:15, 96:18, 105:25, 106:6
**opinions** [3] - 66:19, 106:23, 106:24
**opposed** [3] - 17:20, 86:11, 97:2
**optimization** [1] - 111:24
**OR** [1] - 6:11
**order** [12] - 22:16, 30:18, 31:15, 32:25, 33:9, 41:20, 45:17,

59:9, 64:21, 72:8, 95:2, 109:18
**ordered** [2] - 48:6
**Ordered** [1] - 6:22
**ordinary** [9] - 38:5, 38:6, 88:8, 90:24, 92:1, 93:3, 93:14, 94:11, 106:9
**orientation** [1] - 35:25
**original** [1] - 23:6
**outside** [2] - 9:7, 33:23
**overlap** [1] - 62:12
**overruled** [9] - 9:7, 14:9, 34:1, 37:3, 57:11, 73:24, 90:21, 104:2, 111:8
**overview** [1] - 52:20

**P**

**page** [58] - 19:7, 19:8, 19:11, 19:12, 19:14, 24:11, 24:13, 25:7, 38:1, 42:5, 42:7, 42:9, 42:23, 43:15, 44:4, 47:9, 47:10, 50:3, 50:17, 51:16, 51:18, 51:20, 53:18, 54:5, 54:6, 60:4, 61:6, 65:12, 65:13, 65:14, 65:16, 68:8, 68:22, 68:23, 68:25, 69:14, 70:21, 70:22, 74:2, 78:3, 78:5, 80:3, 80:5, 80:6, 81:20, 82:3, 82:7, 85:15, 85:22, 89:8, 92:13, 112:1, 113:9, 116:11
**PAGE** [1] - 6:3
**pages** [7] - 42:7, 44:4, 73:8, 79:7, 87:6, 89:23, 93:9
**paid** [4] - 106:12, 106:15, 107:1, 108:5
**paper** [34] - 17:2, 17:8, 17:19, 17:22, 18:1, 18:3, 18:11, 18:13, 18:20, 34:24, 35:13, 35:24, 36:3, 36:4, 36:12, 36:15, 37:17, 39:16, 39:17, 47:20, 54:9, 54:18, 54:22, 55:5, 56:20, 56:23, 56:24, 57:4, 57:13, 57:15, 58:8, 67:3, 99:9, 113:16
**papers** [19] - 16:7, 22:16, 25:11, 27:8,

27:10, 27:17, 27:20, 39:21, 42:17, 43:21, 46:25, 52:10, 54:15, 61:3, 67:3, 70:1, 98:17, 99:8, 105:12
**paralegal** [1] - 5:16
**pardon** [1] - 8:2
**Park** [5] - 3:19, 4:10, 4:21, 5:5, 5:9
**part** [4] - 9:21, 23:3, 44:13, 45:14
**partial** [1] - 98:12
**partially** [2] - 98:10, 112:16
**particles** [1] - 92:11
**particular** [4] - 19:9, 21:20, 35:13, 48:8
**particularly** [2] - 18:10, 24:7
**parts** [3] - 10:12, 44:16, 96:11
**pass** [1] - 108:10
**patent** [76] - 20:15, 22:12, 22:25, 23:6, 24:19, 26:17, 28:6, 29:2, 29:4, 29:8, 32:6, 32:15, 34:13, 38:18, 38:22, 38:24, 40:1, 40:4, 40:7, 41:14, 41:17, 41:24, 58:14, 58:19, 62:7, 62:9, 62:13, 62:14, 62:18, 62:24, 63:24, 64:4, 65:20, 65:25, 67:19, 68:4, 75:21, 77:17, 78:11, 78:13, 78:25, 79:12, 79:16, 81:10, 83:13, 86:3, 91:1, 91:20, 93:12, 93:13, 94:9, 95:20, 96:12, 98:1, 98:8, 98:20, 98:21, 99:4, 99:9, 103:1, 103:6, 103:11, 103:14, 104:8, 104:17, 104:18, 104:20, 110:20, 113:20, 113:22, 113:24, 114:5, 114:15, 114:19
**Patent** [1] - 114:2
**patented** [1] - 112:19
**patents** [31] - 19:19, 21:2, 21:3, 21:4, 22:7, 22:10, 23:10, 24:22, 26:17, 26:23, 32:25, 33:14, 38:18, 80:16, 98:23, 105:7, 105:10, 105:23, 107:12, 107:13,

108:2, 108:6, 108:7, 109:10, 109:11, 109:13, 109:15, 111:1, 111:4, 114:6
**patents'** [1] - 24:6
**patents-in-suit** [2] - 23:10, 105:23
**Patricia** [2] - 7:21, 11:17
**PATRICIA** [1] - 4:20
**patricia.young@lw. com** [1] - 4:22
**PAUL** [1] - 3:4
**Paul** [3] - 7:14, 7:15, 8:19
**Pause** [1] - 108:15
**PDX-10_11** [1] - 11:23
**peer** [3] - 39:13, 39:25, 40:14
**peers** [1] - 40:17
**people** [16] - 34:19, 40:5, 54:23, 55:7, 61:16, 61:18, 74:14, 74:17, 74:25, 85:17, 88:4, 98:16, 102:6, 102:9, 102:22, 107:22
**per** [8] - 12:6, 12:9, 12:23, 13:4, 13:6, 14:5, 109:5
**performance** [1] - 77:2
**perhaps** [2] - 10:7, 58:3
**Perpendicular** [5] - 6:14, 16:9, 17:16, 26:4, 35:14
**perpendicular** [12] - 6:18, 16:16, 16:18, 36:16, 37:22, 68:7, 77:1, 77:3, 77:5, 77:8, 77:13, 93:7
**person** [30] - 21:7, 25:2, 27:19, 33:3, 33:15, 33:18, 34:15, 38:5, 39:2, 39:4, 48:11, 52:12, 54:14, 74:5, 85:2, 85:3, 85:5, 86:2, 86:9, 88:3, 88:7, 90:24, 91:21, 91:25, 92:17, 93:2, 93:14, 94:11, 106:9
**persons** [1] - 57:1
**perspective** [1] - 88:7
**phrases** [1] - 20:4
**Phys.** [1] - 6:23
**physically** [1] - 71:18
**Physics** [1] - 18:25
**physics** [3] - 19:1,

19:2, 55:16
**picks** [1] - 84:7
**picture** [2] - 21:25, 85:20
**Ping** [1] - 18:9
**pkroeger@raklaw. com** [1] - 3:7
**place** [3] - 84:6, 92:7, 97:2
**placed** [2] - 36:6, 36:7
**places** [2] - 47:4, 68:5
**plaintiff** [3] - 7:12, 7:16, 12:20
**Plaintiff** [2] - 1:5, 1:10
**PLAINTIFF** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**plaintiff's** [2] - 5:17, 5:17
**platinum** [5] - 36:16, 36:17, 48:6, 48:12
**platinum-rich** [1] - 36:16
**plot** [1] - 15:2
**plots** [1] - 15:3
**plural** [1] - 49:9
**plus** [2] - 69:5, 79:23
**PMR** [2] - 16:18, 43:10
**point** [10] - 13:12, 13:15, 14:11, 14:25, 25:9, 34:12, 49:12, 53:8, 61:16
**pointed** [1] - 97:7
**pointing** [2] - 54:5, 68:21
**POSITA** [1] - 39:2
**positioned** [1] - 94:3
**positions** [1] - 89:5
**possibility** [1] - 32:12
**possibly** [1] - 68:19
**pp** [2] - 6:16, 6:24
**praise** [5] - 95:12, 105:6, 105:7, 105:11, 105:15
**predates** [1] - 26:21
**predicate** [1] - 24:17
**predict** [1] - 100:25
**preferably** [1] - 76:2
**prejudicial** [1] - 100:14
**premier** [2] - 19:1, 19:2
**premise** [1] - 13:21
**prescription** [1] - 74:10
**prescriptive** [1] - 89:3
**presence** [3] - 7:5, 15:11, 81:6
**PRESENT** [1] - 5:15
**present** [3] - 14:18,

14:19, 30:18
**presentation** [21] - 16:2, 56:24, 57:19, 57:22, 57:25, 58:10, 99:18, 99:21, 99:23, 99:25, 100:1, 100:22, 101:5, 101:10, 102:7, 102:25, 103:4, 103:18, 103:21, 104:7, 104:20
**presented** [3] - 13:4, 56:17, 102:21
**presenting** [4] - 13:2, 13:10, 56:20, 100:21
**preserve** [1] - 88:11
**presumably** [1] - 60:1
**pretty** [5] - 23:16, 46:22, 84:20, 107:16, 109:14
**previous** [1] - 73:3
**previously** [3] - 56:18, 65:5, 98:21
**PREVIOUSLY** [1] - 15:20
**principles** [2] - 55:17, 55:25
**Pro** [1] - 2:16
**problem** [4] - 19:24, 74:22, 98:10, 101:11
**problems** [2] - 53:24, 57:6
**proceed** [3] - 49:14, 58:25, 108:16
**proceedings** [2] - 108:15, 116:10
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 115:3
**process** [1] - 40:14
**produced** [2] - 14:16, 15:5
**product** [3] - 11:5, 37:16, 96:10
**products** [3] - 11:1, 11:2, 85:7
**Professor** [10] - 15:23, 16:4, 18:8, 18:23, 22:22, 23:19, 36:9, 81:9, 83:20, 90:19
**professor** [2] - 35:5, 109:7
**profit** [2] - 12:13, 13:7
**promise** [1] - 68:1
**promised** [1] - 67:25
**proper** [2] - 51:10, 64:18
**properties** [1] - 18:16
**proportional** [3] -

29:15, 31:5, 32:3
**proportionally** [1] - 29:18
**proposal** [1] - 100:24
**proposed** [3] - 20:11, 111:17, 112:6
**proposing** [4] - 55:22, 55:25, 56:1, 56:2
**prosecution** [1] - 40:1
**prove** [3] - 94:23, 94:24, 109:9
**provide** [5] - 14:21, 20:7, 40:5, 69:16, 77:2
**provided** [5] - 30:2, 44:25, 79:22, 96:16, 98:11
**provides** [2] - 74:10, 74:24
**providing** [1] - 55:15
**Pt** [2] - 6:19, 6:19
**Pt-rich** [1] - 6:19
**PTX-29** [2] - 10:18, 11:9
**PTX-716** [1] - 12:25
**public** [1] - 17:10
**publication** [9] - 9:20, 9:21, 113:20, 113:23, 114:5, 114:9, 114:11, 114:17, 114:19
**Publication** [2] - 6:17, 114:2
**publications** [1] - 105:10
**publicly** [2] - 17:10, 18:24
**publish** [5] - 35:16, 36:18, 39:16, 47:22, 49:20
**published** [15] - 16:10, 16:12, 16:21, 17:10, 17:12, 17:18, 17:21, 18:10, 19:17, 42:3, 43:1, 44:8, 63:1, 113:23, 114:6
**pull** [4] - 19:10, 57:5, 110:4, 111:10
**pulled** [1] - 16:3
**purple** [3] - 43:12, 69:10, 82:18
**purposes** [2] - 27:1, 52:25
**pursuant** [1] - 116:8
**put** [15] - 9:12, 33:6, 33:8, 34:5, 34:9, 34:10, 34:16, 34:20, 50:15, 63:13, 85:6, 86:7, 86:12, 88:5, 88:6

**puts** [1] - 19:11
**putting** [2] - 37:1, 85:12

## Q

**qualitatively** [2] - 102:22, 102:23
**question-and-answer** [1] - 29:24
**questioned** [3] - 29:23, 31:16, 83:20
**questions** [6] - 9:24, 10:21, 31:13, 53:21, 110:22, 110:24
**quicker** [1] - 68:2
**quickly** [5] - 41:8, 41:10, 80:19, 113:1, 113:3

## R

**raise** [2] - 9:15, 14:11
**raised** [1] - 30:1
**RANDAL** [1] - 6:4
**RANDALL** [1] - 15:20
**rate** [2] - 28:1, 93:8
**RAUTH** [3] - 4:4, 4:12, 5:11
**raw** [2] - 13:23
**re** [10] - 26:14, 30:2, 40:5, 56:13, 99:17, 103:3, 103:16, 103:24, 103:25, 104:17
**re's** [4] - 102:7, 102:16, 103:10, 104:6
**reach** [1] - 52:13
**reaction** [5] - 100:1, 102:8, 102:9, 103:13
**read** [12] - 8:12, 8:21, 10:22, 28:7, 44:25, 54:1, 77:25, 84:5, 104:8, 104:17, 111:21, 112:21
**reading** [2] - 84:6, 84:7
**Reading** [1] - 11:4
**real** [1] - 18:16
**realization** [2] - 18:7, 27:14
**realize** [1] - 35:3
**really** [4] - 10:25, 29:8, 55:13, 87:4
**REALTIME** [1] - 116:5
**reask** [2] - 101:8, 104:16
**reason** [2] - 19:25, 107:2

**rebuttal** [5] - 13:12, 13:15, 14:10, 30:2, 103:25
**received** [7] - 11:10, 35:19, 35:20, 37:6, 37:7, 47:24, 47:25
**receiving** [1] - 54:25
**reception** [1] - 102:6
**recess** [4] - 15:6, 15:9, 80:23, 81:3
**Recess** [2] - 15:10, 81:5
**recognize** [3] - 35:10, 36:12, 47:19
**record** [8] - 7:10, 8:25, 51:15, 62:3, 65:10, 80:13, 89:22, 100:10
**Recording** [6] - 6:15, 16:9, 17:17, 18:6, 26:4, 35:15
**recording** [34] - 6:19, 16:17, 16:18, 20:10, 24:1, 24:22, 28:1, 36:16, 37:22, 42:2, 56:20, 57:13, 62:23, 63:5, 63:9, 63:10, 68:7, 68:17, 68:18, 68:22, 72:14, 77:9, 77:13, 78:17, 78:20, 78:23, 81:15, 81:19, 92:8, 92:24, 93:4, 93:7, 93:8, 112:8
**redirect** [1] - 10:9
**reduce** [2] - 52:21, 52:22
**reduced** [1] - 21:22
**reducing** [2] - 53:11, 54:4
**refer** [1] - 24:11
**referees** [1] - 39:16
**reference** [16] - 16:12, 16:24, 22:23, 27:15, 27:21, 31:10, 31:20, 36:21, 46:8, 47:5, 48:7, 52:19, 66:12, 80:2, 85:13, 90:15
**references** [10] - 38:13, 38:17, 39:7, 39:10, 40:6, 40:7, 51:13, 54:4, 75:5, 111:6
**referencing** [2] - 114:20, 114:22
**referred** [1] - 65:11
**referring** [7] - 18:12, 19:9, 37:23, 38:1, 51:15, 78:2, 90:5
**refers** [4] - 16:16, 29:9, 52:24, 93:6
**reflected** [1] - 42:17

reflection [1] - 103:5
refused [1] - 10:14
regard [1] - 11:13
regarding [2] - 83:8, 104:22
regardless [4] - 61:20, 84:21, 84:24, 105:9
regards [1] - 78:17
region [4] - 47:8, 50:1
regression [2] - 12:6, 14:15
regressions [2] - 13:12, 14:4
regulations [1] - 116:12
REJECTED [1] - 6:12
relate [1] - 33:15
related [3] - 27:11, 29:13, 77:16
relates [2] - 21:2, 40:7
relationship [1] - 72:21
relative [2] - 72:7, 84:12
relatively [1] - 84:25
relied [8] - 8:10, 8:23, 9:2, 9:5, 9:10, 9:25, 10:6, 10:7
rely [1] - 113:4
remaining [4] - 59:14, 78:24, 82:22, 91:3
remember [2] - 46:15, 115:1
remind [3] - 52:17, 74:9, 92:23
reminded [1] - 15:17
render [2] - 78:12, 78:16
renders [14] - 22:17, 67:14, 67:16, 75:12, 75:20, 75:22, 77:23, 78:10, 80:14, 80:17, 87:10, 87:11, 105:3, 105:5
repeat [3] - 21:19, 104:3, 104:5
replaced [1] - 22:1
replacing [1] - 74:11
report [23] - 8:16, 12:4, 12:9, 12:12, 12:15, 13:21, 29:21, 30:2, 30:3, 31:8, 33:23, 36:25, 48:18, 60:25, 61:1, 83:18, 83:23, 83:24, 101:21, 101:25, 102:11, 103:23, 105:22
reported [1] - 116:10
reporter [1] - 8:24

Reporter [1] - 116:20
REPORTER [4] - 1:24, 66:23, 116:1, 116:6
REPORTER'S [1] - 1:14
representative [2] - 5:17, 7:20
representing [1] - 66:7
requests [2] - 8:24, 107:10
require [4] - 29:10, 32:11, 32:25, 95:5
required [10] - 9:18, 45:10, 45:14, 45:23, 46:25, 50:8, 70:2, 70:5, 72:6, 103:1
requirement [11] - 47:12, 48:3, 49:17, 50:6, 50:13, 50:19, 83:9, 88:18, 89:16, 90:6, 95:2
requirements [1] - 52:14
requires [2] - 62:14, 64:5
research [1] - 53:23
respect [27] - 11:18, 14:12, 14:13, 20:15, 27:8, 28:25, 30:12, 32:15, 35:21, 35:25, 38:14, 49:17, 51:3, 51:7, 52:1, 52:18, 53:22, 54:2, 77:22, 78:2, 81:16, 81:25, 91:19, 94:8, 95:3, 97:12, 104:23
respond [3] - 9:9, 9:24, 13:12
responding [3] - 96:23, 103:16, 103:17
responsible [1] - 96:14
rest [2] - 45:5, 92:25
result [4] - 21:23, 25:13, 25:21, 106:3
results [5] - 95:12, 99:16, 100:25, 101:1, 105:2
resume [1] - 114:25
RESUMES [1] - 15:20
reverse [1] - 88:16
review [4] - 39:13, 39:17, 40:14, 108:6
reviewed [2] - 39:21, 41:1
reviewing [1] - 40:1
REZA [1] - 3:8
rich [2] - 6:19, 36:16

RICHARD [1] - 5:4
Richter [2] - 56:16, 56:19
Rick [1] - 8:2
rick.frenkel@lw.com [1] - 5:6
ridiculous [1] - 98:6
right-hand [4] - 23:23, 30:21, 30:23, 66:8
rise [3] - 15:8, 81:4, 115:2
rmirzaie@raklaw. com [1] - 3:11
ROBERT [1] - 2:12
role [4] - 107:5, 107:25, 109:9, 109:11
ROOM [1] - 1:24
roughly [1] - 46:19
row [1] - 66:6
rule [1] - 74:17
Rule [5] - 12:2, 29:19, 31:8, 83:17
running [1] - 67:24
rush [1] - 11:16
RUSS [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8
Russ [1] - 5:16

## S

SACV-22-1599 [1] - 7:7
SAID [1] - 5:11
SALIL [1] - 4:5
Salil [1] - 7:21
samples [1] - 11:5
SANTA [3] - 1:18, 1:25, 7:1
Sarah [1] - 7:21
SARAH [1] - 4:16
sarah.wang@lw. com [1] - 4:19
satisfies [1] - 90:18
save [2] - 62:17, 62:20
saw [5] - 8:17, 21:18, 28:14, 52:19, 70:1
sbali@stradlinglaw. com [1] - 4:7
Schmoller [2] - 5:18, 81:12
scholarship [2] - 39:23, 55:3
science [2] - 55:15, 105:12
scope [6] - 9:7, 33:23, 100:8, 101:18, 101:21, 103:22
Scott [5] - 3:19, 4:9,

4:21, 5:5, 5:8
screwed [2] - 36:8, 53:20
Seagate [3] - 26:2, 26:11, 95:19
search [1] - 29:3
second [9] - 28:10, 30:19, 49:2, 50:8, 67:23, 86:16, 88:3
secondary [10] - 94:17, 94:19, 94:25, 95:1, 95:3, 95:8, 95:15, 97:13, 101:24, 106:5
Section [2] - 113:10, 116:8
sections [1] - 111:17
see [47] - 16:4, 16:15, 16:16, 16:20, 16:23, 17:5, 17:25, 19:4, 20:20, 20:25, 23:23, 24:4, 24:7, 24:8, 24:9, 26:20, 28:7, 30:6, 30:18, 32:14, 32:21, 39:2, 39:17, 39:18, 39:23, 43:17, 44:2, 44:3, 44:24, 44:25, 46:16, 55:9, 61:8, 61:20, 73:7, 80:6, 86:25, 87:6, 91:14, 94:1, 95:10, 99:7, 107:13, 107:14, 114:3, 114:17
seed [3] - 34:4, 34:5, 34:9
selected [2] - 89:6, 94:2
SELNA [1] - 1:3
Send [1] - 107:11
send [1] - 107:12
sense [2] - 98:12
sent [2] - 108:2, 111:12
sentence [1] - 61:8
separate [2] - 61:19, 61:21
set [5] - 60:21, 62:21, 67:21, 97:16, 99:15
several [1] - 47:4
shanle@ stradlinglaw.com [1] - 4:15
Shaoping [2] - 26:2, 98:20
Shen [3] - 6:13, 16:10, 17:17
short [1] - 67:24
show [24] - 20:5, 21:15, 31:17, 36:24,

37:1, 37:10, 45:17, 45:18, 59:9, 70:15, 83:21, 85:19, 86:25, 87:12, 87:24, 90:1, 94:25, 96:7, 96:17, 105:17, 111:2, 111:7, 114:1
showed [6] - 21:20, 38:12, 90:1, 90:16, 94:6
showing [20] - 10:24, 10:25, 19:22, 19:23, 19:24, 22:3, 23:15, 24:24, 25:20, 35:13, 35:24, 36:1, 37:10, 37:12, 38:9, 43:23, 81:16, 81:18, 95:1, 110:14
shown [13] - 8:11, 21:25, 22:15, 25:1, 30:15, 43:20, 47:3, 47:4, 64:19, 69:9, 71:23, 97:2, 110:16
shows [16] - 34:23, 34:25, 37:17, 37:18, 43:11, 64:20, 68:6, 70:9, 70:17, 78:19, 79:25, 81:19, 82:18, 93:5, 105:15
sic [5] - 41:13, 42:23, 65:12, 65:13, 65:14
side [8] - 23:23, 30:21, 30:22, 30:23, 33:12, 66:8, 66:9, 107:15
significance [1] - 39:10
significant [2] - 28:2, 29:1
significantly [1] - 61:22
similar [9] - 22:6, 62:14, 64:5, 69:25, 79:22, 97:9, 98:15, 102:9, 112:7
similarly [2] - 21:12, 49:25
simple [3] - 13:8, 13:14, 13:19
simply [1] - 13:22
single [5] - 27:20, 49:10, 61:17, 74:12, 108:5
single-grain [1] - 61:17
site [2] - 56:23, 80:6
sitting [1] - 40:16
situation [1] - 13:9
situations [1] - 34:14
size [10] - 12:22, 12:24, 14:3, 14:5,

14:6, 61:5, 76:16, 77:6, 77:9, 78:2
**sizes** [2] - 61:21, 92:10
**skill** [33] - 21:8, 25:2, 27:19, 33:3, 33:15, 33:18, 34:15, 34:19, 38:5, 38:6, 39:2, 39:4, 52:12, 54:14, 55:7, 57:1, 74:5, 85:2, 85:3, 85:5, 86:2, 86:9, 88:8, 90:24, 90:25, 91:21, 92:1, 92:18, 93:3, 93:14, 94:11, 102:6, 106:9
**skilled** [2] - 48:11, 88:3
**skipped** [1] - 8:2
**slabs** [5] - 52:22, 52:24, 53:2, 53:3
**slide** [14] - 11:25, 12:2, 12:20, 16:5, 19:22, 23:12, 24:4, 27:24, 37:10, 38:11, 58:3, 58:20, 97:17, 98:18
**Slide** [3] - 11:20, 16:1, 81:11
**slides** [3] - 12:23, 13:5, 54:2
**Slides** [3] - 11:19, 14:13
**slow** [2] - 11:3, 66:23
**small** [4] - 84:20, 84:25, 92:6, 112:9
**smaller** [4] - 59:5, 59:17, 59:21, 91:6
**SNR** [1] - 10:25
**so-called** [1] - 92:10
**Society** [1] - 54:23
**soft** [28] - 20:6, 20:24, 20:25, 21:5, 21:9, 21:25, 22:1, 22:3, 23:19, 23:25, 24:10, 35:1, 36:2, 37:13, 37:19, 43:10, 43:11, 49:10, 49:25, 50:16, 64:24, 65:1, 72:9, 72:11, 74:12, 82:16, 89:3
**sold** [2] - 37:23, 37:24
**solution** [4] - 20:5, 20:11, 20:18, 98:11
**solve** [3] - 77:17, 97:22, 98:3
**solved** [1] - 98:1
**someone** [1] - 97:10
**Sonobe** [2] - 6:17, 85:20

**sorry** [27] - 7:14, 17:8, 23:13, 36:8, 53:20, 55:20, 55:25, 57:10, 58:5, 60:25, 63:7, 63:8, 66:24, 69:14, 72:1, 75:15, 86:22, 88:19, 89:21, 92:21, 94:13, 98:19, 101:16, 103:3, 103:14, 104:13, 114:4
**sort** [14] - 20:14, 21:15, 24:3, 27:10, 29:17, 45:7, 62:21, 67:4, 67:9, 67:10, 70:7, 84:13, 84:17, 97:9
**sorting** [1] - 13:2
**sound** [1] - 39:23
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 116:20
**SPAAN** [3] - 1:23, 116:5, 116:19
**spacing** [1] - 83:17
**speaking** [1] - 86:1
**specific** [3] - 55:14, 74:25, 110:19
**specifically** [9] - 12:5, 27:9, 31:9, 31:19, 49:8, 58:10, 64:23, 78:7, 101:23
**specification** [1] - 41:18
**specified** [1] - 84:16
**specifies** [3] - 45:8, 71:11, 76:1
**Speculation** [1] - 40:10
**speculation** [1] - 40:11
**speech** [1] - 80:25
**spent** [2] - 106:15, 106:19
**spreadsheets** [1] - 13:1
**spring** [17] - 23:1, 23:20, 23:25, 24:10, 24:18, 24:25, 25:17, 71:6, 71:22, 72:11, 72:15, 72:16, 112:6, 112:19, 113:5, 113:20
**Sputtering** [1] - 6:23
**sputtering** [1] - 42:21
**stability** [4] - 20:8, 28:3, 111:23, 112:13
**stable** [4] - 6:18, 20:1, 36:15, 112:9
**stack** [1] - 34:6
**stand** [1] - 8:17

**STAND** [1] - 15:20
**standstill** [1] - 99:5
**start** [4] - 11:21, 21:10, 82:23, 99:16
**started** [1] - 23:22
**starting** [2] - 10:21, 67:21
**STATE** [1] - 116:4
**state** [3] - 7:9, 51:14, 113:4
**state-of-the-art** [1] - 113:4
**statement** [1] - 96:22
**statements** [4] - 57:14, 110:15, 110:17, 110:20
**STATES** [1] - 1:1
**States** [3] - 116:6, 116:8, 116:13
**stenographically** [1] - 116:10
**step** [3] - 41:4, 41:5, 103:14
**STEVEN** [1] - 4:12
**stick** [1] - 34:7
**still** [10] - 15:18, 33:10, 37:24, 60:2, 66:19, 76:5, 77:16, 84:25, 94:5, 94:7
**stop** [2] - 92:8, 114:24
**storage** [52] - 22:10, 24:23, 25:15, 32:17, 44:16, 44:23, 45:10, 45:22, 46:4, 47:1, 47:13, 48:3, 48:13, 48:17, 48:22, 49:3, 49:19, 50:10, 50:20, 51:1, 51:4, 52:2, 54:24, 65:2, 70:3, 70:4, 70:10, 70:25, 71:10, 71:18, 71:19, 71:25, 72:5, 72:15, 73:1, 82:25, 83:8, 83:14, 86:10, 86:13, 86:17, 87:14, 88:5, 88:19, 88:20, 88:24, 90:3, 111:24, 112:24, 113:1
**Storage** [1] - 23:2
**STRADLING** [3] - 4:4, 4:12, 5:11
**STREET** [1] - 1:24
**strength** [4] - 47:13, 48:4, 48:13, 48:14
**stricken** [4] - 100:9, 100:15, 100:16, 102:3
**strictly** [1] - 27:13
**strike** [3] - 102:2, 102:11, 112:24

**strong** [2] - 46:17, 46:22
**stronger** [1] - 46:20
**structure** [20] - 20:6, 22:4, 23:1, 44:15, 44:21, 45:5, 45:11, 45:15, 45:24, 58:15, 61:17, 69:23, 70:3, 74:11, 75:16, 82:22, 86:21, 86:23
**structures** [1] - 111:23
**student** [4] - 16:10, 17:17, 56:18, 97:10
**studied** [1] - 8:13
**stuff** [7] - 18:17, 30:1, 30:2, 34:21, 43:24, 51:13, 79:18
**style** [1] - 21:21
**sub** [2] - 91:12, 94:4
**sub-layers** [2] - 91:12, 94:4
**subject** [3] - 10:16, 17:19, 29:23
**sublayers** [1] - 89:7
**substance** [3] - 62:12, 106:22, 106:24
**substantially** [1] - 83:5
**substrate** [15] - 42:16, 42:18, 42:21, 43:6, 50:12, 68:14, 68:19, 69:2, 72:6, 72:8, 72:13, 81:24, 82:3, 82:14, 87:16
**success** [5] - 95:10, 96:9, 96:15, 96:20
**successful** [1] - 98:24
**successfully** [1] - 97:19
**Suess** [25] - 5:17, 7:13, 16:17, 20:15, 23:19, 28:12, 28:21, 39:4, 57:24, 58:7, 97:25, 98:13, 99:6, 99:20, 100:21, 102:21, 102:25, 103:3, 109:24, 111:13, 112:2, 112:6, 112:19, 113:5, 114:20
**Suess's** [19] - 38:24, 40:1, 77:17, 98:7, 99:9, 99:18, 102:17, 103:4, 103:17, 103:21, 104:7, 104:20, 105:7, 109:10, 113:14, 113:16, 113:19, 113:24
**suggest** [1] - 21:17

**suggestions** [1] - 104:23
**suit** [2] - 23:10, 105:23
**Suite** [7] - 2:17, 3:5, 3:13, 4:6, 4:13, 4:17, 5:12
**SUL** [1] - 82:17
**summary** [1] - 77:21
**superior** [1] - 102:22
**superparamagnetic** [13] - 28:3, 76:23, 77:17, 92:6, 92:11, 97:24, 98:1, 98:3, 98:9, 98:14, 98:22, 98:25, 99:5
**support** [11] - 69:17, 97:13, 97:15, 99:12, 99:14, 105:16, 105:20, 106:1, 112:2, 113:10
**surprise** [1] - 100:13
**surprising** [2] - 100:3, 100:4
**sustained** [6] - 40:11, 55:19, 83:25, 102:14, 103:8, 110:18
**SW** [1] - 2:17
**switch** [1] - 35:4
**switching** [1] - 87:4
**SWORN** [1] - 15:20
**system** [8] - 42:21, 62:15, 62:23, 78:17, 78:21, 78:23, 92:24, 93:4

### T

**table** [1] - 7:19
**Takahashi** [3] - 6:20, 47:20, 48:7
**Takouche** [1] - 7:22
**TAKOUCHE** [1] - 5:11
**talks** [9] - 42:19, 47:7, 49:25, 63:4, 63:5, 63:7, 63:9, 73:4, 91:24
**tallying** [1] - 13:20
**tangible** [1] - 113:12
**target** [1] - 42:20
**tastes** [1] - 33:8
**teaching** [7] - 34:13, 90:15, 95:12, 104:22, 104:23, 104:25, 105:2
**technical** [1] - 113:12
**technically** [2] - 42:9, 61:20
**technician** [2] - 5:17, 5:18

technologies [1] - 77:19
TECHNOLOGIES [2] - 1:4, 1:8
Technologies [3] - 7:7, 7:8, 7:12
Technology [1] - 26:2
technology [1] - 17:23
Temperature [1] - 6:21
temperature [1] - 98:4
tendency [1] - 55:11
tends [3] - 105:16, 105:17
tenth [1] - 50:1
terabyte [3] - 12:7, 13:4, 13:6
terabytes [3] - 12:9, 12:22, 14:4
term [1] - 46:7
terms [27] - 19:17, 20:11, 21:1, 21:8, 23:17, 23:21, 24:5, 27:6, 29:3, 46:16, 71:25, 84:4, 84:9, 84:12, 85:2, 93:3, 95:24, 99:3, 99:4, 99:11, 100:24, 102:19, 103:10, 103:16, 104:6
tesla [17] - 46:5, 46:7, 46:15, 47:13, 48:4, 48:9, 48:10, 48:14, 49:23, 70:16, 70:18, 83:1, 83:4, 83:5, 83:6
Tesla [1] - 46:8
tested [1] - 41:15
testified [6] - 13:3, 15:2, 56:13, 57:24, 99:17, 110:21
testify [1] - 104:17
testifying [3] - 31:12, 83:24, 109:6
testimony [19] - 8:8, 8:11, 9:5, 9:21, 12:21, 13:5, 14:23, 31:14, 49:6, 58:9, 67:25, 102:17, 103:24, 103:25, 104:6, 106:12, 111:3, 111:4
text [6] - 66:6, 70:10, 71:8, 71:23, 81:20, 90:8
THE [71] - 6:4, 7:6, 7:17, 7:25, 8:3, 9:9, 9:12, 9:17, 10:4, 10:14, 11:3, 11:10, 11:12, 11:15, 11:22,

11:24, 12:18, 13:16, 13:25, 14:9, 14:22, 15:6, 15:8, 15:12, 15:17, 15:19, 15:20, 30:5, 31:23, 34:1, 34:3, 35:7, 35:19, 36:20, 37:3, 37:6, 40:11, 47:24, 49:14, 55:19, 56:8, 57:8, 57:9, 57:10, 57:11, 57:12, 66:23, 73:24, 73:25, 80:20, 80:23, 81:4, 81:7, 83:25, 90:21, 100:16, 101:15, 102:3, 102:14, 103:8, 104:2, 104:3, 104:10, 104:11, 104:14, 108:12, 108:17, 110:18, 111:8, 114:24, 115:2
themselves [2] - 33:14, 40:18
theoretical [1] - 27:13
theoretically [1] - 98:9
therefore [2] - 13:18, 14:18
therein [1] - 38:2
thermal [5] - 20:8, 28:2, 111:23, 112:13
Thermally [1] - 6:18
thermally [3] - 20:1, 36:15, 112:9
thermostability [1] - 112:17
they've [1] - 106:12
thick [2] - 59:25, 76:1
thickness [10] - 59:5, 59:17, 59:21, 64:21, 75:24, 89:6, 91:6, 91:11, 91:16, 94:2
thin [6] - 6:19, 36:17, 64:5, 79:19, 93:18, 93:22
Thin [1] - 6:22
third [3] - 18:3, 27:13, 30:20
three [28] - 11:1, 11:20, 16:7, 20:3, 30:24, 32:18, 32:19, 38:13, 46:24, 60:1, 66:5, 66:10, 66:11, 67:22, 69:9, 72:5, 86:23, 89:4, 91:14, 94:15, 98:17, 99:2, 99:7, 99:8, 100:6, 113:9, 113:11, 113:19
three-layer [4] - 30:24, 86:23, 91:14, 100:6

throughout [2] - 13:11, 29:4
THURSDAY [2] - 1:16, 7:1
Tilted [1] - 18:5
title [9] - 16:4, 16:15, 16:16, 17:5, 17:19, 17:20, 26:3, 42:5, 63:4
Title [1] - 116:8
titled [3] - 6:13, 6:18, 6:21
titles [1] - 63:16
today [6] - 7:14, 15:13, 38:14, 67:25, 81:2, 98:18
together [8] - 20:7, 27:10, 27:20, 45:23, 51:5, 64:13, 65:8, 84:6
tomorrow [1] - 15:15
took [2] - 12:6, 100:2
top [14] - 16:4, 20:22, 25:16, 32:15, 33:7, 35:1, 37:19, 47:6, 50:16, 61:17, 63:20, 72:16, 86:5, 87:21
topic [2] - 29:7, 94:18
total [2] - 12:11, 29:4
towards [5] - 52:18, 53:14, 53:23, 77:12, 90:3
Town [1] - 3:22
traditional [1] - 43:10
Transactions [1] - 6:15
transcript [3] - 10:18, 116:9, 116:11
Transcript [1] - 1:5
TRANSCRIPT [1] - 1:14
Transitions [1] - 17:12
Tregillis [2] - 5:18, 7:23
trial [4] - 8:8, 41:15, 110:5, 110:6
TRIAL [1] - 1:15
trick [1] - 76:23
tried [1] - 110:7
trilayer [1] - 113:17
trilemma [1] - 112:8
true [77] - 16:14, 18:22, 19:15, 20:16, 25:8, 26:13, 27:7, 28:16, 31:3, 32:4, 38:3, 39:24, 40:15, 40:24, 42:10, 42:24, 45:25, 48:20, 50:18, 51:6, 51:17, 51:22, 52:16, 53:9, 53:12,

53:19, 54:8, 55:6, 58:1, 59:8, 59:15, 61:7, 61:23, 62:10, 62:25, 64:10, 64:15, 65:4, 66:18, 67:8, 68:24, 69:15, 70:14, 72:20, 73:10, 75:4, 78:8, 80:7, 85:1, 85:16, 85:23, 85:25, 86:24, 87:8, 88:13, 89:24, 92:12, 92:14, 93:10, 94:5, 94:7, 96:5, 109:8, 109:17, 109:20, 110:1, 111:14, 111:19, 111:25, 113:8, 113:15, 113:18, 114:10, 114:18, 116:9
truth [2] - 10:5, 102:13
try [5] - 10:1, 41:9, 74:19, 86:3, 110:23
trying [4] - 57:5, 74:18, 87:24, 97:22
turn [13] - 27:23, 30:9, 38:11, 41:11, 62:7, 64:2, 71:2, 76:16, 78:13, 86:14, 89:25, 92:20, 107:21
turning [3] - 17:8, 17:14, 33:14
two [22] - 11:1, 20:23, 21:11, 25:17, 27:12, 29:13, 44:16, 45:22, 51:11, 56:3, 57:14, 67:18, 73:5, 88:10, 91:15, 93:19, 96:11, 97:13, 107:10, 113:16, 114:12
two-layer [3] - 21:11, 25:17, 57:14
TZENG [1] - 5:8
Tzeng [1] - 7:20

## U

U.S [3] - 1:3, 114:2, 114:5
under [3] - 12:2, 15:18, 76:6
underlayer [19] - 43:5, 43:10, 43:12, 43:20, 44:8, 46:6, 48:19, 66:11, 66:12, 69:7, 69:19, 70:19, 72:14, 82:14, 82:16, 83:1, 83:9, 86:10, 86:13
underlined [2] - 24:2, 45:5
underlying [4] - 14:15,

20:4, 44:13, 51:3
underneath [1] - 46:2
understood [4] - 33:16, 39:6, 85:3
underwhelming [1] - 108:3
undisclosed [1] - 90:15
unexpected [3] - 95:11, 99:15, 105:2
unfair [1] - 10:13
unfortunately [2] - 41:7, 41:8
UNITED [1] - 1:1
United [3] - 116:6, 116:8, 116:13
units [2] - 12:23, 13:24
unlikely [1] - 86:6
unresolved [1] - 97:19
up [26] - 8:3, 8:20, 11:15, 12:13, 13:20, 15:1, 15:7, 16:3, 21:21, 27:16, 34:14, 36:8, 36:9, 52:13, 53:20, 54:2, 54:10, 66:3, 73:18, 81:11, 84:7, 85:8, 110:3, 110:4, 111:10, 114:15
up-front [1] - 73:18
upside [3] - 33:17, 38:8, 87:25
US201000062286 [1] - 113:20
useful [3] - 55:9, 77:11, 101:11
uses [1] - 23:18

## V

valid [4] - 38:25, 40:18, 95:21, 108:9
value [6] - 31:5, 49:22, 70:15, 70:17, 71:9
values [3] - 32:9, 52:23, 64:22
varies [2] - 29:11, 87:5
various [2] - 43:25, 72:22
vary [4] - 29:18, 32:10, 61:22, 64:21
verifiable [1] - 113:12
version [1] - 19:13
versus [1] - 40:22
vertically [2] - 51:11, 61:14
vetted [1] - 39:22
Vice [1] - 2:16
Victora [29] - 15:23,

16:4, 18:23, 29:20, 29:23, 29:25, 46:25, 52:13, 58:20, 60:11, 61:2, 62:1, 62:5, 63:25, 64:3, 65:21, 66:1, 67:14, 70:1, 74:5, 75:5, 75:8, 79:23, 81:9, 83:20, 106:7, 108:9, 108:20

**VICTORA** [2] - 6:4, 15:20

**Victora's** [1] - 90:19

**Victora-1** [14] - 16:21, 17:2, 17:9, 18:18, 19:18, 26:21, 27:8, 38:21, 38:23, 42:5, 51:12, 63:17, 67:3, 67:7

**Victora-2** [11] - 18:1, 38:20, 43:11, 43:13, 44:4, 47:7, 47:10, 49:25, 50:3, 51:12, 51:18

**Victora-3** [23] - 19:8, 38:21, 42:8, 42:19, 43:9, 43:15, 44:5, 47:5, 47:9, 48:5, 48:12, 49:21, 50:2, 50:17, 51:9, 51:16, 51:21, 54:6, 60:4, 61:4, 64:20, 65:11, 67:9

**view** [1] - 112:11

**virtually** [1] - 51:10

**visit** [1] - 108:25

**visual** [1] - 58:24

**Vol** [2] - 6:16, 6:23

**VOLUME** [1] - 1:10

**vs** [2] - 1:7, 7:7

## W

**Wabash** [2] - 3:13, 4:17

**walk** [1] - 70:7

**Wang** [7] - 6:13, 7:21, 18:9, 34:23, 34:24, 35:13, 85:13

**WANG** [1] - 4:16

**wants** [4] - 27:25, 28:2, 76:1, 79:24

**Washington** [1] - 2:18

**wasting** [1] - 76:25

**Watkins** [1] - 7:19

**WATKINS** [8] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4, 5:7

**ways** [1] - 89:3

**WD** [2] - 9:8, 11:8

**welcome** [1] - 7:25

**well-known** [1] - 76:21

**Wendy** [2] - 5:16, 7:15

**WEST** [1] - 1:24

**Western** [13] - 5:18, 7:7, 7:19, 11:17, 23:3, 26:12, 94:22, 94:24, 96:12, 97:3, 108:22, 108:25, 109:6

**WESTERN** [1] - 1:8

**wherein** [1] - 59:4

**whole** [11] - 29:7, 66:20, 67:21, 75:15, 75:17, 76:12, 80:9, 92:16, 94:9, 94:23, 94:25

**widely** [1] - 37:24

**Wilshire** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9

**wise** [1] - 62:19

**withdraw** [2] - 77:24, 109:23

**WITHDRAWN** [1] - 6:11

**WITNESS** [10] - 15:19, 34:3, 35:7, 56:8, 57:8, 57:10, 57:12, 73:25, 104:3, 104:10

**witness** [3] - 11:13, 108:10, 109:9

**witness's** [1] - 111:3

**WITNESSES** [1] - 6:3

**won** [3] - 28:14, 54:22, 55:8

**word** [2] - 108:4, 113:25

**wording** [2] - 23:24, 95:5

**words** [4] - 20:4, 23:18, 24:1, 53:1

**works** [2] - 53:14, 97:5

**world** [1] - 114:7

**worry** [1] - 98:2

**write** [7] - 20:3, 20:9, 39:17, 39:19, 63:10, 83:14, 84:13

**writeability** [4] - 20:9, 21:13, 23:18, 24:2

**writing** [9] - 62:23, 78:17, 78:19, 78:23, 84:9, 92:25, 93:4, 93:5

**written** [3] - 16:9, 55:10, 112:10

**wrote** [4] - 57:13, 109:24, 112:2, 113:7

## X

**Xiao** [2] - 16:10, 17:17

## Y

**year** [4] - 36:3, 37:20, 107:10, 108:25

**yesterday** [10] - 8:7, 10:17, 10:18, 12:1, 12:21, 13:3, 13:9, 21:18, 28:14, 38:12

**YOCCA** [3] - 4:4, 4:12, 5:11

**young** [1] - 13:16

**YOUNG** [9] - 4:20, 11:14, 11:17, 11:23, 11:25, 13:17, 14:3, 14:11, 14:24

**Young** [2] - 7:21, 11:17

**yourself** [1] - 57:17

## Z

**zero** [2] - 29:20, 98:4

UNITED STATES DISTRICT COURT