**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

MR TECHNOLOGIES, GMBH,                )
                                      )
        Plaintiff and                 ) **Certified Transcript**
        Counterclaim Defendant,       )
                                      ) Case No.
        vs.                           ) 8:22-cv-01599-JVS-DFM
                                      )
WESTERN DIGITAL TECHNOLOGIES,         )
INC.,                                 )
                                      )
        Defendant and                 )
        Counterclaim Plaintiff.       ) **DAY 8**
                                      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

FRIDAY, JULY 26, 2024

8:01 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF and COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  MARC A FENSTER, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mfenster@raklaw.com

RUSS AUGUST & KABAT
BY:  BRIAN D. LEDAHL, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
bledahl@raklaw.com

RUSS AUGUST & KABAT
BY:  JACOB ROBERT BUCZKO, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
jbuczko@raklaw.com

RUSS AUGUST & KABAT
BY:  MATTHEW D. AICHELE, ESQ., Pro Hac Vice
800 Maine Avenue, SW
Suite 200
Washington, D.C. 20024
202-664-0623
maichele@raklaw.com

RUSS AUGUST & KABAT
BY:  MINNA Y. CHAN, ATTORNEY AT LAW
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
mchan@raklaw.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR PLAINTIFF AND COUNTERCLAIM DEFENDANT:**

RUSS AUGUST & KABAT
BY:  PAUL A. KROEGER, ESQ.
1224 Wilshire Boulevard
Suite 1200
Los Angeles, California 90025
310-826-7474
pkroeger@raklaw.com

RUSS AUGUST & KABAT
BY:  REZA MIRZAIE, ESQ.
12424 Wilshire Boulevard
12th Floor
Los Angeles, California 90025
310-826-7474
rmirzaie@raklaw.com

LATHAM & WATKINS LLP
BY:  DALE CHANG, ESQ.
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
dchang@raklaw.com


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

LATHAM & WATKINS LLP
BY:  DOUGLAS E. LUMISH, ESQ.
140 Scott Drive
Menlo Park, California 94025
650-328-4600
doug.lumish@lw.com

LATHAM & WATKINS LLP
BY:  JOSEPH HYUK LEE, ESQ.
650 Town Center Drive
20th Floor
Costa Mesa, California 92626
714-540-1235
joseph.lee@lw.com


**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**


STRADLING YOCCA CARLSON & RAUTH LLP
BY:  SALIL BALI, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4278
sbali@stradlinglaw.com

LATHAM & WATKINS LLP
BY:  CHAARUSHENA DEB, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
chaaru.deb@lw.com

STRADLING YOCCA CARLSON & RAUTH LLP
BY:  STEVEN M. HANLE, ESQ.
660 Newport Center Drive
Suite 1600
Newport Beach, California 92660
949-725-4000
shanle@stradlinglaw.com

LATHAM AND WATKINS LLP
BY:  SARAH W. WANG, ATTORNEY AT LAW
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
312-876-7700
sarah.wang@lw.com

LATHAM & WATKINS LLP
BY:  PATRICIA YOUNG, ATTORNEY AT LAW
140 Scott Drive
Menlo Park, California 94025
650-328-4600
patricia.young@lw.com

**APPEARANCES OF COUNSEL**
**(Continued:)**


**FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF:**

LATHAM & WATKINS LLP
BY:  RICHARD GREGORY FRENKEL, ESQ.
140 Scott Drive
Menlo Park, California 94025-1008
650-328-4600
rick.frenkel@lw.com


**ALSO PRESENT:**

Wendy Liu, paralegal (Russ August & Kabat)
Dieter Suess, plaintiff's corporate representative
Andy Mortensen, plaintiff's IT technician
Chris Schmoller, defendant's IT technician

**UNITED STATES DISTRICT COURT**

**I N D E X**

| | PAGE |
|---|---|
| Jury instructions | 27 |
| Plaintiff's closing argument | 67 |
| Defendant's closing argument | 90 |
| Plaintiff's rebuttal argument | 129 |
| Defendant's rebuttal argument | 140 |
| Jury Note 1 | 145 |
| Verdict | 147 |

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| DX-1009 | Article by A. Yu. Dobin & H. J. Richter, titled "Domain Wall Assisted Magnetic Recording," May 8, 2005 | 9 | |

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; FRIDAY, JULY 26, 2024**

**8:01 A.M.**

**- - -**

**(Out of the presence of the jury.)**

THE COURTROOM DEPUTY:  Calling Matter 1, SAC-V22-1599, MR Technologies, GmbH, vs. Western Digital Technologies, Inc.

Counsel, please state your appearances for the record.

MR. KROEGER:  Good morning, Your Honor.  Paul Kroeger for plaintiff.  With me is Jacob Buczko, Minna Chan, and Wendy Liu, and we're ready to proceed.

THE COURT:  Good morning.

MR. FRENKEL:  Good morning, Your Honor.  Rick Frenkel for Western Digital.  With me is Joseph Lee, Sarah Wang, Steve Hanle, Salil Bali.  And Mr. Lumish will be here later.

THE COURT:  Very good.  Good morning.  I received the updated special verdict.  The one in Word is on numbered paper, and if it's agreed, it's fine by me.

MR. KROEGER:  It's agreed by plaintiff, Your Honor.

MR. FRENKEL:  Yes, Your Honor.

THE COURT:  Then, Elsa, will you, at some point, start to copy those.

**UNITED STATES DISTRICT COURT**

At this point, the parties will have an opportunity to make any objections either to the form of special verdict or to the jury instructions, either objections to what the Court proposes to give and what the Court has declined to give.  Any objections previously made and any written filing or on the record will be deemed also to have been made at this time.

MR. KROEGER:  Your Honor, before we do that, can I just make one clarification about the exhibits that were entered into evidence?

THE COURT:  Yeah, sure.  Let's clear that up.

MR. KROEGER:  We've reached an agreement, and Exhibits DX-1187, -1796, and -1797 are deemed published to the jury only but not admitted.  And I believe there was some discussion about PX-1009, whether or not it was previously admitted.  We both agree that that is admitted.

THE COURT:  Okay.

MR. LEE:  Sorry.  It's actually, I believe, "DX" numbers, but other than that -- so just to be clear, DX-1187, -1796, -1797, we don't oppose those just being published.  And then for DX-1009, just to remove any doubt, the parties agree that that exhibit is admitted.

THE COURT:  Okay.  Then DX-1187, -1796, and -1797 will be received for demonstrative purposes only and will not go back to the jury.

MR. LEE:  Understood, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  And 1009 will be received.

MR. LEE:  Understood, Your Honor.

MR. KROEGER:  Thank you, Your Honor.

**(Exhibit Number DX-1009 received.)**

THE COURT:  Okay.  Then let's turn to the jury instructions.

MR. FRENKEL:  Good morning, Your Honor.  Rick Frenkel for Western Digital.  Before we get into making a record, we have a couple of typos that we saw that we wanted to point out.

THE COURT:  Sure.

MR. FRENKEL:  So give me one second.  I'm going to work backwards through this.  On page 32 of the printout -- and this is in the Court's Instruction Number 22 on the second page -- there's a bracket with MRT, colon.  It's on the --

THE COURT:  Okay.

MR. FRENKEL:  -- fifth line down.

THE COURT:  Line 5, yes.

MR. FRENKEL:  All right.  On the Court's Instruction Number 18, there are actually two paragraphs on "inherency" that are somewhat overlapping, and we think that Your Honor did not mean to include both.  That's -- the third paragraph of Number 18 on the bottom of 24 we believe should be stricken because that same language is on the third paragraph on page 25.  The paragraph in 24 that I'm talking about begins "to

rely on inherency," and the paragraph that should be kept, we think, on page 25 is "but to rely on inherency."

THE COURT:  Mr. Kroeger.

MR. KROEGER:  We think that the first one -- we think that the "but to rely on inherency" is a better statement of the law, although we disagree with the last sentence, but that's probably for a different matter.

THE COURT:  So strike, on page 24, Instruction 18, the paragraph beginning "to rely" at line 18?

MR. KROEGER:  Yes, Your Honor.

MR. FRENKEL:  Thank you.  To make it easier and less words for the jury.

THE COURT:  Less words for me too.

MR. FRENKEL:  Also on page 25, just as a typographical issue, there's brackets at the end of the first two paragraphs.

THE COURT:  Yes.  Thank you.

MR. LEE:  And, Your Honor, my apologies.  I'm looking for where it is.

MR. FRENKEL:  While he's looking, Your Honor, one more repetitive paragraph that we caught is on page 12 at the end of Court's Instruction Number 10.  There are two paragraphs that begin with:

"The weight of the evidence as to a fact does not necessarily depend on the number of witnesses

who testify about it."

THE COURT:  I'll delete one.  That's in the standard instruction.

MR. FRENKEL:  Yeah, I know.  We're not saying that both of them should be deleted.  I think the second one is repetitive, and the first one should remain in.

THE COURT:  So the first one, you're saying, Instruction Number 10, page 11, at line 5?

MR. LEE:  And then, Your Honor --

THE COURT:  Just a minute.  I want to make sure -- the first one you're referring to, page 11, Instruction 10 at Line 5?

MR. FRENKEL:  No.  I'm referring to -- it's page 12, which is the second page of --

THE COURT:  Yes.

MR. FRENKEL:  -- Instruction 10.  And the one that starts at line 18, we think should stay in.  It's a more complete statement.  And the one that starts at line 22 seems to be just a repeat of the first sentence.

THE COURT:  Okay.

MR. LEE:  And then, Your Honor, finally, on page 49, the WD-9, we understood from the charge conference yesterday that that additional sentence would be added to instructions, but we don't see it this morning.

MR. KROEGER:  Mr. Lee, I see it on page 23 at

line 17.  Am I wrong?

MR. LEE:  You may not be wrong.  Let me see.

**(Counsel conferred off the record.)**

THE COURT:  I think it's added in Instruction 12.

MR. LEE:  Your Honor, that is not the language I'm referring to.  It's on page 49.

MR. KROEGER:  Mr. Lee, there is no page 49 of these instructions.

MR. LEE:  Sorry.  I'm looking at the wrong version.

Your Honor, I apologize.  I'm looking at the wrong version of the document.

THE COURT:  Okay.

MR. FRENKEL:  So that only leaves one more for us, and that's the curative instruction, Your Honor.  We saw it in your instructions last night.  So we would like to make a record on that.

Did you have anything else for us?

THE COURT:  No, I saw your filing from last night.  On Curative Instruction Number 1, I'm not giving that.

MR. FRENKEL:  Okay.

THE COURT:  Number 2, I am giving it; and number 3, I'm not.

MR. FRENKEL:  Right.  It's the Number two that we're talking about.  So I have prepared some slides.

THE COURT:  Okay.

MR. FRENKEL:  And thank you for letting us make the record, Your Honor.  All right.  So on this comprising curative instruction, we -- you know, we think it's error to give it.  And I want to explain why.

Claim 1 of the '864 patent, again, has four not functional reasons -- I'm not talking about whether the hard magnetic storage layer stores to the nucleation host switches -- but actually physical reasons why they have to be two distinct components:  The nucleation host has coercivity that's measured without the hard magnetic storage layer.  The nucleation host is formed on the hard magnetic storage layer.  They are exchange coupled to each other.  And the hard magnetic storage layer has to be in between the nucleation host and those substrate.

So we cited *Becton, Dickinson*.  *Becton* was also a comprising claim -- is a comprising claim, and the Federal Circuit held that where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.  And they reversed a District Court construction that did not require the spring means and the hinged arm to be distinct.

The Claim 1 I'm showing from *Becton* that was at issue says, "A shieldable needle assembly comprising," and then there were four elements.  I've only included the last two.  And there's a hinged arm, and then there's spring means that's

connected to the hinged arm.  And the Federal Circuit said that the assertion that the spring means and hinged arm can be the same structure renders the asserted claims nonsensical because that would require the hinged arm to be connected to itself.

Claim 24 was also at issue, and that one had the spring means extending between the hinged arm and one other component, much like, in this case, the hard magnetic storage layer is in between the nucleation host and another component. And the Federal Circuit said that's a physical impossibility unless they're distinct components.  And the claim construction that renders the asserted claim as nonsensical cannot be correct.

One other point.  During the charge conference, counsel for MR Tech said, "Well, you don't have to look at *Becton, Dickinson* because it was a means-plus-function case." But Footnote 3 of *Becton, Dickinson* said (as read):

"We don't need to reach whether it's a

means-plus-function because we just conclude

that -- whether the asserted claims are 112 or

not -- or 6 or not -- an added spring element is

required by the plain language of the claims."

So turning to the claim construction, it has three paragraphs in the curative instruction.  I'm showing here the first two.  The middle paragraph on the meaning of "comprising" is already in the Court's Instruction Number 11 word for word

**UNITED STATES DISTRICT COURT**

except adding the term "Western Digital" to Claim 13 -- to Instruction 13.  So we don't think that it's necessary. Mr. Fenster in closing can argue "comprising" based on the Court's Instruction Number 11.

But removing that, you're left with the first and the third paragraph, which we think are confusing.  We think that it implies that they need not be distinct components and that's in violation of *Becton*.  So that's the basis of our objection to this curative instruction.  We think it would be error.  Thank you very much.

THE COURT:  How would you modify this, if at all?

MR. FRENKEL:  We just don't think it should be given.  We don't think that it was error in opening to have made the argument.  And so, you know, we think the definition of "comprising" already in 11 is enough for MR Tech to be able to make its arguments.

THE COURT:  I think all this is doing is suggesting that some of the middle layers can also -- can also store.

MR. FRENKEL:  Right.  And, you know, the definition of "nucleation host" already says that there are one or more ferromagnetic layers.

THE COURT:  Right.

MR. FRENKEL:  So that construction is already available for MR Tech to be able to argue that.  And, again, there's two aspects to this.  There's functional aspects, and

16

then there's physical aspects.

We think it's a physical impossibility for an accused product -- a layer of an accused product media to be both a nucleation host and a hard magnetic storage layer.  And the construction, by calling that out in the first paragraph and giving a curative instruction, leads the implication that that's not the case, which we think is confusing.  And so, again, I don't see the need for a curative instruction on that.

THE COURT:  Well, I think we have evidence that some of these middle layers also store or -- not store, but -- yeah, also store.

MR. FRENKEL:  In the accused products.  But that is not what the patent says and that's what the claim says.  And so this is focused on the claims.  And the claims call for a nucleation host, you know, and a hard magnetic storage layer.  Again --

THE COURT:  I think there's a battle of the experts as to whether those layers can physically both store and act in assisting.

MR. FRENKEL:  Again, I think that was the issue that Mr. Lumish raised yesterday with Your Honor.  And our understanding coming out of that is we're not allowed to raise that defense, so it's no longer a battle of the experts.

And we have a claim construction term "hard magnetic storage layer" that we're arguing about for noninfringement.

**UNITED STATES DISTRICT COURT**

And this curative instruction, I think, leads the jury down the path to, you know, think that, "Well, as long as any layer stores, then there must be a hard magnetic storage layer," when that's not what the claim says.  And, again, I think --

THE COURT:  I think the hard magnetic layer has to store.  But that's a given.

MR. FRENKEL:  Yes.

THE COURT:  But if the other layers also perform some storage function, that comes within the comprising notion.

MR. FRENKEL:  All right.  But, again, by mentioning the two distinct features in the first paragraph of this curative instruction, it implies that there don't need to be two distinct elements.

THE COURT:  How would you modify this?

MR. FRENKEL:  Again, I don't see -- a curative instruction implies that there was some error in what Western Digital did or said.  And we don't think there was any error.  So we don't think that it should even be given.

The -- if you took out the first paragraph -- you know, I think, again, we have no -- we have no dispute with the second paragraph.  None.  That's already in Number 11.  And I think that's all Your Honor is saying, is that if you find that the Western Digital accused products literally infringed that claim, even if they include additional components, provided the presence of those additional components does not negate an

element of the claim or materially affect the basic and novel properties of the invention.

Second paragraph seems to us to be an accurate statement. That's the only one we'd include in Court's Instruction Number 13.

THE COURT: What about the third paragraph?

MR. FRENKEL: I don't think there's any need to give it. We didn't -- you know, we were not allowed to make the "assists in switching" argument. That happened, you know, at some point during the case. And so I just don't think it's necessary here.

THE COURT: Let me hear from Mr. Kroeger.

MR. KROEGER: Thank you, Your Honor. This was extensive -- Paul Kroeger for plaintiff.

This was extensively argued during the July 16th day, I believe in the morning, at page 74. And we were directed by the Court to submit a curative. That's what we've done.

THE COURT: Why do we need the first paragraph if we have -- if we repeat the "comprising" in the third paragraph?

MR. KROEGER: So, Your Honor, there's no dispute in this case that what we have done is we've identified the bottom G1 layers only as the -- as the hard magnetic storage layer and other layers as the nucleation host.

THE COURT: Right.

UNITED STATES DISTRICT COURT

MR. KROEGER:  But WD has been trying to conflate the two, and saying that they both can't do the same function. Even though that's not what they told the Court during claim construction.

This is what Mr. Hanle told the Court during the -- I'm sorry -- during the March 19, 2024, hearing for motion on summary judgment.

You asked him:

"I'm talking about the storage of data.  Can the layers and the nucleation host both cause switching and themselves store data?"

And Mr. Hanle said, "They can do both.  They don't have to do both."

And now in opening and through Dr. Desai, they've tried to argue that the hard magnetic storage layer also assists in switching and the nucleation host also stores data. Therefore, they both can't satisfy the claims.  They've been running directly against "comprising."

We think this curative is necessary to help --

THE COURT:  Why do we need the first paragraph? Seems to me the last paragraph is the essence.

MR. KROEGER:  We just think the first paragraph is necessary to help cure some of the prejudice that they were allowed to argue to the jury, directly contrary to the Court's claim construction.

UNITED STATES DISTRICT COURT

These arguments were made in opening.  They were made repeatedly through Dr. Desai.  And we think that we need some sort of curative to help address the arguments the jury heard contrary to the Court's claim construction and contrary to the law of "comprising."

THE COURT:  I'm going to give this, but I'm going to strike the first paragraph.

MR. FRENKEL:  And, Your Honor, if you're going to give this, the one thing that I'd like to ask:  In the third paragraph, if you notice, the sentence beginning on line 19 says:

"Similarly, if the accused 'nucleation host' meets the elements in the claims but also stores information in magnetically oriented bits."

We'd like that cadence in the first sentence.

So it should say, "Therefore, for example, if the accused 'hard magnetic storage layer,'" and then we should insert the word "meets the" and change "element" in the claim -- no, leave the "element."  Sorry.  It should be "meets the element in the claims" and then should be "but also assists in switching."

So -- do you follow?  I'm sorry.

THE COURT:  Yeah.  I'll read it back to you.  Okay.  Okay?

MR. FRENKEL:  Again, we're going to preserve --

we're not conceding to the instruction, but we're preserving it for the record.

THE COURT: So the sentence at line 16 would read:

"Therefore, for example, if the accused 'hard magnetic storage layer' element meets" --

MR. FRENKEL: Should be "meets the element in the claims."

THE COURT: -- "meets the elements in the claim, but also 'assists in switching' in one or more," "then it nevertheless."

MR. FRENKEL: Thank you.

We have one more preservation for the record. Ms. Wang is going to talk about the verdict form.

MS. WANG: Good morning, Your Honor. Sarah Wang for Western Digital.

We understand that the Court has already decided the issue with regard to verdict form, but we wanted to preserve for the record the instruction regarding SSPPU.

THE COURT: Please.

MS. WANG: Yes. So, again, we believe that this is an important issue that has been discussed extensively in court. We believe that the jury should decide the issue of whether the damages should be derived from the entire hard disk drive or whether it should be apportioned properly.

THE COURT: Objection is noted. That paragraph was

tendered in Western Digital's proposed special verdict.  I'm not going to give it.

As I stated in the settling conference, I'm basically giving a general verdict, and to single out any single element I think is unnecessary and undue.  I think the record in the jury instructions allow you to argue what the smallest salable unit is and to make the argument without having that question in the special verdict.

MS. WANG:  Yes, Your Honor.

THE COURT:  Anything further?

MS. WANG:  No, Your Honor.

THE COURT:  Thank you.

Anything further?

MR. KROEGER:  Yes, Your Honor.  We have one objection we'd like to put on the record.

THE COURT:  Sure.

MR. BUCZKO:  Your Honor, good morning.  Jacob Buczko for plaintiff.

This relates to the SSPPU instruction that Your Honor just mentioned.  And we have our objections noted in the record, but we think there's one change in particular, we would argue for it here, to the instruction that Your Honor indicated you would like to give, and that's on page 35, the second paragraph.  There's a phrase "not on the entire product but instead."  And --

THE COURT:  What line is that?

MR. BUCZKO:  Oh, this is lines 20 and 21.

THE COURT:  Okay.

MR. BUCZKO:  And this is contrary to your Court's order on the *Daubert* motions, which held that MRT does not rely upon the EMVR here.  And Your Honor may recall that there was a motion to strike an SSPPU opinion based on *LaserDynamics* case.  And Your Honor held that that case had limited relevance in this case because MRT doesn't rely on the EMVR case.

I understand that Your Honor is inclined to give the SSPPU instruction, but we believe that this language is incorrect and goes against the -- incorrect legally, and goes against the rulings already in the case.  And, again, it's the phrase "not on the entire product, but instead" in lines 20 and 21 on page 35.

THE COURT:  I'll add this at line 24:

"It is for you to determine whether the smallest salable unit is a component or the whole product."

MR. BUCZKO:  Okay.  That's fine, Your Honor.

THE COURT:  I think it's -- I think the -- that reading is permissible with the instruction as is, but I take your point, and let's make it clear.

MR. BUCZKO:  Great.  Thank you, Your Honor.

MS. WANG:  We have no objections, Your Honor.

THE COURT:  Okay.  I'll make all these changes and come back with copies.

MR. FRENKEL:  Thank you.  Nothing further from defendant.

MR. KROEGER:  Nothing further for the plaintiff, Your Honor.

THE COURT:  Let me say all the gremlins I found in the various drafts, trying to edit, miraculously disappeared last night, which made my life easier.

All right.  Thank you.

THE COURTROOM DEPUTY:  All rise.  This Court is in recess.

**(Recess from 8:29 a.m. to 9:24 a.m.)**

THE COURT:  There was an issue with Instruction Number 13?

MR. FRENKEL:  Yes, Your Honor.  When we just discussed the edits to paragraph 13, we think that what was discussed was the first sentence, saying:

"Therefore, for example, if the accused 'hard magnetic storage layer' meets the elements in the claims," and the words "elements in the" didn't make it in.  We think that's not what was intended.  With those words in, then the first sentence is parallel to the second sentence, which is what we were going for.  That's the only issue.

THE COURT:  Okay.  Well, put "elements in."  We'll print a revised page and distribute the revised page, and people can just substitute.

MR. FRENKEL:  Thank you.

THE COURT:  In terms of the closings -- where's...

MR. BALI:  Mr. Lumish will be right back, Your Honor.

THE COURT:  Okay.  Be back in a minute.

THE COURTROOM DEPUTY:  All rise.  Court is in recess.

**(Recess from 9:25 a.m. to 9:32 a.m.)**

THE COURT:  So that we don't waste any more time, we'll just pass out substitute pages for everyone and ask them to yank 13 and insert this new one.

We discussed the closings, an hour each, but how do you want to split that up?

MR. FENSTER:  Your Honor, my intention is that I'll probably do about 35 or so and save the remaining for rebuttal.

MR. LUMISH:  Would Your Honor permit a rebuttal on our side as well?

THE COURT:  Yes.  I think you're entitled to it.

MR. LUMISH:  Then I think I'd go about 50/10, Your Honor.

THE COURT:  One-five?

MR. LUMISH:  Five-zero, and then ten.  Maybe 45 and

15.

THE COURT:  That's fine.

MR. FENSTER:  Your Honor, is it correct that defendant's rebuttal is limited to validity?

THE COURT:  Limited to their case-in-chief.

MR. FENSTER:  Thank you, Your Honor.

THE COURT:  Anything before we bring the jury in?

I meant to say this, but so you can distinguish the final copy, there's an "F" in the footer.

MR. FRENKEL:  Your Honor, the stapled pages that were just distributed went back to the previous version.

THE COURT:  I'm sorry?

MR. FRENKEL:  The stapled pages that were just distributed went back to the previous version of Instruction Number 13.

THE COURTROOM DEPUTY:  You're going to substitute it out.

MR. FRENKEL:  Oh, we substitute it out?  Okay.

THE COURT:  Has everybody got the correct version?

MR. FRENKEL:  We got the substitute page, but the stapled version that we got at the same time is different.

THE COURT:  Pull 13 in the stapled copy out.

MR. FRENKEL:  Got it.

THE COURT:  Okay.

**(In the presence of the jury.)**

**UNITED STATES DISTRICT COURT**

THE COURTROOM DEPUTY:  Be seated and come to order. This Court is again in session.

THE COURT:  Good morning, ladies and gentlemen. Each of you has a personal copy of the jury instructions. You're welcome to simply listen to me read them -- I'm required to read them -- or you can follow along if you'd like.

Each side has claims in this case.  So this is the order of the arguments.  MR will present its closing argument with respect to the infringement case.  And then Western Digital will present its closing argument with respect to the invalidity case.  And then each side gets a rebuttal.

MR will have a rebuttal with respect to its case-in-chief, the infringement case.  And then Western Digital will have a rebuttal with respect to its case, the invalidity case.

Counsel have a total, each, of an hour for closings.

You also have a copy of the special verdict.  The special verdict is the set of questions you'll be asked to answer as part of your deliberations.

### JURY INSTRUCTIONS

THE COURT:  (Reading:)

"Members of the jury, now that you've heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be sent to the jury" --

**(Pause in proceedings.)**

THE COURT:   (Reading:)

-- "for you to consult during your deliberations.

"It is your duty to find the facts from all the evidence in the case.  To those facts, you will apply the law as I give it to you.  You must follow the law as I give it to you whether or not you agree with it.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

"Please do not read" any -- "Please do not read into these instructions or anything I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

"As I did at the start of the case, I will give you a summary of each side's contentions in this case.  I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

"As I previously told you, MR Technologies seeks money damages from Western Digital for

**UNITED STATES DISTRICT COURT**

allegedly infringing the '864 patent and the '997 patent by making, importing, using, selling, or offering for sale products that MR Technologies argues are covered by Claims 1, 10, 11 of the '864 patent and Claims 1 and 7 of the '997 patent. These are the asserted claims.

"The products that are alleged to infringe are certain Western Digital hard disk drives.

"Western Digital denies that it has infringed the asserted claims of the '864 patent and the '997 patent and contends that, in addition, the asserted claims are invalid.

"Under the law, a corporation is considered to be a person.  It can only act through it owners, officers, employees, agents, and directors. Therefore, a corporation is responsible for the acts of its owners, officers, employees, agents, and directors performed within the scope of authority.

"When a party has the burden of proof on any claim by a preponderance of the evidence, it means that you must be persuaded by the evidence that the claim is more probably true than not true.

"When a party has the burden of proving any claim or defense by clear and convincing evidence,

it means that you must be persuaded by the evidence that the claim or defense is highly probable.  This is a higher standard of proof than proof by a preponderance of the evidence.

"You should base your decision on all of the evidence, regardless of which party presented it.

"The evidence you are to consider in deciding what the facts are consist of:

"1.  The sworn testimony of any witness;

"2.  The exhibits which are received into evidence; and

"3.  Any facts to which the lawyers have agreed.

"Some evidence may be admitted for a limited purpose only.

"When I instruct you that an item of evidence is admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

"Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider

**UNITED STATES DISTRICT COURT**

both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

"By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

"In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

"Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they say in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it

is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

"2.  Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence.  You should not be influenced by the objection or by the Court's ruling on it.

"3.  Testimony that has been excluded or stricken or you've been instructed to disregard is not evidence and must not be considered.  In addition, sometimes testimony and exhibits are received only for a limited purpose.  When I give a limiting instruction, you must follow it.

"4.  Anything you may have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at trial.

"There are Rules of Evidence that control what can be received into evidence.  When the lawyer asks a question or offers an exhibit into evidence and the lawyer on the other side thinks it is not permitted by the Rules of Evidence, that lawyer may object.  If I overrule the objection,

the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

"Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

"In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.  Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

"In considering the testimony of any witness, you may take into account:

"1.  The opportunity and ability of the witness to see or hear or know the things testified to;

"The witness's memory;

"3.  The witness's manner while testifying;

"4.  The witness's interest in the outcome of

the case and any bias or prejudice;

"5.  Whether other evidence contradicted the witness's testimony;

"6.  The reasonableness of the witness's testimony in light of all the evidence; and

"7.  Any other factors that bear on believability.

"You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, sexual [sic] identity or gender, or economic circumstances in your determination of credibility.

"Sometimes a witness may say something that is not consistent with something he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember. Also, two people may see the same thing but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

"However, if you decide that a witness has deliberately testified untruthfully about something

**UNITED STATES DISTRICT COURT**

important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified" truthfully about some things -- "untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

"The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

"I will now explain to you the meaning of some of the words in the claims in this case.  In doing so, I will explain some of the requirements of the claims.  As I have previously instructed you, you must accept my definition of these words in the claims as correct.  The beginning of a claim is known as the preamble.  The preamble of each claim in this case uses the word 'comprising.'  The word 'comprising' means 'including but not excluding others.'  If you decide that an accused product includes all the elements of a claim, even if the accused product included additional components, you must find that it infringes the claim.  For any words in the claim for which I have

**UNITED STATES DISTRICT COURT**

not provided you with a definition, you should apply -- any word, you should apply their common meaning. You must use the same claim meaning for both your decision on infringement and your decision on invalidity. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement. These issues are yours to decide.

"I will now read to you my definitions for certain claim terms. These definitions are also provided in your juror binders.

"'Coercive force field'" means 'a property of magnetic materials that provides a measure of the ability of a ferromagnetic material to withstand an external magnetic field without becoming demagnetized.'

"'Exchange coupled magnetic multilayer structure' means 'a structure including a nucleation host that is exchange coupled to a hard magnetic storage layer.' And 'exchange coupled' means 'the magnetic moments in the nucleation host interact through exchange with the moments in the hard magnetic storage layer.'

"'Coupling layer' means 'layer that alters the coupling between adjacent layers.'

"'The nucleation host is coupled to the hard magnetic storage layer by an exchange coupling layer' means 'the nucleation host is coupled to the hard magnetic storage layer by a layer that alters the exchange coupling between the nucleation host and the hard magnetic storage layer.'

"'Nucleation host comprises ferromagnetic layers with increasing anisotropy constant K from layer to layer' means 'nucleation host includes two or more magnetic [sic] layers that have anisotropy constant K and the values of anisotropy constants [sic] for the layers increase as the layers get closer to the hard magnetic storage layer such that the nucleation host has an overall increase in anisotropy toward the hard magnetic storage layer.'

"'Ferromagnetic layers' means 'layers with a net magnetic moment Ms greater than zero in the absence of an applied magnetic field.

"'Nucleation host' means 'a structure that includes ferromagnetic layers that assist in switching the hard magnetic storage layer and optional coupling layers.'

"'Hard magnetic storage layer' means 'a

magnetic layer that stores information in magnetically oriented bits.'

"'Underlayer' means 'one or more layers on which the hard magnetic storage layer is formed.'

"'A thin exchange coupling layer' means 'a layer that is sufficiently thin to alter but not prevent exchange coupling between adjacent ferromagnetic layers.'

"In patent claims, the word 'comprising' means 'including but not excluding others.'  If you find that Western Digital's accused products include all of the elements in a claim, you must find Western Digital's accused product literally infringed that claim, even if Western Digital's accused products include additional components, provided the presence of these additional components does not negate an element of the claim or materially affect the basic and novel profits of the invention.

"Therefore, for example, if the accused hard magnetic layer meets the elements of the claims but also assists in switching one or more layers in the stack, then it nevertheless may still meet the hard magnetic -- 'hard magnetic storage layer' element in the claim.  Similarly, if the accused

'nucleation host' meets the elements in the claims but also stores information in magnetically oriented bits, then it nevertheless may meet the 'nucleation host' element of the claim.  As long as the elements in the claim are met, there is infringement.

"In order to prove direct infringement, MR Technologies must prove by a preponderance of the evidence, that is, that it is more likely than not that Western Digital made, used, sold, or offered for sale within the United States or imported into the United States a product that meets all the requirements of a claim and did so without the permission of MR Technologies during the time the patent was in force.  To establish by a preponderance of the evidence means to prove something is more likely than not.  To put it differently, if you were to put the evidence favoring one party and the evidence favoring the other party on opposite sides of a scale, the party with the burden of proof on the issue would have to make the scale tip toward its side, even if just slightly.

"You must compare each of the accused products with each and every one of the

requirements of a claim to determine whether all of the requirements of that claim are met.

"If a device can operate in more than one mode, it infringes if operation in any mode infringes, even if it could also operate in modes that do not infringe.

"Western Digital may literally infringe a patent even though, in good faith, Western Digital believes that what it is doing is not an infringement of any patent, or even did not know of the patent.  Literal infringement does not require proof that Western Digital copied a product or patent.

"You must determine, separately for each asserted claim, whether or not there is infringement.  There is one exception to this rule. If you find that a claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to the independent claim. On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the accused product meets additional requirements of any claims that depend from the independent claim.  Thus, whether those

claims have also been infringed.  A dependent claim includes all the requirements of the claim to which it refers, plus additional requirements of its own.

"In reaching your verdict on infringement, keep in mind that only the claims of a patent can be infringed.  You must compare the asserted claims, as I have defined each of them, to the accused products and determine whether there is infringement.  In deciding infringement, the only proper comparison is between the accused products and the limitations of the asserted claims, as the Court has construed the claims previously.  You should not compare the accused products with any specific example set out in the patent.

"If you find that MR Technologies has proved by a preponderance of the evidence that each and every limitation of an" accused claim -- "asserted claim is present in an accused product, then you must find that the accused product infringes the claim.

"As I have previously instructed you, the parties have filed a joint stipulation regarding representative products which I will now read to you, in part.

"A DCM code identifies a specific magnetic

recording medium design used in the disks in one or more accused hard disk drives.

"The groupings of ACM [sic] codes used in the accused hard disk drives will serve for purposes of determining liability for infringement in this case.  You have a copy of the groupings in your notebooks.

"A representative DCM is deemed to have a -- to have substantially the same structure and design as other members of its group.  Accordingly, if MR Technologies proves that a hard disk drive with a representative DCM infringes a particular claim, then hard disk drives with any other DCM in the same group are deemed also to infringe that claim.  Conversely, if MR Technologies does not prove that a hard disk drive with a representative DCM infringes a particular claim, then hard disk drives with any other DCM in the same group are deemed not to infringe that claim.  You have a copy of the DCM groups and codes in your notebooks.  All accused hard disk drives include a writing head, as claimed in Claim 1 of the asserted '997 patent.

"While the parties have agreed" on -- "certain accused products are representative of a class of accused products, you must make your

finding whether or not MR Technologies has proved infringement separately for each representative accused product.  A finding that one representative product infringes does not mean that other representative products infringe.

"I will now instruct you on the rules you must follow in deciding whether or not Western Digital has proven that the asserted claims are invalid.  Each asserted claim is presumed valid. In other words, it is presumed to have been properly granted by the United States Patent and Trademark Office.  But that presumption of validity can be overcome if clear and convincing evidence is presented in court that proves the patent is invalid.

"The priority date of the asserted claims is June 17, 2006.  That is the date that determines what information is considered -- is considered by prior art.  For example, in order for a publication to qualify as prior art, it must have been publicly accessible before that date.  Regardless of whether a particular prior art reference was considered by the patent examiner, you must -- Western Digital must prove by clear and convincing evidence that the challenged claims are invalid.  This burden of

UNITED STATES DISTRICT COURT

proof on Western Digital never changes, regardless of whether the patent examiner considered the reference.

"In order for someone to be entitled to a patent, the invention must actually be not obvious over the prior art.  Western Digital contends that references are prior art because they were published and made available to the public before June 17, 2006 priority date of the patents. Western Digital must prove by clear and convincing evidence that references are prior art.  You must determine whether the references are prior art that can be considered in determining whether the asserted claims would have been obvious.

"Western Digital contends that the asserted claims are invalid because the claimed inventions would have been obvious.  An asserted claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in the art of the claimed invention as of June 17, 2006.  This means that a person of ordinary skill in the field of magnetic storage media would know -- who knew about the prior art would have come up with the claimed invention before the priority date. Obviousness may be shown by considering more than

one item of prior art in combination with another, or one item of prior art in combination with the knowledge of a person of ordinary skill in the art.

"In deciding obvious [sic], you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the patent.  You should not use the patent as a roadmap for selecting and combining items of prior art.  You must put yourself in the place of a person of ordinary skill in the art as of June 17, 2006.

"The following factors must be evaluated to determine whether Western Digital has established that the claimed invention is obvious:

"1.  The scope and content of the prior art relied upon by Western Digital;

"2.  The differences, if any, between each claimed invention of the '864 and '997 patents that Western Digital contends is obvious and the prior art;

"3.  The level of skill in the art as of June 17, 2006; and

"4.  Additional considerations, if any, that indicate that the invention was obvious or not obvious.

**UNITED STATES DISTRICT COURT**

"Each of these factors must be evaluated, although they may be analyzed in any order, and you must perform a separate analysis for each of the claims.  Again, you must undertake this analysis separately for each claim that Western Digital contends is obvious.

"Western Digital must prove by clear and convincing evidence that the invention would have been obvious.

"I will now explain each of the four factors in more detail.

"A prior art reference may be considered if it discloses information that solves any problem or need addressed by the patent.  A prior art reference may also be considered if it discloses information that has obvious use beyond its main purpose and if a person of ordinary skill in the art would reasonably examine the reference when trying to solve any problem or need addressed by the patent.

"A reference only qualifies as prior art for an obvious determination, however, when it is analogous to the claimed invention.  Art that is too remote from the patents being attacked cannot be treated as prior art.  Two separate tests define

**UNITED STATES DISTRICT COURT**

the scope of analogous art:  1, whether the art is in the same field of endeavor regardless of the problem addressed, and 2, the reference is not within the field of the inventor's endeavor, whether the reference is reasonably pertinent to the particular problem with which the inventor is involved.  The 'problem' being examined" must be -- "must not be defined so narrowly as to collapse these inquiries and only consider art within the inventor's field of endeavor.  A reference is reasonably pertinent if it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem.

"You should analyze whether there are relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art as of June 17, 2006. Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the claimed invention as a whole, not merely some portion of it.

"In analyzing the relevance of the differences between the claimed invention and the prior art, you do not need to look to the precise

**UNITED STATES DISTRICT COURT**

teaching in the prior art directed to the subject matter of the claimed invention.  You may consider the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention.  For example, if the claimed invention combined elements known in the prior art and the combination yields results that were predictable to a person of ordinary skill in the art at the time of the invention, then the evidence would make it more likely that the claim was obvious.  On the other hand, if a combination of known elements yields unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claimed invention successfully combined those elements was not obvious.

"Another factor is whether it would have been obvious to try the combination of elements, such as when there is a design incentive or market pressure to solve a problem and there are a finite number of identified, predictable solutions.

"In comparing the scope and content of each prior art reference in a patent, you may find that inherency may supply a claim element that is

otherwise missing from the explicit disclosures in the prior art reference.  The inherent presence of an element so found by you may be used in your evaluation of whether the claimed invention would have been obvious in view of the prior art.

But to rely on inherency to establish the existence of a claim element in the prior art in an obviousness analysis, that element must be present in, or the natural result of, a combination of elements explicitly disclosed by the prior art. Inherency may not be established by probabilities or possibilities.  The mere fact that certain things may result from an explicit disclosure is not sufficient to find inherency.  However, if the disclosure is sufficient to show that the natural result flowing from the explicit disclosure would result in the claim element in question, inherency may be found.

"Importantly, a claim is not proven obvious merely by demonstrating that each of the elements was independently known in the prior art.  Most, if not all, inventions rely on building blocks long known, and claimed discoveries, almost of necessity, will likely be combinations of what was already known.  Therefore, you should consider

whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the teachings in the way the claimed invention does.  The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem or need to be addressed, market demand, or common sense.

"To prove obviousness, you must find that a reason existed at the time of the invention to combine the elements of the prior art to arrive at the claimed invention, and there would have been a reasonable expectation of success for doing so.

"Regardless of whether you are asked to articulate in your verdict what you believe was the level of ordinary skill in the field of the invention, you must consider and assess this factor in reaching your conclusion in this case.

"The person of ordinary skill is presumed to know all prior art that would have been determined to be reasonably relevant.  A person of ordinary skill in the art -- the person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.  To determine the

obviousness of an invention, you must determine the level of ordinary skill in the field of the invention as of June 17, 2006.

"When deciding [sic] the level of ordinary skill in the art, you should consider all the evidence introduced at trial, including, but not limited to:

"1.  The levels of education and experience of the inventor and other persons actively working in the field.

"2.  The types of problems encountered in the field and prior art solutions to those problems.

"3.  The sophistication of the technology in the art as of June 17, 2006, including the rapidity with which innovations were made in the art.

"Before deciding the issue of obviousness for each claimed invention, you must also consider certain factors which may help to determine whether the invention would have been obvious.  No factor alone is dispositive, and you must consider the obviousness or nonobviousness of the invention as a whole.  Certain of these factors include:

"1.  Commercial success of a product due to the merits of the claimed invention;

"2.  A long-felt need for the solution

provided by the claimed invention;

"3.   Unsuccessful attempts by others to find the solution provided by the claimed invention;

"4.   Copying of the claimed invention by others;

"5.   Unexpected and superior results from the claimed invention;

"6.   Acceptance of others of the claimed invention as shown by, for example, praise or surprise expressed by others in the field;

"7.   Other evidence tending to show nonobviousness.

"These factors are relevant only if there is a connection or nexus between the factor and the invention covered by the patent claim.  Even if you conclude that some of the above factors have been established, those factors should be considered along with all the other evidence in the case in determining whether Western Digital has proven the claimed inventions would have been obvious.

"The presence of any of these factors may be considered by you as an indication that the claimed invention was not obvious.

"In deciding obviousness, you must avoid using hindsight.  That is, you should not consider

what is known today or what was learned from the teachings of the patent. You should not use the patent as a roadmap for selecting or combining items of prior art.

"A patent claim composed of several elements is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. In evaluating whether such a claim would have been obvious, you may consider whether Western Digital has identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention.

"If you find that Western Digital infringed any asserted claim of the '864 patent or the '997 patent, you must consider what amount of damages to award MR Technologies. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case on any issue. If you find that Western Digital has not infringed any claim of the patent or that all of the asserted claims are invalid, MR Technologies is not entitled to any damages.

"The damages you award must be adequate to compensate MR Technologies for the infringement, but in no event may damages be -- be less than a reasonable royalty for the use of the invention by Western Digital from the start of the damages period through the expiration of the last-to-expire infringed asserted patent.  You should keep in mind that the damages you award are meant to compensate MR Technologies and not to punish Western Digital.

"MR Technologies has the burden to persuade you of the amount of its damages.  While MR Technologies is not required to prove the amount of its damages with mathematical precision, it must prove them by a preponderance of the evidence.  MR Technologies is not entitled to damages that are remote or speculative.

"A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  This right is called a 'license.'  A reasonable royalty is the payment for the license that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.

"In considering this hypothetical

**UNITED STATES DISTRICT COURT**

negotiation, you must assume that both parties would have acted reasonable and would have entered into a license agreement.  You must assume that both parties believe the patent was valid and infringed.  Your role is to determine what result of that negotiation -- what the result of that negotiation would have been.  The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

"Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Evidence of the actual profits of an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation.

"A royalty can be calculated in several ways, and it is for you to determine which way is the most appropriate based on the evidence you heard.

"You should consider all the facts known and available to the parties at the time the infringement began.

**UNITED STATES DISTRICT COURT**

"In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of noninfringing substitutes to using the patent invention.  A noninfringing substitute must have been available at the time of the infringement, must be acceptable in that it provides the same or next-to-best advantages as the patented invention, and must not infringe the patent.  If there are available and acceptable noninfringing substitutes that the infringer could have used instead of the patented invention, the royalty rate is likely to be lower since the infringer would have had more bargaining power.  But if there are no available and acceptable infringing substitutes, the royalty rate is likely to be higher since the infringer would have no choice but to use the patented technology to compete in the market and the patent holder would have had more bargaining power to demand a higher royalty.

"No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which, in your mind, would have increased or

decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent businesspeople.

"The royalty must reflect the value attributable to the infringing features of the product.  When the accused infringing products have both patented and unpatented features, measuring this value requires you to identify and award only the value of the patented features.

"In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors in addition to any other evidence presented by the parties on the economic value of the patent:

"The royalties received by the patentee for licensing of the patents-in-suit, providing {sic] or tending to prove an established royalty.

"The rates paid by the licensee for the use of other patents comparable to the patents-in-suit;

"The nature and scope of the license as exclusive or nonexclusive, as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

"The licensor's established policy and

**UNITED STATES DISTRICT COURT**

marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

"The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

"The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of nonpatented items; and the extent of such derivative or convoyed sales.

"The duration of the patent and the term of the license.

"The established profitability of the product made under the patent; its commercial success; and current popularity.

"The utility and advantages of the patented property over the old modes or devices, if any, that have been used for working out similar results.

"The number [sic] of the patented invention;

the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

"The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

"The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow the use of the invention or analogous inventions.

"The portion of realized profit that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features of improvements added by the infringer.

"The opinion testimony of qualified experts.

"The amount that a licensor (such as a patentee) and a licensee (such as an infringer) would have agreed upon (at the time infringement began) if both had been reasonably and voluntarily trying to reach agreement; that is, the amount which a prudent licensee who desired, as a business proposition, to obtain a license to manufacturer and sell a particular article embodying the patent invention would have been willing to pay as a

royalty and yet able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

"The amount you find as damages must be based on the value attributable to the patented invention as distinct from unpatented features of the accused product or other factors such as marketing or advertising or the parties' size or market position.  A royalty compensating the patent holder for damages must reflect the value attributable to the infringing features of the product, and no more.  The process of separating value of the allegedly infringing features from all of the features -- all other features is called apportionment.  When the accused infringing products have both patented and unpatented features, MR Technologies must give evidence tending to apportion or separate the damages between the patented and unpatented features, and such evidence must be reliable and tangible, not conjectural or speculative.  You may award damages based only on royalties that are directly attributable to the value of the patented technology.  You may not award damages based on

**UNITED STATES DISTRICT COURT**

royalty attributable to unpatented features of the accused products.  MR Technologies bears the burden to establish the amounts directly attributable to the patented features.

"A multicomponent product may have both infringing and noninfringing components.  In such products, royalties should be based not on the entire product but instead on the k which is the smallest unit that is able to be sold, that practices the patent and has a close relationship to the claimed invention, even if that smallest salable unit is sold only by a third party and not by Western Digital.  It is for you to determine whether the smallest salable unit is a component or the whole product.

"If the smallest salable unit is a multicomponent product containing one or more noninfringing features with no relation to the patent features, damages must only be based on the portion of the value of that product attributable to the patented technology.  This may involve estimating the value of a feature that may not have been individually sold.

"Before you begin your deliberations, elect one member of the jury as your presiding juror.

The presiding juror will preside over your deliberations and serve as the spokesman for the jury in court.

"You shall diligently strive to reach agreement with all of the other jurors if you can do so.  Your verdict must be unanimous.

"Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with other jurors, and listened to their views.

"It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision.  Do not be unwilling to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

"Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves except for discussing the case with your fellow jurors in your deliberations:

"Do not communicate with anyone in any way and do not let anyone communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means, via email, via text messaging or any internet chat room, blog, website, application, including, but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other form of social media.  This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.

"Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it.  Although I have no information that there will be news reports about this case, do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.  Do not visit or view

any place discussed in the case, and do not use internet programs or other devices to search for or view any place discussed during the trial.  Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses, or the lawyers, until you have been excused as jurors.  If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

"These rules protect each party's right to have this case decided only on the evidence that has been presented here in court.  Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside the courtroom or gain any information through improper communications, your verdict may be influenced by inaccurate and incomplete or misleading information that has not been tested by the trial process.  Each of the parties is entitled to a fair trial by an impartial jury.  And if you decide the case based on information not presented in court, you will have denied the parties a fair trial.  Remember that you have taken an oath to follow the rules, and it is

very important that you follow these rules.

"A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to outside information, please notify the Court immediately.

"If it becomes necessary during the trial to communicate with me, you may send a note through the clerk or bailiff signed by your presiding juror or by one or more members of the jury.  No member should ever attempt to communicate with me except by a signed writing.  I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to the question.  Remember, that you are not to tell anyone, including the Court, how the jury stands, whether in terms of vote count or otherwise, until after you have been -- after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the Court.

"A verdict has been prepared for you.  After you have reached a unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise the bailiff that you are ready to return to the courtroom."

At this time we'll take just a ten-minute break, ladies and gentlemen, and then we'll hear from the lawyers. Remember the admonition.  We'll be in recess for ten minutes.

THE COURTROOM DEPUTY:  All rise.

**(Out of the presence of the jury.)**

THE COURT:  Anything before we take the break?

MR. FENSTER:  Not from plaintiff, Your Honor.

MR. LUMISH:  Not for Western Digital.

**(Recess from 10:35 a.m. to 10:48 p.m.)**

**(In the presence of the jury.)**

THE COURTROOM DEPUTY:  Be seated and come to order. This Court is again in session.

THE COURT:  Mr. Fenster, would you like to address the jury at this time?

MR. FENSTER:  I appreciate the opportunity, Your Honor.  Thank you.

THE COURT:  Mr. Lumish, if you need to move to see these charts, you're welcome to.

MR. LUMISH:  I have inspected them.  Thank you,

Your Honor.

THE COURT:  Okay.  Mr. Fenster.

### PLAINTIFF'S CLOSING ARGUMENT

MR. FENSTER:  Good morning, ladies and gentlemen of the jury.

May it please the Court.

On behalf of MR Tech and Dr. Suess, I want to begin by thanking you.  I am grateful for, and I want to tell you I'm deeply humbled by, the attention that you've paid in this case.

As I mentioned at the beginning, this courtroom is the only place in the world where a patent owner can stand toe to toe and be on the same equal ground, equal footing with a company like Western Digital.  These are complex issues, and it is -- and it is only by your diligence and understanding these complex issues that we can get to a just result.

My job in closing is to help synthesize and hopefully help you make sense of all the evidence that you've heard over the last two weeks.  My goal is to give you the tools that you need to do your job, which is to fill out the three questions on the verdict form.

Your common sense is tool number one, and the Court's instructions is tool number two.

Who's been giving you the evidence and argument consistent with the Court's rules throughout the case?  And who's been trying to confuse you by making arguments that don't

**UNITED STATES DISTRICT COURT**

follow the Court's rules?  Who has presented unbiased opinions from neutral experts, and who's been relying too heavily on people too close to the company who will tow the company line because of their loyalty thereto?

Importantly, which side has been giving you evidence in the courtroom today in this trial that is consistent with the documents that existed and were created before this litigation?

Ladies and gentlemen, the truth of this trial is that the inventions of Dr. Suess, MR Tech's patents, represented a fundamental advance in magnetic recording.  The evidence has been overwhelming that Western Digital uses and infringes this technology in all of the accused products.  The evidence is also undisputed -- and this is unusual.  The evidence is undisputed that without using these inventions, Western Digital would not be able to compete in the market.

This is your first patent trial.  I've done a lot of them.  This is the first case where we've ever had their experts telling the jury, and admitting, that without this technology, without using this invention, there is no other alternative to reach the areal densities that allow them to compete in the market.

This is a storage company.  Areal density is the holy grail.  And the evidence is undisputed in this case that without using Dr. Suess's multilayered nucleation host on

top -- formed on top of a hard storage layer, with increasing anisotropy down away from the write head, that they would not be able to reach the areal densities that allow them to compete in the market.

There is a reason that patent cases are tried to juries. It's because they come down to credibility. And while this case is about a great invention, the greatest invention for ferreting out the truth is our jury system. In this case, you have to weigh the credibility of MR Tech and its witnesses versus the credibility of Western Digital and their witnesses.

Opening statements are promises. In our opening statement, I promised you that we would bring you Dr. Suess and he would explain his invention, how he came up with it, why it was different, why it was contrary to the conventional wisdom, and we did so.

I promised you that we would bring Dr. Re to show you the infringement. He didn't use labels. He didn't hand wave. He didn't say, "Trust me." He showed you their actual recipes, their actual test data, their actual testimony showing you at every step that they meet every element of the asserted claims.

And we brought you Mr. Bergman, who showed you the analysis to come down to what is the actual value attributable only to this invention. We relied on the evidence of Dr. Re, who relied on their documents to apportion that, and to -- and

UNITED STATES DISTRICT COURT

on Dr. -- and on Mr. Bergman, who did his regression analysis, which was undisputed in this case.  We'll talk about that later.

One of the biggest keys for you to determine the credibility of witnesses is cross-examination.  It's easy for a witness to get up and tell a good, polished, scripted story on direct, but the test of credibility, and the reason that we have trials, is for cross-examination.  Because the cross-examination is the best tool that we have to uncover whether a witness is telling you the truth, the whole truth, and nothing but, or whether they're trying to give a shaded version.

I'll submit to you that cross-examination revealed that MR Tech's witnesses were rock solid.  Recall Mr. Lumish's cross-examination of Dr. Suess.  Recall Mr. Lumish's cross-examination of Dr. Re.  And recall Ms. Young's cross-examination of Mr. Bergman.  There was not a single credibility hit among any of those cross-examinations.  They told the same story.  They explained their analysis.  They answered straight.  And there was not a single impeachment thereof.

I'll submit to you that there was a stark contrast on how Western Digital's witnesses upheld -- held up under cross-examination.

Recall Mr. Mirzaie's cross-examination of Dr. Desai,

their only corporate rep on technology.  He had one job.  His one job was to tell you "switch together."  Whatever the question is, they switch together.  He denied that the documents -- he denied every document that doesn't show our products.  All of the prior documents that Western Digital created, they're wrong.  They're just cartoons.  They're just concepts.

When he was confronted with the testimony of other witnesses, he said that they're wrong.  Dr. Ikeda's wrong.  Dr. Srinivasan is wrong.

And when he was asked about coherent and incoherent -- he has documents.  We showed his documents where his presentations are showing that break layers, coupling layers encourage incoherent switching, which is important for assisting the layers and assisting the switching.

When Mr. Mirzaie asked this Ph.D. with 15 years' experience, their only corporate rep that they brought here, what is coherent rotation and what is incoherent rotation, he said he didn't know.

Recall my cross-examination of Dr. Bertero.  Dr. Bertero is their infringement expert.  On infringement, your question comes down to weighing the credibility of Dr. Re with Dr. Bertero.

Dr. Bertero admitted repeatedly that the sworn statements that he gave in his declarations before this case --

**UNITED STATES DISTRICT COURT**

before this trial were inconsistent with the evidence.  He told the Court under oath, "We don't measure anisotropy.  The relative values of anisotropy between these layers cannot be inferred from any data Western Digital possesses."  That was shown to be false.  He told you that he testified with the same level of candor in this trial with which he signed those declarations.

Recall the cross-examination of Dr. Becker with Mr. Mirzaie, where he admitted that the regression showed the same analysis that Dr. -- that Mr. Bergman's did.

And recall my cross-examination of Dr. Victora. Dr. Victora admitted that he did not follow the Court's claim constructions repeatedly.  He just said it's obvious.

So this case is not just about the credibility of witnesses, it's about the credibility of the parties.  MR Tech has been telling you a straight story from the beginning, and I submit to you that you can weigh the credibility of Western Digital against that.

So let's go to infringement.  We have been laser-focused from the beginning on the claims.  And the reason is the Court's claim construction is you have to compare the asserted claims, as I've defined them to you, in the accused products to determine whether there's infringement.  In deciding infringement, the only proper comparison is between the accused products and the limitations of the asserted claims

as we've given -- as the Court has instructed.

Western Digital spent a lot of time trying to point out things that just don't matter.  They spent hours talking about whether the anisotropy value -- one anisotropy value should be 9.42 or 8.05, even though it was shown that they infringe under either one.

But most significantly, you heard them make arguments in the opening statement, and throughout, that there has to be discrete structures and discrete functions; that the layers of the nucleation host can't store, that's why they don't infringe; and the layers of the hard storage layer can't help switch, that's why they don't infringe.

Well, ladies and gentlemen, let's go to what the Court's instruction is.

So this is Jury Instruction Number 13.  It's in your notebooks (as read):

"In patent claims, the word 'comprising' means 'including but not excluding others.'  If you find Western Digital's accused products include the elements of the claim, you must find literal infringement, even if the products include additional components."

Jury Instruction 13 goes on:

"Similarly, if the accused 'nucleation host' meets the elements of the claim" -- meaning that it

assists in switching the G1 layer -- "but also stores information in magnetically oriented bits, then it nevertheless may still meet the nucleation elements in the claim.  As long as the elements in the claim are met, there is infringement."

Western Digital's primary argument from the outset of this case was contrary to the Court's claim construction. It was, I submit to you, a distraction.

So let's talk about the invention.  We showed you -- Dr. Suess showed you that he came up with a new structure that did not exist in the world before.  You saw that prior art had single-phase media or bilayer media.

Dr. Suess came up with the idea to put multiple layers in a nucleation host, with increasing anisotropy away from the write head down towards the hard storage layer on the bottom.  And that he discovered, to his surprise and to the world's surprise, that that did not affect thermal stability.

Remember the superparamagnetic limit?  It was always believed that if you decrease coercivity, if you make it more writable, it will reduce the thermal stability.

How did Dr. Suess, out of all of the Ph.D.s in the world who were working on this, come up with it?  Because he had written software as part of his Ph.D. that created a model that allowed him to calculate the thermal stability.  He was the only one in the world who was able to determine the thermal

**UNITED STATES DISTRICT COURT**

stability of a multilayer nucleation host.

What he discovered was shocking. What he discovered was contrary to the conventional wisdom. The conventional wisdom was you keep things right up close to the write head. Why? Because the write head field is strongest at the top, and it gets weaker as you go down.

So we saw in the prior art -- and all the conventional wisdom is you take the hardest layer and you put it right up close, as close as you can, as we saw in Li, to the write head. It was against conventional wisdom to flip the layers like this. It was against conventional wisdom to put multiple layers between the hard -- the write head and hard storage layer because it was thought that that would spread the field, that that would decrease segregation, that it would make it harder to write and it would reduce areal density. What he discovered was shocking.

He showed you his model that actually calculated how the magnetic moments rotate when you apply a force. And he explained that that's what unlocked the key and enabled him to calculate the thermal stability. He showed you this graph showing that his invention -- before the invention, if you reduce coercivity, it would reduce thermal stability. And he discovered that by adding these layers, it would break the superparamagnetic limit by adding this additional limitation.

We saw in this case that up until the trial, Western

Digital, among others, credited Dr. Suess with breaking the superparamagnetic limit.  The slide before this one on JX-2030 says trilemma, superparamagnetic limit, how to overcome it.  And the next slide is "Enter the 'exchange-spring,'" citing Dr. Suess, showing this exact trilayer invention.  That was up until this case, when they were called to answer for their infringement.

Let's talk about their infringement.  We brought Dr. Re, who is an unbiased neutral expert in the field with decades of experience.  He analyzed all of their evidence.  He showed you their exact recipes.  He didn't hand wave.  He didn't use labels like Mr. Lumish suggested that we might.

He went to the -- their recipes and showed this is the actual formula.  He went to their data and showed you the numbers for every single layer.

How do we know that -- actually, before we get there, so what he showed -- and this is an example of one of their representative products -- is that just like the claim requires, it's a magnetic recording media.  There's a substrate, an underlayer, the exchange coupled magnetic multilayer structure is this.  It's undisputed that that's exchanged coupled.  It comprises a hard magnetic storage layer that stores data in magnetically oriented bits.  He showed you that.  They admitted that.

He showed you that it has a coercive field greater

than 0.5 using the 2K over M formula, and we'll come back to that because that's one of their only noninfringement arguments here.

He showed you that it has a nucleation host comprising -- having a second coercive field without the hard magnetic storage layer that's lower.  It is undisputed that this meets -- that these layers meet the Court's construction of "nucleation host":  layers that assist in switching the G1 layer.  Dr. Bertero admitted that on the stand yesterday or the day before.  Wherein the nucleation host -- and this is important -- wherein the nucleation host is formed on top of the hard magnetic storage layers so that the hard magnetic storage layer is between the nucleation host and the substrate. That was contrary to conventional thinking, and that was different than the prior art.

It is exchanged coupled, and it comprises ferromagnetic layers with increasing anisotropy from layer to layer.  This is the overall increase.

There was no dispute in this case.  After all of the fighting beforehand about anisotropy values, they ended up admitting that they do not dispute that every one of the accused products has multiple ferromagnetic layers with an overall increase toward the hard storage layer.

If we can go to Slide 19, please.

Dr. Bertero admitted:

"QUESTION:  But you did not express any opinion disputing that the accused products have a nucleation host that meets the Court's claim construction; correct."

He answered, "That's correct.  Yes."

All of the accused products meet Element 1[h].  I have to pause here because this was the battle for the last two years.  For two years we've been fighting to get this anisotropy data, trying to get them to admit this.  This is the core of the invention, that they have a multilayer nucleation host with increasing anisotropy.

And then it was admitted.  Dr. Bertero admitted in trial:

"I think we've already covered this, but you did not express any opinion disputing Dr. Re's analysis that all of the accused products meet Element 1[h] that have ferromagnetic layers increasing -- with increasing anisotropy constant K from layer to layer in accordance with the Court's claim construction; correct?

"ANSWER:  Correct."

After two years of fighting, that's what this case came down to:  Infringement has been admitted.

Now, with respect to the rest of the claims, 10 and 11, and the '997, Dr. Bertero admitted that (as read):

"If the jury finds that we've met our burden of proving infringement with respect to '864 Claim 1, you would agree that '864 Claims 10 and 11 are also infringed?"  That's undisputed.

Same thing with claims for the '997 patent.  He admitted (as read):

"If the jury finds that the '864 Claim 1 is infringed, then it should find all of the claims infringed, including the '997?

"Correct."

Now, how do we know that Dr. Re's analysis was right?  He went through a mountain of evidence, all of the thousands and thousands of pages that were produced.  How do we know it's right?  Because out of all of the values, they challenged one, and we showed that it didn't matter.  This was -- they challenged one value for the G1 layer, which doesn't even have a requirement of anisotropy.  That was the only layer that they challenged.

And remember what Mr. Lumish said in opening about that statement?  He kind of threw down the gauntlet.  He said, "If they weren't -- if Dr. Re wasn't square with you about that, what else wasn't he being square with you about?"  I think there's an expression about glasshouses that might be applicable here.

That value was shown not to matter.  It was

undisputed in this case that whether the 8.05 or 9.42 anisotropy values were used, in both cases it infringes. Why? Because using either value, the Hs value is greater than 0.5 -- that's this requirement of the coercive field -- and it was undisputed that using either value of the coercive field, it was greater than the 1.71 for the nucleation host coercive value.

So what was their response? They brought Dr. Bertero to testify. He was the first of several supposedly neutral experts with extensive ties to Western Digital. You'll have to evaluate his credibility and what it says about Western Digital's case. He was pretty smooth on cross, but you saw -- or on direct, but you saw what happened on cross-examination. And he was evasive to the point where the Court actually instructed you, "You can consider how -- his manner of answering questions on the stand." That was also pretty unusual.

Okay. So they had two noninfringement -- so one noninfringement argument was the two values. That was a distraction. The second one is that the G1 layers of the product don't store data. The Court's construction requires that the hard magnetic storage layer, which we point to as G1, does not store data. Now what he said is they don't store data on their own.

The claim does not require a hard storage layer on

its own.  It requires a hard storage layer as part of an exchange coupled multilayer structure, including a hard magnetic storage layer and a nucleation host where they're exchanged coupled together.

And it's undisputed in this case.  Dr. Bertero admits:

"And you agree that, as part of that exchange coupled multilayer magnetic stack, the G1 layer does store information in magnetically oriented bits; correct?

"Not by itself, but yes."

That was their first noninfringement argument and recall Court's -- the jury's -- the Court's Instruction Number 13.

Their second argument -- and he said that it was because it was too thin to store on its own.  It doesn't have to store -- you know it doesn't have to store on its own anyway.  But we also showed you that in the patent, it's totally consistent with the patent.  The patent says the hard storage layer can be around three nanometers, and all of their hard storage disks -- hard storage layers are 3 nanometers.

Okay.  So their next argument is Dr. Bertero says that 2K over M was the wrong formula to use in calculating the coercive field.  Recall that Dr. Re showed you his calculations for Hs, which is the coercive field of the hard magnetic

storage layer, and for Hn, and he used the formula in the patent.  The patent at column 6, line 54, says:

"The coercive field is Hc equals 2K over M."

The patent says it.

We showed you that Dr. Papusoi agreed that that is the right measure.  Remember, we're at recording timescale.  These are products that are, at recording timescale in normal operation, one nanosecond.

And then we showed you Dr. Papusoi agreeing that the timescale approximating 1 nanometer, the coercivity approaches 2K over M.  Answered "yes."

We showed you Dr. Papusoi's paper saying that it's 2K over M.  And we showed you that Dr. Victora, their expert, also understood that coercive field equals 2K over M, and that's what he applied in doing his invalidity analysis.  And you'll recall the Court's instructions that you have to apply the claims the same for infringement as you do for invalidity.

Let's talk about invalidity.  So they brought Dr. Victora.

Actually, before we get there, what we've just talked about is infringement.  The first question on your jury form is going to be infringement.  And because we think we've met the burden of showing that Western Digital infringes the claims of the '864 and '997 patents, we ask you to write "Yes" in filling out Question 1 on the verdict form.

UNITED STATES DISTRICT COURT

Let's go to invalidity. This is what -- they brought you Dr. Victora, who showed you it was -- who got up there and said, "It's obvious. It's obvious. It's obvious." Notwithstanding the fact that no one had done it before, everyone in the world was trying -- chasing this holy grail. Everyone knew supposedly about Hagedorn, knew about bilayers, and yet no one had done it before. We showed you why, because it was against conventional thinking, but Dr. Victora just got up there and said it was obvious.

But what did he say in 2017? In 2017, at his own instigation, he nominated Dr. Suess for an IEEE fellow. And what he wrote is, "however" --

(To Mr. Mortensen) Can you blow that up a little bit? (Reading:)

"However, the new media demonstrated the coercivity can be partially decoupled from thermal stability by the use of multiple magnetic layers with graded anisotropy."

He's talking about Dr. Suess's invention.

We know that because he then goes on to say:

"The concept of exchange-spring media was patented by Dr. Suess in 2006."

(To Mr. Mortensen) And then if you can pull that out and go on.

And then he goes on:

UNITED STATES DISTRICT COURT

"This new media storage" -- that he was just referring to -- "was quickly applied by industry. Media based on the new concept was quickly adopted by industry. Nowadays almost all state of the art hard disks rely on this idea."

That's what Dr. Victora said in 2017, unprompted before he was paid by Western Digital to come and say it was obvious.

Ladies and gentlemen, patents are constitutionally protected property rights. They're property rights. They are presumed to be valid, and you can't just tear them up, take them away for all time on someone's say-so. You need clear and convincing evidence.

What they brought was Dr. Victora to try to trivialize this idea by talking to you about cheeseburgers and chocolate cake. And then to show you some prior art and just show -- say it would have been obvious to extend it even though no one did. It's contrary to the evidence.

Now, the first references that Dr. Victora relied on were Hagedorn -- Victora and Hagedorn, and Berger and Hagedorn. But they fail at the first step. Court's Instruction Number 17 says a reference only qualifies as prior art if it's analogous.

You heard Dr. Victora say he didn't know about the standard of proof. He didn't know about clear and convincing evidence. And when he gave his testimony to you, he didn't

mention the word "analogous."

The Court's Instruction 17 tells you there are two ways to meet the analogous test:  field of endeavor and pertinent problem.  He addressed neither of those on direct, but on cross-examination admitted that neither was met.

He admitted that the field of endeavor of the patents is exchange coupled multilayer structures for perpendicular media recording in hard disk drives.  He admitted that Hagedorn didn't address that at all.

What he said is:

"Now, Hagedorn is not related to perpendicular magnetic recording or hard disk drives at all; correct."

"ANSWER:  That is true, in the sense that he never mentioned them at all."

So field of endeavor is out.

Is it reasonably pertinent to the particular problem that Dr. Suess was solving?  The particular problem is undisputed.  He admitted it's improving writeability without reducing thermal stability.  Thermal stability being the key in PMR, perpendicular magnetic recording, for hard disk drives.

And Dr. Victora admitted on the stand that Hagedorn has nothing to do with thermal stability.  Hagedorn is just not proper prior art.  It's out.  And you should reject that validity challenge on that basis.

He admits that:

"Hagedorn had nothing to do with thermal stability at all; correct."

"Hagedorn did not discuss thermal stability."

Okay.  So the standard, Court's Instruction Number 16:

"An asserted claim is invalid if the invention would have been obvious to a person of skill in the art."

This means that a person of ordinary skill in the art who knew about the prior art would have -- would have -- come up with the claimed invention before the priority date. So if there happened to have been someone of ordinary skill in the art who knew about Victora and Hagedorn or Berger and Hagedorn, they have to show that that person would have.

Well, we happen to know in this case that there were multiple people that fit that category.  Dobin and Richter -- they cited Dobin and Richter because Dobin and Richter, who were close colleagues of Dr. Victora, knew about Dr. Victora's work -- cited to Hagedorn.  Remember that?  They cited to Hagedorn in the paper.  And yet they admitted that Dr. Victora -- that Dr. Dobin and Victora did not come up with the multilayer invention.

The other person is Dr. Victora himself. Dr. Victora was a person of extraordinary skill in the art.  He

admitted he knew about Hagedorn by 2005.  He certainly knew about his own prior art.  And he did not come up with it.

Under the Court's Instruction Number 16, that shows you that they have not met their burden of proof, and can't.

Now, at the top of Instruction 16, the Court instructs you, you cannot use hindsight.  You have to see -- put yourself in the place of someone in 2006, like Dr. Victora was, like Dobin and Richter were, like Berger was, and say: Was there something so clear, some reason so compelling that they would have come up with this?

You can't use hindsight.  I submit to you that Dr. Victora's analysis was driven only by hindsight.

Let's talk about Li.  So WD argues that the Li patent was somehow the same.  But you saw that Li had the write head closest to the storage layer.  Just like everything that came before.  You saw that Li was trying to keep the write head as close as possible to the hard storage layer.  He taught away.  He taught that the purpose of his invention, what was good about his structure, was that it put the hard storage layer closest to -- I think that's -- was that it put it closest to the write head.

In Dr. Victora's flipped analysis, it would move it away from it.  Dr. Victora admitted that that -- that Li taught away from this invention.  If there was teaching away, that means it's not obvious.  Because if someone of skill in the art

had Li, followed the teaching of Li, they would be dissuaded from flipping it, because it would be contrary to what was taught in Li.

That was not -- and he admitted, "so Li teaches away from the proposed modification; correct."

He answered "That's correct, yes."

And he didn't tell you about that.

Next.

Now, there was another way that Li taught away from the -- from the invention.  Remember that Li taught that the gradient had to be the same, so that the level of Hk was always within the write field?  And Dr. Victora admitted that that taught away from the invention, which has the anisotropy field increasing as you go away.

Next slide.

Dr. Victora said (as read):

"If you were to modify the Li structure to put the hard storage layer on the bottom, the write-head field would still be decreasing in a vastly exaggerated way?

"Yes.

"And you would end up with an increasing write field shown here?

"This is true."

Ladies and gentlemen, when you get to the second

question on the verdict form, you have to weigh the credibility of Dr. Victora's testimony and what he actually showed you versus what the references actually did and what the evidence shows.  The evidence shows that no one in the world came up with this invention, despite having every motivation in the world to try to improve areal density.

And on damages -- I'll just preview this and then I'll talk to you later.  On damages, we showed you that Mr. Re -- that Dr. Re showed you the amount of increased areal density that was attributable only to this invention.  And Mr. Bergman showed you his analysis -- showed you his regression analysis, showing you that the amount of damages attributable to that is $3.36 per terabyte, resulting in damages of 306 million.

I'm going to get one more opportunity to talk to you after Mr. Lumish.  He's going to talk to you a lot about validity.  On validity, I want you to pay attention and ask -- and see if he shows you any document that shows anyone recommending that putting more layers with graded anisotropy, adding more layers to the bilayer on top of the hard storage layer, if he shows you any document showing that doing so would not reduce thermal stability.

And on benefits, listen very carefully and see if he shows you any evidence disputing that there was any other way to achieve the areal density benefits without using Dr. Suess's

invention.

I'll turn it over to Mr. Lumish now.  I look forward to talking with you afterwards.  Thank you.

THE COURT:  Mr. Fenster, are you deferring your damage discussion?

MR. FENSTER:  I just did -- I just did the damage. I previewed it, Your Honor.

THE COURT:  That's fine.

MR. FENSTER:  Thank you.

THE COURT:  I believe Mr. Lumish will take about 45 minutes.  Would you like to take a break here or are you comfortable?

**(The jury collectively responded**

**"We're comfortable.")**

THE COURT:  Okay.  Very good.

Mr. Lumish.

MR. LUMISH:  May I proceed, Your Honor?

THE COURT:  You may.

### *DEFENDANT'S CLOSING ARGUMENT*

MR. LUMISH:  Good morning, ladies and gentlemen.  I get to talk to you twice.  So this is the first of two.  My second time will be the last thing you hear, and it will be short.

I wanted to go through some of the evidence and summarize for you how we think it shows exactly what we

**UNITED STATES DISTRICT COURT**

promised you when we started together about two weeks ago, which is that Western Digital has been falsely accused in this case and that MRT's lawyers have given false credit, to a fairly magnificent extent, to Dr. Suess for the work of thousands of engineers over decades and across the planet who are working together to figure out the physics and the science and to build, in our case, we believe, the best hard drives in the world at Western Digital.

I want to start where I think the common thread was in -- throughout Mr. Fenster's comments to you.  The case has been a little strange, in a number of ways.  In one way it's sort of been a physics family reunion.  I've never had it before where so many witnesses knew each other, from both sides.

You heard from Dr. Bertero.  You heard from Dr. Victora.  You heard from Dr. Goglia.  They all know Dr. Suess.  They have socialized with him.  They have spoken with him.  They admire him.  And they respect him.

So why did they come here?  Why are they here?  Why did they come to court and spend two weeks in a hotel with a bunch of lawyers to testify in this case?  Why would they subject themselves through this unfamiliar process, and to be called a liar over and over again?  I mean, it just happened 25 times?  I don't know.  I didn't keep count.  Why would they do that?

Was it the money, like the suggestion was? Dr. Victora did it for the money? Well, we know that's not true. Dr. Victora is at the absolute apex of his profession. He's the top scientist in his field. And nobody's denied that. He's a professor who runs a center of great esteem in the University of Minnesota. He came from Minnesota to testify in this case, and stayed with us here in California.

He doesn't need the money. He said he appreciated the money. That was -- who wouldn't? But he doesn't need the money. That's not why he was here.

Dr. Bertero, you heard, did very well in his stock from Western Digital. He retired early. He said he doesn't need the money. Dr. Goglia is a successful businessperson. He has his own consultancy. He doesn't need the money. So we know that's not the answer, even though that's what was hinted to you or suggested to you.

What's left? What's left? Why would they have come? You'll have to decide for yourselves. I submit to you they came because they wanted to set the record straight. This is their field. This is their chosen profession. This is what they've put their life's blood into. And in this court, through this process, all of the credit for the work of all these people -- or much of the credit. I shouldn't say "all" -- is being given to one person.

And they came here to tell you, that's not true;

that Western Digital's products are different from the claims that were written 19 years ago to cover technology that people were kicking around and talking about at the time.  That the claims were obvious extensions of the work of Dr. Victora and others who had come before, including scientists at Western Digital and engineers at Seagate.

And they came here to tell you that it is grossly unfair to suggest that 46 percent of the areal density gains, the holy grail that everybody's working on all around the world, day in, day out, 24 hours a day, 46 percent of that comes from two patents from one man in Austria.  That just doesn't add up.  They didn't think it added up, and they came here to tell you that.

Now, their credibility has been attacked and attacked and attacked again.  That is why we have juries.  And I'm so delighted that we do, because it's for you to judge their credibility, not for MRT's lawyers and not for me.  You met them.  You saw them.  You heard them testify.  They are not polished, professional witnesses by any stretch of the imagination.  But you heard them speak their minds with candor, with passion, and they were unfiltered.

They didn't deserve the treatment they got here. These are men who have earned respect.  And they were not shown it.  I found it disturbing, frankly, to listen, sit in my chair there and not be able to jump up and say anything during the

closing statements, to hear these lions of the profession just called liars over and over again in open court. It's easy to call a man a liar, but it's hard to prove it.

I'm happy that you are here to judge that. And we leave that in your hands, and that it's done in the pursuit of a $300 million payday only makes it harder to swallow.

So that's the first thing. Strange case. They all know each other. Why are they here? We submit to you it's to set the record straight. Not for an hourly consulting fee.

The other thing that was kind of strange in this case, one thing I noticed and I hope you did as well, is Dr. Suess didn't take this credit to himself. He didn't tell you he's responsible for 46 percent of the areal density growth in a period of time. He didn't tell you Western Digital infringes. He didn't tell you his patents are not an obvious extension of Hagedorn's work from the '70s and the work of the folks in industry and Dr. Victora's work. He didn't do that. And when we saw documents that he co-authored, we see that he doesn't take that credit to himself.

This was a slide we saw during trial as JX-2142 that Dr. Suess prepared. And the title of it at the top, if you can see it, is "Overcoming the superparamagnetic limit." You can see that up here. So this is what he said, or who he said was responsible for that. And look what he wrote. He includes himself, but he includes his coauthors Fidler and Schrefl. He

**UNITED STATES DISTRICT COURT**

includes someone we never heard of, Ruigrok.  I'm not sure how to pronounce that.  He includes some researchers in Japan, Inaba, Shimatsu, and Kitakami.  And he, of course, includes Dr. Victora and Dr. Shen.  Everybody was working on -- when PMR came out in 2005, everybody started working on this issue.

Dr. Suess didn't tell you he's the one who did it.  He did it by himself.  Forget all the other engineers and scientists out there.  MRT hired Dr. Re to say all those things.

And he admitted, Dr. Re, that he was a Seagate CTO.  And he's not really working directly in the field in the way that Dr. Suess did, but also Victora and Dr. Desai and Dr. Bertero.  He was an executive overseeing the entire technology department at Seagate.  And he told you he doesn't have any patents in media in this area.  And that's not a slight of Dr. Re.  He's extremely intelligent.  He's extremely capable.  I mean no disrespect at all.  But it was him, not Dr. Suess, who told you those things.

So here's another paper, by the way.  This was a submission from Dr. Suess and a co-author, Dr. Zimanyi.  It's DX-1044.  Where when talking about this notion of the exchange spring media that Mr. Fenster just told you we admitted and confessed was all Dr. Suess in our products, well, when Dr. Suess submits it to the American Physics Society, he doesn't credit himself.  He credits Dr. Victora.  He says:

**UNITED STATES DISTRICT COURT**

"Victora and Shen proposed that the recording density of perpendicular media is increased in exchange spring media."

So false credit I think is here in spades.

Now, another thing I thought was a little unusual is I came into this trial thinking I knew who the plaintiff was. I thought MRT was Dr. Suess and they were one and the same. But you heard testimony that that wasn't right, that there's actually a law firm somewhere that we didn't hear from and didn't come and testify and didn't make the trip out to tell you who they are and what the business is, who apparently owns MRT.

And I think that should weigh on your thinking as it relates to the David and Goliath story that Mr. Fenster told you this, it's hard to go toe to toe and stand in equal footing in the courtroom. We don't even know who we are up against, if there's somebody else who owns this company.

So let me get to the three questions. When I met with you on the first day and I opened the case, I told you there would be three questions for you to answer. And these are the core questions in the verdict form. And I wanted to go through the evidence for each one of them from our point of view.

So let's start with infringement. And I want to just start with my favorite point because it's so critical in

this case.  Every single limitation of the claims has to be found or there's no infringement.  The judge's instructions tell you that.  Opposing counsel, I think, will agree with me on that.

And this notion of a recipe is one that I think is just particularly helpful here, where you can't infringe a recipe if you don't include all the same ingredients.  You don't trespass on your neighbor's yard when you get close to it.  You have to be the same.

And so that's really important here because this case actually gets very simple very, very quickly.  With all the challenging words and equations and all the other things that have kind of kept me up at nights, at the end of the day, it's a very straightforward case.

The claims require a thing called a hard magnetic storage layer, having a first coercive field -- and it gives you a little number there.  It's got to be greater than half a tesla -- formed on an underlayer.

There's been lots of disputes and lots of disagreements between us in this case, and I'm sure there will always be.  But on the question of whether there is a hard magnetic storage layer that itself stores as required, I think you'll see the answer to that is undisputed.  And I'll show it to you.

The word "comprising," I want to talk about that for

UNITED STATES DISTRICT COURT

a moment.  You saw the judge's construction on "comprising."  I wanted to highlight the other paragraph that Mr. Fenster did not highlight, which is the first one.  It says, "In patent claims, the word "comprising" means "including but not excluding others."

So, sure, you can find that other things are in our products.  You can find that they do different functions and other things too, but you can't read out the requirement in the claims that there be a hard storage layer in the singular that meets the judge's construction.  You just can't.  That would be violating the judge's instructions, and that would not be doing your job.

It can include additional components; we don't dispute that.  But it has to have that hard magnetic storage layer.  The judge construed it to mean a magnetic layer that stores information in magnetically oriented bits.  That's what we're looking for.  And it's in every claim.

So these are the three de- -- independent claims of the case from the '864 and '997 patents.  And the dependent claims all then carry these requirements with them.

So Dr. Suess, he acknowledged that the way he thinks of his patent is that the hard magnetic storage layer is one layer.  One layer.  That the hard magnetic storage layer is one ferromagnetic layer.  So we're looking for one layer.  Dr. Re said the same thing.

UNITED STATES DISTRICT COURT

So these are their witnesses.  I want to focus on their witnesses as much as I can because I think that should take the dispute out of it.  Instead of my guy says this, their guy says that, I want to focus on where we found agreement with their witnesses that, we would submit to you, is fatal to their case.

So I asked Dr. Re the question, and he said:

"The hard magnetic storage layer is defined in the patent as a single layer."

And then he admitted what I think is the case away, which is that -- oh, I'm sorry.  This is on the construction.  So he acknowledged that the hard magnetic storage layer has to record data.  Judge already told us that.

And then this is the key one for me, which is the single layer, that G1 layer that they say is the hard magnetic storage layer, does not, in fact, store data in magnetically oriented bits on its own.  No equivocation.  No fighting.  No arguing.  Just that's correct.  That's the evidence.  It's got to be a single layer.  That single layer has to store -- single layer doesn't store.  It's part of a stack of layers.

Now, you heard that from our witnesses too. Dr. Desai confirmed it.  The G1 layer doesn't store data on its own.

Dr. Bertero confirmed it.  He said that it's not stable enough -- it's not thermally stable enough to be a

**UNITED STATES DISTRICT COURT**

single hard magnetic storage layer.  He said that they cannot positively store information, these single layers.  He explained to you how this system works.

There is nobody in the world who knows better than Dr. Bertero does, and maybe this is a good time for me to talk about him for a moment because you heard their comments about him and the attack on his credibility again this morning.

Dr. Bertero -- let me go backwards and put his picture up here.  Dr. Bertero is difficult to examine for everybody.  He is a man who speaks his mind.  He was a senior executive at our company.  He's been running business units.  He is retired.  He is fiercely independent.  He's going to say what he thinks no matter who asks him the question.  And whether you like it or not, it doesn't really matter.

That got him into some trouble.  There were some prickly moments in the trial, for sure.  Most of that came after sort of repeated accusations that he had lied to the Court, which they made again today.  He denied those emphatically.  He explained every single one of those statements.  He stood behind them in those declarations.

He said they're completely accurate.  Their technical distinction about how the products work and whether we were using the anisotropies in the way they claimed, and he was unwavering.  So this is another place where you judge his credibility.  It's not for me to do.  But I hope you found him

the way I've got to know him through this process, which is, he's an honest man despite what you were told.

So he also explained to you that there is a thinness problem, that we can't have a single hard magnetic storage layer in the way we're looking for and what the claims require because our layers are just simply too thin.  Now it is true, as Mr. Fenster said, the patent refers to some layers that are as thin or even thinner than ours, but they're made of totally different material.

It's not a question of whether some really thin layers could store.  That's not infringement.  That's not a theoretical question.

It's to Western Digital's single G1 layers store. Those layers, with the materials they are made out of, do not and cannot.  And so at the end of the day, that should be decisive to the case.  They're part of a stack.  They only -- our storage is done with multiple layers.  We never have one storage layer that itself is thermally stable enough to store data in magnetically oriented bits.

What happens, if that's your magnetic storage layer and you try to store only into the G1 layers, your pictures are gone, your taxes are gone.  It just wouldn't work.

So let's talk about MRT's evidence a little bit. There was all sorts of statements about everything's undisputed and everything's admitted.  You didn't see much evidence to

that.  You heard a lot of comment from counsel.  I'd ask you to go back and look and think about what you've heard and what you said.

We're not admitting anything here.  We're absolutely convicted at Western Digital that there's no infringement.  And what's been done to try to prove it is box drawing, literally box drawing.  You draw a circle around one layer, and you draw a circle around another layer, and you say, "Okay.  We're done."

That's not fair.  There's a lot of values that go into it, and a lot of spreadsheets, and Dr. Re puts data into these values.  And they told you, "Well, we don't dispute any of those values."  That's not correct either as I'll show you in a moment.  Those values are based on that formula, that 2K over Ms formula, which is simply the wrong one to use.

So box drawing and these kinds of documents, over and over again, you were shown documents to show the domino theory of graded anisotropy, to show multiple layers, to show soft and hard layers, all those things.

And these are documents that, in many instances, go back years and -- before the patents were even issued, and there's no dispute that you can't infringe a patent until it issues.  And I doubt there's dispute that technology changes rapidly in this field and in any other.

So the notion that a document from 2009 and 2010 is

**UNITED STATES DISTRICT COURT**

evidence of what's in Western Digital's drives 2018 and later is one that's just not consistent with the real world. Most of these refer to high-level concepts. Many of them were research presentations to talk to the world about Dr. Suess's work, Dr. Victora's work, work that was happening at Western Digital, the ideas that were percolating around to try to make PMR better. That's not evidence of what's in the products though.

And I asked Dr. Re, and he acknowledged -- this is only about one exhibit, but I think the same is true about others, which is, "You didn't hear any testimony from the people who were in the company, when you were there, that those PowerPoints and research documents and the like actually reflect what's in the products today." And that's what matters. You can't infringe if it's not in the products from 2018 or later.

Let me talk about this Cobra G issue for a minute. This is exactly what I told you when I opened. There's no question. There's been no dispute that for this one critical value, the G1 value, for the largest collection of hard drives, the Group 3 drives, that MRT used data from a different spreadsheet. For every other drive, it used data from one spreadsheet, and it got to this one, and it used data from another.

They said I accused Dr. Re of something. I actually accused the lawyers of something. Most of this data comes from

lawyers to their experts.  The experts don't go find it themselves.  It's produced from the lawyers to the lawyers, and they use what they have.

But there's no question -- Dr. Re acknowledged that every -- for every group, he pulled those critical values.  This whole big chart that they showed you and everything's admitted and the arrow goes up, that all depends on these values.  That's not undisputed.

And so he pulled all those from one spreadsheet except for the critical G1 layer, what they call the hard magnetic storage layer, the biggest group of hard drives.  And they pulled it from a product called Cobra G that's never been accused of infringement and that the evidence showed we don't think sell -- Western Digital's never sold.

Here again with the evidence, the answer was "Well, Dr. Desai said that was the right thing to do.  He told us to use that data."  That's not what happened.

I've excerpted from one of MRT's slides, their presentation of his testimony, and they put that ellipses in; I put the red box around it.  They didn't tell you that what Dr. Desai said was "I've never even seen this file before."

And then they said, "Well, Is this alloy 1310?

"Yes.

"Does this value say this number?

"Yes."

So he acknowledged that the spreadsheet said what it said. But what he never did was -- and Dr. Re acknowledged this -- he never testified that it's appropriate to use those critical values from one spreadsheet for every other layer of every other drive -- or every other G layer, I should say, of every other drive and then switch to a different one just for Group 3, the largest group. He's never said that, and it doesn't make sense.

The answer you've heard is it doesn't matter. It doesn't matter. They infringe anyway. They admit they infringe anyway. That's not true at all. Of course it matters. First of all, the truth matters and the process matters.

But leave that aside. Here's why it matters in really clear, direct terms from their presentation to you. Dr. Re told us that he took the green color that he used to draw the box around the G1 layers and the purple color he used to draw the box around the layers above it from the stack that I'm showing you on the left. That comes from -- let me give you the exhibit number -- that comes from JX-2032.

I asked him about those colors. I said, "You picked the colors." There was some suggestion that I was accusing him of doing something untoward. I'm not. I wanted to confirm that he was using the green and the purple -- he chose those colors -- and they're mapping them to that stack on the left.

Couple interesting things about that. One is the stack on the left is not the representative product for Group G. It says "GX1"; the representative product was 5X1.

So why are they using this stack? Because they like the way those colors work to tell their story. It's -- part of their evidence was "We've got our spreadsheets, but then we're going to show you also in Western Digital's" -- what they called -- "design documents the same thing."

And you saw this figure over and over and over again. Of course it matters. This was key evidence to them to try to convince you of infringement.

But Dr. Re acknowledged that that stack of layers on the left is only equivalent to the actual accused representative product, the 5X1 product, if you use the Cobra G data. It's not equivalent with its own data. It's only equivalent if you use it. And then I think maybe more importantly was he testified to you that this stack on the left looks like the Group 3 drives. I think that was the language he used.

It's the language I used in my question here, which was: When you told the jury that that stack on the left from JX-2032 looks like Group 3, that's only true if you use the Cobra G data.

If you'd used the real data, all those layers would be the same color. They would all be purple or they would all

**UNITED STATES DISTRICT COURT**

be green.  Because the data values, 8.04 and 8.27, that's up to the pink layer.  The pink layer is different.  That upper layer of the stack would be a different color.  But the three above the green one, they'd be the same color.

So for that reason, ladies and gentlemen, leaving Cobra G aside, at the end of the day they acknowledge there's a single hard magnetic storage layer defined in the patent.  The judge tells you that it's got to store data in magnetically oriented bits.  Their expert acknowledges it doesn't happen in our products.  There is no single layer that does that.

For that reason, we ask you to check noninfringement and answer the question "No" for Western Digital when you're confronted in the verdict form with the question on infringement.

So let's talk about the cognitive field -- or the coercive field, excuse me, the other requirement that we've challenged in this trial.  And because they use the wrong formula, all of that big chart of data is based on bad data.  The arrows that go up, the anisotropy values they use.  You remember the sort of comparison of the two numbers, which one's bigger, which one's smaller.  Those only work if you accept the anisotropy values that they used.

And for $300 million, in a case like this, our position is they should have measured that data, not gone with an estimate, not gone with an equation to try to figure out

what it might be.  They should have measured it.

In addition, Dr. Bertero walked you through, in ways that, I'll acknowledge, I didn't fully understand because I'm not very good at math, but that acknowledge that that equation doesn't apply in this situation, that they used the wrong equation.  And I'll show you that in a moment.  It does come from the patent, but in a different situation.

So Dr. Suess, he acknowledged that coercive fields can be measured and that there are lots of methods for measuring coercive fields.  The patent shows measured data.  It's got these, what are called, hysteresis loops in it, which come from measurements, not from equations.

And here's the equation.  So they always show you sort of starting at that line itself, where it says the coercive field is this 2K over Ms, but they left out the context around it.  And I asked Dr. Re about this context.  In every instance, this discussion of that equation is related to a two-layer structure:  one hard layer, one soft layer.  You can see that at the top.  It says "hard/soft layer structure." And it talks about a hard and soft layer that's parallel and uniform.  And down below the equation, it talks about a bilayer structure.

So what's the problem with that?  There is a double standard here that's being applied, which I just think makes no sense.

So they're telling you to use a two-layer structure with one hard layer, one soft layer, that Dr. Suess, Dr. Re will tell you is not the invention of the patent. You have to have multiple nucleation layers, not one, or they're going to tell you -- and I'm going to tell you wouldn't infringe. And they're going to tell you, "Well, the art is completely meaningless. Completely ignore all of the art from Dr. Victora, because it's only one layer on top and one layer on bottom. And ignore the art from Dr. Berger, for the same reason."

You can't have it both ways. If this isn't the proper structure of the claim, then why are you using an equation that is for that structure? That's what they did.

Dr. Bertero showed you a much more complicated equation that takes into account the nonparallelism, the nonuniformity, the temperature issues, the angular issues. And the formula that he says the industry uses, broadly, called Sharrock's formula.

So they should have measured, in the first place. They could have and should have. And if they were going to use a formula, they should have used the one that people would use in this situation, which is the Sharrock's formula. And they did neither of those things.

So for that reason, ladies and gentlemen, we would also ask you to find noninfringement. They haven't met their

burden of proof on that critical element.  And the whole chart system that they've built, and all the hours they spent filling it in with data, falls apart like a house of cards if that data is not valid, or if it's not at least proven enough to be valid to stand up in court.

So let's talk validity.  Second question for you. We would ask you, again, to check "No" on the infringement question in the verdict form.  And we get to validity.

I showed you this patent video in the beginning, where the judge in the video tells you that it's your job to decide validity.  It's your job for a couple of reasons.  One is that you may hear arguments that the examiner didn't hear. And the second is mistakes could be made.  People are human, processes are not perfect, and so mistakes might have been made.  And we know this is true.  We know it's the standard. We're having a jury trial over it.  You've been asked to decide it.

And I think one of the things you'll hear when Mr. Fenster comes back up is about how all this art was considered.  And you heard some of that before, that the patent office has seen all this before.  Okay.  They saw some of it. They didn't see the Li patent.  We know that.

But why pound that drum over and over again?  It's because they don't want you to have an independent view of this.  They want you to defer to the patent office.  They want

you to doubt yourself if you think these claims are invalid because they're obvious extensions.  I just ask you not to take the bait.  Please follow the jury instructions.  Look at the art for what it says and what it shows.  And I'll show you some of that right now.

So new arguments are possible.  Mistakes are possible.  We know in this case, actually, it's not just possible.  It absolutely happened.  You heard from, again, some of the most illustrious scientists in the field.  Dr. Victora was the one we presented on validity.  The other gentlemen weren't.  But I'm sure you have a different sense of what this technology is and how it works and what the issues are than you did when you started two weeks ago.

And imagine the patent office, where they heard from none of those people.  They only heard from Dr. Suess.  He went out and met with them personally.  He, himself, sent in comments and remarks and signed his name to them.  They were getting one side of the story.  Which, okay, that's the way the process is made up.  There's nothing wrong with that.  But that's why we have the jury trial, so you can weigh both sides of the story and come up with your own independent view.  Patent office never did that, never had that opportunity.

We also know -- so that's arguments.  New arguments, there was, for sure, in this trial.

How about mistakes?  Well, we know that happened,

too, because Dr. Suess said so in the file history.  He repeatedly told the patent office they were making mistakes.  So, yeah, mistakes happen.  People are human.  And they've happened in this case, and we submit they happened when they issued the patents.

Dr. Victora.  This is another one of those spots in the trial that was a little tough to listen to, in the closing arguments.  He's won every award you can win.  He's one of the most well-regarded people in the business.  And I doubt he'll ever agree to be an expert for anybody again, after the way he was treated here.

This IEEE letter is one that we would submit to you is just fundamentally misused.  Dr. Victora went out of his way to help a younger colleague.  He was trying to help him become a member, a fellow in the IEEE that Dr. Victora is a fellow.  And he did it because he likes Dr. Suess.  He admires Dr. Suess, and he respects him.  He puffed him up to the IEEE.  He wrote this letter, he sent it in.

And they took it out of context for you.  Because what they left out is some of the things that I've underscored.  I know the text is small and probably hard to see, but I wanted to point out a few things.  One is, the very first phrase in this letter puts this in the time period of 2005.  Remember, these patents issued in -- these patents are filed and the idea was told -- had occurred in 2006.

So in 2005, we have Dr. Suess proposing exchange spring media, which is a concept similar to ECC media.  That's Dr. Victora's work, ECC.

So he's not saying, "One man changed the world, revolutionized, and now I've changed my opinion."  He's saying, "He came up with a similar idea to mine.  We're both working on this."  Victora has gotten a ton of credit for it.  He thinks Dr. Suess should get some credit too, for the work in 2005.

And he refers to it as a concept.  You see that word "concept."  He says it's "similar to ECC media."  He says, "Both media break the recording trilemma."  "The concept opened a completely new view."  Not the patents, not the specific recipe of multilayer nucleation host with anisotropy increasing as you go down towards a hard magnetic storage layer.  He doesn't say any of those things in this letter.

He says, "The concept opened a completely new view."  He talks about the use of multiple magnetic layers with graded anisotropy.  Is that completely opposite to what I just told you?  No.  Because two layers are multiple.

You may remember I dwelled on that for a moment with Dr. Re yesterday.  And I did that so I could talk to you about it right now, which is the Victora work with two layers, one hard, one soft, that is a multiple-layer structure.  "Two" just means more than one.

So this isn't some acknowledgment that by adding

another layer or another layer Dr. Suess suddenly changed the world.  This is referring back to the concept they both were talking about in 2005.  And Dr. Re also acknowledged that it's graded anisotropy -- I'll show you this in a moment -- by definition, when you go from soft to hard.

So those two-layer structures they were both working in '05, that's what this letter is about.  It says the concept was patented by Dr. Suess in 2006.  Dr. Victora told you he got that straight from Dr. Suess.  And he didn't go and read the claims and do a patent analysis.  That's not what he does.  And that media is based on this new concept.  The concept is 2005's exchange spring or, you know, this hard/soft notion, not the specific details of these claims.

So let me get into the merits now.  I just felt it was critical to talk about that, because their main attack is: Don't trust Dr. Victora.  And if there's anybody to trust in this field, it's Dr. Victora.

So here's MRT's slide.  I wanted to -- I don't have time to go through all of the limitations with you.  And I wouldn't put you through that again.  But what you heard me do with Dr. Re was to reduce it down to the three critical parts: that there's a multilayer nucleation host, there's an overall increase in anisotropy K, as he puts it, and it's toward the hard magnetic storage layer.

And what's not really at issue are the other details

**UNITED STATES DISTRICT COURT**

of the claims, that everybody knows about nonmagnetic substrates. Everybody knows about soft underlayers. Those things go back to the '60s. And all of those things are in the prior art. And they're all in the prior art in a way that would be obvious to combine in exactly the way Dr. Victora showed you.

So the Hagedorn paper. I think you were told it's not analogous art. This is fundamental discussion of thin films -- thin layers, excuse me, for recording. It's as analogous as it gets. It's from the '70s. We talked about with Dr. Re how layers have gotten thinner and thinner over time. This is fundamental pioneering art.

It talks about multiple slabs, which Dr. Re acknowledged are layers. And it talks about this -- the formula down there, as you heard from, I believe it was, Dr. Victora, would teach you that it's changing in anisotropy in a gradient. He explained to you that the way this was perceived as being a way to get up a hard climb, with a lower slope, to get up to the same altitude with less energy. This is that coercive field we're trying to bring down through the use of Half Dome here.

Dr. Re, he acknowledged that when Hagedorn talks about slabs, those are layers, that they were thin for their time. So we know this is analogous art. It's about exactly what we're talking about now: magnetic thin layers, trying to

**UNITED STATES DISTRICT COURT**

switch the coercivity, trying to use multiple layers, many layers, to bring that field down so that climbing Half Dome is done from the side instead of from the face.

Dr. Re acknowledged that by "many slabs" the patent means more than two. That the use of the N as a variable in the equation means it could be as many of these layers as you want. Could go up to infinity, in principle.

The Berger patent was the Western Digital patent in this case. This is HGST, one of the companies that's merged with us. And it goes back 16 months before Dr. Suess. 16 months. And the evidence was uncontested that Dr. Berger was working 16 months before Dr. Suess on trying to address this superparamagnetic limit fundamental in PMR media. He's attacking the same problem, and that he came up with the same basic idea.

The exchange spring layer, that's -- the title of Dr. Suess's patent is "Multilayer Exchange Spring." So this is an exchange spring layer. It's one layer, not multiple. That's the distinction they'll draw for you. But the exchange spring layer on top of a magnetic recording layer, where the exchange spring layer is softer than the hard magnetic storage layer. That's the concept. That was in Berger 16 months before. You can see it in Figure 3. Exchange spring layers on the top, that's the soft layer; hard layer's on the bottom.

Dr. Berger's patent talks about graded anisotropy

from the soft layer to the hard layer -- towards the hard layer on the bottom.  He talks about the softer exchange-spring layer beginning to reverse, moving to its magnetization moments, those arrows, earlier than the hard layer does.  That's the cascade or domino effect that they've talked to you about as graded anisotropy.  Western Digital's HGST company was doing it 16 months before.

Dr. Re acknowledged that there's the hard magnetic recording layer on the bottom, exchange spring on the top in the Berger patent, that there's graded anisotropy, and the graded anisotropy in that patent increases from top to bottom, from the soft layer down to the hard layer.  In fact, he went so far as to say "That's kind of the definition of soft and hard."  You're going to get that graded anisotropy going down.

He acknowledged what I told you a moment ago, that this Berger patent is describing the domino approach, the cascading of these magnetic moments 16 months before Dr. Suess claimed to have invented that with multiple layers.

Now he also acknowledged, Dr. Re, that the soft layer in Berger is assisting the switching of the hard layer.  And that was, of course, the judge's construction on the nucleation host.  It's got to assist in switching.  It's got to be multiple layers, but it's got to assist in switching.  We see Berger was doing that 16 months before.

And so Dr. Victora explained to you why you would

combine Berger with Hagedorn, how products have always grown with more layers and that essentially if you just add another layer of green, another soft exchange-spring layer, then you'd have the claimed invention in this case.  That is the epitome of obviousness we would submit to you.

Dr. Victora talked to you about his papers, and they teach something very similar:  soft layer over a hard layer connected by an exchange coupling layer or an exchange break layer.  Not disputed that that is what the patent's all about -- or excuse me -- his papers are about.

The soft grains will rotate first when they're hit with this field, like a write field from a hard drive write head, providing an exchange field to the hard grains that will lower the switching field for those grains -- for those hard layers.  That's the cascading; that's the graded anisotropy, however you want to think of it.  That is the assisting in switching from the soft layer to the hard layer in Victora's papers as much as 16 months before Dr. Suess.

You see the hard and soft layers throughout his papers, and he talks about how it lowers the coercivity field while keeping good thermal stability.  You see I underscored that here.  This is the decoupling that they told you was the revolution of Dr. Suess's work.  He decoupled.  Nobody decoupled before, and he decoupled.

Well, that's not true.  Dr. Victora did it.  His

two-part structure, because of the way he thought to use the exchange coupling layer, that layer in the middle, decoupled those two things as well, and he did it first or at least before Dr. Suess did.  And the result was he nearly doubled the areal density of a perpendicular medium.  Nearly doubled it. So we saw areal density gains from his structure before Dr. Suess.

And the top to bottom point, no question here.  It's expressed in the Victora papers that you go from a soft layer on the top to a hard layer on the bottom.

Dr. Re acknowledged it.  He said the hard layer's on the bottom, the soft layer's on the top, then there's graded anisotropy.  It's graded anisotropy going down toward the hard layer on the bottom.

We're missing multiple layers.  And so Dr. Victora says Hagedorn taught us a long time ago to use multiple layers. More layers means more of the same effect.  The Dobin and Richter paper brings them together.  The notion that nobody ever thought to combine them -- I think there was some strong statements about that in opening statement -- it's not consistent with the evidence you saw.

Researchers at Seagate working for Dr. Re did exactly that.  Well, let me be careful when I say "did exactly that."  They took teachings from the Victora papers, and they took teachings from the Hagedorn paper, and they used them

**UNITED STATES DISTRICT COURT**

together.

What you see here is it says, "Victora and Shen proposed the so-called composite media, which are made of two layers." One is hard and the other is soft. And that the switching field reduction occurs when you use a soft layer was taught by Hagedorn. So Hagedorn teaches multiple layers, teaches switching reduction.

And here you have in real time in the early days of PMR, Seagate, through Dobin and Richter, saying, "We're going to use teachings from both those papers."

So we know they're analogous art. We know Hagedorn is analogous. Dobin and Richter are citing it in the field of PMR hard disk recording and combining the teachings in both references.

If you do that, it looks like this (indicating). It's just another layer of soft that would have some additional graded anisotropy. That is ultimately the obviousness problem for them.

Last is the Li patent. We know this patent wasn't before the patent office. It was not disclosed, and so it's not -- it's one of those that the patent video tells you is part of why we have jury trials over this issue. It's about perpendicular media, and it's about hard disk drives. So it's right in the heart of the issues in this case.

No question that it's a multilayer system. Unlike

the criticisms of Victora and Berger, Dr. Li's structures were three layers -- or four layers.  He had a hardest layer, and the example I have on the screen is one of 12,000 oersteds -- that's its anisotropy -- and then you've got three that are less hard above it in increasing numbers or decreasing numbers.

I walked through with Dr. Re how the cascading or domino effect occurs and is taught in the figures of Li, and the only real difference is that hard magnetic storage layer, that M1 layer, is on the top.  The claims in this case say it should be underneath the storage -- pardon me -- the softer nucleation host.  Dr. Li didn't do it that way; he has it on the top.

Dr. Victora explained to you how, when you're making real disk drives, you don't put it on the top.  You would put it on the bottom, and he walked you through that real-world issue for that.

Graded anisotropy.  That's not a new invention of Dr. Suess.  We already know that, but Dr. Li used it over 15 times in his patent.  Nor is assisting from one layer to the other.  The Li patent talks about using a reversal torque from the soft layers to the hard layer to help switch it with the lower field.  That's exactly what the problem was -- or the problem was that Dr. Suess was trying to resolve.

Appears Dr. Re's testimony on it, where we were able to reach agreement.  No question it's a multilayer structure.

**UNITED STATES DISTRICT COURT**

It's got three or more layers.  No question that the Li patent talks about the domino theory, the cascading of these magnetic moments from one layer to the next.  No question that it reverses or switches magnetization with what the engineers have called incoherently.

And there was no question that the Li patent taught multiple layers with an anisotropy field gradient that decreases as you move toward the bottom.  Dr. Re, that's his -- those are his words on the screen.

He -- in further discussion about this graded anisotropy, he acknowledged that there's a progressive reversal where the shift in magnetization goes from layer to layer as the claims talk about, that there's an incoherent reversal.  And the domino process we've talked about is all shown in the Li patent.

And make sure I'm saying what he would say, which is upside down, that they're not in the right order, that blue layer is in the wrong spot, should be on the bottom.

That's the only difference.  That's the only difference here that we think has been shown to you in the Li patent, and it's simply not enough.  Dr. Victora explained to you why and how you would flip that around in making a real hard drive.

I'll skip this one in the interest of time.

So at the end of the day, I think they said we just

said, "Obvious.  Obvious.  Obvious."  They walked you through every single limitation of the claims and where they were found in these combination of references.  They showed you how and why you would combine the Victora and Hagedorn references together, the Berger and Hagedorn references together, and then why Li, just with the person's knowledge in the field of you can put layers in either direction and would in a real hard drive, renders these claims obvious.

So when you get to the verdict form on that one, ladies and gentlemen, we would ask you to check that the claims are invalid in this case.

Last thing I'm going to cover, and I'm almost done, is damages.  And I'll start where I did in opening statements, which is the actual damages in this case are zero.  There's no infringement.  The claims are obvious.  It should be invalidated.  And if you agree with that and you check either one -- by the way, it's not got to be both.  If you find no infringement, damages are zero.  If you find invalidity, damages are zero.  We're asking you to find all three.

The real core question is this 46 percent.  Should we really be giving the credit for 46 percent of areal density in the period that MRT's lawyers identified to Dr. Suess?  So much of the case really comes down to that.  Two patents, not a full body of work, not all the rest of what he's done.  But do those two patents account for 46 percent of areal density

growth?  The evidence in the case and common sense tells you it's not even a close call, that that can't be true.

Dr. Goglia showed you his chart that he created that shows all of the things that have gone into areal density growth over the lifetime of the hard disk drive, and it is a never-ending battle to try to get more data into less space. It is something that constantly happens.  And you won't find -- and this was long before they talked about what do you say when you're not in court.  This was long before this lawsuit, and Dr. Goglia is not crediting Dr. Suess here.  Nor do you see anything that would fairly suggest that somehow these two patents broke open areal density growth.

Dr. Re had a very similar chart.  He said, "Oh, this was just an internal thing.  I didn't want to include our media folks because they had gotten a lot of attaboys."  But it doesn't add up here when you look at what's really being described on this slide.  It's called "Innovations Driving Areal Density Growth."

I mean, that's exactly the question in this case: Is -- are Dr. Suess's alleged innovations driving 46 percent of areal growth?  When Dr. Re wasn't working as a consultant for MRT for this case, he wrote down a whole bunch of things he said were innovations driving areal growth.  It's really hard to see, I know, but these last three columns here start in 2004, right before PMR -- or right after, I should say, PMR's

kind of introduced and -- through to I think it was 2019, if I remember the chart correctly.

And you won't find nucleation hosts, multilayer nucleation hosts, multilayer nucleation hosts with graded anisotropy going down towards the hard magnetic storage layer on the bottom.  You won't see that in any shape or form in this chart.

And the notion that, "Well, I just didn't put media on it doesn't really add up because PMR is on this chart.  That's fundamentally media.  TuMR is on this chart; that's fundamentally media.  There is a number of things that we showed you in the evidence that he does identify as innovations in this chart that go to media.  Dr. Re acknowledges none of those were invented by Dr. Suess.  None of the things he'd said then before this lawsuit were the innovations driving areal density growth were Dr. Suess's inventions.

Putting it in context, Western Digital is an enormous operation around the globe to try to improve areal density.  And you heard about how we're organized into different groups, servo and media and channels, and just hundreds of people around the country are working on these issues day in and day out.  They've led to a number of innovations that have driven areal growth at Western Digital.

My colleagues tell me I'm almost out of time if I'm going to save any to talk to you again, so I'm going to do this

very quickly.

But we've innovated new layers that drive areal density.  We've figured out how to segregate grains more tightly so that you can see them better, to improve areal density.  We've -- Western Digital's pioneered the soft underlayer, as a reflective measure, to make areal density much better.  They've improved read heads to get a stronger signal back, that improves areal density.  They've created this thing called a TuMR reader, trailing shields, helium-filled drives, shingled magnetic recording, triple-stage actuators and heads of the drives, 2D magnetic recording, and energy-assisted PMR.

These were enormous products.  They took millions in R&D, hundreds of engineers and Ph.D.s.  They all contribute to areal density.  Not one person with two patents.

Dr. Goglia tells you if you just correct for those things, 46 percent has to drop a lot.  And his number was 4.9 percent.  That would bring their claim of contribution by Dr. Suess down by 90 percent, roughly, to about a tenth of what they've asked you for in this case.  And that's only if you correct for that.

There's other mistakes that Dr. Becker walked you through.  They were using a price that was too high.  They were using costs that were too low.  You correct for those things, the number only comes lower.

And then one of the fundamental, just completely

**UNITED STATES DISTRICT COURT**

problematic parts of their damages case is they base it on the hard drive as a whole, as a thing called the smallest salable unit. But the evidence was clear, and it's undisputed, that the smallest salable unit is the media. They didn't base their damages model on the media, those platters. They based it on the full hard drive, with all of these other components.

And we know the media is salable because we buy it. The evidence was from Ms. Salayphonh that Western Digital buys this media. It can be sold. It is sold. We're consumers of it.

Let me jump here to the end, which is this is not a one-person operation to get to 46 percent increases in areal growth. Western Digital has 50,000 employees working on it. Over 700 people in multiple divisions, about 400 people in the head division, 300 people in the media division. And they're asking you for all of that work and all the revenue in the shipping and sales for 61 percent of Western Digital's profits. 61 percent.

Their job is to convince you that in a negotiation of -- what's called the hypothetical negotiation between MR Technologies and Western Digital for a license to two patents, and not any of the other work that Dr. Suess has done, Western Digital would have agreed to give $305 million, 61 percent of its profits, just for a license to those two patents. We submit to you that doesn't add up.

Dr. Becker said it's actually worse than that. That if you look at operating profits, if you went all the way down to operating profits, the demand here is for all of them. Western Digital -- the argument to you is Western Digital would agree to give all of its operating profits to MR Technologies just for a license to these two patents.

You can see that, actually, in that big chart they showed you, which is highlighting the parts that show it, which is they showed the contribution of 46 percent at $3.36. That's the addition -- that would be roughly the same as the R&D cost and profits and the operating costs put together. Their argument to you is all of that. Western Digital would give all of that to MR Technologies for two patents.

It also doesn't add up because we know Dr. Suess has gotten grants for his research that includes these patents. And it's been a total of $5 million.

With that, ladies and gentlemen, I'm going to ask you -- I'll come back. I think I only have about five minutes when I come back up. But I'll end here, which is at the end of the day, we'd ask you to find no damages because there's no infringement, and the claims are obvious. Thank you.

THE COURT: Thank you.

Ladies and gentlemen, we'll take a ten-minute recess here, and then we'll come back and hear the two rebuttals back to back. There is about, collectively, a little over 20

minutes left.  So it will be short.

THE COURTROOM DEPUTY:  All rise.

**(Out of the presence of the jury.)**

THE COURT:  Mr. Lumish, you were right on the money.

MR. LUMISH:  Five minutes, Your Honor?

THE COURT:  Five minutes.

MR. LUMISH:  Thank you.

THE COURT:  Mr. Fenster, you have about 18.

MR. FENSTER:  I had 19, but okay.

**(Recess from 12:26 p.m. to 12:36 p.m.)**

THE COURT:  Ready for the jury?

MR. FENSTER:  Yes, Your Honor.

**(In the presence of the jury.)**

THE COURTROOM DEPUTY:  Be seated and come to order.
This Court is again in session.

THE COURT:  Mr. Fenster, would you like to address
the jury?

MR. FENSTER:  Thank you, Your Honor.  May I proceed?

THE COURT:  You may.

### *PLAINTIFF'S REBUTTAL ARGUMENT*

MR. FENSTER:  Good afternoon, ladies and gentlemen.
This is the last time I will get to address you.  I want to
address some of the things that Mr. Lumish talked about.

First of all, he started off making an improper
argument that the hard storage layer has to store on its own.

**UNITED STATES DISTRICT COURT**

(To Mr. Mortensen)  If we can pull up 11.4.

This is the Court's instruction at Number 13.  And he says -- there is no instruction that says that the hard storage layer has to store on its own.  Rather, it says the nucleation host layers can store also.

Mr. Lumish is continuing to make an argument contrary to the Court's constructions even in closing argument, even at the last minute.

Now, I do want to address what he said about Dr. Bertero.  We haven't called anybody a liar.  We pointed out what happened on cross-examination.

(To Mr. Mortensen)  And if you can pull up 11.103. (As read):

"You made a statement, without sufficient evidence at the time, that maybe you believed to be true at the time that turned out not to be true; fair?  And you never corrected that statement with the Court?

"I didn't think I needed to because it was corrected by the evidence."

What we showed you is that the statements that Dr. Bertero made to the Court before they produced the anisotropy data were not right.  They did use anisotropy data. They did have anisotropy data.  And they were doing this as an effort to try to stop this case before it got to you.

Now, with respect to 2K over M, the coercive field, Dr. Bertero argued for a long-term coercivity. The formula that he showed you, Dr. Re testified, was on the timescale of years. The recording timescale is on the timescale of a nanosecond. Papusoi -- Papusoi's paper, Dr. Victora, Dr. Re, Dr. Suess, the patent, everyone says that the right way to calculate coercive field on a short-term coercive -- on a short-term timescale like you have in the actual products is 2K over M.

Now, with respect to validity, Mr. Lumish tried to argue that a bilayer is a multilayer, and that when you have a bilayer going from a soft to a hard, well, that's graded.

Ladies and gentlemen, you have been here for two weeks, and you know the difference now between a bilayer and a multilayer. There is a huge difference between what happened before Dr. Suess, the bilayer, and what happened after Dr. Suess, which was the multilayer.

And Mr. Lumish is just trying to confuse you by saying, "Well, two is a multi. Two is multi. It's a bilayer." Trying to suggest that that explains Dr. Victora's statement to the IEEE. When the IEEE statement says it was a multilayer stack that enabled the new media, that it was the new media with the multilayer stack with the graded anisotropy that was quickly adopted by the field and now is on almost every disk drive.

UNITED STATES DISTRICT COURT

With respect to validity, Dr. -- Mr. Lumish said that Dr. Victora explained that it would be easy to flip it, and why you would. He did say that. He showed you no evidence of that. Rather, the evidence shows that both Li and Victora-3, all of the prior art actually said put the hard storage layer on top. It taught away from it.

Mr. Lumish did not even address the teaching away elements. It's critical. Victora himself, in Victora-3, said -- Mr. Lumish showed you soft on hard. But what did Victora-3 actually say? In practical application, you would flip it. It taught away. If you're going to make it, you do it according to the conventional wisdom and you put the hard storage layer on top.

That's what Li did. Li has no suggestion to put the hard storage layer on the bottom. Rather, it was admitted by Dr. Victora that the teaching was away from doing that.

Their effort to trivialize this fundamental invention is, frankly, offensive. They have not shown you any motivation to combine. Dr. Victora just said it's easier to grow. Where is the evidence? I said at the beginning -- at the end of my opening statement, let them show you where in the statement, where in the prior art, it's going to show you to put multiple layers on top of a hard storage layer. There's no suggestion anywhere.

Court's Instruction Number 16 that says a prior -- a

person of ordinary skill in the art who knew about the prior art would have.  Not could have, not might have, would have.  And the evidence in this case is they didn't.  So we ask you to find "no" with respect to validity.

Let me turn to damages.  Dr. -- Mr. Lumish and Western Digital are saying it is fundamentally improbable that this fundamental invention was so responsible, but here's what we know.  The hard disk drive was invented in 1956.  And up until 2008, when they first introduced the trilayer that Dr. Suess invented, they went from zero to 300.

In the ten years that followed Dr. Suess's invention, his multilayer with graded anisotropy, they went from 300 to 1300.  Think about that.  From 30 years, they went from zero to 300, and it wasn't until Dr. Suess's invention was introduced to the market that they went from 300 gigabits per square inch to 1.3 terabits per square inch.  And the evidence is undisputed that that was enabled by Dr. Suess's invention, multilayered graded anisotropy.

Now, Dr. Lumish -- or Mr. Lumish, I keep promoting him.  Mr. Lumish mentioned at the very end this issue of smallest salable patent-practicing unit.  It is a complete distraction and irrelevant.  Let me tell you why.

Number one --

(To Mr. Mortensen)  If you could bring up '997, Claim 1, and the preamble.

**UNITED STATES DISTRICT COURT**

'997 Claim 1 is to a magnetic recording system that has the write head, the disk that includes the magnetic media. It's undisputed that the smallest salable patent-practicing unit that would practice this is the hard disk drive.

Now, why else is it irrelevant?  Because both experts, Mr. Bergman and Dr. Becker, agree that their analysis cut out -- stripped all the way down to the magnetic media recording.

(To Mr. Mortensen)  If we can go to slide 76, please.  (As read):

"MR. BERGMAN:  If you remember, my analysis initially carves out the entire value of everything else and gets to the media before I start doing allocation."

Mr. Bergman's analysis starts at the media.  He cut everything else out.  Their argument about the SSPPU is a complete distraction.  And Dr. Becker agrees.

(To Mr. Mortensen)  Slide 77, please.

Dr. Becker says:

"So the only model that the jury has seen this week from you or Mr. Bergman does not depend on SSPPU.  Fair?

"Fair."

It's a distraction, ladies and gentlemen.

So let's start with Slide 78, the patent damages

statute.  The statute says if you find infringement, the Court shall award -- shall award -- an amount no less "than a reasonable royalty for the use made of the invention by the infringer."

You -- Slide 79 instructs you -- this is the instruction.  It's Instruction Number 22 in your binders.  This is the hypothetical negotiation.

Mr. Becker's -- so Mr. Bergman showed you his analysis.  He showed you the regression.  And let's now talk about the 46 percent calculation.

(To Mr. Mortensen)  If we can go to Slide 81, please.

This was Dr. Re's analysis showing you, based on their own documents, how to quantify the amount of areal density attributable only to the invention.  Based on their own documents.  The evidence is overwhelming that this is reasonable.  WD documents say that the Suess invention of graded anisotropy multilayer media played a paramount role.

Slide 82.  This is the Srinivasan paper, and it's saying that:

"Media, consisting of a stack of magnetic layers with a gradient in the...anisotropy...have played a paramount role in advancing recording technologies towards 1 terabit by the per square inch."

Slide 83.  Their present -- their presentation summary says:

"The 'exchange-spring' principle has guided most of the advances in PMR media since inception." Since inception.  And what do they cite on the right?  This is Dr. Suess's trilayer image.

We have Dr. Victora's letter, Slide 84, showing:

"However, the new media demonstrated that the coercivity can be partially decoupled from the thermal stability by the... multiple magnetic layers with graded anisotropy," and that that new media was widely adopted.

Mr. Lumish is trying to confuse you by saying that "multilayer" refers to two.  You sat here through too much testimony to know that that's not true.  And the graded anisotropy has never referred to graded from a soft layer to a hard layer.  Graded anisotropy, in this case throughout, has only referred to the layers of the nucleation host above the hard storage layer.  That's what graded anisotropy is.  That's what we've shown you throughout the case.  That's what the patent shows.  That's what Western Digital's documents show.

(To Mr. Mortensen)  Can we go to Slide 85.

And Dr. Goglia, their own expert, admitted:

"If Western Digital was not able to use the multilayer media with varying anisotropy in the

layers, would it be able to compete in terms of areal density in the market?"

He answered:

"Not likely.  I don't know if there's any other solutions out there, but that's the commonly accepted solution."

This is not just our say-so.  This is their documents.  This is their witnesses saying that Dr. Suess's invention was, what I said, a fundamental advance, a breakthrough in magnetic recording.  It's what allowed them to go from 300 to 1.3 terabits.

Dr. Desai came up here, and the only thing he talked about was grain segregation.  But you heard from Dr. Suess, from Dr. Re, even from Dr. Bertero that it's the multiple layers using Dr. Suess's invention that allowed the grain segregation, that it unlocked the areal density.

So let's go to Slide 88.  Mr. Lumish showed you -- do you have the one with all the icons?

This is Mr. Goglia's chart, and it had all of the icons.  Do you recall there were all kinds of icons that were in there?  And why are they removed?  Because they're all before 300 gigabits per square inch.  They're not relevant at all.

What the documents do show --

(To Mr. Mortensen)  Let's go to Slide 90, please.

**UNITED STATES DISTRICT COURT**

What the documents do show is that going -- just adding one extra layer allowed them to go from 500 gigabytes per platter to 750 gigabytes per platter.  The evidence is overwhelming that this invention unlocked capacity and areal density.

All of their documents, Slide 91, are toward graded anisotropy, going from 200 gigabits to 1 terabit per square inch.

Dr. Becker --

(To Mr. Mortensen)  If you can go to slide 94.

Dr. Becker admitted that none of these -- if you click through -- none of these were related to the invention. Let's go back to the hypothetical.  So Dr. Goglia, Dr. Bertero both admitted that you would not be able to compete without it.

(To Mr. Mortensen)  If we can go to Slide 98.

This is the number that would be on the table if you calculate -- this is the number that Dr. -- that Mr. Bergman calculated as the reasonable damages.  Now it is undisputed that the profit on the table at the time was $853 million. $853 million is what was sitting on the table at the hypothetical negotiation.

It is undisputed that the parties to that hypothetical negotiation would know that they would not be able to make that $853 million without paying a reasonable license. If they walk away from the table, which they can't do, they

don't make the sales. Why? Because it is undisputed that there is no noninfringing alternative. There is no other way that they could compete in the market but for having a license. The amount of profit that they say is true is vastly overstated. It's 300 million out of the 853.

THE COURT: Need to wrap up, Mr. Fenster.

MR. FENSTER: Thank you, Your Honor.

Ladies and gentlemen, the truth of this trial is that Western Digital has infringed in a massive way. There is undisputed evidence that they would not be able to make this profit without it.

The only evidence that you have supporting a reasonable royalty is Mr. Bergman's. Mr. Bergman showed you how he calculated the 305.9 million, and Mr. -- Dr. Becker did not give you another number. If they had another number, they'd have given it to you. So I'm not going to tell you what to write. If you get to the damages question, we trust you, but we think the evidence supports the 305.9.

We thank you for your attention and await your verdict. Thank you.

THE COURT: Thank you, Mr. Fenster.

Mr. Lumish.

MR. LUMISH: May I proceed, Your Honor?

THE COURT: You may.

MR. LUMISH: Thank you. Five more minutes, you're

UNITED STATES DISTRICT COURT

out.

### *DEFENDANT'S REBUTTAL ARGUMENT*

MR. LUMISH:  Now it is my honor that I guess I need to defend.  You were told I misled you on multilayer and on hard on top.  So I'm going to show you those two things from what they've told you the invention is.

Multilayer nucleation host, increased anisotropy, toward the hard storage layer on the bottom, so soft layer on the top, I mean to say.

Let's go, Mr. Schmoller, to Slide 56.

I'll show you Dr. Re again.  Multilayer for reducing coercive fields, so the switching is easier goes back to the Hagedorn paper in 1970, and Dr. Re acknowledged it.  It has many slabs.  We agree that includes more than two.  It could have as many as you want to put in up to infinity.  I'm sure there's a physical limit.

(To Mr. Schmoller)  Let's go to Slide 61, please -- 81, sorry.

The Li patent undoubtedly has multiple layers. There was no question about that.  There's a hard layer, and I showed you a three-layer structure in the evidence and a four-layer structure today.  There's no question about it. Dr. Re acknowledges that "when we talk about a multilayer structure, we've got three or more in this reference," and that was about the Li patent.  So it's there.  It's in the art.

**UNITED STATES DISTRICT COURT**

There's no question about it.  This is from their own expert.

How about towards the hard magnetic storage layer on the bottom?

(To Mr. Schmoller)  Let's look at Slide 70, please.

Here you have the Victora references talking about the magnetic hard layer on the bottom and the soft layer on the top.  I didn't pull another slide for you to show it, but the Berger reference shows you exactly the same thing.  The guy at the top of the profession doing the research and one of the two major disk drive companies did it exactly the same way.

(To Mr. Schmoller)  And then let's go to Slide 62, please.

This will be the last piece of evidence I'm going to ask you to look at.

So Mr. Fenster told you graded anisotropy never referred to soft to hard.  That's what he told you five minutes ago.  And I'll just ask you to look at my slide here from Dr. Re.

First of all, he acknowledged that in the Berger patent -- this is the HGST patent -- there was a hard magnetic storage layer on the bottom and an exchange-spring softer layer on the top, that there was graded anisotropy in that two-layer system, and that the anisotropy increases from the soft layer on the top to the hard layer on the bottom.

Again, Mr. Fenster said graded anisotropy never

referred to soft and hard, and I had been misleading you when I suggested it. This is Dr. Re telling you, "It's kind of the definition of soft and hard." Anisotropy increasing from the soft layer to the hard layer going down is kind of the definition of soft and hard.

So I'll end the evidence there, and I wanted to finish my comments to you where Mr. Fenster started and actually join him in thanking you. I've watched you too. I've been watching you the whole time.

Lawyers, all we can do is sit and watch you and hope we're getting through and making our points and reaching you in some way. I can't thank you enough on behalf of Western Digital for the attention you've paid in this case. There's not only a lot of money at stake, but there's -- very important people's reputations have been challenged here.

I've seen you how hard you're working. I've seen you taking notes. I appreciate all the attention you've given me. I'm sure that's true for them as well. It's important to both sides. Thank you very much. We look forward to hearing your verdict. Thank you.

THE COURT: Thank you, Mr. Lumish.

Ladies and gentlemen, the case is now yours, but first, we need to swear the bailiff.

**(The bailiff was sworn.)**

THE COURTROOM DEPUTY: If you could please state

your name for the record.

THE BAILIFF:  Douglas Butsko, B-u-t-s-k-o.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Two thoughts, ladies and gentlemen. Each of you has a copy of the special verdict.  I ask you to use that as your personal scorecard as you go through your deliberations and decide on the answers to the questions.

If the jury reaches a verdict, I will poll you in open court.  That means I will ask whether the answers on the verdict form are, in fact, the answers of each of you.  So I think it will be helpful for you to have that scorecard if I do poll the jury.

Second, you can set your own hours at this point. As long as you work six hours, you can come early or go later, longer lunch, shorter lunch, whatever you want.  So just inform the bailiff of what you're doing.  If you want to go late today, that's fine.  If you want to go a little earlier, catch up next week, that's fine.

Question for you yesterday:  Is Monday a feasible day for you to deliberate?

**(The jury collectively responded "Yes.")**

THE COURT:  Okay.  Would you let the bailiff know what time you want to come in on Monday.  Okay?  With all those thoughts, I'm going to excuse you to begin your deliberations.

THE COURTROOM DEPUTY:  All rise.

**UNITED STATES DISTRICT COURT**

**(Out of the presence of the jury.)**

THE COURT:  Anything for the record at this point?  Mr. Lumish.

MR. LUMISH:  Just a question, Your Honor, on what you said to the jury.  If they -- is there an hour at which they have to leave the courthouse?  Or can they go as late as they choose?

THE COURT:  Late as they choose.

MR. LUMISH:  Great.  Thank you.

THE COURT:  They're the masters of their own destiny at this point.

MR. LUMISH:  Wasn't sure if the marshals would want them to leave.

THE COURT:  The marshals will protect them in pursuing their destiny.  I assume you're going to be in the courthouse or close for the rest of the day?

MR. FENSTER:  We'll stay close, Your Honor.

MR. LUMISH:  Our hotel is too far away.  We'll be staying close and in the courthouse, I suspect, at least in groups.

THE COURT:  Okay.  Well, make sure Ms. Vargas has a telephone number.  Thank you.

**(The jury commences deliberations.)**

**(Out of the presence of the jury.)**

///

UNITED STATES DISTRICT COURT

***JURY NOTE 1***

THE COURT:  The jury has sent out Note Number 1.  Are you just reading it for the first time?

MR. LUMISH:  I've read it, Your Honor.

THE COURT:  Okay.  Note Number 1 which reads:

"The jury requests the following:  During Bergman's testimony, confidence level was mentioned.  Regression analysis usually includes an upper and lower bound associated with a 95 percent confidence interval.  Can we have the lower/higher bound number?"

I think the appropriate response is "You need to determine this for yourselves from the evidence."

MR. LUMISH:  That's our position as well, Your Honor.

MR. FENSTER:  I think that's fine, Your Honor.  There was a demonstrative that he showed that showed the regression within the 95 percent band.

THE COURT:  Fine.

MR. FENSTER:  We would propose sending that back as the response.

THE COURT:  If it's a demonstrative, it's not in evidence.

MR. FENSTER:  I understand, Your Honor.

MR. LUMISH:  We would object.  Thank you.

THE COURT:  So I'm going to respond -- so I'm responding as follows:

"You need to determine this for yourselves from the evidence.  JVS, 7/26/24, at 3:50 p.m."

And Ms. Vargas will make copies.

MR. LUMISH:  No objection from Western Digital.

MR. FENSTER:  No objection, Your Honor.

THE COURT:  I think the jurors may have indicated they want to go home at 4:15.

MR. LUMISH:  Did you say 4:15?

THE COURT:  Right.  We'll see.  It's not my practice to bring the jurors in at the end of the day.  If they want to visit with the Court, they're free to send out a note.  But I just don't do that.

MR. LUMISH:  Understood, Your Honor.  No objection.

MR. FENSTER:  No objection.

THE COURT:  Okay.  Anything else at this time?

MR. LUMISH:  Would the Court let us know when the jury leaves so we also know we're free to leave?

THE COURT:  Yes.  As soon as Ms. Vargas knows, she'll let you know.  Okay.

**(Recess from 3:51 p.m. to 4:33 p.m.)**

**(Out of the presence of the jury.)**

THE COURT:  The jury has sent out Note Number 2, which checks the box, "The jury has reached a unanimous

verdict."

Let's bring the jury in, please.

Oh, I will poll the jurors.

MR. FENSTER:  No objection.

THE COURT:  I'll do it by show of hands as to each question.

**(In the presence of the jury.)**

THE COURTROOM DEPUTY:  Please be seated and come to order.  This Court is again in session.

THE COURT:  Good afternoon, ladies and gentlemen. Do each of you have your own copy of the special verdict?

**(The jury collectively responded "Yes.")**

THE COURT:  Okay.  Could you hand up the original, Mr. Ruhl?

THE JURY FOREPERSON:  Sure.

**(Jury foreperson complies.)**

THE COURT:  Would the clerk publish the verdict, please.

*VERDICT*

THE COURTROOM DEPUTY:  (Reading:)

"United States District Court for the Central District of California, Case Number 8:22-cv-1599-JVS-DFM, MR Technologies GMBH, Plaintiff and Counterclaim Defendant vs. Western Digital Technologies, Inc., Defendant and

**UNITED STATES DISTRICT COURT**

Counterclaim Plaintiff, dated July 26, 2024.

"We, the jury, unanimously agree to the answers to the following questions and return them as our verdict in this case:

"QUESTION 1:  Did MR Technologies prove, by a preponderance of the evidence, that Western Digital infringed the following asserted claims of asserted patents?

"Answer 'Yes' or 'No' for each of the asserted claims.

"Claims of the '864 patent.  Infringed? Answer 'Yes' for MR Technologies or 'No' for Western Digital:

"Claim 1:  Yes.

"Claim 10:  Yes.

"Claim 11:  Yes.

"Claims of the '997 patent.  Infringed? Answer 'Yes' for MR Technologies or 'No' for Western Digital:

"Claim 1:  Yes.

"Claim 7:  Yes.

"Regardless of your answer to Question 1, proceed to Question 2.

"QUESTION 2:  Did Western Digital prove, by a clear and convincing evidence, that the following

asserted claims are invalid?

"Answer 'Yes' or 'No' for each claim.

"Claims of the '864 patent.  Invalid?

"Answer 'Yes' for Western Digital or 'No' for MR Technologies:

"Claim 1:  No.

"Claim 10:  No.

"Claim 11:  No.

"Claims of the '997 patent.  Invalid?

"Answer 'Yes' for Western Digital or 'No' for MR Technologies.

"Claim 1:  No.

"Claim 7:  No.

"If you answered 'Yes' in Question 1 and 'No' in Question 2 for the same claim, answer Question 3.

"QUESTION 3:  What sum of money did MR Technologies prove by a preponderance of the evidence that it would be entitled to as a reasonable royalty for Western Digital's infringement of such claims up through the expiration of the asserted patents?

"2,062,388-" --

Did I say that correctly, Your Honor?

**(The Court and clerk confer off the record.)**

UNITED STATES DISTRICT COURT

THE COURTROOM DEPUTY:  (Reading:)

"262,388,800.

"You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your unanimous determinations.

"I certify that the jury" announce --

"unanimously concurs in every element of the above verdict.

"Signed this 26th day of July, 2024, by the jury foreperson."

THE COURT:  Ladies and gentlemen, is this your verdict, so say you all?

**(The jury collectively responded "Yes.")**

THE COURT:  Okay.  I'm going to poll you on the verdict.  I'm going to reread each question, and I'm going to ask by a show of hands whether the answer I read is your personal answer.  Not what's on this paper, but rather your personal answer.  (Reading:)

"We, the jury, unanimously agree to the answers to the following questions and return them as our verdict in this case.

"QUESTION 1:  Did MR Technologies prove by a preponderance of the evidence that Western Digital infringed the following asserted claims of the asserted patents?

UNITED STATES DISTRICT COURT

"Answer 'Yes' or 'No" for each asserted claim.  Answer 'Yes' for MR Technologies, 'No' for Western Digital.

"Claims of the '864 patent.

"Claim 1:  Yes."

If that's your personal answer -- not what's on this page, but your personal answer -- please raise your hand.

**(The jury complies.)**

THE COURT:  All eight jurors joining the response. (Reading:)

"Claim 10.  Answer:  Yes."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining the response. (Reading:)

"Claim 11:  Yes."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in the response.  (Reading:)

"Claims of the '997 patent.  Infringed?

"Answer 'Yes' for MR Technologies or 'No' for Western Digital.

**UNITED STATES DISTRICT COURT**

"Claim 1:  Yes."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in the response.  (Reading:)

"Claim 7:  Yes."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in the response.  (Reading:)

"Regardless of your answer to Question 1, proceed to Question 2.

"QUESTION 2:  Did Western Digital prove, by clear and convincing evidence, that the following claims are invalid?

"Answer 'Yes' or 'No' for each claim.

"Claims of the '864 patent.  Invalid?

"Answer 'Yes' for Western Digital, 'No' for MR Technologies.

"Claim 1:  No."

If that's your personal answer, raise your hand, please.

**(The jury complies.)**

**UNITED STATES DISTRICT COURT**

THE COURT:  All eight jurors joining in the response.  (Reading:)

"Claim 10:  No."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in the response.  (Reading:)

"Claim 11:  No."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in the response.  (Reading:)

"Claims of the '997 patent.  Invalid?

"Answer 'Yes' for Western Digital, 'No' for MR Technologies.

"Claim 1:  No."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in response. (Reading:)

"Claim 7:  No."

If that's your personal answer, would you raise your

UNITED STATES DISTRICT COURT

hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in the response.  (Reading:)

"If you answered 'Yes' in Question 1 and 'No' in Question 2 for the same claim, answer Question 3.  In other words, only answer Question 3 if you found one of the claims both infringed (Yes in Question 1) and not invalid (No in Question 2).

"QUESTION 3:  What sum did MR Technologies prove by a preponderance of the evidence that it would be entitled to as a reasonable royalty for Western Digital's infringement of such claim or claims up through the expiration of the asserted claims?

"Answer:"  2 million -- "$262,388,800."

If that's your personal answer, would you raise your hand, please.

**(The jury complies.)**

THE COURT:  All eight jurors joining in the response.

Well, that brings this case to conclusion, ladies and gentlemen.  We ran a little longer than anticipated.  But as I said at the very beginning, our jury system simply doesn't work unless ordinary people come down to the courthouse, listen

to the evidence and do their best to reach a verdict.  As I told you at the beginning, that's a duty that the Founding Fathers bequeathed to you here in the 21st Century.  You discharged your duty ably.  This was a tough case to listen to. I saw that you all attended and tracked everything going on.

I've said all along you can't discuss this case. Now you can.  The lawyers and the parties often find it helpful to talk to the jurors after the fact, to find out what went well and perhaps what didn't go so well.  It's entirely up to you whether you wish to discuss the case with anyone.  If you do not wish to discuss the case, simply tell that person directly, "I do not wish to discuss the case."  If anybody persists with you after that, would you get back to me or Ms. Vargas so we can take appropriate action.

And I admonish counsel and the parties that if a juror indicates that he or she does not wish to discuss the case, you're to respect that juror's wishes.

So with the thanks of the Court, ladies and gentlemen, you're excused.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Mr. Fenster, would you prepare a form of verdict, please -- form of judgment?

MR. FENSTER:  Yes, we will, Your Honor.

THE COURT:  If it's endorsed as to form, I will enter it immediately, if not I'll wait seven days for any

objections to the form.

MR. LUMISH:  Understood, Your Honor.

THE COURT:  Anything at this time?

MR. FENSTER:  Not for plaintiff.

MR. LUMISH:  Not for Western Digital.

THE COURT:  Very good.  Thank you.

**(Proceedings concluded at 4:47 p.m.)**

**--oOo--**

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  July 27, 2024*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

## $

**$262,388,800** [1] - 154:16
**$3.36** [2] - 89:13, 128:9
**$300** [2] - 94:6, 107:23
**$305** [1] - 127:23
**$853** [3] - 138:19, 138:20, 138:24

## '

**'05** [1] - 114:7
**'60s** [1] - 115:3
**'70s** [2] - 94:16, 115:10
**'864** [15] - 13:5, 29:1, 29:4, 29:10, 45:18, 53:16, 79:2, 79:3, 79:7, 82:24, 98:19, 148:11, 149:3, 151:4, 152:19
**'997** [17] - 29:1, 29:5, 29:10, 42:22, 45:18, 53:16, 78:25, 79:5, 79:9, 82:24, 98:19, 133:24, 134:1, 148:17, 149:9, 151:23, 153:15
**'a** [1] - 38:5
**'assists** [1] - 21:9
**'coercive** [1] - 36:14
**'comprising** [1] - 35:19
**'comprising'** [3] - 35:20, 38:9, 73:17
**'coupling** [1] - 37:1
**'exchange** [4] - 36:19, 36:22, 76:4, 136:3
**'exchange-spring** [1] - 76:4
**'exchange-spring'** [1] - 136:3
**'ferromagnetic** [1] - 37:18
**'hard** [5] - 20:17, 21:4, 24:19, 37:25, 38:24
**'including** [3] - 35:20, 38:10, 73:18
**'layer** [1] - 37:1
**'layers** [1] - 37:18
**'license** [1] - 54:20
**'No** [1] - 151:1
**'No'** [13] - 148:9, 148:12, 148:18, 149:2, 149:4, 149:10, 149:14, 151:2, 151:24, 152:18, 152:20,
153:16, 154:5
**'nucleation** [7] - 20:12, 37:9, 37:11, 37:21, 39:1, 39:4, 73:24
**'one** [1] - 38:3
**'problem'** [1] - 47:7
**'the** [3] - 36:23, 37:3, 37:5
**'underlayer'** [1] - 38:3
**'Yes'** [14] - 148:9, 148:12, 148:18, 149:2, 149:4, 149:10, 149:14, 151:1, 151:2, 151:24, 152:18, 152:20, 153:16, 154:5

## /

**/S** [1] - 157:19

## 0

**0.5** [2] - 77:1, 80:3

## 1

**1** [40] - 6:8, 7:6, 12:19, 13:5, 13:22, 29:4, 29:5, 30:9, 33:20, 42:22, 45:15, 47:1, 51:8, 51:23, 79:3, 79:7, 82:10, 82:25, 133:25, 134:1, 135:24, 138:7, 145:1, 145:2, 145:5, 148:5, 148:14, 148:20, 148:22, 149:6, 149:12, 149:14, 150:22, 151:5, 152:1, 152:13, 152:22, 153:18, 154:5, 154:9
**1-053** [1] - 1:24
**1.3** [2] - 133:16, 137:11
**1.71** [1] - 80:6
**10** [11] - 10:22, 11:8, 11:11, 11:16, 29:4, 78:24, 79:3, 148:15, 149:7, 151:11, 153:3
**1009** [1] - 9:1
**10:35** [1] - 66:15
**10:48** [1] - 66:15
**11** [13] - 11:8, 11:11, 14:25, 15:4, 15:15, 17:21, 29:4, 78:25, 79:3, 148:16, 149:8, 151:17, 153:9

**11.103** [1] - 130:12
**11.4** [1] - 130:1
**112** [1] - 14:19
**12** [3] - 10:21, 11:13, 12:4
**12,000** [1] - 121:3
**1200** [1] - 3:5
**1224** [1] - 3:5
**12424** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**129** [1] - 6:6
**12:26** [1] - 129:10
**12:36** [1] - 129:10
**12th** [5] - 2:5, 2:9, 2:13, 2:21, 3:9
**13** [12] - 15:1, 15:2, 18:5, 24:15, 24:17, 25:14, 26:15, 26:22, 73:15, 73:23, 81:14, 130:2
**1300** [1] - 133:13
**1310** [1] - 104:22
**140** [5] - 3:19, 4:9, 4:21, 5:5, 6:7
**145** [1] - 6:8
**147** [1] - 6:9
**15** [3] - 26:1, 71:16, 121:18
**16** [13] - 21:3, 86:6, 87:3, 87:5, 116:10, 116:12, 116:22, 117:7, 117:17, 117:24, 118:18, 132:25
**1600** [2] - 4:6, 4:13
**16th** [1] - 18:15
**17** [11] - 12:1, 43:17, 44:9, 44:20, 45:11, 45:22, 47:18, 51:3, 51:14, 84:21, 85:2
**1796** [3] - 8:12, 8:19, 8:22
**1797** [3] - 8:12, 8:19, 8:22
**18** [6] - 9:20, 9:23, 10:8, 10:9, 11:17, 129:8
**19** [5] - 19:6, 20:10, 77:24, 93:2, 129:9
**1956** [1] - 133:8
**1970** [1] - 140:13
**1[h** [1] - 78:17
**1[h]** [1] - 78:6

## 2

**2** [15] - 12:21, 30:10, 32:4, 45:17, 47:3, 51:11, 51:25, 146:24, 148:23,

148:24, 149:15, 152:14, 152:15, 154:6, 154:16
**2)** [1] - 154:9
**2,062,388** [1] - 149:23
**20** [3] - 23:2, 23:14, 128:25
**200** [2] - 2:17, 138:7
**20024** [1] - 2:18
**2004** [1] - 124:25
**2005** [7] - 6:20, 87:1, 95:5, 112:23, 113:1, 113:8, 114:3
**2005's** [1] - 114:11
**2006** [12] - 43:17, 44:9, 44:20, 45:11, 45:22, 47:18, 51:3, 51:14, 83:22, 87:7, 112:25, 114:8
**2008** [1] - 133:9
**2009** [1] - 102:25
**2010** [1] - 102:25
**2017** [3] - 83:10, 84:6
**2018** [2] - 103:1, 103:15
**2019** [1] - 125:1
**202-664-0623** [1] - 2:18
**2024** [6] - 1:16, 7:1, 19:6, 148:1, 150:9, 157:15
**20th** [1] - 3:23
**21** [2] - 23:2, 23:15
**21st** [1] - 155:3
**22** [3] - 9:14, 11:18, 135:6
**23** [1] - 11:25
**24** [6] - 9:23, 9:25, 10:8, 14:5, 23:16, 93:10
**25** [4] - 9:25, 10:2, 10:14, 91:23
**26** [3] - 1:16, 7:1, 148:1
**262,388,800** [1] - 150:2
**26th** [1] - 150:9
**27** [2] - 6:3, 157:15
**28** [1] - 157:8
**2800** [2] - 3:13, 4:17
**2D** [1] - 126:11
**2K** [10] - 77:1, 81:23, 82:3, 82:11, 82:13, 82:14, 102:14, 108:15, 131:1, 131:8

## 3

**3** [19] - 12:21, 14:16, 30:12, 32:10, 33:24,

45:21, 51:13, 52:2, 81:21, 103:20, 105:7, 106:18, 106:22, 116:23, 149:16, 149:17, 154:7, 154:10
**30** [1] - 133:13
**300** [8] - 127:15, 133:10, 133:13, 133:14, 133:15, 137:11, 137:22, 139:5
**305.9** [2] - 139:14, 139:18
**306** [1] - 89:14
**310-826-7474** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**312-876-7700** [2] - 3:14, 4:18
**32** [1] - 9:13
**330** [2] - 3:13, 4:17
**35** [3] - 22:23, 23:15, 25:18
**3:50** [1] - 146:4
**3:51** [1] - 146:22

## 4

**4** [4] - 32:16, 33:25, 45:23, 52:4
**4.9** [1] - 126:17
**400** [1] - 127:14
**411** [1] - 1:24
**45** [2] - 25:25, 90:10
**46** [11] - 93:8, 93:10, 94:13, 123:20, 123:21, 123:25, 124:20, 126:16, 127:12, 128:9, 135:10
**49** [3] - 11:21, 12:6, 12:7
**4:15** [2] - 146:9, 146:10
**4:33** [1] - 146:22
**4:47** [1] - 156:7
**4TH** [1] - 1:24

## 5

**5** [6] - 9:18, 11:8, 11:12, 34:2, 52:6, 128:16
**50,000** [1] - 127:13
**50/10** [1] - 25:22
**500** [1] - 138:2
**54** [1] - 82:2
**56** [1] - 140:10
**5X1** [2] - 106:3, 106:14

**UNITED STATES DISTRICT COURT**

**6**

6 [4] - 14:20, 34:4, 52:8, 82:2
60611 [2] - 3:14, 4:18
61 [4] - 127:17, 127:18, 127:24, 140:17
62 [1] - 141:11
650 [1] - 3:22
650-328-4600 [4] - 3:20, 4:10, 4:22, 5:6
660 [2] - 4:5, 4:13
67 [1] - 6:4

**7**

7 [7] - 29:5, 34:6, 52:11, 148:21, 149:13, 152:7, 153:24
7/26/24 [1] - 146:4
70 [1] - 141:4
700 [1] - 127:14
714-540-1235 [1] - 3:24
74 [1] - 18:16
750 [1] - 138:3
753 [1] - 157:8
76 [1] - 134:9
77 [1] - 134:18
78 [1] - 134:25
79 [1] - 135:5
7953 [2] - 1:23, 157:20

**8**

8 [2] - 1:10, 6:20
8.04 [1] - 107:1
8.05 [2] - 73:5, 80:1
8.27 [1] - 107:1
800 [1] - 2:17
81 [2] - 135:11, 140:18
82 [1] - 135:19
83 [1] - 136:1
84 [1] - 136:7
85 [1] - 136:22
853 [1] - 139:5
88 [1] - 137:17
8:01 [2] - 1:17, 7:2
8:22-cv-01599-JVS-DFM [1] - 1:7
8:22-cv-1599-JVS-DFM [1] - 147:23
8:29 [1] - 24:13

**9**

9 [1] - 6:19
9.42 [2] - 73:5, 80:1

90 [3] - 6:5, 126:18, 137:25
90025 [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
91 [1] - 138:6
92626 [1] - 3:23
92660 [2] - 4:6, 4:14
92701 [1] - 1:25
94 [1] - 138:10
94025 [3] - 3:19, 4:10, 4:21
94025-1008 [1] - 5:5
949-725-4000 [1] - 4:14
949-725-4278 [1] - 4:7
95 [2] - 145:9, 145:18
98 [1] - 138:15
9:24 [1] - 24:13
9:25 [1] - 25:11
9:32 [1] - 25:11

**A**

A.M [2] - 1:17, 7:2
a.m [5] - 24:13, 25:11, 66:15
ability [2] - 33:20, 36:16
able [14] - 15:15, 15:24, 60:1, 61:9, 68:16, 69:3, 74:25, 93:25, 121:24, 136:24, 137:1, 138:14, 138:23, 139:10
ably [1] - 155:4
above-entitled [1] - 157:11
absence [1] - 37:20
absolute [1] - 92:3
absolutely [2] - 102:4, 111:8
accept [4] - 35:5, 35:16, 57:3, 107:21
acceptable [4] - 56:6, 56:9, 56:14, 60:2
acceptance [1] - 52:8
accepted [1] - 137:6
accessible [1] - 43:21
accordance [1] - 78:19
according [2] - 66:4, 132:12
accordingly [1] - 42:10
account [3] - 33:19, 109:15, 123:25
accounts [1] - 63:18
accuracy [1] - 64:14
accurate [2] - 18:3, 100:21
accurately [1] - 150:4
accusations [1] - 100:17
accused [47] - 16:3, 16:12, 17:23, 20:12, 20:17, 21:4, 24:19, 35:21, 35:23, 38:11, 38:13, 38:15, 38:20, 38:25, 39:24, 40:23, 41:8, 41:10, 41:13, 41:17, 41:18, 41:19, 42:2, 42:4, 42:20, 42:24, 42:25, 43:3, 57:7, 60:7, 60:16, 61:2, 68:13, 72:22, 72:25, 73:19, 73:24, 77:22, 78:2, 78:6, 78:16, 91:2, 103:24, 103:25, 104:13, 106:13
accusing [1] - 105:22
achieve [1] - 89:25
acknowledge [3] - 107:6, 108:3, 108:4
acknowledged [19] - 98:21, 99:12, 103:8, 104:4, 105:1, 105:2, 106:12, 108:8, 114:3, 115:14, 115:22, 116:4, 117:8, 117:15, 117:19, 119:11, 122:11, 140:13, 141:19
acknowledges [3] - 107:9, 125:13, 140:23
acknowledgment [1] - 113:25
ACM [1] - 42:3
act [2] - 16:18, 29:14
acted [1] - 55:2
acting [1] - 57:3
action [1] - 155:14
actively [1] - 51:9
acts [1] - 29:17
actual [9] - 55:16, 69:18, 69:19, 69:23, 76:14, 106:13, 123:14, 131:8
actuators [1] - 126:10
add [7] - 23:16, 93:12, 118:2, 124:16, 125:9, 127:25, 128:14
added [5] - 11:23, 12:4, 14:20, 59:15, 93:12
adding [6] - 15:1,

75:23, 75:24, 89:20, 113:25, 138:2
addition [5] - 29:11, 32:13, 57:13, 108:2, 128:10
additional [13] - 11:23, 17:24, 17:25, 35:23, 38:15, 38:16, 40:24, 41:3, 45:23, 73:22, 75:24, 98:13, 120:16
address [9] - 20:3, 66:19, 85:9, 116:12, 129:16, 129:22, 129:23, 130:9, 132:7
addressed [5] - 46:14, 46:19, 47:3, 50:8, 85:4
adequate [1] - 54:1
adjacent [2] - 37:2, 38:7
admire [1] - 91:18
admires [1] - 112:16
admit [2] - 78:9, 105:10
admits [2] - 81:6, 86:1
admitted [36] - 8:13, 8:15, 8:21, 30:14, 30:17, 71:24, 72:9, 72:12, 76:24, 77:9, 77:25, 78:12, 78:23, 78:25, 79:6, 85:5, 85:6, 85:8, 85:19, 85:22, 86:21, 87:1, 87:23, 88:4, 88:12, 95:10, 95:22, 99:10, 101:25, 104:7, 132:15, 136:23, 138:11, 138:14
admitting [3] - 68:19, 77:21, 102:4
admonish [1] - 155:15
admonition [1] - 66:9
adopted [3] - 84:3, 131:24, 136:12
advance [2] - 68:11, 137:9
advances [1] - 136:4
advancing [1] - 135:23
advantages [2] - 56:7, 58:21
advertising [1] - 60:9
advise [1] - 66:5
affect [3] - 18:1, 38:18, 74:17
afternoon [2] - 129:21, 147:10
afterwards [1] - 90:3
agents [2] - 29:15,

29:17
ago [6] - 91:1, 93:2, 111:13, 117:15, 119:16, 141:17
agree [13] - 8:15, 8:20, 28:9, 79:3, 81:7, 97:3, 112:10, 123:16, 128:5, 134:6, 140:14, 148:2, 150:19
agreed [8] - 7:21, 7:22, 30:13, 42:23, 54:22, 59:19, 82:5, 127:23
agreeing [1] - 82:9
agreement [7] - 8:11, 55:3, 59:21, 62:5, 66:2, 99:4, 121:25
agrees [1] - 134:17
AICHELE [1] - 2:16
aids [1] - 55:14
alleged [5] - 29:7, 54:21, 55:17, 57:1, 124:20
allegedly [2] - 29:1, 60:14
allocation [1] - 134:14
allow [4] - 22:6, 59:9, 68:21, 69:3
allowed [7] - 16:22, 18:8, 19:24, 74:24, 137:10, 137:15, 138:2
alloy [1] - 104:22
almost [5] - 49:23, 84:4, 123:12, 125:24, 131:24
alone [1] - 51:20
ALSO [1] - 5:8
alter [1] - 38:6
alternative [2] - 68:21, 139:2
alters [2] - 37:1, 37:6
altitude [1] - 115:19
American [1] - 95:24
amount [13] - 53:17, 54:11, 54:12, 57:11, 59:17, 59:21, 60:2, 60:5, 89:9, 89:12, 135:2, 135:14, 139:4
amounts [1] - 61:3
ANA [3] - 1:18, 1:25, 7:1
analogous [11] - 46:23, 47:1, 59:10, 84:22, 85:1, 85:3, 115:8, 115:10, 115:24, 120:11, 120:12
analysis [22] - 46:3,

UNITED STATES DISTRICT COURT

46:4, 47:19, 49:8, 69:23, 70:1, 70:19, 72:10, 78:16, 79:11, 82:15, 87:12, 87:22, 89:11, 89:12, 114:10, 134:6, 134:11, 134:15, 135:9, 135:13, 145:8

*analyze* [1] - 47:15

*analyzed* [2] - 46:2, 76:10

*analyzing* [1] - 47:23

*ancestry* [1] - 34:10

*AND* [5] - 3:3, 3:17, 4:3, 4:16, 5:3

*Andy* [1] - 5:10

*ANGELES* [1] - 157:3

*Angeles* [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10

*angular* [1] - 109:16

*anisotropies* [1] - 100:23

*anisotropy* [61] - 37:10, 37:12, 37:13, 37:17, 69:2, 72:2, 72:3, 73:4, 74:14, 77:17, 77:20, 78:9, 78:11, 78:18, 79:17, 80:2, 83:18, 88:13, 89:19, 102:18, 107:19, 107:22, 113:13, 113:18, 114:4, 114:23, 115:16, 116:25, 117:6, 117:10, 117:11, 117:14, 118:15, 119:13, 120:17, 121:4, 121:17, 122:7, 122:11, 125:5, 130:23, 130:24, 131:23, 133:12, 133:18, 135:18, 136:11, 136:16, 136:17, 136:19, 136:25, 138:7, 140:7, 141:15, 141:22, 141:23, 141:25, 142:3

*announce* [1] - 150:6

*answer* [44] - 27:19, 33:6, 65:19, 76:6, 92:15, 96:20, 97:23, 104:15, 105:9, 107:12, 148:9, 148:12, 148:18, 148:22, 149:2, 149:4, 149:10, 149:15, 150:16,

150:17, 150:18, 151:1, 151:2, 151:6, 151:7, 151:11, 151:12, 151:18, 151:24, 152:2, 152:8, 152:13, 152:18, 152:20, 152:23, 153:4, 153:10, 153:16, 153:19, 153:25, 154:6, 154:7, 154:16, 154:17

*ANSWER* [2] - 78:21, 85:14

*answered* [9] - 33:1, 33:3, 70:20, 78:5, 82:11, 88:6, 137:3, 149:14, 154:5

*answering* [2] - 65:17, 80:16

*answers* [5] - 143:7, 143:9, 143:10, 148:3, 150:20

*anticipated* [2] - 55:18, 154:23

*anyway* [3] - 81:18, 105:10, 105:11

*apart* [1] - 110:3

*apex* [1] - 92:3

*apologies* [1] - 10:18

*apologize* [1] - 12:10

*APPEARANCES* [4] - 2:1, 3:1, 4:1, 5:1

*appearances* [1] - 7:9

*applicable* [1] - 79:24

*application* [2] - 63:7, 132:10

*applied* [4] - 37:20, 82:15, 84:2, 108:24

*applies* [2] - 27:24, 63:10

*apply* [6] - 28:7, 36:2, 75:18, 82:16, 108:5

*apportion* [2] - 60:19, 69:25

*apportioned* [1] - 21:24

*apportionment* [1] - 60:16

*appreciate* [2] - 66:21, 142:17

*appreciated* [1] - 92:8

*approach* [1] - 117:16

*approached* [1] - 63:13

*approaches* [1] - 82:10

*appropriate* [4] - 55:22, 105:3, 145:12, 155:14

*approximating* [1] - 82:10

*area* [1] - 95:15

*areal* [30] - 68:21, 68:23, 69:3, 75:15, 89:6, 89:9, 89:25, 93:8, 94:13, 119:5, 119:6, 123:21, 123:25, 124:4, 124:12, 124:21, 124:23, 125:15, 125:18, 125:23, 126:2, 126:4, 126:6, 126:8, 126:14, 127:12, 135:14, 137:2, 137:16, 138:4

*Areal* [1] - 124:18

*argue* [7] - 15:3, 15:24, 19:15, 19:24, 22:6, 22:22, 131:11

*argued* [2] - 18:15, 131:2

*argues* [2] - 29:4, 87:13

*arguing* [2] - 16:25, 99:18

*ARGUMENT* [4] - 67:3, 90:19, 129:20, 140:2

*argument* [21] - 6:4, 6:5, 6:6, 6:7, 15:14, 18:9, 22:7, 27:8, 27:10, 67:23, 74:6, 80:19, 81:12, 81:15, 81:22, 128:4, 128:12, 129:25, 130:6, 130:7, 134:16

*arguments* [14] - 15:16, 20:1, 20:3, 27:8, 31:21, 31:24, 67:25, 73:8, 77:2, 110:12, 111:6, 111:23, 112:8

*arm* [6] - 13:21, 13:25, 14:1, 14:2, 14:4, 14:6

*arrive* [1] - 50:12

*arrow* [1] - 104:7

*arrows* [2] - 107:19, 117:4

*art* [84] - 43:19, 43:20, 43:22, 44:6, 44:7, 44:11, 44:12, 44:19, 44:23, 45:1, 45:2, 45:3, 45:9, 45:10, 45:15, 45:20, 45:21, 46:12, 46:14, 46:18, 46:21, 46:23, 46:25, 47:1, 47:9, 47:16, 47:18, 47:25, 48:1,

48:4, 48:5, 48:7, 48:9, 48:14, 48:24, 49:2, 49:5, 49:7, 49:10, 49:21, 50:3, 50:6, 50:7, 50:12, 50:21, 50:23, 51:5, 51:12, 51:14, 51:15, 53:4, 53:8, 53:13, 74:11, 75:7, 77:15, 84:4, 84:16, 84:22, 85:24, 86:9, 86:11, 86:14, 86:25, 87:2, 87:25, 109:6, 109:7, 109:9, 110:19, 111:4, 115:4, 115:8, 115:12, 115:24, 120:11, 132:5, 132:22, 133:1, 133:2, 140:25

*article* [1] - 59:24

*Article* [1] - 6:19

*articulate* [1] - 50:16

*aside* [2] - 105:14, 107:6

*aspects* [3] - 15:25, 16:1

*assembly* [1] - 13:23

*asserted* [33] - 14:3, 14:11, 14:19, 29:6, 29:10, 29:11, 40:15, 41:6, 41:11, 41:17, 42:22, 43:8, 43:9, 43:16, 44:14, 44:15, 44:17, 53:16, 53:23, 54:7, 69:20, 72:22, 72:25, 86:7, 148:7, 148:10, 149:1, 149:22, 150:24, 150:25, 151:1, 154:14

*assertion* [1] - 14:2

*assess* [1] - 50:18

*assessing* [1] - 55:14

*assist* [4] - 37:22, 77:8, 117:22, 117:23

*assisted* [1] - 126:11

*Assisted* [1] - 6:20

*assisting* [6] - 16:19, 71:15, 117:20, 118:16, 121:19

*assists* [5] - 18:9, 19:16, 20:20, 38:22, 74:1

*associated* [1] - 145:9

*assume* [3] - 55:1, 55:3, 144:15

*AT* [4] - 2:20, 4:9, 4:16, 4:20

*attaboys* [1] - 124:15

*attack* [2] - 100:7,

114:15

*attacked* [4] - 46:24, 93:14, 93:15

*attacking* [1] - 116:14

*attempt* [2] - 62:11, 65:12

*attempts* [1] - 52:2

*attended* [1] - 155:5

*attention* [6] - 47:13, 67:9, 89:17, 139:19, 142:13, 142:17

*ATTORNEY* [4] - 2:20, 4:9, 4:16, 4:20

*attorneys* [1] - 32:5

*attributable* [11] - 57:6, 60:6, 60:11, 60:24, 61:1, 61:3, 61:20, 69:23, 89:10, 89:13, 135:15

*AUGUST* [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8

*August* [1] - 5:9

*Austria* [1] - 93:11

*author* [1] - 95:20

*authored* [1] - 94:18

*authority* [1] - 29:19

*availability* [1] - 56:2

*available* [6] - 15:24, 44:8, 55:24, 56:5, 56:9, 56:14

*Avenue* [3] - 2:17, 3:13, 4:17

*avoid* [3] - 34:8, 45:4, 52:24

*await* [1] - 139:19

*award* [9] - 53:18, 54:1, 54:8, 57:9, 60:22, 60:25, 112:8, 135:2

## B

*B-u-t-s-k-o* [1] - 143:2

*background* [1] - 50:6

*backwards* [2] - 9:13, 100:8

*bad* [1] - 107:18

*bailiff* [6] - 65:10, 66:5, 142:23, 142:24, 143:16, 143:22

*BAILIFF* [1] - 143:2

*bait* [1] - 111:3

*BALI* [2] - 4:5, 25:6

*Bali* [1] - 7:17

*band* [1] - 145:18

*bargaining* [2] - 56:13, 56:19

*base* [4] - 30:5, 62:20,

127:1, 127:4
**based** [17] - 15:3, 23:7, 34:9, 55:22, 60:5, 60:23, 60:25, 61:7, 61:19, 64:22, 84:3, 102:14, 107:18, 114:11, 127:5, 135:13, 135:15
**basic** [3] - 18:1, 38:18, 116:15
**basis** [2] - 15:8, 85:25
**battle** [4] - 16:17, 16:23, 78:7, 124:6
**Beach** [2] - 4:6, 4:14
**bear** [1] - 34:6
**bears** [1] - 61:2
**Becker** [9] - 72:8, 126:21, 128:1, 134:6, 134:17, 134:19, 138:9, 138:11, 139:14
**Becker's** [1] - 135:8
**become** [1] - 112:14
**becomes** [1] - 65:8
**becoming** [1] - 36:17
**Becton** [6] - 13:15, 13:22, 14:15, 14:16, 15:8
**beforehand** [1] - 77:20
**began** [4] - 54:24, 55:12, 55:25, 59:20
**begin** [4] - 10:23, 61:24, 67:7, 143:24
**beginning** [11] - 10:9, 20:10, 35:17, 67:10, 72:16, 72:20, 110:9, 117:3, 132:20, 154:24, 155:2
**begins** [1] - 9:25
**behalf** [2] - 67:7, 142:12
**behind** [1] - 100:20
**belief** [1] - 62:18
**beliefs** [1] - 34:10
**believability** [1] - 34:7
**believable** [1] - 35:10
**believes** [1] - 40:9
**below** [1] - 108:21
**benefits** [3] - 59:3, 89:23, 89:25
**bequeathed** [1] - 155:3
**Berger** [16] - 84:20, 86:14, 87:8, 109:9, 116:8, 116:11, 116:22, 117:10, 117:16, 117:20, 117:24, 118:1,

121:1, 123:5, 141:8, 141:19
**Berger's** [1] - 116:25
**BERGMAN** [1] - 134:11
**Bergman** [9] - 69:22, 70:1, 70:17, 89:11, 134:6, 134:21, 135:8, 138:17, 139:13
**Bergman's** [4] - 72:10, 134:15, 139:13, 145:7
**Bertero** [25] - 71:20, 71:21, 71:23, 71:24, 77:9, 77:25, 78:12, 78:25, 80:9, 81:5, 81:22, 91:15, 92:11, 95:13, 99:24, 100:5, 100:8, 100:9, 108:2, 109:14, 130:10, 130:22, 131:2, 137:14, 138:13
**best** [4] - 56:7, 70:9, 91:7, 155:1
**better** [5] - 10:5, 100:4, 103:7, 126:4, 126:7
**between** [22] - 13:13, 14:6, 14:8, 31:2, 37:2, 37:7, 38:7, 41:10, 45:17, 47:16, 47:24, 52:14, 58:5, 60:20, 72:3, 72:24, 75:12, 77:13, 97:20, 127:20, 131:14, 131:15
**beyond** [1] - 46:16
**bias** [2] - 34:1, 34:8
**big** [3] - 104:6, 107:18, 128:7
**bigger** [1] - 107:21
**biggest** [2] - 70:4, 104:11
**bilayer** [8] - 74:12, 89:20, 108:21, 131:11, 131:12, 131:14, 131:16, 131:19
**bilayers** [1] - 83:6
**binders** [2] - 36:13, 135:6
**bit** [2] - 83:14, 101:23
**bits** [10] - 20:14, 38:2, 39:3, 74:2, 76:23, 81:10, 98:16, 99:17, 101:19, 107:9
**bledahl@raklaw.com** [1] - 2:11
**blocks** [1] - 49:22

**blog** [1] - 63:7
**blood** [1] - 92:21
**blow** [1] - 83:13
**blue** [1] - 122:17
**body** [1] - 123:24
**bottom** [23] - 9:23, 18:22, 74:16, 88:18, 109:9, 116:24, 117:2, 117:9, 117:11, 119:8, 119:10, 119:12, 119:14, 121:15, 122:8, 122:18, 125:6, 132:15, 140:8, 141:3, 141:6, 141:21, 141:24
**Boulevard** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**bound** [2] - 145:9, 145:11
**box** [7] - 102:6, 102:7, 102:16, 104:20, 105:17, 105:18, 146:25
**bracket** [1] - 9:15
**brackets** [1] - 10:15
**break** [7] - 66:7, 66:12, 71:13, 75:23, 90:11, 113:11, 118:8
**breaking** [1] - 76:1
**breakthrough** [1] - 137:10
**BRIAN** [1] - 2:8
**bring** [9] - 26:7, 69:12, 69:16, 115:20, 116:2, 126:17, 133:24, 146:12, 147:2
**brings** [2] - 119:18, 154:22
**broadly** [1] - 109:17
**broke** [1] - 124:12
**brought** [7] - 69:22, 71:17, 76:8, 80:8, 82:18, 83:2, 84:14
**BUCZKO** [6] - 2:12, 22:17, 23:2, 23:4, 23:20, 23:24
**Buczko** [2] - 7:12, 22:17
**build** [1] - 91:7
**building** [1] - 49:22
**built** [1] - 110:2
**bunch** [2] - 91:21, 124:22
**burden** [10] - 29:20, 29:24, 39:21, 43:25, 54:10, 61:2, 79:1, 82:23, 87:4, 110:1

**business** [7] - 58:8, 59:9, 59:14, 59:22, 96:11, 100:11, 112:9
**businesses** [1] - 59:9
**businesspeople** [1] - 57:4
**businessperson** [1] - 92:13
**Butsko** [1] - 143:2
**buy** [1] - 127:7
**buys** [1] - 127:8
**BY** [12] - 2:8, 2:16, 3:8, 3:12, 3:18, 3:22, 4:5, 4:9, 4:12, 4:16, 4:20, 5:4

## C

**CA** [1] - 1:25
**cadence** [1] - 20:15
**cake** [1] - 84:16
**calculate** [4] - 74:24, 75:20, 131:7, 138:17
**calculated** [4] - 55:20, 75:17, 138:18, 139:14
**calculating** [1] - 81:23
**calculation** [1] - 135:10
**calculations** [1] - 81:24
**CALIFORNIA** [4] - 1:2, 1:18, 7:1, 157:4
**California** [16] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10, 3:19, 3:23, 4:6, 4:10, 4:14, 4:21, 5:5, 92:7, 147:22, 157:7
**candor** [2] - 72:6, 93:20
**cannot** [9] - 14:11, 33:3, 40:18, 46:24, 72:3, 87:6, 100:1, 101:15
**capable** [1] - 95:17
**capacity** [1] - 138:4
**cards** [1] - 110:3
**careful** [1] - 119:23
**carefully** [1] - 89:23
**CARLSON** [2] - 4:4, 4:12
**carry** [1] - 98:20
**cartoons** [1] - 71:6
**carves** [1] - 134:12
**cascade** [1] - 117:5
**cascading** [4] - 117:17, 118:15, 121:6, 122:2
**case** [114] - 14:7, 14:15, 16:7, 18:10,

18:22, 23:7, 23:8, 23:9, 23:13, 26:5, 27:7, 27:9, 27:11, 27:13, 27:14, 27:15, 27:24, 28:6, 28:12, 28:19, 28:21, 32:18, 33:10, 33:12, 34:1, 35:13, 35:19, 42:6, 50:19, 52:18, 53:21, 56:23, 62:7, 62:21, 62:23, 62:25, 63:3, 63:4, 63:14, 63:18, 63:21, 63:25, 64:1, 64:4, 64:8, 64:11, 64:22, 65:15, 67:9, 67:24, 68:18, 68:24, 69:7, 69:8, 70:2, 71:25, 72:14, 74:7, 75:25, 76:6, 77:19, 78:22, 80:1, 80:12, 81:5, 86:16, 91:3, 91:7, 91:10, 91:21, 92:7, 94:7, 94:11, 96:19, 97:1, 97:11, 97:14, 97:20, 98:19, 99:6, 99:10, 101:16, 107:23, 111:7, 112:4, 116:9, 118:4, 120:24, 121:9, 123:11, 123:14, 123:23, 124:1, 124:19, 124:22, 126:19, 127:1, 130:25, 133:3, 136:17, 136:20, 142:13, 142:22, 148:4, 150:21, 154:22, 155:4, 155:6, 155:10, 155:11, 155:12, 155:17
**Case** [2] - 1:6, 147:22
**case-in-chief** [2] - 26:5, 27:13
**cases** [2] - 69:5, 80:2
**catch** [1] - 143:17
**category** [1] - 86:17
**caught** [1] - 10:21
**center** [1] - 92:5
**Center** [3] - 3:22, 4:5, 4:13
**CENTRAL** [1] - 1:2
**Central** [2] - 147:21, 157:7
**Century** [1] - 155:3
**certain** [7] - 29:8, 31:18, 36:12, 42:24, 49:12, 51:18, 51:22
**certainly** [1] - 87:1
**CERTIFICATE** [1] -

157:1
**Certified** [1] - 1:5
**certify** [2] - 150:6, 157:7
**chaaru.deb@lw.com** [1] - 4:11
**CHAARUSHENA** [1] - 4:9
**chair** [1] - 93:24
**challenge** [1] - 85:25
**challenged** [6] - 43:25, 79:15, 79:16, 79:18, 107:17, 142:15
**challenging** [1] - 97:12
**Chan** [1] - 7:12
**CHAN** [1] - 2:20
**CHANG** [1] - 3:12
**change** [4] - 20:18, 22:21, 62:15, 62:18
**changed** [3] - 113:4, 113:5, 114:1
**changes** [3] - 24:1, 44:1, 102:23
**changing** [1] - 115:16
**channels** [1] - 125:20
**character** [1] - 59:1
**charge** [2] - 11:22, 14:13
**chart** [12] - 104:6, 107:18, 110:1, 124:3, 124:13, 125:2, 125:7, 125:9, 125:10, 125:13, 128:7, 137:19
**charts** [1] - 66:24
**chasing** [1] - 83:5
**chat** [1] - 63:6
**check** [4] - 107:11, 110:7, 123:10, 123:16
**checks** [1] - 146:25
**cheeseburgers** [1] - 84:15
**Chicago** [2] - 3:14, 4:18
**chief** [2] - 26:5, 27:13
**chocolate** [1] - 84:16
**choice** [1] - 56:17
**choose** [3] - 35:1, 144:7, 144:8
**chose** [1] - 105:24
**chosen** [1] - 92:20
**Chris** [1] - 5:10
**circle** [2] - 102:7, 102:8
**Circuit** [3] - 13:17, 14:1, 14:9
**circumstances** [1] -

34:12
**circumstantial** [4] - 30:20, 30:23, 31:3, 31:13
**cite** [1] - 136:5
**cited** [4] - 13:15, 86:18, 86:20
**citing** [2] - 76:4, 120:12
**claim** [108] - 13:5, 13:16, 13:17, 13:18, 14:5, 14:10, 14:11, 14:22, 16:13, 16:24, 17:4, 17:24, 18:1, 19:3, 19:25, 20:4, 20:19, 21:9, 29:21, 29:23, 29:25, 30:2, 35:17, 35:19, 35:22, 35:25, 36:3, 36:12, 38:12, 38:14, 38:17, 38:25, 39:4, 39:5, 39:13, 40:1, 40:2, 40:15, 40:17, 40:19, 40:20, 40:22, 40:25, 41:1, 41:2, 41:17, 41:18, 41:20, 42:12, 42:14, 42:17, 42:19, 43:9, 44:17, 46:5, 48:11, 48:25, 49:7, 49:17, 49:19, 52:15, 53:5, 53:8, 53:16, 53:22, 72:12, 72:21, 73:20, 73:25, 74:4, 74:5, 74:7, 76:18, 78:3, 78:20, 80:25, 86:7, 98:17, 109:12, 126:17, 148:14, 148:15, 148:16, 148:20, 148:21, 149:2, 149:6, 149:7, 149:8, 149:12, 149:13, 149:15, 151:2, 151:5, 151:11, 151:17, 152:1, 152:7, 152:18, 152:22, 153:3, 153:9, 153:18, 153:24, 154:6, 154:13
**Claim** [7] - 13:22, 15:1, 42:22, 79:2, 79:7, 133:25, 134:1
**claimed** [34] - 42:21, 44:16, 44:18, 44:20, 44:24, 45:14, 45:18, 46:23, 47:17, 47:21, 47:24, 48:2, 48:6, 48:16, 49:4, 49:23, 50:4, 50:13, 51:17, 51:24, 52:1, 52:3, 52:4, 52:7, 52:8,

52:20, 52:22, 53:13, 54:19, 61:11, 86:12, 100:23, 117:18, 118:4
**Claims** [3] - 29:4, 29:5, 79:3
**claims** [82] - 14:3, 14:19, 14:21, 16:14, 19:17, 20:13, 20:20, 21:7, 24:21, 27:7, 29:6, 29:10, 29:12, 35:13, 35:15, 35:17, 36:6, 38:9, 38:21, 39:1, 40:17, 40:24, 41:1, 41:5, 41:7, 41:11, 41:12, 43:8, 43:16, 43:25, 44:14, 44:16, 46:4, 53:23, 69:21, 72:20, 72:22, 72:25, 73:17, 78:24, 79:5, 79:8, 82:17, 82:24, 93:1, 93:4, 97:1, 97:15, 98:4, 98:9, 98:18, 98:20, 101:5, 111:1, 114:10, 114:13, 115:1, 121:9, 122:13, 123:2, 123:8, 123:10, 123:15, 128:21, 148:7, 148:10, 148:11, 148:17, 149:1, 149:3, 149:9, 149:21, 150:24, 151:4, 151:23, 152:17, 152:19, 153:15, 154:8, 154:14, 154:15
**clarification** [1] - 8:8
**class** [1] - 42:25
**clear** [16] - 8:10, 8:18, 13:18, 23:23, 29:25, 43:13, 43:24, 44:10, 46:7, 84:12, 84:24, 87:9, 105:15, 127:3, 148:25, 152:16
**clerk** [3] - 65:10, 147:17, 149:25
**click** [1] - 138:12
**clients** [1] - 32:6
**climb** [1] - 115:18
**climbing** [1] - 116:2
**close** [12] - 61:10, 68:3, 75:4, 75:9, 86:19, 87:17, 97:8, 124:2, 144:16, 144:17, 144:19
**closer** [1] - 37:15
**closest** [3] - 87:15, 87:20, 87:21

**closing** [10] - 6:4, 6:5, 15:3, 27:8, 27:10, 31:24, 67:16, 94:1, 112:7, 130:7
**CLOSING** [2] - 67:3, 90:19
**closings** [3] - 25:5, 25:15, 27:16
**co** [2] - 94:18, 95:20
**co-author** [1] - 95:20
**co-authored** [1] - 94:18
**coauthors** [1] - 94:25
**Cobra** [5] - 103:16, 104:12, 106:14, 106:23, 107:6
**Code** [1] - 157:8
**code** [1] - 41:25
**codes** [2] - 42:3, 42:20
**coercive** [19] - 76:25, 77:5, 80:4, 80:5, 80:6, 81:24, 81:25, 82:3, 82:14, 97:16, 107:16, 108:8, 108:10, 108:15, 115:20, 131:1, 131:7, 140:12
**coercivity** [9] - 13:9, 74:19, 75:22, 82:10, 83:16, 116:1, 118:20, 131:2, 136:9
**cognitive** [1] - 107:15
**coherent** [2] - 71:11, 71:18
**collapse** [1] - 47:8
**colleague** [1] - 112:14
**colleagues** [2] - 86:19, 125:24
**collection** [1] - 103:19
**collectively** [5] - 90:13, 128:25, 143:21, 147:12, 150:13
**colon** [1] - 9:15
**color** [6] - 34:9, 105:16, 105:17, 106:25, 107:3, 107:4
**colors** [4] - 105:21, 105:22, 105:25, 106:5
**column** [1] - 82:2
**columns** [1] - 124:24
**combination** [7] - 45:1, 45:2, 48:8, 48:12, 48:19, 49:9, 123:3
**combinations** [1] - 49:24
**combine** [8] - 50:4, 50:12, 53:12, 115:5,

118:1, 119:19, 123:4, 132:19
**combined** [2] - 48:7, 48:17
**combining** [4] - 45:8, 48:14, 53:3, 120:13
**comfortable** [2] - 90:12, 90:14
**coming** [1] - 16:22
**commences** [1] - 144:23
**commended** [1] - 47:13
**comment** [1] - 102:1
**commentary** [1] - 63:18
**comments** [4] - 91:10, 100:6, 111:17, 142:7
**commercial** [4] - 51:23, 58:5, 58:19, 59:1
**common** [7] - 31:15, 36:2, 50:9, 50:25, 67:21, 91:9, 124:1
**commonly** [1] - 137:5
**communicate** [5] - 63:1, 63:2, 65:9, 65:12, 65:13
**communicating** [1] - 63:10
**communications** [1] - 64:17
**companies** [2] - 116:9, 141:10
**company** [8] - 67:13, 68:3, 68:23, 96:17, 100:11, 103:11, 117:6
**comparable** [2] - 57:20, 59:9
**compare** [4] - 39:24, 41:6, 41:13, 72:21
**comparing** [1] - 48:23
**comparison** [3] - 41:10, 72:24, 107:20
**compelling** [1] - 87:9
**compensate** [2] - 54:2, 54:8
**compensating** [1] - 60:10
**compete** [7] - 56:18, 68:16, 68:22, 69:3, 137:1, 138:14, 139:3
**competitors** [1] - 58:7
**complete** [4] - 11:18, 66:3, 133:21, 134:17
**completely** [7] - 100:21, 109:6, 109:7, 113:12, 113:16, 113:18,

| | | | | |
|---|---|---|---|---|
| 126:25 | conflate [1] - 19:1 | consult [2] - 28:3, 65:16 | 96:21, 123:20 | 129:15, 130:18, 130:22, 135:1, |
| complex [2] - 67:13, 67:15 | conformance [1] - 157:12 | consultancy [1] - 92:14 | corporate [3] - 5:9, 71:1, 71:17 | 146:13, 146:18, 147:9, 147:21, |
| complicated [1] - 109:14 | confronted [2] - 71:8, 107:13 | consultant [1] - 124:21 | corporation [2] - 29:13, 29:16 | 149:25, 155:18, 157:6, 157:20 |
| complies [12] - 147:16, 151:8, 151:14, 151:20, 152:4, 152:10, 152:25, 153:6, 153:12, 153:21, 154:2, 154:19 | confuse [3] - 67:25, 131:18, 136:13 | consulting [2] - 63:22, 94:9 | correct [20] - 14:12, 26:3, 26:19, 35:17, 78:4, 78:5, 78:20, 78:21, 79:10, 81:10, 85:13, 86:3, 88:5, 88:6, 99:18, 102:13, 126:15, 126:20, 126:23, 157:9 | court [14] - 21:22, 25:9, 43:14, 62:3, 64:12, 64:13, 64:23, 65:15, 91:20, 92:21, 94:2, 110:5, 124:9, 143:9 |
| | confusing [2] - 15:6, 16:7 | consumers [1] - 127:9 | | |
| | conjectural [1] - 60:22 | contact [1] - 63:16 | | |
| | connected [3] - 14:1, 14:4, 118:8 | containing [1] - 61:17 | | |
| | connection [1] - 52:14 | contends [5] - 29:11, 44:6, 44:15, 45:19, 46:6 | | |
| component [4] - 14:7, 14:8, 23:18, 61:14 | conscientious [1] - 62:14 | content [2] - 45:15, 48:23 | corrected [2] - 130:17, 130:20 | COURT [131] - 1:1, 1:24, 7:14, 7:19, 7:24, 8:10, 8:16, 8:22, 9:1, 9:5, 9:11, 9:16, 9:18, 10:3, 10:8, 10:13, 10:17, 11:2, 11:7, 11:10, 11:15, 11:20, 12:4, 12:12, 12:18, 12:21, 12:25, 15:11, 15:17, 15:22, 16:9, 16:17, 17:5, 17:8, 17:14, 18:6, 18:12, 18:19, 18:25, 19:20, 20:6, 20:23, 21:3, 21:8, 21:19, 21:25, 22:10, 22:12, 22:16, 23:1, 23:3, 23:16, 23:21, 24:1, 24:7, 24:14, 25:1, 25:5, 25:8, 25:12, 25:21, 25:24, 26:2, 26:5, 26:7, 26:12, 26:19, 26:22, 26:24, 27:3, 27:21, 28:2, 66:12, 66:19, 66:23, 67:2, 90:4, 90:8, 90:10, 90:15, 90:18, 128:22, 129:4, 129:6, 129:8, 129:11, 129:16, 129:19, 139:6, 139:21, 139:24, 142:21, 143:4, 143:22, 144:2, 144:8, 144:10, 144:14, 144:21, 145:2, 145:5, 145:19, 145:22, 146:1, 146:8, 146:11, 146:17, 146:20, 146:24, 147:5, 147:10, 147:13, 147:17, 150:11, 150:14, 151:9, 151:15, 151:21, 152:5, 152:11, 153:1, 153:7, 153:13, 153:22, 154:3, |
| components [13] - 13:9, 13:19, 14:10, 15:7, 17:24, 17:25, 35:24, 38:15, 38:17, 61:6, 73:22, 98:13, 127:6 | conscious [1] - 34:8 | contentions [2] - 28:20, 28:23 | correctly [2] - 125:2, 149:24 | |
| | consider [25] - 30:7, 30:18, 30:25, 31:14, 31:16, 31:19, 33:10, 34:20, 45:5, 47:9, 48:2, 49:25, 50:18, 51:5, 51:17, 51:20, 52:25, 53:9, 53:17, 55:23, 56:2, 56:22, 56:24, 57:12, 80:15 | context [4] - 108:16, 112:19, 125:17 | cost [2] - 56:3, 128:10 | |
| | | continue [1] - 65:18 | Costa [1] - 3:23 | |
| | | Continued [3] - 3:1, 4:1, 5:1 | costs [2] - 126:23, 128:11 | |
| composed [1] - 53:5 | | continuing [1] - 130:6 | Counsel [1] - 12:3 | |
| composite [1] - 120:3 | | contradicted [1] - 34:2 | COUNSEL [4] - 2:1, 3:1, 4:1, 5:1 | |
| comprises [3] - 37:9, 76:22, 77:16 | | contrary [11] - 19:24, 20:4, 23:4, 69:14, 74:7, 75:3, 77:14, 84:18, 88:2, 130:7 | counsel [6] - 7:9, 14:14, 27:16, 97:3, 102:1, 155:15 | |
| comprising [15] - 13:2, 13:16, 13:23, 14:24, 15:3, 15:15, 17:9, 18:20, 19:18, 20:5, 77:5, 97:25, 98:1, 98:4 | considerations [1] - 45:23 | contrast [1] - 70:22 | count [3] - 65:22, 65:25, 91:24 | |
| | considered [14] - 29:13, 32:12, 43:18, 43:22, 44:2, 44:13, 46:12, 46:15, 52:17, 52:22, 55:12, 62:9, 110:20 | contribute [1] - 126:13 | COUNTERCLAIM [5] - 2:3, 3:3, 3:17, 4:3, 5:3 | |
| | | contribution [2] - 126:17, 128:9 | Counterclaim [4] - 1:6, 1:10, 147:24, 148:1 | |
| conceding [1] - 21:1 | | control [1] - 32:20 | | |
| concept [12] - 83:21, 84:3, 113:2, 113:9, 113:10, 113:11, 113:16, 114:2, 114:7, 114:11, 116:22 | | controls [1] - 32:3 | country [1] - 125:21 | |
| | considering [4] - 33:18, 44:25, 47:14, 54:25 | conventional [9] - 69:14, 75:3, 75:8, 75:10, 75:11, 77:14, 83:8, 132:12 | COUNTY [1] - 157:3 | |
| | | | couple [3] - 9:9, 106:1, 110:11 | |
| | consist [1] - 30:8 | conversely [1] - 42:15 | coupled [12] - 13:12, 36:19, 36:21, 37:3, 37:5, 76:20, 76:22, 77:16, 81:2, 81:4, 81:8, 85:7 | |
| concepts [3] - 53:12, 71:7, 103:3 | consistent [6] - 34:15, 67:24, 68:6, 81:19, 103:2, 119:21 | convicted [1] - 102:5 | | |
| concerning [2] - 56:2, 65:14 | | convince [2] - 106:11, 127:19 | | |
| conclude [2] - 14:18, 52:16 | consisting [1] - 135:21 | convincing [9] - 29:25, 43:13, 43:24, 44:10, 46:8, 84:13, 84:24, 148:25, 152:16 | coupled' [1] - 36:22 | |
| concluded [1] - 156:7 | constant [3] - 37:10, 37:13, 78:18 | | coupling [9] - 37:2, 37:4, 37:7, 37:24, 38:5, 38:7, 71:13, 118:8, 119:2 | |
| conclusion [2] - 50:19, 154:22 | constantly [1] - 124:7 | convoyed [1] - 58:15 | | |
| concurs [1] - 150:7 | constants [1] - 37:13 | copied [1] - 40:12 | course [5] - 62:12, 95:3, 105:11, 106:10, 117:21 | |
| conditions [1] - 58:3 | constitutionally [1] - 84:9 | copies [2] - 24:2, 146:5 | | |
| confer [1] - 149:25 | | copy [10] - 7:25, 26:9, 26:22, 27:4, 27:17, 27:24, 42:6, 42:19, 143:5, 147:11 | Court [34] - 8:3, 8:4, 13:20, 18:17, 19:3, 19:5, 21:16, 24:11, 27:2, 32:17, 41:12, 63:16, 65:7, 65:21, 65:25, 66:18, 67:6, 72:2, 73:1, 80:14, 87:5, 100:18, | |
| conference [3] - 11:22, 14:13, 22:3 | construction [19] - 13:20, 14:10, 14:22, 15:23, 16:5, 16:24, 19:4, 19:25, 20:4, 72:21, 74:7, 77:7, 78:4, 78:20, 80:21, 98:1, 98:10, 99:11, 117:21 | | | |
| Conference [1] - 157:12 | | | | |
| conferred [1] - 12:3 | | | | |
| confessed [1] - 95:23 | | copying [1] - 52:4 | | |
| confidence [2] - 145:7, 145:10 | constructions [2] - 72:13, 130:7 | core [3] - 78:10, | | |
| confirm [1] - 105:23 | | | | |
| confirmed [2] - 99:22, 99:24 | construed [2] - 41:12, 98:15 | | | |

154:20, 155:21,
155:24, 156:3,
156:6, 157:6
**court's** *[2]* - 84:21,
132:25
**Court's** *[29]* - 9:14,
9:19, 10:22, 14:25,
15:4, 18:4, 19:24,
20:4, 23:4, 32:9,
67:22, 67:24, 68:1,
72:12, 72:21, 73:14,
74:7, 77:7, 78:3,
78:19, 80:21, 81:13,
82:16, 85:2, 86:5,
87:3, 130:2, 130:7
**courthouse** *[4]* -
144:6, 144:16,
144:19, 154:25
**COURTROOM** *[16]* -
7:6, 24:11, 25:9,
26:16, 27:1, 66:10,
66:17, 129:2,
129:14, 142:25,
143:3, 143:25,
147:8, 147:20,
150:1, 155:20
**courtroom** *[5]* - 64:16,
66:6, 67:10, 68:6,
96:16
**cover** *[2]* - 93:2,
123:12
**covered** *[3]* - 29:4,
52:15, 78:14
**created** *[5]* - 68:7,
71:6, 74:23, 124:3,
126:8
**creative** *[1]* - 48:3
**creativity** *[1]* - 50:24
**credibility** *[17]* - 34:13,
69:6, 69:9, 69:10,
70:5, 70:7, 70:18,
71:22, 72:14, 72:15,
72:17, 80:11, 89:1,
93:14, 93:17, 100:7,
100:25
**credit** *[10]* - 91:3,
92:22, 92:23, 94:12,
94:19, 95:25, 96:4,
113:7, 113:8, 123:21
**credited** *[2]* - 59:12,
76:1
**crediting** *[1]* - 124:10
**credits** *[1]* - 95:25
**critical** *[9]* - 96:25,
103:18, 104:5,
104:10, 105:4,
110:1, 114:15,
114:21, 132:8
**criticisms** *[1]* - 121:1
**cross** *[17]* - 70:5, 70:8,

70:9, 70:13, 70:15,
70:16, 70:17, 70:18,
70:24, 70:25, 71:20,
72:8, 72:11, 80:12,
80:13, 85:5, 130:11
**cross-examination**
*[15]* - 70:5, 70:8,
70:9, 70:13, 70:15,
70:16, 70:17, 70:24,
70:25, 71:20, 72:8,
72:11, 80:13, 85:5,
130:11
**cross-examinations**
*[1]* - 70:18
**CRR** *[1]* - 1:23
**CSR** *[2]* - 1:23, 157:20
**CTO** *[1]* - 95:10
**curative** *[12]* - 12:14,
13:2, 14:23, 15:9,
16:6, 16:8, 17:1,
17:12, 17:15, 18:17,
19:19, 20:3
**Curative** *[1]* - 12:19
**cure** *[1]* - 19:23
**current** *[1]* - 58:20
**customary** *[1]* - 59:8
**cut** *[2]* - 134:7, 134:15

## D

**D.C** *[1]* - 2:18
**DALE** *[1]* - 3:12
**damage** *[2]* - 90:5,
90:6
**damages** *[35]* - 21:23,
28:25, 53:17, 53:19,
53:20, 53:25, 54:1,
54:3, 54:5, 54:8,
54:11, 54:13, 54:15,
55:7, 60:5, 60:11,
60:19, 60:22, 60:25,
61:19, 89:7, 89:8,
89:12, 89:14,
123:13, 123:14,
123:18, 123:19,
127:1, 127:5,
128:20, 133:5,
134:25, 138:18,
139:17
**data** *[37]* - 19:9, 19:11,
19:16, 69:19, 72:4,
76:14, 76:23, 78:9,
80:21, 80:23, 99:13,
99:16, 99:22,
101:19, 102:11,
103:20, 103:21,
103:22, 103:25,
104:17, 106:15,
106:23, 106:24,
107:1, 107:8,
107:18, 107:24,

108:10, 110:3,
124:6, 130:23,
130:24
**date** *[7]* - 43:16, 43:17,
43:21, 44:9, 44:24,
66:5, 86:12
**Date** *[1]* - 157:15
**dated** *[1]* - 148:1
**Daubert** *[1]* - 23:5
**David** *[1]* - 96:14
**DAY** *[1]* - 1:10
**days** *[2]* - 120:8,
155:25
**dchang@raklaw.
com** *[1]* - 3:15
**DCM** *[7]* - 41:25, 42:8,
42:12, 42:13, 42:16,
42:18, 42:19
**de** *[1]* - 98:18
**deals** *[1]* - 47:12
**DEB** *[1]* - 4:9
**Debbie** *[1]* - 157:20
**DEBBIE** *[3]* - 1:23,
157:5, 157:19
**decades** *[2]* - 76:10,
91:5
**decide** *[19]* - 21:22,
28:12, 31:4, 31:12,
32:18, 33:13, 34:21,
34:24, 35:21, 36:8,
36:9, 36:10, 40:22,
62:7, 64:22, 92:18,
110:11, 110:16,
143:7
**decided** *[2]* - 21:16,
64:11
**deciding** *[11]* - 30:7,
31:19, 33:10, 33:12,
41:9, 43:7, 45:4,
51:4, 51:16, 52:24,
72:24
**decision** *[5]* - 30:5,
36:4, 36:5, 62:14,
62:16
**decisive** *[1]* - 101:16
**declarations** *[3]* -
71:25, 72:7, 100:20
**declined** *[1]* - 8:4
**decoupled** *[6]* - 83:16,
118:23, 118:24,
119:2, 136:9
**decoupling** *[1]* -
118:22
**decrease** *[2]* - 74:19,
75:14
**decreased** *[1]* - 57:1
**decreases** *[1]* - 122:8
**decreasing** *[2]* -
88:19, 121:5
**deemed** *[5]* - 8:6,

8:12, 42:8, 42:14,
42:18
**deeply** *[1]* - 67:9
**defend** *[1]* - 140:4
**defendant** *[1]* - 24:4
**DEFENDANT** *[5]* - 2:3,
3:3, 3:17, 4:3, 5:3
**Defendant** *[4]* - 1:6,
1:9, 147:24, 147:25
**defendant's** *[2]* - 5:10,
26:4
**DEFENDANT'S** *[2]* -
90:19, 140:2
**Defendant's** *[2]* - 6:5,
6:7
**defense** *[3]* - 16:23,
29:25, 30:2
**defer** *[1]* - 110:25
**deferring** *[1]* - 90:4
**define** *[1]* - 46:25
**defined** *[5]* - 41:7,
47:8, 72:22, 99:8,
107:7
**definition** *[9]* - 15:14,
15:19, 35:16, 36:1,
36:6, 114:5, 117:13,
142:3, 142:5
**definitions** *[2]* - 36:11,
36:12
**delete** *[1]* - 11:2
**deleted** *[1]* - 11:5
**deliberate** *[1]* - 143:20
**deliberately** *[1]* -
34:25
**deliberations** *[10]* -
27:19, 28:4, 61:24,
62:2, 62:25, 65:18,
66:4, 143:7, 143:24,
144:23
**delighted** *[1]* - 93:16
**demagnetized** *[1]* -
36:18
**demand** *[3]* - 50:8,
56:19, 128:3
**demonstrated** *[2]* -
83:15, 136:8
**demonstrating** *[2]* -
49:20, 53:6
**demonstrative** *[3]* -
8:23, 145:17, 145:22
**denied** *[5]* - 64:24,
71:3, 71:4, 92:4,
100:18
**denies** *[1]* - 29:9
**densities** *[2]* - 68:21,
69:3
**Density** *[1]* - 124:18
**density** *[25]* - 68:23,
75:15, 89:6, 89:10,
89:25, 93:8, 94:13,

96:2, 119:5, 119:6,
123:21, 123:25,
124:4, 124:12,
125:16, 125:19,
126:3, 126:5, 126:6,
126:8, 126:14,
135:15, 137:2,
137:16, 138:5
**department** *[1]* - 95:14
**dependent** *[3]* - 40:19,
41:1, 98:19
**DEPUTY** *[16]* - 7:6,
24:11, 25:9, 26:16,
27:1, 66:10, 66:17,
129:2, 129:14,
142:25, 143:3,
143:25, 147:8,
147:20, 150:1,
155:20
**derivative** *[1]* - 58:14
**derived** *[1]* - 21:23
**Desai** *[8]* - 19:14,
20:2, 70:25, 95:12,
99:22, 104:16,
104:21, 137:12
**described** *[1]* - 124:17
**describing** *[1]* -
117:16
**deserve** *[1]* - 93:22
**deserves** *[1]* - 35:11
**design** *[4]* - 42:1,
42:9, 48:20, 106:8
**designed** *[1]* - 58:3
**desired** *[1]* - 59:22
**despite** *[2]* - 89:5,
101:2
**destiny** *[2]* - 144:10,
144:15
**detail** *[1]* - 46:11
**detailed** *[1]* - 28:21
**details** *[2]* - 114:13,
114:25
**determination** *[2]* -
34:12, 46:22
**determinations** *[1]* -
150:5
**determine** *[19]* -
23:17, 40:1, 40:14,
41:8, 44:12, 45:13,
47:19, 50:25, 51:1,
51:18, 55:5, 55:17,
55:21, 61:13, 70:4,
72:23, 74:25,
145:13, 146:3
**determined** *[1]* - 50:21
**determines** *[1]* - 43:17
**determining** *[5]* -
42:5, 44:13, 52:19,
56:1, 57:11
**device** *[1]* - 40:3

**devices** [2] - 58:22, 64:2
**dhinospaan@yahoo. com** [1] - 1:25
**Dickinson** [3] - 13:15, 14:15, 14:16
**dictionaries** [1] - 63:22
**Dieter** [1] - 5:9
**differ** [1] - 32:2
**difference** [5] - 121:8, 122:19, 122:20, 131:14, 131:15
**differences** [5] - 34:21, 45:17, 47:16, 47:20, 47:24
**different** [17] - 10:7, 26:21, 31:10, 34:16, 69:14, 77:15, 93:1, 98:7, 101:9, 103:20, 105:6, 107:2, 107:3, 108:7, 111:11, 125:20
**differently** [2] - 34:20, 39:18
**differs** [1] - 34:22
**difficult** [1] - 100:9
**Digital** [84] - 7:7, 7:16, 9:8, 15:1, 17:17, 17:23, 21:15, 27:10, 27:13, 28:25, 29:8, 29:9, 39:10, 40:7, 40:8, 40:12, 43:8, 43:23, 44:1, 44:6, 44:10, 44:15, 45:13, 45:16, 45:19, 46:5, 46:7, 52:19, 53:10, 53:15, 53:22, 54:5, 54:9, 61:13, 66:14, 67:13, 68:12, 68:16, 69:10, 71:5, 72:4, 72:18, 73:2, 76:1, 80:10, 82:23, 84:7, 91:2, 91:8, 92:12, 93:6, 94:14, 102:5, 103:5, 107:12, 116:8, 125:17, 125:23, 127:8, 127:13, 127:21, 127:23, 128:4, 128:12, 133:6, 136:24, 139:9, 142:13, 146:6, 147:25, 148:6, 148:13, 148:19, 148:24, 149:4, 149:10, 150:23, 151:3, 151:25, 152:15, 152:20, 153:16, 156:5

**DIGITAL** [1] - 1:8
**Digital's** [19] - 22:1, 38:11, 38:13, 38:14, 70:23, 73:19, 74:6, 80:12, 93:1, 101:13, 103:1, 104:14, 106:7, 117:6, 126:5, 127:17, 136:21, 149:20, 154:13
**diligence** [1] - 67:14
**diligently** [1] - 62:4
**direct** [9] - 30:20, 30:21, 31:3, 39:7, 70:7, 80:13, 85:4, 105:15
**directed** [2] - 18:17, 48:1
**direction** [1] - 123:7
**directly** [7] - 19:18, 19:24, 40:20, 60:23, 61:3, 95:11, 155:12
**directors** [2] - 29:15, 29:18
**disagree** [1] - 10:6
**disagreements** [1] - 97:20
**disappeared** [1] - 24:8
**discharged** [2] - 65:24, 155:4
**disclose** [1] - 65:24
**disclosed** [2] - 49:10, 120:20
**discloses** [2] - 46:13, 46:15
**disclosure** [3] - 49:13, 49:15, 49:16
**disclosures** [1] - 49:1
**discovered** [5] - 74:16, 75:2, 75:16, 75:23
**discoveries** [1] - 49:23
**discrete** [2] - 73:9
**discuss** [7] - 63:15, 86:4, 155:6, 155:10, 155:11, 155:12, 155:16
**discussed** [7] - 21:21, 24:17, 24:18, 25:15, 62:9, 64:1, 64:3
**discussing** [2] - 62:24, 63:4
**discussion** [6] - 8:14, 62:15, 90:5, 108:17, 115:8, 122:10
**disk** [21] - 21:23, 29:8, 42:2, 42:4, 42:11, 42:13, 42:16, 42:17, 42:21, 85:8, 85:12, 85:21, 120:13,

120:23, 121:14, 124:5, 131:24, 133:8, 134:2, 134:4, 141:10
**disks** [3] - 42:1, 81:21, 84:5
**dislikes** [1] - 28:10
**dispositive** [2] - 51:20, 56:21
**dispute** [10] - 17:20, 18:21, 77:19, 77:21, 98:14, 99:3, 102:12, 102:22, 102:23, 103:18
**disputed** [1] - 118:9
**disputes** [1] - 97:19
**disputing** [3] - 78:2, 78:15, 89:24
**disregard** [3] - 32:11, 33:8, 33:11
**disrespect** [1] - 95:17
**dissuaded** [1] - 88:1
**distinct** [8] - 13:9, 13:19, 13:21, 14:10, 15:7, 17:11, 17:13, 60:7
**distinction** [3] - 31:2, 100:22, 116:19
**distinguish** [1] - 26:8
**distinguished** [1] - 59:12
**distraction** [5] - 74:8, 80:20, 133:22, 134:17, 134:24
**distribute** [1] - 25:2
**distributed** [2] - 26:11, 26:14
**DISTRICT** [3] - 1:1, 1:2, 1:3
**District** [5] - 13:20, 147:21, 147:22, 157:6, 157:7
**disturbing** [1] - 93:24
**DIVISION** [1] - 1:2
**division** [2] - 127:15
**divisions** [1] - 127:14
**Dobin** [9] - 6:19, 86:17, 86:18, 86:22, 87:8, 119:17, 120:9, 120:12
**document** [5] - 12:11, 71:4, 89:18, 89:21, 102:25
**documents** [20] - 68:7, 69:25, 71:4, 71:5, 71:12, 94:18, 102:16, 102:17, 102:20, 103:12, 106:8, 135:14, 135:16, 135:17,

136:21, 137:8, 137:24, 138:1, 138:6
**Domain** [1] - 6:19
**Dome** [2] - 115:21, 116:2
**domino** [6] - 102:17, 117:5, 117:16, 121:7, 122:2, 122:14
**done** [14] - 18:18, 18:22, 28:16, 68:17, 83:4, 83:7, 94:5, 101:17, 102:6, 102:9, 116:3, 123:12, 123:24, 127:22
**double** [1] - 108:23
**doubled** [2] - 119:4, 119:5
**doubt** [4] - 8:20, 102:23, 111:1, 112:9
**doug.lumish@lw. com** [1] - 3:20
**Douglas** [1] - 143:2
**DOUGLAS** [1] - 3:18
**down** [28] - 9:17, 17:1, 69:2, 69:6, 69:23, 71:22, 74:15, 75:6, 78:23, 79:20, 108:21, 113:14, 114:21, 115:15, 115:20, 116:2, 117:12, 117:14, 119:13, 122:17, 123:23, 124:22, 125:5, 126:18, 128:2, 134:7, 142:4, 154:25
**Dr** [241] - 19:14, 20:2, 67:7, 68:10, 68:25, 69:12, 69:16, 69:24, 70:1, 70:15, 70:16, 70:25, 71:9, 71:10, 71:20, 71:21, 71:22, 71:23, 71:24, 72:8, 72:10, 72:11, 72:12, 74:10, 74:13, 74:21, 76:1, 76:5, 76:9, 77:9, 77:25, 78:12, 78:15, 78:25, 79:11, 79:21, 80:9, 81:5, 81:22, 81:24, 82:5, 82:9, 82:12, 82:13, 82:19, 83:2, 83:8, 83:11, 83:19, 83:22, 84:6, 84:14, 84:19, 84:23, 85:18, 85:22, 86:19, 86:22, 86:24, 86:25, 87:7, 87:12, 87:22, 87:23, 88:12, 88:16, 89:2, 89:9,

89:25, 91:4, 91:15, 91:16, 91:17, 92:2, 92:3, 92:11, 92:13, 93:4, 94:12, 94:17, 94:21, 95:4, 95:6, 95:8, 95:10, 95:12, 95:13, 95:16, 95:18, 95:20, 95:23, 95:24, 95:25, 96:7, 98:21, 98:24, 99:7, 99:22, 99:24, 100:5, 100:8, 100:9, 102:11, 103:4, 103:5, 103:8, 103:24, 104:4, 104:16, 104:21, 105:2, 105:16, 106:12, 108:2, 108:8, 108:16, 109:2, 109:8, 109:9, 109:14, 111:9, 111:15, 112:1, 112:6, 112:13, 112:15, 112:16, 112:17, 113:1, 113:3, 113:8, 113:21, 114:1, 114:3, 114:8, 114:9, 114:16, 114:17, 114:21, 115:5, 115:11, 115:13, 115:16, 115:22, 116:4, 116:10, 116:11, 116:12, 116:17, 116:25, 117:8, 117:17, 117:19, 117:25, 118:6, 118:18, 118:23, 118:25, 119:4, 119:7, 119:11, 119:15, 119:22, 121:1, 121:6, 121:11, 121:13, 121:18, 121:23, 121:24, 122:8, 122:21, 123:22, 124:3, 124:10, 124:13, 124:20, 124:21, 125:13, 125:14, 125:16, 126:15, 126:18, 126:21, 127:22, 128:1, 128:14, 130:10, 130:22, 131:2, 131:3, 131:5, 131:6, 131:16, 131:17, 131:20, 132:1, 132:2, 132:16, 132:19, 133:5, 133:10, 133:11, 133:14, 133:17,

133:19, 134:6, 134:17, 134:19, 135:13, 136:6, 136:7, 136:23, 137:8, 137:12, 137:13, 137:14, 137:15, 138:9, 138:11, 138:13, 138:17, 139:14, 140:11, 140:13, 140:23, 141:18, 142:2

**drafts** *[1]* - 24:8
**draw** *[5]* - 102:7, 105:17, 105:18, 116:19
**drawing** *[3]* - 102:6, 102:7, 102:16
**drive** *[17]* - 21:24, 42:11, 42:16, 103:21, 105:5, 105:6, 118:12, 122:23, 123:8, 124:5, 126:2, 127:2, 127:6, 131:25, 133:8, 134:4, 141:10
**Drive** *[7]* - 3:19, 3:22, 4:5, 4:9, 4:13, 4:21, 5:5
**driven** *[2]* - 87:12, 125:23
**drives** *[19]* - 29:8, 42:2, 42:4, 42:13, 42:17, 42:21, 85:8, 85:13, 85:21, 91:7, 103:1, 103:19, 103:20, 104:11, 106:18, 120:23, 121:14, 126:9, 126:11
**Driving** *[1]* - 124:17
**driving** *[3]* - 124:20, 124:23, 125:15
**drop** *[1]* - 126:16
**drum** *[1]* - 110:23
**due** *[1]* - 51:23
**duration** *[1]* - 58:16
**during** *[14]* - 14:13, 18:10, 18:15, 19:3, 19:5, 19:6, 28:3, 31:8, 39:14, 64:3, 65:8, 93:25, 94:20, 145:6
**duty** *[5]* - 27:23, 28:5, 32:5, 155:2, 155:4
**dwelled** *[1]* - 113:20
**DX** *[1]* - 8:17
**DX-1009** *[3]* - 6:19, 8:20, 9:4
**DX-1044** *[1]* - 95:21

**DX-1187** *[3]* - 8:12, 8:18, 8:22

## E

**early** *[3]* - 92:12, 120:8, 143:14
**earned** *[1]* - 93:23
**easier** *[4]* - 10:11, 24:9, 132:19, 140:12
**easy** *[3]* - 70:5, 94:2, 132:2
**ECC** *[3]* - 113:2, 113:3, 113:10
**economic** *[2]* - 34:12, 57:14
**edit** *[1]* - 24:8
**edits** *[1]* - 24:17
**education** *[1]* - 51:8
**effect** *[5]* - 58:10, 62:18, 117:5, 119:17, 121:7
**effort** *[2]* - 130:25, 132:17
**eight** *[11]* - 151:9, 151:15, 151:21, 152:5, 152:11, 153:1, 153:7, 153:13, 153:22, 154:3, 154:20
**either** *[10]* - 8:2, 8:3, 31:3, 55:9, 73:6, 80:3, 80:5, 102:13, 123:7, 123:16
**elect** *[1]* - 61:24
**electronic** *[1]* - 63:5
**element** *[19]* - 14:20, 18:1, 20:18, 20:19, 20:20, 21:5, 21:6, 22:5, 38:17, 38:24, 39:4, 48:25, 49:3, 49:7, 49:8, 49:17, 69:20, 110:1, 150:7
**Element** *[2]* - 78:6, 78:17
**elements** *[31]* - 13:17, 13:18, 13:24, 17:13, 20:13, 21:8, 24:20, 24:21, 25:1, 35:22, 38:12, 38:21, 39:1, 39:5, 48:7, 48:12, 48:15, 48:17, 48:19, 49:10, 49:20, 50:12, 53:5, 53:7, 53:12, 59:13, 73:20, 73:25, 74:4, 132:8
**ellipses** *[1]* - 104:19
**Elsa** *[1]* - 7:24
**email** *[1]* - 63:6
**embodiment** *[1]* - 59:1

**embodying** *[1]* - 59:24
**emphatically** *[1]* - 100:19
**employed** *[1]* - 48:4
**employees** *[3]* - 29:15, 29:17, 127:13
**employer** *[1]* - 63:11
**EMVR** *[2]* - 23:6, 23:9
**enabled** *[3]* - 75:19, 131:22, 133:17
**encountered** *[1]* - 51:11
**encourage** *[1]* - 71:14
**end** *[15]* - 10:15, 10:22, 88:22, 97:13, 101:15, 107:6, 122:25, 127:11, 128:19, 132:21, 133:20, 142:6, 146:12, 150:3
**endeavor** *[6]* - 47:2, 47:4, 47:10, 85:3, 85:6, 85:16
**ended** *[1]* - 77:20
**ending** *[1]* - 124:6
**endorsed** *[1]* - 155:24
**energy** *[2]* - 115:19, 126:11
**energy-assisted** *[1]* - 126:11
**engineers** *[5]* - 91:5, 93:6, 95:7, 122:4, 126:13
**enormous** *[2]* - 125:18, 126:12
**ensure** *[1]* - 150:4
**enter** *[2]* - 76:4, 155:25
**entered** *[2]* - 8:9, 55:2
**entire** *[7]* - 21:23, 22:24, 23:14, 61:8, 65:5, 95:13, 134:12
**entirely** *[1]* - 155:9
**entitled** *[8]* - 25:21, 44:4, 53:24, 54:15, 64:21, 149:19, 154:12, 157:11
**epitome** *[1]* - 118:4
**equal** *[3]* - 67:12, 96:15
**equals** *[2]* - 82:3, 82:14
**equation** *[9]* - 107:25, 108:4, 108:6, 108:13, 108:17, 108:21, 109:13, 109:15, 116:6
**equations** *[2]* - 97:12, 108:12
**equivalent** *[3]* -

106:13, 106:15, 106:16
**equivocation** *[1]* - 99:17
**error** *[5]* - 13:3, 15:10, 15:13, 17:16, 17:17
**ESQ** *[12]* - 2:4, 2:8, 2:12, 2:16, 3:4, 3:8, 3:12, 3:18, 3:22, 4:5, 4:12, 5:4
**essence** *[1]* - 19:21
**essentially** *[1]* - 118:2
**establish** *[3]* - 39:15, 49:6, 61:3
**established** *[6]* - 45:13, 49:11, 52:17, 57:18, 57:25, 58:18
**esteem** *[1]* - 92:5
**estimate** *[1]* - 107:25
**estimating** *[1]* - 61:22
**evaluate** *[1]* - 80:11
**evaluated** *[2]* - 45:12, 46:1
**evaluating** *[2]* - 53:8, 55:13
**evaluation** *[1]* - 49:4
**evasive** *[1]* - 80:14
**event** *[1]* - 54:3
**Evidence** *[3]* - 32:7, 32:20, 32:24
**EVIDENCE** *[1]* - 6:18
**evidence** *[132]* - 8:9, 10:24, 16:9, 27:23, 28:6, 28:12, 28:17, 29:21, 29:22, 29:25, 30:1, 30:4, 30:6, 30:7, 30:11, 30:14, 30:16, 30:20, 30:21, 30:24, 31:1, 31:3, 31:5, 31:9, 31:13, 31:14, 31:18, 31:22, 31:25, 32:1, 32:5, 32:12, 32:17, 32:18, 32:21, 32:23, 33:7, 33:9, 33:11, 34:2, 34:5, 35:7, 39:9, 39:16, 39:18, 39:19, 41:16, 43:13, 43:24, 44:11, 46:8, 48:10, 48:15, 51:6, 52:11, 52:18, 54:14, 55:11, 55:14, 55:16, 55:22, 56:2, 56:22, 57:12, 57:13, 59:5, 60:18, 60:21, 62:9, 62:19, 62:21, 64:11, 67:17, 67:23, 68:5, 68:12, 68:14, 68:15, 68:24, 69:24, 72:1, 76:10, 79:12, 84:13, 84:18,

84:25, 89:3, 89:4, 89:24, 90:24, 96:22, 99:18, 101:23, 101:25, 103:1, 103:7, 104:13, 104:15, 106:6, 106:10, 116:11, 119:21, 124:1, 125:12, 127:3, 127:8, 130:15, 130:20, 132:3, 132:4, 132:20, 133:3, 133:16, 135:16, 138:3, 139:10, 139:12, 139:18, 140:21, 141:13, 142:6, 145:13, 145:23, 146:4, 148:6, 148:25, 149:19, 150:23, 152:16, 154:11, 155:1
**exact** *[2]* - 76:5, 76:11
**exactly** *[10]* - 90:25, 103:17, 115:5, 115:24, 119:23, 121:22, 124:19, 141:8, 141:10
**exaggerated** *[1]* - 88:20
**examination** *[15]* - 70:5, 70:8, 70:9, 70:13, 70:15, 70:16, 70:17, 70:24, 70:25, 71:20, 72:8, 72:11, 80:13, 85:5, 130:11
**examinations** *[1]* - 70:18
**examine** *[2]* - 46:18, 100:9
**examined** *[1]* - 47:7
**examiner** *[3]* - 43:23, 44:2, 110:12
**example** *[11]* - 20:16, 21:4, 24:19, 31:6, 38:20, 41:14, 43:19, 48:6, 52:9, 76:17, 121:3
**except** *[5]* - 15:1, 62:24, 65:12, 65:15, 104:10
**exception** *[1]* - 40:16
**excerpted** *[1]* - 104:18
**exchange** *[30]* - 13:12, 36:21, 36:24, 37:4, 37:7, 38:5, 38:7, 54:18, 76:20, 81:2, 81:7, 83:21, 85:7, 95:21, 96:3, 113:1, 114:12, 116:16,

116:18, 116:19, 116:21, 116:23, 117:2, 117:9, 118:3, 118:8, 118:13, 119:2, 141:21

**Exchange** [1] - 116:17

**exchange-spring** [4] - 83:21, 117:2, 118:3, 141:21

**exchanged** [3] - 76:22, 77:16, 81:4

**excluded** [1] - 32:10

**excluding** [4] - 35:21, 38:10, 73:18, 98:5

**exclusive** [1] - 57:22

**excuse** [4] - 107:16, 115:9, 118:10, 143:24

**excused** [2] - 64:7, 155:19

**executive** [2] - 95:13, 100:11

**EXHIBIT** [1] - 6:18

**exhibit** [6] - 8:21, 32:22, 33:1, 33:3, 103:9, 105:20

**Exhibit** [1] - 9:4

**EXHIBITS** [1] - 6:15

**Exhibits** [1] - 8:12

**exhibits** [4] - 8:8, 30:10, 31:17, 32:13

**exist** [1] - 74:11

**existed** [3] - 50:1, 50:11, 68:7

**existence** [1] - 49:7

**existing** [1] - 58:12

**expectation** [1] - 50:14

**experience** [4] - 31:15, 51:8, 71:17, 76:10

**expert** [7] - 71:21, 76:9, 82:13, 107:9, 112:10, 136:23, 141:1

**experts** [9] - 16:17, 16:23, 59:16, 68:2, 68:19, 80:10, 104:1, 134:6

**expiration** [3] - 54:6, 149:22, 154:14

**expire** [1] - 54:6

**explain** [5] - 13:4, 35:12, 35:14, 46:10, 69:13

**explained** [10] - 70:19, 75:19, 100:3, 100:19, 101:3, 115:17, 117:25, 121:13, 122:21,

132:2

**explains** [1] - 131:20

**explanation** [1] - 31:11

**explicit** [3] - 49:1, 49:13, 49:16

**explicitly** [1] - 49:10

**exposed** [2] - 62:23, 65:6

**express** [2] - 78:1, 78:15

**expressed** [2] - 52:10, 119:9

**expression** [1] - 79:23

**extend** [1] - 84:17

**extending** [1] - 14:6

**extension** [1] - 94:16

**extensions** [2] - 93:4, 111:2

**extensive** [2] - 18:14, 80:10

**extensively** [2] - 18:15, 21:21

**extent** [4] - 55:13, 58:14, 59:4, 91:4

**external** [1] - 36:17

**extra** [1] - 138:2

**extraordinary** [1] - 86:25

**extremely** [2] - 95:16

## F

**face** [1] - 116:3

**Facebook** [1] - 63:8

**fact** [13] - 10:24, 30:21, 30:25, 31:8, 31:12, 33:16, 35:7, 49:12, 83:4, 99:16, 117:12, 143:10, 155:8

**factor** [5] - 48:18, 50:18, 51:19, 52:14, 56:21

**factors** [14] - 34:6, 45:12, 46:1, 46:10, 51:18, 51:22, 52:13, 52:16, 52:17, 52:21, 56:24, 57:13, 60:8

**facts** [9] - 28:5, 28:6, 30:8, 30:12, 30:24, 31:19, 32:1, 33:12, 55:23

**fail** [1] - 84:21

**fair** [6] - 64:21, 64:24, 102:10, 130:17, 134:22, 134:23

**fairly** [2] - 91:4, 124:11

**fairness** [1] - 65:3

**faith** [1] - 40:8

**falls** [1] - 110:3

**false** [3] - 72:5, 91:3, 96:4

**falsely** [1] - 91:2

**family** [2] - 63:11, 91:12

**far** [2] - 117:13, 144:18

**fatal** [1] - 99:5

**Fathers** [1] - 155:3

**favoring** [2] - 39:19

**favorite** [1] - 96:25

**feasible** [1] - 143:19

**feature** [1] - 61:22

**features** [16] - 17:11, 57:6, 57:8, 57:10, 59:14, 60:7, 60:12, 60:14, 60:15, 60:18, 60:20, 61:1, 61:4, 61:18, 61:19

**Federal** [4] - 13:16, 14:1, 14:9, 157:20

**FEDERAL** [2] - 1:24, 157:5

**fee** [1] - 94:9

**fellow** [4] - 62:25, 83:11, 112:15

**felt** [2] - 51:25, 114:14

**Fenster** [17] - 15:3, 66:19, 67:2, 90:4, 95:22, 96:14, 98:2, 101:7, 110:19, 129:8, 129:16, 139:6, 139:21, 141:15, 141:25, 142:7, 155:21

**FENSTER** [23] - 2:4, 25:17, 26:3, 26:6, 66:13, 66:21, 67:4, 90:6, 90:9, 129:9, 129:12, 129:18, 129:21, 139:7, 144:17, 145:16, 145:20, 145:24, 146:7, 146:16, 147:4, 155:23, 156:4

**Fenster's** [1] - 91:10

**ferreting** [1] - 69:8

**ferromagnetic** [9] - 15:21, 36:16, 37:9, 37:22, 38:8, 77:17, 77:22, 78:17, 98:24

**few** [1] - 112:22

**Fidler** [1] - 94:25

**field** [56] - 36:17, 37:20, 44:21, 47:2, 47:4, 47:10, 50:3, 50:17, 51:2, 51:10, 51:12, 52:10, 53:12, 75:5, 75:14, 76:9,

76:25, 77:5, 80:4, 80:5, 81:24, 81:25, 82:3, 82:14, 85:3, 85:6, 85:16, 88:12, 88:13, 88:19, 88:23, 92:4, 92:20, 95:11, 97:16, 102:24, 107:15, 107:16, 108:15, 111:9, 114:17, 115:20, 116:2, 118:12, 118:13, 118:14, 118:20, 120:5, 120:12, 121:22, 122:7, 123:6, 131:1, 131:7, 131:24

**field'** [1] - 36:14

**fields** [3] - 108:8, 108:10, 140:12

**fiercely** [1] - 100:12

**fifth** [1] - 9:17

**fighting** [4] - 77:20, 78:8, 78:22, 99:17

**Figure** [1] - 116:23

**figure** [3] - 91:6, 106:9, 107:25

**figured** [1] - 126:3

**figures** [1] - 121:7

**file** [2] - 104:21, 112:1

**filed** [2] - 41:22, 112:24

**filing** [2] - 8:5, 12:18

**fill** [1] - 67:19

**filled** [1] - 126:9

**filling** [2] - 82:25, 110:2

**films** [1] - 115:9

**final** [1] - 26:9

**finally** [1] - 11:21

**fine** [8] - 7:21, 23:20, 26:2, 90:8, 143:17, 143:18, 145:16, 145:19

**finish** [1] - 142:7

**finite** [1] - 48:21

**firm** [1] - 96:9

**first** [42] - 10:4, 10:15, 11:6, 11:7, 11:11, 11:19, 14:24, 15:5, 16:5, 17:11, 17:19, 18:19, 19:20, 19:22, 20:7, 20:15, 24:18, 24:23, 54:24, 55:12, 68:17, 68:18, 80:9, 81:12, 82:21, 84:19, 84:21, 90:21, 94:7, 96:19, 97:16, 98:3, 105:12, 109:19, 112:22, 118:11, 119:3, 129:24,

133:9, 141:19, 142:23, 145:3

**fit** [1] - 86:17

**five** [7] - 25:24, 25:25, 128:18, 129:5, 129:6, 139:25, 141:16

**five-zero** [1] - 25:25

**flip** [4] - 75:10, 122:22, 132:2, 132:11

**flipped** [1] - 87:22

**flipping** [1] - 88:2

**Floor** [6] - 2:5, 2:9, 2:13, 2:21, 3:9, 3:23

**flowing** [1] - 49:16

**focus** [2] - 99:1, 99:4

**focused** [2] - 16:14, 72:20

**folks** [2] - 94:17, 124:15

**follow** [10] - 20:22, 27:6, 28:7, 32:15, 43:7, 64:25, 65:1, 68:1, 72:12, 111:3

**followed** [2] - 88:1, 133:11

**following** [9] - 45:12, 57:13, 145:6, 148:3, 148:7, 148:25, 150:20, 150:24, 152:16

**follows** [1] - 146:2

**footer** [1] - 26:9

**footing** [2] - 67:12, 96:15

**Footnote** [1] - 14:16

**FOR** [5] - 2:3, 3:3, 3:17, 4:3, 5:3

**force** [3] - 36:14, 39:15, 75:18

**foregoing** [1] - 157:9

**FOREPERSON** [1] - 147:15

**foreperson** [2] - 147:16, 150:10

**forget** [2] - 34:17, 95:7

**form** [19] - 8:2, 21:13, 21:17, 63:9, 66:4, 67:20, 82:22, 82:25, 89:1, 96:21, 107:13, 110:8, 123:9, 125:6, 143:10, 155:21, 155:22, 155:24, 156:1

**Form** [1] - 150:4

**format** [1] - 157:11

**formed** [5] - 13:11, 38:4, 69:1, 77:11, 97:18

**formula** [13] - 76:14,

77:1, 81:23, 82:1, 102:14, 102:15, 107:18, 109:17, 109:18, 109:21, 109:22, 115:15, 131:2
**forward** [2] - 90:2, 142:19
**Founding** [1] - 155:2
**four** [5] - 13:5, 13:24, 46:10, 121:2, 140:22
**four-layer** [1] - 140:22
**frankly** [2] - 93:24, 132:18
**free** [2] - 146:13, 146:19
**FRENKEL** [38] - 5:4, 7:15, 7:23, 9:7, 9:12, 9:17, 9:19, 10:11, 10:14, 10:20, 11:4, 11:13, 11:16, 12:13, 12:20, 12:23, 13:1, 15:12, 15:19, 15:23, 16:12, 16:20, 17:7, 17:10, 17:15, 18:7, 20:8, 20:25, 21:6, 21:11, 24:3, 24:16, 25:4, 26:10, 26:13, 26:18, 26:20, 26:23
**Frenkel** [2] - 7:16, 9:8
**FRIDAY** [2] - 1:16, 7:1
**full** [2] - 123:24, 127:6
**fully** [2] - 62:9, 108:3
**function** [4] - 14:15, 14:18, 17:9, 19:2
**functional** [2] - 13:6, 15:25
**functions** [2] - 73:9, 98:7
**fundamental** [8] - 68:11, 115:8, 115:12, 116:13, 126:25, 132:17, 133:7, 137:9
**fundamentally** [4] - 112:13, 125:10, 125:11, 133:6

## G

**G1** [14] - 18:23, 74:1, 77:8, 79:16, 80:20, 80:22, 81:8, 99:15, 99:22, 101:13, 101:21, 103:19, 104:10, 105:17
**gain** [1] - 64:16
**gains** [2] - 93:8, 119:6
**garden** [1] - 31:10
**gauntlet** [1] - 79:20

**gender** [1] - 34:11
**general** [1] - 22:4
**generator** [1] - 58:13
**gentlemen** [24] - 27:3, 66:8, 67:4, 68:9, 73:13, 84:9, 88:25, 90:20, 107:5, 109:24, 111:10, 123:10, 128:17, 128:23, 129:21, 131:13, 134:24, 139:8, 142:22, 143:4, 147:10, 150:11, 154:23, 155:19
**gigabits** [3] - 133:15, 137:22, 138:7
**gigabytes** [2] - 138:2, 138:3
**given** [9] - 15:13, 17:6, 17:18, 31:2, 73:1, 91:3, 92:24, 139:16, 142:17
**glasshouses** [1] - 79:23
**globe** [1] - 125:18
**GmbH** [1] - 7:7
**GMBH** [2] - 1:4, 147:23
**goal** [1] - 67:18
**Goglia** [7] - 91:16, 92:13, 124:3, 124:10, 126:15, 136:23, 138:13
**Goglia's** [1] - 137:19
**Goliath** [1] - 96:14
**graded** [31] - 83:18, 89:19, 102:18, 113:17, 114:4, 116:25, 117:6, 117:10, 117:11, 117:14, 118:15, 119:12, 119:13, 120:17, 121:17, 122:10, 125:4, 131:12, 131:23, 133:12, 133:18, 135:18, 136:11, 136:15, 136:16, 136:17, 136:19, 138:6, 141:15, 141:22, 141:25
**gradient** [4] - 88:11, 115:17, 122:7, 135:22
**grail** [3] - 68:24, 83:5, 93:9
**grain** [2] - 137:13, 137:15
**grains** [4] - 118:11,

118:13, 118:14, 126:3
**grant** [1] - 60:3
**granted** [1] - 43:11
**granting** [1] - 58:3
**grants** [1] - 128:15
**graph** [1] - 75:20
**grateful** [1] - 67:8
**great** [4] - 23:24, 69:7, 92:5, 144:9
**greater** [5] - 37:19, 76:25, 80:3, 80:6, 97:17
**greatest** [1] - 69:7
**green** [5] - 105:16, 105:24, 107:1, 107:4, 118:3
**GREGORY** [1] - 5:4
**gremlins** [1] - 24:7
**grossly** [1] - 93:7
**ground** [1] - 67:12
**Group** [5] - 103:20, 105:7, 106:2, 106:18, 106:22
**group** [6] - 42:10, 42:14, 42:18, 104:5, 104:11, 105:7
**groupings** [2] - 42:3, 42:6
**groups** [3] - 42:20, 125:20, 144:20
**grow** [1] - 132:20
**grown** [1] - 118:1
**growth** [9] - 94:13, 124:1, 124:5, 124:12, 124:21, 124:23, 125:16, 125:23, 127:13
**Growth** [1] - 124:18
**guess** [2] - 33:6, 140:3
**guided** [1] - 136:3
**guy** [3] - 99:3, 99:4, 141:8
**GX1** [1] - 106:3

## H

**Hac** [1] - 2:16
**Hagedorn** [26] - 83:6, 84:20, 85:9, 85:11, 85:22, 85:23, 86:2, 86:4, 86:14, 86:15, 86:20, 86:21, 87:1, 115:7, 115:22, 118:1, 119:16, 119:25, 120:6, 120:11, 123:4, 123:5, 140:13
**Hagedorn's** [1] - 94:16

**half** [1] - 97:17
**Half** [2] - 115:21, 116:2
**hand** [17] - 35:2, 40:21, 48:12, 69:17, 76:11, 147:13, 151:7, 151:13, 151:19, 152:3, 152:9, 152:23, 153:5, 153:11, 153:20, 154:1, 154:18
**hands** [3] - 94:5, 147:5, 150:16
**HANLE** [1] - 4:12
**Hanle** [3] - 7:17, 19:5, 19:12
**happy** [1] - 94:4
**hard** [142] - 13:6, 13:10, 13:11, 13:12, 14:7, 16:4, 16:15, 16:24, 17:3, 17:5, 18:23, 19:15, 21:23, 29:8, 36:21, 36:25, 37:3, 37:6, 37:8, 37:15, 37:17, 37:23, 38:4, 38:20, 38:23, 42:2, 42:4, 42:11, 42:13, 42:16, 42:17, 42:21, 69:1, 73:11, 74:15, 75:12, 76:22, 77:5, 77:12, 77:23, 80:22, 80:25, 81:1, 81:2, 81:19, 81:21, 81:25, 84:5, 85:8, 85:12, 85:21, 87:17, 87:19, 88:18, 89:20, 91:7, 94:3, 96:15, 97:15, 97:21, 98:9, 98:14, 98:22, 98:23, 99:8, 99:12, 99:15, 100:1, 101:4, 102:19, 103:19, 104:10, 104:11, 107:7, 108:18, 108:20, 109:2, 112:21, 113:14, 113:23, 114:5, 114:24, 115:18, 116:21, 116:24, 117:1, 117:4, 117:8, 117:12, 117:14, 117:20, 118:7, 118:12, 118:13, 118:14, 118:17, 118:19, 119:10, 119:11, 119:13, 120:4, 120:13, 120:23, 121:5, 121:8, 121:21, 122:23, 123:7,

124:5, 124:23, 125:5, 127:2, 127:6, 129:25, 130:3, 131:12, 132:5, 132:9, 132:12, 132:15, 132:23, 133:8, 134:4, 136:17, 136:19, 140:5, 140:8, 140:20, 141:2, 141:6, 141:16, 141:20, 141:24, 142:1, 142:3, 142:4, 142:5, 142:16
**hard/soft** [2] - 108:19, 114:12
**harder** [2] - 75:15, 94:6
**hardest** [2] - 75:8, 121:2
**Hc** [1] - 82:3
**head** [14] - 42:21, 69:2, 74:15, 75:4, 75:5, 75:10, 75:12, 87:15, 87:16, 87:21, 88:19, 118:13, 127:15, 134:2
**heads** [2] - 126:7, 126:10
**hear** [12] - 18:12, 33:21, 64:7, 66:8, 90:22, 94:1, 96:9, 103:10, 110:12, 110:18, 128:24
**heard** [29] - 20:4, 27:22, 30:23, 32:16, 55:22, 67:18, 73:7, 84:23, 91:15, 91:16, 92:11, 93:18, 93:20, 95:1, 96:8, 99:21, 100:6, 102:1, 102:2, 105:9, 110:20, 111:8, 111:14, 111:15, 114:20, 115:15, 125:19, 137:13
**hearing** [2] - 19:6, 142:19
**heart** [1] - 120:24
**heavily** [1] - 68:2
**held** [5] - 13:17, 23:5, 23:8, 70:23, 157:10
**helium** [1] - 126:9
**helium-filled** [1] - 126:9
**help** [11] - 19:19, 19:23, 20:3, 31:25, 51:18, 67:16, 67:17, 73:12, 112:14, 121:21

| | | | | |
|---|---|---|---|---|
| **helpful** [3] - 97:6, 143:11, 155:7<br>**hereby** [1] - 157:7<br>**HGST** [3] - 116:9, 117:6, 141:20<br>**high** [2] - 103:3, 126:22<br>**high-level** [1] - 103:3<br>**higher** [3] - 30:3, 56:16, 56:19<br>**highlight** [2] - 98:2, 98:3<br>**highlighting** [1] - 128:8<br>**highly** [1] - 30:2<br>**himself** [8] - 86:24, 94:12, 94:19, 94:25, 95:7, 95:25, 111:16, 132:8<br>**hindsight** [5] - 45:5, 52:25, 87:6, 87:11, 87:12<br>**hinged** [6] - 13:21, 13:25, 14:1, 14:2, 14:4, 14:6<br>**Hino** [1] - 157:20<br>**HINO** [3] - 1:23, 157:5, 157:19<br>**Hino-Spaan** [1] - 157:20<br>**HINO-SPAAN** [3] - 1:23, 157:5, 157:19<br>**hinted** [1] - 92:15<br>**hired** [1] - 95:8<br>**history** [1] - 112:1<br>**hit** [2] - 70:18, 118:11<br>**Hk** [1] - 88:11<br>**Hn** [1] - 82:1<br>**holder** [5] - 54:18, 54:21, 56:18, 57:2, 60:10<br>**holy** [3] - 68:24, 83:5, 93:9<br>**home** [1] - 146:9<br>**honest** [2] - 62:18, 101:2<br>**Honor** [67] - 7:11, 7:15, 7:22, 7:23, 8:7, 8:25, 9:2, 9:3, 9:7, 9:21, 10:10, 10:18, 10:20, 11:9, 11:21, 12:5, 12:10, 12:14, 13:2, 16:21, 17:22, 18:13, 18:21, 20:8, 21:14, 22:9, 22:11, 22:14, 22:17, 22:20, 22:22, 23:6, 23:8, 23:10, 23:20, 23:24, 23:25, 24:6, 24:16, 25:7, 25:17, 25:19, | 25:23, 26:3, 26:6, 26:10, 66:13, 66:22, 67:1, 90:7, 90:17, 129:5, 129:12, 129:18, 139:7, 139:23, 144:4, 144:17, 145:4, 145:15, 145:16, 145:24, 146:7, 146:15, 149:24, 155:23, 156:2<br>**honor** [1] - 140:3<br>**HONORABLE** [1] - 1:3<br>**hope** [3] - 94:11, 100:25, 142:10<br>**hopefully** [1] - 67:17<br>**hose** [1] - 31:10<br>**host** [39] - 13:7, 13:9, 13:11, 13:13, 14:8, 15:20, 16:4, 16:15, 18:24, 19:10, 19:16, 36:21, 36:23, 37:3, 37:5, 37:7, 37:9, 37:11, 37:16, 68:25, 73:10, 74:14, 75:1, 77:4, 77:8, 77:10, 77:11, 77:13, 78:3, 78:11, 80:6, 81:3, 113:13, 114:22, 117:22, 121:11, 130:5, 136:18, 140:7<br>**host'** [5] - 20:12, 37:21, 39:1, 39:4, 73:24<br>**hosts** [3] - 125:3, 125:4<br>**hotel** [2] - 91:20, 144:18<br>**hour** [3] - 25:15, 27:16, 144:5<br>**hourly** [1] - 94:9<br>**hours** [5] - 73:3, 93:10, 110:2, 143:13, 143:14<br>**house** [1] - 110:3<br>**Hs** [2] - 80:3, 81:25<br>**huge** [1] - 131:15<br>**human** [2] - 110:13, 112:3<br>**humbled** [1] - 67:9<br>**hundreds** [2] - 125:21, 126:13<br>**hypothetical** [10] - 54:22, 54:25, 55:9, 55:15, 55:18, 127:20, 135:7, 138:13, 138:21, 138:23<br>**hysteresis** [1] - 108:11 | **HYUK** [1] - 3:22<br><br>**I**<br><br>**icons** [3] - 137:18, 137:20<br>**idea** [6] - 74:13, 84:5, 84:15, 112:24, 113:6, 116:15<br>**ideas** [1] - 103:6<br>**identified** [4] - 18:22, 48:22, 53:10, 123:22<br>**identifies** [1] - 41:25<br>**identify** [2] - 57:9, 125:12<br>**identity** [1] - 34:11<br>**IEEE** [6] - 83:11, 112:12, 112:15, 112:17, 131:21<br>**ignore** [5] - 33:5, 33:9, 35:6, 109:7, 109:9<br>**Ikeda's** [1] - 71:9<br>**Illinois** [2] - 3:14, 4:18<br>**illustrious** [1] - 111:9<br>**image** [1] - 136:6<br>**imagination** [1] - 93:20<br>**imagine** [1] - 111:14<br>**immediately** [2] - 65:7, 155:25<br>**impact** [1] - 47:19<br>**impartial** [1] - 64:21<br>**impeachment** [1] - 70:20<br>**implication** [2] - 13:18, 16:6<br>**implies** [3] - 15:7, 17:12, 17:16<br>**important** [10] - 21:21, 35:1, 35:9, 62:11, 65:1, 71:14, 77:11, 97:10, 142:14, 142:18<br>**importantly** [3] - 49:19, 68:5, 106:17<br>**imported** [1] - 39:11<br>**importing** [1] - 29:2<br>**impossibility** [2] - 14:9, 16:2<br>**improbable** [1] - 133:6<br>**improper** [3] - 32:7, 64:17, 129:24<br>**improve** [3] - 89:6, 125:18, 126:4<br>**improved** [1] - 126:7<br>**improvements** [1] - 59:15<br>**improves** [1] - 126:8<br>**improving** [1] - 85:19<br>**IN** [1] - 6:17 | **Inaba** [1] - 95:3<br>**inaccurate** [1] - 64:18<br>**Inc** [2] - 7:8, 147:25<br>**INC** [1] - 1:8<br>**incentive** [1] - 48:20<br>**inception** [2] - 136:4, 136:5<br>**inch** [5] - 133:16, 135:25, 137:22, 138:8<br>**inclined** [1] - 23:10<br>**include** [12] - 9:22, 17:24, 18:4, 38:12, 38:15, 42:21, 51:22, 73:19, 73:21, 97:7, 98:13, 124:14<br>**included** [2] - 13:24, 35:23<br>**includes** [14] - 35:22, 37:11, 37:22, 41:2, 63:4, 94:24, 94:25, 95:1, 95:2, 95:3, 128:15, 134:2, 140:14, 145:8<br>**including** [10] - 36:20, 51:6, 51:14, 63:7, 64:5, 65:20, 79:9, 81:2, 93:5, 98:4<br>**incoherent** [4] - 71:12, 71:14, 71:18, 122:13<br>**incoherently** [1] - 122:5<br>**incomplete** [1] - 64:19<br>**inconsistent** [1] - 72:1<br>**incorrect** [2] - 23:12<br>**increase** [5] - 37:14, 37:16, 77:18, 77:23, 114:23<br>**increased** [4] - 56:25, 89:9, 96:2, 140:7<br>**increases** [3] - 117:11, 127:12, 141:23<br>**increasing** [12] - 37:10, 69:1, 74:14, 77:17, 78:11, 78:18, 88:14, 88:22, 113:13, 121:5, 142:3<br>**independent** [7] - 40:20, 40:21, 40:25, 98:18, 100:12, 110:24, 111:21<br>**independently** [2] - 49:21, 53:7<br>**indicate** [1] - 45:24<br>**indicated** [2] - 22:23, 146:8<br>**indicates** [1] - 155:16<br>**indicating)** [1] - 120:15<br>**indication** [2] - 36:7, | 52:22<br>**indirectly** [1] - 40:20<br>**individually** [1] - 61:23<br>**industry** [4] - 84:2, 84:4, 94:17, 109:17<br>**inferences** [1] - 48:3<br>**inferred** [1] - 72:4<br>**infinity** [2] - 116:7, 140:15<br>**influenced** [3] - 28:9, 32:8, 64:18<br>**inform** [1] - 143:15<br>**information** [16] - 20:14, 38:1, 39:2, 43:18, 46:13, 46:16, 62:23, 63:20, 64:17, 64:19, 64:23, 65:6, 74:2, 81:9, 98:16, 100:2<br>**infringe** [16] - 29:7, 40:6, 40:7, 42:14, 42:19, 43:5, 56:8, 73:6, 73:11, 73:12, 97:6, 102:22, 103:14, 105:10, 105:11, 109:5<br>**infringed** [21] - 17:23, 29:9, 38:14, 40:18, 40:22, 41:1, 41:6, 53:15, 53:22, 54:7, 55:5, 79:4, 79:8, 79:9, 139:9, 148:7, 148:11, 148:17, 150:24, 151:23, 154:8<br>**infringement** [50] - 27:9, 27:13, 36:4, 36:9, 39:6, 39:7, 40:10, 40:11, 40:16, 40:19, 41:4, 41:9, 42:5, 43:2, 54:2, 54:24, 55:12, 55:25, 56:6, 59:19, 69:17, 71:21, 72:19, 72:23, 72:24, 73:21, 74:5, 76:7, 76:8, 78:23, 79:2, 82:17, 82:21, 82:22, 96:24, 97:2, 101:11, 102:5, 104:13, 106:11, 107:14, 110:7, 123:15, 123:18, 128:21, 135:1, 149:21, 154:13<br>**infringer** [10] - 54:22, 55:17, 56:10, 56:13, 56:16, 57:1, 59:4, 59:15, 59:18, 135:4<br>**infringes** [11] - 35:24, |

40:4, 40:5, 41:19, 42:12, 42:17, 43:4, 68:13, 80:2, 82:23, 94:15

**infringing** [8] - 29:1, 56:15, 57:6, 57:7, 60:12, 60:14, 60:16, 61:6

**ingredients** [1] - 97:7

**inherency** [9] - 9:20, 10:1, 10:2, 10:5, 48:25, 49:6, 49:11, 49:14, 49:17

**inherent** [1] - 49:2

**innovated** [1] - 126:2

**innovations** [6] - 51:15, 124:20, 124:23, 125:12, 125:15, 125:23

**Innovations** [1] - 124:17

**inquiries** [1] - 47:9

**insert** [2] - 20:18, 25:14

**inspected** [1] - 66:25

**Instagram** [1] - 63:9

**instance** [1] - 108:17

**instances** [1] - 102:20

**instead** [6] - 22:25, 23:14, 56:11, 61:8, 99:3, 116:3

**instigation** [1] - 83:11

**instruct** [4] - 27:23, 30:16, 43:6, 53:18

**instructed** [5] - 32:11, 35:15, 41:21, 73:1, 80:15

**instructing** [1] - 53:19

**instruction** [21] - 11:3, 12:14, 13:3, 14:23, 15:9, 16:6, 16:8, 17:1, 17:12, 17:16, 21:1, 21:18, 22:19, 22:22, 23:11, 23:22, 32:15, 73:14, 130:2, 130:3, 135:6

**Instruction** [25] - 9:14, 9:19, 10:8, 10:22, 11:8, 11:11, 11:16, 12:4, 12:19, 14:25, 15:2, 15:4, 18:5, 24:14, 26:14, 73:15, 73:23, 81:13, 84:21, 85:2, 86:5, 87:3, 87:5, 132:25, 135:6

**instructions** [17] - 6:3, 8:3, 9:6, 11:23, 12:8, 12:15, 22:6, 27:4, 27:25, 28:15, 28:22, 62:22, 67:22, 82:16,

97:2, 98:11, 111:3

**INSTRUCTIONS** [1] - 27:20

**instructs** [2] - 87:6, 135:5

**intelligent** [1] - 95:16

**intended** [2] - 24:22, 31:25

**intention** [1] - 25:17

**interact** [1] - 36:24

**interest** [2] - 33:25, 122:24

**interesting** [1] - 106:1

**internal** [1] - 124:14

**internet** [3] - 63:6, 63:22, 64:2

**interpret** [1] - 31:25

**interval** [1] - 145:10

**introduced** [4] - 51:6, 125:1, 133:9, 133:15

**invalid** [17] - 29:12, 43:9, 43:15, 43:25, 44:16, 44:18, 53:24, 86:7, 111:1, 123:11, 149:1, 149:3, 149:9, 152:17, 152:19, 153:15, 154:9

**invalidated** [1] - 123:16

**invalidity** [8] - 27:11, 27:14, 36:5, 82:15, 82:17, 82:18, 83:1, 123:18

**invented** [4] - 117:18, 125:14, 133:8, 133:10

**invention** [92] - 13:19, 18:2, 38:19, 44:5, 44:18, 44:20, 44:24, 45:14, 45:18, 45:24, 46:8, 46:23, 47:17, 47:21, 47:24, 48:2, 48:6, 48:10, 48:16, 49:4, 50:2, 50:5, 50:11, 50:13, 50:18, 51:1, 51:3, 51:17, 51:19, 51:21, 51:24, 52:1, 52:3, 52:4, 52:7, 52:9, 52:15, 52:23, 53:14, 54:4, 54:19, 56:4, 56:8, 56:11, 58:2, 58:12, 58:25, 59:3, 59:5, 59:10, 59:12, 59:25, 60:6, 61:11, 68:20, 69:7, 69:13, 69:24, 74:9, 75:21, 76:5, 78:10, 83:19, 86:8, 86:12, 86:23, 87:18, 87:24, 88:10, 88:13,

89:5, 89:10, 90:1, 109:3, 118:4, 121:17, 132:18, 133:7, 133:12, 133:14, 133:17, 135:3, 135:15, 135:17, 137:9, 137:15, 138:4, 138:12, 140:6

**inventions** [7] - 44:16, 49:22, 52:20, 59:10, 68:10, 68:15, 125:16

**inventor** [3] - 47:6, 51:9, 58:8

**inventor's** [3] - 47:4, 47:10, 47:13

**investigation** [2] - 63:24, 64:16

**involve** [1] - 61:21

**involved** [3] - 47:7, 63:12, 64:5

**involves** [1] - 62:24

**irrelevant** [2] - 133:22, 134:5

**issue** [18] - 10:15, 13:23, 14:5, 16:20, 21:17, 21:21, 21:22, 24:14, 24:25, 39:21, 51:16, 53:21, 95:5, 103:16, 114:25, 120:22, 121:16, 133:20

**issued** [3] - 102:21, 112:5, 112:24

**issues** [11] - 36:8, 36:9, 62:24, 67:13, 67:15, 102:23, 109:16, 111:12, 120:24, 125:22

**IT** [2] - 5:10, 5:10

**item** [3] - 30:16, 45:1, 45:2

**items** [3] - 45:9, 53:4, 58:14

**itself** [6] - 14:4, 47:13, 81:11, 97:22, 101:18, 108:14

## J

**JACOB** [1] - 2:12

**Jacob** [2] - 7:12, 22:17

**JAMES** [1] - 1:3

**Japan** [1] - 95:2

**jbuczko@raklaw. com** [1] - 2:15

**jeopardizes** [1] - 65:3

**job** [8] - 67:16, 67:19, 71:1, 71:2, 98:12, 110:10, 110:11,

127:19

**join** [1] - 142:8

**joining** [11] - 151:9, 151:15, 151:21, 152:5, 152:11, 153:1, 153:7, 153:13, 153:22, 154:3, 154:20

**joint** [1] - 41:22

**Joseph** [1] - 7:16

**JOSEPH** [1] - 3:22

**joseph.lee@lw.com** [1] - 3:24

**JUDGE** [1] - 1:3

**judge** [7] - 93:16, 94:4, 98:15, 99:13, 100:24, 107:8, 110:10

**judge's** [5] - 97:2, 98:1, 98:10, 98:11, 117:21

**judgment** [2] - 19:7, 155:22

**Judicial** [1] - 157:12

**July** [4] - 18:15, 148:1, 150:9, 157:15

**JULY** [2] - 1:16, 7:1

**jump** [2] - 93:25, 127:11

**June** [8] - 43:17, 44:9, 44:20, 45:11, 45:22, 47:18, 51:3, 51:14

**juries** [2] - 69:6, 93:15

**juror** [8] - 36:13, 61:25, 62:1, 65:2, 65:5, 65:10, 66:3, 155:16

**juror's** [1] - 155:17

**jurors** [20] - 62:5, 62:10, 62:17, 62:25, 64:7, 146:8, 146:12, 147:3, 151:9, 151:15, 151:21, 152:5, 152:11, 153:1, 153:7, 153:13, 153:22, 154:3, 154:20, 155:8

**JURY** [4] - 1:15, 27:20, 145:1, 147:15

**Jury** [4] - 6:3, 6:8, 73:15, 147:16

**jury** [77] - 7:5, 8:3, 8:13, 8:24, 9:5, 10:12, 17:1, 19:24, 20:3, 21:22, 22:6, 26:7, 26:25, 27:4, 27:22, 27:25, 61:25, 62:3, 63:14, 64:22, 65:11, 65:14, 65:21, 66:11, 66:16, 66:20,

67:5, 68:19, 69:8, 73:23, 79:1, 79:7, 82:21, 90:13, 106:21, 110:16, 111:3, 111:20, 120:22, 129:3, 129:11, 129:13, 129:17, 134:20, 143:8, 143:12, 143:21, 144:1, 144:5, 144:23, 144:24, 145:2, 145:6, 146:19, 146:23, 146:24, 146:25, 147:2, 147:7, 147:12, 148:2, 150:6, 150:10, 150:13, 150:19, 151:8, 151:14, 151:20, 152:4, 152:10, 152:25, 153:6, 153:12, 153:21, 154:2, 154:19, 154:24

**jury's** [1] - 81:13

**JVS** [1] - 146:4

**JX-2030** [1] - 76:2

**JX-2032** [2] - 105:20, 106:22

**JX-2142** [1] - 94:20

## K

**Kabat** [1] - 5:9

**KABAT** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8

**keep** [6] - 41:5, 54:7, 75:4, 87:16, 91:24, 133:19

**keeping** [1] - 118:21

**kept** [2] - 10:1, 97:13

**key** [4] - 75:19, 85:20, 99:14, 106:10

**keys** [1] - 70:4

**kicking** [1] - 93:3

**kind** [7] - 79:20, 94:10, 97:13, 117:13, 125:1, 142:2, 142:4

**kinds** [3] - 31:1, 102:16, 137:20

**Kitakami** [1] - 95:3

**knowledge** [3] - 45:3, 50:6, 123:6

**known** [11] - 35:18, 45:6, 48:7, 48:12, 48:14, 49:21, 49:23, 49:25, 53:1, 53:7, 55:23

**knows** [4] - 100:4, 115:1, 115:2, 146:20
**KROEGER** [16] - 3:4, 7:11, 7:22, 8:7, 8:11, 9:3, 10:4, 10:10, 11:25, 12:7, 18:13, 18:21, 19:1, 19:22, 22:14, 24:5
**Kroeger** [4] - 7:12, 10:3, 18:12, 18:14

## L

**labels** [2] - 69:17, 76:12
**ladies** [23] - 27:3, 66:8, 67:4, 68:9, 73:13, 84:9, 88:25, 90:20, 107:5, 109:24, 123:10, 128:17, 128:23, 129:21, 131:13, 134:24, 139:8, 142:22, 143:4, 147:10, 150:11, 154:22, 155:18
**language** [8] - 9:24, 12:5, 13:18, 14:21, 23:11, 36:6, 106:18, 106:20
**largest** [2] - 103:19, 105:7
**laser** [1] - 72:20
**laser-focused** [1] - 72:20
**LaserDynamics** [1] - 23:7
**last** [16] - 10:6, 12:15, 12:18, 13:24, 19:21, 24:9, 54:6, 67:18, 78:7, 90:22, 120:19, 123:12, 124:24, 129:22, 130:8, 141:13
**last-to-expire** [1] - 54:6
**late** [3] - 143:16, 144:6, 144:8
**LATHAM** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4
**law** [9] - 10:6, 20:5, 27:24, 28:7, 28:8, 29:13, 31:1, 64:4, 96:9
**LAW** [4] - 2:20, 4:9, 4:16, 4:20
**lawsuit** [2] - 124:9, 125:15
**lawyer** [3] - 32:22,

32:23, 32:25
**lawyers** [17] - 30:12, 31:21, 31:22, 32:2, 32:4, 64:6, 65:17, 66:8, 91:3, 91:21, 93:17, 103:25, 104:1, 104:2, 123:22, 155:7
**Lawyers** [1] - 142:10
**layer** [179] - 13:7, 13:10, 13:11, 13:13, 14:8, 16:3, 16:4, 16:15, 16:25, 17:2, 17:3, 17:5, 18:23, 19:15, 20:17, 36:22, 36:25, 37:4, 37:6, 37:8, 37:11, 37:15, 37:17, 37:23, 38:1, 38:4, 38:6, 38:21, 69:1, 73:11, 74:1, 74:15, 75:8, 75:13, 76:15, 76:22, 77:6, 77:9, 77:13, 77:17, 77:18, 77:23, 78:19, 79:16, 79:18, 80:22, 80:25, 81:1, 81:3, 81:8, 81:20, 82:1, 87:15, 87:17, 87:20, 88:18, 89:21, 97:16, 97:22, 98:9, 98:15, 98:22, 98:23, 98:24, 99:8, 99:9, 99:12, 99:15, 99:16, 99:19, 99:20, 99:22, 100:1, 101:5, 101:18, 101:20, 102:7, 102:8, 104:10, 104:11, 105:4, 105:5, 107:2, 107:7, 107:10, 108:18, 108:19, 108:20, 109:1, 109:2, 109:8, 113:14, 113:23, 114:1, 114:6, 114:24, 116:16, 116:18, 116:20, 116:21, 116:22, 116:24, 117:1, 117:2, 117:4, 117:9, 117:12, 117:20, 118:3, 118:7, 118:8, 118:9, 118:17, 119:2, 119:9, 119:10, 119:14, 120:5, 120:16, 121:2, 121:8, 121:9, 121:19, 121:21, 122:3, 122:12, 122:18, 125:5, 129:25, 130:4, 132:6, 132:13,

132:15, 132:23, 136:16, 136:17, 136:19, 138:2, 140:8, 140:20, 140:21, 140:22, 141:2, 141:6, 141:21, 141:22, 141:23, 141:24, 142:4
**layer'** [8] - 21:5, 24:20, 37:1, 37:5, 37:11, 37:25, 38:5, 38:24
**layer's** [3] - 116:24, 119:11, 119:12
**layers** [92] - 15:18, 15:21, 16:10, 16:18, 17:8, 18:23, 18:24, 19:10, 37:2, 37:10, 37:12, 37:14, 37:22, 37:24, 38:3, 38:8, 38:22, 71:13, 71:14, 71:15, 72:3, 73:10, 73:11, 74:14, 75:11, 75:12, 75:23, 77:7, 77:8, 77:12, 77:17, 77:22, 78:17, 80:20, 81:21, 83:17, 89:19, 89:20, 99:20, 100:2, 101:6, 101:7, 101:11, 101:13, 101:14, 101:17, 101:21, 102:18, 102:19, 105:17, 105:18, 106:12, 106:24, 109:4, 113:17, 113:19, 113:22, 115:9, 115:11, 115:14, 115:23, 115:25, 116:1, 116:2, 116:6, 116:23, 117:18, 117:23, 118:2, 118:15, 118:19, 119:15, 119:16, 119:17, 120:4, 120:6, 121:2, 121:21, 122:1, 122:7, 123:7, 126:2, 130:5, 132:23, 135:22, 136:11, 136:18, 137:1, 137:15, 140:19
**layers'** [1] - 37:18
**leads** [2] - 16:6, 17:1
**learn** [1] - 63:24
**learned** [2] - 45:6, 53:1
**least** [3] - 110:4, 119:3, 144:19
**leave** [6] - 20:19, 94:5, 105:14, 144:6,

144:13, 146:19
**leaves** [2] - 12:13, 146:19
**leaving** [1] - 107:5
**led** [1] - 125:22
**LEDAHL** [1] - 2:8
**LEE** [10] - 3:22, 8:17, 8:25, 9:2, 10:18, 11:9, 11:21, 12:2, 12:5, 12:9
**Lee** [3] - 7:16, 11:25, 12:7
**left** [12] - 15:5, 92:17, 105:19, 105:25, 106:2, 106:13, 106:17, 106:21, 108:15, 112:20, 129:1
**legally** [1] - 23:12
**less** [7] - 10:11, 10:13, 54:3, 115:19, 121:5, 124:6, 135:2
**letter** [6] - 112:12, 112:18, 112:23, 113:15, 114:7, 136:7
**letting** [1] - 13:1
**level** [8] - 45:21, 50:17, 51:2, 51:4, 72:6, 88:11, 103:3, 145:7
**levels** [1] - 51:8
**Li** [29] - 75:9, 87:13, 87:14, 87:16, 87:23, 88:1, 88:3, 88:4, 88:9, 88:10, 88:17, 110:22, 120:19, 121:7, 121:11, 121:18, 121:20, 122:1, 122:6, 122:15, 122:20, 123:6, 132:4, 132:14, 140:19, 140:25
**Li's** [1] - 121:1
**liability** [1] - 42:5
**liar** [3] - 91:23, 94:3, 130:10
**liars** [1] - 94:2
**license** [11] - 54:21, 55:3, 57:21, 58:17, 59:23, 60:4, 127:21, 127:24, 128:6, 138:24, 139:3
**licensee** [5] - 57:19, 58:6, 58:12, 59:18, 59:22
**licenses** [1] - 58:3
**licensing** [2] - 57:17, 58:2
**licensor** [4] - 58:6,

58:13, 59:2, 59:17
**licensor's** [1] - 57:25
**lied** [1] - 100:17
**life** [1] - 24:9
**life's** [1] - 92:21
**lifetime** [1] - 124:5
**light** [2] - 31:14, 34:5
**likely** [8] - 39:9, 39:17, 48:11, 48:16, 49:24, 56:12, 56:15, 137:4
**limit** [7] - 74:18, 75:24, 76:2, 76:3, 94:22, 116:13, 140:16
**limitation** [4] - 41:17, 75:24, 97:1, 123:2
**limitations** [3] - 41:11, 72:25, 114:19
**limited** [9] - 23:8, 26:4, 26:5, 30:14, 30:17, 30:18, 32:14, 51:7, 63:8
**limiting** [1] - 32:15
**line** [15] - 9:17, 9:18, 10:9, 11:8, 11:17, 11:18, 12:1, 20:10, 21:3, 23:1, 23:16, 58:7, 68:3, 82:2, 108:14
**Line** [1] - 11:12
**lines** [2] - 23:2, 23:14
**LinkedIn** [1] - 63:9
**lions** [1] - 94:1
**list** [1] - 31:20
**listen** [7] - 27:5, 63:17, 89:23, 93:24, 112:7, 154:25, 155:4
**listened** [1] - 62:10
**lists** [1] - 13:17
**literal** [2] - 40:11, 73:20
**literally** [4] - 17:23, 38:13, 40:7, 102:6
**litigation** [1] - 68:8
**Liu** [2] - 5:9, 7:13
**LLP** [9] - 3:12, 3:18, 3:21, 4:4, 4:8, 4:12, 4:16, 4:20, 5:4
**logically** [1] - 47:12
**long-felt** [1] - 51:25
**long-term** [1] - 131:2
**look** [12] - 14:14, 47:25, 90:2, 94:24, 102:2, 111:3, 124:16, 128:2, 141:4, 141:14, 141:17, 142:19
**looking** [7] - 10:19, 10:20, 12:9, 12:10, 98:17, 98:24, 101:5
**looks** [3] - 106:18,

**UNITED STATES DISTRICT COURT**

106:22, 120:15
**loops** [1] - 108:11
**Los** [6] - 2:6, 2:10, 2:14, 2:22, 3:6, 3:10
**LOS** [1] - 157:3
**low** [1] - 126:23
**lower** [7] - 56:12, 77:6, 115:18, 118:14, 121:22, 126:24, 145:9
**lower/higher** [1] - 145:10
**lowers** [1] - 118:20
**loyalty** [1] - 68:4
**Lumish** [27] - 7:17, 16:21, 25:6, 66:23, 76:12, 79:19, 89:16, 90:2, 90:10, 90:16, 129:4, 129:23, 130:6, 131:10, 131:18, 132:1, 132:7, 132:9, 133:5, 133:19, 133:20, 136:13, 137:17, 139:22, 142:21, 144:3
**LUMISH** [26] - 3:18, 25:19, 25:22, 25:25, 66:14, 66:25, 90:17, 90:20, 129:5, 129:7, 139:23, 139:25, 140:3, 144:4, 144:9, 144:12, 144:18, 145:4, 145:14, 145:25, 146:6, 146:10, 146:15, 146:18, 156:2, 156:5
**Lumish's** [2] - 70:14, 70:15
**lunch** [2] - 143:15

## M

**M1** [1] - 121:9
**magnetic** [89] - 13:7, 13:10, 13:11, 13:12, 14:7, 16:4, 16:15, 16:24, 17:3, 17:5, 18:23, 19:15, 20:17, 21:5, 24:20, 36:15, 36:17, 36:19, 36:22, 36:23, 36:25, 37:4, 37:6, 37:8, 37:12, 37:15, 37:17, 37:19, 37:20, 37:23, 37:25, 38:1, 38:4, 38:21, 38:24, 41:25, 44:22, 68:11, 75:18, 76:19, 76:20, 76:22, 77:6, 77:12, 80:22, 81:3, 81:8, 81:25, 83:17,

85:12, 85:21, 97:15, 97:22, 98:14, 98:15, 98:22, 98:23, 99:8, 99:12, 99:15, 100:1, 101:4, 101:20, 104:11, 107:7, 113:14, 113:17, 114:24, 115:25, 116:20, 116:21, 117:8, 117:17, 121:8, 122:2, 125:5, 126:10, 126:11, 134:1, 134:2, 134:7, 135:21, 136:10, 137:10, 141:2, 141:6, 141:20
**Magnetic** [1] - 6:20
**magnetically** [10] - 20:14, 38:2, 39:2, 74:2, 76:23, 81:9, 98:16, 99:16, 101:19, 107:8
**magnetization** [3] - 117:3, 122:4, 122:12
**magnificent** [1] - 91:4
**maichele@raklaw. com** [1] - 2:19
**main** [2] - 46:16, 114:15
**Maine** [1] - 2:17
**maintain** [1] - 58:1
**major** [1] - 141:10
**man** [5] - 93:11, 94:3, 100:10, 101:2, 113:4
**manner** [2] - 33:24, 80:15
**manufactured** [1] - 57:24
**manufacturer** [1] - 59:23
**manufacturing** [1] - 59:13
**mapping** [1] - 105:25
**MARC** [1] - 2:4
**March** [1] - 19:6
**market** [10] - 48:20, 50:8, 56:18, 60:9, 68:16, 68:22, 69:4, 133:15, 137:2, 139:3
**marketing** [2] - 58:1, 60:8
**marshals** [2] - 144:12, 144:14
**massive** [1] - 139:9
**masters** [1] - 144:10
**material** [2] - 36:16, 101:9
**materially** [2] - 18:1, 38:18
**materials** [3] - 36:15,

63:23, 101:14
**math** [1] - 108:4
**mathematical** [1] - 54:13
**matter** [12] - 10:7, 47:12, 48:2, 63:16, 73:3, 79:15, 79:25, 100:13, 100:14, 105:9, 105:10, 157:11
**Matter** [1] - 7:6
**matters** [6] - 103:14, 105:12, 105:13, 105:14, 106:10
**MATTHEW** [1] - 2:16
**mchan@raklaw.com** [1] - 2:23
**mean** [7] - 9:22, 43:4, 91:23, 95:17, 98:15, 124:19, 140:9
**meaning** [5] - 14:24, 35:12, 36:3, 73:25
**meaningless** [1] - 109:7
**means** [35] - 13:21, 13:25, 14:2, 14:6, 14:15, 14:18, 28:11, 29:21, 30:1, 33:9, 35:20, 36:14, 36:20, 36:23, 37:1, 37:5, 37:11, 37:18, 37:21, 37:25, 38:3, 38:5, 38:10, 39:16, 44:21, 63:5, 73:18, 86:10, 87:25, 98:4, 113:24, 116:5, 116:6, 119:17, 143:9
**means-plus-function** [2] - 14:15, 14:18
**meant** [2] - 26:8, 54:8
**measure** [5] - 36:15, 53:19, 72:2, 82:6, 126:6
**measured** [6] - 13:10, 107:24, 108:1, 108:9, 108:10, 109:19
**measurements** [1] - 108:12
**measuring** [2] - 57:8, 108:10
**media** [49] - 16:3, 44:22, 63:10, 63:11, 63:18, 64:8, 74:12, 76:19, 83:15, 83:21, 84:1, 84:3, 85:8, 95:15, 95:22, 96:2, 96:3, 113:2, 113:10, 113:11, 114:11, 116:13, 120:3,

120:23, 124:14, 125:8, 125:10, 125:11, 125:13, 125:20, 127:4, 127:5, 127:7, 127:9, 127:15, 131:22, 134:2, 134:7, 134:13, 134:15, 135:18, 135:21, 136:4, 136:8, 136:12, 136:25
**medium** [2] - 42:1, 119:5
**meet** [8] - 38:23, 39:3, 69:20, 74:3, 77:7, 78:6, 78:16, 85:3
**meets** [15] - 20:13, 20:18, 20:19, 21:5, 21:6, 21:8, 24:20, 38:21, 39:1, 39:12, 40:23, 73:25, 77:7, 78:3, 98:10
**member** [4] - 61:25, 65:11, 65:14, 112:15
**members** [4] - 27:22, 42:10, 63:11, 65:11
**memory** [2] - 32:3, 33:23
**men** [1] - 93:23
**Menlo** [4] - 3:19, 4:10, 4:21, 5:5
**mention** [1] - 85:1
**mentioned** [5] - 22:20, 67:10, 85:15, 133:20, 145:8
**mentioning** [1] - 17:10
**mere** [1] - 49:12
**merely** [3] - 47:22, 49:20, 53:6
**merged** [1] - 116:9
**merits** [3] - 51:24, 63:3, 114:14
**Mesa** [1] - 3:23
**messaging** [1] - 63:6
**met** [11] - 39:5, 40:2, 74:5, 79:1, 82:23, 85:5, 87:4, 93:18, 96:18, 109:25, 111:16
**methods** [1] - 108:9
**mfenster@raklaw. com** [1] - 2:7
**middle** [4] - 14:24, 15:18, 16:10, 119:2
**might** [6] - 33:6, 76:12, 79:23, 108:1, 110:14, 133:2
**million** [11] - 89:14, 94:6, 107:23, 127:23, 128:16,

138:19, 138:20, 138:24, 139:5, 139:14, 154:16
**millions** [1] - 126:12
**mind** [4] - 41:5, 54:7, 56:25, 100:10
**minds** [1] - 93:20
**mine** [1] - 113:6
**Minna** [1] - 7:12
**MINNA** [1] - 2:20
**Minnesota** [2] - 92:6
**minute** [6] - 11:10, 25:8, 66:7, 103:16, 128:23, 130:8
**minutes** [8] - 66:9, 90:11, 128:18, 129:1, 129:5, 129:6, 139:25, 141:16
**miraculously** [1] - 24:8
**Mirzaie** [2] - 71:16, 72:9
**MIRZAIE** [1] - 3:8
**Mirzaie's** [1] - 70:25
**misleading** [2] - 64:19, 142:1
**misled** [1] - 140:4
**missing** [2] - 49:1, 119:15
**mistakes** [8] - 34:18, 110:13, 110:14, 111:6, 111:25, 112:2, 112:3, 126:21
**mistrial** [1] - 65:4
**misused** [1] - 112:13
**mode** [2] - 40:4
**model** [4] - 74:23, 75:17, 127:5, 134:20
**modes** [2] - 40:5, 58:22
**modification** [1] - 88:5
**modify** [3] - 15:11, 17:14, 88:17
**moment** [8] - 37:19, 98:1, 100:6, 102:14, 108:6, 113:20, 114:4, 117:15
**moments** [7] - 36:23, 36:24, 75:18, 100:16, 117:3, 117:17, 122:3
**Monday** [2] - 143:19, 143:23
**money** [11] - 28:25, 92:1, 92:2, 92:8, 92:9, 92:10, 92:13, 92:14, 129:4, 142:14, 149:17
**monopoly** [2] - 58:1, 58:4

months [8] - 116:10, 116:11, 116:12, 116:22, 117:7, 117:17, 117:24, 118:18

morning [14] - 7:11, 7:14, 7:15, 7:19, 9:7, 11:24, 18:16, 21:14, 22:17, 27:3, 31:7, 67:4, 90:20, 100:7

Mortensen [13] - 5:10, 83:13, 83:23, 130:1, 130:12, 133:24, 134:9, 134:18, 135:11, 136:22, 137:25, 138:10, 138:15

most [9] - 49:21, 55:22, 73:7, 100:16, 103:2, 103:25, 111:9, 112:9, 136:4

motion [2] - 19:6, 23:7

motions [1] - 23:5

motivation [2] - 89:5, 132:19

mountain [1] - 79:12

move [3] - 66:23, 87:22, 122:8

moving [1] - 117:3

MR [160] - 1:4, 7:7, 7:11, 7:15, 7:22, 7:23, 8:7, 8:11, 8:17, 8:25, 9:2, 9:3, 9:7, 9:12, 9:17, 9:19, 10:4, 10:10, 10:11, 10:14, 10:18, 10:20, 11:4, 11:9, 11:13, 11:16, 11:21, 11:25, 12:2, 12:5, 12:7, 12:9, 12:13, 12:20, 12:23, 13:1, 14:14, 15:12, 15:15, 15:19, 15:23, 15:24, 16:12, 16:20, 17:7, 17:10, 17:15, 18:7, 18:13, 18:21, 19:1, 19:22, 20:8, 20:25, 21:6, 21:11, 22:14, 22:17, 23:2, 23:4, 23:20, 23:24, 24:3, 24:5, 24:16, 25:4, 25:6, 25:17, 25:19, 25:22, 25:25, 26:3, 26:6, 26:10, 26:13, 26:18, 26:20, 26:23, 27:8, 27:12, 28:24, 29:3, 39:7, 39:14, 41:15, 42:10, 42:15, 43:1, 53:18, 53:24, 54:2, 54:9, 54:10, 54:11,

54:14, 60:18, 61:2, 66:13, 66:14, 66:21, 66:25, 67:4, 67:7, 68:10, 69:9, 70:14, 72:15, 90:6, 90:9, 90:17, 90:20, 127:21, 128:5, 128:13, 129:5, 129:7, 129:9, 129:12, 129:18, 129:21, 134:11, 139:7, 139:23, 139:25, 140:3, 144:4, 144:9, 144:12, 144:17, 144:18, 145:4, 145:14, 145:16, 145:20, 145:24, 145:25, 146:6, 146:7, 146:10, 146:15, 146:16, 146:18, 147:4, 147:23, 148:5, 148:12, 148:18, 149:5, 149:11, 149:17, 150:22, 151:2, 151:24, 152:21, 153:17, 154:10, 155:23, 156:2, 156:4, 156:5

MRT [8] - 9:15, 23:5, 23:9, 95:8, 96:7, 96:12, 103:20, 124:22

MRT's [6] - 91:3, 93:17, 101:23, 104:18, 114:18, 123:22

MS [5] - 21:14, 21:20, 22:9, 22:11, 23:25

multi [2] - 131:19

multicomponent [2] - 61:5, 61:17

multilayer [27] - 36:19, 75:1, 76:21, 78:10, 81:2, 81:8, 85:7, 86:23, 113:13, 114:22, 120:25, 121:25, 125:3, 125:4, 131:11, 131:15, 131:17, 131:21, 131:23, 133:12, 135:18, 136:14, 136:25, 140:4, 140:7, 140:11, 140:23

Multilayer [1] - 116:17

multilayered [2] - 68:25, 133:18

multiple [25] - 74:13, 75:12, 77:22, 83:17,

86:17, 101:17, 102:18, 109:4, 113:17, 113:19, 113:23, 115:13, 116:1, 116:18, 117:18, 117:23, 119:15, 119:16, 120:6, 122:7, 127:14, 132:23, 136:10, 137:14, 140:19

multiple-layer [1] - 113:23

must [70] - 17:3, 28:7, 28:9, 28:11, 28:22, 29:22, 30:1, 30:17, 31:14, 32:12, 32:15, 33:5, 33:10, 34:8, 35:16, 35:24, 36:3, 38:12, 39:8, 39:24, 40:14, 40:22, 41:6, 41:19, 42:25, 43:7, 43:20, 43:23, 43:24, 44:5, 44:10, 44:11, 45:4, 45:9, 45:12, 46:1, 46:3, 46:4, 46:7, 47:7, 47:8, 47:19, 49:8, 50:10, 50:18, 51:1, 51:17, 51:20, 52:24, 53:17, 54:1, 54:13, 55:1, 55:3, 56:4, 56:6, 56:8, 57:5, 60:5, 60:11, 60:18, 60:21, 61:19, 62:6, 62:7, 62:20, 62:22, 63:14, 73:20

## N

name [2] - 111:17, 143:1

nanometer [1] - 82:10

nanometers [2] - 81:20, 81:21

nanosecond [2] - 82:8, 131:5

narrowly [1] - 47:8

national [1] - 34:10

natural [2] - 49:9, 49:15

nature [2] - 50:7, 57:21

nearly [2] - 119:4, 119:5

necessarily [3] - 10:25, 33:16, 35:8

necessary [5] - 15:2, 18:11, 19:19, 19:23, 65:8

necessity [1] - 49:24

need [25] - 14:17, 15:7, 16:8, 17:12, 18:7, 18:19, 19:20, 20:2, 46:14, 46:19, 47:25, 50:8, 51:25, 66:23, 67:19, 84:12, 92:8, 92:9, 92:13, 92:14, 139:6, 140:3, 142:23, 145:12, 146:3

needed [1] - 130:19

needle [1] - 13:23

negate [2] - 17:25, 38:17

negotiation [12] - 54:23, 55:1, 55:6, 55:7, 55:9, 55:16, 55:19, 127:19, 127:20, 135:7, 138:21, 138:23

neighbor's [1] - 97:8

net [1] - 37:19

neutral [3] - 68:2, 76:9, 80:10

never [18] - 44:1, 85:15, 91:12, 95:1, 101:17, 104:12, 104:14, 104:21, 105:2, 105:3, 105:7, 111:22, 124:6, 130:17, 136:16, 141:15, 141:25

never-ending [1] - 124:6

nevertheless [4] - 21:10, 38:23, 39:3, 74:3

new [16] - 25:14, 74:10, 83:15, 84:1, 84:3, 111:6, 111:23, 113:12, 113:16, 114:11, 121:17, 126:2, 131:22, 136:8, 136:11

Newport [4] - 4:5, 4:6, 4:13, 4:14

news [2] - 63:17, 63:20

next [7] - 56:7, 76:4, 81:22, 88:8, 88:15, 122:3, 143:18

next-to-best [1] - 56:7

nexus [1] - 52:14

night [4] - 12:15, 12:18, 24:9, 31:9

nights [1] - 97:13

nobody [3] - 100:4, 118:23, 119:18

nobody's [1] - 92:4

nominated [1] - 83:11

none [7] - 17:21, 33:15, 111:15, 125:13, 125:14, 138:11, 138:12

nonexclusive [1] - 57:22

noninfringement [7] - 16:25, 77:2, 80:18, 80:19, 81:12, 107:11, 109:25

noninfringing [6] - 56:3, 56:4, 56:10, 61:6, 61:18, 139:2

nonmagnetic [1] - 115:1

nonobviousness [3] - 47:21, 51:21, 52:12

nonparallelism [1] - 109:15

nonpatented [2] - 58:13, 59:13

nonrestricted [1] - 57:23

nonsensical [2] - 14:3, 14:11

nonuniformity [1] - 109:16

normal [1] - 82:7

normally [1] - 57:4

North [2] - 3:13, 4:17

NOTE [1] - 145:1

note [3] - 65:9, 65:25, 146:13

Note [4] - 6:8, 145:2, 145:5, 146:24

notebooks [3] - 42:7, 42:20, 73:16

noted [2] - 21:25, 22:20

notes [1] - 142:17

nothing [6] - 24:3, 24:5, 70:11, 85:23, 86:2, 111:19

notice [1] - 20:10

noticed [1] - 94:11

notify [1] - 65:6

notion [7] - 17:9, 95:21, 97:5, 102:25, 114:12, 119:18, 125:8

notwithstanding [1] - 83:4

novel [2] - 18:1, 38:18

nowadays [1] - 84:4

nucleation [42] - 13:7, 13:9, 13:11, 13:13, 14:8, 15:20, 16:4, 16:15, 18:24, 19:10, 19:16, 36:21, 36:23, 37:3, 37:5, 37:7,

37:16, 68:25, 73:10, 74:3, 74:14, 75:1, 77:4, 77:8, 77:10, 77:11, 77:13, 78:3, 78:10, 80:6, 81:3, 109:4, 113:13, 114:22, 117:22, 121:11, 125:3, 125:4, 130:5, 136:18, 140:7

**Number** *[26]* - 9:4, 9:14, 9:20, 9:23, 10:22, 11:8, 12:19, 12:23, 14:25, 15:4, 17:21, 18:5, 24:15, 26:15, 73:15, 81:14, 84:21, 86:6, 87:3, 130:2, 132:25, 135:6, 145:2, 145:5, 146:24, 147:22

**number** *[24]* - 10:25, 12:21, 33:17, 35:8, 48:21, 58:25, 67:21, 67:22, 91:11, 97:17, 104:24, 105:20, 125:11, 125:22, 126:16, 126:24, 133:23, 138:16, 138:17, 139:15, 144:22, 145:11

**numbered** *[1]* - 7:20

**numbers** *[5]* - 8:18, 76:15, 107:20, 121:5

### O

**oath** *[4]* - 28:13, 64:13, 64:25, 72:2

**object** *[3]* - 32:6, 32:25, 145:25

**objection** *[12]* - 15:9, 21:25, 22:15, 32:8, 32:25, 33:2, 33:4, 146:6, 146:7, 146:15, 146:16, 147:4

**objections** *[7]* - 8:2, 8:3, 8:5, 22:20, 23:25, 32:4, 156:1

**obtain** *[1]* - 59:23

**obvious** *[42]* - 44:5, 44:14, 44:17, 44:19, 45:4, 45:14, 45:19, 45:24, 45:25, 46:6, 46:9, 46:16, 46:22, 48:11, 48:17, 48:19, 49:5, 49:19, 51:19, 52:20, 52:23, 53:6, 53:9, 72:13, 83:3, 83:9, 84:8, 84:17, 86:8, 87:25, 93:4,

94:15, 111:2, 115:5, 123:1, 123:8, 123:15, 128:21

**obviousness** *[10]* - 44:25, 47:20, 49:8, 50:10, 51:1, 51:16, 51:21, 52:24, 118:5, 120:17

**occurred** *[1]* - 112:25

**occurs** *[2]* - 120:5, 121:7

**oersteds** *[1]* - 121:3

**OF** *[9]* - 1:2, 1:14, 2:1, 3:1, 4:1, 5:1, 157:1, 157:3, 157:4

**offensive** *[1]* - 132:18

**offered** *[1]* - 39:10

**offering** *[1]* - 29:3

**offers** *[1]* - 32:22

**Office** *[1]* - 43:12

**office** *[6]* - 110:21, 110:25, 111:14, 111:22, 112:2, 120:20

**officers** *[2]* - 29:15, 29:17

**Official** *[1]* - 157:20

**OFFICIAL** *[3]* - 1:24, 157:1, 157:5

**often** *[2]* - 34:17, 155:7

**old** *[1]* - 58:22

**one** *[128]* - 7:20, 8:8, 9:12, 10:4, 10:20, 11:2, 11:5, 11:6, 11:7, 11:11, 11:16, 11:18, 12:13, 14:5, 14:6, 14:13, 15:20, 18:4, 20:9, 21:9, 21:12, 22:14, 22:21, 25:14, 25:24, 30:24, 38:22, 39:19, 39:25, 40:3, 40:16, 42:1, 43:3, 45:1, 45:2, 47:11, 50:6, 56:21, 61:17, 61:25, 65:11, 67:21, 70:4, 71:1, 71:2, 73:4, 73:6, 74:25, 76:2, 76:17, 77:2, 77:21, 79:15, 79:16, 80:18, 80:20, 82:8, 83:4, 83:7, 84:18, 89:4, 89:15, 91:11, 92:24, 93:11, 94:11, 95:6, 96:7, 96:22, 97:5, 98:3, 98:22, 98:23, 98:24, 99:14, 100:19, 101:17, 102:7, 102:15, 103:2,

103:9, 103:18, 103:21, 103:22, 104:9, 104:18, 105:4, 105:6, 106:1, 107:4, 108:18, 109:2, 109:4, 109:8, 109:21, 110:11, 110:18, 111:10, 111:18, 112:6, 112:8, 112:12, 112:22, 113:22, 113:23, 113:24, 116:9, 116:18, 120:4, 120:21, 121:3, 121:19, 122:3, 122:24, 123:9, 123:17, 126:14, 126:25, 127:12, 133:23, 137:18, 138:2, 141:9, 154:8

**One** *[1]* - 113:4

**one's** *[2]* - 107:20, 107:21

**one-five** *[1]* - 25:24

**one-person** *[1]* - 127:12

**oOo** *[1]* - 156:8

**open** *[4]* - 65:15, 94:2, 124:12, 143:9

**opened** *[4]* - 96:19, 103:17, 113:11, 113:16

**opening** *[11]* - 15:13, 19:14, 20:1, 31:23, 69:11, 73:8, 79:19, 119:20, 123:13, 132:21

**operate** *[2]* - 40:3, 40:5

**operating** *[4]* - 128:2, 128:3, 128:5, 128:11

**operation** *[4]* - 40:4, 82:8, 125:18, 127:12

**opinion** *[7]* - 23:7, 28:16, 59:16, 62:15, 78:2, 78:15, 113:5

**opinions** *[2]* - 28:10, 68:1

**opportunity** *[5]* - 8:1, 33:20, 66:21, 89:15, 111:22

**oppose** *[1]* - 8:19

**opposing** *[1]* - 97:3

**opposite** *[2]* - 39:20, 113:18

**optional** *[1]* - 37:24

**OR** *[1]* - 6:17

**order** *[12]* - 23:5, 27:1, 27:8, 33:7, 39:7,

43:19, 44:4, 46:2, 66:17, 122:17, 129:14, 147:9

**ordered** *[1]* - 63:15

**ordinary** *[22]* - 44:19, 44:21, 45:3, 45:10, 46:17, 47:18, 48:4, 48:9, 50:3, 50:7, 50:17, 50:20, 50:22, 50:23, 50:24, 51:2, 51:4, 53:11, 86:10, 86:13, 133:1, 154:25

**organized** *[1]* - 125:19

**orientation** *[1]* - 34:11

**oriented** *[10]* - 20:14, 38:2, 39:3, 74:2, 76:23, 81:9, 98:16, 99:17, 101:19, 107:9

**original** *[1]* - 147:13

**otherwise** *[2]* - 49:1, 65:22

**outcome** *[1]* - 33:25

**outset** *[1]* - 74:6

**outside** *[2]* - 64:16, 65:6

**overall** *[4]* - 37:16, 77:18, 77:23, 114:22

**overcome** *[2]* - 43:13, 76:3

**Overcoming** *[1]* - 94:22

**overlapping** *[1]* - 9:21

**overrule** *[1]* - 32:25

**overseeing** *[1]* - 95:13

**overstated** *[1]* - 139:5

**overwhelming** *[3]* - 68:12, 135:16, 138:4

**own** *[23]* - 41:3, 62:13, 63:25, 80:24, 81:1, 81:16, 81:17, 83:10, 87:2, 92:14, 99:17, 99:23, 106:15, 111:21, 129:25, 130:4, 135:14, 135:15, 136:23, 141:1, 143:13, 144:10, 147:11

**owned** *[1]* - 59:2

**owner** *[1]* - 67:11

**owners** *[2]* - 29:14, 29:17

**owns** *[2]* - 96:11, 96:17

### P

**p.m** *[7]* - 66:15, 129:10, 146:4, 146:22, 156:7

**page** *[23]* - 9:13, 9:15,

9:25, 10:2, 10:8, 10:14, 10:21, 11:8, 11:11, 11:13, 11:14, 11:21, 11:25, 12:6, 12:7, 18:16, 22:23, 23:15, 25:2, 26:20, 151:7, 157:11

**PAGE** *[1]* - 6:2

**pages** *[4]* - 25:13, 26:10, 26:13, 79:13

**paid** *[4]* - 57:19, 67:9, 84:7, 142:13

**paper** *[11]* - 7:21, 82:12, 86:21, 95:19, 115:7, 119:18, 119:25, 131:5, 135:19, 140:13, 150:17

**papers** *[7]* - 118:6, 118:10, 118:18, 118:20, 119:9, 119:24, 120:10

**Papusoi** *[3]* - 82:5, 82:9, 131:5

**Papusoi's** *[2]* - 82:12, 131:5

**paragraph** *[25]* - 9:22, 9:24, 9:25, 10:1, 10:9, 10:21, 14:24, 15:6, 16:5, 17:11, 17:19, 17:21, 18:3, 18:6, 18:19, 18:20, 19:20, 19:21, 19:22, 20:7, 20:10, 21:25, 22:24, 24:17, 98:2

**paragraphs** *[4]* - 9:20, 10:16, 10:22, 14:23

**paralegal** *[1]* - 5:9

**parallel** *[2]* - 24:23, 108:20

**paramount** *[2]* - 135:18, 135:23

**pardon** *[1]* - 121:10

**Park** *[4]* - 3:19, 4:10, 4:21, 5:5

**part** *[12]* - 27:19, 33:15, 35:5, 41:24, 74:23, 81:1, 81:7, 99:20, 101:16, 106:5, 119:1, 120:22

**partially** *[2]* - 83:16, 136:9

**particular** *[9]* - 22:21, 42:12, 42:17, 43:22, 47:6, 59:8, 59:24, 85:17, 85:18

**particularly** *[1]* - 97:6

**parties** *[15]* - 8:1, 8:20, 41:22, 42:23, 55:1, 55:4, 55:24, 57:14,

64:5, 64:21, 64:24, 72:15, 138:22, 155:7, 155:15
**parties'** [1] - 60:9
**parts** [3] - 114:21, 127:1, 128:8
**party** [9] - 29:20, 29:24, 30:6, 39:19, 39:20, 53:20, 55:10, 61:12
**party's** [1] - 64:10
**pass** [1] - 25:13
**passion** [1] - 93:21
**Patent** [1] - 43:11
**patent** [113] - 13:5, 16:13, 29:1, 29:2, 29:5, 29:10, 29:11, 38:9, 39:15, 40:8, 40:10, 40:11, 40:13, 41:5, 41:14, 42:22, 43:14, 43:23, 44:2, 44:5, 45:7, 45:8, 46:14, 46:20, 48:24, 52:15, 53:2, 53:3, 53:5, 53:16, 53:17, 53:23, 54:7, 54:17, 54:21, 55:4, 56:4, 56:9, 56:18, 57:2, 57:15, 58:1, 58:16, 58:19, 59:24, 60:10, 61:10, 61:19, 67:11, 68:17, 69:5, 73:17, 79:5, 81:18, 81:19, 82:2, 82:4, 87:14, 98:3, 98:22, 99:9, 101:7, 102:22, 107:7, 108:7, 108:10, 109:3, 110:9, 110:20, 110:22, 110:25, 111:14, 111:22, 112:2, 114:10, 116:4, 116:8, 116:17, 116:25, 117:10, 117:11, 117:16, 120:19, 120:20, 120:21, 121:19, 121:20, 122:1, 122:6, 122:15, 122:21, 131:6, 133:21, 134:3, 134:25, 136:21, 140:19, 140:25, 141:20, 148:11, 148:17, 149:3, 149:9, 151:4, 151:23, 152:19, 153:15
**patent's** [1] - 118:9
**patent-practicing** [2] -

133:21, 134:3
**patented** [17] - 13:19, 56:8, 56:11, 56:17, 57:8, 57:10, 58:10, 58:21, 58:25, 60:6, 60:17, 60:20, 60:24, 61:4, 61:21, 83:22, 114:8
**patentee** [3] - 57:16, 59:18, 60:3
**patents** [31] - 44:9, 45:18, 46:24, 57:17, 57:20, 68:10, 82:24, 84:9, 85:7, 93:11, 94:15, 95:15, 98:19, 102:21, 112:5, 112:24, 113:12, 123:23, 123:25, 124:12, 126:14, 127:22, 127:25, 128:6, 128:13, 128:15, 148:8, 149:22, 150:25
**patents-in-suit** [2] - 57:17, 57:20
**path** [1] - 17:2
**PATRICIA** [1] - 4:20
**patricia.young@lw. com** [1] - 4:22
**Paul** [2] - 7:11, 18:14
**PAUL** [1] - 3:4
**Pause** [1] - 28:1
**pause** [1] - 78:7
**pay** [3] - 57:2, 59:25, 89:17
**payday** [1] - 94:6
**paying** [1] - 138:24
**payment** [2] - 54:17, 54:20
**people** [20] - 25:3, 34:17, 34:19, 63:12, 64:5, 68:3, 86:17, 92:23, 93:2, 103:11, 109:21, 110:13, 111:15, 112:3, 112:9, 125:21, 127:14, 127:15, 154:25
**people's** [1] - 142:15
**per** [8] - 89:13, 133:15, 133:16, 135:24, 137:22, 138:3, 138:7
**perceived** [1] - 115:18
**percent** [18] - 93:8, 93:10, 94:13, 123:20, 123:21, 123:25, 124:20, 126:16, 126:17, 126:18, 127:12,

127:17, 127:18, 127:24, 128:9, 135:10, 145:9, 145:18
**percolating** [1] - 103:6
**perfect** [1] - 110:14
**perform** [2] - 17:8, 46:3
**performed** [1] - 29:18
**perhaps** [1] - 155:9
**period** [4] - 54:6, 94:14, 112:23, 123:22
**permissible** [1] - 23:22
**permission** [1] - 39:14
**permit** [1] - 25:19
**permitted** [1] - 32:24
**perpendicular** [6] - 85:8, 85:12, 85:21, 96:2, 119:5, 120:23
**persists** [1] - 155:13
**person** [26] - 29:14, 44:19, 44:21, 45:3, 45:10, 46:17, 47:17, 48:3, 48:9, 50:2, 50:20, 50:22, 50:23, 50:24, 53:11, 63:5, 86:8, 86:10, 86:15, 86:24, 86:25, 92:24, 126:14, 127:12, 133:1, 155:11
**person's** [1] - 123:6
**personal** [17] - 27:4, 28:10, 143:6, 150:17, 150:18, 151:6, 151:7, 151:12, 151:18, 152:2, 152:8, 152:23, 153:4, 153:10, 153:19, 153:25, 154:17
**personally** [2] - 30:23, 111:16
**persons** [1] - 51:9
**persuade** [1] - 54:10
**persuaded** [2] - 29:22, 30:1
**persuades** [1] - 62:15
**pertinent** [4] - 47:5, 47:11, 85:4, 85:17
**Ph.D** [2] - 71:16, 74:23
**Ph.D.s** [2] - 74:21, 126:13
**phase** [1] - 74:12
**phone** [1] - 63:5
**phrase** [3] - 22:24, 23:14, 112:22
**physical** [5] - 13:8, 14:9, 16:1, 16:2,

140:16
**physically** [1] - 16:18
**Physics** [1] - 95:24
**physics** [2] - 91:6, 91:12
**picked** [1] - 105:21
**picture** [1] - 100:9
**pictures** [1] - 101:21
**piece** [1] - 141:13
**pink** [2] - 107:2
**pioneered** [1] - 126:5
**pioneering** [1] - 115:12
**pkroeger@raklaw. com** [1] - 3:7
**place** [8] - 45:10, 54:23, 64:1, 64:3, 67:11, 87:7, 100:24, 109:19
**plain** [1] - 14:21
**PLAINTIFF** [5] - 2:3, 3:3, 3:17, 4:3, 5:3
**Plaintiff** [4] - 1:5, 1:10, 147:24, 148:1
**plaintiff** [8] - 7:12, 7:22, 18:14, 22:18, 24:5, 66:13, 96:6, 156:4
**PLAINTIFF'S** [2] - 67:3, 129:20
**plaintiff's** [2] - 5:9, 5:10
**Plaintiff's** [2] - 6:4, 6:6
**planet** [1] - 91:5
**platter** [2] - 138:3
**platters** [1] - 127:5
**played** [2] - 135:18, 135:23
**plus** [3] - 14:15, 14:18, 41:3
**PMR** [10] - 85:21, 95:4, 103:6, 116:13, 120:9, 120:13, 124:25, 125:9, 126:11, 136:4
**PMR's** [1] - 124:25
**point** [16] - 7:24, 8:1, 9:10, 14:13, 18:10, 23:23, 73:2, 80:14, 80:22, 96:22, 96:25, 112:22, 119:8, 143:13, 144:2, 144:11
**pointed** [1] - 130:10
**points** [1] - 142:11
**policy** [1] - 57:25
**polished** [2] - 70:6, 93:19
**poll** [4] - 143:8, 143:12, 147:3,

150:14
**popularity** [1] - 58:20
**portion** [4] - 47:22, 59:7, 59:11, 61:20
**position** [3] - 60:10, 107:24, 145:14
**positively** [1] - 100:2
**possesses** [1] - 72:4
**possibilities** [1] - 49:12
**possible** [5] - 64:9, 87:17, 111:6, 111:7, 111:8
**pound** [1] - 110:23
**power** [2] - 56:13, 56:19
**PowerPoints** [1] - 103:12
**practical** [1] - 132:10
**practice** [2] - 134:4, 146:11
**practices** [1] - 61:10
**practicing** [2] - 133:21, 134:3
**praise** [1] - 52:9
**preamble** [3] - 35:18, 133:25
**precise** [1] - 47:25
**precision** [1] - 54:13
**predictable** [2] - 48:8, 48:22
**preferred** [1] - 55:10
**prejudice** [2] - 19:23, 34:1
**prejudices** [1] - 28:11
**prepare** [1] - 155:21
**prepared** [3] - 12:24, 66:1, 94:21
**preponderance** [10] - 29:21, 30:4, 39:8, 39:16, 41:16, 54:14, 148:6, 149:18, 150:23, 154:11
**presence** [15] - 7:5, 17:25, 26:25, 31:11, 38:16, 49:2, 52:21, 66:11, 66:16, 129:3, 129:13, 144:1, 144:24, 146:23, 147:7
**present** [5] - 27:8, 27:10, 41:18, 49:8, 136:1
**PRESENT** [1] - 5:8
**presentation** [3] - 104:19, 105:15, 136:1
**presentations** [2] - 71:13, 103:4
**presented** [8] - 30:6,

**UNITED STATES DISTRICT COURT**

43:14, 56:23, 57:14, 64:12, 64:23, 68:1, 111:10

**preservation** [1] - 21:12

**preserve** [3] - 20:25, 21:17, 58:4

**preserving** [1] - 21:1

**preside** [1] - 62:1

**presiding** [4] - 61:25, 62:1, 65:10, 66:3

**press** [1] - 63:12

**pressure** [1] - 48:20

**presumed** [4] - 43:9, 43:10, 50:20, 84:11

**presumption** [1] - 43:12

**pretty** [2] - 80:12, 80:16

**prevent** [1] - 38:7

**preview** [1] - 89:7

**previewed** [1] - 90:7

**previous** [2] - 26:11, 26:14

**previously** [6] - 8:5, 8:14, 28:24, 35:15, 41:12, 41:21

**price** [2] - 59:8, 126:22

**prickly** [1] - 100:16

**primary** [1] - 74:6

**principle** [2] - 116:7, 136:3

**print** [1] - 25:2

**printout** [1] - 9:13

**priority** [4] - 43:16, 44:9, 44:24, 86:12

**Pro** [1] - 2:16

**probabilities** [1] - 49:11

**probable** [1] - 30:2

**probative** [1] - 59:5

**problem** [16] - 46:13, 46:19, 47:3, 47:6, 47:14, 48:21, 50:8, 85:4, 85:17, 85:18, 101:4, 108:23, 116:14, 120:17, 121:22, 121:23

**problematic** [1] - 127:1

**problems** [3] - 50:25, 51:11, 51:12

**proceed** [6] - 7:13, 90:17, 129:18, 139:23, 148:23, 152:14

**proceedings** [3] - 28:1, 65:3, 157:10

**PROCEEDINGS** [1] -

1:14

**Proceedings** [1] - 156:7

**process** [11] - 59:13, 60:13, 64:15, 64:20, 65:5, 91:22, 92:22, 101:1, 105:12, 111:19, 122:14

**processes** [1] - 110:14

**produced** [4] - 59:2, 79:13, 104:2, 130:22

**product** [32] - 16:3, 22:24, 23:14, 23:19, 35:22, 35:23, 38:13, 39:12, 40:12, 40:23, 41:18, 41:19, 43:3, 43:4, 51:23, 57:7, 57:24, 58:18, 60:8, 60:12, 61:5, 61:8, 61:15, 61:17, 61:20, 80:21, 104:12, 106:2, 106:3, 106:14

**products** [42] - 16:12, 17:23, 29:3, 29:7, 38:11, 38:15, 39:25, 41:8, 41:10, 41:13, 41:23, 42:24, 42:25, 43:5, 57:7, 58:11, 60:17, 61:2, 61:7, 68:13, 71:5, 72:23, 72:25, 73:19, 73:21, 76:18, 77:22, 78:2, 78:6, 78:16, 82:7, 93:1, 95:23, 98:7, 100:22, 103:7, 103:13, 103:14, 107:10, 118:1, 126:12, 131:8

**profession** [4] - 92:3, 92:20, 94:1, 141:9

**professional** [1] - 93:19

**professor** [1] - 92:5

**profit** [6] - 59:7, 59:11, 60:1, 138:19, 139:4, 139:11

**profitability** [1] - 58:18

**profits** [9] - 38:18, 55:16, 55:18, 127:17, 127:24, 128:2, 128:3, 128:5, 128:11

**program** [1] - 58:1

**programs** [1] - 64:2

**progressive** [1] - 122:11

**promised** [3] - 69:12, 69:16, 91:1

**promises** [1] - 69:11

**promoter** [1] - 58:9

**promoting** [2] - 58:11, 133:19

**prompted** [2] - 50:2, 53:11

**pronounce** [1] - 95:2

**proof** [12] - 29:20, 30:3, 30:21, 30:24, 33:16, 39:21, 40:12, 44:1, 84:24, 87:4, 110:1

**proper** [4] - 41:10, 72:24, 85:24, 109:12

**properly** [2] - 21:24, 43:11

**properties** [1] - 18:2

**property** [4] - 36:14, 58:22, 84:10

**propose** [1] - 145:20

**proposed** [4] - 22:1, 88:5, 96:1, 120:3

**proposes** [1] - 8:4

**proposing** [1] - 113:1

**proposition** [1] - 59:23

**protect** [2] - 64:10, 144:14

**protected** [1] - 84:10

**prove** [20] - 28:22, 39:7, 39:8, 39:16, 42:15, 43:24, 44:10, 46:7, 50:10, 54:12, 54:14, 57:18, 94:3, 102:6, 148:5, 148:24, 149:18, 150:22, 152:15, 154:11

**proved** [4] - 31:13, 41:15, 43:1, 53:6

**proven** [4] - 43:8, 49:19, 52:19, 110:4

**proves** [2] - 42:11, 43:14

**provide** [2] - 28:21, 31:10

**provided** [6] - 17:24, 36:1, 36:13, 38:16, 52:1, 52:3

**provides** [2] - 36:15, 56:7

**providing** [2] - 57:17, 118:13

**proving** [2] - 29:24, 79:2

**prudent** [3] - 57:4, 59:22, 60:3

**public** [1] - 44:8

**publication** [1] - 43:19

**publicly** [1] - 43:20

**publish** [1] - 147:17

**published** [3] - 8:12, 8:19, 44:8

**puffed** [1] - 112:17

**pull** [5] - 26:22, 83:23, 130:1, 130:12, 141:7

**pulled** [3] - 104:5, 104:9, 104:12

**punish** [1] - 54:9

**purple** [3] - 105:17, 105:24, 106:25

**purpose** [6] - 30:15, 30:17, 30:18, 32:14, 46:17, 87:18

**purposes** [2] - 8:23, 42:4

**pursuant** [1] - 157:8

**pursuing** [1] - 144:15

**pursuit** [1] - 94:5

**put** [27] - 22:15, 25:1, 39:17, 39:18, 45:9, 74:13, 75:8, 75:11, 87:7, 87:19, 87:20, 88:18, 92:21, 100:8, 104:19, 104:20, 114:20, 121:14, 123:7, 125:8, 128:11, 132:5, 132:12, 132:14, 132:23, 140:15

**puts** [3] - 102:11, 112:23, 114:23

**putting** [2] - 89:19, 125:17

**PX-1009** [1] - 8:14

**Q**

**qualified** [1] - 59:16

**qualifies** [2] - 46:21, 84:22

**qualify** [1] - 43:20

**quantify** [1] - 135:14

**QUESTION** [7] - 78:1, 148:5, 148:24, 149:17, 150:22, 152:15, 154:10

**questions** [10] - 27:18, 32:4, 67:20, 80:16, 96:18, 96:20, 96:21, 143:7, 148:3, 150:20

**quickly** [5] - 84:2, 84:3, 97:11, 126:1, 131:24

**R**

**R&D** [2] - 126:13, 128:10

**race** [1] - 34:9

**rained** [1] - 31:8

**raise** [12] - 16:22, 151:7, 151:12, 151:18, 152:2, 152:8, 152:23, 153:4, 153:10, 153:19, 153:25, 154:17

**raised** [1] - 16:21

**ran** [1] - 154:23

**rapidity** [1] - 51:14

**rapidly** [1] - 102:24

**rate** [2] - 56:12, 56:15

**rates** [1] - 57:19

**rather** [4] - 130:4, 132:4, 132:15, 150:17

**RAUTH** [2] - 4:4, 4:12

**re** [44] - 69:16, 69:24, 70:16, 71:22, 76:9, 79:21, 81:24, 89:9, 95:8, 95:16, 98:24, 99:7, 102:11, 103:8, 103:24, 104:4, 105:16, 106:12, 108:16, 109:2, 113:21, 114:3, 114:21, 115:11, 115:13, 115:22, 116:4, 117:8, 117:19, 119:11, 119:22, 121:6, 122:8, 124:13, 124:21, 125:13, 131:3, 131:5, 137:14, 140:11, 140:13, 140:23, 141:18, 142:2

**Re** [3] - 89:9, 95:10, 105:2

**re's** [4] - 78:15, 79:11, 121:24, 135:13

**reach** [9] - 14:17, 59:21, 62:4, 62:11, 62:19, 68:21, 69:3, 121:25, 155:1

**reached** [5] - 8:11, 65:23, 66:2, 146:25, 150:3

**reaches** [1] - 143:8

**reaching** [4] - 31:16, 41:4, 50:19, 142:11

**read** [22] - 14:16, 20:23, 21:3, 27:5, 27:6, 28:14, 28:15, 36:11, 41:23, 63:17, 64:7, 73:16, 78:25, 79:6, 88:16, 98:8, 114:9, 126:7, 130:13, 134:10,

145:4, 150:16
**reader** [1] - 126:9
**reading** [2] - 23:22, 145:3
**Reading** [16] - 27:21, 28:2, 83:14, 147:20, 150:1, 150:18, 151:10, 151:16, 151:22, 152:6, 152:12, 153:2, 153:8, 153:14, 153:23, 154:4
**reads** [1] - 145:5
**ready** [3] - 7:13, 66:6, 129:11
**real** [9] - 103:2, 106:24, 120:8, 121:8, 121:14, 121:15, 122:22, 123:7, 123:20
**real-world** [1] - 121:15
**realized** [1] - 59:11
**really** [11] - 95:11, 97:10, 100:14, 101:10, 105:15, 114:25, 123:21, 123:23, 124:16, 124:23, 125:9
**REALTIME** [1] - 157:5
**reason** [13] - 31:15, 50:1, 50:5, 50:11, 53:10, 69:5, 70:7, 72:20, 87:9, 107:5, 107:11, 109:10, 109:24
**reasonable** [15] - 50:14, 54:4, 54:20, 55:2, 55:13, 56:1, 57:11, 60:1, 135:3, 135:17, 138:18, 138:24, 139:13, 149:20, 154:12
**reasonableness** [1] - 34:4
**reasonably** [6] - 46:18, 47:5, 47:11, 50:22, 59:20, 85:17
**reasons** [3] - 13:6, 13:8, 110:11
**rebuttal** [8] - 6:6, 6:7, 25:18, 25:19, 26:4, 27:11, 27:12, 27:14
**REBUTTAL** [2] - 129:20, 140:2
**rebuttals** [1] - 128:24
**received** [13] - 7:19, 8:23, 9:1, 9:4, 30:10, 31:17, 32:14, 32:19, 32:21, 33:2, 33:4, 57:16, 62:21

**recess** [4] - 24:12, 25:10, 66:9, 128:23
**Recess** [5] - 24:13, 25:11, 66:15, 129:10, 146:22
**recipe** [3] - 97:5, 97:7, 113:13
**recipes** [3] - 69:19, 76:11, 76:13
**recommending** [1] - 89:19
**record** [19] - 7:10, 8:6, 9:9, 12:3, 12:16, 13:2, 21:2, 21:12, 21:18, 22:6, 22:15, 22:21, 33:8, 92:19, 94:9, 99:13, 143:1, 144:2, 149:25
**Recording** [1] - 6:20
**recording** [21] - 42:1, 68:11, 76:19, 82:6, 82:7, 85:8, 85:12, 85:21, 96:1, 113:11, 115:9, 116:20, 117:9, 120:13, 126:10, 126:11, 131:4, 134:1, 134:8, 135:23, 137:10
**red** [1] - 104:20
**reduce** [6] - 74:20, 75:15, 75:22, 89:22, 114:21
**reducing** [2] - 85:20, 140:11
**reduction** [2] - 120:5, 120:7
**refer** [1] - 103:3
**reference** [15] - 43:22, 44:3, 46:12, 46:15, 46:18, 46:21, 47:3, 47:5, 47:10, 48:24, 49:2, 63:23, 84:22, 140:24, 141:8
**references** [10] - 44:7, 44:11, 44:12, 84:19, 89:3, 120:14, 123:3, 123:4, 123:5, 141:5
**referred** [4] - 136:16, 136:18, 141:16, 142:1
**referring** [5] - 11:11, 11:13, 12:6, 84:2, 114:2
**refers** [5] - 40:19, 41:3, 101:7, 113:9, 136:14
**reflect** [3] - 57:5, 60:11, 103:13
**reflective** [1] - 126:6
**reflects** [1] - 150:5

**regard** [1] - 21:17
**regarded** [1] - 112:9
**regarding** [4] - 21:18, 28:17, 36:7, 41:22
**regardless** [7] - 30:6, 43:21, 44:1, 47:2, 50:15, 148:22, 152:13
**regression** [6] - 70:1, 72:9, 89:12, 135:9, 145:8, 145:18
**regulations** [1] - 157:12
**reject** [1] - 85:24
**REJECTED** [1] - 6:18
**related** [3] - 85:11, 108:17, 138:12
**relates** [2] - 22:19, 96:14
**relation** [1] - 61:18
**relationship** [2] - 58:5, 61:10
**relative** [1] - 72:3
**relevance** [2] - 23:8, 47:23
**relevant** [5] - 47:16, 50:3, 50:22, 52:13, 137:22
**reliable** [1] - 60:21
**relied** [4] - 45:16, 69:24, 69:25, 84:19
**religious** [1] - 34:10
**rely** [9] - 10:1, 10:2, 10:5, 10:9, 23:5, 23:9, 49:6, 49:22, 84:5
**relying** [1] - 68:2
**remain** [1] - 11:6
**remaining** [1] - 25:18
**remarks** [1] - 111:17
**remember** [16] - 32:1, 34:18, 34:20, 64:24, 65:19, 66:9, 74:18, 79:19, 82:6, 86:20, 88:10, 107:20, 112:23, 113:20, 125:2, 134:11
**remind** [1] - 62:22
**remote** [2] - 46:24, 54:16
**remove** [1] - 8:20
**removed** [1] - 137:21
**removing** [1] - 15:5
**renders** [3] - 14:3, 14:11, 123:8
**rep** [2] - 71:1, 71:17
**repeat** [2] - 11:19, 18:20
**repeated** [1] - 100:17
**repeatedly** [4] - 20:2,

71:24, 72:13, 112:2
**repetitive** [2] - 10:21, 11:6
**report** [2] - 63:16, 64:9
**reported** [1] - 157:10
**REPORTER** [3] - 1:24, 157:1, 157:6
**Reporter** [1] - 157:20
**REPORTER'S** [1] - 1:14
**reports** [1] - 63:20
**representative** [13] - 5:9, 41:23, 42:8, 42:12, 42:16, 42:24, 43:2, 43:3, 43:5, 76:18, 106:2, 106:3, 106:14
**represented** [1] - 68:11
**reputations** [1] - 142:15
**requests** [1] - 145:6
**require** [7] - 13:20, 14:4, 40:11, 65:4, 80:25, 97:15, 101:5
**required** [4] - 14:21, 27:5, 54:12, 97:22
**requirement** [4] - 79:17, 80:4, 98:8, 107:16
**requirements** [8] - 35:14, 39:13, 40:1, 40:2, 40:24, 41:2, 41:3, 98:20
**requires** [4] - 57:9, 76:19, 80:21, 81:1
**reread** [1] - 150:15
**research** [7] - 63:21, 64:4, 64:15, 103:3, 103:12, 128:15, 141:9
**researchers** [2] - 95:2, 119:22
**resolve** [1] - 121:23
**respect** [14] - 27:9, 27:10, 27:12, 27:14, 57:23, 78:24, 79:2, 91:18, 93:23, 131:1, 131:10, 132:1, 133:4, 155:17
**respects** [1] - 112:17
**respond** [2] - 63:15, 146:1
**responded** [4] - 90:13, 143:21, 147:12, 150:13
**responding** [1] - 146:2
**response** [14] - 80:8, 145:12, 145:21,

151:9, 151:15, 151:22, 152:6, 152:12, 153:2, 153:8, 153:14, 153:22, 154:4, 154:21
**responsible** [4] - 29:16, 94:13, 94:24, 133:7
**rest** [4] - 35:6, 78:24, 123:24, 144:16
**restricted** [1] - 57:22
**restrictions** [1] - 65:2
**result** [9] - 49:9, 49:13, 49:16, 49:17, 55:5, 55:6, 65:4, 67:15, 119:4
**resulted** [2] - 55:8, 55:15
**resulting** [1] - 89:13
**results** [4] - 48:8, 48:13, 52:6, 58:24
**retired** [2] - 92:12, 100:12
**return** [3] - 66:6, 148:3, 150:20
**reunion** [1] - 91:12
**revealed** [1] - 70:13
**revenue** [1] - 127:16
**reversal** [3] - 121:20, 122:11, 122:13
**reverse** [1] - 117:3
**reversed** [1] - 13:20
**reverses** [1] - 122:4
**review** [1] - 150:4
**reviewing** [1] - 48:5
**revised** [2] - 25:2
**revolution** [1] - 118:23
**revolutionized** [1] - 113:5
**REZA** [1] - 3:8
**RICHARD** [1] - 5:4
**Richter** [8] - 6:19, 86:17, 86:18, 87:8, 119:18, 120:9, 120:12
**Rick** [2] - 7:15, 9:7
**rick.frenkel@lw.com** [1] - 5:6
**rights** [2] - 84:10
**rise** [6] - 24:11, 25:9, 66:10, 129:2, 143:25, 155:20
**risks** [1] - 59:14
**rmirzaie@raklaw. com** [1] - 3:11
**roadmap** [2] - 45:8, 53:3
**ROBERT** [1] - 2:12
**rock** [1] - 70:14

UNITED STATES DISTRICT COURT

| | | | | |
|---|---|---|---|---|
| **role** [3] - 55:5, 135:18, 135:23 | **sat** [1] - 136:14 | 117:24, 118:19, 118:21, 120:2, 124:10, 124:24, 125:6, 126:4, 128:7, 146:11 | 109:18, 109:22 | **shows** [14] - 87:3, 89:4, 89:18, 89:21, 89:24, 90:25, 108:10, 111:4, 124:4, 132:4, 136:21, 141:8 |
| **ROOM** [1] - 1:24 | **satisfy** [1] - 19:17 | | **Shen** [3] - 95:4, 96:1, 120:2 | |
| **room** [1] - 63:7 | **save** [2] - 25:18, 125:25 | | **shieldable** [1] - 13:23 | |
| **rotate** [2] - 75:18, 118:11 | **saw** [21] - 9:9, 12:14, 12:18, 30:23, 74:11, 75:7, 75:9, 75:25, 80:12, 80:13, 87:14, 87:16, 93:18, 94:18, 94:20, 98:1, 106:9, 110:21, 119:6, 119:21, 155:5 | **seeks** [1] - 28:25 | **shields** [1] - 126:9 | **sic** [8] - 34:11, 37:12, 37:14, 42:3, 45:4, 51:4, 57:17, 58:25 |
| **rotation** [2] - 71:18 | | **segregate** [1] - 126:3 | **shift** [1] - 122:12 | |
| **roughly** [2] - 126:18, 128:10 | | **segregation** [3] - 75:14, 137:13, 137:16 | **Shimatsu** [1] - 95:3 | **side** [9] - 25:20, 27:7, 27:11, 28:22, 32:23, 39:22, 68:5, 111:18, 116:3 |
| **royalties** [3] - 57:16, 60:23, 61:7 | | **selecting** [2] - 45:8, 53:3 | **shingled** [1] - 126:10 | |
| **royalty** [22] - 54:4, 54:17, 54:20, 55:8, 55:13, 55:14, 55:20, 56:1, 56:12, 56:15, 56:20, 57:1, 57:5, 57:12, 57:18, 60:1, 60:10, 61:1, 135:3, 139:13, 149:20, 154:12 | **say-so** [2] - 84:12, 137:7 | **sell** [3] - 54:19, 59:24, 104:14 | **shipping** [1] - 127:17 | **side's** [1] - 28:20 |
| | **sbali@stradlinglaw. com** [1] - 4:7 | **selling** [3] - 29:2, 58:10, 59:7 | **shocking** [2] - 75:2, 75:16 | **sides** [4] - 39:20, 91:14, 111:20, 142:19 |
| | **scale** [2] - 39:20, 39:22 | **SELNA** [1] - 1:3 | **short** [4] - 90:23, 129:1, 131:7, 131:8 | **sidewalk** [2] - 31:7, 31:12 |
| | **Schmoller** [5] - 5:10, 140:10, 140:17, 141:4, 141:11 | **send** [3] - 65:9, 65:16, 146:13 | **short-term** [2] - 131:7, 131:8 | **sign** [1] - 66:4 |
| **Ruhl** [1] - 147:14 | **Schrefl** [1] - 94:25 | **sending** [1] - 145:20 | **shorter** [1] - 143:15 | **signal** [1] - 126:7 |
| **Ruigrok** [1] - 95:1 | **science** [1] - 91:6 | **senior** [1] - 100:10 | **show** [28] - 49:15, 52:11, 69:16, 71:4, 84:16, 84:17, 86:15, 97:23, 102:13, 102:17, 102:18, 106:7, 108:6, 108:13, 111:4, 114:4, 128:8, 132:21, 132:22, 136:21, 137:24, 138:1, 140:5, 140:11, 141:7, 147:5, 150:16 | **signed** [5] - 65:10, 65:13, 72:6, 111:17, 150:9 |
| **rule** [1] - 40:16 | **scientist** [1] - 92:4 | **sense** [10] - 31:15, 50:9, 50:25, 67:17, 67:21, 85:14, 105:8, 108:25, 111:11, 124:1 | | |
| **Rules** [3] - 32:7, 32:20, 32:24 | **scientists** [3] - 93:5, 95:8, 111:9 | | | **significant** [1] - 59:14 |
| **rules** [6] - 43:6, 64:10, 64:25, 65:1, 67:24, 68:1 | **scope** [5] - 29:18, 45:15, 47:1, 48:23, 57:21 | **sent** [5] - 27:25, 111:16, 112:18, 145:2, 146:24 | | **significantly** [1] - 73:7 |
| | | | | **similar** [6] - 58:23, 113:2, 113:6, 113:10, 118:7, 124:13 |
| **ruling** [1] - 32:9 | **scorecard** [2] - 143:6, 143:11 | **sentence** [9] - 10:6, 11:19, 11:23, 20:10, 20:15, 21:3, 24:18, 24:23, 24:24 | | |
| **rulings** [1] - 23:13 | **Scott** [4] - 3:19, 4:9, 4:21, 5:5 | | **showed** [50] - 69:18, 69:22, 71:12, 72:9, 74:9, 74:10, 75:17, 75:20, 76:11, 76:13, 76:14, 76:17, 76:23, 76:25, 77:4, 79:15, 81:18, 81:24, 82:5, 82:9, 82:12, 82:13, 83:2, 83:7, 89:2, 89:8, 89:9, 89:11, 104:6, 104:13, 109:14, 110:9, 115:6, 123:3, 124:3, 125:12, 128:8, 128:9, 130:21, 131:3, 132:3, 132:9, 135:8, 135:9, 137:17, 139:13, 140:21, 145:17 | **Similarly** [1] - 20:12 |
| **running** [2] - 19:18, 100:11 | **screen** [2] - 121:3, 122:9 | **separate** [3] - 46:3, 46:25, 60:19 | | **similarly** [2] - 38:25, 73:24 |
| **runs** [1] - 92:5 | **scripted** [1] - 70:6 | **separately** [5] - 13:17, 40:14, 40:23, 43:2, 46:5 | | **simple** [1] - 97:11 |
| **Russ** [1] - 5:9 | **Seagate** [5] - 93:6, 95:10, 95:14, 119:22, 120:9 | | | **simply** [9] - 27:5, 55:9, 62:17, 62:19, 101:6, 102:15, 122:21, 154:24, 155:11 |
| **RUSS** [7] - 2:4, 2:8, 2:12, 2:16, 2:20, 3:4, 3:8 | **search** [1] - 64:2 | **separating** [1] - 60:13 | | **single** [20] - 22:4, 22:5, 70:17, 70:20, 74:12, 76:15, 97:1, 99:9, 99:15, 99:19, 100:1, 100:2, 100:19, 101:4, 101:13, 107:7, 107:10, 123:2 |
| | **searching** [1] - 63:22 | **serve** [2] - 42:4, 62:2 | | |
| | **seated** [4] - 27:1, 66:17, 129:14, 147:8 | **service** [1] - 63:14 | | |
| | | **servo** [1] - 125:20 | | |
| **S** | **second** [16] - 9:12, 9:14, 11:5, 11:14, 17:21, 18:3, 22:24, 24:23, 77:5, 80:20, 81:15, 88:25, 90:22, 110:6, 110:13, 143:13 | **session** [5] - 27:2, 32:17, 66:18, 129:15, 147:9 | | |
| **SAC-V22-1599** [1] - 7:7 | | **set** [5] - 27:18, 41:14, 92:19, 94:9, 143:13 | **showing** [12] - 13:22, 14:23, 69:19, 71:13, 75:21, 76:5, 82:23, 89:12, 89:21, 105:19, 135:13, 136:7 | **single-phase** [1] - 74:12 |
| **salable** [10] - 22:7, 23:18, 61:12, 61:14, 61:16, 127:2, 127:4, 127:7, 133:21, 134:3 | | **settling** [1] - 22:3 | | **singular** [1] - 98:9 |
| | | **seven** [1] - 155:25 | | **sit** [2] - 93:24, 142:10 |
| **Salayphonh** [1] - 127:8 | **Section** [1] - 157:8 | **several** [3] - 53:5, 55:20, 80:9 | **shown** [12] - 44:25, 52:9, 72:5, 73:5, 79:25, 88:23, 93:23, 102:17, 122:14, 122:20, 132:18, 136:20 | **sitting** [1] - 138:20 |
| **sale** [2] - 29:3, 39:11 | **see** [32] - 11:24, 11:25, 12:2, 16:8, 17:15, 31:7, 33:21, 34:19, 66:23, 87:6, 89:18, 89:23, 94:18, 94:22, 94:23, 97:23, 101:25, 108:19, 110:22, 112:21, 113:9, 116:23, | **sexual** [2] - 34:10, 34:11 | | **situation** [3] - 108:5, 108:7, 109:22 |
| **sales** [5] - 58:11, 58:13, 58:15, 127:17, 139:1 | | **shaded** [1] - 70:11 | | **six** [1] - 143:14 |
| **Salil** [1] - 7:17 | | **shall** [3] - 62:4, 135:2 | | **size** [1] - 60:9 |
| **SALIL** [1] - 4:5 | | **shanle@ stradlinglaw.com** [1] - 4:15 | | **skill** [24] - 44:19, 44:21, 45:3, 45:10, 45:21, 46:17, 47:18, 48:4, 48:9, 50:3, 50:7, 50:17, 50:20, |
| **SANTA** [3] - 1:18, 1:25, 7:1 | | | | |
| **Sarah** [2] - 7:16, 21:14 | | **shape** [1] - 125:6 | | |
| **SARAH** [1] - 4:16 | | **Sharrock's** [2] - | | |
| **sarah.wang@lw. com** [1] - 4:19 | | | | |

50:23, 51:2, 51:5, 53:11, 86:9, 86:10, 86:13, 86:25, 87:25, 133:1
**skip** [1] - 122:24
**slabs** [4] - 115:13, 115:23, 116:4, 140:14
**slide** [12] - 76:2, 76:4, 88:15, 94:20, 114:18, 124:17, 134:9, 135:19, 136:1, 138:10, 141:7, 141:17
**Slide** [15] - 77:24, 134:18, 134:25, 135:5, 135:11, 136:7, 136:22, 137:17, 137:25, 138:6, 138:15, 140:10, 140:17, 141:4, 141:11
**slides** [2] - 12:24, 104:18
**slight** [1] - 95:16
**slightly** [1] - 39:23
**slope** [1] - 115:19
**small** [1] - 112:21
**smaller** [1] - 107:21
**smallest** [10] - 22:7, 23:18, 61:9, 61:11, 61:14, 61:16, 127:2, 127:4, 133:21, 134:3
**smooth** [1] - 80:12
**Snapchat** [1] - 63:9
**so-called** [1] - 120:3
**social** [1] - 63:10
**socialized** [1] - 91:17
**Society** [1] - 95:24
**soft** [35] - 102:19, 108:18, 108:20, 109:2, 113:23, 114:5, 115:2, 116:24, 117:1, 117:12, 117:13, 117:19, 118:3, 118:7, 118:11, 118:17, 118:19, 119:9, 119:12, 120:4, 120:5, 120:16, 121:21, 126:5, 131:12, 132:9, 136:16, 140:8, 141:6, 141:16, 141:23, 142:1, 142:3, 142:4, 142:5
**softer** [4] - 116:21, 117:2, 121:10, 141:21

**software** [1] - 74:23
**sold** [8] - 39:10, 57:24, 61:9, 61:12, 61:23, 104:14, 127:9
**solely** [2] - 28:12, 32:18
**solid** [1] - 70:14
**solution** [3] - 51:25, 52:3, 137:6
**solutions** [3] - 48:22, 51:12, 137:5
**solve** [3] - 46:19, 48:21, 50:25
**solves** [1] - 46:13
**solving** [1] - 85:18
**someone** [5] - 44:4, 86:13, 87:7, 87:25, 95:1
**sometimes** [4] - 32:13, 33:7, 34:14, 34:16
**somewhat** [1] - 9:21
**somewhere** [1] - 96:9
**soon** [2] - 64:9, 146:20
**sophistication** [1] - 51:13
**sorry** [8] - 8:17, 12:9, 19:6, 20:19, 20:22, 26:12, 99:11, 140:18
**sort** [5] - 20:3, 91:12, 100:17, 107:20, 108:14
**sorts** [1] - 101:24
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 157:20
**SPAAN** [3] - 1:23, 157:5, 157:19
**space** [1] - 124:6
**spades** [1] - 96:4
**speaks** [1] - 100:10
**special** [9] - 7:20, 8:2, 22:1, 22:8, 27:17, 27:18, 58:3, 143:5, 147:11
**specialty** [1] - 58:10
**specific** [4] - 41:14, 41:25, 113:12, 114:13
**speculative** [2] - 54:16, 60:22
**spend** [1] - 91:20
**spent** [3] - 73:2, 73:3, 110:2
**split** [1] - 25:16
**spoken** [1] - 91:17
**spokesman** [1] - 62:2
**spot** [1] - 122:18
**spots** [1] - 112:6
**spread** [1] - 75:13

**spreadsheet** [5] - 103:21, 103:22, 104:9, 105:1, 105:4
**spreadsheets** [2] - 102:11, 106:6
**spring** [20] - 13:21, 13:25, 14:2, 14:6, 14:20, 76:4, 83:21, 95:22, 96:3, 113:2, 114:12, 116:16, 116:18, 116:20, 116:21, 116:23, 117:2, 117:9, 118:3, 141:21
**Spring** [1] - 116:17
**spring'** [1] - 136:3
**square** [7] - 79:21, 79:22, 133:16, 135:24, 137:22, 138:7
**Srinivasan** [2] - 71:10, 135:19
**SSPPU** [6] - 21:18, 22:19, 23:7, 23:11, 134:16, 134:22
**stability** [15] - 74:17, 74:20, 74:24, 75:1, 75:20, 75:22, 83:17, 85:20, 85:23, 86:3, 86:4, 89:22, 118:21, 136:10
**stable** [3] - 99:25, 101:18
**stack** [15] - 38:23, 81:8, 99:20, 101:16, 105:18, 105:25, 106:2, 106:4, 106:12, 106:17, 106:21, 107:3, 131:22, 131:23, 135:21
**stage** [1] - 126:10
**stake** [1] - 142:14
**stand** [6] - 67:11, 77:9, 80:16, 85:22, 96:15, 110:5
**standard** [6] - 11:2, 30:3, 84:24, 86:5, 108:24, 110:15
**stands** [1] - 65:21
**stapled** [4] - 26:10, 26:13, 26:21, 26:22
**stark** [1] - 70:22
**start** [11] - 7:25, 28:19, 54:5, 65:5, 91:9, 96:24, 96:25, 123:13, 124:24, 134:13, 134:25
**started** [5] - 91:1, 95:5, 111:13,

129:24, 142:7
**starting** [1] - 108:14
**starts** [3] - 11:17, 11:18, 134:15
**state** [3] - 7:9, 84:4, 142:25
**STATE** [1] - 157:4
**statement** [13] - 10:5, 11:18, 18:4, 69:12, 73:8, 79:20, 119:20, 130:14, 130:17, 131:20, 131:21, 132:21, 132:22
**statements** [10] - 31:21, 31:23, 69:11, 71:25, 94:1, 100:20, 101:24, 119:20, 123:13, 130:21
**STATES** [1] - 1:1
**States** [7] - 39:11, 39:12, 43:11, 147:21, 157:6, 157:8, 157:13
**statute** [2] - 135:1
**stay** [2] - 11:17, 144:17
**stayed** [1] - 92:7
**staying** [1] - 144:19
**stenographically** [1] - 157:10
**step** [2] - 69:20, 84:21
**steps** [1] - 48:3
**Steve** [1] - 7:17
**STEVEN** [1] - 4:12
**still** [4] - 38:23, 40:22, 74:3, 88:19
**stipulation** [1] - 41:22
**stock** [1] - 92:11
**stood** [1] - 100:20
**stop** [1] - 130:25
**storage** [84] - 13:7, 13:10, 13:11, 13:13, 14:7, 16:4, 16:15, 16:25, 17:3, 17:9, 18:23, 19:9, 19:15, 20:17, 21:5, 24:20, 36:22, 36:25, 37:4, 37:6, 37:8, 37:15, 37:17, 37:23, 37:25, 38:4, 38:24, 44:22, 68:23, 69:1, 73:11, 74:15, 75:13, 76:22, 77:6, 77:12, 77:13, 77:23, 80:22, 80:25, 81:1, 81:3, 81:20, 81:21, 82:1, 84:1, 87:15, 87:17, 87:19, 88:18, 89:20, 97:16, 97:22, 98:9, 98:14, 98:22, 98:23, 99:8,

99:12, 99:16, 100:1, 101:4, 101:17, 101:18, 101:20, 104:11, 107:7, 113:14, 114:24, 116:21, 121:8, 121:10, 125:5, 129:25, 130:4, 132:6, 132:13, 132:15, 132:23, 136:19, 140:8, 141:2, 141:21
**store** [28] - 15:18, 16:10, 16:11, 16:18, 17:6, 19:11, 73:10, 80:21, 80:23, 81:9, 81:16, 81:17, 99:16, 99:19, 99:20, 99:22, 100:2, 101:11, 101:13, 101:18, 101:21, 107:8, 129:25, 130:4, 130:5
**stores** [10] - 13:7, 17:3, 19:16, 20:13, 38:1, 39:2, 74:2, 76:23, 97:22, 98:16
**story** [7] - 70:6, 70:19, 72:16, 96:14, 106:5, 111:18, 111:21
**STRADLING** [2] - 4:4, 4:12
**straight** [5] - 70:20, 72:16, 92:19, 94:9, 114:9
**straightforward** [1] - 97:14
**strange** [3] - 91:11, 94:7, 94:10
**STREET** [1] - 1:24
**stretch** [1] - 93:19
**stricken** [3] - 9:23, 32:11, 33:8
**strike** [3] - 10:8, 20:7, 23:7
**stripped** [1] - 134:7
**strive** [1] - 62:4
**strong** [1] - 119:19
**stronger** [1] - 126:7
**strongest** [1] - 75:5
**structure** [22] - 14:3, 36:20, 37:21, 42:9, 74:10, 76:21, 81:2, 87:19, 88:17, 108:18, 108:19, 108:22, 109:1, 109:12, 109:13, 113:23, 119:1, 119:6, 121:25, 140:21, 140:22, 140:24

**UNITED STATES DISTRICT COURT**

structure' [1] - 36:20
structures [4] - 73:9, 85:7, 114:6, 121:1
subject [2] - 48:1, 91:22
submission [1] - 95:20
submit [13] - 18:17, 70:13, 70:22, 72:17, 74:8, 87:11, 92:18, 94:8, 99:5, 112:4, 112:12, 118:5, 127:25
submits [1] - 95:24
substantially [1] - 42:9
substitute [6] - 25:3, 25:13, 26:16, 26:18, 26:20, 56:4
substitutes [3] - 56:3, 56:10, 56:15
substrate [3] - 13:14, 76:20, 77:13
substrates [1] - 115:2
success [3] - 50:14, 51:23, 58:19
successful [1] - 92:13
successfully [1] - 48:16
suddenly [1] - 114:1
Suess [55] - 5:9, 67:7, 68:10, 69:12, 70:15, 74:10, 74:13, 74:21, 76:1, 76:5, 83:11, 83:22, 85:18, 91:4, 91:17, 94:12, 94:21, 95:6, 95:12, 95:18, 95:20, 95:23, 95:24, 96:7, 98:21, 108:8, 109:2, 111:15, 112:1, 112:16, 112:17, 113:1, 113:8, 114:1, 114:8, 114:9, 116:10, 116:12, 117:17, 118:18, 119:4, 119:7, 121:18, 121:23, 123:22, 124:10, 125:14, 126:18, 127:22, 128:14, 131:6, 131:16, 133:10, 135:17, 137:13
suess [1] - 131:17
Suess's [14] - 68:25, 83:19, 89:25, 103:4, 116:17, 118:23, 124:20, 125:16, 133:11, 133:14, 133:17, 136:6,

137:8, 137:15
sufficient [3] - 49:14, 49:15, 130:14
sufficiently [1] - 38:6
suggest [3] - 93:8, 124:11, 131:20
suggested [3] - 76:12, 92:16, 142:2
suggesting [2] - 15:17, 53:20
suggestion [4] - 92:1, 105:22, 132:14, 132:24
suit [2] - 57:17, 57:20
Suite [6] - 2:17, 3:5, 3:13, 4:6, 4:13, 4:17
sum [2] - 149:17, 154:10
summarize [1] - 90:25
summary [3] - 19:7, 28:20, 136:2
superior [1] - 52:6
superparamagnetic [6] - 74:18, 75:24, 76:2, 76:3, 94:22, 116:13
supply [1] - 48:25
supporting [1] - 139:12
supports [1] - 139:18
supposedly [2] - 80:9, 83:6
surprise [3] - 52:10, 74:16, 74:17
suspect [1] - 144:19
sustain [2] - 33:2, 33:4
SW [1] - 2:17
swallow [1] - 94:6
swear [1] - 142:23
switch [6] - 71:2, 71:3, 73:12, 105:6, 116:1, 121:21
switches [2] - 13:8, 122:4
switching [18] - 18:9, 19:11, 19:16, 20:21, 37:23, 38:22, 71:14, 71:15, 74:1, 77:8, 117:20, 117:22, 117:23, 118:14, 118:17, 120:5, 120:7, 140:12
switching' [1] - 21:9
sworn [3] - 30:9, 71:24, 142:24
sympathy [1] - 28:11
synthesize [1] - 67:16
system [7] - 69:8, 100:3, 110:2,

120:25, 134:1, 141:23, 154:24

**T**

table [4] - 138:16, 138:19, 138:20, 138:25
talks [11] - 108:20, 108:21, 113:17, 115:13, 115:14, 115:22, 116:25, 117:2, 118:20, 121:20, 122:2
tangible [1] - 60:21
taught [13] - 87:17, 87:18, 87:23, 88:3, 88:9, 88:10, 88:13, 119:16, 120:6, 121:7, 122:6, 132:6, 132:11
taxes [1] - 101:22
teach [2] - 115:16, 118:7
teaches [4] - 48:14, 88:4, 120:6, 120:7
teaching [5] - 48:1, 87:24, 88:1, 132:7, 132:16
teachings [7] - 45:7, 50:4, 53:2, 119:24, 119:25, 120:10, 120:13
tear [1] - 84:11
Tech [6] - 14:14, 15:15, 15:24, 67:7, 69:9, 72:15
Tech's [2] - 68:10, 70:14
technical [1] - 100:22
technician [2] - 5:10, 5:10
TECHNOLOGIES [2] - 1:4, 1:8
Technologies [36] - 7:7, 7:8, 28:24, 29:3, 39:8, 39:14, 41:15, 42:11, 42:15, 43:1, 53:18, 53:24, 54:2, 54:9, 54:10, 54:12, 54:15, 60:18, 61:2, 127:21, 128:5, 128:13, 147:23, 147:25, 148:5, 148:12, 148:18, 149:5, 149:11, 149:18, 150:22, 151:2, 151:24, 152:21, 153:17, 154:10

technologies [1] - 135:24
technology [11] - 51:13, 56:17, 60:25, 61:21, 68:13, 68:20, 71:1, 93:2, 95:14, 102:23, 111:12
telephone [1] - 144:22
temperature [1] - 109:16
ten [5] - 25:25, 66:7, 66:9, 128:23, 133:11
ten-minute [2] - 66:7, 128:23
tendered [1] - 22:1
tending [3] - 52:11, 57:18, 60:19
tenth [1] - 126:18
terabit [2] - 135:24, 138:7
terabits [2] - 133:16, 137:11
terabyte [1] - 89:13
term [6] - 15:1, 16:24, 58:16, 131:2, 131:7, 131:8
terms [6] - 25:5, 36:12, 57:23, 65:21, 105:15, 137:1
territory [2] - 57:23, 58:7
tesla [1] - 97:18
test [4] - 55:7, 69:19, 70:7, 85:3
tested [2] - 64:14, 64:20
testified [7] - 33:21, 34:25, 35:3, 72:5, 105:3, 106:17, 131:3
testify [8] - 11:1, 33:17, 35:9, 80:9, 91:21, 92:6, 93:18, 96:10
testifying [1] - 33:24
testimony [25] - 30:9, 30:22, 31:17, 32:10, 32:13, 33:13, 33:14, 33:18, 34:3, 34:5, 34:21, 34:23, 35:11, 59:16, 64:14, 69:19, 71:8, 84:25, 89:2, 96:8, 103:10, 104:19, 121:24, 136:15, 145:7
tests [1] - 46:25
text [2] - 63:6, 112:21
thanking [2] - 67:8, 142:8
THE [146] - 7:6, 7:14, 7:19, 7:24, 8:10,

8:16, 8:22, 9:1, 9:5, 9:11, 9:16, 9:18, 10:3, 10:8, 10:13, 10:17, 11:2, 11:7, 11:10, 11:15, 11:20, 12:4, 12:12, 12:18, 12:21, 12:25, 15:11, 15:17, 15:22, 16:9, 16:17, 17:5, 17:8, 17:14, 18:6, 18:12, 18:19, 18:25, 19:20, 20:6, 20:23, 21:3, 21:8, 21:19, 21:25, 22:10, 22:12, 22:16, 23:1, 23:3, 23:16, 23:21, 24:1, 24:7, 24:11, 24:14, 25:1, 25:5, 25:8, 25:9, 25:12, 25:21, 25:24, 26:2, 26:5, 26:7, 26:12, 26:16, 26:19, 26:22, 26:24, 27:1, 27:3, 27:21, 28:2, 66:10, 66:12, 66:17, 66:19, 66:23, 67:2, 90:4, 90:8, 90:10, 90:15, 90:18, 128:22, 129:2, 129:4, 129:6, 129:8, 129:11, 129:14, 129:16, 129:19, 139:6, 139:21, 139:24, 142:21, 142:25, 143:2, 143:3, 143:4, 143:22, 143:25, 144:2, 144:8, 144:10, 144:14, 144:21, 145:2, 145:5, 145:19, 145:22, 146:1, 146:8, 146:11, 146:17, 146:20, 146:24, 147:5, 147:8, 147:10, 147:13, 147:15, 147:17, 147:20, 150:1, 150:11, 150:14, 151:9, 151:15, 151:21, 152:5, 152:11, 153:1, 153:7, 153:13, 153:22, 154:3, 154:20, 155:20, 155:21, 155:24, 156:3, 156:6
the.. [1] - 136:10
the...anisotropy... have [1] - 135:22
themselves [3] - 19:11, 91:22, 104:2

**theoretical** [1] - 101:12

**theory** [2] - 102:18, 122:2

**Therefore** [3] - 20:16, 21:4, 24:19

**therefore** [5] - 19:17, 29:16, 31:12, 38:20, 49:25

**thereof** [1] - 70:21

**thereto** [1] - 68:4

**thermal** [15] - 74:17, 74:20, 74:24, 74:25, 75:20, 75:22, 83:16, 85:20, 85:23, 86:2, 86:4, 89:22, 118:21, 136:10

**thermally** [2] - 99:25, 101:18

**they've** [11] - 19:14, 19:17, 92:21, 110:2, 112:3, 117:5, 125:22, 126:7, 126:8, 126:19, 140:6

**thin** [10] - 38:5, 38:6, 81:16, 101:6, 101:8, 101:10, 115:8, 115:9, 115:23, 115:25

**thinking** [4] - 77:14, 83:8, 96:6, 96:13

**thinks** [4] - 32:23, 98:21, 100:13, 113:7

**thinner** [3] - 101:8, 115:11

**thinness** [1] - 101:3

**third** [7] - 9:22, 9:24, 15:6, 18:6, 18:20, 20:9, 61:12

**thoughts** [2] - 143:4, 143:24

**thousands** [3] - 79:13, 91:5

**thread** [1] - 91:9

**three** [15] - 14:22, 67:20, 81:20, 96:18, 96:20, 98:18, 107:3, 114:21, 121:2, 121:4, 122:1, 123:19, 124:24, 140:21, 140:24

**three-layer** [1] - 140:21

**threw** [1] - 79:20

**throughout** [6] - 67:24, 73:8, 91:10, 118:19, 136:17, 136:20

**ties** [1] - 80:10

**tightly** [1] - 126:4

**timescale** [7] - 82:6, 82:7, 82:10, 131:3, 131:4, 131:8

**tip** [1] - 39:22

**title** [2] - 94:21, 116:16

**Title** [1] - 157:8

**titled** [1] - 6:19

**today** [7] - 45:6, 53:1, 68:6, 100:18, 103:13, 140:22, 143:17

**toe** [4] - 67:11, 67:12, 96:15

**together** [10] - 71:2, 71:3, 81:4, 91:1, 91:6, 119:18, 120:1, 123:5, 128:11

**ton** [1] - 113:7

**took** [7] - 17:19, 28:13, 105:16, 112:19, 119:24, 119:25, 126:12

**tool** [3] - 67:21, 67:22, 70:9

**tools** [1] - 67:19

**top** [29] - 69:1, 75:5, 77:11, 87:5, 89:20, 92:4, 94:21, 108:19, 109:8, 116:20, 116:24, 117:9, 117:11, 119:8, 119:10, 119:12, 121:9, 121:12, 121:14, 132:6, 132:13, 132:23, 140:5, 140:9, 141:7, 141:9, 141:22, 141:24

**torque** [1] - 121:20

**total** [2] - 27:16, 128:16

**totally** [2] - 81:19, 101:8

**touching** [1] - 64:8

**tough** [2] - 112:7, 155:4

**tow** [1] - 68:3

**toward** [8] - 37:17, 39:22, 77:23, 114:23, 119:13, 122:8, 138:6, 140:8

**towards** [6] - 74:15, 113:14, 117:1, 125:5, 135:24, 141:2

**Town** [1] - 3:22

**tracked** [1] - 155:5

**Trademark** [1] - 43:12

**trailing** [1] - 126:9

**Transcript** [1] - 1:5

**transcript** [2] - 157:9,

157:11

**TRANSCRIPT** [1] - 1:14

**treated** [2] - 46:25, 112:11

**treatment** [1] - 93:22

**trespass** [1] - 97:8

**TRIAL** [1] - 1:15

**trial** [26] - 32:19, 51:6, 63:12, 64:3, 64:15, 64:20, 64:21, 64:24, 65:5, 65:8, 68:6, 68:9, 68:17, 72:1, 72:6, 75:25, 78:13, 94:20, 96:6, 100:16, 107:17, 110:16, 111:20, 111:24, 112:7, 139:8

**trials** [2] - 70:8, 120:22

**tried** [3] - 19:15, 69:5, 131:10

**trilayer** [3] - 76:5, 133:9, 136:6

**trilemma** [2] - 76:3, 113:11

**trip** [1] - 96:10

**triple** [1] - 126:10

**triple-stage** [1] - 126:10

**trivialize** [2] - 84:15, 132:17

**trouble** [1] - 100:15

**true** [20] - 29:23, 35:6, 85:14, 88:24, 92:3, 92:25, 101:6, 103:9, 105:11, 106:22, 110:15, 118:25, 124:2, 130:16, 136:15, 139:4, 142:18, 157:9

**Trust** [1] - 69:18

**trust** [3] - 114:16, 139:17

**truth** [8] - 35:5, 64:13, 68:9, 69:8, 70:10, 105:12, 139:8

**truthfully** [1] - 35:3

**try** [12] - 48:19, 63:24, 84:14, 89:6, 101:21, 102:6, 103:6, 106:11, 107:25, 124:6, 125:18, 130:25

**trying** [19] - 19:1, 24:8, 46:19, 59:21, 67:25, 70:11, 73:2, 78:9, 83:5, 87:16, 112:14, 115:20, 115:25, 116:1, 116:12,

121:23, 131:18, 131:20, 136:13

**TuMR** [2] - 125:10, 126:9

**turn** [4] - 9:5, 64:8, 90:2, 133:5

**turned** [2] - 31:10, 130:16

**turned-on** [1] - 31:10

**turning** [1] - 14:22

**twice** [1] - 90:21

**Twitter** [1] - 63:8

**two** [56] - 9:20, 10:16, 10:22, 12:23, 13:9, 13:24, 14:24, 15:25, 17:11, 17:13, 19:2, 34:19, 37:11, 46:25, 67:18, 67:22, 78:7, 78:8, 78:22, 80:18, 80:19, 85:2, 90:21, 91:1, 91:20, 93:11, 107:20, 108:18, 109:1, 111:13, 113:19, 113:22, 113:23, 114:6, 116:5, 119:1, 119:3, 120:3, 123:23, 123:25, 124:11, 126:14, 127:21, 127:24, 128:6, 128:13, 128:24, 131:13, 131:19, 136:14, 140:5, 140:14, 141:9, 141:22, 143:4

**two-layer** [4] - 108:18, 109:1, 114:6, 141:22

**two-part** [1] - 119:1

**types** [1] - 51:11

**typographical** [1] - 10:15

**typos** [1] - 9:9

## U

**U.S** [1] - 1:3

**ultimately** [1] - 120:17

**unanimous** [6] - 62:6, 62:12, 65:23, 66:2, 146:25, 150:5

**unanimously** [3] - 148:2, 150:7, 150:19

**unbiased** [2] - 68:1, 76:9

**unconscious** [1] - 34:9

**uncontested** [1] - 116:11

**uncover** [1] - 70:9

**under** [8] - 29:13,

32:7, 58:3, 58:19, 70:23, 72:2, 73:6, 87:3

**underlayer** [3] - 76:20, 97:18, 126:6

**underlayers** [1] - 115:2

**underneath** [1] - 121:10

**underscored** [2] - 112:20, 118:21

**understood** [6] - 8:25, 9:2, 11:22, 82:14, 146:15, 156:2

**undertake** [1] - 46:4

**undisputed** [21] - 68:14, 68:15, 68:24, 70:2, 76:21, 77:6, 79:4, 80:1, 80:5, 81:5, 85:19, 97:23, 101:24, 104:8, 127:3, 133:17, 134:3, 138:18, 138:22, 139:1, 139:10

**undoubtedly** [1] - 140:19

**undue** [1] - 22:5

**unexpected** [2] - 48:13, 52:6

**unfair** [1] - 93:8

**unfamiliar** [1] - 91:22

**unfiltered** [1] - 93:21

**uniform** [1] - 108:21

**unit** [10] - 22:7, 23:18, 61:9, 61:12, 61:14, 61:16, 127:3, 127:4, 133:21, 134:4

**United** [7] - 39:11, 39:12, 43:11, 147:21, 157:6, 157:8, 157:13

**UNITED** [1] - 1:1

**units** [1] - 100:11

**University** [1] - 92:6

**unless** [2] - 14:10, 154:25

**unlike** [1] - 120:25

**unlocked** [3] - 75:19, 137:16, 138:4

**unnecessary** [1] - 22:5

**unpatented** [5] - 57:8, 60:7, 60:17, 60:20, 61:1

**unpredictable** [1] - 48:13

**unprompted** [1] - 84:6

**unsuccessful** [1] - 52:2

**untoward** [1] - 105:23
**untrue** [1] - 34:22
**untruthfully** [2] - 34:25, 35:4
**unusual** [3] - 68:14, 80:17, 96:5
**unwavering** [1] - 100:24
**unwilling** [1] - 62:14
**up** [62] - 8:10, 25:16, 31:6, 44:23, 69:13, 70:6, 70:23, 74:10, 74:13, 74:22, 75:4, 75:9, 75:25, 76:5, 77:20, 83:2, 83:9, 83:13, 84:11, 86:12, 86:22, 87:2, 87:10, 88:22, 89:4, 93:12, 93:25, 94:23, 96:16, 97:13, 100:9, 104:7, 107:1, 107:19, 110:5, 110:19, 111:19, 111:21, 112:17, 113:6, 115:18, 115:19, 116:7, 116:14, 124:16, 125:9, 127:25, 128:14, 128:19, 130:1, 130:12, 133:8, 133:24, 137:12, 139:6, 140:15, 143:18, 147:13, 149:21, 154:14, 155:9
**updated** [1] - 7:20
**upheld** [1] - 70:23
**upper** [2] - 107:2, 145:9
**upside** [1] - 122:17
**uses** [3] - 35:19, 68:12, 109:17
**utility** [1] - 58:21

## V

**valid** [5] - 43:9, 55:4, 84:11, 110:4
**validity** [12] - 26:4, 43:12, 85:25, 89:17, 110:6, 110:8, 110:11, 111:10, 131:10, 132:1, 133:4
**value** [25] - 57:5, 57:9, 57:10, 57:14, 58:12, 59:6, 60:6, 60:11, 60:13, 60:24, 61:20, 61:22, 69:23, 73:4, 79:16, 79:25, 80:3, 80:5, 80:7, 103:19, 104:24, 134:12

**values** [16] - 37:13, 72:3, 77:20, 79:14, 80:2, 80:19, 102:10, 102:12, 102:13, 102:14, 104:5, 104:8, 105:4, 107:1, 107:19, 107:22
**Vargas** [4] - 144:21, 146:5, 146:20, 155:14
**variable** [1] - 116:5
**various** [1] - 24:8
**varying** [1] - 136:25
**vastly** [2] - 88:20, 139:4
**Verdict** [2] - 6:9, 150:3
**VERDICT** [1] - 147:19
**verdict** [44] - 7:20, 8:2, 21:13, 21:17, 22:1, 22:4, 22:8, 27:17, 27:18, 28:17, 31:16, 41:4, 50:16, 62:6, 62:12, 62:19, 62:20, 64:18, 65:23, 66:1, 66:3, 66:4, 67:20, 82:25, 89:1, 96:21, 107:13, 110:8, 123:9, 139:20, 142:20, 143:5, 143:8, 143:10, 147:1, 147:11, 147:17, 148:4, 150:8, 150:12, 150:15, 150:21, 155:1, 155:22
**version** [7] - 12:9, 12:11, 26:11, 26:14, 26:19, 26:21, 70:12
**versions** [1] - 34:17
**versus** [2] - 69:10, 89:3
**via** [2] - 63:6
**Vice** [1] - 2:16
**Victora** [59] - 72:11, 72:12, 82:13, 82:19, 83:2, 83:8, 84:6, 84:14, 84:19, 84:20, 84:23, 85:22, 86:14, 86:19, 86:22, 86:24, 86:25, 87:7, 87:23, 88:12, 88:16, 91:16, 92:2, 92:3, 93:4, 95:4, 95:12, 95:25, 96:1, 109:8, 111:9, 112:6, 112:13, 112:15, 113:7, 113:22, 114:8, 114:16, 114:17, 115:5, 115:16, 117:25, 118:6,

118:25, 119:9, 119:15, 119:24, 120:2, 121:1, 121:13, 122:21, 123:4, 131:5, 132:2, 132:8, 132:16, 132:19, 141:5
**Victora's** [10] - 86:19, 87:12, 87:22, 89:2, 94:17, 103:5, 113:3, 118:17, 131:20, 136:7
**Victora-3** [3] - 132:5, 132:8, 132:10
**video** [3] - 110:9, 110:10, 120:21
**view** [10] - 36:7, 47:17, 49:5, 63:25, 64:3, 96:23, 110:24, 111:21, 113:12, 113:16
**views** [1] - 62:10
**violates** [1] - 65:2
**violating** [1] - 98:11
**violation** [1] - 15:8
**visit** [2] - 63:25, 146:13
**voluntarily** [1] - 59:20
**vote** [2] - 65:22, 65:24
**vs** [3] - 1:7, 7:7, 147:24

## W

**Wabash** [2] - 3:13, 4:17
**wait** [1] - 155:25
**waiting** [1] - 65:19
**wake** [1] - 31:6
**walk** [1] - 138:25
**walked** [5] - 108:2, 121:6, 121:15, 123:1, 126:21
**Wall** [1] - 6:20
**WANG** [6] - 4:16, 21:14, 21:20, 22:9, 22:11, 23:25
**Wang** [3] - 7:17, 21:13, 21:14
**Washington** [1] - 2:18
**waste** [1] - 25:12
**watch** [2] - 63:17, 142:10
**watched** [1] - 142:8
**watching** [1] - 142:9
**water** [1] - 31:11
**WATKINS** [7] - 3:12, 3:18, 3:21, 4:8, 4:16, 4:20, 5:4
**wave** [2] - 69:18,

76:11
**ways** [5] - 55:20, 85:3, 91:11, 108:2, 109:11
**WD** [3] - 19:1, 87:13, 135:17
**WD-9** [1] - 11:22
**weaker** [1] - 75:6
**website** [1] - 63:7
**week** [2] - 134:21, 143:18
**weeks** [5] - 67:18, 91:1, 91:20, 111:13, 131:14
**weigh** [5] - 69:9, 72:17, 89:1, 96:13, 111:20
**weighing** [1] - 71:22
**weight** [6] - 10:24, 31:2, 31:4, 35:7, 35:10, 62:18
**welcome** [2] - 27:5, 66:24
**well-regarded** [1] - 112:9
**Wendy** [2] - 5:9, 7:13
**WEST** [1] - 1:24
**Western** [102] - 7:7, 7:16, 9:8, 15:1, 17:16, 17:23, 21:15, 22:1, 27:9, 27:13, 28:25, 29:8, 29:9, 38:11, 38:13, 38:14, 39:10, 40:7, 40:8, 40:12, 43:7, 43:23, 44:1, 44:6, 44:10, 44:15, 45:13, 45:16, 45:19, 46:5, 46:7, 52:19, 53:10, 53:15, 53:22, 54:5, 54:9, 61:13, 66:14, 67:13, 68:12, 68:16, 69:10, 70:23, 71:5, 72:4, 72:17, 73:2, 73:19, 74:6, 75:25, 80:10, 80:11, 82:23, 84:7, 91:2, 91:8, 92:12, 93:1, 93:5, 94:14, 101:13, 102:5, 103:1, 103:5, 104:14, 106:7, 107:12, 116:8, 125:17, 125:23, 126:5, 127:8, 127:13, 127:17, 127:21, 127:23, 128:4, 128:12, 133:6, 136:21, 136:24, 139:9, 142:12, 146:6, 147:24, 148:6,

148:13, 148:19, 148:24, 149:4, 149:10, 149:20, 150:23, 151:3, 151:25, 152:15, 152:20, 153:16, 154:13, 156:5
**WESTERN** [1] - 1:8
**western** [1] - 117:6
**wet** [1] - 31:7
**where's..** [1] - 25:5
**wherein** [2] - 77:10, 77:11
**whole** [10] - 23:18, 47:21, 51:22, 61:15, 70:10, 104:6, 110:1, 124:22, 127:2, 142:9
**widely** [1] - 136:12
**willing** [4] - 57:2, 57:3, 59:25, 60:3
**Wilshire** [6] - 2:5, 2:9, 2:13, 2:21, 3:5, 3:9
**win** [3] - 28:22, 53:21, 112:8
**wisdom** [7] - 69:14, 75:3, 75:4, 75:8, 75:10, 75:11, 132:12
**wish** [4] - 155:10, 155:11, 155:12, 155:16
**wishes** [1] - 155:17
**WITHDRAWN** [1] - 6:17
**withstand** [1] - 36:16
**witness** [12] - 30:9, 30:22, 33:15, 33:18, 33:21, 34:14, 34:24, 35:2, 35:3, 70:6, 70:10
**witness's** [6] - 33:23, 33:24, 33:25, 34:3, 34:4, 34:9
**witnesses** [22] - 10:25, 31:22, 33:17, 34:16, 35:8, 35:10, 64:6, 64:12, 69:9, 69:10, 70:5, 70:14, 70:23, 71:9, 72:15, 91:13, 93:19, 99:1, 99:2, 99:5, 99:21, 137:8
**won** [1] - 112:8
**Word** [1] - 7:20
**word** [12] - 14:25, 20:18, 35:19, 35:20, 36:2, 38:9, 73:17, 85:1, 97:25, 98:4, 113:9
**words** [11] - 10:12, 10:13, 24:21, 24:23,

| | |
|---|---|
| *35:13, 35:16, 35:25, 43:10, 97:12, 122:9, 154:7*<br>**works** *[2]* - *100:3, 111:12*<br>**world** *[15]* - *67:11, 74:11, 74:22, 74:25, 83:5, 89:4, 89:6, 91:8, 93:10, 100:4, 103:2, 103:4, 113:4, 114:2, 121:15*<br>**world's** *[1]* - *74:17*<br>**worse** *[1]* - *128:1*<br>**wrap** *[1]* - *139:6*<br>**writable** *[1]* - *74:20*<br>**write** *[18]* - *69:2, 74:15, 75:4, 75:5, 75:10, 75:12, 75:15, 82:24, 87:14, 87:16, 87:21, 88:12, 88:19, 88:23, 118:12, 134:2, 139:17*<br>**write-head** *[1]* - *88:19*<br>**writeability** *[1]* - *85:19*<br>**writing** *[4]* - *42:21, 63:5, 65:13, 65:15*<br>**written** *[3]* - *8:5, 74:23, 93:2*<br>**wrote** *[4]* - *83:12, 94:24, 112:18, 124:22* | *133:14*<br>**Zimanyi** *[1]* - *95:20* |
| **Y** | |
| **yank** *[1]* - *25:14*<br>**yard** *[1]* - *97:8*<br>**years** *[8]* - *78:8, 78:22, 93:2, 102:21, 131:4, 133:11, 133:13*<br>**years'** *[1]* - *71:16*<br>**yesterday** *[5]* - *11:22, 16:21, 77:9, 113:21, 143:19*<br>**yields** *[2]* - *48:8, 48:13*<br>**YOCCA** *[2]* - *4:4, 4:12*<br>**YOUNG** *[1]* - *4:20*<br>**young's** *[1]* - *70:16*<br>**younger** *[1]* - *112:14*<br>**yourself** *[4]* - *45:9, 62:8, 87:7, 111:1*<br>**yourselves** *[3]* - *92:18, 145:13, 146:3*<br>**YouTube** *[1]* - *63:8*<br>**Yu** *[1]* - *6:19* | |
| **Z** | |
| **zero** *[7]* - *25:25, 37:19, 123:14, 123:18, 123:19, 133:10,* | |

**UNITED STATES DISTRICT COURT**