1   Douglas E. Lumish, SBN 183863
      doug.lumish@lw.com
2   Richard G. Frenkel, SBN 204133
      rick.frenkel@lw.com
3   Patricia Young, SBN 291265
      patricia.young@lw.com
4   Linfong Tzeng, SBN 281798
      linfong.tzeng@lw.com
5   Chaarushena Deb, SBN 342764
      chaaru.deb@lw.com
6   LATHAM & WATKINS LLP
7   140 Scott Drive
    Menlo Park, CA 94025
8   Telephone: (650) 328-4600
    Facsimile: (650) 463-2600
9
    Joseph H. Lee, SBN 248046
10    joseph.lee@lw.com
    LATHAM & WATKINS LLP
11  650 Town Center Drive, 20th Floor
    Costa Mesa, CA 92626
12  Telephone: (714) 540-1235
13
    Attorneys for Defendant and Counterclaim Plaintiff
14  Western Digital Technologies, Inc.

15              **UNITED STATES DISTRICT COURT**

16          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17  MR TECHNOLOGIES, GMBH, | CASE NO. 8:22-cv-01599-JVS-DFM |
| 18        Plaintiff and | Judge:  District Judge James V. Selna |
| 19        Counterclaim Defendant, | Magistrate Judge Douglas F. McCormick |
| 20  vs. | **MEMORANDUM IN SUPPORT OF DEFENDANT WESTERN DIGITAL TECHNOLOGIES, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b)** |
| 21  WESTERN DIGITAL | |
| 22  TECHNOLOGIES, INC., | |
| 23        Defendant and | |
| 24        Counterclaim Plaintiff. | Complaint Filed:  August 26, 2022 |
| 25 | Hearing Date:     November 18, 2024 |
| 26 | Time:                   1:30 p.m. |
| | Courtroom:        10C |
| 27 | |
| 28 | |

Sarah W. Wang (admitted *pro hac vice*)
  sarah.wang@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7642

Gabriel K. Bell (admitted *pro hac vice*)
  gabriel.bell@lw.com
Charles S. Dameron (admitted *pro hac vice*)
  charles.dameron@lw.com
Ashley N. Finger (admitted *pro hac vice*)
  ashley.finger@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Steve Hanle, SBN 168876
  shanle@stradlinglaw.com
Salil Bali, SBN 263001
  sbali@stradlinglaw.com
Ahmad S. Takouche, SBN 322911
  atakouche@stradlinglaw.com
STRADLING YOCCA CARLSON & RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone:  (949) 725 4000
Facsimile:  (949) 725 4100

Henning Schmidt (admitted *pro hac vice*)
  hschmidt@stradlinglaw.com
STRADLING YOCCA CARLSON & RAUTH LLP
500 W. 2nd St., Suite 1900
Austin, TX 78701
Telephone: (512) 788-5018

# <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ............................................................................. 1

II.    LEGAL STANDARDS ..................................................................... 1

III.   MRT FAILED TO OFFER SUFFICIENT EVIDENCE TO
       SUPPORT A FINDING OF INFRINGEMENT ............................... 2

       A.    MRT Failed to Prove That the Accused Products Have the
             Claimed  "Hard Magnetic Storage Layer" ............................ 3

             1.    No Reasonable Jury Could Find the Accused
                   Products Have a "Layer That Stores" ........................ 3

             2.    MRT Cannot Rely on the Entire Stack ..................... 5

             3.    MRT's Counter-Arguments Do Not Resolve Its
                   Legal Error ................................................................ 8

       B.    MRT Failed to Prove That the Accused Products Have the
             Claimed "Nucleation Host" ................................................. 10

       C.    MRT Failed to Prove the "Coercivity" Requirements of the
             Claims ................................................................................. 14

       D.    For Half of Accused Sales, MRT Used Data From
             Unaccused Products for Values Required to Prove
             Infringement ....................................................................... 15

IV.    MRT FAILED TO OFFER SUFFICIENT EVIDENCE TO
       SUPPORT A DAMAGES AWARD ............................................... 16

       A.    MRT Failed to Offer Sufficient Evidence of Its $305.9
             Million Damages Demand .................................................. 16

       B.    MRT's Damages Demand Was Based on the Incorrect
             SSPPU .................................................................................. 19

       C.    MRT's Regression Model Is Unreliable ............................. 20

V.     CONCLUSION ............................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apple Inc. v. Samsung Electronics Co.*,
  695 F.3d 1370 (Fed. Cir. 2012) ..................................................................... 9, 10

*Becton, Dickinson & Co. v. Tyco Healthcare Grp.*,
  616 F.3d 1249 (Fed. Cir. 2010) ......................................................................... 6, 7

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com*,
  289 F.3d 801 (Fed. Cir. 2002) ............................................................................. 9

*Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*,
  838 F. App'x 551 (Fed. Cir. 2021) ...................................................................... 7

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015) ......................................................................... 20

*CommScope Techs. LLC v. Dali Wireless Inc.*,
  10 F.4th 1289 (Fed. Cir. 2021) ............................................................................ 2

*Dow Chem. Co. v. Mee Indus., Inc.*,
  341 F.3d 1370 (Fed. Cir. 2003) ........................................................................... 2

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,
  914 F.3d 1347 (Fed. Cir. 2019) ........................................................................... 1

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*,
  879 F.3d 1332 (Fed. Cir. 2018) ......................................................................... 17

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018) ......................................................................... 20

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ................................................................................... 13, 15

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
  340 F.3d 1314 (Fed. Cir. 2003) ......................................................................... 13

*Hoya Corp. v. Alcon Inc.*,
  No. 3:20-cv-3629, 2024 WL 310706 (N.D. Tex. Jan. 26, 2024) ....................... 13

*In re NFL "Sunday Ticket" Antitrust Litig.*,
  No. ML 15-02668, 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024)..................... 13

*Johns Hopkins Univ. v. Datascope Corp.*,
  543 F.3d 1342 (Fed. Cir. 2008) ............................................................. 12

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ................................................................. 19

*Liberty Ammunition, Inc. v. United States*,
  835 F.3d 1388 (Fed. Cir. 2016) ............................................................. 10

*Raytheon Co. v. Sony Corp.*,
  727 F. App'x 662 (Fed. Cir. 2018) ......................................................... 10

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) .............................................................................. 1

*Smith v. Garlock Equip. Co.*,
  658 F. App'x 1017 (Fed. Cir. 2016)........................................................ 12

*Spectrum Int'l v. Sterilite Corp.*,
  164 F.3d 1372 (Fed. Cir. 1998) ............................................................... 9

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ............................................................... 2

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
  595 F.3d 1340 (Fed. Cir. 2010) ............................................................... 9

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ............................................................. 19

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ............................................................. 19

*WhitServe, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ........................................................... 1, 17

*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
  992 F.3d 1366 (Fed. Cir. 2021) ............................................................... 7

*Wis. Alumni Rsch. Found. v. Apple Inc.*,
  112 F.4th 1364 (Fed. Cir. 2024) ............................................................. 5

iii

*Wis. Alumni Rsch. Found. v. Apple Inc.*,
    905 F.3d 1341 (Fed. Cir. 2018) ............................................................................. 9

*Wordtech Sys. Inc. v. Integrated Network Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ........................................................................... 17

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
    465 F.3d 1312 (Fed. Cir. 2006) ........................................................................... 12

**STATUTES**

35 U.S.C. § 284 ............................................................................................................ 2

**RULES**

Fed. R. Civ. P. 50(a)(1) ............................................................................................... 1

**TREATISES**

9B Charles Alan Wright & Arthur R. Miller, *Federal Practice &
    Procedure* (3d ed. 2011) ...................................................................................... 1

## I.      INTRODUCTION

Pursuant to Fed. R. Civ. P. 50(b), Defendant Western Digital Technologies, Inc. ("WD") respectfully submits this memorandum in support of its Renewed Motion for Judgment as a Matter of Law ("JMOL") of (1) non-infringement as to all asserted claims and all accused products and (2) no damages because Plaintiff MR Technologies, GmbH ("MRT") failed to present legally sufficient evidence.  Dkt. 616.

## II.     LEGAL STANDARDS

Judgment as matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  The standard for JMOL "mirrors" that of summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).

While "the Court must draw all reasonable inferences in favor of the nonmoving party, and … may not make credibility determinations or weigh the evidence," the Court "should review all of the evidence in the record" and "give credence to the evidence … supporting the moving party that is uncontradicted and unimpeached." *Id.* at 150-51 (citations omitted).  "[G]eneral and conclusory testimony" by experts "is not enough to be … substantial evidence in support of a verdict."  *WhitServe, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012).  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party."  9B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2524 (3d ed. 2011).

MRT bears the burden of presenting sufficient evidence to establish infringement, including that every element of the asserted claims is present in the accused products.  *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).  JMOL of non-infringement is warranted where the patentee fails to

present evidence of a claim limitation.  *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1296-1300 (Fed. Cir. 2021) (reversing denial of JMOL).

MRT also bears the burden to establish entitlement to "damages adequate to compensate for … infringement" "in an amount no less than a reasonable royalty." 35 U.S.C. § 284; *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020).  "The statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec*, 978 F.3d at 1291.

## III.   MRT FAILED TO OFFER SUFFICIENT EVIDENCE TO SUPPORT A FINDING OF INFRINGEMENT

At trial, MRT pursued only literal, direct infringement of asserted claims 1, 10 and 11 of the '864 patent, and claims 1 and 7 of the '997 patent ("Asserted Claims").[1] MRT failed, however, to present sufficient evidence that the accused products practice each and every element of the Asserted Claims.  *CommScope*, 10 F.4th at 1296-1300.

Prior to trial, the parties entered a joint stipulation organizing the accused products into seven groups and designating a representative product for each group. Dkt. 231.  None of the representative products practice any of the following required claim elements: (1) a "hard magnetic storage layer" ("HMSL") that stores information in accordance with the Court's claim construction; (2) a "nucleation host" ("NH") that assists with switching the HMSL as required by the Court's construction, and (3) a HMSL and NH that each meet respective coercivity requirements.  At trial, MRT failed to adduce legally sufficient evidence from which a reasonable jury could conclude that any one (let alone all) of these elements is met.

Additionally, in an attempt to show that the layers in product Group 3 meet the coercivity requirements, MRT's expert (Dr. Re) relied on anisotropy (Ku) and

---

[1] MRT did not argue indirect infringement or doctrine of equivalents.  Dkts. 88, 473, 481.

magnetism (Ms) values from an entirely separate product that was never accused or sold. Dr. Re inexplicably pulled those numbers from a non-applicable spreadsheet different from the one from which he obtained the same values for the other accused drives. 7/18/24 Vol. I Tr. 68:3-73:19, 92:11-20, 98:14-21; 7/18/24 Vol. II Tr. 81:22-102:5. This amounts to an independent failure of proof for nearly half of the accused products by sales volume.

## A. MRT Failed to Prove That the Accused Products Have the Claimed "Hard Magnetic Storage Layer"

Every Asserted Claim requires a "hard magnetic storage layer." '864 patent cls. 1, 10, and 11; '997 patent cls. 1 and 7. The Court construed "hard magnetic storage layer" as "a magnetic *layer that stores information* in magnetically oriented bits." Dkt. 195 at 30 (emphasis added). MRT failed to show that this limitation is met by any accused product.

In its Summary Judgment Order, Dkt. 321, the Court acknowledged that MRT had two options for this limitation: MRT could argue that a specific bottom layer in each accused product is the claimed HMSL, or that the entire magnetic stack is the claimed HMSL. *Id.* at 8. Under the former, MRT failed to meet its evidentiary burden; under the latter, MRT's argument runs contrary to Federal Circuit precedent.

### 1. No Reasonable Jury Could Find the Accused Products Have a "Layer That Stores"

At trial, MRT failed to present evidence that a specific bottom layer stores information as required by the Court's construction. MRT relied solely on its technical expert, Dr. Re, for infringement and Dr. Re mapped the single bottom layer—G-1 in most representative products and SCL in the remainder—to the claimed HMSL. 7/18/24 Vol. II Tr. 64:20-65:4 (confirming the HMSL "is defined in the patent as a single layer"); 7/18/24 Vol. I Tr. 43:15-21, 48:2-6, 57:10-12, 64:14-16, 66:7-67:12, 68:19-20, 74:3-5, 85:18-86:1, 86:23-87:1, 88:24-89:17, 94:6-12.

1       But, as Dr. Re conceded, these bottom layers do not and cannot store

2   information in magnetically oriented bits.  To store information in the accused

3   products, the entire stack, including many additional layers, must work together as a

4   unit.  7/18/24 Vol. II Tr. 65:5-13 ("No. They couldn't store data on their own."),

5   65:23-66:23 ("Q: So the G1 layers or SCL layers in green, they couldn't store data all

6   on their own, magnetically or in bits, in any meaningful way, right?  A: Not if they

7   were separated and on their own, no."), 72:7-10; 7/19/24 Vol. I Tr. 37:7-24 (agreeing

8   that the accused HMSL only stores "when it's in media together in a stack with all the

9   other magnetic layers" and "does not, in fact, store data in magnetically oriented bits

10  on its own").  While Dr. Re testified that "the bottom layer of the stack gets switched

11  to write a bit," the deposition testimony Dr. Re relies on for that statement is clear that

12  it is "the whole stack" that "stores information in magnetically oriented bits."  7/18/24

13  Vol. I Tr. 88:21-89:4 (referring to deposition testimony played at trial); 1/26/24 Desai

14  Dep. Tr. 37:10-21; 2/9/24 Desai Dep. Tr. 267:8-269:12.  Both Dr. Re and named

15  inventor Dr. Suess also confirmed that the patent "define[s]" the HMSL as "one

16  layer," not an entire stack.  7/17/24 Vol. II Tr. 87:4-8; 7/18/24 Vol. II. Tr. 64:20-65:4.

17      WD subsequently presented testimony from technical fact witness Dr. Desai

18  and non-infringement expert Dr. Bertero, both of whom further confirmed that the

19  identified bottom layers cannot store information as required by the claims.  7/19/24

20  Vol. II Tr. 53:12-54:11, 56:12-21, 114:6-13 ("[The G1 layer] cannot store by itself.");

21  7/23/24 Vol. II Tr. 97:6-21 ("The G1 layers – any of the G layers in the WD media

22  stack cannot retain data for any meaningful period of time on their own."),

23  99:17-100:20 ("[T]he G1 layers in the accused products by themselves cannot

24  positively store information in a meaningful way. The [information encoded] would

25  decay very quickly.").  MRT did not rebut that testimony.  MRT, therefore, failed to

26  offer any evidence that the bottom layer of each accused product stores information

27  in magnetically oriented bits as required by the Court's construction of HMSL.

28

## 2.    MRT Cannot Rely on the Entire Stack

As an initial matter, MRT's opposition to the Rule 50(a) motion affirmatively disclaimed reliance on the entire stack to demonstrate that the accused products meet the HMSL limitation.  Dkt. 558 at 4 ("WD next contends that MRT and Dr. Re 'accused the entire stack of magnet layers' as 'providing the storage function required by the Court's construction of the hard magnetic storage layer.'  WD is wrong."), 5 ("neither MRT nor Dr. Re identified the entire stack as the 'hard magnetic storage layer'"); *see also Wis. Alumni Rsch. Found. v. Apple Inc.*, 112 F.4th 1364, 1374 (Fed. Cir. 2024) (finding waiver where plaintiff "affirmatively abandoned" an infringement theory "for strategic purposes").

Nonetheless, at trial, MRT relied on the entire stack.  Because the thin bottom magnetic layer of the accused products cannot store information except as part of a stack of magnetic layers, MRT needed to rely on the entire stack of magnetic layers— the bottom G-1 or SCL layer *and* all of the magnetic "G" layers above the bottom layer— that store information *together*.  *See* 7/18/24 Vol. I Tr. 33:21-34:9, 40:18-41:4 ("It would be required basically.  It would be nonsensical for [the other layers] to not store data."), 41:13-20; 7/18/24 Vol. II Tr. 65:16-22  ("And they all store stable data, yes."), 66:2-6 ("[T]hey all need to be there to store the bits."), 72:18-25; 7/19/24 Vol. I Tr. 31:5-21 ("Q.  Collectively with all the other magnetic layers in the stack that you call a nucleation host?  A.  Correct.").  Under that theory, the entire stack would be the claimed HMSL, which is insufficient given the admissions that the HMSL is a single layer.  While MRT arbitrarily circled a single layer of that stack and said it was the HMSL, MRT did not—and could not—show through evidence presented at trial that any single magnetic layer meets the requirements of the claimed single-layer HMSL that stores information.

As the Court warned in its Summary Judgment Order, MRT's "entire stack" theory is also in tension with MRT being able to identify "a distinct nucleation host" as required by the Asserted Claims.  Dkt. 321 at 8.  The Asserted Claims each recite

a "multilayer structure, including" both "a hard magnetic storage layer" that stores information and a mutually exclusive "nucleation host" with distinct properties. *See also* Dkt. 321 at 8-9 ("In view of the claim language and the Court's constructions, identifying the same components as meeting both the 'hard magnetic storage layer' and the 'nucleation host' layer poses problems, especially in view of the differing coercive field requirements."). Under the theory wherein the entire stack meets the HMSL limitation, the "G" layers above the G-1 or SCL layer would be *both* part of the HMSL and the separately claimed "nucleation host." As a matter of law, no reasonable jury could find that the "G" layers meet both limitations.

The inventor assigned two different terms to these claimed components—HMSL and, separately, NH. The law makes clear that different terms in the same claim are presumed to have different meanings. *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1254 (Fed. Cir. 2010). Throughout trial, the named inventor and MRT's technical expert agreed. 7/17/24 Vol. II Tr. 33:6-13 (agreeing that the patent has "two distinct components"), 37:1-5 ("I agree that the abstract describe[s] these two distinct structures"), 37:19-38:1, 39:13-17 (agreeing that "the structure that has these two distinct components of a nucleation host and a hard magnetic storage layer is a critical aspect" of the invention), 40:20-41:18, 94:2-9; 7/18 Vol. I Tr. 43:8-14, 57:10-15, 64:14-19, 74:3-8, 95:3-5; *see also* 7/17/24 Vol. I Tr. 26:11-16 (counsel for MRT stating "[the nucleation host] has to be a multilayer nucleation host separate and apart from the hard storage layer.").

As in *Becton, Dickinson*, the surrounding claim language and the specification confirm that the HMSL and NH are distinct. The claims themselves require the HMSL to have a coercive field $H_s$ greater than 0.5 T, and the NH to have a different coercive field, $H_n$ that is less than $H_s$. '864 patent cls. 1, 10, 11; '997 patent cls. 1, 7; *see also* Dkt. 321 at 8-9 (acknowledging the "differing coercive field requirements" for the two structures); '864 patent at 4:53-58 ("The recording media includes hard magnetic storage layer 24 and softer nucleation host 21."). Despite relying on the entire stack

to show storage, MRT used estimates for the single, bottommost magnetic layer of the accused products for the coercivity limitations of the Asserted Claims. 7/18/24 Vol. II Tr. 91:18-94:2 ("Q. Just to recap, is it fair to say that the bottom G layer or the hard storage layer in all the accused products has a first coercive field $H_s$ of around 2 tesla? A. Correct.").

The specification also repeatedly distinguishes the HMSL from the NH. *See generally* '864 patent. And the distinction between the HMSL and the NH is further supported by the Court's claim constructions. The Court construed "exchange coupled magnetic multilayer structure" to be "a structure including a *nucleation host that is exchange coupled to a hard magnetic storage layer*." Dkt. 195 at 30. The Court separately construed "hard magnetic storage layer" and "nucleation host" to be different layers with different names and different functions. *Id.*

Additionally, as in *Becton, Dickinson*, interpreting the claims such that the HMSL and NH "can be the same structure renders the asserted claims nonsensical." *Id.* at 1255. In *Becton, Dickinson*, the Federal Circuit found that relational terms such as "connected to" and "extending between" indicated distinct components. *Id.*; *see also Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*, 838 F. App'x 551, 553 (Fed. Cir. 2021) ("By listing the [claim] elements separately and by using the word 'coupled,' [the claim] strongly indicates" two components are "distinct[.]"); *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1378 (Fed. Cir. 2021) (similar). Here, the claims require the HMSL to be "formed on" the underlayer and the NH to be "formed on" the HMSL; the HMSL to be "between the nucleation host and the non-magnetic substrate"; and the HMSL and NH to be "exchange coupled." The claims also require the NH to have its own "layers with increasing anisotropy constant K from layer to layer."

If (as required under the entire stack theory), the upper "G" layers are part of both the HMSL (the full stack) and the NH (only the upper "G" layers), none of these additional claim limitations are coherent:

1.  It makes no sense to say that the NH is formed on the HMSL because the same "G" layer(s) would be part of both;

2.  It makes no sense to have a comparison of the coercive field of the HMSL and the coercive field of the NH "without the hard magnetic storage layer";

3.  It makes no sense to say that the NH "is exchange coupled to the hard magnetic storage layer" as a layer cannot be exchanged coupled to itself; and

4.  Because under the Court's construction the layers of the NH must also have "an overall increase in anisotropy toward the hard magnetic storage layer," it makes no sense to have an overall increase in anisotropy "towards" itself, or that increases in both directions.

Relying on the upper "G" layers for both the HMSL and NH limitations is therefore insufficient to identify separate components as required by the claims.

### 3.    MRT's Counter-Arguments Do Not Resolve Its Legal Error

Recognizing the fatal flaws in its infringement case, MRT maintains two counter-arguments. Both fail.

*First*, MRT attempts to recast WD's non-infringement position as requiring the HMSL to be somehow physically "remove[d]" from the stack or media and store information on its own, without the other layers. 7/18/24 Vol. II Tr. 131:22-132:7. This is not WD's position. Rather, as detailed above, the claims and the Court's construction require a distinct HMSL that itself stores information in magnetically oriented bits—regardless of whether it is located within a stack. Dkt. 195 at 30; Dkt. 321 at 8-9. WD does not contend that the accused G-1 and SLC layers must be able to store information if they are removed entirely from the media of the accused drives. Rather, WD presented unrebutted testimony that if only a single layer stored

1   information, it would need to be "at least as thick as the entire stack."  7/23/24 Vol. II

2   Tr. 103:6-22; *see also id.* at 105:25-107:7.

3          *Second*, MRT misapplies the law concerning the meaning of "comprising" in

4   an effort to rewrite the claims and erase any distinction between the claimed HMSL

5   and NH.  Specifically, MRT argues that its trial position relying on the upper "G"

6   layers for both the NH and the "store information" function of the HMSL is consistent

7   with the claim language.  *E.g.*, Dkt. 558 at 3-4.  The problem, however, is not whether

8   an accused NH layer can store information as an additional, unrecited feature.  The

9   problem is that MRT has not identified (and cannot identify) both a NH and a distinct

10  HMSL that meets the Court's requirement of storing information in the accused

11  products.

12         The use of "comprising" does not relieve MRT of its burden of showing every

13  limitation is met by the accused products.  *Catalina Mktg. Int'l, Inc. v.*

14  *Coolsavings.com*, 289 F.3d 801, 812 (Fed. Cir. 2002); *Wis. Alumni Rsch. Found. v.*

15  *Apple Inc.*, 905 F.3d 1341, 1348–50 (Fed. Cir. 2018) (reversing denial of JMOL of

16  non-infringement and rejecting the argument that reciting "comprising" in the

17  preamble allowed reading out a required claim element).  While "comprising" "does

18  not exclude additional unrecited elements" it "is not a weasel word with which to

19  abrogate claim limitations."  *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1380

20  (Fed. Cir. 1998); *see also Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340,

21  1354 (Fed. Cir. 2010) (holding that "comprising" cannot be used to negate a claim

22  element).  MRT cannot, therefore, rely on the claims' recitation of "comprising" to

23  unwind the requirement of both a HMSL and a distinct NH, as described above.  *See*

24  *also, e.g.*, '864 patent cl. 1 ("A magnetic recording medium, comprising: … an

25  exchange coupled magnetic multilayer structure, including a hard magnetic storage

26  layer … and a nucleation host …").

27         In *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370 (Fed. Cir. 2012), the

28  Federal Circuit addressed a similar issue.  There, the asserted claim required a

"plurality" of modules where "each … employs a different, predetermined heuristic algorithm." *Id*. at 1373. The court held that "despite the use of 'comprising,'" the claim was "not amenable to the addition of other modules that do not use different heuristic algorithms because such addition would impermissibly wipe out the express limitation that requires every module to have a unique heuristic algorithm." *Id.* at 1379. Similarly, in *Raytheon Co. v. Sony Corp.*, 727 F. App'x 662, 672-73 (Fed. Cir. 2018), the "claim term 'second substrate'" required "permanent attachment throughout the fabrication process." Focusing "solely on the 'comprising' transition," the Board found that prior art disclosing an additional manufacturing step that removed the second substrate met that limitation. *Id.* While the court ultimately affirmed the Board's ruling invalidating the challenged claims, the court found that the Board's interpretation of "comprising" to "vitiat[e] the 'second substrate' limitation [was] improper." *Id.* at 673.

Here, MRT's comprising argument would also "impermissibly wipe out the express limitation[s] that require" both a HMSL and a NH, each with distinct properties. *See also Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1399 (Fed. Cir. 2016) (open-ended transitions, such as "including" and "comprising" cannot be used to abrogate claim limitations or contradict the patent specification).

In sum, MRT failed to adduce a legally sufficient evidentiary basis for a reasonable jury to find the G-1, G1-1, and SLC layers in the WD accused products are hard magnetic storage layers that store information in magnetically oriented bits. WD respectfully asks the Court to grant judgment as a matter of law of no infringement.

## B. MRT Failed to Prove That the Accused Products Have the Claimed "Nucleation Host"

The Court construed "nucleation host" as "a structure that includes ferromagnetic layers that assist in switching the hard magnetic storage layer, and optional coupling layers." Dkt. 195 at 30. MRT failed to proffer sufficient evidence

for a reasonable jury to find a NH in the accused products for at least two independent reasons.

*First*, MRT's evidence conflates the NH and the HMSL. *Supra* Section III.A. But doing so ignores the fact that the patent claims and specification call out and require two distinct claim requirements. As shown above, MRT's only evidence relating to the storage of information invited the jury to find either: (1) that the entire stack meets the HMSL limitation, or (2) that the accused products' multiple storage layers together constitute the NH. Neither finding would constitute a finding that the accused products contain a distinct NH. *See* Dkt. 321 at 8. This warrants judgment as a matter of law.[2]

*Second*, MRT failed to present sufficient evidence for a reasonable jury to find that the alleged NH of the accused products "assist[s] in switching" a HMSL as required by the Court's construction. MRT relies on three pieces of evidence presented through Dr. Re's testimony: (1) modeling unrelated to any accused product, (2) slide 152 of Dr. Re's own demonstratives, and (3) JX2047, a 2010 WD conference presentation. 7/19/24 Vol. I Tr. 22:12-25:25. Dr. Re opined that "the switching *should be* incoherent," (i.e., using the "domino" theory of sequential magnetization changes MRT relies on for assistance), not that it was, in fact, incoherent in any accused product. *Id*. This is insufficient to avoid JMOL.

Testimony from Dr. Re and named inventor Dr. Suess established that the "modeling" Dr. Re relies on for this limitation was a simulation Dr. Suess presented at a conference in 2008—10 years before the earliest possible date of infringement. 7/17/24 Vol. I Tr. 92:24-93:21. Rather than measure or model the accused products,

---

[2] In addition to no infringement as a matter of law due to MRT's failure to prove the accused products have a HMSL separate from a NH, for the reasons set forth in WD's concurrently-filed motion for a new trial, WD also should have been permitted to affirmatively argue to the jury in closing why all layers in the accused products were storage layers, and none could be considered a "nucleation host."

1    Dr. Re relied on Dr. Suess's model to speculate "how the physics works" and inform

2    his infringement analysis. 7/19/24 Vol. I Tr. 31:22-33:3. At best, this model explains

3    how the claimed invention might work in theory based on Dr. Suess's understanding

4    in 2008. And yet, Dr. Re never performed any modeling on his own and never

5    modeled or measured the actual accused products in this case. 7/18/24 Vol. II Tr.

6    74:14-75:6, 78:1-79:15 ("You would have to rely on modeling to prove that."),

7    79:16-22 ("It's a very difficult experimental measurement" … "But clearly, the lower

8    anisotropy layer will start to switch first"), 80:14-18 ("[T]hat's probably a very

9    difficult measurement to make, and I don't have the capabilities to make that

10    measurement."); 7/19/24 Vol. I Tr. 31:22-33:3. Expert testimony without "any

11    examinations or tests of the actual accused products" is insufficient to support an

12    infringement verdict. *Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed.

13    Cir. 2006) (affirming JMOL of non-infringement).

14    Dr. Re otherwise relied on out-of-context statements from WD documents to

15    support his infringement analysis; namely, JX2047, a high-level conference

16    presentation that pre-dates the accused products by 8 years and, accordingly, does not

17    relate to or mention any particular accused product. Even these, Dr. Re conceded,

18    described general concepts, not how the alleged "nucleation host" *in the accused*

19    *products* assists in switching the alleged HMSL. 7/19/24 Vol. I Tr. 31:22-37:3. As

20    WD's technical witness Dr. Desai repeatedly testified, in the accused products, the

21    magnetic stack layers are self-switching and all switch together. 7/23/24 Vol. I Tr.

22    35:7-36:12 ("I've been doing this for 15 years. Yes, they switch together.").[3] That

23    testimony stands unrebutted.

24    Because "[e]xpert testimony that fails to show *how* the accused device meets a

25    particular limitation cannot constitute substantial evidence supporting a finding of

26

27

---

28    [3] The referenced "capping" layer is irrelevant. MRT did not argue that the capping layer meets any limitation.

12

1    literal infringement," MRT's evidence fails as a matter of law.  *Smith v. Garlock*

2    *Equip. Co.*, 658 F. App'x 1017, 1024 (Fed. Cir. 2016) (citing *Johns Hopkins Univ. v.*

3    *Datascope Corp.*, 543 F.3d 1342 (Fed. Cir. 2008)) (emphasis added); *see Hewlett-*

4    *Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003) (holding that

5    infringement verdict was unsupported by substantial evidence because the accused

6    device did not perform the required function).

7        Dr. Re's reliance on the theoretical model further renders his infringement

8    opinion regarding this limitation unreliable such that his testimony cannot support a

9    jury verdict of infringement.  *See In re NFL "Sunday Ticket" Antitrust Litig.*, No. ML

10   15-02668, 2024 WL 3628118, at *3 (C.D. Cal. Aug. 1, 2024) (finding expert

11   testimony unreliable in a post-trial *Daubert* analysis and granting JMOL "because

12   there was no other support" for an element).  At trial, Dr. Re acknowledged that he

13   did not himself know how the switching works in the context of the theoretical model

14   and needed to rely on Dr. Suess to explain the physics.  7/18/24 Vol. II Tr. 73:20-75:6,

15   76:20-77:2 ("I think Dr. Seuss' [*sic*] simulation show[s] that, but I did not show that.").

16   When cross-examined about the implications of the timescale at which the bits in the

17   accused products flip (less than a nanosecond), Dr. Re could not respond, deferring to

18   Dr. Suess.  *Id.* at 74:14-19 ("I think I'd have to ask Dr. Seuss about that.").  Dr. Suess,

19   of course, could not perform the analysis with respect to the accused products as he

20   was not "permitted access to WD's internal technical documents."  Dkt. 558 at 8; *see*

21   *also* 7/18/24 Vol. II Tr. 74:14-22, 78:1-16.

22       An expert who "lacks critical information about the basis for [their] opinion that

23   would be necessary for [the opposing party] to effectively cross-examine [them],"

24   demonstrates unreliability that cannot be cured through cross-examination. *Hoya*

25   *Corp. v. Alcon Inc.*, No. 3:20-cv-3629, 2024 WL 310706, at *19 (N.D. Tex. Jan. 26,

26   2024); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that where an expert

27   considers relevant material but fails to provide an opinion explaining how that

28   material leads to his conclusion, "[a] court may conclude that there is simply too great

an analytical gap between the data and the opinion proffered"). Dr. Re's testimony relying on Dr. Suess's models should be excluded and, therefore, cannot support a jury verdict of infringement.

### C.    MRT Failed to Prove the "Coercivity" Requirements of the Claims

At trial, MRT failed to present sufficient evidence that the accused products meet the coercive field requirement of the HMSL ($H_s > 0.5$ Tesla) or comparative coercive field of the NH ($H_n < H_s$).[4]

As Dr. Suess testified, coercivity is typically measured. 7/17/24 Vol. II Tr. 41:3-42:12. And, MRT has the requisite tools for those measurements. 7/17/24 Vol. II Tr. 41:19-42:5 (confirming Dr. Suess has a vibrating sample magnetometry "VSM" machine in his lab for measuring coercive fields); 7/18/24 Vol. II Tr. 104:18-25 (Dr. Re confirming that his former employer used the same machinery for coercivity). Yet, MRT never measured the coercive fields in the accused products. *Id.* at 105:1-11.

Instead, MRT's infringement expert, Dr. Re, used the equation $2K/M_s$ to *estimate* the coercive fields. 7/17/24 Trial Tr. Vol. I 106:8-21 ("[W]e use a very simple formula to calculate the coercive field."); *see also* 7/18/24 Vol. I Tr. 45:14-47:7, 57:16-58:24, 61:18-63:17, 64:20-66:18, 69:4-70:2, 74:9-75:11, 76:3-6, 91:18-93:20, 96:2-20, 97:9-22, 98:4-100:2; 7/18/24 Vol. II Tr. 15:23-17:24. MRT's estimate fails to meet its burden for two reasons.

*First*, while the patent permits the use of a simple formula ($Hk=2K_{eff} / M_{eff}$) to estimate the coercive field in some contexts, the specification unequivocally establishes that this formula applies only to a bilayer "structure where the magnetization in the hard and soft layer is parallel and uniform." '864 patent at 6:47-51. The simplified formula may be used only because the "bilayer structure leads to the same thermal stability as the single layer structure of the same thickness for the same value of the coercive field and for the same value of the average magnetization."

---

[4] MRT presented no coercivity value for the entire stack. *Supra* at 6-7.

*Id.* at 6:57-60.  MRT's expert (Dr. Re) admitted as much, testifying that this portion of the specification relates to "a structure that only has one hard and one soft layer." 7/18/24 Vol. II Tr. 103:2-104:17.

A bilayer structure is, however, inconsistent with both the claim language and the accused products.  Every Asserted Claim requires at least two NH layers plus a HMSL layer for a minimum of three layers, *see* '864 patent cl. 1; '997 patent cls. 1 and 7, and recites a "multilayer structure," which, Dr. Re testified, "means more than two layers."  7/18/24 Vol. I Tr. 25:10-26:5; *see also* 7/18/24 Vol. II Tr. 104:2-4 (confirming that the "bilayer structure is not the claimed invention").  And, none of the accused products in this case are bilayer products where the magnetization of the layers is homogeneous, parallel, and uniform.  The simplified formula therefore does not accurately represent coercivity.

*Second*, Dr. Suess admitted that there are "some conditions under which that equation … would be a very bad approximation." 7/17/24 Vol. II Tr. 43:24-44:3.  Dr. Suess identified certain parameters to consider before relying on the $2K/M_s$ formula, including (1) layer thickness, (2) anisotropy constant, (3) timescale, (4) ratio of the anisotropy constants, and (5) shape of the grain.  *Id.* at 44:4-10, 45:18-49:3 ("I testified that it can depend on all these parameters, depending on the condition of entities used, this formula.").  The formula itself does not account for these variables.  And Dr. Re never considered or accounted for these variables in the accused products.  *See* 7/18/24 Vol. II Tr. 104:2-105:11; *see also* 7/18/24 Vol. I Tr. 43:25-44:7.  Thus, Dr. Re's reliance on the $2K/M_s$ formula in his infringement opinion is unreliable.  *Gen. Elec.*, 522 U.S. at 146.  Left with no measurements or a reliable estimate, a reasonable jury could not find infringement.

**D.    For Half of Accused Sales, MRT Used Data From Unaccused Products for Values Required to Prove Infringement**

Even if the simplified coercivity estimate $2K/M_s$ were applied, MRT still needs to demonstrate that the accused products have the requisite coercivities pursuant to

that formula.  For Product Group 3 (represented by a product called 5X1), MRT failed to do so.  This Product Group constitutes nearly half (49%) of all accused sales by volume and more than one-third of MRT's requested damages.  7/18/24 Vol. II Tr. 88:18-89:1; 7/19/24 Vol. I Tr. 46:3-11.

For this best-selling group of products, MRT used $K_u$ and $M_s$ values for the G1 layer (the accused HMSL) of the never-sold Cobra G product, not representative product 5X1 or any other product in Group 3.  7/18/24 Vol. II Tr. 89:2-92:17; JX2028. MRT's expert admitted he did not confirm those values apply to any accused product. 7/18/24 Vol. II Tr. 92:18-98:21 (confirming that the $K_u$ and $M_s$ inputs come from a spreadsheet describing Cobra G and that he did not investigate whether Cobra G was accused, sold, or continued beyond 2017).

WD's technical witness confirmed that it would be inappropriate to use data for the discontinued, never-sold Cobra G platform for the "completely different" (and actually accused) 5X1 product because the differing substrate, parameters, process, and grain size would result in different intrinsic properties for the material.  7/19/24 Vol. II Tr. 58:14-59:25 (confirming it would not "make sense to use the test measurements for AL1310 as used in the Cobra G product for the AL1310 that is used in the 5X1 product" because "that's a different product, a different substrate, [and] different property of that intrinsic material," Cobra G was canceled in 2016, was never sold by Western Digital, and is not accused).  MRT therefore failed to present evidence that the accused HMSL for Group 3 (5X1) meets the claimed coercivity requirements and no reasonable jury could find that the Group 3 products infringe.

## IV.    MRT FAILED TO OFFER SUFFICIENT EVIDENCE TO SUPPORT A DAMAGES AWARD

### A.    MRT Failed to Offer Sufficient Evidence of Its $305.9 Million Damages Demand

WD renews its motion for JMOL that no damages should have been awarded. At trial, MRT's expert, Mr. Bergman, presented one damages number: a $305.9

million lump-sum reasonable royalty. That is not, however, the figure in Mr. Bergman's report that he opined the parties would have agreed to at a hypothetical negotiation. Dkt. 359-6 (Bergman Report) ¶ 319. Rather, it is one of two "instructive royalty amounts" Mr. Bergman adjusted to reach a lump-sum reasonable royalty of $253.4 million. Bergman Report ¶¶ 314, 319. At trial, Mr. Bergman failed to analyze under the *Georgia-Pacific* factors how the input number of $305.9 million is transformed into the final number that the parties would have arrived at in a hypothetical negotiation. *See* 7/19/24 Vol. I Tr. 53:20-54:17 (referring generally to *Georgia-Pacific* factors), 58:21-60:7, 119:18-120:7. That is insufficient to support a damages award. *WhitServe*, 694 F.3d at 31 (rejecting a "superficial recitation of the *Georgia-Pacific* factors, followed by conclusory remarks"); *see also Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1350 (Fed. Cir. 2018) ("When performing a *Georgia-Pacific* analysis, damages experts must not only analyze the applicable factors, but also carefully tie those factors to the proposed royalty rate.").

Permitting Mr. Bergman to present this new lump-sum reasonable royalty is also contrary to this Court's rulings excluding the opinion of Dr. Becker (WD's expert) that a lump-sum reasonable royalty would be no more than $1.4 million. In a pretrial order, the Court found that Dr. Becker presented sufficient evidence that the Panasonic Agreement he relied on for his damages analysis was technologically and economically comparable. Dkt. 473 at 13-14. However, the Court also found that Dr. Becker "cannot invite the jury to apply the lump sum rate from the Panasonic Agreement as the reasonable royalty rate here," citing *Wordtech Sys. Inc. v. Integrated Network Sols., Inc*., 609 F.3d 1308, 1320 (Fed. Cir. 2010). *Id.*

MRT requested clarification of that order, submitting a brief that highlighted *Wordtech* and incorrectly argued that Dr. Becker would improperly invite the jury to apply the lump sum from the Panasonic Agreement because there is no "'additional data,' such as 'how the parties calculated the lump sum, the licensee's intended products, [and] how many products each licensee is expected to produce.'" Dkt. 484-1

1    at 1.  MRT misstated the facts and the law.  Dr. Becker's opinion was not a bare

2    application of the lump sum in the Panasonic Agreement.  Rather, he properly relied

3    on the Panasonic Agreement as a starting point based on its technological and

4    economic comparability (which the Court found sufficient) and applied the

5    *Georgia-Pacific* factors to "bring the rate up or down."  Dkt. 498-2 at 1.  Further,

6    MRT misinterpreted *Wordtech*.  Dkt. 498-2 at 1-2.  *Wordtech* does not "require[]" an

7    expert to consider specific "additional data" as MRT contends.  Dkt. 484-1 at 1-4.

8        The Court, however, adopted MRT's positions and precluded Dr. Becker from

9    relying on the Panasonic Agreement other than for rebutting Mr. Bergman's

10   discussion of the MagSil Agreement.  Dkt. 505 at 1.  The Court further concluded that

11   Dr. Becker could not present any damages number because it "already excluded" Dr.

12   Becker's "Analytical Approach," "the other piece" of Dr. Becker's *Georgia-Pacific*

13   analysis.  *Id.* at 3.  In other words, according to the Court's clarification order,

14   excluding one of only two inputs into the calculation of the ultimate damages figure

15   rendered Dr. Becker's opinion improper and so his damages calculation was

16   precluded.

17       Under the Court's reasoning, the same is true for Mr. Bergman's $305.9 million

18   figure.  Prior to trial, Mr. Bergman opined that the lump-sum reasonable royalty would

19   have been $253.4 million (not $305.9 million).  Dkt. 512-1 at 2.  He arrived at the

20   $253.4 million figure by calculating the midpoint between two inputs—the Market

21   Approach ($200.9 million) and the Income Approach ($305.9 million).  *Id.*  MRT's

22   first input ($200.9 million) was struck, so Mr. Bergman relied solely on the second

23   input ($305.9 million)—arguing, for the first time at trial, that a lump-sum reasonable

24   royalty would have been $305.9 million.  *Id.* at 1.  Under the Court's prior reasoning,

25   the Income Approach ($305.9 million) is "just a piece" of Mr. Bergman's *Georgia-*

26   *Pacific* analysis and "cannot stand alone to support the lump sum figure."  Dkt. 505 at

27   3.  At trial, Mr. Bergman did not make any adjustments, present any analysis of other

28   factors, or provide "additional data" to reach a $305.9 million lump sum.  7/19/24 Vol.

1  I Tr. 59:21-60:7.  For that additional reason, Mr. Bergman's testimony cannot support

2  a damages award.

3          **B.    MRT's Damages Demand Was Based on the Incorrect SSPPU**

4          JMOL of no damages should be granted for the separate reason that MRT

5  legally erred by incorrectly identifying the smallest salable patent-practicing unit

6  ("SSPPU").  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014)

7  (internal citation omitted).  At trial, MRT's expert, Mr. Bergman, presented only a

8  $305.9 million damages demand based on profits of the entire hard disk drive.  But

9  the entire hard disk drive is not the SSPPU.  MRT presented no evidence that the entire

10  market value rule applies.  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d

11  51, 67 (Fed. Cir. 2012) (referring to the entire market value rule as a "narrow

12  exception").  And Mr. Bergman did not further apportion as required.  *Uniloc USA,*

13  *Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (finding that the patentee

14  "must in every case give evidence tending to separate or apportion the defendant's

15  profits and the patentee's damages") (internal quotations and citation omitted).

16          There is uncontroverted evidence that the SSPPU is the media (a component of

17  the hard disk drive) and not the entire hard disk drive.  *See LaserDynamics*, 694 F.3d

18  at 68-70.  Ms. Salayphonh (a WD fact witness), testified that WD buys media from a

19  company called Showa Denko.  7/23/14 Vol. II Tr. 64:16-21, 72:7-74:12; 7/24/24 Vol.

20  II Tr. 20:22-21:25.  Western Digital uses the Showa Denko media platters in the

21  accused hard disk drive products.  7/23/24 Vol. II Tr. 72:7-24; 7/24/24 Vol. II Tr.

22  92:13-21.  The cost of the components, including the media platters, is readily

23  available information that WD tracks.  7/23/24 Vol. II Tr. 71:11-72:6.  However,

24  rather than starting with the media, Mr. Bergman started with the entire hard disk drive

25  as the SSPPU.  7/19/24 Vol. I Tr. 124:9-127:22; *see also id.* at 124:19-23 (admitting

26  that the "starting point before I make all the allocations" is "revenues for the entire

27  hard disk drive").

28          Starting with the profits of the entire hard disk drive is prejudicial, even if Mr.

Bergman claims to have apportioned down to the value attributable only to the claimed invention.  7/19/24 Vol. I Tr. 126:4-12; *see Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc*., 809 F.3d 1295, 1302 (Fed. Cir. 2015).  As the Federal Circuit recited in *Commonwealth*, there are "two justifications" for requiring a patentee to start with the SSPPU.  809 F.3d at 1302.  First, "calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product."  *Id.*  "Second is the 'important evidentiary principle' that 'care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product.'"  *Id.*  "[D]isclosure of the end product's total revenue 'cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.'"  *Id.*  It was improper for MRT to do so here.

While MRT may cite to the portion of *Commonwealth* finding it "untenable" to begin with the SSPPU in every case, *Commonwealth* made clear this was in the context of relying on "comparable licenses" that already apportion, not the Income Approach propounded by Mr. Bergman.  *Commonwealth*, 809 F.3d at 1303 (finding such a "rule" "untenable" because "[i]t conflicts with our prior approvals of a methodology that values the asserted patent based on comparable licenses").

## C.    MRT's Regression Model Is Unreliable

MRT has also failed to meet its burden of proof on damages by failing to apportion to the purportedly "infringing features" of the accused products "and no more." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018).  Mr. Bergman's $305.9 million demand is based on a flawed regression model that overestimates the price per terabyte, underestimates the cost per terabyte, fails to account for research and development, and fails to apportion.  Mr. Bergman, therefore, grossly overestimated the alleged damages.

As Mr. Bergman testified, his regression model relied on values for only 56 percent of the accused products, or "External Products," for all accused products.

7/19/24 Vol. I Tr. 131:11-132:3 ("It's not the precise amount, that's true."), 132:4-19 ("It is not that number."), 136:6-25.  Inaccuracy in these figures directly affects the gross profit per terabyte.  7/19/24 Vol. II Tr. 17:22-18:10 (confirming that "if the price per terabyte is too high" or the "cost per terabyte is too low," the "gross profit per terabyte would also be too high").  Indeed, when Mr. Bergman applied the $11.24 gross profit per terabyte to the 89 million terabytes sold between March 2018 and June 2023, he arrived at gross profits of over a billion dollars—nearly double the gross profits "associated with the accused products" of "between 577 million to 665 million."  *Id.* at 28:3-22.  Further underscoring the unreliability of his model, Mr. Bergman confirmed that the result is that "Western Digital would pay MRT basically more than the R&D costs that [he accounts] per terabyte."  *Id.* at 24:8-16.

\*     \*     \*

Accordingly, for any of the foregoing reasons, WD's renewed motion for JMOL of no damages should be granted.

## V.    CONCLUSION

For the reasons set forth above, WD respectfully requests entry of judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).

DATED:  Sept. 26, 2024          **LATHAM & WATKINS LLP**

By:   */s/ Douglas E. Lumish*
      Douglas E. Lumish
      Richard G. Frenkel
      Gabriel K. Bell
      Patricia Young
      Joseph H. Lee
      Linfong Tzeng
      Sarah W. Wang
      Charles S. Dameron
      Ashley N. Finger
      Chaarushena Deb


**STRADLING YOCCA CARLSON & RAUTH LLP**

1

2          Steven M. Hanle
           Salil Bali
3          Ahmad S. Takouche
           Henning Schmidt
4
5          *Attorneys for Defendant and*
           *Counterclaim Plaintiff Western Digital*
6          *Technologies, Inc.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF COMPLIANCE</u>

2           The undersigned, counsel of record for Western Digital Technologies,

3     Inc. certifies that this brief contains 6,991 words, which [choose one]:

4            <u>X</u>  complies with the word limit of L.R. 11-6.1.

5           ____ complies with the word limit set by court order dated [date].

6

7     DATED:  Sept. 26, 2024           **LATHAM & WATKINS LLP**

8                                      By:   <u>*/s/ Douglas E. Lumish*</u>
                                              Douglas E. Lumish
9                                             Richard G. Frenkel
                                              Gabriel K. Bell
10                                            Patricia Young
                                              Joseph H. Lee
11                                            Linfong Tzeng
                                              Sarah W. Wang
12                                            Charles S. Dameron
                                              Ashley N. Finger
13                                            Chaarushena Deb
14
15                                     **STRADLING YOCCA CARLSON & RAUTH LLP**
16
17                                            Steven M. Hanle
                                              Salil Bali
18                                            Ahmad S. Takouche
                                              Henning Schmidt
19
20                                     *Attorneys for Defendant and Counterclaim Plaintiff Western Digital Technologies, Inc.*
21
22
23
24
25
26
27
28

WESTERN DIGITAL TECHNOLOGIES, INC.'S MEMO ISO MOT. FOR JMOL
PURSUANT TO FED. R. CIV. P. 50(b)
8:22-cv-01599-JVS-DFM