UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE JAMES V. SELNA, JUDGE PRESIDING

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| MR TECHNOLOGIES, GMBH, | ) |
| | ) |
|     Plaintiff and | ) |
|     Counterclaim Defendant, | ) |
| | ) |
|      vs. | ) SACV NO. |
| | ) 8:22-cv-01599-JVS-DVM |
| WESTERN DIGITAL TECHNOLOGIES, | ) |
| INC., | ) |
| | ) |
|     Defendant and | ) |
|     Counterclaim Plaintiff. | ) **DAY 5, VOLUME II** |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

TUESDAY, JULY 23, 2024

1:02 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF and COUNTERCLAIM DEFENDANT:

MARC A. FENSTER
RUSS, AUGUST & KABAT
12424 WILSHIRE BOULEVARD
12TH FLOOR
LOS ANGELES, CALIFORNIA 90025
(310) 826-7474
mfenster@raklaw.com


BRIAN D. LEDAHL
RUSS, AUGUST & KABAT
12424 WILSHIRE BOULEVARD
12TH FLOOR
LOS ANGELES, CALIFORNIA 90025
(310) 826-7474
bledahl@raklaw.com


JACOB ROBERT BUCZKO
RUSS, AUGUST & KABAT
12424 WILSHIRE BOULEVARD
12TH FLOOR
LOS ANGELES, CALIFORNIA 90025
(310) 826-7474
jbuczko@raklaw.com


MATTHEW D. AICHELE
RUSS, AUGUST, KABAT, *pro hac vice*
800 MAINE AVENUE, SW
SUITE 200
WASHINGTON, D.C. 20024
(202) 664-0623
maichele@raklaw.com


MINNA Y. CHAN
RUSS, AUGUST & KABAT
12424 WILSHIRE BOULEVARD
12TH FLOOR
LOS ANGELES, CALIFORNIA 90025
(310) 826-7474
mchan@raklaw.com

**APPEARANCES OF COUNSEL:** *(Continued)*

FOR THE PLAINTIFF and COUNTERCLAIM DEFENDANT:

PAUL A. KROEGER
RUSS, AUGUST & KABAT
12424 WILSHIRE BOULEVARD
12TH FLOOR
LOS ANGELES, CALIFORNIA 90025
(310) 826-7474
pkroeger@raklaw.com

REZA MIRZAIE
RUSS, AUGUST & KABAT
12424 WILSHIRE BOULEVARD
12TH FLOOR
LOS ANGELES, CALIFORNIA 90025
(310) 826-7474
rmirzaie@raklaw.com

DALE CHANG
RUSS, AUGUST & KABAT
12424 WILSHIRE BOULEVARD
12TH FLOOR
LOS ANGELES, CALIFORNIA 90025
(310) 826-7474
dchang@raklaw.com

FOR THE DEFENDANT and COUNTERCLAIM PLAINTIFF:

DOUGLAS E. LUMISH
LATHAM & WATKINS LLP
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
doug.lumish@lw.com

JOSEPH HYUK LEE
LATHAM & WATKINS, LLP-COSTA MESA
650 TOWN CENTER DRIVE
20TH FLOOR
COSTA MESA, CALIFORNIA 92626
(714) 540-1235
joseph.lee@lw.com

**APPEARANCES OF COUNSEL:** *(Continued)*

FOR THE DEFENDANT and COUNTERCLAIM PLAINTIFF:

SALIL BALI
STRADLING YOCCA CARLSON & RAUTH P.C.
660 NEWPORT CENTER DRIVE
SUITE 1600
NEWPORT BEACH, CALIFORNIA 92660
(949) 725-4278
sbali@stradlinglaw.com


CHAARUSHENA DEB
LATHAM & WATKINS LLP
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
chaaru.deb@lw.com


STEVEN M. HANLE
STRADLING YOCCA CARLSON & RAUTH P.C.
660 NEWPORT CENTER DRIVE
SUITE 1600
NEWPORT BEACH, CALIFORNIA 92660
(949) 725-4094
shanle@stradlinglaw.com


SARAH W. WANG
LATHAM & WATKINS LLP
330 NORTH WABASH AVENUE
SUITE 2800
CHICAGO, ILLINOIS 60611
(312) 876-7700
sarah.wang@lw.com


PATRICIA YOUNG
LATHAM & WATKINS LLP
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
patricia.young@lw.com

**APPEARANCES OF COUNSEL:** *(Continued)*

FOR THE DEFENDANT and COUNTERCLAIM PLAINTIFF:

RICHARD GREGORY FRENKEL
LATHAM & WATKINS LLP - MENLO PARK
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
rick.frenkel@lw.com

**ALSO PRESENT:**

Wendy Liu, Paralegal, Russ August & Kabat

Dieter Suess, MR Technologies, Corporate Representative

Chris Schmoller, Litigation Support, Western Digital Technologies

Mary Noffsinger, Jury Consultant, Western Digital Technologies

I N D E X

| DEFENDANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER GOGLIA, PH.D | 8 | 37 | 55 | 60 |
| CHANTHEE SALAYPHONH | 62 | 79 | | |
| GERARDO BERTERO, PH.D | 82 | | | |

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| JX-2047 The 21st Magnetic Recording Conference 2010, August 16-18, 2010 | | 139 |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| JX-2021 Bertero, G. et al., "Advanced Double Exchange-Break PMR Media Structures" | | 71 |
| JX-2099 NGOPEX Operating Expense - USD Reporting Projects | | 67 |

**SANTA ANA, CALIFORNIA; TUESDAY, JULY 23, 2024; 1:02 P.M.**

**-o0o-**

*(The following proceedings were had outside the presence of the jury:)*

THE COURT:  Are you ready to proceed?

MR. BALI:  Defense is ready.

MR. LEDAHL:  Yes, Your Honor.

THE COURT:  You may proceed.

Do you have something?

MR. LEDAHL:  No.  I thought we needed the jury.

THE COURT:  Oh.

MR. LEDAHL:  I thought we -- I was just standing for them, that's all.

*(Pause.)*

*(Jury enters courtroom.)*

*(The following proceedings were had in open court in the presence of the jury:)*

THE CLERK:  Be seated and come to order.  This Court is again in session.

THE COURT:  Good afternoon, ladies and gentlemen of the jury.

Mr. Bali.

MR. BALI:  Thank you, Your Honor.

*(The document was published in open court.)*

///

*Deborah D. Parker, U.S. Court Reporter*

PETER GOGLIA, PH.D, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. BALI:  *(Continuing)*

Q    Dr. Goglia, just to reorient us, we -- before we left for the lunch break, we were discussing the slide by -- that Dr. Re presented in 2015.  And this slide, just so we -- all on the same page, this slide, what does it show again?

A    Again, this shows a timeline of areal density from 1950 to 2019 or so.

Q    Okay.  You prepared another chart showing Dr. Re's positions in this case.  Let's turn to that and maybe you could explain this to the jury.

A    Yes.  Well, the previous chart had many technologies that covered areal density growth in different periods of time.  If we compare that to what Dr. Re presents in terms of areal density growth, he's showing two periods not tied to any products and only one technology.

Q    Dr. Re's position in this case is that the MRT patents are responsible for 46 percent of all areal density improvements since the 1950s.

Do you agree with those claims?

A    I do not.

Q    Could you help the jury understand why you disagree?

A    Yes.  As I mentioned before, tremendous technology advancement happened prior to this period in time.  We saw

tremendous growth, hundreds of millions of times density improvement prior to the introduction of this technology of PMR.

So it ignores that 50 years plus of technology development. It's not based on any actual products. It's points in time, and there's no one technology that really moves the needle by itself. And in areal density, you need to move all of the technologies together, and so you --

*(Court Reporter requests clarification for the record.)*

THE WITNESS: You need to move all of the technologies together. So there's many technologies involved, and I'll talk about a few of those.

BY MR. BALI:

Q    So in reaching his 46 percent, Dr. Re has opined that a hundred percent of areal density between 300 and 700 is attributable to the MRT patent.

Do you agree with him?

A    I do not.

Q    Okay. So let's take a moment and just remind the jury of the math that gets us to the 46 percent.

Could you walk through the math for the jury?

A    Sure.

So there's three periods of time involved here. There's zero to 300 gigabits per square inch, and that's all

the time that's being accounted for prior to the alleged invention introduction.  And then there's 300 to 700.  In that period of time, hundred percent of the areal density increase is attributed to one thing:  The MRT patents.  And then beyond that, from 700 to 1300 gigabits per square inch, one-third or 33 percent, 33.3 percent, is being attributed to the MRT patents.

So if you go through the math, we're talking about gigabits per square inch, and there was 400 gigabits per square inch increase from 300 to 700, hundred percent of that, so that's 400.  And then 33 percent of 700 to 1300.  Well, there's 600 gigabits per square inch between those two limits.  One-third of that is 200.  So that 400 plus 200 is 600 divided by the areal density at the end of this period, 1300, which results in Mark Re's -- Dr. Mark Re's 46 percent.

Q    So why do you disagree with Dr. Re on this?

A    Well, there are many other technologies that contribute to areal density, not just one.  And when you put those technologies together, then you have to attribute areal density growth to multiple technologies.

Q    So when exactly was -- or approximately was PMR introduced into products?

A    PMR was introduced somewhere around 2005, 2006.

Q    And when it was first introduced, how many layers did

those products have?  How many magnetic layers -- sorry -- did those products have?

A    Oh, it's my understanding that it was in two-layer product.

Q    What was the predecessor technology to PMR?

A    Well, from the beginning of the industry in 1956, longitudinal magnetic recording was utilized, right up until the point when MMR was introduced in 2005/2006.  And that was the period of time when all that tremendous technology growth occurred.

Q    And were there improvements to LMR over that long range?

A    Clearly, you know, huge improvements in LMR technology.

Q    And was the average areal density industry-wide when PMR was first being introduced to the market?

A    PMR was introduced somewhere in the 240 to 300-gigabit-per-square-inch range.

Q    And did the density -- the areal density gains after the introduction of PMR increase using that early PMR products?

A    Well, that's where it was introduced, but there were advancements beyond that.

Q    So why would the industry keep working on early PMR products?

A    Well, any new technology and introduction, you really

*Deborah D. Parker, U.S. Court Reporter*

try to minimize your risk.  So if you can introduce a new technology combined with an older technology, you would do that to split your risk.  I can give you an example.

When I was at WD, we split products into TMR, which is an old reader technology, with PMR, because the PMR gave you a lot more signal by itself.  PMR was old reader technology combined with new writer technology.  But we had another product that used LMR, the old writer technology, combined with tunneling, which is a new reader technology.

So split it to try to minimize the risk.  And this is common to try to introduce products, put more focus on the new technology by itself and utilize older technology along with it.

Q    And in that example you gave the jury, did both of those products give you areal density increases or areal density improvements from the prior products?

A    They did.

Q    So is it your opinion that Dr. Re -- oh, sorry, let me rephrase.

In your opinion, has Dr. Re properly accounted for the areal density gains from early PMR products?

A    No.

Q    And can you explain that?

A    Well, I mean, PMR started in that range of 240 to --

        *(Court Reporter requests clarification for the*

*Deborah D. Parker, U.S. Court Reporter*

*record.)*

THE WITNESS:  240 -- sorry.  240 to 300 gigabits per square inch.  And in that period of time, other technologies were contributing to areal density growth other than the media technology.  So there were products that continued to use bilayer media.  There were products that continued to use other new technologies, other older technologies.  There were really a combination of product development that occurred in that time frame.

Q   So let's take a step back and talk about road maps. We've seen several different road maps in this case so far. Can you explain the role that road maps play and how they are coordinated through a company like Seagate or Western Digital?

A   Yes.  Road maps are essential to communication throughout the company.  It starts with a product road map. There's a set of products over time that the company wants to offer to the public, and these will be split out into consumer products and enterprise products and capacity points and time.  And that becomes the overarching goal for all the development within the company.

So it will roll down into things that are non-areal density-related, like power consumption and vibration and interface and pre-amp and other factors.  And then there'll be a whole group that's areal density-related,

and there's dozens of different divisions that work on things that contribute to areal density.  And you'll see media, servo --

(Court Reporter requests clarification for the record.)

THE WITNESS:  Media, servo, channel, platter count.  That's not areal density, but it does contribute to capacity.  The read head, the write head, sector layouts, head media spacing.  All these different technologies are contributing to areal density growth or capacity growth.

BY MR. BALI:

Q    So would it be common for different divisions to have road maps that show similar areal density achievement goals?

A    Yes.  It's all very tightly coordinated with the areal density roadmap process.  There's numerous meetings continuously cross-checking on who's contributing what in their area to contribute to the same areal density goals over time.

So you'll see road maps from read head, write head, media, servo, channel, all targeting the same areal density goals.  It doesn't mean they all are -- each are responsible for that goal.  They're responsible for their part in achieving that goal.

Q    So how have you been involved in this road map coordination?

A    Both at Seagate and Western Digital, I was part of that road map process.  I worked across the company in developing technologies within my own division and cross-checking with other divisions on, you know, their related contributions and making the proper trade-offs between those.

Q    Were there other non-media innovations or technologies that Dr. Re failed to consider in his analysis?

A    Yes.

Q    Could you talk through, briefly, with the jury some of these key other technologies?

A    Yes.  There were dozens of technologies.  I'm picking out five key technologies, and we'll go through them one at a time.  Dynamic flying height control.  Low-density parity-check.  Tunnel injunction or TUMR readers.  Wraparound write head shielding and dual stage servos.

Q    In your opinion, were any of these innovations ordinary improvements, as Dr. Re has characterized them?

A    Well, each of these is a critical improvement required for areal density growth.

Q    Let's walk through these.  The first one you mentioned dynamic flying height control.  Could you explain what dynamic flying height control is to the jury?

A    Yes.  Dynamic flying height control is a means of reducing the spacing between the head and the disk.  The head media spacing is a combination of a number of things.

It's the head which flies on a thin film of air or helium, in some cases, over the disk and the coding thicknesses on the disk and on the head, among other things.

Nominally in this time frame without dynamic flying height control, the head would fly at 10 nanometers. Now, that's a really small number. And the goal of the dynamic flying height control was to bring that spacing down to 2 nanometers, but 2 nanometers is a 100,000 times less than -- no, 30 -- 35,000 times less than the diameter of a human hair. It's a very small number.

And by putting a heating element in the trailing edge of the slider right above the read sensor or the write sensor, you can create that shape change. That shape change pushes the head down in a very controlled manner. There's feedback that gives you an idea where that spacing is relative to the disk so you can stay away from contacting the disk.

Contacting the disk is destructive to the head, so you want to remain, you know, some very controlled spacing away from the disk, and this allows you to -- to do that. This is -- 2 nanometers is like 10 carbon atoms thick. It's a very small number.

Q   And so how did this impact areal density?

A   It -- head media spacing is a very critical part of areal density. Now, I have a chart up here that shows the

trend of head media spacing as it relates to areal density. It's a constant requirement over the growth of areal density that you must reduce the head media spacing.

As the head gets closer to the disk, you can refine the amount -- you can resolve either in writing or reading and there's just no way around it that over time, as areal density goes up, you have to reduce the spacing. And when you get down to spacings of the order we're talking about, these nanometers, it's -- it requires innovation, invention, and a tremendous amount of R&D.

Q    So the second technology you mentioned was low-density parity-check.

Could you explain that briefly to the jury?

A    Yes.  Low-density parity-check is a channel technology. It's an error correction technology and it is a new way of doing this error correction that made a big improvement over the previous method.  And what it allows you to do is to recover a signal.

Now, the signals, the ones and zeros are coming in through the recording head and amplifier -- the pre-amplifier, and then are -- you try to decode them, but there's noise in there.  And with the coding schemes, you try to accurately detect those ones and zeros in the face of noise.  And the LDPC code --

*(Court Reporter requests clarification for the*

*Deborah D. Parker, U.S. Court Reporter*

*record.)*

THE WITNESS:  Yeah.  The LDPC code changes the rules on how much noise is allowed.  It allows more noise and less signal and still accurately recover the data.  And why is this important?  Because areal density depends on making smaller bits.  And with smaller bits, you get less signal.  You don't reduce the noise as much as you reduce the signal.  So this allows higher density recording system to be designed.

Q    So the third technology you talked about is tunneling junction Magnetoresistive reader.  Could you explain that mouthful to the jury?

A    Yes.  Tunneling junction Magnetoresistive or TUMR is a new technology for the reading sensor.  If you look at the chart here, we'll take a look at the left-hand one.  It's the previous technology.  It's called GMR.  And if the current that is used to sense the signal goes from left to right.  And if I use a Post-it Note to represent that -- that little stripe that -- that's the reading sensor, the current goes from left to right or your right to left.

And this is a fairly low resistance film, and in the presence of a magnetic field, you get a small signal.  It's on the order of 5 percent change in resistance, and that doesn't give you a lot of signal.

In the development of tunneling, the process was

turned on its head.  Instead of going from left to right, now you're going through the film, through a very complex tunneling barrier.  And that barrier creates much more resistance and the change in resistance is much higher, so you get much higher signal.

It's about 75 percent change in resistance, so you get 15 times more signal.  That's dramatic and a big improvement in your ability to read small signals.

Q    So the tunneling TUMR reader technology continued developing.  Has it continued to develop after its introduction?

A    Yes, it's continued throughout this time frame.  In fact, it's -- it continued to innovate and improve it.  It's used in today's products.

Q    So by 2009, what was the areal density that the TUMR reader helped the industry accomplish?  Sorry, yeah, 2011.

A    2011?  If we look at this chart we were looking at, the maximum areal density is shown right here at 750 gigabits per square inch.

Q    And the fourth technology you mentioned is wraparound write head shielding.

A    Yes.

Q    Can you explain what wraparound write head shielding is to the jury?

A    Yes.  So we talked about the reader.  That's -- that

reads back the signal that's captured in the disk.

This is the writer. This is the element that writes the disk, writes the bit to the disk. If you look at this area right here, you can see the magnetization going through the disk -- this is the disk layer -- down into a soft underlayer, then returning through a return --

*(Court Reporter requests clarification for the record.)*

THE WITNESS: -- pole. Now, you can see here there's a spread to the magnetization, and you really want to contain that as much as possible. The first introduction was a trailing and shield which positioned at the one side of the head which pulled in the field a little bit and allowed you to write a smaller bit along the --

*(Court Reporter requests clarification for the record.)*

THE WITNESS: -- along the track.

And then if you go to the next page, the wraparound shield -- and that's this item here -- put a shield around the writer and pulled the field in narrower, which allows you to write more tracks without interference.

BY MR. BALI:

Q    And what was the areal density benefit from this wraparound shield -- shielding?

A    Well, you can't say by itself what the areal density

benefit is, but is used in this range of areal density from 450 through, you know, much higher.

Q    So these are two of the last documents or two of the last charts we just saw, and both were road maps and they development milestones at -- let's say, pick September of 2009.  Is this what you were talking about with road map coordination?

A    Yes.

Q    And so what does this show in terms of the development at 2009?

A    Well, I mean, as I mentioned before, road maps are used throughout the technology development community in each company and they're coordinated.  So each technology is looking at the developing their part for that areal density.

And you're looking at, you know, family to family, program to program, areal density range to areal density range, all looking at the same numbers.  So it's not that each one of them by itself contributes to that areal density, it's that all of them together working on their part of that then result in a product that gives you that areal density.

Q    So the fifth technology that we discussed was dual-stage servos.  Could you explain that to the jury?

A    Yes.  The servo system -- and you may have heard something about this before -- is the system that holds the

head up over the disk much like a tone arm holds its needle over -- over a record and applies -- and tracks the grooves.

Well, the previous technology was a single pivot that moved the arm over the tracks, which are concentric rings on the disk, and accurately, as accurately as you can, positions it over the track so that it can read the bits on that track.

The dual-stage servo, as the tracks get narrower, they're harder to follow, harder to keep the head within the confines of the tracks so it can actually read.  So now instead of just having one pivot, you have a pivot like introducing my wrist, smaller and lighter and more accurate and can allow the head to follow smaller tracks.

Q    So how did this impact areal density role?

A    Well, if you can follow smaller tracks together with other technologies to creates smaller tracks, you can improve the number of tracks on the disk.  More tracks you can put on the disk, the higher the capacity.

Q    So as a reminder, Dr. Re has opined that a hundred percent of areal density gains between three and 700 are attributable to the MRT patents.  Does he include any of these technologies that we were just discussing?

A    None of these are included in his analysis.

Q    Were these technologies advances as a result of nominal research efforts?

A    Well, I think we just went through some of the dramatic technology development required for each of these.  It's not nominal.  It's highly innovative or revolutionary.

Q    Do any of these technologies we just discussed have anything to do with graded anisotropy or media composition?

A    None of these are media related at all.

Q    So how would you allocate the contributions to areal density from these non-media-related technologies we were just discussing?

A    Well, just taking these five, I would weight them equally, so one-fifth.

Q    And what if you included media into your allocations, how would that change?

A    Okay.  Now we're looking at six technologies out of many, but again, weighting them equally would be fair.

Q    Were there other technological innovations in media outside of what's claimed by the MRT patents?

A    Well, certainly, yes.

Q    And so how would you then allocate the technology contribution from the MRT patent using this?

A    Well, there were many technologies in media other than the alleged technologies in the MRT patent related to grain and other media innovations.  So if we give all the other innovations in media half and leave half for the MRT patent, then you'd have one-twelfth, which half of one-sixth is

one-twelfth.

Q    And would your allocations change if the relevant range was smaller?

A    No, because all of the other technologies are still required to achieve those density goals.

Q    So we've talked through what the industry needed to get to 700 gigabits per square inch.  Do those same technologies get us over 700 gigabits per square inch?

A    Well, those technologies are still required, but you need more.  There's more technology introduction that's required to get beyond 700 to the 1300 range.

        *(Court Reporter requests clarification for the record.)*

            MR. BALI:  Sorry.

BY MR. BALI:

Q    Could you briefly talk to us about a few of those technologies?

A    Yes.  I've listed six here:  Helium-filled drives.  Shingled Magnetic Recording.  Triple-stage actuators.  Two Dimensional Magnetic Recording.  Energy-assisted PMR and UltraSMR.

Q    So let's go back for a second to Dr. Re's presentation that we were looking at earlier.  I think it's Exhibit 1295.  So the page right before the chart we were looking at earlier -- sorry, the page right after the chart we were

looking at earlier -- page 6 in that document -- is this graphic.

Could you explain to us what this graphic depicts?

A    Well, in this chart, this is -- this is addressing the challenges to increasing drive capacity, and we're looking at three sections: thermal stability, reader-writer scalability, and then drive form factor.

Q    Does Dr. Re suggest solutions to address some of these challenges?

A    Well, the first one is thermal stability, and you can see reduced screen size is one of the things, making grains harder to switch, and then -- but the solution is heat-assisted magnetic recording.

Q    And what about for the second grouping there?

A    Well, you see the scaling of the reader and writer, which means that you need to reduce the bits size, both the width and the length of the bit so that you can pack them in more densely.  And the solution here is shingled magnetic writing and two-dimensional recording.

Q    And the third group over there, what is that?

A    Well, this is addressing the drive itself, and you're looking at adding heads and disks as an opportunity, but then the solutions being advanced mechanical designs, including helium drives, and form factors and optimization for racks.

Q    And were any of the technologies listed by Dr. Re here included in the six technologies you listed for the jury earlier?

A    Yes.

Q    So let's talk about the first technology that you mentioned, helium-filled drives.  Could you briefly explain to the jury what that is?

A    Well, as the name implies, you're replacing the air inside of a hard disk enclosure with helium.  And this isn't trivial by itself since helium likes to escape.  It's a very small atom and it will creep through small cracks in the casting or in seals.  So that introduction itself was significant.

       The effect of that is taking air turbulence which is created when the disk is spinning.  It can spin at speeds -- the tip speed is somewhere around 200 miles an hour.  It creates a turbulence and air.  That turbulence creates vibration and drives the head off the track.  You can see the signal here where air is -- the -- where air is pointing toward a higher signal.  That's showing the effect of the turbulence.  And when you introduce helium, then you get a smaller band of disturbance because you've taken all of the turbulence out.

Q    So the second technology you mentioned was shingled magnetic recording.  Could you explain that to the jury?

A    Yes.  A shingled magnetic recording uses a larger write head to write a smaller track.  It seems like a contradiction, but the way it's achieved is you use a large write head to write a wide track, one wide track -- wide track, then you write another wide track right on top of it.

So you're erasing part of the track and you're leaving a narrow band.  And then you do it again, another narrow band, and again till you have a whole grouping of tracks that create a region of narrow tracks.

Now, this region can then be -- have very high density because you've only left a very narrow track behind, this whole string of narrow tracks.  It gives you the ability to pack more tracks on the disk.

Q    The third technology you mentioned was triple-stage actuators.  Could you explain that to the jury?

A    Yes.  We talked about dual stage before, and this is another innovation on top of that.

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  You have the large actuator on the left with a bearing in the middle.

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  Bearing, yeah.  Sorry.

And then the Milli Actuator, which is a second

stage that we talked about before, introducing a new actuator at the very tip right by the recording head. And it's like adding another -- another more precise element. You've got the large actuator, which is like my elbow, the Milli Actuator, which -- like my wrist, then you have the micro actuator or the third stage. It's like my finger, very small, light, and precise. So now you can track even smaller tracks.

BY MR. BALI:

Q    What was the areal density impact from introducing this third-stage actuator?

A    Well, it was introduced to help exceed 700 gigabits per square inch.

Q    The fourth technology you talk about is two-dimensional magnetic recording. Could you explain that to the jury?

A    Yes.  Two-dimensional magnetic recording or TDMR is a really incredible technology where now you're placing more than one read element on the recording head.  This illustration shows six read elements, so this is -- theoretically, you could use as many as you'd like, but it's very hard to make.

The first introduction was two read elements.  And this is important because as you -- as you read more data at the same time, you have more information to remove errors. There's a lot of different sources of those errors.  One is

*Deborah D. Parker, U.S. Court Reporter*

the common mode --

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  Yeah, sorry.

Common mode noise between the adjacent tracks.  So both heads are reading that same noise, and because you see it in both signals, you can take it out.  In addition, now you have two tracks' worth of data that you're reading at the same time.  Now, air correction depends on having a lot of information.  Now you have twice as much information to eliminate errors.

So this technology is significant in improving your ability to read tracks and eliminate the noise, correct errors.

BY MR. BALI:

Q    The fifth technology you mentioned was energy-assisted PMR.

Could you explain that to the jury?

A    Yes.  So there's many types source -- there's many types of energy-assisted PMR writing.  I'm just going to talk about two.  The first one is DC write bias, and it's shown with an illustration on the left.  There's a small steady current that's superimposed on the signal that stabilizes the head and -- a little bit in the media.  And because you now have a more stable writing process, you can

write smaller bits.

The second one on the right shows -- it's much more complicated.  There's a -- there's actually a device that's deposited inside the write head right in the middle of the gap.  It's a little tiny -- a microwave emitter.  It's called a spin torque oscillator.  And when you excite -- when you energize that, that microwave energy goes into the media and reduces the amount of field you need to flip the bit.  So now you've enabled the head to write on stronger media, and when you remove the microwave energy, it's --

*(Court Reporter requests clarification for the record.)*

THE WITNESS:   -- stable.

BY MR. BALI:

Q    The sixth technology you mentioned is UltraSMR.

Could you explain that to the jury?

A    Yes.  So all UltraSMR is a technology that combines multiple technologies, and this is -- this is kind of the ultimate of how hard drive development works, is you have multiple technologies working together.  This one, there are -- one, two, three, four -- five technologies below we talked about, and now introduces distributor sector formatting.

We talked a little bit about when you have more

information, you can have a more robust error correction. Well, this distributor sector now combines much more information together, and after it's read, then you can use this more information to more effectively reduce any potential errors.

The OptiNAND is a fast buffer and it's used to improve performance. It's especially needed in the shingled write because when you write all these tracks, you're erasing tracks as you write. So if you write a track in the middle, you've eliminated some tracks.

You've got to remember the data on all that tracks from where you wrote to the edge of the band so that later you can come back and reconstruct what you just erased. So having a fast system do that -- to do that enables improved performance of the shingled process.

Q   So to reach the rest of this 46 percent, Dr. Re opines that at least one-third of areal density gains from seven to 1300 are attributable to the MRT patents.

Do you agree with that?

A   No.

Q   Are you familiar with how Dr. Re gets to that one-third number?

A   Yes.

Q   So let's look at presentation JX-2023, which is, I believe, in evidence.

Have you seen this document?

A    Yes.

Q    Okay.  So why don't you agree with Dr. Re that this presentation supports his conclusion?

A    Well, I guess the first point is that it's media focused.  We talked about road maps, and each part of the areal density technology, they have their own road map.  They're all focused on the same areal density ranges, and this would be the media folks talking about the areal density contribution they have.  It's not the only one.  It's one of -- one of many technologies that are required.

The second is there's really no quantification of the contribution of the media.  It just states from three bullets --

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  -- from three bullets, it picks out one and says that's one-third.

So the other part is that this slide was developed in 2011.  It was quite a bit before the period of time we're talking about for 700 to 1300 gigabits per square inch.  So what was -- what was discussed here may not have actually resulted in the things that are claimed.

The last part is, well, that third -- that middle bullet talks about continued optimization.  Well, if it was

revolutionary, then perhaps they would have used different wording.

BY MR. BALI:

Q    So how do you go about -- or what do you use to ground your analysis?

A    There's a couple of things that are critical.  One is something from a more relevant time frame, closer to the area we're talking about.  And the second is quantification.

So we have a chart up now that shows an analysis done by Dr. Roger Wood in 2016.  Now, this is right in the middle of that area that we're talking about.  The other part about this is he's doing a very detailed modeling analysis of how the technology of that time can be advanced in narrow density, and it's based on a baseline of a product.

It's called the "Leo B" at the bottom of the chart, and that's at 1 terabyte per square inch, right in the middle of that range of what we're talking about, areal density improvement.  Each of these lines on the chart represent the contribution that the expert, Dr. Wood, Dr. Roger Wood is estimating based on his detailed analysis, can contribute to improving areal density.  You see there's quite of a number of bullets there.

MR. BALI:  And my fault, but to allow us to orient the jury a little bit, this is JX-2033 at page 23.

BY MR. BALI:

Q   So let me ask you:  Does this slide mention several of the technologies that you were just listing and walking the jury through?

A   Yes.  I mean, we're looking at head meter spacing reduction, the write-head geometries, read head signal to noise, two reader or three reader, two-dimensional recording.  So quite a bit -- quite a few of these channel improvements, quite a few of these bullets represent things I already talked about.

Q   So going back for a second, when you were at Seagate or even Western Digital, would any of these areas discussed here fall under your purview, your leadership?

A   Actually, when I was Seagate and Western Digital, these top four would've been things that I would've managed were I there at that time.

Q   And when you were at Western Digital, how many people were working for you at the time?

A   As I mentioned, more or less 200.

Q   And would you or any one of your scientists claim that one technology you were working on was contributing to 46 percent of all areal density gains?

A   I think Dr. Wood would indicate that that's not the case, and I wouldn't agree that 46 percent was the right number for any one technology.

35

Q    So using this slide, how would you allocate the contributions to areal density from 700 to 1300 from the MRT patent?  And I understand to do that, you have to make assumption that the MRT patents are valid and infringed.  So in that context, what -- how would you allocate?

A    Okay.  Well, using the numbers in the chart as my guidepost, you'd take a look at the media as a 12 percent contribution.  We start there, 12 percent out of the 41 percent.  So then in the media, there's a number of different factors.  You have the --

(Court Reporter requests clarification for the record.)

THE WITNESS:  Sorry.

-- media stack and grain geometry, then media quality.  There's two different items on this chart. Together they constitute 12 percent.

Now, the media quality is unrelated to the MRT patent, so we can take 7.8 percent as listed on here out of the 12 percent.  Leaves 4.2 percent.  Now, we're leave -- left with media stack and grain geometry.  Well, there's a number of factors that go into grain geometry and those are critical for areal density.

There's the media stack, which has more than the MRT patent in it, but let's just say all of it's MRT.  So dividing that half, you take the 4.2 percent and divide it

by two, which results in 2.1 percent.  So then the total allocation -- the total growth that's outlined here is 41 percent, so you take the 2.1 percent, divide by 41 percent, and you're left with more or less 5 percent.  So that's how I would quantify the contribution of the media stack.

BY MR. BALI:

Q    So if we extend your corrections across -- how would -- sorry.

If we extend this correction across, how would that impact the areal density from 700 to 1300?

A    Yes.  So this chart is looking at the same type of analysis that Dr. Re did except now correcting the percentages.  So 300 to 700 is 8.3 percent.  So now you take 8.3 percent times the range there, which is 400, and you get 33 gigabits per square inch.  8.3 percent of 400 is 33.  And then the range from 700 to 1300 we just saw was 5 percent.  And that's 600 gigabits per square inch times 5 percent is 30 gigabits per square inch.

Add those two together, just as was done in the previous analysis, and you get 63.3 percent gigabits per square range total areal density benefit over 1300, and that results in 4.9 percent attributable to media stack.

MR. BALI:  Turn the witness.

(Pause.)

MR. LEDAHL:  May we approach, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. LEDAHL:

Q    Dr. Goglia, I want to start with a little bit of grounding.  You showed a graphic in your presentation and I think you talked a few times about developments over more than 50 years.

Do you recall that?

A    Yes.

MR. LEDAHL:  Okay.  Could we bring up -- I believe it was a demonstrative from your slides, from DX-1460, I think it is.

*(The document was published in open court.)*

MR. LEDAHL:  And let's go to the figure that I think Dr. Goglia showed.

Yes, this one.  Yeah.

BY MR. LEDAHL:

Q    This is a figure that you showed, right?

A    Yes, it is.

Q    And you talked about how these were developments that took place over more than 50 years in the magnetic recording space; is that right?

A    Correct.

Q    Okay.  And I prepared a version of this that I want to

use to just clarify some things?

MR. LEDAHL:  So if we can bring that up.

*(The document was published in open court.)*

MR. LEDAHL:  Now, let's bring up -- I think we have one that we prepared a demonstrative on this, just to -- nope, hold on.  Go back.

BY MR. LEDAHL:

Q   So now, your chart here, if I look at it, the scale on the left, the numbers --

MR. LEDAHL:  Let's see if we can expand that a little bit.

BY MR. LEDAHL:

Q   That scale on the left-hand side, the -- as it goes up, that's what we might call a logarithmic scale, it's not 1, 2, 3, 4, right?

A   Correct.

Q   It goes 1 to --

A   10.

Q   It starts very low.  It -- 10 to the minus 6.  That's a -- less than 1 by a few decimal places, right?  Is that right?

A   Oh.  Yes.

Q   And this is in the quantity where -- this is gigabits per square inch, correct?

A   Right.

39

Q    So right here, if I go right here, that's 1, 1 gigabit per square inch.  That's that point on the scale?

A    That's correct.

Q    Right?  And if I go -- if I want to look for, say, 300 gigabits per square inch, that's way up here, right?

A    That's correct.

Q    Okay.

        MR. LEDAHL:  Now, let's go back out to the document.

BY MR. LEDAHL:

Q    So if we look at this overall chart, 300 gigabits per square inch, that's up here somewhere.  Is that about right?

A    No.  It's lower on the chart.

Q    Okay.  About here?

A    That's about right.

Q    Okay.  So that's about 300 gigabits per square inch.

        Now, you've been here in court this week and you heard Dr. Re testify and Mr. Bergman testify about their analysis; that's right?

A    I did.

Q    And I think I even showed that Dr. Re, in his analysis, he did not suggest that any part of the development between zero and 300 gigabits per square inch was being attributed to Dr. Seuss' invention, right?

A    That's correct.

Q    And that was something that basically had been achieved before his invention.  Fair?

A    Yes.

Q    Okay.  So if we take off all the technologies from this chart before 300 gigabits per square inch, there's not much left, is there?  It's just that SMR that you talked about, shingled-magazine recording.  Is that fair?

A    If you put in the perspective of technology development, everything to the right of that uses -- continues to use many, many of the technologies that were developed prior to that point in time.  So you can say there's --

Q    Dr. Goglia, can you answer my question?

A    Okay.

Q    The only thing that's left above the 300 on your chart that you showed us is the shingled magnetic recording, right?

A    Yes.

Q    Okay.  And all those things, those 50 years of development, those got us to that 300 point, right?

A    Correct.

Q    Okay.  So you understand that Dr. Re wasn't suggesting that Dr. Seuss was taking credit for any of that, he wasn't suggesting that any of that should be credited to the vague and ambiguous of his invention.  Fair?

A    Correct.

Q    Okay.  Now, you indicated and I think in one of your slides early on you told us you had done a pretty fair amount of analysis in this case.  Is that fair?

A    That's fair.

Q    And you showed us -- sorry, one second.  Never read that button quite right.  You showed us -- I think it was this slide.

A    Yes.

Q    And so you talked about reading Dr. Re's report, doing research on the state of the industry, studying Western Digital documents, all those kinds of things?

A    Correct.

Q    Now, I assume you're telling us today that you did all of that before forming the opinions that you offered to the jury in this case, right?

A    Yes.

Q    Okay.  Now, you -- before you get to testify in court, you provide a report that has all those opinions set out.  Yes?

A    Correct.

Q    And the time between when you first got hired, when anybody told you about this case and you actually got hired and the time you provided that report, was a total of 11 days, right?

A    That's correct.  It was a heck of a time, I'll tell you.

Q    So your whole analysis that you're telling the jury you put together, that was done in 11 days?

A    Yes.

Q    And you're not offering opinions here about whether or not any of the products in this case infringe Dr. Seuss' patents, correct?

A    I offer no opinion on infringement.

Q    And you're not offering any opinions on whether they're valid or invalid, right?

A    Correct.

Q    You also mentioned the inventions here -- and you've heard this in court -- relate to media and magnetic recording media, correct?

A    Yes.

Q    Now, you don't have any experience in magnetic recording media as a media expert.  Is that fair?

A    That's fair.

Q    You've not worked with -- excuse me.

     You didn't study magnetic recording media as part of your Ph.D work?

A    I did not.

Q    And you don't hold any degrees in physics relating to magnetic recording media; right?

43

A    That's correct.

Q    No pub -- excuse me.

No publications relating to magnetic recording media?

A    Correct.

Q    And no patents relating to magnetic recording media?

A    Correct.

Q    Okay.  And you've never worked on the development of any of the magnetic recording media; is that right?

A    Not directly, just in cross-functional teams.

Q    Okay.  Now, you were a Western Digital employee from 2004 to 2007, I think you told us; is that right?

A    That's correct.

Q    And you've also -- you've been someone who's testified -- this isn't your first time testifying as an expert and being paid by Western Digital to give testimony; is that right?

A    That's correct.

Q    You mentioned you also worked at sea gay [sic] under Dr. -- Seagate under Dr. Re before you worked at Western Digital; is that right?

A    I don't believe I worked for Dr. Re.

Q    You worked at Seagate, right?

A    I worked at Seagate at the same time Dr. Re was there.

Q    Was he somewhere in the same organizational structure

as you?

A    He was CTO, which is company-wide, so yes.

Q    So you weren't his boss, right?

A    No.

Q    He was a couple levels up from you.  Is that fair?

A    In a different part of the organization.

Q    Your organization wasn't part of the technology at Seagate?

    *(Court Reporter requests clarification for the record.)*

        THE WITNESS:  There was a recording that operation.  I don't believe it reported directly to Dr. Re.

BY MR. LEDAHL:

Q    But you weren't an executive senior to Dr. Re at Seagate --

A    No --

Q    Fair?

A    -- I was not.

Q    Now, let's talk about a few of these technologies that you talked about.  I'm going to start a little bit at the -- you talked about a number of technologies that you said helped exceed 700 gigabits per square inch.

        Do you recall that?

A    I do.

Q    Okay.

MR. LEDAHL:  Let's take a look -- if we have it, could we look at -- Mr. Mortenson, at Dr. Goglia's slide 35. Do you have that there?

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    These are the technologies you talked about, right?

A    Correct.

Q    Now, how many of -- you didn't -- excuse me, strike that.

You don't know how many of the accused products have -- are helium-filled drives.  Is that fair?

A    I didn't quantify that, no.

Q    You would agree that it's certainly not the case that all of the accused products are helium-filled drives in this case, right?

A    Correct.  They used mainly on the enterprise class of drive.

Q    You also, I think, testified you don't know how many of the accused products use shingled magnetic recording.  Is that fair?

A    I didn't quantify that, no.

Q    You don't know.

Now, there are accused products in this case that have densities around 1300 or 1.3 terabits per square inch, correct?

46

A    Yes.

Q    And you're not here testifying that even all of those products use shingled magnetic recording, correct?

A    Correct.

Q    So there are products that have density of 1300 terabit -- 1300 gigabits per square inch but don't use this technology.  Agreed?

A    That's correct.

Q    Do you know if all of the accused products use triple-stage actuators?

A    I don't know.

Q    Do you know if all the accused products use two-dimensional magnetic recording?

A    I don't know for sure, but probably not.

Q    Okay.  So do you know if any of the accused products use two-dimensional magnetic recording?

A    I have high confidence that some do.

Q    Okay.  But you don't know how many?

A    No.

Q    Now, am I -- would it be fair to say that none of the accused products use energy-assisted PMR?

A    That's not correct.

Q    So you talked about a couple of technologies.  You talked about HAMR heat-assisted magnetic recording.

        Do you recall that?

*Deborah D. Parker, U.S. Court Reporter*

A    I didn't talk about that in this presentation.

Q    Okay.  You talked about microwave assisted --

A    Correct.

Q    -- technology.

You would agree with me that certainly not all of the accused products use microwave-assisted recording technology, right?

A    That's correct.

Q    And you don't know how many do and how many don't?

A    I don't have that information, no.

Q    Okay.  And would you agree with me that not all of the accused products use UltraSMR technology?

A    Correct.

Q    And I think you explained earlier that UltraSMR technology -- let me see if I can find your slide here. That was -- that was your slide 48.

MR. LEDAHL:  Let's pull that up if we could.

BY MR. LEDAHL:

Q    So you listed a number of technologies here that go into UltraSMR.  Is that fair?

A    Yes.  Um-hmm.

Q    And you testified at your deposition that all of these technologies in UltraSMR combined increase areal density only about 18 percent, correct?

A    That's correct.

Q    And you also would agree with me that that technology, to use it required media with multiple layers with varying anisotropy, right?

A    I can't testify to that.  I don't know.

Q    Well, let's take a look at your deposition.  You should have a copy there in your binder that I gave you at page 134.  And you can look at 133 as well.

A    *(Witness so complies.)*  Okay.

Q    And if you look at 134, page lines 2 to 6.

Do you have that, sir?  Are you there?

A    Yes, I see it.

Q    And the question was asked:

"QUESTION:  And the media that -- in the system that they required required the allegedly infringing technology of a multilayered media with varying anisotropy; fair?"

And your answer was:

"ANSWER:  That's fair."

Did I read your testimony correctly?

A    That was my answer then, yes.

Q    Okay.  Now, you testified a moment ago your conclusion I think you showed on your last slide was that the patents in this case contributed only about 33 -- or excuse me, about 63 gigabytes per square inch of capacity?

A    Correct.

Q    So is it your testimony, sir, that -- let's put this in context.  Currently, products go all the way up to 1300 gigabytes per square inch, right?

A    A little bit more today, yeah.

Q    But close to that --

A    Yeah.

Q    -- we can agree on that?

A    Yes.

Q    Okay.  So let's use 1300.  That's the top number that was in Dr. Re's analysis, wasn't it?

A    Correct.

Q    Okay.  So it's your testimony that if Western Digital didn't have the benefit of the patents-in-suit, that they'd be 1,240 gigabits square inch?  Is that the opinion you're offering in this court?

A    I'm not making any judgment or opinion on the use of the allegedly infringing technology.

Q    And you certainly wouldn't suggest that the bilayer structure that you said came before Dr. Seuss' invention, you're not suggesting that those structures ever did or even could approach 1,240 gigabits per square inch in density, are you?  You didn't offer that opinion.

A    I didn't.

Q    Now, you were at Western Digital, you said -- I think we established from 2004 to 2007, correct?

A    Correct.

Q    And increasing areal density, that's one of the main objectives of Western Digital's media development efforts. Fair?

A    I would assume so, yes.

Q    It's important for Western Digital to be able to compete in the hard drive market to have areal density, right?

A    One of the most important things, yes.

Q    If it wasn't able to keep up with the areal density of its competitors, it would be difficult for Western Digital to compete.  Is that fair?

A    Yes.  Western Digital has competed at lower areal density in the past and there's always ways to make up some of that, but over a long trend, you'd need to advance areal density.

Q    Now, Dr. Seuss' invention, the invention at issue in this case, that introduced --

    *(Court Reporter requests clarification for the record.)*

        MR. LEDAHL:  Sorry.

BY MR. LEDAHL:

Q    -- that introduced multiple -- multilayer media with varying anisotropy layers, and that was introduced in 2006, correct?

MR. BALI:  Object, Your Honor.

Outside the scope of his testimony.  He's asking to talk about what Dr. Seuss' technology is, and that's not what Dr. Goglia testified to at all.

MR. LEDAHL:  He testified, Your Honor, about these supposed ranges of time and the relevant developments.  I think I'm inquire -- entitled to inquire about some foundational matters.

THE COURT:  Overruled.

BY MR. LEDAHL:

Q   And you have provided information in this case that by the end of 2007, the areal density industry-wide was about 240 gigabits per square inch.  Fair?

A   Correct.

Q   And shortly after that, the industry adopted the technology of multilayered with varying anisotropy and layers, correct?

MR. BALI:  Objection, Your Honor.  That's, again, not part of Dr. Goglia's testimony.

THE COURT:  Overruled.

THE WITNESS:  So it's my understanding that the legacy technology of bilayer continued well beyond 300 gigabits per square inch, so I don't think you're accurate.

BY MR. LEDAHL:

Q   My question, sir, was a little different, so listen

52

carefully.

It was shortly after that 2007 time frame that the industry adopted the technology of multilayered with varying anisotropy and layers, correct?

A    When you say "adopted," are you implying that adopted across the board or there was one product or what?  Can you clarify the question, please?

Q    Well, why don't we take a look at your deposition, because I think you were able to answer my question when we -- your deposition was taken.  Let's look at page 113 of your deposition, lines 5 to 9.  And actually, let me even step back a little bit.  You can look at page 112.  You should have it there at the bottom.

MR. LEDAHL:  Can we bring that up, Mr. Mortenson, starting at line 24?

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    And this is quoting your report, I believe, but the question was asked first:

"QUESTION:  By the end of 2007, the average areal density industry-wide was approximately 240 gigabits per square inch."

Do you see that?

And you said "Yes."  That's referring to your report, correct?

*Deborah D. Parker, U.S. Court Reporter*

53

A    Yes.

Q    And then the question was asked:

"QUESTION:  And it was shortly after this that the industry-widely adopted the alleged infringing technology of multilayer media with varying anisotropy and layers, correct?"

And your answer was:

"ANSWER:  Correct."

Did I read it accurately?

A    You read it accurately.

Q    Okay.  And you agree that Western Digital's accused products, you're not disputing that they use a multilayer media with varying anisotropy in the layers and that's one of the things that contributes to its ability to compete in terms of areal density, correct?

A    That's outside the range of what I wrote my report on.

Q    You wouldn't disagree with that, though, right?  You agreed with us at your deposition that that was true.

A    Yes.

Q    And if Western Digital was not able to use multilayer media with varying anisotropy in the layers, it would not be able to compete in the hard drive market, correct?

A    Again, that assumes that the multilayer media is the patent that we're talking about, and I don't know that.  I did not opine on that.

Q    Well, sir, let's take a look at your deposition again, page 81, lines 7 to 13.

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    You were asked -- you were under oath at your deposition, right?  Do you remember that?

A    Yes.

Q    Just like you were under oath here today.

A    Yes.

Q    You were asked:

"QUESTION:  If Western Digital was not able to use multilayer media with varying anisotropy in the layers, would it be able to compete in terms of areal density in the market?"

    And your answer was:

"ANSWER:  Not likely.  I don't know if there's any other you solutions out there, but that's the commonly accepted solution."

    Did I read your testimony correctly?

A    Yes.

    MR. LEDAHL:  Pass the witness, Your Honor.

    MR. BALI:  Mr. Schmoller, can I have my slides real quick please.

*(The document was published in open court.)*

*////*

REDIRECT EXAMINATION

BY MR. BALI:

Q    Dr. Goglia, I'm going to try and -- oop.  If the technology wants to work for me.

        MR. BALI:  Let's go to slide -- can you go to slide nine, please, and back out the animation for a second. Actually, you can leave it.

    (The document was published in open court.)

BY MR. BALI:

Q    So my colleague there was asking about there's only one technology listed 0here, shingled write-reader; is that correct?

A    Correct.

Q    What are the other dots that are shown in here?

A    Each one of those represents a product that was introduced at that point on the timeline at an areal density.

Q    So there are, in fact, other products that are shown in --

    (Court Reporter requests clarification for the record.)

BY MR. BALI:

Q    -- in this representation?

A    Yes.

Q    And would each one of those products have technologies

56

that are relevant to areal density growth in this time frame?

A    Yes, clearly.

Q    And the way you testified this graphic is tracked is each one of those products is an advancement in areal density growth?

A    Well, you see a continuous growth from left to right across the timeline, and each one represents an increase in areal density.

Q    So Mr. Ledahl also mentioned 11 days that it took you to write your report.

A    Yeah.

Q    Do you know a lot of the history and the background for the technology?  Is that within your knowledge base?

A    Well, yes.  I have long -- 40-plus years experience in the hard drive space.  It's engrained.  It's hard to get rid of those -- that knowledge.  It's there.

Q    And you've had several patents of your own in this area, right?

A    Yes.

Q    Particularly related to head media spacing?

A    Yes, that's correct.

Q    Okay.  And at the end there when Mr. Ledahl was asking -- I think he showed you some depo testimony about -- I believe it might have been page 81.

MR. BALI:  Was that right, Mr. Ledahl?  Was that the last depo?  I didn't get the page number.

BY MR. BALI:

Q    But it was -- I believe it was page 81, lines 7 through 13 where you testified in your deposition that it wasn't likely that areal density would be able to achieved without multilayer media.

Do you recall that?

A    I see that.

Q    Would areal density have been able to achieved without LDPC?

A    No.

Q    Would areal density growth have been able to achieved without head media spacing controls?

A    No.

Q    Could you have achieved growth in areal density without advancements in reader technology?

A    No.  Absolutely required.

Q    Could you achieve areal density growth without advancements in writer technology?

A    No.  Absolutely required.

Q    And Mr. Ledahl was also talking about the earlier bilayer products and an introduction -- when that was introduced.  I think he might have cut you off a little bit when you were explaining.

*Deborah D. Parker, U.S. Court Reporter*

What's the trajectory of a technologies introduction?  Does it stay in the industry for a period of time?

A    Yeah, there's always that overlap of continuing to use older technology as long as you can because -- I mean, there's risk involved in introducing new technology.  So you're not going to put all your eggs in one basket until it's proven.  And then the bilayer technology was continued to use beyond the 300-gigabit-per-square-inch range.

Q    So we're in agreement that there was a preexisting bilayer technology.

To go from a bilayer to a trilayer, could you consider that an iterative process?

A    It's adding another couple layers, yeah.

Q    So Mr. Ledahl also brought up some testimony of yours. I think it was page 113 of your deposition about shortly after the introduction.  So somewhere around 2007, bilayer PMR was introduced at around 240 to 300 gigabits, and shortly after it was introduced across the -- and you were asking some questions for clarification.

What did you mean "shortly after it might be incorporated in products"?  Does it take a little bit of time for an introduced technology to make its way into products?

A    Yes.  When a technology is introduced, especially if

it's a theoretical -- it's an idea about the technology, you'd actually have to figure how to -- how to manufacture it.  You'd have to figure out how to integrate that into the whole recording subsystem.  You'd have to have equipment developed to manufacture it.  It takes development refinement of the process in order to have it become part of the mainstay of the products.

Q    So is it fair to say that "shortly" in this context is probably several years?

A    Could be several years, yeah.  It's commonly several years.

Q    Mr. Ledahl also was asking about your experience in media, and I believe you were talking to -- or attempting to talk to him a little about cross-functional terms.

What are cross-functional teams?

A    Well, as I discussed on the areal density road map for him down from the fire code map, there are many different technology areas that are involved in producing areal density gains.  The cross-functional teams are those that are coordinated across the company, across the organizations, across the different technology areas, so that each is sharing the ideas that -- and developments and progress that they're making along it so it can be -- you can basically coordinate the effort of reaching that goal. It's a give and take.

Q    So even if you yourself weren't a director in media development and maybe aren't as steeped in the technology of underpinnings of media, are you familiar with how hard drives work and how hard drives were developed?

A    Intimately.

Q    Also, you had mentioned that there are lots of other technologies that go into the development of a hard drive. Did you count all of the various technologies and present them all to the jury and would they all be involved in areal density growth?

A    Well, there's many more technologies in addition to what I discussed. I only picked a few. Number one, they're significant; and number two, it would take all day to go through all of them.

Q    So is it fair to say that your estimates are, in fact, conservative?

A    I would think so, yes.

        MR. BALI:   Turn the witness.

                    RECROSS-EXAMINATION

BY MR. LEDAHL:

Q    Dr. Goglia, just a moment ago you were asked about something to try to clarify one of my questions. Now, you agreed with me that at the end of 2007, areal density and products was about 240 gigabits per square inch. We established that during our questioning, right?

A     Correct.

Q     Okay.  Mr. Bali, I think, just selected that it was shortly after that introduction of multilayered products, maybe that was a few years.

That wasn't a few years in this case, was it?  You were here for Dr. Desai testimony, were you not?

A     Yes.

Q     And you were here when he admitted that Western Digital released multilayer products with graded anisotropy in 2008.

You remember that?

A     Yes.

Q     Okay.  So it wasn't several years.  It was right in 2008.

A     Well, the technology was discussed in 2006 and 2008 is two years.

Q     Well, I asked you about shortly after 2007.  You would agree with me that 2008 is shortly after 2007?

A     Yes.

MR. LEDAHL:  No further questions, Your Honor.

THE COURT:  You may step down, sir.  Thank you.

(Pause.)

THE COURT:  Ms. Young.

MS. YOUNG:  Good afternoon, Your Honor.

Western Digital calls Ms. Chanthee Salayphonh.

THE CLERK:  Stand behind the court reporter and

raise your right hand.

CHANTHEE SALAYPHONH, DEFENDANT'S WITNESS, SWORN

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may step up on the witness stand, please.

If you could please state your full name, spelling your first and last name for the record.

DEFENDANT:  Chanthee Salayphonh, C-H-A-N-T-H-E-E, Salayphonh, S-A-L-A-Y-P-H-O-N-H.

THE CLERK:  Thank you.

MS. YOUNG:  May I proceed?

THE COURT:  You may.

DIRECT EXAMINATION

BY MS. YOUNG:

Q    Good afternoon.

Ms. Salayphonh, can you please introduce yourself to the jury?

A    Sure.

Hi.  My name is Chanthee Salayphonh.  I live in Northern California, and I work at Western Digital.

Q    You might want to move the mic.

A    Oh.

Q    How long have you been at Western Digital?

A    For about 15 and a half years.

Q    And what is your current role at Western Digital?

A    My current role is director of revenue operations and accounting.

Q    And can you tell the jury what you do day to day in that role?

A    Sure.  My day-to-day responsibilities is to provide accounting guidance and process guidance to -- that -- related to revenue to our global teams.

Q    And how long have you had this role?

A    For about 15 and a half years -- I mean, this current role, six years.  Sorry.

Q    Since you've been at Western Digital for over 15 years, what were your prior roles?

A    Sure.  So before this role, I was a senior manager within the commissions and accounting organization.  I did this role for about two to three years.

Prior to that, I was a senior manager within our general ledger and consolidations team, also with the accounting organization, and I had that role for about three years.

And then prior to that, I came back to the revenue side as a program manager related to program reserves, and I had that role for about two to three years.

Q    And then can you tell the jury about your educational background?

A    Sure.  I graduated from Cal Poly, San Luis Obispo with

a bachelor's degree in accounting and a concentration in accounting finance.

Q    All right.  Let's turn to the issues in the case.

Do you understand that an important disputed issue is what the lawyers and the damages experts have been calling the smallest salable unit?

A    Yes.

Q    So many of the questions that I will ask you go to that issue, but before I do that, let's start with the accused products.

Are you familiar with them?

A    Yes.

Q    And what do you understand them to be?

A    I understand that they are related to Western Digital's hard disk drive that uses PMR.

Q    Do you know what the specific component or feature that's at issue?

A    Yes.  It's the media component.

Q    And what do you understand media to be?

A    It's the platter within the hard disk drive and it's the component or a subset of the hard disk drive.

Q    So let's talk about pricing.

Are you familiar with pricing for the accused products?

A    Yes, I am in general.

Q    So how does Western Digital price its hard disk drive products?

A    We price it based on multiple factors.  We look at our margin, customer market, how long our inventory's been sitting in the channel, to just list a few.

Q    And so how do these factors that you just listed affect the price?

A    So these factors can -- depending on when, like I mentioned, it's sitting in the channel, we might want to push that unit faster, so we will increase or decrease our price, but there's no prescriptive formula for our pricing.

Q    And just to be clear, what do you mean by a "prescriptive formula"?

A    So there's not a easy A plus B equals C every single time.  There's going to be other -- based on those factors I mentioned, you might have A plus C equals D to get to the price.

Q    And does your testimony that there's no prescriptive pricing apply to the accused products?

A    Yes.

Q    Now, just to be clear, does Western Digital price its hard disk drives on a --

        *(Court Reporter requests clarification for the record.)*

////

*Deborah D. Parker, U.S. Court Reporter*

BY MS. YOUNG:

Q    -- on a per-terabyte basis?

A    No.

Q    All right.  Let's switch gears and discuss costs as they relate to the hard disk drives.

With respect to the accused hard disk drives, are you familiar with Western Digital's costs that go into developing the products?

A    Yes, I do in general.

Q    And what are they?

A    So typically we have standard costs, research and development, selling and marketing costs, and then general and administrative.

Q    Can you explain what standard costs are?

A    So typically standard costs includes labor, materials, overhead.

Q    And then you also mentioned research and development costs.  What are those?

A    R&D costs usually relates to the development of new product.  This is where engineers will do proof of concept and testing.

Q    Ms. Salayphonh, can you turn to JX-2099 in your binder?

A    (Witness so complies.)

Q    Do you recognize this?

A    Yes.

Q    What is it?

A    This is Western Digital's HDD R&D cost.

MR. BALI:  And, Your Honor, at this time I'd like to move to admit JX-2099 into evidence.

MR. LEDAHL:  No objection, Your Honor.

THE COURT:  JX-2099 will be received.

*(Defendant's Exhibit JX-2099 received in evidence.)*

MS. YOUNG:  Mr. Schmoller, can we bring that up? Thank you.

BY MR. BALI:

Q    All right.  Well, what does -- can you explain to the jury what JX-2099 shows?

A    Yes.  It shows the four main categories of our R&D costs that we -- that we, as a company, view our business. I don't see the rows, but its head of media development, HDD product development, CTO and platform is the four main ones.

Q    And just to be clear, where -- what are these five categories with products are these directed to?

A    HDD.

Q    And I'll break that down.  So what is included in the platform expense that you identified?

A    So the platform R&D usually relates to our higher -- it's leaning towards customers with needs for higher capacity.  I think of it more like a combination of HDDs.

Q    And what about the CTO?

A    CTO focuses on our long-term development and enablement of our future products.

Q    What about the product development line?

A    The product development line usually tracks our development, design, and testing of new products.

Q    What about the head of media R&D expense?

A    The head of media R&D expense is related to the components of the head and media units.

Q    So what about the top line that just says "media," what is that?

A    That top line tracks only our R&D related to the media group.  This is a subset of the head and media development line.

Q    How much -- so actually before I ask that, what does this JX-2099 cover in terms of the years?

A    It covers 2017 to 2023 actuals, and then it has a forecasted of 2024.

Q    And then based on this document, do you know what the R&D spend is on media only for 2017 to 2023?

A    Yes.  So based on previous calculation, it's about 550 million.

Q    And how do -- can you determine the percentage of R&D spent on media at Western Digital as compared to total R&D spent on hard disk drives?

A    Yes.  So you can take -- and I'll use 2017 as an example.  Take the 76 million divided by the 812 million and it'll get you a percentage.

Q    And do you know what that percentage is from 2017 to 2023?  And in particular, I mean the percentage of R&D spend on media.

A    Yes.  In previous calculations, it's about 11.4 percent.

Q    And just to remind the jury, what costs are included in R&D?

A    So it typically tracks the salaries of our engineers, material, test equipment, et cetera.

Q    And just to be clear, are there media costs in the -- the media costs that are identified in the first line, are they separate from the other costs?

A    Yes.  The cost is separate because at Western Digital, we track all of our costs base on a cost center.  So we have specific cost centers that roll up to each of the categories.

        MS. YOUNG:  Mr. Schmoller, you can take this one down.

BY MS. YOUNG:

Q    So, Ms. Salayphonh, do you also happen to know the total U.S. payroll for media engineers in the last six years?

*Deborah D. Parker, U.S. Court Reporter*

A     Yes.  It's about 241 million.

Q     What about the average salary of the U.S. hard disk drive engineer in the last six years?

A     Yes.  About 140K to 141K, so a year.

Q     So why does Western Digital focus so much on R&D?

A     R&D is central to our business.  It's central to, I think, most companies.  If you don't focus and give enough attention to R&D, you just don't move forward as a company.  The goal for any R&D is to make sure our product is as best as possible for our customers while making sure we meet their needs as well.

Q     All right.  Let's discuss another aspect of the accused products: manufacturing.  Do you know if Western Digital makes or purchases all its components for the hard disk drives?

A     We do both.

Q     Then let's discuss the costs that go into manufacturing the products then.

        Ms. Salayphonh, can you turn to JX-2021 in your binder?

A     *(Witness so complies.)*

Q     And what is this?

A     This is a cost -- a financial cost breakdown of our hard disk drives.

Q     Is this kept in the ordinary course of business?

*Deborah D. Parker, U.S. Court Reporter*

71

A      Yes.

MS. YOUNG:  At this time, I'd like to move in and -- move and admit JX-2101.

MR. LEDAHL:  No objection, Your Honor.

THE COURT:  I'm sorry?  I'm sorry?

MR. LEDAHL:  No objection.

THE COURT:  JX-2021 will be received.

*(Defendant's Exhibit JX-2021 received in evidence.)*

BY MS. YOUNG:

Q      All right.  Can you explain to the jury what JX-2021 shows?

A      Yes.  This is a cost breakdown for the ten specific SKUs that you see.  The SKU is in -- our finished goods SKU is in Column C.

Q      And then if you look at Column H, what does that tell you?

A      Column H is our media part number or SKU.  And I can tell that it's WD SKUs from the Column H here.

Q      And what about Column L, what does that tell you?

A      Column L is the total media cost for this -- that's being used for this SKU.  For example, on the first row, the $12, it takes four platters for this SKU, so four times the $3 in Column K or four platters times the $3 in Column K equals the $12 in Column L.

*Deborah D. Parker, U.S. Court Reporter*

72

Q    Why does Western Digital keep track of the costs of the different components?

A    We keep track to monitor our gross margin and to make sure we also have analysis on how to keep our costs as low as possible.  The goal is to make sure we minimize our costs, but keep the price to our customers constant.

Q    Now, you mentioned that Western Digital sometimes purchases its components.  Has Western Digital ever purchased media?

A    Yes.

Q    And who has Western Digital purchased media from?

        (Court Reporter requests clarification for the record.)

        THE WITNESS:  Showa Denko.

BY MS. YOUNG:

Q    And just to be clear, when you say "media," what exactly are they purchasing?

A    We're purchasing the media platters.

Q    Do you know what products the Showa Denko media is used in?

A    Yes.  It's used in various hard disk drives.

Q    What are -- are the Showa Denko medias used in the accused products?

A    Yes.

Q    And do you know if those products that use the

73

Showa Denko media are sold in the U.S.?

A    Yes.

Q    So just bringing all this together, when we talk about the accused products, is an entire hard drive the smallest unit that can be sold?

A    No, it's not.  Components can also be sold.

          MS. YOUNG:  Mr. Schmoller, you can take that down.

BY MS. YOUNG:

Q    How about when we talk about the issues in the case relating to storing in Western Digital's accused hard drivers, is the entire hard drive the smallest unit that can be sold in that context?

A    No.

Q    And what would be sold in that context?

A    We can sell media platters.

Q    So just to be clear, are the media platters ever actually sold separately by Western Digital?

A    No, it's not.

Q    Could Western Digital sell just the media platters, if it chose to?

          MR. LEDAHL:  Speculation, Your Honor.

          THE COURT:  Do the foundation.

     (Pause.)

          THE COURT:  Lay the foundation, please.

          MS. YOUNG:  I know.

BY MS. YOUNG:

Q    So do you know -- when does Western Digital sell components?

A    If we wanted to sell components, we would have a -- if we had a business decision to sell components, we could.

Q    And so then could Western Digital sell media platters if it chose to?

MR. LEDAHL:  A little speculation, Your Honor.

THE COURT:  Overruled.

BY MS. YOUNG:

Q    You can answer.

A    Yes.

MS. YOUNG:  Pass the witness.

THE COURT:  Before we do that, why don't we take about a ten-minute break here, ladies and gentlemen.

THE CLERK:  All rise.

*(Recess taken from 2:32 p.m. to 2:41 p.m.)*

*(The following proceedings were had outside the presence of the jury:)*

MR. LUMISH:  Mr. Fenster's still not here. Mr. Frenkel's still not here.  They were the ones meeting and conferring.  And they -- I believe there are still objections to the slides that we'd have to resolve.

THE COURT:  Well, they're not here and not ready to talk about, we'll just go forward and get to that.

MR. LUMISH:  We're about to call that witness, though.  And I'm just -- because Mr. Fenster's not here, I know he had objections.  I'm just trying to make sure that's addressed.

(Pause.)

MR. LUMISH:  Your Honor, can take it up after this.  We still have -- it's really for the next witness.

THE COURT:  We'll be at the next witness very shortly.

MR. LUMISH:  Exactly.

THE COURT:  Well, let's do this now.

(Pause.)

MR. FENSTER:  May I pass up the revised -- so, Your Honor, we made some progress, but this is slide 24.

(Court Reporter requests clarification for the record.)

MR. FENSTER:  Sorry.

So for each of the products, they do a line drawing -- a redline drawing around the entire mag sack.

THE COURT:  Sorry.

MR. FENSTER:  It's -- on the left side, it's DDX-1.24.  There are numbers.  The numbers are confusing.

THE COURT:  Yeah.  Yeah, let's start with 1-87.

MR. FENSTER:  87?

THE COURT:  87.

MR. FENSTER:  Do you have a copy for the Court?

MR. FRENKEL:  I don't even have a current copy.

MR. FENSTER:  We -- they just advised that I only got one copy handed to me.

Your Honor, may I show it?

THE COURT:  Put them on the ELMO.

MR. FENSTER:  Okay.  So this is slide DDX-1-24, Your Honor.  And they're making this line drawing labeling it as mag stack.  So they're identifying the entire stack as the storage layer.  That's exactly contrary to the Court's ruling this morning on the reverse doctrine of equivalence. They then go -- and this mag stack drawing is not in the Dr. Bertero's report.

Then on slide 26 --

This one's out?  Okay.  Thank you.

So then on slide 27, they make this argument that this is all the mag stack.  What I suggested as a solution, Your Honor, is if they eliminate the top part and just show this G1 layer with the thickness, they can argue it's too thin to store.  That's what they can argue.

Making it part of the mag stack is contrary to the Court's order this morning.  So that's -- that's the primary argument, Your Honor.  I've offered that as a solution.

*(Court Reporter requests clarification for the record.)*

MR. FRENKEL:  It's Rick Frenkel, thank you, for Western Digital.

Your Honor, we made a lot of progress on the slides.  Dr. Bertero is going to testify that the G1 layer is not a hard magnetic storage layer because it doesn't independently thermally store.  I think he's -- I'm permitted to ask him if it's not the hard magnetic, then what is it?  Because the jury's going to want to know, because they've already heard testimony from both sides that all the layers in Western Digital's products store.

They're part of a stack of -- they're part of the magnetic stack, as Western Digital calls them.  That's all I want him to do is to explain if it's not the G1 layer, what is it.  It's part of a stack of layers.  He says it all over his report.  It's not just an arguee, and all of the witnesses have said it, so I don't think that should be controversial.

THE COURT:  The objection is overruled.

MR. FRENKEL:  Thank you.

MR. FENSTER:  Your Honor, there are two others, and these are just Rule 26.  This is slide 179, referring to JX-2042.  And this is slide 180, also referring to JX-2042.  The objection here is Rule 26.  Dr. Bertero does not cite to this exhibit or to these figures in his report.

MR. FRENKEL:  On those slides, Your Honor,

there's -- Dr. Bertero's talking about how great --

THE COURT:  Did he cite to those on his report?

MR. FRENKEL:  He did not.  He's used those as a demonstrative to demonstrate a picture showing grain segregation.  We can -- I offered to just cut off the picture and not reference it as part of an exhibit because it's a good picture to describe what he was talking about in his report.  There's no question it's support in his report.

THE COURT:  Why don't you do that.

MR. FRENKEL:  Okay.

THE COURT:  Does take resolve that?

MR. FENSTER:  I think this resolves everything.  It's going to take about 15 minutes to get this all together, and I'll try to make that...

(Pause.)

(Jury enters courtroom.)

(The following proceedings were had in open court

in the presence of the jury:)

THE CLERK:  Be seated and come to order.

This Court is again in session.

THE COURT:  Mr. Ledahl.

MR. LEDAHL:  May we approach, Your Honor, to...

THE COURT:  You may.

(Pause.)

MR. LEDAHL:  May I proceed, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. LEDAHL:

Q    Ms. Salayphonh, am I saying that right, Salayphonh?

A    Yes.

Q    Thank you.

You testified during your direct testimony a little bit about pricing and prices of Western Digital's products.

Do you recall that?

A    Yes.

Q    Now, sometimes Western Digital sells essentially two versions of the same product, one that has more capacity than the other, right?

A    Yes.

Q    As a general matter, the ones with more capacity are priced higher than the ones with less capacity.  Is that fair?

A    Not always.

Q    Maybe not always, but most of the time.  Would you agree with me?

A    In general.

Q    You generally don't charge less for an 8-terabyte drive than the same drive with 4 terabytes.  Is that fair?

A    Not all the time, but we do offer discounts.

Q    But as a general matter, the price is higher if there's more capacity in the same product?

A    Sure.

Q    Okay.  And you also talked about the media, the disks inside the accused products.  And I think you testified that Western Digital has never, to your knowledge, sold that media to anyone outside Western Digital, right?

A    Correct.

Q    And, in fact, we've heard during the trial that the recipes and the details of how that media's constructed, those are proprietary things for Western Digital, right?

A    I --

            MS. YOUNG:  Objection.  She hasn't been here.

            MR. LEDAHL:  That's fair.

BY MR. LEDAHL:

Q    You don't know one way or the other if those are proprietary and sensitive, those particular media that are used in the accused products?

A    Correct.  I do not know.

Q    Okay.  Now, you talked a bit about pricing of some products, and I think you spoke a little bit about that with counsel.

            You've never done to present in this case and you didn't offer a regression showing the effect of capacity on the price across all of the products at issue in this case.

Is that fair?

A    No, I did not do a regression testing.

Q    And you've never done a regression testing the cost as a matter of capacity on all of the products at issue in this case.  Is that fair?

A    No, I have not.

Q    And you're not providing the jury with any statements or opinions as to the value to Western Digital of using the patents that are at issue in this case.  Is that also correct?

A    I'm not aware of the patents, so I don't know if I can comment on that.

MR. LEDAHL:  Pass the witness, Your Honor.

MS. YOUNG:  No questions.

THE COURT:  You may step down.  Thank you.

MR. LUMISH:  Your Honor, our next witnesses is the one we just addressed.  I think I can check and see where we are on that, if you'd like.

(Pause.)

MR. LUMISH:  Your Honor, I'm told we're 10 minutes away from resolving that issue.

THE COURT:  Okay.  Some charts are literally being created and had to be modified, so why don't you retire to the jury room briefly.

THE CLERK:  All rise.

(*Jury exits courtroom.*)

(*Brief Recess.*)

(*The following proceedings were had outside the presence of the jury:*)

THE COURT:  Let's bring the jury in, please.

(*Jury enters courtroom.*)

(*The following proceedings were had in open court in the presence of the jury:*)

THE CLERK:  Please be seated and come to order. This Court is again in session.

THE COURT:  Mr. Frenkel.

MR. FRENKEL:  Your Honor, Western Digital calls Dr. Gerardo Bertero to the stand.

THE CLERK:  Please stop there, sir, and raise your right hand.

GERARDO BERTERO, PH.D, DEFENDANT'S WITNESS, SWORN

THE CLERK:  If you could please state your full name, spelling your first and last name for the record.

THE WITNESS:  My name is Gerardo Bertero, G-E-R-A-R-D-O, last name is Bertero, B-E-R-T-E-R-O.

THE COURT:  Mr. Frenkel.

DIRECT EXAMINATION

BY MR. FRENKEL:

Q    Good afternoon, Dr. Bertero.

A    Good afternoon.

Q   Can you please take a moment to introduce yourself to the jury?

A   Yes.  As I said, my name is Gerardo Bertero.  I was born in Argentina.  I live in the San Francisco Bay area with my wife of 37 years.  I have three kids, two of them in San Diego, California and one of them lives in this Austin, Texas.

Q   And are you a U.S. citizen, Dr. Bertero?

A   I am, since 2005.

Q   And have you ever testified at trial before?

A   No.  This is my first time.

Q   Now, you have a couple of roles here today, and is one of your roles to be here as a fact witness?

A   It is.

Q   And are you also here as an expert for Western Digital on whether or not there's infringement of the '864 and '997 patents?

A   That's correct.

Q   Now, you were here in the courtroom when MR Tech questioned its witnesses about whether it's wrong to be an expert for a company that you once worked for.

     What's your opinion on that, Dr. Bertero?

A   My opinion is that I value my reputation very much so. If I had felt that WD infringed in any of the technologies, I would've told them so.  I --

THE COURT:  Sir, would you pull the mic closer.

THE WITNESS:  Sorry.

I reviewed all the data, all the documents, and my opinion is that WD has done nothing wrong in this case, that it doesn't infringe.

BY MR. FRENKEL:

Q    Are you being paid for your work today?

A    I am.

Q    And what's your rate, Dr. Bertero?

A    $500 an hour.

Q    And does your compensation depend on the outcome of the case?

A    No, not at all.

Q    And how about -- we've been talking a lot about Dr. Seuss and there were some slides shown earlier with your name on it and his name on it.

Do you know Seuss personally?

A    Yes, I know Dr. Seuss personally.

Q    How long have you known him?

A    For a long, long time.

Q    Okay.  And do you have an opinion as about his reputation?

A    I think Dr. Seuss is a highly reputable person.  I think he's highly regarded across the field and I hold him in high regards myself.

Q    Now, we'll later hear Dr. Victora.

Do you also know Dr. Victora in this case?

A    Yes, also for much longer time.

Q    And did there come a time when you learned about certain work that was being researched by Dr. Victora and his coworkers?

A    Yes, I do.

Q    And what was that work generally known in the field? What was the name for it?

A    So the name was ECC media or exchange coupled composite media.  It was a bilayer of a soft and hard stack separated by an exchange break layer, a thin exchange layer.

Q    And how about Dr. Seuss, did you -- were you familiar with his work in the 2006 time frame?

A    Yes, I was.

Q    And what was that called?

A    That was exchange spring media.  In this case, it was bilayer, but there was no exchange break layer in between the two.  The media stack needed to be significantly thicker to accomplish the same.

Q    And in you're talking about your --

MR. FENSTER:  Your Honor, we had -- I apologize, but we had a *motion in limine* about referring and comparing to prior art, and this witness is -- has only been designated as infringement and not validity.

*Deborah D. Parker, U.S. Court Reporter*

MR. FRENKEL:  This is background, Your Honor, about his knowledge of Dr. Seuss and Dr. Victora's work generally.

THE COURT:  Move on.

MR. FRENKEL:  Thank you.

BY MR. FRENKEL:

Q    Dr. Bertero, did you help prepare slides that we'll be using for your testimony today?

A    I have.

Q    And could you please tell us about your education?

A    Yes.  As I said, I was born in Argentina.  I went to school in -- attending the Catholic University in Cordoba and graduated with a bachelor's degree in engineering there.

Subsequently I came to the United States to attend Vanderbilt University with -- and graduated with a master's degree in materials science and engineering, and after that came to California and -- to attend Stanford University and graduated with a Ph.D. in material science and engineering.

Q    What got you interested in magnetics, Dr. Bertero?

A    I was always mesmerized by science of the big and the small, and Stanford University gave me an opportunity to do that, to apply my research on structures that were extremely, extremely thin at the atomic level.

Q    And did you write a Ph.D. thesis at Stanford?

A    Yes, I did.

*Deborah D. Parker, U.S. Court Reporter*

87

Q    What was that about?

A    It was about understanding the origins of magnetic anisotropy in a multilayer system based on --

    *(Court Reporter requests clarification for the record.)*

        THE WITNESS:  -- based on cobalt and platinum thin layers.

BY MR. FRENKEL:

Q    And at the cobalt and platinum, is -- are those the kinds of materials that are used in modern hard disk drive media today?

A    Yes, very much so.

Q    Turning to the next slide, can you tell us where you worked after Stanford?

A    Yeah.  After graduating from Stanford, I was hired by a company called Komag that sells component media to -- sold component media to the rest of companies integrating hard disk drives.  That was in 1994.  And I stayed at Komag until 2007.

        And in 2006, I was promoted to vice president -- vice president -- excuse me -- of the division performing research and development on thin film structures as we are discussing in this case.

Q    And when did you stop working at Komag?

A    In 2007.  That's because Komag was acquired by Western

Digital.

Q    And what position did you end up with at Western Digital in 2007?

A    I continued until 2010 on the same -- with the same title and the same responsibilities that I had at Komag in Western Digital.  And after 2010, I became a senior director and the chief technology officer at corporate level.

In 2015, there was a reorganization and I continued as a senior director in the research organization.  The chief technology office was no longer.

Q    So all told, between Komag and Western Digital, how long did you work at the company?

A    I think is something like 29 years.  A long time.

Q    Your entire career after graduate school?

A    Yes, that's correct.

Q    And do you still work for Western Digital?

A    I don't.

Q    And why did you leave Western Digital?

A    I took retirement in March of 2023, last year.

Q    Now, were you working in the industry at the time of the transition from longitudinal magnet -- magnetic recording or LMR to perpendicular magnetic recording or PMR?

A    Yes, I was.

Q    And can you explain to the jury what's -- briefly, what's the difference just in the way that the bits are

oriented between those two?

A    Yeah.  You can see on the image on the left called LMR -- LMR stands for longitudinal magnetic recording.  It had been the established technology for many, many decades and we were pushing areal density higher and higher, and we knew that we would be running against complications in trying to extend it.  You can imagine us having the bits are like magnets, permanent magnets, and as you push two magnets of the same polarity, that of first resistance, it's hard to push them together.

That's one of the main reasons as to why longitudinal magnetic recording didn't work.  We knew that if we could put the easy access of magnetization in the perpendicular direction, now if you write opposite bits, they have different polarity and they actually attract.  And so it's easier to write bits denser with perpendicular recording than with LMR recording.

Q    Dr. Bertero, did this require a whole new retooling of technology?

A    From the ground up, yeah.  It took many years, this transition, but it required completely new layers, new structures.  We had to reinvent the whole wheel.  There were additional layers that were needed in PMR recording.  One of them you can see here because of the magnetic underlayer.  That's just not one of -- it was a single layer.  It's a

thick layer.  It's a thick structure.

But there -- but every single layer had to re- -- had to be reinvented, so it was a big transition.  The position system, the sputtering, the testing, all required new equipment.  It was a big, big investment and research and development effort to qualify products into -- with this new technology.

Q    And when did you start researching into PMR at Komag, what year, approximately?

A    End of 1999, beginning of 2000.

Q    Let's turn to the next slide.  Can you briefly summarize some of your recognitions?

A    Yes.  Well, so I'm a member of the IEEE Magnetic Society.  I'm also a life member of the Alpha Sigma Mu Honor Society and Materials.  Have additional memberships.  I've chaired the local chapter of the IEEE Magnetic Society, the Santa Clara Valley Chapter a couple times.

I've served as chair of the Magnetic Recording Conference three times.  I've chaired additional conferences, organized -- help organize symposia, chaired plus invited in many talks and so forth.

Q    And how many patents do you have, Dr. Bertero?

A    68, I believe.

Q    And how many of them are on the hard disk drive media -- hard disk drive media?

A    I would say in excess of 45.  I couldn't have a count as of today, but I'd say in excess of 45.

Q    And you -- it says here 68 publications.  How many of those are also in the area of hard disk drive media?

A    A large majority of them are.

Q    Now, turning to the next slide, when you did your analysis, Dr. Bertero, you looked at it through the lens of a person of skilled in the art.  What did you determine that a person of skilled in the art in this field would be?

A    Right.  So I was asked to define what an ordinary person of skill in the art would have to be.  And in my opinion, to understand the basics of the patents, you would have to have a Ph.D. in a discipline such as material science, physics, EE chemistry or equivalent, and at least two years of --

        *(Court Reporter requests clarification for the record.)*

        THE WITNESS:  -- of direct experience working on -- directly on the field we are discussing.

BY MR. FRENKEL:

Q    And are you -- do you meet those qualifications, Dr. Bertero?

A    Yes, I think I easily meet them.

        MR. FRENKEL:  Your Honor, at this time I would like to offer Dr. Gerardo Bertero as an expert regarding

hard disk drive media and other technology at issue in this case.

MR. FENSTER:  No objection.

THE COURT:  He'll be received as an expert in those fields.  Again, ladies and gentlemen, I find he has at least the minimum qualifications to express opinions in those areas.  It's for you to determine how much weight to give those opinions.

BY MR. FRENKEL:

Q    All right.  Dr. Bertero, can you tell the jury what you were asked to do in this case?

A    Yes.  I was asked to review Dr. Re's and MR Tech's opinions or accusations of infringement by WD on its IP and help WD determine whether the company indeed infringes on the claims.

Q    And what did you have to do in order to access whether there was infringement, Dr. Bertero?

A    In order for literal infringement to be present, you have to determine that every element of every claim is present in the accused products.

Q    And how did you go about making this assessment?

A    Well, first I studied the patents and the claims in the patents, the claim as construed by the Court on -- in this case.  And then you have to compare the elements in the claim to the elements in the product and determine whether

they're present or not.

Q    And were you asked to do anything else other than look at the infringement issue in this case?

A    Yes.  I was asked to respond to Dr. Re's opinions on the contribution of this technology in enabling WD in making higher areal density products.

Q    All right.  Well, can you tell the -- I'm sorry.

Can you tell the jury at a high level what were your conclusions in this case?  And then we'll go through them in more detail.

A    Yeah.  My conclusions are that MR Technology doesn't meet its burden of proof to prove infringement for two main reasons.  One, MR Tech and Dr. Re identify the G1 layers in the WD products as being the hard magnetic recording layer, and my conclusions is that it cannot be.

I also think that Dr. Re used the wrong coercivity estimates in determining the coercivity limitations present in the independent claims.

Additionally, I disagree with Dr. Re's opinions on the contributions of the IP present in the patent in WD's ability to increase areal density not only because I don't believe there is infringement, but because of the -- Dr. Re ignores many, many other contributions around the media and inside the media as well.

Q    All right.  Let's turn to your first opinion of a

non-infringement, that is no single -- that the single G1 layer identified in each of the product groups is too thin to store data.

Did you study the claims in order to reach your conclusion?

A    Yes, I did.

Q    So what about Claim 1, what was the limitation that you looked at here in order to determine this?

A    Well, the limitation was that the structure needs to have a hard magnetic storage layer having a first coercive field of higher than .5 tesla that's formed on the underlayer.

Q    And did you look at the Court's claim construction for hard magnetic storage layer?

A    Yes, I did.

Q    And what did that tell you?

A    The Court understood that a hard magnetic storage layer is a magnetic layer that stores information in magnetically oriented bit.  And by store is the layer that has the function of storing in the claim construction.  That means that it needs to store information for a meaningful period of time.

Q    And what does that mean -- and what kind of properties does a layer have to have in order to store information for a meaningful period of time?

A    The properties that combine in order to provide a layer or a structure with sufficient thermal stability are anisotropy and magnetization and volume grain size.  Those are -- those are all properties that are needed.

Q    And when you talk about thermal stability, what is it that you mean?

A    The thermal stability provides -- is the -- it's related to the energy barrier that you have to overcome in order to flip the magnetic bits from one to a zero or a zero to a one.  The thermal stability is what determines whether a layer or a grain can store information.  It needs to be of a minimum size; otherwise, that barrier is too low and it's easy to jump over that barrier.

So you need high thermal stability such that if you expose the drive under normal conditions without wanting to lose the information, that drive, that information is retained for, like I said, a minimum period of time.

Q    Now, did you look at any sections of the specification, did they inform you whether or not the hard magnetic storage layer has to be independently and thoroughly stable?

A    Yes.  I think this was also addressed prior to this, but there's text, for example, in --

MR. FENSTER:  Objection, Your Honor.  This is the kind -- this is contrary to the Court's claim construction.  The Court rejected any requirement that the hard storage

layer have any thermal stability requirement.

THE COURT:  Sustained.

MR. FRENKEL:  Right.  I'll move on.

BY MR. FRENKEL:

Q    And, Dr. Bertero, did you see the same claim term present in all the independent claims of both patents?

A    Yes, I have.

Q    Now, speaking of thermal stability, were you here in the courtroom when Dr. Seuss testified that he solved the trilemma by decoupling writability from thermal stability?

A    Yes, I was.

Q    Is that what happens in modern hard disk drive media today?  Is thermal stability decoupled from writability?

A    No, not at all.  We're still --

MR. FENSTER:  Objection, Your Honor.

THE COURT:  Sir, when there's an objection made, you stop your answer, okay?

THE WITNESS:  I'm sorry.

MR. FENSTER:  Rule 26 -- and this is not a disclosed non-infringement.

THE COURT:  On the mic, please.

MR. FENSTER:  Sorry, Your Honor.

Rule 26.  This was not a disclosed opinion and it's not a disclosed non-infringement argument.

MR. FRENKEL:  Just setting up the -- you know, to

help explain what thermal stability is.  Dr. Seuss was here testifying about it.

THE COURT:  Sustained.

MR. FRENKEL:  All right.

BY MR. FRENKEL:

Q    All right.  Well, let's turn to your -- some testimony that I think is within your opinion.

Were you here in the courtroom when Dr. Seuss testified that the hard magnetic storage layer is of one thermal magnetic layer?

A    I agreed with Dr. Seuss' statement, yes.

Q    That's how you interpret the patent?

A    That -- yes, that's the same as my interpretation.

Q    All right.  And then also, you were here for Dr. Re's testimony.  And how does this support your opinion?

A    Same opinion as Dr. Re.  Also agreed with that opinion.

Q    And he says here that they couldn't store data on their own.  What is your understanding of what he was saying here?

A    I agree with that as well.  The G1 layers -- any of the G layers in the WD media stack cannot retain data for any meaningful period of time on their own.

Q    All right.  And in trying to explain why he chose the hard magnetic storage layer on the bottom, Dr. Re talked about having to get the head very close to the disk, the media service.

Q   Do you agree with that there was a need to put the hard magnetic storage layer on the bottom for PMR?

A   No, I don't agree with him on that.

Q   Why not?

A   Because in PMR, as we saw, there's a soft magnetic underlayer which is pretty thick. That soft magnetic underlayer provides an image to the writing field. We're going to see that later. So the writing field is in between the soft magnetic underlayer and the pole of the head, so the field is very uniform in that gap.

So there's no decaying of magnetic within the field away from the surface of the pole because the field is very uniform in between the right of the -- the right pole of the head and the image that it produces in the soft magnetic underlayer.

Think of the soft magnetic underlayer as being the mirror to the magnetic structure of the head, and so it really mirrors the field in a way that is very uniform in that gap.

Q   All right. Well, turning to the next slide, Dr. Bertero, did you review the spreadsheets that were combined to make up the recipes --

A   Yes.

Q   -- for the case products?

A   Sorry. Yes, I have.

Q    And here we've started with a Group 3 accused products. Why did you choose to start with the Group 3 accused products?

A    Because Group 3 products are the ones that have the vast majority of sales in the accused products, and so I decided to start with that as a good example.

Q    Now, Dr. Re's -- you reviewed Dr. Re's report and you were here for his testimony, right?

A    I was.

Q    And he drew the -- the G1 layer as the sole hard magnetic storage layer.  But before I ask you a question, we've been talking about a G1, G2, G3.  Do you know what the Western Digital -- why it calls his layer the G layers?

A    They're called the G layers because they are granular layers, meaning that they are the layers that form the grains that we discussed prior to -- prior days in this court.  So those are -- that's why, simple reason.

Q    And do you agree with Dr. Re's conclusion for the Group 3 products that what is in the green box is the hard magnetic storage layer?

A    No, absolutely not.

Q    And why not?

A    Because the G1 layers in the accused products by themselves cannot positively store information in a meaningful way.  The formation eroded would decay very

quickly.

Q    And so what is the G1 layer if it's not the hard magnetic storage layer of the Group 3 products?

A    It's just one layer in the stack of magnetic layers in the product.

Q    Now, earlier you said that if there was -- you used the G1 layer on its own that the data would decay.  What did you mean by that?

A    Okay.  So imagine that you want to reserve your information and you were to write on a hard disk drive that only had a G1 layer as the recording layer in the product. If you want to store your images, memories, movies, that information would decay in the matter of minutes, hours, maybe days, but not any more than that.

Q    All right.  I got a little ahead of myself there in the slides.

Does -- does Western -- did you ever hear the term used around Western Digital "hard magnetic storage layer," just like that?

A    No.  We don't talk in those terms at all.

*(Court Reporter requests clarification for the record.)*

MR. FRENKEL:  I will.  Thank you.

BY MR. FRENKEL:

Q    So what about nucleation host?  Have you ever heard

*Deborah D. Parker, U.S. Court Reporter*

101

that used around Western Digital?

A    No, it's not used in any of the documents or the jargon between engineers developing the products.

Q    Okay.  And so going back to the recipes then, what would you identify as the layers that would store data in the Western Digital Group 3 products?

A    In this case for Group 3, it'd be G1 through G5.  So all of the -- all of the stack in between G1 and G5 would be the magnetic stack, and that's the stack that stores data.

MR. FENSTER:  Objection, Your Honor.  That's exactly the ruling that we had this morning.  This is the opinion that was struck that was the subject of our argument this morning.

MR. FRENKEL:  No, that was overruled.

THE COURT:  The answer will be stricken.

Please disregard the answer, ladies and gentlemen.

BY MR. FRENKEL:

Q    All right.  I think the question that I needed to ask is, what does Western Digital refer to layers G1 through 5 within the company?

A    Magnetic stack.

Q    Thank you.

And then you heard earlier testimony about whether or not the right number to use for the anisotropy of G1 is 9.42 or 8.05.  I won't go into that any more detail, but

which one would you use there to do any kind of analysis?

A    8.05 because that's -- that would be provide an apples-to-apples comparison.  That's in the same spreadsheet as the other values that were provided to the plaintiffs.

Q    So what -- so, Dr. Bertero, what kind of -- well, first of all, let's look at this recipe chart.  There's a column there that says "layer thickness, THK," and in parentheses there's an "A" with a little circle over it.

Can you explain to the jury what that's representing?

A    Yeah.  That's the layer thickness for each one of them. An ångström -- so one ångström is one-tenth of a nanometer. So you can divide by 10 and arrive at what the thickness would be for a nanometer.

Q    Okay.  And to the right of that is a column that says K in units of megahertz per cc.  Now, what is "K," first of all?

A    K in this case is the magnetic --

    *(Court Reporter requests clarification for the record.)*

    THE WITNESS:  Magnetocrystalline anisotropy is the anisotropy of the layer in this unit's megahertz per cc.

BY MR. FRENKEL:

Q    Okay.  And then what units would you use to determine whether or not the G1 layer would be a sole hard magnetic

layer in the stack?  What would you look at?

A    You would look at the thickness or the value of anisotropy.  Those are the -- and the grain size.  Those are the main properties of the layer that you need to understand.

Q    And have you looked at the G layers of the Group 3 product to determine whether they could be the sole hard magnetic layer of the stack?

A    Knowing what the grain size, which is around 6 and a half, 7-nanometers, you would have to have a much, much thicker layer in order to provide sufficient energy barrier to impart that layer with sufficient stability to be able to store.

So a layer that's only 4.5 nanometers would definitely not be able to achieve that.  You would have -- you would need a layer that's at least as thick as the entire stack.

Q    Okay.  And so is the G1 layer then thermally stable enough to be the sole hard magnetic storage layer of the stack?

A    No.  That layer only thermally -- is extremely thermally unstable.

Q    Okay.  And then, you know, looking at the other layers, Dr. Bertero, can any of the other layers be the sole hard magnetic storage layer of the stack?

A    No.   As you can see there, none of those layers would have sufficient anisotropy and thickness, just as the G1 layer, to be hard magnetic storage layers that could possibly store information in a meaningful time.

Q    All right.   And in the Western Digital hard disk drive media at issue in this case, in other words, the accused products, what do the anisotropy values generally range from for the G layers?

A    In the Western Digital products, they range from just above 6 to just under 9.

Q    Do you ever have any products or Western Digital -- do any of the accused products in this case have an anisotropy value bigger than 9 in a G layer?

A    Not in the accused products.  And if -- I rarely, rarely see anything at 9 or just above 9 for other products. This is not -- not present in the WD accused products.

Q    And would you consider -- using the scale from low to medium to high, would you consider anisotropy values in the range of 6 to 9 to be low, medium or high or something else?

A    No, I would consider that to be all high anisotropy values.

Q    All right.   Let's turn to the Group 1 accused products. What did Dr. Re identify to be the hard magnetic storage layer of the Group 1 products?

A    For Group 1, he identified the G1-1 layer as being the

hard magnetic storage layer.

Q    And do you agree with him?

A    No, I don't.

Q    Why not?

A    Because I believe that Dr. Re arbitrarily chose the bottommost G layer of the product.  But as I said, that layer cannot store on its own as demanded by the construction -- the Court construction for a hard storage magnetic layer.

Q    Is that because the G1-1 layer isn't independently thermally stable?

A    That's correct, yes.

Q    And where -- what would you identify as being -- what you tell -- I'm sorry.  Let me strike that.

         What would you call the G1-1 layer?  How -- what is it then if it's not the hard magnetic storage layer?

A    It's one of the layers, just as the other layers in the magnetic stack.

Q    And which layers would you say would be part of that magnetic stack?

A    G1 through G2 in this case, including the -- I'm sorry. I need my glasses.

Q    Is this what you would put it?

A    G1 through G2.

Q    All right.  And, again, with the properties that we

looked at in mind -- and I think we've blown them up on this slide -- would the -- at these anisotropy values and these thickness values, would you believe that the G1-1 layer was thick enough to serve as the hard magnetic storage layer?

A    No.  As you can see here highlighted or written in red, the G1 layer's just too thin to store.  Again, it would have to be over thickness of 12 nanometers or higher to possibly have the thermal stability -- thermal stability needed to impart the structure with the storage capability.

Q    All right.  Let's go through the rest of the accused products groups.  Did you look at the Group 2 accused products as analyzed by Dr. Re?

A    Yes, I have.

Q    And did you agree with him that the G1 layer there was the single hard magnetic storage layer of the stack?

A    No, I do not.

Q    And why not?

A    For the same reasons.  The G1 layer in Group 2 products is not thermally stable on its own as demanded by the grains.

Q    And as part of that analysis, did you look at the thickness and anisotropy values?

A    Yes, I have.

Q    And what did they tell you?

A    That the G1 layer, by looking at its properties and

knowing the grain size, is not at all capable of supporting storage in that one layer.

Q    And I see there that, you know, the other layers in the G2s -- the stack of magnetic layers, G2, G3, G4, are any of those layers have the right thicknesses to be able to serve as a sole hard magnetic storage layer?

A    No, they do not.

Q    Okay.  Let's turn to the Group 4A products.  Was it also your opinion there that the G1 layer is -- that, in fact, Dr. Re is incorrect?

A    That is my opinion, yes.

Q    And why?

A    The G1 layer in this group of products, 4A, doesn't have the necessary thermal stability in order to fulfill its function of storing data.

Q    And, again, just focusing on what Western Digital calls it, what does Western Digital call the layers G1 through G6 in the Group 4A products?

A    G layers or magnetic stack layers.

Q    All right.  And did you look at the anisotropies and thicknesses here?

A    Yes, I have.

Q    And what did they tell you?

A    That none of the layers are capable of storing on their own, G1 layer on its own is not capable of storing

information.

Q    And what's the range of thicknesses here in the G4 -- Group 4A products?

A    1.1 nanometer to 3.6 nanometers.

Q    Is that relatively -- is that pretty thin to you, Dr. Bertero?  Or how does that rank in terms of thicknesses of these kinds of products?

A    The range of each layer is very, very thin, and typically the magnetic layer stack, including the capping layers, is 14, 15, 16 nanometers as most.

Q    Okay.  Let's go to the Group 4B products then.  Again here, you looked at the G1 layer identified by Dr. Re?

A    I have.

Q    And did you agree with him that the G1 layer's a sole hard magnetic storage layer?

A    I do not agree with Dr. Re.

Q    And in order to make the conclusion, what did you look at?

A    Well, you look, again, at the properties of that layer, the anisotropy, the volume, the thickness, the grain size. And it's easy to conclude -- for anybody skilled in the art to know that layer by itself cannot possibly retain information on its own because it wouldn't have the necessary thermal stability.

         (Court Reporter requests clarification for the

*record.)*

MR. FRENKEL:  I will slow down.  Thank you.

BY MR. FRENKEL:

Q    And here, the thickness of the G1 level is 4.2 nanometers.  What does that inform you about whether or not in the Group 4B products the G1 layer is sufficiently thick to be independently thermally stable?

A    Again, my conclusion is that it is not sufficient.  You would need three times -- at least three times the thickness, if not more, for that one layer to be thermally stable on its own.

Q    And as time went on in the Western Digital hard disk drive media products, did Western Digital continue to try to make these layers thinner and thinner?

A    Well, the tendency has been to add more layers for different functionalities, and so you're forced to having each one of those individual layers to go into thinner and thinner and thinner values.  They're all strongly coupled together, so together they provide the structure with the sufficient thermal stability, but not in isolation.

Q    Okay.  So let's look at the Group 4C products.  And again, here we're looking at another stack of layers from G1 to G6, and Dr. Re identified the G1 layers being the hard magnetic storage layer.

Did you look whether or not he was right?

110

A    I did, and I believe Dr. Re -- I know that Dr. Re's wrong.

Q    And what would Western layer -- Western Digital refer to these G1 through G6 layers as?

A    G layers or magnetic stack layers.

Q    And how did the values of thickness and anisotropy here ranging from 0.9 to 3.5 in thickness nanometers inform your opinion?

A    This is -- they're all very, very thin.  None of them are capable of storing information, again, in any meaningful way for the drive to be useful to anybody.

Q    All right.  And so in your opinion, would any one of these G1 through G6 layers be able to act as a sole hard magnetic storage layer and independently store data?

A    None of the layers by themselves would be capable of doing that.

Q    All right.  And then our last group is -- now we've got through G7 in the Group 5 products, and again, Dr. Re identified the G1 layer.  What does Western Digital refer to G1 through G -- or in this case, SCL to G7 in the Group 5 products as?

A    Yeah, "SCL" stands for Segregation Control Layer, but it's equivalent to the G1 layers that we've seen in the past.  But that layer by itself, again, same conclusion, cannot possibly store data on its own.  It doesn't have the

necessary thermal stability.

Q    And does that have anything to do with the properties that we're seeing here in anisotropy and thickness?

A    Right.  So for the anisotropies that we have available to us, limiting the high value at 8 and a half or 8.7 megahertz per cc, the thickness for any one of these layers to provide sufficient thermal stability would have to be as thick as the entire stack.  So none of these layers are capable of storing by themselves.

Q    So, Dr. Bertero, what is your opinion as to whether in any of the Western Digital accused products there is a single layer that can act as the hard magnetic storage layer that's independently thermally stable?

A    There are no single magnetic layers -- thermal magnetic layers like we see here that are capable of storing information meeting the requirements for a hard magnetic storage layer.

Q    So putting back up Claim 1 of the '864 patent then, what is your conclusion as to whether the accused products infringe due to this layer involving the hard magnetic storage layer?

A    That WD does not infringe because it does not possess in its products a layer that can be called a hard magnetic storage layer.

Q    And is it your opinion the same for the '997 patent?

112

A     Yes, that requirement is present in the two independent claims of the '997 patent as well.

Q     All right.  Now, Dr. Bertero, you also provided an opinion regarding the coercivity limitations at issue here, so let's turn to that.

       First of all, what are the coercivity limitations in the -- in Claim 1 of the '864 patent?

A     We can see them highlighted here in yellow.  Let me read.  It's -- well, one of them is that the coercivity of the hard magnetic storage layer needs to be higher than .5 tesla.  The coercivity of the nucleation host that's defined by the patent needs to be higher than the coercivity of the hard magnetic storage layer, but it has -- they have to be measured separately.

       So you have to measure the coercivity of the hard magnetic storage layer by itself and the coercivity of the nucleation host separate from the coercivity of the hard magnetic storage layer.

Q     Now, you were in the courtroom when Dr. Re presented his opinions on this coercivity limitation.  Do you -- did you agree with Dr. Re?

A     No, I do not.

Q     Now, before we go to that, we're talking about coercivity, and is that the same thing as coercive field?

A     Yes, coercivity and coercive field can be understood as

the same entity.

Q    Now, the Court provided a claim construction of coercive field. Would you please explain to the jury what it says?

A    Let me read it so that I don't make a mistake. The plain meaning of the term is a property of magnetic materials that provides a measure of the ability of a ferromagnetic material to withstand an external magnetic field without becoming demagnetized.

Q    Now we've --

A    So --

Q    Go ahead.

A    I was going to explain that if you imagine you magnetize -- here, any layer, in one given direction, and now you apply an opposite magnetic field, as you increase the magnitude of that field, the magnetization in that layer is going to start to switch in response to the applied field. If that field is high enough when that magnetization in the layer becomes zero, that's how the Court defines coercivity.

Q    And we've also heard a little bit and will be hearing about anisotropy field. Is that the same thing as coercive field, Dr. Bertero?

A    No. They are very different things.

Q    And what's the difference?

114

A    If I may explain, an anisotropy field is much more related solely to the anisotropy energy of the anisotropy constant of the material.

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  Imagine you have a material with easy access up and down.  And in order to find what the anisotropy field is you now apply a magnetic field aligned along the hard access, an access where the magnetization doesn't want to align to.

So the field necessary to force that magnetization along the axis that it doesn't want to go to, that's called the anisotropy field.  It takes a large field in order to force the magnetization to be where it doesn't want to be.  That's anisotropy field.

But coercivity's a much, much different concept.  A material with very, very high anisotropy can have extremely low coercivity if the volume is very small.  So you can have situations with high anisotropy and yet the coercivity be very low, like we just said.

The G1 layers, for example, have very low volume because their thickness is very small for a given grain size.  And so the anisotropy is high, but the coercivity of those layers is very low.  So anisotropy field and coercivity are not the same definition.

*Deborah D. Parker, U.S. Court Reporter*

BY MR. FRENKEL:

Q     Well, let's look at your first opinion here and your criticisms of Dr. Re.  And the first one is that he did not use actual measurements of coercivity.  What is that?

A     Yes.  Measuring coercivity is pretty standard in the industry.  And day in and day out, there's hundreds and thousands of pieces of equipment to measure coercivity in a company like WD, but also across university labs and for many different disciplines measuring coercivity is a pretty standard measurement, and Dr. Re did not measure coercivity.

Q     Does the patent describe how to measure coercivity for a multilayer structure?

A     Yes, the patent does in --

Q     And can -- sorry, we're putting up JX-2000.  You can proceed.  What does the patent say, looking at Figure 4 here?

A     So this is an example of --

        (Court Reporter requests clarification for the
        record.)

        THE WITNESS:  -- a hysteresis look provided in Figure 4.  It's a portion of one.  And you can see here where at the bottom is the applied field and in the Y axis -- can I write on this?

        Yeah.  In the Y axis is the magnetization.

        And as I said, if you've saturated the sample at a

high value, when you cross the zero point, that would be the coercive field for that one sample.  For this other sample, it'd be this other one.  For this other sample, it'd be that one.  I don't know if I can -- oh, clear all, okay.

BY MR. FRENKEL:

Q    All right.

A    Can someone do it for me because I don't see the -- there you go.  Thank you so much.

Q    Okay.  And how would one measure coercivity?  What kind of equipment would you use?

A    There are many different commercial products that do so called VSM or vibrating-sample magnetometer.  Also MOKE systems, Magneto-Optical Kerr Rotation Systems.  Those are just two, but there are many different techniques that all -- all measuring coercive -- coercivity materials.

Q    What do you have to measure the hard magnetic storage layer of a product -- absent anything else, how would you do that?

A    You would deposit the G1 layer on its own and easily measure it with any one of the equipments that I just described.

Q    All right.  And could you measure the rest of the layers as well in that way?

A    Yes.  You would deposit the rest of the layers on their own on top of the underlayer and easily measure them

separate from the G1 layer.

Q    So going back to your summary of your disagreements with Dr. Re, what is the next thing that you say that Dr. Re did incorrectly?

A    Instead of measuring -- conducting actual measurements, Dr. Re instead use the -- a proxy for coercivity that was the anisotropy field, 2K over MS.

Q    All right.  Well, let's take this slowly now, since we're talking about math, but when you say 2K over MS, is that what's showing here?

A    Right.  So in red, you see there 2K over MS, and that is the anisotropy field.  That is the definition of an anisotropy field as I had tried to explain before.  That is not coercivity.

Q    And so what is the other equation that you have here? There's a lot of letters.  What is it?

A    So this is -- has been known for many, many decades. It's called Sharrock's formula or Sharrock's equation.  It's been mentioned before.  But here you see a full -- a much more accurate description of what coercivity is where you see that coercivity depends on time -- sorry, depends on time, depends on temperature, depends on the volume of the sample, and depends on angular application of the field, implicit, and it's not.  So there's many different aspects of coercivity that needs to be taken into account when

estimating it.

Q    So what was Dr. Re's error here?

A    Dr. Re failed to account for temperature and time effects in measuring coercivity and he used the wrong assumption for if not, which is called the attempt frequency.

Q    And could you look up that -- the proper attempt frequency somewhere if you wanted to look at it?

A    Yes.  Can you help me erase, please?  Thank you.

Yes, you can.  You -- there are many published papers of the last 10 years or so that have advanced the field significantly and determined and published in support of frequencies that are typically significantly higher than what was used 30 years ago in materials that were lower in anisotropy.

Q    And if you can turn in your binder to DX-1814.

A    I'm there.

Q    Is this a paper that you relied on in your analysis in this case?

A    Yes, it is.

Q    And what's the paper titled?

A    It's called "Calculating Thermal Stability and Attempt Frequency of Advanced Recording Structures without Free Parameters."

MR. FRENKEL:  Your Honor, we'd like to move this

in.

THE COURT:  Exhibit number again, please.

MR. FRENKEL:  DX-1814.

THE COURT:  Any objection?

MR. FENSTER:  Yes, Your Honor.  We object to its admission on hearsay grounds.  We think it's not being -- excuse me.  Our understanding in the meet and confer is that they were offering it as a learned treatise only, not to be offered for admission as a -- not for admission.

MR. FRENKEL:  I'm happy to just use it as a learned treatise and publish it then, if that's --

THE COURT:  Fine.

BY MR. FRENKEL:

Q    So if you can then we'll turn to the next slide.  And who's the author of this paper or this title you just indicated?

A    Yeah.  The author Christopher Vogler and Dieter Seuss -- Dr. Dieter Seuss, I'm sorry, is also a co-author in this paper.

Q    And when was this paper written?

A    It was published in 2014.

Q    Okay.  And then turning to Table 2 in DX-1840.04, what did this table inform you about the attempt frequency?  Well, first all, what is the GM there that we're looking at?

A    So GM is the graded media.  This is a multilayer graded

media that they were studying.  And HMS stands for hard magnetic single particle that had high anisotropy.  So this would be akin to having the G1 layer measured by itself, and then you would have to use the values corresponding to GM if you wanted to determine that of a multilayer structure.

Q    And to be clear, you're talking about the G1 layer in the patent?

A    Right.  I'm referring to what would you have to do in order to do that estimation based on the description of the patent.

Q    What does it say the attempt frequency is for graded media in terms of units of gigahertz?

A    It's 8,893 gigahertz.

Q    And what about for HMS?  What is the attempt frequency for that?

A    6,560.

Q    All right.  And then what did Dr. Re assume for attempt frequency in gigahertz when applying the anisotropy field equation for coercive field?

A    Dr. Re assumed an attempt frequency of 1, so this is almost 10,000 times higher than frequency.

Q    How large of an error would result by using the wrong attempt frequency in Sharrock's formula?

A    It would be a significant error.  It could be very easily -- you could very easily arrive at the wrong

121

conclusions, as I believe Dr. Re did.  You cannot ignore that difference in attempt frequencies and assume that they're the same.

Q    All right.  Well, let's go to the next -- let's go to the next opinion you have on Dr. Re's calculations of coercive field.

And what do you ignore angular aspects of PMR fields?

A    Coercivity aside from time, temperature, volume, depends very strongly in the direction that you apply the magnetic field respect to the easy access of magnetization in those samples.  And that difference can be significant.  It could be a factor of two.  It can be quite, quite different depending, again, on the -- the geometry of the angular difference between the applied field and the easy access.

Q    And does the patent again talk about angular aspects of KMR fields?

A    The patent indeed does, yes.

Q    And here we're looking at Figure 3 from JX-2000 and some text from Column 8, lines 43 to 45.

What does that tell you about angular dependence and coercivity measurements?

A    So the patent in this Figure 3 describes a situation of an angular dependence of -- I think in this case maybe a

122

trilayer -- it's a multilayer example, but you can see how -- how much it deviates from the coercivity at 1, which would be when the field --

(Court Reporter requests clarification for the record.)

THE WITNESS:  I apologize.  I moved away from the microphone.

When applied field is colinear with the easy access of magnetization.  So if you now applied a field at an angle, the coercive field could be significantly different.  And depending on the design of the sample, it could be higher, but it could also be -- it could also be lower.

BY MR. FRENKEL:

Q    Okay.  The X axis or the horizontal axis of the bottom -- do you mind if I clear?

A    Please do, yeah.

Q    What does the X axis show here?

A    The X axis shows the angle that the applied field would make or makes with the easy access of magnetization.

Q    And in the accused products, what is the angle that the applied field would make?

A    The accused products are purposefully made that the head is purposefully made such that there's a trailing shield -- those are called the trailing shield heads that

have been used ever since the interaction of PMR technology -- such that the field is applied at an angle and particularly in order to lower the coercive field of the material so the head field can actually improve writing.

We saw amazing improvement when those heads became available, and the angle can be typically anywhere between 10, 20, sometimes 30 degrees.

Q    And what did Dr. Re assume as the angle in doing his analysis about the accused products?

A    He assumed zero angle.

Q    And would that result in an error in coercive field?

A    Yes.  You can see that the error could be 40 percent, sometimes 50 percent, depending on the design of the product, yes.

Q    And Dr. Bertero, we heard a lot of testimony that the coercive field approaches the anisotropy field as the angle gets closer to zero.

Do you agree with that?

A    I'm sorry, can you repeat the question?

Q    Did you agree that the coercive field approaches the anisotropy field as the angle gets closer to zero?

A    Okay.  Yeah, depending on the situation.  If the field is always at a different angle, the coercive field and the anisotropy field will never be the same.  The anisotropy field can be -- at a 45-degree in a single particle can be

124

one-half of the anisotropy field.

So a coercivity -- so the anisotropy field at a 45-degree is K over MS.  It wouldn't be 2 K over MS.  So the angle makes a big difference.

Q   All right.  Let's go to your third opinion, and that's -- the 2 K over MS is only useful for parallel and uniform structures.  Does the patent talk about that?

A   Yes, it does.

Q   And what's your opinion on what it informs someone that's skilled in the art?

A   Well, Dr. Re used the formula of K effective over MS effective to estimate the coercivity of the nucleation field composed of many, many different layers, which is a formula that Dr. Re in his patent utilizes to differentiate his invention from that of other people.  He says that this formula only applies -- of weighted averages only applies for when part -- the magnetization is parallel and uniform during the entire switching.  And that -- that is correct.

In that situation, you would apply that formula.  But then he goes on to say that it is not what happens in my products.  And, in fact, we've seen already so many cases where slides where the coercive field can be 18 or 19 of 2 K over MS.  So even in Dr. Seuss' patent and publications, coercive field can deviate significantly from 2K over MS in his invention.

*Deborah D. Parker, U.S. Court Reporter*

125

Q    And so, Dr. Bertero, with all those -- all that in mind, what's your opinion as to whether MR Tech approved infringement of the limitation shown here involving the coercivity of the hard magnetic storage layer in the nucleation host?

A    Yes, it's my opinion that Dr. Re failed to prove that WD infringes on this limitations -- this elements presents in the claim.

Q    All right.  Now, let's turn to your third opinion and your -- to his factors increasing areal density.  Can you give the jury a little background and how data -- like a picture here of a cat and a dog gets stored?

A    Okay.  So imagine you want to preserve a picture that you like very much.  That picture would then have to be digitized and a system -- operating system does that.  It encodes that information into ones and zeroes.  And that digital information then gets written as such on the media in the form of bits oriented according to the encoded information.

So in this case, we have a bit 1 that we labeled as black and bit zero where inside those bits the grains are magnetized either up or down.  So those grains that you see in there, the tiny magnetic grains that we refer to when we label the layers G for granular, those are the grains that are magnetic grains in the sample.

Q    On a typical hard disk drive media, how many of those grains are there?

A    Per square inch, I think I estimated that you may have 100 trillion.  So in one square inch, there's about 100 trillion grains of magnetic entities.

Q    And then turning to the next slide, can you please remind the jury -- I heard a lot about it, but what is areal density?

A    Areal density is the amount of information that you store in a given area.  So density of information is -- bits per square inch is a typical measurement that you use.

Q    And here you have something below that.  It says "To maintain SNR, number of grains per bit should ideally be kept constant."

          What is "SNR"?

A    "SNR" stands for Signal-To-Noise Ratio.  It's a quantity that you always want to maximize.  You want large signal in any case and you want low noise.  So the quality of your signal improves as the Signal-To-Noise Ratio gets larger.  It's typically measured in decibels.

Q    Is it -- is the easiest way to fit more data and less space just to make the grain smaller?

A    It's not easy.  If you could, you would.  But the industry has not meaningfully been able to decrease grain size in, like I said, any meaningful way since its

introduction.

So since 2006 to date, there's been up and down minimal changes in grain size, but we're practically stuck at about 7 nanometers, maybe 6 and a half nanometers for the core size of the grain and 8 and a half, 9 for the center-to-center distance, which is relevant in magnetic recording. I don't know if we have the opportunity to see one of those close, but the industry has not changed the grain size significantly.

Q    And what are we looking at on the right side of this slide, Dr. Bertero?

A    So we're looking at the number of grains that you could contain in a bit when the density was a hundred gigabits per square inch, this number here. That's in relation to the size of the bit in the relationship to the size of the grain. That's the size of the bit. As you increase the areal density, the bit shrinks.

And in a recording system, you'd like to scale everything down to the size of the bit, so you'd like to scale the grain size, you'd like to head media spacing and others aspects of the recording system so that you maintain --

        (Court Reporter requests clarification for the record.)

        THE WITNESS:   -- SNR.   That's very hard to do.

So as you see, we were not able to decrease grain size and we're now at 1.3 gigabits per square inch past this bottom square there, rectangle, and we're recording at just a few grains, very, very few grains.  That represents a big loss in SNR because of this, which then has to be overcome by finding other opportunities to recover SNR to the channels from elsewhere.

And I believe that my colleague did earlier -- talked about that, but in addition, there are other aspects of the media that can be used to overcome this deficit.

BY MR. FRENKEL:

Q    I believe you misspoke.  You said "1.3 gigabits per square" inch is what you've achieved?

A    I did.  I misspoke by a factor of a thousand.  1.3 terabytes per square inch, which is 1,300 gigabits per square inch.  Thank you.

Q    All right.  And then looking at the next slide, slide 69, what are we looking at here in terms of Signal-To-Noise Ratio or SNR?

A    Right.  So this is a demonstrative to show what poor SNR would be.  You need in the system in order to store data and recover it with high fidelity.  So if you have low Signal-To-Noise Ratio, either in writing or in reading, the information that you encoded and saved on -- in the right in this case would not be able to be easily read back if the

SNR is poor.  The situation on the right shows us a picture of a case where you wrote with high fidelity and you read back with high fidelity.

Q    And here it says that bad SNR results in low AD.  Is AD areal density?

A    AD stands for areal density, yes.  SNR translates almost directly to areal density capability in a system.

Q    Okay.  And turning to the next slide, you talked about the importance of Signal-To-Noise Ratio in writing.  Is that what you're explaining here?

A    Yeah.  Just to give an easy understanding of a good and a bad writing, imagine you have a wet piece of paper and you try to write on it.  The ink would just run all over the place.  That's bad writing.  In a recording system, that results in bad SNR, writing SNR, yes.

Q    And then --

A    In physics, it's hard.

Q    And then turning to the next slide, what is this showing you here?

A    This is the other half of the coin where for readback, you need the read SNR to be good as well.  So even if you wrote with high fidelity and your readback SNR is bad, of course, you would still be reading bad information.

So imagine you're driving on the highway with your glasses on and you hit a bump on the road and your glasses

fall off and all of a sudden you cannot make out what a signage on the road is.  If you were to put your glasses back on, now everything is good and clear.

Q   Now, Dr. Bertero, you were present when Dr. Re testified that the asserted patents are solely responsible for all of the increases -- all of Western Digital's increases in areal density from 300 to 700 gigabits per square inch and for a significant portion of the increases from 700 to 1300 gigabits per square inch.

Do you agree with?

A   No.  I strongly disagree with that statement.

Q   Why not -- why do you disagree with him?

A   Because I believe that Dr. Re ignores many aspects of the recording system having to do with gains in SNR arising or coming from other aspects of the media beside, but also as importantly from other aspects of head design channels, servo, firmware.  So there's the -- a significant number of components in a drive that all need to contribute to SNR gains.

Q   And before we get into those other reasons, let's talk about some context.  How long has Western Digital been researching ways to increase areal density in PMR?

A   I believe that's ever since the introduction of PMR.  That's always, always the goal in a company like Western Digital from the MMR days to PMR, to increase areal density

131

and improve SNR.

Q    How many engineers work on this?

A    There were times that R&D were -- there were -- easily over a thousand Ph.D.s performing research and development functions all over the world.  This is -- thousands of engineers of every level and maybe tens of thousands of operators and technicians performing research/development operations all over the world.

Q    And have you prepared a list of other technologies that improve areal density?

A    Yeah.  This focus mostly -- basically all of them focus on the media design.  And like I said, this is just for examples that Mr. -- Dr. Re -- I apologize -- didn't mention that are critical for delivering better SNR outside of the media stack having to do with the invention.  But also there's, like I said, many other aspects of SNR gain that are not covered in this report.

Q    All right.  Let's turn to the first one, which is titled "New and Improved Layers."  So focusing on this slide and then turning back to the recipe from JX-2039, what are we -- what are these layers that we're looking at here, Dr. Bertero?

A    These are the three of the layers that are situated in between the bottommost G layer and the soft magnetic underlayer.  One is called GIIL.  GIIL stands for grain

initiation isolation layer.  The other layer is inter-layer ruthenium or ruthenium oxide, and the bottommost layer in this list is pre-IL, pre-inter-layer.

Q    All right.  And let's start with -- first of all, Dr. Re testified that he credited as part of his analysis to Western Digital for normal research and development.

Do you consider the GIIL, for example, G-I-I-L, to be normal research and development or was it more significant?

A    No.  This is a -- this is something very significant that allowed WD to improve its products in a very meaningful way.  WD has a few patents on this technology.  It was invented by WD engineers.

Q    And what -- how does the grain initiation isolation layer increase areal density?

A    It does so because, as the name implies, it's a layer that helps with the isolation.  This is the -- the amount of nonmagnetic isolation separated going to the grain boundaries of the grain.  We will get a little bit more into that later.

But also, because it helps significantly with the grain size uniformity, and that is a critical aspect of the recording system.  You want every grain to be as uniform as its neighbor because when you're writing transitions, bits, you want -- under the influence of a head field gradient,

133

you want those transitions to be as sharp as possible.  And if you have broad distributions of properties, then the transitions would be very broad.

Conversely, if you had uniform properties, in this case uniform grain size and other -- other aspects of it, then the transitions can be sharp and you gain SNR by doing so.

Q    And did Western Digital invent the GIIL layer?

A    Yes, it did.

Q    All right.  Let's look at the next layer.  I'm sorry, that's not it.  Let's look at the next layer down, the IL ruthenium oxide layer.  What is that?

A    That layer was critical because it's a layer that helps to orient the easy access of magnetization in the autoplane direction.  Remember we talked about MMR and PMR where we needed different layers to be able to force the magnetization to be in the autoplane direction.

And that layer consisting mostly of ruthenium, but also ruthenium oxide, helps to achieve the orientation that you need in the magnetic layer grains so there is the access in the autoplane direction.

Q    And below that, you list the pre-IL layer.  What is that layer?

A    That layer serves the purpose of orienting the inter-layer ruthenium oxide layer.  It's a layer that helps

134

with the overall perfection of -- it's called crystallographic texture. The -- the disk -- with a perfection of the growth in the autoplane direction so that there's very dispersion of easy access.

Q    And did MR Tech invent either the IL ruthenium oxide layer or the pre-IL layer?

A    MR Tech did not, no.

Q    And how long has Western Digital been working on the -- these layers?

A    Western Digital doesn't stop working on these layers. These layers need to be optimized. Sometimes you need to go to different materials. If you could change the thickness, you would bring the distance from the pole of the head to its image and to soften the layer to be closer. You then -- you gain writing field strength in that way. But these layers are critical for orienting the magnetic bits, for initiation -- initiation of the grain segregation, achieving grain size uniformity.

Q    All right. And then turning to the next slide, how do these layers improve areal density?

A    So I like this demonstrative very much because I think it drives the point. Imagine that the magnetic stack that's here is the house that you're building, and these three layers are the foundation for that house.

So if the foundation is bad, it's made under poor

soil or it doesn't have the structural character that it needs, no matter how good your house on top of it, it would just crumble.  So the three layers that we just discussed are like the foundation and the house on top is the magnetic stack in the accused products.

MR. FRENKEL:  All right.  I'm going to move on to the next one, but, Your Honor, we should keep going?

THE COURT:  That's fine.

MR. FRENKEL:  Okay.

THE COURT:  I think we'll stop here.

Ladies and gentlemen, we have a regular day tomorrow.  Please remember the admonition not to discuss the case with anyone, not to form any opinions on issues in the case until it's submitted to you.

So we'll see you bright and early tomorrow.

THE CLERK:  All rise.

(*Jury exits courtroom.*)

(*The following proceedings were had outside the presence of the jury:*)

THE COURT:  Doctor, you may step down.

Mr. Lumish, where are you in your case-in-chief?

MR. LUMISH:  I had to remember, Your Honor.  We have two more witnesses after this one.  Mr. Frenkel estimates another 15 or 20 minutes with this witness on direct.  Then we have our invalidity expert, Dr. Victora,

136

our damages expert, Dr. Becker.  I think we're -- in the opposite order.  We're likely to call Dr. Becker first.

THE COURT:  Would that take up all of tomorrow, your estimate?

MR. LUMISH:  I think it would, yes, Your Honor.

THE COURT:  Okay.  And then, Mr. Fenster, are you planning a rebuttal case?

MR. FENSTER:  We do, Your Honor.  We have disclosed Dr. Seuss, Dr. Re, and Dr. -- and Mr. Bergman.

THE COURT:  Okay.

MR. FENSTER:  We had -- go ahead.

THE COURT:  Okay.  Depending on what they put on, I think you're entitled to rebut for your case as well.

MR. LUMISH:  We'll try to reserve some time then, Your Honor.  Appreciate that.  We're still working within the limits you gave us from the beginning of 14 hours.

THE COURT:  All right.  I think that still works.

MR. LUMISH:  Well, I think it's important because we've tailored all of our exams to meet those numbers.

THE COURT:  MR has about four hours 20 left.  Western Digital has about -- about 545 left.  Give you the exact numbers in the morning.

MR. LUMISH:  Thank you, Your Honor.

THE COURT:  And I did get the additional corrections that you sent in late yesterday afternoon.

MR. LUMISH:  And was that acceptable to the Court?

THE COURT:  Yes, it was.

MR. LUMISH:  Yes.  Thank you.

MR. FENSTER:  Your Honor, was that 4:20?

THE COURT:  Yes.

MR. FENSTER:  Thank you.

THE COURT:  I come in at some time ago to give a speech to the luncheon for the Federal Bar Association.  That's on Thursday.  I'd been gone from about 11:30 to 1:30, slightly more than for lunch.  If we got the evidence in, why don't we spend Thursday afternoon trying to go over the jury instructions.

MR. LUMISH:  That makes sense, Your Honor.

May I ask, is the person who's going to be closing, if I can be excused from and have somebody from my team handle the charge conference?

THE COURT:  Sure.

MR. LUMISH:  Thank you, Your Honor.

THE COURT:  But you're to remain fully responsible.

MR. LUMISH:  I understand.  That's -- I get that.

MR. FENSTER:  Your Honor, were you -- I had trouble hearing.  Were you anticipating a Friday close then?

THE COURT:  Yeah.

MR. FENSTER:  Friday morning?

138

THE COURT:  Yeah, I don't see -- as I recall, your last estimates were about an hour each for closing.

MR. LUMISH:  Correct.  Exactly, Your Honor.  I think we'd we run out of time on Thursday with the 14 hours.

MR. FENSTER:  Yeah.

THE COURT:  Well, I think you'd run out of time, but you wouldn't go back to back to back.

MR. LUMISH:  Oh, fair enough.

MR. FENSTER:  And, Your Honor, is it your intention to instruct the jury -- give the jury instructions before closing on Thursday?

THE COURT:  Right.

MR. FENSTER:  Perfect.  Thank you, Your Honor.

THE COURT:  And the jurors will each have their individualized set of instructions.

MR. FENSTER:  Yes.

MR. LUMISH:  And I think you meant before closing on Friday, but we can -- you said before closing on Thursday.

MR. FENSTER:  I meant the instructions would be on Thursday --

MR. LUMISH:  Yeah, before closing on Friday.

MR. FENSTER:  Yeah.

THE COURT:  Okay.  Anything else for today?

MR. FENSTER:  Not for Plaintiff, Your Honor.

*(Court Reporter requests clarification for the record.)*

MR. KROEGER:  Yes, Paul Kroeger for Plaintiff, Your Honor.

As a matter of housekeeping, JX-2047 was used with Dr. Re both on redirect and recross.  It was inadvertently not moved into evidence, so we move JX-2047 into evidence, and WD does not have an objection to it on the exhibit list.

MR. LUMISH:  No objection, Your Honor.

THE COURT:  2047 will be received.

*(Plaintiff's Exhibit JX-2047 received in evidence.)*

THE COURT:  Okay.  Thank you.  So see you in the morning.

*(At 4:33 p.m., proceedings were adjourned.)*

-oOo-

140

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  July 23, 2024


_____/s/DEBORAH D. PARKER_____
DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*