**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE JAMES V. SELNA, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| MR TECHNOLOGIES, GMBH, | ) |
| | ) |
|     Plaintiff and | ) |
|     Counterclaim Defendant, | ) |
| | ) |
|     vs. | ) SACV NO. |
| | ) 8:22-cv-01599-JVS-DVM |
| WESTERN DIGITAL TECHNOLOGIES, | ) |
| INC., | ) |
| | ) |
|     Defendant and | ) |
|     Counterclaim Plaintiff. | ) **DAY 7, VOLUME II** |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

THURSDAY, JULY 25, 2024

1:29 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF and COUNTERCLAIM DEFENDANT:

> MARC A. FENSTER
> RUSS, AUGUST & KABAT
> 12424 WILSHIRE BOULEVARD
> 12TH FLOOR
> LOS ANGELES, CALIFORNIA 90025
> (310) 826-7474
> mfenster@raklaw.com


> BRIAN D. LEDAHL
> RUSS, AUGUST & KABAT
> 12424 WILSHIRE BOULEVARD
> 12TH FLOOR
> LOS ANGELES, CALIFORNIA 90025
> (310) 826-7474
> bledahl@raklaw.com


> JACOB ROBERT BUCZKO
> RUSS, AUGUST & KABAT
> 12424 WILSHIRE BOULEVARD
> 12TH FLOOR
> LOS ANGELES, CALIFORNIA 90025
> (310) 826-7474
> jbuczko@raklaw.com


> MATTHEW D. AICHELE
> RUSS, AUGUST, KABAT, *pro hac vice*
> 800 MAINE AVENUE, SW
> SUITE 200
> WASHINGTON, D.C. 20024
> (202) 664-0623
> maichele@raklaw.com


> MINNA Y. CHAN
> RUSS, AUGUST & KABAT
> 12424 WILSHIRE BOULEVARD
> 12TH FLOOR
> LOS ANGELES, CALIFORNIA 90025
> (310) 826-7474
> mchan@raklaw.com

**APPEARANCES OF COUNSEL:** *(Continued)*

    FOR THE PLAINTIFF and COUNTERCLAIM DEFENDANT:

                PAUL A. KROEGER
                RUSS, AUGUST & KABAT
                12424 WILSHIRE BOULEVARD
                12TH FLOOR
                LOS ANGELES, CALIFORNIA 90025
                (310) 826-7474
                pkroeger@raklaw.com

                REZA MIRZAIE
                RUSS, AUGUST & KABAT
                12424 WILSHIRE BOULEVARD
                12TH FLOOR
                LOS ANGELES, CALIFORNIA 90025
                (310) 826-7474
                rmirzaie@raklaw.com

                DALE CHANG
                RUSS, AUGUST & KABAT
                12424 WILSHIRE BOULEVARD
                12TH FLOOR
                LOS ANGELES, CALIFORNIA 90025
                (310) 826-7474
                dchang@raklaw.com

    FOR THE DEFENDANT and COUNTERCLAIM PLAINTIFF:

                DOUGLAS E. LUMISH
                LATHAM & WATKINS LLP
                140 SCOTT DRIVE
                MENLO PARK, CALIFORNIA 94025
                (650) 328-4600
                doug.lumish@lw.com

                JOSEPH HYUK LEE
                LATHAM & WATKINS, LLP-COSTA MESA
                650 TOWN CENTER DRIVE
                20TH FLOOR
                COSTA MESA, CALIFORNIA 92626
                (714) 540-1235
                joseph.lee@lw.com

**APPEARANCES OF COUNSEL:** *(Continued)*

FOR THE DEFENDANT and COUNTERCLAIM PLAINTIFF:

SALIL BALI
STRADLING YOCCA CARLSON & RAUTH P.C.
660 NEWPORT CENTER DRIVE
SUITE 1600
NEWPORT BEACH, CALIFORNIA 92660
(949) 725-4278
sbali@stradlinglaw.com

CHAARUSHENA DEB
LATHAM & WATKINS LLP
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
chaaru.deb@lw.com

STEVEN M. HANLE
STRADLING YOCCA CARLSON & RAUTH P.C.
660 NEWPORT CENTER DRIVE
SUITE 1600
NEWPORT BEACH, CALIFORNIA 92660
(949) 725-4094
shanle@stradlinglaw.com

SARAH W. WANG
LATHAM & WATKINS LLP
330 NORTH WABASH AVENUE
SUITE 2800
CHICAGO, ILLINOIS 60611
(312) 876-7700
sarah.wang@lw.com

PATRICIA YOUNG
LATHAM & WATKINS LLP
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
patricia.young@lw.com

**APPEARANCES OF COUNSEL:** *(Continued)*

FOR THE DEFENDANT and COUNTERCLAIM PLAINTIFF:

RICHARD GREGORY FRENKEL
LATHAM & WATKINS LLP
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
rick.frenkel@lw.com

LINFONG TZENG
LATHAM & WATKINS LLP
140 SCOTT DRIVE
MENLO PARK, CALIFORNIA 94025
(650) 328-4600
lin.tzeng@lw.com

**ALSO PRESENT:**

Wendy Liu, Paralegal, Russ August & Kabat
Dieter Suess, MR Technologies, Corporate
Representative

Chris Schmoller, Litigation Support,
Western Digital Technologies

Mary Noffsinger, Jury Consultant,
Western Digital Technologies

```
                        I N D E X


PLAINTIFF'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

 MARK RE                    64      86       120        124

 JAMES BERGMAN             126     141


DEFENDANT'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

 RANDALL H. VICTORA                  8       41         62
```

**SANTA ANA, CALIFORNIA; THURSDAY, JULY 25, 2024; 1:29 P.M.**

**-o0o-**

*(The following proceedings were had outside the presence of the jury:)*

MR. LEDAHL:  Your Honor, before we begin with the jury, one very quick housekeeping question.  My understanding is this is Defendant's last witness, after which they'll be resting.  We'll have a customary 50(a) motion to make.

When would you like us to do that from a time perspective?

THE COURT:  The end of the day --

*(Court Reporter requests clarification for the record.)*

THE COURT:  At the end of the day -- however we deem made at the end of Plaintiff's case.

MR. LEDAHL:  Thank you, Your Honor.  At the end of defense case.  Thank you, Your Honor.

THE COURT:  Bring the jury in, please.

THE CLERK:  All rise for the jury.

*(The following proceedings were had in open court in the presence of the jury:)*

THE CLERK:  Please be seated and come to order. This Court is again in session.

THE COURT:  Mr. Fenster.

*Deborah D. Parker, U.S. Court Reporter*

MR. FENSTER:  Good afternoon, ladies and gentlemen.

Good afternoon, Your Honor.

RANDALL H. VICTORA, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. FENSTER:

Q    Dr. Victora, you ended your direct talking about secondary considerations.

MR. FENSTER:  Can we bring that up, please?

*(The document was published in open court.)*

BY MR. FENSTER:

Q    You said that there was -- that you had seen no evidence of secondary considerations that would support non-obviousness, correct?

A    No.  Not evidence, yes.

Q    You said that there was no evidence that anyone had ever praised Dr. Seuss' invention, correct?

A    If that is true, I certainly didn't mean to say that -- well, praise, yes, I agree with what you just said.

Q    You said there was no evidence of commercial success, correct?

A    Right, that is correct.

Q    And you didn't tell the jury about the IEEE nomination letter that we saw right at -- right before lunch, correct?

A    You mean during my testimony?

Q    Correct.

A    That's correct.

MR. FENSTER:  If we can bring that up, please.

*(The document was published in open court.)*

BY MR. FENSTER:

Q    And in that letter, you say, "This concept, this new storage media, was quickly applied by industry.  Media based on the new concept was quickly adopted by industry. Nowadays, almost all state of the art hard disks rely on this idea."

That is what you wrote this nomination, correct?

A    First of all, it's a draft, but that is written there.

Q    Okay.  And would you agree that that goes to commercial success?

A    I think the keyword there is -- it says new concept.

Q    Okay.  And you didn't tell the jury about this in your testimony on direct, correct?

A    Didn't tell them what?

Q    About your letter and what you had said about Dr. Seuss' concept and idea, correct?

A    I did not tell them about the letter during my direct.

Q    Okay.  Now --

MR. FENSTER:  You can take that down.

BY MR. FENSTER:

Q    You have never served on a patent validity expert

before, correct?

A    This is true.

Q    And before -- and the -- as part of your work, you had to do a report disclosing all of your opinions in this case?

A    Correct.

Q    And then you sat for a deposition under oath, correct?

A    Yes.

Q    Correct?

A    I think I said yes.

Q    Oh, sorry.

Now, at the time you did your analysis and formed your conclusions, you did not even know the standard of proof required to invalidate a patent that has been issued by the United States Patent Office, correct?

A    That is not true.

Q    Let's go to your deposition at page 25, lines 12 through 16.

MR. FENSTER:  Can you bring that up?

*(The document was published in open court.)*

BY MR. FENSTER:

Q    Now, it's on the screen.  You were asked:

"QUESTION:  Do you know the standard of proof,

Dr. Victora, that is required to invalidate a

patent that has been issued by the Patent Office?"

You answered:

"ANSWER:  Probably not."

That was your -- did I read that correctly?

A   That's what's written there.  Yes, uh-huh.

Q   Okay.  Now, the Court has issued claim constructions in this case, right?

A   Yes, they have.

Q   And we all have to apply the Court's claim constructions, correct?

A   Yes.

Q   Any analysis that does not follow the Court's claim constructions would be invalid.

You agree?

A   This is true.

MR. FENSTER:  Okay.  Can you bring up the claim constructions for nucleation host and nucleation host comprising letters?

*(The document was published in open court.)*

BY MR. FENSTER:

Q   You're aware that -- we're looking at the bottom one.

A   Um-hmm.

Q   You're aware that the Court specifically construed nucleation hosts to be layers that assist switching of the storage layer and optional coupling layers, correct?

A   That's correct.

Q   Now, you disagree with the Court's construction,

correct?

A    I do, but that's irrelevant.

Q    Your opinion is that the patents do not cover media that has exchanged coupling layers in the nucleation host, correct?

A    Within this court, yes.

Q    And at your deposition, you said you can't believe the Court wrote that claim construction, didn't you?

A    Probably.  You'd have to show it to me, but it's certainly possible.

Q    When you were doing your invalidity analysis, sir, you applied your own understanding that the claims did not include coupling layers in the nucleation host rather than the Court's actual construction, correct?

A    Only in the part that you are referring to, which was regarding the -- whether there's -- in fact -- you know, whether or not Western Digital was making the MIT media.

Q    So the answer is yes, correct?  When you did your invalidity analysis, you did -- you applied a claim construction that was different than the Court's claim construction, correct?

A    I cannot agree with that.

            MR. FENSTER:  Okay.  Let's go to your deposition at page 24, 18 to 21.

            *(The document was published in open court.)*

13

THE WITNESS:  It's going to come up?

BY MR. FENSTER:

Q    Yeah.

A    Yep.

Q    And you were asked:

"QUESTION:  Even though you were applying an
understanding of the claims that was different
than the Court's claim construction, is that
right?"

And you answered:

"ANSWER:  This particular aspect, yes, I was."

Did I read that correctly?

A    I think you'd have to look at the context.

Q    Okay.  Now, if we can go back to the claim
constructions, the claim constructions for nucleation host,
you would agree, require a multilayer nucleation host,
correct?

A    Repeat it, but probably.  Repeat what I said.
Repeat --

Q    The Court's construction of nucleation host requires
more than one layer.  Two or more layers --

A    That is true.

Q    -- correct?

A    True.

Q    You agree?

14

A    I do.

Q    Okay.  Now, when you were talking about your bilayer, you said that your Victora bilayer, the single soft layer, was a nucleation host.

Do you recall that?

A    I probably did.

Q    Yep, you sure did.  And that's when I objected.

Do you recall that?

A    No.

Q    Okay.  Well -- so you were applying -- you were calling a single layer the nucleation host even though the nucleation host is construed by the Court to be two or more layers, right?

A    This statement is true.

Q    Okay.  And you did the same with Berger, correct?

A    Yes.

Q    Okay.  And you would agree that that's not following the Court's claims construction and applying it correctly, right?

A    I believe I said corresponds to.

Q    I think you said it was.

A    Okay.  If that's true, sure.

Q    If you said that, you would agree that you were not applying the Court's claim construction correctly?

A    Just to be clarifying, you're talking about my

testimony earlier today?

Q    You bet.

A    That's true.

Q    All right.  For -- let's talk about anticipation.

For a patent to be issued by the Patent Office, the Patent Office has to determine that the patent meets all of the requirements for patentability, correct?

A    Yes.

Q    That means it has to be new and nonobvious, correct?

A    True.

Q    New means that the prior -- that no prior art ever disclosed the claimed invention as it's claimed, right?

A    Okay.  Could you repeat that, please?

Q    Yep.  New means that no prior art ever described the exact invention as it's claimed, correct?

A    Okay.  I'm probably -- I'm sorry.  Could you repeat again?  I still don't get the question.

Q    New -- in order to prove that it's not new, you'd have to show that one piece of prior art showed all of the elements in the claim in -- as it's claimed, right?

A    Now, in the -- if I was trying to show anticipation, yes, that's correct.

Q    Okay.

*(Court Reporter requests clarification for the record.)*

*Deborah D. Parker, U.S. Court Reporter*

16

BY MR. FENSTER:

Q    WD Western, Western Digital, the defendant, is not challenging that the -- that Dr. Seuss' patents are new, correct?  They're not challenging that at all.  You're not raising an anticipation defense.

A    Yes, we are not -- I don't believe we are raising an anticipation defense.

Q    You agree that none of the prior art that you've talked about today, Victora, Berger, Hagadorn, Dobin disclosed a multilayer graded anisotropy with anisotropy increasing toward the hard storage layer on the bottom.  You agree, right?

A    By themselves?

Q    That's right.

A    By themselves, they do not.

Q    Okay.  So let's talk about the standard for obviousness.

To prove that the patent is invalid for obviousness, you have to prove that a person of ordinary skill in the art would have come up with the invention as claimed by the priority date, correct?

A    Yes.

Q    Now, WD does not dispute that the only person who ever did come up with this invention before the priority date was Dr. Seuss, correct?

A    I mean, I think I -- hasn't that been the point of my whole testimony?

Q    The whole point of your testimony, as I understood it, is no one had done it before, but it would have been so obvious to just flip the layers.  That's what I got out of your testimony.  Is that fair?

A    With respect to Li?

Q    Yep.

A    With respect to Li, yes, that is a correct statement.

Q    Okay.

A    Meaning that it's so obvious to flip the layers.

Q    Yeah.

Now, in deciding obviousness, you have to avoid using hindsight, correct?

A    True.

Q    Meaning you can't look at the patent now, what Dr. Seuss already disclosed, and say, now, oh, yeah, that would have been obvious now.  That would be improper, right?

A    I agree.

Q    You have to put yourself in the shoes of someone back in -- before June 2006 and say would it have been so obvious to them that they would have done it, right?

A    Yes.

Q    Okay.  Now, you were a person of ordinary skill in the art as of June 17, 2006, correct?

*Deborah D. Parker, U.S. Court Reporter*

A    That is correct.

Q    In fact, all modesty aside, you were a person of extraordinary skill in the art as of June 17, 2006.  Fair?

A    I'll take your word for it.

Q    Okay.  Thank you.

And you have not presented any prior art reference today showing that you came up with the idea of flipping the layers or adding multiple layers as claimed in Dr. Seuss' invention, correct?

A    Okay.  Could --

Q    And in prior art reference, you have not shown in any prior art reference that you've presented today that you described combining multiple layers to the bilayer system or flipping Li, correct?

A    I was not -- I did not present it because I was not allowed to.

Q    Okay.  Now, you agree that the examiners at the United States Patent Office have much more experience examining patents and comparing patents to the prior art than you do.  Fair?

A    They have more general experience probably in this particular field.

Q    And you agree that all three of Victora, Berger, Hagadorn and even Dobin and Richter were all cited to the Patent Office and considered by the Patent Office when the

examiner issued the patents at issue today, correct?

A    No, that's not actually correct.

Q    You agree that Victor 2, Victora 3, Berger, Hagadorn, and Dobin, Richter were all discussed at the Patent Office inside the --

A    Those were.

Q    Okay.  Now, you agree that Berger and Victora do not invalidate on their own, right?

A    This is correct.

Q    You have to rely on combining them with Hagadorn, right?

A    This is correct.

Q    Now, to qualify as prior art for an obviousness combination, you have to prove by clear and convincing evidence that Hagadorn is analogous art to the Seuss' patent, correct?

A    Yes.

Q    Now, I was listening carefully.  You didn't mention analogous art at all during your opening -- during your direct testimony, correct?

A    Probably that is true.

Q    Okay.  And you didn't compare -- you compared Hagadorn to other prior art, but you didn't compare it to the problem being solved by -- you didn't compare it to the Seuss' patents, correct?

20

A    Explicitly?

Q    Yes.

A    No.

Q    Okay.

          MR. FENSTER:  Let's pull up PDX-8.40.

          *(The document was published in open court.)*

BY MR. FENSTER:

Q    Now, for a reference to qualify as analogous prior art, you have to prove by clear and convincing evidence that it's either in the same field of endeavor as the patent, correct, or that it's reasonably pertinent to the particular problem that the inventor was solving, right?

A    True.

Q    Okay.  Now, for field of endeavor, you would agree --

          MR. FENSTER:  If you can go to 8.41.

          *(The document was published in open court.)*

BY MR. FENSTER:

Q    -- the field of endeavor of the Seuss' patents is multilayer exchange coupled structures for perpendicular magnetic recording in hard disk drives, right?

A    That's what it says, yes.

Q    You agree that that is the field of endeavor.  You testified to that at your deposition --

A    Yes.

Q    -- right?

*Deborah D. Parker, U.S. Court Reporter*

A    I would agree.

Q    Okay.  Now, Hagadorn is not related to perpendicular magnetic recording or hard disk drives at all, correct?

A    That is true --

Q    Okay.

A    -- in the sense that he never mentioned them at all.

Q    Great.

MR. FENSTER:  Let's go to the 8.42.

*(The document was published in open court.)*

BY MR. FENSTER:

Q    For the particular problem -- the particular problem that the Seuss' invention addresses is improving writability while preserving thermal stability in PMR media for hard disk drives.

You agree?

A    True.

Q    Hagadorn had nothing to do with thermal stability at all, correct?

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  Hagadorn did not discuss thermal stability.

BY MR. FENSTER:

Q    Hagadorn was concerned with something called the Brown Paradox which had to do with defects in why -- in permanent

magnetic and why coercivity was lower than expected in permanent magnetics, right?

A    No, that -- I disagree with that.

Q    Okay.  Now, the vast majority of Hagadorn is only describing a pair of thin films, two thin films, correct?

A    A large majority is concerned with two films.

Q    Now, you're trying to tell the jury that Hagadorn is so well-known since 1970 that anyone of skill in the art would've known about it and would've thought to combine it PMR to add more layers, right?

A    I am certainly agreeing that if they were given Hagadorn, they would know to combine it and do it, yes.

Q    Now, you were one of the most preeminent professors in the field of magnetism in 2006, correct?

A    Hopefully.

Q    Okay.  And the first time you ever heard about the Hagadorn article was in 2005, correct?

A    Right, or maybe early 2006.

Q    And perpendicular magnetic recording has been around since 1980s.  Maybe 1985, I think you said?

A    Roughly.

Q    Okay.  And between 1985 and 2006, no one ever combined this super famous Hagadorn reference to add more layers to PMR the way Dr. Seuss described in his patent, correct?

A    No -- maybe you can repeat it, if you don't mind.

23

Q    Between 1985 --

A    Um-hmm.

Q    -- and 2006, no one combined Hagadorn, the super famous reference from 1970, to add multiple nucleation host layers with increasing anisotropy to a PMR media the way Dr. Seuss described in June 2006, correct?

A    Right, they did not do that.

Q    Okay.  Now, none of the references that you rely on as prior art, Victora 1, Victora 2, Victora 3, Berger, Li, none of them mention or cite to Hagadorn at all.  Fair?

A    Yeah, that's true.

Q    Okay.  The only reference -- the only reference that you point to as citing to Hagadorn at all in the context of PMR that you use as a motivation to combine, right, is the Dobin and Richter article?

A    That's correct.

Q    And Dobin and Richter only cites Hagadorn for a bilayer implementation, correct?

A    That's correct.

Q    So even though Dobin and Richter, who were dealing with PMR and were people of ordinary skill in the art -- you'd agree?

A    Oh, they were, yes.

Q    They certainly were.

        And even though they were dealing with PMR and

they knew about Hagadorn, they don't describe any suggestion in their paper about extending to multiple layers, correct?

A    They don't state it in their paper.

Q    Okay.  Now, Victora -- let's talk about your references.

Victora taught a bilayer which was a soft layer and a hard layer, right?

A    True.

Q    And your soft layer ideally was perfectly soft, right?

A    That statement is there.

Q    Meaning that if it's perfectly soft, by that, we mean it has a -- an anisotropy K value of zero?

A    Technically what it was a reference about -- do you want the --

Q    No.  I want you to answer my question, please.  I apologize, I'm on a clock.

So when you say "perfectly soft," you were referring ideally to something that had an anisotropy value K of zero, correct?

A    I was referring to the combination of shape and crystalline anisotropy --

Q    Okay.

A    -- to be zero.

Q    Okay.  And you would agree that if you had a perfectly soft layer, you couldn't add a softer layer on top.  Fair?

A    Oh, this is true.

Q    Yeah.

     Now, the purpose of adding the soft layer in both Victora and Berger was to try to achieve the benefit in writability of something called tilted media, correct?

A    It was to obtain the perpendicular writability without any of the problems of tilted media.

Q    Right.  And what you were trying to achieve was the benefit of tilted media without the negatives of having to make it tilted.  Fair?

     *(Court Reporter requests clarification for the record.)*

     THE WITNESS:  Adjacent track erasure.

BY MR. FENSTER:

Q    Okay.  And that was true for both Victora and Berger, correct?

A    This is true.

Q    And in both Victora and Berger, you both concluded that you could achieve the maximum benefit of tilted media with two layers.  Fair?

A    Both of us reached out to two layers -- I'm sorry. Two -- maybe you should repeat.  I'm sorry.

Q    Both Victora and Berger -- both of you -- both of those references concluded in the references that you could achieve the maximum benefit of the tilted media with only

the two layers, correct?

A    That is probably true.  Certainly for myself.  I'm not sure about Berger.

Q    Okay.  And there's no suggestion in your Victora papers that multiple layers would further improve writability, correct?

A    Meaning Victora 1, 2, and 3 --

Q    Correct.

A    -- that is correct.

Q    And the same is true for Berger, correct?

A    Probably, yes.

Q    Now, you have to show by clear and convincing evidence that a person of ordinary skill in the art would've combined Victora and Hagadorn in the very specific way claimed in the patent, correct?  It's not -- let me back up.

It's not enough to say someone would have thought to combine them.  You have to show that someone would have motivated to combine them in the very specific way that's claim in the Seuss' patents, correct?

A    I don't really agree with that statement.

Q    Okay.  In your report, you did not provide any details about what a combination of Victora plus Hagadorn would look like, correct?

A    I did not draw a picture.  That is true.

Q    The first time you ever drew of a picture of what that

might look like is for this trial?

A    You mean for -- that you could see.

Q    Yeah, that I could see.

A    Yeah, that's true.

Q    Okay.  Thank you.

Now, you think that Li shows the combination of Victora and Hagadorn, correct?

A    Well, again, that's a -- I'm not sure I understand exactly the question or --

Q    Yeah.  Let's go to your report at paragraph 223.

A    Um-hmm.

Q    And you said, "It is obvious to combine Victora's model with Hagadorn's theory and in fact, Li does so. For example, where it discloses layers with increasing anisotropy," and it goes on.

Do you see that?

A    I agree that statement is there.  I don't know if that corresponded to your statement, though.

Q    You stated that Li in fact combined -- you said Li does so.  Li does combine Victora's model with Hagadorn theory, right?  That's what you said?

A    Li does combine Victora's model with Hagadorn theory --

Q    Okay.

A    -- that is correct.

Q    And when he did so, he ended with the hard storage

layer on top, which is different than the claimed invention, correct?

A   Li had the hard layer on top.  That's why I objected to your first phrasing of the statement.

Q   Okay.

MR. FENSTER:  PDX-8.33, please.

*(The document was published in open court.)*

BY MR. FENSTER:

Q   So you said that Li combines Victora and Hagadorn, right, in your report?  We just saw --

A   You -- we all saw the report.

Q   Okay.  And Li is shown on the right, right?

A   Li is shown on the right.

Q   And what Li discloses is that the hard storage layer is M1, and that is at the top, correct?

A   Yeah.  This is exactly why I objected to your first statement.

Q   The -- you agree that when Li combined, as you say, Victora and Hagadorn, he didn't do it in the way that Dr. Seuss' patent requires.  He did it with the hard storage layer on top, correct?

A   That is true.

Q   And Dr. Seuss' patents require that this nucleation host be formed on top of the hard storage layer so the hard storage layer is between the nucleation host and the

substrate, correct?

A    I agree.

        (Pause.)

            MR. FENSTER:  I apologize, ladies and gentlemen.

            Okay.  If we could go to Victora 3.

        (The document was published in open court.)

            MR. FENSTER:  And, Mr. Mortensen, if you can go to that section that we pulled up about the disclosure of --

        (The document was published in open court.)

            MR. FENSTER:  Thank you.

BY MR. FENSTER:

Q    So this is your Victora 3.  So let me back up.

        So Victora 1 and Victora 2 were purely theoretical papers, right?

A    That's correct, yeah.

Q    The only time that you ever made any actual media, any practical implementation was in Victora 3, correct?

A    Yes.

Q    Okay.  And in Victora 3 -- this is what we're looking at -- you had -- the magnetic layer was put on the bottom and the soft layer on top, correct?

A    True.

Q    And then this -- your co-author, Dr. Wang -- is it Wong or Wang?

A    Dr. Wang.

Q    Dr. Wang -- thank you -- states, "In the practical application, it's a better idea to reverse the position of these two layers," correct?  He says -- that's what this says, correct?

A    There's two aspects to what you just said.  One is -- is that sentence up here, not written by me, which is true, and then the other part is exactly who wrote it, which I don't know.

Q    Okay.  But your paper that you reviewed that was peer-reviewed and that you're relying on in this case as prior art to invalidate MR Tech's patents says that in the practical application, it's better to reverse the position of these two layers, correct?

A    It's certainly that sentence there.

Q    You would agree that teaching -- you've heard of the concept of teaching away?

A    Yes.

Q    If there is something in the prior art that would teach a person of skill in the art away from the invention, that's certainly pertinent, it's relevant to obviousness analysis, right?

A    Absolutely.

Q    And you did not disclose that your own reference teaches that in the practical application, it would be better to put the hard storage layer on top, correct?

A    "Disclosed" meaning present and direct?  Is what you're saying?

Q    I mean tell the jury.  That's what I mean, Dr. Victora.

A    Right.  There's one sentence that goes against the prevailing direction of that paper.

Q    Okay.

        MR. FENSTER:  And if we go can to 8.30, PDX-8.30.

        *(The document was published in open court.)*

BY MR. FENSTER:

Q    This is what you showed the jury, right?

A    That's true.

Q    But if you followed either the teaching of Victora 3 to reverse it or Li, you would end up with this in 8.34, correct?

A    I disagree with your statement.

Q    Can you go to 8.34?

A    Um-hmm.

Q    Okay.  Now, if we can go to the claim that requires nucleation host with the HN is less than HS.

A    Oh, yeah, right.

Q    So you agree that the claim requires a nucleation host that has a second coercive field, HN, that is less than HS, correct?

A    True.

Q    And the nucleation host that we're talking about is the

multilayer nucleation host, correct?

A    That's true.

Q    Now, you calculated only the HN for your single soft layer in Victora, correct?

A    Yes.

Q    That's at DDX-4.71.

A    Is that Victora 2 or 1 or something?

Q    Yes.  So this is Victora 1-- or this is Victora where you said -- this was your evidence that HN is less than HS, right?

A    Right.  That was part of my evidence.

Q    And you were referring only to the single layer in your bilayer system, correct?

A    This is correct.

Q    And you did the same thing for Berger, right?  That's at 4.124?

A    Probably.

Q    I don't think that's the right one, actually.  But you did do the same thing only for Berger, right?  Here it is.

A    I would prefer to see it, but I tend to believe it, yeah.

Q    You can see it now.

A    Oh, yeah, this is true.

Q    So when you address the HN coercion field for the nucleation host, you were only talking about the single soft

layer in Berger and the single soft layer in Victora, correct?

A    This is true.

Q    And you never in your direct provided any opinion about the coercive field of the multilayer nucleation host of your proposed combination, correct?

A    Let me take a second.  You could be right.  Let me see here.  Yeah, I think I would agree with that.

Q    Okay.  Let's talk about Li real quick.

Now, you agree that Li does not describe any embodiment where the hard storage layer is on the bottom between the nucleation host and the substrate, correct?

A    Oh, I don't agree with that at all.

Q    Let's go to your depo at 140, lines 10 through 16.  You were asked:

"QUESTION:  You would agree that the Li '564 patent does not describe any embodiments where the hard storage layer is on the bottom, correct?

"ANSWER:  If you want to careful check, I'll have to go through it again.  My firsthand thought is probably that's correct."

That was your answer, right?

A    I believe that was my answer.

Q    Okay.

A    That's my firsthand thought.

34

Q    Okay.  And you did not on your direct today provide -- show the jury any embodiment in Li '564 that has the reverse flip.  That was something that you invented, correct?

A    Okay.  That's a two-part question.

Q    Let me break it down.

You did not on direct show the jury any embodiment in Li '564 patent where the hard storage layer was not on top, correct?

A    This is true.

Q    Now, Li discloses a concept called head media spacing, correct?

A    He does.

Q    That's also not something that you discussed in direct, correct?

A    This is true.

MR. LEE:  If we can go to Li DX-1001 at Column 11, line 6.

*(The document was published in open court.)*

BY MR. FENSTER:

Q    Li teaches advantageously, when the magnetization reversal process is incoherent, the read-write head spacing is reduced, correct?

A    He says that, yep.

Q    And then if you go down to line 23, he says that the -- there is an increase in SNR, meaning signal-to-noise ratio,

by virtue of the dramatic decrease in head media spacing, HMS, afforded by the invention, correct?

A    He writes it.

Q    Li tauts that one of the benefits of his invention with the hard layer on top is that it enables the smallest effective head media spacing, correct?

A    Again, he writes it.

Q    Okay.

        MR. FENSTER:  Let's go to PDX-8.26.

        *(The document was published in open court.)*

BY MR. FENSTER:

Q    And this is what he's showing.  When you put the hard media layer, M1, up closest to the hard storage layer, the distance between the write head and the hard storage layer is at a minimum, correct?

A    Say it again, please.

Q    When you put the hard storage layer on top, the distance between the write head and the M1 layer is the smallest, correct?

A    If the M1 layer is always -- okay.  One would have to wonder what he would call M1 if it were upside down.  But I think what you're just trying to say is that his minimum distance between the writer and the hard layer --

Q    Yeah.

A    -- if he does it this way -- is that what you're trying

to say?

Q    Yes.

A    Yeah.

Q    You agree, right?

A    I agree with that.

Q    Okay.  And if the M layer were put on the bottom like you propose, the distance between the write head and the M1 layer, the hard layer, would be at a maximum in your proposed modification, correct?

A    It would be at a maximum but would work better.

Q    Okay.  But it's contrary to what Dr. Li wrote in his report -- in his patent.  Fair?

A    That is correct.

Q    So Li teaches away from your proposed modification, correct?

A    Um-hmm.

Q    Correct?

A    That's correct, yes.  Sorry.

Q    And you didn't tell the jury about that, did you?

A    I -- probably not.  I think not.

Q    Now, there's another way in which Li teaches away.

        MR. FENSTER:  And let's look at PDX-8.16.

    *(The document was published in open court.)*

BY MR. FENSTER:

Q    In Li, so what we're showing here on the left, this is

37

the write head, right?  And these are the M1, M2 layers.
Are you with me?  And what I'm showing in the grayed area is
the write head field.  Are you with me?  The strength of the
write head field.

A    Okay.

Q    Okay?

A    Just to be clear, that's very schematic and that's
anything what the slopes would look like.

Q    Okay.

A    But if you're just looking for a qualitative effect, I
would agree.

Q    Okay.  And you agree that in Li, the strength of the
write field starts high, close to the write head, and
decreases as you go down the stack, correct?

A    That's correct.

Q    As shown qualitative here, right?

A    Yeah.

Q    And in Li, the anisotropy field starts high with the M1
layer, right?

A    Um-hmm.

Q    And it decreases as you go down the stack consistent
with the write-head gradient, correct?

A    The write-head gradient is decreasing in the same
direction as the anisotropy gradient, if that's what you're
saying.

Q    And, in fact, it states at the top -- this is from Column 11, lines 25 through 27 -- Li teaches it should be noted that the head field of magnetic gradient should be less than the gradient of the magnetic anisotropy of the various sublayers, right?

A    He writes that, yeah.

Q    Okay.  And what he's saying is that those two gradients have to be such that the right field is higher than the anisotropy at each layer, correct?

A    I think so.  If you want me to say for sure, you have to show it to me, but --

Q    I can show you your deposition.

A    Okay.  That would be fine.

Q    Okay.  Let's go to 149 at lines 3 through 7.

MR. LEE:  I object, Your Honor.  I think there's an inconsistent statement here.  He's saying he thinks so. To the extent of his recollection, I guess --

THE COURT:  You're not on the mic.

MR. LEE:  I'm sorry.  It's not impeachment, Your Honor.

BY MR. FENSTER:

Q    Do you agree, sir, that what you said -- do you agree --

THE COURT:  Just a minute.

MR. FENSTER:  Yeah, I'm sorry?

THE COURT:  Respond.

MR. FENSTER:  I'll rephrase.

THE COURT:  Okay.

BY MR. FENSTER:

Q    Do you agree, sir, that the right field at each level has to be high enough to write to the anisotropy field of that particular layer?  Correct?

A    That is stated in Li.

Q    I'm sorry?

A    That is stated in Li.

Q    Okay.  And he -- he's -- Li is saying that you cannot have a situation where the bottom layer has an anisotropy that is greater than the write field at that distance from the write head because then you wouldn't be able to write to it, correct?

A    That is true.

Q    And that was consistent with conventional thinking at the time.  Do you agree?

A    I don't think so, no.

Q    Okay.

A    I disagree.

*(Court Reporter requests clarification for the record.)*

MR. FENSTER:  Sure.

*////*

40

BY MR. FENSTER:

Q    Can we go to PDX-8.17?

A    Sure.

Q    And if you were to modify the Li structure to put the hard storage layer on the bottom, the write-head field would still be decreasing as shown on the right, right?

A    In a vastly exaggerated fashion, but yes.

Q    Okay.  And you would end up with an increasing anisotropy field as shown here, correct?

A    This is true.

Q    And you would agree that statement in Li also teaches away from your proposed modification, correct?

A    Li, as I recall, states that he wants the gradient of the head field to be greater than the anisotropy -- smaller than the anisotropy gradient, and that's going to be true if, for example, you have a negative number.

Q    Dr. Victora -- all right.

        Do you recall -- I'm going to switch topics now. Do you recall that there was a lot of discussion -- you were here for the whole trial.  There was a lot of discussion about whether coercive field could be fairly approximated or determined using the formula 2K over M?

A    That's true.

Q    You understood Dr. Seuss' patents to teach that coercive field should be calculated using 2K over M,

correct?

A    That is the way he designed it.

Q    And you used the 2K over M formula in your validity analysis to determine the coercive field limitations, correct?

A    Right.  We followed Seuss' lead on this.

MR. FENSTER:  Okay.  I'll pass the witness, Your Honor.

THE COURT:  Mr. Lee.

MR. LEE:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. LEE:

Q    Good afternoon, Professor Victora.

A    Good afternoon.

Q    Let me start, I think, near the end of Mr. Fenster's presentation.

He complained, I think, at a couple times at you didn't tell the jury about something that he questioned you on.

A    That's true.

Q    Now, I think, for example, with regards to the distance between the heads in Li, that was one of the things that he said that you didn't tell the jury in your direct?

A    This is true.

Q    Okay.  Now, do you remember that I tried to ask you

questions about that and he wouldn't let me do it or he objected to that?

A    That is also correct.

Q    Okay.  So now that he's asked these questions, let's see what your response is.

He asked you whether or not a person of skill in the art looking at Li wouldn't follow Li's advice to minimize the distance from the hardest layer and the write head, and I think your response was that it would work better, but he didn't let you explain why it would work better.

Can you please provide that explanation?

MR. FENSTER:  Beyond the scope of his report, Your Honor.

MR. LEE:  Your Honor, they opened the door.  They asked the questions of him at his deposition.

THE COURT:  Overruled.

MR. LEE:  Thank you, Your Honor.

THE WITNESS:  Well, I think your question is why would you want to put the soft layer on the top for strictly magnetic reasons?

BY MR. LEE:

Q    Well, I guess why would a person of skill in the art, looking at Li and despite what Li says about minimizing the distance in the write-head grains and all that stuff, why

would they go ahead and essentially flip the stack, as you testified on direct?

A    Okay.  I mean, first of all, the reason that it's easier to fabricate still exists, but the additional reason is that the key issue is magnetic material is not -- each grain differs and therefore you want a strong gradient or variation in the field with regard to position so you can write a transition at exactly the right spot.

        This is -- therefore what you need is the maximum gradient right next to where the switching starts.  And if the switching starts at the top, then you're much better off having the softest layer up at the top.

Q    And is this something that a person of skill in the art would've known and considered in 2006 when looking at the Li reference?

A    Probably, but not -- probably.

Q    Okay.  I mean, it's certainly something that people of skill in the art, when looking at Li, they would have understood that one of the ways that you can implement is to flip the layers, I think, as you said before?

A    Yes.  Yes.

Q    And I think he also asked you some questions --

        MR. LEE:  And actually, if we can please bring up PDX-834.  I don't know if they gave it to us, so maybe they will need to show it.  MRT, that is.

44

(The document was published in open court.)

BY MR. LEE:

Q    Do you remember this being shown to you?

A    I do.

Q    And he tried to imply that you're doing a comparison of -- you're saying Victora plus Hagadorn equals Li.

Do you remember that?

A    He made a couple variations of that statement, and one of them matched exactly what you just said.

Q    Okay.  What's missing from here, though, is I think what you testified at during your direct, which is, you didn't testify about Li alone, did you?

A    No, I do not.

Q    What did you actually testify about?

A    I talked about Li in combination with a person of ordinary skill in the art.

Q    Okay.  And is that on this slide that MRT created?

A    No.

Q    Okay.  So if you had added in and compared the two things you actually did compare to the patent, Victora and Hagadorn versus Li and the knowledge of a person of ordinary skill in the art, would they then have looked pretty much the same?

A    Yes, they would have.

Q    He also tried to draw a distinction between your

opinions on certain of the nucleation host limitations and I think Victora and Berger on their own.  So maybe we can bring that up.  I think the exhibit is DDX-465, shows the claims with the limitations I want to ask you about highlighted.

A    Okay.

    *(The document was published in open court.)*

        THE WITNESS:  Yeah, I can see it, yes.

BY MR. LEE:

Q    Okay.  Great.  And so I think here, if you recall from your direct, you had discussed that the nucleation host requires a number of things in that in order to satisfy the claim.

A    This is true.

Q    And one of those things is the existence of multiple layers with increasing --

    *(Court Reporter requests clarification for the record.)*

BY MR. LEE:

Q    -- anisotropy constant, the last limitation?

A    True.

Q    And so when you were giving your opinion as to whether or not the combination of Victora and Hagadorn or the Berger and Hagadorn rendered obvious the requirement in the claims for a nucleation host, were you factoring in that that --

it's that combination that has the multiple layers in it?

A     You need to factor it in.

Q     Okay.  And so, for example, when you were saying that it would've been obvious -- the combination of Hagadorn, it would've been obvious to have an H field or coercive field; lower than the hard magnetic storage layer coercive field, were you factoring in that that would include the additional layers contributed by the Hagadorn teachings?

A     Of course.

Q     And with respect to the existence of layer -- extra layers themselves or additional layers themselves in the nucleation host, were you factoring that Hagadorn provides that additional layers?

A     I was, yes.

Q     Okay.  And I'm not going to go over every limitation, but for all the limitations or all the requirements for the nucleation host in the claims, were you factoring in in your testimony and your analysis that for Victora, you were combining in the Hagadorn teachings in terms of discussing whether or not it was obvious -- those limitations are obvious?

A     Yes, I was.

          MR. FENSTER:  Objection.  Leading.

          THE COURT:  Sustained.

////

47

BY MR. LEE:

Q    Let me reask that question.

When you were doing your analysis and determining whether or not each of these limitations were met, were you -- did you analyze whether or not they were met in the -- with the combination of Victora and Hagadorn?

A    Yes.  I always analyzed it terms of the combination of Victora and Hagadorn.

Q    Okay.  And I'm not going to repeat every single limitation, but did you take that same approach with Berger and Hagadorn?

A    I had to, yes.

Q    Now, I think he also asked you about whether or not -- about tilted media performance.

Do you remember that?

A    True.

Q    Were people in 2006, were they satisfied with what tilted media provided in terms of performance?

A    Well, first of all, you couldn't make it, but they even -- within the modeling sense, they were not happy with -- first of all, it did have an adjacent tracking ratio problem and also, you always want to do better.

Q    I mean, is that generally true, that people want to improve stuff?

A    Of course.  I mean, that's -- the idea is to beat their

48

competition and get there and do it first.

Q    Right.  And so essentially, because your work or Berger's work achieved the equivalent of tilted media, would a person of skill in the art have said, That's enough, let's stop here?

A    No, they would not stop.

Q    He also asked you about your paper where it says -- and, again, I guess we don't know who wrote it, but that -- and practically, you'd want to put -- reverse the layers, basically put the hard on top and soft on bottom.

Do you remember him asking you about that?

A    You're referring to the sentence?

Q    That's right.

A    Yeah, I do.

Q    And I think you made a comment along the lines of that's not -- that goes against the rest of the paper.

Can you explain that comment?

A    Well, the entire rest of the paper talks about putting the hard on the bottom and the soft on top.  And, yes, there is the one sentence there that points the wrong way, but it runs completely counter to the rest of the paper.

Q    And so when a person of skill in the art, looking at Li -- let's say they had your paper in front of them that said the practical is to flip it -- and to be fair, Li does have the hard on the top.  Would a person of skill in the

art have said, I'm going to believe what's in your paper and not bother to improve Li?

A    I -- it's hard to image when all of the experimental evidence and everything goes the other way.

Q    Now, he also asked you about Hagadorn.  I think he showed you a slide.  I think it's PDX-840.

MR. LEE:  Can you please bring that up?

*(The document was published in open court.)*

BY MR. LEE:

Q    And I think the second -- the last highlight is -- reference qualifies as prior art if it's reasonably pertinent to the particular problem with which the inventor is involved.

Do you see that?

A    This is true.

Q    Was one of the problems that Dr. Seuss was trying to address was to lower the coercive force?

MR. FENSTER:  Objection, Your Honor.  This was never in his report, never in his direct.

MR. LEE:  Your Honor, he opened the door.  He asked about Hagadorn and about the problems.  This is in direct response to that.

MR. FENSTER:  He's expanding his opinion beyond his report.  He can't do that --

THE COURT:  Sustained.

MR. FENSTER:  -- in response.

THE COURT:  All right.

BY MR. LEE:

Q    Well, let me ask you a different question.  Well, let me ask you a different question then.

Do you remember in your direct --

MR. LEE:  And let's please pull up DDX -- page 18.

*(The document was published in open court.)*

BY MR. LEE:

Q    Do you see what's underlined there, Professor?

A    Yes.  It's the unvariable increase of the coercivity.

Q    And what's that mean?

A    Well, basically, that as you try to increase the thermal stability, you may end up with an increase of the coercivity.

Q    Okay.  So Dr. Seuss in his patent talked about the coercivity maybe increasing unfavorably?

A    Yes.  Yes.

MR. LEE:  Okay.  So let's turn to slide 23 of your demonstrative.

*(The document was published in open court.)*

BY MR. LEE:

Q    And this is the DX-1213, page 9.  Why don't you take a look at the last highlight there.  Well, no, sir, actually, even the first highlight.

What is Hagadorn's paper addressing in terms of coercive force?

A    Well, he's showing you a way to obtain an arbitrarily low coercive force.

Q    Is that the same thing that we just saw in Dr. Seuss' patent that he indicated was an issue?

A    This is true.

Q    Now, he asked you some questions about whether or not you applied the right standard of proof for a claim construction.  And I think one thing he showed you was your deposition testimony where you said of this particular aspect, I think, you weren't necessarily applying the Court's construction.  But when you -- when you were doing your invalidity analysis, did you apply the Court's construction?

A    Right, I applied the Court's construction during the invalidity analysis.  He correctly found one small example and questioned me about it.  And, yeah, that particular section was a mistake.

Q    Okay.

A    That's not in the invalidity analysis.  That was just one of several arguments in the area of the secondary considerations.

Q    And is that an argument that you were making in your direct today?

A    No.

Q    And it is true, I guess, that you did not know the term "clear and convincing," or you didn't remember the term "clear and convincing" in your deposition, but do you understand what that standard means?

A    Just to be very clear about this, I used the clear and convincing standard when I was, you know, writing the report, et cetera.  But when he questioned about it during the deposition, I have to admit I temporarily lost the words.  I couldn't think of them.

Q    We all lose words.  I think I gave several examples of that myself today.

        Now, let's talk about -- actually, let's lead into this.  So I think he showed you this letter that -- or draft, at least, of a letter that you wrote on behalf of Dr. Seuss.

        Do you remember that?

A    He did.

Q    Okay.  And I think one of the things he said was this letter -- you said that there's, you know -- you know, everybody's using your -- some of that -- I'm paraphrasing here, but what exactly it is that you thought was being used by the industry?

A    The concepts.  And that was the concept, I might add, as defined in the very first sentence of both media.  That

would be my media and Dieter Seuss' media.

Q    Okay.  Let's actually bring up that letter. Unfortunately, Plaintiffs did not give us the letter before the testimony.

MR. LEE:  So if you guys could please bring up that letter.  Sorry, are you guys going to bring up...

*(The document was published in open court.)*

MR. LEE:  Thank you very much.

Can you please zoom into the first paragraph -- or sorry.  I think it's the third paragraph starting in 2005?

*(The document was published in open court.)*

BY MR. LEE:

Q    Now, I think that -- and I think this is fair to say, honestly, that MRT's attorney was basically suggesting that you were lying to the jury when you gave your analysis.

Did you lie to the jury, sir?

A    Not at all.

Q    Now, this letter that you wrote, was it a scholarly article of some kind?

A    No.

Q    Why did you write this letter?

A    Help Dieter out.

Q    And so when you're writing this letter, were you focused on all the problems with Dieter's scholarship?

A    Of course not.  He's not going to get any awards that

way.

Q    Okay.  Were you trying to put him in the best possible light so that he could get the IEEE fellow designation he was hoping for?

A    Yes, I was.

Q    Now, this is a letter -- and granted it's a draft, but this is a letter that was intended to go to IEEE?

A    True.

Q    Okay.  Let me -- actually, before we talk about the letter.

        MR. LEE:  Let's go to the --

        *(Court Reporter requests clarification for the record.)*

        MR. LEE:  -- the e-mail to Dr. Seuss that includes the letter.  Can you please bring that up, actually.  I think that's --

        *(The document was published in open court.)*

        MR. LEE:  Thank you very much.

        Can you please zoom in?  And actually, can you show the highlighted version you showed during the cross?

        *(The document was published in open court.)*

        MR. LEE:  Thank you very much.

BY MR. LEE:

Q    So you can see there he focused a lot on what you suggested Dr. Seuss' award should be for, right?  Do you

remember that?

A    I do.

Q    Okay.  He didn't highlight the sentence right after that, did he?

A    No, he did not.

Q    Okay.  What does that sentence say?

A    "Also, ECC media was actually discovered in 2003 and presented publicly in February 2004."

Q    Okay.  And this is just an e-mail between you and Dr. Seuss?

A    That's correct.

Q    This is not meant to be shared with the IEEE, which you were hoping would look at Dr. Seuss in a favorable light?

A    That is true.

Q    What were you telling Dr. Seuss just between the two of you?

A    I -- well, what the actual history was.

Q    And were you -- in the letter itself to the IEEE, did you point to them that, hey, actually, the ECC stuff was invented earlier?

        MR. FENSTER:  Objection.  Leading.

        THE WITNESS:  Yeah.

        THE COURT:  Overruled.

        THE WITNESS:  No.  In the letter itself, I actually made it seem like they came out roughly the same

time.

BY MR. LEE:

Q    Okay.  So let's go back to that letter.

MR. LEE:  Can you please show that?

*(The document was published in open court.)*

MR. LEE:  And again, please zoom in on the paragraph starting in 2005.

*(The document was published in open court.)*

BY MR. LEE:

Q    So in -- when was the Seuss' patents filed?

A    2006.

Q    Okay.  So in 2005 -- and I think you were in court when they talked about some 2005 stuff that Dr. Seuss had done?

A    True.

Q    So what is that 2005 a reference to?

A    It's a two-layer structure.

Q    Okay.  And so -- and then I think the next phrase -- can you please read that next phrase?

A    "Both media break the recording trilemma by allowing versus grains to be both thermally stable and easily written by conventional write heads."

Q    Is that a reference to Dr. Seuss' patent or the 2005 work?

A    No, that is to his 2005 work.

Q    Okay.  And actually, I think you had said in your --

when we talked about the prior e-mail about you're trying to boost his credit, is that -- that first phrase after in 2005, is that what you're referring to there?

A    I probably don't understand the question.

Q    That's a bad question.

Let me just ask you.  In that -- right after in 2005, what is it that you're trying to say there?

A    Oh, I emphasized that Dr. Seuss proposed exchange spring media, and then related certain -- the concept that I introduced, which is basically the same concept.

Q    Okay.  And then I think the rest of that paragraph, for the most part, talks about concept.  So is that concept, is that the same concept that you're saying there, exchange spring media/ECC media?

A    It's all about concept.

Q    Okay.  And that's the concept that I think in the private email you said you had come up with in 2003?

A    This is true.

Q    And so I'm not going to go over all this, but in general, when you were talking about your letter things like the storage media was -- the concept was applied by an industry or adopted by an industry and the like, were you referring to -- what were you referring to?

A    Well, I was referring to the general idea that is described in the first sentence.  It's a concept that ECC

media and his media shared.

Q   Okay.  And I think one of the things that he highlighted for you was multiple magnetic layers with graded anisotropy?

A   He did.

Q   Is two layers multiple layers?

A   It is and it's also graded.

Q   Now, there is a sentence in there, "the concept of exchange spring media was patented by Dr. Seuss in 2006."

Do you see that?

A   I do.

Q   And he also told you that -- later in letter you reference the patent publication, the public patent; is that right?

A   Well, I think what he showed me -- you're talking about what he showed you on the screen?  That did not have, for example, the final claims or anything.  That was way before.

Q   Oh, I see.  So --

MR. LEE:  And if you could please go to the middle of the next page, pull that up.  Thank you.

(The document was published in open court.)

BY MR. LEE:

Q   The 1, 2, 3 under Section 6.

A   Right.

Q    If wouldn't mind.  Thank you very much.

So that last line there, that's not to the patents?

A    That is not to the issued patent at all.  It can't be. The patent wasn't issued yet.  I didn't know that, but it wasn't issued yet.

Q    Did Mr. Fenster, when he questioned you about it, did he tell you, as I think you just said, that the claims in that publication are not the same as the ones being asserted in this case?

A    No, he did not say that.

Q    And did he tell you that, for example, those claims don't actually specify the arrangement of nucleation host and then underneath hard source layer and then underneath that, a substrate?

A    He did not tell me that.

Q    And so even if you were referring to this publication in your letter, were you referring to the actual claims, the patents-in-suit?

A    No, of course not.

Q    Now, where did you get this information about what Dr. Seuss was patenting?

A    He told me.

Q    Did you do your own independent analysis of that patent or, I guess, that patent publication?

60

A    I did not.

Q    So were you trusting that Dr. Seuss would give you the right information?

A    I trusted him, yes.

Q    So with everything that you know now, do you feel that the info he gave you was accurate?

A    Of course not.

Q    I mean, how do you feel about that?

A    Disappointed, I guess.

Q    Okay.  Let me ask you -- sorry, I'm taking a quick look at my notes.

And actually, let me ask you one more question -- or sorry, more than one more question.

When Dr. Seuss gave you the information about what he was trying to patent, was there any source of information other than Dr. Seuss himself?

A    No, there was not.

Q    And you yourself, you didn't do any independent study at the time?

A    I did not.

Q    And now that you're here testifying to the jury, do you feel that you could have just relied upon what Dr. Seuss told you earlier in your analysis?

A    I guess I wish I had checked that, but your point of that he -- I mean, he told me that and I took his word for

it.

Q   Okay.  And actually, you -- I think Mr. Fenster mentioned that he took your deposition.

A   He did.

Q   Do you remember him showing you and asking you questions about that letter at your deposition?

A   Absolutely.

Q   After those questions and the letter itself, did you think that that letter -- this letter changes your opinion at all about whether or not the claims are invalid?

A   No, the letter does not, no.

Q   All right.  And then I have a note here, so I just have to check.  Do you -- do you think that any of the teachings in Li with -- that Mr. Fenster raised regarding the distance from the write head or the different write field, W-R-I-T-E, field versus anisotropy gradient going in different directions -- I'm not even sure understood that myself.

Does any of that teach away from the idea of taking what's in Li and essentially flipping upside down?

A   No, no.

Q   Okay.

A   In fact, that was a very important point when I was analyzing Li, because I wanted to make sure whether or not his argument actually worked.

MR. LEE:  All right.  Your Honor, I pass the

62

witness.

RECROSS-EXAMINATION

BY MR. FENSTER:

Q    This will be super quick.  If you could just go to --
now, on redirect, you were taking -- you were saying that
you were referring to both concepts, your concept and his,
and you were taking credit for multilayer.

You had -- your concept was a bilayer always,
correct?

A    Oh, this is correct.

Q    Okay.

MR. FENSTER:  Can you pull up "However" and blow
that up, please?

*(The document was published in open court.)*

BY MR. FENSTER:

Q    "However, the new media demonstrated that the
coercivity can be partially decoupled from thermal stability
by the use of multiple magnetic layers with graded
anisotropy."

That's what you referred to as the new media,
correct?  You say, "However" --

A    That's right.

Q    -- "the new media," correct?

A    Um-hmm.

Q    And then you go on to say the new storage media was

*Deborah D. Parker, U.S. Court Reporter*

quickly applied by the industry.

A    I do.

Q    Okay.  Now, what you're describing as obvious, that was so obvious, not a single person in the entire world before Dr. Seuss combined Hagadorn with Victora or any other reference or flipped Li, nobody in the world described a multiple -- in a prior art reference described a multilayer nucleation host with increasing anisotropy down towards a hard storage layer, correct?

A    Multiple -- okay.  Probably, but you -- please repeat it.

Q    Yep.

Nobody in the world before Dr. Seuss described a multilayer nucleation host formed on top of a hard storage layer with increasing anisotropy toward the hard storage layer, correct?

A    All in one sentence, no.

Q    Thank you.

MR. FENSTER:  Pass the witness.

MR. LEE:  Your Honor, may the witness be excused?

THE COURT:  Sir, you may step down.  Thank you.

MR. LUMISH:  Your Honor, Western Digital rests.

THE COURT:  Very good.

MR. CHANG:  Dale Chang for MR Tech.

We call Dr. Mark Re.

THE CLERK:  Sir, you're just reminded you're under oath as you took previously.

And if you could please state your full name, spelling your first and last name for the record.

THE WITNESS:  Mark Re, M-A-R-K R-E.

DIRECT EXAMINATION

BY MR. CHANG:

Q    Welcome back, Dr. Re.

A    Thank you.

Q    Can you just briefly tell us what you're going to talk about today?

A    Yes.  I'm here to talk about validity, infringement, and benefits.

Q    And did you bring some slides?

A    I did.

Q    All right.  Let's start with validity.  Did you perform your analysis from the perspective of a person of ordinary skill in the art as you described before?

A    Yes, I did.

Q    And is there a presumption that the patents here are valid?

A    Yes.  It's presumed that the Patent Office did validate the patents correctly.

Q    And is there any dispute that Dr. Seuss developed his invention before anyone else?

65

A    No, none whatsoever.

Q    Then what does Dr. Victora argue to say that his patents are somehow invalid?

A    He's arguing that the inventions were supposedly obvious.

Q    And what does he have to show to establish obviousness?

A    He has to show that someone of skill in the art and knowing the prior art would come up with the claimed inventions before the priority date.

Q    And did he show that?

A    Not in my opinion.

Q    Can you remind the jury of how many years you were in the field of hard disk drives before June 2006?

A    About 20 years at that point.

Q    And what was your role at that time?

A    I was senior vice president in charge of media development.

Q    Where?

A    At Seagate Technology.

Q    And can you just remind us what Seagate was?

A    Yes.  Seagate was the leading supplier of hard disk drives at the time.

Q    About how many Ph.D.s at Seagate?

A    Well, it's about 20 percent of the engineering workforce, so hundreds.

*Deborah D. Parker, U.S. Court Reporter*

Q    So hundreds of Ph.D.s at Seagate and Western Digital, and no one came up with the invention before Dr. Seuss?

A    This is true.

Q    It's not as simple as flipping a cheeseburger or adding a layer to a cake, is it?

A    Not quite.

Q    Throughout your 20 years in the field by that time, had you heard of anyone, anyone attempting any of the combinations of Victora, Berger or Li that Dr. Victora presented?

A    No, I did not.

Q    Ever heard of anyone even suggesting that they could be combined or modified in all these different ways?

A    No.  It defied conventional wisdom.

Q    Does that surprise you?

A    No, it doesn't.

Q    Why not?

A    Well, for one thing, at this time, Dr. Seuss had a particularly advanced model.  It was a three-dimensional micromagnetic model that was basically at the atom scale, atomistic scale, and it also had a very unique feature that it looked at something called energy bands, which you've talked -- we've talked about a bit, which allowed him to calculate the thermal stability.  Dr. Victora's model that he used for this work was a two-spin model that was not able

67

to calculate thermal stability as Dr. Seuss could.

Q    Fair to say Dr. Seuss' software was light years ahead of Dr. Victora's?

A    We've already had problems with measuring the speed of light, so maybe I wouldn't use that term, but it -- I think it was more advanced.

Q    And so what did you conclude as to how Dr. Victora came up with his multiple random assortment of theories of obviousness?

A    I think he used hindsight meaning --

Q    And what is that?

A    Well, if you know the answer, it's easy to put pieces together to get to that answer.  So I think it's, you know, looking backwards once you know what the answer is.

Q    And what tells you -- what confirms for you that he did, in fact, used hindsight, that he used the invention and worked backward?

A    Well, I think we saw hypothetical combinations that he presented.  He also really presented no evidence that anyone would've thought of these hypothetical combinations, and clearly no one did.  And he also picked some arbitrary values from various papers to try to make his point.

Q    But he did have the Victora papers, right, three of them?

A    Yes.

Q    He had Berger?

A    True.

Q    There was lots of technical data in all those references, right?

A    Yes, they were.

Q    Did he really use that data?

A    No.

Q    Did you see that?

A    No, I didn't see.

Q    Why do you think that is?

A    Well, again, because he was using hindsight.  He had the answer he wanted and worked that backwards.

Q    So can you summarize your conclusions on validity, please?

A    Yes.  So I would say that the asserted claims are not obvious over Victora combined with Hagadorn.  I'd say that the asserted claims are not obvious over Berger combined with Hagadorn.  I'd also say that the asserted claims are not obvious over Li combined with knowledge of a person skilled in the art.

Q    Anything else, sir?

A    There's extensive objective evidence as well that this was not obvious.

Q    Just briefly, what is objective evidence?

A    Beyond the patents.  So confirmation from others in the

field, things of that nature.

Q    Now, you heard Dr. Victora say that two of the three Victora papers were considered by the patent examiner, right?

A    I did.

Q    And you recall him pointing out that one of them wasn't considered?

A    Yes.

Q    Did Dr. Victora point to anything in that one paper not disclosed in the other two?

A    Not that I was aware of.

Q    So fair to say that the patent examiner considered the relevant disclosures of all three?

A    Yes, I would agree with that.

Q    Now, what was the goal of Victora?

A    So the goal was to emulate tilted media, which was not practical to make.

Q    And did the Victora papers, did those achieve the objective of emulating tilted media?

A    Yes.  So Victora described a single soft low anisotropy uniform layer and a hard storage layer, and his work did meet the goal of providing the benefits of tilted media.

Q    And so would a person of skill in the art have added layers?

A    Well, he states in the papers that there's an upper

bound to the -- how hard the soft layer can be.  So he basically wants it extremely soft.  It can't be more than one-tenth of the anisotropy of the hard layer.  So once you have a soft layer that meets the objective, there's really no reason to add more soft layers on top of this.

Q    Any other evidence you wouldn't add layers to Victora?

A    Yes.  We heard a few things about the Dobin and Richter, who were on my team at Seagate.  And they looked at two layers, a hard and a soft layer, and said that the ultimate performance benefits were reached with this combination.

Q    And is that consistent with conventional wisdom at the time?

A    Yes, it was.

Q    Now, Dr. Victora says it'd be obvious to combine with Hagadorn.

A    Correct.

Q    Do you recall that?

A    Yes.

Q    Do you agree?

A    No, I don't.

Q    Why not?

A    I would say Hagadorn doesn't even qualify as prior art, given the definition here from -- you know, applied to patents.  So it has to be the same field of endeavor.

Q    And is Hagadorn in the same field of endeavor?

A    No, it's not.  It's not related to perpendicular recording media.

Q    Is it related to hard disk drive media at all?

A    In no way.

Q    What about the second question?  Is Hagadorn related or reasonably pertinent to improving writability without producing thermal stability in PMR media?

A    No.  Hagadorn does not discuss thermal stability at all.

Q    And the passage that Dr. Victora relies on, what does that actually relate to?

A    So it concerns something called the Brown Paradox, which was a difference between the theoretical results and the experimental results for permanent magnetics where the experimental results, the coercivity was actually too low. So he was trying to explain away low coercivity, not trying to implement it.

Q    Is this only part of Hagadorn that Dr. Victora relied on?

A    Yes, it is.

Q    Did the Dobin and Richter paper discuss this part of Hagadorn?

A    No, it did not.

Q    And by June 2006, you'd been in the hard disk drive

industry for about 20 years, right?

A    Right.

Q    Had you ever heard about Hagadorn?

A    No, I'd never heard of it.

Q    And do you recall Dr. Victora saying that someone would've found this part of Hagadorn relevant because Dr. Seuss discussed it in his patents?

A    Yes, I did hear that, which --

Q    Is that proper to do?

A    No.  To me it sounds like a textbook example of hindsight.  I've looked at the patent and now I know that this is relevant.

Q    Any other reason why you wouldn't combine Victora and Hagadorn?

A    Well, as conventional wisdom was at the time and stated in one of the Victora papers, it states in a practical application, it's better idea to reverse the position of these two layers, meaning instead of putting the soft layer on the bottom, the conventional wisdom, you put the hard layer on top.

         What they did in the paper was put the soft layer on the bottom, as shown in this figure, but the paper states that, well, if you're going to do this in real life, you'd want to put the hard layer on top.

Q    So what would that mean as to whether a person of skill

in the art would've combined Victora and Hagadorn in the way that Dr. Victora asserted?

A    I don't think it would've happened, and clearly it didn't, so...

Q    And can you just briefly summarize the parts of the claims that the Victora and Hagadorn combination don't meet?

A    Yes.  For the '864, basically they don't meet claims 1C, IE, 1F, 1G and 1H.  And then for the Claims 10 and 11, the dependent patents, they also don't meet these same criteria.

Q    And so they don't meet -- that combination doesn't meet any of the limitations related to the nucleation host, for example, right?

A    Correct.

Q    And the same goes for the '997 claims?

A    Yes.  For the '997 claims, it also doesn't meet any of the claims that are associated with the nucleation host.

Q    All right.  Let's talk briefly about Berger for Hagadorn.  Can you just briefly summarize your opinions on that?

A    Again, the patent examiner who examined these patents for 12 years was aware of Berger and Hagadorn.  There was no modification -- or no motivation to modify Berger.  As I mentioned, Hagadorn doesn't qualify as prior art, and Dr. Victora's imaginary contribution -- or combinations

relied on hindsight.

Q    And what was Berger's objective?

A    Berger was clearly trying to emulate tilted media, which, as I mentioned, could not be practically made at the time.

Q    Did Berger meet that objective?

A    He did.  So the media that he discusses in the patent behaves like tilted media, but it was able to be fabricated.

Q    And how did Berger meet that objective?

A    So Berger put at soft magnetic layer on top of a hard storage layer.

Q    Any reason anyone would want to add layers to Berger?

A    No, there's no reason.  Again, it's a soft magnetic layer on top and it meets the objectives, so there would be no motivation to add --

Q    And what would happen if you did?

A    Actually, the performance would get worse, so the signal-to-noise would go down and thermal stability would also decrease.

Q    Any other reason why a person skilled in the art wouldn't have added one or more layers to Berger?

A    So, again, here's -- in his text, in the Berger text, mentioning what I just said, but again, there's really no motivation at all to be adding more layers to this once you already have a soft layer on top.

75

Q    Is there other evidence supporting the fact that people thought that the bilayer was the best you could do?

A    Yes.  Again, the conventional wisdom at the time, and shown here again, in the Dobin and Richter paper, was that this hard soft combination two layers had optimal performance.

Q    And these guys were your employers, right?

A    Yes, they were.

Q    Now, Dr. Victora, as with his Victora papers, tries to combine Hagadorn with Berger.  What's your opinion on that?

A    Again, for the same reasons that I gave before, I do not view Hagadorn to be qualified as prior art.

Q    Can you just briefly describe again the field of endeavor?

A    Sure.  The field of endeavor is perpendicular magnetic recording media.  The Hagadorn reference is decades old and in a completely different field.

Q    All right.  And so the -- can you summarize the parts of the claims that the Berger and Hagadorn combination don't meet?

A    Similar to the Victora-Hagadorn combination wanted, they don't meet the claims related to the nucleation host on the '864 patient, either Claim 1 or of the dependents.

Q    So the same missing limitation as the Victora and Hagadorn combination?

A    Correct.

Q    Let's turn to the Li reference.

Did you know Dr. Li?

A    Yes, I knew Dr. Li and all the other coinventors.  They were on my team at Seagate.

Q    And how did you know them?

A    Well, yeah, they're on my team --

Q    Okay.

A    -- at Seagate.

Q    Do you know whether the Li invention ever got adopted?

A    No, the Li invention was not adopted.

Q    And in all the papers that we've seen, including from Western Digital and other publications, do people cite him as being the guy who invented modern PMR media in the same way they credit Dr. Seuss?

A    Not to my knowledge.  I haven't seen that.

Q    What path did Seagate follow?

A    Seagate followed the path that Dr. Seuss put forward in his invention.

MR. CHANG:  All right.  Let's see why that might be.

*(The document was published in open court.)*

BY MR. CHANG:

Q    Can you give us a brief overview of what the Li patent actually discloses?

77

A    Yes.  Very clearly, it states that the anisotropy field decreases towards the bottom of the recording media.  It also says that the hard storage layer needs to be on top closest to the write head.

Q    Is that in every embodiment?

A    Every embodiment.

Q    And how does that compare -- oh, excuse me.

And how does that compare to Dr. Seuss' invention?

A    It's upside down.  Goes in the wrong direction.

So Dr. Li is talking about a decreasing HK towards the bottom of the stack, whereas Dr. Seuss speaks of an increasing anisotropy constant towards the hard storage layer on the bottom of the stack.

Q    What were Li's objectives?

A    There were -- basically to reduce the head media spacing to minimize that, and to make sure that you could match the HK gradient with your field -- or match the field gradient with the HK gradient.

Q    And did Li meet those objectives?

A    He did.

Q    Okay.  Let's talk about the first one.

A    Okay.  So the first one is -- there we go.  So this in conventional media where he describes that with a spacing between the bottom of the writer and the top of the media, he gave an example of that being 6 nanometers.

Q    And what was the HMS for conventional media?

A    So the HMS is a concept where you go to the middle of the media thickness and then add the write head spacing -- write head to media spacing to that middle of the thickness of the conventional layer.

Q    And what was the HMS at -- in this example?

A    So this example that he gave with the 6-nanometer write head to media spacing and a 200-nanometer media thickness, it comes out to 16 nanometers.

Q    And what about using his -- what he actually disclosed has his invention?  What was the HMS value?

A    So it was -- you want to decrease HMS because it would be better for reading and writing purposes.  And what Li's invention was putting the hard storage layer on top and --

Q    So what was that value -- the HMS value?

A    If you these thinner layers on top so that they're switching incoherently, the HMS value was giving by 6 nanometers of that head to the top of the disk spacing and then half of 6, so a total of 8.5 nanometers.

Q    And so that was -- how would you characterize that improvement in terms of the reduction of head media spacing, which was one of Li's core objectives?

A    It was a huge reduction.  Almost a factor or two.

Q    Now, what would happen if you tried Dr. Victora's modification?

A    So Li completely teaches away from this.  It's countered at what's in the claims in the patents, the teaching in the patent.  So if you did this with the -- again, the numbers that were used in the example, Dr. Victora's HMS would be 23.5 nanometers.  Again, a substantial increase away from Li's HMS, more than a factor or two.

Q    And so would someone who's implementing Li, starting with Li have even thought of trying Dr. Victora's imaginary modification?

A    No.  It's completely contrary to what's taught in the patent.

Q    Did Li meet his second objective of matching the gradients?

A    Yes.  So it's the head field would reduce as it goes through the media.  Li wanted the HK to be decreasing as well.

Q    And so the write-field gradient is the gray triangle background; is that right?

A    Correct.  So the boxes, as we've been using, are the HK in this case, value for the different layers.  And the gray background is the representation of the head field.

Q    And so what Li teaches is that those bars should be within the gray triangle?

A    Correct.

Q    And what would happen if you try Dr. Victora's modification?

A    Again, it's totally contrary to the teachings that were this the Li patent.

Q    Does that tell you that Dr. Victora used hindsight?

A    That would be my conclusion, yes.

Q    Is that a proper way to do an obviousness analysis?

A    No, it's not.

Q    And what did you conclude as far as the missing limitations from his modification?

A    So for the Li patent, I would say it -- that the modifications do not solve -- or do not match with the Claim 1C, IE, 1F and 1H, and also the dependent claims from the '864 10 and 11.

THE COURT:  I think we'll take the mid-afternoon break here.

We'll be in recess for 15 minutes, ladies and gentlemen.  Please remember the admonition.

THE CLERK:  All rise.

(*Jury exits courtroom.*)

(*The following proceedings were had outside the presence of the jury:*)

THE COURT:  You got about 34 minutes left, and Western Digital has 46.

Okay.  We'll be in recess.

*(Recess taken from 3:03 p.m. to 3:16 p.m.)*

*(The following proceedings were had outside the presence of the jury:)*

THE COURT:  Bring the jury in, please.

*(The following proceedings were had in open court in the presence of the jury:)*

THE CLERK:  Please remain seated and come to order.  This Court is once again in session.

THE COURT:  You may proceed.

MR. FENSTER:  Thank you, Your Honor.

BY MR. FENSTER:  *(Continuing)*

Q    Okay.  Let's hit infringement briefly.

Do you recall Dr. Bertero come here and say that he didn't think the accused products infringe?

A    I do.

Q    Anything he say change your conclusions?

A    No.

Q    Do you recall he suggested you use the wrong method to determine coercive field?

A    Yes, I do.

Q    Did that affect your conclusions?

A    No.

Q    Why not?

A    Because it's the right method.  The experts at WD mentioned that in their depositions or their testimony.

Dr. Seuss has shown it's the right method, so it's the -- it's the way that it's done in the industry.

Q   And how about the patents?

A   The patents also define that method, which is what we're supposed to be using.

Q   Do you recall Dr. Bertero suggesting that you should have measured it a different way?

A   I do.

Q   What do you think about that?

A   I don't agree.

Q   Why not?

A   Because that was not the correct method to be using.

Q   What timescale was he using?

A   The table he referred to in the papers that he mentioned was something on the order of years.

Q   What paper?

A   This is the paper where Dr. Seuss and his students were coauthors.

Q   What part of the chart that he was showing indicated to you that the timescale that he was using was years?

A   Well, the frequencies involved what he -- that's what was in the paper.  It's not proper.

Q   And what's the timescale used in actual hard drives?

A   As we've discussed, nanoseconds.

Q   Did Dr. Bertero present any measurements suggesting

that coercive field HS of the hard storage layer and the accused products isn't greater than half a tesla?

A    No, he didn't present any data to that effect.

Q    Did he present any measurements suggesting the coercive field HN of the nucleation host in the accused products isn't lower than the hard storage layer?

A    No.

Q    All right.  Let's talk about benefits.

Do you recall Dr. Goglia focusing on your 46 percent number?

A    I do.

Q    Was his testimony a fair characterization of your analysis?

A    No, I don't believe it was.

Q    Why not?

A    Well, I said to subtract R&D.  I'm not the economist. Mr. Bergman will do that.

Q    And you were here when Mr. Bergman testified?

A    I was.

Q    And how did he account for that?

A    He took out all the R&D that WD performed with some added benefits to it.

Q    And how much was that?

A    I don't remember the exact number, but well over $500 million, I believe.

84

Q    So 46 percent minus over 500 million?

A    Correct.

Q    Okay.  And did the R&D include all Western Digital's R&D?

A    Yes.  This was all the R&D including R&D that didn't work.

Q    Like what?

A    Well, for instance, the Cobra product which was brought up.  MAMR, HAMR.  I can keep going.  There's lots of things that don't work that's part of what R&D is.  If you knew it worked, it probably wouldn't be R&D.

Q    And so would you say that your estimate, taking into account -- are all of Western Digital's R&D, it's conservative or aggressive?

A    I think it's conservative.

Q    Did you hear Dr. Goglia testify about various features he thinks were contributors to areal density?

A    I did.

Q    And did you account for all of those features in your analysis?

A    Yes.  Those are included in the R&D, and also I discounted some of the media gains, as you recall, beyond 700.

Q    And did Dr. Goglia quantify how much those features that he talked about contributed to areal density?

85

A      No.

Q      Do you recall he suggested that those various features should -- equally contributed?

A      Yes, I do.

Q      Does that even make sense?

A      No, not at all.

Q      Why not?

A      Well, they just don't contribute equally.  The media solved this fundamental problem of decoupling the thermal stability from the writability.  None of those other features did that.

Q      And just to wrap up, if Western Digital couldn't use Dr. Seuss' invention, what would that mean?

A      They clearly couldn't compete in the industry.

MR. FENSTER:  I pass the witness.

(Pause.)

MR. LUMISH:  May we pass up some binders?

THE COURT:  I'm sorry?

MR. LUMISH:  May we bring up some binders?

THE COURT:  All right.

MR. LUMISH:  Thank you.

And we're going to put a little whiteboard here, if that's all right with the Court.

May I proceed?

THE COURT:  You may.

*Deborah D. Parker, U.S. Court Reporter*

MR. LUMISH:  Thank you.

*(Pause.)*

CROSS-EXAMINATION

BY MR. LUMISH:

Q   Hello again, Dr. Re.

A   Hello.

Q   I know I'm going to break your heart here.  So you'll be happy to hear I do have a number of questions for you.

A   Of course.

Q   I want to start with where I think you started in your direct examination, which was nobody did it first.  You had a conversation with Mr. Chang about that.

Do you recall that?

A   Yes, I do.

Q   But you'll agree with me whether one person or entity put all of the ideas down into one piece of paper, that's not the standard that's at play here today?

A   The standard for?

Q   For obviousness.

A   Correct.

Q   So you know that the standard for obviousness assumes a combination of multiple prior art references?

A   Yes.

Q   Were you applying a standard in your analysis that said for obviousness, you have to find everything in one

reference?

A     No.   It was combined with a person of skill in the art.

Q     Well, were you leaning away from obviousness because you didn't find one reference that had all of the claim elements in it?

A     No.   I was leaning away because the prior art teaches -- taught away from that combination.

Q     You know from your work in the field that lots of patents have been invalidated for obviousness by a combination of multiple references, right?

A     I don't know about lots.   I don't know what the numbers are.

Q     You don't know?

A     No.

Q     Well, let me ask you this.   If it's not a standard and it didn't influence how you addressed the actual standard, why'd you spend so much time on it?

A     What?   Because I was following the rules that said that you had to look at the prior art if a person skilled in the art would combine the prior art to get to a solution.

Q     It's also not true, sir, to say that nobody ever combined the teachings from the Hagadorn and Victora papers together in a paper, right?   That's not a true statement?

A     Well, Dr. Victora did, and Dobin and Richter combined a different part --

88

Q    Right.

A    -- of the pat- -- of the paper.

Q    Well, let's look at Dobin and Richter, if we could, please.  So that's DX-1009.  It should be in the binder that we handed up to you, sir.

        MR. LUMISH:  And, Mr. Schmoller, if you can bring up DX-1009, page 1, and the first page and the second full paragraph.

    *(The document was published in open court.)*

BY MR. LUMISH:

Q    It says, "as a means to resolve."

A    Um-hmm.

Q    Do you see that sentence, sir?

A    Yes.

Q    Okay.  And it says, "As a means to resolve this problem, Victora and Chen proposed the so-called composite media, which are made of two layers, one of which hard, possesses high magnetocrystalline anisotropy, while the other soft layer has a very low anisotropy."

        You see that?

A    I do.

Q    Okay.  So Dobin and Richter here are talking about Victora and Chen and their use of multiple layers, one hard, one soft.

A    Two layers, correct.

*Deborah D. Parker, U.S. Court Reporter*

89

*(Court Reporter requests clarification for the record.)*

BY MR. LUMISH:

Q    Two is multiple, isn't it?

A    I think not as defined by Dr. Seuss' patent, no.

Q    You're talking about in the nucleation host?

A    Yes.

Q    Okay.  I'm just saying there's two layers.

A    There's two layers.

Q    And that's multiple layers.

A    Okay.

Q    Okay.

MR. LUMISH:  And if we can go to the next page, please, DX-1009.002.  And, Mr. Schmoller, about seven or eight lines from above the figure on the bottom right column there, you'll see a sentence that says "The switching field reduction."  If you can bring that up for us, please.

*(The document was published in open court.)*

THE WITNESS:  Yes.

BY MR. LUMISH:

Q    Okay.  Here it says, "The switching field reduction with soft layer anisotropy was first predicted by Hagadorn," right?

A    Correct.

Q    So this is also talking about reducing the switching

field, isn't it?

A     Yes.

Q     And by using a soft layer as part of the structure?

A     Correct.

Q     So we can at least agree that Dobin and Richter combined the teachings of both Hagadorn and Victora in the way we have just talked about.

A     They -- yes.

Q     Okay.  Another thing you talked about with Mr. Chang was how long examiners spent on the field history.

Do you recall that?

A     I do.

Q     You made a comment about 12 years.  You don't know, sir, what the examiner or examiners actually did related to Dr. Seuss' applications, do you?

A     Not in great detail.

Q     Well, you weren't there.

A     I wasn't there, but there's a file history, so...

Q     Sure.

You didn't interact with the examiners, right?

A     No, I did not.

Q     Do you know how many examiners there were?

A     I'm not aware.

Q     Do you know if it was one through the entire 12 years?

A     I'm not aware.

Q    You never went to the Patent Office and met with or spoke with any of those examiners, did you, sir?

A    No.

Q    And you don't know if the examiners ever even read Victora, do you?

A    Well, I would assume that they're doing their job, so they look at the references.  It's -- the assumption is that the patent is valid.

Q    Why would you assume that?

A    Because that's -- isn't that the assumption.  That the Patent Office does their job and the patent's valid?

Q    I don't think there's anything that I've seen, sir, that shows that patent examiners read all the references that are submitted to them.

Are you aware of any such data?

A    I'm aware of no such data.

Q    And you didn't see anything in the file history for the actual patents of Dr. Seuss that received to Hagadorn or Victora by name by the examiner, did you?

A    I'm not aware that.

Q    And you didn't see that for the other Berger patent that was in front of the examiner?

A    Again, I'm not aware of that.

Q    And I said the Victora, I apologize.  But you didn't see any reference, discussion by the examiner about Victora,

did you?

A    Again, I don't recall that.

Q    You don't know if during those 12 years the applications for Dr. Seuss' patents just sat in a box somewhere gathering dust for much that time, do you?

A    I have no knowledge.

Q    And you don't know if the examiner spent more than a handful of hours in any given year over that 12-year span?

A    I'm not aware of that.

Q    Okay.

        MR. LUMISH:  Mr. Schmoller, would you please bring PDX-263.21.

        *(The document was published in open court.)*

BY MR. LUMISH:

Q    This will be a slide, sir, from your direct examination last week.

        Do you recognize it?

A    I do.

Q    I wanted to ask you about the title.  Do you see the title bar at the top?

A    Yes, sir.

Q    It says, "Invention, Multilayer Nucleation Host."  And that's in yellow, right?

A    Correct.

Q    With overall increase in anisotropy K in yellow?

A    Correct.

Q    And then toward hard storage layer on the bottom, right?

A    Yes, that's right.

Q    And -- excuse me.  Your -- your presentation throughout the case -- and I think you probably heard other witnesses for MRT -- have talked about the patents in this case as having those three elements.  Is that fair?

A    Yes, that's fair.

Q    And the elements are the multilayer nucleation host, overall anisotropy increase.  And let me pause on that.

That's the one that you've talked about as being shown by the domino theory or the cascading.  Is that fair?

A    Yes.

Q    And it goes to that layer-to-layer requirement in the claims?

A    Correct.

Q    Okay.  And then the third one is that it's got to be doing that toward the hard storage layer on the bottom, right?

A    Yes.

Q    Okay.  I can't keep two things up at once, so I brought this out.  I just want to write those three things down on the board so we have them in front of us as I ask you some questions about the prior art.

94

A    Sounds good.

    (Pause.)

BY MR. LUMISH:

Q    Okay.  Thank you for waiting for me.

    Did I write down the three elements fairly?

A    Yes, sir, you did.

Q    Okay.  Thank you.

    I want to ask you about these in the prior art. One thing is the title bar there and what I wrote here to summarize it, it doesn't refer to things like nonmagnetic substrates, soft under layers, those kind of things, because I think we can agree those have been known since the '60s, right?

A    Yes.

Q    And you'll agree even though that when you started to work at IBM in the '80s, you were already familiar then with hard magnetic storage layers, right?

A    Yes.

Q    So that's not something that's new to this case in a general sense?

A    In a, yeah, general sense on their own, no.

Q    Okay.  So let's talk about the Hagadorn paper?

    MR. LUMISH:  Mr. Schmoller, can you bring up, please, DX-1213?

    (The document was published in open court.)

*Deborah D. Parker, U.S. Court Reporter*

BY MR. LUMISH:

Q    I'm losing my voice a little bit, so I apologize.

A    Me too.

        MR. LUMISH:  And if you can go to DX-1213, page 9.

        *(The document was published in open court.)*

BY MR. LUMISH:

Q    This is -- I'm going to show you the section that everybody's been talking about for much of the case, sir, so you --

        MR. LUMISH:  And if you can bring it all the way down past the equation by about five lines, please.

        *(The document was published in open court.)*

BY MR. LUMISH:

Q    You recognize this as part of the Hagadorn paper that has been at issue throughout this case, right?

A    That's correct.

Q    And it talks about how a combination of many slabs could yield an arbitrarily low coercive field force, right?

A    Yes.

Q    And can we agree, sir, that when it talks about slabs, that that's what we now call layers?

A    Yes.  In this case, they were, I believe, 4-micron thick layers, so thick layers, yes.

Q    And -- well, you thought they were thin for their time in the deposition that you had, right?

A    That's correct.

Q    Okay.  So layers have gotten thinner over time?

A    Yes, they have.

Q    For 1970, that's pretty thin?

A    True.

Q    Okay.  It says many slabs.  Can we agree that would include more than two?

A    Yes.I think many would include more than two.

Q    And there's a reference to the letter N which it uses for numbers.  It talks about N as a variable.

Do you see that?

A    Yes.

Q    And that can go to infinity, right?

A    In principle.

Q    So --

A    It's pretty tricky.

Q    So can we agree that in Hagadorn it's talking about many layers that can include three or more?

A    Yes.

Q    Now, the patents-in-suit, they talk about this Hagadorn reference, right?

A    Correct.

MR. LUMISH:  And, Mr. Schmoller, can you bring up the '864 patent for me, please?  This is JX-2000, and we'll go to page 12, and this will be at Column 7, lines 35

through 48 of one of the patents in this case, the specification we've all been referring to.  So JX-2000, Mr. Schmoller.  Page 12, line at Column 7, lines 35 through 48, if you could below that up for me.

        (The document was published in open court.)

BY MR. LUMISH:

Q    Okay.  You see the reference to Hagadorn about two lines from the top there?

        MR. LUMISH:  Can you take that highlighting off for me, please, Mr. Schmoller?

        (The document was published in open court.)

BY MR. LUMISH:

Q    Okay.  Do you see the reference to Hagadorn up there?

A    Yes, sir.

Q    And you recognize this paragraph?  I know you've read it many times.  It's about the Hagadorn reference and how it works, right?

A    That's correct.

Q    And it makes a comment about how -- it says, "For example, if the anisotropy of the M layer" --

        MR. CHANG:  Your Honor, objection.  This violates the MIL against using the patents as a road map.

        THE COURT:  Sustained.

        Proceed.

        MR. LUMISH:  I'm trying to combine the patent,

Your Honor.  I just -- it's just a discussion of what Hagadorn teaches.

THE COURT:  This is the patent, isn't it?

MR. LUMISH:  Yes, sir.

THE COURT:  Proceed.

MR. LUMISH:  Okay.

All right.  Well, let's bring that down, please.

BY MR. LUMISH:

Q    You distinguish the Hagadorn reference from the patents in this case because the Brown Paradox.  Is that what I heard during your direct examination?

A    Yes.  That's correct.

Q    But it was cited by Seuss in his -- Dr. Seuss -- excuse me -- and his lawyer?

MR. CHANG:  Your Honor, same objection.

MR. LUMISH:  I'm not even talking about the substance.

THE COURT:  Sustained.

BY MR. LUMISH:

Q    Okay.  Well, let's talk about Victora.

MR. LUMISH:  Can you go to DX-31, please?

*(The document was published in open court.)*

BY MR. LUMISH:

Q    You recognize the Victora reference to 1031 is what we called the Victora 3 reference, sir?

A    Yes, that's correct.

Q    And it was published in the "Applied Physics Letters Journal" in 2005?

A    Yes, I believe that's right.

Q    And you knew about Victora -- Dr. Victora in 2005.

A    Of course.

Q    Okay.

        MR. LUMISH:  Let go to the DX-31, page 2, and there's a bottom -- at the bottom left column, if you can bring up where it says, "Recently, a composite PMR and medium," and go from there for me, please, Mr. Schmoller. It's about 15 -- 12 lines from the bottom left column, about -- thank you.

    *(The document was published in open court.)*

BY MR. LUMISH:

Q    You've seen this text before, Doctor?

A    Yes, sir.

Q    Okay.  And it says, "Recently, a composite PMR medium consisting of two vertically exchange coupled magnetic layers, one is magnetically soft and one is magnetically hard, within each grain has been discussed theoretically."

        Do you see that?

A    I do.

Q    So we're talking here about a hard layer, soft layer, right?

A    Correct.

Q    And using to try to reduce the coercive field and how -- switching?

A    That's correct.

Q    Okay.

        MR. LUMISH:  If you can go down to the bottom of this column, please, Mr. Schmoller, and bring me the bottom line and then the rest of that paragraph at the top of the column to the right.  And just for the record, we're still on DX-1031, page 2.

    *(The document was published in open court.)*

BY MR. LUMISH:

Q    So here we -- it says:

        "With a proper exchange coupling, the
        softer grains will rotate first under
        the external field, while at the same
        time providing an exchange field to the
        hard grains to effectively tilt their
        easy axis, thus achieving a lower
        switching field."

        Do you see that, sir?

A    Yes, I do.

Q    And so here again, we have a discussion of using hard and soft layers in order to reduce the switching coercivity.

A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

Q    Okay.

MR. LUMISH:  And let's jump ahead to DX-1031 -- excuse me -- page 4 and go to the bottom of the left column where it says, "In summary."

(The document was published in open court.)

BY MR. LUMISH:

Q    Okay.  So here it says:

"In summary, we have demonstrated experimentally a promising way to alleviate the writing field limitation in PMR using composite media."

Do you see that?

A    Yes, I do.

Q    Oh, it continues.  It says "which is made up of gains." That should be "grains," right?

A    It should be.

Q    Okay.  (Reading:)

"Made up of grains with two vertically exchanged coupled magnetic regions.  One is sort and another is hard magnetic. Significantly lowering the coercivity field was observed while still keeping good thermal stability."

So here's another place where we see the Victora patent talking about using -- improving PMR switching using

102

this soft and hard approach, right?

A    Yes, with not great thermal stability, but good, it says.

Q    And the direction it goes is top to bottom, right?

A    The direction -- could you be more specific.  I'm not sure I understand.

Q    Sure.

MR. LUMISH:  If we do to 1031 -- so DX-1031, page 2, please.  And you'll see, it -- if you have the hard copy, you'll see it's towards the top of the right column.

BY MR. LUMISH:

Q    It will be on your screen in a second.

A    Okay.

(The document was published in open court.)

BY MR. LUMISH:

Q    So it says -- there it is.  So it says "The composite medium" at the first sentence.

Do you see that?

A    Yes.

Q    So I'll just direct you to the highlighted part, but read what you need for context.  It tells us that the magnetic hard layer was put on the bottom and the soft layer was on top, right?

A    Yes.  In this experiment, that's what it did, yeah.

Q    And so with a hard layer on the bottom, soft layer on

the top, can agree that there's graded anisotropy between them?

A    I guess you could say that for this bilayer structure, yes.

Q    And it would be graded going down?

A    In this experiment.

Q    With the hard layer on the bottom?

A    That's correct.

Q    Okay.

        MR. LUMISH:  Let's go to the Berger patent, please.  So that's DX-1245.

        (The document was published in open court.)

BY MR. LUMISH:

Q    You recognize this one as the patent that was issued to HGST?

A    Yes, sir.

Q    And you know that's a company that's now a part of Western Digital, right?

A    I'm aware of.

Q    And can we agree this is prior art?  It was filed 16 months or so before the filing of the patents in this case?

A    I believe that's correct, yeah.  There it is.

Q    And the title --

        MR. LUMISH:  If you could blow that up for me,

104

please, Mr. Schmoller.

(The document was published in open court.)

BY MR. LUMISH:

Q    -- is "Perpendicular Recording Media Having an Exchange Spring Structure."

Do you see that?

A    Yes, I do.

Q    And exchange spring, that's one Dr. Seuss has used for a long time to describe some of his work relevant to this case?

A    Correct.

Q    Okay.  So this patent was using that phrase and the notion of an exchange spring structure 16 months before Dr. Seuss.

A    Yeah.  Different structure, but yes, same terminology.

Q    Okay.

MR. LUMISH:  Can you bring up, please, for me DX-1245, page 9.  I want to bring up Column 1, lines 23 to 26.

(The document was published in open court.)

BY MR. LUMISH:

Q    And you'll see here a reference to a primary challenge in increasing areal density being overcoming the constraints imposed by the superparamagnetic effect.

Do you see that?

105

A    I do.

Q    And the next sentence references that again.  It says, "The superparamagnetic effect," and it goes on from there.

Can we agree that the Western Digital or HGST Berger patent was looking at with its structure addressing the superparamagnetic limit in the same way Dr. Seuss was?

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  I said, Not in the same way.  This patent was emulating tilted media.

BY MR. LUMISH:

Q    My point -- I'm sorry.  My point being that both were trying to address the superparamagnetic limit.

Can we agree on that?

A    In some way.

Q    Okay.

MR. LUMISH:  Can we go to DX-1245, page 4?

*(The document was published in open court.)*

BY MR. LUMISH:

Q    And I'll ask you to look at Figure 3 with me, please. This is one of the figures you discussed with your lawyer, Mr. Chang; is that right?

A    MRT's.

Q    MRT's lawyer.  Pardon me.  Yes.  And this is one -- let me just ask it this way.  This is a figure you discussed in

your direct examination.

A    Yes, sir, I did.

Q    Okay.  And you know that 304 -- the layer that's labeled 304, that's the exchange spring layer?

A    That was the soft layer, yes.

Q    And below it, 302, that is the -- what's called the hard magnetic recording layer?

A    That's correct.

Q    So here, again, we have the hard magnetic recording layer on the bottom, the exchange spring on the top, right?

A    In this figure, yes.

Q    And so they'll have a graded anisotropy from top to bottom, soft to hard?

A    In this bilayer structure, correct.

Q    The anisotropy increases from the soft layer to the hard layer going down.

A     Yeah.  It'd kind of the definition of soft and hard, yes.

Q    Okay.

        MR. LUMISH:  Let's go to page 11, please, DX-1245, page 11, at Column 6, lines 16 through 21, please.

        *(The document was published in open court.)*

BY MR. LUMISH:

Q    So here you have a statement in the Berger patent that says:

*Deborah D. Parker, U.S. Court Reporter*

"The interlayer exchange coupling should

be adjusted such that the magnetization

of the exchange spring layer, 304,

reverses before that of the magnetic

grains of the magnetic recording layer,

302, to aid in the magnetic reversal of

the magnetic recording layer."

Did I get that right?

A    Yes, you did.

Q    So this is describing that domino or cascade, I understand with two layers, but it's describing that process of the soft layer moving first followed by the hard layer. True?

A    I think that's fair.

Q    And the movement of that soft layer is being described in this Berger patent as -- I think the word was -- was aiding, right?  It says to aid in the magnetic -- the reversal; is that right?

A    That's what it says, yes.

Q    Okay.  So it's -- the soft layer is assisting the switching of the hard layer here.

A    Yes.

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  Oh, I'm sorry.  It's tilting the

108

magnetization of the hard layer to emulate tilted media.

BY MR. LUMISH:

Q    Okay.

       MR. LUMISH:  So let's look, please, at DX-1245, page 11, so the same page, but Column 6, lines 49 to 59.

       *(The document was published in open court.)*

BY MR. LUMISH:

Q    Moving over a column here.

A    Okay.

Q    I know I'm just showing this to you now, but you've read this many times, right?

A    Yes, sir.

Q    You know this discussion is part of the explanation of how the Berger structure would work?

A    Correct.

Q    And it says, "Upon applying a reverse magnetic field" -- I'm skipping the reference numbers -- "the magnetization of the softer exchange spring layer may begin to reverse, thereby exerting a torque on to the magnetically harder magnetic recording layer."

       Do you see that?

A    I do.

Q    And so here again, what we are seeing is the soft layer begins to move first and it exerts a force or a torque, it says, to help switch the hard layer?

A    Yes, correct, it's what it says.

Q    Let me skip ahead to Li, I think, in the interest of time.

        MR. LUMISH:  Let's go to DX-1001, please.

        *(The document was published in open court.)*

BY MR. LUMISH:

Q    So we're going to switch to the Li patent, the Seagate patent, sir.

A    Okay.

Q    While it's coming up, you -- this was a patent you've seen before and you talked about on direct examination?

A    Yes, I have.

Q    And you know it was filed in September of 2005 and --

A    That's correct.

Q    Can we agree it's prior art to the patents in this case?

A    Yes, we can agree on that.

Q    It was filed about nine months before the patents in this case were?

A    That's correct.

Q    And you already said this, but Dr. Li and the other coinventors were colleagues of yours?

A    That's right.

Q    Okay.  Can we agree that the Li patent describes perpendicular magnetic recording PMR?

110

A    Certainly.

MR. LUMISH:  And if we can go to DX-1001, page 6, please.  And bring up lines 1 -- Column 1, lines 8 through 12, please.

*(The document was published in open court.)*

BY MR. LUMISH:

Q    So this is in the section called the field of the invention.  This gives some background for what the patent's useful for.

Can we agree on that?

A    That's right.

Q    And it says, "The present invention relates to improved perpendicular magnetic data information storage and retrieval media.  The invention has particular utility in the design and use of hard disk media," and it goes on from there.

So the point of the Seagate-Li patent is to try to improve PMR and improve hard drives, right?

A    Correct.

Q    Same basic field as the patents in this case.

A    That's right.

Q    All right.

MR. LUMISH:  Let's go to DX-1001, page 8, and bring up Column 5, lines 66 through Column 6, line 9, please.

*Deborah D. Parker, U.S. Court Reporter*

111

*(The document was published in open court.)*

BY MR. LUMISH:

Q    You've seen this section before?

A    Yes, I have.

Q    And it's describing a three-layer structure now, right?

A    That's right.

Q    And so when we talk about a multilayer structure, we've got three or more in this reference?

A    Yes.

Q    And there's a hard first sublayer, it says, at one end with 12,000 oersteds as its anisotropy.

        Do I have that right?

A    As its anisotropy fields, correct.

Q    Anisotropy field.

        Then there's a second that is in the middle that's less hard than that one at 9,000 oersteds.

A    That's right.

Q    And then there's a third layer that's even softer at 3,000 oersteds.

A    Correct.

Q    We're seeing increasing anisotropy -- or decreasing, I should say, anisotropy from layer to layer in the order I just read it.

A    Yes, that's right.

        MR. LUMISH:  And then if we go to DX-1001, page 8,

*Deborah D. Parker, U.S. Court Reporter*

112

so same page.  But bring up Column 6, lines 10 to 22, please.

(The document was published in open court.)

BY MR. LUMISH:

Q    Here there's a four-layer structure that's described; is that right?

A    Yes.

Q    And we have again that same hard first sublayer of 12,000 oersteds.

A    Correct.

Q    Then there's a next hardest one at 9,000?

A    Yes.

Q    Then there's a third at 6,000?

A    That's correct.

Q    And then there's a fourth layer, the softest layer at 3,000 oersteds.

A    Yes, that's accurate.  And again, these are anisotropy fields, just to be complete.

MR. LUMISH:  Let's go to Figure 3, please, so DX-1001, page 4.

(The document was published in open court.)

BY MR. LUMISH:

Q    And, of course, you recognize this figure, right?

A    I do.

Q    I just wanted to walk through it with you and make sure

113

we agree on what it does show.

You see T equals zero at the bottom?

A    Yes, I do.

Q    That's time equals zero?

A    Correct?

Q    And are what -- is what we're seeing a grain made up of four layers as it progresses over time from left to right?

A    Yes, that's right.

Q    And so with T equal zero, all the magnetization moments, as you put it, are pointing straight up.

A    Correct.

Q    And then at T equals T1, that's the next moment in time that we're talking at?

A    That's right.

Q    And we see the moments starting to shift, right?

A    Yes.

Q    We see M1 is still pointing up, but the others are beginning go to cascade down.

A    That's correct.

Q    And we see M4 has sort of switched the most, but then M3 and then M2, right?

A    Yes.

Q    Okay.  If we go to T equals T2, we see that cascade. I'll call it, continuing.  And then T3 until we get to T4, when they all point down.

*Deborah D. Parker, U.S. Court Reporter*

114

A     Correct.

Q     This is the domino theory that we have talked about, isn't it, sir?  It's that cascading of magnetic moments from one layer to the next?

A     Yes, similar.

Q     The reversal of the magnetization as shown in this figure would start with the bottom layer and progress to the higher anisotropy layers above it; is that right?

A     Right.  It reverses incoherently starting with the softest layer.

Q     And so can we agree that Figure 3 discloses multiple sublayers with an anisotropy gradient that progresses from layer to layer?

A     An anisotropy field gradient is what was talked in here.  So multiple layers with an anisotropy field gradient that decreases as you move toward the bottom, yes, that what's represented here.

Q     If the magnetization stays constant, is there -- there's no difference between an anisotropy field and an anisotropy constant, right?

A     About that caveat.

Q     With that caveat, you would agree with what I said?

A     If the magnetization is constant, than HK and KU would be proportional.

Q     Okay.  I asked you Figure 3.  I just want to ask about

the patent more broadly.

Can we agree that the Li patent discloses multiple subleases with increasing anisotropy field moving from layer to layer?

A    Actually, it describes decreasing anisotropy field.

Q    Okay.  Let me say it again then.

A    Okay.

Q    Can we agree that the Li patent discloses multiple sublayers with decreasing anisotropy or an anisotropy field progressing from layer to layer?

A    Yes, that's correct.

Q    Okay.

MR. LUMISH:  I just want to -- if we go to DX-1001, page 8, please, and bring up Column 5, lines 9 through 16.

*(The document was published in open court.)*

BY MR. LUMISH:

Q    It says "in accordance with the embodiments."

Do you see that, sir?

A    I do.

Q    And I'll read it into the record.  It says:

"In accordance with the embodiments of
the present invention, application of an
external magnetic field to the recording
layer induces a progressive reversal

116

process of an initial magnetization direction of each of the polarity of columnar-shaped magnetic grains which originates at one of the ends, progresses toward the other end and results in reversal of the initial magnetization direction to yield a final magnetization direction."

Did I read that okay?

A    Yes, you did.

Q    Is that putting in word what we just saw in the figure?

A    That's correct.

Q    And so we have this progressive reversal where the magnetization shifts from layer to layer?

A    Right, this incoherent reversal, yes.

Q    It's the domino process that we've talked about throughout the case?

A    Correct.

MR. LUMISH:  Let's go, please, to DX-1001, page 10, and bring up Column 10, lines 28 to 32.

*(The document was published in open court.)*

BY MR. LUMISH:

Q    I'm skipping a few of these that I think say the same thing, since we seem to be able to agree what we're looking at here.

*Deborah D. Parker, U.S. Court Reporter*

All right.  Thank you.  So you should have in front of you there, Column 10, line 28 through 32 of the Li patent.  And I'm starting with the word -- wait, that doesn't --

MR. LUMISH:  I don't think that's right, Mr. Schmoller.  So Column 10, lines 28 to 32.  It's on DX-1001, page 10.

*(The document was published in open court.)*

MR. LUMISH:  There we go.  Thank you.

BY MR. LUMISH:

Q    Do you see where it says "tailoring"?

A    I do.

Q    It says:

"Tailoring of the local exchange coupling strength, between adjacent sublayers is therefore necessary in order to achieve maximum local magnetization reversal torque and for significantly reducing the overall switching field of each grain."

Do you see that?

A    Yes, I do.

Q    Can we agree that the reference to reversal torque there is now in the Li patent, it's showing that the progressive movement, this domino theory of gradient

*Deborah D. Parker, U.S. Court Reporter*

118

anisotropy field, is applying torque to help switch the hard magnetic storage layer?

A    Right, to help assist in switching.  Yes.

Q    Okay.  You talked a little bit about the benefits at the end of your examination?

A    Correct.

Q    And one of the questions was about taking out all of the R&D.

Do you recall that?

A    Yes, I did.

Q    You said that you didn't know to take out, you left that to the accountant, right?

A    Specific dollar-wise, correct.

Q    And you were in the room when Mr. Bergman testified about that?

A    Yes, I was.

Q    Did you hear him say that he only gave Western Digital's R&D a lifespan of one year?

A    To be honest, I don't remember him saying that, but I remember your expert saying that, so --

Q    Okay.

A    -- yes, I --

Q    You know from Seagate, though, that's not how R&D works, right?  Some of it doesn't pan out to anything, some of it might live for a year, but some of it might go on for

a long time.

A    That's fair.

Q    I mean, in this case the argument is that Dr. Seuss' work has gone on for a long time, right?

A    It has.

Q    Okay.  And so the same would be true for Western Digital, wouldn't it?

MR. CHANG:  Foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.  Could you --

BY MR. LUMISH:

Q    You would expect the same to be true for Western Digital's R&D.  It wouldn't just fall off a cliff on an annual yearly basis, would it?

A    As we said, some would, some wouldn't.  But yes, I think that's a fair statement.

Q    I mean, you -- in your role as CTO at Seagate, you would track Western Digital's developments, right.

A    Track, I don't know, but yeah, I was aware of them.

Q    And can we agree that Western Digital had many innovations that lived on for years or even decades?

A    Decades might be a bit of a stretch, but certainly years.

Q    And can we agree that it wouldn't make sense to you that all of Western Digital's R&D would be encapsulated into

one-year increments and that's all they get?

A   Again, no, I don't know how to do that from an economist point of view, so...

Q   I forgot to ask you a question on the Li patents.

You know that the Patent Office never considered the Li patent for the two application that -- or the application, I should say, that led to the two patents in this case?

A   That is my understanding.

Q   All right.  Thank you.

MR. LUMISH:  I pass the witness, Your Honor.

THE COURT:  Mr. Chang.

REDIRECT EXAMINATION

BY MR. CHANG:

Q   Dr. Re, you were asked about the Li patent, shown multiple passages, right?

A   Yes.

Q   And took you through a lot of it?

A   Yes.

Q   And every single example, there was the hard storage there?

A   On the top of the stack away from the bottom of the stack.

Q   And how's that compare to the invention here?

A   It's completely reversed.

121

Q    Now, he also asked you about the prosecution history.

Remember that?

A    I do.

Q    The 12-year prosecution history?

A    Yes.

Q    Do you remember how thick that was?

A    It was big.

Q    That tell anything how careful the Patent Office was?

A    Seems like they did their job.

MR. CHANG:  Can we go to slide 15 of -- we'll skip that for now.

THE WITNESS:  Oh, there it is.

MR. CHANG:  Of Dr. Re's deck.

BY MR. CHANG:

Q    All right.  While we wait for that, do you remember Mr. Lumish asking you about how Victora's software helps tilt the field?

A    I do.

Q    And what was the purpose of that?

A    To emulate tilted media.

Q    And he showed you something about thermal stability.

Remember that?

A    I do.

Q    And did the Victora bilayer or the Berger bilayer, did that actually decouple thermal stability from writability?

*Deborah D. Parker, U.S. Court Reporter*

A    No, not at all.

Q    Okay.

         MR. CHANG:  And so we have slide 15 up?

    *(The document was published in open court.)*

BY MR. CHANG:

Q    Now, Mr. Lumish didn't show you this part of the field history, right?

A    No.

Q    Can you read what it says -- first of all, what is the passage on the top labeled --

    *(Court Reporter requests clarification for the record.)*

BY MR. CHANG:

Q    -- '864 patent?

A    On the title of the slides?  Says, "The Patent Office concluded invention is valid over Victora and Hagadorn."

Q    Okay.  And do you understand that to be the reasons for allowance from the Patent Office?

A    Yes.

Q    And what does it say there?

A    "However, the prior art of record does not teach nor suggest the coercive field relationship between the nucleation host and the hard magnetic storage layer and a nucleation host comprising multiple ferromagnetic layers with increasing anisotropy constant K from layer to layer."

123

Q    And were the Victora references and Hagadorn the prior art of record?

A    Yes.

          MR. CHANG:  Let's go to the next one.

     *(The document was published in open court.)*

BY MR. CHANG:

Q    Do you understand that to be the reasons for allowance for the '997 patent?

A    That's correct.

Q    And were all three, the Victora reference, the Berger reference, and Hagadorn, part of the prior art of record there?

A    Yes.

Q    How many papers have you reviewed on Victora bilayer media, Berger bilayer media, Dobin bilayer media?  How many papers have you seen?

A    I didn't keep count, but both hands and my toes and probably somebody else's.

Q    Did any single one them suggest anything close to Dr. Seuss's invention?

A    No, not at all.

Q    Does the fact that Dr. Victora came up here and argued that all these reference, all these people trying to solve this trilemma, that not one of them mentioned anything close to Dr. Seuss' invention, did that tell you anything?

A    Tells me that it wasn't obvious.

MR. CHANG:  Pass the witness.

RECROSS-EXAMINATION

BY MR. LUMISH:

Q    Just a quick question on that prior art of record point.

A    Sure.

MR. LUMISH:  Mr. Schmoller, bring up JX-2000, page 1 for me, please.  Actually, let's go to page 2.

BY MR. LUMISH:

Q    You know the patents list the prior art of record?

A    Yes.

Q    Okay.  I just want to show you that list.

MR. LUMISH:  JX-2000, page 2.

*(The document was published in open court.)*

BY MR. LUMISH:

Q    Do you see the reference to cited and other publications there?

A    Yes.

Q    That's taking up all -- pretty much all the screen that we saw right now?

A    Correct.

Q    There were a number of reference over the course of the prosecution history that would be prior art of record?

A    That's correct.

*Deborah D. Parker, U.S. Court Reporter*

Q    And Mr. Chang didn't just show you any discussion where the examiner says anything about Victora or Hagadorn specifically, did he?

A    I don't know if it was specific, but it was included in the prior art of record.

Q    Right, but I'm -- my point is there's no reference by name from the examiner saying here's what Hagadorn says or here's what Victora says, and that particular reference is different for some reasons, expressly referencing those pieces of prior art that you were shown?

A    I think that's correct.

Q    And the Li patent's not in this, is it?

A    No, the Li patent is not.

Q    All right.  Thank you very much.

MR. LUMISH:  No questions, Your Honor.

THE COURT:  Sir, you may step down.  Thank you.

THE WITNESS:  Thank you.

MR. LEDAHL:  Your Honor, may we have just a second to set up and could we maybe move this?

THE COURT:  You've got about 24 minutes left.

MR. LEDAHL:  Thank you, Your Honor.

If I may, while we're doing that, the plaintiff calls Jim Bergman to the stand.

THE CLERK:  Sir, you're just reminded that you're under oath, as you previously took.  And if you could please

126

state your full name, spelling your first and last name for the record.

THE WITNESS:  It's James Bergman, J-A-M-E-S B-E-R-G-M-A-N.

DIRECT EXAMINATION

BY MR. LEDAHL:

Q    Mr. Bergman, welcome back.

A    Good to be back.

Q    Were you here for Dr. Becker's testimony yesterday?

A    I was, yes.

Q    Do you recall he expressed some opinions about the reliability of your regression model that you used to calculate damages?

A    I recall that, yes.

Q    One of the things he said was that you were trying to force a straight line graphic analysis.

Do you recall that?

A    I do, yes.

Q    Do you have a response to that criticism?

A    I do, yes.  I think it was an unfair characterization. I mean, I think as I talked about in my testimony last week, my analysis was to evaluate the data and then create a regression that fit that data.  When I ran the linear regression that I ran, I got a P value of zero.  I can tell you I've run a lot of regressions in my days.  I have --

this is the first time I saw a P value of zero.

The R squared value that Dr. Becker talked about, I got a 92 percent, which mean -- I don't mean if we talked a lot about on my direct, but a R squared is just really how good the model fits the data, and a 92 percent is a very, very high rate.  So there was no need to do anything else at that point.

Q    Have you analyzed the differences between Dr. Becker's two regressions and your 12 reignitions that we talked about?

A    I have, yes.

MR. LEDAHL:  Can we bring up PDX-1012.1, please?

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    Is this something you prepared, Mr. Bec-- Dr. -- Mr. Bergman?  Excuse me.

A    I did, yes.  I prepared this, actually, right after I received Mr. Becker's -- or Dr. Becker's report.

Q    Can you explain what we see here?

A    Yeah.  So what this is showing is -- this is actually the exact same dot plot with my line that I showed in my first testimony.  So that's the -- you know, all the blue dots, again, are the individual observations.  And then the grain line here -- I'm overwriting it, but the green line here is my regression line.  The red line actually

represents Dr. Becker's regression.

And I think as he stated in his testimony, it's a slight curve.  And you can see that for the most part, his line is almost right on top of my line, except when you get to the outer limits of the regression analysis.

Q    And what does that mean that his line is right on top of your line?

A    For the most part, it actually validates my regression. We can talk about sort of this outskirt area here, but, you know, he's a little bit below me here and above me here. But for the most part, it's very consistent with the overall regression that I performed.

Q    Now, Dr. Becker showed -- and actually, let me just ask you.

MR. LEDAHL:  If we can go to the next slide, please.

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    I think the first one -- maybe it was a little small to read -- referred to the external products.

Did you look at this for all three groups of the products, the electra- -- the external, the color and the Ultrastar or the groups that you used in your modeling?

A    I did.  So, you know, Dr. Becker only actually ran -- I think as he admitted, only ran two regressions for the

external products and said that a Quadratic equation would be better. I wanted to actually see what did it look like for the color products, right? Those are 35 percent of the products. They had a per-terabyte average selling price of $26 as opposed to $18. I wanted to see like is there really a need for a Quadratic equation in the analysis.

Q   And is that what we see here on this slide, the results of that analysis?

A   Yeah. And as you can see, it's actually much, much closer to together than even what you had in the external products.

Q   Now, Dr. Becker showed yesterday that his price regression had adjusted -- I think it's called an R squared value that -- of 9.26. And yours was 9.16.

Do you recall that?

A   I do, yes.

Q   What does difference mean?

A   So it was interesting. I mean, I -- if I recall his testimony, he basically said that, you know, by adding this slight curve, he was able to get the R squared number up 1 percent, and because of that, my model was unreliable, I think is what he said.

You know, in reality this is -- it's not so binary, right? So his analysis is actually adding complexity to the regression in order to get a better fit,

but that doesn't mean it's the right regression.  And we can talk about that.

Q    And this is, I think, what Dr. Becker showed.  Is where he was highlighting this distinction?

A    That's right.  And actually, I think an important point is while he is getting a higher R squared, which means it's a slightly better fit, his standard error numbers are significantly higher than mine, which means that his dots are further away from the line.

So by adding complexity, he's getting a little better in one area, but then worse in another, which is what you would expect when you add this kind of complexity on top of the analysis.

Q    And that difference between .91 and .92, is that a big, significant different in talking about the reliability of these two regressions?

A    It's not, and you can see that when you overlay and look at the chart themselves.

Q    Did you compare the results of Dr. Berger's -- or excuse me.  Little tough with all the B names.

Did you compare the results of Dr. Becker's regression outputs with your regression?

A    I did, yeah.  When I saw the lines and how close they were to each other, I actually wanted to see what would happen if you applied his numbers to the actual number of

04:14:16 terabytes that were sold.

Q    All right.

MR. LEDAHL:  So let's go to the PDX-5 -- excuse me, 10.8.

04:14:23 *(The document was published in open court.)*

BY MR. LEDAHL:

Q    So what is this that we see here, Mr. Becker -- Mr. Bergman.  I'm sorry.  It's going to be tough on me all time -- the whole time.

04:14:31 A    So this is the number of terabytes over the entire damage period based on the overall drive size.

Q    Okay.  And did you then use that to analyze Dr. Becker's results?

A    I did.  And then I think as Dr. Becker stated, there's 04:14:48 no dispute here that these are the right number of terabytes over the damage period.

Q    So let's jump ahead to sort of how this plays out.

MR. LEDAHL:  Let's go to PDX-10.11.

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    So what do we see here, Mr. Bergman?

A    Yeah, so there's a lot of data on this slide, but the first two columns here represent exactly what we just saw, right, so the overall number of terabytes based on the drive 04:15:12 size.

The third column here is the output from Dr. Becker's regression, right?  These are exactly his numbers on a per-terabyte basis.  And so we can see exactly if you multiply the number of terabytes in that particular drive size times the average selling price, you can figure out the total amount of revenue attributable to that based on Dr. Bergman's own regression.

The exact same analysis he performed for the average selling costs, that's what that column is under the Becker regression cost per terabyte.  These are the numbers he presented yesterday as part of his regression.

So if we want to offset the amount of revenue by the amount of cost, we can multiply it by the number of terabytes and we can see that that's $840 millions. Subtracting the average selling price amount from the average selling cost amount to get to the profit, we can see that based on Dr. Becker's own regression -- these are his numbers that come directly out of the regression applied to the number of terabytes that everybody agrees to, he's showing a profit of $1.294 billon.

Q   And how does that compare with the profit that came out of your regression modeling?

A   If you apply the same analysis -- so mine was $18.45 per terabyte across the size -- across every drive size, my number is $1.290 billion.  There is a 4 million-dollar

difference between my analysis and Dr. Becker's analysis. That's at .3 percent -- we agree based on the output of both of our regressions, 99.7 percent.

Q   And did I hear you correctly that Dr. Becker's regression actually output a slightly higher number overall than yours did?

A   Yes.

Q   Now, I want to go to a slightly different point.

      MR. LEDAHL:   Could we bring up PTX-10.4, please?

      (The document was published in open court.)

BY MR. LEDAHL:

Q   Do you recall Dr. Becker showed this slide during his presentation about sort of where the distribution of sales was of the hard drives that were at issue in this case?  Do you recall that?

A   I do, yes.

Q   Is this a fair representation, in your view, of actually showing how the drive sales were distributed?

A   So I don't think this is a fair representation of -- or at least a fair use of this data for the type of analysis that we're doing.

Q   And why is that?

A   Because what Dr. Becker is showing here and I've highlighted in red, this is analysis based on units, just how many of these particular drives have been sold.  The

analysis that we've been talking about that Dr. Becker applied, that I applied, is based on the number of terabytes.

So what Dr. Becker is actually showing here is -- if we just take, for example, the 18-terabyte drive, that bar chart is just based on the number of units.  So one units gets one value, but it's an 18-terabyte drive, so you should be showing this based on the number of terabytes with a one -- 18-terabyte drive being 18 instead of one.

Q    If we were to replot Dr. Becker's data more fairly representing it with terabytes, did you prepare a chart showing what that would look like?

A    I did.  So the analysis that Dr. Becker did was just to June of 2023.  Remember this goes -- this analysis goes all the way out to 2027, but -- so if we do an apples-to-apples...

MR. LEDAHL:  Let's go to the next slide.

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    Is this what you're talking about?

A    That's right.  So now this is an analysis based on terabytes.  And if you remember, what Dr. Becker said was -- I think it was right around the 10-terabyte range is where his per-profit number was greater than my per-profit number.

And I think the point that he was making was of

*Deborah D. Parker, U.S. Court Reporter*

course my analysis is skewing because there's more unit sales in the lower terabytes. But, again, we're talking about numbers of terabytes, not numbers of units. This is the way to look at this analysis.

Q    And if you did this analysis out through the entire damages period, does it change a little bit more?

A    It does. And as I said, this only goes to June of 2023. As you would imagine, more and more high-capacity drives are being sold over time. Like there are no .5-terabytes drives being sold anymore. So I wanted to see -- we had actual data up till June of 2023. What does the last three months of data look like?

And so if we go to the next slide, this is actually that distribution of a three-month period. Right in that June of 2023 time frame, again, if we take that 10-terabyte level as sort of the tipping point in those regressions, almost everything now is the 10-terabyte or greater level.

Q    I want to change topics a little bit.

Dr. Becker suggested during his testimony that your damages calculations were -- I think he suggested it was taking all of WD's profits on hard drive or something to that effect.

Do you recall that?

A    I did, yes.

136

Q    Did he show any data to support that assertion?

A    He didn't.

Q    Have you seen anything in all of the Western Digital documents and data that you reviewed that would support Dr. Becker's assertion?

A    No.

Q    If you were going to make an assertion like that, would you feel that you needed to show your work to show evidence to actually back it up?

A    Yes.

Q    Now, we've heard some testimony from Dr. Goglia and from some other witnesses that basically confirmed that Western Digital couldn't really compete in this market if they didn't have access to the patented technology.

You recall that?

A    I did, yes.

Q    Did Dr. Becker take that into account in his damages analysis and modeling?

A    He didn't.  And to be frank, actually, neither did I. I think, as I said in my prior testimony, my analysis assumes that Western Digital is selling the exact same number of hard drives into the market, that nothing with regard to the number of sales has changed.  It's just that they would have to charge a lower price for those sales.  So I'm not even taking into account the potential for lost

sales.

Q   And so if you took that into account, would that suggest higher or lower damages?

A   It would suggest higher damages.  So, you know, looking at the example on that board, that would put that 4792 that Western Digital keeps right off the bat, that puts all of that at risk.

Q   I see.  So when those things are at risk, it's not just that Western Digital might not much as much profit.  They might lose the sale entirely.

Is that what you mean?

A   That's right.

Q   Okay.  Now, Dr. Becker, he suggested during his testimony that there was a very significant difference between your regression and his regression.  I think he showed some different numbers, about $15 or so for the profit -- or excuse me, the sale price number.

Do you recall that?

A   I do, yes.

Q   Now, a few minutes ago, you were saying that the regression seemed to come out very close to the same.  What are we missing?  What's the catch here?

A   So Dr. Becker's analysis, he -- at the end of the day, he doesn't apply his regression numbers.  Those aren't the numbers that he's applying to come up with his final number.

He takes the numbers out of his regression and then re-weights them based on a -- based on the number of observations.  And we'll -- I'll describe this in a little more detail in a second here.

But his number isn't based on those numbers that come from his regression.  It's a re-weighting outside of his regression that changes his analysis from being something very -- almost exactly the same that I get to that -- to a different amount.

MR. LEDAHL:  Let's bring up PDX-10.12, please.

*(The document was published in open court.)*

BY MR. LEDAHL:

Q    So am I understanding correctly this is Dr. Becker's regression line that you talked about a few minutes ago?

A    Yeah.  So what we're seeing on the left, this -- I think he actually presented in his testimony.  This is the -- right.  Those are his numbers that come from his Quadratic equation.  And then if we go to the chart, this is what he shows, right, that slight curve that he's got as part of his analysis.

Q    Okay.  Now, you mentioned this re-weighting.  What is that?

A    So actually, if we go to the next slide, it -- it's a little bit harder to explain because, honestly, I -- when I read his report, I didn't understand the basis for the

re-weighting.  When I read his deposition, I did not understand the basis for the re-weighting.

And then I was actually very much looking forward to his testimony yesterday to understand why he was doing the re-weighting and -- I mean, I think if you blinked, you would've missed it.

There's really no logical reason for this, and so I'm going to try to explain as quickly as I can what he does.

So he takes his regression numbers which are shown on the right and then re-weights them based on the number of observations.  And we talked about this a little bit in my initial.  An observation is just whether or not a product, one product had been sold in a particular quarter.  That's it.  They could have sold a thousand, a hundred thousand or one.  He takes the percentage.

So if we take, for example, the .5-terabyte drive, he says that it should be $12.90.  This is what he testified to.  That's the right number, according to Dr. Becker.

But instead, because those .5 drives are only 1.3 percent of the observations -- again, not the sales, just the observations -- he then -- if we go back to the chart, instead of using $12.90 as part of his number, he actually uses $2.57 cents.  That's the number that's actually applied to get to his 15-dollar number.

And so you can see here this chart makes no sense. If we go to -- if we go to the end -- the 22-terabyte drive, it's only .3 percent, which means that while his regression tells you it should be $27, he's only applying $1.26 at the end of the day. That's what his number is. And so this chart is the actual application after his re-weighting on a per-terabyte basis.

Q   And one final thing, Mr. Bergman. Dr. Becker suggested that his results had these high confidence values, R squared P values that were very significant.

Do those values relate to this chart and those numbers?

A   Not at all. I mean, as you can see, this chart is nonsensical. It makes no sense in the context of these drives, and especially not even in relation to his testimony where he was trying to explain why a higher number made sense at the higher terabyte range. That's not what he ended up applying.

Q   Would it be fair to say that Dr. Becker's suggestion that the numbers he was presenting had a high R squared value or a high P value would be misleading?

A   After this re-weighting, absolutely.

MR. LEDAHL:  Pass the witness, Your Honor.

THE COURT:  Ladies and gentlemen of the jury, we have about 20 more minutes of testimony before each side

141

uses up its time budget.  Can you folks -- we'll take a short break.  Can you folks hang in there for another 20 minutes, or if your preference is do it first thing tomorrow?

UNIDENTIFIED JUROR:  I think we should keep going.

THE COURT:  Anybody wants to take a short break? Nobody would like to take a break?  Okay.

Okay.  Ms. Young.

MS. YOUNG:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. YOUNG:

Q    Mr. Berger, so just to be clear, I'm down to a last few minutes of trial, as your Honor said, so I'm going to focus on a few point, so I'd like us to stay focused.

So you were here when Dr. Becker testified, correct?

A    Yes.

Q    And you heard your counsel talk to Dr. Becker about how much work you did, including your 12 regressions?

A    I remember that.

Q    Okay.  And you didn't run a Quadratic regression on price like Dr. Becker did until after you saw his report, correct?

A    That's right.

Q    And that same is true for costs?

142

A    Yes.

Q    And so you only ran linear models and your 12 regressions were all linear, right?

A    That's right.  There was no need to add complexity.

Q    Okay.  So you were well-aware that if you have enough data points, something can look like a linear relationship even if it isn't?

A    I'm not sure I understand that question.

Q    Sometimes things look like they could be linearly coordinated, but they really aren't?  It's a possibility?

A    Well, that's the reason why you -- I guess it's possible, but that's the reason why you run the regression and evaluate the output --

Q    Okay.

A    -- because it will tell you whether or not it's linear or not.

Q    All right.  So we've actually talked about --

        MS. YOUNG:  Actually, Mr. Schmoller, can I get PDX-1, 1001?  Or somebody, who ever has it?

    (The document was published in open court.)

BY MS. YOUNG:

Q    All right.  So, Mr. Bergman, this is your graph, right?

A    Yes.

Q    And you used your graph to try to show that a linear regression better represents what the data said than

Dr. Becker's Quadratic regression, right?

A    Can you repeat that?

Q    So you pointed this to tell the jury that, in fact, this shows that your linear regression better represents the data in the case than Dr. Becker's Quadratic regression.  Is that fair?

A    I don't think that was the purpose I was using this for.

Q    Okay.  Well, you didn't -- let's put it this way.  You didn't perform any analysis to determine whether the difference in these two regressions models are statistically significant, correct?

A    Can you repeat that one more time?  I'm sorry.

Q    You didn't perform any analysis to determine whether the difference in these two regressions models are statistically significant?

A    The difference between the two, by comparing two to determine whether they are statistically significant?

Q    Correct.  Well, you certainly didn't before today, correct?

A    I don't know if that's true.  I think what this chart shows is that these -- it's a little bit hard to see.  But this is the 95 percent confidence interval, the shading right here.  That's the reason why I added that, to show that Dr. Becker's regression is within the 95 percent

144

confidence interval.

Q    Mr. Bergman, you took a deposition in this -- your deposition was taken in this case?

A    Yes.

MS. YOUNG:  Can we get to -- go to page 138, lines 16 through 22?

MR. LEDAHL:  Objection.  This isn't impeachment.

MS. YOUNG:  He -- I asked the questions to -- well, it contradicts what he just said.

THE COURT:  Overruled.

MS. YOUNG:  All right.  Can we have that up, please.

*(The document was published in open court.)*

BY MS. YOUNG:

Q    And there it says:

"QUESTION:  Have you performed any analysis to determine whether the differences in those two regression models are statistically significant?"

And you said:

"ANSWER:  I mean, I haven't -- I got Dr. Becker's report 36 hours ago, so I've only had so much time to really be able to dive into it and understand it."

Did I read that correctly?

A    You did.

145

Q    Okay.  So when you were pointing to the R squared date just now, you were pointing to the analysis that Dr. Becker did, correct?

A    Yes.

Q    And so Dr. Becker is the one who did a statistical test to compare the linear regression to the Quadratic regression.  Fair?

A    I mean, he has the R squared numbers of both of those, yes.

Q    Okay.  And you agree that the R squared number on the Quadratic is higher, correct?

A    I agree with that.

Q    All right.

MS. YOUNG:  Let's got to slide 7 of your -- of Mr. Bergman's deck.

*(The document was published in open court.)*

BY MS. YOUNG:

Q    So if I draw a line down around the 8-terabyte range, you would agree with me that there are still more terabytes that are less than -- or there more units and terabytes less than the 8 terabytes -- on the 8-terabyte side than above it, correct?

A    That's true.

Q    And so what you understand that Dr. Becker --

MS. YOUNG:  You can take that down, Mr. Schmoller.

BY MR. LUMISH:

Q    (continued) -- used the weighted average to reflect what the data says about that portion of the units at issue, right?

A    I don't understand that question.

Q    All right.  Well, you agree that Dr. Becker used a weighted average on his regression, correct?

A    Used a weighted average after his regression --

Q    Okay.

A    -- or part of his regression.

Q    Fair.

So you agree with me that Dr. Becker ran a regression and he used an output and ran a weighted average?

A    That I would agree with that.

Q    Okay.  So that -- and in doing that, his analysis produced a result of $15.45 per price, correct?

A    Yes.

Q    And your analysis produced a priced per terabyte of $18.45?

A    Based on my regression, yes.

Q    And so the difference in that, when there's 116-million terabytes in the case is the -- if his number's correct, is a $3 overstatement, right?  Sorry.  Let me back up.

So if Dr. Becker's number is correct, it's a $3 overstatement, and since there's 116-million terabytes in

the case, that is like a 315 million overstatement on price, correct?

A    That's what the math would be, yes.

Q    Okay.  All right.  So I think you and Dr. Becker do not dispute the total hard drive profit, correct?  Do not dispute Western Digital's total hard disk drive profit?

A    I didn't calculate total hard disk drive profit through the entire damage period.  I think he had a number in the high 800s.  I haven't validated that.

Q    Okay.  But finally, for the last point, though, is, you did hear Dr. Becker testify that MRT's demand is 61 percent of Western Digital's hard disk drive profits, correct?

A    I heard him testify that.  I think that's completely wrong.

Q    But you haven't calculated it yourself.

A    Well, if you just take his 860 million-dollar number and take the demand, that's not 61 percent.

Q    Did he -- just to be clear -- I know what you're saying is the number, but you didn't calculate the number yourself, did you?

A    I can do it in my head.

Q    I'm not asking you to.  I'm asking if you did it.

A    I just did.  But, yes, it's -- I didn't do it ahead of time.

        MR. LUMISH:  Pass the witness.

THE COURT:  I think everyone is out of time at this point.

MR. LEDAHL:  That's fine, Your Honor.

THE COURT:  May I see Mr. Fenster and Mr. Lumish at sidebar, please.

*(The following was held at sidebar:)*

THE COURT:  The question is what do we want to do at this point?

We've still got your 50(a) motion.  We've got settlement instructions.  I guess I propose that we bring the jury back by 9:30 tomorrow.  We get together at 8:00 o'clock and review the results of what we worked through tonight.

MR. FENSTER:  That sounds fine for us, Your Honor.

THE COURT:  If we run into lunch hour, I'm committed to having -- having closings back to back.

MR. LUMISH:  Right.  Start at 9:30 and be done.

THE COURT:  We've got to instruct.

MR. FENSTER:  Yeah.  So I would propose -- so my suggestion, Your Honor, is we would release the jury.  If you're available tonight, then let's do the 50(a) and the charge conference and then instruct them at 9:00 a.m.

THE COURT:  I can't -- I want some time for us.  We can finish off the instructions in the morning, get -- produced tonight, come back and get your final thoughts.

149

MR. FENSTER:  If you're available, we're available to work with you to do that.

THE COURT:  Okay.  Let's do that.

MR. LUMISH:  Tonight or tomorrow?

THE COURT:  No, no.

Off the record.

*(Off the record.)*

MR. FENSTER:  So my suggestion, release the jury. We'll work with you tonight to resolve that and bring them back at 9:00 tomorrow.

THE COURT:  Bring them back at 9:30.

MR. FENSTER:  Okay.

THE COURT:  I want to have enough time --

MR. FENSTER:  Got you.

THE COURT:  -- to make best of my ability, we get the instructions, right?

MR. FENSTER:  Okay.

THE COURT:  I've learned not to rush with the instructions.

MR. FENSTER:  Okay.

MR. LUMISH:  Understood, Your Honor.

THE COURT:  That's what we'll do then.

MR. FENSTER:  Thank you, Your Honor.

*(Sidebar discussion concluded.)*

THE COURT:  Ladies and gentlemen, we're going to

150

conclude here.  I'm going to ask you to come back at 9:30 tomorrow.  At that time I will provide the instructions to you and we'll hear the closings of counsel.  I'm committed to having you hear the closing back to back.

And given the time it will take to read the instructions, that's going to run into the lunch hour. We'll probably have the lunch hour at, you know, quarter to 1:00 or 1:00.  So if you want to bring a snack to have midmorning or something, but I think that's the best way to do it.

So I'm going to excuse you at this time.  Please remember the admonition not to discuss the case with anyone, not to form any opinions on the issues in the case until it's submitted to you.  9:30 tomorrow.

THE CLERK:  All rise.

THE COURT:  Oh, one other thing.  If you don't conclude your deliberations tomorrow, our next regular court day would be Tuesday, but I have some things in law and motions, but there's no reason you couldn't come back on Monday to continue your deliberation.  So let me know tomorrow if that's a viable prospect.  Okay?  Thank you.

(*Jury exits courtroom.*)

(*The following proceedings were had outside the presence of the jury:*)

THE COURT:  At this time, MR will present its

*Deborah D. Parker, U.S. Court Reporter*

151

Rule 50(a) motion.  It will be deemed to have been made at the close Defendant's case-in-chief.

MR. LEDAHL:  Thank you, Your Honor.

Defendant -- or excuse me.  Plaintiff MR Tech moves for judgment as a matter of law under Rule 50(a) as to -- first as to Defendant's claim of invalidity of both of the two patents-in-suit and as to all of the claims that were alleged.  There was no sufficient showing to support a finding of obviousness based on any prior art references under Section 103 or on any other theory of invalidity.

As to the Victora and Hagadorn combination that was presented, there was no showing of all elements having been disclosed in the prior art references.  There was no showing of the coercivity value for the nucleation host as modified in the analysis that was presented in the obviousness presented analysis by Western Digital.

There was no showing of a motivation to combine the references that were asserted.  And there was no showing that the Hagadorn reference was a reference within the scope of the prior art for the patents-in-suit.  In particular, Dr. Victora admitted on the stand that he compared the field of endeavor of the Hagadorn reference to the other prior art reference asserted and not to the asserted patents.

As to the Berger and Hagadorn references, similarly, there was no showing that all elements were

disclosed in -- all elements of the asserted claims were disclosed in either of the prior art references.  There was no showing of a motivation to combine the Berger and Hagadorn reference.

Similar to the prior combination, there was no showing that Hagadorn was a reference within the scope of the prior art for the same reasons I already mentioned.  And there was no showing of a coercivity value HN for the modified nucleation host that was argued to exist in the modification of the Berger reference.

With respect to the Li combination that was argued by Defendants, there was no showing that all of the elements in the reference were -- or excuse me, that all of the elements of the claim were either in the reference or there would be a motivation to modify the reference as argued by the -- by Dr. Victora, the only witness on this subject.

And there was further no showing that the coercivity of the -- I didn't hear a showing of any coercivity value for the -- what was alleged to be the hard storage layer in the Li reference, nor did we see a showing of the relative coercivity values as required by the Court's claim construction for the nucleation host vis-à-vis the hard storage layer.

We would also at this time move for judgment as a matter of law in the claims of infringement.  Defendant has

153

conceded that it's making only two challenges that were presented to the jury in this matter, both of which we believe are contrary to the Court's claim construction and to the appropriate construction of the claims in this matter.

The argument regarding the hard magnetic storage layer presented by Defendants is based on importing extraneous limitations contrary to the Court's claim construction and therefore not a valid basis for asserting non-infringement.

The argument regarding the formula for the coercive field, which was the other argument presented by Defendants, is adding a requirement for the -- into the claim about how that field should be calculated that's not present in any asserted claim nor in any claim construction entered by the Court.

And further, that Western Digital's assertions regarding its non-infringement theories are supported only by conclusory and insufficient testimony from its witnesses and therefore insufficient to raise a triable issue of fact for the jury.

THE COURT:  I believe there's sufficient evidence to submit all of the claims to the jury and all of the affirmative defenses, so the motion will be denied.

I guess we'll settle the instruction in the jury

*Deborah D. Parker, U.S. Court Reporter*

154

room.  They're informal.  You'll have an opportunity to put on the record any objections not reflected in your filings to date.

So why don't we take about a 10-minute break and I'll come back and we'll begin with the jury -- Mr. Lumish?

MR. LUMISH:  Your Honor, we're going to test your patience, and I'm reticent to weigh back into this, but I was hoping to ask for a point of clarification before I close tomorrow in the hopes of avoiding an objection and any sort of trouble with Your Honor.  Is it okay if I explain my question?

THE COURT:  Please.

MR. LUMISH:  So this goes to the exclusion.  If your Honor will recall, we had an exclusion of a number of slides from Dr. Bertero that followed an argument about the assist layer -- the assisting -- my question is the following.  I've read through the transcript.

I think we may have agreement with opposing Counsel, but I don't want to represent that from what I've read in the transcript, that we should be able to criticize their infringement position on the hard magnetic storage layer by making the point that the nucleation host and the hard magnetic storage layer are distinct components under Your Honor's construction and under the structure of the claims.

*Deborah D. Parker, U.S. Court Reporter*

155

We don't have affirmative evidence of that from Dr. Bertero. That was stricken. But as a criticism of their case and their theory, I'm trying to determine whether I can do that. If Your Honor says no, of course I won't, but I just wanted to get clarity on that.

THE COURT: Mr. Fenster.

MR. FENSTER: Your Honor, we would object to that. This was the -- this is the affirmative argument of reversed doctrine of equivalents that they are two distinct components and we would object to it. We think it's been excluded, Your Honor.

THE COURT: I agree. I think you've made your record.

*(Court Reporter requests clarification for the record.)*

MR. LUMISH: I understand your ruling, Your Honor.

THE COURT: Okay, good. We're in recess for 10 minutes.

MR. KROEGER: Paul Kroeger for Plaintiff.

We have a few housekeeping matters about some of the evidence this morning, but we can take it up tomorrow morning if you'd like, or I can do it now. It shouldn't take very long.

THE COURT: We'll do it tomorrow morning.

MR. KROEGER: Thank you, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

156

THE CLERK:  All rise.  This Court is adjourned.

*(At 4:47 p.m., proceedings were adjourned.)*

-oOo-

*Deborah D. Parker, U.S. Court Reporter*

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  July 26, 2024

_____/s/DEBORAH D. PARKER____
DEBORAH D. PARKER, OFFICIAL REPORTER

BY MR. CHANG: [7] 64/7 76/23 120/14 121/14 122/5 122/13 123/6

BY MR. FENSTER: [25] 8/6 8/11 9/5 9/24 10/20 11/18 13/2 16/1 20/7 20/17 21/10 21/23 25/14 28/8 29/11 31/9 34/19 35/11 36/24 38/21 39/4 39/25 62/3 62/15 81/11

BY MR. LEDAHL: [8] 126/6 127/14 128/18 131/6 131/20 133/11 134/19 138/12

BY MR. LEE: [15] 41/12 42/22 44/2 45/9 45/19 46/25 49/9 50/3 50/9 50/22 53/12 54/23 56/2 56/9 58/23

BY MR. LUMISH: [40] 86/4 88/10 89/3 89/20 92/14 94/3 95/1 95/6 95/13 97/6 97/12 98/8 98/19 98/23 99/15 100/12 101/6 102/11 102/15 103/13 104/3 104/21 105/11 105/19 106/23 108/2 108/7 109/6 110/6 111/2 112/4 112/22 115/17 116/22 117/10 119/11 124/4 124/10 124/16 146/1

BY MS. YOUNG: [4] 141/11 142/21 144/14 145/17

MR. CHANG: [10] 63/24 76/20 97/21 98/15 119/8 121/10 121/13 122/3 123/4 124/2

MR. FENSTER: [41] 8/1 8/9 9/3 9/23 10/18 11/14 12/23 20/5 20/15 21/8 28/6 29/4 29/7 29/10 31/7 35/9 36/22 38/25 39/2 39/24 41/7 42/13 46/23 49/18 49/23 50/1 55/21 62/12 63/19 81/10 85/15 148/14 148/19 149/1 149/8 149/12 149/14 149/17 149/20 149/23 155/7

MR. KROEGER: [2] 155/19 155/25

MR. LEDAHL: [15] 7/5 7/17 125/18 125/21 127/12 128/15 131/3 131/18 133/9 134/17 138/10 140/23 144/7 148/3 151/3

MR. LEE: [22] 34/16 38/15 38/19 41/10 42/15 42/18 43/23 49/7 49/20 50/7 50/19 53/5

53/8 54/11 54/14 54/18 54/22 56/4 56/6 58/20 61/25 63/20

MR. LUMISH: [48] 63/22 85/17 85/19 85/21 86/1 88/6 89/13 92/11 94/23 95/4 95/10 96/23 97/9 97/25 98/4 98/6 98/16 98/21 99/8 100/6 101/2 102/8 103/10 103/25 104/17 105/17 106/20 108/4 109/4 110/2 110/23 111/25 112/19 115/13 116/19 117/5 117/9 120/11 124/8 124/14 125/15 147/25 148/17 149/4 149/21 154/6 154/13 155/16

MS. YOUNG: [7] 141/9 142/18 144/5 144/8 144/11 145/14 145/25

THE CLERK: [8] 7/20 7/23 64/1 80/19 81/7 125/24 150/15 156/1

THE COURT: [56] 7/12 7/15 7/19 7/25 38/18 38/24 39/1 39/3 41/9 42/17 46/24 49/25 50/2 55/23 63/21 63/23 80/15 80/23 81/4 81/9 85/18 85/20 85/25 97/23 98/3 98/5 98/18 119/9 120/12 125/16 125/20 140/24 141/6 144/10 148/1 148/4 148/7 148/15 148/18 148/23 149/3 149/5 149/11 149/13 149/15 149/18 149/22 149/25 150/16 150/25 153/22 154/12 155/6 155/12 155/17 155/24

THE WITNESS: [15] 13/1 21/21 25/13 42/19 45/8 55/22 55/24 64/5 89/19 105/9 107/25 119/10 121/12 125/17 126/3

UNIDENTIFIED JUROR: [1] 141/5

**$**

$1.26 [1] 140/4
$1.290 [1] 132/25
$1.290 billion [1] 132/25
$1.294 [1] 132/20
$12.90 [2] 139/18 139/23
$15 [1] 137/16
$15.45 [1] 146/16
$18 [1] 129/5
$18.45 [2] 132/23 146/19
$2.57 [1] 139/24
$26 [1] 129/5
$27 [1] 140/4
$3 [2] 146/23 146/24
$500 [1] 83/25

$500 million [1] 83/25
$840 [1] 132/14
$840 millions [1] 132/14

**,**

'564 [3] 33/16 34/2 34/7
'60s [1] 94/12
'80s [1] 94/16
'864 [5] 73/7 75/23 80/14 96/24 122/14
'997 [3] 73/15 73/16 123/8

**-**

-o0o [1] 7/2
-oOo [1] 156/3

**.**

.3 [2] 133/2 140/3
.3 percent [2] 133/2 140/3
.5 [3] 135/10 139/17 139/20
.5-terabyte [1] 139/17
.5-terabytes [1] 135/10
.91 [1] 130/14
.92 [1] 130/14

**/**

/s/DEBORAH [1] 157/12

**0**

053 [1] 1/22
0623 [1] 2/19

**1**

1 percent [1] 129/21
1-053 [1] 1/22
1.3 percent [1] 139/21
10 [9] 33/14 73/8 80/14 112/1 116/20 116/20 117/2 117/6 117/7
10 minutes [1] 155/18
10-minute [1] 154/4
10-terabyte [3] 134/23 135/16 135/17
10.11 [1] 131/18
10.12 [1] 138/10
10.4 [1] 133/9
10.8 [1] 131/4
1001 [10] 34/16 109/4 110/2 110/23 111/25 112/20 115/14 116/19 117/7 142/19
1009 [2] 88/4 88/7
1009.002 [1] 89/14
1012.1 [1] 127/12
103 [1] 151/10
1031 [5] 98/24 100/10 101/2 102/8 102/8
10342 [1] 1/20
11 [7] 34/16 38/2 73/8 80/14 106/20 106/21 108/5
116-million [2] 146/21 146/25
12 [12] 10/16 73/22 90/13 90/24 92/3 96/25

97/3 99/12 110/4 127/9 141/19 142/2
12,000 [1] 111/11
12,000 oersteds [1] 112/9
12-year [2] 92/8 121/4
1213 [3] 50/23 94/24 95/4
1235 [1] 3/24
12424 [7] 2/4 2/8 2/13 2/22 3/4 3/8 3/13
1245 [5] 103/11 104/18 105/17 106/20 108/4
12TH [7] 2/4 2/9 2/13 2/22 3/4 3/9 3/13
138 [1] 144/5
140 [6] 3/18 4/8 4/21 5/4 5/7 33/14
149 [1] 38/14
15 [3] 99/12 121/10 122/3
15 minutes [1] 80/17
15-dollar [1] 139/25
16 [7] 10/17 33/14 78/9 104/13 106/21 115/15 144/6
16 months [1] 103/21
1600 [2] 4/4 4/13
17 [2] 17/25 18/3
18 [3] 12/24 50/7 134/9
18-terabyte [3] 134/5 134/7 134/9
1970 [3] 22/8 23/4 96/4
1980s [1] 22/20
1985 [3] 22/20 22/22 23/1
1:00 [2] 150/8 150/8
1:29 [2] 1/19 7/1
1C [2] 73/8 80/13
1F [2] 73/8 80/13
1G [1] 73/8
1H [2] 73/8 80/13

**2**

20 [4] 65/14 66/7 72/1 140/25
20 minutes [1] 141/3
20 percent [1] 65/24
200 [1] 2/18
200-nanometer [1] 78/8
2000 [4] 96/24 97/2 124/8 124/14
20024 [1] 2/18
2003 [2] 55/7 57/17
2004 [1] 55/8
2005 [13] 22/17 53/10 56/7 56/12 56/13 56/15 56/22 56/24 57/3 57/7 99/3 99/5 109/13
2006 [14] 17/21 17/25 18/3 22/14 22/18 22/22 23/3 23/6 43/14 47/17 56/11 58/9 65/13 71/25
202 [1] 2/19
2023 [4] 134/14 135/8 135/11 135/15
2024 [3] 1/18 7/1 157/9
2027 [1] 134/15
20TH [1] 3/23

21 [2] 12/24 106/21
22 [2] 112/1 144/6
22-terabyte [1] 140/2
223 [1] 27/10
229-4305 [1] 1/23
23 [3] 34/24 50/19 104/18
23.5 [1] 79/5
24 [2] 12/24 125/20
25 [4] 1/18 7/1 10/16 38/2
26 [2] 104/19 157/9
263.21 [1] 92/12
27 [1] 38/2
28 [4] 116/20 117/2 117/6 157/3
2800 [1] 4/17
2K [3] 40/22 40/25 41/3

**3**

3,000 oersteds [2] 111/19 112/16
302 [2] 106/6 107/6
304 [3] 106/3 106/4 107/3
31 [2] 98/21 99/8
310 [7] 2/5 2/10 2/14 2/23 3/5 3/10 3/14
312 [1] 4/18
315 million [1] 147/1
32 [3] 116/20 117/2 117/6
328-4600 [5] 3/19 4/9 4/22 5/5 5/8
330 [1] 4/17
34 [1] 80/23
35 [2] 96/25 97/3
35 percent [1] 129/3
36 [1] 144/21
3:03 [1] 81/1
3:16 [1] 81/1

**4**

4 million-dollar [1] 132/25
4-micron [1] 95/22
4.124 [1] 32/16
4.71 [1] 32/6
4094 [1] 4/14
411 [1] 1/22
4278 [1] 4/5
4305 [1] 1/23
46 [1] 80/24
46 percent [2] 83/10 84/1
4600 [5] 3/19 4/9 4/22 5/5 5/8
465 [1] 45/3
4792 [1] 137/5
48 [2] 97/1 97/4
49 [1] 108/5
4:47 [1] 156/2

**5**

50 [5] 7/8 148/9 148/21 151/1 151/5
500 million [1] 84/1
540-1235 [1] 3/24
59 [1] 108/5

**6**

**6-nanometer [1]** 78/7
**60611 [1]** 4/18
**61 percent [2]** 147/11 147/17
**650 [6]** 3/19 3/22 4/9 4/22 5/5 5/8
**657 [1]** 1/23
**66 [1]** 110/24
**660 [2]** 4/4 4/12
**664-0623 [1]** 2/19

**7**

**700 [1]** 84/23
**714 [1]** 3/24
**725-4094 [1]** 4/14
**725-4278 [1]** 4/5
**7474 [7]** 2/5 2/10 2/14 2/23 3/5 3/10 3/14
**753 [1]** 157/2
**7700 [1]** 4/18

**8**

**8-terabyte [2]** 145/18 145/21
**8.16 [1]** 36/22
**8.17 [1]** 40/2
**8.26 [1]** 35/9
**8.30 [2]** 31/7 31/7
**8.33 [1]** 28/6
**8.34 [2]** 31/13 31/16
**8.40 [1]** 20/5
**8.41 [1]** 20/15
**8.42 [1]** 21/8
**8.5 [1]** 78/19
**800 [1]** 2/17
**800s [1]** 147/9
**826-7474 [7]** 2/5 2/10 2/14 2/23 3/5 3/10 3/14
**834 [1]** 43/24
**840 [1]** 49/6
**860 million-dollar [1]** 147/16
**876-7700 [1]** 4/18
**8:00 o'clock [1]** 148/12
**8:22-cv-01599-JVS-DVM [1]** 1/9

**9**

**9,000 [2]** 111/16 112/11
**9.16 [1]** 129/14
**9.26 [1]** 129/14
**90025 [7]** 2/5 2/9 2/14 2/23 3/5 3/9 3/14
**92 percent [2]** 127/3 127/5
**92626 [1]** 3/23
**92660 [2]** 4/5 4/13
**92701 [1]** 1/23
**94025 [5]** 3/19 4/9 4/22 5/4 5/8
**949 [2]** 4/5 4/14
**95 [1]** 143/25
**95 percent [1]** 143/23
**99.7 percent [1]** 133/3
**9:00 [1]** 149/10
**9:00 a.m [1]** 148/22
**9:30 [5]** 148/11 148/17 149/11 150/1 150/14

**A**

**a.m [1]** 148/22
**ability [1]** 149/15
**able [7]** 39/14 66/25 74/8 116/24 129/20 144/22 154/20
**about [153]** 8/7 8/23 9/16 9/19 9/19 9/21 14/2 14/25 15/4 16/9 16/16 22/9 22/16 24/1 24/2 24/4 24/13 26/3 26/22 29/8 31/25 32/25 33/4 33/9 36/19 40/21 41/18 42/1 42/24 44/12 44/14 44/15 45/4 47/13 47/14 48/7 48/11 48/18 49/5 49/21 49/21 50/16 51/8 51/18 52/6 52/8 52/13 54/9 56/13 57/1 57/1 57/12 57/15 57/20 58/15 59/7 59/21 60/8 60/14 61/6 61/10 64/11 64/12 65/14 65/23 65/24 66/23 70/7 71/6 72/1 72/3 73/18 77/10 77/21 78/10 80/23 82/3 82/9 83/8 84/16 84/25 86/12 87/11 88/22 89/6 89/14 89/25 90/7 90/9 90/13 91/25 92/19 93/7 93/12 93/25 94/8 94/22 95/8 95/11 95/17 95/20 96/10 96/17 96/20 97/7 97/16 97/19 98/16 98/20 99/5 99/12 99/13 99/24 101/25 109/11 109/18 111/7 114/2 114/21 114/25 116/16 118/4 118/7 118/15 120/15 121/1 121/16 121/21 125/2 125/20 126/11 126/21 127/2 127/4 127/10 128/9 130/2 130/15 133/13 134/1 134/20 135/3 137/16 138/14 139/12 140/25 141/18 142/17 146/3 153/14 154/4 154/15 155/20
**above [5]** 89/15 114/8 128/10 145/21 157/5
**above-entitled [1]** 157/5
**absolutely [3]** 30/22 61/7 140/22
**access [1]** 136/14
**accordance [2]** 115/18 115/22
**according [1]** 139/19
**account [6]** 83/20 84/13 84/19 136/17 136/25 137/2
**accountant [1]** 118/12
**accurate [2]** 60/6 112/17
**accused [3]** 81/14 83/2 83/5
**achieve [6]** 25/4 25/8 25/19 25/25 69/18

117/17
**achieved [1]** 48/3
**achieving [1]** 100/19
**across [2]** 132/24 132/24
**actual [10]** 12/14 29/16 55/17 59/18 82/23 87/16 91/18 130/25 135/11 140/6
**actually [52]** 19/2 32/18 43/23 44/14 44/20 50/24 52/13 53/2 54/9 54/15 54/19 55/7 55/19 55/25 56/25 59/13 60/12 61/2 61/24 71/12 71/16 74/17 76/25 78/10 90/14 115/5 121/25 124/9 127/17 127/20 127/25 128/8 128/13 128/24 129/2 129/9 129/24 130/5 130/24 133/5 133/18 134/4 135/14 136/9 136/19 138/16 138/23 139/3 139/24 139/25 142/17 142/18
**add [12]** 22/10 22/23 23/4 24/25 52/24 70/5 70/6 74/12 74/15 78/3 130/12 142/4
**added [5]** 44/19 69/23 74/21 83/22 143/24
**adding [8]** 18/8 25/3 66/4 74/24 129/19 129/24 130/10 153/13
**additional [4]** 43/4 46/7 46/11 46/13
**address [3]** 32/24 49/17 105/13
**addressed [1]** 87/16
**addresses [1]** 21/12
**addressing [2]** 51/1 105/5
**adjacent [3]** 25/13 47/21 117/15
**adjourned [2]** 156/1 156/2
**adjusted [2]** 107/2 129/13
**admit [1]** 52/9
**admitted [2]** 128/25 151/21
**admonition [2]** 80/18 150/12
**adopted [4]** 9/8 57/22 76/10 76/11
**advanced [2]** 66/19 67/6
**advantageously [1]** 34/20
**advice [1]** 42/7
**affect [1]** 81/21
**affirmative [3]** 153/24 155/1 155/8
**afforded [1]** 35/2
**after [10]** 7/7 55/3 57/2 57/6 61/8 127/17 140/6 140/22 141/22 146/8
**afternoon [5]** 8/1 8/3

41/13 41/14 80/15
**again [36]** 7/24 15/17 27/8 33/20 35/7 35/16 48/8 56/6 68/11 73/21 74/13 74/22 74/23 75/3 75/4 75/11 75/13 79/4 79/5 80/3 81/8 86/5 91/23 92/2 100/23 105/2 106/9 108/23 112/8 112/17 115/6 120/2 127/23 135/2 135/15 139/21
**against [3]** 31/4 48/16 97/22
**aggressive [1]** 84/14
**ago [3]** 137/20 138/14 144/21
**agree [75]** 8/19 9/13 11/12 12/22 13/16 13/25 14/17 14/23 16/8 16/11 17/19 18/17 18/23 19/3 19/7 20/14 20/22 21/1 21/15 23/22 24/24 26/20 27/17 28/18 29/2 30/15 31/21 33/8 33/10 33/13 33/16 36/4 36/5 37/11 37/12 38/22 38/23 39/5 39/18 40/11 69/14 70/20 82/10 86/15 90/5 94/12 94/15 95/20 96/6 96/17 103/1 103/20 105/4 105/14 109/15 109/17 109/24 110/10 113/1 114/11 114/22 115/2 115/8 116/24 117/23 119/20 119/24 133/2 145/10 145/12 145/19 146/6 146/12 146/14 155/12
**agreeing [1]** 22/11
**agreement [1]** 154/18
**agrees [1]** 132/19
**ahead [6]** 43/1 67/2 101/2 109/2 131/17 147/23
**AICHELE [1]** 2/16
**aid [2]** 107/6 107/17
**aiding [1]** 107/17
**all [113]** 7/20 9/9 9/12 10/4 11/7 15/4 15/6 15/19 16/4 18/2 18/23 18/24 19/4 19/19 21/3 21/6 21/18 23/10 23/13 28/11 33/13 40/17 42/25 43/3 46/16 46/16 47/19 47/21 49/3 50/2 52/11 53/17 53/24 57/15 57/19 59/4 61/10 61/12 61/25 63/17 64/16 66/13 68/3 69/13 71/4 71/10 73/18 74/24 75/18 76/4 76/12 76/20 80/19 83/8 83/21 84/3 84/5 84/13 84/19 85/6 85/20 85/23 86/16 87/4 91/13 95/10 97/2 98/7 110/22 113/9 113/25 117/1 118/7 119/25

120/1 120/10 121/15 122/1 122/9 123/10 123/21 123/23 123/23 124/20 124/20 125/14 127/22 128/21 130/20 131/2 131/8 134/14 135/22 136/3 137/6 140/13 142/3 142/17 142/22 144/11 145/13 146/6 147/4 150/15 151/7 151/12 151/25 152/1 152/12 152/13 153/23 153/23 156/1
**alleged [2]** 151/8 152/19
**alleviate [1]** 101/10
**allowance [2]** 122/18 123/7
**allowed [2]** 18/16 66/23
**allowing [1]** 56/19
**almost [5]** 9/9 78/23 128/4 135/17 138/8
**alone [1]** 44/12
**along [1]** 48/15
**already [6]** 17/17 67/4 74/25 94/16 109/21 152/7
**also [28]** 5/11 34/13 40/11 42/3 43/22 44/25 47/13 47/22 48/7 49/5 55/7 58/7 58/12 66/21 67/19 67/21 68/18 73/9 73/16 74/19 77/3 80/13 82/4 84/21 87/21 89/25 121/1 152/24
**always [4]** 35/20 47/7 47/22 62/8
**am [2]** 22/11 138/13
**amount [6]** 132/6 132/12 132/13 132/15 132/16 138/9
**ANA [4]** 1/3 1/17 1/23 7/1
**analogous [3]** 19/15 19/19 20/8
**analysis [52]** 10/11 11/10 12/11 12/19 30/20 41/4 46/18 47/3 51/14 51/17 51/21 53/15 59/24 60/23 64/17 80/7 83/13 84/20 86/24 126/16 126/22 128/5 129/6 129/8 129/24 130/13 132/8 132/23 133/1 133/1 133/20 133/24 134/1 134/13 134/14 134/21 135/1 135/4 135/5 136/18 136/20 137/23 138/7 138/20 143/10 143/14 144/16 145/2 146/15 146/18 151/15 151/16
**analyze [2]** 47/5 131/12
**analyzed [2]** 47/7 127/8
**analyzing [1]** 61/23
**ANGELES [7]** 2/5 2/9

**A**

**ANGELES... [5]** 2/14 2/23 3/5 3/9 3/14

**anisotropy [53]** 16/10 16/10 23/5 24/12 24/18 24/21 27/15 37/18 37/24 38/4 38/9 39/6 39/12 40/9 40/14 40/15 45/20 58/4 61/16 62/19 63/8 63/15 69/20 70/3 77/1 77/12 88/18 88/19 89/22 92/25 93/11 97/20 103/1 106/12 106/15 111/11 111/13 111/14 111/21 111/22 112/17 114/8 114/12 114/14 114/15 114/19 114/20 115/3 115/5 115/9 115/9 118/1 122/25

**annual [1]** 119/14

**another [6]** 36/21 90/9 101/20 101/24 130/11 141/2

**answer [8]** 12/18 24/15 33/22 33/23 67/12 67/13 67/14 68/12

**answered [2]** 10/25 13/10

**anticipation [4]** 15/4 15/21 16/5 16/7

**any [48]** 11/10 18/6 18/11 24/1 25/7 26/21 29/16 29/16 33/4 33/10 33/17 34/2 34/6 53/25 60/15 60/18 61/13 61/18 63/5 64/24 66/8 70/6 72/13 73/12 73/16 74/12 74/20 82/25 83/3 83/4 91/2 91/15 91/25 92/8 123/19 125/1 136/1 143/10 143/14 144/16 150/13 151/9 151/10 152/18 153/15 153/15 154/2 154/9

**Anybody [1]** 141/6

**anymore [1]** 135/10

**anyone [9]** 8/16 22/8 64/25 66/8 66/8 66/12 67/19 74/12 150/12

**anything [15]** 37/8 58/17 68/21 69/9 81/16 91/12 91/17 118/24 121/8 123/19 123/24 123/25 125/2 127/6 136/3

**apologize [4]** 24/16 29/4 91/24 95/2

**APPEARANCES [4]** 1/25 2/24 3/25 4/23

**apples [2]** 134/16 134/16

**application [8]** 30/2 30/12 30/24 72/17 115/23 120/6 120/7 140/6

**applications [2]** 90/15 92/4

**applied [14]** 9/7 12/12 12/19 51/9 51/16 57/21 63/17 70/24 99/2 130/25 132/18 134/2 134/2 139/25

**apply [4]** 11/7 51/14 132/23 137/24

**applying [11]** 13/6 14/10 14/18 14/24 51/12 86/24 108/16 118/1 137/25 140/4 140/18

**approach [2]** 47/10 102/1

**appropriate [1]** 153/4

**approximated [1]** 40/21

**arbitrarily [2]** 51/3 95/18

**arbitrary [1]** 67/21

**are [56]** 12/15 16/3 16/6 16/6 37/1 37/2 37/3 46/20 53/6 59/9 61/10 64/20 65/3 68/15 68/17 68/18 73/17 79/20 84/13 84/21 87/12 88/17 88/22 91/14 91/15 93/10 108/23 112/17 113/6 113/10 113/17 127/23 129/3 130/7 130/9 131/15 132/2 132/10 132/17 135/9 135/9 137/8 137/22 138/17 139/10 139/20 143/11 143/15 143/18 144/18 145/19 145/20 153/3 153/18 154/23 155/9

**area [4]** 37/2 51/22 128/9 130/11

**areal [3]** 84/17 84/25 104/23

**aren't [2]** 137/24 142/10

**argue [1]** 65/2

**argued [4]** 123/22 152/9 152/11 152/15

**arguing [1]** 65/4

**argument [8]** 51/24 61/24 119/3 153/6 153/11 153/12 154/15 155/8

**arguments [1]** 51/22

**around [3]** 22/19 134/23 145/18

**arrangement [1]** 59/13

**art [69]** 9/9 15/11 15/14 15/19 16/8 16/20 17/25 18/3 18/6 18/11 18/12 18/19 19/13 19/15 19/19 19/23 20/8 22/8 23/9 23/21 26/13 30/11 30/18 30/19 42/7 42/23 43/13 43/18 44/16 44/22 48/4 48/22 49/1 49/11 63/7 64/18 65/7 65/8 68/20 69/23 70/23 73/1 73/24 74/20 75/12 86/22 87/2 87/6 87/19 87/20 87/20 93/25 94/8

103/20 109/15 122/21 123/2 123/11 124/5 124/11 124/24 125/5 125/10 151/9 151/13 151/20 151/22 152/2 152/7

**article [3]** 22/17 23/15 53/19

**as [110]** 10/3 15/12 15/15 15/20 16/20 17/3 17/25 18/3 18/8 19/13 20/8 20/10 23/8 23/13 23/14 28/18 30/10 37/14 37/16 37/21 37/24 40/6 40/9 40/13 43/1 43/20 45/22 49/11 50/13 52/25 59/8 59/9 62/20 63/3 64/2 64/18 66/4 66/4 67/1 67/7 68/22 70/23 72/15 72/22 72/25 73/23 73/24 74/4 75/9 75/12 75/24 76/14 79/15 79/16 79/20 80/9 80/9 82/24 84/22 88/11 88/15 89/5 90/3 93/7 93/12 93/24 95/14 96/10 97/22 103/14 107/16 110/20 111/11 111/13 113/7 113/10 114/6 114/16 119/15 119/17 125/25 126/21 128/2 128/25 129/5 129/9 131/14 132/11 135/7 135/8 135/16 136/20 137/9 138/19 139/8 139/8 139/23 140/13 141/13 151/5 151/5 151/6 151/7 151/11 151/14 151/24 152/15 152/21 152/24 155/2

**aside [1]** 18/2

**ask [18]** 41/25 45/4 50/4 50/5 57/6 60/10 60/12 87/15 92/19 93/24 94/8 105/20 105/25 114/25 120/4 128/13 150/1 154/8

**asked [16]** 10/21 13/5 33/15 42/4 42/6 42/16 43/22 47/13 48/7 49/5 49/21 51/8 114/25 120/15 121/1 144/8

**asking [5]** 48/11 61/5 121/16 147/22 147/22

**aspect [2]** 13/11 51/12

**aspects [1]** 30/5

**asserted [10]** 59/9 68/15 68/17 68/18 73/2 151/18 151/23 151/23 152/1 153/15

**asserting [1]** 153/9

**assertion [3]** 136/1 136/5 136/7

**assertions [1]** 153/17

**assist [3]** 11/22 118/3 154/16

**assisting [2]** 107/20

154/16

**associated [1]** 73/17

**assortment [1]** 67/8

**assume [2]** 91/6 91/9

**assumes [2]** 86/21 136/21

**assumption [2]** 91/7 91/10

**atom [1]** 66/20

**atomistic [1]** 66/21

**attempting [1]** 66/8

**attorney [1]** 53/14

**attributable [1]** 132/6

**AUGUST [9]** 2/3 2/8 2/12 2/17 2/21 3/3 3/8 3/12 5/12

**author [1]** 29/23

**available [3]** 148/21 149/1 149/1

**AVENUE [2]** 2/17 4/17

**average [9]** 129/4 132/5 132/9 132/15 132/16 146/2 146/7 146/8 146/13

**avoid [1]** 17/13

**avoiding [1]** 154/9

**award [1]** 54/25

**awards [1]** 53/25

**aware [14]** 11/19 11/21 69/11 73/22 90/23 90/25 91/15 91/16 91/20 91/23 92/9 103/19 119/19 142/5

**away [14]** 30/16 30/19 36/14 36/21 40/12 61/18 71/17 79/1 79/6 87/3 87/6 87/7 120/22 130/9

**axis [1]** 100/19

**B**

**back [23]** 13/14 17/20 26/15 29/12 56/3 64/8 126/7 126/8 136/9 139/22 146/23 148/11 148/16 148/16 148/25 149/10 149/11 150/1 150/4 150/4 150/19 154/5 154/7

**background [3]** 79/19 79/22 110/8

**backward [1]** 67/17

**backwards [2]** 67/14 68/12

**bad [1]** 57/5

**BALI [1]** 4/3

**bands [1]** 66/22

**bar [3]** 92/20 94/9 134/6

**bars [1]** 79/23

**based [18]** 9/7 131/11 131/24 132/6 132/17 133/2 133/24 134/2 134/6 134/8 134/21 138/2 138/2 138/5 139/11 146/20 151/9 153/7

**basic [1]** 110/20

**basically [10]** 48/10 50/13 53/14 57/10

66/20 70/2 73/7 77/15 129/19 136/12

**basis [6]** 119/14 132/3 138/25 139/2 140/7 153/9

**bat [1]** 137/6

**be [103]** 7/8 7/23 11/11 11/22 14/12 14/25 15/5 15/9 17/18 24/23 28/24 30/24 33/7 36/8 36/10 37/7 38/2 38/3 38/8 38/13 39/6 39/14 40/6 40/14 40/15 40/21 40/25 48/24 52/6 53/1 54/25 55/12 56/20 59/4 62/4 62/17 63/20 66/12 70/1 70/2 70/15 70/25 74/4 74/8 74/14 74/24 75/12 76/21 77/3 78/13 79/5 79/16 79/23 80/6 80/17 80/25 82/5 82/12 84/11 86/8 88/4 92/15 93/18 96/25 101/15 101/16 102/5 102/12 103/5 107/2 112/18 114/24 116/24 118/19 119/6 119/12 119/22 119/25 122/17 123/7 124/24 126/8 129/2 131/8 134/8 136/19 139/18 140/4 140/19 140/21 141/12 142/9 144/22 147/3 147/18 148/17 150/18 151/1 152/15 152/19 153/14 153/24 154/20

**BEACH [2]** 4/5 4/13

**beat [1]** 47/25

**Bec [1]** 127/15

**because [21]** 18/15 39/14 48/2 61/23 68/11 72/6 78/12 81/24 82/12 87/3 87/6 87/18 91/10 94/11 98/10 129/21 133/23 135/1 138/24 139/20 142/15

**Because that's [1]** 91/10

**Becker [29]** 127/2 128/13 128/24 129/12 130/3 131/7 131/14 132/10 133/12 133/23 134/1 134/4 134/13 134/22 135/20 136/17 137/13 139/19 140/8 141/15 141/18 141/22 145/2 145/5 145/24 146/6 146/12 147/4 147/11

**Becker's [21]** 126/9 127/8 127/18 127/18 128/1 130/21 131/13 132/2 132/17 133/1 133/4 134/10 136/5 137/23 138/13 140/19 143/1 143/5 143/25 144/20 146/24

**been [23]** 10/13 10/24 17/1 17/4 17/18 17/21

## B

**been... [17]** 22/19 46/4 46/5 71/25 79/20 87/9 94/12 95/8 95/15 97/2 99/21 133/25 134/1 139/14 151/1 151/13 155/10
**before [29]** 7/5 8/24 10/1 10/3 16/24 17/4 17/21 43/20 53/3 54/9 58/18 63/4 63/13 64/18 64/25 65/9 65/13 66/2 75/11 99/16 103/21 104/13 107/4 109/11 109/18 111/3 140/25 143/19 154/8
**begin [3]** 7/5 108/18 154/5
**beginning [1]** 113/18
**begins [1]** 108/24
**behalf [1]** 52/15
**behaves [1]** 74/8
**being [14]** 19/24 44/3 52/22 59/9 76/14 77/25 93/12 104/23 105/12 107/15 134/9 135/9 135/10 138/7
**believe [13]** 12/7 14/20 16/6 32/20 33/23 49/1 83/14 83/25 95/22 99/4 103/23 153/3 153/22
**below [3]** 97/4 106/6 128/10
**benefit [4]** 25/4 25/9 25/19 25/25
**benefits [7]** 35/4 64/13 69/22 70/10 83/8 83/22 118/4
**Berger [46]** 14/15 16/9 18/23 19/3 19/7 23/9 25/4 25/15 25/18 25/23 26/3 26/10 32/15 32/19 33/1 45/2 45/23 47/10 66/9 68/1 68/17 73/18 73/22 73/23 74/3 74/6 74/9 74/10 74/12 74/21 74/22 75/10 75/19 91/21 103/10 105/5 106/24 107/16 108/14 121/24 123/10 123/15 141/12 151/24 152/3 152/10
**Berger's [3]** 48/3 74/2 130/19
**Bergman [12]** 83/17 83/18 118/14 125/23 126/3 126/7 127/16 131/8 131/21 140/8 142/22 144/2
**Bergman's [2]** 132/7 145/15
**Bertero [5]** 81/13 82/6 82/25 154/15 155/2
**best [4]** 54/2 75/2 149/15 150/9
**bet [1]** 15/2
**better [16]** 30/2 30/12 30/25 36/10 42/10 42/11 43/11 47/22

72/17 78/13 129/2 129/25 130/7 130/11 142/25 143/4
**between [23]** 22/22 23/1 28/25 33/12 35/14 35/18 35/23 36/7 41/22 44/25 55/9 55/15 71/14 77/24 103/1 114/19 117/15 122/22 127/8 130/14 133/1 137/15 143/17
**beyond [4]** 42/13 49/23 68/25 84/22
**big [2]** 121/7 130/14
**bilayer [15]** 14/2 14/3 18/13 23/17 24/6 32/13 62/8 75/2 103/3 106/14 121/24 121/24 123/14 123/15 123/15
**billion [1]** 132/25
**billon [1]** 132/20
**binary [1]** 129/24
**binder [1]** 88/4
**binders [2]** 85/17 85/19
**bit [10]** 66/23 95/2 118/4 119/22 128/10 135/6 135/19 138/24 139/12 143/22
**bledahl [1]** 2/10
**blinked [1]** 139/5
**blow [2]** 62/12 103/25
**blue [1]** 127/22
**board [2]** 93/24 137/5
**boost [1]** 57/2
**both [19]** 25/3 25/15 25/18 25/18 25/21 25/23 25/23 25/23 52/25 56/19 56/20 62/6 90/6 105/12 123/17 133/2 145/8 151/6 153/2
**bother [1]** 49/2
**bottom [35]** 11/19 16/11 29/20 33/11 33/18 36/6 39/12 40/5 48/10 48/19 72/19 72/22 77/2 77/11 77/13 77/24 89/15 93/2 93/19 99/9 99/9 99/12 100/6 100/7 101/3 102/4 102/22 102/25 103/7 106/10 106/13 113/2 114/7 114/16 120/22
**BOULEVARD [7]** 2/4 2/8 2/13 2/22 3/4 3/8 3/13
**bound [1]** 70/1
**box [1]** 92/4
**boxes [1]** 79/20
**break [8]** 34/5 56/19 80/16 86/7 141/2 141/6 141/7 154/4
**BRIAN [1]** 2/7
**brief [1]** 76/24
**briefly [7]** 64/10 68/24 73/5 73/18 73/19 75/13 81/12
**bring [39]** 7/19 8/9 9/3

10/18 11/14 43/23 45/3 49/7 53/2 53/5 53/6 54/14 64/14 81/4 85/19 88/6 89/17 92/11 94/23 95/10 96/23 98/7 99/10 100/7 104/17 104/18 110/3 110/24 112/1 115/14 116/20 124/8 127/12 133/9 138/10 148/10 149/9 149/11 150/8
**broadly [1]** 115/1
**brought [2]** 84/8 93/22
**Brown [3]** 21/24 71/13 98/10
**BUCZKO [1]** 2/12
**budget [1]** 141/1

## C

**cake [1]** 66/5
**calculate [5]** 66/24 67/1 126/13 147/7 147/19
**calculated [4]** 32/3 40/25 147/15 153/14
**calculations [1]** 135/21
**CALIFORNIA [19]** 1/2 1/17 1/23 2/5 2/9 2/14 2/23 3/5 3/9 3/14 3/19 3/23 4/5 4/9 4/13 4/22 5/4 5/8 7/1
**call [4]** 35/21 63/25 95/21 113/24
**called [10]** 21/24 25/5 34/10 66/22 71/13 88/16 98/25 106/6 110/7 129/13
**calling [1]** 14/10
**calls [1]** 125/23
**came [6]** 18/7 55/25 66/2 67/7 123/22 132/21
**can [112]** 8/9 9/3 9/23 10/18 11/14 13/14 20/15 22/25 29/7 31/7 31/16 31/18 32/22 34/16 38/12 40/2 42/12 43/7 43/19 43/23 45/2 45/8 48/17 49/7 53/9 54/15 54/19 54/19 54/24 56/4 56/18 62/12 62/17 64/10 65/12 65/20 68/13 70/1 73/5 73/19 75/13 75/18 76/24 84/9 88/6 89/13 89/17 90/5 94/12 94/23 95/4 95/10 95/20 96/6 96/13 96/17 96/18 96/23 97/9 98/21 99/9 100/6 103/1 103/20 104/17 105/4 105/14 105/17 109/15 109/17 109/24 110/2 110/10 114/11 115/2 115/8 117/23 119/20 119/24 121/10 122/9 126/24 127/12 127/19 128/3 128/9 128/15 129/9 130/1 130/17 132/3 132/5 132/13 132/14

132/16 139/8 140/1 140/13 141/1 141/2 142/6 142/18 143/2 143/13 144/5 144/11 145/25 147/21 148/24 155/4 155/21 155/22
**can't [7]** 12/7 17/16 49/24 59/4 70/2 93/22 148/23
**cannot [2]** 12/22 39/11
**capacity [1]** 135/8
**careful [2]** 33/19 121/8
**carefully [1]** 19/18
**CARLSON [2]** 4/3 4/12
**cascade [3]** 107/10 113/18 113/23
**cascading [2]** 93/13 114/3
**case [32]** 7/16 7/18 10/4 11/5 30/10 59/10 79/21 93/6 93/7 94/19 95/8 95/15 95/22 97/1 98/10 103/22 104/10 109/16 109/19 110/20 116/17 119/3 120/8 133/14 143/5 144/3 146/22 147/1 150/12 150/13 151/2 155/3
**catch [1]** 137/22
**caveat [2]** 114/21 114/22
**CENTER [3]** 3/22 4/4 4/12
**CENTRAL [1]** 1/2
**cents [1]** 139/24
**certain [2]** 45/1 57/9
**certainly [11]** 8/18 12/10 22/11 23/24 26/2 30/14 30/20 43/17 110/1 119/22 143/19
**CERTIFICATE [1]** 156/4
**CERTIFIED [1]** 1/5
**certify [1]** 157/2
**cetera [1]** 52/8
**chaaru.deb [1]** 4/10
**CHAARUSHENA [1]** 4/7
**challenge [1]** 104/22
**challenges [1]** 153/1
**challenging [2]** 16/3 16/4
**CHAN [1]** 2/21
**CHANG [7]** 3/12 63/24 86/12 90/9 105/22 120/12 125/1
**change [3]** 81/16 135/6 135/19
**changed [1]** 136/23
**changes [2]** 61/9 138/7
**characterization [2]** 83/12 126/20
**characterize [1]** 78/20
**charge [3]** 65/16 136/24 148/22
**chart [11]** 82/19 130/18 134/6 134/12 138/18 139/23 140/1 140/6 140/11 140/13 143/21

**check [2]** 33/19 61/13
**checked [1]** 60/24
**cheeseburger [1]** 66/4
**Chen [2]** 88/16 88/23
**CHICAGO [1]** 4/18
**chief [1]** 151/2
**Chris [1]** 5/14
**cite [2]** 23/10 76/13
**cited [3]** 18/24 98/13 124/17
**cites [1]** 23/17
**citing [1]** 23/13
**claim [28]** 11/4 11/7 11/10 11/14 12/8 12/19 12/20 13/8 13/14 13/15 14/24 15/20 26/19 31/18 31/21 45/13 51/9 75/23 80/13 87/4 151/6 152/14 152/22 153/3 153/8 153/14 153/15 153/15
**Claim 1C [1]** 80/13
**claimed [9]** 15/12 15/12 15/15 15/20 16/21 18/8 26/14 28/1 65/8
**claims [31]** 12/12 13/7 14/18 45/4 45/24 46/17 58/17 59/8 59/12 59/18 61/10 68/15 68/17 68/18 73/6 73/7 73/8 73/15 73/16 73/17 75/19 75/22 79/2 80/13 93/16 151/7 152/1 152/25 153/4 153/23 154/25
**clarification [13]** 7/13 15/24 21/19 25/11 39/22 45/17 54/12 89/1 105/7 107/23 122/11 154/8 155/14
**clarifying [1]** 14/25
**clarity [1]** 155/5
**clear [10]** 19/14 20/9 26/12 37/7 52/3 52/4 52/6 52/6 141/12 147/18
**clearly [5]** 67/21 73/3 74/3 77/1 85/14
**cliff [1]** 119/13
**clock [1]** 24/16
**close [7]** 37/13 123/19 123/24 130/23 137/21 151/2 154/9
**closer [1]** 129/10
**closest [2]** 35/13 77/4
**closing [1]** 150/4
**closings [2]** 148/16 150/3
**co [1]** 29/23
**co-author [1]** 29/23
**coauthors [1]** 82/18
**Cobra [1]** 84/8
**Code [1]** 157/3
**coercion [1]** 32/24
**coercive [17]** 31/22 33/5 40/21 40/25 41/4 46/5 46/6 49/17 51/2 51/4 81/19 83/1 83/4

**C**

coercive... [4] 95/18 100/2 122/22 153/12
coercivity [14] 22/1 50/11 50/15 50/17 62/17 71/16 71/17 100/24 101/21 151/14 152/8 152/18 152/19 152/21
coinventors [2] 76/4 109/22
colleagues [1] 109/22
color [2] 128/22 129/3
column [25] 34/16 38/2 89/15 96/25 97/3 99/9 99/12 100/7 100/9 101/3 102/10 104/18 106/21 108/5 108/8 110/3 110/24 110/24 112/1 115/14 116/20 117/2 117/6 132/1 132/9
Column 1 [1] 104/18
Column 10 [2] 116/20 117/2
Column 11 [2] 34/16 38/2
Column 5 [2] 110/24 115/14
Column 6 [2] 110/24 112/1
Column 7 [1] 96/25
columnar [1] 116/3
columnar-shaped [1] 116/3
columns [1] 131/23
combination [25] 19/14 24/20 26/22 27/6 33/6 44/15 45/23 46/1 46/4 47/6 47/7 70/11 73/6 73/11 75/5 75/19 75/21 75/25 86/22 87/7 87/10 95/17 151/11 152/5 152/11
combinations [4] 66/9 67/18 67/20 73/25
combine [15] 22/9 22/12 23/14 26/17 26/18 27/12 27/20 27/22 70/15 72/13 75/10 87/20 97/25 151/17 152/3
combined [15] 22/22 23/3 26/13 27/19 28/18 63/5 66/13 68/16 68/17 68/19 73/1 87/2 87/22 87/24 90/6
combines [1] 28/9
combining [3] 18/13 19/10 46/19
come [17] 7/23 13/1 16/20 16/24 57/17 65/8 81/7 81/13 132/18 137/21 137/25 138/6 138/17 148/25 150/1 150/19 154/5
comes [1] 78/9
coming [1] 109/10
comment [4] 48/15

48/17 90/13 97/19
commercial [2] 8/20 9/13
committed [2] 148/16 150/3
company [1] 103/17
compare [11] 19/22 19/23 19/24 44/20 77/7 77/8 120/24 130/19 130/21 132/21 145/6
compared [3] 19/22 44/19 151/21
comparing [2] 18/19 143/17
comparison [1] 44/5
compete [2] 85/14 136/13
competition [1] 48/1
complained [1] 41/17
complete [1] 112/18
completely [6] 48/21 75/17 79/1 79/11 120/25 147/13
complexity [4] 129/25 130/10 130/12 142/4
components [2] 154/23 155/10
composite [5] 88/16 99/10 99/18 101/11 102/16
comprising [2] 11/16 122/24
conceded [1] 153/1
concept [20] 9/6 9/8 9/15 9/20 30/16 34/10 52/24 57/9 57/10 57/12 57/12 57/13 57/15 57/16 57/21 57/25 58/8 62/6 62/8 78/2
concepts [2] 52/24 62/6
concerned [2] 21/24 22/6
concerns [1] 71/13
conclude [4] 67/7 80/9 150/1 150/17
concluded [4] 25/18 25/24 122/16 149/24
conclusion [1] 80/6
conclusions [4] 10/12 68/13 81/16 81/21
conclusory [1] 153/19
conference [2] 148/22 157/7
confidence [3] 140/9 143/23 144/1
confirmation [1] 68/25
confirmed [1] 136/12
confirms [1] 67/15
conformance [1] 157/6
conservative [2] 84/14 84/15
considerations [3] 8/8 8/13 51/23
considered [6] 18/25 43/14 69/3 69/7 69/12 120/5
consistent [4] 37/21 39/17 70/12 128/11

consisting [1] 99/19
constant [6] 45/20 77/12 114/18 114/20 114/23 122/25
constraints [1] 104/23
construction [19] 11/25 12/8 12/14 12/20 12/21 13/8 13/20 14/18 14/24 51/10 51/13 51/15 51/16 152/22 153/3 153/4 153/9 153/15 154/24
constructions [6] 11/4 11/8 11/11 11/15 13/15 13/15
construed [2] 11/21 14/12
Consultant [1] 5/15
context [4] 13/13 23/13 102/21 140/14
continue [1] 150/20
continued [4] 3/1 4/1 5/1 146/2
continues [1] 101/14
continuing [2] 81/11 113/24
contradicts [1] 144/9
contrary [5] 36/11 79/11 80/3 153/3 153/8
contribute [1] 85/8
contributed [3] 46/8 84/25 85/3
contribution [1] 73/25
contributors [1] 84/17
conventional [10] 39/17 56/21 66/14 70/12 72/15 72/19 75/3 77/23 78/1 78/5
conversation [1] 86/12
convincing [6] 19/14 20/9 26/12 52/3 52/4 52/7
coordinated [1] 142/10
copy [1] 102/10
core [1] 78/22
Corporate [1] 5/12
correct [191]
correctly [9] 11/2 13/12 14/18 14/24 51/17 64/23 133/4 138/13 144/24
corresponded [1] 27/18
corresponds [1] 14/20
cost [3] 132/10 132/13 132/16
COSTA [2] 3/22 3/23
costs [2] 132/9 141/25
could [33] 15/13 15/16 18/10 25/19 25/24 27/2 27/3 29/5 33/7 40/21 53/5 54/3 58/20 60/22 62/4 64/3 66/12 67/1 74/4 75/2 77/16 88/3 95/18 97/4 102/5 103/3 103/25 119/10 125/19 125/25 133/9 139/15 142/9
couldn't [7] 24/25

47/19 52/10 85/12 85/14 136/19 150/19
counsel [7] 2/1 3/1 4/1 5/1 141/18 150/3 154/19
count [1] 123/17
counter [1] 48/21
Counterclaim [7] 1/7 1/11 2/2 3/2 3/16 4/2 5/2
countered [1] 79/2
couple [2] 41/17 44/8
coupled [3] 20/19 99/19 101/19
coupling [6] 11/23 12/4 12/13 100/14 107/1 117/15
course [11] 46/9 47/25 53/25 59/20 60/7 86/9 99/6 112/23 124/23 135/1 155/4
court [98] 1/1 1/21 1/21 7/13 7/21 7/24 8/10 9/4 10/19 11/4 11/17 11/21 12/6 12/8 12/25 14/12 15/24 20/6 20/16 21/9 21/19 25/11 28/7 29/6 29/9 31/8 34/18 35/10 36/23 39/22 44/1 45/7 45/17 49/8 50/8 50/21 53/7 53/11 54/12 54/17 54/21 56/5 56/8 56/12 58/22 62/14 76/22 81/5 81/8 85/23 88/9 89/1 89/18 92/13 94/25 95/5 95/12 97/5 97/11 98/22 99/14 100/11 101/5 102/14 103/12 104/2 104/20 105/7 105/18 106/22 107/23 108/6 109/5 110/5 111/1 112/3 112/21 115/16 116/21 117/8 122/4 122/11 123/5 124/15 127/13 128/17 131/5 131/19 133/10 134/18 138/11 142/20 144/13 145/16 150/17 153/16 155/14 156/1
Court's [15] 11/7 11/10 11/25 12/14 12/20 13/8 13/20 14/18 14/24 51/13 51/14 51/16 152/21 153/3 153/8
courtroom [2] 80/20 150/22
cover [1] 12/3
create [1] 126/22
created [1] 44/17
credit [3] 57/2 62/7 76/15
criteria [1] 73/10
criticism [2] 126/19 155/2
criticize [1] 154/20
cross [6] 6/3 6/7 8/5 54/20 86/3 141/10
CROSS-EXAMINATION [3] 8/5 86/3 141/10

crystalline [1] 24/21
CSR [1] 1/26
CTO [1] 119/17
curve [3] 128/3 129/20 138/19
customary [1] 7/8
cv [1] 1/9

**D**

D.C [1] 2/18
DALE [2] 3/12 63/24
damage [3] 131/11 131/16 147/8
damages [6] 126/13 135/6 135/21 136/17 137/3 137/4
data [20] 68/3 68/6 83/3 91/15 91/16 110/13 126/22 126/23 127/5 131/22 133/20 134/10 135/11 135/12 136/1 136/4 142/6 142/25 143/5 146/3
date [6] 16/21 16/24 65/9 145/1 154/3 157/9
day [6] 1/11 7/12 7/15 137/23 140/5 150/18
days [1] 126/25
dchang [1] 3/15
ddparker.com [1] 1/24
DDX [3] 32/6 45/3 50/7
DDX-4.71 [1] 32/6
DDX-465 [1] 45/3
dealing [2] 23/20 23/25
DEB [1] 4/7
DEBORAH [3] 1/20 157/12 157/12
decades [3] 75/16 119/21 119/22
deciding [1] 17/13
deck [2] 121/13 145/15
decouple [1] 121/25
decoupled [1] 62/17
decoupling [1] 85/9
decrease [3] 35/1 74/19 78/12
decreases [4] 37/14 37/21 77/2 114/16
decreasing [7] 37/23 40/6 77/10 79/16 111/21 115/5 115/9
deem [1] 7/16
deemed [1] 151/1
defects [1] 21/25
defendant [10] 1/7 1/11 2/2 3/2 3/16 4/2 5/2 16/2 151/4 152/25
DEFENDANT'S [5] 6/7 7/7 8/4 151/2 151/6
Defendants [3] 152/12 153/7 153/13
defense [3] 7/18 16/5 16/7
defenses [1] 153/24
defied [1] 66/14
define [1] 82/4
defined [2] 52/25 89/5
definition [2] 70/24 106/17
deliberation [1] 150/20

D

**deliberations [1]** 150/17
**demand [2]** 147/11 147/17
**demonstrated [2]** 62/16 101/8
**demonstrative [1]** 50/20
**denied [1]** 153/24
**density [3]** 84/17 84/25 104/23
**dependent [2]** 73/9 80/13
**dependents [1]** 75/23
**depo [1]** 33/14
**deposition [16]** 10/6 10/16 12/7 12/23 20/23 38/12 42/16 51/11 52/4 52/9 61/3 61/6 95/25 139/1 144/2 144/3
**depositions [1]** 81/25
**describe [6]** 24/1 33/10 33/17 75/13 104/9 138/3
**described [12]** 15/14 18/13 22/24 23/6 57/25 63/6 63/7 63/13 64/18 69/20 107/15 112/5
**describes [3]** 77/23 109/24 115/5
**describing [5]** 22/5 63/3 107/10 107/11 111/5
**design [1]** 110/15
**designation [1]** 54/3
**designed [1]** 41/2
**despite [1]** 42/24
**detail [2]** 90/16 138/4
**details [1]** 26/21
**determine [8]** 15/6 41/4 81/19 143/10 143/14 143/18 144/17 155/3
**determined [1]** 40/22
**determining [1]** 47/3
**developed [1]** 64/24
**development [1]** 65/17
**developments [1]** 119/18
**did [153]** 9/21 10/11 10/12 11/2 12/12 12/18 12/19 13/12 14/6 14/7 14/15 16/24 18/15 21/21 23/7 26/21 26/24 27/25 28/20 30/23 32/15 32/19 34/1 34/6 36/19 44/12 44/14 44/20 47/5 47/10 47/21 51/14 52/2 52/18 53/3 53/16 53/21 55/4 55/5 55/18 58/5 58/16 59/7 59/7 59/11 59/12 59/16 59/21 59/24 60/1 60/20 61/4 61/8 64/14 64/15 64/16 64/19 64/22 65/10 66/11 67/7 67/16 67/21 67/23 68/6 68/8 69/5 69/9 69/18 69/18

69/21 71/22 71/24 72/8 72/21 74/6 74/7 74/9 74/16 76/3 76/6 76/17 77/19 77/20 79/3 79/13 80/9 81/21 82/25 83/4 83/20 84/3 84/16 84/18 84/19 84/24 85/11 86/11 87/24 90/14 90/21 91/2 91/19 92/1 94/5 94/6 102/24 106/2 107/8 107/9 116/9 116/10 118/10 118/17 121/9 121/24 121/24 123/19 123/25 125/3 127/17 128/21 128/24 129/2 130/19 130/21 130/23 131/12 131/14 133/4 133/6 134/11 134/13 134/13 135/5 135/25 136/1 136/16 136/17 136/19 139/1 141/19 141/22 144/24 144/25 145/3 145/5 147/11 147/18 147/20 147/22 147/23 152/20
**didn't [47]** 8/18 8/23 9/16 9/18 12/8 19/18 19/22 19/23 19/24 28/19 36/19 41/18 41/23 42/10 44/12 52/3 55/3 59/5 60/18 68/9 73/4 81/14 83/3 84/5 87/4 87/16 90/20 91/17 91/21 91/24 118/11 122/6 123/17 125/1 136/2 136/14 136/19 138/25 141/21 143/9 143/10 143/14 143/19 147/7 147/19 147/23 152/18
**Dieter [3]** 5/12 53/1 53/22
**Dieter's [1]** 53/24
**difference [10]** 71/14 114/19 129/17 130/14 133/1 137/14 143/11 143/15 143/17 146/21
**differences [2]** 127/8 144/17
**different [18]** 12/20 13/7 28/1 50/4 50/5 61/15 61/16 66/13 75/17 79/21 82/7 87/25 104/15 125/9 130/15 133/8 137/16 138/9
**differs [1]** 43/6
**DIGITAL [20]** 1/9 5/14 5/16 12/17 16/2 63/22 66/1 76/13 80/24 85/12 103/18 105/4 119/7 119/20 136/3 136/13 136/21 137/6 137/9 151/16
**Digital's [9]** 84/3 84/13 118/18 119/13 119/18 119/25 147/6 147/12 153/17
**dimensional [1]** 66/19
**direct [28]** 6/3 6/7 8/7

9/17 9/21 19/20 31/1 33/4 34/1 34/6 34/13 41/23 43/2 44/11 45/11 49/19 49/22 50/6 51/25 64/6 86/11 92/15 98/11 102/20 106/1 109/11 126/5 127/4
**direction [8]** 31/5 37/24 77/9 102/4 102/5 116/2 116/7 116/8
**directions [1]** 61/17
**directly [1]** 132/18
**disagree [4]** 11/25 22/3 31/15 39/21
**Disappointed [1]** 60/9
**disclose [1]** 30/23
**disclosed [9]** 15/12 16/9 17/17 31/1 69/10 78/10 151/13 152/1 152/2
**discloses [7]** 27/14 28/14 34/10 76/25 114/11 115/2 115/8
**disclosing [1]** 10/4
**disclosure [1]** 29/8
**disclosures [1]** 69/13
**discounted [1]** 84/22
**discovered [1]** 55/7
**discuss [4]** 21/21 71/9 71/22 150/12
**discussed [8]** 19/4 34/13 45/11 72/7 82/24 99/21 105/21 105/25
**discusses [1]** 74/7
**discussing [1]** 46/19
**discussion [8]** 40/19 40/20 91/25 98/1 100/23 108/13 125/1 149/24
**disk [12]** 20/20 21/3 21/14 65/13 65/21 71/4 71/25 78/18 110/15 147/6 147/7 147/12
**disks [1]** 9/9
**dispute [5]** 16/23 64/24 131/15 147/5 147/6
**distance [9]** 35/14 35/18 35/23 36/7 39/13 41/21 42/8 42/25 61/14
**distinct [2]** 154/23 155/9
**distinction [2]** 44/25 130/4
**distinguish [1]** 98/9
**distributed [1]** 133/18
**distribution [2]** 133/13 135/14
**DISTRICT [3]** 1/1 1/2 1/21
**dive [1]** 144/22
**DIVISION [1]** 1/3
**do [162]**
**Dobin [14]** 16/9 18/24 19/4 23/15 23/17 23/20 70/7 71/22 75/4 87/24 88/3 88/22 90/5 123/15
**Doctor [1]** 99/16
**doctrine [1]** 155/9
**document [69]** 8/10

9/4 10/19 11/17 12/25 20/6 20/16 21/9 28/7 29/6 29/9 31/8 34/18 35/10 36/23 44/1 45/7 49/8 50/8 50/21 53/7 53/11 54/17 54/21 56/5 56/8 58/22 62/14 76/22 88/9 89/18 92/13 94/25 95/5 95/12 97/5 97/11 98/22 99/14 100/11 101/5 102/14 103/12 104/2 104/20 105/18 106/22 108/6 109/5 110/5 111/1 112/3 112/21 115/16 116/21 117/8 122/4 123/5 124/15 127/13 128/17 131/5 131/19 133/10 134/18 138/11 142/20 144/13 145/16
**documents [1]** 136/4
**does [35]** 11/10 16/23 27/13 27/19 27/20 27/22 33/10 33/17 34/12 35/25 48/24 55/6 61/11 61/18 65/2 65/6 66/15 71/9 71/11 77/7 77/8 80/5 85/5 91/11 113/1 122/20 122/21 123/22 128/6 129/17 132/21 135/6 135/7 135/11 139/9
**doesn't [10]** 66/16 70/23 73/11 73/16 73/24 94/10 117/4 118/24 130/1 137/24
**doing [10]** 12/11 44/5 47/3 51/13 91/6 93/19 125/22 133/21 139/4 146/15
**dollar [4]** 118/13 132/25 139/25 147/16
**dollar-wise [1]** 118/13
**domino [5]** 93/13 107/10 114/2 116/16 117/25
**don't [52]** 15/17 16/6 22/25 24/1 24/3 26/20 27/17 30/8 32/18 33/13 39/19 43/24 48/8 50/23 57/4 59/13 70/21 73/3 73/6 73/7 73/9 73/11 75/19 75/22 82/10 83/14 83/24 84/10 85/8 87/11 87/11 87/13 90/13 91/4 91/12 92/2 92/3 92/7 117/5 118/19 119/19 120/2 125/4 127/3 133/19 143/7 143/21 146/5 150/16 154/4 154/19 155/1
**done [5]** 17/4 17/22 56/13 82/2 148/17
**door [2]** 42/15 49/20
**dot [1]** 127/21
**dots [2]** 127/23 130/8
**doug.lumish [1]** 3/20
**DOUGLAS [1]** 3/17
**down [25]** 9/23 34/5

34/24 35/21 37/14 37/21 61/19 63/8 63/21 74/18 77/9 86/16 93/23 94/5 95/11 98/7 100/6 103/5 106/16 113/18 113/25 125/16 141/12 145/18 145/25
**Dr [19]** 29/23 29/25 30/1 31/3 40/17 54/14 56/22 58/9 67/3 77/10 82/6 98/13 126/9 127/8 127/15 127/18 130/19 134/13 143/25
**Dr. [136]** 8/7 8/17 9/20 10/23 16/3 16/25 17/17 18/8 22/24 23/5 28/20 28/23 36/11 40/24 49/16 50/16 51/5 52/16 54/25 55/10 55/13 55/15 56/13 57/8 59/22 60/2 60/14 60/16 60/22 63/5 63/13 63/25 64/8 64/24 65/2 66/2 66/9 66/18 66/24 67/1 67/2 67/7 69/2 69/9 70/15 71/11 71/19 72/5 72/7 73/2 73/25 75/9 76/3 76/4 76/15 76/18 77/8 77/11 78/24 79/5 79/9 80/1 80/5 81/13 82/1 82/17 82/25 83/9 84/16 84/24 85/13 86/5 87/24 89/5 90/15 91/18 92/4 99/5 104/8 104/14 105/6 109/21 119/3 120/15 121/13 123/20 123/22 123/25 127/2 128/1 128/13 128/24 129/12 130/3 130/21 131/13 131/14 132/2 132/7 132/17 133/1 133/4 133/12 133/23 134/1 134/4 134/10 134/22 135/20 136/5 136/11 136/17 137/13 137/23 138/13 139/19 140/8 140/19 141/15 141/18 141/22 143/1 143/5 144/20 145/2 145/5 145/24 146/6 146/12 146/24 147/4 147/11 151/21 152/16 154/15 155/2
**Dr. Becker [26]** 127/2 128/13 128/24 129/12 130/3 131/14 133/12 133/23 134/1 134/4 134/22 135/20 136/17 137/13 139/19 140/8 141/15 141/18 141/22 145/2 145/5 145/24 146/6 146/12 147/4 147/11
**Dr. Becker's [16]** 128/1 130/21 131/13 132/2 132/17 133/1 133/4 134/10 136/5 137/23 138/13 140/19 143/1 143/5 144/20 146/24

**D**

**Dr. Bergman's [1]** 132/7
**Dr. Bertero [4]** 81/13 82/25 154/15 155/2
**Dr. Goglia [4]** 83/9 84/16 84/24 136/11
**Dr. Li [4]** 36/11 76/3 76/4 109/21
**Dr. Mark [1]** 63/25
**Dr. Re [3]** 64/8 86/5 120/15
**Dr. Re's [1]** 121/13
**Dr. Seuss [33]** 16/25 17/17 22/24 23/5 49/16 50/16 52/16 55/10 55/13 55/15 56/13 57/8 59/22 60/2 60/14 60/16 60/22 63/5 63/13 64/24 66/2 66/18 67/1 72/7 76/15 76/18 77/11 82/1 82/17 91/18 104/8 104/14 105/6
**Dr. Seuss' [17]** 8/17 9/20 16/3 18/8 28/20 28/23 40/24 51/5 54/23 67/2 77/8 85/13 89/5 90/15 92/4 119/3 123/25
**Dr. Seuss's [1]** 123/20
**Dr. Victora [19]** 8/7 10/23 65/2 66/9 67/7 69/2 69/9 70/15 71/11 71/19 72/5 73/2 75/9 80/5 87/24 99/5 123/22 151/21 152/16
**Dr. Victora's [6]** 66/24 73/25 78/24 79/5 79/9 80/1
**draft [3]** 9/12 52/15 54/6
**dramatic [1]** 35/1
**draw [3]** 26/24 44/25 145/18
**drew [1]** 26/25
**drive [25]** 3/18 3/22 4/4 4/8 4/12 4/21 5/4 5/7 71/4 71/25 131/11 131/24 132/5 132/24 133/18 134/5 134/7 134/9 135/22 139/17 140/2 147/5 147/6 147/7 147/12
**drives [14]** 20/20 21/3 21/14 65/13 65/22 82/23 110/18 133/14 133/25 135/9 135/10 136/22 139/20 140/15
**during [13]** 8/25 9/21 19/19 19/19 44/11 51/16 52/8 54/20 92/3 98/11 133/12 135/20 137/13
**dust [1]** 92/5
**DVM [1]** 1/9
**DX [25]** 34/16 50/23 88/4 88/7 89/14 94/24 95/4 98/21 99/8 100/10 101/2 102/8 103/11

104/18 105/17 106/20 108/4 109/4 110/2 110/23 111/25 112/20 115/14 116/19 117/7
**DX-1001 [9]** 34/16 109/4 110/2 110/23 111/25 112/20 115/14 116/19 117/7
**DX-1009 [2]** 88/4 88/7
**DX-1009.002 [1]** 89/14
**DX-1031 [3]** 100/10 101/2 102/8
**DX-1213 [3]** 50/23 94/24 95/4
**DX-1245 [5]** 103/11 104/18 105/17 106/20 108/4
**DX-31 [2]** 98/21 99/8

**E**

**e-mail [3]** 54/14 55/9 57/1
**each [9]** 38/9 39/5 43/5 47/4 99/21 116/2 117/20 130/24 140/25
**earlier [3]** 15/1 55/20 60/23
**early [1]** 22/18
**easier [1]** 43/4
**easily [1]** 56/20
**easy [2]** 67/12 100/19
**ECC [4]** 55/7 55/19 57/14 57/25
**economist [2]** 83/16 120/3
**effect [5]** 37/10 83/3 104/24 105/3 135/23
**effective [1]** 35/6
**effectively [1]** 100/18
**eight [1]** 89/15
**either [5]** 20/10 31/12 75/23 152/2 152/14
**electra [1]** 128/22
**elements [10]** 15/20 87/5 93/8 93/10 94/5 151/12 151/25 152/1 152/12 152/14
**else [3]** 64/25 68/21 127/6
**else's [1]** 123/18
**email [1]** 57/17
**embodiment [5]** 33/11 34/2 34/6 77/5 77/6
**embodiments [3]** 33/17 115/18 115/22
**emphasized [1]** 57/8
**employers [1]** 75/7
**emulate [4]** 69/16 74/3 108/1 121/20
**emulating [2]** 69/19 105/10
**enables [1]** 35/5
**encapsulated [1]** 119/25
**end [14]** 7/12 7/15 7/16 7/17 31/13 40/8 41/15 50/14 111/10 116/5 118/5 137/23 140/2 140/5
**endeavor [9]** 20/10

20/14 20/18 20/22 70/25 71/1 75/14 75/15 151/22
**ended [3]** 8/7 27/25 140/18
**ends [1]** 116/4
**energy [1]** 66/22
**engineering [1]** 65/24
**enough [5]** 26/16 39/6 48/4 142/5 149/13
**entered [1]** 153/16
**entire [6]** 48/18 63/4 90/24 131/10 135/5 147/8
**entirely [1]** 137/10
**entitled [1]** 157/5
**entity [1]** 86/15
**equal [1]** 113/9
**equally [2]** 85/3 85/8
**equals [5]** 44/6 113/2 113/4 113/12 113/23
**equation [4]** 95/11 129/1 129/6 138/18
**equivalent [1]** 48/3
**equivalents [1]** 155/9
**erasure [1]** 25/13
**error [1]** 130/7
**especially [1]** 140/15
**essentially [3]** 43/1 48/2 61/19
**establish [1]** 65/6
**estimate [1]** 84/12
**et [1]** 52/8
**et cetera [1]** 52/8
**evaluate [2]** 126/22 142/13
**even [23]** 10/12 13/6 14/11 18/24 23/20 23/25 47/20 50/25 59/17 61/17 66/12 70/23 79/9 85/5 91/4 94/15 98/16 111/18 119/21 129/10 136/25 140/15 142/7
**even sure [1]** 61/17
**ever [14]** 8/17 15/11 15/14 16/23 22/16 22/22 26/25 29/16 66/12 72/3 76/10 87/21 91/4 142/19
**every [6]** 46/15 47/9 77/5 77/6 120/20 132/24
**everybody [1]** 132/19
**everybody's [2]** 52/21 95/8
**everyone [1]** 148/1
**everything [4]** 49/4 60/5 86/25 135/17
**evidence [19]** 8/13 8/15 8/16 8/20 19/15 20/9 26/12 32/9 32/11 49/4 67/19 68/22 68/24 70/6 75/1 136/8 153/22 155/1 155/21
**exact [5]** 15/15 83/24 127/21 132/8 136/21
**exactly [10]** 27/9 28/16 30/7 43/8 44/9 52/22

131/23 132/2 132/3 138/8
**exaggerated [1]** 40/7
**examination [15]** 8/5 41/11 62/2 64/6 86/3 86/11 92/15 98/11 106/1 109/11 118/5 120/13 124/3 126/5 141/10
**examined [1]** 73/21
**examiner [11]** 19/1 69/3 69/12 73/21 90/14 91/19 91/22 91/25 92/7 125/2 125/7
**examiners [8]** 18/17 90/10 90/14 90/20 90/22 91/2 91/4 91/13
**examining [1]** 18/19
**example [18]** 27/14 40/16 41/21 46/3 51/17 58/17 59/12 72/10 73/13 77/25 78/6 78/7 79/4 97/20 120/20 134/5 137/5 139/17
**examples [1]** 52/11
**except [1]** 128/4
**exchange [16]** 20/19 57/8 57/14 58/9 99/19 100/14 100/17 104/4 104/8 104/13 106/4 106/10 107/1 107/3 108/18 117/14
**exchange spring [1]** 57/14
**exchanged [2]** 12/4 101/19
**excluded [1]** 155/11
**exclusion [2]** 154/13 154/14
**excuse [11]** 77/7 93/5 98/13 101/3 127/16 130/20 131/3 137/17 150/11 151/4 152/13
**excused [1]** 63/20
**exerting [1]** 108/19
**exerts [1]** 108/24
**exhibit [1]** 45/3
**exist [1]** 152/9
**existence [2]** 45/15 46/10
**exists [1]** 43/4
**exits [2]** 80/20 150/22
**expanding [1]** 49/23
**expect [2]** 119/12 130/12
**expected [1]** 22/1
**experience [2]** 18/18 18/21
**experiment [2]** 102/24 103/6
**experimental [3]** 49/3 71/15 71/16
**experimentally [1]** 101/9
**expert [2]** 9/25 118/20
**experts [1]** 81/24
**explain [8]** 42/10 48/17 71/17 127/19 138/24 139/8 140/16 154/10

**explanation [2]** 42/12 108/13
**Explicitly [1]** 20/1
**expressed [1]** 126/11
**expressly [1]** 125/9
**extending [1]** 24/2
**extensive [1]** 68/22
**extent [1]** 38/17
**external [6]** 100/16 115/24 128/20 128/22 129/1 129/10
**extra [1]** 46/10
**extraneous [1]** 153/8
**extraordinary [1]** 18/3
**extremely [1]** 70/2

**F**

**fabricate [1]** 43/4
**fabricated [1]** 74/8
**fact [11]** 12/16 18/2 27/13 27/19 38/1 61/22 67/16 75/1 123/22 143/3 153/20
**factor [3]** 46/2 78/23 79/6
**factoring [4]** 45/25 46/7 46/12 46/17
**fair [26]** 17/6 18/3 18/20 23/10 24/25 25/10 25/20 36/12 48/24 53/13 67/2 69/12 83/12 93/8 93/9 93/13 107/14 119/2 119/16 133/17 133/19 133/20 140/19 143/6 145/7 146/11
**fairly [3]** 40/21 94/5 134/11
**fairly representing [1]** 134/11
**fall [1]** 119/13
**familiar [1]** 94/16
**famous [2]** 22/23 23/3
**far [1]** 80/9
**fashion [1]** 40/7
**favorable [1]** 55/13
**feature [1]** 66/21
**features [5]** 84/16 84/19 84/24 85/2 85/11
**February [1]** 55/8
**February 2004 [1]** 55/8
**feel [4]** 60/5 60/8 60/22 136/8
**fellow [1]** 54/3
**FENSTER [7]** 2/3 7/25 59/7 61/2 61/14 148/4 155/6
**Fenster's [1]** 41/15
**ferromagnetic [1]** 122/24
**few [7]** 70/7 116/23 137/20 138/14 141/12 141/14 155/20
**field [78]** 18/22 20/10 20/14 20/18 20/22 22/14 31/22 32/24 33/5 37/3 37/4 37/13 37/18 38/3 38/8 39/5 39/6 39/13 40/5 40/9 40/14 40/21 40/25 41/4 43/7

**F**

**field... [53]** 46/5 46/5 46/6 61/15 61/16 65/13 66/7 69/1 70/25 71/1 75/13 75/15 75/17 77/1 77/17 77/17 79/15 79/18 79/22 81/19 83/1 83/5 87/8 89/16 89/21 90/1 90/10 95/18 100/2 100/16 100/17 100/20 101/10 101/22 108/17 110/7 110/20 111/14 114/14 114/15 114/19 115/3 115/5 115/9 115/24 117/20 118/1 121/17 122/6 122/22 151/21 153/12 153/14
**fields [2]** 111/13 112/18
**figure [12]** 72/22 89/15 105/20 105/25 106/11 112/19 112/23 114/7 114/11 114/25 116/11 132/5
**Figure 3 [3]** 105/20 112/19 114/11
**figures [1]** 105/21
**file [2]** 90/18 91/17
**filed [4]** 56/10 103/20 109/13 109/18
**filing [1]** 103/21
**filings [1]** 154/2
**films [3]** 22/5 22/5 22/6
**final [5]** 58/17 116/7 137/25 140/8 148/25
**finally [1]** 147/10
**find [2]** 86/25 87/4
**finding [1]** 151/9
**fine [3]** 38/13 148/3 148/14
**finish [1]** 148/24
**first [34]** 9/12 22/16 26/25 28/4 28/16 43/3 47/19 47/21 48/1 50/25 52/25 53/9 57/2 57/25 64/4 77/21 77/22 86/11 88/7 89/22 100/15 102/17 107/12 108/24 111/10 112/8 122/9 126/1 127/1 127/22 128/19 131/23 141/3 151/6
**firsthand [2]** 33/20 33/25
**fit [3]** 126/23 129/25 130/7
**fits [1]** 127/5
**five [1]** 95/11
**flip [6]** 17/5 17/11 34/3 43/1 43/20 48/24
**flipped [1]** 63/6
**flipping [4]** 18/7 18/14 61/19 66/4
**FLOOR [8]** 2/4 2/9 2/13 2/22 3/4 3/9 3/13 3/23
**focus [1]** 141/13
**focused [3]** 53/24 54/24 141/14
**focusing [1]** 83/9

**folks [2]** 141/1 141/2
**follow [3]** 11/10 42/7 76/17
**followed [5]** 31/12 41/6 76/18 107/12 154/15
**following [10]** 7/3 7/21 14/17 80/21 81/2 81/5 87/18 148/6 150/23 154/17
**force [6]** 49/17 51/2 51/4 95/18 108/24 126/16
**foregoing [1]** 157/3
**forgot [1]** 120/4
**form [1]** 150/13
**format [1]** 157/6
**formed [3]** 10/11 28/24 63/14
**formula [3]** 40/22 41/3 153/11
**forward [2]** 76/18 139/3
**found [2]** 51/17 72/6
**Foundation [1]** 119/8
**four [2]** 112/5 113/7
**four-layer [1]** 112/5
**fourth [2]** 1/22 112/15
**frame [1]** 135/15
**frank [1]** 136/19
**FRENKEL [1]** 5/3
**frequencies [1]** 82/21
**front [4]** 48/23 91/22 93/24 117/2
**full [3]** 64/3 88/7 126/1
**fundamental [1]** 85/9
**further [4]** 26/5 130/9 152/17 153/17

**G**

**gains [2]** 84/22 101/14
**gathering [1]** 92/5
**gave [9]** 43/24 52/11 53/15 60/6 60/14 75/11 77/25 78/7 118/17
**general [5]** 18/21 57/20 57/24 94/20 94/21
**generally [1]** 47/23
**gentlemen [5]** 8/2 29/4 80/18 140/24 149/25
**get [24]** 15/17 48/1 53/25 54/3 59/21 67/13 74/17 87/20 107/8 113/24 120/1 128/4 129/20 129/25 132/16 138/8 139/25 142/18 144/5 148/11 148/24 148/25 149/15 155/5
**gets [1]** 134/7
**getting [2]** 130/6 130/10
**give [3]** 53/3 60/2 76/24
**given [4]** 22/11 70/24 92/8 150/5
**gives [1]** 110/8
**giving [2]** 45/22 78/17
**GMBH [1]** 1/6
**go [70]** 10/16 12/23 13/14 20/15 21/8 27/10 29/5 29/7 31/7 31/16

31/18 33/14 33/20 34/18 34/24 35/9 37/14 37/21 38/14 40/2 43/1 46/15 54/7 54/11 56/3 57/19 58/20 62/4 62/25 74/18 77/22 78/2 89/13 95/4 96/13 96/25 98/21 99/8 99/11 100/6 101/3 103/10 105/17 106/20 109/4 110/2 110/23 111/25 112/19 113/18 113/23 115/13 116/19 117/9 118/25 121/10 123/4 124/9 128/15 131/3 131/18 133/8 134/17 135/13 138/18 138/23 139/22 140/2 140/2 144/5
**goal [3]** 69/15 69/16 69/22
**goes [16]** 9/13 27/15 31/4 48/16 49/4 73/15 77/9 79/15 93/15 102/4 105/3 110/15 134/14 134/14 135/7 154/13
**Goglia [4]** 83/9 84/16 84/24 136/11
**going [29]** 13/1 40/15 40/18 46/15 47/9 49/1 53/6 53/25 57/19 61/16 64/10 72/23 84/9 85/22 86/7 95/7 103/5 106/16 109/7 131/8 136/7 139/8 141/5 141/13 149/25 150/1 150/6 150/11 154/6
**gone [1]** 119/4
**good [11]** 8/1 8/3 41/13 41/14 63/23 94/1 101/23 102/2 126/8 127/5 155/17
**got [15]** 17/5 76/10 80/23 93/18 111/8 125/20 126/24 127/3 138/19 144/20 145/14 148/9 148/9 148/18 149/14
**gotten [1]** 96/2
**graded [7]** 16/10 58/3 58/7 62/18 103/1 103/5 106/12
**gradient [18]** 37/22 37/23 37/24 38/3 38/4 40/13 40/15 43/6 43/10 61/16 77/17 77/18 77/18 79/18 114/12 114/14 114/15 117/25
**gradients [2]** 38/7 79/14
**grain [5]** 43/6 99/21 113/6 117/20 127/24
**grains [8]** 42/25 56/20 100/15 100/18 101/15 101/18 107/5 116/3
**granted [1]** 54/6
**graph [2]** 142/22 142/24
**graphic [1]** 126/16
**gray [3]** 79/18 79/21

79/24
**grayed [1]** 37/2
**great [4]** 21/7 45/10 90/16 102/2
**greater [5]** 39/13 40/14 83/2 134/24 135/18
**green [1]** 127/24
**GREGORY [1]** 5/3
**groups [2]** 128/21 128/23
**guess [11]** 38/17 42/23 48/8 52/2 59/25 60/9 60/24 103/3 142/11 148/10 153/25
**guy [1]** 76/14
**guys [3]** 53/5 53/6 75/7

**H**

**hac [1]** 2/17
**had [49]** 7/3 7/21 8/12 8/16 9/19 10/3 17/4 21/17 21/25 24/18 24/24 28/3 29/20 44/19 45/11 47/12 48/23 56/13 56/25 57/17 60/24 62/8 66/7 66/18 66/21 67/4 68/1 68/11 72/3 75/5 80/21 81/2 81/5 86/11 87/4 87/19 95/25 119/20 129/4 129/10 129/13 135/11 139/14 140/9 140/20 144/21 147/8 150/23 154/14
**Hagadorn [88]** 16/9 18/24 19/3 19/10 19/15 19/22 21/2 21/17 21/21 21/24 22/4 22/7 22/12 22/17 22/23 23/3 23/10 23/13 23/17 24/1 26/14 26/22 27/7 27/20 27/22 28/9 28/19 44/6 44/21 45/23 45/24 46/4 46/8 46/12 46/19 47/6 47/8 47/11 49/5 49/21 63/5 68/16 68/18 70/16 70/23 71/1 71/6 71/9 71/19 71/23 72/3 72/6 72/14 73/1 73/6 73/19 73/22 73/24 75/10 75/12 75/16 75/19 75/21 75/25 87/22 89/22 90/6 91/18 94/22 95/14 96/17 96/20 97/7 97/13 97/16 98/2 98/9 122/16 123/1 123/11 125/2 125/7 151/11 151/19 151/22 151/24 152/4 152/6
**Hagadorn's [2]** 27/13 51/1
**half [2]** 78/19 83/2
**HAMR [1]** 84/9
**handed [1]** 88/5
**handful [1]** 92/8
**hands [1]** 123/17
**hang [1]** 141/2
**HANLE [1]** 4/11
**happen [4]** 74/16 78/24 80/1 130/25

**happened [1]** 73/3
**happy [2]** 47/20 86/8
**hard [96]** 9/9 16/11 20/20 21/3 21/13 24/7 27/25 28/3 28/14 28/20 28/24 28/24 30/25 33/11 33/18 34/7 35/5 35/12 35/13 35/14 35/17 35/23 36/8 40/5 46/6 48/10 48/19 48/25 49/3 59/14 63/9 63/14 63/15 65/13 65/21 69/21 70/1 70/3 70/9 71/4 71/25 72/19 72/24 74/10 75/5 77/3 77/12 78/14 82/23 83/1 83/6 88/17 88/23 93/2 93/19 94/17 99/21 99/24 100/18 100/23 101/20 102/1 102/9 102/22 102/25 103/7 106/7 106/9 106/13 106/16 106/17 107/12 107/21 108/1 108/25 110/15 110/18 111/10 111/16 112/8 118/1 120/20 122/23 133/14 135/22 136/22 143/22 147/5 147/6 147/7 147/12 152/19 152/23 153/6 154/21 154/23
**harder [2]** 108/20 138/24
**hardest [2]** 42/8 112/11
**has [30]** 10/13 10/24 11/4 12/4 15/6 15/9 22/19 24/12 31/22 34/2 39/6 39/12 46/1 65/7 70/25 78/11 80/24 82/1 88/19 95/15 99/21 104/8 110/14 113/20 119/4 119/5 136/23 142/19 145/8 152/25
**hasn't [1]** 17/1
**have [102]** 7/8 9/25 11/6 11/7 12/9 13/13 15/18 16/19 16/20 17/4 17/13 17/18 17/20 17/21 17/22 18/6 18/11 18/18 18/21 19/10 19/14 20/9 26/12 26/16 26/17 26/17 33/19 35/20 38/8 38/10 39/12 40/16 43/18 44/22 44/24 46/5 47/21 48/4 48/25 49/1 52/9 58/16 60/22 61/12 61/12 65/6 67/23 69/23 70/4 74/21 74/25 79/9 82/7 86/8 86/25 87/9 90/7 92/6 93/7 93/24 94/12 96/2 96/3 100/23 101/8 102/9 106/9 106/12 106/24 109/12 111/4 111/12 112/8 114/2 116/13 117/1 122/3 123/14 123/16 125/18 126/19 126/25 127/8

# H

**have... [19]** 127/11 133/25 136/3 136/14 136/24 139/15 140/25 142/5 144/11 144/16 149/13 150/7 150/8 150/18 151/1 154/1 154/18 155/1 155/20
**haven't [4]** 76/16 144/20 147/9 147/15
**having [8]** 25/9 43/12 93/8 104/4 148/16 148/16 150/4 151/12
**he [154]** 21/6 27/25 27/25 28/19 28/20 30/3 34/12 34/23 34/24 35/3 35/7 35/21 35/25 38/6 38/16 39/11 40/13 41/2 41/17 41/18 41/22 42/1 42/1 42/6 42/10 43/22 44/5 44/8 44/25 47/13 48/7 49/5 49/5 49/20 49/20 49/24 51/6 51/8 51/10 51/17 52/8 52/14 52/18 52/19 54/3 54/3 54/24 55/3 55/4 55/5 58/2 58/5 58/12 58/15 58/16 59/7 59/8 59/11 59/12 59/16 59/23 60/6 60/15 60/25 60/25 61/3 61/4 65/6 65/7 65/10 66/25 67/10 67/15 67/16 67/18 67/19 67/21 67/23 68/1 68/6 68/11 68/11 68/12 69/25 70/1 71/17 74/7 74/7 77/20 77/23 77/25 78/7 78/10 81/14 81/16 81/18 82/13 82/14 82/14 82/19 82/20 82/21 83/3 83/4 83/20 83/21 84/17 84/25 85/2 118/17 121/1 121/21 125/3 126/11 126/15 128/2 128/25 129/19 129/20 129/22 130/4 130/6 132/8 132/11 134/25 135/21 136/1 136/2 136/19 137/13 137/15 137/23 137/24 138/1 138/16 138/19 139/4 139/8 139/10 139/16 139/18 139/18 139/22 139/23 140/16 140/17 140/20 144/8 144/9 145/8 146/13 147/8 147/18 151/21
**he's [15]** 35/12 38/7 38/16 39/11 42/4 49/23 51/3 53/25 65/4 128/10 130/10 132/19 137/25 138/19 140/4
**head [30]** 34/10 34/21 35/1 35/6 35/14 35/18 36/7 37/1 37/3 37/4 37/13 37/22 37/23 38/3 39/14 40/5 40/14 42/9 42/25 61/15 77/4 77/15 78/3 78/4 78/8 78/18

**heads [2]** 41/22 56/21
**hear [9]** 72/8 84/16 86/8 118/17 133/4 147/11 150/3 150/4 152/18
**heard [13]** 22/16 30/15 66/8 66/12 69/2 70/7 72/3 72/4 93/6 98/11 136/11 141/18 147/13
**heart [1]** 86/7
**held [2]** 148/6 157/5
**Hello [2]** 86/5 86/6
**help [4]** 53/22 108/25 118/1 118/3
**helps [1]** 121/16
**here [64]** 30/6 32/19 33/8 36/25 37/16 38/16 40/9 40/20 44/10 45/10 48/5 52/22 60/21 61/12 64/12 64/20 70/24 75/4 80/16 81/13 83/18 85/22 86/7 86/17 88/22 89/21 94/9 99/24 100/13 100/23 101/7 104/22 106/9 106/24 107/21 108/8 108/23 112/5 114/15 114/17 116/25 120/24 123/22 126/9 127/19 127/24 127/25 128/9 128/10 128/10 129/7 131/7 131/15 131/21 131/23 132/1 133/23 134/4 137/22 138/4 140/1 141/15 143/24 150/1
**here's [4]** 74/22 101/24 125/7 125/8
**hereby [1]** 157/2
**hey [1]** 55/19
**HGST [2]** 103/15 105/4
**high [10]** 37/13 37/18 39/6 88/18 127/6 135/8 140/9 140/20 140/21 147/9
**high-capacity [1]** 135/8
**higher [10]** 38/8 114/8 130/6 130/8 133/5 137/3 137/4 140/16 140/17 145/11
**highlight [4]** 49/10 50/24 50/25 55/3
**highlighted [5]** 45/5 54/20 58/3 102/20 133/24
**highlighting [2]** 97/9 130/4
**him [11]** 42/16 48/11 54/2 60/4 61/5 66/23 69/6 76/13 118/17 118/19 147/13
**himself [1]** 60/16
**hindsight [7]** 17/14 67/10 67/16 68/11 72/11 74/1 80/5
**his [84]** 22/24 35/4 35/22 36/11 36/12

**78/21 79/15 79/22 147/21**
**38/17 42/13 42/16 49/19 49/19 49/23 49/24 50/14 56/24 57/2 58/1 60/25 61/24 62/6 64/24 65/2 67/8 67/22 69/21 72/7 74/22 75/9 76/19 78/10 78/11 79/13 80/10 82/17 83/12 98/13 98/14 104/9 128/2 128/3 128/6 129/12 129/18 129/24 130/7 130/8 130/25 132/2 132/11 132/17 133/12 134/24 135/20 136/17 137/13 137/15 137/24 137/25 138/1 138/5 138/6 138/7 138/7 138/16 138/17 138/17 138/20 138/25 139/1 139/4 139/10 139/23 139/25 140/3 140/5 140/6 140/9 140/15 141/22 146/7 146/8 146/10 146/15 146/22 147/16**
**history [8]** 55/17 90/10 90/18 91/17 121/1 121/4 122/7 124/24
**hit [1]** 81/12
**HK [6]** 77/10 77/17 77/18 79/16 79/20 114/23
**hmm [8]** 11/20 23/2 27/11 31/17 36/16 37/20 62/24 88/12
**HMS [10]** 35/2 78/1 78/2 78/6 78/11 78/12 78/15 78/17 79/5 79/6
**HN [7]** 31/19 31/22 32/3 32/9 32/24 83/5 152/8
**honest [1]** 118/19
**honestly [2]** 53/14 138/24
**Honor [41]** 7/5 7/17 7/18 8/3 38/15 38/20 41/8 41/10 42/14 42/15 42/18 49/18 49/20 61/25 63/20 63/22 81/10 97/21 98/1 98/15 120/11 125/15 125/18 125/21 140/23 141/9 141/13 148/3 148/14 148/20 149/21 149/23 151/3 154/6 154/10 154/14 155/4 155/7 155/11 155/16 155/25
**Honor's [1]** 154/24
**HONORABLE [1]** 1/4
**Hopefully [1]** 22/15
**hopes [1]** 154/9
**hoping [3]** 54/4 55/13 154/8
**host [41]** 11/15 11/15 12/4 12/13 13/15 13/16 13/20 14/4 14/11 14/12 23/4 28/24 28/25 31/19 31/21 31/25 32/1 32/25 33/5 33/12 45/1 45/11

**38/17 42/13 42/16** 45/25 46/12 46/17 59/13 63/8 68/14 73/12 73/17 75/22 83/5 89/6 92/22 93/10 122/23 122/24 151/14 152/9 152/22 154/22
**hosts [1]** 11/22
**hour [3]** 148/15 150/6 150/7
**hours [2]** 92/8 144/21
**housekeeping [2]** 7/6 155/20
**how [37]** 60/8 65/12 65/23 67/7 70/1 74/9 76/6 77/7 77/8 78/20 82/3 83/20 83/23 84/24 87/16 90/10 90/22 95/17 97/16 97/19 100/3 108/14 118/23 120/2 121/6 121/8 121/16 123/14 123/15 127/4 130/23 131/17 132/21 133/18 133/25 141/18 153/14
**how's [1]** 120/24
**however [5]** 7/15 62/12 62/16 62/21 122/21
**HS [4]** 31/19 31/22 32/9 83/1
**huge [1]** 78/23
**huh [1]** 11/3
**hundred [1]** 139/15
**hundreds [2]** 65/25 66/1
**hypothetical [2]** 67/18 67/20
**HYUK [1]** 3/21

# I

**I'd [4]** 68/16 68/18 72/4 141/14
**I'll [10]** 18/4 33/19 39/2 41/7 102/20 105/20 113/24 115/21 138/3 154/5
**I'm [60]** 15/16 15/16 24/16 25/21 25/22 26/2 27/8 37/2 38/19 38/25 39/9 40/18 46/15 47/9 49/1 52/21 57/19 60/10 61/17 64/12 83/16 85/18 86/7 89/8 90/23 90/25 91/16 91/20 91/23 92/9 95/2 95/7 97/25 98/16 102/5 103/19 105/12 107/25 108/10 108/17 116/23 117/3 119/10 125/6 127/24 131/8 136/25 139/8 141/12 141/13 142/8 143/13 147/22 147/22 148/15 150/1 150/3 150/11 154/7 155/3
**I've [8]** 72/11 91/12 126/25 133/23 144/21 149/18 154/17 154/19
**IBM [1]** 94/16
**idea [8]** 9/10 9/20 18/7 30/2 47/25 57/24 61/18

**72/17**
**ideally [2]** 24/9 24/18
**ideas [1]** 86/16
**IE [2]** 73/8 80/13
**IEEE [5]** 8/23 54/3 54/7 55/12 55/18
**II [1]** 1/11
**ILLINOIS [1]** 4/18
**image [1]** 49/3
**imaginary [2]** 73/25 79/9
**imagine [1]** 135/8
**impeachment [2]** 38/19 144/7
**implement [2]** 43/19 71/18
**implementation [2]** 23/18 29/17
**implementing [1]** 79/8
**imply [1]** 44/5
**important [2]** 61/22 130/5
**importing [1]** 153/7
**imposed [1]** 104/24
**improper [1]** 17/18
**improve [5]** 26/5 47/24 49/2 110/18 110/18
**improved [1]** 110/12
**improvement [1]** 78/21
**improving [3]** 21/12 71/7 101/25
**INC [1]** 1/10
**include [6]** 12/13 46/7 84/3 96/7 96/8 96/18
**included [2]** 84/21 125/4
**includes [1]** 54/14
**including [3]** 76/12 84/5 141/19
**incoherent [2]** 34/21 116/15
**incoherently [2]** 78/17 114/9
**inconsistent [1]** 38/16
**increase [7]** 34/25 50/11 50/13 50/14 79/6 92/25 93/11
**increases [1]** 106/15
**increasing [13]** 16/10 23/5 27/14 40/8 45/16 50/17 63/8 63/15 77/12 104/23 111/21 115/3 122/25
**increasing anisotropy [1]** 111/21
**increments [1]** 120/1
**independent [2]** 59/24 60/18
**indicated [2]** 51/6 82/19
**individual [1]** 127/23
**induces [1]** 115/25
**industry [9]** 9/7 9/8 52/23 57/22 57/22 63/1 72/1 82/2 85/14
**infinity [1]** 96/13
**influence [1]** 87/16
**info [1]** 60/6
**informal [1]** 154/1

**I**

**information [5]** 59/21 60/3 60/14 60/15 110/13
**infringe [1]** 81/14
**infringement [6]** 64/12 81/12 152/25 153/10 153/18 154/21
**initial [3]** 116/1 116/6 139/13
**innovations [1]** 119/21
**inside [1]** 19/5
**instance [1]** 84/8
**instead [4]** 72/18 134/9 139/20 139/23
**instruct [2]** 148/18 148/22
**instruction [1]** 153/25
**instructions [6]** 148/10 148/24 149/16 149/19 150/2 150/6
**insufficient [2]** 153/19 153/20
**intended [1]** 54/7
**interact [1]** 90/20
**interest [1]** 109/2
**interesting [1]** 129/18
**interlayer [1]** 107/1
**interval [2]** 143/23 144/1
**introduced [1]** 57/10
**invalid [4]** 11/11 16/18 61/10 65/3
**invalidate [4]** 10/13 10/23 19/8 30/11
**invalidated [1]** 87/9
**invalidity [7]** 12/11 12/19 51/14 51/17 51/21 151/6 151/10
**invented [3]** 34/3 55/20 76/14
**invention [30]** 8/17 15/12 15/15 16/20 16/24 18/9 21/12 28/1 30/19 35/2 35/4 64/25 66/2 67/16 76/10 76/11 76/19 77/8 78/11 78/14 85/13 92/22 110/8 110/12 110/14 115/23 120/24 122/16 123/20 123/25
**inventions [2]** 65/4 65/9
**inventor [2]** 20/12 49/12
**involved [2]** 49/13 82/21
**irrelevant [1]** 12/2
**is [334]**
**is always [1]** 35/20
**isn't [10]** 83/2 83/6 89/4 90/1 91/10 98/3 114/3 138/5 142/7 144/7
**issue [7]** 19/1 43/5 51/6 95/15 133/14 146/3 153/20
**issued [9]** 10/13 10/24 11/4 15/5 19/1 59/4

59/5 59/6 103/14
**issues [1]** 150/13
**it [267]**
**it'd [2]** 70/15 106/17
**it's [103]** 9/12 10/21 12/9 13/1 15/12 15/15 15/18 15/20 17/11 20/9 20/11 24/11 26/15 26/16 30/2 30/12 30/14 30/20 36/11 38/19 43/3 43/17 46/1 49/3 49/6 49/11 50/11 53/10 54/6 56/16 57/15 57/25 58/7 64/22 65/24 66/4 67/12 67/13 71/2 71/2 72/17 74/13 77/9 79/1 79/11 79/15 80/3 80/8 81/24 82/1 82/1 82/2 82/2 82/22 84/13 84/15 87/15 87/21 91/7 93/18 96/16 96/17 97/16 98/1 99/12 102/10 107/11 107/20 107/25 109/1 109/10 109/15 111/5 114/3 116/16 117/6 117/24 120/25 126/3 128/2 128/11 129/9 129/13 129/23 130/1 130/6 130/17 131/8 134/7 136/23 137/8 138/6 138/23 140/3 142/10 142/11 142/15 143/22 146/24 147/23 150/14 153/1 155/10
**It's not [1]** 26/15
**its [7]** 105/5 111/11 111/13 141/1 150/25 153/18 153/19
**itself [3]** 55/18 55/24 61/8

**J**

**J-A-M-E-S [1]** 126/3
**JACOB [1]** 2/12
**JAMES [2]** 1/4 126/3
**jbuczko [1]** 2/15
**Jim [1]** 125/23
**job [3]** 91/6 91/11 121/9
**JOSEPH [1]** 3/21
**joseph.lee [1]** 3/24
**Journal [1]** 99/3
**JUDGE [1]** 1/4
**judgment [2]** 151/5 152/24
**Judicial [1]** 157/7
**JULY [3]** 1/18 7/1 157/9
**JULY 25 [2]** 1/18 7/1
**jump [2]** 101/2 131/17
**June [10]** 17/21 17/25 18/3 23/6 65/13 71/25 134/14 135/7 135/11 135/15
**June 17 [2]** 17/25 18/3
**June 2006 [4]** 17/21 23/6 65/13 71/25
**jury [38]** 1/16 5/15 7/4 7/6 7/19 7/20 7/22 8/23 9/16 22/7 31/3 31/10

34/2 34/6 36/19 41/18 41/23 53/15 53/16 60/21 65/12 80/20 80/22 81/3 81/4 81/6 140/24 143/3 148/11 148/20 149/8 150/22 150/24 153/2 153/21 153/23 153/25 154/5
**just [70]** 8/19 14/25 17/5 28/10 30/5 35/22 37/7 37/10 38/24 44/9 51/5 51/21 52/6 55/9 55/15 57/6 59/8 60/22 61/12 62/4 64/1 64/10 65/20 68/24 73/5 73/19 74/23 75/13 85/8 85/12 89/8 90/7 92/4 93/23 98/1 98/1 100/9 102/20 105/25 108/10 111/23 112/18 112/25 114/25 115/13 116/11 119/13 124/5 124/13 125/1 125/18 125/24 127/4 128/13 131/23 133/24 134/5 134/6 134/13 136/23 137/8 139/13 139/22 141/12 144/9 145/2 147/16 147/18 147/23 155/5
**just saw [1]** 28/10
**JVS [1]** 1/9
**JX [4]** 96/24 97/2 124/8 124/14
**JX-2000 [4]** 96/24 97/2 124/8 124/14

**K**

**KABAT [9]** 2/3 2/8 2/12 2/17 2/21 3/3 3/8 3/12 5/12
**keep [4]** 84/9 93/22 123/17 141/5
**keeping [1]** 101/22
**keeps [1]** 137/6
**key [1]** 43/5
**keyword [1]** 9/15
**kind [4]** 53/19 94/11 106/17 130/12
**knew [4]** 24/1 76/4 84/10 99/5
**know [57]** 10/12 10/22 12/16 22/12 27/17 30/8 43/24 48/8 52/2 52/7 52/20 52/20 59/5 60/5 67/12 67/13 67/14 70/24 72/11 76/3 76/6 76/10 86/7 86/21 87/8 87/11 87/11 87/13 90/13 90/22 90/24 91/4 92/3 92/7 97/15 103/17 106/3 108/10 108/13 109/13 118/11 118/23 119/19 120/2 120/5 124/11 125/4 127/22 128/10 128/24 129/19 129/23 137/4 143/21 147/18 150/7 150/20
**knowing [1]** 65/8
**knowledge [4]** 44/21 68/19 76/16 92/6

**known [4]** 22/8 22/9 43/14 94/12
**KROEGER [2]** 3/3 155/19
**KU [1]** 114/23

**L**

**labeled [2]** 106/4 122/10
**ladies [5]** 8/1 29/4 80/17 140/24 149/25
**large [1]** 22/6
**last [12]** 7/7 45/20 49/10 50/24 59/2 64/4 92/16 126/1 126/21 135/12 141/12 147/10
**later [1]** 58/12
**LATHAM [7]** 3/18 3/22 4/8 4/16 4/21 5/3 5/7
**law [3]** 150/18 151/5 152/25
**lawyer [3]** 98/14 105/21 105/24
**layer [138]** 11/23 13/21 14/3 14/11 16/11 24/6 24/7 24/9 24/25 24/25 25/3 28/1 28/3 28/14 28/21 28/24 28/25 29/20 29/21 30/25 32/4 32/12 33/1 33/1 33/11 33/18 34/7 35/5 35/13 35/13 35/14 35/17 35/18 35/20 35/23 36/6 36/8 36/8 37/19 38/9 39/7 39/12 40/5 42/8 42/20 43/12 46/6 46/10 56/16 59/14 63/9 63/15 63/16 66/5 69/21 69/21 70/1 70/3 70/4 70/9 72/18 72/20 72/21 72/24 74/10 74/11 74/14 74/25 77/3 77/13 78/5 78/14 83/1 83/6 88/19 89/22 90/3 93/2 93/15 93/15 93/19 97/20 99/24 99/24 102/22 102/22 102/25 102/25 103/7 106/3 106/4 106/5 106/7 106/10 106/15 106/16 107/3 107/5 107/7 107/12 107/12 107/15 107/20 107/21 108/1 108/18 108/20 108/23 108/25 111/5 111/18 111/22 111/22 112/5 112/15 112/15 114/4 114/7 114/10 114/13 114/13 115/3 115/4 115/10 115/10 115/25 116/14 116/14 118/2 122/23 122/25 122/25 152/20 152/23 153/7 154/16 154/22 154/23
**layers [66]** 11/22 11/23 12/4 12/13 13/21 14/13 17/5 17/11 18/8 18/8 18/13 22/10 22/23 23/4 24/2 25/20 25/21 26/1 26/5 27/14 30/3 30/13

37/1 43/20 45/16 46/1 46/8 46/11 46/11 46/13 48/9 58/3 58/6 58/6 62/18 69/24 70/5 70/6 70/9 72/18 74/12 74/21 74/24 75/5 78/16 79/21 88/17 88/23 88/25 89/8 89/9 89/10 94/11 94/17 95/21 95/23 95/23 96/2 96/18 99/20 100/24 107/11 113/7 114/8 114/15 122/24
**lead [2]** 41/6 52/13
**leading [3]** 46/23 55/21 65/21
**leaning [2]** 87/3 87/6
**learned [1]** 149/18
**least [3]** 52/15 90/5 133/20
**led [1]** 120/7
**LEDAHL [1]** 2/7
**LEE [2]** 3/21 41/9
**left [9]** 36/25 80/23 99/9 99/12 101/3 113/7 118/11 125/20 138/15
**less [7]** 31/19 31/22 32/9 38/4 111/16 145/20 145/20
**let [24]** 26/15 29/12 33/7 33/7 34/5 41/15 42/1 42/10 47/2 50/4 50/4 54/9 57/6 60/10 60/12 87/15 93/11 99/8 105/24 109/2 115/6 128/13 146/23 150/20
**let's [53]** 10/16 12/23 15/4 16/16 20/5 21/8 24/4 27/10 33/9 33/14 35/9 36/22 38/14 42/4 48/4 48/23 50/7 50/19 52/13 52/13 53/2 54/11 56/3 64/16 73/18 76/2 76/20 77/21 81/12 83/8 88/3 94/22 98/7 98/20 101/2 103/10 106/20 108/4 109/4 110/23 112/19 116/19 123/4 124/9 131/3 131/17 131/18 134/17 138/10 143/9 145/14 148/21 149/3
**letter [29]** 8/24 9/6 9/19 9/21 52/14 52/15 52/20 53/2 53/3 53/6 53/18 53/21 53/23 54/6 54/7 54/10 54/15 55/18 55/24 56/3 57/20 58/12 59/18 61/6 61/8 61/9 61/9 61/11 96/9
**letters [2]** 11/16 99/2
**level [3]** 39/5 135/16 135/18
**Li [90]** 17/7 17/9 18/14 23/9 27/6 27/13 27/19 27/19 27/19 27/20 27/22 28/3 28/9 28/12 28/13 28/14 28/18 31/13 33/9 33/10 33/16 34/2 34/7 34/10 34/16 34/20 35/4 36/11

**L**

**Li... [63]** 36/14 36/21 36/25 37/12 37/18 38/2 39/8 39/10 39/11 40/4 40/11 40/13 41/22 42/7 42/24 42/24 43/14 43/18 44/6 44/12 44/15 44/21 48/23 48/24 49/2 61/14 61/19 61/23 63/6 66/9 68/19 76/2 76/3 76/4 76/10 76/11 76/24 77/10 77/19 79/1 79/8 79/9 79/13 79/16 79/23 80/4 80/11 109/2 109/7 109/21 109/24 110/17 115/2 115/8 117/2 117/24 120/4 120/6 120/15 125/12 125/13 152/11 152/20

**Li's [5]** 42/7 77/14 78/13 78/22 79/6

**lie [1]** 53/16

**life [1]** 72/23

**lifespan [1]** 118/18

**light [4]** 54/3 55/13 67/2 67/5

**like [26]** 7/10 26/23 27/1 36/6 37/8 55/25 57/20 57/22 72/10 74/8 84/7 94/10 121/9 129/2 129/5 134/12 135/9 135/12 136/7 141/7 141/14 141/22 142/6 142/9 147/1 155/22

**limit [2]** 105/6 105/13

**limitation [5]** 45/20 46/15 47/10 75/24 101/10

**limitations [9]** 41/4 45/1 45/4 46/16 46/20 47/4 73/12 80/10 153/8

**limits [1]** 128/5

**lin.tzeng [1]** 5/9

**line [20]** 34/17 34/24 59/2 97/3 100/8 110/24 117/2 126/16 127/21 127/24 127/24 127/25 127/25 128/4 128/4 128/6 128/7 130/9 138/14 145/18

**linear [8]** 126/23 142/2 142/3 142/6 142/15 142/24 143/4 145/6

**linearly [1]** 142/9

**lines [23]** 10/16 33/14 38/2 38/14 48/15 89/15 95/11 96/25 97/3 97/8 99/12 104/18 106/21 108/5 110/3 110/3 110/24 112/1 115/14 116/20 117/6 130/23 144/6

**lines 10 [2]** 33/14 112/1

**lines 12 [1]** 10/16

**lines 16 [1]** 144/6

**lines 23 [1]** 104/18

**lines 25 [1]** 38/2

**lines 28 [2]** 116/20

117/6

**lines 35 [2]** 96/25 97/3

**lines 49 [1]** 108/5

**lines 66 [1]** 110/24

**lines 8 [1]** 110/3

**lines 9 [1]** 115/14

**LINFONG [1]** 5/6

**list [2]** 124/11 124/13

**listening [1]** 19/18

**Litigation [1]** 5/14

**little [13]** 85/22 95/2 118/4 128/10 128/19 130/10 130/20 135/6 135/19 138/3 138/24 139/12 143/22

**Liu [1]** 5/12

**live [1]** 118/25

**lived [1]** 119/21

**LLP [7]** 3/18 3/22 4/8 4/16 4/21 5/3 5/7

**LLP-COSTA [1]** 3/22

**local [2]** 117/14 117/17

**logical [1]** 139/7

**long [5]** 90/10 104/9 119/1 119/4 155/23

**look [22]** 13/13 17/16 26/22 27/1 36/22 37/8 50/24 55/13 60/10 87/19 88/3 91/7 105/20 108/4 128/21 129/2 130/18 134/12 135/4 135/12 142/6 142/9

**looked [4]** 44/22 66/22 70/8 72/11

**looking [13]** 11/19 29/19 37/10 42/7 42/24 43/14 43/18 48/22 67/14 105/5 116/24 137/4 139/3

**LOS [7]** 2/5 2/9 2/14 2/23 3/5 3/9 3/14

**lose [2]** 52/11 137/10

**losing [1]** 95/2

**lost [2]** 52/9 136/25

**lot [7]** 40/19 40/20 54/24 120/18 126/25 127/4 131/22

**lots [4]** 68/3 84/9 87/8 87/11

**low [6]** 51/4 69/20 71/16 71/17 88/19 95/18

**lower [8]** 22/1 46/6 49/17 83/6 100/19 135/2 136/24 137/3

**lowering [1]** 101/21

**LUMISH [5]** 3/17 121/16 122/6 148/4 154/5

**lunch [4]** 8/24 148/15 150/6 150/7

**lw.com [7]** 3/20 3/24 4/10 4/19 4/23 5/5 5/9

**lying [1]** 53/15

**M**

**M-A-R-K [1]** 64/5

**M1 [9]** 28/15 35/13 35/18 35/20 35/21 36/7 37/1 37/18 113/17

**M2 [2]** 37/1 113/21

**M3 [1]** 113/21

**M4 [1]** 113/20

**made [14]** 7/16 29/16 44/8 48/15 55/25 74/4 88/17 90/13 101/14 101/18 113/6 140/16 151/1 155/12

**magnetic [39]** 20/20 21/3 22/1 22/19 29/20 38/3 38/4 42/21 43/5 46/6 58/3 62/18 74/10 74/13 75/15 94/17 99/19 101/19 101/20 102/22 106/7 106/9 107/4 107/5 107/6 107/7 107/17 108/16 108/20 109/25 110/13 114/3 115/24 116/3 118/2 122/23 153/6 154/21 154/23

**magnetic storage [1]** 118/2

**magnetically [3]** 99/20 99/20 108/19

**magnetics [2]** 22/2 71/15

**magnetism [1]** 22/14

**magnetization [13]** 34/20 107/2 108/1 108/18 113/9 114/6 114/18 114/23 116/1 116/7 116/8 116/14 117/18

**magnetocrystalline [1]** 88/18

**maichele [1]** 2/19

**mail [3]** 54/14 55/9 57/1

**MAINE [1]** 2/17

**majority [2]** 22/4 22/6

**make [12]** 7/9 25/10 47/19 61/23 67/22 69/17 77/16 85/5 112/25 119/24 136/7 149/15

**makes [3]** 97/19 140/1 140/14

**making [5]** 12/17 51/24 134/25 153/1 154/22

**MAMR [1]** 84/9

**many [13]** 65/12 65/23 90/22 95/17 96/6 96/8 96/18 97/16 108/11 119/20 123/14 123/15 133/25

**map [1]** 97/22

**MARC [1]** 2/3

**Mark [2]** 63/25 64/5

**market [2]** 136/13 136/22

**Mary [1]** 5/15

**match [3]** 77/17 77/17 80/12

**matched [1]** 44/9

**matching [1]** 79/13

**material [1]** 43/5

**math [1]** 147/3

**matter [5]** 151/5 152/25

153/2 153/5 157/5

**matters [1]** 155/20

**MATTHEW [1]** 2/16

**maximum [6]** 25/19 25/25 36/8 36/10 43/9 117/17

**may [14]** 50/14 63/20 63/21 81/9 85/17 85/19 85/24 85/25 108/18 125/16 125/18 125/22 148/4 154/18

**maybe [10]** 22/18 22/20 22/25 25/22 43/24 45/2 50/17 67/5 125/19 128/19

**mchan [1]** 2/24

**me [63]** 12/9 26/15 29/12 30/6 33/7 33/7 34/5 37/2 37/3 38/10 38/11 41/15 42/1 47/2 50/4 50/5 51/18 54/9 57/6 58/15 59/16 59/23 60/10 60/12 60/25 72/10 77/7 86/15 87/15 93/5 93/11 94/4 95/3 96/24 97/4 97/10 98/14 99/11 100/7 101/3 103/25 104/17 105/20 105/24 105/25 109/2 115/6 124/1 124/9 127/16 128/10 128/10 128/13 130/20 131/4 131/8 137/17 145/19 146/12 146/23 150/20 151/4 152/13

**mean [30]** 8/18 8/25 17/1 24/11 27/2 31/3 31/3 43/3 43/17 47/23 47/25 50/12 60/8 60/25 72/25 85/13 119/3 119/17 126/21 127/3 127/3 128/6 129/17 129/18 130/1 137/11 139/5 140/13 144/20 145/8

**meaning [8]** 17/11 17/16 24/11 26/7 31/1 34/25 67/10 72/18

**means [9]** 15/9 15/11 15/14 52/5 88/11 88/15 130/6 130/8 140/3

**meant [1]** 55/12

**measured [1]** 82/7

**measurements [2]** 82/25 83/4

**measuring [1]** 67/4

**media [71]** 9/7 9/7 12/3 12/17 21/13 23/5 25/5 25/7 25/9 25/19 25/25 29/16 34/10 35/1 35/6 35/13 47/14 47/18 48/3 52/25 53/1 53/1 55/7 56/19 57/9 57/14 57/14 57/21 58/1 58/1 58/9 62/16 62/20 62/23 62/25 65/16 69/16 69/19 69/22 71/3 71/4 71/8 74/3 74/7 74/8 75/16 76/14 77/2 77/15

77/23 77/24 78/1 78/3 78/4 78/8 78/8 78/21 79/16 84/22 85/8 88/17 101/11 104/4 105/10 108/1 110/14 110/15 121/20 123/15 123/15 123/15

**media/ECC [1]** 57/14

**medium [3]** 99/11 99/18 102/17

**meet [13]** 69/22 73/6 73/7 73/9 73/11 73/11 73/16 74/6 74/9 75/20 75/22 77/19 79/13

**meets [3]** 15/6 70/4 74/14

**MENLO [5]** 3/19 4/9 4/22 5/4 5/8

**mention [2]** 19/18 23/10

**mentioned [9]** 21/6 61/3 73/24 74/4 81/25 82/15 123/24 138/21 152/7

**mentioning [1]** 74/23

**MESA [2]** 3/22 3/23

**met [3]** 47/4 47/5 91/1

**method [5]** 81/18 81/24 82/1 82/4 82/12

**mfenster [1]** 2/6

**mic [1]** 38/18

**micromagnetic [1]** 66/20

**micron [1]** 95/22

**mid [1]** 80/15

**mid-afternoon [1]** 80/15

**middle [4]** 58/20 78/2 78/4 111/15

**midmorning [1]** 150/9

**might [8]** 27/1 52/24 76/20 118/25 118/25 119/22 137/9 137/10

**MIL [1]** 97/22

**million [7]** 83/25 84/1 132/25 146/21 146/25 147/1 147/16

**millions [1]** 132/14

**mind [2]** 22/25 59/1

**mine [2]** 130/8 132/23

**minimize [2]** 42/8 77/16

**minimizing [1]** 42/24

**minimum [2]** 35/15 35/22

**MINNA [1]** 2/21

**minus [1]** 84/1

**minute [2]** 38/24 154/4

**minutes [9]** 80/17 80/23 125/20 137/20 138/14 140/25 141/3 141/13 155/18

**MIRZAIE [1]** 3/7

**misleading [1]** 140/21

**missed [1]** 139/6

**missing [4]** 44/10 75/24 80/9 137/22

**mistake [1]** 51/19

**MIT [1]** 12/17

**M**

**model [10]** 27/12 27/20 27/22 66/19 66/20 66/24 66/25 126/12 127/5 129/21
**modeling [4]** 47/20 128/23 132/22 136/18
**models [4]** 142/2 143/11 143/15 144/18
**modern [1]** 76/14
**modesty [1]** 18/2
**modification [9]** 36/9 36/14 40/12 73/23 78/25 79/10 80/2 80/10 152/10
**modifications [1]** 80/12
**modified [3]** 66/13 151/15 152/9
**modify [3]** 40/4 73/23 152/15
**moment [1]** 113/12
**moments [3]** 113/10 113/15 114/3
**moments from [1]** 114/3
**Monday [1]** 150/20
**month [1]** 135/14
**months [4]** 103/21 104/13 109/18 135/12
**more [33]** 13/21 13/21 14/12 18/18 18/21 22/10 22/23 60/12 60/13 60/13 67/6 70/2 70/5 74/21 74/24 79/6 92/7 96/7 96/8 96/18 102/5 111/8 115/1 134/10 135/1 135/6 135/8 135/8 138/4 140/25 143/13 145/19 145/20
**more experience [1]** 18/18
**morning [4]** 148/24 155/21 155/22 155/24
**Mortensen [1]** 29/7
**most [6]** 22/13 57/12 113/20 128/3 128/8 128/11
**motion [4]** 7/9 148/9 151/1 153/24
**motions [1]** 150/19
**motivated [1]** 26/18
**motivation [7]** 23/14 73/23 74/15 74/24 151/17 152/3 152/15
**move [4]** 108/24 114/16 125/19 152/24
**movement [2]** 107/15 117/25
**moves [1]** 151/5
**moving [3]** 107/12 108/8 115/3
**MR [11]** 1/6 5/12 30/11 61/14 63/24 97/10 104/1 131/7 142/22 150/25 151/4
**Mr. [42]** 7/25 29/7 41/9 41/15 59/7 61/2 83/17

83/18 86/12 88/6 89/14 90/9 92/11 94/23 96/23 97/3 99/11 100/7 105/22 117/6 118/14 120/12 121/16 122/6 124/8 125/1 126/7 127/15 127/16 127/18 131/8 131/21 140/8 141/12 142/18 144/2 145/15 145/25 148/4 148/4 154/5 155/6
**Mr. Bec [1]** 127/15
**Mr. Becker's [1]** 127/18
**Mr. Berger [1]** 141/12
**Mr. Bergman [9]** 83/17 83/18 118/14 126/7 127/16 131/8 131/21 140/8 144/2
**Mr. Bergman's [1]** 145/15
**Mr. Chang [5]** 86/12 90/9 105/22 120/12 125/1
**Mr. Fenster [5]** 7/25 59/7 61/2 148/4 155/6
**Mr. Fenster's [1]** 41/15
**Mr. Lee [1]** 41/9
**Mr. Lumish [4]** 121/16 122/6 148/4 154/5
**Mr. Mortensen [1]** 29/7
**Mr. Schmoller [12]** 88/6 89/14 92/11 94/23 96/23 97/3 99/11 100/7 117/6 124/8 142/18 145/25
**MRT [3]** 43/25 44/17 93/7
**MRT's [4]** 53/14 105/23 105/24 147/11
**Ms [1]** 141/8
**much [21]** 18/18 43/11 44/22 53/8 54/18 54/22 59/1 83/23 84/24 87/17 92/5 95/8 124/20 125/14 129/9 129/9 137/9 137/9 139/3 141/19 144/21
**multilayer [11]** 13/16 16/10 20/19 32/1 33/5 62/7 63/7 63/14 92/22 93/10 111/7
**multiple [24]** 18/8 18/13 23/4 24/2 26/5 45/15 46/1 58/3 58/6 62/18 63/7 63/10 67/8 86/22 87/10 88/23 89/4 89/10 114/11 114/15 115/2 115/8 120/16 122/24
**multiply [2]** 132/4 132/13
**my [48]** 7/6 8/25 9/21 14/25 17/1 24/15 32/11 33/20 33/23 33/25 53/1 60/11 65/11 70/8 76/5 76/7 76/16 80/6 95/2 105/12 105/12 120/9 123/17 125/6 126/21

126/22 126/25 127/4 127/21 127/21 127/25 128/4 128/8 129/21 132/24 133/1 134/24 135/1 136/20 136/20 139/12 146/20 147/21 148/19 149/8 149/15 154/10 154/16
**myself [3]** 26/2 52/12 61/17

**N**

**name [6]** 64/3 64/4 91/19 125/7 126/1 126/1
**names [1]** 130/20
**nanometer [2]** 78/7 78/8
**nanometers [5]** 77/25 78/9 78/18 78/19 79/5
**nanoseconds [1]** 82/24
**nature [1]** 69/1
**near [1]** 41/15
**necessarily [1]** 51/12
**necessary [1]** 117/16
**need [7]** 43/9 43/25 46/2 102/21 127/6 129/6 142/4
**needed [1]** 136/8
**needs [1]** 77/3
**negative [1]** 40/16
**negatives [1]** 25/9
**neither [1]** 136/19
**never [8]** 9/25 21/6 33/4 49/19 49/19 72/4 91/1 120/5
**new [14]** 9/6 9/8 9/15 15/9 15/11 15/14 15/18 15/18 16/3 62/16 62/20 62/23 62/25 94/19
**NEWPORT [4]** 4/4 4/5 4/12 4/13
**next [15]** 43/10 56/17 56/18 58/21 89/13 105/2 112/11 113/12 114/4 123/4 128/15 134/17 135/13 138/23 150/17
**nine [1]** 109/18
**no [108]** 1/8 8/12 8/15 8/16 8/20 14/9 15/11 15/14 17/4 19/2 20/3 22/3 22/22 22/25 23/3 24/15 26/4 39/19 44/13 44/18 48/6 50/24 52/1 53/20 55/5 55/24 56/24 59/11 59/20 60/17 61/11 61/11 61/20 61/20 63/17 65/1 66/2 66/11 66/14 66/16 67/19 67/21 68/7 68/9 70/5 70/21 71/2 71/5 71/9 71/24 72/4 72/10 73/22 73/23 74/13 74/13 74/15 74/23 76/11 79/11 80/8 81/17 81/22 83/3 83/7 83/14 85/1 85/6 87/2 87/6 87/14 89/5 90/21 91/3

91/16 92/6 94/21 114/19 120/2 122/1 122/8 123/21 125/6 125/13 125/15 127/6 131/15 135/9 136/6 139/7 140/1 140/14 142/4 149/5 149/5 150/19 151/8 151/12 151/13 151/17 151/18 151/25 152/3 152/5 152/8 152/12 152/17 155/4
**no motivation [1]** 74/15
**nobody [5]** 63/6 63/13 86/11 87/21 141/7
**Noffsinger [1]** 5/15
**noise [2]** 34/25 74/18
**nomination [2]** 8/23 9/11
**non [3]** 8/14 153/10 153/18
**non-infringement [2]** 153/10 153/18
**non-obviousness [1]** 8/14
**none [5]** 16/8 23/8 23/9 65/1 85/10
**nonmagnetic [1]** 94/10
**nonobvious [1]** 15/9
**nonsensical [1]** 140/14
**NORTH [1]** 4/17
**not [171]**
**note [1]** 61/12
**noted [1]** 38/3
**notes [1]** 60/11
**nothing [2]** 21/17 136/22
**notion [1]** 104/13
**now [79]** 9/22 10/11 10/21 11/4 11/25 13/14 14/2 15/21 16/23 17/13 17/16 17/17 17/18 17/24 18/17 19/7 19/13 19/18 20/8 20/14 21/2 22/4 22/7 22/13 23/8 24/4 25/3 26/12 27/6 31/18 32/3 32/22 33/10 34/10 36/21 40/18 41/21 41/25 42/4 47/13 49/5 51/8 52/13 53/13 53/18 54/6 58/8 59/21 60/5 60/21 62/5 63/3 69/2 69/15 70/15 72/11 75/9 78/24 95/21 96/20 103/17 108/10 111/5 117/24 121/1 121/11 122/6 124/21 128/13 129/12 133/8 134/21 135/17 136/11 137/13 137/20 138/21 145/2 155/22
**Nowadays [1]** 9/9
**nucleation [42]** 11/15 11/15 11/22 12/4 12/13 13/15 13/16 13/20 14/4 14/11 14/12 23/4 28/23 28/25 31/19 31/21 31/25 32/1 32/25 33/5

33/12 45/1 45/11 45/25 46/12 46/19 59/13 63/8 63/14 73/12 73/17 75/22 83/5 89/6 92/22 93/10 122/23 122/24 151/14 152/9 152/22 154/22
**number [41]** 40/16 45/12 83/10 83/24 86/8 124/23 129/20 130/25 131/10 131/15 131/24 132/4 132/13 132/19 132/25 133/5 134/2 134/6 134/8 134/24 134/24 136/22 136/23 137/17 137/25 138/2 138/5 139/11 139/19 139/23 139/24 139/25 140/5 140/16 145/10 146/24 147/8 147/16 147/19 147/19 154/14
**number's [1]** 146/22
**numbers [21]** 79/4 87/11 96/10 108/17 130/7 130/25 132/3 132/10 132/18 135/3 135/3 137/16 137/24 137/25 138/1 138/5 138/17 139/10 140/12 140/20 145/8

**O**

**o'clock [1]** 148/12
**o0o [1]** 7/2
**oath [3]** 10/6 64/2 125/25
**object [3]** 38/15 155/7 155/10
**objected [4]** 14/7 28/3 28/16 42/2
**objection [7]** 46/23 49/18 55/21 97/21 98/15 144/7 154/9
**objections [1]** 154/2
**objective [8]** 68/22 68/24 69/19 70/4 74/2 74/6 74/9 79/13
**objectives [4]** 74/14 77/14 77/19 78/22
**observation [1]** 139/13
**observations [5]** 127/23 138/3 139/12 139/21 139/22
**observed [1]** 101/22
**obtain [2]** 25/6 51/3
**obvious [19]** 17/5 17/11 17/18 17/21 27/12 45/24 46/4 46/5 46/20 46/21 63/3 63/4 65/5 68/16 68/17 68/19 68/23 70/15 124/1
**obviousness [16]** 8/14 16/17 16/19 17/13 19/13 30/20 65/6 67/9 80/7 86/19 86/21 86/25 87/3 87/9 151/9 151/16
**oersteds [5]** 111/11 111/16 111/19 112/9 112/16
**off [7]** 43/11 97/9

## Q

**off... [5]** 119/13 137/6 148/24 149/6 149/7
**Office [15]** 10/14 10/24 15/5 15/6 18/18 18/25 18/25 19/4 64/22 91/1 91/11 120/5 121/8 122/15 122/18
**OFFICIAL [2]** 1/21 157/12
**offset [1]** 132/12
**oh [15]** 10/10 17/17 23/23 25/1 31/20 32/23 33/13 57/8 58/19 62/10 77/7 101/14 107/25 121/12 150/16
**okay [179]**
**old [1]** 75/16
**once [5]** 67/14 70/3 74/24 81/8 93/22
**one [81]** 7/6 11/19 13/21 15/19 17/4 22/13 22/22 23/3 30/5 31/4 32/18 35/4 35/20 41/22 43/19 44/8 45/15 48/20 49/16 51/10 51/17 51/22 52/19 58/2 60/12 60/13 63/17 66/2 66/18 67/21 69/6 69/9 70/3 72/16 74/21 77/21 77/22 78/22 86/15 86/16 86/25 87/4 88/17 88/23 88/24 90/24 93/12 93/18 94/9 97/1 99/20 99/20 101/19 103/14 104/8 105/21 105/24 111/10 111/16 112/11 114/4 116/4 118/7 118/18 120/1 123/4 123/19 123/24 126/15 128/19 130/11 134/6 134/7 134/9 134/9 139/14 139/16 140/8 143/13 145/5 150/16
**one-tenth [1]** 70/3
**one-year [1]** 120/1
**ones [1]** 59/9
**only [25]** 12/15 16/23 22/4 23/12 23/12 23/17 25/25 29/16 32/3 32/12 32/19 32/25 71/19 118/17 128/24 128/25 135/7 139/20 140/3 140/4 142/2 144/21 152/16 153/1 153/18
**oOo [1]** 156/3
**open [71]** 7/21 8/10 9/4 10/19 11/17 12/25 20/6 20/16 21/9 28/7 29/6 29/9 31/8 34/18 35/10 36/23 44/1 45/7 49/8 50/8 50/21 53/7 53/11 54/17 54/21 56/5 56/8 58/22 62/14 76/22 81/5 88/9 89/18 92/13 94/25 95/5 95/12 97/5 97/11 98/22 99/14 100/11 101/5 102/14 103/12

104/2 104/20 105/18 106/22 108/6 109/5 110/5 111/1 112/3 112/21 115/16 116/21 117/8 122/4 123/5 124/15 127/13 128/17 131/5 131/19 133/10 134/18 138/11 142/20 144/13 145/16
**opened [2]** 42/15 49/20
**opening [1]** 19/19
**opinion [7]** 12/3 33/4 45/22 49/23 61/9 65/11 75/10
**opinions [5]** 10/4 45/1 73/19 126/11 150/13
**opportunity [1]** 154/1
**opposed [1]** 129/5
**opposing [1]** 154/18
**optimal [1]** 75/5
**optional [1]** 11/23
**order [9]** 7/23 15/18 45/12 81/8 82/15 100/24 111/22 117/17 129/25
**ordinary [7]** 16/19 17/24 23/21 26/13 44/16 44/21 64/17
**originates [1]** 116/4
**other [25]** 19/23 30/7 49/4 60/16 63/5 69/10 70/6 72/13 74/20 75/1 76/4 76/13 85/10 88/19 91/21 93/6 109/21 116/5 124/17 130/24 136/12 150/16 151/10 151/22 153/12
**others [2]** 68/25 113/17
**our [2]** 133/3 150/17
**out [20]** 17/5 25/21 53/22 55/25 69/6 78/9 83/21 93/23 118/7 118/11 118/24 131/17 132/6 132/18 132/21 134/15 135/5 137/21 138/1 148/1
**outer [1]** 128/5
**output [5]** 132/1 133/2 133/5 142/13 146/13
**outputs [1]** 130/22
**outside [5]** 7/3 80/21 81/2 138/6 150/23
**outskirt [1]** 128/9
**over [19]** 40/22 40/25 41/3 46/15 57/19 68/16 68/17 68/19 83/24 84/1 92/8 96/2 108/8 113/7 122/16 124/23 131/10 131/16 135/9
**overall [7]** 92/25 93/11 117/19 128/11 131/11 131/24 133/5
**overcoming [1]** 104/23
**overlay [1]** 130/17
**Overruled [4]** 42/17 55/23 119/9 144/10
**overstatement [3]** 146/23 146/25 147/1

**overview [1]** 76/24
**overwriting [1]** 127/24
**own [8]** 12/12 19/8 30/23 45/2 59/24 94/21 132/7 132/17

## P

**P.C [2]** 4/3 4/12
**p.m [5]** 1/19 7/1 81/1 81/1 156/2
**page [34]** 10/16 12/24 50/7 50/23 58/21 88/7 88/7 89/13 95/4 96/25 97/3 99/8 100/10 101/3 102/9 104/18 105/17 106/20 106/21 108/5 108/5 110/2 110/23 111/25 112/1 112/20 115/14 116/20 117/7 124/9 124/9 124/14 144/5 157/6
**page 1 [1]** 124/9
**page 10 [1]** 116/20
**page 11 [1]** 106/20
**page 12 [1]** 96/25
**page 138 [1]** 144/5
**page 18 [1]** 50/7
**page 2 [2]** 102/9 124/9
**page 24 [1]** 12/24
**page 25 [1]** 10/16
**pair [1]** 22/5
**pan [1]** 118/24
**paper [24]** 24/2 24/3 30/9 31/5 48/7 48/16 48/18 48/21 48/23 49/1 51/1 69/9 71/22 72/21 72/22 75/4 82/16 82/17 82/22 86/16 87/23 88/2 94/22 95/14
**papers [14]** 26/4 29/14 67/22 67/23 69/3 69/18 69/25 72/16 75/9 76/12 82/14 87/22 123/14 123/16
**Paradox [3]** 21/25 71/13 98/10
**paragraph [8]** 27/10 53/9 53/10 56/7 57/11 88/8 97/15 100/8
**paragraph 223 [1]** 27/10
**Paralegal [1]** 5/12
**paraphrasing [1]** 52/21
**Pardon [1]** 105/24
**PARK [5]** 3/19 4/9 4/22 5/4 5/8
**PARKER [3]** 1/20 157/12 157/12
**part [26]** 10/3 12/15 30/7 32/11 34/4 57/12 71/19 71/22 72/6 82/19 84/10 87/25 90/3 95/14 102/20 103/17 108/13 122/6 123/11 128/3 128/8 128/11 132/11 138/20 139/23 146/10
**partially [1]** 62/17
**particular [15]** 13/11 18/22 20/11 21/11 21/11 39/7 49/12 51/11

51/18 110/14 125/8 132/4 133/25 139/14 151/20
**particularly [1]** 66/19
**parts [2]** 73/5 75/18
**pass [9]** 41/7 61/25 63/19 85/15 85/17 120/11 124/2 140/23 147/25
**passage [2]** 71/11 122/10
**passages [1]** 120/16
**past [1]** 95/11
**pat [1]** 88/2
**patent [81]** 9/25 10/13 10/14 10/24 10/24 15/5 15/5 15/6 15/6 16/18 17/16 18/18 18/25 18/25 19/4 19/16 20/10 22/24 26/15 28/20 33/17 34/7 36/12 44/20 50/16 51/6 56/22 58/13 58/13 59/4 59/5 59/24 59/25 60/15 64/22 69/3 69/12 72/11 73/21 74/7 76/24 79/3 79/12 80/4 80/11 89/5 91/1 91/8 91/11 91/13 91/21 96/24 97/25 98/3 101/25 103/10 103/14 104/12 105/5 105/10 106/24 107/16 109/7 109/8 109/10 109/24 110/17 115/1 115/2 115/8 117/3 117/24 120/5 120/6 120/15 121/8 122/14 122/15 122/18 123/8 125/13
**patent's [3]** 91/11 110/8 125/12
**patentability [1]** 15/7
**patented [2]** 58/9 136/14
**patenting [1]** 59/22
**patents [43]** 12/3 16/3 18/19 18/19 19/1 19/25 20/18 26/19 28/23 30/11 40/24 56/10 59/3 59/19 64/20 64/23 65/3 68/25 70/25 72/7 73/9 73/21 79/2 82/3 82/4 87/9 91/18 92/4 93/7 96/20 97/1 97/22 98/9 103/21 109/15 109/18 110/20 120/4 120/7 124/11 151/7 151/20 151/23
**path [2]** 76/17 76/18
**patience [1]** 154/7
**patient [1]** 75/23
**PATRICIA [1]** 4/20
**patricia.young [1]** 4/23
**PAUL [2]** 3/3 155/19
**pause [5]** 29/3 85/16 86/2 93/11 94/2
**PDX [14]** 20/5 28/6 31/7 35/9 36/22 40/2 43/24 49/6 92/12 127/12 131/3 131/18

138/10 142/19
**PDX-1 [1]** 142/19
**PDX-10.11 [1]** 131/18
**PDX-10.12 [1]** 138/10
**PDX-1012.1 [1]** 127/12
**PDX-263.21 [1]** 92/12
**PDX-5 [1]** 131/3
**PDX-8.16 [1]** 36/22
**PDX-8.17 [1]** 40/2
**PDX-8.26 [1]** 35/9
**PDX-8.30 [1]** 31/7
**PDX-8.33 [1]** 28/6
**PDX-8.40 [1]** 20/5
**PDX-834 [1]** 43/24
**PDX-840 [1]** 49/6
**peer [1]** 30/10
**peer-reviewed [1]** 30/10
**people [7]** 23/21 43/17 47/17 47/23 75/1 76/13 123/23
**per [9]** 129/4 132/3 132/10 132/24 134/24 134/24 140/7 146/16 146/18
**per-profit [2]** 134/24 134/24
**per-terabyte [3]** 129/4 132/3 140/7
**percent [15]** 65/24 83/10 84/1 127/3 127/5 129/3 129/21 133/2 133/3 139/21 140/3 143/23 143/25 147/11 147/17
**percentage [1]** 139/16
**perfectly [4]** 24/9 24/11 24/17 24/24
**perform [3]** 64/16 143/10 143/14
**performance [5]** 47/14 47/18 70/10 74/17 75/6
**performed [4]** 83/21 128/12 132/8 144/16
**period [5]** 131/11 131/16 135/6 135/14 147/8
**permanent [3]** 21/25 22/2 71/15
**perpendicular [9]** 20/19 21/2 22/19 25/6 71/2 75/15 104/4 109/25 110/13
**person [23]** 16/19 16/23 17/24 18/2 26/13 30/19 42/6 42/23 43/13 44/15 44/21 48/4 48/22 48/25 63/4 64/17 68/19 69/23 72/25 74/20 86/15 87/2 87/19
**perspective [2]** 7/11 64/17
**pertinent [4]** 20/11 30/20 49/12 71/7
**Ph.D.s [2]** 65/23 66/1
**phrase [4]** 56/17 56/18 57/2 104/12
**phrasing [1]** 28/4
**Physics [1]** 99/2

## P

picked [1] 67/21
picture [2] 26/24 26/25
piece [2] 15/19 86/16
pieces [2] 67/12 125/10
pkroeger [1] 3/6
place [1] 101/24
plaintiff [10] 1/7 1/11 2/2 3/2 3/16 4/2 5/2 125/22 151/4 155/19
PLAINTIFF'S [2] 6/3 7/16
Plaintiffs [1] 53/3
play [1] 86/17
plays [1] 131/17
please [65] 7/19 7/23 8/9 9/3 15/13 24/15 28/6 35/16 42/12 43/23 49/7 50/7 53/5 53/9 54/15 54/19 56/4 56/6 56/18 58/20 62/13 63/10 64/3 68/14 80/18 81/4 81/7 88/4 89/14 89/17 92/11 94/24 95/11 96/24 97/10 98/7 98/21 99/11 100/7 102/9 103/11 104/1 104/17 105/20 106/20 106/21 108/4 109/4 110/3 110/4 110/25 112/2 112/19 115/14 116/19 124/9 125/25 127/12 128/16 133/9 138/10 144/12 148/5 150/11 154/12
plot [1] 127/21
plus [2] 26/22 44/6
PMR [15] 21/13 22/10 22/24 23/5 23/14 23/21 23/25 71/8 76/14 99/10 99/18 101/11 101/25 109/25 110/18
point [27] 17/1 17/3 23/13 55/19 60/24 61/22 65/14 67/22 69/9 105/12 105/12 110/17 113/25 120/3 124/6 125/6 127/7 130/5 133/8 134/25 135/16 141/14 147/10 148/2 148/8 154/8 154/22
pointed [1] 143/3
pointing [5] 69/6 113/10 113/17 145/1 145/2
points [2] 48/20 142/6
polarity [1] 116/2
portion [1] 146/3
position [5] 30/2 30/12 43/7 72/17 154/21
possesses [1] 88/18
possibility [1] 142/10
possible [3] 12/10 54/2 142/12
potential [1] 136/25
practical [7] 29/17 30/1 30/12 30/24 48/24 69/17 72/16

practically [2] 48/9 74/4
praise [1] 8/19
praised [1] 8/17
predicted [1] 89/22
preeminent [1] 22/13
prefer [1] 32/20
preference [1] 141/3
prepare [1] 134/11
prepared [2] 127/15 127/17
presence [6] 7/4 7/22 80/22 81/3 81/6 150/24
present [10] 5/11 18/15 31/1 82/25 83/3 83/4 110/12 115/23 150/25 153/15
presentation [3] 41/16 93/5 133/13
presented [14] 18/6 18/12 55/8 66/10 67/19 67/19 132/11 138/16 151/12 151/15 151/16 153/2 153/7 153/12
presenting [1] 140/20
preserving [1] 21/13
president [1] 65/16
PRESIDING [1] 1/4
presumed [1] 64/22
presumption [1] 64/20
pretty [4] 44/22 96/4 96/16 124/20
prevailing [1] 31/5
previously [3] 8/4 64/2 125/25
price [9] 129/4 129/12 132/5 132/15 136/24 137/17 141/22 146/16 147/1
priced [1] 146/18
primary [1] 104/22
principle [1] 96/14
prior [46] 15/11 15/11 15/14 15/19 16/8 18/6 18/11 18/12 18/19 19/13 19/23 20/8 23/9 30/11 30/18 49/11 57/1 63/7 65/8 70/23 73/24 75/12 86/22 87/6 87/19 87/20 93/25 94/8 103/20 109/15 122/21 123/1 123/11 124/5 124/11 124/24 125/5 125/10 136/20 151/9 151/13 151/20 151/22 152/2 152/5 152/7
priority [3] 16/21 16/24 65/9
private [1] 57/17
pro [1] 2/17
probably [20] 11/1 12/9 13/18 14/6 15/16 18/21 19/21 26/2 26/11 32/17 33/21 36/20 43/16 43/16 57/4 63/10 84/11 93/6 123/18 150/7
problem [8] 19/23 20/11 21/11 21/11

problems [5] 25/7 49/19 49/25 53/24 67/4
proceed [4] 81/9 85/24 97/24 98/5
proceedings [9] 1/15 7/3 7/21 80/21 81/2 81/5 150/23 156/2 157/5
process [4] 34/21 107/11 116/1 116/16
produced [3] 146/16 146/18 148/25
producing [1] 71/8
product [3] 84/8 139/13 139/14
products [9] 81/14 83/2 83/5 128/20 128/22 129/1 129/3 129/4 129/11
Professor [2] 41/13 50/10
professors [1] 22/13
profit [10] 132/16 132/20 132/21 134/24 134/24 137/9 137/17 147/5 147/6 147/7
profits [2] 135/22 147/12
progress [1] 114/7
progresses [3] 113/7 114/12 116/5
progressing [1] 115/10
progressive [3] 115/25 116/13 117/25
promising [1] 101/9
proof [3] 10/13 10/22 51/9
proper [4] 72/9 80/7 82/22 100/14
proportional [1] 114/24
propose [3] 36/7 148/10 148/19
proposed [6] 33/6 36/9 36/14 40/12 57/8 88/16
prosecution [3] 121/1 121/4 124/24
prospect [1] 150/21
prove [5] 15/18 16/18 16/19 19/14 20/9
provide [4] 26/21 34/1 42/12 150/2
provided [2] 33/4 47/18
provides [1] 46/12
providing [2] 69/22 100/17
PTX [1] 133/9
PTX-10.4 [1] 133/9
public [1] 58/13
publication [4] 58/13 59/9 59/17 59/25
publications [2] 76/13 124/18
publicly [1] 55/8
published [70] 8/10 9/4 10/19 11/17 12/25 20/6 20/16 21/9 28/7

29/6 29/9 31/8 34/18 35/10 36/23 44/1 45/7 49/8 50/8 50/21 53/7 53/11 54/17 54/21 56/5 56/8 58/22 62/14 76/22 88/9 89/18 92/13 94/25 95/5 95/12 97/5 97/11 98/22 99/2 99/14 100/11 101/5 102/14 103/12 104/2 104/20 105/18 106/22 108/6 109/5 110/5 111/1 112/3 112/21 115/16 116/21 117/8 122/4 123/5 124/15 127/13 128/17 131/5 131/19 133/10 134/18 138/11 142/20 144/13 145/16
pull [4] 20/5 50/7 58/21 62/12
pulled [1] 29/8
purely [1] 29/13
purpose [3] 25/3 121/19 143/7
purposes [1] 78/13
pursuant [1] 157/2
put [24] 17/20 29/20 30/25 35/12 35/17 36/6 40/4 42/20 48/9 48/10 54/2 67/12 72/19 72/21 72/24 74/10 76/18 85/22 86/16 102/22 113/10 137/5 143/9 154/1
puts [1] 137/6
putting [4] 48/18 72/18 78/14 116/11

## Q

Quadratic [8] 129/1 129/6 138/18 141/21 143/1 143/5 145/6 145/11
qualified [1] 75/12
qualifies [1] 49/11
qualify [4] 19/13 20/8 70/23 73/24
qualitative [2] 37/10 37/16
quantify [1] 84/24
quarter [2] 139/14 150/7
question [21] 7/6 15/17 24/15 27/9 34/4 42/19 47/2 50/4 50/5 57/4 57/5 60/12 60/13 71/6 120/4 124/5 142/8 146/5 148/7 154/11 154/16
questioned [4] 41/18 51/18 52/8 59/7
questions [12] 42/1 42/4 42/16 43/22 51/8 61/6 61/8 86/8 93/25 118/7 125/15 144/8
quick [5] 7/6 33/9 60/10 62/4 124/5
quickly [4] 9/7 9/8 63/1 139/8
quite [1] 66/6

## R

R-E [1] 64/5
raise [1] 153/20
raised [1] 61/14
raising [2] 16/5 16/6
raklaw.com [8] 2/6 2/10 2/15 2/19 2/24 3/6 3/10 3/15
ran [7] 126/23 126/24 128/24 128/25 142/2 146/12 146/13
RANDALL [1] 8/4
random [1] 67/8
range [3] 134/23 140/17 145/18
rate [1] 127/6
rather [1] 12/13
ratio [2] 34/25 47/21
RAUTH [2] 4/3 4/12
re [14] 63/25 64/5 64/8 86/5 120/15 138/2 138/6 138/21 139/1 139/2 139/5 139/11 140/6 140/22
Re's [1] 121/13
re-weighting [7] 138/6 138/21 139/1 139/2 139/5 140/6 140/22
re-weights [2] 138/2 139/11
reached [2] 25/21 70/10
read [20] 11/2 13/12 34/21 56/18 91/4 91/13 97/15 102/21 108/11 111/23 115/21 116/9 122/9 128/20 138/25 139/1 144/24 150/5 154/17 154/20
read-write [1] 34/21
reading [2] 78/13 101/17
real [2] 33/9 72/23
reality [1] 129/23
really [11] 26/20 67/19 68/6 70/4 74/23 127/4 129/5 136/13 139/7 142/10 144/22
reask [1] 47/2
reason [12] 43/3 43/4 70/5 72/13 74/12 74/13 74/20 139/7 142/11 142/12 143/24 150/19
reasonably [3] 20/11 49/11 71/7
reasons [6] 42/21 75/11 122/17 123/7 125/9 152/7
recall [30] 14/5 14/8 40/13 40/18 40/19 45/10 69/6 70/18 72/5 81/13 81/18 82/6 83/9 84/22 85/2 86/13 90/11 92/2 118/9 126/11 126/14 126/17 129/15 129/18 133/12 133/15 135/24 136/15 137/18 154/14
received [2] 91/18

**R**

**received... [1]** 127/18
**Recently [2]** 99/10 99/18
**recess [4]** 80/17 80/25 81/1 155/17
**recognize [6]** 92/17 95/14 97/15 98/24 103/14 112/23
**recollection [1]** 38/17
**record [27]** 7/14 15/25 21/20 25/12 39/23 45/18 54/13 64/4 89/2 100/9 105/8 107/24 115/21 122/12 122/21 123/2 123/11 124/5 124/11 124/24 125/5 126/2 149/6 149/7 154/2 155/13 155/15
**recording [15]** 20/20 21/3 22/19 56/19 71/3 75/16 77/2 104/4 106/7 106/9 107/5 107/7 108/20 109/25 115/24
**RECROSS [4]** 6/3 6/7 62/2 124/3
**RECROSS-EXAMINATI ON [2]** 62/2 124/3
**red [2]** 127/25 133/24
**redirect [5]** 6/3 6/7 41/11 62/5 120/13
**reduce [4]** 77/15 79/15 100/2 100/24
**reduced [1]** 34/22
**reducing [2]** 89/25 117/19
**reduction [4]** 78/21 78/23 89/17 89/21
**refer [1]** 94/10
**reference [52]** 18/6 18/11 18/12 20/8 22/23 23/4 23/12 23/12 24/13 30/23 43/15 49/11 56/15 56/22 58/13 63/6 63/7 75/16 76/2 87/1 87/4 91/25 96/9 96/21 97/7 97/13 97/16 98/9 98/24 98/25 104/22 108/17 111/8 117/23 123/10 123/11 123/23 124/17 124/23 125/6 125/8 151/19 151/19 151/22 151/23 152/4 152/6 152/10 152/13 152/14 152/15 152/20
**references [16]** 23/8 24/5 25/24 25/24 68/4 86/22 87/10 91/7 91/13 105/2 123/1 151/9 151/13 151/18 151/24 152/2
**referencing [1]** 125/9
**referred [3]** 62/20 82/14 128/20
**referring [13]** 12/15 24/18 24/20 32/12 48/12 57/3 57/23 57/23 57/24 59/17 59/18 62/6 97/2

**reflect [1]** 146/2
**reflected [1]** 154/2
**regard [2]** 43/7 136/23
**regarding [5]** 12/16 61/14 153/6 153/11 153/18
**regards [1]** 41/21
**regions [1]** 101/19
**regression [46]** 126/12 126/23 126/24 127/25 128/1 128/5 128/8 128/12 129/13 129/25 130/1 130/22 130/22 132/2 132/7 132/10 132/11 132/17 132/18 132/22 133/5 137/15 137/15 137/21 137/24 138/1 138/6 138/7 138/14 139/10 140/3 141/21 142/12 142/25 143/1 143/4 143/5 143/25 144/18 145/6 145/7 146/7 146/8 146/10 146/13 146/20
**regressions [10]** 126/25 127/9 128/25 130/16 133/3 135/17 141/19 142/3 143/11 143/15
**regular [1]** 150/17
**regulations [1]** 157/7
**reignitions [1]** 127/9
**relate [2]** 71/12 140/11
**related [8]** 21/2 57/9 71/2 71/4 71/6 73/12 75/22 90/14
**relates [1]** 110/12
**relation [1]** 140/15
**relationship [2]** 122/22 142/6
**relative [1]** 152/21
**release [2]** 148/20 149/8
**relevant [5]** 30/20 69/13 72/6 72/12 104/9
**reliability [2]** 126/12 130/15
**relied [3]** 60/22 71/19 74/1
**relies [1]** 71/11
**rely [3]** 9/9 19/10 23/8
**relying [1]** 30/10
**remain [1]** 81/7
**remember [22]** 41/25 44/3 44/7 47/15 48/11 50/6 52/3 52/17 55/1 61/5 80/18 83/24 118/19 118/20 121/2 121/6 121/15 121/22 134/14 134/22 141/20 150/12
**remind [2]** 65/12 65/20
**reminded [2]** 64/1 125/24
**rendered [1]** 45/24
**repeat [11]** 13/18 13/18 13/19 15/13 15/16 22/25 25/22 47/9 63/10 143/2 143/13

**rephrase [1]** 39/2
**replot [1]** 134/10
**report [14]** 10/4 26/21 27/10 28/10 28/11 36/12 42/13 49/19 49/24 52/8 127/18 138/25 141/22 144/21
**reported [1]** 157/4
**REPORTER [14]** 1/21 7/13 15/24 21/19 25/11 39/22 45/17 54/12 89/1 105/7 107/23 122/11 155/14 157/12
**REPORTER'S [1]** 1/15
**represent [2]** 131/23 154/19
**representation [3]** 79/22 133/17 133/19
**Representative [1]** 5/13
**represented [1]** 114/17
**representing [1]** 134/11
**represents [3]** 128/1 142/25 143/4
**requests [12]** 7/13 15/24 21/19 25/11 39/22 45/17 54/12 89/1 105/7 107/23 122/11 155/14
**require [2]** 13/16 28/23
**required [3]** 10/13 10/23 152/21
**requirement [3]** 45/24 93/15 153/13
**requirements [2]** 15/7 46/16
**requires [5]** 13/20 28/20 31/18 31/21 45/12
**resolve [3]** 88/11 88/15 149/9
**respect [4]** 17/7 17/9 46/10 152/11
**Respond [1]** 39/1
**response [5]** 42/5 42/9 49/22 50/1 126/19
**rest [5]** 48/16 48/18 48/21 57/11 100/8
**resting [1]** 7/8
**rests [1]** 63/22
**result [1]** 146/16
**results [10]** 71/14 71/15 71/16 116/6 129/7 130/19 130/21 131/13 140/9 148/12
**reticent [1]** 154/7
**retrieval [1]** 110/14
**revenue [2]** 132/6 132/12
**reversal [10]** 34/21 107/6 107/18 114/6 115/25 116/6 116/13 116/15 117/18 117/23
**reverse [8]** 30/2 30/12 31/13 34/2 48/9 72/17 108/16 108/19
**reversed [2]** 120/25 155/8

**reverses [2]** 107/4 114/9
**review [1]** 148/12
**reviewed [4]** 30/9 30/10 123/14 136/4
**REZA [1]** 3/7
**RICHARD [1]** 5/3
**Richter [12]** 18/24 19/4 23/15 23/17 23/20 70/8 71/22 75/4 87/24 88/3 88/22 90/5
**rick.frenkel [1]** 5/5
**right [193]**
**rise [4]** 7/20 80/19 150/15 156/1
**risk [2]** 137/7 137/8
**rmirzaie [1]** 3/10
**road [1]** 97/22
**ROBERT [1]** 2/12
**role [2]** 65/15 119/17
**room [2]** 118/14 154/1
**rotate [1]** 100/15
**roughly [2]** 22/21 55/25
**Rule [2]** 151/1 151/5
**Rule 50 [2]** 151/1 151/5
**rules [1]** 87/18
**ruling [1]** 155/16
**run [5]** 126/25 141/21 142/12 148/15 150/6
**runs [1]** 48/21
**rush [1]** 149/18
**RUSS [9]** 2/3 2/8 2/12 2/17 2/21 3/3 3/8 3/12 5/12

**S**

**SACV [1]** 1/8
**said [54]** 8/12 8/16 8/19 8/20 9/19 10/9 12/7 13/18 14/3 14/20 14/21 14/23 22/20 27/12 27/19 27/21 28/9 30/5 32/9 38/22 41/23 43/20 44/9 48/4 48/24 49/1 51/11 52/19 52/20 56/25 57/17 59/8 70/9 74/23 83/16 86/24 87/18 91/24 105/9 109/21 114/22 118/11 119/15 126/15 129/1 129/19 129/22 134/22 135/7 136/20 141/13 142/25 144/9 144/19
**sale [2]** 137/10 137/17
**sales [7]** 133/13 133/18 135/2 136/23 136/24 137/1 139/21
**SALIL [1]** 4/3
**same [40]** 14/15 20/10 26/10 32/15 32/19 37/23 44/23 47/10 51/5 55/25 57/10 57/13 59/9 70/25 71/1 73/9 73/15 75/11 75/24 76/14 98/15 100/16 104/15 105/6 105/9 108/5 110/20 112/1 112/8 116/23 119/6 119/12 127/21 132/8 132/23

136/21 137/21 138/8 141/25 132/7
**SANTA [4]** 1/3 1/17 1/23 6/10
**SARAH [1]** 4/16
**sarah.wang [1]** 4/19
**sat [2]** 10/6 92/4
**satisfied [1]** 47/17
**satisfy [1]** 45/12
**saw [11]** 8/24 28/10 28/11 51/5 67/18 116/11 124/21 127/1 130/23 131/23 141/22
**say [39]** 8/18 9/6 17/17 17/21 24/17 26/16 28/18 35/16 35/22 36/1 38/10 48/23 53/13 55/6 57/7 59/11 62/21 62/25 65/2 67/2 68/15 68/16 68/18 69/2 69/12 70/23 80/11 81/13 81/16 84/12 87/21 103/3 111/22 115/6 116/23 118/17 120/7 122/20 140/19
**saying [16]** 31/2 37/25 38/7 38/16 39/11 44/6 46/3 57/13 62/5 72/5 89/8 118/19 118/20 125/7 137/20 147/18
**says [49]** 9/15 20/21 30/3 30/4 30/11 34/23 34/24 42/24 48/7 70/15 77/3 88/11 88/15 89/16 89/21 92/22 96/6 97/19 99/10 99/18 100/13 101/4 101/7 101/14 102/3 102/16 102/16 105/2 106/25 107/17 107/19 108/16 108/25 109/1 110/12 111/10 115/18 115/21 117/11 117/13 122/9 122/15 125/2 125/7 125/8 139/18 144/15 146/3 155/4
**sbali [1]** 4/6
**scale [2]** 66/20 66/21
**schematic [1]** 37/7
**Schmoller [15]** 5/14 88/6 89/14 92/11 94/23 96/23 97/3 97/10 99/11 100/7 104/1 117/6 124/8 142/18 145/25
**scholarly [1]** 53/18
**scholarship [1]** 53/24
**scope [3]** 42/13 151/19 152/6
**SCOTT [5]** 3/18 4/8 4/21 5/4 5/7
**screen [4]** 10/21 58/16 102/12 124/20
**Seagate [14]** 65/19 65/20 65/21 65/23 66/1 70/8 76/5 76/9 76/17 76/18 109/7 110/17 118/23 119/17
**Seagate-Li [1]** 110/17
**seated [2]** 7/23 81/7

**S**

**second [10]** 31/22 33/7 49/10 71/6 79/13 88/7 102/12 111/15 125/18 138/4
**secondary [3]** 8/8 8/13 51/22
**section [8]** 29/8 51/19 58/24 95/7 110/7 111/3 151/10 157/2
**Section 103 [1]** 151/10
**Section 6 [1]** 58/24
**see [66]** 27/2 27/3 27/16 32/20 32/22 33/7 42/5 45/8 49/14 50/10 54/24 58/10 58/19 68/8 68/9 76/20 88/13 88/20 89/16 91/17 91/21 91/25 92/19 96/11 97/7 97/13 99/22 100/21 101/12 101/24 102/9 102/10 102/18 104/6 104/22 104/25 108/21 113/2 113/15 113/17 113/20 113/23 115/19 117/11 117/21 124/17 127/19 128/3 129/2 129/5 129/7 129/9 130/17 130/24 131/7 131/21 132/3 132/14 132/16 135/11 137/8 140/1 140/13 143/22 148/4 152/20
**seeing [4]** 108/23 111/21 113/6 138/15
**seem [2]** 55/25 116/24
**seemed [1]** 137/21
**Seems [1]** 121/9
**seen [9]** 8/12 76/12 76/16 91/12 99/16 109/11 111/3 123/16 136/3
**selling [6]** 129/4 132/5 132/9 132/15 132/16 136/21
**SELNA [1]** 1/4
**senior [1]** 65/16
**sense [9]** 21/6 47/20 85/5 94/20 94/21 119/24 140/1 140/14 140/17
**sentence [15]** 30/6 30/14 31/4 48/12 48/20 52/25 55/3 55/6 57/25 58/8 63/17 88/13 89/16 102/17 105/2
**September [1]** 109/13
**served [1]** 9/25
**session [2]** 7/24 81/8
**set [1]** 125/19
**settle [1]** 153/25
**settlement [1]** 148/10
**Seuss [37]** 16/25 17/17 22/24 23/5 49/16 50/16 52/16 54/14 55/10 55/13 55/15 56/13 57/8 58/9 59/22 60/2 60/14 60/16 60/22 63/5 63/13 64/24 66/2 66/18 67/1

72/7 76/15 76/18 77/11 82/182/17 91/18 98/13 98/13 104/8 104/14 105/6
**Seuss' [26]** 8/17 9/20 16/3 18/8 19/15 19/24 20/18 21/12 26/19 28/20 28/23 40/24 41/6 51/5 53/1 54/25 56/10 56/22 67/2 77/8 85/13 89/5 90/15 92/4 119/3 123/25
**Seuss's [1]** 123/20
**seven [1]** 89/14
**several [2]** 51/22 52/11
**shading [1]** 143/23
**shanle [1]** 4/14
**shape [1]** 24/20
**shaped [1]** 116/3
**shared [2]** 55/12 58/1
**shift [1]** 113/15
**shifts [1]** 116/14
**shoes [1]** 17/20
**short [2]** 141/2 141/6
**should [21]** 25/22 38/2 38/3 40/25 54/25 79/23 82/6 85/3 88/4 101/15 101/16 107/1 111/22 117/1 120/7 134/8 139/18 140/4 141/5 153/14 154/20
**shouldn't [1]** 155/22
**show [25]** 12/9 15/19 15/21 26/12 26/17 34/2 34/6 38/11 38/12 43/25 54/20 56/4 65/6 65/7 65/10 95/7 113/1 122/6 124/13 125/1 136/1 136/8 136/8 142/24 143/24
**showed [15]** 15/19 31/10 49/6 51/10 52/14 54/20 58/15 58/16 121/21 127/21 128/13 129/12 130/3 133/12 137/16
**showing [29]** 18/7 35/12 36/25 37/2 51/3 61/5 82/19 108/10 117/24 127/20 132/20 133/18 133/23 134/4 134/8 134/12 151/8 151/12 151/14 151/17 151/18 151/25 152/3 152/6 152/8 152/12 152/17 152/18 152/20
**shown [15]** 18/11 28/12 28/13 37/16 40/6 40/9 44/3 72/22 75/4 82/1 93/13 114/6 120/15 125/10 139/10
**shows [6]** 27/6 45/3 91/13 138/19 143/4 143/22
**side [2]** 140/25 145/21
**sidebar [3]** 148/5 148/6 149/24
**signal [2]** 34/25 74/18
**significant [7]** 130/15

137/14 140/10 143/12 143/16 143/18 144/18
**significantly [3]** 101/21 117/19 130/8
**similar [3]** 75/21 114/5 152/5
**similarly [1]** 151/25
**simple [1]** 66/4
**since [5]** 22/8 22/20 94/12 116/24 146/25
**single [11]** 14/3 14/11 32/3 32/12 32/25 33/1 47/9 63/4 69/20 120/20 123/19
**sir [32]** 12/11 38/22 39/5 50/24 53/16 63/21 64/1 68/21 87/21 88/5 88/13 90/14 91/2 91/12 92/15 92/21 94/6 95/8 95/20 97/14 98/4 98/25 99/17 100/21 103/16 106/2 108/12 109/8 114/3 115/19 125/16 125/24
**situation [1]** 39/12
**size [5]** 131/11 131/25 132/5 132/24 132/24
**skewing [1]** 135/1
**skill [21]** 16/20 17/24 18/3 22/8 23/21 26/13 30/19 42/6 42/23 43/13 43/18 44/16 44/22 48/4 48/22 48/25 64/18 65/7 69/23 72/25 87/2
**skilled [3]** 68/20 74/20 87/19
**skip [2]** 109/2 121/10
**skipping [2]** 108/17 116/23
**slabs [3]** 95/17 95/20 96/6
**slide [14]** 44/17 49/6 50/19 92/15 121/10 122/3 128/15 129/7 131/22 133/12 134/17 135/13 138/23 145/14
**slides [3]** 64/14 122/15 154/15
**slight [3]** 128/3 129/20 138/19
**slightly [3]** 130/7 133/5 133/8
**slopes [1]** 37/8
**small [2]** 51/17 128/19
**smaller [1]** 40/14
**smallest [2]** 35/5 35/19
**snack [1]** 150/8
**SNR [1]** 34/25
**so [232]**
**so-called [1]** 88/16
**soft [46]** 14/3 24/6 24/9 24/9 24/11 24/17 24/25 25/3 29/21 32/3 32/25 33/1 42/20 48/10 48/19 69/20 70/1 70/2 70/4 70/5 70/9 72/18 72/21 74/10 74/13 74/25 75/5 88/19 88/24 89/22 90/3 94/11 99/20 99/24

100/24 102/1 102/22 102/25 106/9 106/13 106/15 106/17 107/12 107/15 107/20 108/23
**softer [4]** 24/25 100/15 108/18 111/18
**softest [3]** 43/12 112/15 114/10
**software [2]** 67/2 121/16
**sold [6]** 131/1 133/25 135/9 135/10 139/14 139/15
**solution [1]** 87/20
**solve [2]** 80/12 123/23
**solved [2]** 19/24 85/9
**solved by [1]** 19/24
**solving [1]** 20/12
**some [28]** 43/22 51/8 52/21 53/19 56/13 64/14 67/21 83/21 84/22 85/17 85/19 93/24 104/9 105/15 110/8 118/24 118/24 118/25 119/15 119/15 125/9 126/11 136/11 136/12 137/16 148/23 150/18 155/20
**somebody [2]** 123/18 142/19
**somehow [1]** 65/3
**someone [6]** 17/20 26/16 26/17 65/7 72/5 79/8
**something [20]** 21/24 24/18 25/5 30/18 32/7 34/3 34/13 41/18 43/13 43/17 66/22 71/13 82/15 94/19 121/21 127/15 135/22 138/8 142/6 150/9
**Sometimes [1]** 142/9
**somewhere [1]** 92/5
**sorry [19]** 10/10 15/16 25/21 25/22 36/18 38/19 38/25 39/9 53/6 53/10 60/10 60/13 85/18 105/12 107/25 119/10 131/8 143/13 146/23
**sort [7]** 101/20 113/20 128/9 131/17 133/13 135/16 154/10
**sounds [3]** 72/10 94/1 148/14
**source [2]** 59/14 60/15
**SOUTHERN [1]** 1/3
**spacing [11]** 34/10 34/21 35/1 35/6 77/16 77/23 78/3 78/4 78/8 78/18 78/21
**span [1]** 92/8
**speaks [1]** 77/11
**specific [5]** 26/14 26/18 102/5 118/13 125/4
**specifically [2]** 11/21 125/3
**specification [1]** 97/2

**specify [1]** 59/13
**speed [1]** 67/4
**spelling [2]** 64/4 126/1
**spend [1]** 87/17
**spent [2]** 90/10 92/7
**spin [1]** 66/25
**spoke [1]** 91/2
**spot [1]** 43/8
**spring [10]** 57/9 57/14 58/9 104/5 104/8 104/13 106/4 106/10 107/3 108/18
**squared [10]** 127/2 127/4 129/13 129/20 130/6 140/9 140/20 145/1 145/8 145/10
**stability [15]** 21/13 21/17 21/22 50/14 62/17 66/24 67/1 71/8 71/9 74/18 85/10 101/23 102/2 121/21 121/25
**stable [1]** 56/20
**stack [7]** 37/14 37/21 43/1 77/11 77/13 120/22 120/23
**stand [2]** 125/23 151/21
**standard [13]** 10/12 10/22 16/16 51/9 52/5 52/7 86/17 86/18 86/21 86/24 87/15 87/16 130/7
**start [5]** 41/15 64/16 86/10 114/7 148/17
**started [2]** 86/10 94/15
**starting [6]** 53/10 56/7 79/8 113/15 114/9 117/3
**starts [4]** 37/13 37/18 43/10 43/11
**state [4]** 9/9 24/3 64/3 126/1
**stated [6]** 27/19 39/8 39/10 72/15 128/2 131/14
**statement [15]** 14/14 17/9 24/10 26/20 27/17 27/18 28/4 28/17 31/15 38/16 40/11 44/8 87/23 106/24 119/16
**states [13]** 1/1 1/21 10/14 18/18 30/1 38/1 40/13 69/25 72/16 72/22 77/1 157/3 157/7
**statistical [1]** 145/5
**statistically [4]** 143/11 143/16 143/18 144/18
**stay [1]** 141/14
**stays [1]** 114/18
**stenographically [1]** 157/4
**step [2]** 63/21 125/16
**STEVEN [1]** 4/11
**still [8]** 15/17 40/6 43/4 100/9 101/22 113/17 145/19 148/9
**stop [2]** 48/5 48/6
**storage [41]** 9/7 11/23

**S**

storage... **[39]** 16/11 27/25 28/14 28/20 28/24 28/25 30/25 33/11 33/18 34/7 35/13 35/14 35/17 40/5 46/6 57/21 62/25 63/9 63/14 63/15 69/21 74/11 77/3 77/12 78/14 83/1 83/6 93/2 93/19 94/17 110/13 118/2 120/20 122/23 152/20 152/23 153/6 154/21 154/23
STRADLING **[2]** 4/3 4/12
stradlinglaw.com **[2]** 4/6 4/14
straight **[2]** 113/10 126/16
STREET **[1]** 1/22
strength **[3]** 37/3 37/12 117/15
stretch **[1]** 119/22
stricken **[1]** 155/2
strictly **[1]** 42/20
strong **[1]** 43/6
structure **[14]** 40/4 56/16 90/3 103/3 104/5 104/13 104/15 105/5 106/14 108/14 111/5 111/7 112/5 154/24
structures **[1]** 20/19
students **[1]** 82/17
study **[1]** 60/18
stuff **[4]** 42/25 47/24 55/19 56/13
subject **[1]** 152/16
sublayer **[2]** 111/10 112/8
sublayers **[4]** 38/5 114/12 115/9 117/16
subleases **[1]** 115/3
submit **[1]** 153/23
submitted **[2]** 91/14 150/14
substance **[1]** 98/17
substantial **[1]** 79/6
substrate **[3]** 29/1 33/12 59/15
substrates **[1]** 94/11
subtract **[1]** 83/16
Subtracting **[1]** 132/15
success **[2]** 8/20 9/14
such **[4]** 38/8 91/15 91/16 107/2
Suess **[1]** 5/12
sufficient **[2]** 151/8 153/22
suggest **[4]** 122/22 123/19 137/3 137/4
suggested **[7]** 54/25 81/18 85/2 135/20 135/21 137/13 140/8
suggesting **[5]** 53/14 66/12 82/6 82/25 83/4
suggestion **[5]** 24/1 26/4 140/19 148/20 149/8
suit **[4]** 59/19 96/20

151/7 151/20
SUITE **[5]** 1/22 2/18 4/4 4/13 4/17
summarize **[5]** 68/13 73/5 73/19 75/18 94/10
summary **[2]** 101/4 101/8
super **[3]** 22/23 23/3 62/4
superparamagnetic **[4]** 104/24 105/3 105/6 105/13
supplier **[1]** 65/21
support **[5]** 5/14 8/13 136/1 136/4 151/8
supported **[1]** 153/18
supporting **[1]** 75/1
supposed **[1]** 82/5
supposedly **[1]** 65/4
sure **[17]** 14/7 14/22 26/3 27/8 38/10 39/24 40/3 61/17 61/23 75/15 77/16 90/19 102/6 102/7 112/25 124/7 142/8
surprise **[1]** 66/15
Sustained **[4]** 46/24 49/25 97/23 98/18
SW **[1]** 2/17
switch **[4]** 40/18 108/25 109/7 118/1
switched **[1]** 113/20
switching **[14]** 11/22 43/10 43/11 78/17 89/16 89/21 89/25 100/3 100/20 100/24 101/25 107/21 117/20 118/3
SWORN **[1]** 8/4
system **[2]** 18/13 32/13

**T**

T1 **[1]** 113/12
T2 **[1]** 113/23
T3 **[1]** 113/24
T4 **[1]** 113/24
table **[1]** 82/14
tailoring **[2]** 117/11 117/14
take **[22]** 9/23 18/4 33/7 47/10 50/23 80/15 97/9 118/11 134/5 135/15 136/17 139/17 141/1 141/6 141/7 145/25 147/16 147/17 150/5 154/4 155/21 155/23
taken **[2]** 81/1 144/3
takes **[3]** 138/1 139/10 139/16
taking **[9]** 60/10 61/19 62/5 62/7 84/12 118/7 124/20 135/22 136/25
talk **[18]** 15/4 16/16 24/4 33/9 52/13 54/9 64/10 64/12 73/18 77/21 83/8 94/22 96/20 98/20 111/7 128/9 130/2 141/18
talked **[24]** 16/8 44/15

50/16 56/13 57/1 66/23 66/23 84/25 90/7 90/9 93/7 93/12 109/11 114/2 114/14 116/16 118/4 126/21 127/2 127/3 127/9 138/14 139/12 142/17
talking **[21]** 8/7 14/2 14/25 31/25 32/25 57/20 58/15 77/10 88/22 89/6 89/25 95/8 96/17 98/16 99/24 101/25 113/13 130/15 134/1 134/20 135/2
talks **[5]** 48/18 57/12 95/17 95/20 96/10
taught **[3]** 24/6 79/11 87/7
tauts **[1]** 35/4
teach **[4]** 30/18 40/24 61/18 122/21
teaches **[10]** 30/24 34/20 36/14 36/21 38/2 40/11 79/1 79/23 87/7 98/2
teaching **[4]** 30/15 30/16 31/12 79/3
teachings **[6]** 46/8 46/19 61/13 80/3 87/22 90/6
team **[3]** 70/8 76/5 76/7
Tech **[2]** 63/24 151/4
Tech's **[1]** 30/11
technical **[1]** 68/3
Technically **[1]** 24/13
TECHNOLOGIES **[5]** 1/6 1/9 5/12 5/14 5/16
technology **[2]** 65/19 136/14
tell **[19]** 8/23 9/16 9/18 9/21 22/7 31/3 36/19 41/18 41/23 59/8 59/12 59/16 64/10 80/5 121/8 123/25 126/24 142/15 143/3
telling **[1]** 55/15
tells **[4]** 67/15 102/21 124/1 140/4
temporarily **[1]** 52/9
tend **[1]** 32/20
tenth **[1]** 70/3
terabyte **[17]** 129/4 132/3 132/10 132/24 134/5 134/7 134/9 134/23 135/16 135/17 139/17 140/2 140/7 140/17 145/18 145/21 146/18
terabytes **[19]** 131/1 131/10 131/15 131/24 132/4 132/14 132/19 134/3 134/8 134/11 134/22 135/2 135/3 135/10 145/19 145/20 145/21 146/22 146/25
term **[3]** 52/2 52/3 67/5
terminology **[1]** 104/15
terms **[5]** 46/19 47/7 47/18 51/1 78/21

tesla **[1]** 83/2
test **[2]** 145/3 154/6
testified **[7]** 20/23 43/2 44/11 83/18 118/14 139/18 141/15
testify **[5]** 44/12 44/14 84/16 147/11 147/13
testifying **[1]** 60/21
testimony **[26]** 8/25 9/17 15/1 17/2 17/3 17/6 19/20 46/18 51/11 53/4 81/25 83/12 126/9 126/21 127/22 128/2 129/19 135/20 136/11 136/20 137/14 138/16 139/4 140/15 140/25 153/19
text **[3]** 74/22 74/22 99/16
textbook **[1]** 72/10
than **[36]** 12/13 12/20 13/8 13/21 18/20 22/1 28/1 31/19 31/22 32/9 38/4 38/8 39/13 40/14 40/15 46/6 60/13 60/16 70/2 79/6 83/2 83/6 92/7 96/7 96/8 111/16 114/23 129/10 130/8 133/6 134/24 142/25 143/5 145/20 145/21 145/21
thank **[34]** 7/17 7/18 18/5 27/5 29/10 30/1 41/10 42/18 53/8 54/18 54/22 58/21 59/1 63/18 63/21 64/9 81/10 85/21 86/1 94/4 94/7 99/13 117/1 117/9 120/10 125/14 125/16 125/17 125/21 141/9 149/23 150/21 151/3 155/25
that **[796]**
that's **[148]** 9/2 11/3 11/24 12/2 14/7 14/17 14/22 15/3 15/22 16/14 17/5 19/2 20/21 23/11 23/16 23/19 26/18 27/4 27/8 27/21 28/3 29/15 30/3 30/19 31/3 31/11 32/2 32/6 32/15 32/18 33/21 33/25 34/4 34/13 36/18 37/7 37/7 37/15 37/24 40/15 40/23 41/20 47/25 48/4 48/13 48/16 51/21 54/16 55/11 57/5 57/16 59/2 62/20 62/22 82/21 84/10 85/23 86/16 86/17 87/23 88/4 89/10 91/10 92/23 93/4 93/9 93/12 94/19 94/19 95/16 95/21 96/1 96/4 97/18 98/12 99/1 99/4 100/4 102/24 103/8 103/11 103/17 103/17 103/23 104/8 106/3 106/4 106/8 107/14 107/19 109/14 109/20 109/23 110/11 110/21

111/6 111/15 111/17 111/18 111/24 112/5 112/14 112/17 113/4 113/8 113/12 113/14 113/19 115/11 116/12 117/5 118/23 119/2 119/16 120/1 123/9 124/20 124/25 125/11 127/22 130/5 132/9 132/14 133/2 134/21 137/12 139/14 139/19 139/24 139/24 140/5 140/17 141/24 142/4 142/11 142/12 143/21 143/24 145/23 147/3 147/13 147/17 148/3 149/22 150/6 150/9 150/21 153/14
their **[17]** 19/8 24/2 24/3 45/2 47/25 81/25 81/25 88/23 91/6 91/11 94/21 95/24 100/18 121/9 154/21 155/3 155/3
them **[26]** 9/18 9/21 17/22 19/10 21/6 23/10 26/17 26/18 44/9 48/23 52/10 55/19 67/24 69/6 76/6 91/14 93/24 103/2 119/19 123/19 123/24 138/2 139/11 148/22 149/9 149/11
themselves **[5]** 16/13 16/15 46/11 46/11 130/18
then **[47]** 10/6 29/23 30/7 34/24 39/14 43/11 44/22 50/5 56/17 57/9 57/11 59/14 59/14 61/12 62/25 65/2 73/8 78/3 78/19 93/2 93/18 94/16 100/8 111/15 111/18 111/25 112/11 112/13 112/15 113/12 113/20 113/21 113/24 115/6 126/22 127/23 130/11 131/12 131/14 138/1 138/18 139/3 139/11 139/22 148/21 148/22 149/22
then this **[1]** 29/23
theoretical **[2]** 29/13 71/14
theoretically **[1]** 99/21
theories **[2]** 67/8 153/18
theory **[8]** 27/13 27/20 27/22 93/13 114/2 117/25 151/10 155/3
there **[80]** 8/12 8/16 8/20 9/12 9/15 11/3 24/10 27/17 30/14 30/18 34/25 40/19 40/20 48/1 48/19 48/20 50/10 50/24 54/24 57/3 57/7 57/13 58/8 58/8 59/2 60/15 60/17 64/20 64/24 68/3 73/22 74/14 75/1 77/15 77/22 89/16

**T**

**there... [44]** 90/17 90/18 90/22 94/9 97/8 97/13 99/11 102/16 103/23 105/3 110/16 114/18 117/2 117/9 117/24 120/20 120/21 121/12 122/20 123/12 124/18 124/23 127/6 129/5 132/25 135/9 137/14 141/2 142/4 144/15 145/19 145/20 151/8 151/12 151/13 151/17 151/18 151/25 152/2 152/5 152/8 152/12 152/14 152/17

**there's [37]** 12/16 26/4 30/5 31/4 36/21 38/15 52/20 68/22 69/25 70/4 74/13 74/23 84/9 89/8 89/9 90/18 91/12 96/9 99/9 103/1 111/10 111/15 111/18 112/5 112/11 112/13 112/15 114/19 125/6 131/14 131/22 135/1 139/7 146/21 146/25 150/19 153/22

**thereby [1]** 108/19
**therefore [5]** 43/6 43/9 117/16 153/9 153/20
**thermal [15]** 21/13 21/17 21/21 50/14 62/17 66/24 67/1 71/8 71/9 74/18 85/9 101/23 102/2 121/21 121/25
**thermally [1]** 56/20
**these [28]** 30/3 30/13 37/1 42/4 47/4 66/13 67/20 72/18 73/9 73/21 75/7 78/16 94/8 112/17 116/23 123/23 123/23 130/16 131/15 132/2 132/10 132/17 133/25 140/9 140/14 143/11 143/15 143/22

**they [61]** 11/6 16/15 17/22 18/21 22/11 22/12 23/7 23/23 23/24 23/25 24/1 24/1 24/3 42/15 42/15 43/1 43/18 43/24 43/24 44/22 44/24 47/5 47/17 47/19 47/20 48/6 48/23 55/25 56/13 66/12 68/5 70/8 72/21 73/7 73/9 73/11 75/8 75/22 76/4 76/15 85/8 85/14 90/8 91/7 95/22 95/24 96/3 96/20 113/25 120/1 121/9 129/4 130/23 136/14 136/24 137/9 139/15 142/9 142/10 143/18 155/9

**they'll [2]** 7/8 106/12
**they're [5]** 16/4 76/7 78/16 91/6 154/1
**thick [3]** 95/23 95/23 121/6

**thickness [3]** 78/3 78/4 78/8
**thin [4]** 22/5 22/5 95/24 96/4
**thing [11]** 32/15 32/19 51/5 51/10 66/18 90/9 94/9 116/24 140/8 141/3 150/16
**things [18]** 41/22 44/20 45/12 45/15 52/19 57/20 58/2 69/1 70/7 84/9 93/22 93/23 94/10 94/11 126/15 137/8 142/9 150/18
**think [103]** 9/15 10/9 13/13 14/21 17/1 22/20 27/6 32/18 33/8 35/22 36/20 38/10 38/15 39/19 41/15 41/17 41/21 42/9 42/19 43/20 43/22 44/10 45/2 45/3 45/10 47/13 48/15 49/5 49/6 49/10 51/10 51/12 52/10 52/11 52/14 52/19 53/10 53/13 53/13 54/16 56/12 56/17 56/25 57/11 57/16 58/2 58/15 59/8 61/2 61/9 61/13 67/5 67/10 67/13 67/18 68/10 73/3 80/15 81/14 82/9 84/15 86/10 89/5 91/12 93/6 94/12 96/8 107/14 107/16 109/2 116/23 117/5 119/16 125/11 126/20 126/21 128/2 128/19 128/25 129/13 129/22 130/3 130/5 131/14 133/19 134/23 134/25 135/21 136/20 137/15 138/16 139/5 141/5 143/7 143/21 147/4 147/8 147/13 148/1 150/9 154/18 155/10 155/12
**thinking [1]** 39/17
**thinks [2]** 38/16 84/17
**thinner [2]** 78/16 96/2
**third [5]** 53/10 93/18 111/18 112/13 132/1
**this [237]**
**those [35]** 19/6 25/23 38/7 45/15 46/20 59/12 61/8 68/3 69/18 77/19 79/23 84/19 84/21 84/24 85/2 85/10 91/2 92/3 93/8 93/23 94/11 94/12 125/9 129/3 135/16 136/24 137/8 137/24 138/5 138/17 139/20 140/11 140/11 144/17 145/8
**though [9]** 13/6 14/11 23/20 23/25 27/18 44/10 94/15 118/23 147/10
**thought [9]** 22/9 26/16 33/20 33/25 52/22 67/20 75/2 79/9 95/24

**thoughts [1]** 148/25
**thousand [2]** 139/15 139/15
**three [15]** 18/23 66/19 67/23 69/2 69/13 93/8 93/23 94/5 96/18 111/5 111/8 123/10 128/21 135/12 135/14
**three-dimensional [1]** 66/19
**three-layer [1]** 111/5
**three-month [1]** 135/14
**through [21]** 10/17 33/14 33/20 38/2 38/14 79/16 90/24 97/1 97/3 106/21 110/3 110/24 112/25 115/15 117/2 120/18 135/5 144/6 147/7 148/13 154/17
**throughout [4]** 66/7 93/5 95/15 116/17
**THURSDAY [2]** 1/18 7/1
**thus [1]** 100/19
**till [1]** 135/11
**tilt [2]** 100/18 121/17
**tilted [17]** 25/5 25/7 25/9 25/10 25/19 25/25 47/14 47/18 48/3 69/16 69/19 69/22 74/3 74/8 105/10 108/1 121/20
**tilting [1]** 107/25
**time [45]** 7/10 10/11 22/16 26/25 29/16 39/18 56/1 60/19 65/15 65/22 66/7 66/18 70/13 72/15 74/5 75/3 87/17 92/5 95/24 96/2 100/17 104/9 109/3 113/4 113/7 113/12 119/1 119/4 127/1 131/9 131/9 135/9 135/15 141/1 143/13 144/21 147/24 148/1 148/23 149/13 150/2 150/5 150/11 150/25 152/24
**times [4]** 41/17 97/16 108/11 132/5
**timescale [3]** 82/13 82/20 82/23
**tipping [1]** 135/16
**title [6]** 92/19 92/20 94/9 103/24 122/15 157/3
**today [11]** 15/1 16/9 18/7 18/12 19/1 34/1 51/25 52/12 64/11 86/17 143/19
**toes [1]** 123/17
**together [4]** 67/13 87/23 129/10 148/11
**told [4]** 58/12 59/23 60/23 60/25
**tomorrow [11]** 141/4 148/11 149/4 149/10 150/2 150/14 150/17 150/21 154/9 155/21 155/24

**tonight [5]** 148/13 148/21 148/25 149/4 149/9
**too [2]** 71/16 95/3
**took [8]** 60/25 61/3 64/2 83/21 120/18 125/25 137/2 144/2
**top [44]** 24/25 28/1 28/3 28/15 28/21 28/24 29/21 30/25 34/8 35/5 35/17 38/1 42/20 43/11 43/12 48/10 48/19 48/25 63/14 70/5 72/20 72/24 74/10 74/14 74/25 77/3 77/24 78/14 78/16 78/18 92/20 97/8 100/8 102/4 102/10 102/23 103/1 106/10 106/12 120/22 122/10 128/4 128/6 130/12
**topics [2]** 40/18 135/19
**torque [5]** 108/19 108/24 117/18 117/23 118/1
**total [5]** 78/19 132/6 147/5 147/6 147/7
**totally [1]** 80/3
**tough [2]** 130/20 131/8
**toward [6]** 16/11 63/15 93/2 93/19 114/16 116/5
**towards [5]** 63/8 77/2 77/10 77/12 102/10
**TOWN [1]** 3/22
**track [3]** 25/13 119/18 119/19
**tracking [1]** 47/21
**transcript [6]** 1/5 1/15 154/17 154/20 157/4 157/6
**transcripts [1]** 1/24
**transition [1]** 43/8
**triable [1]** 153/20
**trial [4]** 1/16 27/1 40/20 141/13
**triangle [2]** 79/18 79/24
**tricky [1]** 96/16
**tried [4]** 41/25 44/5 44/25 78/24
**tries [1]** 75/9
**trilemma [2]** 56/19 123/24
**trouble [1]** 154/10
**true [63]** 8/18 10/2 10/15 11/13 13/22 13/24 14/14 14/22 15/3 15/10 17/15 19/21 20/13 21/4 21/16 23/11 24/8 25/1 25/15 25/17 26/2 26/10 26/24 27/4 28/22 29/22 30/6 31/11 31/24 32/2 32/23 33/3 34/9 34/15 39/16 40/10 40/15 40/23 41/20 41/24 45/14 45/21 47/16 47/23 49/15 51/7 52/2 54/8 55/14 56/14 57/18 66/3 68/2 87/21

**tonight [5]** 87/23 96/5 107/13 119/6 119/12 141/25 143/21 145/23 157/3
**trusted [1]** 60/4
**trusting [1]** 60/2
**try [8]** 25/4 50/13 67/22 80/1 100/2 110/17 139/8 142/24
**trying [20]** 15/21 22/7 25/8 35/22 35/25 49/16 54/2 57/1 57/7 60/15 71/17 71/17 74/3 79/9 97/25 105/13 123/23 126/15 140/16 155/3
**Tuesday [1]** 150/18
**turn [2]** 50/19 76/2
**two [51]** 13/21 14/12 22/5 22/6 25/20 25/21 25/22 26/1 30/3 30/5 30/13 34/4 38/7 44/19 55/15 56/16 58/6 66/25 69/2 69/10 70/9 72/18 75/5 78/23 79/7 88/17 88/25 89/4 89/8 89/9 93/22 96/7 96/8 97/7 99/19 101/18 107/11 120/6 120/7 127/9 128/25 130/16 131/23 143/11 143/15 143/17 143/17 144/17 151/7 153/1 155/9
**two-layer [1]** 56/16
**two-part [1]** 34/4
**two-spin [1]** 66/25
**type [1]** 133/20
**TZENG [1]** 5/6

**U**

**uh [1]** 11/3
**uh-huh [1]** 11/3
**ultimate [1]** 70/10
**Ultrastar [1]** 128/23
**Um [8]** 11/20 23/2 27/11 31/17 36/16 37/20 62/24 88/12
**Um-hmm [8]** 11/20 23/2 27/11 31/17 36/16 37/20 62/24 88/12
**under [11]** 10/6 58/24 64/1 94/11 100/15 125/25 132/9 151/5 151/10 154/23 154/24
**underlined [1]** 50/10
**underneath [2]** 59/14 59/14
**understand [15]** 27/8 52/5 57/4 102/6 107/11 122/17 123/7 138/25 139/2 139/4 142/8 144/22 145/24 146/5 155/16
**understanding [5]** 7/7 12/12 13/7 120/9 138/13
**understood [5]** 17/3 40/24 43/19 61/17 149/21
**unfair [1]** 126/20
**unfavorably [1]** 50/17
**Unfortunately [1]** 53/3

## U

**uniform [1]** 69/21
**unique [1]** 66/21
**unit [1]** 135/1
**UNITED [6]** 1/1 1/21 10/14 18/18 157/3 157/7
**United States [3]** 10/14 18/18 157/7
**units [6]** 133/24 134/6 134/7 135/3 145/20 146/3
**unreliable [1]** 129/21
**until [3]** 113/24 141/22 150/13
**unvariable [1]** 50/11
**up [77]** 8/9 9/3 10/18 11/14 13/1 16/20 16/24 18/7 20/5 26/15 29/8 29/12 30/6 31/13 35/13 40/8 43/12 43/23 45/3 49/7 50/7 50/14 53/2 53/5 53/6 54/15 57/17 58/21 62/12 62/13 65/8 66/2 67/8 84/9 85/12 85/17 85/19 88/5 88/7 89/17 93/22 94/23 96/23 97/4 97/13 99/10 101/14 101/18 103/25 104/17 104/18 109/10 110/3 110/24 112/1 113/6 113/10 113/17 115/14 116/20 122/3 123/22 124/8 124/20 125/19 127/12 129/20 133/9 135/11 136/9 137/25 138/10 140/18 141/1 144/11 146/23 155/21
**up all [1]** 124/20
**upon [2]** 60/22 108/16
**upper [1]** 69/25
**upside [3]** 35/21 61/19 77/9
**us [13]** 7/10 25/21 43/24 53/3 64/10 65/20 76/24 89/17 93/24 102/21 141/14 148/14 148/23
**use [10]** 23/14 62/18 67/5 68/6 81/18 85/12 88/23 110/15 131/12 133/20
**used [18]** 41/3 52/6 52/22 66/25 67/10 67/16 67/16 79/4 80/5 82/23 104/8 126/12 128/23 142/24 146/2 146/6 146/8 146/13
**useful [1]** 110/9
**uses [3]** 96/9 139/24 141/1
**using [21]** 17/14 40/22 40/25 52/21 68/11 78/10 79/20 82/5 82/12 82/13 82/20 90/3 97/22 100/2 100/23 101/11 101/25 101/25 104/12 139/23 143/7

**utility [1]** 110/14

## V

**valid [5]** 64/21 91/8 91/11 122/16 153/9
**validate [1]** 64/22
**validated [1]** 147/9
**validates [1]** 128/8
**validity [5]** 9/25 41/3 64/12 64/16 68/13
**value [17]** 24/12 24/18 78/11 78/15 78/15 78/17 79/21 126/24 127/1 127/2 129/14 134/7 140/21 140/21 151/14 152/8 152/19
**values [5]** 67/22 140/9 140/10 140/11 152/21
**variable [1]** 96/10
**variation [1]** 43/7
**variations [1]** 44/8
**various [4]** 38/5 67/22 84/16 85/2
**vast [1]** 22/4
**vastly [1]** 40/7
**version [1]** 54/20
**versus [3]** 44/21 56/20 61/16
**vertically [2]** 99/19 101/18
**very [25]** 7/6 26/14 26/18 37/7 52/6 52/25 53/8 54/18 54/22 59/1 61/22 63/23 66/21 77/1 88/19 125/14 127/5 127/6 128/11 137/14 137/21 138/8 139/3 140/10 155/23
**viable [1]** 150/21
**vice [2]** 2/17 65/16
**Victor [1]** 19/3
**VICTORA [100]** 8/4 8/7 10/23 14/3 16/9 18/23 19/3 19/7 23/9 23/9 23/9 24/4 24/6 25/4 25/15 25/18 25/23 26/4 26/7 26/14 26/22 27/7 28/9 28/19 29/5 29/12 29/13 29/13 29/17 29/19 31/3 31/12 32/4 32/7 32/8 32/8 33/1 40/17 41/13 44/6 44/20 45/2 45/23 46/18 47/6 47/8 63/5 65/2 66/9 66/9 67/7 67/23 68/16 69/2 69/3 69/9 69/15 69/18 69/20 70/6 70/15 71/11 71/19 72/5 72/13 72/16 73/1 73/2 73/6 75/9 75/9 75/21 75/24 80/5 87/22 87/24 88/16 88/23 90/6 91/5 91/19 91/24 91/25 98/20 98/24 98/25 99/5 99/5 101/24 121/24 122/16 123/1 123/10 123/14 123/22 125/2 125/8 151/11 151/21 152/16
**Victora 1 [1]** 29/13
**Victora 2 [1]** 29/13

**Victora 3 [2]** 29/17 29/19
**Victora's [11]** 27/12 27/20 27/22 66/24 67/3 73/25 78/24 79/5 79/9 80/1 121/16
**Victora-Hagadorn [1]** 75/21
**view [3]** 75/12 120/3 133/17
**violates [1]** 97/21
**virtue [1]** 35/1
**vis [2]** 152/22 152/22
**vis-à-vis [1]** 152/22
**voice [1]** 95/2
**VOLUME [1]** 1/11
**vs [1]** 1/8

## W

**W-R-I-T-E [1]** 61/15
**WABASH [1]** 4/17
**wait [2]** 117/3 121/15
**waiting [1]** 94/4
**walk [1]** 112/25
**WANG [5]** 4/16 29/23 29/24 29/25 30/1
**want [28]** 24/14 24/15 33/19 38/10 42/20 43/6 45/4 47/22 47/23 48/9 72/24 74/12 78/12 86/10 93/23 94/8 104/18 114/25 115/13 124/13 132/12 133/8 135/19 148/7 148/23 149/13 150/8 154/19
**wanted [11]** 61/23 68/12 75/21 79/16 92/19 112/25 129/2 129/5 130/24 135/10 155/5
**wants [3]** 40/13 70/2 141/6
**was [295]**
**WASHINGTON [1]** 2/18
**wasn't [5]** 59/5 59/6 69/6 90/18 124/1
**WATKINS [7]** 3/18 3/22 4/8 4/16 4/21 5/3 5/7
**way [30]** 22/24 23/5 26/14 26/18 28/19 35/25 36/21 41/2 48/20 49/4 51/3 54/1 58/17 71/5 73/1 76/15 80/7 82/2 82/7 90/7 95/10 101/9 105/6 105/9 105/15 105/25 134/15 135/4 143/9 150/9
**ways [2]** 43/19 66/13
**WD [4]** 16/2 16/23 81/24 83/21
**WD's [1]** 135/22
**we [146]** 7/5 7/15 8/9 8/24 9/3 11/7 13/14 16/6 16/6 24/11 28/10 28/11 29/5 29/8 31/7 31/18 34/16 40/2 41/6 43/23 45/2 48/8 51/5 52/11 54/9 57/1 63/25 67/18 70/7 77/22 85/17 85/19 88/3 88/5 89/13

90/5 90/7 93/24 94/12 95/20 95/21 96/6 96/17 98/24 100/13 100/23 101/8 101/24 102/8 103/20 105/4 105/14 105/17 106/9 108/23 109/15 109/17 109/24 110/2 110/10 111/7 111/25 112/8 113/1 113/15 113/17 113/20 113/23 113/23 113/24 114/2 114/11 115/2 115/8 115/13 116/11 116/13 116/24 117/9 117/23 119/15 119/20 119/24 121/10 121/15 122/3 124/21 125/18 125/19 127/3 127/9 127/12 127/19 128/9 128/15 129/7 130/1 131/7 131/21 131/23 132/3 132/12 132/13 132/14 132/16 133/2 133/9 134/5 134/10 134/15 135/11 135/13 135/15 137/22 138/18 138/23 139/12 139/17 139/22 140/2 140/2 140/24 141/5 144/5 144/11 148/7 148/10 148/11 148/12 148/15 148/20 148/24 149/15 152/20 152/24 153/2 154/4 154/14 154/18 154/20 155/1 155/7 155/10 155/10 155/20 155/21
**we'll [15]** 7/8 80/15 80/17 80/25 96/24 121/10 138/3 141/1 149/9 149/22 150/3 150/7 153/25 154/5 155/24
**we're [21]** 11/19 29/19 31/25 36/25 82/5 85/22 99/24 100/9 109/7 111/21 113/6 113/13 116/24 125/22 133/21 135/2 138/15 149/1 149/25 154/6 155/17
**we've [14]** 66/23 67/4 76/12 79/20 82/24 97/2 111/7 116/16 134/1 136/11 142/17 148/9 148/9 148/18
**week [2]** 92/16 126/21
**weigh [1]** 154/7
**weighted [4]** 146/2 146/7 146/8 146/13
**weighting [7]** 138/6 138/21 139/1 139/2 139/5 140/6 140/22
**weights [2]** 138/2 139/11
**welcome [2]** 64/8 126/7
**well [48]** 8/19 14/10 22/8 27/8 42/19 42/23 47/19 48/18 50/4 50/4

59/13 50/24 51/3 55/17 57/24 58/18 65/24 66/18 67/12 67/18 68/11 68/22 69/25 72/15 72/23 76/7 79/17 82/21 83/16 83/24 84/8 85/8 87/3 87/15 87/24 88/3 90/17 91/6 95/24 98/7 98/20 142/5 142/11 143/9 143/19 144/9 146/6 147/16
**well-aware [1]** 142/5
**well-known [1]** 22/8
**Wendy [1]** 5/12
**went [1]** 91/1
**were [124]** 7/3 7/21 10/21 12/11 13/5 13/6 14/2 14/10 14/10 14/23 17/24 18/2 18/24 19/4 19/6 22/11 22/13 23/20 23/21 23/23 23/24 23/25 24/17 25/8 29/13 32/12 32/25 33/15 35/21 36/6 40/4 40/19 45/22 45/25 46/3 46/7 46/12 46/17 46/18 47/3 47/4 47/4 47/5 47/17 47/17 47/20 51/13 51/24 53/15 53/23 54/2 55/13 55/15 55/18 56/12 57/20 57/22 57/23 59/17 59/18 60/2 62/5 62/5 62/6 62/7 65/4 65/12 68/5 69/3 70/8 70/10 75/7 75/8 76/5 77/14 77/15 79/4 80/3 80/21 81/2 81/5 82/17 83/18 84/17 86/24 87/3 90/22 94/16 95/22 95/24 105/12 109/19 109/22 118/14 120/15 123/1 123/10 124/23 125/10 126/9 126/15 130/24 131/1 133/14 133/18 134/10 135/21 136/7 137/20 140/10 141/15 142/3 142/5 145/1 145/2 150/23 151/8 151/18 151/25 152/1 152/13 152/14 153/1 156/2
**weren't [2]** 51/12 90/17
**WEST [1]** 1/22
**WESTERN [30]** 1/9 5/14 5/16 12/17 16/2 16/2 63/22 66/1 76/13 80/24 84/3 84/13 85/12 103/18 105/4 118/17 119/6 119/12 119/18 119/20 119/25 136/3 136/13 136/21 137/6 137/9 147/6 147/12 151/16 153/17
**what [168]**
**what's [13]** 11/3 44/10 49/1 50/10 50/12 61/19 75/10 79/2 79/11 82/23 106/6 114/17 137/22
**whatsoever [1]** 65/1

**W**

**when [50]** 7/10 12/11 12/18 14/2 14/7 18/25 24/17 27/25 28/18 32/24 34/20 35/12 35/17 43/14 43/18 45/22 46/3 47/3 48/22 49/3 51/13 51/13 52/7 52/8 53/15 53/23 56/10 56/12 57/1 57/20 59/7 60/14 61/22 83/18 94/15 95/20 111/7 113/25 118/14 126/23 128/4 130/12 130/17 130/23 137/8 138/24 139/1 141/15 145/1 146/21
**where [26]** 27/14 32/8 33/11 33/17 34/7 39/12 43/10 48/7 51/11 59/21 65/18 71/15 77/23 78/2 82/17 86/10 99/10 101/4 101/24 116/13 117/11 125/1 130/3 133/13 134/23 140/16
**whereas [1]** 77/11
**whether [22]** 12/16 12/17 40/21 42/6 45/22 46/20 47/4 47/5 47/13 51/8 61/10 61/23 72/25 76/10 86/15 139/13 142/15 143/10 143/14 143/18 144/17 155/3
**which [35]** 7/8 12/15 21/25 24/6 28/1 30/6 30/7 36/21 44/11 49/12 55/12 57/10 66/22 66/23 69/16 71/14 72/8 74/4 78/22 82/4 84/8 86/11 88/17 88/17 96/9 101/14 116/3 127/3 130/6 130/8 130/11 139/10 140/3 153/2 153/12
**while [9]** 21/13 88/18 100/16 101/22 109/10 121/15 125/22 130/6 140/3
**whiteboard [1]** 85/22
**who [9]** 16/23 23/20 30/7 48/8 70/8 73/21 76/14 142/19 145/5
**who's [1]** 79/8
**whole [4]** 17/2 17/3 40/20 131/9
**why [28]** 21/25 22/1 28/3 28/16 42/10 42/19 42/23 42/25 50/23 53/21 66/17 68/10 70/22 72/13 74/20 76/20 81/23 82/11 83/15 85/7 91/9 133/22 139/4 140/16 142/11 142/12 143/24 154/4
**why'd [1]** 87/17
**will [14]** 43/25 62/4 83/17 92/15 96/25 100/15 102/12 142/15 150/2 150/5 150/25

151/1 153/24 154/14
**WILSHIRE [7]** 2/4 2/8 2/13 2/22 3/4 3/8 3/13
**wisdom [5]** 66/14 70/12 72/15 72/19 75/3
**wise [1]** 118/13
**wish [1]** 60/24
**within [7]** 12/6 47/20 79/24 99/21 143/25 151/19 152/6
**without [3]** 25/6 25/9 71/7
**witness [12]** 7/7 8/4 41/7 62/1 63/19 63/20 85/15 120/11 124/2 140/23 147/25 152/16
**witnesses [5]** 6/3 6/7 93/6 136/12 153/19
**won't [1]** 155/4
**wonder [1]** 35/21
**Wong [1]** 29/23
**word [5]** 18/4 60/25 107/16 116/11 117/3
**words [2]** 52/10 52/11
**work [21]** 10/3 36/10 42/9 42/10 48/2 48/3 56/23 56/24 66/25 69/21 84/6 84/10 87/8 94/16 104/9 108/14 119/4 136/8 141/19 149/2 149/9
**worked [5]** 61/24 67/17 68/12 84/11 148/12
**workforce [1]** 65/25
**works [2]** 97/17 118/24
**world [3]** 63/4 63/6 63/13
**worse [2]** 74/17 130/11
**would [119]** 7/10 8/13 9/13 11/11 13/16 14/17 14/23 16/20 17/4 17/18 17/18 17/21 17/22 20/14 21/1 22/12 24/24 26/5 26/16 26/17 26/22 30/15 30/18 30/24 31/13 32/20 33/8 33/16 35/20 35/21 36/8 36/10 36/10 37/8 37/11 38/13 40/5 40/8 40/11 42/9 42/10 42/20 42/23 43/1 43/18 44/22 44/24 46/7 48/3 48/6 48/25 53/1 55/13 60/2 65/8 68/15 69/14 69/23 70/23 72/25 74/12 74/14 74/16 74/17 74/18 74/18 78/12 78/20 78/24 79/5 79/8 79/15 80/1 80/6 80/11 84/12 85/13 87/20 91/6 91/9 92/11 96/6 96/8 103/5 108/14 114/7 114/22 114/23 119/6 119/12 119/14 119/15 119/18 119/25 124/24 129/1 130/12 130/24 134/12 135/8 136/4 136/7 136/24 137/2 137/4 137/5 140/19 140/21

141/7 145/19 146/14 147/3 148/19 148/20 150/18 152/15 152/24 155/7 155/10
**would've [11]** 22/9 22/9 26/13 43/14 46/4 46/5 67/20 72/6 73/1 73/3 139/6
**wouldn't [13]** 39/14 42/1 42/7 59/1 67/5 70/6 72/13 74/21 84/11 119/7 119/13 119/15 119/24
**wrap [1]** 85/12
**writability [7]** 21/12 25/5 25/6 26/5 71/7 85/10 121/25
**write [30]** 34/21 35/14 35/18 36/7 37/1 37/3 37/4 37/13 37/13 37/22 37/23 39/6 39/13 39/14 39/14 40/5 42/8 42/25 43/8 53/21 56/21 61/15 61/15 77/4 78/3 78/4 78/7 79/18 93/23 94/5
**write-field [1]** 79/18
**write-head [4]** 37/22 37/23 40/5 42/25
**writer [2]** 35/23 77/24
**writes [3]** 35/3 35/7 38/6
**writing [4]** 52/7 53/23 78/13 101/10
**written [4]** 9/12 11/3 30/6 56/20
**wrong [4]** 48/20 77/9 81/18 147/14
**wrote [8]** 9/11 12/8 30/7 36/11 48/8 52/15 53/18 94/9

**Y**

**yeah [36]** 13/3 17/12 17/17 23/11 25/2 27/3 27/4 27/10 28/16 29/15 31/20 32/21 32/23 33/8 35/24 36/3 37/17 38/6 38/25 45/8 48/14 51/18 55/22 76/7 94/21 102/24 103/23 104/15 106/17 119/19 127/20 129/9 130/23 131/22 138/15 148/19
**year [6]** 92/8 92/8 118/18 118/25 120/1 121/4
**yearly [1]** 119/14
**years [13]** 65/12 65/14 66/7 67/2 72/1 73/22 82/15 82/20 90/13 90/24 92/3 119/21 119/23
**yellow [2]** 92/23 92/25
**yep [6]** 13/4 14/7 15/14 17/8 34/23 63/12
**yes [172]**
**Yes.l [1]** 96/8
**yesterday [4]** 126/9 129/12 132/11 139/4
**yet [2]** 59/5 59/6

**yield [2]** 95/18 116/7
**YOCCA [2]** 4/3 4/12
**you [718]**
**you'd [8]** 12/9 13/13 15/18 23/21 48/9 71/25 72/23 155/22
**you'll [8]** 86/7 86/15 89/16 94/15 102/9 102/10 104/22 154/1
**you're [35]** 11/19 11/21 14/25 16/4 22/7 30/10 31/1 35/22 35/25 37/10 37/24 38/18 43/11 44/5 44/6 48/12 53/23 57/1 57/3 57/7 57/13 58/15 60/21 63/3 64/1 64/1 64/10 72/23 89/6 125/24 125/24 134/20 147/18 148/21 149/1
**you've [12]** 16/8 18/12 30/15 66/22 93/12 97/15 99/16 108/10 109/10 111/3 125/20 155/12
**YOUNG [2]** 4/20 141/8
**your [186]**
**Your Honor [2]** 38/20 42/14
**Your Honor's [1]** 154/24
**yours [3]** 109/22 129/14 133/6
**yourself [4]** 17/20 60/18 147/15 147/19

**Z**

**zero [8]** 24/12 24/19 24/23 113/2 113/4 113/9 126/24 127/1
**zoom [3]** 53/9 54/19 56/6